Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

```
                                    )
AL OTRO LADO, INC., ET              )
AL.,                                )
     PLAINTIFFS,                    )
                                    )
VS.                                 ) CASE NO.
                                    ) 17-cv-02366-BAS-KSC
                                    )
KEVIN K. MCALEENAN, ET              )
AL.,                                )
     DEFENDANTS.                    )
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

RODNEY HARRIS

JUNE 2, 2020

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of RODNEY HARRIS, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on June 2, 2020, from 10:23 a.m. to 6:27 p.m., before Delia Ordonez, CSR in and for the State of Texas, reported by machine shorthand, via Webex Magna LegalVision.

Magna Legal Services

866.624.6221

www.MagnaLS.com



Page 2

```
 1                A P P E A R A N C E S
 2   FOR THE PLAINTIFFS:
 3       Rebecca Cassler
         Sara Rich
 4       Southern Poverty Law Center
         1101 17th Street, N.W., Suite 705
 5       Washington, D.C. 20036
         202.355.4471
 6       Rebecca.cassler@splcenter.org
         Sara.rich@splcenter.org
 7
         Allison Parr
 8       Steve Medlock
         Mayer Brown
 9       1999 K Street, N.W.
         Washington, D.C. 20006
10       202.263.3221
         AWParr@mayerbrown.com
11
     FOR THE DEFENDANTS:
12
         Ari Nazarov
13       Dhruman Y. Sampat
         U.S. Department of Justice
14       Office of Immigration Litigation
         P.O. Box 868, Ben Franklin Station
15       Washington, D.C. 20044
         202.598.8259
16       Ari.Nazarov@usdoj.gov
         Dhruman.y.sampat@usdoj.gov
17
18   ALSO PRESENT:
19       Louisa Slocum, CBP
20       Benjamin Wolarsky
21   THE VIDEOGRAPHER:
         Noah Fox
22
     THE MAGNA LEGAL TECHNICIAN:
23
         Kevin Cranford
24
25
```



1                           INDEX

              ORAL AND VIDEOTAPED DEPOSITION OF

2                       RODNEY HARRIS

                        JUNE 2, 2020

3

4                  E X A M I N A T I O N

5    RODNEY HARRIS                            P A G E

6         By Ms. Rebecca Cassler...........    6

7         By Ms. Allison Parr..............   236

8         By Mr. Ari Nazarov...............   286

9    FURTHER EXAMINATION

10        By Ms. Rebecca Cassler...........   291

11

12   Signature and Changes................   294

13   Reporter's Certificate...............   296

14

15

16

17

18

19

20

21

22

23

24

25



```
                                                          Page 4
 1                           EXHIBITS
                 ORAL AND VIDEOTAPED DEPOSITION OF
 2                         RODNEY HARRIS
                          JUNE 2, 2020
 3
 4    NO.           DESCRIPTION                    P A G E
 5    Exhibit 222   AOL-DEF-00011374                 57
 6    Exhibit 223   AOL-DEF-00028834                 68
 7    Exhibit 224   AOL-DEF-00911036                 68
 8    Exhibit 228   AOL-DEF-00095894                118
 9    Exhibit 230   AOL-DEF-00027826                131
10    Exhibit 231   FRE 1006 Exhibit Laredo QM      134
                    Reports
11
      Exhibit 233   AOL-DEF-00911232                138
12
      Exhibit 234   AOL-DEF-01037408                150
13
      Exhibit 238   AOL-DEF-00094682                214
14
      Exhibit 239   AOL-DEF-00060248                161
15
      Exhibit 243   AOL-DEF-00909668                143
16
      Exhibit 247   AOL-DEF-00576995                239
17
      Exhibit 249   AOL-DEF-00563847                255
18
      Exhibit 250   AOL-DEF-00579234                268
19
      Exhibit 251   AOL-DEF-00585486                278
20
21
22
23
24
25
```



Page 5

```
 1                    THE VIDEOGRAPHER:  We are now on the

 2    record.  This begins Media 1 in the deposition of Rodney

 3    Harris.  Today is Tuesday, June 2nd, 2020, and the time

 4    is 10:23 a.m.  This deposition is being taken remote- --

 5                    MS. CASSLER:  Uh --

 6                    THE VIDEOGRAPHER:  Yes, Counsel.

 7                    MS. CASSLER:  Sorry.  We're actually -- the

 8    deponent is in -- is in Central Time, so could we --

 9    could we use Central Time for the record, please?

10                    THE VIDEOGRAPHER:  Yes.  Stand by, please.

11                    MS. CASSLER:  Great.  Sorry about that.

12                    THE VIDEOGRAPHER:  That's fine.  I can

13    start over.

14                    We're now on the record.  This begins Media

15    1 in the deposition of Rodney Harris.  Today is Tuesday,

16    June 2nd, 2020, and the time is 9:23 a.m.  This

17    deposition is being taken remotely by way of Magna

18    LegalVision.  The videographer is Noah Fox, and the

19    court reporter is Delia Ordonez, both of Magna Legal

20    Services.  All counsel will be noted on the stenographic

21    record.

22                    Will the court reporter please swear in the

23    witness?  And then we can proceed.

24                    RODNEY HARRIS,

25    having been first duly sworn, testified as follows:
```



Page 6

```
 1                    EXAMINATION

 2  BY MS. CASSLER:

 3      Q.  Good morning, Mr. Harris.  We're now continuing

 4  the 30(b)(6) deposition of defendant Customs and Border

 5  Protection.  My name is Rebecca Cassler, and I represent

 6  the plaintiff in this action which is caused Al Otro

 7  Lado v. Wolf.

 8              Could you please state and spell your name

 9  for the record?

10      A.  Sorry.  I was turning off a fan.  Rodney --

11      Q.  Okay.

12      A.  Rodney Harris, R-O-D-N-E-Y, Harris,

13  H-A-R-R-I-S.

14      Q.  Have you ever gone by any other name?

15      A.  No, I have not.

16      Q.  Okay.  Before we begin, I'd like to go over

17  some ground rules.  As you have seen, there's a court

18  reporter on the line taking down everything we say.  So

19  that the court reporter can accurately record your

20  testimony, you must give audible responses.  So please

21  do not shake your head or answer with noises like

22  "uh-huh."  Do you understand?

23      A.  Yes.

24      Q.  And this deposition is being taken remotely, as

25  is obvious, so counsel and the court reporter and you
```



Page 7

1    are all in different locations, and we're conducting the

2    deposition via a web-based videoconference platform.

3    Given the web format and the slight time lag in the

4    audio, it's even more important than normal that we

5    don't talk over each other.  So please wait until I

6    finish before answering every question, and I'll do my

7    best to do the same with your answers.  Do you

8    understand that?

9         A.  Yes, I understand.

10        Q.  And if you don't understand a question, please

11   say so.  Do you agree with that?

12        A.  Yes.

13        Q.  If you do answer a question, I'm going to

14   assume that you understood it.  Okay?

15        A.  Okay.

16        Q.  From time to time, your attorney may object to

17   a question that I ask, and that's their right.  However,

18   unless you're instructed not to answer my questions, you

19   need to provide an answer, even if there's an objection.

20   Does that make sense?

21        A.  Yes.

22        Q.  And we'll probably take a break every hour or

23   so.  If you need a break sooner than that, just let me

24   know, and I might let you know if I need a break as

25   well.  However, we must -- you must answer any pending



Page 8

1    questions before going on a break.  Does that make

2    sense?

3        A.  Yes.

4        Q.  Unless I state otherwise, my questions relate

5    to the period of January 1st, 2016, to the present.  Do

6    you understand that?

7        A.  Yes, I understand.

8        Q.  And during this deposition, I'm going to refer

9    to the U.S. Department of Homeland Security as DHS.  Do

10   you understand that?

11       A.  Yes.

12       Q.  During this deposition, I will referring --

13   sometimes I'll refer to a port of entry as a POE.  Do

14   you understand that?

15       A.  Yes, I do.

16       Q.  Do you understand that you've taken an oath to

17   tell the truth today?

18       A.  Yes.

19       Q.  Oh, one more.  And I'll probably refer to

20   Customs and Border Protection as CBP.  Do you understand

21   that?

22       A.  Yes.

23       Q.  Okay.  And do you understand that the oath that

24   you've taken today is the same oath that you would take

25   if you were testifying in court?



Page 9

1        A.  Yes, I understand.

2        Q.  And do you understand that there are criminal

3   consequences for lying under oath?

4        A.  Yes.

5        Q.  Is there any reason that you can't testify

6   truthfully today?

7        A.  No, no reason at all.

8        Q.  Good.  Do you understand that you're not

9   allowed to communicate privately with your attorneys or

10  anyone else during the deposition other than during

11  breaks?

12       A.  Yes, I understand.

13       Q.  Okay.  So that means that you can't text,

14  e-mail, or otherwise communicate with counsel other than

15  during breaks, right?

16       A.  Yes, I understand.

17       Q.  Uh-huh.  You can talk to your counsel on the

18  record orally so everyone can hear.  That's the only

19  exception to the rule I just stated.

20       A.  Okay.

21       Q.  Okay.  So you've been designated as CBP's Rule

22  30(b)(6) deposition witness for the Laredo field office

23  for two topics.  Did you know that?

24       A.  Yes.

25       Q.  Okay.  Specifically, you've been designated as



Page 10

1    the 30(b)(6) witness for CBP on Topic 2, which covers

2    CBP's:  "Practice of metering, queue management and/or

3    Turnbacks at Ports of Entry" -- specifically in -- in

4    the Laredo Field Office -- "including but not limited to

5    the development of the practice, the reasons for its

6    adoption, and its implementation."

7                    Are you prepared to testify on that topic?

8        A.  Can you say the last -- the last phrase?

9        Q.  Yeah.  So:  "Including but not limited to

10   development of the practice, the reason for its

11   adoption, and its implementation."

12       A.  Implementation.  Okay.  Yes, I understand.

13       Q.  And you've also been designated as a 30(b)(6)

14   for Topic 15, which covers:  "CBP's communications with

15   INM, COMAR, Grupos Beta, and any other Mexican

16   government agency concerning metering, queue management,

17   or Turnbacks."

18                    Are you prepared to testify on that topic?

19       A.  Yes.

20       Q.  And we might occasionally refer to INM as INAMI

21   or -- or -- do both of those acronyms make sense to you?

22       A.  Yes, I understand both of those terms.

23       Q.  During this 30(b)(6) deposition, I will be

24   asking questions about Topic 2, the first one we

25   covered, and my colleague, Allison Parr, will be



Page 11

1    questioning you on the other topic.

2              You're also testifying today in your

3    personal capacity, which we call that a 30(b)(1)

4    witness.  Do you understand that?

5         A.  Yes, I do.

6         Q.  So from time to time, I'll ask you questions in

7    your capacity as a 30(b)(1) witness.  And when I do

8    that, I'll try to be clear in my question that I'm

9    asking you personally.  Okay?

10        A.  Okay.  I understand.

11        Q.  Moving on.  Have you ever testified in court

12   before?

13        A.  Just once that I recall.

14        Q.  When was that?

15        A.  It was in 20 -- it was either -- I believe it

16   was the year 2000, maybe 2001.  It's been -- it's been

17   quite a while.

18        Q.  Okay.  Where was that court located?

19        A.  It's located in Laredo, Texas.

20        Q.  Okay.  And what was the -- can you give me

21   just, like, a sentence or two, what did you testify

22   about?  I don't need a long answer.

23        A.  It was -- I believe they called it an

24   identification and removal hearing.  We arrested

25   someone, and the defense attorney wanted to know how we



Page 12

1    determined that the person we arrested was, in fact, the

2    person who was the subject of the warrant.

3         Q.  Got it.  And that's the only time you ever

4    testified in court?  If you can't remember, that's good

5    enough for me on this one.

6         A.  That was the only time that I can recall, yes.

7         Q.  Okay.  Have you ever testified in a deposition

8    before?

9         A.  No.

10        Q.  Okay.  Have you ever been involved in an

11   arbitration proceeding?

12        A.  In a what?

13        Q.  An arbitration proceeding.

14        A.  No, I don't think I've ever been involved in an

15   arbitration proceeding.

16        Q.  Have you ever testified before a governmental

17   body before, other than a court?

18        A.  No, I have not.

19        Q.  Okay.  So you've never testified before

20   Congress or Senate?

21        A.  No, I've never done anything like that.

22        Q.  Okay.  Outside of this case, have you ever

23   provided any written testimony under oath in an

24   affidavit or declaration?

25        A.  Outside of this case, not that I can recall,



Page 13

1    no.

2        Q.  Okay.  So the one other case that you testified

3    in, did you testify truthfully?

4        A.  Yes, I did.

5        Q.  Okay.  Other than traffic offenses, have you

6    ever been charged with a crime?

7        A.  Other than traffic offenses, no.

8        Q.  Other than traffic offenses, have you ever been

9    convicted of a crime?  I'm realizing that's a stupid

10   question.  Never mind.

11       A.  No, I have not been.

12       Q.  Good.  Have you ever been arrested?

13       A.  No, I've never been arrested.

14       Q.  Have you ever been sued before?

15       A.  Ever been sued?

16       Q.  Uh-huh.

17       A.  No, I have not.

18       Q.  Have you ever been a party to a lawsuit?

19       A.  No, I've never personally sued anyone, no.

20       Q.  Okay.  Have you ever been disciplined for your

21   conduct at CBP?

22       A.  No.

23       Q.  Are you a member of any social networking

24   platforms, like LinkedIn or Facebook?

25       A.  Got a Facebook account, and I -- I think I have



Page 14

1  a LinkedIn account.  I say I think I have a LinkedIn

2  account.  I get e-mails from them --

3      Q.  Thank you.

4      A.  -- from time to time, but it's been years.

5      Q.  Thank you.

6      A.  I do not remember creating the account, so I --

7  I'm not active with it, no.

8      Q.  All right.  Are you a member of any Facebook

9  groups related to your work at CBP?

10     A.  I'm a member of a -- related to my work at CBP?

11     Q.  Yes.

12     A.  No, I would say not.  I'm a member of some --

13     Q.  I don't need to know about "Kittens."

14     A.  Yeah.

15     Q.  Sorry.

16     A.  No.  I'm a member of some Facebook groups that

17  has mostly federal employees in it, but it doesn't have

18  anything to do related with our work.

19     Q.  Okay.  Have you ever been a member of a

20  Facebook group called "I'm 10-15"?

21     A.  No.

22     Q.  Have you ever seen posts from a Facebook group

23  called "I'm 10-15"?

24     A.  I am 10-15?  No, that doesn't sound familiar.

25     Q.  Okay.  Other than Facebook and LinkedIn, are



Page 15

1    there any other social networking platforms that -- that

2    you have accounts with?

3         A.  I think I have a -- I have a -- I have an

4    Instagram account.  I don't post anything.  I also do

5    have a Twitter account, but, once again, I don't tweet

6    or post anything.  I created it so I could see

7    something, but that's been several years, couple of

8    years maybe.

9         Q.  That's how I use Twitter too.  It's annoying.

10              When did you find out that you would be a

11   Rule 30(b)(6) witness in this case?

12        A.  Can you repeat the question, please?

13        Q.  When did you find out that you would be a Rule

14   30(b)(6) witness in this case?

15        A.  It was earlier this year.  I don't recall.  I

16   believe it was February.

17        Q.  Okay.

18        A.  I'm not certain.

19        Q.  Who told you that you would be a Rule 30(b)(6)

20   witness in this case?

21        A.  One of the -- well, the -- the local OCC

22   office.

23        Q.  That's fine.

24        A.  Jim Sims.

25        Q.  I don't -- yeah.  Okay.  Without going into the



Page 16

1    substance of any conversations you've had with CBP's

2    attorneys -- this might be OCC or DOJ -- have you met

3    with any CBP attorneys in preparation for this

4    deposition, including by phone or video or in person?

5        A.   Okay.  I heard "have you met with," and I

6    didn't hear the phrase immediately after that.

7        Q.   Okay.  Have you met with any CBP attorneys in

8    preparation for this deposition, including in person, by

9    video, or phone?

10       A.   Yes, I have.

11       Q.   How many meetings did you have with CBP's

12   attorneys?

13       A.   I'd say around -- at least six.

14       Q.   Okay.  Who did you meet with?  I know you had a

15   number of meetings, so maybe if you could just list off

16   the attorneys that you met with in any order, that would

17   work.

18       A.   Okay.  Definitely with CBP OCC attorneys Ben

19   Wolarsky, Louisa Slocum.  And they might have had other

20   people on the phone as well.  I don't -- I'm not certain

21   who.  We spoke with them several times, two to three

22   conference calls.  Then I've had, I believe, three

23   conference calls with those two attorneys and the DOJ

24   attorneys.

25       Q.   Which DOJ attorneys?



Page 17

```
 1        A.  Ari and Dhru.

 2        Q.  Okay.  So you said that you think OCC might

 3   have had other people on the phone.  Were those people

 4   who work in OCC's office?

 5        A.  Yes, that's my understanding.

 6        Q.  Okay.  And were those all remote meetings?

 7        A.  So I had a -- I think I remember twice I

 8   actually went over to the OCC office here in Laredo with

 9   Ben, and the other attorneys were on the line.

10        Q.  Okay.  When did those meetings happen?

11        A.  I don't know the exact dates.  We had maybe

12   either two last month or one last month and one the

13   month before.

14        Q.  Okay.  So it's spread out --

15        A.  But I don't remember the --

16        Q.  -- over the last --

17        A.  -- dates.  I'm sorry.

18        Q.  That's fine.  I'm sorry to interrupt you.

19             So they were spread out over the last three

20   months or so?

21        A.  March, April -- yes.

22        Q.  Okay.  And were those meetings all about the

23   same length of time?

24        A.  I don't recall how long they were, but they

25   weren't, I mean, excessive.  I'd say yes --
```



MAGNA
LEGAL SERVICES

Page 18

1     Q.  Do you think --

2     A.  -- they were about the same length of time, an

3   hour, 90 minutes.  I -- I don't recall.  Sorry.

4     Q.  Okay.  That's fine.  This is not a memory test.

5          So --

6     A.  Right.

7     Q.  -- the longest --

8     A.  I was --

9     Q.  -- meeting you had was -- oh, go ahead.

10    A.  I'm sorry.  No.  I was going to say the --

11   in -- I don't remember.  It was early March, I believe,

12   I did actually travel with attorney Ben Wolarsky to a

13   couple of ports to actually visually see them.  So I

14   don't know if that would be considered a meeting or not.

15    Q.  Okay.  Which ports did you go to?

16    A.  Laredo, Brownsville, and Hidalgo.

17    Q.  What did you do at those ports?  I don't -- I

18   should clarify.  I don't want to know what your attorney

19   and you discussed.

20    A.  Uh-huh.

21    Q.  But I am curious if you can talk about what you

22   did at those ports without talking about those

23   confidential communications.  Please go ahead.

24    A.  Yeah, sure.  We would do what we call a basic

25   port tour in our vernacular.  We saw the bridges and all



Page 19

1    three ports of entry, the queue points.  We generally

2    walk inside, into the processing areas, the -- what we

3    call the primary, the secondary areas, just to get

4    a -- a visual of what -- what the -- the line of

5    demarcation looked like, the -- the walkways, the -- any

6    infrastructure that was at the queue management points.

7            MR. NAZAROV:  Rebecca, I'm just going to

8    jump in a little bit.  We're just kind of getting close

9    to a little bit to mental impressions and stuff of

10   counsel, so --

11           MS. CASSLER:  We can move away from this.

12   Yeah.

13           MR. NAZAROV:  Yeah.

14           MS. CASSLER:  No problem.

15           MR. NAZAROV:  Yeah.

16           MS. CASSLER:  Yeah.

17   Q.  (BY MS. CASSLER)  So were there any

18   nonattorneys present when you were meeting with

19   Mr. Wolarsky at the ports?

20   A.  Yeah.  At the ports, yes, of course.  At every

21   port would -- we would -- we had a POC that we would

22   drive around with and speak with.

23   Q.  Could you tell me the names of the points of

24   contact for each of those three ports?

25   A.  Sure.  At Brownsville, the primary point of



Page 20

1    contact would have been Assistant Port Director Adriana

2    Gonzalez.

3        Q.   Okay.

4        A.   At Hidalgo, primary POC would have been Port

5    Director Carlos Rodriguez.

6        Q.   Okay.

7        A.   As well as their -- we broke off with him.  He

8    had to -- at -- at one point, he had to attend another

9    meeting, and we were escorted around by Javier, Javier

10   Gonzalez, I believe.  Carlos Javier.

11       Q.   Okay.  Okay.  They both work at the Hidalgo

12   Port of Entry?

13       A.   I'm sorry?

14       Q.   Javier also works at the Hidalgo Port of Entry?

15       A.   Yes, yes.  He's -- I think, at the time, he

16   might have been the acting chief of staff, but he's the

17   chief CBPO at Hidalgo.

18       Q.   Okay.  And Laredo?

19       A.   Yeah, the primary POC was Jesus Barrera.  He

20   was the port director.  We also met with Adriana Arce,

21   who's an assistant port director.  Israel Cruz was with

22   us.  I think those were the main -- the main people.  At

23   every location, whoever would have been working at the

24   time, CBPOs, CBP officers, supervisors, whoever was

25   actually working at the time, I mean, we would have


MAGNA
LEGAL SERVICES

Page 21

1    encountered them, but they weren't our main -- we were

2    mainly there to speak with them.

3         Q.  All right.  Did you -- let's see.  Can you tell

4    me what the line of demarcation is?

5         A.  The line of demarcation is --

6              MR. NAZAROV:  Objection, form.

7         A.  -- an actual boundary line --

8         Q.  (BY MS. CASSLER)  Okay.

9         A.  -- between the United States and Mexico.

10             MR. NAZAROV:  There was an objection there

11    just to form.  You can still answer the question.

12        Q.  (BY MS. CASSLER)  Can you tell me roughly when

13    these visits occurred?

14        A.  So the --

15             MR. NAZAROV:  Objection, form.

16             You can answer the question.

17        A.  I believe it was in the beginning of March.

18        Q.  (BY MS. CASSLER)  Okay.

19        A.  It might have --

20        Q.  Was this the first --

21        A.  -- been the end of February, but it was -- I do

22    believe it was the first few days in March.

23        Q.  Okay.  And was this the first visit that you

24    made to any of these ports?

25        A.  No.  It was the -- well, I visited all of the



Page 22

1    ports of entry before.  I believe it was -- it was the

2    first time I'd seen some of the areas of the ports that

3    we visited.  For example, Brownsville is obviously the

4    furthest in location from the field office, so we don't

5    make it down there as frequently as we do some of the

6    other ports.  So I -- you know, like, for example, I

7    don't think I'd ever been out on the bridge at Veterans

8    or Los Indios before.

9         Q.  Uh-huh.

10        A.  So it -- it's the first time I'd seen some

11   areas of those ports, but not the -- the port in

12   general.

13        Q.  Okay.  Were there any areas of the ports other

14   than those you just mentioned that you were seeing for

15   the first time on these visits?

16        A.  Some of the processing areas, I'd never been

17   into before, some of the secondary areas.

18        Q.  Secondary processing you mean?

19        A.  Yeah, secondary processing areas.

20        Q.  You call it secondary inspections?

21        A.  I -- I use the terms interchangeably sometimes.

22   I'll -- I'll try to be more clear.

23        Q.  Oh, no, you're fine.  Just curious, to be

24   honest.

25                  Okay.  Were there any other areas that you



Page 23

1    were seeing for the first time on these visits?

2        A.  The actual middle of the bridge at most of the

3    Brownsville ports of entry I'd never actually seen

4    before, so that was the first time I'd seen the

5    midbridge area, line of demarcation, international

6    boundary --

7        Q.  Uh-huh.

8        A.  -- however you want to refer to it.

9        Q.  Uh-huh.  Other than the points of contact that

10   you already listed, are there any other people that you

11   had conversations with during these visits that we

12   haven't discussed yet?

13            MR. NAZAROV:  Okay.  I'm going to object to

14   that under the attorney-client privilege.  I instruct

15   the witness not to answer.

16       Q.  (BY MS. CASSLER)  Are you going to follow your

17   attorney's instruction?

18       A.  Yes, I am.

19            MS. CASSLER:  So the identity of people

20   who -- with whom he spoke is privileged, in your view,

21   Ari?

22            MR. NAZAROV:  I just -- I think we're

23   getting real close.  He's -- he's been really open about

24   some of the people he has met with.  I just -- you have

25   my objection on the record.



Page 24

 1               MS. CASSLER:  I don't mean conversations

 2    with attorneys, just --

 3               MR. NAZAROV:  I mean, we're getting into

 4    that area.  I think we are getting into conversation of

 5    attorneys, who picked who to speak with, and I -- I

 6    think I'm -- I'm going to stand by my objection.

 7    Q.  (BY MS. CASSLER)  Were there any people that

 8    you spoke with that you -- that -- where the

 9    conversation was not at the instruction of an attorney,

10    Mr. Harris?

11               MR. NAZAROV:  Objection, vague.

12    A.  Can you repeat the question?

13    Q.  (BY MS. CASSLER)  So on these visits that you

14    made to the ports, did you have any conversations that

15    did not occur at the instruction of an attorney?

16               MR. NAZAROV:  Objection, vague.

17    A.  Yeah, of course.

18    Q.  (BY MS. CASSLER)  Which conversations?

19    A.  So attorney didn't really instruct me to speak

20    with anyone, so I would say that everyone I spoke with

21    was not really under the instruction of my attorney.

22    Q.  Okay.

23    A.  That is the way I'm interpreting instruction,

24    as an attorney telling me, "Hey, go speak with that

25    guy."  So I don't -- I'm not sure how you're meaning it.



Page 25

1      Q.  Yeah, that sounds about right.

2           So were -- were there any other people that

3  you spoke with that we haven't already mentioned that

4  were not at the instruction of an attorney?

5      A.  So --

6           MR. NAZAROV:  I'm going to object again and

7  say attorney-client privilege.  And I instruct the

8  witness not to answer.

9      Q.  (BY MS. CASSLER)  Are you going to follow your

10  attorney's instructions?

11      A.  Yes.

12      Q.  All right.  Did you review any documents to

13  prepare to testify as a Rule 30(b)(6) witness today?

14      A.  Yes, I did.

15      Q.  How many documents did you review?

16      A.  I wouldn't be able to put an exact number on

17  it.  Quite a lot.

18      Q.  Could you give me an estimate?

19      A.  Actual documents, over 100 e-mails.  If you're

20  including an e-mail as a document, I would say several

21  hundred.

22      Q.  Well, when did you start reviewing those

23  documents?

24      A.  Started in probably February, late February, as

25  soon as I was -- you know, knew that this was -- that I



Page 26

1    was going to be the agency -- an agency witness.  I

2    started reviewing documents, e-mails, and really a lot

3    of it was scrolling through e-mails, you know,

4    that -- that I -- that I saved.  That wasn't

5    really -- not really an intensive thing.  It was

6    electronic documents for the most part.

7              So we started in -- you know, in February

8    as I had the time, and then, once the deposition was

9    postponed due to the -- the current situation, the

10   problem and whatnot, I kind of stopped and then picked

11   it back up again a few weeks ago.

12       Q.  That's about what I did too.

13              How long did you spend reviewing documents

14   overall in all that, since February?

15       A.  Oh, total time?

16       Q.  Yes, estimate.

17       A.  That's really hard to estimate 'cause, I mean,

18   I have other work I'm doing as well.  I wasn't just

19   focused on that.  Okay?  So it would --

20       Q.  Understood.

21       A.  -- be as I had an hour or two here, I would,

22   you know, scroll through e-mails, looking for anything,

23   you know, relevant or responsive.  In- -- including, you

24   know, the times, at least 24 hours, maybe over 30.

25       Q.  Okay.  Were all the documents you reviewed



Page 27

```
 1   provided to you by one of CBP's attorneys?

 2              MR. NAZAROV:  Objection --

 3        A.  No.

 4              MR. NAZAROV:  -- attorney-client privilege.

 5   I instruct the witness not to answer.

 6              MS. CASSLER:  I am not going to get into

 7   the content of the documents.  I just want to know if he

 8   reviewed them at the instruction of attorneys.

 9              MR. NAZAROV:  Well, no, I think this leads

10   to mental impressions of counsel.  I'm going to have to

11   object.  I just don't feel comfortable about this line

12   of questioning on that.  I don't feel -- I didn't

13   feel --

14              MS. CASSLER:  I --

15              MR. NAZAROV:  -- comfortable before; I

16   don't feel comfortable now.

17              MS. CASSLER:  All right.  I'm going to ask

18   the question:  Did the attorneys provide the documents

19   or not?  And then I'll stop.  Okay?

20              MR. NAZAROV:  Again, I'm going to have the

21   same objection.  I don't feel comfortable with this line

22   of questioning.

23              MS. CASSLER:  Okay.

24              MR. NAZAROV:  It's --

25              MS. CASSLER:  You know it's not privileged.
```



Page 28

1  So, I mean --

2              MR. NAZAROV:  Well, at least it calls

3  into --

4              MS. CASSLER:  -- I'll let you object, and

5  we can move on.

6              MR. NAZAROV:  -- question of which

7  documents.

8              MS. CASSLER:  All right.

9      Q.  (BY MS. CASSLER)  Mr. Harris, did attorneys

10  provide all of the documents that you reviewed in --

11              MR. NAZAROV:  Objection.

12      Q.  (BY MS. CASSLER) -- preparation for this

13  deposition?

14              MR. NAZAROV:  Objection, attorney-client

15  privilege.  I instruct the witness not to answer.

16      Q.  (BY MS. CASSLER)  Are you going to follow your

17  attorney's instructions?

18      A.  Yes.

19      Q.  What documents did you review that attorneys

20  did not direct you to review?

21              MR. NAZAROV:  Objection.  That's

22  attorney-client privilege.

23              I instruct you not to answer the question.

24      Q.  (BY MS. CASSLER)  Are you going to follow your

25  attorney's instructions?



Page 29

1          A.  Yes.

2                    MR. MEDLOCK:  Hey, Ari, this is -- Ari,

3     this is Steve Medlock from Mayer Brown.  I've been

4     listening in.  Can we go off the record for maybe five

5     minutes?

6                    MR. NAZAROV:  Sure.

7                    THE VIDEOGRAPHER:  We are going off the

8     video record.  The time is 9:53 a.m.

9                    (Break was taken.)

10                    THE VIDEOGRAPHER:  We are back on the video

11     record.  The time is 10:02 a.m.  Counsel, you may

12     proceed.

13          Q.  (BY MS. CASSLER)  You understand you're still

14     on the record, Mr. Harris, right?  You understand you're

15     still on the record, right?

16          A.  Yes, I understand.

17          Q.  Did attorneys provide documents to you to

18     review in anticipation of this deposition?

19          A.  Can you repeat that one more time?  Did

20     attorneys provide?

21          Q.  Provide -- did the -- did attorneys direct you

22     to specific documents to review to prepare for this

23     deposition?

24          A.  Yes.

25          Q.  Were there some documents you reviewed that



Page 30

```
 1   were not provided to you by your attorneys?

 2       A.  Yes.

 3       Q.  What were the documents that were not provided

 4   to you by your attorneys?

 5               MR. NAZAROV:  Objection, attorney-client

 6   privilege.  I instruct him not to answer.  That's

 7   not -- I instruct the witness not to answer.

 8               MS. CASSLER:  You don't get to choose if a

 9   question you don't like is being asked.  That's not a

10   privileged question, Ari.

11               MR. NAZAROV:  Well, you can work backwards

12   from that question.

13               MS. CASSLER:  We don't know what documents

14   he reviewed that were provided by attorneys, so your

15   objection doesn't make sense.

16               MR. NAZAROV:  All right.  I'm going to

17   withdraw my objection.

18               Mr. Harris, answer to the extent that it

19   does not include privileged information.

20       Q.  (BY MS. CASSLER)  So the question was:  What

21   documents did you review that were not provided by

22   attorneys?

23       A.  I reviewed a lot of documents.  I don't know

24   what specific documents I reviewed, but it was all

25   electronic information that I saved over the years as a
```



Page 31

1  part of the litigation hold that we're under.  So

2  basically, I started chronologically and looked in my

3  e-mail folders and looked for e-mails that would have

4  been relevant to what we were going to discuss, just to

5  familiarize myself with what was going on at the --

6  during the various -- the time periods going back to

7  2016.

8        Q.  Okay.  So you looked at your saved e-mails and

9  other saved files?

10       A.  Say that one more time, please.

11       Q.  So you looked both at saved e-mails and other

12  types of saved files?

13       A.  Over -- overwhelmingly, it was e-mails.  We

14  keep everything electronically.  I don't have -- we have

15  very few paper files.  We do have some, you know, files

16  in our -- in our shared drives that we save documents

17  in.  I looked at a few of those, but all of that is

18  duplicative to what's in e-mail.  So primarily, I prefer

19  to use my e-mail archives.

20       Q.  Okay.  So on your own, unprompted by your

21  attorneys, you reviewed probably hundreds of documents

22  in -- in -- in preparation for this deposition?

23       A.  So if you include an e-mail as a document,

24  then, yes, it would have been --

25       Q.  Okay.



Page 32

1       A.  -- in the order of hundreds.

2       Q.  Uh-huh.

3       A.  And they weren't all -- and I'm using the term

4   "review" broadly, by the way.  Scrolling through --

5       Q.  Got it.

6       A.  -- seeing if something is responsive, you know,

7   to refresh my memory is how I'm using the term.

8       Q.  Did you take any notes while you were reviewing

9   documents to prepare for this deposition?

10      A.  Yes.

11      Q.  Did you retain those notes?

12      A.  Yes.

13      Q.  Where are they?

14      A.  Either in my e-mail archives, I've got a few

15  sheets of paper, and a small notebook.  I've got those

16  here in a box in my office.

17      Q.  All right.  Do you have any notes -- any of

18  those notes in front of you today?

19      A.  No, I do not.

20      Q.  All right.  Did you bring any other documents

21  with you to this deposition today?

22      A.  No, I did not.

23      Q.  Apart from the discussions that we've already

24  talked about at the ports of entry and with attorneys,

25  did you speak to any CBP employees to prepare to testify



Page 33

1   today?

2        A.   Yes.

3        Q.   Who?

4        A.   I'm going to be very broad here.  So the --

5   spoke with, obviously, my boss, my direct supervisor.

6   His name is Robert Fencel, F-E-N-C-E-L.  And I should

7   probably clarify this wasn't -- the conversations are

8   more along the lines of, "Hey, I'm going to do this.

9   Hey, this is upcoming.  What's going on?" not about

10  the -- the testimony itself.

11               I also spoke with the DFO, Randy Howe,

12  H-O-W-E, and then we -- we had a conference call with

13  DAC Owen.  And, no, I don't remember the exact date, but

14  it was -- he just wanted to know was it about testimony,

15  what testimony to give, or, you know, any sort of

16  instruction.  He was -- had been deposed at some time in

17  the past for the same case, so he was just kind of

18  sharing his experiences.

19       Q.   Depositions are weird.

20               Okay.  So what did you talk about with

21  Randy Howe?

22       A.   It -- it was the same thing.  He kind of -- he

23  shared his --

24               MR. NAZAROV:  Objection --

25               MS. CASSLER:  Hello?



Page 34

1           MR. NAZAROV:  -- form.  Answer to the -- to

2    the extent it doesn't include privileged information.

3       Q.  (BY MS. CASSLER)  Here, I'll ask again.

4           Was there an attorney present in your

5    conversation with Randy Howe?

6       A.  No --

7       Q.  What did you talk about?

8       A.  -- not that I recall.

9       Q.  Okay.  What did you talk about?

10      A.  It was just a general -- he shared his

11   experience during the deposition, how long it lasted.  I

12   said that Mr. Owen said that it was -- these -- these

13   are my words, but it was -- it was -- it was a little

14   taxing.  Mr. Howe said that, no, he didn't think it was

15   that bad.  He's been in other dep- -- but he's been in

16   other depositions that were -- that were longer.

17      Q.  Uh-huh.

18      A.  It was more like a -- and all these were more

19   like -- like encouragement-type conversations, you know,

20   "You'll do fine.  You know, you -- you know the subject

21   matter.  You've been here a while, you -- don't worry

22   about it" type of --

23      Q.  Uh-huh.

24      A.  -- type of things.

25      Q.  Did you speak to anyone else to prepare for



Page 35

1    this deposition that works at CBP other than

2    conversations we've already discussed?

3        A.  So, yes, yes.

4        Q.  Who?

5        A.  So I have one of my staff members here at the

6    field office.  His name is Enrique -- Enrique Garcia,

7    E-N-R-I-Q-U-E.  He's a program manager that handles a

8    lot of our admissibility issues, so I just spoke with

9    him about general terminology and what -- what certain

10   programs entailed.  He's an immigration subject matter

11   expert, so I just wanted to get a few things straight in

12   my mind.

13       Q.  What type of --

14       A.  And a lot of it actually is not relevant to

15   these topics we're -- directly relevant to these topics

16   we're talking about, but I'm trying to be inclusive

17   here.  Okay?  I don't want to leave anything out.  Like,

18   it's really hard to talk about queue management and

19   processing without talking about some of the other

20   immigration issues, right?

21              So I asked him to put me together some

22   bullets on different immigration authorities and laws.

23   And once again, not directly relevant to these topics,

24   but it was part of my preparation.  I wanted to get

25   these things kind of organized in my mind.



Page 36

1      Q.   Where are those documents now?

2      A.   Say that one more time, please.

3      Q.   Did -- did you keep a copy of what he prepared

4  for you?

5      A.   Oh, yes.

6      Q.   Where is that?

7      A.   It's in my e-mail.

8      Q.   Okay.  And you mentioned that you talked to

9  your boss Robert Fencel; is that right?

10     A.   Robert Fencel, yes.  He's the --

11     Q.   And what was that --

12     A.   -- assistant director that I report to.

13     Q.   Okay.  At the Laredo field office?

14     A.   Yes, correct.

15     Q.   What did you talk to him about?

16     A.   I was just keeping him abreast of what we had

17  going on, what was going to happen, changes in dates,

18  what, you know, we were planning on doing, what

19  potential dates were.  And then, once it got canceled,

20  of course, I told him, "Hey, it's been postponed, don't

21  know exact dates."  But it was just that -- that -- that

22  type of thing.

23     Q.   Okay.  Thanks for your --

24     A.   And also --

25     Q.   -- flexibility on that.



Page 37

 1        A.   I'm sorry?

 2        Q.   Thank you for your flexibility on schedule.

 3        A.   I'd also -- once again being overly, you know,

 4   inclusive, I did call the ports -- we have eight ports

 5   of entry here in the -- the field office -- just to get

 6   kind of an update on whether or not they were doing

 7   queue management.  That would have been, once again,

 8   early March.

 9        Q.   2019 -- or 2020 --

10        A.   Yeah --

11        Q.   -- right?

12        A.   -- 2020.  Sorry.

13        Q.   Okay.

14        A.   And then, also, yesterday I talked with the

15   port directors at -- I talked with not necessarily the

16   port directors but some of the -- the staff at

17   Brownsville, Laredo, Hidalgo, just to ensure that

18   nothing had changed as far as their queue management

19   practices in the last -- that I wasn't aware of.

20        Q.   Okay.  So you had many conversations with

21   people at -- at all the ports in Laredo Field Office to

22   prepare for this?

23        A.   Well, I mean, yes, but we have those

24   conversations every day on operations in general, so

25   it's not really out of the ordinary.



Page 38

1          Q.  Okay.  So it's almost like your actual job, in

2    some ways, prepared you for this deposition --

3          A.  I would agree --

4          Q.  -- is that right?

5          A.  -- with that, yes.

6          Q.  Okay.  Anything else that you think is

7    important that you did to prepare for this deposition?

8          A.  Not that I can recall.  The -- no, not that I

9    can recall.

10         Q.  Okay.  Did you take any notes during your calls

11   with the ports related to preparing for this deposition?

12              MR. NAZAROV:  Objection, vague.

13              You can answer.

14         A.  Yes.

15         Q.  (BY MS. CASSLER)  Where are those notes?

16         A.  They're in my e-mail.  As -- as I stated

17   before, that's my preferred method of saving information

18   electronically.  Or I made some -- as I mentioned before

19   as well, I've got a few -- maybe one or two sheets of

20   paper with some notes on it and a -- a small notebook

21   with some notes in it.

22         Q.  So you write e-mails that you save for

23   yourself; is that right?

24         A.  Yes.

25         Q.  Do you send those out to someone or you base it



Page 39

1    as draft somewhere?

2        A.   So it would definitely be saved as a draft

3    while I'm working on it.  And then, once I'm done with

4    it, I'll send it to myself so I can archive it.

5        Q.   Got it.  Please don't -- don't destroy any of

6    the notes that you prepared to -- to prepare for this

7    deposition.

8        A.   Of course.  I understand that.

9        Q.   Great.  Apart from all that we talked about

10   already, did you do any independent research to prepare

11   for your deposition today?

12       A.   What do you mean by "independent research"?

13       Q.   I mean, I guess you had -- you spoke with

14   Mr. Garcia, who prepared some research for you, but did

15   you do any of your own, kind of, searching on the

16   Internet or within -- no, I don't know what else you

17   would have done.  Probably it would be Internet

18   research.

19            MR. NAZAROV:  Objection, vague.

20            But you can answer to the extent you can.

21       A.   No, not that I recall.  Everything I would have

22   done would have been -- as far as my own personal

23   research, would have been in my own e-mail archives.

24       Q.   (BY MS. CASSLER)  Okay.  Did you read any news

25   stories regarding this lawsuit?



Page 40

1     A.  I've -- I've seen this lawsuit mentioned in a

2    couple of -- of news stories, yes.

3     Q.  And was that between February 2020 and today?

4     A.  I don't recall.  Maybe it -- maybe once, like a

5    daily, you know, news report that has stuff where --

6    news reports mostly on the Internet where CBP is

7    mentioned.  So if it would have been in one of those,

8    then I might have seen it, yes.

9     Q.  Okay.  Let's change topics and -- well, do you

10   want to take a break, or do you want to keep going?

11   It's been just under an hour.

12    A.  I'm good for now.

13    Q.  Okay.  Cool.  This shouldn't take too long.

14   Let's talk about just your work history.

15          So you're presently employed by CBP, right?

16    A.  Yes.

17    Q.  What's your job title?

18    A.  Right now I am the deputy assistant director

19   for the Border Security Division of the Laredo Field

20   Office.

21    Q.  Okay.  How long have you been in that position?

22    A.  Mid-2018, when I was appointed --

23    Q.  And how long --

24    A.  -- to this position.

25    Q.  Oh, sorry.  I didn't catch the last thing you



Page 41

1    said.

2         A.   That's when I was appointed to this position,

3    mid-2018.

4         Q.   How long have you worked at CBP overall?

5         A.   So I started in 1999 with the U.S. Customs

6    Service as a customs inspector.  And then, when CBP was

7    created a few years later, of course, I transferred over

8    to Customs and Border Protection as a CBP officer.

9         Q.   What year was that?

10        A.   Oh, gosh.  2003, I believe we were -- we were

11   all switched over.

12        Q.   Okay.  Going back in time just for one quick

13   note, what's the highest level of education that you've

14   obtained?

15        A.   I've got a bachelor's degree in government with

16   a concentration in international studies.

17        Q.   And where did you graduate from college?

18        A.   Campbell, C-A-M-P-B-E-L-L, University in a city

19   called Buies Creek, B-U-I-E-S, creek, C-R-E-E-K, North

20   Carolina.

21        Q.   What year did you graduate?

22        A.   '90 --

23        Q.   You can estimate.

24        A.   '98, I believe.

25        Q.   Okay.  Cool.  So then, after graduating, pretty



Page 42

1    quickly you moved over to U.S. Customs, right?

2        A.  Yeah.  I worked for the State of North Carolina

3    for about a year and then moved over to the Customs

4    Service in the fall of '99.

5        Q.  What did you do for the State of North

6    Carolina?

7        A.  I worked for the Department of Corrections.

8        Q.  What was your job?

9        A.  I was a correctional officer.

10       Q.  So you were a Customs inspector starting in

11   1999, right?

12       A.  Yes.

13       Q.  Then you became a CBP officer in 2003, right?

14       A.  I -- I believe it was 2003 --

15       Q.  Okay.

16       A.  -- when they completed the transition.

17       Q.  About 2003?

18       A.  Yes.

19       Q.  Yeah.  What were your job duties as a CBP

20   officer?

21       A.  For most of my time as a CBP officer, I worked

22   in a cargo environment, so I was involved in the

23   processing of trade, cargo.  Of course --

24       Q.  Where were you --

25       A.  -- over time -- did someone say something?


MAGNA
LEGAL SERVICES

Page 43

1     Q.  Sorry.  I interrupted you.  I didn't realize
2  you were still talking.  Could you either move your
3  camera down or move back?  I can't see your mouth, so I
4  can't tell when you're talking.
5     A.  (Witness complies.)
6     Q.  Great.
7     A.  How's that?
8     Q.  Thanks.  That's great.  Go on.
9     A.  So primarily, I was in the cargo environment
10  for most of my time as a CBP officer.  I would work the
11  passenger bridges on overtime or on occasion.
12     Q.  Okay.
13     A.  And that's -- I had a special assignment.  I
14  was detailed to an organization or a -- a work group
15  called the ISET, I-S-E-T, Import Specialist Enforcement
16  Team, where we would -- would do targeting and
17  inspections on high-risk merchandise, primarily looking
18  for intellectual property rights violations.
19     Q.  Okay.  When did you stop being a CBP officer?
20     A.  So I was promoted to supervisory CBP officer
21  in, I believe, 2007.
22     Q.  And what were your job duties as a supervisory
23  CBP officer?
24     A.  So as a supervisor, I primarily worked at the
25  passenger bridges at first in Laredo, Texas, and I was



Page 44

1  overseeing -- over CBP officers' day-to-day duties in

2  the -- you know, the passenger environment, processing

3  travelers' vehicles.  After a while, I was moved over to

4  the Colombia Solidarity Bridge here in Laredo that has

5  passenger as well as cargo traffic.  So I would -- once

6  I transferred over there, I would spend most of my time

7  in the cargo environment and some time in the passenger

8  environment.

9      Q.  So one quick thing:  Before you became a

10 supervisor, when you were just a CBP officer, were you

11 at the Laredo Port of Entry as well?

12     A.  Yes, I was.

13     Q.  Okay.  And how long were you a supervisory CBP

14 officer for?

15     A.  I want to say about four years.  I believe I

16 got another promotion in 2011 and came over here to

17 the -- the field office as a program manager.

18     Q.  What does a program manager do?

19     A.  So a program manager is a very broad job

20 description, job title, and you could do really

21 anything.  What I was primarily doing at the time was I

22 was involved in emergency management, technology

23 deployments, monitoring the use of different types of

24 technology that we use, port runners and absconders,

25 port -- it's what we call port-hardening infrastructure



Page 45

1    to help calm traffic and, you know, prevent port runners

2    and absconders.  I did a lot of reports.  Which, you

3    know, that's a field office.  One of the main field

4    office functions usually done by program managers is

5    we'll get reports from all eight ports of entry within

6    the field office, consolidate them, and then send them

7    over to OFO headquarters.

8        Q.  Uh-huh.  Okay.

9        A.  So in general, a program manager is going to

10   monitor a program and then you've --

11       Q.  Gotcha.

12       A.  -- got dozens of those.

13       Q.  Yeah.  Okay.  You've laid out a number of

14   specific types of programs that you worked on.  Was

15   there anything else major that you managed when you were

16   a program manager?

17       A.  Major, no, I wouldn't say so.  They all fit in

18   kind of broad buckets.  From 2011 to -- excuse me --

19   2012 to 2015, I was detailed -- I was still field office

20   staff, but I was detailed to an organization called the

21   South Texas Campaign, the headquarters element of the

22   South Texas Campaign, which is also here in Laredo.  I

23   served that detail as well during that time period.

24       Q.  So that was after you were a program manager,

25   right?



Page 46

1         A.  Yes, I was a program manager.  I'd been a

2    program manager for about a year or so when I got that

3    detail added to my job responsibilities.

4         Q.  What -- what did that detail consist of?

5         A.  So I'd probably spend -- at that -- that time,

6    the STC, South Texas Campaign, headquarters element was

7    located on the compound of the border patrol sector here

8    in Laredo, Laredo sector, and I would spend about maybe

9    half my day over there, if not more, and half my day

10   here at field office.  I was what we call the J4, which

11   was an assistant commander of the logistics division,

12   and I was keeping track of a lot of spreadsheets and

13   reports related to the South Texas Campaign, working on

14   documents and projects for them.

15        Q.  I don't know what the South Texas Campaign is.

16   Can you tell me what it is?

17        A.  Yep.  It was -- the South Texas Campaign was

18   the initial efforts to kind of unify, kind of a unity

19   effort of all of the operation components in CBP, which

20   would have been OFO, United States Border Patrol, and

21   the Office of Air and Marine.  And the commander was

22   also charged with liaising with the other law

23   enforcement agencies in DHS, such as HSI, Homeland

24   Security Investigations, as well as state and local

25   partners to have kind of a focused unity effort in



Page 47

```
 1    certain geographical locations.  The South Texas

 2    Campaign eventually morphed into the Joint Task

 3    Force-West.  I'm not sure if you've ever heard of that.

 4          Q.  Uh-huh.  Okay.  So that was through 2015 that

 5    you were a program manager with partial detail to the

 6    South Texas Campaign, right?

 7          A.  Right, correct.

 8          Q.  And then, what was your next job after that?

 9          A.  So I was a supervisory program manager, and I

10    got that promotion in late 2015.  I believe it was

11    late --

12          Q.  And what did you do --

13          A.  -- 2015, maybe 2016.

14          Q.  May 2016?

15          A.  No.  I -- I believe it was late 2015.  I

16    don't --

17          Q.  Okay.

18          A.  -- recall the exact dates.  Sorry.

19          Q.  How long were you in that position?

20          A.  So I was in that position until the ADFO

21    appointed me as the deputy ADFO.

22          Q.  Okay.  And what did you do, real briefly, as

23    the supervisory program manager?

24          A.  So I had -- I had several program managers that

25    I was, you know, the direct supervisor of --
```



Page 48

1    Q.   Uh-huh.

2    A.   -- monitoring their work, their -- their

3    programs.  Of course, I also had several programs of my

4    own that I continued to monitor.  By that time, we

5    had -- we were in the process of setting up the -- what

6    we call the Laredo Operations Center, so eventually that

7    was -- came under my portfolio as well.

8    Q.   In all of these roles, is it accurate to say --

9    all the roles that you've had at CBP post-CBP officer,

10   is it accurate to say that you've had some supervisory

11   responsibilities for pedestrian processing?

12   A.   Directly?

13   Q.   Or indirectly.

14   A.   As -- so directly, no.  As -- when I was a

15   CBP -- supervisory CBP officer, yes.  If I was assigned

16   to passenger processing, I would have had, you know,

17   that responsibility.  Since then, the field office

18   doesn't have direct supervisory role on, you know, any

19   sort of processing at a port.  We have what we call

20   oversight --

21   Q.   Okay.

22   A.   -- of those programs, but we don't have any

23   sort of supervisory role.

24   Q.   Got it.  So what is -- supervisory role, that

25   has to do with kind of, like, direct interaction with



Page 49

1    the employee and kind of the -- the union relationship,

2    right?  Is that the difference between supervision and

3    oversight?

4         A.  So supervision, yes, you're going to have

5    direct interaction with the CBP officers and other

6    employees.  You're going to -- as, you know, the

7    ground-level supervisor, you're going to be directing

8    their work on a daily basis and in general.

9         Q.  Let's go back in time to when you were training

10   to be a CBP officer.  You were trained, right, before

11   you became a customs officer?

12        A.  Right.  I went through the Federal Law

13   Enforcement Training Center in -- in Georgia in -- from

14   September to December 1999.

15        Q.  Okay.  Did you take any courses during that

16   training regarding U.S. asylum law?

17        A.  During that time period, we still had the

18   Immigration and Naturalization Service, and you had the

19   U.S. Customs Service and two different departments of

20   the government.  So we had very --

21        Q.  Okay.

22        A.  -- we had very little training on immigration

23   law.  We did have some training on immigration law, yes,

24   but it was -- it wasn't the focus of our training.

25        Q.  Okay.  When you moved over to CBP, did you get



Page 50

1    additional training on asylum?

2        A.  Not that I recall.  I never worked in -- as a

3    CBP officer, I never worked in a -- a secondary-type

4    environment where asylum seekers or even any immigration

5    cases were processed.  So, no, I didn't receive any

6    training on that.  And back --

7        Q.  Okay.

8        A.  -- then, if you -- if you had received

9    training, it would have been -- it's an OJT, on-the-job

10   type of training for the -- the level we used to call

11   legacy customs employees.

12       Q.  Okay.  That makes sense.  So you're a cargo

13   guy, largely?

14       A.  Well, I mean, I -- I've done both, but I -- I

15   spend a lot of time in cargo, yes.

16       Q.  Yeah.  And currently, in your oversight role,

17   in your current position, you have oversight

18   responsibilities over all eight ports within the Laredo

19   Field Office, right?

20       A.  The field office has oversight responsibility,

21   yes.

22       Q.  Do you personally have oversight responsibility

23   over all eight in some form or another?

24       A.  I would say no.  I'm a -- I'm a staff member.

25   I'm a staffer.  Okay?  The -- a DFO has oversight of all



Page 51

1    eight ports of entry.  He can tell -- you know, give

2    direction to port directors, but a staffer, no, not so

3    much.

4         Q.  Okay.  Do you -- does your work involve all

5    eight ports of entry?

6         A.  Yes.

7         Q.  Okay.  I don't think we've actually talked too

8    much about your current job.  What are your main areas

9    of -- of responsibility in your current job?

10        A.  We're in a bit of a transition right now here

11   at the field office.  I still have the same title, but

12   we're kind of transitioning job responsibilities.

13   But -- so I've got several program managers that I

14   directly oversee in a supervisory capacity.  The Laredo

15   Operations Center, which I mentioned previously, did

16   fall under my portfolio up until recently.

17        Q.  Okay.

18        A.  So I do a lot of -- I hate to use the term

19   "staff work," but I do a lot of staff work, looking at

20   stats, compiling reports.  I hear -- in this role, I

21   hear a lot of -- I shouldn't say a lot, but I hear LER,

22   Labor and Employee Relations cases, grievances,

23   disciplinary actions being proposed.  I hear some of

24   those proposals --

25        Q.  Uh-huh.



Page 52

1         A.   -- make recommendations to the deciding

2    authorities.

3         Q.   Okay.  Let's change topics a bit and talk about

4    the Laredo Field Office, which we might call LFO in this

5    deposition.  Does that make sense?  "Yes"?

6         A.   Can you say -- can you speak up?  There's a

7    train going by outside.  I apologize.

8         Q.   I just said I'll refer to Laredo Field Office

9    as LFO.  All right?

10        A.   Okay.  Perfect.

11        Q.   Yeah.  So the 8 ports in LFO, I want to make

12   sure I've got them right.  They're Brownsville, Del Rio,

13   Eagle Pass, Hidalgo, Laredo, Progreso, Rio Grande City,

14   and Roma, right?

15        A.   Yes.

16        Q.   And LFO is broken into a northern command and a

17   southern command, right?

18        A.   It was up until very recently.

19        Q.   Oh.

20        A.   That goes back to that transition I was

21   speaking of.  So it's up until --

22        Q.   Why the change?

23        A.   I'm sorry?

24        Q.   Go ahead.  When did -- when did that change?

25        A.   It's -- it's been coming for -- we've been



Page 53

1    looking at different options -- or I should say

2    leadership has been looking at different options for the

3    last few months, and, literally, last month it was

4    finally put out that we were going to change from what

5    we call the Northern Operations Command, sometimes

6    referred to as the NOC, N-O-C, and the Southern

7    Operations Command, referred to as the SOC, S-O-C.  So

8    those two -- that organizational structure has been

9    re- -- it's been done away with, and now they're going

10   forward with the new organizational structure.

11        Q.   What's the new organizational structure?

12        A.   Well, a lot of the programs, a lot of the

13   initiatives, the enforcement initiatives, that the NOC

14   and the SOC had that worked well, they are going to be

15   moved under an ADFO, Assistant Director of Field

16   Operations, CND, Counter Network Division.

17        Q.   Okay.  So the NOC and SOC are no more?

18        A.   Right.  So there's one -- one field office

19   falling under the border security division for all the

20   programs they were running.

21        Q.   Got it.  All right.  Let's talk about

22   pedestrian processing.  So I'm going to just describe my

23   understanding of what happens normally for pedestrians,

24   not necessarily asylum seekers, but just any old

25   pedestrian coming to a port, and I want you to tell me



Page 54

1     if it's accurate.

2                 So when a pedestrian wants to enter the

3     United States at a Class A port, the normal process is

4     to walk on a pedestrian walkway from Mexico across the

5     international boundary into the United States, right?

6          A.  Yes.

7          Q.  And then the pedestrian is in an area that's on

8     U.S. territory but not yet in the federal inspection

9     station, right?

10         A.  Yes.

11         Q.  Then, from there, the pedestrian would keep

12    walking until they reach the Federal Inspection Station,

13    or FIS, right?

14         A.  Generally, yes.

15         Q.  And then, once they reach the FIS, there's

16    usually a building, or I should say probably always a

17    building, where a CBP officer would inspect them, right?

18         A.  At -- at some of our ports of entry, pedestrian

19    inspections are conducted outside, not necessarily in a

20    building, but -- but, yes, they'll encounter a CBP

21    officer either by entering a building or outside at a

22    booth or a work station of some sort.

23         Q.  Okay.  And then that officer will decide

24    whether or not the pedestrian can enter the United

25    States or not, right?



Page 55

1      A.  Well, they are going to present their documents

2   or, you know, make a claim of United States citizenship,

3   but there will probably be a record of the trip.  We

4   call it a trip.  A record of their crossing will be

5   created in our -- in our system.  You know, the officer

6   will be looking at their documents, may ask them a few

7   questions, and then, yes, at -- at some point, the

8   officer will determine whether or not the person should

9   be referred for additional inspection or allowed to

10  enter the United States.

11      Q.  Okay.  And people do that at LFO ports every

12  day, right?

13      A.  Yes, the basic job function of a CBPO.

14      Q.  So prior to 2016, is the process that I just

15  described or that we just described, is that the way

16  that pedestrians seeking asylum would be inspected at

17  ports?

18      A.  Yes.

19      Q.  In all your years of experience, which I think

20  are 21 years of experience at Customs and then CBP, in

21  all those years, do you know of any deviations to that

22  process prior to 2016?

23              MR. NAZAROV:  Objection, vague.

24              You can answer to the degree you can.

25      A.  Speaking only about pedestrians, I -- I can't



Page 56

 1   recall.

 2        Q.  (BY MS. CASSLER)  Okay.

 3        A.  I can't recall any -- I mean, other than

 4   changes in infrastructure and all the documents are

 5   stand or presented, you know, changes to the overall

 6   process, no, I can't recall.

 7        Q.  Okay.  So do you want to take a break now, or

 8   do you want to just keep powering forward?

 9             MR. NAZAROV:  Can we -- Rebecca, can we

10   just take a ten-minute break?

11             MS. CASSLER:  Sure.

12             MR. NAZAROV:  Is that okay?

13             MS. CASSLER:  Yeah.  So be back here at

14   10:55 Central; is that right?

15             MR. NAZAROV:  Yeah.

16             THE WITNESS:  Yes.

17             MS. CASSLER:  Okay.

18             MR. NAZAROV:  Mr. Harris, is that good?

19   Okay.

20             THE WITNESS:  Yeah, that's -- that's good

21   for me.

22             MR. NAZAROV:  Okay.

23             MS. CASSLER:  Off the record.

24             THE VIDEOGRAPHER:  Going off the video

25   record.  The time is 10:42 a.m.



Page 57

1                    (Break was taken.)

2                    THE VIDEOGRAPHER:  We are back on the video

3    record.  The time is 11:00 a.m.  Counsel, you may

4    proceed.

5         Q.  (BY MS. CASSLER)  Hi, Mr. Harris.  You

6    understand that you're still under oath, right?

7         A.  Yes.

8         Q.  Okay.  We're going to move on to look at some

9    exhibits now.

10                   MS. CASSLER:  So, Kevin, can you please put

11   up Exhibit 222?

12        Q.  (BY MS. CASSLER)  All right.  I'm showing you

13   what's been marked as Exhibit 222 to your deposition,

14   and it's a two-page document with Bates numbers starting

15   at AOL-DEF-00011374.

16                   Can you see it okay, Mr. Harris?

17        A.  Yes, I can see the -- the first page.

18        Q.  Okay.  This is an e-mail thread dated

19   April 27th, 2018, and the e-mail at the top is from

20   David Higgerson to Bradd Skinner.  Do you see that?

21        A.  Yes.

22        Q.  On April 27th, 2018, David Higgerson was the

23   director of the Laredo Field Office, right?

24        A.  Correct.

25        Q.  And at that time, Bradd Skinner was the deputy



Page 58

1    director of the LFO, right?

2         A.  Yes.

3         Q.  Okay.  So let's go down to the -- the bottom of

4    the first page where we see an e-mail from Todd Hoffman

5    at 3:08 p.m. on April 27th.  Do you see that?

6         A.  Yes.

7         Q.  At that time, Mr. Hoffman was the executive

8    director of admissibility and passenger programs for

9    OFO, right?

10        A.  I believe so, yes.

11        Q.  And that's out of CBP headquarters, right?

12        A.  Yes.

13        Q.  Okay.  And this e-mail from Todd Hoffman was

14   sent to the southwest border field office heads; is that

15   right?

16        A.  Well, it looks like the -- the DFOs for the

17   southwest border, yes.

18        Q.  Okay.  Including David Higgerson, who's the --

19        A.  Yes.

20        Q.  -- LFO, right?  Yeah.

21        A.  Yes.

22        Q.  So I'm going to read the opening of this

23   e-mail, and it says:  "Directors, please see the

24   attached processing guidance during surge events."

25               Did I read that right?



Page 59

1      A.   Yes.

2      Q.   And below that is the metering guidance from

3  April 27th, 2018, right?

4      A.   Yes.   That appears to be what we commonly refer

5  to as the EAC's memo or the metering memo, yes.

6      Q.   Okay.   You call that the metering memo?

7      A.   I call it the EAC's memo is what I call it,

8  but --

9      Q.   Okay.

10      A.   -- but, yes.   Probably the metering --

11      Q.   So if I refer to it as -- or the metering

12  guidance.   Okay.

13           So what -- what is a surge event?

14      A.   Well, in this e-mail, a surge event is not

15  defined or -- you want to know my personal --

16      Q.   What does CBP under -- like, how -- how is that

17  term used at CBP?

18      A.   Well, if you talk about a surge at a port of

19  entry, it will be a sudden -- an increase in traffic, an

20  increase in -- the context we're talking about here, it

21  would be an increase in, you know, persons arriving at a

22  port of entry.

23      Q.   Okay.   Did LFO understand this metering

24  guidance to be applicable as a matter of normal routine

25  or only during surge events?



Page 60

1      A.   I'd say it -- when this memo first came out in

2   late April, it wasn't really defined as a matter of

3   normal business, something that could be done when you

4   needed to, yes.

5      Q.   So only during surge events?

6      A.   Yes.

7      Q.   Is that what you mean?

8      A.   When -- when --

9      Q.   Okay.

10     A.   -- when it first came out, that was -- that was

11   my understanding, yes.

12     Q.   Did that change?

13     A.   Yes, I would say so.

14     Q.   When did that change?

15     A.   I'd say as -- as -- as early as June of 2018.

16     Q.   Okay.  We'll talk about that a little more

17   later.

18          So going back to this guidance, this was

19   sent to all LFO port staff eventually; is that right?

20     A.   It -- on this particular e-mail string, I

21   didn't see who-all it was addressed to, but at -- at

22   some point in time, yes, everyone in the LFO would

23   have -- would have received it.

24     Q.   And were all LFO staff mustered, either in

25   person or in writing, about this guidance?



Page 61

1        A.   What do you mean by LFO staff?

2        Q.   Sorry.  Yeah.  How should we -- I mean

3   everybody who works at LFO, kind of what you just said.

4   It's everybody.  How -- how -- how does it make sense to

5   refer to that?

6        A.   So when I hear LFO staff, I think of staffers

7   here at the actual field office, LFO employees of the

8   Laredo Field Office, the element here at Shiloh Tower in

9   Laredo, Texas.

10       Q.   Okay.

11       A.   So I don't know...

12       Q.   So how would I refer to, like, everybody who

13  works at some component of LFO, including the port?  We

14  can just pick a term for this deposition.

15       A.   Yeah.  So I would say all port personnel is

16  probably how I would refer to it.

17       Q.   Okay.  And so when I refer to port personnel,

18  I'm just talking about LFO.  So we don't need to worry

19  about, you know, other field offices, okay, even if I

20  don't say LFO.

21       A.   Okay.

22       Q.   Does that -- okay.

23       A.   Yes.

24       Q.   So -- so all LFO staff and port personnel were

25  mustered in person and in writing about this guidance;



Page 62

1   is that right?

2         A.  I don't know.  I know that -- that we -- the

3   port directors were certainly aware and their -- their

4   staff at -- but I believe we directed that they muster

5   supervisory personnel, but then the supervisory

6   personnel should have, in turn, mustered their direct

7   reports, their officers.

8         Q.  Okay.

9         A.  So when that occurred and in what manner, I

10  can't tell you.

11        Q.  Uh-huh.  Did port personnel raise any questions

12  or complaints about this guidance when it came out?

13        A.  When it came out, I would -- was not aware of

14  any.  When it came out, no.  Over time --

15        Q.  What about after -- go ahead.

16        A.  Yeah.  So over time, you know, the union did

17  raise some concerns.

18        Q.  I'm going to list some concerns that I suspect

19  they raised, and can you tell me if port personnel, the

20  union, or somebody else did, in fact, raise these

21  concerns?

22              One is about safety concerns because

23  officers would have to be so close to Mexico, right?

24        A.  Yes, I believe that concern was raised by the

25  union in a grievance.



Page 63

1     Q.  Okay.  And did other staff other than through

2  the union raise -- raise that as well?

3               MR. NAZAROV:  I'm going to object to that

4  as just vague.

5               But you can answer to the degree you can.

6               MS. CASSLER:  Ari, please refrain from

7  speaking objections.

8     A.  Can you repeat that?  Was that directed at me,

9  ma'am?

10              MS. CASSLER:  I said:  Ari, please refrain

11  from making speaking objections.

12              MR. NAZAROV:  Okay.  It was an objection.

13  I object as to form.

14              Go ahead.  You can answer that question.

15              That's all I said.  I wasn't speaking.

16     Q.  (BY MS. CASSLER)  So my question was:  Was it

17  just the union that raised that safety concern that we

18  mentioned, or did other LFO staff or port personnel also

19  raise that concern?

20     A.  Well, an actual grievance or complaint coming

21  from other personnel, I'm not aware of any.  But when we

22  do anything, any new -- any -- I mean, the safety of our

23  officers is always in mind when we come out with

24  something like this.  So we try to implement, you know,

25  this -- this guidance in a manner that's going to be



Page 64

1    safe, that's going to have, you know, positive security

2    repercussions for the port and keep our people safe.  So

3    that's a safety concern in any law enforcement

4    operation.  To include this is always something that

5    we're looking at.  So --

6        Q.  Okay.

7        A.  -- if that answers your question.

8        Q.  Yeah.  Yeah.  So when I talk about concerns or

9    complaints being raised, I'm talking about either a

10   formal grievance or something more informal that came up

11   in conversation or in meetings.  Okay?

12       A.  Okay.

13       Q.  Does that make sense?

14           Okay.

15       A.  Right.

16       Q.  So --

17           MR. NAZAROV:  Rebecca, I'm just going to

18   object to these as outside the scope.  He can answer to

19   the degree he -- he's able to.

20           MS. CASSLER:  This -- these are about the

21   implementation of the metering guidance, these

22   questions.  Okay?

23           MR. NAZAROV:  Well, no.  These are about

24   grievances filed by port personnel.

25           MS. CASSLER:  Respectfully --



Page 65

1              MR. NAZAROV:  But I told --

2              MS. CASSLER:  -- disagree.

3              MR. NAZAROV:  Okay.  Well, my objection is

4    on the record.  He can answer to the degree he's --

5              MS. CASSLER:  All right.

6              MR. NAZAROV:  -- capable.

7              MS. CASSLER:  All right.  Let's just make

8    that a standing objection.  But --

9              MR. NAZAROV:  That's fine.

10             MS. CASSLER:  Is that okay?

11             MR. NAZAROV:  That's fine.

12        Q.  (BY MS. CASSLER)  So other safety concerns that

13   were raised at some point include the long distance

14   between CBP facilities and the international boundary;

15   yes or no?

16        A.  Yes.

17        Q.  And that's dangerous potentially because it

18   means that when officers are at the bound- -- at the

19   demarcation line, ████████████████████████████

20   ████████████████████████████████████████████

21        A.  ████████████████████████████████████████ ,

22   ████████████████████████████████████████████████████

23   ████████████████████████████████████████████

24        Q.  ████████████████████████████████████████████

25   ████████████████████████████████████████████████



Page 66

```
 1        A.  Yes, that's correct.

 2        Q.  (BY MS. CASSLER)  All right.  And -- oh, sorry.

 3   Were you going to say something else?

 4        A.  Yeah.  I was going to say:  But, as always,

 5   we -- you know, we try to take steps to mitigate

 6   any -- you know, any safety concerns.

 7        Q.  The safety concerns raised at some point by

 8   port personnel also included that ████████████████

 9   ███████████████████████████████████████████████████

10   ████████████████████████████████████████████████

11        A.  ██████████████████████████████████████████

12   ███████████████████████████████

13        Q.  And these safety concerns raised by port

14   personnel also included ████████████████████████

15   ████████████████

16        A.  Yes, I believe so.

17        Q.  ██████████████████████████████████████████

18   ███████████████████████████████████████████████████

19   ███████████████████████████████████████████████████

20             MR. NAZAROV:  Objection, form.

21             You can answer.

22        A.  Well, that -- that -- that's -- that was

23   just -- that's just kind of a -- an across-the-board

24   concern.  But, once again, we've, you know, tried to

25   mitigate those concerns as best we can with
```



Page 67

1    infrastructure.

2         Q.  (BY MS. CASSLER)  Yes or no that the safety

3    concerns raised by port personnel also included ████

4    ███████████████████████████████████████████████

5    ██████

6         A.  Yes.

7         Q.  And the safety concerns raised by port

8    personnel also included that at some port -- some land

9    crossings, ██████████████████████████████████

10   ██████████████████████████

11        A.  That concern was brought up, but, once again,

12   we tried to mitigate that, and I actually looked into

13   that personally at one point.

14        Q.  So --

15        A.  I drove down --

16        Q.  -- because -- oh, sorry.  We can --

17        A.  I'm sorry.  Go ahead.

18        Q.  -- put this exhibit away, then I'll be able to

19   see you.

20             MS. CASSLER:  Kevin, can we put the exhibit

21   away, please?  Thanks.

22        Q.  (BY MS. CASSLER)  So multiple LFO ports

23   requested permission to place their limit line position

24   closer to the port buildings, right?

25        A.  It -- that sounds vaguely familiar, but I don't



Page 68

```
 1   recall any details on that.

 2        Q.  All right.  Let's look at Exhibit 223.

 3              MS. CASSLER:  Oh, wait.  Sorry.  224,

 4   Kevin, 224.  My bad.

 5              MR. NAZAROV:  Hey, Rebecca, could you hold

 6   on just one second.  We haven't gotten the exhibit.

 7              MS. CASSLER:  No worries.  Sorry.  I think

 8   223 was accidently sent as well, but we're not going to

 9   use it.

10              MR. NAZAROV:  Hold on.  220 -- we've got --

11              MS. CASSLER:  All right.  Have you gotten

12   it?

13              MR. NAZAROV:  No.  Is --

14              MS. CASSLER:  I got it.

15              MR. NAZAROV:  You got it.

16              MS. RICH:  Hi, Ari.  This is Sarah Rich,

17   counsel for plaintiff.  I'm the one sending the e-mails

18   to you and Dhru, and the other people that you requested

19   they be sent to.  So sorry for the slight lag.

20              MR. SAMPAT:  No worries.  Dhru.  I just got

21   it, so...

22              MR. NAZAROV:  We just got it.

23              MS. CASSLER:  Great.  Great.

24              MR. NAZAROV:  Thank you.

25              MS. CASSLER:  Cool.
```



Page 69

1      Q.   (BY MS. CASSLER)   Okay.  So this exhibit

2  is -- is marked as Exhibit 224, or it will be marked,

3  and it's a one-page e-mail with Bates

4  No. AOL-DEF-00911036.  And this is an e-mail dated

5  May 30th, 2018, from Daniel Mercado, who's the Eagle

6  Pass port director, to Frank Longoria and Bradd Skinner.

7           Do you see that?

8      A.   Yes, I do.

9      Q.   Okay.  Can you please read the first full

10  sentence of this e-mail?

11      A.   "Eagle Pass POE is requesting to deviate from

12  the metering guidance and relocate the metering point to

13  a location operationally feasible."

14      Q.   This e-mail is a request for Eagle Pass to

15  place its limit line officers well into U.S. territory

16  rather than at the international boundary, right?

17      A.   That's the way I read it, yes.

18      Q.   And below that, the e-mail says "Eagle Pass 1"

19  and "Eagle Pass 2."

20           These are references to the two

21  different -- well, are they references to the two

22  different bridges in the Eagle Pass Port of Entry?

23      A.   Yes.  That should be representing Bridge 1 and

24  Bridge 2 in Eagle Pass.

25      Q.   Great.  So, for example, under Eagle Pass 2,



Page 70

1    the second bullet says:  ███████████████████

2    ████████████████████████████

3                    Right?  Did I read that right?

4        A.  Yes.

5        Q.  And the third bullet says:  "The pedestrian

6    walkway is intersected by commercial traffic and ██████

7    ████████████████

8                    Did I read that right?

9        A.  Yes.

10       Q.  And the fifth bullet says:  "No canopy or shade

11   to maintain safety of officers at borderline."

12                   Did I read that right?

13       A.  Well, there's a typo in "at border line," but,

14   yes, that's --

15       Q.  Oh.

16       A.  -- basically --

17       Q.  -- yeah.

18       A.  -- what it says.

19       Q.  My brain fixed it.

20                   MR. NAZAROV:  I'm just --

21       Q.  (BY MS. CASSLER)  Sorry about that.

22                   MR. NAZAROV:  I'm sorry to interrupt.  We

23   just have a standing objection to scope, but go ahead,

24   continue.

25                   MS. CASSLER:  Okay.  Thanks.



Page 71

1      Q.   (BY MS. CASSLER)   The bullets corresponding to

2  each bridge state the reasons why Eagle Pass should be

3  allowed to deviate from the metering guidance, right?

4      A.   Yes.

5      Q.   Okay.  And LFO leadership granted Mr. Mercado's

6  request, didn't they?

7      A.   Can you say that one more time, please?

8      Q.   The request to deviate here was granted, wasn't

9  it?

10     A.   I don't know.

11     Q.   If I told you that it was granted, would you

12  have any reason to doubt the truth of that statement?

13     A.   I wouldn't have any reasons to doubt it, but

14  I -- you know, I'd like to see the e-mail or whatever

15  just for my personal reference.

16     Q.   LFO leadership received a number of other

17  similar requests from LFO ports, didn't they?

18     A.   Well, once again, it -- the -- the issue is I'm

19  vaguely familiar on the requesting.  I didn't run across

20  anything similar to this in my research, but I can tell

21  you that, you know, as of a week later, we plainly told

22  the ports that they had to be at the middle of the

23  bridge or the line of demarcation to conduct our

24  metering operations.

25     Q.   Okay.  If -- if it would make you more



Page 72

1   comfortable, I can pull those out and show them to you

2   later, but we do have e-mails from Del Rio, Brownsville,

3   and Eagle Pass showing that these requests were made and

4   granted.

5           Do you have any reason to doubt that

6   that -- that that's true?

7       A.  No, I don't.

8           MR. NAZAROV:  I'm going to object to form.

9       Q.  (BY MS. CASSLER)  And those requests would have

10  been granted out of a concern for officer safety, right?

11          MR. NAZAROV:  Objection, form.

12          You can answer.

13      A.  So generally, the field office allows the port

14  director to run their day-to-day operations.  And if

15  that's what the port director felt was best for a

16  particular bridge, you know, his partic- -- his or her

17  particular port, then, yeah, the field office would --

18  is generally going to defer to the judgment of the port

19  director, unless and until, you know, we put out some

20  sort of contrary guidance and -- which, you know, we did

21  shortly hereafter.

22      Q.  (BY MS. CASSLER)  Okay.  Did LFO or any of the

23  port directors who made these requests face any negative

24  consequences for granting the deviations?

25      A.  Not that I'm aware of and I -- I -- not that



Page 73

1    I'm aware of.

2        Q.  Okay.

3             MS. CASSLER:  We can put that document

4    away.

5        Q.  (BY MS. CASSLER)  So if a person were metered

6    and sent back to Mexico at a port during the time when

7    the deviation was in place, that would be a violation of

8    U.S. law, right?

9             MR. NAZAROV:  Objection, form.

10             You can answer.

11        A.  I don't know if that would be a violation of

12    U.S. law or not.  During that time period, the -- the

13    guidance was still evolving as to whether we could

14    return people once they'd actually, you know, stepped on

15    U.S. soil.  As of -- like I said, you know, a week

16    later, we were plainly telling the ports if they wanted

17    to conduct queue management, then they absolutely had to

18    be at the line of demarcation, the international

19    boundary.  And, you know, I'm personally aware not --

20    of -- of -- well, I'll -- I'll just leave it at that.

21        Q.  (BY MS. CASSLER)  What are you personally aware

22    of?  What were you going to say?

23        A.  I'm just -- I was going to say that I'm not,

24    you know, aware of -- of -- of a lot of people being

25    sent back in the situations that -- you know, that



Page 74

1    you're describing.

2         Q.  Okay.  Thanks.  So the ports were required to

3    move their limit line positions to the international

4    boundary about a week after this e-mail, right?

5         A.  Yes.

6         Q.  The -- yeah.  So that would have been early

7    June 2018?

8         A.  Yes, June 7, June 8, somewhere around there.

9         Q.  Who gave that order?

10        A.  Well, it would have come from the DFO to the

11   port directors.  Well, actually, Mr. Skinner, the deputy

12   DFO, actually sent the e-mail to the port directors with

13   the specific guidance.  And I think he -- as of

14   midnight, you know, tonight -- I don't recall if it was

15   June 7th or June 8th -- you need to be -- have your

16   queue management points at the middle of the bridge.

17              So prior to that, we had requested the

18   ports work on some documents.  I think we called it a

19   concept of operations, sometimes referred to as a

20   CONOPS.  But we were trying to get a handle on the

21   number of personnel, the infrastructure, on the durable,

22   and, you know, disposable goods they would need to have

23   a safe and effective operation at the middle of the

24   bridge to try to mitigate some of the concerns that we

25   spoke about earlier.



Page 75

1        Q.    Uh-huh.    Uh-huh.    Did the order to move the

2   limit line to the demarcation line come from CBP

3   headquarters?

4        A.    There was conversations from the end of April,

5   once the memo came out, until early June where we were

6   kind of being -- I don't remember specifics.  I'm sorry.

7   But the general gist was our attorneys, OCC, was -- was

8   telling leadership that, ████████████████████████████████

9   ████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ██████████████████████████████████████████████████████

12  ████████████████████████████████████████████

13  ████████████████████████

14       Q.    Okay.    So is it fair to say that CBP

15  headquarters passed on to LFO, "You guys need to move

16  your limit line to the midbridge"?

17       A.    I don't think that's fair to say because I

18  never saw something or heard of any specific direction

19  like that, but at the same, we were being guided in that

20  direction.  Because if -- even if you read the memo,

21  it's -- it still says because of operational feasibility

22  in mind, it needs to be as close to the limit line as

23  possible.  But the -- I mean, it should have been done

24  at a line of demarcation is the way I was -- I was

25  taking the guidance.



Page 76

1     Q.  Okay.  LFO directed all ports to move the limit

2  line to the demarcation line after it had previously

3  said, like a week earlier, you can put it closer if you

4  need to.  That direction to move the limit line to the

5  demarcation line came from somewhere, didn't it?

6                 MR. NAZAROV:  Objection, form.

7                 You can answer to the degree you

8  can -- you -- you're able to.

9     Q.  (BY MS. CASSLER)  You understand my question,

10  right?

11     A.  Yes.  No, I understand the question.

12  But -- but specific direction came from the deputy DFO.

13  I don't know where -- if and, you know, where they were

14  getting direction from, from, you know, some higher

15  echelon.

16     Q.  Uh-huh.  Uh-huh.

17     A.  I don't recall any -- any being briefed or

18  being a part of any discussions where I was told, "Hey,

19  you know, person A said to do this."

20     Q.  Gotcha.  So do orders get made at the LFO level

21  that contradict LFO's prior orders without some

22  intervention from headquarters?  Does that normally

23  happen?

24                 MR. NAZAROV:  Objection, form.

25                 You can answer.



Page 77

1          A.  So that could happen, but if -- I don't know if
2     I'd use contradiction as much as, "So we became aware of
3     additional information" or --
4          Q.  (BY MS. CASSLER)  Uh-huh.  Uh-huh.
5          A.  -- additional --
6          Q.  Yeah.
7          A.  -- you know, "concerns were raised."  Maybe we
8     spoke with -- we did something without, you know,
9     consulting attorneys, and once we did, "Okay, maybe we
10    should backtrack and take a different direction."
11    That -- that could happen.
12         Q.  Uh-huh.  And do you think Bradd Skinner would
13    know the answer to the question about whether this came
14    from headquarters?
15              MR. NAZAROV:  Objection, form.
16              You can answer to the degree you're able
17    to.
18         A.  He may.  I don't know.
19         Q.  (BY MS. CASSLER)  He's the person who made the
20    order that was sent out to the ports, right?
21         A.  I'm sorry?
22         Q.  He's the person who gave that order to the
23    ports, right?
24         A.  Yes, correct.
25              MR. NAZAROV:  Objection, form.



Page 78

1       Q.   (BY MS. CASSLER)   Okay.   Let's go back to

2   Exhibit 222, to the first page.

3               MR. SAMPAT:   I'm sorry, Rebecca, you cut

4   out.   Which exhibit is that?

5               MS. CASSLER:   222.

6       Q.   (BY MS. CASSLER)   So the second e-mail from the

7   top is an e-mail from Bradd Skinner to David Higgerson

8   with a few folks cc'd, sent on April 27th, 2018, right?

9       A.   Yes.

10      Q.   I'm going to read the first sentence, which

11  says:   "Sir, with your concurrence, I think useful to

12  organize a teleconference this afternoon with the port

13  directors to hash out any questions that they may have

14  at this time, confirm what is currently taking place,

15  and identify reporting protocols."

16              I read that correctly, except I added the

17  word that was missing, right?

18      A.   Yes.

19      Q.   He forgot to say "have."   So his e-mail says:

20  "Any questions they may at this time."

21              Right?

22      A.   Yes, that's the way I would read that, yes.

23      Q.   Okay.   Did that teleconference happen?

24      A.   I would presume it did.   I don't remember, you

25  know, that particular teleconference.   Can I add



Page 79

1   something real quick?

2       Q.  Yeah.

3       A.  Now that we're talking about Mr. Skinner, I do

4   recall that I had one phone call with him a few weeks

5   ago in preparation for this deposition.  We were just --

6       Q.  Oh, okay.

7       A.  -- discussing general -- that during this --

8   this -- the -- the -- the time period.

9       Q.  Okay.  So what did you discuss with

10  Mr. Skinner?

11      A.  Well, just like a general, "Hey, Mr. Skinner."

12  He's obviously moved on to another field office now.

13  You know, we exchanged cordialities, and I discussed --

14  asked him about a few e-mails.  I think we might have

15  discussed the e-mail that we're currently talking about

16  where he directed the -- the port directors to move

17  the -- the -- the queue management operations to the

18  line of demarcation to the middle of the bridge.

19      Q.  Okay.  What did he say about it?

20      A.  Well, he just talked about generally what --

21  'cause we were having some -- I wasn't able to find very

22  few resources in between the EAC's memo and when we did

23  that in June.  There was a lot of RFIs, requests for

24  information, going back and forth, you know, the

25  instructions that create the CONOPS, and -- and not a



Page 80

1    whole lot else.  So I was just trying to get a -- a

2    better idea of -- of why we had decided to do that.  I

3    wasn't able to find any -- the direction that you

4    alluded to earlier from either headquarters or -- or any

5    other elements, so I was just -- I wanted to see if he

6    recalled any or had any new information about that.

7         Q.  Okay.

8         A.  I don't recall --

9         Q.  Thanks so much for that.

10        A.  I don't recall anything else specifically

11   we -- we discussed.

12        Q.  Okay.  If anything else comes up that you

13   remember that's responsive to a question like that,

14   feel -- feel free to just interject that.  That's really

15   helpful.

16             So I want to go back for a second.  You did

17   say that OCC attorneys were telling CBP, ███████████

18   ████████████████████████████████████████████████████

19   ██████████████████████████

20             MR. NAZAROV:  Objection, form.

21             You can answer to the degree you're able

22   to.

23        A.  I wasn't -- I don't recall being told that

24   specifically or being part of a call or anything where

25   our attorneys were saying that, but I -- I -- I believe


MAGNA ▶
LEGAL SERVICES

Page 81

1    that that's what they were telling our higher

2    leadership.

3        Q.  (BY MS. CASSLER)  Okay.  And --

4             MR. NAZAROV:  Rebecca --

5        Q.  (BY MS. CASSLER)  -- that directive comes down

6    from higher leadership?

7             MR. NAZAROV:  Rebecca, I'm just going to

8    start instructing him not to answer if you continue

9    talking about what attorneys told him.

10            MS. CASSLER:  No more of that.  No more of

11   that.

12       Q.  (BY MS. CASSLER)  So that instruction

13   eventually made it to the port, right, "You've got to do

14   this at the demarcation line if you're going to do it"?

15       A.  So as of the end of first week in June, the

16   field office had instructed the ports to move their

17   queue management operations, and it was a firm -- I -- I

18   thought it was very emphatic.  I mean, there wasn't any

19   wiggle room, and it had to be done at the middle of the

20   bridge.

21       Q.  Okay.

22            MS. CASSLER:  Let's move down to the second

23   page of this exhibit, the one that's currently up.

24       Q.  (BY MS. CASSLER)  And I want to look at the

25   third paragraph, where we see -- I'm going to just read



Page 82

1    it:  "INAMI has, at times, elected to conduct exit

2    controls at some locations in Mexico to limit the

3    throughput of travelers into the United States.  CFOs

4    should be particularly aware of any INAMI controls that

5    are preventing U.S. citizens, LPRs, or Mexican

6    nationals, some of whom may intend to claim fear, from

7    entering the United States and should work with INAMI as

8    appropriate to address such concerns."

9              Did I read that right?

10       A.  Yes.

11       Q.  Okay.  When did INAMI start electing to conduct

12   exit controls in LFO?

13       A.  From -- it would have been, for the most part,

14   from my recollection, latter 2018, mid to latter 2018.

15   I -- I don't have exact dates.  INAMI didn't come to us

16   and say, "Hey, we're going to start enacting exit

17   controls."

18       Q.  Okay.  This memo is from April of 2018.

19   So -- and it -- it suggests -- I mean, I think it

20   suggests that INAMI started doing that before the

21   April of 2018 memo.  Do you read it that way?

22              MR. NAZAROV:  Objection, form.

23              You can answer to the degree you can.

24       A.  It's -- the memo is saying that, yes, INAMI

25   has, at times, elected to conduct exit controls, but it



Page 83

1    doesn't say, you know, where, it doesn't give any

2    geographical region -- region along the southwest

3    border, and, I mean, obviously, it certainly doesn't

4    mention specific cities or -- or ports.

5         Q.  (BY MS. CASSLER)  Okay.

6         A.  But it has -- I mean, memo says as you stated

7    it does, but I'm not -- personally, I'm not aware of

8    any -- any INAMI doing that in this location or in

9    our area --

10        Q.  Until after -- sorry.  So in LFO, those exit

11   controls started after this memo was created, right?

12        A.  I think it was several months, a couple months

13   at least that I'm aware of.

14        Q.  And why did INAMI conduct exit controls at LFO

15   ports?

16        A.  So the -- kind of the -- what generally

17   happened was once we moved our -- set up queue

18   management points across the field office, we started

19   having a lot of people waiting on the bridges for

20   extended periods of time.

21        Q.  Uh-huh.

22        A.  I don't know how long, a day, longer maybe,

23   while they were waiting their turn to come into one of

24   the ports to get processed.  So they were there, in some

25   cases, with their luggage.  Sometimes they would, you



Page 84

```
 1   know, come and go.  Sometimes they would just stay there

 2   and wait.  So they were eating there, sleeping there.

 3   The bridge honors -- the bridge parties, I should

 4   probably say, were getting -- started getting complaints

 5   from the traveling public, started coming out, you know,

 6   photographs in the media.  You know, there were

 7   reporters on -- on both sides of the bridge trying to

 8   walk and talk with the persons waiting.

 9        Q.  Uh-huh.

10        A.  It just became kind of a -- a situation, you

11   know, that they had to manage.  So they started

12   gradually, you know, clearing out their side of the

13   bridge and only letting in a few people at a time --

14        Q.  Are you familiar --

15        A.  -- at most points of entry.  There wasn't any

16   hard-and-fast dates.  There wasn't consistency across

17   the field office, you know, amongst the -- amongst

18   whatever, you know, the Government of Mexico was doing.

19        Q.  Okay.  Does INAMI still conduct exit controls

20   at LFO ports?

21        A.  As far as I'm aware of, most ports of entry,

22   yes.

23        Q.  Okay.  So going back to this exhibit, that

24   list, U.S. citizens, LPRs, or Mexican nationals, that

25   doesn't include asylum seekers other than Mexicans, does
```



Page 85

1    it?

2        A.   The list on this memo, no, it does not include

3    asylum seekers other than Mexicans who may intend to

4    claim fear is how it's worded.

5        Q.   Uh-huh.  And when I say "asylum seeker," it's

6    kind of just a shorthand for someone who's claiming fear

7    or who -- who asserts the -- a request to apply for

8    asylum.  Does that make sense to you?

9        A.   I usually refer to them as migrants because we

10   really don't know what they're going to claim or what

11   their intentions are.

12       Q.   Okay.  That's -- that's fine.  I can try to do

13   that too where appropriate.

14            So is CBP's position that INAMI

15   conducting -- conducting exit controls of asylum seekers

16   or migrants other than Mexicans is acceptable?

17       A.   That's an internal Government of Mexico, you

18   know, decision.  So I don't know whether it's our proper

19   place to comment on it or not.

20       Q.   Well, we do have, in this memo, a line saying:

21   "DFOs should be particularly aware of certain INAMI

22   controls and should work with INAMI to address those

23   concerns."

24            Right?

25            MR. NAZAROV:  Objection, form.



Page 86

 1                    You can answer.

 2          A.   So --

 3          Q.   (BY MS. CASSLER)   Do you see that?

 4          A.   -- I guess "address such concerns," such

 5     concerns would be the controls that are preventing U.S.

 6     citizens, LPRs, or Mexican nationals, some of who may

 7     intend to claim fear, from entering the U.S.  And that's

 8     what the memo says, yes.

 9          Q.   So that indicates to me that CBP does have

10     something to say about those types of exit controls.  Is

11     that how you read it?

12                    MR. NAZAROV:  Objection, form.

13                    You can answer to the degree you can.

14          A.   Okay.  So other than -- the phrase immediately

15     before that, "should work with INAMI," we, you know,

16     work with INAMI.  We work with Capufe.  We -- Capufe is

17     the Mexican, kind of, bridge and road authority, I

18     guess.  They have authority over some, if not all, of

19     the bridges, from what I understand.

20                    You know, and other Mexican government

21     agencies do -- you know, have an orderly process of all

22     traffic, not just asylum seekers.  So we work with them

23     on a regular basis.  As far as their actual, you know,

24     internal decisions on how they're going to manage

25     their -- you know, their business, it's not something


MAGNA
LEGAL SERVICES

Page 87

1  that we have -- you know, we certainly don't have

2  control over it, and, you know, we try to -- it's --

3  it's just not our place.  Sorry.

4        Q.  (BY MS. CASSLER)  Okay.  No, that's okay.

5             So -- so just to summarize:  CBP does get

6  involved when U.S. citizens, LPRs, or Mexican nationals

7  might be subjected to exit controls, but it won't get

8  involved when somebody else is subjected to exit

9  controls; is that right?

10            MR. NAZAROV:  Objection, form.

11       A.  I wouldn't say that's correct.

12       Q.  (BY MS. CASSLER)  How is that incorrect?

13            MR. NAZAROV:  You can answer the question.

14  I just noted a form objection.  Go ahead.  Go ahead,

15  Mr. Harris.

16       A.  Yes, I would not say the way you stated that

17  is -- is correct.

18       Q.  (BY MS. CASSLER)  It is correct?

19       A.  No, it's not correct.

20       Q.  Okay.  I'm sorry.

21       A.  I would not say that is correct.  I can't agree

22  with that statement.  You know, Mexico is a sovereign

23  nation, and we're not going to get involved with the way

24  the Government of Mexico runs their -- you know,

25  their -- their ports on their side.  We have



Page 88

1    conversations, you know, meetings, sometimes on a daily

2    basis, on what -- the binational bridge, obviously, but

3    when it comes down to it, we don't tell Mexico what to

4    do and how to run their business.

5                MS. CASSLER:  We can put this document away

6    for now.

7        Q.  (BY MS. CASSLER)  So later on, on June 5th,

8    2018, headquarters sent out another memo about metering,

9    right?

10               MR. NAZAROV:  Objection, form.  I withdraw

11   my objection.

12               Mr. Harris, you may answer.

13       A.  Yeah, in June 20 --

14       Q.  (BY MS. CASSLER) You can always answer.

15               Yeah --

16       A.  June 2018 --

17       Q.  -- June --

18       A.  -- you mentioned the memo?

19       Q.  Yep.

20       A.  Do you know the title of the memo?

21       Q.  There was a memo called "The Prioritization

22   Based Queue Management" memo.

23       A.  Right.

24       Q.  Yeah.  You're familiar with that, aren't you?

25       A.  Yes, I am.



Page 89

1    Q.  Okay.  And when I use the term "metering," it's

2    a reference to queue management and vice versa.  Is that

3    your understanding?

4    A.  It -- yes.  Now metering and queue management

5    are used interchangeably.

6    Q.  Okay.  Was that June 5th memo mustered to all

7    LFO personnel?

8    A.  Not that I'm aware of, no.

9    Q.  Who was it mustered to?

10   A.  I don't know.  At -- at the time, I don't

11   recall seeing that memo.

12   Q.  Hmm.  Was it ever mustered?

13   A.  I don't know if that particular memo was or

14   not.

15   Q.  Okay.  Okay.  Interesting.

16       Is that memo still in effect in LFO?

17   A.  Well, it was updated in 2019, I believe, with a

18   different priorities-based queue management memo.

19   Q.  Oh.  When was that?

20   A.  I don't recall the date.  It might have been --

21   November 2019 comes to mind.  I'd have to -- I'm not

22   certain on the exact date, but there have been two of

23   the priorities -- mission priority queue management-type

24   memos that came out.

25   Q.  Okay.  I don't have that 2019 one in front of



Page 90

1    me.  Could you give me, like, a quick rundown of what

2    the differences were between the 2018

3    prioritization-based queue management memo and the 2019

4    version?

5         A.   The -- basically, they had same -- had the same

6    national security enforcement priorities.  It

7    specifically added outbound operations to the

8    enforcement.

9         Q.   To the list of priorities?

10        A.   To the list of priorities, yes.  Well, it -- it

11   combined them, but it still had the, you know,

12   facilitating trade and the legitimate trade and travel.

13   That was really --

14        Q.   Uh-huh.

15        A.   -- the only -- the only difference.

16        Q.   Okay.  So the major edit was that there was one

17   more priority added to the list?

18                MR. NAZAROV:  I'm going to object to form.

19                You can answer to the degree you can or

20   able to.

21        A.   Yeah.  From my recollection, I mean, that's

22   what stands out is they added outbound to the

23   enforcement piece.  You know, they were both -- they

24   were two-page documents that had a lot of stats and

25   whatnot, so --



Page 91

1       Q.   (BY MS. CASSLER)   Uh-huh.

2       A.   -- I don't recall the information off the top

3   of my head.

4       Q.   Okay.  So some of the information may have

5   changed just to be accurate for the time of signing,

6   right?

7                MR. NAZAROV:  I'm going to object to form.

8                You can answer to the degree you're able

9   to.

10      A.   I would presume so, but I'd need to, you know,

11  look at both memos.

12      Q.   (BY MS. CASSLER)   That's fine.  Was the -- you

13  mentioned outbound -- was it outbound travel?

14      A.   Outbound enforcement operations.

15      Q.   Okay.  And was that placed above processing of

16  asylum seekers on the list of priorities?

17               MR. NAZAROV:  Objection, form.

18               You can answer to the degree you're able

19  to.

20      A.   I -- I would say yes, 'cause processing asylum

21  seekers wasn't really on the list of priorities, if you

22  look at the boldfaced bullets of what the priorities

23  are.

24      Q.   (BY MS. CASSLER)   Okay.

25               MS. CASSLER:  Can we take a quick break?





Page 92

```
 1                    MR. NAZAROV:  Absolutely.
 2                    MS. CASSLER:  I just need to find
 3    something.  Okay.  Thanks.
 4                    MR. NAZAROV:  Do you want to take
 5    10 minutes?  15?
 6                    MS. CASSLER:  I think just five minutes
 7    would be fine for me, if that's --
 8                    MR. NAZAROV:  Okay.
 9                    MS. CASSLER:  -- okay with you.  Okay.
10    Let's go off the record and come back at 11:50.
11                    THE WITNESS:  That works for --
12                    MR. NAZAROV:  Mr. Harris, does that work
13    for you?
14                    THE WITNESS:  Oh, that's fine.
15                    MR. NAZAROV:  Okay.
16                    MS. CASSLER:  Thank you so much.
17                    MR. NAZAROV:  Thank you.
18                    THE VIDEOGRAPHER:  We're going off the
19    video record.  The time is 11:45 a.m.
20                    (Break was taken.)
21                    THE VIDEOGRAPHER:  We are back on video
22    record.  This marks the beginning of Media 2.  The time
23    is 11:56 a.m.  Counsel, you may proceed.
24        Q.  (BY MS. CASSLER)  Mr. Harris, you understand
25    that you're under oath still, right?
```



Page 93

```
 1        A.  Yes, I understand.

 2        Q.  Great.  So you previously testified that all

 3   the ports in LFO were instructed to set up their queue

 4   management points at the demarcation line effective

 5   June 8th, 2018, right?

 6        A.  Yes, around that time, June 7th, June 8th,

 7   June 9th.

 8        Q.  All right.  And that was a mandatory order,

 9   right?  All the ports had to do it?

10        A.  That's the way I read it, yes.

11        Q.  Okay.  So it was mandatory.

12             Is -- is it just that you read it that way

13   or it was mandatory?

14        A.  No, there was no other way to interpret that.

15   Yes, the DFO, the field office, was telling the ports to

16   stand up their queue management points at the -- the

17   middle of the bridge, the line of demarcation.

18        Q.  Okay.  Thanks.  And so because it was

19   mandatory, that means they were required to move their

20   queue management points to the demarcation line,

21   regardless of their capacity at that time; is that

22   right?

23             MR. NAZAROV:  Objection, form.

24        A.  Yes.

25        Q.  (BY MS. CASSLER)  Okay.  I'm going to ask you a
```



Page 94

1   few questions about the smaller ports in LFO.  So

2   that's -- I mean Eagle Pass, Progreso, Rio Grande City,

3   Roma, and Del Rio.

4           Do you consider those the smaller ports in

5   LFO?

6       A.  Eagle Pass, sometimes we refer to it as a

7   medium-sized port, but those -- of our eight ports of

8   entry, those would be the smallest, yes.

9       Q.  Okay.  And those five report that --

10          MR. NAZAROV:  Rebecca, I'm just going to

11  have a standing objection just to scope, but I don't

12  want to interrupt your questioning, so it's just going

13  to be standing.  Okay?

14          MS. CASSLER:  Great.  Thanks, Ari.

15      Q.  (BY MS. CASSLER)  So the five ports that I just

16  listed, they were all instructed to funnel asylum

17  seekers to other ports, right?

18      A.  So that instruction was -- that was, you know,

19  an open instruction.  If it needed to be done, then they

20  did have that authority.  And by funneling, what I mean

21  is they could suggest to an asylum seeker that -- or

22  that's, you know, someone, a migrant, at the middle of

23  the bridge who you're referring to as an asylum seeker,

24  I believe --

25      Q.  Yes.



Page 95

1    A.  -- the -- the instruction is, you know, "Okay.

2    You're at Del Rio" -- Roma, wherever it was -- "you're

3    welcome to wait until we have, you know, the resources

4    to process you, or you might get processed quicker at

5    one of the larger ports, such as Laredo."

6    Q.  Oh, okay.

7    A.  That was the --

8    Q.  So --

9    A.  -- that was the way it was instructed.

10   Q.  Okay.  So it was like either meter -- meter or

11   funnel?

12           MR. NAZAROV:  Objection, form.

13   A.  So that's a very simplistic way of saying it.

14   But they were at the limit line, at the line of

15   demarcation, at the middle of the bridge, and if someone

16   were to come up, a migrant, if they didn't have the

17   space, the capacity to bring them in, then, you know,

18   they would tell the person, "Hey, you're welcome to wait

19   here until we have space to process you, or you can try

20   a larger port of entry.  You might get processed

21   quicker."  But no one was ever dissuaded from waiting.

22   No one was ever instructed, "Hey, you have to go to

23   Laredo or Brownsville or Hidalgo or whatever larger port

24   of entry was close by.

25   Q.  (BY MS. CASSLER)  So giving people the



Page 96

1    opportunity to go to another port under funneling, that

2    means that they would have to travel through Mexico to

3    another port city, right?

4                    MR. NAZAROV:  Objection, form.

5        A.  Correct.

6                    THE WITNESS:  Sorry.

7        A.  Go ahead.

8        Q.  (BY MS. CASSLER)  Yeah.  And Mexican cities and

9    states across the river from LFO ports are especially

10   dangerous, right?

11                   MR. NAZAROV:  Objection, form.

12       A.  Especially dangerous?  I'm -- I don't know what

13   you're comparing it to, but it would be -- I would

14   rather travel through the U.S. than through a Mexican

15   city personally.  But, you know, especially dangerous,

16   these, you know, people, these migrants have, you know,

17   come from all over the world in some cases.  So, you

18   know, traveling down the road, I mean, it's --

19   especially dangerous.  I don't know.  Sorry.  I'm having

20   trouble with that.

21                   But I will go ahead and add to that, that

22   from my conversations that -- with the -- the ports,

23   very few people actually decided to do that, if any.  It

24   just didn't happen for a very long period of time

25   either.



Page 97

1    Q.  (BY MS. CASSLER)  Let's go back to "especially

2    dangerous."

3    A.  Sure.

4    Q.  So the State Department has classifications for

5    different countries and states in terms of whether they

6    advise Americans to travel to that location or not.  Are

7    you aware of that?

8    A.  Yes.

9    Q.  And you're probably aware, I'm guessing, of the

10   fact that the state of Tamaulipas is classified as a

11   Level 4.  Did you know that?

12          MR. NAZAROV:  Objection, form.

13   A.  I don't know what their current classification

14   is, but that -- that sounds right.

15   Q.  (BY MS. CASSLER)  Okay.  And a Level 4 is the

16   highest classification, meaning it's the most dangerous,

17   kind of, category of (inaudible) --

18          MR. NAZAROV:  Objection, form.

19   Q.  (BY MS. CASSLER) -- right?

20          MR. NAZAROV:  I'm going to object, form.

21   A.  I don't know if that's the highest or not.

22   Q.  (BY MS. CASSLER)  Would it surprise you to

23   learn that the State Department has officially told

24   Americans not to travel in Tamaulipas?

25   A.  Would that surprise me?



Page 98

1        Q.  Yeah.

2        A.  It wouldn't surprise me, but I can tell you

3   that Americans and legal permanent -- permanent

4   residents travel into Tamaulipas every day and, you

5   know, cross our bridges every day back and forth

6   with -- with no issue, so...

7        Q.  So are you saying that you don't think

8   Tamaulipas is dangerous?

9        A.  Oh, no, I'm not saying that.

10       Q.  So you do think it's a pretty dangerous place?

11            MR. NAZAROV:  Objection, form.

12       A.  Well, yeah, in my personal opinion, I think

13   it's, you know, more dangerous than Texas, but people

14   travel and do business in Tamaulipas and the other, you

15   know, border states on a regular basis.

16       Q.  (BY MS. CASSLER)  So not in your personal

17   capacity but as you're sitting here today as a witness

18   for CBP, CBP -- for all the time period covering this

19   lawsuit, CBP has been aware that Tamaulipas is a Level 4

20   under the State Department classification, right?

21            MR. NAZAROV:  Objection, form.

22       A.  I'll take your word that it's been a Level 4

23   for the entire time.  I don't keep up with what, you

24   know, level of travel advisory particular areas are.

25       Q.  (BY MS. CASSLER)  But you would agree that CBP



Page 99

1    would know about the State Department classifications,

2    whatever they are, right?

3         A.  At Tama- -- yeah, CBP would be aware of

4    the -- the travel classification from the State

5    Department, I would say.

6         Q.  Okay.  So going back to funneling, you -- you

7    said -- I don't think I totally caught it, but

8    there -- the funneling only happened for a short period?

9    Is that what you said?

10        A.  Yes, that's what I said.

11        Q.  Okay.  Could you -- like, when -- sorry.

12             When did funneling start in LFO, and when

13   did it stop?

14        A.  Yeah.  So I wasn't able to locate any reference

15   material on that.  To the best of my recollection, it

16   was a very short period of time, and I don't know that

17   it occurred in more than a few incidents.  Most of

18   the --

19        Q.  Okay.

20        A.  -- time, from general conversations, I recall

21   people saying that if, you know, they did offer that

22   option, the migrants would just prefer to wait there at

23   the bridge they're already at.

24        Q.  All right.  Let's move on.

25             Have you ever personally worked at the



Page 100

1    limit line position?

2        A.   Worked there as -- I've been there.  I have not

3    personally worked at a limit line position, no.

4        Q.   Okay.  But you have been there and observed

5    what happens at the limit line?

6        A.   Yes.

7        Q.   Okay.  At what ports did you observe the limit

8    line?

9        A.   Well, personally observed the limit line at

10   Eagle Pass; Laredo Bridge 1; Laredo Bridge 2, also known

11   as Gateway to the Americas Bridge; and Juárez-Lincoln or

12   Lincoln-Juárez Bridge, here in Laredo.  Personally been

13   to the bridges in Hidalgo, Pharr, Anzalduas, and

14   Hidalgo; been to all port bridges in Brownsville.  I

15   may, at some point, been to the limit line position at

16   Donna International Bridge, which falls under the Port

17   of Progreso --

18       Q.   Uh-huh.

19       A.   -- but I'm not confident on that.

20       Q.   Okay.  That's fine.  You've worked at

21   CBP -- what was it? -- 21 years -- sorry -- customs and

22   CBP together for 21 years; is that right?

23       A.   That sounds about right, yes.

24       Q.   Feel free to correct my math.  So based on

25   those many years of experience, is it your understanding



Page 101

1    that metering is a departure from long-standing CBP

2    practice prior to 2016?

3         A.  Oh, there was definitely a change in how we'd

4    always done things, but, you know, it was really

5    necessitated by the change in migration patterns and

6    the, you know, just overwhelming numbers we were getting

7    back then.

8         Q.  Okay.  That makes sense.  So let's switch to

9    the topic of wait list.  So port person -- I just want

10   to talk through how metering happens.  So port personnel

11   select who to inspect by communicating with somebody

12   keeping a waiting list in Mexico, right?

13        A.  Can you say that one more time, please?

14        Q.  Port personnel select or decide or learn who to

15   inspect by communicating with people keeping a waiting

16   list in Mexico, right?

17        A.  No, that's not correct.

18        Q.  (Inaudible) not correct?

19        A.  Say that again, please.

20        Q.  Could you correct what was incorrect about my

21   statement?

22        A.  Okay.  Can -- can you define what you mean by

23   choose who to inspect?

24        Q.  Yeah.  I don't know what the right verb is

25   there, but port personnel learn who is going to be



Page 102

1    inspected by communicating with people keeping a wait

2    list in Mexico; is that right?

3         A.  No.  No, that's -- that's not correct.  I think

4    you're asking about migrants coming up to a port and how

5    do we encounter those migrants.

6         Q.  Yeah.  Yeah.  And I'm not talking about the

7    interaction at the limit line.  I'm talking about how a

8    migrant goes from being on the waiting list in Mexico to

9    moving into CBP's jurisdiction for processing.  Does

10   that make sense?

11        A.  Yes.

12        Q.  Okay.  I don't know how to totally explain it,

13   so bear with me.

14                Can you tell me in your own words how

15   that -- how CBP encounters a migrant for processing?

16        A.  Well, at some ports of entry, the migrants just

17   walk up to the middle of the bridge, you know, and

18   request to be processed, request to come in.  At some

19   ports, yes, there is -- you mentioned a waiting list.

20   My understanding is there is a waiting list in Mexico,

21   which is at the larger ports of entry, and, yeah,

22   they -- they generally would be -- would be processed in

23   order.  And every port of entry is a little bit

24   different.

25        Q.  Uh-huh.



Page 103

1          A.  So it's nothing that CBP -- this -- you know,

2     the waiting list that -- you called it a waiting list,

3     right?

4          Q.  Yeah.

5          A.  Okay.  So what you're calling a waiting list,

6     it's nothing that CBP manages, nothing that OFO manages.

7          Q.  Got it.  So -- yeah.  Let's just -- I just want

8     to talk about how it works logistically.  So in --

9     we're -- let's only talk about the ports where there is

10    a list.  Okay?  So is it the case that, in some port

11    towns, the list keepers in Mexico are migrant shelter

12    workers?

13         A.  That's my understanding, yes.  In some places,

14    the shelters will -- will maintain the list.

15         Q.  And then, in some places, INM keeps the list,

16    right?

17         A.  That's my understanding, yes.

18         Q.  And then, there may be other town -- well, are

19    there other places where Me- -- other Mexican government

20    entities keep the list?

21         A.  I've heard of in some locations that there's an

22    organization called Grupos Beta that would keep the

23    list, but they're not in our AOR.  So --

24         Q.  Okay.

25         A.  -- for the Laredo Field Office, I'm not aware



Page 104

1    of any other Mexican government entities that would keep

2    a list.

3        Q.  All right.  So it's either INM or a shelter

4    when there's a list?

5        A.  Correct.

6        Q.  Okay.  So I just -- I know there might

7    be -- well, strike that.

8            So the person at the port who's chart --

9    who's job it is to arrange processing, that person will

10   tell the list keeper how many asylum seekers can be

11   inspected on a given day, right?

12           MR. NAZAROV:  Objection.

13       A.  Can you say the whole thing again?  I'm -- I'm

14   sorry.

15       Q.  (BY MS. CASSLER)  Yeah, yeah.

16           So let's say that we're at a port, and

17   they're like, "We're going to process some migrants."

18   There's a person at the port, a CBP employee of some

19   sort -- it might -- the identity might depend on the

20   port, but it will be a CBP employee who will communicate

21   with the list keeper about how many asylum seekers that

22   port is ready to process on a given day, right?

23       A.  Yes.

24           MR. NAZAROV:  Objection, form.

25       Q.  (BY MS. CASSLER)  Your answer --



Page 105

1        A.  Yes.

2        Q.  -- was "yes"?

3             Okay.  And then that list keeper will

4   provide the port information about who's next on the

5   list, right?

6        A.  Not necessarily.  In -- in -- that, again,

7   could vary by port.  In some ports, yes, and other

8   ports, you know, they might just send the number that

9   the port requested to the bridge.

10       Q.  Okay.  And when the list is kept by INM, then

11  INM and CBP coordinate to ensure that those migrants are

12  dropped off at a specified place and time, right?

13       A.  That's a fair statement.

14       Q.  Okay.  And when the list keeper is a shelter or

15  shelter staff, then the shelter and INM and CBP might

16  all communicate to arrange that processing, right?

17       A.  Yes, that's fair as well.

18       Q.  Okay.

19       A.  And I -- can I throw one more potential

20  situation at you?

21       Q.  Please do.

22       A.  Okay.  So the only -- I -- I thought of

23  a -- kind of -- it's a smaller port, but there is --

24  at -- at a point in time in Del Rio, there was a migrant

25  camp fairly close to the border on the -- on the Mexican



Page 106

1  side, and that particular camp kept their own list.  So

2  I don't know if you would consider that a shelter in

3  some respects, but we -- we always referred to it as a

4  migrant camp.  But they would keep -- they would keep

5  their own -- own list at that -- at that particular

6  place.

7        Q.  All right.  So then, there was a point of

8  contact at the migrant camp who would communicate with

9  CBP on the U.S. side about arranging for processing?

10       A.  No.  I believe they would still go through INM

11 and ask for the -- you know, the number of persons for

12 processing.  INM would then liaise with the -- the

13 migrant camp and --

14       Q.  Okay.

15       A.  -- escort over to CBP.

16       Q.  That makes -- thanks for clarifying.

17            You used one acronym, AOR.  What does that

18 mean?

19       A.  Area of responsibility.

20       Q.  Thanks.  All right.  Let's talk a little bit

21 about capacity.

22            So there's no one at CBP who's tasked with

23 calculating operational capacity of a port of entry,

24 right?

25            MR. NAZAROV:  Objection, form.



Page 107

1          A.  What I -- the question I heard was:  There's no

2     one at CBP who's tasked with calculating operational

3     capacity?

4          Q.  (BY MS. CASSLER)  Yeah, for a -- for a given

5     port of entry.

6          A.  Yeah.  No, that's -- we never -- we've never

7     had a calculation for an -- an operational capacity.

8          Q.  Okay.  Do ports report up to headquarters or at

9     least up to LFO management how many asylum seekers they

10    decided to process on any given day?

11         A.  As a matter of business?  As a course of

12    business every day?  No.

13         Q.  Okay.  Do they do it sometimes?

14         A.  No.  That's the port director's day-to-day

15    business that he's managing.  There wouldn't be any

16    reason to report that to the LFO unless there was

17    some -- some anomaly, some issue, something happened

18    during the, you know, during the processing, something

19    out of the ordinary.  But that's just -- you know,

20    processing X number of persons in a day is not something

21    we'd be -- that would be reported up.

22         Q.  Okay.  So we just talked about the wait list

23    process in general terms.  When did ports and LFOs start

24    using that wait list process?

25                   MR. NAZAROV:  Objection, form.



Page 108

1          A.   Okay.  So to, you know, reiterate, ports and

2    the LFO don't maintain a wait list.  We don't use a wait

3    list to determine who we process.  We liaise with an

4    entity in -- in Mexico, you know, and ask for a certain

5    number of persons --

6          Q.   (BY MS. CASSLER)  Yeah.

7          A.   -- a day, and then they, you know, send us

8    people that are presumably on the -- on the --

9          Q.   Yeah.

10         A.   -- wait list.

11         Q.   So that process you just described, when did --

12         A.   Right.

13         Q.   -- that start happening?

14         A.   Okay.  So that would have started to happen, as

15   I mentioned earlier -- give me just one second to

16   silence this phone, please.

17              MS. CASSLER:  Oh, no problem.

18              THE WITNESS:  It's my office phone.  Sorry

19   about that.

20              MS. CASSLER:  That's okay.

21         A.   So I mentioned earlier that after June 2018,

22   when we were doing our queue management at the middle of

23   the bridge, some of the larger ports started seeing

24   larger numbers of people waiting on the bridge on the

25   Mexican side.  So as the Government of Mexico elected to



Page 109

1    not allow these people to wait on the bridge any longer,

2    then that's when that communication would have started

3    to occur.

4         Q.  (BY MS. CASSLER)  How did CBP even know that

5    there were waiting lists?

6         A.  So that would have -- the day-to-day business

7    conversations with our Mexican counterparts.

8         Q.  Yeah.  I mean, that makes sense.

9              And at this point, for the ports that have

10   wait lists, the process is, more or less, similar across

11   the ports, right, in terms of how the wait list works?

12   Like, you talk to INM, you give them a number, and then

13   processing happens; is that right?

14              MR. NAZAROV:  Objection, form.

15        A.  It's -- it's similar, not -- not -- it -- it's

16   going to vary at every port to a certain extent, but in

17   overall, high-level terms, yes.  We request a certain --

18        Q.  (BY MS. CASSLER)  Yeah.

19        A.  -- number of persons either that day, or I

20   think in the case of Hidalgo, they actually request

21   the -- the evening before, late, for the next morning.

22   And, yes, the next morning the -- the migrants will be

23   escorted to the middle of the bridge by INM in most

24   cases.

25        Q.  So that policy -- or -- sorry -- that -- that



Page 110

1    practice that you just described, was that ever

2    mustered?

3         A.  That is -- that practice is not -- is not our

4    policy.  It's not something that we have control over.

5    So we've never put out any sort of a muster telling

6    people this is how the process you've described is

7    go- -- is going to work.  That's something that would be

8    managed at the -- the local level.

9         Q.  Okay.  But all the ports seem to kind of do a

10   similar thing.  We -- we already talked about that,

11   right?

12                   MR. NAZAROV:  Objection, form.

13        A.  Yes, it's similar, and it's -- and what --

14   what's happening in the current state, you know,

15   developed over time.

16        Q.  (BY MS. CASSLER)  Uh-huh.

17        A.  But it was not --

18        Q.  Was there information sharing between ports

19   about best practices on this issue?

20                   MR. NAZAROV:  Objection, form.

21        A.  I would presume so.  Our ports are encouraged,

22   you know, to share information about best practices,

23   whether it be, you know, processing migrants or, you

24   know, narcotics enforcement.  Whatever the mission set

25   is, they're going to share information and best



Page 111

1  practices.  And in some cases, the actual -- I mean,

2  the -- the INM directors in Mexico will cover multiple

3  ports, multiple United States ports, so...

4       Q.  (BY MS. CASSLER)  Uh-huh.  Yeah.  Was this kind

5  of set of practices about the wait list that you

6  described, has it ever been written down?

7       A.  Has it ever been written down?  We've never

8  written it down as sort of a -- you mean like as an SOP,

9  a standard operating procedure, or what do you mean by

10  that?

11       Q.  Yeah.  Or even like a more informal, an e-mail

12  saying, "This is how we're doing it, guys," even just

13  for a specific port.

14       A.  It might have been.  I wouldn't be surprised if

15  it was written down as an informal communiqué or "hey,

16  this is what we're doing" or "this is what INM is

17  doing."  That -- that wouldn't surprise me.  But I can't

18  think of anything right now that -- any written document

19  or anything.  Sorry.

20       Q.  Uh-huh.  LFO has reported that's the way that

21  this wait list process happens.  It's been reported up

22  to CBP headquarters, right?

23            MR. NAZAROV:  Objection, form.

24       A.  Reported up?  I don't recall seeing any sort

25  of -- it -- it might have been, but I don't -- I'm



Page 112

1   trying to recall now making specific reports on how this

2   process works.  It could have been, but I can't -- I

3   don't recall any specific instructing report saying

4   that.

5        Q.  (BY MS. CASSLER)  It could have been discussed

6   in a phone call with CBP headquarters, right?

7        A.  I'm sorry?

8        Q.  It could have been discussed on the phone with

9   CBP headquarters, right?

10            MR. NAZAROV:  Objection, form.

11       A.  It could very well have been, and it wouldn't

12  surprise me if it was.

13       Q.  (BY MS. CASSLER)  Okay.  So you don't have any

14  reason to believe that it wasn't communicated to CBP

15  headquarters, right?

16            MR. NAZAROV:  Objection, form.

17       A.  No, I don't.  That sounds like the sort of

18  thing we would talk about in informal conversation,

19  "Hey, this is what we're doing."

20       Q.  (BY MS. CASSLER)  Uh-huh.  Uh-huh.  Okay.

21  Migrants waiting in Mexico are at risk of deportation

22  from Mexico if they come into contact with INM, right?

23            MR. NAZAROV:  Objection, form.

24       A.  So from -- my understanding is that most

25  migrants -- I'm going to try to answer your question.



Page 113

1    If a migrant is in Mexico legally, then, no, they're

2    not --

3         Q.   (BY MS. CASSLER)   Uh-huh.

4         A.   -- at risk of deportation from INM.   If they

5    are in Mexico illegally, they've never sought, you know,

6    to regula- -- regularize their status in Mexico, they've

7    never requested a permit from INM, they've never

8    requested asylum from the Government of Mexico, they've

9    never tried to follow any legal pathway into Mexico,

10   then -- then, yes, my understanding is they would be at

11   risk of deportation from Mexico.   And most of --

12        Q.   Uh-huh.

13        A.   -- the people that we encounter, I would not

14   say they're at that risk because they do have,

15   generally, some sort of Mexican document --

16        Q.   Uh-huh.

17        A.   -- allowing them to be in Mexico at least

18   temporarily.

19        Q.   Uh-huh.   So, like, the short passes for

20   transiting through Mexico, is that what you're talking

21   about, short-term passes?

22        A.   Yeah.   We've heard the term "transit permit"

23   before.

24        Q.   Yeah.   Okay.

25        A.   We've also --



Page 114

1    Q.  Is it fair to say --

2    A.  -- seen plenty of people that have actual visas

3    to be in Mexico.

4    Q.  Uh-huh.

5    A.  You know, in their passport, they have work

6    visas or tourist visas.  We get people who have --

7    excuse me -- we have people who have asylum paperwork

8    from Mexico.  They requested asylum in Mexico.  But, I

9    mean --

10    Q.  Yeah.

11    A.  -- yes, different pathways that they

12    can -- they can use to be legal in Mexico.

13    Q.  Uh-huh.  Uh-huh.  And we already talked about

14    how the wait list operates.  So is it fair to say that

15    in order to go through that wait list process at all the

16    ports in LFO that have a list that a migrant has to make

17    contact with INM at some point?

18              MR. NAZAROV:  Objection, form.

19    A.  No, I wouldn't say that's a true statement.

20    From my understanding, in at least two of our large

21    ports that shelters maintain the lists, either wholly or

22    in conjunction with INM.

23    Q.  (BY MS. CASSLER)  So does -- does the

24    shelter -- do the shelters in those ports have to work

25    with INM for the actu- -- you know, the handoff of



Page 115

1    people to -- to the U.S. government?

2         A.  So my understanding is yes in Brownsville.

3    That's the process in Hidalgo.  It -- it's kind of yes

4    and no.  Sometimes the shelter director or someone from

5    his staff will bring people directly to the -- to the

6    bridge.  Sometimes INM will bring them.  You know, we're

7    not certain what -- what they have, you know, going on.

8    We think it's just a matter of what -- who's available

9    at the time to give -- you know, escort people to the

10   bridge.

11        Q.  Yeah.  And INM staff the bridge in Hidalgo,

12   right, on the Mexico side?

13        A.  As far as I know, yes.

14        Q.  Okay.

15        A.  I don't think it's a large office, but they

16   should have people, yeah.

17        Q.  Uh-huh.  Before the wait list started, how did

18   ports and LFO determine who to inspect?  I've kind of

19   always wondered this.  Like, if there was metering for a

20   period of time but if people didn't stay on the bridge,

21   there wasn't any way to know who was next in line, was

22   there?

23             MR. NAZAROV:  Objection, form.

24        A.  Yeah.  So my understanding is that Mexico would

25   release people at -- you know, a few at a time, just in



Page 116

1    order not to have a large amount of people congregating

2    on the bridge, but they would let a certain amount of

3    people in.

4        Q.   (BY MS. CASSLER)  And was that --

5        A.   Prior to the construction of the -- you know,

6    the -- the -- a system, for lack of a better word, of

7    the list.

8        Q.   Yeah.  Okay.

9             MS. CASSLER:  So we can take a break now,

10   or I can do another 20 minutes.  What do you prefer?

11            MR. NAZAROV:  How are you feeling,

12   Mr. Harris?  How long do you want to take?  Like

13   45 minutes?  30 minutes?

14            MS. CASSLER:  Yeah.  I don't think we

15   should do longer than that.  We could even do 30,

16   probably.

17            MR. NAZAROV:  Mr. Harris, how are you --

18            THE WITNESS:  No, I'm -- I'm --

19            MR. NAZAROV:  Okay.

20            THE WITNESS:  -- still good to go.

21   Whatever you guys want to do is fine with me, but

22   I'm -- I'm okay.

23            MR. NAZAROV:  I -- I -- I'd be open to a

24   30-minute break, and then, yeah, come back at 2:00

25   Eastern.  That's -- hold on.



Page 117

```
1                    MS. CASSLER:  1:00 Central?

2                    MR. NAZAROV:  1:00 Central.

3                    MS. CASSLER:  Great.  Okay.

4                    MR. NAZAROV:  Okay.

5                    MS. CASSLER:  Have a good lunch, everybody.

6               We can go off the record.

7                    THE VIDEOGRAPHER:  We're going off the

8    video record.  The time is 12:27 p.m.

9                    (Break was taken.)

10                   THE VIDEOGRAPHER:  We're back on the video

11   record.  The time is 1:03 p.m.  Counsel, you may

12   proceed.

13        Q.  (BY MS. CASSLER)  Hi, Mr. Harris.  You

14   understand that you're still under oath, right?

15        A.  Yes.

16        Q.  My video needs to be pinned.  Hold on just a

17   second.  All right.  There we go.

18                   Did you meet with your attorneys during the

19   lunch break?

20        A.  Yes, at the very beginning.

21        Q.  Did you talk about the substance of your

22   testimony during that meeting?

23        A.  Can you repeat that, please?

24        Q.  Did you talk about the substance of your

25   testimony during that meeting?
```



Page 118

1        A.  No.

2        Q.  All right.  Let's look at Exhibit 228, if

3   everybody has that.

4                MR. NAZAROV:  We don't have it yet.

5                MS. CASSLER:  All right.  It should be

6   coming.

7                MR. NAZAROV:  Yeah.  Sorry about that.

8                MS. CASSLER:  No, no, no.  That's okay.

9   Just a hazard of remote depositions.  Thanks for bearing

10  with us.

11               MR. NAZAROV:  Of course.

12               MS. CASSLER:  Are we good to go?

13               MR. NAZAROV:  We still don't have it.

14               MS. RICH:  This is Sarah Rich again.  It

15  was just sent a moment ago.  It may take a second to get

16  through everyone's servers.

17               MR. NAZAROV:  No, no worries.

18               MS. CASSLER:  And what's -- what's showing

19  on the screen is the entirety of it, other than -- I

20  guess, yeah, that's the entirety of the document.

21               MR. NAZAROV:  Mr. Harris, can you see that

22  clearly?

23               THE WITNESS:  Yes, I can.

24               MR. NAZAROV:  Okay.  Do you feel

25  comfortable starting?



Page 119

1                    THE WITNESS:  I do, if that was directed at

2     me.

3                    MR. NAZAROV:  Yes.

4                    MS. CASSLER:  All right.  Let's do it.

5                    MR. NAZAROV:  Yes, let's go ahead and --

6     oh, we just got it.  I'm sorry.  Go ahead.

7                    MS. CASSLER:  Okay.  Wonderful.

8          Q.  (BY MS. CASSLER)  So this is going to be marked

9     as Exhibit 228, and it's a one-page document with Bates

10    No. AOL-DEF-00095894.

11                   This is a queue manage report -- queue

12    management report for LFO dated August 14th, 2018,

13    right?

14         A.  Yes.

15         Q.  These reports are sent daily to CBP management,

16    right?

17         A.  Yes.

18         Q.  And the data for these reports is collected on

19    a daily basis, right?

20         A.  Yes.

21         Q.  And these reports have been sent to CBP

22    management daily for a number of years at this point,

23    right?

24         A.  As of right now, yes, it's been several years.

25         Q.  Okay.  And they started sometime in summer



Page 120

1    2018, right?

2         A.  To the best of my recollection, yes.  There

3    was -- there was an MCAT in -- in prior years that was

4    stood up for a while and then stood down.  I don't

5    remember the exact dates.

6         Q.  Okay.  And this --

7         A.  And I don't remember if this particular report

8    was submitted during those dates, but the -- this

9    isn't --

10        Q.  Okay.

11        A.  -- the first time we've had an MCAT.

12        Q.  Gotcha.  Thanks for clarifying.

13             Can you just state for the record what MCAT

14   is?

15        A.  Well, a CAT is going to be a Crisis Action

16   Team, and it could be stood up for anything.  This time

17   the M should stand for migration, so Migration Crisis

18   Action Team.

19        Q.  What is a Migration Crisis Action Team?

20        A.  I'm sorry?

21        Q.  What is MCAT?

22        A.  What is the MCAT?  From my understanding,

23   it's -- I've never worked on one or been a part of it,

24   but it should be the headquarters group at CBP

25   headquarters that's, I guess, a clearinghouse.  They're



Page 121

1   assembling data for senior leaders at OFO and CBP, kind

2   of the go-between --

3       Q.  Uh-huh.

4       A.  -- between the senior leadership and in the

5   field.

6       Q.  Okay.  And the MCAT, unlike other CATs, MCAT is

7   specifically about migration?

8       A.  Yes.

9       Q.  Okay.  Thanks.  In your experience, if CBP

10  management doesn't find the report useful, they'll ask

11  it to be changed or discontinued, right?

12          MR. NAZAROV:  Objection, form.

13      A.  So not necessarily.  We do a lot of reporting,

14  and sometimes the -- the field does initiate.  Sometimes

15  it's from a port to the field office.  They'll ask us,

16  "Hey, do you guys really need this report anymore?"

17  Sometimes it's from the field office to headquarters,

18  "Do we still need to be sending this?  We've been

19  sending it for, you know, quite a while."  Occasionally,

20  they -- they will -- you know, whatever level will come

21  back or headquarters will come back and say, "You know

22  what, no, you don't need to send this anymore."

23      Q.  (BY MS. CASSLER)  Uh-huh.

24      A.  But it's -- if something's not useful, I

25  wouldn't see a point in -- you know, in continuing it,



Page 122

1    if asked.

2        Q.  Uh-huh.  Yeah.  Does -- did -- did LFO ever ask

3    headquarters, "Hey, do you still need this report?  Can

4    we stop?"

5                MR. NAZAROV:  Objection, form.

6        A.  On that -- that particular one, no, I don't

7    believe so.  I don't think we've ever made that -- that

8    inquiry.

9        Q.  (BY MS. CASSLER)  Okay.  And management -- or

10   headquarters has never said, "Stop giving us that

11   report," right?

12       A.  Not that I'm aware of.  There's been some

13   changes to it, but I do believe it's still required.

14       Q.  Okay.  The fourth column in this table, it says

15   "Percent of Capacity," right?

16       A.  Yes.

17       Q.  And that refers to the percent of each port's

18   temporary holding capacity that's being used on that

19   date, right?

20       A.  Yes.

21       Q.  How does a port determine what its temporary

22   holding capacity is?

23       A.  The temporary holding capacity numbers, where

24   that percentage comes from is based on the number -- the

25   capacity -- the holding capacity, the physical holding



Page 123

1    capacity of the detention cells that would typically be

2    used during the -- the processing of migrants.

3         Q.   Okay.  Yeah.  And that's often referred to as

4    detention capacity too, right?

5         A.   Yeah, that would be the detention capacity,

6    yes.

7         Q.   Okay.  Is that number -- like, is it from,

8    like, a building code, or where did the -- the -- the

9    number for how many people can be hold in a cell come

10   from?

11        A.   Every -- every cell is going to be rated at a

12   maximum capacity.

13        Q.   Uh-huh.

14        A.   That's not saying that we're always able to use

15   it at that maximum --

16        Q.   Right.

17        A.   -- capacity --

18        Q.   Right, right, right.

19        A.   -- but it's -- it -- it would be based on some

20   formula from -- from GSA, yes, with taking into account

21   the fire codes and -- and whatnot.  What exactly that

22   formula is, I don't know.  But when they -- you know,

23   when they build a building and there's a detention cell

24   there, it's going to be rated for --

25        Q.   Uh-huh.



Page 124

1    A. -- maximum number of people as -- at a

2  maximum --

3    Q. Okay.

4    A. -- capacity.

5    Q. So it's a DSA number. That's helpful.

6    A. I would presume. So I don't have -- I've never

7  seen anything that actually says that, but, I mean,

8  your -- your capacity of any building is going to be,

9  you know, based on those construction formulas, as far

10  as I'm aware.

11    Q. Okay. Has the detention capacity at any of the

12  LFO ports changed since 2016?

13    A. Yes.

14    Q. Let just start with the first one in your head

15  and go through and, like, talk about all the changes.

16          So what's one example of a change in

17  detention capacity at LFO?

18    A. Probably the biggest would be the Port of

19  Laredo.

20    Q. How did that change?

21    A. So in Laredo, the two main passenger processing

22  facilities are bridges, Bridge 1, Bridge 2. Gateway to

23  the Americas or Juárez-Lincoln/Lincoln-Juárez have both

24  undergone major reconstruction since 2016 that began in,

25  I believe, the summer of 2016. One bridge was completed



Page 125

1    in April of 2018.  The second bridge was completed in

2    January of 2019, I believe.  I'm sorry.  It's escaping

3    me right now which bridge was the completed construction

4    at first --

5            Q.  That's okay.

6            A.  -- but, you know, during the course of that

7    time, the -- the detention capacity, the holding

8    capacity was changing on a fairly regular basis.

9            Q.  So --

10           A.  The buildings were completely -- Bridge 1 was

11   completely gutted and renovated on the inside.  The

12   outside didn't change.  But the facility at Bridge 2,

13   that was razed completely and rebuilt, so it's --

14           Q.  Oh, wow.

15           A.  -- a complete change.

16           Q.  So setting aside the construction period, like,

17   I know they're -- things were probably changing during

18   construction, but comparing before construction and

19   after construction, did the detention capacity go up or

20   down at those ports?

21           A.  At the Port of Laredo, it -- it went up, I

22   believe.

23           Q.  Okay.  Do you know how much?

24           A.  I think we were reporting ■ prior, at the very

25   beginning of that period, and now we should be reporting



Page 126

1   around ▇.

2        Q.  Okay.  Other than Laredo, what other changes to

3   detention capacity have occurred since 2016?

4        A.  So there were some changes at the very

5   beginning at really all the ports.  We lowered

6   the -- the detention capacity or the holding capacity

7   once we had kind of a better understanding of what we

8   were really being asked to report on, some of the

9   initial reports.

10              And we included, you know, our -- the --

11  the entirety of our holding cell footprint, regardless

12  of whether the cell was in an area that was usable to

13  actually detain people, whether it was in a facility

14  that would process migrants or not, you know, example

15  being the cargo lots, an airport, a railroad.  Over

16  time, we started -- we removed those from the capacity

17  reports because they weren't --

18       Q.  When was --

19       A.  -- our understanding, they weren't really

20  relevant to the question that was being asked, which was

21  "What is your detention, your holding capacity, at the

22  places where you can process migrants?"

23       Q.  When would those have been removed from the

24  detention capacity numbers, roughly?

25       A.  Yeah.  I'm trying to think.  I can't recall



Page 127

1    the -- the dates.

2        Q.  Was it after --

3        A.  I can't recall --

4        Q.  -- these records started being created?

5        A.  I'm sorry?

6        Q.  I didn't mean to talk over you.  What were you

7    saying?

8        A.  I'm saying I can't recall the exact date.

9    I -- I'm sorry.

10       Q.  Oh, that's fine.  I was asking:  Was -- was it

11   after they started requiring this specific report?

12       A.  Yes, I believe so.  But when you say "this

13   specific report," I would say some version of this

14   report because this report has also changed over time.

15       Q.  Okay.  Did this -- sorry if I already asked

16   this.  This queue management report started being

17   required around June 2018; is that right?

18       A.  June 2018?

19       Q.  Uh-huh.

20       A.  That sounds about right.

21       Q.  Okay.

22       A.  I don't remember the exact date, but that

23   sounds about right.

24       Q.  Okay.  So the major changes to detention

25   capacity at LFO ports are -- one, there was construction


MAGNA
LEGAL SERVICES

Page 128

1    at Laredo, and both bridges had their facilities majorly

2    upgraded.  And other than that, there were changes

3    showing up -- we -- we should expect to see changes

4    showing up in the data based on some detention capacity

5    being removed from the data; is that right?

6         A.  Yes.

7         Q.  Yeah.  Okay.

8         A.  Well, our -- like I said, our interpretation of

9    what they were -- what was actually being asked of us.

10   We used to have, you know, some facilities that may have

11   a holding cell there, but they would never be used to

12   actually, you know, hold a migrant.

13        Q.  Why not?

14        A.  Because of their location.  I've got -- you

15   know, going back to Laredo for an example, they have a

16   holding cell at -- I believe they have a holding cell

17   still at -- at the railroad.  There's holding cells at

18   our airports and some of the other, you know, cargo

19   lots.  Well, all of the cargo lots, you're going to have

20   cells, but you're not going to hold a migrant at a cargo

21   lot.

22             We have facilities that are only open part

23   of the day.  They may have a holding cell, which

24   would -- you know, could be included in your number of

25   hold ing cells that a -- you know, a field office report



Page 129

1    has, but a migrant's not going to be held there.  It's

2    just not operational --

3        Q.  And so -- oh, go ahead.

4        A.  No, I'm just saying it's not operationally

5    feasible to hold a migrant in a lot of these locations.

6        Q.  The cells at cargo lots specifically, are those

7    designed to hold people?

8        A.  Yes.

9        Q.  Okay.  Let's look back at this exhibit.  So

10   the -- the column -- it's -- one, two -- it's the fifth

11   column, "Number and Queue at Boundary Line."  That

12   refers to the number of asylum seekers, or, I guess, to

13   use your term, migrants, physically waiting on the

14   bridge on the Mexico side to be processed that day,

15   right?

16       A.  That's how I understand the column, yes.

17       Q.  Who collected that data?

18       A.  I'm sorry?

19       Q.  Who would have collected that data?

20       A.  So the ports of entry, all the ports of entry

21   are going to send that data to the Laredo Operations

22   Center every morning, and then we'll compile it --

23       Q.  Uh-huh.

24       A.  -- send it to OFO.

25       Q.  Okay.  And the "Impact to Port Operations"



Page 130

1  column, that refers to the impact of metering and

2  migrant processing on port operations, right?

3      A.  That's how I would understand it, yes.  I don't

4  think it was ever defined in anything we were ever

5  given.

6      Q.  Okay.  So let's -- I'm looking at the line for

7  Roma where that impact column says "Queue Management

8  Staffing Overtime."  Do you see that?

9      A.  Yes.

10      Q.  So, to me, that means that staffing the limit

11  line at Roma required the port to pay staff overtime.

12  Is that your understanding?

13      A.  That's how I would interpret that, yes.

14      Q.  Okay.  Do you have any reason to believe that's

15  not what the Roma port meant when they filled that in?

16      A.  No.

17      Q.  Okay.  And you're personally involved in

18  overseeing this specific report, right?

19      A.  No.  When it -- when it first came out or when

20  a change came out -- I think when it first came out, I

21  might have disseminated it to the ports, but that's --

22      Q.  Uh-huh.

23      A.  Really, the purpose we have this Laredo

24  Operations Center is so they can collect data from the

25  ports, compile it, and then send it wherever it needs to



Page 131

1    go so that, you know, one of the field office staff

2    doesn't have to do that.

3        Q.  Where are the scopes in the Laredo -- you said

4    Laredo Operations Center?  Is that what you said?

5        A.  Right, Laredo Operations Center, sometimes

6    referred to in messages and conversations as the LOC.

7        Q.  Okay.  Are those folks in your office in

8    Laredo?

9        A.  Yes, they're in the same office building, yeah,

10   same floor.

11       Q.  Cool.  Is there any reason to doubt the

12   accuracy of the data of these queue management reports?

13       A.  In this particular one, I don't -- wouldn't see

14   anything that I would view as being inaccurate.  I have

15   seen some before, it was brought to our attention that

16   the numbers might be a little off, and, you know, we

17   found errors in -- the spreadsheet got corrupted or a

18   copy-and-paste error, something like that.

19       Q.  But those are usually --

20       A.  But overall, I would not -- I'm sorry?

21       Q.  Go ahead.

22       A.  No, I said:  But overall, I mean, it should

23   be -- they're going to report fairly accurately what's

24   reported to them.

25       Q.  Okay.  Let's move on to Exhibit 230.  I'll just



Page 132

1   give Ari a second to get it.

2              MR. NAZAROV:  Yeah, it will be a problem

3   again with that delay.  I'm sure we'll get it anytime.

4      Q.  (BY MS. CASSLER)  So I won't start asking

5   questions until Ari says "go," but just to keep moving,

6   I'm going to say what this is for the record.

7              I'm showing you what will be marked as

8   Exhibit 230.  It's a four-page document with Bates

9   numbers starting at AOL-DEF-00027826.

10             MS. CASSLER:  Have you got it yet, Ari?

11             MR. NAZAROV:  We don't.

12             But, Mr. Harris, can you see it clearly?

13             THE WITNESS:  I can see the -- the first

14  page, yes.

15             MR. NAZAROV:  Okay.

16     Q.  (BY MS. CASSLER)  We're only going to look at

17  the first page.

18             MR. NAZAROV:  Yeah.  So I think everybody

19  can -- I think we're good seeing it, so you can go

20  ahead.

21             MS. CASSLER:  Great.  Thank you.

22             MR. NAZAROV:  Yeah, I'll interrupt -- I'm

23  sorry -- if I don't get it in, like, the next -- I don't

24  know -- three minutes or something.  Go ahead.

25             MS. CASSLER:  Right.  Cool.  Great.



Page 133

1     Thanks.

2          Q.  (BY MS. CASSLER)  So this is a field queue

3     management report from August 14th, 2018, right?

4          A.  Yes.

5          Q.  Okay.  Who created this field queue management

6     report?

7          A.  Who created the original?

8          Q.  Yeah.

9          A.  I'm presuming -- I'm sorry?

10         Q.  Yeah.

11         A.  I'm presuming we got the original template from

12    headquarters.  We might have made some adjustments to

13    it.

14         Q.  Okay.  And then who input the data?

15         A.  Well, once again, anytime I see a report like

16    this, the -- the ports will be inputting the data or

17    sending the data to the LOC, and then the LOC would --

18    would input it.

19         Q.  Okay.  And my understanding -- so this is for

20    the -- from the same date as Exhibit 228 that we just

21    looked at.  My understanding -- which please correct me

22    if it's wrong.  My understanding is that that e-mail we

23    saw that was LFO only is the source of some of the data

24    on this table.  Is that right?

25         A.  Yeah, it looks like several of the columns



Page 134

1    would have been used to populate this one.

2        Q.  Yeah.  And those would be the total in custody,

3    percent capacity, right?

4        A.  Yes.  I'm presuming -- yeah.  I mean, that's

5    what I would -- how I would rate it, yeah.

6        Q.  And the column right after that that says "Do

7    you have any UDAs in line waiting in the Mexi- -- on the

8    Mexico side?  If so -- if yes, how many?" that

9    corresponds to the column in the last exhibit that says:

10   "Number in queue at boundary line."

11            Those are the same -- same thing, right?

12       A.  Right.

13       Q.  What does UDA stand for?

14       A.  I would interpret that as undocumented aliens.

15       Q.  Okay.  And then there's one more column that

16   I -- I'm guessing corresponds between the two.  That's

17   the last column.  In the LFO port, we had a column that

18   said "Impact to Port Operations," and in this exhibit

19   that's up on the screen, 230, we have a column that

20   says:  "What are your issues and/or challenges?"

21            Is it your understanding that those -- the

22   data in that column would be the same?

23       A.  It looks the same to me, yes.

24       Q.  Okay.  So let's move on to Exhibit 231.  And

25   I'll just read for the record what it is and wait to ask



Page 135

1  questions.

2              MR. NAZAROV:  We got the last one, by the

3  way.  I just didn't want to interrupt you.

4              MS. CASSLER:  Oh, thank you.  Good.

5  Q.  (BY MS. CASSLER)  So I'm showing you what will

6  be marked as Exhibit 231 to your deposition.  And this

7  is a multipage Federal Rule of Evidence 1006 summary

8  exhibit, so it's something that we made, and it's titled

9  "Laredo Port of Entry:  Impact to Port Operations,

10 June 17th, 2018-July 15th, 2019."

11             This document summarizes the capacity and

12 impact to port operations portions of the queue

13 management report of the type that we just looked at,

14 and it's specific to Laredo.  So this compiles all the

15 reports that we could find from Laredo that we got in

16 discovery from CBP from the tables that we just talked

17 about.  There are times when we only had LFO or only had

18 the field reports, but as you've testified, those should

19 have the same data in them.  So that's the source of

20 this data.

21             MS. CASSLER:  Did you get it yet, Ari?

22             MR. NAZAROV:  Yeah.  231, yeah, we got it.

23             MS. CASSLER:  Yeah.  Okay.

24 Q.  (BY MS. CASSLER)  So this might be kind of

25 difficult.



Page 136

1         MS. CASSLER:  Kevin, is there any way for
2    Mr. Harris to scroll through this?
3         MAGNA TECH:  Not using the program I'm
4    using to control it.  So he can just tell me when he's
5    done reading, and I can just go to next page for him and
6    through it.
7         MS. CASSLER:  Okay.  Okay.
8    Q.  (BY MS. CASSLER)  I'd like you to scro- -- skim
9    this document and tell me if you see any days where
10   there was an impact to port operations reported.
11        MR. NAZAROV:  I'm just going to object as
12   to form.
13   Q.  (BY MS. CASSLER)  You can go ahead.
14   A.  I think there's a few days where they have the
15   impact to port operations, they have comments about the
16   number of detainees and how many were credible fear
17   applicants.
18   Q.  Okay.
19   A.  Or how many were being processed for credible
20   fear.
21   Q.  Yeah.
22        MAGNA TECH:  That was the complete
23   document.
24   Q.  (BY MS. CASSLER)  All right.  Did you see days
25   where there was a reported impact to port operations



Page 137

1    other than a note stating how many people were detained?

2        A.    No.    There was the notes, commentary on how

3    many people were detained and how many of that number

4    were being processed for credible fear, but other than

5    that, I didn't notice any impacts listed.

6        Q.    Okay.    Let's go to the month of September 2018.

7    So that looks like it's page 3.    So I'd like you to tell

8    me the percent capacity that Laredo was at on

9    September 10th, 2018.

10       A.    10th through the 18th?

11       Q.    No, just September 10th, 2018.

12       A.    Okay.    Well, according to this, that's

13   10 percent.

14       Q.    And then, looking at the whole month of

15   September 2018, Laredo reported that it was at between

16   10 and 44 percent, right?

17       A.    Yes.

18       Q.    And it never went above 44 percent, correct?

19       A.    Not according to this, no.

20       Q.    Okay.

21            MS. CASSLER:    We can put that document

22   away.

23       Q.    (BY MS. CASSLER)    Sorry.    Just a second.    I

24   missed a page.

25            Let's talk about operational capacity.    So



Page 138

1    when did CBP start using the term "operational capacity"

2    in relation to queue management?

3        A.  I would say, from what I recall, maybe as early

4    as June 2018, but I don't have anything that says, you

5    know, "On this date we started using operational

6    capacity," so that's -- that's my recollection.

7        Q.  Okay.  So it was some -- probably sometime

8    around June 2018, right?

9        A.  June 2018?

10       Q.  Yeah.

11       A.  That -- that's -- that's my best estimation,

12   yes.

13       Q.  Let's look at Exhibit 233.  And I'll just read

14   into the record what it is.  It's -- so what will be

15   marked as Exhibit 233 is a one-page e-mail with Bates

16   No. AOL-DEF-00911232.

17              Do you see that e-mail on the screen?

18       A.  Yes.

19              MS. CASSLER:  And Ms. Rich sent it to the

20   government, I'm assuming.

21              MR. NAZAROV:  Yeah, we're waiting.

22              But, Mr. Harris, can you see this okay?

23              THE WITNESS:  Yes, I can.

24              MR. NAZAROV:  Okay.  You can go ahead,

25   Rebecca.



Page 139

 1          MS. CASSLER:  Cool.

 2     Q.  (BY MS. CASSLER)  So this is an e-mail chain

 3  with the top e-mail, so the most recent, an -- it's an

 4  e-mail from Frank Longoria to Bradd Skinner, dated

 5  June 13th, 2018.  Do you see that?

 6     A.  Yes.

 7     Q.  And Mr. Longoria -- we've talked about through

 8  there.  Okay.  Yeah.

 9          So this e-mail is a cover e-mail for

10  sending a draft queue management plan for Laredo, right?

11     A.  That would -- you know, without the attachment,

12  that would appear to be the case.  Yes, this --

13     Q.  Uh-huh.  Uh-huh.

14     A.  -- seems to pertain to that.

15     Q.  So the Laredo Field Office created a queue

16  management plan, right?

17     A.  Yes.

18     Q.  Yeah.  And that was in early 2018; is that

19  correct?

20     A.  In early 2018?  Well --

21     Q.  Or in June 2018.  I'm sorry.

22     A.  Yeah, mid-2018, so June 2018.

23     Q.  Great.  So could you please read out the second

24  line in this e-mail from Frank Longoria?

25     A.  "Do we need to revisit since we have moved from



Page 140

1   'detention capacity' to 'operational capacity'?"

2       Q.  So that's consistent with your thought that

3   operational capacity was a term that CBP started using

4   in June 2018, right?

5       A.  From what I remember, yes.  That appears to be

6   the case.

7       Q.  Uh-huh.  Uh-huh.  Then could you read the next

8   two sentences?

9       A.  "Recommend we send to the ports for their

10  review and comment before we go final.  This way we can

11  have port directors tell us what 'operational capacity'

12  means to them.  What say you?"

13      Q.  Uh-huh.  So I read this e-mail, and I think

14  Frank Longoria and Bradd Skinner don't know what

15  operational capacity means.  Is that --

16              MR. NAZAROV:  Objection, form.

17      Q.  (BY MS. CASSLER)  -- how you read it?

18              MR. NAZAROV:  Objection, form.

19      A.  Okay.  No.  The way I read it is there's not a

20  definition of operational capacity that we were giving,

21  so it would be up to interpretation.  So they wanted to

22  hear what the port directors think it means.  Well,

23  Mr. Longoria --

24      Q.  (BY MS. CASSLER)  Okay.

25      A.  -- wants to hear what the port directors think



Page 141

1    it means -- thinks it means.

2        Q.  Okay.

3        A.  That's how I would interpret it.

4            MS. CASSLER:  Okay.  We can -- okay.  We

5    can put that away.

6        Q.  (BY MS. CASSLER)  Since queue management

7    started, ports in LFO have metered asylum seekers after

8    they cross onto U.S. soil, right?

9            MR. NAZAROV:  Objection, form.

10       A.  They have not --

11       Q.  (BY MS. CASSLER)  What did you say?

12       A.  Talk -- talking to me or to the attorney?

13       Q.  To you, Mr. Harris.  I couldn't hear --

14       A.  Okay.  Yeah.

15       Q.  -- what you said.

16       A.  So, yeah.  No, that has happened in very

17   limited circumstances.  It -- it's -- you know, and we

18   were made aware of the situation, corrective actions

19   were taken.  It was, of course, in accordance with our

20   policy or the EEC's guidance.

21       Q.  Okay.  So you don't --

22       A.  I can't say that it hasn't happened.  It just

23   hasn't happened on a wide scale.  It's been very

24   limited --

25       Q.  Uh-huh.



Page 142

1        A.  -- circumstances or incidents that I'm aware

2   of.

3        Q.  Okay.  So you don't deny that it happened,

4   right?

5        A.  No, I don't, in very, very limited

6   circumstances and specific incidents.

7        Q.  Did it happen at multiple ports of entry?

8        A.  I'm sorry?

9        Q.  Did it happen at more than one port of entry?

10       A.  Yes.

11       Q.  Which ports of entry did it happen at?

12       A.  So I'm aware of Eagle Pass and Laredo.  They

13   both had incidents of what you're describing.

14       Q.  Okay.

15       A.  And it said metered after crossing into the

16   U.S., so I'm presuming that means we actually sent

17   someone back to Mexico.  Is that what you're

18   insinuating?  Okay.

19       Q.  Yeah.

20       A.  Yes.

21       Q.  Yeah.  So you're aware of Eagle Pass and

22   Laredo?

23       A.  Yes.

24       Q.  Is it possible that it happened at other ports

25   and you're not aware of it?



Page 143

1              MR. NAZAROV:  Objection, form.

2      A.  I suppose it's possible.

3      Q.  (BY MS. CASSLER)  Let's look at Exhibit 243.

4  I'll just read what that is.  I'm showing you what will

5  be marked as Exhibit 243.  It's a two-page e-mail with

6  Bates numbers starting at AOL-DEF-00909668.

7              Can you see that e-mail?

8      A.  Yes.  It's a little fuzzy, but I can see it.

9      Q.  Okay.  Yeah.  This one's hard to read.

10             MS. CASSLER:  Ari, have you gotten it?  Are

11  you okay with going --

12             MR. NAZAROV:  We have not.  We have not.

13             Mr. Harris, has it become less fuzzy since

14  Kevin kind of blew it up?

15             THE WITNESS:  It's not as sharp as

16  the -- the other exhibits, but it -- it's -- it's

17  legible.  It's...

18             MR. NAZAROV:  You're able to read it?

19             THE WITNESS:  Yeah.  I'm trying to read it

20  now.

21             MR. NAZAROV:  Okay.

22             MS. CASSLER:  Okay.

23      Q.  (BY MS. CASSLER)  So let's go to --

24             MR. NAZAROV:  Are you --

25      Q.  (BY MS. CASSLER)  -- the second --



Page 144

```
 1                    MS. CASSLER:  Oh, I'm sorry.  What did you
 2      say, Ari?
 3                    MR. NAZAROV:  Yeah.  We haven't gotten it,
 4      but if we can read it and I can read most of it and
 5      if -- if Kevin highlights it, you can go ahead.
 6                    MS. CASSLER:  Okay.  And it should be on
 7      its way to you, so...
 8                    Let's go to the second page.
 9                    MR. NAZAROV:  Received.  Received.
10                    MS. CASSLER:  Great.  Great.
11                    Thank you, Kevin.
12         Q.  (BY MS. CASSLER)  So there, we've got a
13      situational awareness report from the Hidalgo Port of
14      Entry, right?
15         A.  Yes.
16         Q.  And is it fair to summarize this as a report
17      about a circumventer arriving in a taxi at Hidalgo?
18         A.  Yes.
19         Q.  Okay.  So that person was in a car, and the car
20      crossed the international boundary, right?
21         A.  Yes.
22         Q.  And that person didn't have entry documents,
23      correct?
24         A.  Yes, that appears to be what happened.
25         Q.  Okay.  And the last sentence, I'm going to read
```



Page 145

1    it.  It says:  "Cuban nationals were directed to the

2    Hidalgo queue station to await processing."

3                 Is that right?

4        A.  Yes.

5        Q.  And the Cuban nationals are the migrants

6    referred to, the migrants who didn't have entry

7    documents, right?

8        A.  Correct.

9        Q.  And what's the Hidalgo queue station?

10       A.  That would have been the -- the queue

11   management point at the middle of the bridge.

12       Q.  Okay.  So going -- well, let's just stay there.

13                So this is an example of metering happening

14   to someone on U.S. soil on Hidalgo, right?

15       A.  Yes, that's -- that's exactly what this is.

16       Q.  And you testified that you were aware of Eagle

17   Pass and Laredo, right?

18       A.  Yes.

19       Q.  So tho- -- you were aware of those two ports

20   having incidents were someone was metered after crossing

21   into U.S. territory --

22       A.  Yes.

23       Q.  -- right?

24                Have you seen this e-mail before?

25       A.  Evidently I have.  I'm -- I'm copied on there.



Page 146

1      Q.  Ah.  Yeah.  I mean, I know you get a lot

2  e-mail --

3      A.  Yeah.

4      Q.  -- because I've read a lot of it.

5          So is it possible that there could be other

6  instances where someone was metered after crossing onto

7  U.S. soil that you don't remember?

8      A.  Yes, that's -- that's possible.  This is --

9      Q.  Is it --

10     A.  -- an example.

11     Q.  Yeah.  Is it possible that there are other

12 instances of someone being metered after crossing onto

13 U.S. territory that were never reported to you?

14     A.  That would be possible as well.

15     Q.  All right.

16         MS. CASSLER:  We can put that document

17 away.

18     Q.  (BY MS. CASSLER)  Is it your testimony that

19 port staff have discretion to determine how many asylum

20 seekers to process on a given day?

21     A.  What was the first part of that question?

22     Q.  Is it your testimony that port staff have

23 discretion to decide how many asylum seekers to process

24 on a given day?

25         MR. NAZAROV:  Objection, form.



Page 147

1    A.  Well, ultimately, it would be the port

2    director, but, yes, the port has that discretion.

3        Q.  (BY MS. CASSLER)  Okay.  Yeah.  So it's a

4    port-level decision?  That's what I'm getting at.

5        A.  Yes.

6        Q.  Okay.  So if the port staff decided to inspect

7    no asylum seekers at all on a given day, is that

8    something that there would be consequences for from CBP

9    headquarters?

10           MR. NAZAROV:  Objection, form.

11       A.  Consequences, no.

12       Q.  (BY MS. CASSLER)  Okay.  What if port staff

13   decided to remove the limit line position and not meter

14   at all?  Would there be consequences for that?

15           MR. NAZAROV:  Objection, form.

16       A.  There would not be consequences, but the

17   port -- the port director -- no, there would not be

18   consequences for -- for that.

19       Q.  (BY MS. CASSLER)  What would happen if a port

20   decided to remove the limit line position and stop

21   metering altogether?

22       A.  I don't -- the port would not do that without

23   consulting with the field office.  The port director

24   wouldn't take an action like that without discussing it

25   with the DFO.



Page 148

1      Q.  Uh-huh.  So are you essentially saying that the

2  port director would need permission to do that?

3      A.  I'm sorry?

4      Q.  Would the port essentially need permission to

5  do that?

6      A.  I wouldn't --

7           MR. NAZAROV:  Objection, form.

8      A.  -- say permission.  In -- so some of our ports

9  have queue management points 24/7 at some of their

10  bridges, and some of them don't.  Some of them staff

11  them as needed.

12      Q.  (BY MS. CASSLER)  Okay.

13      A.  So if it's one of those as-needed type of

14  things, then they wouldn't necessarily need permission.

15  If it's, you know, a bridge like Hidalgo where we've had

16  a lot of incidents in the past, you know, has heavy

17  traffic with migrants, I just don't see a port director

18  removing that queue point without discussing it with the

19  DFO first and, you know, making him aware of his

20  reasoning for doing that.  And I don't see why a port

21  director would remove a -- a queue point at this point

22  at -- at any of those bridges.  I can't see a valid, you

23  know, business reason to do so.

24      Q.  Okay.  And we previously discussed how the

25  order to move the queue point to the demarcation line



Page 149

1    from June 2018 -- how that was mandatory, right?

2        A.  Yes.

3        Q.  Okay.  Is it still mandatory to keep the limit

4    line position there?

5        A.  At the line of demarcation, midbridge, yes.

6        Q.  Okay.  Has CBP headquarters ever set a target

7    number of asylum seekers who should be processed on a

8    given day?

9        A.  Not that I'm aware of.

10       Q.  And doing so wouldn't really make sense, right?

11            MR. NAZAROV:  Objection, form.

12       Q.  (BY MS. CASSLER)  Like, that number -- I'll

13   restate that.

14            The number is supposed to be based on

15   port-specific conditions, right?

16       A.  Yes.

17       Q.  Yeah.  Similarly, has CBP headquarters ever set

18   a percentage of asylum seekers who should be processed

19   on a given day at any port?

20       A.  Can you restate that question, please?

21       Q.  Yeah.

22            Has CBP headquarters ever set a percentage,

23   for example, a percent of capacity space, that should be

24   filled or that would indicate how many people should be

25   processed on a given day?



Page 150

1      A.  No.

2      Q.  Doing so -- just like setting a number, doing

3  so wouldn't really make sense because processing is

4  supposed to be based on port conditions, right?

5      A.  Yes.

6      Q.  Okay.  So I'm showing you Exhibit 234, what

7  will be marked as Exhibit 234.  It's a three-page

8  document with Bates numbers starting at

9  AOL-DEF-01037408.

10          MR. NAZAROV:  Rebecca, we're just still

11  waiting on it.

12          MS. CASSLER:  No problem.  Give it a

13  minute.

14          And, Kevin, we're just going to look at the

15  top e-mail, so you can zoom in to the top e-mail.

16      Q.  (BY MS. CASSLER)  And just for the record, this

17  is an e-mail dated July 6th, 2018, from Bradd Skinner to

18  David Higgerson.

19          And can you tell me how to pronounce the

20  last name of Ryan Koseor?

21      A.  No.  I would -- I remember the name, but I

22  would say Koseor.  I'm not certain.

23      Q.  Okay.  We'll just do that.  All right.

24          MS. CASSLER:  Ari, have you gotten it?

25          MR. NAZAROV:  Yeah.  We're good.  We got



Page 151

 1    it.

 2                MS. CASSLER:  All right.

 3                MR. NAZAROV:  Thank you.

 4        Q.  (BY MS. CASSLER)  So this e-mail discusses Ryan

 5    Koseor, who was the deputy commander for the MCAT at the

 6    time, right?

 7                MR. NAZAROV:  Objection, form.

 8        A.  I don't recall what his position was, but

 9    I'll -- I'll take your word for it, yeah.

10        Q.  (BY MS. CASSLER)  Okay.  I'm going to read the

11    first sentence of this e-mail, which says:  "Sir, just

12    fyi I spoke with Ryan Koseor earlier today and he

13    relayed headquarters standing down for now on developing

14    the queue management metrics, good news."

15                Did I read that right?

16        A.  Yes.

17        Q.  And so he's relaying -- Bradd Skinner is

18    relaying to David Higgerson some information from

19    headquarters, right?

20        A.  Yes.

21        Q.  Okay.  So now I'm going to read the third

22    sentence.  It says:  "The view is that we s/b" -- which

23    I think means should be -- "processing up to 70 percent

24    of detention/holding capacity, depending on -- depending

25    upon what is coming at us on any given day."



Page 152

1          Did I read that right?  I stumbled a little

2    bit.

3          A.  Yeah.  The "s/b," we should be or we southwest

4    border.  I don't know what it -- what it means, but what

5    you're saying makes sense, yeah.

6          Q.  Okay.  So Ryan Koseor is telling or told Bradd

7    Skinner, according to this e-mail, that ports should be

8    processing up to 70 percent of their detention capacity,

9    right?

10         A.  Well --

11              MR. NAZAROV:  Objection, form.

12         A.  Can you say that one more time, please?

13         Q.  (BY MS. CASSLER)  Yeah.

14              So when I read this e-mail, it looks to me

15   like Bradd Skinner is reporting to David Higgerson that

16   Ryan Koseor said ports should be processing up to

17   70 percent of detention/holding capacity.

18              MR. NAZAROV:  Objection, form.

19         Q.  (BY MS. CASSLER)  Is that accurate?

20         A.  I would not interpret it quite that way.  So

21   he's not -- I don't see anything that actually -- where

22   Ryan Koseor is telling Bradd Skinner to do that.  He's

23   telling him that the view is that this is what should be

24   done.  There's a --

25         Q.  Uh-huh.  Uh-huh.



Page 153

1        A.   -- a difference there between --

2        Q.   That's fair.

3        A.   -- direction and what we think you should be

4    doing.

5        Q.   That's fair.  So do you read that to mean the

6    view of headquarters?

7             MR. NAZAROV:  Objection, form.

8        A.   Can I read it to you in the view of

9    headquarters?

10       Q.   (BY MS. CASSLER)  When he says "the view is,"

11   whose view is that?

12       A.   I would presume it would be CBP headquarters.

13       Q.   Okay.  Was that view ever mustered to

14   port-level staff?

15            MR. NAZAROV:  Objection, form.

16       A.   Not that I'm aware of.

17       Q.   (BY MS. CASSLER)  Have you ever heard

18   of -- never mind.

19            Let's go back to Exhibit 231.  This is the

20   Laredo summary exhibit that we created based on queue

21   management reports from June 17th, 2018, to July 15th,

22   2019.  I'm going to ask Kevin to scroll through it again

23   like he did last time, and I want you to look and see if

24   there are any days where capacity was over 70 percent.

25       A.   Go ahead.  Go ahead, please.  Slow down.  Go



Page 154

 1    back up one page, please.  Okay.  You can -- you can

 2    scroll, please.  Scroll, please.  You can scroll,

 3    please.  Okay.  You can scroll, please.  You can scroll

 4    please.  Okay.  Scroll, please.  Please scroll.  Please

 5    scroll.  Please scroll.  So I guess page 14 is the end

 6    of the document.  I don't see any days that were over

 7    70 percent.

 8        Q.  And I'm just going to -- instead of making you

 9    scroll through this again, I'm just going to tell you

10    there's one day where it was at 70 percent, and that's

11    June 19th, 2018.  Do you have any reason to --

12        A.  Yeah, I saw --

13        Q.  -- doubt that?

14        A.  I see that.

15        Q.  Yeah.  Okay.  Seems like -- I mean, after

16    looking at this exhibit, do you -- do you question

17    whether perhaps that 70 percent guideline for how many

18    to process might have been communicated to ports?

19            MR. NAZAROV:  Objection, form.

20        A.  Yeah.  So after looking at this exhibit, does

21    it make me believe that the guideline may have been

22    communicated to the ports?  No, I don't believe so

23    because there were -- there was one day that was

24    70 percent and a couple of days that were in the high

25    60s.  Other than that, nowhere was -- I didn't see



Page 155

1    anywhere that was, you know, in that -- in that range.

2        Q.   (BY MS. CASSLER)   Laredo was metering during

3    this time period, right?

4        A.   June 2018 to '19, yes.

5        Q.   Okay.  So Laredo was metering, and they never

6    filled their detention space up to more than 70 percent

7    of detention capacity as CBP defines it, right?

8        A.   Well, based on this report, yes, that's --

9        Q.   Okay.

10       A.   -- more than likely correct, but not

11   necessarily the case because you still haven't really

12   captured what this report is showing.

13       Q.   This report is just taken from the queue

14   management reports, right?

15       A.   Right.  And we -- we never really defined what

16   that port is show -- what that report is showing.  And

17   that report is showing a particular moment in time when

18   those stats are captured.  It's not --

19       Q.   Okay.  Got it.

20       A.   -- showing what happened the other 23 hours of

21   the day.  So at that --

22       Q.   Got it.

23       A.   -- 10:00 o'clock in the morning when the port

24   sent us their -- their data, that's what was happening

25   at the port right then.  That was --



Page 156

1       Q.  Okay.

2       A.  -- precisely at 10:00 o'clock in the morning

3   or, you know, whatever the cutoff time was.  I -- I

4   believe it's 10:00 o'clock for the -- the queue

5   management report.

6       Q.  Okay.  That's fair.  So it's not capturing what

7   was happening at 2:00 p.m.  I hear that.  That makes

8   sense.

9               MR. NAZAROV:  Objection, form.

10              MS. CASSLER:  Let's put that away.

11      Q.  (BY MS. CASSLER)  Just a second.

12              So you're familiar with LFO's mass

13  migration contingency plans, right?

14      A.  Yes.

15      Q.  Yeah.  I don't -- I'm not going to introduce

16  one because it's already been produced.  I don't think

17  there's a lot to discuss in there, but if you feel the

18  need to see one, we can introduce one.

19              So LFO created -- started creating those

20  plans in 2016, right?

21      A.  No.

22      Q.  No?

23              When did they start creating the

24  contingency plans?

25      A.  The first -- first one I saw, I believe, was



Page 157

1    dated 2009 or 2010.

2        Q.  Oh, yeah.  Got it.  Thanks.  And those

3    contingency plans set out plans for how to expand

4    asylum-seeker processing capacity in the event of mass

5    migration or sustained migration, correct?

6        A.  Not necessarily asylum seekers, just processing

7    in general due to some emergent event, yes.

8        Q.  Okay.

9        A.  But the -- yeah, but the --

10        Q.  But there are other --

11        A.  -- goal was to be able to expand the process

12    and capacity quickly.

13        Q.  Okay.  Has there ever been a mass migration or

14    sustained migration big enough to trigger the

15    application of Laredo's or LFO's mass migration

16    contingency plan since 2016?

17        A.  Since 2016 you said?

18        Q.  Yeah.

19        A.  No, not that I'm aware of.  And I would argue

20    that it's not necessarily meant for a sustained

21    migration, depending on the length of -- of time we're

22    talking about a sustained migration being.

23        Q.  Okay.  You're aware that the plans use the term

24    "sustained migration," right?

25        A.  Yes, yes.



Page 158

1      Q.  Okay.  So is your testimony that they're not

2   actually meant for a sustained migration?

3      A.  Well, it depends on how you're using -- how

4   long of a period of time you mean by sustained.  For

5   multiple years, no.

6      Q.  Uh-huh.

7      A.  That's not what it's meant for.  Primarily

8   meant for an emergent, short-term -- short-term -- a

9   sustained amount of -- a short-term migration, people

10  showing up, you know, over a period of days or weeks --

11     Q.  Uh-huh.

12     A.  -- that's what I believe was meant by

13  sustained.

14     Q.  Yeah.  So --

15     A.  We're not talking about years.

16     Q.  When there's a spike in migration, you won't

17  actually know how long it's going to last until after

18  the fact, right?

19           MR. NAZAROV:  Objection, form.

20     A.  True.  We, you know, can forecast on

21  intelligence and whatnot, but -- but, yeah.

22     Q.  (BY MS. CASSLER)  Uh-huh.  Uh-huh.  So your

23  testimony today as CBP's 30(b)(6) deponent is that there

24  have not been a mass migration or a sustained migration

25  since 2016 big enough to trigger the application of



Page 159

1    LFO's staff migration contingency plan; is that right?

2        A.  The entire plan, no.  Certain -- certain

3    elements that you might find in it, such as, you know,

4    ████████████████████████████████████████████████████

5    ███████████  I mean, that happens, but that's, you know,

6    something that was worked out locally.  But the

7    actual --

8        Q.  Uh-huh.

9        A.  -- no, a DFO, to my knowledge, has never said

10   we are enacting the LFO's mass migration contingency

11   plan across the LFO, no.

12       Q.  Okay.

13               MR. NAZAROV:  Um --

14               MS. CASSLER:  Go ahead.

15               MR. NAZAROV:  Rebecca, I'm sorry to jump

16   in.

17               Mr. Harris, do you need a little break?

18               MS. CASSLER:  It's been an hour.  We can

19   break.

20               MR. NAZAROV:  It's up to you, sir.

21       A.  No.  I think --

22       Q.  (BY MS. CASSLER)  Yeah.

23       A.  -- I'm okay for a little while longer.

24               MR. NAZAROV:  Okay.

25       Q.  (BY MS. CASSLER)  Okay.  You just say the word



Page 160

1    when you want a break.

2         A.  Okay.  Thanks.

3              THE VIDEOGRAPHER:  Rebecca -- sorry -- this

4    is Noah.  Is it possible for you just to tilt your

5    webcam down just a little bit?  The video was starting

6    to get cut off around your chin.  Or if you're able to

7    just stand back slightly.  Thank you.  Yeah, that's

8    great.

9              MS. CASSLER:  Let me -- that's good?

10             THE VIDEOGRAPHER:  Yeah, that's good on my

11   end.

12             MS. CASSLER:  Cool.  Thanks.  Sorry about

13   that.

14        Q.  (BY MS. CASSLER)  So changing topics.  It's

15   true that CBP has the authority to release noncitizens

16   without travel documents directly from a POE, right?

17             MR. NAZAROV:  Objection, form.

18        A.  If we have to, after, you know, exhausting

19   other options, yes, we can do that.

20        Q.  (BY MS. CASSLER)  Okay.  So the fact that you

21   can do it, to me, means that you have the power to do

22   it; is that right?

23             MR. NAZAROV:  Objection, form.

24        A.  In certain instances, yes.

25        Q.  (BY MS. CASSLER)  Okay.  And what term would



Page 161

1    you use to describe that?  Is it parole?

2         A.  Yes.

3         Q.  Okay.  And if an asylum seeker or migrant is

4    paroled after coming in at a port of entry, would that

5    person always be given an NTA?

6              MR. NAZAROV:  Objection, scope.

7         A.  Would they always be given an NTA?  I believe

8    so, yes.  I'm trying to think of situations and -- and

9    whatnot, but I believe so.

10        Q.  (BY MS. CASSLER)  Okay.  Is it possible that

11   someone could be processed for expedited

12   removal/credible fear and then paroled from the port?

13             MR. NAZAROV:  Objection, form.

14        A.  Right.  So the expedited removal -- expedited

15   removal/credible fear is generally going to require

16   detention.  So if we were unable to have any other sort

17   of processing, you know, for whatever reason, if it's an

18   emergent medical condition or something, that should

19   probably be switched to an NTA before the parole is

20   done --

21        Q.  (BY MS. CASSLER)  Okay.

22        A.  -- is my understanding.

23        Q.  Okay.  Let me just find my exhibit.  Let's look

24   at Exhibit 239, which I don't think has been sent yet,

25   so I'll just read in what it is.



Page 162

1          Exhibit 230 -- or what will be marked as

2    Exhibit 239 is a five-page document beginning with Bates

3    No. AOL-DEF-00060248.  And we're just going to be

4    looking at the first page of this document.

5          MR. NAZAROV:  Mr. Harris, are you able to

6    see it clearly?

7          THE WITNESS:  Yes.

8          MS. CASSLER:  And it is coming by e-mail.

9          MR. NAZAROV:  Thank you.

10   Q.  (BY MS. CASSLER)  So this is an e-mail written

11   by you, Rodney Harris, and sent to a number of LFO port

12   personnel, right?

13   A.  Yes.

14   Q.  And it's dated February 23rd, 2018.  Do you see

15   that?

16   A.  Yes.

17   Q.  Okay.  Do you need a minute to review this

18   e-mail, or do you kind of -- is it fresh enough for you

19   to --

20   A.  I reviewed the first page.  It should be our

21   cover guidance and with the headquarter's guidance down

22   below are attached.

23   Q.  Uh-huh.  Uh-huh.

24   A.  I think that's inadmissible aliens with medical

25   conditions and family units to -- that come from OFO



Page 163

1    headquarters.

2        Q.  Uh-huh.  So your first sentence here, I'm just

3    going to read it out in this e-mail.  It says:  "As a

4    reminder, inadmissible aliens should only be released

5    from the ports under very limited circumstances."

6              Did I read that right?

7        A.  Yes.

8        Q.  Okay.  And this is not just referring to people

9    with medical conditions, right?

10       A.  Medical emergency would be one of the very

11   limited circumstances, yes, but not just --

12       Q.  Got it.

13       A.  -- no.

14       Q.  Got it.  Okay.  So below that, there are steps

15   with five bullet points laid out, and those are -- I'll

16   just read them:  "Process" -- first bullet:  "Process

17   for ER-C" -- or F -- I'm getting tired -- bullet:

18   "Process for ER/CF with mandatory detention."

19              The second bullet is:  "Request

20   placement/bed space from ERO."

21              The third bullet is:  "Receive ERO's denial

22   in writing (e-mail)."

23              The fourth bullet is:  "Convert case to

24   NTA - detained."

25              And the fifth is:  "Remand to ICE-ERO for



Page 164

1    detention."

2              Did I read that right --

3         A.  Yes.

4         Q.  -- basically?

5         A.  Yes.

6         Q.  Okay.  So are those bullet points -- these are

7    bullet points for releasing people other than in limited

8    circumstances, like medical conditions, right?

9         A.  Give me one second, please, to silence my phone

10   again.

11        Q.  Sure.

12        A.  Sorry about that.

13        Q.  That's okay.

14        A.  Okay.  So can you repeat your last question?  I

15   apologize.

16        Q.  Yeah.

17              So your first sentence lays out the idea

18   that there are certain limited circumstances where

19   release from the port might be permitted for things like

20   medical reasons, right?

21        A.  Yes.

22        Q.  And then, below that, there are bullet points.

23   And my question is:  Those bullet points aren't about

24   that -- those limited circumstances, like medical

25   conditions, right?



Page 165

1      A.  Okay.  No.

2      Q.  These are for other peop- -- just the normal

3  case; is that right?

4      A.  So this e-mail is still not about releasing

5  people out of port of entry.  This is about making it

6  quicker, less burdensome on ICE to turn custody over to

7  them so that ICE could then make the parole.  ICE could

8  then --

9      Q.  Okay.

10     A.  -- you know, make the parole.

11     Q.  Okay.  So is the process laid out in these

12  bullet points still in place in LFO?

13     A.  Sorry.  So that would -- it is still generally

14  the case, yes.

15     Q.  Okay.

16     A.  We -- we were getting some guidance at one

17  point from headquarters that we didn't necessarily have

18  to have a denial for each and every case of custody

19  detention if we knew that -- let's say whatever category

20  this person or family fit into, if we already knew that

21  ICE had already issued a -- a blanket detention denial,

22  then we wouldn't have to go through the steps, but most

23  ports would -- would still do that.

24          Some of the higher-volume ports, you know,

25  might go straight to -- might not wait for that specific



Page 166

1    e-mail, but they would attach a blanket denial from ICE

2    they had received, you know, that day or the week

3    previous or something along those lines prior to

4    whenever the case was being processed.

5        Q.  Is that --

6        A.  But it's generally --

7        Q.  -- still happening?

8        A.  -- still occurring.  Sorry.

9        Q.  Sorry.  It's really hard for me to see you with

10   the document up.  I'm so sorry.  Go ahead.

11           But you -- I think you were about to say

12   it's generally still applicable across LFO today.

13           MR. NAZAROV:  Objection, form.

14       A.  Yeah.  So since this came out in 2018, we have

15   other -- you know, other programs that we might look at

16   other than simply turning someone over to ERO for

17   detention.  But if the course -- the best course of

18   action was determined to be they needed to be turned

19   over to ERO for detention, then, in that case, this is

20   the step that would be -- would be followed generally,

21   yes.

22       Q.  (BY MS. CASSLER)  Okay.  And you were

23   about -- I think you were explaining that there was a

24   period of time when headquarters said that you might not

25   need a denial for each and every person if there was a



Page 167

1    blanket denial; is that right?

2         A.  Yes, correct.  Yes.

3         Q.  Is that still the case?

4         A.  That guidance, I don't believe has been

5    rescinded.  But with -- but whether or not an ERO can

6    take people into custody, that's always been depending

7    on their -- you know, their -- their current holding

8    capacity, their -- how many beds they have available in

9    different areas, and what, you know, type of custody

10   facility it is.  So there's -- there's always been an

11   ebb and flow.

12        Q.  Uh-huh.

13        A.  You know, most recently, that has -- that's

14   been less of an issue than it was during this time

15   period.

16        Q.  Okay.  So these five steps, this -- these

17   instructions, did they come from headquarters?

18        A.  That's probably my copy-and-paste from a

19   previous e-mail that was sent out by one of our

20   admissibility program managers or Mr. Longoria, or it

21   could have come directly from a headquarters e-mail, but

22   those are -- it's kind of a -- a synopsis, salient, you

23   know, the bullet points of the -- whatever the e-mail

24   was or whatever the guidance was saying we should do.

25        Q.  Okay.  So this is a boiled-down version of what



Page 168

1    headquarters has directed?

2        A.  Yeah.  It's the -- you know, the main points

3    extracted from whatever it came from.

4        Q.  Yeah, that makes sense.  Do you know -- hmm.

5            When did headquarters adopt this procedure?

6            MR. NAZAROV:  Objection, form.

7        A.  I don't know.  I can't recall.  It would have

8    been whenever that -- the -- the memo muster and the

9    title came out.

10       Q.  (BY MS. CASSLER)  Uh-huh.  So there was a time

11   where this procedure wasn't the procedure followed for

12   transferring folks to ICE, right?

13       A.  Can you repeat that, please?  You kind of got

14   very low there.

15       Q.  So there was a time where this wasn't the

16   procedure, right?

17       A.  Where there was or wasn't?

18       Q.  Was not.

19       A.  I would presume, yes.  If they made it a point

20   to send this out, "this is the procedure," then, yes,

21   prior to that, it would have been something slightly

22   different probably, but I can't -- I don't recall what

23   that -- what that would have been.

24       Q.  Okay.  Let's talk about the bullets

25   specifically.  So that first bullet, CBP processes the



Page 169

1    person for ERCS, how long does that take?

2        A.  In 20 -- so really easy case, no issues, very

3    experienced processor, I've been told two to three

4    hours.  Lately, I've been told it takes up to four hours

5    to process the case.  When you start talking about

6    people who have prior immigration history in the U.S.,

7    if they have criminal history, if it appears they have

8    criminal history in their home country --

9        Q.  Uh-huh.

10       A.  -- if they have a -- those will be the main

11   points, but, you know, that can cause a case to take

12   longer.

13       Q.  What's longer?  How many hours?

14       A.  Sometimes -- if we're talking about somebody

15   with criminal or immigration history, we have to request

16   documents, we have to request judgments, and we can't

17   get it online, it can take up to days if we have to

18   request hard copies of, you know, documents.

19       Q.  Okay.

20       A.  It can also take longer if it's a language

21   other than Spanish.  We have to get a translation

22   service.  It can take significantly longer.

23       Q.  Uh-huh.  Uh-huh.  So after that, CBP --

24   according to these bullets, CBP sends a request in

25   writing to ERO for bed space and then waits for ERO to



Page 170

1    respond, right?

2         A.  Yes.

3         Q.  How long does it take for ERO to respond on

4    average?

5         A.  Anywhere from -- sometimes the response is

6    immediate.  If they don't get a response back pretty

7    quickly, they're going to, you know, resend or -- or

8    call and say, "Hey, we sent you this placement request.

9    Can -- can you look for it?"

10                  I'm sorry.  I think this is a -- don't know

11   what this number is.

12        Q.  I'm sorry?

13        A.  But it shouldn't take more than, I would say, a

14   few hours.

15        Q.  Okay.

16        A.  And generally less.

17        Q.  Uh-huh.

18        A.  Sometimes the --

19        Q.  And then after --

20        A.  -- response will be -- I'm sorry?

21        Q.  Go ahead.  Go ahead.

22        A.  Sometimes the response will be, "Please

23   resubmit your request" in -- you know, the port shift or

24   the fourth shift or whatever the next shift is.  So then

25   we would be waiting to resubmit the request.



Page 171

1        Q.  Okay.  I --

2                MR. NAZAROV:  Can I jump in real quick?

3    I'm sorry to interrupt, Rebecca, but I just want to say

4    I know this is probably because of this video remote

5    deposition thing, but sometimes Mr. Harris is not able

6    to finish his answer before the next question is asked,

7    and I just wanted to flag that.

8                MS. CASSLER:  I -- it's a delay on my end.

9    I'm sorry about that.

10               MR. NAZAROV:  No, no.  No, no --

11               MS. CASSLER:  Thank you.

12               MR. NAZAROV:  -- it's not your fault.

13   Technology, totally.  Okay.  Go ahead.

14               MS. CASSLER:  Thank you.  Yeah.

15       Q.  (BY MS. CASSLER)  Sorry about that, Mr. Harris.

16               So after -- let's say the ERO denies the

17   request.  Okay?  That happens fairly regularly, doesn't

18   it?

19               MR. NAZAROV:  Objection, form.

20       A.  So during this -- this time period, yes.  Keep

21   in mind that hasn't always been the case, you know, and

22   still may not necessarily be the case that they are

23   denying detention space.

24       Q.  (BY MS. CASSLER)  Uh-huh.

25       A.  But when this was written, then, yes, that



Page 172

1    would have been the case.

2        Q.  Is it the case that sometimes CBP would request

3    bed space knowing that the request was most likely going

4    to be denied?

5            MR. NAZAROV:  Objection, form.

6        A.  Yes.

7        Q.  (BY MS. CASSLER)  And after receiving a denial,

8    CBP has to then convert the case to NTA detained, right?

9            MR. NAZAROV:  Objection, form.

10       A.  Yes.

11       Q.  (BY MS. CASSLER)  That's essentially

12   reprocessing the person in CBP's computer system, right?

13           MR. NAZAROV:  Objection, form.

14       A.  Yes.  And, you know, to alleviate that and to

15   make things a little quicker, at some point, we did tell

16   the ports that you don't necessarily have to do that.

17   If you know you have a family unit in front of you that

18   there's -- for whatever reason, ERO is not going to

19   detain this family, you can go ahead and start from

20   scratch with whatever sort of case processing you feel

21   you need to do.  And then we can, you know, verify the

22   denial or use the blanket denial, you know, in the file

23   as to why we processed a certain way.

24       Q.  (BY MS. CASSLER)  So there were times when CBP

25   would choose to kind of short-circuit the five steps



Page 173

1    listed here, right?

2                MR. NAZAROV:  Objection, form.

3        A.  Yeah, I wouldn't say short-circuit, but it was

4    just, you know, the -- the recognition that given a

5    particular set of circumstances in place at the time,

6    you know, we had these blanket denials in ERO, we had

7    ERO, you know, was telling the ports on a regular basis,

8    "Okay.  This is who we can accept.  This is who we

9    cannot accept."

10               So we knew, unless if there were, you know,

11   extenuating circumstances, we might not be able to get

12   the, you know, placement for someone, so we'd just skip

13   the -- the initial steps and avoid having to reprocess.

14   As you mentioned, make things a little quicker.

15       Q.  (BY MS. CASSLER)  Uh-huh.  How long does it

16   take to process a case for NTA detained?

17       A.  How long does it take to process a case for NTA

18   detained?

19       Q.  Correct.

20       A.  I don't know.  I would -- starting from

21   scratch, I would say the same, you know, two to three,

22   up to four hours, depending on the experience of the

23   officer, the complexity of the case.  Is it just one

24   person?  Is it a family?  How many people are in the

25   family?  Is there criminality?  Is there previous



Page 174

1    immigration history?

2         Q.  Okay.  So that's similar to the original ER/CF

3    processing if you're processing NTADs detained from

4    scratch, right?

5                   MR. NAZAROV:  Objection, form.

6         A.  So that would be my best estimate, but

7    how -- exactly how long, I cannot tell you for either

8    one, other than to say --

9         Q.  (BY MS. CASSLER)  Okay.

10        A.  -- it's going to vary a lot based on the

11   complexity of the case, the complexity of the family, if

12   it's a family unit, just, you know, the different

13   factors involved, the ages of the kids if it is a family

14   unit.  It's just going to vary.

15        Q.  What about converting a case to NTA detained

16   after it's already been processed ER/CF?

17        A.  I don't know how long that takes.

18        Q.  Does it -- is it possible that it takes hours?

19                  MR. NAZAROV:  Objection, form.

20        A.  It's possible.  But, you know, keep in mind a

21   lot of the initial work has already been done.  By that

22   point, they've already done the systems queries of the

23   individuals.  If they're adults, they've already taken

24   their fingerprints; the officers have already taken

25   their photograph s.  They've already done a lot of



Page 175

1    the -- the background work, the biographical work, if

2    you will, that has to be done.

3         Q.  (BY MS. CASSLER)  Uh-huh.

4         A.  Exactly how long it takes to switch from one to

5    another in, you know, our systems, I -- I don't know.

6         Q.  Okay.  And after that, if ICE has denied that

7    space, then CBP's next step is to transfer the person to

8    ICE anyway, right?

9         A.  Well, at this particular time, that was

10   guidance.  But, you know, once again, that guidance --

11   that particular bullet has changed over time as well.

12        Q.  How has it changed?

13        A.  So some ports have worked with ICE to have an

14   officer on-site, you know, giving them a workstation, if

15   not all day, then part of the day, so they could effect

16   their releases or do their -- you know, their part there

17   at the port of entry in -- in some cases.  Most cases,

18   we would actually, you know, just transport the person

19   over to ICE ourselves.  So those would be the two

20   main --

21        Q.  Okay.

22        A.  -- main pathways, if you will.

23        Q.  Uh-huh.

24             MR. NAZAROV:  Rebecca, may I jump in?

25   Would you be able to take a break after the next



Page 176

1    question, maybe a 10-minute bathroom break?

2            MS. CASSLER:  I was going to use this

3    document for maybe like four or five more questions.

4    Would that be okay?

5            MR. NAZAROV:  That's fine.

6            MS. CASSLER:  Okay.  Thank you.

7            MR. NAZAROV:  Mr. Harris, is that -- I'm

8    sorry.  I should have checked with Mr. Harris.

9            MS. CASSLER:  That's fine.

10           MR. NAZAROV:  Are you okay with that?

11           THE WITNESS:  Yeah.  No, I'm good.

12           MR. NAZAROV:  Okay.

13           MS. CASSLER:  Okay.

14           MR. NAZAROV:  Thank you.

15           MS. CASSLER:  Thanks.

16       Q.  (BY MS. CASSLER)  So remanding to ICRO for

17   detention, that fifth bullet, depending on the port,

18   that can take many hours, right?

19           MR. NAZAROV:  Objection, form.

20       A.  Depending on the port, yes.

21       Q.  (BY MS. CASSLER)  Okay.  So, for example,

22   from -- let's see.  Some ports need to drive people all

23   the way to Port Isabel, right?

24       A.  Down in the Valley, yes.  Yes.

25       Q.  Yeah.  And that could -- that could take a



Page 177

1    number of hours, right?

2        A.  Yes.

3        Q.  Okay.  After those bullets, you said in this

4    e-mail:  "Under no circumstances should the alien be

5    paroled from a port of entry in lieu of ICE accepting

6    custody nor should ICE effectuate any parole at the port

7    of entry."

8            Did I read that right?

9        A.  Yes.

10       Q.  So I understood your testimony from a moment

11   ago to be that actually now ICE is sometimes permitted

12   to effectuate paroles at the port; is that right?

13       A.  So at this point in time when this e-mail was

14   from, the "under no circumstances" sentence you just

15   read was the guidance.

16       Q.  Uh-huh.

17       A.  After that and since then, you know, as in a

18   lot of cases, our guidance changed.

19       Q.  Uh-huh.

20       A.  So, yes, in some ports, ICE would come to the

21   port.  In some ports, we would meet ICE, and then we

22   would transport to one of their facilities, and they

23   would have a -- a station set up.  They wouldn't

24   necessarily go inside into their, you know, detention

25   facility.  I actually believe in a few ports, ICE could



Page 178

1    e-mail the parole documentation or transmit it somehow

2    electronically to CBP at the port of entry, and then we

3    could have the documents signed where they would -- ICE

4    would send us their paroles.

5         Q.  Uh-huh.

6         A.  So these different things have happened at

7    different ports of entry since then.  But at the time,

8    February 23rd, 2018, whenever this is dated, then, yes,

9    that would have been our -- our guidance.

10        Q.  Uh-huh.  So is this a fair summary, that when a

11   person who arrives at a port of entry is paroled, CBP

12   needs ICE to do that parole; CBP won't do that parole

13   itself?  Is that right?

14        A.  So when --

15             MR. NAZAROV:  Objection, form.

16        A.  The -- the way you stated the question, that is

17   not correct.  There are certain --

18        Q.  (BY MS. CASSLER)  Could you correct it for me?

19        A.  I'm sorry?

20        Q.  Could you please correct it for me?

21        A.  Okay.  So -- well, numerous agencies within the

22   federal government have what we call parole authority,

23   including CBP.  So we can parole people in certain

24   circumstances, you know, and we do.

25        Q.  Okay.  The part that I read from this e-mail



Page 179

1  that says "under no circumstances should the alien be

2  paroled from a port of entry in lieu of ICE accepting

3  custody," is that communicating the idea that if a

4  person is going to be paroled, CBP prefers ICE to do it

5  rather than CBP cutting that parole?

6      A.  So in the context of these -- these migrants,

7  someone who was the original, you know, bullet process

8  for ER/CF.  So would have been what you've been

9  referring to as asylum seekers, a migrant that we

10  thought should be processed for expedited removal with a

11  credible fear determination.  Under those circumstances

12  is what we're talking about, not necessarily under any

13  circumstances.  I know it says "under no circumstances,"

14  but you have to look at the context of the e-mail.

15      Q.  Got it.  Okay.  That's -- so then, asylum

16  seekers or migrants, CBP needs parole to cut that

17  parole -- or CBP needs ICE to cut that parole.  Is that

18  CBP policy?

19                MR. NAZAROV:  Objection, form.

20      A.  That -- that parole should be done by ICE.

21  They should be taken into ICE in custody and then, you

22  know, ICE should continue with their part of the

23  process.

24      Q.  (BY MS. CASSLER)  Uh-huh.

25      A.  Though there are, as I mentioned them, limited



Page 180

1  circumstances, you know, where we can do those paroles,

2  but it's our -- it's our contention, yes, that ICE

3  should be taking custody of most of, if not all of,

4  these -- these migrants.

5       Q.  If LFO ports were to parole asylum seekers

6  directly rather than letting ICE do the parole, would

7  that get reported up to CBP headquarters?

8                 MR. NAZAROV:  Objection, form.

9       A.  In, like, a limited incident?  Like a limited

10  capacity, it's done, for whatever reason, once or twice,

11  something like that?

12      Q.  (BY MS. CASSLER)  Sure.

13      A.  No, not necessarily.

14      Q.  Would it get reported up to CBP headquarters if

15  it were done more often than once or twice?

16                 MR. NAZAROV:  Objection, form.

17      A.  If it was done -- oh, yeah.  If it -- if it was

18  something we had to do on a regular basis, yes.

19      Q.  (BY MS. CASSLER)  But under this five-bullet

20  process that you -- that we've discussed here in this

21  e-mail, the end result is basically the same, right, the

22  person gets released?

23                 MR. NAZAROV:  Objection, form.

24      Q.  (BY MS. CASSLER)  Is that correct?

25      A.  Well, we're presuming that ICE is going to



Page 181

1   release the person.  But if ICE did give us the

2   authority to parole and release the person, then, yes,

3   the end result would be the same.

4       Q.  But the reporting would be different, right, in

5   terms of ERO would have to report that they paroled the

6   person rather than CBP reporting they paroled the

7   person; is that right?

8       A.  Well, I don't know anything about ERO's

9   reporting, but, I mean, that stands to reason.

10      Q.  Uh-huh.

11              MS. CASSLER:  Okay.  Let's take a break.

12              MR. NAZAROV:  Okay.  What do you think?

13  10 minutes?

14              MS. CASSLER:  That's great.  Yeah.  2:40

15  Central?

16              MR. NAZAROV:  2:40 Central, uh-huh.  Yeah,

17  that's fine.  I think Mr. Harris heard that.

18              MS. CASSLER:  All right.  We can go off the

19  record now.

20              Noah?

21              THE REPORTER:  Noah, give me a time off,

22  please.

23              THE VIDEOGRAPHER:  Yeah.  Sorry.  Off the

24  record at 2:30 p.m.

25              (Break was taken.)



Page 182

1          THE VIDEOGRAPHER:  We're back on the video

2     record.  This marks beginning of Media 3.  The time is

3     2:42 p.m.  Counsel, you may proceed.

4          Q.  (BY MS. CASSLER)  Hi, Mr. Harris.  You

5     understand that you're still under oath, correct?

6          A.  Yes, I understand.

7          Q.  Great.  So let's go back to metering.  Queue

8     management requires a position at the limit line that

9     didn't exist before, right?

10          MR. NAZAROV:  Objection, form.

11          A.  The -- the static position, yes.

12          Q.  (BY MS. CASSLER)  What do you mean by "the

13     static position"?

14          A.  So we've always gone outside of the -- the

15     primary -- preprimary area of the port.  We'll go under

16     the bridges, do what we call our preprimary roving.

17          Q.  Uh-huh.

18          A.  You know, we've had people that would either

19     operate -- come back and forth from the operations, yes,

20     out on the bridge, all the way up to, you know, the

21     middle of the bridge, the -- the line of demarcation.

22     But someone just standing there in a static position all

23     the way to the middle of the bridge, no.

24          Q.  Okay.  That makes sense.  Thanks for

25     clarifying.



Page 183

```
 1              And how many people usually staff the limit
 2    line position when it's staffed?
 3        A.  So that's going to vary based on the port of
 4    entry as well as the individual crossing at the port of
 5    entry.  Laredo, for example, usually has ███ people out
 6    there, sometimes ███.
 7        Q.  Uh-huh.
 8        A.  You know, the same with most of the crossings
 9    in Brownsville; you'll have ███ people there.  Hidalgo
10    has always had significantly more, and they're usually
11    going to have a supervisor there as well.  Most of the
12    smaller ports of entry are going to have, you know, just
13    ███ people out there at -- at the crossing.
14        Q.  Okay.  Why does Hidalgo have more and a
15    supervisor?
16        A.  So Hidalgo has always had -- or I shouldn't say
17    always, but Hidalgo has, a lot of times, had a longer
18    line, more migrants waiting at the middle of the bridge,
19    and then, the -- the migrants that were there tended to
20    be a little rowdy, less inclined to be compliant with
21    the officers' instructions.
22              We've had a lot of -- well, not a lot.
23    We've had a few issues at Hidalgo with what we call --
24    we use the term of port circumvention, people trying to
25    run through the queue points, you know, to get into the
```



Page 184

1    U.S.  Most of that that has happened has occurred at --

2    at Hidalgo, so they felt the need to have additional

3    personnel there as well as a supervisor.

4         Q.  Okay.  So is it fair to say that comparing

5    premetering to metering, staff had to be reassigned from

6    other posts in order to staff the limit line?

7         A.  Yes.

8              ELECTRONIC VOICE:  I'm sorry.  There's been

9    an internal error.  You will be disconnected now.

10   Goodbye.

11             THE VIDEOGRAPHER:  Rebecca must -- Kevin,

12   this is the videographer.  Can we briefly go off the

13   record for a second?

14             MR. NAZAROV:  We got disconnected.

15             THE VIDEOGRAPHER:  Okay.  We're going off

16   the video record.  The time is 2:45 p.m.

17                  (Break was taken.)

18             THE VIDEOGRAPHER:  We're back on the video

19   record.  The time is 2:49 p.m.  Counsel, you may

20   proceed.

21        Q.  (BY MS. CASSLER)  Mr. Harris, you understand

22   that you're still under oath, right?

23        A.  Yes, I understand.

24        Q.  Great.  So going back to our discussion about

25   metering and staff, could you -- do you have any way to



Page 185

1    estimate how many staff hours have been used staffing

2    the limit line since metering started?

3              MR. NAZAROV:  Objection, form.

4         A.  You know, I'm not certain if we do or not.  I

5    know at some point our mission support staff was looking

6    at creating project codes for use in our scheduling

7    system that would allow the ports to -- excuse me -- you

8    know, track that information.  But other than that, it

9    would be, you know, some sort of a manual -- a manual

10   data pull from the ports.  But do I have a method right

11   now or does the -- you know, to look at that?  No.

12        Q.  (BY MS. CASSLER)  Okay.  But that data exists

13   somewhere in CBP's system?

14             MR. NAZAROV:  Objection, form.

15        A.  I don't know if it does or not.  We were

16   looking at that in -- in the past, using those -- those

17   codes in our scheduling system to see if we could track

18   that data.  I don't know the -- I don't remember if that

19   was done or, you know, if it's still being done or not.

20        Q.  (BY MS. CASSLER)  Okay.  Let's just do some

21   rough math together.

22             Is it true that each port has at least one

23   bridge that's open 24/7?

24             MR. NAZAROV:  Objection, form.

25        A.  No, that's not true.  Rio Grande City Port of



Page 186

1    Entry does not have a 24/7 bridge, but I believe the

2    other seven ports would have at least one bridge that's

3    open 24 hours a day.

4         Q.  And some ports have two bridges that are open

5    24 hours a day, right?

6         A.  Yes.

7         Q.  Okay.  So if we said -- let's say there are

8    eight bridges.  I know that's probably an undercount,

9    but is it fair to say there are at least eight bridges

10   that are open 24 hours a day in LFO?

11        A.  Yes, that's -- that's fair.

12        Q.  And are there at least eight bridges where the

13   limit line is staffed 24/7 in LFO?

14        A.  Yes.

15        Q.  Okay.

16        A.  That's fair.

17        Q.  So I did some math ahead of time.  Tell me if

18   this sounds right.  So if there are 24 hours in a day,

19   there are 8,760 hours in a year, and so one limit line

20   position open for 24 hours a day for a year, that's

21   800 -- 8,760 staff hours.  Does that sound right to you?

22        A.  I'm not doing the math along with you, but

23   I'll -- I'll take your word for it.

24        Q.  If there's a calculator error, I'll take the

25   blame for that.  We're just estimating here.



Page 187

1              So we've got 8,760 hours in a year times

2    two officers times two years times eight bridges.

3    That's over 280,000 hours of staff time.  That sound

4    about right to you?

5        A.  I'll defer to your math, yes.

6        Q.  Okay.  Could ports have used that 280,000 hours

7    of staff time to accomplish other aspects of CBP's

8    mission if ports were not required to staff the limit

9    line?

10       A.  Could we have used those staff hours to

11   accomplish other missions if we weren't required to

12   staff the limit line?  Was that the question?

13       Q.  Yep.

14       A.  Well, yes, we would have used the hours in some

15   other method, yes.

16       Q.  Uh-huh.  And could those hours have been used

17   to do -- to process additional migrants if there were no

18   limit line to staff?

19       A.  They could have been used for anything, but, I

20   mean, they -- they could have been, yes.  Would they

21   have been?  No, I can't attest to that.  But is it

22   possible?  Yes.

23       Q.  Okay.  Moving on from staff hours, have there

24   been expenditures in addition to staff time required to

25   implement -- implement metering in LFO?



Page 188

 1                   MR. NAZAROV:  Objection, form.

 2          A.  Yes, minor infrastructure expenditures.

 3          Q.  (BY MS. CASSLER)  Have there also been

 4    equipment costs?

 5          A.  Well, yes, I'm including equipment in

 6    infrastructure.  So, yes --

 7          Q.  Okay.

 8          A.  -- equipment infrastructure to make a -- make

 9    us safe and make a safe, amenable, you know, workplace

10    for the employees there at the middle of the bridge:

11    Shaded from the sun, water cooler, probably Jersey

12    barriers, concrete barriers to better alleviate the

13    traffic concerns that you mentioned earlier in the day.

14          Q.  Uh-huh.

15          A.  And a lot of those were very low cost because

16    we already had the -- the -- the equipment or the

17    infrastructure at a port.  It was just simply moving it

18    from one place to another.  But, yeah, we had purchased

19    sports-type canopies, for example, for shade, water

20    coolers, things like that.

21          Q.  Uh-huh.  And apart from infrastructure, has

22    there been other equipment required, new equipment?

23          A.  Required?  Not necessarily was it required, but

24    we have purchased some -- off the top of my head, we

25    purchased some -- once again, to alleviate some of those



Page 189

1   safety and security concerns the officers brought up, we

2   purchased some plastic shields.  That's about the only

3   other present piece I can think of now.  There might

4   have been other smaller pieces of equipment we

5   purchased, yes, to staff the queue points.

6       Q.  Okay.  Let's talk about circumventers.  When I

7   refer to a circumventer, you understand that to be a

8   person who evades inspection at the limit line, either

9   on foot or in a vehicle?  That sound right?

10      A.  Yes, understand.

11      Q.  Uh-huh.  And circumventing didn't exist before

12  queue management, right?

13              MR. NAZAROV:  Objection, form.

14      A.  Yes.  No, we didn't use that term before queue

15  management.  We've had what we call port runners, people

16  who tried to run through a port of entry either on foot

17  or in vehicle.  But the term "circumventer," no, I don't

18  think it was used prior to queue management.

19      Q.  (BY MS. CASSLER)  Okay.  And, I mean, that

20  would make sense because the documents tend to talk

21  about circumvention specifically in relation to

22  circumventing the queue point, right?

23      A.  That would be my understanding, yes.

24      Q.  Sorry.  Just one second.

25              Okay.  Isn't it true that LFO port



Page 190

1   personnel predicted that metering would give rise to a

2   circumventing problem?

3           MR. NAZAROV:  Objection, form.

4       A.  It stands to reason that, you know, people

5   aren't going to want to wait in line, but I'm going

6   to -- I will be inclined to say yes, but I can't think

7   of any specific, well, occurrences of what you

8   described, but, yeah, I mean, it stands to reason and

9   makes sense.

10      Q.  (BY MS. CASSLER)  If I told you that a concern

11  about the idea that metering would cause increased

12  circumvention, if I told you that that concern was

13  reported up to CBP headquarters in June 2018 or before,

14  would that surprise you?

15          MR. NAZAROV:  Objection, form.

16      A.  No, that wouldn't surprise me, but, I mean,

17  it's -- it's also -- before we had queue management, we

18  wouldn't have -- have any circumvention, so I don't know

19  if the term "increase" would be proper.

20      Q.  (BY MS. CASSLER)  Fair enough.  But there

21  were -- there were port-level personnel who raised the

22  concern that queue management would cause circumvention

23  issues, correct?

24          MR. NAZAROV:  Objection, scope.

25      A.  I wouldn't be surprised to see that, no.



Page 191

1          Q.  (BY MS. CASSLER)  Okay.

2          A.  But, once again, I can't recall anything

3     off -- you know, and nothing's coming to mind where --

4          Q.  Uh-huh.

5          A.  -- where it was brought up before we actually

6     started the queue management, though.

7          Q.  Uh-huh.  Yeah.  I think those concerns were

8     raised in the context of the time period between the

9     metering guidance and the prioritization of queue

10    management memo, so that would have been between April

11    and June 2018.  Does that sound about right to you?

12              MR. NAZAROV:  Objection, form.

13         A.  Yeah, that would have been the time period

14    between the two documents you described, yeah.

15         Q.  (BY MS. CASSLER)  Uh-huh.  So it's conceivable

16    that, at that time, ports would have had enough

17    information about metering to prevent -- to predict that

18    circumventing might be a side effect of metering, right?

19              MR. NAZAROV:  Objection, form.

20         A.  That's a logical conclusion, yes, but --

21         Q.  (BY MS. CASSLER)  Uh-huh.  So you mentioned

22    port runners a few minutes ago.  So before metering,

23    what you referred to as port runners, those people were

24    trying -- or would be trying to completely evade

25    inspection, right?



Page 192

1      A.   Right.  A port runner, an EWI.  An entry

2   without inspection is an acronym we often use,

3   but -- but, yeah.

4      Q.   Uh-huh.  Uh-huh.

5      A.   Generally yes.

6      Q.   So those people weren't trying to get

7   inspected; they were trying to get away from inspection.

8   Is that fair to say?

9      A.   There was a -- for the most part, yes.  There

10   were -- there was a period of time when the -- right

11   when we started metering, maybe a little before, we

12   would have people, mostly Central Americans, who would

13   try to EWI through the middle of the bridge or through a

14   primary lane, but they had the goal of getting caught.

15   They would go as far as to look behind and make sure

16   someone was chasing them because this is what

17   the -- someone in Mexico had told them to do.

18      Q.   Uh-huh.

19      A.   But, no, they were not necessarily trying to

20   get away from us.

21      Q.   Uh-huh.  Okay.  And before metering, there were

22   usually just a handful of runners at any given court --

23   at any given port per quarter, right?

24            MR. NAZAROV:  Objection, scope.

25      A.   I would agree with that, yes.



Page 193

1        Q.   (BY MS. CASSLER)   And now let's move into the

2    period in which metering is happening, so 2018 and on,

3    metering pursuant to the memos we've discussed.

4                So the circumventers, during the metering

5    period, they want to be inspected, right?

6        A.   Yes.

7        Q.   Uh-huh.   Their reason to circumvent is to get

8    in front of an officer and claim fear, right?

9                MR. NAZAROV:   Objection, form.

10       A.   Generally, yes, I would suspect that to be the

11   case.

12       Q.   (BY MS. CASSLER)   The vast majority of

13   circumventers during metering have been seeking

14   inspection, right?

15               MR. NAZAROV:   Objection, form.

16       A.   Well, I mean, after the fact, that's easy to

17   determine, but, you know, while the attempt is going on,

18   we really don't know what's -- what's happening.

19       Q.   (BY MS. CASSLER)   But it is true that you've

20   seen a rise in circumventing numbers since metering was

21   implemented, right?

22       A.   Well, once again, before we had metering, we

23   wouldn't have necessarily had circumvention, so I can't

24   say there was a rise.   But that phenomenon occurred,

25   yes, after we started metering.



Page 194

1      Q.  Thanks for that correction.

2            Since metering began, circumventing has

3    actually happened at every land-bordering LFO, right?

4      A.  I don't know that it's necessarily happened at

5    some of the smaller ports.  No instances are coming to

6    mind.  But definitely at the -- the larger ports, yes.

7      Q.  At Hidalgo -- we talked about this a little bit

8    before, but at Hidalgo, circumventer numbers got so high

9    at one point that the port started creating regular

10   reports just to keep track of queue circumvention,

11   right?

12     A.  Yes.  And I believe that at -- at one point,

13   there was actually a CBP report that there was

14   circumvention.

15     Q.  What do you mean by "CBP report"?  Like, from

16   headquarters?

17     A.  Headquarter's report.

18     Q.  Oh.  Did headquarters require that for all

19   ports?

20            MR. NAZAROV:  Objection, form.

21     A.  I don't recall the -- the specifics.  I'm

22   sorry.

23     Q.  (BY MS. CASSLER)  That's okay.  What kind of

24   information is reported up regarding circumvention?

25            MR. NAZAROV:  Objection, form.



Page 195

1        A.  I don't recall.  There's been certain -- I

2    mean, a -- a report on a particular incident would

3    include, you know, the details of the incident.  But as

4    far as field-office-wide or, you know,

5    port-wide reports, I -- I don't recall.  Certainly,

6    the -- you know, the numbers, I believe the report

7    included the -- you know, the number in -- the number in

8    custody or the number processed and what percentage of

9    that number was -- were circumventers.

10       Q.  (BY MS. CASSLER)  Uh-huh.

11       A.  But --

12       Q.  Okay.

13       A.  -- I don't remember the particulars of -- of

14   those reports.

15       Q.  How does processing of circumventers who claim

16   fear differ from processing of other people who claim

17   fear, so non-circum- --

18            MR. NAZAROV:  Objection, form.

19       A.  Can you say that one more time, please?

20       Q.  (BY MS. CASSLER)  Yeah.  Let me phrase that a

21   little better.  Sorry.

22            I'm curious to know if there's any

23   difference in the process for processing circumventers

24   as compared to other migrants who didn't circumvent.

25       A.  Yeah.  So generally -- and, once again, it's --



Page 196

1  almost everything we do is case specific, incident

2  specific.  But if it's a circumvention case, depending

3  on what type of circumvention it was, we could -- up to

4  and including, seeking prosecution of -- of the person.

5      Q.  Okay.  So is it fair to say that processing a

6  circumventer might take more time than processing a

7  non-circumventer claiming fear?

8      A.  It -- it would take -- for certain cases, it

9  would take longer, yes.  For others, maybe not, not so

10  much.

11     Q.  Uh-huh.

12     A.  If it were, you know, an egregious case and we

13  were trying to get prosecution and, you know, we have

14  investigative agencies involved or we wanted to present

15  something to the U.S.A., then, yes, it could take

16  longer.

17     Q.  Okay.  So as we've discussed, circumvention

18  arose as a problem only after metering started, right?

19     A.  Well, yes, because circumvention wasn't a thing

20  until we had metering.

21     Q.  Uh-huh.  Yeah.  So my understanding of metering

22  is that it's based on a concept of processing when

23  there's capacity, right?

24     A.  Based on a process of what?

25     Q.  Metering is supposed to be based on the idea of



Page 197

1  processing when there's capacity to process, right?

2       A.  Yeah.  So your metering is going to -- I don't

3  know about based on, but it -- your operational

4  capacity, your capacity to process migrants, you're

5  going to use the queue management to manage that

6  capacity, yes.

7       Q.  But isn't it the case that ports that

8  experience high levels of circumvention often end up

9  processing well above their stated detention capacity?

10              MR. NAZAROV:  Objection, form.

11      A.  Well, yeah, the -- the circumvention could lead

12  you to have more cases in custody and in process than

13  you would like to based on your detention or your

14  holding capacity or your operational capacity.  That

15  could --

16      Q.  (BY MS. CASSLER)  So --

17      A.  -- be the case, but not necessarily.

18      Q.  Uh-huh.  I didn't introduce it as an exhibit,

19  but I did create an exhibit selecting the data from

20  Hidalgo from queue management reports.  Would it

21  surprise you if I told you that for a period of months

22  in early 2019, the capacity was listed at over

23  100 percent every single day?

24              MR. NAZAROV:  Objection, form.

25      A.  No, that wouldn't surprise me.



Page 198

1    Q.   (BY MS. CASSLER)  So I'm curious where the

2    capacity to process those people comes from if the ports

3    are at capacity already.  Do you -- do you understand my

4    question?

5    A.   Yeah, I understand the question, but -- well,

6    frankly, if -- you're saying their -- the capacity

7    numbers they indicate are higher than what their stated

8    capacity is.  Okay.  So you got to keep in mind that

9    stated capacity is based on the number of holding cells

10   that are available.  You know, it's not -- so they're

11   going to basically be holding people in areas that are

12   not designated holding cells, they're not identified

13   holding cells for holding persons undergoing this

14   migrant processing.  So they will be holding people in

15   other areas.

16   Q.   Okay.  And it's true that if a circumventer

17   reaches U.S. soil, CBP has to process them, right?

18   A.   That's always been our guidance, yes.

19   Q.   Okay.  Circumventing also creates safety issues

20   for officers, right?

21   A.   So a migrant who, yeah, attempts to evade our

22   officers, isn't following -- isn't compliant with their

23   commands, yes, it can create safety issues for our

24   officers.

25   Q.   Some of those safety issues may include running



Page 199

1   into car lanes, right?

2       A.  Yes, it could include that.

3       Q.  Yeah.  Has any CBP officer at the limit line

4   been injured because of an encounter with a

5   circumventer?

6       A.  Yes.

7       Q.  Circumventing can also slow down vehicle

8   traffic at ports, right?

9       A.  It can, yes.

10      Q.  And that would be primarily due to pedestrians

11  in the car lanes, right?

12              MR. NAZAROV:  Objection, form.

13      A.  Yes, a pedes- -- the -- the situation you

14  described would be the circumventer, the migrant,

15  running into a car lane.  So presumably the cars are

16  going to start slowing down, stop.

17      Q.  (BY MS. CASSLER)  Uh-huh.  Has circumventing

18  ever led to increased wait times at LFO ports?

19              MR. NAZAROV:  Objection, form.

20      A.  I don't know if we've ever -- I would say so,

21  yes.

22      Q.  (BY MS. CASSLER)  Okay.  Let's talk

23  specifically about Pharr and Anzalduas.  Am I saying

24  those right?

25      A.  Pharr, Anzalduas, yes.



Page 200

1     Q.   I've been sitting there thinking, "Well, how do

2     I say that word?"  I was dreaming about it.

3               So in April 2019, was there queue

4     management happening at Pharr Bridge?

5     A.   I believe so, yes.

6     Q.   In April 2019?

7     A.   April 2019?  You know what, I'm not certain.

8     They have conducted queue management at Pharr.  They

9     haven't always conducted queue management at Pharr, but

10    they have conducted queue management operations at

11    Pharr.  So I would -- I can't say for certain, but I

12    will be inclined to say that they were.

13    Q.   Okay.  And what about at Anzalduas?  Was there

14    queue management in April 2019, at that time?

15    A.   Yes, there should have been queue management in

16    Anzalduas in April 2019.

17    Q.   Okay.  Eventually, because of the circumventer

18    problem, LFO began queue management at both of those

19    bridges, right?

20    A.   Yes.

21    Q.   And there weren't problems with circumventers

22    at Pharr before LFO started metering, right?

23    A.   Well, once again, they wouldn't have been

24    called circumventers before we started metering.  So you

25    would have -- Pharr is a -- a long bridge.  It's



Page 201

1    primarily a cargo bridge.  It does have passenger

2    traffic at certain times during the day, limited times

3    during the day, so it was never a spot where migrants

4    would typically arrive.  So migrants would arrive there

5    from time to time, but circumventers know after queue

6    meter -- after queue management started, we would see

7    more people over at Pharr.

8        Q.  Uh-huh.  Does Pharr have a pedestrian walkway?

9        A.  I do believe they have an older pedestrian

10   walkway.  I -- I can't picture the layout of the -- the

11   port right now, but one of our ports had the same or

12   similar design standards, and a lot of those cargo

13   bridges were built with -- it -- it's probably referred

14   to as a pedestrian walkway, but it's kind of a -- a

15   foyer -- a foyer with entries into the -- the passenger

16   area.

17       Q.  Uh-huh.

18       A.  It very well may, yes.

19       Q.  Okay.  But it's a really long bridge, right?

20       A.  Right.  It's a long bridge, and it doesn't

21   process pedestrian traffic as a -- a course of business.

22   It's not their -- what it's intended for.

23       Q.  Okay.  And similarly, there weren't problems

24   with circumventers at Anzalduas before LFO started

25   metering, right?



Page 202

1       A.  Well, the same answer would apply.  They

2  weren't really circumventers.  You would have maybe

3  occasional migrants.  I can't say that there weren't,

4  but, once again, it -- I think Anzalduas is just as

5  long, if not longer, than Pharr, and it just wasn't

6  a -- a place where migrants would arrive.  There's

7  no -- you know, I should add on the Mexican side of

8  those bridges, there's no real infrastructure or, you

9  know, a large INM presence or, you know, anything that

10  would support the migrants, so it just wasn't a --

11  wasn't a place where they would arrive.

12       Q.  Were there many runners at either of those

13  bridges prior to metering?

14       A.  From my recollection at -- we would get port

15  runners at Anzalduas.  How many -- I think you said,

16  "Were there many?"  I would say there weren't many, no.

17       Q.  Okay.

18       A.  But you would --

19       Q.  And --

20       A.  We would encounter them, yes.

21       Q.  Okay.  Sorry to interrupt you there.

22            And what about at Pharr?

23       A.  I'd say at Pharr there were less than

24  Anzalduas.  I don't want to say we never had one, but at

25  Pharr, no, there were not -- were not many.



Page 203

1    Q.  Uh-huh.  When did queue management start at

2    Pharr?

3    A.  I cannot give an exact date, but it would have,

4    you know, definitely been after June 2018 when we

5    started having more people arrive in Pharr and

6    Anzalduas.  I can't give an exact date.

7    Q.  Okay.  And is that the same answer if I asked

8    you when did queue management start at Anzalduas?

9    A.  It's going to be the same answer, yes.

10   Q.  What does the queue point consist of at Pharr?

11   A.  I am trying to remember exactly what it looks

12   like, and I cannot.  I'm sorry.  At Pharr -- at Pharr,

13   it might just be vehicles out there, but I -- I can't

14   recall.  I'm sorry.

15   Q.  That's all right.

16   A.  It's going to be in the middle of the bridge,

17   the line of demarcation.  But what actual infrastructure

18   we have there, if any, I can't recall right now.

19   Q.  Okay.  You mentioned vehicles.  Is that a

20   reference to the limit line officer sitting in a CBP

21   vehicle near the demarcation line as a way to staff the

22   limit line?

23   A.  Yes.  You have a -- a CBP vehicle with the

24   lights on, but, yes, that's what I would -- that's what

25   I would mean by that.



Page 204

1      Q.   Okay.  So at a port that has that setup, they

2  might not have a physical structure at the limit line,

3  but they'll just go sit in a car instead; is that right?

4      A.   They might not or -- and what I have seen in

5  some of the ports that don't have a -- a physical

6  walkway or a covered walkway is they'll bring the

7  camping or sporting event type of pop-up canopies,

8  Jersey barriers.  Once again, I'm not saying that's at

9  Pharr because I -- I can't recall them.  Much more

10  familiar with Anzalduas, but...

11      Q.   Okay.  Is CBP still metering at Pharr and

12  Anzalduas?

13      A.   As far as I know, yes.

14      Q.   And isn't it the case that in order to meter

15  these two bridges, more staff is required than at most

16  other LFO bridges?

17      A.   Is it required?  No. ███████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████

21      Q.   So how many people might staff the limit line

22  at Anzalduas at -- during a given shift?

23      A.   I would say ██████████████.

24      Q.   And is this answer the same for Pharr?

25      A.   If the Pharr was open, yes.  I'm trying to



Page 205

1    recall.  I've been to Anzalduas a couple of times, and I

2    think there were ████████████████ persons

3    at -- I've been there at least twice, and I believe

4    there were ████ or ████ persons there.

5         Q.  Uh-huh.  Okay.  And is it fair to say that

6    there's a need to meter at these two bridges because

7    there's metering at other ports?

8              MR. NAZAROV:  Objection, form.

9         A.  Yeah.  So the -- the metering there and the

10   queue point, I don't know that we meter there 'cause

11   we -- once again, you seldom get arrivals there,

12   migrants asking to be processed any longer, but it's,

13   you know, mostly to alleviate safety concerns of people

14   walking up and down those long bridges.

15        Q.  (BY MS. CASSLER)  Wait.  Did you say you don't

16   get asylum seekers at those bridges anymore?  Sorry.  I

17   probably cut out.

18        A.  Yeah.  I haven't personally seen reports of

19   asylum seekers at those bridges in -- in a while.

20        Q.  Okay.  Did LFO -- or I guess it would be

21   specifically the Hidalgo Port of Entry have to rearrange

22   its resources in order to make metering at Pharr and

23   Anzalduas feasible?

24        A.  So -- well, use your term "rearrange the

25   resources."  So any position, if you didn't have it



Page 206

1    before and you start staffing, yeah, you're -- you're

2    going to have to make some sort of adjustments in

3    your -- most places call it a rotation, their work

4    rotation, or staffing assignments.  Yes, some -- some

5    sort of adjustment would have to be made.

6         Q.  Isn't it the case that LFO had to limit or cut

7    services for other activities at Pharr and Anzalduas in

8    order to set up queue points there?

9         A.  So services at Pharr, primarily passenger

10   vehicle services were -- have gone down, the number of

11   available hours since then.  Anzalduas, I don't believe

12   the number of hour -- the open hours there has changed.

13   I guess I'd ask what you mean by "services."

14        Q.  Just other port functions.  I think it could be

15   passenger processing, it could be cargo, it could be

16   other inspections, could be enforcement.

17        A.  I mean, if -- if that's how you're defining

18   services, then, yes, something would have had to have

19   been, you know, curtailed.

20             MR. NAZAROV:  Rebecca, I'm sorry to

21   interrupt.  I hate it when people ask me this during

22   depositions, but we've crossed about the six-hour mark.

23   And I realize we had about 50 minutes in breaks there.

24   Just to give us a ballpark, do you guys have a bunch

25   more?



Page 207

 1                    MS. CASSLER:  Sarah, what -- how much time

 2      have we used up on the record; do you know?  I think

 3      Sarah's been keeping time.

 4                    MR. SAMPAT:  I'm calculating it right now.

 5                    MS. CASSLER:  According to --

 6                    MR. SAMPAT:  Oh, yeah.  Go ahead.

 7                    MS. CASSLER:  I've got four -- 4 hours and

 8      40 minutes, uh-huh.

 9                    MR. NAZAROV:  I'm not saying you're not

10      entitled to more time.  I just wanted to check in a

11      little bit.  That's all.

12                    MS. CASSLER:  Sure.  I mean, we all want to

13      get out of here.

14                    MR. NAZAROV:  No.  I mean, you know --

15                    MS. CASSLER:  You know, I have to --

16                    MR. NAZAROV:  -- I hate it when people ask

17      me this question, so --

18                    MS. CASSLER:  No.  That's fine.  I think

19      I've probably got -- I've got less than an hour left,

20      and then Allison, I believe, has about an hour.

21                    MR. NAZAROV:  Okay.

22          Q.  (BY MS. CASSLER)  So just one more question

23      about Pharr and Anzalduas.

24                    So your testimony was that you haven't

25      heard of many migrants presenting at Pharr and Anzalduas



Page 208

1  lately; is that right?

2      A.  Yes.

3           MR. NAZAROV:  Objection, form.

4      Q.  (BY MS. CASSLER)  Yeah.

5      A.  Yes.

6      Q.  But it's technically possible for migrants to

7  be processed at those ports, right?  At those crossings,

8  right?

9           MR. NAZAROV:  Objection, form.

10     A.  Is it possible?  Yes.  If they were, you know,

11 within the U.S., we encountered them already within the

12 U.S., and, you know, a migrant, you know, made -- made

13 the claim of fear or asked to be processed for asylum,

14 whatever, inside the U.S., then, yes, we would be able

15 to process them at those ports, or probably transported

16 to Hidalgo for processing, but -- but, yes, they would

17 be processed.

18     Q.  (BY MS. CASSLER)  Uh-huh.  When a circumventer

19 is prevented from crossing the international boundary,

20 does that person get advised about the list?  Does that

21 make sense?

22     A.  When -- can you state that question again,

23 please?

24     Q.  Yeah.

25          So let's say we're at a port of entry and



Page 209

1    there's a circumventer, an attempt -- a person

2    attempting to circumvent the limit line, but the limit

3    line staff is successful in preventing them from

4    crossing that demarcation line.  I'm assuming that

5    happens sometimes.  Does that happen in your --

6          A.  Yeah, I would say so, yes.

7          Q.  Yeah.  So then, is that person who was

8    attempting to circumvent, are they metered?  What

9    happens to that person?

10         A.  So that person, you know, tries to come in not

11   across the sidewalk, whatever, a CBPO realizes, you

12   know, says, "Hey, don't do that," you -- you're asking

13   what would happen next.  A person doesn't cross into the

14   U.S. is the situation you're proposing?

15         Q.  Uh-huh.  Right.

16         A.  Okay.  Right.  So in -- in general, what

17   we're -- tell the migrants is that, you know, the port

18   is at capacity, welcome to wait for processing.  But,

19   no, I wouldn't be surprised if some of the officers

20   would tell a migrant, "Hey, there's -- you need to go,

21   you know, somewhere else."  The beginning of our

22   statement is going to be:  "We are at our capacity.

23   You're welcome to wait in Mexico."

24         Q.  Uh-huh.

25         A.  So I -- I don't know -- I'm having trouble



Page 210

1    envisioning what you're --

2        Q.  No, I think you got it.

3        A.  Okay.  Thank you.

4        Q.  And some officers would advise about the

5    existence of the wait list, right?

6        A.  I would say so, yes.  But more than likely,

7    the -- the migrant already knows about it and knows the

8    proper thing to do.  They just, you know, are trying

9    their hand at -- at getting across.

10       Q.  In response to the problem of circumvention,

11   specifically circumvention by riding across the line,

12   the international boundary, in a vehicle, LFO started

13   queue management of vehicles, right?

14       A.  Yes.  It's not the same as the pedestrians,

15   but -- but, yes, we have put queue points on vehicle,

16   vehicle bridges.

17       Q.  Which bridges?

18       A.  Laredo Bridge 2, for example.

19       Q.  Any other bridges?

20       A.  I can't say that we haven't done queue

21   management at any of the vehicle bridges because we

22   probably have, but if it was a long-standing practice,

23   if it was -- close in surge is term we use where you are

24   doing it sporadically or periodically or as needed.

25   It -- it could have been done at almost anywhere.



Page 211

1    Laredo Bridge 2, I'm familiar with just because they

2    don't have, you know, pedestrians; they don't have

3    commercial.  It's just solely vehicular traffic.

4        Q.  And -- and can you just explain how vehicle

5    queue management works?  I'm having a little trouble

6    envisioning it.

7        A.  Right.  So it's -- from what I've seen, if the

8    person is driving up -- at first, of course, the people

9    didn't have any idea what's going on, so we kind of have

10   to tell the -- you know, the regular crossers what we're

11   doing, and they'll -- officers would be standing in the

12   middle of the bridge and people will be driving up

13   slowly through a lane, holding up their identification,

14   and the officers would be like, "Okay," you know, just

15   send the person, go ahead.

16            If they see someone who's bewildered, has

17   no clue what's going on, more than likely it's someone

18   who's not from the area or hasn't seen that before, not

19   a regular crosser.  He's -- if it's a bus, you're going

20   to stop the bus.  You know, the CBPOs might go onto the

21   bus.  It's the same thing.  Everyone will be holding up

22   their documents.  But, of course, if it's something like

23   that, by the time that happens, the person would be in

24   the U.S. and then, you know, they -- they would be

25   brought in.



Page 212

```
 1        Q.   Okay.  So --

 2        A.   It's --

 3        Q.   Sorry.  Go ahead.  It's delayed --

 4        A.   Well, it's --

 5        Q.   -- on my end.

 6        A.   Yeah.  It's a -- it -- it -- it's not as -- not

 7   as easy as it is on the pedestrian walkway.

 8        Q.   Uh-huh.

 9        A.   In the re- -- in the reality, a lot of the

10   reason we started that was not necessarily for the --

11   the persons in the vehicles or the persons in the

12   busses, but the pedestrians, people who would try to

13   walk across that bridge and intermingle with the

14   vehicular traffic.  Or a vehicle would drop someone off

15   in the middle of the bridge, and then they would try to

16   come across the rest of the bridge as a pedestrian.  So

17   having officers --

18        Q.   Uh-huh.

19        A.   -- out there would alleviate that because that

20   type of activity would be immediately visible.

21        Q.   Uh-huh.  So where does an officer stand when he

22   or she is doing vehicle queue management?

23             MR. NAZAROV:  Objection, form.

24        A.   They would be at the middle of the bridge, the

25   line of demarcation.  I mean, they're not standing there
```



Page 213

1    with their toes on the line.  They are going to shift,

2    and go back and forth for a few feet, but it'll be at

3    the middle of the bridge.

4         Q.  (BY MS. CASSLER)  Would they be on the

5    pedestrian walkway or in the road?

6         A.  I've seen both.

7         Q.  Okay.  So sometimes they are standing in the

8    roadway?

9         A.  I would say most cases, yes, they will be in

10   the roadway.

11        Q.  Are you concerned that this might pose safety

12   concerns for officers?

13        A.  Well, anytime we go out and onto the bridge

14   like that, there's a safety concern, but we've always

15   traditionally done what we call preprimary operations

16   all the way up to the middle of the bridge where we're

17   conducting enforcement operations on the bridge with our

18   officers, our K9s.  So that's -- that's really nothing

19   that's new to us.

20        Q.  But vehicle queue management is a change,

21   right?

22        A.  Well, vehicle queue management, yes, but being

23   on the bridge itself, conducting operations isn't

24   necessarily a change.

25        Q.  Let's move on from that.  Oh, actually, I have



Page 214

 1    one more question.

 2              When did LFO start doing vehicle queue

 3    management?

 4        A.  So it would have been -- I don't have an exact

 5    date.  Okay?  Like I said before, it would have been

 6    after June 2018, once the queue management process at

 7    the pedestrian lanes was, you know, cemented there at

 8    the middle of the bridge and it was, you know, just part

 9    of our daily operations.

10              And the circumventers, what we've called

11    circumventers before, would, you know, seek a way around

12    that by going to a bridge where they didn't have a queue

13    point.  So that's when it would have -- that's when we

14    would have started doing that.  Once again, no

15    hard-and-fast dates.  As the problem sets started to

16    increase, we would have started doing that.

17        Q.  And the problem set, you mean circumventers?

18        A.  The circumventers, yes, the problem.

19        Q.  All right.  Let's go to an exhibit we haven't

20    looked at yet, Exhibit 238.

21              MS. CASSLER:  I think Sarah is going to

22    send that momentarily.

23        Q.  (BY MS. CASSLER)  I'm showing you what will be

24    marked as Exhibit 238.  It's a two-page document

25    starting with Bates No. AOL-DEF-00094682, and this is a



Page 215

1    document dated November 1st, 2018, and it's typed.  It

2    is "Four step approach to maximize admissibility

3    operational capabilities at the Laredo, Texas Port of

4    Entry."

5                    MS. CASSLER:  Ari, have you gotten it?

6                    MR. NAZAROV:  238, just got it.  Just hit.

7    Let me make sure --

8                    Mr. Harris, can you see that clearly?

9                    THE WITNESS:  Yes, I can see it.

10                   MR. NAZAROV:  Are you able to read it?

11                   THE WITNESS:  Yes.

12                   MR. NAZAROV:  Okay.

13       Q.  (BY MS. CASSLER)  Who created this document?

14       A.  I would presume the port of entry.  It does not

15   look familiar, so I'm going to need to read it, the

16   comment on it.  If I -- if I've ever -- if I received

17   this document on e-mail or something, I don't -- I

18   don't -- I don't recall it.

19       Q.  Okay.  Take your time.  It's only two pages.

20       A.  Okay.  Thanks.  Could we go to the second page?

21                   Is -- there's not a third page, you said?

22       Q.  That's it.

23       A.  Okay.

24       Q.  All right.  Is it accurate to say that this

25   document is a plan for improving processing efficiency



Page 216

1    in the face of increased numbers of asylum seekers at

2    the Laredo Port of Entry?

3                MR. NAZAROV:  Objection to form.

4        A.   Yeah, that's how I read it.  It says it's a --

5    a plan to be able to continue case processing if, you

6    know, ERO space is difficult to get.

7        Q.   (BY MS. CASSLER)  Uh-huh.  Let's go down to the

8    second paragraph under "Step II.-Systematic Process."

9    I'm about seven lines down, and I'm just going to read

10   the -- the last few lines, starting with "The Port of

11   Laredo, Texas."

12   ████████████████████████████████████████████████

13   ████████████████████████████████████████████████

14   ████████████████████████████████████████████████

15   ████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████████████

20   ████████████

21                Did I read that right?

22       A.   Yes.

23       Q.   And FAMU, that's a reference to family units,

24   right?

25       A.   That should be family unit, yes.



Page 217

1        Q.  And UAC is a reference to unaccompanied

2    children; is that right?

3        A.  Unaccompanied alien child or unaccompanied

4    alien children, I would -- yes.

5        Q.  Okay.  So the portion of this document that I

6    just read outlines the process by which CBP would

7    transport asylum seekers between bridges on the U.S.

8    side so they can be processed more efficiently, right?

9        A.  Yes.

10        Q.  And doing so would be a way to increase the

11    Port of Laredo's capacity, right?

12        A.  That would be a way to increase their

13    processing capacity, yes.  That's the way I read it.

14        Q.  Isn't it true that there are various ways that

15    a port can increase its capacity?

16        A.  Well, yes.

17        Q.  Let's go to the second page, "Step

18    III.-Expedient adjudication of NTA asylum claims."  Do

19    you see that?

20        A.  Yes.

21        Q.  That paragraph describes having ERO office

22    on-site to prepare an NTA so that an asylum seeker

23    needn't be transported elsewhere in order to enter ERO

24    custody, right?

25        A.  Yeah.  That's exactly what I mentioned earlier



Page 218

1    when we were talking about the -- the memo, the document

2    that you showed.

3         Q.  Uh-huh.  And that would make asylum-seeker

4    processing more efficient, right?

5         A.  In this case, yes.  The way they describe it,

6    yes.

7         Q.  And let's look at "Step IV.-Expansion of

8    processing capabilities."  And I'm just going to read

9    the first sentence:

10

11

12

13              Did I read that right?

14         A.  Yes.

15         Q.  And I'll now read the last sentence, which

16    says:

17

18

19              Did I read that right?

20         A.  Yes.

21         Q.  So this paragraph, Step IV, discusses a way to

22    increase the number of processing stations at the Port

23    of Laredo so that more asylum seekers can be processed

24    within a given period of time, right?

25         A.  That's what it says, yes.



Page 219

1       Q.  All right.  Do you know if this -- the plan

2   outlined in this document was ever implemented?

3       A.  So the -- the Step III, the part about having

4   ERO on-site, I know they did that.  Step IV, the --

5   whatever room they're talking about, I don't know if

6   that was ever -- ever set up.  I can tell you that right

7   now they're not -- you know, the steps that are being

8   talked about in this plan aren't really -- isn't

9   applicable currently, but the -- the -- the Step III,

10   the ERO officer on-site, you know, processing their

11   cases there, yes, that was -- that was done.

12       Q.  Okay.  And let's go to the top of page 1.  I'm

13   just going to read the first sentence.

14             "The Laredo Port of Entry is adopting an

15   innovative approach to processing admissibility cases to

16   manage the potential crisis created by the increase of

17   migrants applying for asylum on the southern border of

18   the United States."

19             Did I read that right?

20       A.  Yes.

21       Q.  So is it fair to say that this plan is aimed at

22   helping the port manage the higher number of asylum

23   seekers in general?

24       A.  That's, you know, the stated purpose of the

25   plan, but it -- as always, there's -- anytime you add to



Page 220

1    one process, you have to take away from somewhere else.

2    But, yes, they're talking about using a room to increase

3    their processing capacity, but that's, you know, a room

4    that's booked and it can't be used for another process.

5    You're talking about adding 14 workstations.  Well,

6    that's 14 computers that we have to procure.  If we

7    already have them at the port, that's 14 workstations

8    that can't be used for some other process.  The same

9    thing --

10    Q.  Do you know --

11    A.  -- with the officers who are doing this

12    processing.  It's -- you know, that's their plan, but

13    those processing officers could have been doing

14    something else that now they're not going to be able to

15    do.  So that's -- we just don't have these extra assets

16    and room and facilities just, you know, laying dormant

17    that can be repurposed for this.

18    Q.  Sorry to interrupt you there.

19    A.  I'm sorry.

20    Q.  No, you're good.

21        Can you say with certainty that the -- the

22    room that was identified in this plan was being used for

23    something else at the time that they identified it?

24        MR. NAZAROV:  Objection to form.

25    A.  I cannot say that with certainty because I'm



Page 221

```
 1   not certain what -- what room they're talking about, no.

 2        Q.  (BY MS. CASSLER)  All right.  I'm nearly done.

 3   I think I'm going to ask just a few more questions, and

 4   then -- then we can take a quick break.  Does that sound

 5   all right?

 6        A.  That's fine with me.

 7             MS. CASSLER:  Kevin, I think we're done

 8   with that exhibit.

 9        Q.  (BY MS. CASSLER)  Sorry.  Just a second.

10             On July 16th, 2019, DOJ and DHS implemented

11   an interim final rule providing that any non-Mexican

12   person entering the U.S. through the southern land

13   border is generally ineligible for asylum with a few

14   exceptions.  Are you familiar with that interim final

15   rule?

16        A.  The -- the rule -- the interim final rule, the

17   IFR, yes, I'm familiar with what you're talking about.

18        Q.  Uh-huh.  And that's the rule that -- I mean,

19   the major exception is if a person applied for and was

20   denied asylum in entering the country.  Are you familiar

21   with that?

22             MR. NAZAROV:  Objection, form.

23        A.  I know what you're talking about, yes.  I'm

24   familiar with it.

25        Q.  (BY MS. CASSLER)  Okay.  I'm just going to call
```



Page 222

1    it the transit rule just for efficiency sake.  Is that

2    okay?

3          A.  Sure.

4          Q.  So back in November 2019, the court in this

5    case granted a preliminary injunction prohibiting the

6    application of the transit rule to people who were

7    metered before July 16th, 2019.  Are you aware of that

8    injunction?

9                MR. NAZAROV:  Objection, scope.

10         A.  Yes, I'm aware.

11         Q.  (BY MS. CASSLER)  How did you become aware of

12   that injunction?

13               MR. NAZAROV:  Objection, scope.

14         A.  I'm sure I saw an e-mail from CBP headquarters.

15   I believe we also have a -- a litigation hold regarding

16   the whole, you know, final rule.  I could be mistaken,

17   but I believe that's out there.

18         Q.  (BY MS. CASSLER)  Did CBP headquarters provide

19   you any formal or informal guidance about the

20   injunction?

21               MR. NAZAROV:  Objection, scope.

22               MS. CASSLER:  Do you want a standing

23   objection about scope?

24               MR. NAZAROV:  Yeah, that's fine.

25               MS. CASSLER:  Great.



Page 223

1      Q.   (BY MS. CASSLER)  I'll ask the question again.

2           Did CBP headquarters provide you any formal

3   or informal guidance about the injunction?

4      A.   I don't recall, but that -- that injunction

5   never really affected our processes.  So --

6      Q.   Were there --

7      A.   -- I'm sure --

8      Q.   Oh, go ahead.

9      A.   -- I'm sure we found out about it somehow, but

10  from -- from -- from what I can recall, that -- not --

11  not the injunction, but even the IFR didn't really

12  affect our processes in the OFO from what I understand.

13     Q.   Okay.  So CBP headquarters never ordered ports

14  in LFO to do anything based on the injunction, right?

15           MR. NAZAROV:  Objection, form.

16     A.   Not that I recall.  But I also -- going back to

17  the -- the IFR, I don't think that we ever changed any

18  processes as a result of that, that I can recall.

19     Q.   (BY MS. CASSLER)  Okay.  So is it fair to say

20  that you were not -- excuse me -- that LFO personnel

21  were not ordered to do anything to implement the

22  injunction?

23           MR. NAZAROV:  Objection, form.

24     A.   Yeah.  So I -- I -- I just don't recall just

25  the transit rule, the IFR, however you want to refer to



Page 224

1    it, I don't recall it ever having affected our

2    operations.  If we were ordered to do something with

3    the -- regarding the injunction to it, then I don't

4    recall.  I don't recall.  I'm sorry.

5        Q.  (BY MS. CASSLER)  No, it's okay.  Okay.  Let's

6    move on to a different topic.

7            We talked about the list keepers in Mexico

8    earlier today.  Do you remember that?

9        A.  Yes.

10       Q.  Would it be possible for LFO port personnel to

11   obtain copies of the wait list from the Mexican list

12   keepers?

13           MR. NAZAROV:  Objection, form.

14       A.  Would it be possible?  Yes.  I mean, we could

15   ask.

16       Q.  (BY MS. CASSLER)  After the Ninth Circuit

17   listed -- this question doesn't make sense.  Hold on.

18           Has CBP headquarters ever requested that

19   any component of LFO ever request those lists from the

20   Mexican list keepers?

21           MR. NAZAROV:  Objection, form.

22       A.  Not that I remember.  We've been --

23   requested -- most of the requests are just about

24   numbers, like, "Hey, how many people are waiting to come

25   across?"  But I don't recall having been asked to



Page 225

1    request a copy of the list, no.

2         Q.  (BY MS. CASSLER)  So do the ports know how many

3    people are on the list at any given time?

4              MR. NAZAROV:  Objection, form.

5         A.  Generally, yes.  They will have those

6    conversations with their counterparts.

7         Q.  (BY MS. CASSLER)  So just to clarify, you mean

8    that CBP personnel will talk to their Mexican

9    counterparts at INM who will tell them how many people

10   are waiting on the list?

11             MR. NAZAROV:  Objection, form.

12        A.  Yes.  As I've said, we talk with INM on a

13   regular basis, and one of the data points that the field

14   office often asks of the ports and one of the data

15   points that sometimes OFO headquarters asks from us is,

16   "Hey, approximately how many people are waiting to

17   cross, you know, into the U.S.?"  So that's just -- has

18   been asked before.  That is just a, you know, kind of a

19   normal part of the conversation now, "Hey, we have

20   this" --

21        Q.  (BY MS. CASSLER)  Uh-huh.

22        A.  -- "many people waiting."  "Hey, okay.

23   Thanks."

24        Q.  Uh-huh.  And that number is essentially the

25   number of people on the list at that time, whatever time



Page 226

 1    that request is made, right?

 2         A.  I would presume so.  I mean, I -- I don't know,

 3    but we're, you know, going to go with whatever the

 4    Government of Mexico tells us.

 5         Q.  Uh-huh.  Do you know if any LFO component has

 6    copies of the wait list, either current copies or dated

 7    versions?

 8         A.  I don't know.  No, I don't know.

 9         Q.  That's okay.  Did CBP headquarters ever order

10    any LFO components to destroy or delete copies of the

11    wait lists in their possession?

12         A.  No.  I'm not aware of that ever happening.

13         Q.  Moving on.  In July 2019, the United States

14    signed an asylum cooperative agreement, or ACA, with

15    Guatemala.  You're aware of that agreement, right?

16              MR. NAZAROV:  Objection, scope.

17         A.  Yes, I'm aware.

18         Q.  (BY MS. CASSLER)  And I'm asking you in your

19    personal capacity.

20         A.  I didn't hear that last --

21         Q.  In September --

22         A.  I didn't hear the last thing you said.

23         Q.  I'm -- I'm asking you about this in your

24    personal capacity, so your personal awareness.

25         A.  Right.



Page 227

```
 1        Q.  In September 2019, the United States signed
 2   similar ACAs with Honduras and El Salvador.  And are you
 3   aware of those as well?
 4                MR. NAZAROV:  Objection, scope.
 5        A.  I -- I may have heard of it, but primarily I'm
 6   aware of the Guatemala ACA is what, you know, we refer
 7   to.
 8        Q.  (BY MS. CASSLER)  Uh-huh.  Has CBP ever applied
 9   any of those ACAs to a noncitizen who entered the United
10   States at an LFO port?
11                MR. NAZAROV:  Objection, form.
12        A.  Yes.
13        Q.  (BY MS. CASSLER)  When was that?
14        A.  I don't remember exactly when we started with
15   ACA.  I don't remember if it was late last year or early
16   this year.  Sorry.  But it was -- it was a relatively
17   short period of time here in the LFO.  It was -- the
18   program was begun in some of the other field offices
19   prior to us, but I don't remember the exact date.
20   Sorry.
21        Q.  So the program that you're referring to is
22   applying the ACA to people who enter at the port; is
23   that right?
24        A.  Yes.  I would have been referring to the ACA.
25        Q.  Okay.  And is the ACA still being applied to
```



Page 228

1    people who enter at ports in LFO?

2         A.  Not that I'm aware of.

3         Q.  For how long was the ACA applied to people

4    entering at LFO ports?

5         A.  I don't recall.  There wasn't a -- it wasn't a

6    long period of time, but I don't recall.

7         Q.  When you say it wasn't long, do you mean it was

8    a number of days?  Weeks?  Months?

9              MR. NAZAROV:  Objection, form.

10        A.  Longer than days, probably longer than weeks.

11   I wouldn't say longer than months, but I -- I don't

12   recall when we started it.

13        Q.  (BY MS. CASSLER)  Which ports was this

14   happening at?

15             MR. NAZAROV:  Objection, scope.

16        A.  So it was rolled out at different -- at

17   different areas at different times, but I don't recall

18   at what -- I don't recall at what ports it was being

19   applied at.

20        Q.  (BY MS. CASSLER)  Was it at most of the ports

21   in LFO?

22        A.  Well, it would have definitely been at the

23   larger three ports that get most of the migrant traffic,

24   but -- and I do believe that it was, you know, rolled

25   out in the different areas at different times.  But it



Page 229

1    would have considerably been done at all the ports, yes.

2        Q.  Okay.

3            MR. NAZAROV:  Rebecca, can we take a break

4    for 10, 15 minutes?

5            MS. CASSLER:  I've got about three more

6    questions on this.

7            MR. NAZAROV:  Mr. Harris, can you do three

8    more questions, and then we'll take a break?  You

9    feel --

10            THE WITNESS:  Okay.

11            MR. NAZAROV:  -- okay?

12            THE WITNESS:  Yeah.

13        Q.  (BY MS. CASSLER)  Okay.  This'll be quick.  I

14    promise.

15            Do you know how many people were -- had the

16    ACA applied to them at LFO ports?

17            MR. NAZAROV:  Objection, scope.

18        A.  Off the top of my head, no, I don't know that

19    number.

20        Q.  (BY MS. CASSLER)  Would you say that it was

21    hundreds or less?

22            MR. NAZAROV:  Objection, scope and form.

23        A.  I'd say, maximum, low hundreds, but I don't

24    know that stat off the top of my head.  I'm sorry.

25        Q.  (BY MS. CASSLER)  Is that statistic in a report



Page 230

1    somewhere?

2         A.  It would be in a report somewhere, yes.

3         Q.  Do you know what that report is called?

4         A.  No, I don't.  We run lots of reports on stats.

5    Presume it would have come up in one of those, but a

6    specific name for that report, no.

7         Q.  Is there a specific database that that

8    information would have been entered into?

9              MR. NAZAROV:  Objection, form.

10        A.  Yeah.  It would have been entered into

11   our -- our processing.  The codes would have been put

12   into SIGMA or USAC, and then that's where it would be

13   extrapolated from.

14             MS. CASSLER:  All right.  Let's -- we can

15   take a quick break.  And I've got maybe five minutes of

16   questions left.

17             MR. NAZAROV:  Okay.  It's 5:00 o'clock

18   here, 4:00 o'clock there.

19             THE VIDEOGRAPHER:  We are going off the

20   video record.  The time is 3:59 p.m.

21                  (Break was taken.)

22             THE VIDEOGRAPHER:  We are back on video

23   record.  The time is 4:17 p.m.  Counsel, you may

24   proceed.

25        Q.  (BY MS. CASSLER)  Hi, Mr. Harris.  You



Page 231

1   understand that you're still under oath, right?

2       A.  Yes.

3       Q.  So we've talked about how the limit line

4   position is staffed near the international boundary,

5   right?

6               MR. NAZAROV:  Objection, form.

7       A.  Yes.

8       Q.  (BY MS. CASSLER)  And previously you testified

9   that headquarters required LFO ports to move their limit

10  lines to a point near the international boundary, right?

11      A.  Well, the LFO required the ports to do that.

12  My understanding is that's, you know, the way it should

13  have been done, but I never saw any documentation from

14  headquarters actually ordering us to do that.

15      Q.  Okay.  But it most likely came from

16  headquarters, right?

17              MR. NAZAROV:  Objection, form.

18      A.  I would presume so, but I don't have any

19  knowledge of that and haven't seen anything in my

20  research that would -- you know, that emphatically

21  states that.

22      Q.  (BY MS. CASSLER)  Okay.  If an officer staffing

23  the limit line permits a migrant to step foot into the

24  United States during that limit line conversation, so

25  when the person has just approached for the first time,


MAGNA
LEGAL SERVICES

Page 232

1    that officer isn't doing the job correctly, right?

2        A.  If the migrant comes into the United States?

3        Q.  Uh-huh.

4        A.  Right.  The -- they need to be -- once they

5    step foot into the U.S., then our guidance has always

6    been then he should be taken into the port for -- to

7    complete their processing.

8        Q.  So officers staffing the limit line are

9    directed to prevent migrants from crossing that

10   international boundary, right?

11       A.  Yes.

12       Q.  Uh-huh.  And as you just stated, that's because

13   once they do cross the boundary, then they have to be

14   processed, right?

15       A.  Yes.

16       Q.  On the other hand, if an asylum seeker doesn't

17   cross the international boundary, there's no requirement

18   in CBP's view that the person be processed, right?

19       A.  Correct.

20       Q.  Uh-huh.  So in CBP's -- excuse me.  Sorry.

21           Is it fair to characterize the limit line

22   position as having the purpose of preventing migrants

23   from crossing the international boundary line?

24           MR. NAZAROV:  Objection, form.

25       A.  Well, that's for the purpose of allowing us to



Page 233

1   manage more effectively, you know, our intake at the

2   ports --

3        Q.  (BY MS. CASSLER)  Uh-huh.

4        A.  -- not just to keep them out indefinitely.

5        Q.  But there's no promises that anybody who's

6   metered at the limit line is going to make it onto the

7   list and eventually be processed, is there?

8                MR. NAZAROV:  Objection, form.

9        A.  So I think you're kind of complaining (sic) a

10  couple of different things there that I don't, you know,

11  see the relationship there between seeing how the limit

12  line you know, told you, you have to wait and then

13  making it on the -- you know, the list that's not

14  managed by us.  I don't see those as one issue, you

15  know, bleeding into the other.

16       Q.  (BY MS. CASSLER)  Okay.  So after a person is

17  not permitted to cross into the United States at the

18  limit line, it's not CBP's problem anymore, is it?

19               MR. NAZAROV:  Objection, form.

20       A.  So say -- say that one more time, please.

21       Q.  (BY MS. CASSLER)  I mean, you just testified

22  that there's no link between a person being turned away

23  at the limit line and their sitting on the list in order

24  to be processed; is that right?

25               MR. NAZAROV:  Objection, form.



Page 234

1        A.   Yeah.  CBP doesn't maintain that list or, you

2    know, have any say-so on who gets on it or -- or -- or

3    what.  So I don't see the --

4        Q.   (BY MS. CASSLER)  Uh-huh.

5        A.   -- I don't see the applicability of what

6    you're -- you're saying there.

7        Q.   Okay.  So the purpose of the limit line

8    position, just to be clear, is to prevent people from

9    crossing the international boundary, right?

10       A.   Well, the purpose of that queue management

11   position or limit line position, using interchange areas

12   to keep migrants from crossing the international

13   boundary and overwhelming our ports of entry, and, you

14   know, allowing us to maintain a safe and orderly process

15   for the people we already have in custody, allowing us

16   to use our resources effectively and efficiently.

17       Q.   But as long as somebody stays on the U- -- on

18   the Mexico side of that international boundary, CBP's

19   view is there's no duty to process them, right?

20            MR. NAZAROV:  Objection, form.

21       A.   As long as the person is on -- in Mexico, which

22   being on the Mexican side of the international boundary

23   line, they would be in Mexico, then, yes, we don't see

24   it as our mandate to -- to process them nor could we.

25       Q.   (BY MS. CASSLER)  There's no guarantee that an



Page 235

1  asylum seeker or migrant who's prevented from crossing

2  the limit line when they first approach will ever be

3  allowed into the United States, is there?

4            MR. NAZAROV:  Objection, form.

5       A.  Guarantee?  So that implies some sort of

6  something from us.  So, no.  They're told that, you

7  know, if someone is -- is metered, if they are prevented

8  from crossing the limit line at any particular time,

9  they're told that, "The port is at -- you know, at

10  current capacity.  We can't take you in right now for

11  processing.  You're going to have to, you know, wait in

12  Mexico."

13            Now, no, there's no guarantee implied or

14  has ever been implied.  I'm not sure what sort

15  of -- what sort of guarantee we would -- so, no.  The

16  answer to your question is:  No, there's no guarantee,

17  but I'm really not sure where you are.  We don't give a

18  person anything saying at some point in the future, you

19  might be processed here.  That's the way I interpret

20  you're using "guarantee."

21       Q.  (BY MS. CASSLER)  If a person, a migrant, were

22  allowed to cross the limit line, then they would be

23  guaranteed inspection and process ing, right?

24       A.  I'm interpreting guarantee as we are going to

25  take them in, inspect them, and process them, yes.



Page 236

1    So...

2        Q.  I -- I think I'm using guarantee in the sense

3    of we can say we -- it's going to happen.

4            MR. NAZAROV:  Objection, form.

5        Q.  (BY MS. CASSLER)  Does that make sense to you?

6        A.  Yeah, that makes sense.  I'm sorry.  It's the

7    same answer.  If a person comes into the United States

8    and at that point makes a claim of a fear, they ask for

9    asylum, whatever the case is, then, yes, they would be

10   processed appropriately.

11           MS. CASSLER:  I think we can stop there.

12   And my colleague, Allison Parr, has questions about

13   Topic 15, so I'm going to mute, and Allison will take

14   over.

15           MS. PARR:  Thank you, Becky.

16                   EXAMINATION

17   BY MS. PARR:

18       Q.  Good afternoon, Mr. Harris.  My name is Allison

19   Parr, and I also represent Plaintiffs in this case.

20           You testified at the beginning of your

21   deposition that you were designated as the CBP

22   representative to speak to Topic 15 today, correct?

23       A.  Yes.

24       Q.  I apologize.

25           MS. PARR:  Is my video working?



Page 237

 1                MR. NAZAROV:  Yeah, you're fine.

 2                MS. PARR:  Oh, thank you very much.

 3       Q.  (BY MS. PARR)  And do you feel prepared to

 4  testify as to Topic 15?

 5       A.  Could you repeat what Topic 15 was?

 6       Q.  Topic 15 concerns communication -- one moment

 7  here.

 8                Topic 15 considers -- concerns your

 9  communications with:  "Instituto Nacional de Migración

10  ("INM"), Comisión Mexicana de Ayuda a Refugiados

11  ("COMAR"), Grupos Beta, or any other Mexican government

12  agency concerning metering, queue management, or

13  Turnbacks."

14                Do you feel prepared to testify on this

15  topic today?

16       A.  As well as I can, yes.

17       Q.  Thank you very much, Mr. Harris.  And the same

18  rules that Ms. Cassler laid out the -- at the beginning

19  of her questioning also apply to mine.  So verbal

20  responses.  If you don't understand something that I

21  said, please let me know, and I will do my best to

22  rephrase it.

23                So you -- when you were speaking with my

24  colleague, you mentioned that INM, which also -- we also

25  call INAMI -- and CBP communicate regularly about



Page 238

1  day-to-day operations; is that correct?

2      A.  Yes.

3      Q.  Have you ever personally communicated with

4  Mexican government officials?

5      A.  Have I ever personally communicated with

6  Mexican government officials?  Yes.

7      Q.  How -- how did these communications take place?

8      A.  E-mail, phone, face-to-face.

9      Q.  And are these officials at INM basically your

10  counterparts at that agency, or do they -- do they play

11  a similar role in that agency as you do at LFO?

12      A.  So I never said that I communicated with anyone

13  with INM.  I said I communicated with Mexican government

14  officials.

15      Q.  Is it the practice of --

16      A.  And then, to me -- I'm sorry?

17      Q.  I apologize.  I cut you off.  Please continue.

18      A.  No, that's -- to the -- to the extent I

19  communicated with a -- an INAMI official, an INM

20  official, was at a -- at a meeting in, I want to say,

21  McAllen.  He said, "Hello," "Hi," "How are you?" that

22  sort of thing.  But other than that, I've never had any

23  communication with -- with other INAMI officials that

24  I'm aware of.

25      Q.  Okay.  But as you testified previously, it is



MAGNA
LEGAL SERVICES

Page 239

1    the -- it is the practice of CBP to regularly be in

2    communication with INAMI regarding issues at the border;

3    is that correct?

4        A.  Yes.

5        Q.  Great.  Thank you.  I would like to show you

6    what we have marked Exhibit No. 247.

7            MS. PARR:  Mr. Nazarov, Ms. Rich will be

8    sending that over to you shortly.

9        Q.  (BY MS. PARR)  And this document bears the

10   Bates No. AOL-DEF-00576995.  I would like to scroll --

11           MR. NAZAROV:  Now, how --

12       Q.  (BY MS. PARR)  -- to the second --

13           MS. PARR:  Yes.

14           MR. NAZAROV:  Now, hold on a second.

15           Mr. Harris, are you able to see the

16   document 'cause I can see very little of it?  It's very

17   small print.

18           THE WITNESS:  Yeah, I can see the -- the

19   first page.  I'm not sure how many pages it has.

20           MS. PARR:  There's only two pages.

21           MR. NAZAROV:  Okay.

22           MS. PARR:  And I'm -- I'm going to show

23   little portions of it at a time because it's an e-mail

24   chain.

25           MR. NAZAROV:  Well -- okay.  I want him to



Page 240

1    have the opportunity to read all of it before you do

2    that maybe.

3                    MS. PARR:  Oh, certainly.

4                    Kevin, if you could please blow up the top

5    exchange from Frank Longoria to the chain of officials

6    there.

7                    MR. NAZAROV:  Mr. Harris, do you want to

8    take some time to read the entire two-page document?

9                    THE WITNESS:  I would like to, yes --

10                   MR. NAZAROV:  Okay.

11                   THE WITNESS:  -- to see the total document.

12       Q.  (BY MS. PARR)  Certainly.  Please let me know

13    when you're finished.

14                   MR. NAZAROV:  Do you need to blow it -- do

15    you need them to blow it up anymore, Mr. Harris, or you

16    can -- you can read it?

17                   THE WITNESS:  No, I'm good on this one.

18                   MR. NAZAROV:  Okay.

19                   Allison, we got the document.  Thank you.

20                   MS. PARR:  Thank you.

21       A.  I'm ready for the second page whenever you are.

22    Okay.  I'm good whenever everyone else is.

23       Q.  (BY MS. PARR)  Thank you, Mr. Harris.  Just for

24    the record, I -- I want to state that the document that

25    we have marked as Exhibit No. 247 to your deposition



Page 241

1    bears the Bates No. AOL-DEF-00576995.  And I would

2    actually like to start with this second page of the

3    document that we're currently on.

4              MS. PARR:  Kevin, could you please blow up

5    the -- the very first e-mail communication?

6         Q.  (BY MS. PARR)  This is an e-mail message dated

7    November 12, 2016, from Frank Longoria, sent to various

8    port directors, with you and others copied on this

9    correspondence; is that correct?

10        A.  Yes.

11        Q.  And the subject line reads:  "Meeting with

12   INM."

13              Did I read that correctly?

14        A.  Yes.

15        Q.  Do you have any reason to doubt the accuracy of

16   the information contained in this document?

17        A.  I don't.

18        Q.  Thank you.  And in this e-mail, Mr. Longoria

19   states that port directors of the LFO port are to:

20   "Meet with your INM counterpart and request that they

21   control the flow of aliens to the point of entry.  For

22   example, if you determine that you can only process 50

23   aliens at a time, you will request that INM release only

24   50."

25              Is that correct?



Page 242

1        A.  Yes.

2        Q.  And could you please clarify or just confirm

3    for me, please, that Mr. Longoria was the assistant

4    director of field operations at LFO; is that correct?

5        A.  Yes.

6        Q.  Great.  Thank you.  In the e-mail, he further

7    states:  "If INM cannot or will not control the flow,

8    your staff is to provide the alien with a piece of paper

9    identifying a date and time for an appointment and

10   return then to Mexico."

11              Is that correct?

12       A.  Yes.

13       Q.  And is it your understanding that this process

14   that Mr. Longoria just described is metering?

15       A.  That -- that would have been -- in my

16   understanding, yeah, that would have been the

17   first -- the first instance of -- of metering, when we

18   started, you know, this metering.

19       Q.  Thank you very much.  So continuing,

20   Mr. Longoria states:  "Please schedule a meeting with

21   your INM counterparts ASAP.  Let us know the date and

22   time of your meeting as soon as it's scheduled.  We will

23   also need a summary of your meeting to include who you

24   met with, what was discussed, what was agreed to,

25   issues/concerns, and timeline."



Page 243

1           Did I read that correctly?

2      A.  Yes.

3      Q.  Great.  Thank you so much.

4           MS. PARR:  Now I would like to scroll up to

5    the -- to the first page at the bottom of that page.

6    Actually, Kevin, further down.  Sorry.

7      Q.  (BY MS. PARR)  So I'm looking at the

8    November 14th e-mail from Juan Chavez to a number of

9    people, including yourself, Mr. Harris.

10          MR. NAZAROV:  Mr. Harris, can you -- can

11   you see that clearly?

12          THE WITNESS:  I can now, yes.

13          MR. NAZAROV:  Okay.

14          MS. PARR:  Thank you.

15     Q.  (BY MS. PARR)  This e-mail states -- in this

16   e-mail, Mr. Chavez states:  "A meeting was held on

17   November 14th, 2016, with MX officials to discuss the

18   guidelines for processing immigrants from Central

19   America."

20          Is that right?

21     A.  Yes.

22     Q.  And Mr. Chavez was the assistant port director

23   for the Laredo POE at the time, right?

24     A.  Yeah.  He was assistant port director for

25   passenger processing operations.


MAGNA
LEGAL SERVICES

Page 244

1      Q.   Okay.  Thank you.  And looking at the

2    second -- looking at the second page of the -- of the

3    e-mail, Mr. Chavez includes a list -- a list of meeting

4    attendees, including deputy port director Mr. Flores,

5    himself, other CBP officials, as well as officials from

6    INAMI and Mexican Customs, correct?

7      A.   Yes.

8      Q.   And what does SAT stand for?

9      A.   Servicio Aduanal Tributorio (sic), I believe.

10   It's -- it's an acronym composed of the -- the -- the

11   Spanish translation of Mexican custom service.

12     Q.   Thank you.  I appreciate that.  And so in this

13   e-mail, Mr. Chavez, summarizing the meeting, states:

14   "DPD Flores and APD Chavez advised MX officials on the

15   new processing guides for immigrants arriving at the POE

16   for processing.  SAT and INAMI officials advise that

17   they are on board with new procedures and are willing to

18   help out in any way possible to initiate plan."

19            Is that right?

20     A.   Yes.

21     Q.   And so according to this e-mail, Mexican --

22   Mexican governmental officials agreed to work with CBP

23   to implement these new processing measures, its early

24   iteration of metering, correct?

25     A.   Yes.



Page 245

1    Q.  And this processing measure, this early

2    iteration of metering, involved Mexican government

3    officials helping to reduce the number of individuals

4    presenting themselves at the Laredo POE for processing,

5    commensurate with a number that Laredo POE could process

6    on a given day; is that right?

7    A.  So can you say that again, please, especially

8    the last part?  Sorry.

9    Q.  Oh, no.  Of course.

10            So this -- this early iteration of metering

11   involves -- involved the Mexican government helping out

12   CBP by learning the number of migrants that Laredo POE

13   could process on any given day and only sending that

14   number of migrants to them for processing --

15            MR. NAZAROV:  Objection --

16   Q.  (BY MS. PARR)  -- is that right?

17            MR. NAZAROV:  Objection, form.

18   A.  Yeah.  So that was the proposal.

19   Q.  (BY MS. PARR)  Oh, okay.  Do you have any

20   reason to believe that this policy was not implemented?

21   A.  Yes, I do.  As far as I'm aware, this proposal

22   was -- was -- was not implemented at the Laredo Port of

23   Entry.

24   Q.  Interesting.  Why would Mr. Chavez have sent

25   that summary to Mr. Longoria if it wasn't going to be



Page 246

1    implemented, as Mr. Chavez said in his e-mail,

2    immediately?

3        A.  So the -- the -- the really salient line there

4    is:  "All queries will be conducted on each immigrant

5    prior to being returned."

6            Mr. Longoria, I don't know if he picked up

7    on it or someone in the admissibility unit picked up on

8    it, but it -- from my reading of another message is that

9    it -- maybe the same day, maybe the next day, the field

10   office pushed back to the port of entry and told them,

11   "Hey, this is really not the intention.  What you're

12   doing here is obviously being done not only in the U.S.

13   but in secondary.  That's where those queries would have

14   to be conducted.  So the person -- it's -- you know,

15   makes it sound like they're already going to be in our

16   facility.  This isn't really what -- what we wanted to

17   happen."

18           So that's -- and if you look at the

19   attachment that's referenced, it's -- from what I

20   recall, it had the person's name and an exact date and a

21   lot of information on it.  The field office just pushed

22   back to the port, saying, "Hey, this isn't really

23   what" -- and this is a really -- really big paraphrase

24   here -- "this isn't what the intention was."  But that

25   was -- the bottom line is that was never implemented,



Page 247

1    this proposal.

2         Q.  Was a variation of this proposal ever

3    implemented at the Laredo POE?

4         A.  Yes.

5         Q.  And in what form was that POE?

6         A.  So what they did for a relatively short period

7    of time was once they were at their capacity, they felt

8    the need to meter, they would actually do it at the

9    limit line at the middle of the bridge there at Bridge

10   1, Gateway to the Americas Bridge.  And they were giving

11   the -- the migrants a piece of paper, but that piece of

12   paper had a -- basically a list of social services and

13   legal ser- -- free legal services, shelters, hospitals,

14   things like that in Nuevo Laredo, the phone numbers,

15   maybe even the address.

16             We'd give them that resource sheet and then

17   a general time on when to return, "Come back today after

18   4:00," "Come back tomorrow after 8:00," and from

19   conversations with the staff there, specifically APD

20   Juan Chavez, he said most of the migrants just elected

21   to wait on the bridge and they never returned to Mexico.

22   They would wait on -- wait on the Mexican side of the

23   bridge versus returning.

24        Q.  Thank you for that explanation, Mr. Harris.

25   That's really helpful.



Page 248

1             So you were saying that your understanding

2    is that the -- the plan that was described by Mr. Chavez

3    in this e-mail was not implemented, and that's because

4    it would have been illegal to turn back migrants once

5    they had reached American soil; is that correct?

6             MR. NAZAROV:  Objection --

7        A.  Yeah.  That -- that was the -- so the hang-up

8    was -- yeah, I mean, this -- this plan, it was -- it was

9    plain they weren't just waiting to be processed.  They

10   were actually returned to Mexico, and, you know, data

11   was being provided.  This was not really what -- you

12   know, what -- what we were intending to be done, no.

13       Q.  (BY MS. PARR)  And so is it your understanding

14   that Mr. Chavez didn't necessarily think that this would

15   be illegal when he proposed it and when he discussed

16   this with Mexican government officials, but this was

17   flagged to him by somebody else within CBP?

18            MR. NAZAROV:  Objection to form.

19       A.  Yeah, I -- I wasn't following about the second

20   half of your -- your statement there -- your question.

21   I'm sorry.

22       Q.  (BY MS. PARR)  I apologize.

23       A.  No problem.

24       Q.  So presumably, Mr. Chavez did not think that

25   this plan was illegal or would -- would circumvent



Page 249

1  asylum and immigration law in the United States when he

2  spoke with government officials in Mexico about it,

3  right?

4          MR. NAZAROV:  Objection to form.

5      A.  You know, I mean, of course, he wouldn't

6  have -- have thought that.  It -- I'm --

7      Q.  (BY MS. PARR)  Do you know -- I apologize.

8  Please continue.

9          MR. NAZAROV:  Please allow him to answer

10  the question.

11          Go ahead, Mr. Harris.

12      A.  I was going to say he was, you know, I think to

13  the best of his ability, my reading of it, trying to

14  come up with a -- you know, a good plan to do what was

15  being asked of him.  He didn't quite understand it is my

16  take on it.  But as I said before, this plan was not

17  implemented.  We, you know, pushed back on it right

18  away.

19      Q.  (BY MS. PARR)  Thank you, Mr. Harris.  Did

20  somebody else at CBP catch the -- the problems with this

21  plan that you pointed out?

22          MR. NAZAROV:  Objection to form.

23      A.  I believe so, yes.

24      Q.  (BY MS. PARR)  Do you know who that

25  individual -- I apologize.  I'm sorry for interrupting.



Page 250

```
 1      A.  No.  I was -- I want to say that there was -- I
 2  might be -- I might be -- I'm crossing my messages here,
 3  but there's -- could have potentially been a gentleman
 4  by the name of Ryan Hutton could have commented on it as
 5  well.  I don't think it was Ryan Koseor, but, yeah, I
 6  believe that someone -- there was another -- a comment
 7  on this plan that was in agreement with the field
 8  office.
 9      Q.  And what is Mr. Hutton's position at CBP?
10      A.  I -- I don't know.  I think at the time he was
11  in Enforcement Programs division or APP, which was --
12  was mentioned earlier.  But, once again, I might be
13  switching up two different messages or mess- --
14  message -- message screens, but I'm not certain.
15      Q.  I understand.  But to the best of your
16  recollection, it was Mr. Hutton who pointed out -- who
17  flagged this issue --
18          MR. NAZAROV:  Objection to --
19      Q.  (BY MS. PARR) -- with the -- the new plan?
20          MR. NAZAROV:  Objection, form.
21      A.  Yes, I don't recall who flagged it initially,
22  but we would have -- using your term "flag," we -- we
23  saw an issue with it.  And you could see right away
24  Mr. Longoria replied to this e-mail with -- you know,
25  with some concerns, and he probably would have, you
```



Page 251

1    know, done additional research or talked with people

2    after that, so...

3        Q.  (BY MS. PARR)  And as you explained before,

4    Mr. Longoria -- part of Mr. Longoria's issue with this

5    plan was that it would -- it would have involved sharing

6    private information about an asylum seeker with a

7    foreign government; is that correct?

8                MR. NAZAROV:  Objection, form.

9        A.  I believe that's what the issue he stated was,

10   yes.

11       Q.  (BY MS. PARR)  Thank you.  And the -- the

12   imp- -- the plan that was later implemented, the one

13   that didn't have these same issues, was that meeting

14   ever -- excuse me -- let me rephrase.

15               You mentioned that this plan was never

16   implemented, but there was a similar improved plan that

17   was.  Do you know if Mr. Chavez and the other CBP

18   officials at Laredo meant -- met with INM again to

19   discuss the next plan?

20               MR. NAZAROV:  Objection to form.

21       A.  I don't know if they did or not.  If -- if I

22   was made aware of it, I don't recall.

23       Q.  (BY MS. PARR)  But the plan that was

24   implemented did involve cooperation from Mexican

25   officials, correct?



Page 252

1          MR. NAZAROV:  Objection to form.

2      A.  So in everything we do, you know, we want to

3  take into account our Mexican counterparts' concerns, to

4  use your term, cooperation.  I don't know that they

5  would necessarily have to cooperate as we weren't

6  sending anyone back to Mexico.

7              It was, you know, conducted at the line of

8  demarcation and -- but obviously, in -- in everything,

9  we're going to, you know, seek to have not -- I don't

10  want to say concurrence, but we don't want to be -- you

11  know, we want to be good neighbors and take their

12  concerns into account on -- I don't know if that makes

13  sense.

14      Q.  (BY MS. PARR)  That certainly makes sense

15  with --

16      A.  But we weren't --

17      Q.  -- the official --

18      A.  I'm sorry.  I -- I was going to add:  We

19  weren't giving them this second plan I told you about.

20  We weren't giving the Mexicans -- the Mexican government

21  officials, you know, information as, you know, this plan

22  stated.  We weren't telling them when we were going to

23  send people back.  It just happened there at the middle

24  of the bridge.

25      Q.  Thank you, Mr. Harris.  You mentioned that the



Page 253

1   version of the plan that was implemented at the Laredo

2   P -- POE involved CBP officials handing a migrant a

3   piece of paper with information about social services in

4   Mexico, correct?

5        A.   Right.  When I say "social services," from what

6   I remember, it had hospital information on there; it had

7   INAMI's contact information, I believe; shelter

8   information, I believe.  And there's another sheet we

9   often give out called "Free Legal Services."  It might

10  have had the free legal service information on there.  I

11  don't, you know, recall exactly what was on there, but

12  that's what I mean by social services.

13       Q.   Thank you.  And did CBP ask anyone at INAMI for

14  advice or suggestions in compiling these resources?

15            MR. NAZAROV:  Objection to form and scope.

16       A.   I don't know if they did or not.

17       Q.   (BY MS. PARR)  Do you know if that information

18  was compiled by CBP or by INAMI?

19            MR. NAZAROV:  Objection to form and scope.

20       A.   I don't know who --

21            MS. PARR:  Mr. Nazarov, is that --

22       Q.   (BY MS. PARR)  I'm sorry.  Please continue.

23       A.   I don't know who the information was compiled

24  by.

25            MS. PARR:  Mr. Nazarov, is there a way for



MAGNA
LEGAL SERVICES

Page 254

 1    me to have better phrased that question?

 2              MR. NAZAROV:  You asked him a question --

 3    off the top of my head, I don't have a way for you.

 4    You're asking about should the communications outside of

 5    the three ports that is the scope that he is answering

 6    for.  He's also saying he doesn't know, and you're

 7    asking him to speculate.  So off the top of my head, I

 8    don't know how you would rephrase that question.

 9              MS. PARR:  It's my understanding that

10    Mr. Harris is here as the 30(b)(6) deponent for the

11    entire Laredo LFO.  And that would include all of the

12    ports of entry within it, correct?

13              MR. NAZAROV:  Well, I'm not sure.  It seems

14    like your questions are for CBP for all ports.  That's

15    how I -- I'm reading your questions.  And they're

16    also -- they're asking for speculation on his -- on

17    his -- he's speaking on behalf of Laredo Brownsville and

18    Hidalgo, and you're asking him to speculate.

19              I'll say this, Allison:  Why don't you just

20    let me make my objection because we're getting kind of

21    to the end, and I'm worried about him a little bit as

22    far as exhaustion.  So why don't you just ask your

23    questions, I can have a standing objection, and that way

24    we can get through it.  How about that?  And then we

25    can --



Page 255

1          MS. PARR:  That sounds good to me.

2          MR. NAZAROV:  We'll -- we'll talk about it

3     later if it's an issue.  Okay?  So why don't I --

4          MS. PARR:  Okay.

5          MR. NAZAROV:  -- do a standing scope

6     objection, and I'll only chime in if I think there's a

7     form objection, and then we'll just deal with it at the

8     other end.  Okay?

9          MS. PARR:  Thank you.  That works for me.

10     Q.  (BY MS. PARR)  So I -- I would like to go next

11     to -- oh, sorry.  Mr. Harris, I just wanted to clarify

12     that when I'm asking about all ports, I am not asking

13     about all ports at the U.S.-Mexico border.  I'm asking

14     about all ports that are within your purview, so all of

15     the ports within the Laredo Field Office.  Does that

16     make sense?

17     A.  Yes.

18     Q.  Thank you so much.  I would like to show you

19     Exhibit 249.  This document bears the Bates No.

20     AOL-DEF-00563847.

21          MS. PARR:  And, Kevin, if we could scroll

22     to the bottom of the second page of the document, which

23     is Bates No. AOL-DEF-00563848.

24     Q.  (BY MS. PARR)  There's an e-mail sent from

25     CBP -- sorry -- CBP-CAT, dated November 17th, 2016, sent



Page 256

1    to certain LFO personnel, including Mr. Longoria; is

2    that correct, Mr. Harris?

3                MR. NAZAROV:  I'm sorry.  I'm sorry to

4    interrupt.  We -- we don't have that document.  I also

5    want Mr. Harris the opportunity to read the entire

6    document before you launch into a question on a small

7    part of it, if that's okay --

8                MS. PARR:  Certainly.

9                MR. NAZAROV:  -- with you.  Okay.  Thank

10   you.

11               Mr. Harris, would you like the opportunity

12   to skim through the entire document?

13               THE WITNESS:  Yeah.  It doesn't seem to be

14   that long.  Yes, I would.

15               MR. NAZAROV:  Okay.

16               And we just got the document, so thank you

17   very much, Allison, and -- and Sarah.

18               Yeah.  Mr. Harris, why don't you just take

19   an opportunity to look through this document and kind of

20   orient yourself with it, and then -- and then we'll go

21   from there.  Thank you.

22       A.  Okay.  I've read the first section.  If you

23   could move it up some, please.  Okay.  You can move it

24   up, please.  Okay.  I've got that section.  Okay.

25       Q.  (BY MS. PARR)  Thank you, Mr. Harris.



Page 257

1          MS. PARR:  Kevin, if you could actually

2     blow up that.

3          A.  Okay.

4          Q.  (BY MS. PARR)  Mr. Harris, have you reviewed

5     the document in its entirety?

6          A.  Yes.

7          Q.  Great.  Thank you so much.

8          MS. PARR:  Kevin, I would actually like to

9     go to the last e-mail communication, which is at the

10    bottom of the page ending in Bates -- Bates 48.  Yes,

11    perfect.

12         Q.  (BY MS. PARR)  This is an e-mail from

13    Mr. Longoria asking -- I'm sorry.  This is an e-mail

14    from CBP-CAT asking that certain port directors provide

15    responses to this list of six questions, correct?

16         A.  Yes.

17         Q.  And these questions include:  "It's the POE or

18    crossing metering?  Who is doing the metering? (CBP or

19    Mexico)  Where is the metering taking place?  How is the

20    metering being handled?  If the metering is being done

21    by Mexico, how is POE communicating the number of OTMs

22    to be metered to the POE?  Has the POE crossing --

23    border crossing turned away any aliens due to capacity

24    issues once the aliens were on U.S. soil?"

25              Is that correct?


MAGNA
LEGAL SERVICES

Page 258

1       A.  Yes.

2       Q.  And OTM is an abbreviation for other than

3   Mexicans; is that correct?

4       A.  Yes.

5       Q.  Thank you.  And going up to the next portion of

6   that communication, I see an e-mail from later that day,

7   11:40 a.m., with Mr. Longoria directing the port

8   directors to pass along the answers to that

9   information -- to those questions to you; is that right?

10      A.  Yes.

11      Q.  Was reviewing this information part of your

12  role as a sup- -- in a supervisory role over programs

13  being implemented at the LFO?

14      A.  Okay.  Repeat that, please.

15      Q.  I'm sorry.  At the time of this e-mail, you

16  were in a supervisory program role; is that right?

17      A.  Yes.

18      Q.  And so it was -- it was your job to review all

19  of the answers to these questions?

20      A.  Right.  So what I would have been doing is

21  consolidating all the answers and putting them into one

22  document.

23      Q.  Do you know what that -- do you know what that

24  document would be called?

25      A.  It -- no, I don't.  It probably just -- the



Page 259

1    name of the document, no, I don't recall, but it would

2    have just been probably a Word document.  We would have

3    formatted it somehow, you know, attached it to an

4    e-mail, and responded to the CAT.

5        Q.  And was the purpose of that Word document, just

6    to memorialize what -- what each port of entry was doing

7    with respect to metering?

8        A.  Well, the purpose is to answer the questions

9    that were asked by the CAT, which is -- that's -- I

10   mean, the RFI, we're pressed for information, we get

11   RFIs on everything all the time at the field office.  So

12   that's just one of our many duties here.

13       Q.  Thank you, Mr. Harris.  And do you know who

14   would have reviewed this information once you compiled

15   it and sent it along?

16       A.  Who would have reviewed it once I compiled it

17   and then what?

18       Q.  Sent it along to --

19       A.  Sent it along?

20       Q.  -- to the CAT.

21       A.  Yes.  At the time, I would have sent it

22   for -- to Mr. Longoria for review, I'm sure.

23       Q.  Thank you, Mr. Harris.  So I would like to look

24   at Mr. Chris Cantu's response, which is just above.  And

25   at the time that he sent this e-mail, he was the port



Page 260

1    director for the Roma Port of Entry; is that correct?

2        A.  Yes, that's correct.

3        Q.  Thank you.  And in this e-mail, Mr. Cantu

4    informed you that the Roma POE met with Mexican

5    Immigration to discuss the metering process, which was

6    to:  "Provide migrants a sheet of paper with the

7    date/time (no CBP information/logos) as to when they can

8    return to be processed."

9            Did I read that correctly?

10       A.  Yes.

11       Q.  Do you know why Mr. Cantu specified that the

12   sheets of paper being given to migrants did not contain

13   any CBP information or logos?

14       A.  No, I don't.

15       Q.  From what you recall on being involved in this

16   project, receiving this information and compiling it to

17   be sent to the CAT, do you recall if the other -- if the

18   other ports within Laredo LFO did the same?

19            MR. NAZAROV:  I'm going to object to form

20   and scope on this.

21            MS. PARR:  Certainly.  I'll ask that

22   another way.

23       Q.  (BY MS. PARR)  So Mr. Cantu says that the Roma

24   POE is handing out pieces of paper that don't identify

25   CBP or have any information or logos about CBP; is that



Page 261

1    right?

2         A.  Yes.

3              MR. NAZAROV:  I'm going to have a standing

4    objection.  I believe we've objected to this, but go

5    ahead.  He can answer.

6              MS. PARR:  Thank you.

7         Q.  (BY MS. PARR)  So I was just going to ask:  Do

8    you recall whether the other ports also had a practice

9    of giving migrants pieces of paper that did not identify

10   CBP or have any information or logos about CBP on it?

11        A.  So from what I recall, this process, as I think

12   Mr. Sanders said somewhere there, you know, they never

13   had to implement this process, which was the case in

14   most of the ports.  But from what I recall, migrants who

15   were given a sheet of paper, it was -- yeah, it was a

16   scrap of paper with, you know, the time on it or -- or a

17   general time.  It wasn't an official appointment card

18   or -- or anything like that.  So if the other ports were

19   doing that, then, yes, it would have been the same type

20   of -- type of process, no official CBP document, just a

21   sheet of paper with a time on it.

22        Q.  Why would that have been the same for each port

23   of entry, that the -- the documentation wouldn't

24   identify CBP?

25        A.  Yeah, I would presume it would be the same for



Page 262

1   every port, yes.

2       Q.  Do you know why that is?

3           MR. NAZAROV:  Objection, form.

4       A.  No.  I mean...

5       Q.  (BY MS. PARR)  Mr. Harris, you can answer.

6       A.  Yeah.  No, I don't know.  I could, you know,

7   speculate.  We don't want it to look like it's an

8   official government document or something, but we're not

9   actually telling someone we can process you at, you

10  know, 5:15 this afternoon.  It was more general, "Hey,

11  this shift has all they can process.  You know, come

12  back after this certain period of time."  That's my

13  understanding.  It was a more general advisement in

14  nature.

15      Q.  Thank you.  And as you stated, Mr. Cantu also

16  represented that the Roma POE had not turned away any

17  migrants due to capacity issues, correct?

18      A.  That's what's stated in the e-mail, yes.  And

19  that was the case at most of the ports that I'm aware

20  of.

21          MR. NAZAROV:  Allison, I'd just like to

22  come in here.  I'm definitely not a math whiz, but I

23  just want to let you know we started at 10:23.  We took

24  about an hour's worth of breaks by my calculations.  So

25  we believe at about 6:23 or so is when the 7 hours runs.



Page 263

1    And I'm also a little bit worried about Mr. Harris right

2    now.

3              MS. PARR:  I only have a handful -- handful

4    of documents.

5              Sarah, what is your count on the time?

6              MS. RICH:  Yes.  This is Sarah Rich for the

7    plaintiffs.  I've been keeping time on the record, and

8    it's about -- it's six hours right now.  I don't think,

9    you know, Ms. Parr will be dragging this on

10   unnecessarily, so I think we'll be moving right along,

11   but we still have an hour.

12             MR. NAZAROV:  Well, that -- I mean -- okay.

13   I mean, I'm not going to argue with you guys.  I

14   definitely want you to have your time.  I understand you

15   did your calculations.  I did my calculations.  So, you

16   know, I'm coming out with eight hours, and we took about

17   an hour of breaks.  Now, did I count every five-minute

18   break?  Most of them, I did.  But -- okay.  Allison, I'm

19   going to let you go and continue with your questions.

20             MS. CASSLER:  Noah -- excuse me.  Noah kept

21   time as well, right, the official time?

22             THE VIDEOGRAPHER:  Yeah, I've kept time

23   too.  I have six hours and one minute.

24             MR. NAZAROV:  Okay.

25             THE VIDEOGRAPHER:  The -- the -- that's the



Page 264

 1    total time for being on the video record.

 2              MR. NAZAROV:  We -- we had a lot of stuff

 3    off the record too.  I mean, that should count.  And we

 4    had to wait 30 minutes for the videographer.  Again, I'm

 5    not -- you know, I'm going to let you ask questions, of

 6    course.

 7              MS. PARR:  Thank you.  I'll get back to

 8    that then.

 9        Q.  (BY MS. PARR)  Let's see.  I wanted to scroll

10    up to see the top of this document, the second to top

11    actually, an e-mail that you sent in response to

12    Mr. Cantu.

13              And in this e-mail, you've asked Mr. Cantu

14    some follow-up questions to understand -- to understand

15    what he had agreed to with INAMI; is that correct?

16        A.  I was asking him follow-up questions, but I

17    wouldn't say that it had anything relating to what he

18    agreed to with INAMI.  I was just trying to get a better

19    handle on his plan for metering.  I don't see anything

20    there that INAMI would have had to agree to.

21        Q.  Oh, apologies.  I -- I actually didn't think

22    about this.

23              Going to the -- the top of this, of the

24    second page, the e-mail from Chris Cantu to you at

25    12:07 p.m. on the 17th of November, Mr. Cantu is



Page 265

1    summarizing a meeting that he had with INAMI officials,

2    correct?

3                    MR. NAZAROV:  Objection, form.

4         A.  Yeah, that -- that's the -- that would be the

5    summary of his meeting, I believe.

6         Q.  (BY MS. PARR)  Do you know whether this meeting

7    happened in person, over the phone, or over some other

8    form of communication?

9         A.  I -- no, I don't know.  That's -- I don't see

10   it stated anywhere in there, in the -- in the message.

11        Q.  Is there a mode of communication between CBP

12   officers within the Laredo OFO and -- and INAMI or other

13   Mexican officials?

14        A.  Can you state that question again, please?  I

15   didn't hear the beginning.

16        Q.  I apologize.  Is there a typical way that CBP

17   communicates with Mexican officials?

18        A.  Phone, text, face-to-face meetings, of course,

19   and -- and more recently than -- probably not 2016, but

20   apps like WhatsApp, yes, have become popular.

21        Q.  Thank you.  I appreciate that.  And then,

22   finally, just scrolling up to the top of the first page,

23   Cantu is responding to your questions about his metering

24   practice.  He responds that:  "Metering would be done on

25   the U.S. side at the pedestrian lane by admissibility



Page 266

1    officers."

2            And that:  "OTMs would be turned back at

3    the turnstile with special instructions on a tentative

4    return day and time for processing."

5            Did I read that correctly?

6    A.  Yes.

7    Q.  And is that your understanding of how metering

8    worked at that time?

9    A.  Yes.  When all this first started, which is

10   when this RFI originated, there was -- and, you know, we

11   saw with the documents from Laredo earlier there were

12   still a lot of -- I don't want to say misconception, but

13   the concept was new, it was -- I don't want to say

14   misconception or misunderstanding, but there just wasn't

15   a very good understanding of, you know, what metering

16   meant, what we should be doing.  So this was his best

17   understanding of at the time was -- was that have been

18   okay -- or that would have been okay -- excuse me -- to,

19   you know, meter there at his turnstiles as they're

20   coming into the -- the port.

21           But, as you know, we've made claim more

22   than once it was, you know, communicated to ports that

23   any sort of metering had to be done at the line of

24   demarcation.  And by metering, I should probably say

25   turnbacks, that they shouldn't be turning people back



Page 267

1    from within the U.S.  We don't really use the term

2    "turnback" in the LFO, but I know that I -- I've seen

3    that on the -- the documents, the -- the documents on

4    what it would be that were read this morning.

5         Q.   Thank you.  And so your understanding is that

6    these turnbacks were not necessarily a correct

7    interpretation of CBP's legal requirements, but there

8    may have been a time, and, in fact, there was a time,

9    when this was happening at the ports of entry before the

10   LFO knew about it?

11             MR. NAZAROV:  Objection, form and scope.

12        A.   So I'm going to ask you to repeat that

13   question, but I'm going to say that I -- I don't agree

14   with that statement, though.  Could you ask it again,

15   please?

16        Q.   (BY MS. PARR)  Oh, yes, of course.

17             So it -- you stated that you didn't want to

18   use the word "misconception" or "misunderstanding," but

19   you thought that -- you thought that this -- this

20   practice of turnbacks that Mr. Cantu described here was

21   not necessarily proper; is that right?

22             MR. NAZAROV:  Object --

23        A.   Yes, from this --

24             MR. NAZAROV:  -- on the scope --

25             Let me object.



Page 268

1              Objection, scope and form.

2              Go ahead.

3      A.  So as I understand, like I said, we've never

4  used the term "turnback" in the LFO, but as I understand

5  the way you're using the term, then, yes, what he is

6  proposing would be an example of a turnback.  Does that

7  answer your question?

8      Q.  (BY MS. PARR)  Yes, it does.

9      A.  Okay.

10     Q.  Do you know for certain that this was never

11  implemented at Roma?

12     A.  That it was -- so never is a long time, so, no,

13  I don't know for certain that it was never implemented.

14  But my understanding is that Roma, like a lot of the

15  small ports, never would have had a reason to implement

16  that at the time.  So from what I understand, it was

17  never implemented.  But could it have at some point in

18  time been?  Yes, I suppose.

19     Q.  Thank you.

20             MS. PARR:  I'm finished with this document.

21     Q.  (BY MS. PARR)  I'd like to direct your

22  attention to what will be marked as Exhibit 250 to your

23  deposition.

24             MR. NAZAROV:  All right.  Allison, let's do

25  this again.  We still have not received it.  I would



Page 269

1   like to -- Kevin to blow it up so that Mr. Harris can

2   read the entire document, if you don't mind.

3                   Mr. Harris, are you able to see that?

4                   THE WITNESS:  Yes.

5                   MR. NAZAROV:  Okay.  Take your time reading

6   the entire document, please.

7                   MAGNA TECH:  It's a few pages.  Let me know

8   when you're done with this e-mail, and then we'll scroll

9   up again.

10                  THE WITNESS:  I will.  Thank you.

11                  MR. NAZAROV:  Allison, are you guys sending

12  it to us?

13                  MS. PARR:  Yes.

14                  MR. NAZAROV:  Thank you.

15                  MS. RICH:  I'm sending all the exhibits as

16  they are coming up.  It's just taking a second to get

17  through servers.

18                  MR. NAZAROV:  Of course.  Thank you, Sarah.

19                  THE WITNESS:  I've read that first section.

20                  MR. NAZAROV:  Okay.  We got it.

21                  MS. PARR:  Thank you.

22                  THE WITNESS:  Okay.  I've read this

23  section. Okay.  Okay.  Okay.  Okay.  Okay.  Okay.

24  Okay.  Okay.  Okay.  Okay.  Okay.  Okay.  Okay.  Okay.

25  Okay.  Thank you.  Got it.  Thank you.  Okay.  Okay.



Page 270

1    Okay.  Okay.

2         Q.  (BY MS. PARR)  Great.  Thank you, Mr. Harris,

3    for reviewing this correspondence.

4              So in -- this e-mail is from George

5    Calderon, who is a CBP employee -- a program manager and

6    border security at the LFO; is that correct?

7         A.  Yes, that's correct.

8         Q.  And I just got to state for the record that

9    this is the document that we have marked as Exhibit 250

10   to your deposition, which bears the Bates No.

11   AOL-DEF-00579234.

12             And this e-mail message dated August 17th,

13   2018, from George Calderon was sent to Jesus Barrera and

14   cc'd a number of people, including yourself, correct?

15        A.  Yes.

16        Q.  And he's asking about whether September 5th

17   works as a date for Government of Mexico to visit the

18   Laredo PED -- POE; is that right?

19        A.  Yes.

20        Q.  Did this meeting occur on September 5th, 2018?

21        A.  I -- I don't know.  I don't recall if it

22   occurred or not.  I remember the -- the string, but I

23   can't remember if the meeting actually occurred or if it

24   was further postponed or canceled.

25        Q.  Do you have any reason to believe that it did



Page 271

1    not occur?

2        A.  I don't have a reason to believe -- to believe

3    either way.  It -- it may have, yes.  I -- I don't know.

4        Q.  Who typically attends these meetings?

5        A.  It -- so a meeting like this, it's -- you know,

6    it mentioned is working level.  They want to see the

7    processes, so it's going to be kind of a, you know,

8    working-level meeting.  The port for sure would have

9    representation, probably at the APD level, since it did

10   sound like DHS personnel were going to be there.  The

11   field office would have had representation at -- at some

12   level, probably not high level.  But I can see that the

13   field office probably would have had a representative

14   and the port as well.

15       Q.  Thank you.  And the field office

16   representative, would that have been somebody like a

17   program manager or someone in a supervisory role?

18       A.  Yeah.  So it would have been Mr. Calderon.

19   It -- I'm not certain who ended up coming from CBP

20   headquarters or DHS, but I might have attended.  Once

21   again, depending on who the representatives were, the

22   ADFO, Mr. Longoria, may have attended.  But I don't

23   recall this particular meet ing, exactly what we did.

24   And also, you come into calendars.  People might already

25   be scheduled for something else.  So we would have had



Page 272

1    representation; I just don't know who.

2        Q.  Did Laredo POE host the Government of Mexico

3    for any other meeting?

4            MR. NAZAROV:  Objection, form.

5        A.  Yes.

6        Q.  (BY MS. PARR)  What -- what were the subjects

7    of those meetings?  What was discussed?

8            MR. NAZAROV:  Form.

9        A.  So there's -- I'm trying to think of meetings.

10   Okay?  I'm not -- I haven't zoned out.  There's a

11   recurring meeting that occurs at most of our ports of

12   entry called PSCs, Port Security Committee, sometimes

13   referred to as binational PSC.  And we've been mandated

14   by OFO and maybe even CBP for years now to have these

15   meetings on a monthly basis, if possible.

16            And who attends these meetings and what's

17   discussed is going to vary based on the port.  Some

18   ports might not have a meeting every month.  Laredo Port

19   of Entry, I believe they usually do have a meeting, and

20   it'll be different officials.  It could be INAMI.  It

21   could be Serena.  It could be SAT, Mexican Customs.

22   It -- you know, the participants can vary from month to

23   month as well as the U.S. government participants.

24            So you're generally going to get us, the

25   Office of Field Operations, a lot of times U.S. Border



Page 273

1    Patrol will attend the meetings.  In some places, you're

2    going to get other state and local stakeholders will

3    attend the meetings.  But the intent is to be inclusive

4    of, you know, whoever had a stake at -- in the bridge,

5    in the operations.  Let's discuss from primarily --

6    seizure activity is always a -- a topic that's

7    discussed.  By seizure activity, I mean narcotics,

8    currency, weapons, enforcement-type seizures.  So that's

9    one meeting that occurs on a regular basis.

10            So the freight side of the house, cargo,

11    I'm not as familiar with anymore, but there are meetings

12    in Mexico, meetings in the U.S. at both -- at either

13    port of entry in the U.S. on the Mexican side.

14    Oftentimes you'll find these meetings held at local

15    university where it's -- once again, it's going to be

16    CBP, Mexican government officials, state and local

17    stakeholders attending these meetings, talking about

18    trade, cargo issues.

19            But hopefully, I haven't drifted off topic

20    from your question.  It's been since -- a while since

21    you asked it.  But the -- we have regular meetings with

22    the Government of Mexico on a -- you know, a lot of

23    topics.  But since we initiated MPP, Migrant Protection

24    Protocols, there's, especially in Brownsville and

25    Laredo, there's a lot of day-to-day communication and



Page 274

1    meetings.  You could call a meeting on that process flow

2    because it does require, you know, agreement and

3    cooperation to make that function.

4        Q.  (BY MS. PARR)  Thank you, Mr. Harris.  I

5    appreciate that.  So I just want to look at the second

6    e-mail down from the one that we just looked at.  And

7    this e-mail is from Morgan Plumer to a number of

8    recipients.  And in this e-mail, Mr. Plumer, who is the

9    deputy director for the office policy at DHS, states:

10   "Today I was able to chat with the head of COMAR in

11   person."

12               And they came -- and stating that they came

13   to an agreement about a date.

14               Would COMAR have been one of the -- one of

15   the entities planning to come to this meeting?

16       A.  I don't know.  I'd have to look at the string

17   again.  But it -- I don't know if it mentions COMAR

18   being there.  COMAR, I'm really not 100 percent sure who

19   they are.  I think that's the Mexican agency that kind

20   of runs their refugee-type program.  But COMAR isn't

21   someone that we would normally deal with.

22       Q.  Okay.  Thank you.  And all of these meetings

23   that you're discussing that occur at different port of

24   entry -- different ports of entry, sometimes as

25   frequently as once a month and discuss a myriad of



Page 275

1    issues, how are these typically scheduled?  Are they

2    scheduled over the phone, WhatsApp messaging, text

3    messaging, or e-mail?

4         A.  So, like, the -- the binational PSC, the port

5    security me- -- meetings I mentioned, a lot of times at

6    the meeting they'll schedule the next meeting, but it

7    would be scheduled locally.  More than likely, there

8    would be an e-mail sent out, "Hey, is everybody

9    available this day?  We want to have it at, you know,

10   Bridge 2 conference room in Laredo," on, you know,

11   whatever date at whatever time.  And so people could put

12   it on their calendars.  There might even be a calendar

13   invite.  I -- I don't know.

14        Q.  And have you ever attended any of these

15   meetings?

16        A.  Yes, I've attended a couple of the binational

17   port security meetings.  I haven't attended any

18   recently.  It's probably been several years.  I've

19   attended meetings at the -- the consulate in Nuevo

20   Laredo that had -- I believe had Mexican government

21   officials there, definitely had Mexican trade

22   stakeholders.  I attended a meeting in San Antonio at

23   the Government of Mexico's -- I believe it's a cultural

24   center they have in San Antonio.  But I've attended

25   meetings with Mexican officials, yes.



Page 276

 1      Q.  Thank you, Mr. Harris.  And I just finally want

 2   to draw your attention to the last page of this

 3   document, the correspondence -- I'm sorry.  Not the last

 4   page of this document, the second-to-last page, ending

 5   in 00579240.

 6              I'm looking specifically at the June 5th,

 7   2018, e-mail message from Shawna Garrison to Calderon.

 8   I -- actually, I apologize.  That's not the right --

 9   that's not the right message.  It's at the top of the

10   page ending with Bates stamp 00579240.

11              MR. NAZAROV:  Hold on a second.  Is this it

12   (indicating)?

13              MS. PARR:  Yes.  This is right.

14      Q.  (BY MS. PARR)  I --

15              MR. NAZAROV:  I'm sorry.  I just want to

16   make sure Mr. Harris is able to see it.

17      A.  From Shawna Garrison --

18      Q.  (BY MS. PARR)  Mr. Harris, can you see?

19      A.  -- to -- I'm sorry.  I didn't mean to

20   interrupt.

21      Q.  Oh, no.  I apologize.  I just wanted to make

22   sure that you could see the document.

23      A.  Yeah.  So we're talking about from Shawna

24   Garrison to George Calderon, with William Plumer copied,

25   and it's June 5th at 9:41 a.m.?  Is that the one?



Page 277

1        Q.  Yes, that's correct.

2        A.  Okay.

3        Q.  So I just wanted to point your attention to the

4    last sentence of the e-mail where Ms. Garrison states:

5    "Many thanks for your assistance, this is aligned with

6    one of C1's top priorities."

7              She's referring there to the upcoming

8    Government of Mexico visit to the Laredo POE, correct?

9        A.  So -- yeah.  My interpretation is "this" being

10   this meeting would be aligned with one of the top

11   priorities of C1.

12       Q.  Could you explain a little bit more about that?

13   Who is C1?

14       A.  Can I explain a little bit more about?

15       Q.  Sorry.  Just about what you -- what you said.

16   Who is C1?

17       A.  C1 is going to be the commissioner of CBP.

18       Q.  Okay.  And how does this visit align with one

19   of his priorities?

20       A.  So I -- I don't know what his priorities were

21   in -- in the middle of 2018.  I don't know what they are

22   and if those priorities would have been -- I don't know

23   if it's agencies.  And sometimes agency heads will put

24   out, you know, documents saying, "Hey, these are my

25   priorities," a mission statement type of document.  But



Page 278

1    I don't know what -- which are the top priorities that,

2    you know, Shawna Garrison is referring to.

3        Q.  Thank you very much, Mr. Harris.  I just have

4    one more exhibit that I would like to look at with you,

5    and this is going to be marked Exhibit 251 to your

6    deposition.

7                MS. PARR:  And, Ari, you should be

8    receiving it shortly.

9                MR. NAZAROV:  Great.  I'm sorry to

10   interrupt.  I just wanted to make sure he's able to see.

11   Is this the new exhibit you're putting up?

12               MS. PARR:  Yes.

13               MR. NAZAROV:  The app?

14               MS. PARR:  Exhibit 251.

15               MR. NAZAROV:  Yeah.  I just want to give

16   him an opportunity again to just read the entire

17   exhibit, if you --

18               MS. PARR:  Okay.

19               MR. NAZAROV:  -- don't mind.

20               MS. PARR:  The exhibit is just a single

21   page.  That's absolutely fine.  And --

22               MR. NAZAROV:  Oh, okay.

23               MS. PARR:  -- for the record, this exhibit

24   bears the Bates stamp AOL-DEF-00585486.

25               MR. NAZAROV:  We got it.  251, right?



Page 279

```
 1                   MS. PARR:  Excuse me?
 2                   MR. NAZAROV:  We just got it.  It's 251?
 3                   MS. PARR:  That's correct.
 4                   MR. NAZAROV:  Thank you.  So I just
 5      want -- if Kevin could blow up so that Mr. Harris
 6      can -- can read this.  'Cause it seems kind of small
 7      here, but that might be my computer.  I don't know.
 8                   MAGNA TECH:  And, sir, if you can't read
 9      it, I can blow them up separately by e-mail if you'd
10      like.
11                   MR. NAZAROV:  Okay.  I'm -- I'm sorry I'm
12      again interrupting.
13                   Just as a matter of housekeeping, Sarah,
14      you just sent two -- they're not separate exhibits.
15      They're just two copies, right?  The same thing?
16                   MS. RICH:  Yes, I believe I accidently
17      attached the exhibit twice, but it's the same document.
18                   MR. NAZAROV:  Yeah.  I'm getting tired, so
19      I was wondering if I was seeing things pass twice.
20                   MS. RICH:  Just messing with your head,
21      Ari.  Just playing with him, right?
22                   MR. NAZAROV:  I know you are.  It's
23      working.  It's working.
24         Q.  (BY MS. PARR)  Mr. Harris, have you had a
25      chance to review the document?
```



Page 280

1        A.  Is it just the one page here?

2        Q.  Yes, it's just the one page.

3        A.  Yes.  Yes, I read the three -- the three

4    messages.

5        Q.  Great.  Thank you.  So I wanted to start at the

6    bottom of the page.  This is an e-mail from ███████.

7    His e-mail address indicates that he is a State

8    Department employee.  And the subject line of the e-mail

9    is:  "List of asylum seekers at casa migrants Nazareth."

10                Is that correct?

11       A.  Yes.

12       Q.  And in this e-mail, he states:  "We met with

13   the director of casa migrants Nazareth yesterday and he

14   provided us with a list of asylum seekers currently at

15   the shelter waiting for INM to give them time to cross

16   the bridge.  Let me know if this is useful.  He said he

17   can send this to us every time they have a major change

18   in the number or composition."

19                Did I read that correctly?

20       A.  Yes.

21       Q.  Thank you.  In looking at the next message up,

22   you've forwarded ███████ communication to

23   Mr. Crawford and Mr. Barrera; is that correct?

24       A.  Yes.

25       Q.  And Mr. Barrera, is he the -- what was his role



Page 281

1    at Laredo?

2         A.  He's held several positions over the years, but

3    I think at this particular time, if you look at that

4    last -- the top of the message, it says chief of staff.

5         Q.  Thank you.  And Mr. Crawford?

6         A.  At that time, I believe he was the deputy port

7    director.

8         Q.  Thank you so much.  And in this e-mail, you ask

9    them:  "Would you have any interest in getting these

10   lists?"

11               Correct?

12        A.  Yes.

13        Q.  And just going to the top of the document,

14   Mr. Barrera's response, he says:  "They help in that we

15   would at least know what is coming our way and would

16   allow us to prepare for anything out of the ordinary."

17               Correct?

18        A.  Yes.

19        Q.  And is Mr. Barrera saying that having access to

20   these wait lists would be operationally beneficial for

21   the Laredo Port of Entry?

22        A.  That's the way I read, yes.

23        Q.  Do you know -- did you ever respond to

24   ███████████ e-mail and follow up about these lists?

25        A.  Yeah.  So after having received that



Page 282

1    response -- excuse me.  So having received that response

2    from the port, I would have responded to ▮▮▮▮▮▮ and

3    said, yes, you know, the port's interested in seeing

4    this -- this information.  I wouldn't know if that --

5    you know, from my perspective, which is probably why I

6    didn't respond and I sent it to the port for comment, is

7    that that shelter is only one of the shelters in Nuevo

8    Laredo, and they have numerous shelters.  So just one --

9    having the information from one shelter doesn't really

10   give anyone a comprehensive picture of what's going on

11   in Nuevo Laredo, which is the city across from Laredo,

12   Texas.  So I would have, you know, an interest in the

13   overall numbers, but the actual list, no.

14        Q.  Did you receive these lists from --

15        A.  I'm sorry?

16        Q.  -- from this shelter?

17             Did you end up receiving the list from this

18   shelter?

19        A.  I don't recall, but probably.

20        Q.  Would you happen to recall how frequently you

21   received these lists?

22        A.  No, I don't.  If -- when I did receive them, I

23   would have just forwarded them to the port.

24        Q.  Would the list be stored anywhere, perhaps in

25   your e-mail?



Page 283

1        A.   Oh, yes.  As mentioned before, I made it a

2    point to save anything even remotely similar to this as

3    part of the litigation hold that we're under.

4        Q.   Got it.  And do you recall whether the list

5    would have come directly from the shelter or from

6    ██████ from the State Department?

7        A.   I don't recall having ever received anything

8    directly from the shelter, so it would have come from

9    ████████

10       Q.   Thank you.  And you mentioned that this

11   particular shelter, casa migrants Nazareth, is just one

12   of many shelters serving that area, correct?

13       A.   Yes.

14       Q.   Have you ever received lists from the other

15   shelters in the area?

16       A.   I may have.  I don't recall.  I wouldn't be

17   surprised if I did, but it probably would have

18   been -- or it would have been forwarded from the State

19   Department and, more than likely, ██████, yes.

20       Q.   Thank you.  And either from ██████ or

21   from -- or from any other -- any other entity, have you

22   ever received any wait lists at shelters that are

23   relevant to the other POEs within the Laredo LFO?

24            MR. NAZAROV:  Objection, form.

25            MS. PARR:  I apologize.  I'll restate that.



Page 284

1     Q.  (BY MS. PARR)  Have you ever received any wait

2  lists of asylum seekers from other shelters?

3     A.  I believe so.  I recall having received

4  messages from the ports, but from what I remember, a

5  port of entry would have just sent us something, "Hey,

6  FYI, you know, we -- we got this list from -- you know,

7  from one of the shelters."  But it's -- I never saw that

8  as being -- and I don't think it is -- even in this

9  case, it's not the -- you know, the comprehensive "the

10  list" that everyone refers to.  It's just a list of

11  people that happened to be waiting at that particular

12  shelter.

13     Q.  Thank you, Mr. Harris.  And did you ever

14  receive any lists from INM?

15     A.  I don't recall having received anything

16  directly from INM.

17     Q.  And do you know if any ports within LFO

18  received any lists from INM?

19     A.  The ports, they may have, but I -- I don't

20  recall.  I don't recall.  No, not that I recall.

21     Q.  Thank you, Mr. Harrison.

22     A.  But I would be inclined to think that they

23  have.

24     Q.  I'm sorry.  Could you please repeat that?

25     A.  I said I will be inclined to think that they



Page 285

1    have.  Whether it -- how detailed it was, you know, what

2    was on it, I don't know, but I don't recall anything

3    specifically.

4        Q.  Okay.  But as we said, it -- it's possible, and

5    actually, you -- you think they probably have, correct?

6        A.  Yeah, it -- it's possible, but I think that

7    whatever they received would have been similar to this,

8    not a comprehensive list, just, you know, a list of

9    what -- you know, who was staying in the shelter or, you

10   know, what the -- the nationality breakdown would have

11   been.  That's always helpful information.  So that's

12   kind of the nature I think it would have taken, but I

13   don't recall --

14       Q.  Okay.

15       A.  -- specifics to answer your question.  I'm

16   sorry.

17       Q.  Thank you so much, Mr. Harris.  I really

18   appreciate your time.

19              MS. PARR:  Can we go off the record just

20   very briefly?

21              THE VIDEOGRAPHER:  We're going off the

22   video record.  The time is 5:43 p.m.

23              (Break was taken.)

24              THE VIDEOGRAPHER:  We are back on the video

25   record.  The time is 6:10 p.m.  Counsel, you may



Page 286

1    proceed.

2              MS. CASSLER:  So should we -- we should

3    probably say we have no further questions.

4              MR. NAZAROV:  Okay.  Okay.

5                        EXAMINATION

6    BY MR. NAZAROV:

7         Q.  Okay.  Mr. Harris, what factors go into

8    operational capacity?

9         A.  So there's a lot of factors that go into

10   operational capacity.  And -- and first, I should

11   probably say it's never really been defined to us as to

12   what it is.  I've never seen a textbook of operational

13   capacity.  So the operational capacity of a port of

14   entry, a particular crossing, is going to be based on

15   the -- the number.  And so in context of asylum seekers

16   and context of migrant processing is the context

17   or -- which is what I'm going to presume, or just in

18   general?

19        Q.  Yes, that's --

20        A.  Okay.

21        Q.  -- the context.

22        A.  Okay.  So when you're looking at your

23   operational capacity to bring in migrants for

24   processing, you're going to be looking at a lot of

25   different factors, primarily what else is going on at



Page 287

1    the port, other mission sets that you have to fulfill,

2    also how many people you already have in custody,

3    whether or not they are migrant cases or other types of

4    admissibility cases, which we have the -- that -- that

5    same space comes into account, how much physical space

6    is available, which gets into the holding capacity or

7    holding -- the detention capacity we talked about.

8              But we also get a lot of other types of

9    cases that take up that same physical space as well as

10   the same processing computers.  The same officers that

11   would be processing the migrants are also processing

12   other types of admissibility cases.  We get a lot of

13   persons with fraudulent documents, for example.  And I'm

14   going to use the term "inadmissible" for just in general

15   the types of cases that are going to be processed in

16   these spaces.  You know, we process quite a lot of

17   inadmissibles in the LFO, over 49,000 last year, I

18   believe.

19             But anyway, so you're talking about people

20   with fraudulent documents, people that might have

21   legitimate documents that they obtained fraudulently,

22   might have people that are making claims to be an United

23   States citizen and we don't think they are, may have

24   wanted persons.  And there's lots of different types of

25   cases they can be processing.  Additionally, the type


MAGNA ▶
LEGAL SERVICES

Page 288

1    and the makeup of the cases is going to affect that

2    operational capacity.

3                For example, if someone's, you know, a

4    native Spanish speaker or if they speak English, that

5    case is going to get processed a lot quicker than

6    someone who speaks a language that our officers don't

7    speak.  We get a lot of people from African nations.  We

8    get a lot of people from the Middle East, Eastern

9    Europe, and we have to get translators for all those

10   people, and that adds time to the process, which, you

11   know, is going to figure negatively into your

12   operational capacity numbers for a day.

13               Other things that might be going on at the

14   port, you know, outside of that, immigration secondary

15   processing, drug seizures, money seizures, weapons

16   seizures.  You get a lot of people that are Jeeped out

17   to the border patrol right now, and that's been the case

18   for, you know, several years with helping them out on

19   the -- other mission sets, we talked about those, you

20   know, earlier with the priorities.  The trade processing

21   is a -- you know, a really big thing in South Texas.

22               But I'd just say, in general, the people

23   that we have to dedicate to the other mission sets are

24   going to reduce your operational capacity in the

25   immigration realm, the migration processing.  Excuse me.



Page 289

1   But with the complexity of the cases, I touched on that

2   when I talked about the -- if a person doesn't speak

3   Spanish or English, if they're from another country, as

4   well as if a person has prior immigration or prior

5   criminality in their background, that's going to make

6   that case take longer.  That's going to take more

7   recesses -- more resources to request those documents.

8              If it's -- a family unit is going to take

9   longer and require more resources than, you know, a

10  single adult.  The same thing with a UAC, if it's what's

11  sometimes referred to as a vulnerable population.  So

12  this is going to figure into your -- your holding, and

13  now your operational capacity is affected by, you know,

14  what can that area really process, what can those cells

15  really hold.  If I get a UAC and there aren't any other

16  UACs around the same age currently in custody, then I

17  may have to dedicate a whole area just to that one

18  child.  The same thing with a family unit.

19             It's really hard to state this in general

20  terms, which is why I'm giving examples here.  But if

21  I've got, say, a male -- a family unit with a male head

22  of household who has children who are older and another

23  family unit with a female head of household who has

24  relatively young children, then I'm not going to be able

25  to detain them in the same detention areas or holding


MAGNA
LEGAL SERVICES

Page 290

1   cells.  So that, you know, as well is going to figure

2   into my holding capacity as well as the operational

3   capacity.

4            The downstream process is a -- a big factor

5   that was alluded to earlier.  We talked to that a bit.

6   But if, you know, we're having to wait on USCIS, we're

7   having to wait on ERO, HHS, OOR for the UACs, the -- the

8   more time we have to wait on those other agencies, then

9   the further -- obviously, the longer our cases are going

10  to take to come -- come to completion.  Hospital runs

11  are a big time drain as well.  We spend a lot of

12  personnel hours taking migrants to hospitals, medical

13  clinics, getting them medically cleared.  I'm trying to

14  think of some other examples.

15           Just in general terms, in addition to the

16  migration processing, the other mission sets and what's

17  going on at, you know, the port of entry is going to

18  figure into that.  I hate to use the term "calculation,"

19  but there's only so much footprint at a port, physical

20  space, there's only so many, you know, personnel to work

21  in a given day, so it has to be allocated.  And

22  everything else that's going on takes away from our

23  capacity to process the migrants.

24  Q.  Would you say that operational capacity is a

25  fluid concept at Laredo, Hidalgo, and Brownsville?



Page 291

1      A.  Yes, I would.  Operational capacity as well

2  as -- you didn't ask about it, but the holding capacity

3  we discussed earlier, that's also fluid.

4      Q.  Okay.  Thank you, Mr. Harris.

5              MR. NAZAROV:  I have no further questions.

6  I don't know if Rebecca or Allison have any kind of

7  redirect.

8              MS. CASSLER:  Hi.  This is Ms. Cassler.  I

9  do have a very brief redirect.  So can we take, like, a

10  five-minute break and reconvene?  And it'll be minimal

11  after that.

12              Is that okay --

13              THE WITNESS:  Sure.

14              MS. CASSLER:  -- Mr. Harris?

15              MR. NAZAROV:  Sure.  Five-minute break.

16              THE VIDEOGRAPHER:  We're going off the

17  video record.  The time is 6:19 p.m.

18              (Break was taken.)

19              THE VIDEOGRAPHER:  We're back on the video

20  record.  The time is 6:26 p.m.  Counsel, you may

21  proceed.

22                  FURTHER EXAMINATION

23  BY MS. CASSLER:

24      Q.  Mr. Harris, you recall that you're still under

25  oath today, right?



Page 292

1       A.  Yes.

2       Q.  All right.  Mr. Nazarov just asked you what

3  factors go into operational capacity, right?

4       A.  Right.

5       Q.  And at the beginning of your answer, you said

6  that there is no definition of operational capacity

7  officially, right?

8       A.  Right.

9       Q.  And, in fact, you've told me a few times today

10  that this term has never been officially defined by CBP,

11  right?

12      A.  As far as I'm aware, yes.

13      Q.  So really there is no official list of factors

14  that go into operational capacity, correct?

15      A.  That will be correct.

16           MS. CASSLER:  No further questions.  Thank

17  you so much for your time today, Mr. Harris.  I know we

18  put you through the wringer.  So thank you so much

19  for -- for being here today and for bearing with us.

20           THE WITNESS:  Sure.  No problem.

21           MS. CASSLER:  That's all from us.

22           MR. NAZAROV:  Okay.  Can we have -- the

23  witness would like to read and sign.

24           THE REPORTER:  Do you want a copy?

25           THE VIDEOGRAPHER:  All right.  Everyone



Page 293

1    stand by.  I'll put us off video.

2                    We're going off the video record.  The time

3    is 6:27 p.m.  This concludes today's deposition.

4                    (Deposition concluded at 6:27 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 294

1                    CHANGES AND SIGNATURE

2

3    PAGE LINE          CHANGE              REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____



Page 295

 1       I, RODNEY HARRIS, have read the foregoing
 2  deposition and hereby affix my signature that same is
 3  true and correct, except as noted above.
 4
 5
 6
 7       _____
         RODNEY HARRIS
 8
 9
10
11  THE STATE OF TEXAS      )
12  COUNTY OF HARRIS        )
13
14       Before me, _____, on this day
    personally appeared RODNEY HARRIS, known to me (or
15  proved to me under oath or through _____)
    (description of identity card or other document) to be
16  the person whose name is subscribed to the foregoing
    instrument and acknowledged to me that they executed the
17  same for the purposes and consideration therein
    expressed.
18       Given under my hand and seal of office this _____
    day of _____.
19
20
21
22       _____
         NOTARY PUBLIC IN AND FOR
23       THE STATE OF _____
24
25



Page 296

```
 1              UNITED STATES DISTRICT COURT
 2             SOUTHERN DISTRICT OF CALIFORNIA
 3
                                )
 4    AL OTRO LADO, INC., ET     )
      AL.,                       )
 5        PLAINTIFFS,            )
                                )
 6    VS.                        ) CASE NO.
                                ) 17-cv-02366-BAS-KSC
 7                               )
      KEVIN K. MCALEENAN, ET     )
 8    AL.,                       )
          DEFENDANTS.            )
 9
10              REPORTER'S CERTIFICATION
               DEPOSITION OF RODNEY HARRIS
11                   JUNE 2, 2020
12
13        I, Delia Ordonez, Certified Shorthand Reporter in
14   and for the State of Texas, hereby certify to the
15   following:
16        That the witness, RODNEY HARRIS, was duly sworn by
17   the officer and that the transcript of the oral
18   deposition is a true record of the testimony given by
19   the witness;
20        That the deposition transcript was submitted on
21   _____ to the witness or to the attorney
22   for the witness for examination, signature and return to
23   me by _____;
24        That the amount of time used by each party at the
25   deposition is as follows:
```



Page 297

1        Rebecca Cassler.....05:13
         Allison Parr.....01:18
2        Ari Nazarov .....00:09
         Dhruman Y. Sampat.....00:00
3
4        That pursuant to information given to the
5  deposition officer at the time said testimony was taken,
6  the following includes counsel for all parties of
7  record:
8        Rebecca Cassler, Attorney for Plaintiff
         Allison Parr, Attorney for Plaintiff
9        Ari Nazarov, Attorney for Defendant
         Dhruman Y. Sampat, Attorney for Defendant
10
11       That $_____ is the deposition officer's
12  charges to the Plaintiff for preparing the original
13  deposition transcript and any copies of exhibits;
14       I further certify that I am neither counsel for,
15  related to, nor employed by any of the parties or
16  attorneys in the action in which this proceeding was
17  taken, and further that I am not financially or
18  otherwise interested in the outcome of the action.
19       Certified to by me this ____ of June, 2020
20
21       _____
         DELIA ORDONEZ Texas CSR 7040
22       Expiration Date:  12/31/20
         Firm Registration No. 633
23       Magna Legal Services
         1635 Market Street, 8th Floor
24       Philadelphia, PA 19103
         (866)624-6221
25       www.MagnalLS.com



**A**

**abbreviation**
258:2
**ability** 249:13
**able** 25:16 64:19
67:18 76:8
77:16 79:21
80:3,21 90:20
91:8,18 99:14
123:14 143:18
157:11 160:6
162:5 171:5
173:11 175:25
208:14 215:10
216:5 220:14
239:15 269:3
274:10 276:16
278:10 289:24
**above-styled**
1:19
**abreast** 36:16
**absconders** 44:24
45:2
**absolutely** 73:17
92:1 278:21
**ACA** 226:14
227:6,15,22,24
227:25 228:3
229:16
**ACAs** 227:2,9
**accept** 173:8,9
**acceptable** 85:16
**accepting** 177:5
179:2
**access** 281:19
**accidently** 68:8
279:16
**accomplish** 187:7
187:11
**account** 13:25
14:1,2,6 15:4,5
123:20 252:3
252:12 287:5
**accounts** 15:2
**accuracy** 131:12

241:15
**accurate** 48:8,10
54:1 91:5
152:19 215:24
**accurately** 6:19
131:23
**acknowledged**
295:16
**acronym** 106:17
192:2 244:10
**acronyms** 10:21
**across-the-board**
66:23
**acting** 20:16
**action** 6:6 120:15
120:18,19
147:24 166:18
297:16,18
**actions** 51:23
141:18
**active** 14:7
**activities** 206:7
**activity** 212:20
273:6,7
**actu** 114:25
**actual** 21:7 23:2
25:19 38:1 61:7
63:20 70:1
86:23 111:1
114:2 159:7
203:17 282:13
**add** 78:25 96:21
202:7 219:25
252:18
**added** 46:3 78:16
90:7,17,22
**adding** 220:5
**addition** 187:24
290:15
**additional** 50:1
55:9 77:3,5
184:2 187:17
218:10 251:1
**Additionally**
287:25
**address** 82:8

85:22 86:4
247:15 280:7
**addressed** 60:21
**adds** 288:10
**ADFO** 47:20,21
53:15 271:22
**adjudication**
217:18
**adjustment**
206:5
**adjustments**
133:12 206:2
**admissibility**
35:8 58:8
167:20 215:2
219:15 246:7
265:25 287:4
287:12
**adopt** 168:5
**adopting** 219:14
**adoption** 10:6,11
**Adriana** 20:1,20
**Aduanal** 244:9
**adult** 289:10
**adults** 174:23
**advice** 253:14
**advise** 97:6 210:4
244:16
**advised** 208:20
244:14
**advisement**
262:13
**advisory** 98:24
**affect** 223:12
288:1
**affidavit** 12:24
**affix** 295:2
**African** 288:7
**afternoon** 78:12
236:18 262:10
**age** 289:16
**agencies** 46:23
86:21 178:21
196:14 277:23
290:8
**agency** 10:16

26:1,1 237:12
238:10,11
274:19 277:23
**ages** 174:13
**ago** 26:11 79:5
118:15 177:11
191:22
**agree** 7:11 38:3
87:21 98:25
192:25 264:20
267:13
**agreed** 242:24
244:22 264:15
264:18
**agreement**
226:14,15
250:7 274:2,13
**Ah** 146:1
**ahead** 18:9,23
52:24 62:15
63:14 67:17
70:23 87:14,14
96:7,21 119:5,6
129:3 131:21
132:20,24
136:13 138:24
144:5 153:25
153:25 159:14
166:10 170:21
170:21 171:13
172:19 186:17
207:6 211:15
212:3 223:8
249:11 261:5
268:2
**aimed** 219:21
**Air** 46:21
**airport** 126:15
**airports** 128:18
**AI** 1:4,4,8 6:6
296:4,4,8
**alien** 177:4 179:1
217:3,4 242:8
**aliens** 134:14
162:24 163:4
241:21,23

257:23,24
**align** 277:18
**aligned** 277:5,10
**alleviate** 172:14
188:12,25
205:13 212:19
**Allison** 2:7 3:7
10:25 207:20
236:12,13,18
240:19 254:19
256:17 262:21
263:18 268:24
269:11 291:6
297:1,8
**allocated** 290:21
**allow** 109:1
185:7 249:9
281:16
**allowed** 9:9 55:9
71:3 235:3,22
**allowing** 113:17
232:25 234:14
234:15
**allows** 72:13
**alluded** 80:4
290:5
**altogether**
147:21
**amenable** 188:9
**America** 243:19
**American** 248:5
**Americans** 97:6
97:24 98:3
192:12
**Americas** 100:11
124:23 247:10
**amount** 116:1,2
158:9 296:24
**and/or** 10:2
134:20
**annoying** 15:9
**anomaly** 107:17
**answer** 6:21 7:13
7:18,19,25
11:22 21:11,16
23:15 25:8 27:5



28:15,23 30:6,7
30:18 34:1
38:13 39:20
55:24 63:5,14
64:18 65:4
66:21 72:12
73:10 76:7,25
77:13,16 80:21
81:8 82:23 86:1
86:13 87:13
88:12,14 90:19
91:8,18 104:25
112:25 171:6
202:1 203:7,9
204:24 235:16
236:7 249:9
259:8 261:5
262:5 268:7
285:15 292:5
**answering** 7:6
254:5
**answers** 7:7 64:7
258:8,19,21
**anticipation**
29:18
**Antonio** 275:22
275:24
**anybody** 233:5
**anymore** 121:16
121:22 205:16
233:18 240:15
273:11
**anytime** 132:3
133:15 213:13
219:25
**anyway** 175:8
287:19
**Anzalduas**
100:13 199:23
199:25 200:13
200:16 201:24
202:4,15,24
203:6,8 204:10
204:12,22
205:1,23 206:7
206:11 207:23

207:25
**AOL-DEF-000...**
4:5 57:15
**AOL-DEF-000...**
4:9 132:9
**AOL-DEF-000...**
4:6
**AOL-DEF-000...**
4:14 162:3
**AOL-DEF-000...**
4:13 214:25
**AOL-DEF-000...**
4:8 119:10
**AOL-DEF-005...**
4:17 255:20
**AOL-DEF-005...**
255:23
**AOL-DEF-005...**
4:16 239:10
241:1
**AOL-DEF-005...**
4:18 270:11
**AOL-DEF-005...**
4:19 278:24
**AOL-DEF-009...**
4:15 143:6
**AOL-DEF-009...**
4:7 69:4
**AOL-DEF-009...**
4:11 138:16
**AOL-DEF-010...**
4:12 150:9
**AOR** 103:23
106:17
**apart** 32:23 39:9
188:21
**APD** 244:14
247:19 271:9
**apologies** 264:21
**apologize** 52:7
164:15 236:24
238:17 248:22
249:7,25
265:16 276:8
276:21 283:25
**app** 250:11

278:13
**appear** 139:12
**appeared** 295:14
**appears** 59:4
140:5 144:24
169:7
**applicability**
234:5
**applicable** 59:24
166:12 219:9
**applicants**
136:17
**application**
157:15 158:25
222:6
**applications**
218:12
**applied** 221:19
227:8,25 228:3
228:19 229:16
**apply** 85:7 202:1
237:19
**applying** 219:17
227:22
**appointed** 40:22
41:2 47:21
**appointment**
242:9 261:17
**appreciate**
244:12 265:21
274:5 285:18
**approach** 215:2
219:15 235:2
**approached**
231:25
**appropriate** 82:8
85:13
**appropriately**
236:10
**approximately**
225:16
**apps** 265:20
**April** 17:21
57:19,22 58:5
59:3 60:2 75:4
78:8 82:18,21

125:1 191:10
200:3,6,7,14,16
**arbitration** 12:11
12:13,15
**Arce** 20:20
**archive** 39:4
**archives** 31:19
32:14 39:23
**area** 23:5 24:4
54:7 83:9
106:19 126:12
182:15 201:16
211:18 283:12
283:15 289:14
289:17
**areas** 19:2,3 22:2
22:11,13,16,17
22:19,25 51:8
98:24 167:9
198:11,15
228:17,25
234:11 289:25
**argue** 157:19
263:13
**Ari** 2:12 3:8 17:1
23:21 29:2,2
30:10 63:6,10
68:16 94:14
132:1,5,10
135:21 143:10
144:2 150:24
215:5 278:7
279:21 297:2,9
**Ari.Nazarov@...**
2:16
**arose** 196:18
**arrange** 104:9
105:16
**arranging** 106:9
**arrested** 11:24
12:1 13:12,13
**arrivals** 205:11
**arrive** 201:4,4
202:6,11 203:5
**arrives** 178:11
**arriving** 59:21

144:17 244:15
**ASAP** 242:21
**aside** 125:16
**asked** 30:9 35:21
79:14 122:1
126:8,20
127:15 128:9
171:6 203:7
208:13 224:25
225:18 249:15
254:2 259:9
264:13 273:21
292:2
**asking** 10:24
11:9 102:4
127:10 132:4
205:12 209:12
226:18,23
254:4,7,16,18
255:12,12,13
257:13,14
264:16 270:16
**asks** 225:14,15
**aspects** 187:7
**assembling** 121:1
**asserts** 85:7
**assets** 220:15
**assigned** 48:15
**assignment** 43:13
**assignments**
206:4
**assistance** 277:5
**assistant** 20:1,21
36:12 40:18
46:11 53:15
242:3 243:22
243:24
**assume** 7:14
**assuming** 138:20
209:4
**asylum** 49:16
50:1,4 53:24
55:16 84:25
85:3,5,8,15
86:22 91:16,20
94:16,21,23



104:10,21
107:9 113:8
114:7,8 129:12
141:7 146:19
146:23 147:7
149:7,18 157:6
161:3 179:9,15
180:5 205:16
205:19 208:13
216:1 217:7,18
217:22 218:23
219:17,22
221:13,20
226:14 232:16
235:1 236:9
249:1 251:6
280:9,14 284:2
286:15
**asylum-seeker**
157:4 218:3
**asylum/credible**
216:17 218:11
218:17
**as-needed** 148:13
**attach** 166:1
**attached** 58:24
162:22 259:3
279:17
**attachment**
139:11 246:19
**attempt** 193:17
209:1
**attempting** 209:2
209:8
**attempts** 198:21
**attend** 20:8 273:1
273:3
**attended** 271:20
271:22 275:14
275:16,17,19
275:22,24
**attendees** 244:4
**attending** 273:17
**attends** 271:4
272:16
**attention** 131:15

268:22 276:2
277:3
**attest** 187:21
**attorney** 7:16
11:25 18:12,18
24:9,15,19,21
24:24 25:4 34:4
141:12 296:21
297:8,8,9,9
**attorneys** 9:9
16:2,3,7,12,16
16:18,23,24,25
17:9 24:2,5
27:1,8,18 28:9
28:19 29:17,20
29:21 30:1,4,14
30:22 31:21
32:24 75:7 77:9
80:17,25 81:9
117:18 297:16
**attorney's** 23:17
25:10 28:17,25
**attorney-client**
23:14 25:7 27:4
28:14,22 30:5
**audible** 6:20
**audio** 7:4
**August** 119:12
133:3 270:12
**authorities** 35:22
52:2
**authority** 86:17
86:18 94:20
160:15 178:22
181:2
**available** 115:8
167:8 198:10
206:11 275:9
287:6
**average** 170:4
**avoid** 173:13
**await** 145:2
**aware** 37:19 62:3
62:13 63:21
72:25 73:1,19
73:21,24 77:2

82:4 83:7,13
84:21 85:21
89:8 97:7,9
98:19 99:3
103:25 122:12
124:10 141:18
142:1,12,21,25
145:16,19
148:19 149:9
153:16 157:19
157:23 222:7
222:10,11
226:12,15,17
227:3,6 228:2
238:24 245:21
251:22 262:19
292:12
**awareness**
144:13 226:24
**AWParr@may...**
2:10
**Ayuda** 237:10
**a.m** 1:20 5:4,16
29:8,11 56:25
57:3 92:19,23
258:7 276:25

_____
**B**
_____
**bachelor's** 41:15
**back** 26:11 29:10
31:6 41:12 43:3
49:9 50:6 52:20
56:13 57:2
60:18 73:6,25
78:1 79:24
80:16 84:23
92:10,21 97:1
98:5 99:6 101:7
116:24 117:10
121:21,21
128:15 129:9
142:17 153:19
154:1 160:7
170:6 182:1,7
182:19 184:18
184:24 213:2

222:4 223:16
230:22 246:10
246:22 247:17
247:18 248:4
249:17 252:6
252:23 262:12
264:7 266:2,25
285:24 291:19
**background**
175:1 289:5
**backtrack** 77:10
**backup** 65:25
**backwards** 30:11
**bad** 34:15 68:4
**ballpark** 206:24
**Barrera** 20:19
270:13 280:23
280:25 281:19
**Barrera's** 281:14
**barriers** 188:12
188:12 204:8
**base** 38:25
**based** 88:22
100:24 122:24
123:19 124:9
128:4 149:14
150:4 153:20
155:8 174:10
183:3 196:22
196:24,25
197:3,13 198:9
223:14 272:17
286:14
**basic** 18:24 55:13
**basically** 31:2
70:16 90:5
164:4 180:21
198:11 238:9
247:12
**basis** 49:8 86:23
88:2 98:15
119:19 125:8
173:7 180:18
218:18 225:13
272:15 273:9
**Bates** 57:14 69:3

119:9 132:8
138:15 143:6
150:8 162:2
214:25 239:10
241:1 255:19
255:23 257:10
257:10 270:10
276:10 278:24
**bathroom** 176:1
**bear** 102:13
**bearing** 118:9
292:19
**bears** 239:9
241:1 255:19
270:10 278:24
**Becky** 236:15
**bed** 169:25 172:3
**beds** 167:8
**began** 124:24
194:2 200:18
**beginning** 21:17
92:22 117:20
125:25 126:5
162:2 182:2
209:21 236:20
237:18 265:15
292:5
**begins** 5:2,14
**begun** 227:18
**behalf** 254:17
**believe** 11:15,23
15:16 16:22
18:11 20:10
21:17,22 22:1
41:10,24 42:14
43:21 44:15
47:10,15 58:10
62:4,24 66:11
66:16 80:25
89:17 94:24
106:10 112:14
122:7,13
124:25 125:2
125:22 127:12
128:15 130:14
154:21,22



156:4,25
158:12 161:7,9
167:4 177:25
186:1 194:12
195:6 200:5
201:9 205:3
206:11 207:20
222:15,17
228:24 244:9
245:20 249:23
250:6 251:9
253:7,8 261:4
262:25 265:5
270:25 271:2,2
272:19 275:20
275:23 279:16
281:6 284:3
287:18
**Ben** 2:14 16:18
17:9 18:12
**beneficial** 281:20
**Benjamin** 2:20
**best** 7:7 66:25
72:15 99:15
110:19,22,25
120:2 138:11
166:17 174:6
237:21 249:13
250:15 266:16
**Beta** 10:15
103:22 237:11
**better** 80:2 116:6
126:7 188:12
195:21 254:1
264:18
**bewildered**
211:16
**big** 157:14
158:25 246:23
288:21 290:4
290:11
**biggest** 124:18
**binational** 88:2
272:13 275:4
275:16
**biographical**

175:1
**bit** 19:8,9 51:10
52:3 102:23
106:20 152:2
160:5 194:7
207:11 254:21
263:1 277:12
277:14 290:5
**blame** 186:25
**blanket** 165:21
166:1 167:1
172:22 173:6
**bleeding** 233:15
**blew** 143:14
**blow** 240:4,14,15
241:4 257:2
269:1 279:5,9
**board** 244:17
**body** 12:17
**boiled-down**
167:25
**boldfaced** 91:22
**booked** 220:4
**booth** 54:22
**border** 6:4 8:20
40:19 41:8 46:7
46:20 53:19
58:14,17 70:13
83:3 98:15
105:25 152:4
219:17 221:13
239:2 255:13
257:23 270:6
272:25 288:17
**borderline** 70:1
70:11
**boss** 33:5 36:9
**bottom** 58:3
243:5 246:25
255:22 257:10
280:6
**bound** 65:18
**boundary** 21:7
23:6 54:5 65:14
69:16 73:19
74:4 129:11

134:10 144:20
208:19 210:12
231:4,10
232:10,13,17
232:23 234:9
234:13,18,22
**box** 2:14 32:16
**Bradd** 57:20,25
69:6 77:12 78:7
139:4 140:14
150:17 151:17
152:6,15,22
**brain** 70:19
**break** 7:22,23,24
8:1 29:9 40:10
56:7,10 57:1
91:25 92:20
116:9,24 117:9
117:19 159:17
159:19 160:1
175:25 176:1
181:11,25
184:17 221:4
229:3,8 230:15
230:21 263:18
285:23 291:10
291:15,18
**breakdown**
285:10
**breaks** 9:11,15
206:23 262:24
263:17
**bridge** 22:7 23:2
44:4 67:5 69:23
69:24 71:2,23
72:16 74:16,24
75:12 79:18
81:20 84:3,3,7
84:13 86:17
88:2 93:17
94:23 95:15
99:23 100:10
100:10,11,12
100:16 102:17
105:9 108:23
108:24 109:1

109:23 115:6
115:10,11,20
116:2 124:22
124:22,25
125:1,3,10,12
129:14 145:11
148:15 182:20
182:21,23
183:18 185:23
186:1,2 188:10
192:13 200:4
200:25 201:1
201:19,20
203:16 210:18
211:1,12
212:13,15,16
212:24 213:3
213:13,16,17
213:23 214:8
214:12 216:13
216:13,15,16
216:18,19
218:10 247:9,9
247:10,21,23
252:24 273:4
275:10 280:16
**bridges** 18:25
43:11,25 69:22
83:19 86:19
98:5 100:13,14
124:22 128:1
148:10,22
182:16 186:4,8
186:9,12 187:2
200:19 201:13
202:8,13
204:15,16
205:6,14,16,19
210:16,17,19
210:21 217:7
**brief** 291:9
**briefed** 76:17
**briefly** 47:22
184:12 285:20
**bring** 32:20
95:17 115:5,6

204:6 286:23
**broad** 33:4 44:19
45:18
**broadly** 32:4
**broke** 20:7
**broken** 52:16
**brought** 67:11
131:15 189:1
191:5 204:18
211:25
**Brown** 2:8 29:3
**Brownsville**
18:16 19:25
22:3 23:3 37:17
52:12 72:2
95:23 100:14
115:2 183:9
254:17 273:24
290:25
**buckets** 45:18
**Buies** 41:19
**build** 123:23
**building** 54:16
54:17,20,21
65:20 123:8,23
124:8 131:9
**buildings** 67:24
125:10
**built** 201:13
**bullet** 70:1,5,10
163:15,16,17
163:19,21,23
164:6,7,22,23
165:12 167:23
168:25 175:11
176:17 179:7
**bullets** 35:22
71:1 91:22
168:24 169:24
177:3
**bunch** 206:24
**burdensome**
165:6
**bus** 211:19,20,21
**business** 60:3
86:25 88:4



98:14 107:11
107:12,15
109:6 148:23
201:21
**busses** 212:12
**B-U-I-E-S** 41:19

**C**

**C** 2:1
**calculating**
106:23 107:2
207:4
**calculation** 107:7
290:18
**calculations**
262:24 263:15
263:15
**calculator** 186:24
**Calderon** 270:5
270:13 271:18
276:7,24
**calendar** 275:12
**calendars** 271:24
275:12
**CALIFORNIA**
1:2 296:2
**call** 11:3 18:24
19:3 22:20
33:12 37:4
44:25 46:10
48:6,19 50:10
52:4 53:5 55:4
59:6,7,7 79:4
80:24 112:6
170:8 178:22
182:16 183:23
189:15 206:3
213:15 221:25
237:25 274:1
**called** 11:23
14:20,23 41:19
43:15 45:20
74:18 88:21
103:2,22
200:24 214:10
230:3 253:9

258:24 272:12
**calling** 103:5
**calls** 16:22,23
28:2 38:10
**calm** 45:1
**camera** 43:3
███████████
**camp** 105:25
106:1,4,8,13
**Campaign** 45:21
45:22 46:6,13
46:15,17 47:2,6
**Campbell** 41:18
**camping** 204:7
**canceled** 36:19
270:24
**canopies** 188:19
204:7
**canopy** 70:10
**Cantu** 260:3,11
260:23 262:15
264:12,13,24
264:25 265:23
267:20
**Cantu's** 259:24
**capabilities**
215:3 218:8
**capable** 65:6
**capacity** 11:3,7
51:14 93:21
95:17 98:17
106:21,23
107:3,7 122:15
122:18,22,23
122:25,25
123:1,4,5,12,17
124:4,8,11,17
125:7,8,19
126:3,6,6,16,21
126:24 127:25
128:4 134:3
135:11 137:8
137:25 138:1,6
140:1,1,3,11,15
140:20 149:23
151:24 152:8

152:17 153:24
155:7 157:4,12
159:5 167:8
180:10 196:23
197:1,4,4,6,9
197:14,14,22
198:2,3,6,8,9
209:18,22
216:19 217:11
217:13,15
220:3 226:19
226:24 235:10
247:7 257:23
262:17 286:8
286:10,13,13
286:23 287:6,7
288:2,12,24
289:13 290:2,3
290:23,24
291:1,2 292:3,6
292:14
**captured** 155:12
155:18
**capturing** 156:6
**Capufe** 86:16,16
**car** 144:19,19
199:1,11,15
204:3
**card** 261:17
295:15
**cargo** 42:22,23
43:9 44:5,7
50:12,15
126:15 128:18
128:19,20
129:6 201:1,12
206:15 273:10
273:18
**Carlos** 20:5,10
**Carolina** 41:20
42:2,6
**cars** 199:15
**casa** 280:9,13
283:11
**case** 1:6 12:22,25
13:2 15:11,14

15:20 33:17
65:25 103:10
109:20 139:12
140:6 155:11
163:23 165:3
165:14,18
166:4,19 167:3
169:2,5,11
171:21,22
172:1,2,8,20
173:16,17,23
174:11,15
193:11 196:1,2
196:12 197:7
197:17 204:14
206:6 216:5
218:5 222:5
236:9,19
261:13 262:19
284:9 288:5,17
289:6 296:6
**cases** 50:5 51:22
83:25 96:17
109:24 111:1
175:17,17
177:18 196:8
197:12 213:9
216:18 218:17
219:11,15
287:3,4,9,12,15
287:25 288:1
289:1 290:9
**Cassler** 2:3 3:6
3:10 5:5,7,11
6:2,5 19:11,14
19:16,17 21:8
21:12,18 23:16
23:19 24:1,7,13
24:18 25:9 27:6
27:14,17,23,25
28:4,8,9,12,16
28:24 29:13
30:8,13,20
33:25 34:3
38:15 39:24
56:2,11,13,17

56:23 57:5,10
57:12 63:6,10
63:16 64:20,25
65:2,5,7,10,12
66:2 67:2,20,22
68:3,7,11,14,23
68:25 69:1
70:21,25 71:1
72:9,22 73:3,5
73:21 76:9 77:4
77:19 78:1,5,6
81:3,5,10,12,22
81:24 83:5 86:3
87:4,12,18 88:5
88:7,14 91:1,12
91:24,25 92:2,6
92:9,16,24
93:25 94:14,15
95:25 96:8 97:1
97:15,19,22
98:16,25
104:15,25
107:4 108:6,17
108:20 109:4
109:18 110:16
111:4 112:5,13
112:20 113:3
114:23 116:4,9
116:14 117:1,3
117:5,13 118:5
118:8,12,18
119:4,7,8
121:23 122:9
132:4,10,16,21
132:25 133:2
135:4,5,21,23
135:24 136:1,7
136:8,13,24
137:21,23
138:19 139:1,2
140:17,24
141:4,6,11
143:3,10,22,23
143:25 144:1,6
144:10,12
146:16,18



147:3,12,19
148:12 149:12
150:12,16,24
151:2,4,10
152:13,19
153:10,17
155:2 156:10
156:11 158:22
159:14,18,22
159:25 160:9
160:12,14,20
160:25 161:10
161:21 162:8
162:10 166:22
168:10 171:8
171:11,14,15
171:24 172:7
172:11,24
173:15 174:9
175:3 176:2,6,9
176:13,15,16
176:21 178:18
179:24 180:12
180:19,24
181:11,14,18
182:4,12
184:21 185:12
185:20 188:3
189:19 190:10
190:20 191:1
191:15,21
193:1,12,19
194:23 195:10
195:20 197:16
198:1 199:17
199:22 205:15
207:1,5,7,12,15
207:18,22
208:4,18 213:4
214:21,23
215:5,13 216:7
221:2,7,9,25
222:11,18,22
222:25 223:1
223:19 224:5
224:16 225:2,7

225:21 226:18
227:8,13
228:13,20
229:5,13,20,25
230:14,25
231:8,22 233:3
233:16,21
234:4,25
235:21 236:5
236:11 237:18
263:20 286:2
291:8,8,14,23
292:16,21
297:1,8
**CAT** 120:15
259:4,9,20
260:17
**catch** 40:25
249:20
**category** 97:17
165:19
**CATs** 121:6
**caught** 99:7
192:14
**cause** 1:20 26:17
79:21 91:20
169:11 190:11
190:22 205:10
239:16 279:6
**caused** 6:6
**CBP** 2:19 8:20
10:1 13:21 14:9
14:10 16:3,7,18
20:24 32:25
35:1 40:6,15
41:4,6,8 42:13
42:19,21 43:10
43:19,20,23
44:1,10,13
46:19 48:9,15
48:15 49:5,10
49:25 50:3
54:17,20 55:20
58:11 59:16,17
65:14 70:2 75:2
75:14 80:17

86:9 87:5 98:18
98:18,19,25
99:3 100:21,22
101:1 102:15
103:1,6 104:18
104:20 105:11
105:15 106:9
106:15,22
107:2 109:4
111:22 112:6,9
112:14 119:15
119:21 120:24
121:1,9 135:16
138:1 140:3
147:8 149:6,17
149:22 153:12
155:7 160:15
168:25 169:23
169:24 172:2,8
172:24 178:2
178:11,12,23
179:4,5,16,17
179:18 180:7
180:14 181:6
190:13 194:13
194:15 198:17
199:3 203:20
203:23 204:11
216:17 217:6
222:14,18
223:2,13
224:18 225:8
226:9 227:8
234:1 236:21
237:25 239:1
244:5,22
245:12 248:17
249:20 250:9
251:17 253:2
253:13,18
254:14 255:25
257:18 260:7
260:13,25,25
261:10,10,20
261:24 265:11
265:16 270:5

271:19 272:14
273:16 277:17
292:10
**CBPO** 20:17
55:13 209:11
**CBPOs** 20:24
70:7 211:20
**CBP's** 9:21 10:2
10:14 16:1,11
27:1 85:14
102:9 158:23
172:12 175:7
185:13 187:7
232:18,20
233:18 234:18
267:7
**CBP-CAT**
255:25 257:14
**cc'd** 78:8 270:14
**cell** ███ 123:9,11
123:23 126:11
126:12 128:11
128:16,16,23
**cells** 123:1
128:17,20,25
129:6 198:9,12
198:13 289:14
290:1
**cemented** 214:7
**center** 2:4 48:6
49:13 51:15
129:22 130:24
131:4,5 216:14
275:24
**Central** 5:8,9
56:14 117:1,2
181:15,16
192:12 243:18
**certain** 15:18
16:20 35:9 47:1
85:21 89:22
108:4 109:16
109:17 115:7
116:2 150:22
159:2,2 160:24
164:18 172:23

178:17,23
185:4 195:1
196:8 200:7,11
201:2 221:1
250:14 256:1
257:14 262:12
268:10,13
271:19
**certainly** 62:3
83:3 87:1 195:5
240:3,12
252:14 256:8
260:21
**certainty** 220:21
220:25
**Certificate** 3:13
**CERTIFICAT...**
296:10
**Certified** 296:13
297:19
**certify** 296:14
297:14
**CFOs** 82:3
**Chad** 280:6
**chain** 139:2
239:24 240:5
**challenges**
134:20
**chance** 279:25
**change** 40:9 52:3
52:22,24 53:4
60:12,14 101:3
101:5 124:16
124:20 125:12
125:15 130:20
213:20,24
280:17 294:3
**changed** 37:18
91:5 121:11
124:12 127:14
175:11,12
177:18 206:12
223:17
**changes** 3:12
36:17 56:4,5
122:13 124:15



126:2,4 127:24
128:2,3 294:1
**changing** 125:8
125:17 160:14
**characterize**
232:21
**charged** 13:6
46:22
**charges** 297:12
**chart** 104:8
**chasing** 192:16
**chat** 274:10
**Chavez** 243:8,16
243:22 244:3
244:13,14
245:24 246:1
247:20 248:2
248:14,24
251:17
**check** 207:10
**checked** 176:8
**chief** 20:16,17
281:4
**child** 217:3
289:18
**children** 217:2,4
289:22,24
**chime** 255:6
**chin** 160:6
**choose** 30:8
101:23 172:25
**Chris** 259:24
264:24
**chronologically**
31:2
**Circuit** 224:16
**circumstances**
141:17 142:1,6
163:5,11 164:8
164:18,24
173:5,11 177:4
177:14 178:24
179:1,11,13,13
180:1
**circumvent**
193:7 195:24

209:2,8 248:25
**circumventer**
144:17 189:7
189:17 194:8
196:6 198:16
199:5,14
200:17 208:18
209:1
**circumventers**
189:6 193:4,13
195:9,15,23
200:21,24
201:5,24 202:2
214:10,11,17
214:18
**circumventing**
189:11,22
190:2 191:18
193:20 194:2
198:19 199:7
199:17
**circumvention**
183:24 189:21
190:12,18,22
193:23 194:10
194:14,24
196:2,3,17,19
197:8,11
210:10,11
**cities** 83:4 96:8
**citizen** 287:23
**citizens** 82:5
84:24 86:6 87:6
**citizenship** 55:2
**city** 41:18 52:13
94:2 96:3,15
185:25 282:11
**claim** 55:2 82:6
85:4,10 86:7
193:8 195:15
195:16 208:13
236:8 266:21
**claiming** 85:6
196:7
**claims** 217:18
287:22

**clarify** 18:18
33:7 225:7
242:2 255:11
**clarifying** 106:16
120:12 182:25
**Class** 54:3
**classification**
97:13,16 98:20
99:4
**classifications**
97:4 99:1
**classified** 97:10
**clear** 11:8 22:22
234:8
**cleared** 290:13
**clearing** 84:12
**clearinghouse**
120:25
**clearly** 118:22
132:12 162:6
215:8 243:11
**clinics** 290:13
**close** 19:8 23:23
62:23 75:22
95:24 105:25
210:23
**closer** 67:24 76:3
**clue** 211:17
**CND** 53:16
**code** 123:8
**codes** 123:21
185:6,17
230:11
**colleague** 10:25
236:12 237:24
**collect** 130:24
**collected** 119:18
129:17,19
**college** 41:17
**Colombia** 44:4
**column** 122:14
129:10,11,16
130:1,7 134:6,9
134:15,17,17
134:19,22
**columns** 133:25

**COMAR** 10:15
237:11 274:10
274:14,17,18
274:20
**combined** 90:11
**come** 63:23 74:10
75:2 82:15
83:23 84:1
92:10 95:16
96:17 102:18
112:22 116:24
121:20,21
123:9 162:25
167:17,21
177:20 182:19
209:10 212:16
224:24 230:5
247:17,18
249:14 262:11
262:22 271:24
274:15 283:5,8
290:10,10
**comes** 80:12 81:5
88:3 89:21
122:24 198:2
232:2 236:7
287:5
**comfortable**
27:11,15,16,21
72:1 118:25
**coming** 52:25
53:25 63:20
84:5 102:4
118:6 151:25
161:4 162:8
191:3 194:5
263:16 266:20
269:16 271:19
281:15
**Comisión** 237:10
**command** 52:16
52:17 53:5,7
**commander**
46:11,21 151:5
**commands**
198:23

**commensurate**
245:5
**comment** 85:19
140:10 215:16
250:6 282:6
**commentary**
137:2
**commented**
250:4
**comments**
136:15
**commercial** 70:6
211:3
**commissioner**
277:17
**Committee**
272:12
**commonly** 59:4
**communicate** 9:9
9:14 104:20
105:16 106:8
237:25
**communicated**
112:14 154:18
154:22 238:3,5
238:12,13,19
266:22
**communicates**
265:17
**communicating**
101:11,15
102:1 179:3
257:21
**communication**
109:2 237:6
238:23 239:2
241:5 257:9
258:6 265:8,11
273:25 280:22
**communications**
10:14 18:23
237:9 238:7
254:4
**communiqué**
111:15
**compared** 195:24



comparing 96:13
125:18 184:4
compile 129:22
130:25
compiled 253:18
253:23 259:14
259:16
compiles 135:14
compiling 51:20
253:14 260:16
complaining
233:9
complaint 63:20
complaints 62:12
64:9 84:4
complete 125:15
136:22 232:7
completed 42:16
124:25 125:1,3
completely
125:10,11,13
191:24
completion
290:10
complexity
173:23 174:11
174:11 289:1
compliant 183:20
198:22
complies 43:5
component 61:13
224:19 226:5
components
46:19 226:10
composed 244:10
composition
280:18
compound 46:7
comprehensive
282:10 284:9
285:8
computer 172:12
279:7
computers 220:6
287:10
conceivable

191:15
concentration
41:16
concept 74:19
196:22 266:13
290:25
concern 62:24
63:17,19 64:3
65:22 66:24
67:11 72:10
190:10,12,22
213:14
concerned
213:11
concerning 10:16
237:12
concerns 62:17
62:18,21,22
64:8 65:12 66:6
66:7,13,25 67:3
67:7 74:24 77:7
82:8 85:23 86:4
86:5 188:13
189:1 191:7
204:18 205:13
213:12 237:6,8
250:25 252:3
252:12
concluded 293:4
concludes 293:3
conclusion
191:20
concrete 188:12
concurrence
78:11 252:10
condition 161:18
conditions
149:15 150:4
162:25 163:9
164:8,25
conduct 13:21
71:23 73:17
82:1,11,25
83:14 84:19
conducted 54:19
200:8,9,10

246:4,14 252:7
conducting 7:1
85:15,15
213:17,23
conference 16:22
16:23 33:12
275:10
confident 100:19
confidential
18:23
confirm 78:14
242:2
congregating
116:1
Congress 12:20
conjunction
114:22
CONOPS 74:20
79:25
consequences 9:3
72:24 147:8,11
147:14,16,18
consider 94:4
106:2
considerably
229:1
consideration
295:17
considered 18:14
considers 237:8
consist 46:4
203:10
consistency
84:16
consistent 140:2
consolidate 45:6
consolidating
258:21
construction
116:5 124:9
125:3,16,18,18
125:19 127:25
consulate 275:19
consulting 77:9
147:23
contact 19:24

20:1 23:9 106:8
112:22 114:17
253:7
contain 260:12
contained 241:16
content 27:7
contention 180:2
context 59:20
179:6,14 191:8
286:15,16,16
286:21
contingency
156:13,24
157:3,16 159:1
159:10
continue 70:24
81:8 179:22
216:5,17
238:17 249:8
253:22 263:19
continued 48:4
continuing 6:3
121:25 242:19
contradict 76:21
contradiction
77:2
contrary 72:20
control 87:2
110:4 136:4
241:21 242:7
controls 82:2,4
82:12,17,25
83:11,14 84:19
85:15,22 86:5
86:10 87:7,9
conversation
24:4,9 34:5
64:11 112:18
225:19 231:24
conversations
16:1 23:11 24:1
24:14,18 33:7
34:19 35:2
37:20,24 75:4
88:1 96:22
99:20 109:7

131:6 225:6
247:19
convert 163:23
172:8
converting
174:15
convicted 13:9
Cool 40:13 41:25
68:25 131:11
132:25 139:1
160:12
cooler 188:11
coolers 188:20
cooperate 252:5
cooperation
251:24 252:4
274:3
cooperative
226:14
coordinate
105:11
copied 145:25
241:8 276:24
copies 169:18
224:11 226:6,6
226:10 279:15
297:13
copy 36:3 225:1
292:24
copy-and-paste
131:18 167:18
cordialities 79:13
correct 36:14
47:7 57:24 66:1
77:24 87:11,17
87:18,19,21
96:5 100:24
101:17,18,20
102:3 104:5
133:21 137:18
139:19 144:23
145:8 155:10
157:5 167:2
173:19 178:17
178:18,20
180:24 182:5



190:23 232:19
236:22 238:1
239:3 241:9,25
242:4,11 244:6
244:24 248:5
251:7,25 253:4
254:12 256:2
257:15,25
258:3 260:1,2
262:17 264:15
265:2 267:6
270:6,7,14
277:1,8 279:3
280:10,23
281:11,17
283:12 285:5
292:14,15
295:3
**correction** 194:1
**correctional** 42:9
**Corrections** 42:7
**corrective** 141:18
**correctly** 78:16
232:1 241:13
243:1 260:9
266:5 280:19
**correspondence**
241:9 270:3
276:3
**corresponding**
71:1
**corresponds**
134:9,16
**corrupted** 131:17
**cost** 188:15
**costs** 188:4
**counsel** 5:6,20
6:25 9:14,17
19:10 27:10
29:11 57:3
68:17 92:23
117:11 182:3
184:19 230:23
285:25 291:20
297:6,14
**count** 263:5,17

264:3
**Counter** 53:16
**counterpart**
241:20
**counterparts**
109:7 225:6,9
238:10 242:21
252:3
**countries** 97:5
**country** 169:8
221:20 289:3
**COUNTY**
295:12
**couple** 15:7
18:13 40:2
83:12 154:24
205:1 233:10
275:16
**course** 19:20
24:17 36:20
39:8 41:7 42:23
48:3 107:11
118:11 125:6
141:19 166:17
166:17 201:21
211:8,22 245:9
249:5 264:6
265:18 267:16
269:18
**courses** 49:15
**court** 1:1 5:19,22
6:17,19,25 8:25
11:11,18 12:4
12:17 192:22
222:4 296:1
**cover** 111:2
139:9 162:21
**covered** 10:25
204:6
**covering** 67:4
98:18
**covers** 10:1,14
**co-workers** 65:20
**Cranford** 2:23
**Crawford** 280:23
281:5

**create** 79:25
197:19 198:23
**created** 15:6 41:7
55:5 83:11
127:4 133:5,7
139:15 153:20
156:19 215:13
219:16
**creates** 70:6
198:19
**creating** 14:6
156:19,23
185:6 194:9
**credible** 136:16
136:19 137:4
179:11
**creek** 41:19,19
**crime** 13:6,9
**criminal** 9:2
169:7,8,15
**criminality**
173:25 289:5
**crisis** 120:15,17
120:19 219:16
**cross** 98:5 141:8
209:13 225:17
232:13,17
233:17 235:22
280:15
**crossed** 144:20
206:22
**crosser** 211:19
**crossers** 211:10
**crossing** 55:4
142:15 145:20
146:6,12 183:4
183:13 208:19
209:4 232:9,23
234:9,12 235:1
235:8 250:2
257:18,22,23
286:14
**crossings** 67:9
183:8 208:7
**Cruz** 20:21
**CSR** 1:21 297:21

**Cuban** 145:1,5
**cultural** 275:23
**curious** 18:21
22:23 195:22
198:1
**currency** 273:8
**current** 26:9
50:17 51:8,9
97:13 110:14
167:7 226:6
235:10
**currently** 50:16
78:14 79:15
81:23 219:9
241:3 280:14
289:16
**curtailed** 206:19
**custody** 134:2
165:6,18 167:6
167:9 177:6
179:3,21 180:3
195:8 197:12
217:24 234:15
287:2 289:16
**custom** 244:11
**customs** 6:4 8:20
41:5,6,8 42:1,3
42:10 49:11,19
50:11 55:20
100:21 244:6
272:21
**cut** 78:3 160:6
179:16,17
205:17 206:6
238:17
**cutoff** 156:3
**cutting** 179:5
**C-A-M-P-B-E-...**
41:18
**C-R-E-E-K**
41:19
**C1** 277:11,13,16
277:17
**C1's** 277:6

_____ **D** _____

**DAC** 33:13
**daily** 40:5 49:8
88:1 119:15,19
119:22 214:9
218:18
**dangerous** 65:17
66:17 96:10,12
96:15,19 97:2
97:16 98:8,10
98:13
**Daniel** 69:5
**data** 119:18
121:1 128:4,5
129:17,19,21
130:24 131:12
133:14,16,17
133:23 134:22
135:19,20
155:24 185:10
185:12,18
197:19 225:13
225:14 248:10
**database** 230:7
**date** 33:13 89:20
89:22 122:19
127:8,22
133:20 138:5
203:3,6 214:5
227:19 242:9
242:21 246:20
270:17 274:13
275:11 297:22
**dated** 57:18 69:4
119:12 139:4
150:17 157:1
162:14 178:8
215:1 226:6
241:6 255:25
270:12
**dates** 17:11,17
36:17,19,21
47:18 82:15
84:16 120:5,8
127:1 214:15
**date/time** 260:7
**David** 57:20,22



58:18 78:7
150:18 151:18
152:15
**day** 37:24 46:9,9
55:12 83:22
98:4,5 104:11
104:22 107:10
107:12,20
108:7 109:19
128:23 129:14
146:20,24
147:7 149:8,19
149:25 151:25
154:10,23
155:21 166:2
175:15,15
186:3,5,10,18
186:20 188:13
197:23 201:2,3
245:6,13 246:9
246:9 258:6
266:4 275:9
288:12 290:21
295:14,18
**days** 21:22 136:9
136:14,24
153:24 154:6
154:24 158:10
169:17 228:8
228:10
**day-to-day** 44:1
72:14 107:14
109:6 238:1
273:25
**de** 237:9,10
**deal** 255:7
274:21
**December** 49:14
**decide** 54:23
101:14 146:23
**decided** 80:2
96:23 107:10
147:6,13,20
**deciding** 52:1
**decision** 85:18
147:4

**decisions** 86:24
**declaration**
12:24
**dedicate** 288:23
289:17
**defendant** 6:4
297:9,9
**DEFENDANTS**
1:8 2:11 296:8
**defense** 11:25
**defer** 72:18 187:5
**define** 101:22
**defined** 59:15
60:2 130:4
155:15 286:11
292:10
**defines** 155:7
**defining** 206:17
**definitely** 16:18
39:2 101:3
194:6 203:4
228:22 262:22
263:14 275:21
**definition** 140:20
292:6
**degree** 41:15
55:24 63:5
64:19 65:4 76:7
77:16 80:21
82:23 86:13
90:19 91:8,18
**Del** 52:12 72:2
94:3 95:2
105:24
**delay** 132:3
171:8
**delayed** 212:3
**delete** 226:10
**Delia** 1:21 5:19
296:13 297:21
**demarcation**
19:5 21:4,5
23:5 65:19 66:9
71:23 73:18
75:2,24 76:2,5
79:18 80:18

81:14 93:4,17
93:20 95:15
148:25 149:5
182:21 203:17
203:21 209:4
212:25 252:8
266:24
**denial** 163:21
165:18,21
166:1,25 167:1
172:7,22,22
**denials** 173:6
**denied** 172:4
175:6 221:20
**denies** 171:16
**deny** 142:3
**denying** 171:23
**dep** 34:15
**Department** 2:13
8:9 42:7 97:4
97:23 98:20
99:1,5 280:8
283:6,19
**departments**
49:19
**departure** 101:1
**depend** 104:19
**depending**
151:24,24
157:21 167:6
173:22 176:17
176:20 196:2
271:21
**depends** 158:3
**deployments**
44:23
**deponent** 5:8
158:23 254:10
**deportation**
112:21 113:4
113:11
**deposed** 33:16
**deposition** 1:12
1:17 3:1 4:1 5:2
5:4,15,17 6:4
6:24 7:2 8:8,12

9:10,22 10:23
12:7 16:4,8
26:8 28:13
29:18,23 31:22
32:9,21 34:11
35:1 38:2,7,11
39:7,11 52:5
57:13 61:14
79:5 135:6
171:5 236:21
240:25 268:23
270:10 278:6
293:3,4 295:2
296:10,18,20
296:25 297:5
297:11,13
**depositions** 33:19
34:16 118:9
206:22
**deputy** 40:18
47:21 57:25
74:11 76:12
151:5 244:4
274:9 281:6
**describe** 53:22
161:1 218:5
**described** 55:15
55:15 108:11
110:1,6 111:6
190:8 191:14
199:14 242:14
248:2 267:20
**describes** 217:21
**describing** 74:1
142:13
**description** 4:4
44:20 295:15
**design** 201:12
**designate** 216:12
**designated** 9:21
9:25 10:13
198:12 236:21
**designed** 129:7
**destroy** 39:5
226:10
**detail** 45:23 46:3

46:4 47:5
**detailed** 43:14
45:19,20 285:1
**details** 68:1
195:3
**detain** 126:13
172:19 289:25
**detained** 137:1,3
163:24 172:8
173:16,18
174:3,15
**detainees** 136:16
**detention** 123:1,4
123:5,23
124:11,17
126:6,21,24
127:24 128:4
140:1 152:8
155:6,7 161:16
163:18 164:1
165:19,21
166:17,19
171:23 176:17
177:24 197:9
197:13 216:19
287:7 289:25
**detention/holdi...**
151:24 152:17
**determination**
179:11
**determine** 55:8
108:3 115:18
122:21 146:19
193:17 241:22
**determined** 12:1
166:18
**developed** 110:15
**developing**
151:13
**development**
10:5,10
**deviate** 69:11
71:3,8
**deviation** 73:7
**deviations** 55:21



72:24
**DFO** 33:11 50:25
74:10,12 76:12
93:15 147:25
148:19 159:9
**DFOs** 58:16
85:21
**Dhru** 17:1 68:18
68:20
**Dhruman** 2:13
297:2,9
**Dhruman.y.sa...**
2:16
**DHS** 8:9 46:23
221:10 271:10
271:20 274:9
**differ** 195:16
**difference** 49:2
90:15 153:1
195:23
**differences** 90:2
**different** 7:1
35:22 44:23
49:19 53:1,2
69:21,22 77:10
89:18 97:5
102:24 114:11
167:9 168:22
174:12 178:6,7
181:4 224:6
228:16,17,17
228:25,25
233:10 250:13
272:20 274:23
274:24 286:25
287:24
**difficult** 135:25
216:6
**direct** 28:20
29:21 33:5
47:25 48:18,25
49:5 62:6
268:21
**directed** 62:4
63:8 76:1 79:16
119:1 145:1

168:1 232:9
**directing** 49:7
258:7
**direction** 51:2
75:18,20 76:4
76:12,14 77:10
80:3 153:3
**directive** 81:5
**directly** 35:15,23
48:12,14 51:14
115:5 160:16
167:21 180:6
283:5,8 284:16
**director** 20:1,5
20:20,21 36:12
40:18 53:15
57:23 58:1,8
69:6 72:14,15
72:19 115:4
147:2,17,23
148:2,17,21
242:4 243:22
243:24 244:4
260:1 274:9
280:13 281:7
**directors** 37:15
37:16 51:2
58:23 62:3
72:23 74:11,12
78:13 79:16
111:2 140:11
140:22,25
241:8,19
257:14 258:8
**director's** 107:14
**disagree** 65:2
**disciplinary**
51:23
**disciplined** 13:20
**disconnected**
184:9,14
**discontinued**
121:11
**discovery** 135:16
**discretion** 146:19
146:23 147:2

**discuss** 31:4 79:9
156:17 243:17
251:19 260:5
273:5 274:25
**discussed** 18:19
23:12 35:2
79:13,15 80:11
112:5,8 148:24
180:20 193:3
196:17 242:24
248:15 272:7
272:17 273:7
291:3
**discusses** 151:4
218:21
**discussing** 79:7
147:24 148:18
274:23
**discussion**
184:24
**discussions** 32:23
76:18
**disposable** 74:22
**disseminated**
130:21
**dissuaded** 95:21
**distance** 65:13
**DISTRICT** 1:1,2
296:1,2
**division** 40:19
46:11 53:16,19
250:11
**document** 25:20
31:23 57:14
73:3 88:5
111:18 113:15
118:20 119:9
132:8 135:11
136:9,23
137:21 146:16
150:8 154:6
162:2,4 166:10
176:3 214:24
215:1,13,17,25
217:5 218:1
219:2 239:9,16

240:8,11,19,24
241:3,16
255:19,22
256:4,6,12,16
256:19 257:5
258:22,24
259:1,2,5
261:20 262:8
264:10 268:20
269:2,6 270:9
276:3,4,22
277:25 279:17
279:25 281:13
295:15
**documentation**
178:1 231:13
261:23
**documents** 25:12
25:15,19,23
26:2,6,13,25
27:7,18 28:7,10
28:19 29:17,22
29:25 30:3,13
30:21,23,24
31:16,21 32:9
32:20 36:1
46:14 55:1,6
56:4 74:18
90:24 144:22
145:7 160:16
169:16,18
178:3 189:20
191:14 211:22
263:4 266:11
267:3,3 277:24
287:13,20,21
289:7
**doing** 26:18
36:18 37:6
44:21 75:9,9,12
82:20 83:8
84:18 108:22
111:12,16,17
112:19 148:20
149:10 150:2,2
153:4 186:22

210:24 211:11
212:22 214:2
214:14,16
217:10 220:11
220:13 232:1
246:12 257:18
258:20 259:6
261:19 266:16
**DOJ** 16:2,23,25
221:10
**Donna** 100:16
**dormant** 220:16
**doubt** 71:12,13
72:5 131:11
154:13 241:15
**downstream**
290:4
**dozens** 45:12
**DPD** 244:14
**draft** 39:1,2
139:10
**dragging** 263:9
**drain** 290:11
**draw** 276:2
**dreaming** 200:2
**drifted** 273:19
**drive** 19:22
176:22
**drives** 31:16
**driving** 211:8,12
**drop** 212:14
**dropped** 105:12
**drove** 67:15
**drug** 288:15
**DSA** 124:5
**due** 26:9 157:7
199:10 257:23
262:17
**duly** 1:19 5:25
296:16
**duplicative** 31:18
**durable** 74:21
**duties** 42:19
43:22 44:1
259:12
**duty** 234:19



**D.C** 2:5,9,15

**E**

**E** 2:1,1 3:4,5 4:4
**EAC's** 59:5,7
  79:22
**Eagle** 52:13 69:5
  69:11,14,18,19
  69:22,24,25
  71:2 72:3 94:2
  94:6 100:10
  142:12,21
  145:16
**earlier** 15:15
  74:25 76:3 80:4
  108:15,21
  151:12 188:13
  204:18 217:25
  224:8 250:12
  266:11 288:20
  290:5 291:3
**early** 18:11 37:8
  60:15 74:6 75:5
  138:3 139:18
  139:20 197:22
  227:15 244:23
  245:1,10
**East** 288:8
**Eastern** 116:25
  288:8
**easy** 169:2
  193:16 212:7
**eating** 84:2
**ebb** 167:11
**echelon** 76:15
**edit** 90:16
**education** 41:13
**EEC's** 141:20
**effect** 89:16
  175:15 191:18
**effective** 74:23
  93:4
**effectively** 233:1
  234:16
**effectuate** 177:6
  177:12

**efficiency** 215:25
  222:1
**efficient** 218:4
**efficiently** 217:8
  234:16
**effort** 46:19,25
**efforts** 46:18
**egregious** 196:12
**eight** 37:4 45:5
  50:18,23 51:1,5
  94:7 186:8,9,12
  187:2 263:16
**either** 11:15
  17:12 32:14
  43:2 54:21
  60:24 64:9 80:4
  95:10 96:25
  104:3 109:19
  114:21 174:7
  182:18 189:8
  189:16 202:12
  226:6 271:3
  273:12 283:20
**El** 227:2
**elected** 82:1,25
  108:25 247:20
**electing** 82:11
**electronic** 26:6
  30:25 184:8
**electronically**
  31:14 38:18
  178:2
**element** 45:21
  46:6 61:8
**elements** 80:5
  159:3
**emergency** 44:22
  163:10
**emergent** 157:7
  158:8 161:18
**emphatic** 81:18
**emphatically**
  231:20
**employed** 40:15
  297:15
**employee** 49:1

51:22 104:18
  104:20 270:5
  280:8
**employees** 14:17
  32:25 49:6
  50:11 61:7
  188:10
**enacting** 82:16
  159:10
**encounter** 54:20
  102:5 113:13
  199:4 202:20
**encountered** 21:1
  208:11
**encounters**
  102:15
**encouraged**
  110:21
**encouragemen...**
  34:19
**ended** 271:19
**enforcement**
  43:15 46:23
  49:13 53:13
  64:3 90:6,8,23
  91:14 110:24
  206:16 213:17
  250:11
**enforcement-t...**
  273:8
**English** 288:4
  289:3
**Enrique** 35:6,6
**ensure** 37:17
  105:11 216:17
**entailed** 35:10
**enter** 54:2,24
  55:10 217:23
  227:22 228:1
**entered** 227:9
  230:8,10
**entering** 54:21
  82:7 86:7
  221:12,20
  228:4
**entire** 98:23

159:2 240:8
  254:11 256:5
  256:12 269:2,6
  278:16
**entirety** 118:19
  118:20 126:11
  257:5
**entities** 103:20
  104:1 274:15
**entitled** 207:10
**entity** 108:4
  283:21
**entries** 201:15
**entry** 8:13 10:3
  19:1 20:12,14
  22:1 23:3 32:24
  37:5 44:11 45:5
  51:1,5 54:18
  59:19,22 69:22
  84:15,21 94:8
  95:20,24
  102:16,21,23
  106:23 107:5
  129:20,20
  135:9 142:7,9
  142:11 144:14
  144:22 145:6
  161:4 165:5
  175:17 177:5,7
  178:2,7,11
  179:2 183:4,5
  183:12 186:1
  189:16 192:1
  205:21 208:25
  215:4,14 216:2
  219:14 234:13
  241:21 245:23
  246:10 254:12
  259:6 260:1
  261:23 267:9
  272:12,19
  273:13 274:24
  274:24 281:21
  284:5 286:14
  290:17
**environment**

42:22 43:9 44:2
  44:7,8 50:4
**envisioning**
  210:1 211:6
**equipment** 188:4
  188:5,8,16,22
  188:22 189:4
**ERCS** 169:1
**ERO** 163:20
  166:16,19
  167:5 169:25
  169:25 170:3
  171:16 172:18
  173:6,7 181:5
  216:6,18
  217:21,23
  219:4,10 290:7
**ERO's** 163:21
  181:8
**error** 131:18
  184:9 186:24
**errors** 131:17
**ER-C** 163:17
**ER/CF** 163:18
  174:2,16 179:8
**escaping** 125:2
**escort** 106:15
  115:9
**escorted** 20:9
  109:23
**especially** 96:9
  96:12,15,19
  97:1 245:7
  273:24
**essentially** 148:1
  148:4 172:11
  225:24
**estimate** 25:18
  26:16,17 41:23
  174:6 185:1
**estimating**
  186:25
**estimation**
  138:11
**ET** 1:4,7 296:4,7
**Europe** 288:9



MAGNA
LEGAL SERVICES

evade 191:24
198:21
evades 189:8
evening 109:21
event 59:13,14
157:4,7 204:7
events 58:24
59:25 60:5
eventually 47:2
48:6 60:19
81:13 200:17
233:7
everybody 61:3,4
61:12 117:5
118:3 132:18
275:8
everyone's
118:16
Evidence 135:7
Evidently 145:25
evolving 73:13
EWI 192:1,13
exact 17:11 25:16
33:13 36:21
47:18 82:15
89:22 120:5
127:8,22 203:3
203:6 214:4
227:19 246:20
exactly 123:21
145:15 174:7
175:4 203:11
217:25 227:14
253:11 271:23
examination 3:9
6:1 236:16
286:5 291:22
296:22
example 22:3,6
69:25 124:16
126:14 128:15
145:13 146:10
149:23 176:21
183:5 188:19
210:18 241:22
268:6 287:13

288:3
examples 289:20
290:14
exception 9:19
221:19
exceptions
221:14
excessive 17:25
exchange 240:5
exchanged 79:13
excuse 45:18
114:7 185:7
223:20 232:20
251:14 263:20
266:18 279:1
282:1 288:25
executed 295:16
executive 58:7
exhausting
160:18
exhaustion
254:22
exhibit 4:5,6,7,8
4:9,10,10,11,12
4:13,14,15,16
4:17,18,19
57:11,13 67:18
67:20 68:2,6
69:1,2 78:2,4
81:23 84:23
118:2 119:9
129:9 131:25
132:8 133:20
134:9,18,24
135:6,8 138:13
138:15 143:3,5
150:6,7 153:19
153:20 154:16
154:20 161:23
161:24 162:1,2
197:18,19
214:19,20,24
221:8 239:6
240:25 255:19
268:22 270:9
278:4,5,11,14

278:17,20,23
279:17
exhibits 4:1 57:9
143:16 269:15
279:14 297:13
exist 182:9
189:11
existence 210:5
exists 185:12
exit 82:1,12,16
82:25 83:10,14
84:19 85:15
86:10 87:7,8
expand 157:3,11
Expansion 218:7
expect 128:3
Expedient
217:18
expedited 161:11
161:14,14
179:10
expenditures
187:24 188:2
experience 34:11
55:19,20
100:25 121:9
173:22 197:8
experienced
169:3
experiences
33:18
expert 35:11
Expiration
297:22
explain 102:12
211:4 277:12
277:14
explained 251:3
explaining
166:23
explanation
247:24
expressed 295:17
extended 83:20
extent 30:18 34:2
39:20 109:16

238:18
extenuating
173:11
extra 220:15
extracted 168:3
extrapolated
230:13
e-mail 9:14 25:20
31:3,18,19,23
32:14 36:7
38:16 39:23
57:18,19 58:4
58:13,23 59:14
60:20 69:3,4,10
69:14,18 71:14
74:4,12 78:6,7
78:19 79:15
111:11 133:22
138:15,17
139:2,3,4,9,9
139:24 140:13
143:5,7 145:24
146:2 150:15
150:15,17
151:4,11 152:7
152:14 162:8
162:10,18
163:3,22 165:4
166:1 167:19
167:21,23
177:4,13 178:1
178:25 179:14
180:21 215:17
222:14 238:8
239:23 241:5,6
241:18 242:6
243:8,15,16
244:3,13,21
246:1 248:3
250:24 255:24
257:9,12,13
258:6,15 259:4
259:25 260:3
262:18 264:11
264:13,24
269:8 270:4,12

274:6,7,8 275:3
275:8 276:7
277:4 279:9
280:6,7,8,12
281:8,24
282:25
e-mails 14:2
25:19 26:2,3,22
31:3,8,11,13
38:22 68:17
72:2 79:14
E-N-R-I-Q-U-E
35:7

F

F 163:17
face 72:23 216:1
Facebook 13:24
13:25 14:8,16
14:20,22,25
face-to-face
238:8 265:18
facilitating 90:12
facilities 65:14
124:22 128:1
128:10,22
177:22 220:16
facility 125:12
126:13 167:10
177:25 246:16
fact 12:1 62:20
97:10 158:18
160:20 193:16
267:8 292:9
factor 290:4
factors 174:13
286:7,9,25
292:3,13
fair 75:14,17
105:13,17
114:1,14
144:16 153:2,5
156:6 178:10
184:4 186:9,11
186:16 190:20
192:8 196:5



205:5 219:21
223:19 232:21
**fairly** 105:25
125:8 131:23
171:17
**fall** 42:4 51:16
**falling** 53:19
**falls** 100:16
**familiar** 14:24
67:25 71:19
84:14 88:24
156:12 204:10
211:1 215:15
221:14,17,20
221:24 273:11
**familiarize** 31:5
**family** 162:25
165:20 172:17
172:19 173:24
173:25 174:11
174:12,13
216:23,25
289:8,18,21,23
**FAMU** 216:13,23
**FAMUs** 216:14
216:19
**fan** 6:10
**far** 37:18 39:22
65:24 84:21
86:23 115:13
124:9 192:15
195:4 204:13
204:18 245:21
254:22 292:12
**fault** 171:12
**fear** 82:6 85:4,6
86:7 136:16,20
137:4 161:12
161:15 179:11
193:8 195:16
195:17 196:7
208:13 216:18
218:11,17
236:8
**feasibility** 75:21
**feasible** 69:13

129:5 205:23
**February** 15:16
21:21 25:24,24
26:7,14 40:3
162:14 178:8
**federal** 14:17
49:12 54:8,12
135:7 178:22
**feel** 27:11,12,13
27:16,21 80:14
80:14 100:24
118:24 156:17
172:20 229:9
237:3,14
**feeling** 116:11
**feet** 213:2
**felt** 72:15 184:2
247:7
**female** 289:23
**Fencel** 33:6 36:9
36:10
**field** 9:22 10:4
22:4 35:6 36:13
37:5,21 40:19
44:17 45:3,3,6
45:19 46:10
48:17 50:19,20
51:11 52:4,8
53:15,18 57:23
58:14 61:7,8,19
72:13,17 79:12
81:16 83:18
84:17 93:15
103:25 121:5
121:14,15,17
128:25 131:1
133:2,5 135:18
139:15 147:23
225:13 227:18
242:4 246:9,21
250:7 255:15
259:11 271:11
271:13,15
272:25
**field-office-wide**
195:4

**fifth** 70:10
129:10 163:25
176:17
**figure** 288:11
289:12 290:1
290:18
**file** 172:22
**filed** 64:24
**files** 31:9,12,15
31:15
**filled** 130:15
149:24 155:6
**final** 140:10
221:11,14,16
222:16
**finally** 53:4
265:22 276:1
**financially**
297:17
**find** 15:10,13
79:21 80:3 92:2
121:10 135:15
159:3 161:23
216:18 273:14
**fine** 5:12 15:23
17:18 18:4
22:23 34:20
65:9,11 85:12
91:12 92:7,14
100:20 116:21
127:10 176:5,9
181:17 207:18
221:6 222:24
237:1 278:21
**fingerprints**
174:24
**finish** 7:6 171:6
**finished** 240:13
268:20
**fire** 123:21
**firm** 81:17
297:22
**first** 5:25 10:24
21:20,22,23
22:2,10,15 23:1
23:4 43:25

57:17 58:4 60:1
60:10 69:9 78:2
78:10 81:15
120:11 124:14
125:4 130:19
130:20 132:13
132:17 146:21
148:19 151:11
156:25,25
162:4,20 163:2
163:16 164:17
168:25 211:8
218:9 219:13
231:25 235:2
239:19 241:5
242:17,17
243:5 256:22
265:22 266:9
269:19 286:10
**FIS** 54:13,15
**fit** 45:17 165:20
**five** 29:4 92:6
94:9,15 163:15
167:16 172:25
176:3 230:15
**five-bullet**
180:19
**five-minute**
263:17 291:10
291:15
**five-page** 162:2
**fixed** 70:19
**flag** 171:7 250:22
**flagged** 248:17
250:17,21
**flexibility** 36:25
37:2
**floor** 131:10
297:23
**Flores** 244:4,14
**flow** 167:11
241:21 242:7
274:1
**fluid** 290:25
291:3
**focus** 49:24

**focused** 26:19
46:25
**folders** 31:3
**folks** 78:8 131:7
168:12
**follow** 23:16 25:9
28:16,24 113:9
281:24
**followed** 166:20
168:11
**following** 198:22
248:19 296:15
297:6
**follows** 5:25
296:25
**follow-up** 264:14
264:16
**foot** 189:9,16
231:23 232:5
**footprint** 126:11
290:19
**Force-West** 47:3
**forecast** 158:20
**foregoing** 295:1
295:16
**foreign** 251:7
**forgot** 78:19
**form** 21:6,11,15
34:1 50:23
63:13 66:20
72:8,11 73:9
76:6,24 77:15
77:25 80:20
82:22 85:25
86:12 87:10,14
88:10 90:18
91:7,17 93:23
95:12 96:4,11
97:12,18,20
98:11,21
104:24 106:25
107:25 109:14
110:12,20
111:23 112:10
112:16,23
114:18 115:23



121:12 122:5
136:12 140:16
140:18 141:9
143:1 146:25
147:10,15
148:7 149:11
151:7 152:11
152:18 153:7
153:15 154:19
156:9 158:19
160:17,23
161:13 166:13
168:6 171:19
172:5,9,13
173:2 174:5,19
176:19 178:15
179:19 180:8
180:16,23
182:10 185:3
185:14,24
188:1 189:13
190:3,15
191:12,19
193:9,15
194:20,25
195:18 197:10
197:24 199:12
199:19 205:8
208:3,9 212:23
216:3 220:24
221:22 223:15
223:23 224:13
224:21 225:4
225:11 227:11
228:9 229:22
230:9 231:6,17
232:24 233:8
233:19,25
234:20 235:4
236:4 245:17
247:5 248:18
249:4,22
250:20 251:8
251:20 252:1
253:15,19
255:7 260:19

262:3 265:3,8
267:11 268:1
272:4,8 283:24
**formal** 64:10
222:19 223:2
**format** 7:3
**formatted** 259:3
**formula** 123:20
123:22
**formulas** 124:9
**forth** 79:24 98:5
182:19 213:2
**forward** 53:10
56:8
**forwarded**
280:22 282:23
283:18
**found** 131:17
223:9
**four** 44:15 169:4
173:22 176:3
204:23 205:2,2
 207:7
215:2
**fourth** 122:14
163:23 170:24
**four-page** 132:8
**Fox** 2:21 5:18
**foyer** 201:15,15
**Frank** 69:6 139:4
139:24 140:14
240:5 241:7
**Franklin** 2:14
**frankly** 198:6
**fraudulent**
287:13,20
**fraudulently**
287:21
**FRE** 4:10
**free** 80:14 100:24
247:13 253:9
253:10
**freight** 273:10
**frequently** 22:5
274:25 282:20
**fresh** 162:18

**front** 32:18 89:25
172:17 193:8
**fulfill** 287:1
**full** 69:9
**function** 55:13
274:3
**functions** 45:4
206:14
**funnel** 94:16
95:11
**funneling** 94:20
96:1 99:6,8,12
**further** 3:9 242:6
243:6 270:24
286:3 290:9
291:5,22
292:16 297:14
297:17
**furthest** 22:4
**future** 235:18
**fuzzy** 143:8,13
**fyi** 151:12 284:6
**F-E-N-C-E-L**
33:6

---

### G

**G** 3:5 4:4
**Garcia** 35:6
39:14
**Garrison** 276:7
276:17,24
277:4 278:2
**Gateway** 100:11
124:22 247:10
**general** 22:12
34:10 35:9
37:24 45:9 49:8
75:7 79:7,11
99:20 107:23
157:7 209:16
219:23 247:17
261:17 262:10
262:13 286:18
287:14 288:22
289:19 290:15
**generally** 19:1

54:14 72:13,18
79:20 83:16
102:22 113:15
161:15 165:13
166:6,12,20
170:16 192:5
193:10 195:25
221:13 225:5
272:24
**gentleman** 250:3
**geographical**
47:1 83:2
**George** 270:4,13
276:24
**Georgia** 49:13
**getting** 19:8
23:23 24:3,4
76:14 84:4,4
101:6 147:4
163:17 165:16
192:14 210:9
254:20 279:18
281:9 290:13
**gist** 75:7
**give** 6:20 11:20
25:18 33:15
51:1 83:1 90:1
108:15 109:12
115:9 132:1
150:12 164:9
181:1,21 190:1
203:3,6 206:24
235:17 247:16
253:9 278:15
280:15 282:10
**given** 7:3 104:11
104:22 107:4
107:10 130:5
146:20,24
147:7 149:8,19
149:25 151:25
161:5,7 173:4
192:22,23
204:22 218:24
225:3 245:6,13
260:12 261:15

290:21 295:18
296:18 297:4
**giving** 95:25
122:10 140:20
175:14 247:10
252:19,20
261:9 289:20
**go** 6:16 18:9,15
18:23 24:24
29:4 43:8 49:9
52:24 58:3
62:15 63:14
67:17 70:23
78:1 80:16 84:1
87:14,14 92:10
95:22 96:1,7,21
97:1 106:10
110:7 114:15
116:20 117:6
117:17 118:12
119:5,6 124:15
125:19 129:3
131:1,21 132:5
132:19,24
136:5,13 137:6
138:24 140:10
143:23 144:5,8
153:19,25,25
153:25 159:14
165:22,25
166:10 170:21
170:21 171:13
172:19 177:24
181:18 182:7
182:15 184:12
192:15 204:3
207:6 209:20
211:15,20
212:3 213:2,13
214:19 215:20
216:7 217:17
219:12 223:8
226:3 249:11
255:10 256:20
257:9 261:4
263:19 268:2

285:19 286:7,9
292:3,14
**goal** 157:11
192:14
**goes** 52:20 102:8
**going** 7:13 8:1,8
15:25 18:10
19:7 23:13,16
24:6 25:6,9
26:1 27:6,10,17
27:20 28:16,24
29:7 30:16 31:4
31:5,6 33:4,8,9
36:17,17 40:10
41:12 45:9 49:4
49:6,7 52:7
53:4,9,14,22
55:1 56:24 57:8
58:22 60:18
62:18 63:3,25
64:1,17 66:3,4
68:8 72:8,18
73:22,23 75:8,9
78:10 79:24
80:18 81:7,14
81:25 82:16
84:23 85:10
86:24 87:23
90:18 91:7
92:18 93:25
94:10,12 97:20
99:6 101:25
104:17 109:16
110:7,25
112:25 115:7
117:7 119:8
120:15 123:11
123:24 124:8
128:15,19,20
129:1,21
131:23 132:6
132:16 136:11
143:11 144:25
145:12 150:14
151:10,21
153:22 154:8,9

156:15 158:17
161:15 162:3
163:3 170:7
172:3,18
174:10,14
176:2 179:4
180:25 183:3
183:11,12
184:15,24
190:5,5 193:17
197:2,5 198:11
199:16 203:9
203:16 206:2
209:22 211:9
211:17,19
213:1 214:12
214:21 215:15
216:9 218:8
219:13 220:14
221:3,25
223:16 226:3
230:19 233:6
235:11,24
236:3,13
239:22 245:25
246:15 249:12
252:9,18,22
258:5 260:19
261:3,7 263:13
263:19 264:5
264:23 267:12
267:13 271:7
271:10 272:17
272:24 273:2
273:15 277:17
278:5 281:13
282:10 285:21
286:14,17,24
286:25 287:14
287:15 288:1,5
288:11,13,24
289:5,6,8,12,24
290:1,9,17,17
290:22 291:16
293:2
**Gonzalez** 20:2,10

**good** 6:3 9:8 12:4
13:12 40:12
56:18,20
116:20 117:5
118:12 132:19
135:4 150:25
151:14 160:9
160:10 176:11
220:20 236:18
240:17,22
249:14 252:11
255:1 266:15
**Goodbye** 184:10
**goods** 74:22
**gosh** 41:10
**Gotcha** 45:11
76:20 120:12
**gotten** 68:6,11
143:10 144:3
150:24 215:5
**government**
10:16 41:15
49:20 84:18
85:17 86:20
87:24 103:19
104:1 108:25
113:8 115:1
138:20 178:22
226:4 237:11
238:4,6,13
245:2,11
248:16 249:2
251:7 252:20
262:8 270:17
272:2,23
273:16,22
275:20,23
277:8
**governmental**
12:16 244:22
**go-between**
121:2
**gradually** 84:12
**graduate** 41:17
41:21
**graduating** 41:25

**Grande** 52:13
94:2 185:25
**granted** 71:5,8
71:11 72:4,10
222:5
**granting** 72:24
**great** 5:11 39:9
43:6,8 68:23,23
69:25 93:2
94:14 117:3
132:21,25
139:23 144:10
144:10 160:8
181:14 182:7
184:24 222:25
239:5 242:6
243:3 257:7
270:2 278:9
280:5
**grievance** 62:25
63:20 64:10
**grievances** 51:22
64:24
**ground** 6:17
**ground-level**
49:7
**group** 14:20,22
43:14 120:24
**groups** 14:9,16
**Grupos** 10:15
103:22 237:11
**GSA** 123:20
**guarantee** 234:25
235:5,13,15,16
235:20,24
236:2
**guaranteed**
235:23
**Guatemala**
226:15 227:6
**guess** 39:13 86:4
86:18 118:20
120:25 129:12
154:5 205:20
206:13
**guessing** 97:9

134:16
**guidance** 58:24
59:2,12,24
60:18,25 61:25
62:12 63:25
64:21 69:12
71:3 72:20
73:13 74:13
75:25 141:20
162:21,21
165:16 167:4
167:24 175:10
175:10 177:15
177:18 178:9
191:9 198:18
222:19 223:3
232:5
**guided** 75:19
**guideline** 154:17
154:21
**guidelines** 243:18
**guides** 244:15
**gutted** 125:11
**guy** 24:25 50:13
**guys** 75:8,15
111:12 116:21
121:16 206:24
263:13 269:11

―――――――
**H**
―――――――
**half** 46:9,9
248:20
**hand** 210:9
232:16 295:18
**handful** 192:22
263:3,3
**handing** 253:2
260:24
**handle** 74:20
218:11 264:19
**handled** 257:20
**handles** 35:7
**handoff** 114:25
**hang-up** 248:7
**happen** 17:10
36:17 76:23



77:1,11 78:23
96:24 108:14
142:7,9,11
147:19 209:5
209:13 236:3
246:17 282:20
**happened** 83:17
99:8 107:17
141:16,22,23
142:3,24
144:24 155:20
178:6 184:1
194:3,4 252:23
265:7 284:11
**happening**
108:13 110:14
145:13 155:24
156:7 166:7
193:2,18 200:4
226:12 228:14
267:9
**happens** 53:23
100:5 101:10
109:13 111:21
159:5 171:17
209:5,9 211:23
**hard** 26:17 35:18
143:9 166:9
169:18 289:19
**hard-and-fast**
84:16 214:15
**Harris** 1:13,17
3:2,5 4:2 5:3,15
5:24 6:3,12,12
24:10 28:9
29:14 30:18
56:18 57:5,16
87:15 88:12
92:12,24
116:12,17
117:13 118:21
132:12 136:2
138:22 141:13
143:13 159:17
162:5,11 171:5
171:15 176:7,8

181:17 182:4
184:21 215:8
229:7 230:25
236:18 237:17
239:15 240:7
240:15,23
243:9,10
247:24 249:11
249:19 252:25
254:10 255:11
256:2,5,11,18
256:25 257:4
259:13,23
262:5 263:1
269:1,3 270:2
274:4 276:1,16
276:18 278:3
279:5,24
284:13 285:17
286:7 291:4,14
291:24 292:17
295:1,7,12,14
296:10,16
**Harrison** 284:21
**hash** 78:13
**hate** 51:18
206:21 207:16
290:18
**hazard** 70:7
118:9
**head** 6:21 91:3
124:14 188:24
229:18,24
254:3,7 274:10
279:20 289:21
289:23
**headquarters**
45:7,21 46:6
58:11 75:3,15
76:22 77:14
80:4 88:8 107:8
111:22 112:6,9
112:15 120:24
120:25 121:17
121:21 122:3
122:10 133:12

147:9 149:6,17
149:22 151:13
151:19 153:6,9
153:12 163:1
165:17 166:24
167:17,21
168:1,5 180:7
180:14 190:13
194:16,18
222:14,18
223:2,13
224:18 225:15
226:9 231:9,14
231:16 271:20
**headquarter's**
162:21 194:17
**heads** 58:14
277:23
**hear** 9:18 16:6
51:20,21,21,23
61:6 140:22,25
141:13 156:7
226:20,22
265:15
**heard** 16:5 47:3
75:18 103:21
107:1 113:22
153:17 181:17
207:25 227:5
**hearing** 11:24
**heavy** 148:16
**held** 129:1
243:16 273:14
281:2
**Hello** 33:25
238:21
**help** 45:1 244:18
281:14
**helpful** 80:15
124:5 247:25
285:11
**helping** 159:4
219:22 245:3
245:11 288:18
**hey** 24:24 29:2
33:8,9 36:20

68:5 75:8 76:18
79:11 82:16
95:18,22
111:15 112:19
121:16 122:3
170:8 209:12
209:20 224:24
225:16,19,22
246:11,22
262:10 275:8
277:24 284:5
**HHS** 290:7
**Hi** 57:5 68:16
117:13 182:4
230:25 238:21
291:8
**Hidalgo** 18:16
20:4,11,14,17
37:17 52:13
95:23 100:13
100:14 109:20
115:3,11
144:13,17
145:2,9,14
148:15 183:9
183:14,16,17
183:23 184:2
194:7,8 197:20
205:21 208:16
254:18 290:25
**Higgerson** 57:20
57:22 58:18
78:7 150:18
151:18 152:15
**high** 154:24
194:8 197:8
271:12
**higher** 76:14
81:1,6 198:7
219:22
**higher-volume**
165:24
**highest** 41:13
97:16,21
**highlights** 144:5
**high-level** 109:17

**high-risk** 43:17
**history** 40:14
169:6,7,8,15
174:1
**hit** 215:6
**hmm** 89:12 168:4
**Hoffman** 58:4,7
58:13
**hold** 31:1 68:5,10
116:25 117:16
123:9 128:12
128:20,25
129:5,7 222:15
224:17 239:14
276:11 283:3
289:15
**holding** 122:18
122:22,23,25
122:25 125:7
126:6,11,21
128:11,16,16
128:17,23
167:7 197:14
198:9,11,12,13
198:13,14
211:13,21
287:6,7 289:12
289:25 290:2
291:2
**home** 169:8
**Homeland** 8:9
46:23
**Honduras** 227:2
**honest** 22:24
**honors** 84:3
**hopefully** 273:19
**hospital** 253:6
290:10
**hospitals** 247:13
290:12
**host** 272:2
**hour** 7:22 18:3
26:21 40:11
159:18 206:12
207:19,20
263:11,17



**hours** 26:24
155:20 169:4,4
169:13 170:14
173:22 174:18
176:18 177:1
185:1 186:3,5
186:10,18,19
186:20,21
187:1,3,6,10,14
187:16,23
206:11,12
207:7 262:25
263:8,16,23
290:12
**hour's** 262:24
**house** 273:10
**household**
289:22,23
**housekeeping**
279:13
**Howe** 33:11,21
34:5,14
**How's** 43:7
**HSI** 46:23
**hundred** 25:21
**hundreds** 31:21
32:1 229:21,23
**Hutton** 250:4,16
**Hutton's** 250:9
**H-A-R-R-I-S**
6:13
**H-O-W-E** 33:12

**I**

**ICE** 165:6,7,7,21
166:1 168:12
175:6,8,13,19
177:5,6,11,20
177:21,25
178:3,12 179:2
179:4,17,20,21
179:22 180:2,6
180:25 181:1
**ICE-ERO** 163:25
**ICRO** 176:16
**idea** 80:2 164:17

179:3 190:11
196:25 211:9
**identification**
11:24 211:13
**identified** 198:12
218:9 220:22
220:23
**identify** 78:15
260:24 261:9
261:24
**identifying** 242:9
**identity** 23:19
104:19 295:15
**IFR** 221:17
223:11,17,25
**II** 216:8
**III** 217:18 219:3
219:9
**illegal** 248:4,15
248:25
**illegally** 113:5
**immediate** 170:6
**immediately**
16:6 86:14
212:20 246:2
**immigrant** 246:4
**immigrants**
243:18 244:15
**immigration**
2:14 35:10,20
35:22 49:18,22
49:23 50:4
169:6,15 174:1
249:1 260:5
288:14,25
289:4
**imp** 251:12
**impact** 129:25
130:1,7 134:18
135:9,12
136:10,15,25
**impacts** 137:5
**implement** 63:24
187:25,25
223:21 244:23
261:13 268:15

**implementation**
10:6,11,12
64:21
**implemented**
193:21 219:2
221:10 245:20
245:22 246:1
246:25 247:3
248:3 249:17
251:12,16,24
253:1 258:13
268:11,13,17
**implied** 235:13
235:14
**implies** 235:5
**Import** 43:15
**important** 7:4
38:7
**impressions** 19:9
27:10
**improved** 251:16
**improving**
215:25
**inaccurate**
131:14
**inadmissible**
162:24 163:4
287:14
**inadmissibles**
287:17
**INAMI** 10:20
82:1,4,7,11,15
82:20,24 83:8
83:14 84:19
85:14,21,22
86:15,16
237:25 238:19
238:23 239:2
244:6,16
253:13,18
264:15,18,20
265:1,12
272:20
**INAMI's** 253:7
**inaudible** 97:17
101:18

**incident** 65:25
180:9 195:2,3
196:1
**incidents** 99:17
142:1,6,13
145:20 148:16
**inclined** 183:20
190:6 200:12
284:22,25
**include** 30:19
31:23 34:2 64:4
65:13 84:25
85:2 195:3
198:25 199:2
242:23 254:11
257:17
**included** 66:8,14
67:3,8 126:10
128:24 195:7
**includes** 244:3
297:6
**including** 10:4,9
16:4,8 25:20
26:23 58:18
61:13 178:23
188:5 196:4
243:9 244:4
256:1 270:14
**inclusive** 35:16
37:4 273:3
**incorrect** 87:12
101:20
**increase** 59:19,20
59:21 190:19
214:16 217:10
217:12,15
218:11,16,22
219:16 220:2
**increased** 190:11
199:18 216:1
**indefinitely**
233:4
**independent**
39:10,12
**INDEX** 3:1
**indicate** 149:24

198:7
**indicates** 86:9
280:7
**indicating** 276:12
**Indios** 22:8
**indirectly** 48:13
**individual** 183:4
249:25
**individuals**
174:23 245:3
**ineligible** 221:13
**informal** 64:10
111:11,15
112:18 222:19
223:3
**information**
30:19,25 34:2
38:17 77:3
79:24 80:6 91:2
91:4 105:4
110:18,22,25
151:18 185:8
191:17 194:24
230:8 241:16
246:21 251:6
252:21 253:3,6
253:7,8,10,17
253:23 258:9
258:11 259:10
259:14 260:13
260:16,25
261:10 282:4,9
285:11 297:4
**information/lo...**
260:7
**informed** 260:4
**infrastructure**
19:6 44:25 56:4
67:1 74:21
188:2,6,8,17,21
202:8 203:17
**ing** 128:25
235:23 271:23
**initial** 46:18
126:9 173:13
174:21



**initially** 250:21
**initiate** 121:14
  244:18
**initiated** 273:23
**initiatives** 53:13
  53:13
**injunction** 222:5
  222:8,12,20
  223:3,4,11,14
  223:22 224:3
**injured** 199:4
**INM** 10:15,20
  103:15 104:3
  105:10,11,15
  106:10,12
  109:12,23
  111:2,16
  112:22 113:4,7
  114:17,22,25
  115:6,11 202:9
  225:9,12
  237:10,24
  238:9,13,19
  241:12,20,23
  242:7,21
  251:18 280:15
  284:14,16,18
**innovative**
  219:15
**input** 133:14,18
**inputting** 133:16
**inquiry** 122:8
**inside** 19:2
  125:11 177:24
  208:14
**insinuating**
  142:18
**inspect** 54:17
  101:11,15,23
  115:18 147:6
  235:25
**inspected** 55:16
  102:1 104:11
  192:7 193:5
**inspection** 54:8
  54:12 55:9

189:8 191:25
  192:2,7 193:14
  235:23
**inspections** 22:20
  43:17 54:19
  206:16
**inspector** 41:6
  42:10
**Instagram** 15:4
**instance** 1:18
  242:17
**instances** 146:6
  146:12 160:24
  194:5
**Instituto** 237:9
**instruct** 23:14
  24:19 25:7 27:5
  28:15,23 30:6,7
**instructed** 7:18
  81:16 93:3
  94:16 95:9,22
**instructing** 81:8
  112:3
**instruction** 23:17
  24:9,15,21,23
  25:4 27:8 33:16
  81:12 94:18,19
  95:1
**instructions**
  25:10 28:17,25
  79:25 167:17
  183:21 266:3
**instrument**
  295:16
**intake** 233:1
**intellectual** 43:18
**intelligence**
  158:21
**intend** 82:6 85:3
  86:7
**intended** 201:22
**intending** 248:12
**intensive** 26:5
**intent** 273:3
**intention** 246:11
  246:24

**intentions** 85:11
**interaction** 48:25
  49:5 102:7
**interchange**
  234:11
**interchangeably**
  22:21 89:5
**interest** 281:9
  282:12
**interested** 282:3
  297:18
**Interesting** 89:15
  245:24
**interim** 221:11
  221:14,16
**interject** 80:14
**intermingle**
  212:13
**internal** 85:17
  86:24 184:9
**international**
  23:5 41:16 54:5
  65:14 69:16
  73:18 74:3
  100:16 144:20
  208:19 210:12
  231:4,10
  232:10,17,23
  234:9,12,18,22
**Internet** 39:16,17
  40:6
**interpret** 93:14
  130:13 134:14
  141:3 152:20
  235:19
**interpretation**
  128:8 140:21
  267:7 277:9
**interpreting**
  24:23 235:24
**interrupt** 17:18
  70:22 94:12
  132:22 135:3
  171:3 202:21
  206:21 220:18
  256:4 276:20

278:10
**interrupted** 43:1
**interrupting**
  249:25 279:12
**intersected** 70:6
**intervention**
  76:22
**introduce** 156:15
  156:18 197:18
**Investigations**
  46:24
**investigative**
  196:14
**invite** 275:13
**involve** 51:4
  251:24
**involved** 12:10
  12:14 42:22
  44:22 87:6,8,23
  130:17 174:13
  196:14 245:2
  245:11 251:5
  253:2 260:15
**involves** 245:11
**Isabel** 176:23
**ISET** 43:15
**Israel** 20:21
**issue** 71:18 98:6
  107:17 110:19
  167:14 233:14
  250:17,23
  251:4,9 255:3
**issued** 165:21
**issues** 35:8,20
  134:20 169:2
  183:23 190:23
  198:19,23,25
  239:2 251:13
  257:24 262:17
  273:18 275:1
**issues/concerns**
  242:25
**iteration** 244:24
  245:2,10
**it'll** 213:2 272:20
  291:10

**IV** 218:7,21
  219:4
**I-S-E-T** 43:15

_____

**J**

**January** 8:5
  125:2
**Javier** 20:9,9,10
  20:14
**Jeeped** 288:16
**Jersey** 188:11
  204:8
**Jesus** 20:19
  270:13
**Jim** 15:24
**job** 38:1 40:17
  42:8,19 43:22
  44:19,20 46:3
  47:8 51:8,9,12
  55:13 104:9
  232:1 258:19
**Joint** 47:2
**Juan** 243:8
  247:20
**judgment** 72:18
**judgments**
  169:16
**July** 150:17
  153:21 221:10
  222:7 226:13
**jump** 19:8
  159:15 171:2
  175:24
**June** 1:14,20 3:2
  4:2 5:3,16
  60:15 74:7,8,8
  74:15,15 75:5
  79:23 81:15
  88:7,13,16,17
  89:6 93:5,6,6,7
  108:21 127:17
  127:18 135:10
  138:4,8,9 139:5
  139:21,22
  140:4 149:1
  153:21 154:11



155:4 190:13
191:11 203:4
214:6 276:6,25
296:11 297:19
**jurisdiction**
102:9
**Justice** 2:13
**Juárez** 216:13
**Juárez-Lincoln**
100:11
**Juárez-Lincoln...**
124:23
**J4** 46:10

**K**
**K** 1:7 2:9 296:7
**keep** 31:14 36:3
40:10 54:11
56:8 64:2 98:23
103:20,22
104:1 106:4,4
132:5 149:3
171:20 174:20
194:10 198:8
233:4 234:12
**keeper** 104:10,21
105:3,14
**keepers** 103:11
224:7,12,20
**keeping** 36:16
46:12 101:12
101:15 102:1
207:3 263:7
**keeps** 103:15
**kept** 105:10
106:1 263:20
263:22
**Kevin** 1:7 2:23
57:10 67:20
68:4 136:1
143:14 144:5
144:11 150:14
153:22 184:11
221:7 240:4
241:4 243:6
255:21 257:1,8

269:1 279:5
296:7
**kids** 174:13
**kind** 19:8 26:10
33:17,22 35:25
37:6 39:15
45:18 46:18,18
46:25 48:25
49:1 51:12 61:3
66:23 75:6
83:16 84:10
85:6 86:17
97:17 105:23
110:9 111:4
115:3,18 121:1
126:7 135:24
143:14 162:18
167:22 168:13
172:25 194:23
201:14 211:9
225:18 233:9
254:20 256:19
271:7 274:19
279:6 285:12
291:6
**Kittens** 14:13
**knew** 25:25
165:19,20
173:10 267:10
**know** 7:24,24
9:23 11:25
14:13 16:14
17:11 18:14,18
22:6 25:25 26:3
26:7,22,23,24
27:7,25 30:13
30:23 31:15
32:6 33:14,15
34:19,20,20
36:18,21 37:3
39:16 40:5 44:2
45:1,3 46:15
47:25 48:16,18
49:6 51:1 55:2
55:5,21 56:5
59:15,21 61:11

61:19 62:2,2,16
63:24 64:1 66:5
66:6,24 71:10
71:14,21 72:16
72:19,20 73:11
73:14,15,19,24
73:25 74:14,22
75:10 76:13,13
76:14,19 77:1,7
77:8,13,18
78:25 79:13,24
83:1,22 84:1,5
84:6,11,12,17
84:18 85:10,18
85:18 86:15,20
86:21,23,25
87:1,2,22,24
88:1,20 89:10
89:13 90:11,23
91:10 94:18,22
95:1,3,17 96:12
96:15,16,16,18
96:19 97:11,13
97:21 98:5,13
98:15,24 99:1
99:16,21 101:4
101:6,24
102:12,17
103:1 104:6
105:8 106:2,11
107:18,19
108:1,4,7 109:4
110:14,22,23
110:24 113:5
114:5,25 115:6
115:7,9,13,21
115:25 116:5
121:19,20,21
121:25 123:22
123:22 124:9
125:6,17,23
126:10,14
128:10,12,15
128:18,24,25
131:1,16
132:24 138:5

139:11 140:14
141:17 146:1
148:15,16,19
148:23 152:4
155:1 156:3
158:10,17,20
159:3,5 160:18
161:17 165:10
165:24 166:2
166:15 167:7,9
167:13,23
168:2,4,7
169:11,18
170:7,10,23
171:4,21
172:14,17,21
172:22 173:4,6
173:7,10,12,20
173:21 174:12
174:17,20
175:5,5,10,14
175:16,18
177:17,24
178:24 179:7
179:13,22
180:1 181:8
182:18,20
183:8,12,25
185:4,5,8,9,11
185:15,18,19
186:8 188:9
190:4,18 191:3
193:17,18
194:4 195:3,4,6
195:7,22
196:12,13
197:3 198:10
199:20 200:7
201:5 202:7,9,9
203:4 204:13
205:10,13
206:19 207:2
207:14,15
208:10,12,12
209:10,12,17
209:21,25

210:8 211:2,10
211:14,20,24
214:7,8,11
216:6 219:1,4,5
219:7,10,24
220:3,10,12,16
221:23 222:16
225:2,17,18
226:2,3,5,8,8
227:6 228:24
229:15,18,24
230:3 231:12
231:20 233:1
233:10,12,13
233:15 234:2
234:14 235:7,9
235:11 237:21
240:12 242:18
242:21 246:6
246:14 248:10
248:12 249:5,7
249:12,14,17
249:24 250:10
250:24 251:1
251:17,21
252:2,4,7,9,11
252:12,21,21
253:11,16,17
253:20,23
254:6,8 258:23
258:23 259:3
259:13 260:11
261:12,16
262:2,6,6,10,11
262:23 263:9
263:16 264:5
265:6,9 266:10
266:15,19,21
266:22 267:2
268:10,13
269:7 270:21
271:3,5,7 272:1
272:22 273:4
273:22 274:2
274:16,17
275:9,10,13



277:20,21,22
277:24 278:1,2
279:7,22
280:16 281:15
281:23 282:3,4
282:5,12 284:6
284:6,9,17
285:1,2,8,9,10
287:16 288:3
288:11,14,18
288:20,21
289:9,13 290:1
290:6,17,20
291:6 292:17
**knowing** 172:3
**knowledge** 159:9
231:19
**known** 100:10
295:14
**knows** 210:7,7
**Koseor** 150:20
150:22 151:5
151:12 152:6
152:16,22
250:5
**K9s** 213:18

──────── **L** ────────

**Labor** 51:22
**lack** 67:3,9 116:6
**Lado** 1:4 6:7
296:4
**lag** 7:3 68:19
**laid** 45:13 163:15
165:11 237:18
**land** 67:8 221:12
**land-bordering**
194:3
**lane** 192:14
199:15 211:13
265:25
**lanes** 199:1,11
214:7
**language** 169:20
288:6
**Laredo** 4:10 9:22

10:4 11:19 17:8
18:16 20:18
36:13 37:17,21
40:19 43:25
44:4,11 45:22
46:8,8 48:6
50:18 51:14
52:4,8,13 57:23
61:8,9 95:5,23
100:10,10,12
103:25 124:19
124:21 125:21
126:2 128:1,15
129:21 130:23
131:3,4,5,8
135:9,14,15
137:8,15
139:10,15
142:12,22
145:17 153:20
155:2,5 183:5
210:18 211:1
215:3 216:2,11
216:12 218:9
218:18,23
219:14 243:23
245:4,5,12,22
247:3,14
251:18 253:1
254:11,17
255:15 260:18
265:12 266:11
270:18 272:2
272:18 273:25
275:10,20
277:8 281:1,21
282:8,11,11
283:23 290:25
**Laredo's** 157:15
217:11
**large** 114:20
115:15 116:1
202:9
**largely** 50:13
**larger** 95:5,20,23
102:21 108:23

108:24 194:6
228:23
**lasted** 34:11
**late** 25:24 47:10
47:11,15 60:2
109:21 227:15
**lately** 169:4
208:1
**launch** 256:6
**law** 2:4 46:22
49:12,16,23,23
64:3 73:8,12
249:1
**laws** 35:22
**lawsuit** 13:18
39:25 40:1
98:19
**laying** 220:16
**layout** 201:10
**lays** 164:17
**lead** 197:11
**leaders** 121:1
**leadership** 53:2
71:5,16 75:8
81:2,6 121:4
**leads** 27:9
**learn** 97:23
101:14,25
**learning** 245:12
**leave** 35:17 73:20
**led** 199:18
**left** 207:19
230:16
**legacy** 50:11
**legal** 1:24 2:22
5:19 98:3 113:9
114:12 247:13
247:13 253:9
253:10 267:7
297:23
**legally** 113:1
**LegalVision** 1:23
5:18
**legible** 143:17
**legitimate** 90:12
287:21

**length** 17:23 18:2
157:21
**LER** 51:21
**letting** 84:13
180:6
**let's** 21:3 40:9,14
49:9 52:3 53:21
58:3 65:7 68:2
78:1 81:22
92:10 97:1
99:24 101:8
103:7,9 104:16
106:20 118:2
119:4,5 129:9
130:6 131:25
134:24 137:6
137:25 138:13
143:3,23 144:8
145:12 153:19
156:10 161:23
165:19 168:24
171:16 176:22
181:11 182:7
185:20 186:7
189:6 193:1
199:22 208:25
213:25 214:19
216:7 217:17
218:7 219:12
224:5 230:14
264:9 268:24
273:5
**level** 41:13 50:10
76:20 97:11,15
98:19,22,24
110:8 121:20
271:6,9,12,12
**levels** 197:8
**LFO** 52:4,9,11
52:16 55:11
58:1,20 59:23
60:19,22,24
61:1,3,6,7,13
61:18,20,24
63:18 67:22
71:5,16,17

72:22 75:15
76:1,20 82:12
83:10,14 84:20
89:7,16 93:3
94:1,5 96:9
99:12 107:9,16
108:2 111:20
114:16 115:18
119:12 122:2
124:12,17
127:25 133:23
134:17 135:17
141:7 156:19
159:11 162:11
165:12 166:12
180:5 186:10
186:13 187:25
189:25 194:3
199:18 200:18
200:22 201:24
204:16 205:20
206:6 210:12
214:2 223:14
223:20 224:10
224:19 226:5
226:10 227:10
227:17 228:1,4
228:21 229:16
231:9,11
238:11 241:19
242:4 254:11
256:1 258:13
260:18 267:2
267:10 268:4
270:6 283:23
284:17 287:17
**LFOs** 107:23
**LFO's** 76:21
156:12 157:15
159:1,10
**liaise** 106:12
108:3
**liaising** 46:22
**lieu** 177:5 179:2
**lights** 203:24
**limit** 67:23 69:15



74:3 75:2,16,22
76:1,4 82:2
95:14 100:1,3,5
100:7,9,15
102:7 130:10
147:13,20
149:3 182:8
183:1 184:6
185:2 186:13
186:19 187:8
187:12,18
189:8 199:3
203:20,22
204:2,21 206:6
209:2,2 231:3,9
231:23,24
232:8,21 233:6
233:11,18,23
234:7,11 235:2
235:8,22 247:9
**limited** 10:4,9
141:17,24
142:5 163:5,11
164:7,18,24
179:25 180:9,9
201:2
**Lincoln** 216:13
**Lincoln–Juárez**
100:12
**line** 6:18 17:9
19:4 21:4,5,7
23:5 27:11,21
65:19,21 66:9
67:23 69:15
70:13 71:23
73:18 74:3 75:2
75:2,16,22,24
76:2,2,4,5
79:18 80:19
81:14 85:20
93:4,17,20
95:14,14 100:1
100:3,5,8,9,15
102:7 115:21
129:11 130:6
130:11 134:7

134:10 139:24
147:13,20
148:25 149:4,5
182:8,21 183:2
183:18 184:6
185:2 186:13
186:19 187:9
187:12,18
189:8 190:5
199:3 203:17
203:20,21,22
204:2,19,21
209:2,3,4
210:11 212:25
213:1 231:3,23
231:24 232:8
232:21,23
233:6,12,18,23
234:7,11,23
235:2,8,22
241:11 246:3
246:25 247:9
252:7 266:23
280:8 294:3
**lines** 33:8 66:9
166:3 216:9,10
231:10
**link** 233:22
**LinkedIn** 13:24
14:1,1,25
**list** 16:15 62:18
84:24 85:2 90:9
90:10,17 91:16
91:21 101:9,12
101:16 102:2,8
102:19,20
103:2,2,5,10,11
103:14,15,20
103:23 104:2,4
104:10,21
105:3,5,10,14
106:1,5 107:22
107:24 108:2,3
108:10 109:11
111:5,21
114:14,15,16

115:17 116:7
208:20 210:5
224:7,11,11,20
225:1,3,10,25
226:6 233:7,13
233:23 234:1
244:3,3 247:12
257:15 280:9
280:14 282:13
282:17,24
283:4 284:6,10
284:10 285:8,8
292:13
**listed** 23:10
94:16 137:5
173:1 197:22
224:17
**listening** 29:4
**lists** 109:5,10
114:21 224:19
226:11 281:10
281:20,24
282:14,21
283:14,22
284:2,14,18
**literally** 53:3
**litigation** 2:14
31:1 222:15
283:3
**little** 19:8,9 34:13
49:22 60:16
102:23 106:20
131:16 143:8
152:1 159:17
159:23 160:5
172:15 173:14
183:20 192:11
194:7 195:21
207:11 211:5
239:16,23
254:21 263:1
277:12,14
**LOC** 131:6
133:17,17
**local** 15:21 46:24
110:8 273:2,14

273:16
**locally** 159:6
275:7
**locate** 99:14
**located** 11:18,19
46:7
**location** 20:23
22:4 69:13 83:8
97:6 128:14
218:10
**locations** 7:1
47:1 82:2
103:21 129:5
**logical** 191:20
**logistically** 103:8
**logistics** 46:11
**logos** 260:13,25
261:10
**long** 11:22 17:24
26:13 34:11
40:13,21,23
41:4 44:13
47:19 65:13
83:22 96:24
116:12 158:4
158:17 169:1
170:3 173:15
173:17 174:7
174:17 175:4
200:25 201:19
201:20 202:5
205:14 228:3,6
228:7 234:17
234:21 256:14
268:12
**longer** 34:16
83:22 109:1
116:15 159:23
169:12,13,20
169:22 183:17
196:9,16 202:5
205:12 228:10
228:10,11
289:6,9 290:9
**longest** 18:7
**Longoria** 69:6

139:4,7,24
140:14,23
167:20 240:5
241:7,18 242:3
242:14,20
245:25 246:6
250:24 251:4
256:1 257:13
258:7 259:22
271:22
**Longoria's** 251:4
**long-standing**
101:1 210:22
**look** 57:8 68:2
81:24 91:11,22
118:2 129:9
132:16 138:13
143:3 150:14
153:23 161:23
166:15 170:9
179:14 185:11
192:15 215:15
218:7 246:18
256:19 259:23
262:7 274:5,16
278:4 281:3
**looked** 19:5 31:2
31:3,8,11,17
67:12 133:21
135:13 214:20
274:6
**looking** 26:22
43:17 51:19
53:1,2 55:6
64:5 130:6
137:14 154:16
154:20 162:4
185:5,16 243:7
244:1,2 276:6
280:21 286:22
286:24
**looks** 58:16
133:25 134:23
137:7 152:14
203:11
**Los** 22:8



**lot** 25:17 26:2
30:23 35:8,14
45:2 46:12
50:15 51:18,19
51:21,21 53:12
53:12 73:24
79:23 80:1
83:19 90:24
121:13 128:21
129:5 146:1,4
148:16 156:17
174:10,21,25
177:18 183:17
183:22,22
188:15 201:12
212:9 246:21
264:2 266:12
268:14 272:25
273:22,25
275:5 286:9,24
287:8,12,16
288:5,7,8,16
290:11
**lots** 126:15
128:19,19
129:6 230:4
287:24
**Louisa** 2:19
16:19
**low** 168:14
188:15 229:23
**lowered** 126:5
**LPRs** 82:5 84:24
86:6 87:6
**luggage** 83:25
**lunch** 117:5,19
**lying** 9:3

**M**

**M** 3:4 120:17
**machine** 1:22
**Magna** 1:22,24
2:22 5:17,19
136:3,22 269:7
279:8 297:23
**main** 20:22,22

21:1 45:3 51:8
124:21 168:2
169:10 175:20
175:22
**maintain** 70:11
103:14 108:2
114:21 234:1
234:14
**major** 45:15,17
90:16 124:24
127:24 221:19
280:17
**majority** 193:12
**majorly** 128:1
**makeup** 288:1
**making** 63:11
112:1 148:19
154:8 165:5
233:13 287:22
**male** 289:21,21
**males/females**
216:16
**manage** 84:11
86:24 119:11
197:5 219:16
219:22 233:1
**managed** 45:15
110:8 233:14
**management**
10:2,16 19:6
35:18 37:7,18
44:22 73:17
74:16 75:10
79:17 81:17
83:18 88:22
89:2,4,18 90:3
93:4,16,20
107:9 108:22
119:12,15,22
121:10 122:9
127:16 130:7
131:12 133:3,5
135:13 138:2
139:10,16
141:6 145:11
148:9 151:14

153:21 155:14
156:5 182:8
189:12,15,18
190:17,22
191:6,10 197:5
197:20 200:4,8
200:9,10,14,15
200:18 201:6
203:1,8 210:13
210:21 211:5
212:22 213:20
213:22 214:3,6
234:10 237:12
**management-t...**
89:23
**manager** 35:7
44:17,18,19
45:9,16,24 46:1
46:2 47:5,9,23
270:5 271:17
**managers** 45:4
47:24 51:13
167:20
**manages** 103:6,6
**managing** 107:15
**mandate** 234:24
**mandated** 272:13
**mandatory** 93:8
93:11,13,19
149:1,3 163:18
**manner** 62:9
63:25
**manual** 185:9,9
**March** 17:21
18:11 21:17,22
37:8
**Marine** 46:21
**mark** 206:22
**marked** 57:13
69:2,2 119:8
132:7 135:6
138:15 143:5
150:7 162:1
214:24 239:6
240:25 268:22
270:9 278:5

**Market** 297:23
**marks** 92:22
182:2
**mass** 156:12
157:4,13,15
158:24 159:10
**material** 99:15
**math** 100:24
185:21 186:17
186:22 187:5
262:22
**matter** 34:21
35:10 59:24
60:2 107:11
115:8 279:13
**maximize** 215:2
**maximum**
123:12,15
124:1,2 229:23
**Mayer** 2:8 29:3
**ma'am** 63:9
**MCALEENAN**
1:7 296:7
**McAllen** 238:21
**MCAT** 120:3,11
120:13,21,22
121:6,6 151:5
**mean** 17:25
20:25 22:18
24:1,3 26:17
28:1 37:23
39:12,13 50:14
56:3 60:7 61:1
61:2 63:22
65:22,24 75:23
81:18 82:19
83:3,6 90:21
94:2,20 96:18
101:22 106:18
109:8 111:1,8,9
114:9 124:7
127:6 131:22
134:4 146:1
153:5 154:15
158:4 159:5
181:9 182:12

187:20 189:19
190:8,16
193:16 194:15
195:2 203:25
206:13,17
207:12,14
212:25 214:17
221:18 224:14
225:7 226:2
228:7 233:21
248:8 249:5
253:12 259:10
262:4 263:12
263:13 264:3
273:7 276:19
**meaning** 24:25
97:16
**means** 9:13 65:18
93:19 96:2
130:10 140:12
140:15,22
141:1,1 142:16
151:23 152:4
160:21
**meant** 130:15
157:20 158:2,7
158:8,12
251:18 266:16
**measure** 245:1
**measures** 244:23
**media** 5:2,14
84:6 92:22
182:2
**medical** 161:18
162:24 163:9
163:10 164:8
164:20,24
290:12
**medically** 290:13
**medium-sized**
94:7
**Medlock** 2:8 29:2
29:3
**meet** 16:14
117:18 177:21
241:20 271:23



meeting 18:9,14
19:18 20:9
117:22,25
238:20 241:11
242:20,22,23
243:16 244:3
244:13 251:13
265:1,5,6
270:20,23
271:5,8 272:3
272:11,18,19
273:9 274:1,15
275:6,6,22
277:10
meetings 16:11
16:15 17:6,10
17:22 64:11
88:1 265:18
271:4 272:7,9
272:15,16
273:1,3,11,12
273:14,17,21
274:1,22 275:5
275:15,17,19
275:25
member 13:23
14:8,10,12,16
14:19 50:24
members 35:5
memo 59:5,5,6,7
60:1 75:5,20
79:22 82:18,21
82:24 83:6,11
85:2,20 86:8
88:8,18,20,21
88:22 89:6,11
89:13,16,18
90:3 168:8
191:10 218:1
memorialize
259:6
memory 18:4
32:7
memos 89:24
91:11 193:3
mental 19:9

27:10
mention 83:4
mentioned 22:14
25:3 36:8 38:18
40:1,7 51:15
63:18 88:18
91:13 102:19
108:15,21
173:14 179:25
188:13 191:21
203:19 217:25
237:24 250:12
251:15 252:25
271:6 275:5
283:1,10
mentions 274:17
Mercado 69:5
Mercado's 71:5
merchandise
43:17
mess 250:13
message 241:6
246:8 250:14
250:14 265:10
270:12 276:7,9
280:21 281:4
messages 131:6
250:2,13 280:4
284:4
messaging 275:2
275:3
messing 279:20
met 16:2,5,7,16
20:20 23:24
242:24 251:18
260:4 280:12
meter 80:18
95:10,10
147:13 201:6
204:14 205:6
205:10 247:8
266:19
metered 73:5
141:7 142:15
145:20 146:6
146:12 209:8

222:7 233:6
235:7 257:22
metering 10:2,16
59:2,5,6,10,11
59:23 64:21
69:12,12 71:3
71:24 75:10
88:8 89:1,4
101:1,10
115:19 130:1
145:13 147:21
155:2,5 182:7
184:5,25 185:2
187:25 190:1
190:11 191:9
191:17,18,22
192:11,21
193:2,3,4,13,20
193:22,25
194:2 196:18
196:20,21,25
197:2 200:22
200:24 201:25
202:13 204:11
205:7,9,22
237:12 242:14
242:17,18
244:24 245:2
245:10 257:18
257:18,19,20
257:20 259:7
260:5 264:19
265:23,24
266:7,15,23,24
method 38:17
185:10 187:15
metrics 151:14
Mexi 134:7
Mexican 10:15
82:5 84:24 86:6
86:17,20 87:6
96:8,14 103:19
104:1 105:25
108:25 109:7
113:15 202:7
224:11,20

225:8 234:22
237:11 238:4,6
238:13 244:6
244:11,21,22
245:2,11
247:22 248:16
251:24 252:3
252:20 260:4
265:13,17
272:21 273:13
273:16 274:19
275:20,21,25
Mexicana 237:10
Mexicans 84:25
85:3,16 252:20
258:3
Mexico 21:9 54:4
62:23 73:6 82:2
84:18 85:17
87:22,24 88:3
96:2 101:12,16
102:2,8,20
103:11 108:4
108:25 111:2
112:21,22
113:1,5,6,8,9
113:11,17,20
114:3,8,8,12
115:12,24
129:14 134:8
142:17 192:17
209:23 224:7
226:4 234:18
234:21,23
235:12 242:10
247:21 248:10
249:2 252:6
253:4 255:13
257:19,21
270:17 272:2
273:12,22
277:8
Mexico's 275:23
mid 82:14
midbridge 23:5
67:10 75:16

149:5
middle 23:2
71:22 74:16,23
75:11 79:18
81:19 93:17
94:22 95:15
102:17 108:22
109:23 145:11
182:21,23
183:18 188:10
192:13 203:16
211:12 212:15
212:24 213:3
213:16 214:8
247:9 252:23
277:21 288:8
midnight 74:14
mid-2018 40:22
41:3 139:22
Migración 237:9
migrant 94:22
95:16 102:8,15
103:11 105:24
106:4,8,13
113:1 114:16
128:12,20
129:5 130:2
161:3 179:9
198:14,21
199:14 208:12
209:20 210:7
228:23 231:23
232:2 235:1,21
253:2 273:23
286:16 287:3
migrants 85:9,16
96:16 99:22
102:4,5,16
104:17 105:11
109:22 110:23
112:21,25
123:2 126:14
126:22 129:13
145:5,6 148:17
179:6,16 180:4
183:18,19



187:17 195:24
197:4 201:3,4
202:3,6,10
205:12 207:25
208:6 209:17
219:17 232:9
232:22 234:12
245:12,14
247:11,20
248:4 260:6,12
261:9,14
262:17 280:9
280:13 283:11
286:23 287:11
290:12,23
**migrant's** 129:1
**migration** 101:5
120:17,17,19
121:7 156:13
157:5,5,13,14
157:15,21,22
157:24 158:2,9
158:16,24,24
159:1,10
288:25 290:16
**mind** 13:10 35:12
35:25 63:23
75:22 89:21
153:18 171:21
174:20 191:3
194:6 198:8
269:2 278:19
**mine** 237:19
**minimal** 291:10
**minor** 188:2
**minute** 150:13
162:17 263:23
**minutes** 18:3
29:5 92:5,6
116:10,13,13
132:24 181:13
191:22 206:23
207:8 229:4
230:15 264:4
**misconception**
266:12,14

267:18
**missed** 137:24
**missing** 78:17
**mission** 89:23
110:24 185:5
187:8 277:25
287:1 288:19
288:23 290:16
**missions** 187:11
**mistaken** 222:16
**misunderstand...**
266:14 267:18
**mitigate** 66:5,25
67:12 74:24
204:17
**mitigated** 65:23
**mode** 265:11
**moment** 118:15
155:17 177:10
237:6
**momentarily**
214:22
**money** 288:15
**monitor** 45:10
48:4
**monitoring** 44:23
48:2
**month** 17:12,12
17:13 53:3
137:6,14
272:18,22,23
274:25
**monthly** 272:15
**months** 17:20
53:3 83:12,12
197:21 228:8
228:11
**Morgan** 274:7
**morning** 6:3
109:21,22
129:22 155:23
156:2 267:4
**morphed** 47:2
**mouth** 43:3
**move** 19:11 28:5
43:2,3 57:8

74:3 75:1,15
76:1,4 79:16
81:16,22 93:19
99:24 131:25
134:24 148:25
193:1 213:25
224:6 231:9
256:23,23
**moved** 42:1,3
44:3 49:25
53:15 79:12
83:17 139:25
**moving** 11:11
102:9 132:5
187:23 188:17
226:13 263:10
**MPP** 273:23
**multipage** 135:7
**multiple** 67:22
111:2,3 142:7
158:5
**muster** 62:4
110:5 168:8
**mustered** 60:24
61:25 62:6 89:6
89:9,12 110:2
153:13
**mute** 236:13
**MX** 243:17
244:14
**myriad** 274:25

---

**N**

**N** 2:1 3:4,4
**Nacional** 237:9
**name** 6:5,8,14
33:6 35:6
150:20,21
230:6 236:18
246:20 250:4
259:1 295:16
**names** 19:23
**narcotics** 110:24
273:7
**narrow** 66:19
**nation** 87:23

**national** 90:6
**nationality**
285:10
**nationals** 82:6
84:24 86:6 87:6
145:1,5
**nations** 288:7
**native** 288:4
**Naturalization**
49:18
**nature** 262:14
285:12
**Nazareth** 280:9
280:13 283:11
**Nazarov** 2:12 3:8
19:7,13,15 21:6
21:10,15 23:13
23:22 24:3,11
24:16 25:6 27:2
27:4,9,15,20,24
28:2,6,11,14,21
29:6 30:5,11,16
33:24 34:1
38:12 39:19
55:23 56:9,12
56:15,18,22
63:3,12 64:17
64:23 65:1,3,6
65:9,11 66:20
68:5,10,13,15
68:22,24 70:20
70:22 72:8,11
73:9 76:6,24
77:15,25 80:20
81:4,7 82:22
85:25 86:12
87:10,13 88:10
90:18 91:7,17
92:1,4,8,12,15
92:17 93:23
94:10 95:12
96:4,11 97:12
97:18,20 98:11
98:21 104:12
104:24 106:25
107:25 109:14

110:12,20
111:23 112:10
112:16,23
114:18 115:23
116:11,17,19
116:23 117:2,4
118:4,7,11,13
118:17,21,24
119:3,5 121:12
122:5 132:2,11
132:15,18,22
135:2,22
136:11 138:21
138:24 140:16
140:18 141:9
143:1,12,18,21
143:24 144:3,9
146:25 147:10
147:15 148:7
149:11 150:10
150:25 151:3,7
152:11,18
153:7,15
154:19 156:9
158:19 159:13
159:15,20,24
160:17,23
161:6,13 162:5
162:9 166:13
168:6 171:2,10
171:12,19
172:5,9,13
173:2 174:5,19
175:24 176:5,7
176:10,12,14
176:19 178:15
179:19 180:8
180:16,23
181:12,16
182:10 184:14
185:3,14,24
188:1 189:13
190:3,15,24
191:12,19
192:24 193:9
193:15 194:20



194:25 195:18
197:10,24
199:12,19
205:8 206:20
207:9,14,16,21
208:3,9 212:23
215:6,10,12
216:3 220:24
221:22 222:9
222:13,21,24
223:15,23
224:13,21
225:4,11
226:16 227:4
227:11 228:9
228:15 229:3,7
229:11,17,22
230:9,17 231:6
231:17 232:24
233:8,19,25
234:20 235:4
236:4 237:1
239:7,11,14,21
239:25 240:7
240:10,14,18
243:10,13
245:15,17
248:6,18 249:4
249:9,22
250:18,20
251:8,20 252:1
253:15,19,21
253:25 254:2
254:13 255:2,5
256:3,9,15
260:19 261:3
262:3,21
263:12,24
264:2 265:3
267:11,22,24
268:24 269:5
269:11,14,18
269:20 272:4,8
276:11,15
278:9,13,15,19
278:22,25

279:2,4,11,18
279:22 283:24
286:4,6 291:5
291:15 292:2
292:22 297:2,9
**near** 203:21
231:4,10
**nearly** 221:2
**necessarily** 37:15
53:24 54:19
65:19,21 105:6
121:13 148:14
155:11 157:6
157:20 165:17
171:22 172:16
177:24 179:12
180:13 188:23
192:19 193:23
194:4 197:17
212:10 213:24
248:14 252:5
267:6,21
**necessitated**
101:5
**need** 7:19,23,24
11:22 14:13
61:18 74:15,22
75:12,15 76:4
80:18 91:10
92:2 121:16,18
121:22 122:3
139:25 148:2,4
148:14 156:18
159:17 162:17
166:25 172:21
176:22 184:2
205:6 209:20
215:15 232:4
240:14,15
242:23 247:8
**needed** 60:4
94:19 148:11
166:18 210:24
**needn't** 217:23
**needs** 75:11,22
117:16 130:25

178:12 179:16
179:17
**negative** 72:23
**negatively**
288:11
**neighbors** 252:11
**neither** 297:14
**Network** 53:16
**networking**
13:23 15:1
**never** 12:19,21
13:10,13,19
22:16 23:3 50:2
50:3 75:18
107:6,6 110:5
111:7 113:5,7,7
113:9 120:23
122:10 124:6
128:11 137:18
146:13 153:18
155:5,15 159:9
201:3 202:24
223:5,13
231:13 238:12
238:22 246:25
247:21 251:15
261:12 268:3
268:10,12,13
268:15,17
284:7 286:11
286:12 292:10
**new** 53:10,11
63:22 80:6
188:22 213:19
244:15,17,23
250:19 266:13
278:11
**news** 39:24 40:2
40:5,6 151:14
**Ninth** 224:16
**Noah** 2:21 5:18
160:4 181:20
181:21 263:20
263:20
**NOC** 53:6,13,17
**noises** 6:21

**nonattorneys**
19:18
**noncitizen** 227:9
**noncitizens**
160:15
**non-circum**
195:17
**non-circumven...**
196:7
**non-Mexican**
221:11
**normal** 7:4 54:3
59:24 60:3
165:2 225:19
**normally** 53:23
76:22 274:21
**North** 41:19 42:2
42:5
**northern** 52:16
53:5
**NOTARY**
295:22
**note** 41:13 137:1
**notebook** 32:15
38:20
**noted** 5:20 87:14
295:3
**notes** 32:8,11,17
32:18 38:10,15
38:20,21 39:6
137:2
**nothing's** 191:3
**notice** 137:5
**November** 89:21
215:1 222:4
241:7 243:8,17
255:25 264:25
**NTA** 161:5,7,19
163:24 172:8
173:16,17
174:15 217:18
217:22
**NTADs** 174:3
**Nuevo** 247:14
275:19 282:7
282:11

**number** 16:15
25:16 45:13
71:16 74:21
105:8 106:11
107:20 108:5
109:12,19
119:22 122:24
123:7,9 124:1,5
128:24 129:11
129:12 134:10
136:16 137:3
149:7,12,14
150:2 162:11
170:11 177:1
195:7,7,8,9
198:9 206:10
206:12 218:16
218:22 219:22
225:24,25
228:8 229:19
243:8 245:3,5
245:12,14
257:21 270:14
274:7 280:18
286:15
**numbered** 1:20
**numbers** 57:14
101:6 108:24
122:23 126:24
131:16 132:9
143:6 150:8
193:20 194:8
195:6 198:7
216:1 224:24
247:14 282:13
288:12
**numerous** 178:21
282:8
**N-O-C** 53:6
**N.W** 2:4,9

_____
### O
_____
**O** 3:4
**oath** 8:16,23,24
9:3 12:23 57:6
92:25 117:14



182:5 184:22
231:1 291:25
295:15
**object** 7:16 23:13
25:6 27:11 28:4
63:3,13 64:18
72:8 90:18 91:7
97:20 136:11
260:19 267:22
267:25
**objected** 261:4
**objection** 7:19
21:6,10,15
23:25 24:6,11
24:16 27:2,21
28:11,14,21
30:5,15,17
33:24 38:12
39:19 55:23
63:12 65:3,8
66:20 70:23
72:11 73:9 76:6
76:24 77:15,25
80:20 82:22
85:25 86:12
87:10,14 88:10
88:11 91:17
93:23 94:11
95:12 96:4,11
97:12,18 98:11
98:21 104:12
104:24 106:25
107:25 109:14
110:12,20
111:23 112:10
112:16,23
114:18 115:23
121:12 122:5
140:16,18
141:9 143:1
146:25 147:10
147:15 148:7
149:11 151:7
152:11,18
153:7,15
154:19 156:9

158:19 160:17
160:23 161:6
161:13 166:13
168:6 171:19
172:5,9,13
173:2 174:5,19
176:19 178:15
179:19 180:8
180:16,23
182:10 185:3
185:14,24
188:1 189:13
190:3,15,24
191:12,19
192:24 193:9
193:15 194:20
194:25 195:18
197:10,24
199:12,19
205:8 208:3,9
212:23 216:3
220:24 221:22
222:9,13,21,23
223:15,23
224:13,21
225:4,11
226:16 227:4
227:11 228:9
228:15 229:17
229:22 230:9
231:6,17
232:24 233:8
233:19,25
234:20 235:4
236:4 245:15
245:17 248:6
248:18 249:4
249:22 250:18
250:20 251:8
251:20 252:1
253:15,19
254:20,23
255:6,7 261:4
262:3 265:3
267:11 268:1
272:4 283:24

**objections** 63:7
63:11
**observe** 100:7
**observed** 100:4,9
**obtain** 224:11
**obtained** 41:14
287:21
**obvious** 6:25
**obviously** 22:3
33:5 79:12 83:3
88:2 246:12
252:8 290:9
**OCC** 15:21 16:2
16:18 17:2,8
75:7 80:17
**occasion** 43:11
**occasional** 202:3
**occasionally**
10:20 121:19
**occur** 24:15
109:3 270:20
271:1 274:23
**occurred** 21:13
62:9 99:17
126:3 184:1
193:24 270:22
270:23
**occurrences**
190:7
**occurring** 166:8
**occurs** 272:11
273:9
**OCC's** 17:4
**offenses** 13:5,7,8
**offer** 99:21
**office** 2:14 9:22
10:4 15:22 17:4
17:8 22:4 32:16
35:6 36:13 37:5
37:21 40:20
44:17 45:3,4,6
45:19 46:10,21
48:17 50:19,20
51:11 52:4,8
53:18 57:23
58:14 61:7,8

72:13,17 79:12
81:16 83:18
84:17 93:15
103:25 108:18
115:15 121:15
121:17 128:25
131:1,7,9
139:15 147:23
217:21 225:14
246:10,21
250:8 255:15
259:11 271:11
271:13,15
272:25 274:9
295:18
**officer** 41:8 42:9
42:13,20,21
43:10,19,20,23
44:10,14 48:9
48:15 49:10,11
50:3 54:17,21
54:23 55:5,8
72:10 173:23
175:14 193:8
199:3 203:20
212:21 219:10
231:22 232:1
296:17 297:5
**officers** 20:24
44:1 49:5 62:7
62:23 63:23
65:18 67:4
69:15 70:2,11
174:24 183:21
187:2 189:1
198:20,22,24
209:19 210:4
211:11,14
212:17 213:12
213:18 220:11
220:13 232:8
265:12 266:1
287:10 288:6
**officer's** 297:11
**offices** 61:19
227:18

**official** 238:19,20
252:17 261:17
261:20 262:8
263:21 292:13
**officially** 97:23
292:7,10
**officials** 238:4,6
238:9,14,23
240:5 243:17
244:5,5,14,16
244:22 245:3
248:16 249:2
251:18,25
252:21 253:2
265:1,13,17
272:20 273:16
275:21,25
**OFO** 45:7 46:20
58:9 103:6
121:1 129:24
162:25 223:12
225:15 265:12
272:14
**Oftentimes**
273:14
**oh** 8:19 18:9
22:23 26:15
36:5 40:25
41:10 52:19
66:2 67:16 68:3
70:15 79:6
89:19 92:14
95:6 98:9 101:3
108:17 119:6
125:14 127:10
129:3 135:4
144:1 157:2
180:17 194:18
207:6 213:25
223:8 237:2
240:3 245:9,19
255:11 264:21
267:16 276:21
278:22 283:1
**OJT** 50:9
**okay** 6:11,16



| | | | | |
|---|---|---|---|---|
| 7:14,15 8:23 | 84:19,23 85:12 | 145:12 147:3,6 | 209:16 210:3 | 54:15 66:24 |
| 9:13,20,21,25 | 86:14 87:4,4,20 | 147:12 148:12 | 211:14 212:1 | 67:11 71:18 |
| 10:12 11:9,10 | 89:1,6,15,15,25 | 148:24 149:3,6 | 213:7 214:5 | 73:14 75:5 77:9 |
| 11:18,20 12:7 | 90:16 91:4,15 | 150:6,23 | 215:12,19,20 | 83:17 126:7 |
| 12:10,19,22 | 91:24 92:3,8,9 | 151:10,21 | 215:23 217:5 | 133:15 175:10 |
| 13:2,5,20 14:19 | 92:9,15 93:11 | 152:6 153:13 | 219:12 221:25 | 180:10,15 |
| 14:25 15:17,25 | 93:18,25 94:9 | 154:1,3,4,15 | 222:2 223:13 | 188:25 191:2 |
| 16:5,7,14,18 | 94:13 95:1,6,10 | 155:5,9,19 | 223:19 224:5,5 | 193:22 195:25 |
| 17:2,6,10,14,22 | 97:15 99:6,11 | 156:1,6 157:8 | 225:22 226:9 | 200:23 202:4 |
| 18:4,15 20:3,6 | 99:19 100:4,7 | 157:13,23 | 227:25 229:2 | 204:8 205:11 |
| 20:11,11,18 | 100:20 101:8 | 158:1 159:12 | 229:10,11,13 | 214:6,14 232:4 |
| 21:8,18,23 | 101:22 102:12 | 159:23,24,25 | 230:17 231:15 | 232:13 247:7 |
| 22:13,25 23:13 | 103:5,10,24 | 160:2,20,25 | 231:22 233:16 | 248:4 250:12 |
| 24:22 26:19,25 | 104:6 105:3,10 | 161:3,10,21,23 | 234:7 238:25 | 257:24 259:14 |
| 27:19,23 31:8 | 105:14,18,22 | 162:17 163:8 | 239:21,25 | 259:16 266:22 |
| 31:20,25 33:20 | 106:14 107:8 | 163:14 164:6 | 240:10,18,22 | 271:20 273:15 |
| 34:9 35:17 36:8 | 107:13,22 | 164:13,14 | 243:13 244:1 | 274:25 |
| 36:13,23 37:13 | 108:1,14,20 | 165:1,9,11,15 | 245:19 255:3,4 | **one's** 143:9 |
| 37:20 38:1,6,10 | 110:9 112:13 | 166:22 167:16 | 255:8 256:7,9 | **one-page** 69:3 |
| 39:24 40:9,13 | 112:20 113:24 | 167:25 168:24 | 256:15,22,23 | 119:9 138:15 |
| 40:21 41:12,25 | 115:14 116:8 | 169:19 170:15 | 256:24,24 | **online** 169:17 |
| 42:15 43:12,19 | 116:19,22 | 171:1,13,17 | 257:3 258:14 | **on-site** 175:14 |
| 44:13 45:8,13 | 117:3,4 118:8 | 173:8 174:2,9 | 263:12,18,24 | 217:22 219:4 |
| 47:4,17,22 | 118:24 119:7 | 175:6,21 176:4 | 266:18,18 | 219:10 |
| 48:21 49:15,21 | 119:25 120:6 | 176:6,10,12,13 | 268:9 269:5,20 | **on-the-job** 50:9 |
| 49:25 50:7,12 | 120:10 121:6,9 | 176:21 177:3 | 269:22,23,23 | **OOR** 290:7 |
| 50:25 51:4,7,17 | 122:9,14 123:3 | 178:21,25 | 269:23,23,23 | **open** 23:23 94:19 |
| 52:3,10 53:17 | 123:7 124:3,11 | 179:15 181:11 | 269:23,24,24 | 116:23 128:22 |
| 54:23 55:11 | 125:5,23 126:2 | 181:12 182:24 | 269:24,24,24 | 185:23 186:3,4 |
| 56:2,7,12,17,19 | 127:15,21,24 | 183:14 184:4 | 269:24,24,24 | 186:10,20 |
| 56:22 57:8,16 | 128:7 129:9,25 | 184:15 185:12 | 269:25,25,25 | 204:25 206:12 |
| 57:18 58:3,13 | 130:6,14,17 | 185:20 186:7 | 270:1,1 272:10 | **opening** 58:22 |
| 58:18 59:6,9,12 | 131:7,25 | 186:15 187:6 | 274:22 277:2 | **operate** 182:19 |
| 59:23 60:9,16 | 132:15 133:5 | 187:23 188:7 | 277:18 278:18 | **operates** 114:14 |
| 61:10,17,19,21 | 133:14,19 | 189:6,19,25 | 278:22 279:11 | **operating** 111:9 |
| 61:22 62:8 63:1 | 134:15,24 | 191:1 192:21 | 285:4,14 286:4 | **operation** 46:19 |
| 63:12 64:6,11 | 135:23 136:7,7 | 194:23 195:12 | 286:4,7,20,22 | 64:4 74:23 |
| 64:12,14,22 | 136:18 137:6 | 196:5,17 198:8 | 291:4,12 | **operational** |
| 65:3,10,24 69:1 | 137:12,20 | 198:16,19 | 292:22 | 75:21 106:23 |
| 69:9 70:25 71:5 | 138:7,22,24 | 199:22 200:13 | **old** 53:24 | 107:2,7 129:2 |
| 71:25 72:22 | 139:8 140:19 | 200:17 201:19 | **older** 201:9 | 137:25 138:1,5 |
| 73:2 74:2 75:14 | 140:24 141:2,4 | 201:23 202:17 | 289:22 | 140:1,3,11,15 |
| 76:1 77:9 78:1 | 141:4,14,21 | 202:21 203:7 | **once** 11:13 15:5 | 140:20 197:3 |
| 78:23 79:6,9,19 | 142:3,14,18 | 203:19 204:1 | 26:8 35:23 | 197:14 215:3 |
| 80:7,12 81:3,21 | 143:9,11,21,22 | 204:11 205:5 | 36:19 37:3,7 | 286:8,10,12,13 |
| 82:11,18 83:5 | 144:6,19,25 | 205:20 207:21 | 39:3 40:4 44:5 | 286:23 288:2 |



288:12,24
289:13 290:2
290:24 291:1
292:3,6,14
**operationally**
69:13 129:4
281:20
**operations** 37:24
48:6 51:15 53:5
53:7,16 70:2
71:24 72:14
74:19 79:17
81:17 90:7
91:14 129:21
129:25 130:2
130:24 131:4,5
134:18 135:9
135:12 136:10
136:15,25
182:19 200:10
213:15,17,23
214:9 224:2
238:1 242:4
243:25 272:25
273:5
**opinion** 98:12
**opportunity** 96:1
240:1 256:5,11
256:19 278:16
**option** 99:22
**options** 53:1,2
160:19
**oral** 1:12,17 3:1
4:1 296:17
**orally** 9:18
**order** 16:16 32:1
74:9 75:1 77:20
77:22 93:8
102:23 114:15
116:1 148:25
184:6 204:14
205:22 206:8
217:23 226:9
233:23
**ordered** 223:13
223:21 224:2

**ordering** 231:14
**orderly** 86:21
234:14
**orders** 76:20,21
**ordinary** 37:25
107:19 281:16
**Ordonez** 1:21
5:19 296:13
297:21
**organization**
43:14 45:20
103:22
**organizational**
53:8,10,11
**organize** 78:12
**organized** 35:25
**orient** 256:20
**original** 133:7,11
174:2 179:7
297:12
**originated**
266:10
**OTM** 258:2
**OTMs** 257:21
266:2
**Otro** 1:4 6:6
296:4
**outbound** 90:7
90:22 91:13,13
91:14
**outcome** 297:18
**outlined** 219:2
**outlines** 217:6
**outside** 12:22,25
52:7 54:19,21
64:18 125:12
182:14 254:4
288:14
**overall** 26:14
41:4 56:5
109:17 131:20
131:22 282:13
**overly** 37:3
**oversee** 51:14
**overseeing** 44:1
130:18

**oversight** 48:20
49:3 50:16,17
50:20,22,25
**overtime** 43:11
130:8,11
**overwhelming**
101:6 234:13
**overwhelmingly**
31:13
**Owen** 33:13
34:12
**o'clock** 155:23
156:2,4 230:17
230:18

---

**P**

**P** 2:1,1 3:5 4:4
253:2
**PA** 297:24
**page** 57:17 58:4
78:2 81:23
132:14,17
136:5 137:7,24
144:8 154:1,5
162:4,20
215:20,21
217:17 219:12
239:19 240:21
241:2 243:5,5
244:2 255:22
257:10 264:24
265:22 276:2,4
276:4,10
278:21 280:1,2
280:6 294:3
**pages** 215:19
239:19,20
269:7
**paper** 31:15
32:15 38:20
242:8 247:11
247:12 253:3
260:6,12,24
261:9,15,16,21
**paperwork** 114:7
**paragraph** 81:25

216:8 217:21
218:21
**paraphrase**
246:23
**parole** 161:1,19
165:7,10 177:6
178:1,12,12,22
178:23 179:5
179:16,17,17
179:20 180:5,6
181:2
**paroled** 161:4,12
177:5 178:11
179:2,4 181:5,6
**paroles** 177:12
178:4 180:1
**Parr** 2:7 3:7
10:25 236:12
236:15,17,19
236:25 237:2,3
239:7,9,12,13
239:20,22
240:3,12,20,23
241:4,6 243:4,7
243:14,15
245:16,19
248:13,22
249:7,19,24
250:19 251:3
251:11,23
252:14 253:17
253:21,22,25
254:9 255:1,4,9
255:10,21,24
256:8,25 257:1
257:4,8,12
260:21,23
261:6,7 262:5
263:3,9 264:7,9
265:6 267:16
268:8,20,21
269:13,21
270:2 272:6
274:4 276:13
276:14,18
278:7,12,14,18

278:20,23
279:1,3,24
283:25 284:1
285:19 297:1,8
**part** 26:6 31:1
35:24 76:18
80:24 82:13
120:23 128:22
146:21 175:15
175:16 178:25
179:22 192:9
214:8 219:3
225:19 245:8
251:4 256:7
258:11 283:3
**partial** 47:5
**partic** 72:16
**participants**
272:22,23
**particular** 60:20
72:16,17 78:25
89:13 98:24
106:1,5 120:7
122:6 131:13
155:17 173:5
175:9,11 195:2
235:8 271:23
281:3 283:11
284:11 286:14
**particularly**
66:17 82:4
85:21
**particulars**
195:13
**parties** 84:3
297:6,15
**partners** 46:25
**party** 13:18
296:24
**pass** 52:13 69:6
69:11,14,18,19
69:22,24,25
71:2 72:3 94:2
94:6 100:10
142:12,21
145:17 258:8



279:19
**passed** 75:15
**passenger** 43:11
  43:25 44:2,5,7
  48:16 58:8
  124:21 201:1
  201:15 206:9
  206:15 243:25
**passes** 113:19,21
**passport** 114:5
**pathway** 113:9
**pathways** 114:11
  175:22
**patrol** 46:7,20
  273:1 288:17
**patterns** 101:5
**pay** 130:11
**PED** 270:18
**pedes** 199:13
**pedestrian** 48:11
  53:22,25 54:2,4
  54:7,11,18,24
  66:18 70:5
  201:8,9,14,21
  212:7,16 213:5
  214:7 265:25
**pedestrians**
  53:23 55:16,25
  199:10 210:14
  211:2 212:12
**pending** 7:25
**peop** 165:2
**people** 16:20
  17:3,3 20:22
  23:10,19,24
  24:7 25:2 37:21
  55:11 64:2
  68:18 73:14,24
  83:19 84:13
  95:25 96:16,23
  98:13 99:21
  101:15 102:1
  108:8,24 109:1
  110:6 113:13
  114:2,6,7 115:1
  115:5,9,16,20

115:25 116:1,3
123:9 124:1
126:13 129:7
137:1,3 149:24
158:9 163:8
164:7 165:5
167:6 169:6
173:24 176:22
178:23 182:18
183:1,5,9,13,24
189:15 190:4
191:23 192:6
192:12 195:16
198:2,11,14
201:7 203:5
204:20,21
205:13 206:21
207:16 211:8
211:12 212:12
222:6 224:24
225:3,9,16,22
225:25 227:22
228:1,3 229:15
234:8,15 243:9
251:1 252:23
266:25 270:14
271:24 275:11
284:11 287:2
287:19,20,22
288:7,8,10,16
288:22
**percent** 122:15
  122:17 134:3
  137:8,13,16,18
  149:23 151:23
  152:8,17
  153:24 154:7
  154:10,17,24
  155:6 197:23
  274:18
**percentage**
  122:24 149:18
  149:22 195:8
**perfect** 52:10
  257:11
**period** 8:5 45:23

49:17 73:12
79:8 96:24
98:18 99:8,16
115:20 125:16
125:25 155:3
158:4,10
166:24 167:15
171:20 191:8
191:13 192:10
193:2,5 197:21
218:24 227:17
228:6 247:6
262:12
**periodically**
  210:24
**periods** 31:6
  83:20
**permanent** 98:3
  98:3
**permission** 67:23
  148:2,4,8,14
**permit** 113:7,22
**permits** 231:23
**permitted** 164:19
  177:11 233:17
**person** 12:1,2
  16:4,8 55:8
  60:25 61:25
  73:5 76:19
  77:19,22 95:18
  101:9 104:8,9
  104:18 144:19
  144:22 161:5
  165:20 166:25
  169:1 172:12
  173:24 175:7
  175:18 178:11
  179:4 180:22
  181:1,2,6,7
  189:8 196:4
  208:20 209:1,7
  209:9,10,13
  211:8,15,23
  221:12,19
  231:25 232:18
  233:16,22

234:21 235:18
235:21 236:7
246:14 265:7
274:11 289:2,4
295:16
**personal** 11:3
  39:22 59:15
  71:15 98:12,16
  226:19,24,24
**personally** 11:9
  13:19 50:22
  67:13 73:19,21
  83:7 96:15
  99:25 100:3,9
  100:12 130:17
  205:18 238:3,5
  295:14
**personnel** 61:15
  61:17,24 62:5,6
  62:11,19 63:18
  63:21 64:24
  66:8,14 67:3,8
  74:21 89:7
  101:10,14,25
  162:12 184:3
  190:1,21
  223:20 224:10
  225:8 256:1
  271:10 290:12
  290:20
**persons** 59:21
  84:8 106:11
  107:20 108:5
  109:19 198:13
  205:2,4 212:11
  212:11 287:13
  287:24
**person's** 246:20
**perspective**
  282:5
**pertain** 139:14
**Pharr** 100:13
  199:23,25
  200:4,8,9,11,22
  200:25 201:7,8
  202:5,22,23,25

203:2,5,10,12
203:12 204:9
204:11,24,25
205:22 206:7,9
207:23,25
**phenomenon**
  193:24
**Philadelphia**
  297:24
**phone** 16:4,9,20
  17:3 79:4
  108:16,18
  112:6,8 164:9
  238:8 247:14
  265:7,18 275:2
**photograph**
  174:25
**photographs**
  84:6
**phrase** 10:8 16:6
  86:14 195:20
**phrased** 254:1
**physical** 122:25
  204:2,5 287:5,9
  290:19
**physically** 129:13
**pick** 61:14
**picked** 24:5
  26:10 246:6,7
**picture** 201:10
  282:10
**piece** 90:23 189:3
  242:8 247:11
  247:11 253:3
**pieces** 189:4
  260:24 261:9
**pinned** 117:16
**place** 67:23 69:15
  73:7 78:14
  85:19 87:3
  98:10 105:12
  106:6 165:12
  173:5 188:18
  202:6,11 238:7
  257:19
**placed** 91:15



**placement** 170:8
173:12
**placement/bed**
163:20
**places** 103:13,15
103:19 126:22
206:3 273:1
**plain** 248:9
**plainly** 71:21
73:16
**plaintiff** 1:18 6:6
68:17 297:8,8
297:12
**plaintiffs** 1:5 2:2
236:19 263:7
296:5
**plan** 139:10,16
157:16 159:1,2
159:11 215:25
216:5 219:1,8
219:21,25
220:12,22
244:18 248:2,8
248:25 249:14
249:16,21
250:7,19 251:5
251:12,15,16
251:19,23
252:19,21
253:1 264:19
**planning** 36:18
274:15
**plans** 156:13,20
156:24 157:3,3
157:23
**plastic** 189:2
**platform** 7:2
**platforms** 13:24
15:1
**play** 238:10
**playing** 279:21
**please** 5:9,10,22
6:8,20 7:5,10
15:12 18:23
31:10 36:2 39:5
57:10 58:23

63:6,10 67:21
69:9 71:7
101:13,19
105:21 108:16
117:23 133:21
139:23 149:20
152:12 153:25
154:1,2,2,3,3,4
154:4,4,4,5
164:9 168:13
170:22 178:20
181:22 195:19
208:23 233:20
237:21 238:17
240:4,12 241:4
242:2,3,20
245:7 249:8,9
253:22 256:23
256:24 258:14
265:14 267:15
269:6 284:24
**plenty** 114:2
**Plumer** 274:7,8
276:24
**POC** 19:21 20:4
20:19
**POE** 8:13 69:11
160:16 243:23
244:15 245:4,5
245:12 247:3,5
253:2 257:17
257:21,22,22
260:4,24
262:16 270:18
272:2 277:8
**POEs** 283:23
**point** 19:25 20:8
55:7 60:22
65:13 66:7
67:13 69:12
100:15 105:24
106:7 109:9
114:17 119:22
121:25 145:11
148:18,21,21
148:25 165:17

168:19 172:15
174:22 177:13
185:5 189:22
194:9,12
203:10 205:10
214:13 231:10
235:18 236:8
241:21 268:17
277:3 283:2
**pointed** 249:21
250:16
**points** 19:1,6,23
23:9 74:16
83:18 84:15
93:4,16,20
148:9 163:15
164:6,7,22,23
165:12 167:23
168:2 169:11
183:25 189:5
206:8 210:15
225:13,15
**policy** 109:25
110:4 141:20
179:18 245:20
274:9
**popular** 265:20
**populate** 134:1
**population**
289:11
**pop-up** 204:7
**port** 8:13 18:25
19:21 20:1,4,12
20:14,20,21
22:11 37:15,16
44:11,24,25
45:1 48:19 51:2
53:25 54:3
59:18,22 60:19
61:13,15,17,24
62:3,11,19
63:18 64:2,24
65:20 66:8,13
67:3,7,8,24
69:6,22 70:2
72:13,15,17,18

72:23 73:6
74:11,12 78:12
79:16 81:13
94:7 95:20,23
96:1,3 100:14
100:16 101:9
101:10,14,25
102:4,23
103:10 104:8
104:16,18,20
104:22 105:4,7
105:9,23
106:23 107:5
107:14 109:16
111:13 121:15
122:21 124:18
125:21 129:25
130:2,11,15
134:17,18
135:9,9,12
136:10,15,25
140:11,22,25
142:9 144:13
146:19,22
147:1,2,6,12,17
147:17,19,22
147:23 148:2,4
148:17,20
149:19 150:4
155:16,23,25
159:4,4 161:4
161:12 162:11
164:19 165:5
170:23 175:17
176:17,20,23
177:5,6,12,21
178:2,11 179:2
182:15 183:3,4
183:24 185:22
185:25 188:17
189:15,16,25
191:22,23
192:1,23 194:9
201:11 202:14
204:1 205:21
206:14 208:25

209:17 215:3
215:14 216:2
216:10,12
217:11,15
218:9,18,22
219:14,22
220:7 224:10
227:10,22
232:6 235:9
241:8,19,19
243:22,24
244:4 245:22
246:10,22
257:14 258:7
259:6,25 260:1
261:22 262:1
266:20 271:8
271:14 272:12
272:17,18
273:13 274:23
275:4,17 281:6
281:21 282:2,6
282:23 284:5
286:13 287:1
288:14 290:17
290:19
**portfolio** 48:7
51:16
**portion** 217:5
258:5
**portions** 135:12
239:23
**ports** 10:3 18:13
18:15,17,22
19:1,19,20,24
21:24 22:1,2,6
22:11,13 23:3
24:14 32:24
37:4,4,21 38:11
45:5 50:18 51:1
51:5 52:11
54:18 55:11,17
66:18 67:22
71:17,22 73:16
74:2,18 76:1
77:20,23 81:16



83:4,15,24
84:20,21 87:25
93:3,9,15 94:1
94:4,7,15,17
95:5 96:9,22
100:7 102:16
102:19,21
103:9 105:7,8
107:8,23 108:1
108:23 109:9
109:11 110:9
110:18,21
111:3,3 114:16
114:21,24
115:18 124:12
125:20 126:5
127:25 129:20
129:20 130:21
130:25 133:16
140:9 141:7
142:7,11,24
145:19 148:8
152:7,16
154:18,22
163:5 165:23
165:24 172:16
173:7 175:13
176:22 177:20
177:21,25
178:7 180:5
183:12 185:7
185:10 186:2,4
187:6,8 191:16
194:5,6,19
197:7 198:2
199:8,18
201:11 204:5
205:7 208:7,15
223:13 225:2
225:14 228:1,4
228:13,18,20
228:23 229:1
229:16 231:9
231:11 233:2
234:13 254:5
254:12,14

255:12,13,14
255:15 260:18
261:8,14,18
262:19 266:22
267:9 268:15
272:11,18
274:24 284:4
284:17,19
**port's** 122:17
282:3
**port-hardening**
44:25
**port-level** 147:4
153:14 190:21
**port-specific**
149:15
**port-wide** 195:5
**pose** 213:11
**position** 40:21,24
41:2 47:19,20
50:17 67:23
85:14 100:1,3
100:15 147:13
147:20 149:4
151:8 182:8,11
182:13,22
183:2 186:20
205:25 231:4
232:22 234:8
234:11,11
250:9
**positions** 74:3
281:2
**positive** 64:1
**possession**
226:11
**possible** 75:23
142:24 143:2
146:5,8,11,14
160:4 161:10
174:18,20
187:22 208:6
208:10 224:10
224:14 244:18
272:15 285:4,6
**post** 15:4,6

**postponed** 26:9
36:20 270:24
**posts** 14:22 184:6
**post-CBP** 48:9
**potential** 36:19
65:25 105:19
219:16
**potentially** 65:17
250:3
**Poverty** 2:4
**power** 160:21
**powering** 56:8
**practice** 10:2,5
10:10 101:2
110:1,3 210:22
238:15 239:1
261:8 265:24
267:20
**practices** 37:19
110:19,22
111:1,5
**precisely** 156:2
**predict** 191:17
**predicted** 190:1
**prefer** 31:18
99:22 116:10
**preferred** 38:17
**prefers** 179:4
**preliminary**
222:5
**premetering**
184:5
**preparation** 16:3
16:8 28:12
31:22 35:24
79:5
**prepare** 25:13
29:22 32:9,25
34:25 37:22
38:7 39:6,10
217:22 281:16
**prepared** 10:7,18
36:3 38:2 39:6
39:14 237:3,14
**preparing** 38:11
297:12

**preprimary**
182:15,16
213:15
**presence** 202:9
**present** 2:18 8:5
19:18 34:4 55:1
189:3 196:14
**presented** 56:5
**presenting**
207:25 245:4
**presently** 40:15
**pressed** 259:10
**presumably**
108:8 199:15
248:24
**presume** 78:24
91:10 110:21
124:6 153:12
168:19 215:14
226:2 230:5
231:18 261:25
286:17
**presuming** 133:9
133:11 134:4
142:16 180:25
**pretty** 41:25
98:10 170:6
**prevent** 45:1
191:17 232:9
234:8
**prevented** 208:19
235:1,7
**preventing** 82:5
86:5 209:3
232:22
**previous** 166:3
167:19 173:25
**previously** 51:15
76:2 93:2
148:24 231:8
238:25
**primarily** 31:18
43:9,17,24
44:21 158:7
199:10 201:1
206:9 227:5

273:5 286:25
**primary** 19:3,25
20:4,19 182:15
192:14
**print** 239:17
**prior** 55:14,22
74:17 76:21
101:2 116:5
120:3 125:24
166:3 168:21
169:6 189:18
202:13 227:19
246:5 289:4,4
**priorities** 89:23
90:6,9,10 91:16
91:21,22 277:6
277:11,19,20
277:22,25
278:1 288:20
**priorities-based**
89:18
**prioritization**
88:21 191:9
**prioritization-...**
90:3
**priority** 89:23
90:17
**private** 251:6
**privately** 9:9
**privilege** 23:14
25:7 27:4 28:15
28:22 30:6
**privileged** 23:20
27:25 30:10,19
34:2
**probably** 7:22
8:19 25:24
31:21 33:7
39:17 46:5
54:16 55:3
59:10 61:16
84:4 97:9
116:16 124:18
125:17 138:7
161:19 167:18
168:22 171:4



186:8 188:11
201:13 205:17
207:19 208:15
210:22 228:10
250:25 258:25
259:2 265:19
266:24 271:9
271:12,13
275:18 282:5
282:19 283:17
285:5 286:3,11
**problem** 19:14
26:10 108:17
132:2 150:12
190:2 196:18
200:18 210:10
214:15,17,18
233:18 248:23
292:20
**problems** 200:21
201:23 249:20
**procedure** 111:9
168:5,11,11,16
168:20
**procedures**
244:17
**proceed** 5:23
29:12 57:4
92:23 117:12
182:3 184:20
230:24 286:1
291:21
**proceeding** 12:11
12:13,15
297:16
**process** 48:5 54:3
55:14,22 56:6
86:21 95:4,19
104:17,22
107:10,23,24
108:3,11
109:10 110:6
111:21 112:2
114:15 115:3
126:14,22
146:20,23

154:18 157:11
163:16,16,18
165:11 169:5
173:16,17
179:7,23
180:20 187:17
195:23 196:24
197:1,4,12
198:2,17
201:21 208:15
214:6 216:8
217:6 220:1,4,8
234:14,19,24
235:23,25
241:22 242:13
245:5,13 260:5
261:11,13,20
262:9,11 274:1
287:16 288:10
289:14 290:4
290:23
**processed** 50:5
83:24 95:4,20
102:18,22
129:14 136:19
137:4 149:7,18
149:25 161:11
166:4 172:23
174:16 179:10
195:8 205:12
208:7,13,17
216:16 217:8
218:17,23
232:14,18
233:7,24
235:19 236:10
248:9 260:8
287:15 288:5
**processes** 168:25
223:5,12,18
271:7
**processing** 19:2
22:16,18,19
35:19 42:23
44:2 48:11,16
48:19 53:22

58:24 91:15,20
102:9,15 104:9
105:16 106:9
106:12 107:18
107:20 109:13
110:23 123:2
124:21 130:2
145:2 150:3
151:23 152:8
152:16 157:4,6
159:4 161:17
172:20 174:3,3
195:15,16,23
196:5,6,22
197:1,9 198:14
206:15 208:16
209:18 215:25
216:5,14,15,17
217:13 218:4,8
218:10,22
219:10,15
220:3,12,13
230:11 232:7
235:11 243:18
243:25 244:15
244:16,23
245:1,4,14
266:4 286:16
286:24 287:10
287:11,11,25
288:15,20,25
290:16
**processor** 169:3
**procure** 220:6
**produced** 1:18
156:16
**program** 35:7
44:17,18,19
45:4,9,10,16,24
46:1,2 47:5,9
47:23,24 51:13
136:3 167:20
227:18,21
258:16 270:5
271:17 274:20
**programs** 35:10

45:14 48:3,3,22
53:12,20 58:8
166:15 250:11
258:12
**Progreso** 52:13
94:2 100:17
**prohibiting**
222:5
**project** 185:6
260:16
**projects** 46:14
**promise** 29:14
**promises** 233:5
**promoted** 43:20
**promotion** 44:16
47:10
**pronounce**
150:19
**proper** 85:18
190:19 210:8
267:21
**property** 43:18
**proposal** 245:18
245:21 247:1,2
**proposals** 51:24
**proposed** 51:23
248:15
**proposing** 209:14
268:6
**prosecution**
196:4,13
**Protection** 6:5
8:20 41:8
273:23
**protective** 67:4
**protocols** 78:15
273:24
**proved** 295:15
**provide** 7:19
27:18 28:10
29:17,20,21
105:4 222:18
223:2 242:8
257:14 260:6
**provided** 12:23
27:1 30:1,3,14

30:21 248:11
280:14
**providing** 221:11
**proximity** 66:14
**PSC** 272:13
275:4
**PSCs** 272:12
**public** 84:5
295:22
**pull** 72:1 185:10
**purchased**
188:18,24,25
189:2,5
**purpose** 130:23
219:24 232:22
232:25 234:7
234:10 259:5,8
**purposes** 295:17
**pursuant** 193:3
297:4
**purview** 255:14
**pushed** 246:10
246:21 249:17
**put** 25:16 35:21
53:4 57:10
67:18,20 70:1
72:19 73:3 76:3
88:5 110:5
137:21 141:5
146:16 156:10
210:15 230:11
275:11 277:23
292:18 293:1
**putting** 258:21
278:11
**p.m** 1:21 58:5
117:8,11 156:7
181:24 182:3
184:16,19
230:20,23
264:25 285:22
285:25 291:17
291:20 293:3,4
**P.O** 2:14

---

**Q**



**QM** 4:10
**quarter** 192:23
**queries** 174:22
246:4,13
**question** 7:6,10
7:13,17 11:8
13:10 15:12
21:11,16 24:12
27:18 28:6,23
30:9,10,12,20
63:14,16 64:7
76:9,11 77:13
80:13 87:13
107:1 112:25
126:20 146:21
149:20 154:16
164:14,23
171:6 176:1
178:16 187:12
198:4,5 207:17
207:22 208:22
214:1 223:1
224:17 235:16
248:20 249:10
254:1,2,8 256:6
265:14 267:13
268:7 273:20
285:15
**questioning** 11:1
27:12,22 94:12
237:19
**questions** 7:18
8:1,4 10:24
11:6 55:7 62:11
64:22 78:13,20
94:1 132:5
135:1 176:3
221:3 229:6,8
230:16 236:12
254:14,15,23
257:15,17
258:9,19 259:8
263:19 264:5
264:14,16
265:23 286:3
291:5 292:16

**queue** 10:2,16
19:1,6 35:18
37:7,18 73:17
74:16 75:10
79:17 81:17
83:17 88:22
89:2,4,18,23
90:3 93:3,16,20
108:22 119:11
119:11 127:16
129:11 130:7
131:12 133:2,5
134:10 135:12
138:2 139:10
139:15 141:6
145:2,9,10
148:9,18,21,25
151:14 153:20
155:13 156:4
182:7 183:25
189:5,12,14,18
189:22 190:17
190:22 191:6,9
194:10 197:5
197:20 200:3,8
200:9,10,14,15
200:18 201:5,6
203:1,8,10
205:10 206:8
210:13,15,20
211:5 212:22
213:20,22
214:2,6,12
234:10 237:12
**quick** 41:12 44:9
79:1 90:1 91:25
171:2 221:4
229:13 230:15
**quicker** 95:4,21
165:6 172:15
173:14 288:5
**quickly** 42:1
157:12 170:7
**quite** 11:17 25:17
121:19 152:20
249:15 287:16

---
**R**
---
**R** 2:1

▮▮▮▮▮

**railroad** 126:15
128:17
**raise** 62:11,17,20
63:2,2,19
**raised** 62:19,24
63:17 64:9
65:13 66:7,13
67:3,7 77:7
190:21 191:8
**Randy** 33:11,21
34:5
**range** 155:1
**rate** 134:5
**rated** 123:11,24
**razed** 125:13
**reach** 54:12,15
**reached** 216:20
248:5
**reaches** 198:17
**read** 39:24 58:22
58:25 69:9,17
70:3,8,12 75:20
78:10,16,22
81:25 82:9,21
86:11 93:10,12
134:25 138:13
139:23 140:7
140:13,17,19
143:4,9,18,19
144:4,4,25
146:4 151:10
151:15,21
152:1,14 153:5
153:8 161:25
163:3,6,16
164:2 177:8,15
178:25 215:10
215:15 216:4,9
216:21 217:6
217:13 218:8
218:13,15,19
219:13,19

240:1,8,16
241:13 243:1
256:5,22 260:9
266:5 267:4
269:2,19,22
278:16 279:6,8
280:3,19
281:22 292:23
295:1
**reading** 136:5
246:8 249:13
254:15 269:5
**reads** 241:11
**ready** 104:22
240:21
**real** 23:23 47:22
79:1 171:2
202:8
**reality** 212:9
**realize** 43:1
206:23
**realizes** 209:11
**realizing** 13:9
**really** 23:23
24:19,21 26:2,5
26:5,17 35:18
37:25 44:20
60:2 66:18
75:11 80:14
85:10 90:13
91:21 101:4
121:16 126:5,8
126:19 130:23
149:10 150:3
155:11,15
166:9 169:2
193:18 201:19
202:2 213:18
219:8 223:5,11
235:17 246:3
246:11,16,22
246:23,23
247:25 248:11
267:1 274:18
282:9 285:17
286:11 288:21

289:14,15,19
292:13
**realm** 288:25
**rearrange** 205:21
205:24
**reason** 9:5,7
10:10 71:12
72:5 107:16
112:14 130:14
131:11 148:23
154:11 161:17
172:18 180:10
181:9 190:4,8
193:7 212:10
241:15 245:20
268:15 270:25
271:2 294:3
**reasoning** 148:20
**reasons** 10:5 71:2
71:13 164:20
**reassigned** 184:5
**Rebecca** 2:3 3:6
3:10 6:5 19:7
56:9 64:17 68:5
78:3 81:4,7
94:10 138:25
150:10 159:15
160:3 171:3
175:24 184:11
206:20 229:3
291:6 297:1,8
**Rebecca.cassle...**
2:6
**rebuilt** 125:13
**recall** 11:13 12:6
12:25 15:15
17:24 18:3 34:8
38:8,9 39:21
40:4 47:18 50:2
56:1,3,6 68:1
74:14 76:17
79:4 80:8,10,23
89:11,20 91:2
99:20 111:24
112:1,3 126:25
127:3,8 138:3



151:8 168:7,22
191:2 194:21
195:1,5 203:14
203:18 204:9
205:1 215:18
223:4,10,16,18
223:24 224:1,4
224:4,25 228:5
228:6,12,17,18
246:20 250:21
251:22 253:11
259:1 260:15
260:17 261:8
261:11,14
270:21 271:23
282:19,20
283:4,7,16
284:3,15,20,20
284:20 285:2
285:13 291:24
**recalled** 80:6
**receive** 50:5
163:21 282:14
282:22 284:14
**received** 50:8
60:23 71:16
144:9,9 166:2
215:16 268:25
281:25 282:1
282:21 283:7
283:14,22
284:1,3,15,18
285:7
**receiving** 172:7
260:16 278:8
282:17
**recesses** 289:7
**recipients** 274:8
**recognition**
173:4
**recollection**
82:14 90:21
99:15 120:2
138:6 202:14
250:16
**Recommend**

140:9
**recommendati...**
52:1
**reconstruction**
124:24
**reconvene**
291:10
**record** 5:2,9,14
5:21 6:9,19
9:18 23:25 29:4
29:8,11,14,15
55:3,4 56:23,25
57:3 65:4 92:10
92:19,22 117:6
117:8,11
120:13 132:6
134:25 138:14
150:16 181:19
181:24 182:2
184:13,16,19
207:2 230:20
230:23 240:24
263:7 264:1,3
270:8 278:23
285:19,22,25
291:17,20
293:2 296:18
297:7
**records** 127:4
**recurring** 272:11
**redirect** 291:7,9
**reduce** 245:3
288:24
**refer** 8:8,13,19
10:20 23:8 52:8
59:4,11 61:5,12
61:16,17 75:11
85:9 94:6 189:7
223:25 227:6
**reference** 71:15
89:2 99:14
203:20 216:23
217:1
**referenced**
246:19
**references** 69:20

69:21
**referred** 53:6,7
55:9 74:19
106:3 123:3
131:6 145:6
191:23 201:13
272:13 289:11
**referring** 8:12
94:23 163:8
179:9 227:21
227:24 277:7
278:2
**refers** 122:17
129:12 130:1
284:10
**refrain** 63:6,10
**refresh** 32:7
**refugee-type**
274:20
**Refugiados**
237:10
**regarding** 39:25
49:16 194:24
222:15 224:3
239:2
**regardless** 93:21
126:11
**region** 83:2,2
**Registration**
297:22
**regula** 113:6
**regular** 86:23
98:15 125:8
173:7 180:18
194:9 211:10
211:19 225:13
273:9,21
**regularize** 113:6
**regularly** 171:17
237:25 239:1
**reiterate** 108:1
**relate** 8:4
**related** 14:9,10
14:18 38:11
46:13 297:15
**relating** 264:17

**relation** 138:2
189:21
**Relations** 51:22
**relationship** 49:1
233:11
**relatively** 227:16
247:6 289:24
**relayed** 151:13
**relaying** 151:17
151:18
**release** 115:25
160:15 164:19
181:1,2 241:23
**released** 163:4
180:22
**releases** 175:16
**releasing** 164:7
165:4
**relevant** 26:23
31:4 35:14,15
35:23 126:20
283:23
**reliable** 67:9
**relocate** 69:12
**Remand** 163:25
**remanding**
176:16
**remember** 12:4
14:6 17:7,15
18:11 33:13
75:6 78:24
80:13 120:5,7
127:22 140:5
146:7 150:21
185:18 195:13
203:11 224:8
224:22 227:14
227:15,19
253:6 270:22
270:23 284:4
**reminder** 163:4
**remote** 5:4 17:6
118:9 171:4
**remotely** 5:17
6:24 283:2
**removal** 11:24

161:14 179:10
**removal/credible**
161:12,15
**remove** 147:13
147:20 148:21
**removed** 126:16
126:23 128:5
**removing** 148:18
**renovated** 125:11
**repeat** 15:12
24:12 29:19
63:8 117:23
164:14 168:13
237:5 258:14
267:12 284:24
**repercussions**
64:2
**rephrase** 237:22
251:14 254:8
**replied** 250:24
**report** 36:12 40:5
94:9 107:8,16
112:3 119:11
119:12 120:7
121:10,16
122:3,11 126:8
127:11,13,14
127:14,16
128:25 130:18
131:23 133:3,6
133:15 135:13
144:13,16
155:8,12,13,16
155:17 156:5
181:5 194:13
194:15,17
195:2,6 229:25
230:2,3,6
**reported** 1:22
107:21 111:20
111:21,24
131:24 136:10
136:25 137:15
146:13 180:7
180:14 190:13
194:24



**reporter** 5:19,22
6:18,19,25
181:21 292:24
296:13
**reporters** 84:7
**Reporter's** 3:13
296:10
**reporting** 78:15
121:13 125:24
125:25 152:15
181:4,6,9
**reports** 4:10 40:6
45:2,5 46:13
51:20 62:7
112:1 119:15
119:18,21
126:9,17
131:12 135:15
135:18 153:21
155:14 194:10
195:5,14
197:20 205:18
230:4
**represent** 6:5
236:19
**representation**
271:9,11 272:1
**representative**
236:22 271:13
271:16
**representatives**
271:21
**represented**
262:16
**representing**
69:23
**reprocess** 173:13
**reprocessing**
172:12
**repurposed**
220:17
**request** 69:14
71:6,8 85:7
102:18,18
109:17,20
163:19 169:15

169:16,18,24
170:8,23,25
171:17 172:2,3
224:19 225:1
226:1 241:20
241:23 289:7
**requested** 67:23
68:18 74:17
105:9 113:7,8
114:8 224:18
224:23
**requesting** 69:11
71:19
**requests** 71:17
72:3,9,23 79:23
224:23
**require** 161:15
194:18 274:2
289:9
**required** 74:2
93:19 122:13
127:17 130:11
187:8,11,24
188:22,23,23
204:15,17
231:9,11
**requirement**
232:17
**requirements**
267:7
**requires** 182:8
**requiring** 127:11
**rescinded** 167:5
**research** 39:10
39:12,14,18,23
71:20 231:20
251:1
**resend** 170:7
**residents** 98:4
**resource** 247:16
**resources** 79:22
95:3 205:22,25
234:16 253:14
289:7,9
**respect** 259:7
**Respectfully**

64:25
**respects** 106:3
**respond** 170:1,3
281:23 282:6
**responded** 259:4
282:2
**responding**
265:23
**responds** 265:24
**response** 170:5,6
170:20,22
210:10 259:24
264:11 281:14
282:1,1
**responses** 6:20
237:20 257:15
**responsibilities**
46:3 48:11
50:18 51:12
**responsibility**
48:17 50:20,22
51:9 106:19
**responsive** 26:23
32:6 80:13
**rest** 212:16
**restate** 149:13,20
283:25
**resubmit** 170:23
170:25
**result** 180:21
181:3 223:18
**retain** 32:11
**return** 73:14
242:10 247:17
260:8 266:4
296:22
**returned** 246:5
247:21 248:10
**returning** 247:23
**review** 25:12,15
28:19,20 29:18
29:22 30:21
32:4 140:10
162:17 258:18
259:22 279:25
**reviewed** 26:25

27:8 28:10
29:25 30:14,23
30:24 31:21
162:20 257:4
259:14,16
**reviewing** 25:22
26:2,13 32:8
258:11 270:3
**revisit** 139:25
**RFI** 259:10
266:10
**RFIs** 79:23
259:11
**Rich** 2:3 68:16,16
118:14,14
138:19 239:7
263:6,6 269:15
279:16,20
**riding** 210:11
**right** 7:17 9:15
14:8 18:6 21:3
25:1,12 27:17
28:8 29:14,15
30:16 32:17,20
35:20 36:9
37:11 38:4,23
40:15,18 42:1
42:11,13 45:25
47:6,7 49:2,10
49:12 50:19
51:10 52:9,12
52:14,17 53:18
53:21 54:5,9,13
54:17,25 55:12
56:14 57:6,12
57:23 58:1,9,11
58:15,20,25
59:3 60:19 62:1
62:23 64:15
65:5,7,20,25
66:2,10,15,19
67:24 68:2,11
69:16 70:3,3,8
70:12 71:3
72:10 73:8 74:4
76:10 77:20,23

78:8,17,21
80:19 81:13
82:9 83:11
85:24 87:9 88:9
88:23 91:6
92:25 93:5,8,9
93:22 94:17
96:3,10 97:14
97:19 98:20
99:2,24 100:22
100:23 101:12
101:16,24
102:2 103:3,16
104:3,11,22
105:5,12,16
106:7,20,24
108:12 109:11
109:13 110:11
111:18,22
112:6,9,15,22
115:12 117:14
117:17 118:2,5
119:4,13,16,19
119:23,24
120:1 121:11
122:11,15,19
123:4,16,18,18
123:18 125:3
127:17,20,23
128:5 129:15
130:2,18 131:5
132:25 133:3
133:24 134:3,6
134:11,12
136:24 137:16
138:8 139:10
139:16 140:4
141:8 142:4
144:14,20
145:3,7,14,17
145:23 146:15
149:1,10,15
150:4,23 151:2
151:6,15,19
152:1,9 155:3,7
155:14,15,25



156:13,20
157:24 158:18
159:1 160:16
160:22 161:14
162:12 163:6,9
164:2,8,20,25
165:3 167:1
168:12,16
170:1 172:8,12
173:1 174:4
175:8 176:18
176:23 177:1,8
177:12 178:13
180:21 181:4,7
181:18 182:9
184:22 185:10
186:5,18,21
187:4 189:9,12
189:22 191:11
191:18,25
192:1,10,23
193:5,8,14,21
194:3,11
196:18,23
197:1 198:17
198:20 199:1,8
199:11,24
200:19,22
201:11,19,20
201:25 203:15
203:18 204:3
207:4 208:1,7,8
209:15,16
210:5,13 211:7
213:21 214:19
215:24 216:21
216:24 217:2,8
217:11,24
218:4,13,19,24
219:1,6,19
221:2,5 223:14
226:1,15,25
227:23 230:14
231:1,5,10,16
232:1,4,10,14
232:18 233:24

234:9,19
235:10,23
243:20,23
244:19 245:6
245:16 249:3
249:17 250:23
253:5 258:9,16
258:20 261:1
263:1,8,10,21
267:21 268:24
270:18 276:8,9
276:13 278:25
279:15,21
288:17 291:25
292:2,3,4,7,8
292:11,25
**rights** 43:18
**Rio** 52:12,13 72:2
94:2,3 95:2
105:24 185:25
**rise** 190:1 193:20
193:24
**risk** 112:21 113:4
113:11,14
**river** 96:9
**road** 86:17 96:18
213:5
**roadway** 213:8
213:10
**Robert** 33:6 36:9
36:10
**Rodney** 1:13,17
3:2,5 4:2 5:2,15
5:24 6:10,12
162:11 295:1,7
295:14 296:10
296:16
**Rodriguez** 20:5
**role** 48:18,23,24
50:16 51:20
238:11 258:12
258:12,16
271:17 280:25
**roles** 48:8,9
**rolled** 228:16,24
**Roma** 52:14 94:3

95:2 130:7,11
130:15 260:1,4
260:23 262:16
268:11,14
**room** 81:19
218:11,16
219:5 220:2,3
220:16,22
221:1 275:10
**rotation** 206:3,4
**rough** 185:21
**roughly** 21:12
126:24
**routine** 59:24
**roving** 182:16
**rowdy** 183:20
**rule** 9:19,21
15:11,13,19
25:13 135:7
221:11,15,16
221:16,18
222:1,6,16
223:25
**rules** 6:17 237:18
**run** 71:19 72:14
88:4 183:25
189:16 230:4
**rundown** 90:1
**runner** 192:1
**runners** 44:24
45:1 189:15
191:22,23
192:22 202:12
202:15
**running** 53:20
198:25 199:15
**runs** 87:24
262:25 274:20
290:10
**Ryan** 150:20
151:4,12 152:6
152:16,22
250:4,5
**R-O-D-N-E-Y**
6:12

**S**

**s** 2:1 174:25
**safe** 64:1,2 74:23
188:9,9 234:14
**safety** 62:22
63:17,22 64:3
65:12,22 66:6,7
66:13 67:2,7
70:11 72:10
189:1 198:19
198:23,25
204:19 205:13
213:11,14
**sake** 222:1
**salient** 167:22
246:3
**Salvador** 227:2
**Sampat** 2:13
68:20 78:3
207:4,6 297:2,9
**San** 275:22,24
**Sanders** 261:12
**Sara** 2:3
**Sarah** 68:16
118:14 207:1
214:21 256:17
263:5,6 269:18
279:13
**Sarah's** 207:3
**Sara.rich@spl...**
2:6
**SAT** 244:8,16
272:21
**save** 31:16 38:22
283:2
**saved** 26:4 30:25
31:8,9,11,12
39:2
**saving** 38:17
**saw** 18:25 66:11
75:18 133:23
154:12 156:25
222:14 231:13
250:23 266:11
284:7

**saying** 80:25
82:24 85:20
95:13 98:7,9
99:21 111:12
112:3 123:14
127:7,8 129:4
148:1 152:5
167:24 198:6
199:23 204:8
207:9 234:6
235:18 246:22
248:1 254:6
277:24 281:19
**says** 58:23 69:18
70:1,5,10,18
75:21 78:11,19
83:6 86:8
122:14 124:7
130:7 132:5
134:6,9,20
138:4 145:1
151:11,22
153:10 163:3
179:1,13
209:12 216:4
218:16,25
260:23 281:4
281:14
**say-so** 234:2
**scale** 141:23
**schedule** 37:2
242:20 275:6
**scheduled** 242:22
271:25 275:1,2
275:7
**scheduling** 185:6
185:17
**scope** 64:18
70:23 94:11
161:6 190:24
192:24 222:9
222:13,21,23
226:16 227:4
228:15 229:17
229:22 253:15
253:19 254:5



255:5 260:20
267:11,24
268:1
scopes 131:3
scrap 261:16
scratch 172:20
173:21 174:4
screen 118:19
134:19 138:17
screens 250:14
scro 136:8
scroll 26:22
136:2 153:22
154:2,2,2,3,3,4
154:4,5,5,9
239:10 243:4
255:21 264:9
269:8
scrolling 26:3
32:4 265:22
seal 295:18
searching 39:15
second 68:6 70:1
78:6 80:16
81:22 108:15
117:17 118:15
125:1 132:1
137:23 139:23
143:25 144:8
156:11 163:19
164:9 184:13
189:24 215:20
216:8 217:17
221:9 239:12
239:14 240:21
241:2 244:2,2
248:19 252:19
255:22 264:10
264:24 269:16
274:5 276:11
secondary 19:3
22:17,18,19,20
246:13 288:14
secondary-type
50:3
second-to-last

276:4
section 256:22,24
269:19,23
sector 46:7,8
security 8:9
40:19 46:24
53:19 64:1 90:6
189:1 270:6
272:12 275:5
275:17
see 15:6 18:13
21:3 43:3 57:16
57:17,20 58:4,5
58:23 60:21
67:19 69:7
71:14 80:5
81:25 86:3
118:21 121:25
128:3 130:8
131:13 132:12
132:13 133:15
136:9,24
138:17,22
139:5 143:7,8
148:17,20,22
152:21 153:23
154:6,14,25
156:18 162:6
162:14 166:9
176:22 185:17
190:25 201:6
211:16 215:8,9
217:19 233:11
233:14 234:3,5
234:23 239:15
239:16,18
240:11 243:11
250:23 258:6
264:9,10,19
265:9 269:3
271:6,12
276:16,18,22
278:10
seeing 22:14 23:1
32:6 89:11
108:23 111:24

132:19 233:11
279:19 282:3
seek 214:11
252:9
seeker 85:5 94:21
94:23 161:3
217:22 232:16
235:1 251:6
seekers 50:4
53:24 84:25
85:3,15 86:22
91:16,21 94:17
104:10,21
107:9 129:12
141:7 146:20
146:23 147:7
149:7,18 157:6
179:9,16 180:5
205:16,19
216:1 217:7
218:23 219:23
280:9,14 284:2
286:15
seeking 55:16
193:13 196:4
seen 6:17 14:22
22:2,10 23:3,4
40:1,8 65:19
114:2 124:7
131:15 145:24
193:20 204:4
205:18 211:7
211:18 213:6
231:19 267:2
286:12
seizure 273:6,7
seizures 273:8
288:15,15,16
seldom 205:11
select 101:11,14
selecting 197:19
Senate 12:20
send 38:25 39:4
45:6 105:8
108:7 121:22
129:21,24

130:25 140:9
168:20 178:4
211:15 214:22
252:23 280:17
sending 68:17
121:18,19
133:17 139:10
239:8 245:13
252:6 269:11
269:15
sends 169:24
senior 121:1,4
sense 7:20 8:2
10:21 30:15
50:12 52:5 61:4
64:13 85:8
101:8 102:10
109:8 149:10
150:3 152:5
156:8 168:4
182:24 189:20
190:9 208:21
224:17 236:2,5
236:6 252:13
252:14 255:16
sent 58:14 60:19
68:8,19 73:6,25
74:12 77:20
78:8 88:8
118:15 119:15
119:21 138:19
142:16 155:24
161:24 162:11
167:19 170:8
241:7 245:24
255:24,25
259:15,18,19
259:21,25
260:17 264:11
270:13 275:8
279:14 282:6
284:5
sentence 11:21
69:10 78:10
144:25 151:11
151:22 163:2

164:17 177:14
218:9,15
219:13 277:4
sentences 140:8
separate 279:14
separately 279:9
September 49:14
137:6,9,11,15
226:21 227:1
270:16,20
ser 247:13
Serena 272:21
served 45:23
servers 118:16
269:17
service 41:6 42:4
49:18,19 67:10
169:22 244:11
253:10
services 1:24
5:20 206:7,9,10
206:13,18
247:12,13
253:3,5,9,12
297:23
Servicio 244:9
serving 283:12
set 83:17 93:3
110:24 111:5
149:6,17,22
157:3 173:5
177:23 206:8
214:17 218:10
219:6
sets 214:15 287:1
288:19,23
290:16
setting 48:5
125:16 150:2
setup 204:1
seven 186:2
216:9
shade 70:10
188:19
Shaded 188:11
shake 6:21



share 110:22,25
shared 31:16
    33:23 34:10
sharing 33:18
    110:18 251:5
sharp 143:15
Shawna 276:7,17
    276:23 278:2
sheet 247:16
    253:8 260:6
    261:15,21
sheets 32:15
    38:19 260:12
shelter 103:11
    104:3 105:14
    105:15,15
    106:2 114:24
    115:4 253:7
    280:15 282:7,9
    282:16,18
    283:5,8,11
    284:12 285:9
shelters 103:14
    114:21,24
    247:13 282:7,8
    283:12,15,22
    284:2,7
shields 189:2
shift 170:23,24
    170:24 204:22
    213:1 262:11
Shiloh 61:8
short 99:8,16
    113:19 227:17
    247:6
shorthand 1:22
    85:6 296:13
shortly 72:21
    239:8 278:8
short-circuit
    172:25 173:3
short-term
    113:21 158:8,8
    158:9
show 72:1 155:16
    239:5,22

255:18
showed 218:2
showing 57:12
    72:3 118:18
    128:3,4 132:7
    135:5 143:4
    150:6 155:12
    155:16,17,20
    158:10 214:23
sic 233:9 244:9
side 84:12 87:25
    106:1,9 108:25
    115:12 129:14
    134:8 191:18
    202:7 217:8
    234:18,22
    247:22 265:25
    273:10,13
sides 84:7
sidewalk 209:11
████████
SIGMA 230:12
sign 292:23
signature 3:12
    294:1 295:2
    296:22
signed 178:3
    226:14 227:1
significantly
    169:22 183:10
signing 91:5
silence 108:16
    164:9
similar 71:17,20
    109:10,15
    110:10,13
    174:2 201:12
    227:2 238:11
    251:16 283:2
    285:7
similarly 149:17
    201:23
simplistic 95:13
simply 166:16
    188:17

Sims 15:24
single 197:23
    216:15 278:20
    289:10
sir 78:11 151:11
    159:20 279:8
sit 204:3
sitting 98:17
    200:1 203:20
    233:23
situation 26:9
    84:10 105:20
    141:18 199:13
    209:14
situational
    144:13
situations 73:25
    161:8
six 16:13 257:15
    263:8,23
six-hour 206:22
skim 136:8
    256:12
Skinner 57:20,25
    69:6 74:11
    77:12 78:7 79:3
    79:10,11 139:4
    140:14 150:17
    151:17 152:7
    152:15,22
skip 173:12
sleeping 84:2
slight 7:3 68:19
slightly 160:7
    168:21
Slocum 2:19
    16:19
slow 153:25
    199:7
slowing 199:16
slowly 211:13
small 32:15
    38:20 239:17
    256:6 268:15
    279:6
smaller 94:1,4

105:23 183:12
    189:4 194:5
smallest 94:8
SOC 53:7,14,17
social 13:23 15:1
    247:12 253:3,5
    253:12
soil 73:15 141:8
    145:14 146:7
    198:17 248:5
    257:24
solely 211:3
Solidarity 44:4
somebody 62:20
    87:8 101:11
    169:14 234:17
    248:17 249:20
    271:16
someone's 288:3
something's
    121:24
soon 25:25
    242:22
sooner 7:23
SOP 111:8
sorry 5:7,11 6:10
    14:15 17:17,18
    18:3,10 20:13
    37:1,12 40:25
    43:1 47:18
    52:23 61:2 66:2
    67:16,17 68:3,7
    68:19 70:21,22
    75:6 77:21 78:3
    83:10 87:3,20
    96:6,19 99:11
    100:21 104:14
    108:18 109:25
    111:19 112:7
    118:7 119:6
    120:20 125:2
    127:5,9,15
    129:18 131:20
    132:23 133:9
    137:23 139:21
    142:8 144:1

148:3 159:15
    160:3,12
    164:12 165:13
    166:8,9,10
    170:10,12,20
    171:3,9,15
    176:8 178:19
    181:23 184:8
    189:24 194:22
    195:21 202:21
    203:12,14
    205:16 206:20
    212:3 220:18
    220:19 221:9
    224:4 227:16
    227:20 229:24
    232:20 236:6
    238:16 243:6
    245:8 248:21
    249:25 252:18
    253:22 255:11
    255:25 256:3,3
    257:13 258:15
    276:3,15,19
    277:15 278:9
    279:11 282:15
    284:24 285:16
sort 33:15 48:19
    48:23 54:22
    72:20 104:19
    110:5 111:8,24
    112:17 113:15
    161:16 172:20
    185:9 206:2,5
    235:5,14,15
    238:22 266:23
sought 113:5
sound 14:24
    186:21 187:3
    189:9 191:11
    221:4 246:15
    271:10
sounds 25:1
    67:25 97:14
    100:23 112:17
    127:20,23



186:18 255:1
**source** 133:23
135:19
**South** 45:21,22
46:6,13,15,17
47:1,6 288:21
**southern** 1:2 2:4
52:17 53:6
219:17 221:12
296:2
**southwest** 58:14
58:17 83:2
152:3
**sovereign** 87:22
**space** 95:17,19
149:23 155:6
163:20 169:25
171:23 172:3
175:7 216:6,19
287:5,5,9
290:20
**spaces** 287:16
**Spanish** 169:21
244:11 288:4
289:3
**speak** 19:22 21:2
24:5,19,24
32:25 34:25
52:6 236:22
288:4,7 289:2
**speaker** 288:4
**speaking** 52:21
55:25 63:7,11
63:15 237:23
254:17
**speaks** 288:6
**special** 43:13
266:3
**Specialist** 43:15
**specific** 29:22
30:24 45:14
74:13 75:18
76:12 83:4
111:13 112:1,3
127:11,13
130:18 135:14

142:6 165:25
190:7 196:1,2
230:6,7
**specifically** 9:25
10:3 80:10,24
90:7 121:7
129:6 168:25
189:21 199:23
205:21 210:11
247:19 276:6
285:3
**specifics** 75:6
194:21 285:15
**specified** 105:12
260:11
**speculate** 254:7
254:18 262:7
**speculation**
254:16
**spell** 6:8
**spend** 26:13 44:6
46:5,8 50:15
290:11
**spike** 158:16
**spoke** 16:21
23:20 24:8,20
25:3 33:5,11
35:8 39:13
74:25 77:8
151:12 249:2
**sporadically**
210:24
**sporting** 204:7
**sports-type**
188:19
**spot** 201:3
**spread** 17:14,19
**spreadsheet**
131:17
**spreadsheets**
46:12
**staff** 20:16 35:5
37:16 45:20
50:24 51:19,19
60:19,24 61:1,6
61:24 62:4 63:1

63:18 105:15
115:5,11
130:11 131:1
146:19,22
147:6,12
148:10 153:14
159:1 183:1
184:5,6,25
185:1,5 186:21
187:3,7,8,10,12
187:18,23,24
189:5 203:21
204:15,21
209:3 242:8
247:19 281:4
**staffed** 183:2
186:13 231:4
**staffer** 50:25
51:2
**staffers** 61:6
**staffing** 130:8,10
185:1 206:1,4
231:22 232:8
**stake** 273:4
**stakeholders**
273:2,17
275:22
**stamp** 276:10
278:24
**stand** 5:10 24:6
56:5 93:16
120:17 134:13
160:7 212:21
244:8 293:1
**standard** 111:9
**standards** 201:12
**standing** 65:8
67:4 70:23
94:11,13
151:13 182:22
211:11 212:25
213:7 222:22
254:23 255:5
261:3
**stands** 90:22
181:9 190:4,8

**start** 5:13 25:22
81:8 82:11,16
99:12 107:23
108:13 124:14
132:4 138:1
156:23 169:5
172:19 199:16
203:1,8 206:1
214:2 241:2
280:5
**started** 25:24
26:2,7 31:2
41:5 82:20
83:11,18 84:4,5
84:11 108:14
108:23 109:2
115:17 119:25
126:16 127:4
127:11,16
138:5 140:3
141:7 156:19
185:2 191:6
192:11 193:25
194:9 196:18
200:22,24
201:6,24 203:5
210:12 212:10
214:14,15,16
227:14 228:12
242:18 262:23
266:9
**starting** 42:10
57:14 118:25
132:9 143:6
150:8 160:5
173:20 214:25
216:10
**stat** 229:24
**state** 1:21 6:8 8:4
42:2,5 46:24
71:2 97:4,10,23
98:20 99:1,4
110:14 120:13
208:22 240:24
265:14 270:8
273:2,16 280:7

283:6,18
289:19 295:11
295:23 296:14
**stated** 9:19 38:16
83:6 87:16
178:16 197:9
198:7,9 219:24
232:12 251:9
252:22 262:15
262:18 265:10
267:17
**statement** 71:12
87:22 101:21
105:13 114:19
209:22 248:20
267:14 277:25
**states** 1:1 21:9
46:20 54:3,5,25
55:2,10 82:3,7
96:9 97:5 98:15
111:3 219:18
226:13 227:1
227:10 231:21
231:24 232:2
233:17 235:3
236:7 241:19
242:7,20
243:15,16
244:13 249:1
274:9 277:4
280:12 287:23
296:1
**static** 182:11,13
182:22
**stating** 137:1
274:12
**station** 2:14 54:9
54:12,22 145:2
145:9 177:23
**stations** 218:22
**statistic** 229:25
**stats** 51:20 90:24
155:18 230:4
**status** 113:6
**stay** 84:1 115:20
145:12



**staying** 285:9
**stays** 234:17
**STC** 46:6
**stenographic**
    5:20
**step** 166:20 175:7
    215:2 216:8
    217:17 218:7
    218:21 219:3,4
    219:9 231:23
    232:5
**stepped** 73:14
**steps** 66:5 75:13
    163:14 165:22
    167:16 172:25
    173:13 219:7
**Steve** 2:8 29:3
**stood** 120:4,4,16
**stop** 27:19 43:19
    99:13 122:4,10
    147:20 199:16
    211:20 236:11
**stopped** 26:10
**stored** 282:24
**stories** 39:25
    40:2
**straight** 35:11
    165:25
**Street** 2:4,9
    297:23
**strike** 104:7
**string** 60:20
    270:22 274:16
**structure** 53:8,10
    53:11 204:2
**studies** 41:16
**stuff** 19:9 40:5
    264:2
**stumbled** 152:1
**stupid** 13:9
**subject** 12:2
    34:20 35:10
    241:11 280:8
**subjected** 87:7,8
**subjects** 272:6
**submitted** 120:8

296:20
**subscribed**
    295:16
**substance** 16:1
    117:21,24
**successful** 209:3
**sudden** 59:19
**sued** 13:14,15,19
**suggest** 94:21
**suggestions**
    253:14
**suggests** 82:19,20
**Suite** 2:4
**summarize** 87:5
    144:16
**summarizes**
    135:11
**summarizing**
    244:13 265:1
**summary** 135:7
    153:20 178:10
    242:23 245:25
    265:5
**summer** 119:25
    124:25
**sun** 188:11
**sup** 258:12
**supervision** 49:2
    49:4
**supervisor** 33:5
    43:24 44:10
    47:25 49:7
    183:11,15
    184:3
**supervisors**
    20:24
**supervisory**
    43:20,22 44:13
    47:9,23 48:10
    48:15,18,23,24
    51:14 62:5,5
    258:12,16
    271:17
**support** 185:5
    202:10
**suppose** 143:2

268:18
**supposed** 149:14
    150:4 196:25
**sure** 18:24 19:25
    24:25 29:6 47:3
    52:12 56:11
    97:3 132:3
    164:11 180:12
    192:15 207:12
    215:7 222:3,14
    223:7,9 235:14
    235:17 239:19
    254:13 259:22
    271:8 274:18
    276:16,22
    278:10 291:13
    291:15 292:20
**surge** 58:24
    59:13,14,18,25
    60:5 210:23
**surprise** 97:22,25
    98:2 111:17
    112:12 190:14
    190:16 197:21
    197:25
**surprised** 111:14
    190:25 209:19
    283:17
**suspect** 62:18
    193:10
**sustained** 157:5
    157:14,20,22
    157:24 158:2,4
    158:9,13,24
**swear** 5:22
**switch** 101:8
    175:4
**switched** 41:11
    161:19
**switching** 250:13
**sworn** 1:19 5:25
    296:16
**synopsis** 167:22
**system** 55:5
    116:6 172:12
    185:7,13,17

**Systematic** 216:8
**systems** 174:22
    175:5
**S-O-C** 53:7
**s/b** 151:22 152:3

———————

**T**

———————

**T** 3:4
**table** 122:14
    133:24
**tables** 135:16
**take** 7:22 8:24
    32:8 38:10
    40:10,13 49:15
    56:7,10 66:5
    77:10 91:25
    92:4 98:22
    116:9,12
    118:15 147:24
    151:9 167:6
    169:1,11,17,20
    169:22 170:3
    170:13 173:16
    173:17 175:25
    176:18,25
    181:11 186:23
    186:24 196:6,8
    196:9,15
    215:19 220:1
    221:4 229:3,8
    230:15 235:10
    235:25 236:13
    238:7 240:8
    249:16 252:3
    252:11 256:18
    269:5 287:9
    289:6,6,8
    290:10 291:9
**taken** 1:19 5:4,17
    6:24 8:16,24
    29:9 57:1 92:20
    117:9 141:19
    155:13 174:23
    174:24 179:21
    181:25 184:17
    230:21 232:6

285:12,23
    291:18 297:5
    297:17
**takes** 169:4
    174:17,18
    175:4 290:22
**talk** 7:5 9:17
    18:21 33:20
    34:7,9 35:18
    36:15 40:14
    52:3 53:21
    59:18 60:16
    64:8 84:8
    101:10 103:8,9
    106:20 109:12
    112:18 117:21
    117:24 124:15
    127:6 137:25
    141:12 168:24
    189:6,20
    199:22 225:8
    225:12 255:2
**talked** 32:24 36:8
    37:14,15 39:9
    51:7 79:20
    107:22 110:10
    114:13 135:16
    139:7 194:7
    219:8 224:7
    231:3 251:1
    287:7 288:19
    289:2 290:5
**talking** 18:22
    35:16,19 43:2,4
    59:20 61:18
    64:9 79:3,15
    81:9 102:6,7
    113:20 141:12
    157:22 158:15
    169:5,14
    179:12 218:1
    219:5 220:2,5
    221:1,17,23
    273:17 276:23
    287:19
**Tama** 99:3



Tamaulipas
97:10,24 98:4,8
98:14,19
target 149:6
targeting 43:16
Task 47:2
tasked 106:22
107:2
taxi 144:17
taxing 34:14
Team 43:16
120:16,18,19
TECH 136:3,22
269:7 279:8
technically 208:6
TECHNICIAN
2:22
technology 44:22
44:24 171:13
teleconference
78:12,23,25
tell 8:17 19:23
21:3,12 43:4
46:16 51:1
53:25 62:10,19
71:20 88:3
95:18 98:2
102:14 104:10
136:4,9 137:7
140:11 150:19
154:9 172:15
174:7 186:17
209:17,20
211:10 219:6
225:9
telling 24:24
73:16 75:8
80:17 81:1
93:15 110:5
152:6,22,23
173:7 252:22
262:9
tells 226:4
template 133:11
temporarily
113:18

temporary
122:18,21,23
tend 189:20
tended 183:19
tentative 266:3
ten-minute 56:10
term 32:3,7
51:18 59:17
61:14 89:1
113:22 129:13
138:1 140:3
157:23 160:25
183:24 189:14
189:17 190:19
205:24 210:23
250:22 252:4
267:1 268:4,5
287:14 290:18
292:10
terminology 35:9
terms 10:22
22:21 97:5
107:23 109:11
109:17 181:5
289:20 290:15
territory 54:8
69:15 145:21
146:13
test 18:4
testified 5:25
11:11 12:4,7,16
12:19 13:2 93:2
135:18 145:16
231:8 233:21
236:20 238:25
testify 9:5 10:7
10:18 11:21
13:3 25:13
32:25 237:4,14
testifying 8:25
11:2
testimony 6:20
12:23 33:10,14
33:15 117:22
117:25 146:18
146:22 158:1

158:23 177:10
207:24 296:18
297:5
Texas 1:22 11:19
43:25 45:21,22
46:6,13,15,17
47:1,6 61:9
98:13 215:3
216:11,12
282:12 288:21
295:11 296:14
297:21
text 9:13 265:18
275:2
textbook 286:12
thank 14:3,5 37:2
68:24 92:16,17
132:21 135:4
144:11 151:3
160:7 162:9
171:11,14
176:6,14 210:3
236:15 237:2
237:17 239:5
240:19,20,23
241:18 242:6
242:19 243:3
243:14 244:1
244:12 247:24
249:19 251:11
252:25 253:13
255:9,18 256:9
256:16,21,25
257:7 258:5
259:13,23
260:3 261:6
262:15 264:7
265:21 267:5
268:19 269:10
269:14,18,21
269:25,25
270:2 271:15
274:4,22 276:1
278:3 279:4
280:5,21 281:5
281:8 283:10

283:20 284:13
284:21 285:17
291:4 292:16
292:18
thanks 36:23
43:8 67:21
70:25 74:2 80:9
92:3 93:18
94:14 106:16
106:20 118:9
120:12 121:9
133:1 157:2
160:2,12
176:15 182:24
194:1 215:20
225:23 277:5
they'd 73:14
thing 26:5 33:22
36:22 40:25
44:9 104:13
110:10 112:18
134:11 171:5
196:19 210:8
211:21 220:9
226:22 238:22
279:15 288:21
289:10,18
things 34:24
35:11,25 101:4
125:17 148:14
164:19 172:15
173:14 178:6
188:20 233:10
247:14 279:19
288:13
think 12:14
13:25 14:1 15:3
17:2,7 18:1
20:15,22 22:7
23:22 24:4,6
27:9 34:14 38:6
51:7 55:19 61:6
68:7 74:13,18
75:17 77:12
78:11 79:14
82:19 83:12

92:6 98:7,10,12
99:7 102:3
109:20 111:18
115:8,15
116:14 122:7
125:24 126:25
130:4,20
132:18,19
136:14 140:13
140:22,25
151:23 153:3
156:16 159:21
161:8,24
162:24 166:11
166:23 170:10
181:12,17
189:3,18 190:6
191:7 202:4,15
205:2 206:14
207:2,18 210:2
214:21 221:3,7
223:17 233:9
236:2,11
248:14,24
249:12 250:5
250:10 255:6
261:11 263:8
263:10 264:21
272:9 274:19
281:3 284:8,22
284:25 285:5,6
285:12 287:23
290:14
thinking 200:1
thinks 141:1
third 70:5 81:25
151:21 163:21
215:21
This'll 229:13
tho 145:19
thought 81:18
105:22 140:2
179:10 249:6
267:19,19
thread 57:18
three 16:21,22



17:19 19:1,24
132:24 169:3
173:21 ■■■
204:23 ■■
228:23 229:5,7
254:5 280:3,3
**three-page** 150:7
**throughput** 82:3
**throw** 105:19
**tilt** 160:4
**time** 5:3,8,9,16
7:3,16,16 11:6
11:6 12:3,6
14:4,4 17:23
18:2 20:15,24
20:25 22:2,10
22:15 23:1,4
26:8,15 29:8,11
29:19 31:6,10
33:16 36:2
41:12 42:21,25
43:10 44:6,7,21
45:23 46:5 48:4
49:9,17 50:15
56:25 57:3,25
58:7 60:22
62:14,16 71:7
73:6,12 78:14
78:20 79:8
83:20 84:13
89:10 91:5
92:19,22 93:6
93:21 96:24
98:18,23 99:16
99:20 101:13
105:12,24
110:15 115:9
115:20,25
117:8,11
120:11,16
125:7 126:16
127:14 151:6
152:12 153:23
155:3,17 156:3
157:21 158:4
166:24 167:14

168:10,15
171:20 173:5
175:9,11
177:13 178:7
181:21 182:2
184:16,19
186:17 187:3,7
187:24 191:8
191:13,16
192:10 195:19
196:6 200:14
201:5,5 207:1,3
207:10 211:23
215:19 218:24
220:23 225:3
225:25,25
227:17 228:6
230:20,23
231:25 233:20
235:8 239:23
240:8 241:23
242:9,22
243:23 247:7
247:17 250:10
258:15 259:11
259:21,25
261:16,17,21
262:12 263:5,7
263:14,21,21
263:22 264:1
266:4,8,17
267:8,8 268:12
268:16,18
269:5 275:11
280:15,17
281:3,6 285:18
285:22,25
288:10 290:8
290:11 291:17
291:20 292:17
293:2 296:24
297:5
**timeline** 242:25
**times** 16:21
26:24 82:1,25
135:17 172:24

183:17 187:1,2
187:2 199:18
201:2,2 205:1
228:17,25
272:25 275:5
292:9
**tired** 163:17
279:18
**title** 40:17 44:20
51:11 88:20
168:9
**titled** 135:8
**today** 5:3,15 8:17
8:24 9:6 11:2
25:13 32:18,21
33:1 39:11 40:3
98:17 151:12
158:23 166:12
224:8 236:22
237:15 247:17
274:10 291:25
292:9,17,19
**today's** 293:3
**Todd** 58:4,13
**toes** 213:1
**told** 15:19 36:20
65:1 71:11,21
76:18 80:23
81:9 97:23
152:6 169:3,4
190:10,12
192:17 197:21
233:12 235:6,9
246:10 252:19
292:9
**tomorrow** 247:18
**tonight** 74:14
**top** 57:19 78:7
91:2 139:3
150:15,15
188:24 219:12
229:18,24
240:4 254:3,7
264:10,10,23
265:22 276:9
277:6,10 278:1

281:4,13
**topic** 10:1,7,14
10:18,24 11:1
101:9 224:6
236:13,22
237:4,5,6,8,15
273:6,19
**topics** 9:23 35:15
35:15,23 40:9
52:3 160:14
273:23
**total** 26:15 134:2
240:11 264:1
**totally** 99:7
102:12 171:13
**touched** 289:1
**tour** 18:25
**tourist** 114:6
**Tower** 61:8
**town** 103:18
**towns** 103:11
**track** 46:12
185:8,17
194:10
**trade** 42:23
90:12,12
273:18 275:21
288:20
**traditionally**
213:15
**traffic** 13:5,7,8
44:5 45:1 59:19
66:15 70:6
86:22 148:17
188:13 199:8
201:2,21 211:3
212:14 228:23
**train** 52:7
**trained** 49:10
**training** 49:9,13
49:16,22,23,24
50:1,6,9,10
**transcript** 296:17
296:20 297:13
**transfer** 175:7
**transferred** 41:7

44:6
**transferring**
168:12
**transit** 113:22
222:1,6 223:25
**transiting** 113:20
**transition** 42:16
51:10 52:20
**transitioning**
51:12
**translation**
169:21 244:11
**translators** 288:9
**transmit** 178:1
**transport** 175:18
177:22 217:7
**transported**
208:15 216:15
217:23
**travel** 18:12
90:12 91:13
96:2,14 97:6,24
98:4,14,24 99:4
160:16
**travelers** 44:3
82:3
**traveling** 84:5
96:18
**Tributorio** 244:9
**tried** 66:24 67:12
113:9 189:16
**tries** 209:10
**trigger** 157:14
158:25
**trip** 55:3,4
**trouble** 96:20
209:25 211:5
**true** 72:6 114:19
158:20 160:15
185:22,25
189:25 193:19
198:16 217:14
295:3 296:18
**truth** 8:17 71:12
**truthfully** 9:6
13:3



**try** 11:8 22:22
  63:24 66:5
  74:24 85:12
  87:2 95:19
  112:25 192:13
  212:12,15
**trying** 35:16
  74:20 80:1 84:7
  112:1 126:25
  143:19 161:8
  183:24 191:24
  191:24 192:6,7
  192:19 196:13
  203:11 204:25
  210:8 249:13
  264:18 272:9
  290:13
**Tuesday** 5:3,15
**turn** 62:6 83:23
  165:6 248:4
**turnback** 267:2
  268:4,6
**turnbacks** 10:3
  10:17 237:13
  266:25 267:6
  267:20
**turned** 166:18
  233:22 257:23
  262:16 266:2
**turning** 6:10
  166:16 266:25
**turnstile** 266:3
**turnstiles** 266:19
**tweet** 15:5
**twice** 17:7 180:10
  180:15 205:3
  279:17,19
**Twitter** 15:5,9
**two** 9:23 11:21
  16:21,23 17:12
  26:21 38:19
  49:19 53:8
  69:20,21 89:22
  114:20 124:21
  129:10 134:16
  140:8 145:19

169:3 173:21
175:19 ▮▮▮
▮▮▮▮ 186:4
187:2,2 191:14
204:15 205:6
215:19 239:20
250:13 279:14
279:15
**two-page** 57:14
  90:24 143:5
  214:24 240:8
**type** 34:22,24
  35:13 36:22
  50:10 135:13
  148:13 167:9
  196:3 204:7
  212:20 261:19
  261:20 277:25
  287:25
**typed** 215:1
**types** 31:12 44:23
  45:14 86:10
  287:3,8,12,15
  287:24
**typical** 265:16
**typically** 123:1
  201:4 204:19
  271:4 275:1
**typo** 70:13

---

**U**

**U** 234:17
**UAC** 216:13
  217:1 289:10
  289:15
**UACs** 216:14
  289:16 290:7
**UDA** 134:13
**UDAs** 134:7
**Uh** 5:5
**uh-huh** 6:22 9:17
  13:16 18:20
  22:9 23:7,9
  32:2 34:17,23
  45:8 47:4 48:1
  51:25 62:11

75:1,1 76:16,16
77:4,4,12 83:21
84:9 85:5 90:14
91:1 100:18
102:25 110:16
111:4,20
112:20,20
113:3,12,16,19
114:4,13,13
115:17 121:3
121:23 122:2
123:13,25
127:19 129:23
130:22 139:13
139:13 140:7,7
140:13 141:25
148:1 152:25
152:25 158:6
158:11,22,22
159:8 162:23
162:23 163:2
167:12 168:10
169:9,23,23
170:17 171:24
173:15 175:3
175:23 177:16
177:19 178:5
178:10 179:24
181:10,16
182:17 183:7
187:16 188:14
188:21 189:11
191:4,7,15,21
192:4,4,18,21
193:7 195:10
196:11,21
197:18 199:17
201:8,17 203:1
205:5 207:8
208:18 209:15
209:24 212:8
212:18,21
216:7 218:3
221:18 225:21
225:24 226:5
227:8 232:3,12

232:20 233:3
234:4
**ultimately** 147:1
**Um** 159:13
**unable** 161:16
  216:18
**unaccompanied**
  217:1,3,3
**undercount**
  186:8
**undergoing**
  198:13
**undergone**
  124:24
**understand** 6:22
  7:8,9,10 8:6,7
  8:10,14,16,20
  8:23 9:1,2,8,12
  9:16 10:12,22
  11:4,10 29:13
  29:14,16 39:8
  57:6 59:23 76:9
  76:11 86:19
  92:24 93:1
  117:14 129:16
  130:3 182:5,6
  184:21,23
  189:7,10 198:3
  198:5 223:12
  231:1 237:20
  249:15 250:15
  263:14 264:14
  264:14 268:3,4
  268:16
**understanding**
  17:5 53:23
  60:11 89:3
  100:25 102:20
  103:13,17
  112:24 113:10
  114:20 115:2
  115:24 120:22
  126:7,19
  130:12 133:19
  133:21,22
  134:21 161:22

189:23 196:21
231:12 242:13
242:16 248:1
248:13 254:9
262:13 266:7
266:15,17
267:5 268:14
**understood** 7:14
  26:20 177:10
**undocumented**
  134:14
**unify** 46:18
**union** 49:1 62:16
  62:20,25 63:2
  63:17
**unit** 172:17
  174:12,14
  216:25 246:7
  289:8,18,21,23
**United** 1:1 21:9
  46:20 54:3,5,24
  55:2,10 82:3,7
  111:3 219:18
  226:13 227:1,9
  231:24 232:2
  233:17 235:3
  236:7 249:1
  287:22 296:1
**units** 162:25
  216:23
**unity** 46:18,25
**university** 41:18
  273:15
**unnecessarily**
  263:10
**unprompted**
  31:20
**upcoming** 33:9
  277:7
**update** 37:6
**updated** 89:17
**upgraded** 128:2
**usable** 126:12
**USAC** 230:12
**USCIS** 290:6
**use** 5:9 15:9



22:21 31:19
44:23,24 51:18
68:9 77:2 89:1
108:2 114:12
123:14 129:13
157:23 161:1
172:22 176:2
183:24 185:6
189:14 192:2
197:5 205:24
210:23 234:16
252:4 267:1,18
287:14 290:18
**useful** 78:11
121:10,24
280:16
**usually** 45:4
54:16 85:9
131:19 183:1,5
183:10 192:22
272:19
**U.S** 2:13 8:9 41:5
42:1 49:16,19
54:8 69:15 73:8
73:12,15 75:13
82:5 84:24 86:5
86:7 87:6 96:14
106:9 115:1
141:8 142:16
145:14,21
146:7,13 169:6
184:1 198:17
208:11,12,14
209:14 211:24
217:7 221:12
225:17 232:5
246:12 255:13
257:24 265:25
267:1 272:23
272:25 273:12
273:13
**U.S.A** 196:15

———————
**V**
———————
**v** 6:7
**vague** 24:11,16

38:12 39:19
55:23 63:4
**vaguely** 67:25
71:19
**valid** 148:22
**Valley** 176:24
**variation** 247:2
**various** 31:6
217:14 241:7
**vary** 105:7
109:16 174:10
174:14 183:3
272:17,22
**vast** 193:12
**vehicle** 66:14
189:9,17 199:7
203:21,23
206:10 210:12
210:15,16,21
211:4 212:14
212:22 213:20
213:22 214:2
**vehicles** 44:3
203:13,19
210:13 212:11
**vehicular** 211:3
212:14
**verb** 101:24
**verbal** 237:19
**verify** 172:21
**vernacular** 18:25
**versa** 89:2
**version** 90:4
127:13 167:25
253:1
**versions** 226:7
**versus** 247:23
**Veterans** 22:7
**vice** 89:2
**video** 16:4,9 29:8
29:10 56:24
57:2 92:19,21
117:8,10,16
160:5 171:4
182:1 184:16
184:18 230:20

230:22 236:25
264:1 285:22
285:24 291:17
291:19 293:1,2
**videoconference**
7:2
**videographer**
2:21 5:1,6,10
5:12,18 29:7,10
56:24 57:2
92:18,21 117:7
117:10 160:3
160:10 181:23
182:1 184:11
184:12,15,18
230:19,22
263:22,25
264:4 285:21
285:24 291:16
291:19 292:25
**VIDEOTAPED**
1:12,17 3:1 4:1
**view** 23:20
131:14 151:22
152:23 153:6,8
153:10,11,13
232:18 234:19
**violation** 73:7,11
**violations** 43:18
**visas** 114:2,6,6
**visible** 212:20
**visit** 21:23
270:17 277:8
277:18
**visited** 21:25
22:3
**visits** 21:13 22:15
23:1,11 24:13
**visual** 19:4
**visually** 18:13
**VOICE** 184:8
**VS** 1:6 296:6
**vulnerable**
289:11

———————
**W**
———————
**want** 18:18 23:8

**wait** 7:5 68:3
84:2 95:3,18
99:22 101:9
102:1 107:22
107:24 108:2,2
108:10 109:1
109:10,11
111:5,21
114:14,15
115:17 134:25
165:25 190:5
199:18 205:15
209:18,23
210:5 224:11
226:6,11
233:12 235:11
247:21,22,22
264:4 281:20
283:22 284:1
290:6,7,8
**waiting** 83:19,23
84:8 95:21
101:12,15
102:8,19,20
103:2,2,5
108:24 109:5
112:21 129:13
134:7 138:21
150:11 170:25
183:18 224:24
225:10,16,22
248:9 280:15
284:11
**waits** 169:25
**walk** 19:2 54:4
84:8 102:17
212:13
**walking** 54:12
205:14
**walkway** 54:4
70:6 201:8,10
201:14 204:6,6
212:7 213:5
**walkways** 19:5
66:18

27:7 35:17
40:10,10 44:15
52:11 53:25
56:7,8 59:15
75:11 80:16
81:24 92:4
94:12 101:9
103:7 116:12
116:21 135:3
153:23 160:1
171:3 190:5
193:5 202:24
207:12 222:22
223:25 238:20
239:25 240:7
240:24 250:1
252:2,10,10,11
256:5 262:7,23
263:14 266:12
266:13 267:17
271:6 274:5
275:9 276:1,15
278:15 279:5
292:24
**wanted** 11:25
33:14 35:11,24
73:16 80:5
140:21 171:7
196:14 207:10
246:16 255:11
264:9 276:21
277:3 278:10
280:5 287:24
**wants** 54:2
140:25
**warrant** 12:2
**Washington** 2:5
2:9,15
**wasn't** 26:4,18
33:7 37:19
49:24 60:2
63:15 71:8
79:21 80:3,23
81:18 84:15,16
91:21 99:14
112:14 115:21



168:11,15,17
196:19 202:5
202:10,11
228:5,5,7
245:25 248:19
261:17 266:14
**water** 188:11,19
**way** 5:17 24:23
32:4 55:15
69:17 75:24
78:22 82:21
87:16,23 93:10
93:12,14 95:9
95:13 111:20
115:21 135:3
136:1 140:10
140:19 144:7
152:20 172:23
176:23 178:16
182:20,23
184:25 203:21
213:16 214:11
217:10,12,13
218:5,21
231:12 235:19
244:18 253:25
254:3,23
260:22 265:16
268:5 271:3
281:15,22
**ways** 38:2 217:14
**weapons** 273:8
288:15
**web** 7:3
**webcam** 160:5
**Webex** 1:22
**web-based** 7:2
**week** 71:21 73:15
74:4 76:3 81:15
166:2
**weeks** 26:11 79:4
158:10 228:8
228:10
**weird** 33:19
**welcome** 95:3,18
209:18,23

**went** 17:8 49:12
125:21 137:18
**weren't** 17:25
21:1 32:3 66:8
126:17,19
187:11 192:6
200:21 201:23
202:2,3,16
248:9 252:5,16
252:19,20,22
██████ 280:6
282:2 283:6,9
283:19,20
██████ 280:22
281:24
**we'll** 7:22 45:5
60:16 129:22
132:3 150:23
182:15 229:8
255:2,2,7
256:20 263:10
269:8
**we're** 5:7,14 6:3
7:1 19:8 23:22
24:3 31:1 35:15
35:16 51:10,12
57:8 59:20 64:5
68:8 79:3,15
82:16 87:23
92:18 103:9
104:16,17
111:12,16
112:19 115:6
117:7,10
123:14 132:16
132:19 138:21
150:10,14,25
157:21 158:15
162:3 169:14
179:12 180:25
182:1 184:15
184:18 186:25
208:25 209:17
211:10 213:16
221:7 226:3
241:3 252:9

254:20 259:10
262:8 276:23
283:3 285:21
290:6,6 291:16
291:19 293:2
**we've** 32:23 35:2
51:7 52:25
66:24 68:10
107:6 110:5
111:7 113:22
113:25 120:11
121:18 122:7
139:7 144:12
148:15 180:20
182:14,18
183:22,23
187:1 189:15
193:3 196:17
199:20 206:22
213:14 214:10
224:22 231:3
261:4 266:21
268:3 272:13
**whatnot** 26:10
90:25 123:21
158:21 161:9
**WhatsApp**
265:20 275:2
**whiz** 262:22
**wholly** 114:21
**who-all** 60:21
**wide** 141:23
**wiggle** 81:19
**William** 276:24
**willing** 244:17
**withdraw** 30:17
88:10
**witness** 1:18 5:23
9:22 10:1 11:4
11:7 15:11,14
15:20 23:15
25:8,13 26:1
27:5 28:15 30:7
43:5 56:16,20
92:11,14 96:6
98:17 108:18

116:18,20
118:23 119:1
132:13 138:23
143:15,19
162:7 176:11
215:9,11
229:10,12
239:18 240:9
240:11,17
243:12 256:13
269:4,10,19,22
291:13 292:20
292:23 296:16
296:19,21,22
**Wolarsky** 2:20
16:19 18:12
19:19
**Wolf** 6:7
**wondered** 115:19
**Wonderful** 119:7
**wondering**
279:19
**word** 78:17 98:22
116:6 151:9
159:25 186:23
200:2 259:2,5
267:18
**worded** 85:4
**words** 34:13
102:14
**work** 14:9,10,18
16:17 17:4
20:11 26:18
30:11 40:14
43:10,14 48:2
49:8 51:4,19,19
54:22 74:18
82:7 85:22
86:15,16,16,22
92:12 110:7
114:5,24
174:21 175:1,1
206:3 244:22
290:20
**worked** 41:4 42:2
42:7,21 43:24

45:14 50:2,3
53:14 99:25
100:2,3,20
120:23 159:6
175:13 266:8
**workers** 103:12
**working** 20:23
20:25 39:3
46:13 236:25
271:6 279:23
279:23
**working-level**
271:8
**workplace** 188:9
**works** 20:14 35:1
61:3,13 92:11
103:8 109:11
112:2 211:5
255:9 270:17
**workstation**
175:14
**workstations**
220:5,7
**world** 96:17
**worried** 254:21
263:1
**worries** 68:7,20
118:17
**worry** 34:21
61:18
**worth** 262:24
**wouldn't** 25:16
45:17 71:13
87:11 98:2
107:15 111:14
111:17 112:11
114:19 121:25
131:13 147:24
148:6,14
149:10 150:3
165:22 173:3
177:23 190:16
190:18,25
193:23 197:25
200:23 209:19
228:11 249:5



261:23 264:17
282:4 283:16
**wow** 125:14
**wringer** 292:18
**write** 38:22
**writing** 60:25
61:25 163:22
169:25
**written** 12:23
111:6,7,8,15,18
162:10 171:25
**wrong** 133:22
**www.MagnaL...**
297:25
**www.MagnaL...**
1:25

---
**X**
---
**X** 3:4 107:20

---
**Y**
---
**Y** 2:13 297:2,9
**yeah** 10:9 14:14
15:25 18:24
19:12,13,15,16
19:20 20:19
22:19 24:17
25:1 37:10 42:2
42:19 45:13
50:16 52:11
56:13,15,20
58:20 61:2,15
62:16 64:8,8
66:4,17 70:17
72:17 74:6 77:6
79:2 88:13,15
88:24 90:21
96:8 98:1,12
99:3,14 101:24
102:6,6,21
103:4,7 104:15
104:15 107:4,6
108:6,9 109:8
109:18 111:4
111:11 113:22
113:24 114:10

115:11,16,24
116:8,14,24
118:7,20 122:2
123:3,5 126:25
128:7 131:9
132:2,18,22
133:8,10,25
134:2,4,5
135:22,22,23
136:21 138:10
138:21 139:8
139:18,22
141:14,16
142:19,21
143:9,19 144:3
146:1,3,11
147:3 149:17
149:21 150:25
151:9 152:3,5
152:13 154:12
154:15,20
156:15 157:2,9
157:18 158:14
158:21 159:22
160:7,10
164:16 166:14
168:2,4 171:14
173:3 176:11
176:25 180:17
181:14,16,23
188:18 190:8
191:7,13,14
192:3 195:20
195:25 196:21
197:2,11 198:5
198:21 199:3
205:9,18 206:1
207:6 208:4,24
209:6,7 212:6
216:4 217:25
222:24 223:24
229:12 230:10
234:1 236:6
237:1 239:18
242:16 243:24
245:18 248:7,8

248:19 250:5
256:13,18
261:15,25
262:6 263:22
265:4 271:18
276:23 277:9
278:15 279:18
281:25 285:6
**year** 11:16 15:15
41:9,21 42:3
46:2 186:19,20
187:1 227:15
227:16 287:17
**years** 14:4 15:7,8
30:25 41:7
44:15 55:19,20
55:21 100:21
100:22,25
119:22,24
120:3 158:5,15
187:2 272:14
275:18 281:2
288:18
**Yep** 46:17 88:19
187:13
**yesterday** 37:14
280:13
**young** 289:24

---
**Z**
---
**zoned** 272:10
**zoom** 150:15

---
**0**
---
**00:00** 297:2
**00:09** 297:2
**00579240** 276:5
276:10
**01:18** 297:1
**05:13** 297:1

---
**1**
---
**1** 5:2,15 69:18,23
100:10 124:22
125:10 216:16
216:18 218:10

219:12 247:10
**1st** 8:5 215:1
**1:00** 117:1,2
**1:03** 117:11
**10** 92:5 137:13,16
181:13 229:4
**10th** 137:9,10,11
**10-minute** 176:1
**10-15** 14:20,23
14:24
**10:00** 155:23
156:2,4
**10:02** 29:11
**10:23** 1:20 5:4
262:23
**10:42** 56:25
**10:55** 56:14
**100** 25:19 197:23
274:18
**1006** 4:10 135:7
**11:00** 57:3
**11:40** 258:7
**11:45** 92:19
**11:50** 92:10
**11:56** 92:23
**1101** 2:4
**118** 4:8
**12** 241:7
**12/31/20** 297:22
**12:07** 264:25
**12:27** 117:8

██████
**13th** 139:5
**131** 4:9
**134** 4:10
**138** 4:11
**14** 154:5 220:5,6
220:7
**14th** 119:12
133:3 243:8,17
**143** 4:15
**15** 10:14 92:5
229:4 236:13
236:22 237:4,5
237:6,8
**15th** 135:10

153:21
**150** 4:12
**16th** 221:10
222:7
**161** 4:14
**1635** 297:23
**17th** 2:4 135:10
153:21 255:25
264:25 270:12
**17-cv-02366-B...**
1:6 296:6
**18th** 137:10
**19** 155:4
**19th** 154:11
**19103** 297:24
**1999** 2:9 41:5
42:11 49:14

---
**2**
---
**2** 1:14,20 3:2 4:2
10:1,24 69:19
69:24,25 92:22
100:10 124:22
125:12 210:18
211:1 216:13
216:15,19
275:10 296:11
**2nd** 5:3,16
**2:00** 116:24
156:7
**2:30** 181:24
**2:40** 181:14,16
**2:42** 182:3
**2:45** 184:16
**2:49** 184:19
**20** 11:15 88:13
116:10 169:2
**2000** 11:16
**20006** 2:9
**2001** 11:16
**2003** 41:10 42:13
42:14,17
**20036** 2:5
**20044** 2:15
**2007** 43:21
**2009** 157:1



**2010** 157:1
**2011** 44:16 45:18
**2012** 45:19
**2015** 45:19 47:4
  47:10,13,15
**2016** 8:5 31:7
  47:13,14 55:14
  55:22 101:2
  124:12,24,25
  126:3 156:20
  157:16,17
  158:25 241:7
  243:17 255:25
  265:19
**2018** 57:19,22
  59:3 60:15 69:5
  74:7 78:8 82:14
  82:14,18,21
  88:8,16 90:2
  93:5 108:21
  119:12 120:1
  125:1 127:17
  127:18 133:3
  137:6,9,11,15
  138:4,8,9 139:5
  139:18,20,21
  139:22 140:4
  149:1 150:17
  153:21 154:11
  155:4 162:14
  166:14 178:8
  190:13 191:11
  193:2 203:4
  214:6 215:1
  270:13,20
  276:7 277:21
**2018-July** 135:10
**2019** 37:9 89:17
  89:21,25 90:3
  125:2 135:10
  153:22 197:22
  200:3,6,7,14,16
  221:10 222:4,7
  226:13 227:1
**202.263.3221**
  2:10

**202.355.4471** 2:5
**202.598.8259**
  2:15
**2020** 1:14,20 3:2
  4:2 5:3,16 37:9
  37:12 40:3
  296:11 297:19
**21** 55:20 100:21
  100:22
**214** 4:13
**220** 68:10
**222** 4:5 57:11,13
  78:2,5
**223** 4:6 68:2,8
**224** 4:7 68:3,4
  69:2
**228** 4:8 118:2
  119:9 133:20
**23** 155:20
**23rd** 162:14
  178:8
**230** 4:9 131:25
  132:8 134:19
  162:1
**231** 4:10 134:24
  135:6,22
  153:19
**233** 4:11 138:13
  138:15
**234** 4:12 150:6,7
**236** 3:7
**238** 4:13 214:20
  214:24 215:6
**239** 4:14,16
  161:24 162:2
**24** 26:24 186:3,5
  186:10,18,20
**24/7** 148:9
  185:23 186:1
  186:13
**243** 4:15 143:3,5
**247** 4:16 239:6
  240:25
**249** 4:17 255:19
**250** 4:18 268:22
  270:9

**251** 4:19 278:5,14
  278:25 279:2
**255** 4:17
**268** 4:18
**27th** 57:19,22
  58:5 59:3 78:8
**278** 4:19
**280,000** 187:3,6
**286** 3:8
**291** 3:10
**294** 3:12
**296** 3:13

---

**3**
**3** 137:7 182:2
**3:08** 58:5
**3:59** 230:20
**30** 26:24 116:13
  116:15 264:4
**30th** 69:5
**30(b)(1)** 11:3,7
**30(b)(6)** 6:4 9:22
  10:1,13,23
  15:11,14,19
  25:13 158:23
  254:10
**30-minute**
  116:24

---

**4**
**4** 97:11,15 98:19
  98:22 207:7
**4:00** 230:18
  247:18
**4:17** 230:23
**40** 207:8
**44** 137:16,18
**45** 116:13
**48** 257:10
**49,000** 287:17

---

**5**
**5th** 88:7 89:6
  270:16,20
  276:6,25
**5:00** 230:17

**5:15** 262:10
**5:43** 285:22
**50** 206:23 241:22
  241:24
**57** 4:5

---

**6**
**6** 3:6
**6th** 150:17
**6:10** 285:25
**6:19** 291:17
**6:23** 262:25
**6:26** 291:20
**6:27** 1:20 293:3,4
**60s** 154:25
**633** 297:22
**68** 4:6,7

---

**7**
**7** 74:8 262:25
**7th** 74:15 93:6
**70** 151:23 152:8
  152:17 153:24
  154:7,10,17,24
  155:6
**7040** 297:21
**705** 2:4

---

**8**
**8** 52:11 74:8
**8th** 74:15 93:5,6
  297:23
**8,760** 186:19,21
  187:1
**8:00** 247:18
**800** 186:21
**866)624-6221**
  297:24
**866.624.6221**
  1:24
**868** 2:14

---

**9**
**9th** 93:7
**9:23** 5:16
**9:41** 276:25

**9:53** 29:8
**90** 18:3 41:22
  ▓▓▓▓▓
**98** 41:24
**99** 42:4



MAGNA ▶
LEGAL SERVICES