MAYER BROWN LLP
   Matthew H. Marmolejo (CA Bar No. 242964)
   *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
   Ori Lev (DC Bar No. 452565)
   (*pro hac vice*)
   *olev@mayerbrown.com*
   Stephen M. Medlock (VA Bar No. 78819)
   (*pro hac vice*)
   *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
   Melissa Crow (DC Bar No. 453487)
   (*pro hac vice*)
   *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Chad F. Wolf,[1] *et al.*, <br><br> Defendants. | Case No.:  17-cv-02366-BAS-KSC <br><br> **EXHIBIT 16 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** <br><br> **FILED UNDER SEAL** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

EXHIBIT 16 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


Al Otro Lado, Inc., et al., ) No. 17-cv-02366-BAS-KSC
                            )
         Plaintiffs,        )
                            )
v.                          )
                            )
                            )
Kevin K. McAleenan, et      )
al.,                        )
                            )
         Defendants.        )
                            )



VIDEOTAPED VIRTUAL 30(B)(6) DEPOSITION OF

U.S. CUSTOMS AND BORDER PROTECTION

April 29, 2020

Phoenix, Arizona




MAGNA LEGAL SERVICES

(866)624-6221

www.MagnaLS.com


Reported by Alisa Smith, AZ CR

AZ Certified Reporter No. 50712



```
 1              VIDEOTAPED VIRTUAL 30(b)(6) DEPOSITION OF
 2    U.S. CUSTOMS AND BORDER PROTECTION was taken on
 3    April 29, 2020, commencing at 8:41 a.m., with all
 4    parties appearing virtually at their respective
 5    offices, before Alisa Smith, a Certified Reporter of
 6    the State of Arizona.
 7
 8                              * * *
 9    COUNSEL APPEARING:
10    For Plaintiffs:
11              By:  Ori Lev
                MAYER BROWN LLP
12              350 South Grand Avenue, 25th Floor
                Los Angeles, California 90071
13              olev@mayerbrown.com
14              By:  Karolina Walters
                AMERICAN IMMIGRATION COUNCIL
15              1331 G Street NW, Suite 200
                Washington, D.C. 20005
16              kwalters@immcouncil.org
17    For Defendants:
18              By:  Katherine J. Shinners
                By:  Ari Nazarov
19              U.S. DEPARTMENT OF JUSTICE
                Office of Immigration Litigation
20              950 Pennsylvania Avenue, NW
                Washington, DC 20530
21              katherine.j.shinners@usdoj.gov
22    Also present:  Kendra Dobson, Videographer
                     Kevin Cranford, Exhibit Coordinator
23
24
25
```



Page 3

```
 1                    I N D E X

 2   WITNESS                                      PAGE

 3   MICHAEL HUMPHRIES

     30(b)(6) U.S. CUSTOMS AND BORDER PROTECTION

 4

 5      Examination by Mr. Lev                       6

 6      Examination by Ms. Walters                 121

 7      Examination by Ms. Shinners                143

 8

 9                    *  *  *  *  *

10                  EXHIBITS MARKED

11   EXHIBIT    DESCRIPTION                        PAGE

12   Exhibit 120 Exhibit 29 to Defendants' Opposition  29

13   Exhibit 128 E-mail attaching the MCAT Report   110

14              dated 8/24/2019

15   Exhibit 129 E-mail attaching the MCAT Report   112

16              dated 8/25/2019

17   Exhibit 130 E-mail attaching the MCAT Report   115

18              dated 6/17/2019

19   Exhibit 131 E-mail attaching the MCAT Report   117

20              dated 6/27/2019

21   Exhibit 132 E-mail attaching the MCAT Report   119

22              dated 4/25/2019

23   Exhibit 141 E-mail FW: Asylum Processing dated  71

24              4/2/2019

25   ///
```



Page 4

1                      EXHIBITS MARKED

2    EXHIBIT     DESCRIPTION                         PAGE

3    Exhibit 142 E-mail FW Metering Flow dated        123

4                11/22/2016

5    Exhibit 143 E-mail RE SWB POE Holding Capacity    96

6                dated 10/26/2016

7    Exhibit 152 E-mail FW San Luis FAMU surge dated  122

8                8/24/2016

9    Exhibit 153 E-mails FW MCAT Daily Report for      95

10               October 23 dated 10/23/2018

11   Exhibit 154 E-mail Re San Luis- UDAS in          132

12               custody... dated 11/16/2016

13   Exhibit 155 E-mail RE **RFI** Please Provide     129

14               Response by COB Today dated

15               11/17/2016

16   Exhibit 156 E-mail RE Shelters and Metering      137

17               dated 8/21/2019

18   Exhibit 158 E-mail - Asylum Claims from large    104

19               groups... dated 2/21/2019

20

21

22

23

24

25



Page 5

1            THE VIDEOGRAPHER:  We are now on the

2      record.  This begins Media No. 1 in the deposition

3      of Michael Humphries in the matter of Al Otro Lado

4      v. Kevin K. McAleenan in the United States District

5      Court, Southern District of California.  Today is

6      Wednesday, April 29th, 2020, and the time is

7      8:41 a.m.

8            This is the -- this deposition is being

9      taken completely by remote at the request of Mayer

10     Brown, LLP - DC.  The videographer is Kendra Dobson,

11     and the court reporter is Alisa Smith, both of Magna

12     Legal Services.

13           Will counsel and all parties present state

14     their appearances and whom they represent?

15           MR. LEV:  Good morning.  This is Ori

16     Lev from Mayer Brown.  I represent the plaintiffs.

17           MS. WALTERS:  Good morning.  This is

18     Karolina Walters with the American Immigration

19     Council.  I also represent the plaintiffs.

20           MS. SHINNERS:  This is Katherine

21     Shinners of the U.S. Department of Justice, Office

22     of Immigration Litigation, District court Section,

23     and I represent the defendants in this matter.

24           MR. NAZAROV:  This is Ari Nazarov, also

25     with the Department of Justice, and I represent the



Page 6

1    defendants in this matter.

2            THE VIDEOGRAPHER:  Will the court

3    reporter please swear in the witness.

4                MICHAEL HUMPHRIES,

5        30(b)(6) U.S. CUSTOMS AND BORDER PROTECTION,

6    the witness herein, having been first duly sworn by

7    the Certified Court Reporter, was examined and

8    testified as follows:

9                EXAMINATION

10   BY MR. LEV:

11       Q.   Good morning, Mr. Humphries, and thank you

12   for your patience this morning.  As you heard, my

13   name is Ori Lev.  I represent the plaintiffs in this

14   litigation, as well as Ms. Walters.  She's going to

15   be asking you some questions toward the end of the

16   deposition.

17           Before we begin, I would like to go over

18   some ground rules.  This is essentially a one-way

19   conversation where Ms. Walters and I ask questions

20   and you answer them.  So that the court reporter can

21   get an accurate record of your testimony, we need

22   you to give audible responses.  Not -- no head

23   shakes or nods and no "uh-huhs" and "huh-uhs," but

24   "yes," "no," and [indiscernible audio].

25           Do you understand that?



Page 7

1     A.    Yes.

2     Q.    And especially given the web format, it's

3     important that we not talk over each other so that

4     the court reporter can get down our words, you can

5     ensure you've heard my whole question.

6           If you could please wait until I'm finished

7     talking before you begin answering and I'll make an

8     effort to wait for you to finish your answer before

9     I start my next question.

10          If you don't understand a question, please

11    let me know.  If you answer it, I'm going to assume

12    that you understood it.

13          Do you agree to that?

14    A.    Yes, I do.

15    Q.    From time to time, your attorneys might

16    object to a question that I ask, which is their

17    right.  Unless they instruct you not to answer the

18    question, you need to answer, notwithstanding the

19    objection.

20          Do you understand that?

21    A.    Yes, I do.

22    Q.    We'll take breaks approximately every hour.

23    If you need a break at any other time, just please

24    let me know.  I'll just ask that you answer any

25    pending question, and then we can take a break if we



Page 8

1    need to.

2          Unless I state otherwise, my questions

3    relate to the time period covering January 1, 2016,

4    through the present.

5          Do you understand that?

6      A.    Yes.

7      Q.    I'm going to refer to the Department of

8    Homeland Security as "DHS."

9          Do you understand that?

10     A.    I do.

11     Q.    And I'm going to refer to U.S. Customs and

12   Border Protection as "CBP."

13         Do you understand that?

14     A.    Yes.

15     Q.    And I'm going to refer to a port of entry as

16   a "POE."

17         Do you understand that?

18     A.    Yes.

19     Q.    And you understand that you're testifying

20   today as a representative of CBP; correct?

21     A.    I do.

22     Q.    And during this deposition, I'm sometimes

23   going to refer to your knowledge or your

24   understanding, and when I say that, I'm really

25   referring to CBP's knowledge or understanding.



Page 9

1          Do you understand that?

2      A.   Yes.

3      Q.   And you understand that the oath -- you

4  understand you've taken an oath to tell the truth

5  today; correct?

6      A.   I do.

7      Q.   And you understand that that oath is the

8  same as the oath you would take in a courtroom if

9  you were testifying?

10     A.   Yes.

11     Q.   Do you understand that there are criminal

12  consequences for lying under oath?

13     A.   Yes.

14     Q.   Is there any reason that you are unable to

15  testify truthfully today?

16     A.   No.

17     Q.   And you understand that you're not allowed

18  to communicate privately with your attorneys or

19  anyone else during the course of the deposition

20  other than during breaks?

21     A.   Yes.

22     Q.   So that means you can't be texting or

23  e-mailing or otherwise communicating with counsel

24  other than during breaks or orally so that we can

25  all hear you.



1          Do you understand that?

2     A.   I do.

3     Q.   With that, let's get started.

4          If you could please state and spell your

5     name for the record.

6     A.   Michael Humphries, M-i-c-h-a-e-l, last name

7     Humphries, H-u-m-p-h-r-i-e-s.

8     Q.   And have you ever gone by any other name,

9     sir?

10    A.   Mike.

11    Q.   And you're presently employed by CBP;

12    correct?

13    A.   Yes, I am.

14    Q.   And what is your current job title?

15    A.   Area Port Director, Nogales, Arizona.

16    Q.   And how long have you worked at CBP?

17    A.   Thirty-three years.

18    Q.   And, I'll get into your work history in a

19    little bit.

20         Before that, have you ever testified in

21    court before?

22    A.   Yes, I have.

23    Q.   How many times?

24    A.   Quite a few.

25    Q.   Does that mean more than a dozen?  Fewer



Page 11

1    than a dozen?

2        A.    It may be a little more than a dozen.

3        Q.    Can you describe for me the kinds of cases

4    you have testified in?

5        A.    My last testimony was in November of '18 at

6    the criminal trial of El Chapo.

7        Q.    Have you ever testified -- have all -- has

8    all of your testimony been in cases involving

9    individual -- individuals who are either being

10   criminally charged or subject to immigration

11   proceedings?

12       A.    Work-related also.

13       Q.    What do you mean by "work-related"?

14       A.    EEO hearing.  I don't know if that's

15   considered testimony.

16       Q.    Okay.  Have you ever testified in a case

17   such as this where agency's policies and procedures

18   are being challenged, as opposed to the issue being

19   an individual's status?

20       A.    No.  Mostly -- mostly criminal, family,

21   child support, you know, kind of like that.  But

22   most of my testimony has been in criminal trials.

23       Q.    Okay.  Other than in court, have you ever

24   testified before a government body?

25             I think you mentioned the EEO claims?



Page 12

```
 1      A.    EEO claims, but I'm not sure -- can you
 2   clarify?  Government body, such as congress or --
 3      Q.    Like an administrative proceeding of some
 4   kind that's like a trial but it's not a court.
 5      A.    Well, I guess that's what the EEO cases
 6   would be.
 7      Q.    Anything other than that?
 8      A.    Not that I can remember right now.
 9      Q.    Have you ever testified before congress?
10      A.    No.
11      Q.    And have you ever had your deposition taken
12   before?
13      A.    Possibly in one of the criminal trials.
14      Q.    Outside of this case, have you ever provided
15   written testimony under oath in the form of an
16   affidavit or a declaration?
17      A.    I believe I've done an affidavit before, but
18   that would have been in probably either the EEO case
19   or a criminal case.
20      Q.    Do you have copies of your testimony from
21   prior matters, or not?
22      A.    No, I don't.
23      Q.    Do you have a copy of declarations you've
24   submitted in prior matters?
25      A.    I don't think I have any available.
```



Page 13

```
 1      Q.   In all of these cases, you testified
 2  truthfully?
 3      A.   I did.
 4      Q.   Other than traffic offenses, have you ever
 5  been convicted of a crime?
 6      A.   No.
 7      Q.   Other than traffic offenses, have you ever
 8  been charged with a crime?
 9      A.   No.
10      Q.   Have you ever been arrested?
11      A.   No.
12      Q.   Have you ever been sued?
13      A.   No.
14      Q.   Have you ever been a party to a lawsuit?
15      A.   No.
16           Such as this?
17      Q.   Any -- any lawsuit where you were a named
18  party, either the plaintiff or the defendant.
19      A.   No.
20      Q.   You hesitated.
21           What were you thinking about when you
22  hesitated?
23      A.   Well, this is a lawsuit that's -- that's
24  happening right now.
25      Q.   Understood.  Okay.
```



Page 14

1          Have you ever been disciplined for your

2     conduct at CBP?

3          A.    No.

4          Q.    Are you -- do you have a LinkedIn account?

5          A.    No.

6          Q.    Do you have a Facebook account?

7          A.    No.

8          Q.    Okay.  Are you -- have you ever seen posts

9     from a Facebook group called "I'm 10-15"?

10         A.    No.

11         Q.    I would like to talk a little bit about your

12    preparation for today's testimony.

13              MR. LEV:  And if we could show the

14    witness what's been marked as Exhibit 79.

15    BY MR. LEV:

16         Q.    Mr. Humphries, you have before you on the

17    screen Exhibit 79.  This is a document captioned

18    Plaintiffs' Notice of Fed.R. Civ.P. 30(b)(6)

19    Deposition of U.S. Customs And Border Protection.

20              Have you ever seen this document before?

21         A.    I believe so.

22         Q.    Okay.  And if we could turn to page --

23    sorry -- the top of page 7, in the middle of page 7,

24    do you see it says at line 17, "Topics for

25    Examination?



Page 15

1      A.   Yes.

2      Q.   And do you understand that you've been

3   designated to testify in Topic No. 2, which relates

4   to the prac- -- CBP's practice of metering, queue

5   management, and/or turnbacks at Ports of Entry,

6   including but not limited to the development of the

7   practice, the reasons for its adoption, and its

8   implementation?

9      A.   I understand that I'm representing on

10  Topic 2, yes.

11     Q.   Okay.  And if we could turn to page 9, do

12  you also understand that you are speaking on behalf

13  of CBP with respect to Topic 15 regarding certain

14  communications with Mexican government agencies

15  that's listed there?

16     A.   Yes, I do.

17     Q.   Okay.  When did you find --

18          MS. SHINNERS:  If I may object for the

19  record.  I just want to clarify that Mr. Humphries

20  is speaking on behalf of CBP from the perspective of

21  the Nogales Port of Entry.

22  BY MR. LEV:

23     Q.   When did you find out you would be a

24  Rule 30(b)(6) witness in this case?

25     A.   Possibly in January maybe of this year.



Page 16

1    Q.    Okay.  And who told you that?

2    A.    Maybe February.

3    Q.    And who told you that?

4    A.    I'm not sure if it was counsel.  Possibly.

5    Q.    Who else might it have been?

6    A.    Well, it could have been -- no.  I think it

7    was my Director of Field Operations is the one that

8    told me initially.

9    Q.    And who is that?

10    A.    Guadalupe Ramirez.

11    Q.    Okay.

12          MR. LEV:  And, Kevin, can we go back to

13    seeing the witness instead of the exhibit, which I'm

14    not going to be asking more questions about it?

15    Thank you.

16    BY MR. LEV:

17    Q.    And Mr. Ramirez, he's your Director of Field

18    Operations, does he report to you, or do you report

19    to him?

20    A.    I report to him.

21    Q.    Okay.  And are you a direct report to him?

22    A.    Yes, I am.

23    Q.    Okay.  And what did he tell you about what

24    your role would be and why you had been asked to

25    testify?


MAGNA ▶
LEGAL SERVICES

Page 17

```
 1      A.   Well, he didn't -- I don't believe he got

 2   into the -- the 30(b)(6), just that I needed to

 3   testify -- I needed to testify or give a deposition

 4   in the case involving Al Otro Lado.

 5      Q.   And did he tell you the nature of what your

 6   testimony was going to be about?

 7      A.   I don't believe he did at that time.

 8      Q.   Did he at another time?  Did you have

 9   further discussions with him about your testimony?

10      A.   I think after that -- no, I don't think he

11   gave me the topics.

12      Q.   Who gave you the topics?

13      A.   I believe it was counsel -- Chief Counsel,

14   Tucson.

15      Q.   Okay.  When did you start preparing for your

16   testimony?

17      A.   Probably shortly after that.

18      Q.   And what did you do to begin preparing?

19      A.   Well, I wanted to get my -- to prepare

20   myself to look back.  I mean, initially, I thought

21   back of what occurred at Nogales and dates and

22   reviewed documents, e-mails.

23      Q.   Okay.  What documents specifically did you

24   review in preparation for this deposition?

25      A.   I reviewed mainly --
```



Page 18

```
 1              MS. SHINNERS:  Objection.  I just
 2    wanted to instruct the witness not to answer to the
 3    extent it would reveal selection of documents
 4    selected by counsel.
 5              Otherwise, you can answer the question,
 6    Mr. Humphries.
 7    BY MR. LEV:
 8       Q.   So what documents that you selected to
 9    review, did you review in preparation for this
10    deposition?
11       A.   I was concerned with -- not concerned, but I
12    wanted to look up documents of things that I had
13    done to ensure the safe handling and proper care of
14    everybody in our custody and things I've done to
15    make that, I guess, a better -- a better process.
16       Q.   What I'm trying to understand is
17    specifically what documents you looked at.
18              You mentioned e-mails.  What e-mails did you
19    look at in preparation for this deposition?
20       A.   Well, I was looking at -- for e-mails.  For
21    instance, when we -- when we started a medical unit
22    at our Passport Control Unit and the date and others
23    such as that.
24       Q.   How did you go about identifying the e-mails
25    you wanted to look at?
```



Page 19

```
 1        A.    Well, I went through some of my folders and

 2   looked at -- for those kinds of documents.  I

 3   inquired of my Assistant Port Director and the

 4   Chief, you know, for example when -- you know, do

 5   you have anything when we met with the hospital

 6   emergency room or when we met with Mariposa Clinic,

 7   when we first met with them to discuss the -- the

 8   care of undocumented persons in our custody.

 9        Q.    So you -- the e-mails you looked at were all

10   e-mails that you have in folders in your in-box?

11        A.    Well, some I could find and others I -- I

12   asked.  Like -- like I just said, "When did we start

13   this," or "How did we do that?"

14        Q.    Did you print these out?

15        A.    Some I did.

16        Q.    And do you have them collected somewhere?

17        A.    Some I do, the ones that I printed out.

18        Q.    Okay.  Have you been instructed not to

19   destroy those?

20        A.    No, I haven't.

21        Q.    I'm going to ask you to not -- not destroy

22   those collections of e-mails that you printed out in

23   preparation for this deposition, please.

24              I forgot to ask you another question.

25              Do you have any documents with you right now
```



Page 20

1    that you've brought to refer to during this

2    deposition?

3        A.    No, I don't.  I have my documents that I

4    brought that I was studying before, but they're not

5    available to me here.

6        Q.    Okay.  What do you mean?  When you say, "I

7    have them," meaning they exist, but they're just not

8    with you?

9        A.    They're -- they're in a backpack.

10       Q.    Okay.  And those are the documents that you

11   selected or the documents that your counsel selected

12   or both?

13       A.    Both.

14       Q.    Other than e-mails, what other documents did

15   you look at to prepare for this deposition?

16       A.    I looked at documents that involved the

17   topics -- really all the topics that were there.  I

18   wasn't sure it was No. 2 and 15.  I looked at all

19   the topics.

20       Q.    So you looked at all of the -- all of the

21   topics in the deposition notice because you didn't

22   know which ones you were testifying to?

23       A.    Correct.

24       Q.    Did you look at policies regarding metering

25   and queue management?



Page 21

 1     A.    I did.

 2     Q.    What policies did you look at?

 3     A.    I looked at the memo on metering.  I looked

 4  at the policy on agency priorities, among -- among

 5  others that I can't readily think of right now.

 6     Q.    Can you think of any other agency policy

 7  documents regarding metering that you looked at?

 8     A.    The main one was probably the metering.

 9     Q.    Okay.  Did you review any interrogatory

10  responses in preparation for your deposition?

11          MS. SHINNERS:  And I'm just going to

12  remind the witness not to reveal the documents --

13  the list of documents or the selection of documents

14  used by counsel to prepare for -- to prepare you for

15  this deposition.

16          You can answer.

17          THE WITNESS:  I did -- I did review the

18  interrogatories.

19  BY MR. LEV:

20     Q.    Okay.  Did you review the interrogatories

21  that relate to how metering has been implemented in

22  Nogales?

23     A.    I did.

24     Q.    And did you review any deposition

25  transcripts in preparation for your testimony?



Page 22

1       A.    Yes, I did.

2       Q.    Whose depositions did you review?

3       A.    I reviewed EAC Owen's deposition and XD

4    Howell's deposition.

5       Q.    Anybody else?  Any other depositions?

6       A.    No.

7       Q.    Did you review any of the documents produced

8    by Al Otro Lado in preparation for this deposition?

9       A.    Can you -- such as?

10       Q.    During the course of discovery, the

11    government has produced documents to us, and Al Otro

12    Lado has produced documents to the government about

13    its operations.

14            Have you reviewed any of the documents that

15    Al Otro Lado gave to the government as part of this

16    lawsuit, internal Al Otro Lado documents?

17       A.    Possibly in documents provided by counsel.

18       Q.    Do you remember any specific Al Otro Lado

19    documents you reviewed in preparing for this

20    deposition?

21            MS. SHINNERS:  Objection.  If it was in

22    documents selected by counsel, then I'm going to

23    instruct the witness not to answer.

24    BY MR. LEV:

25       Q.    Okay.  Were they in documents selected --



Page 23

1    Al Otro Lado documents you reviewed in the documents

2    selected by counsel?

3        A.    Can you repeat that?

4        Q.    Yes.

5              Were any Al Otro Lado documents that you

6    reviewed, were those among the documents that

7    counsel had selected?

8                   MS. SHINNERS:  Objection.  Vague.

9                   THE WITNESS:  Yes.

10   BY MR. LEV:

11       Q.    And are you going to follow your counsel's

12   instruction not to answer?

13       A.    I'm not sure that counsel asked me not to

14   answer this.

15       Q.    She asked you not -- well, she asked you not

16   to answer to the extent the documents were among

17   those she provided to you.

18                   MR. LEV:  Katie, do you want to repeat

19   the instruction?

20                   MS. SHINNERS:  Is there a question

21   pending?  Yes -- no.  I think that there are a

22   couple different questions you've asked.  It may

23   help if you re-ask the question or go back to the

24   question that you initially asked.

25   ///



Page 24

1              MR. LEV:  You know what?  In the

2    interest of time, I'm going to move on.  I think

3    you're correct.  That would be the way to do it,

4    Katie, but I'm just going to go on.

5    BY MR. LEV:

6       Q.   You indicated you spoke with your Director

7    of Field Operations in preparation for this

8    deposition?

9       A.   Well, he informed me that I was going to be

10   a witness.

11      Q.   And his name again was?

12      A.   Guadalupe Ramirez.

13      Q.   Okay.  And other than informing you you're

14   going to be a witness, did you have any other

15   conversations with him about this deposition?

16      A.   No, other than to tell him that I was

17   preparing for it and that I was going to be at

18   his -- this is where he works, so I could be out of

19   my office and away from any distractions there.

20      Q.   Did you have any discussions with him about

21   the substance of your testimony?

22      A.   I think he knew the general, I guess, theme

23   of the lawsuit or the -- the substance of the --

24   yeah, the lawsuit, I guess.

25      Q.   Did you -- did you talk to him about what



Page 25

1   kinds of things you wanted to refresh yourself

2   about?

3       A.   I probably did mention that -- you know,

4   that there was a lot of stuff that I did to make

5   sure that the flow was managed and going -- that --

6   that took into consideration the health and safety

7   of everybody in our custody, as well as our

8   employees.

9       Q.   You had mentioned earlier you were trying to

10  refresh your memory about things that had happened.

11      Did you ask him questions about things that

12  had happened to refresh your memory in preparation

13  for this deposition?

14      A.   No, I didn't, but your -- your voice was

15  fading out there.

16      Q.   I'm sorry.  I'll try to speak more directly

17  into the microphone.

18      Who else did you speak with in preparation

19  for this deposition?

20      A.   As I mentioned before, counsel.

21      Q.   Other than counsel?

22      A.   Assistant Port Director, a subordinate to

23  me, and my chief.

24      Q.   Which -- which APD and which chief?

25      A.   APD George Campos.



Page 26

```
 1        Q.    Campos, C-a-m-p-o-s?

 2        A.    Yes.

 3        Q.    And the chief?

 4        A.    Jose Aguirre, A-g- -- A-g-u-i-r-r-e.

 5        Q.    Anyone else?

 6        A.    I made -- I worked with -- I asked -- well,

 7   specifically to the lawsuit?

 8        Q.    Specifically in preparation for this

 9   deposition.

10        A.    Well, again, I was looking at stuff that I

11   did to improve the process.

12        Q.    And I'm asking, who did you speak with in

13   preparation for the deposition other than Mr. Campos

14   and Mr. Aguirre?

15        A.    I spoke to Mr. Jeffrey Bequette.

16        Q.    How do you spell his last name?

17        A.    B-e-q-e-t-t-e [sic].

18        Q.    Anybody else that you spoke with in

19   preparation for this deposition?

20        A.    There was a conference call, I think early

21   on, just to discuss matters, and I believe counsel

22   was on that.

23        Q.    Okay.  How many times have you spoken to

24   counsel in preparation for this deposition?

25        A.    Many times.
```



Page 27

1           Originally, I was going to testify in, I
2      believe, early March, so we kind of prepared for
3      that.  When we knew it wasn't going to go, the --
4      the COVID-19 started, I kind of -- I had very
5      important things to take care of during that.
6      Everything started with that.
7           Q.   And for that initial March date, how much
8      time had you spent with counsel preparing for the
9      deposition?
10               MS. SHINNERS:  Objection.  Vague.
11     BY MR. LEV:
12          Q.   You can answer.
13          A.   Several hours over -- over a time period.
14          Q.   So for the March date, what does "several
15     hours" mean?  Five hours?  More than that?
16          A.   I wouldn't say it was five hours.  It was
17     usually -- you know, there may have been like one
18     that lasted 45 minutes or an hour and then maybe
19     several that were, you know, maybe 10 or 15 minutes.
20          Q.   So under five hours' total in preparation
21     for the original March date; correct?
22          A.   With counsel or --
23          Q.   With counsel, yeah.
24          A.   I would say under five hours.
25          Q.   And then how much time have you spent with



Page 28

1    counsel preparing for today's deposition?

2        A.    Several hours again, and -- probably more

3    than five hours.

4        Q.    More than ten hours?

5        A.    Maybe -- maybe -- maybe ten hours.

6        Q.    Have you done anything else besides what

7    we've talked about to prepare for today's

8    deposition?

9        A.    Can you clarify that?

10        Q.    Have you spoken with any other people you

11    haven't told me?  Have you looked at -- you know,

12    done any independent research to look into things or

13    any other activity that you took thinking, "I need

14    to be prepared, so I'm going to do X"?

15        A.    I did -- for my personal reasons, did look

16    up -- try to find a couple of news articles and

17    stuff like that.

18            Is that what you're referring to?

19        Q.    Yes, exactly.

20            What news articles were you looking for?

21        A.    Well, I remember a specific news article

22    where I was looking that indicated that processing

23    had increased at the Nogales Port of Entry.  Our

24    numbers went up, something -- something to that

25    effect.



1     Q.   Did you print out these news articles that

2   you looked at?

3     A.   I believe I only have one printed out.  It's

4   not a article.  It's a photograph from an article.

5     Q.   What's it a photograph of?

6     A.   It's a photograph of undocumented folks

7   waiting to get into the Nogales Port of Entry.

8     Q.   Okay.  And that's with the other materials

9   that we spoke about earlier that you had printed up?

10     A.   Yes.

11             MR. LEV:  Can we please -- Kevin, can

12   we please show the witness Exhibit 120?

13             (Whereupon, Exhibit No. 120 was marked

14   for identification.)

15   BY MR. LEV:

16     Q.   You're being shown what's been marked as

17   Exhibit 120, your --

18             MR. LEV:  Have these been premarked,

19   Kevin?

20             KEVIN CRANFORD:  They haven't been

21   stickered yet, no.

22             MR. LEV:  Okay.  So how are we doing

23   that?

24             KEVIN CRANFORD:  Typically, we sticker

25   them afterwards when we send them to --



Page 30

1                    MR. LEV:  Okay.

2       BY MR. LEV:

3          Q.   So I'm showing you what's going to be marked

4       as Exhibit 120 to your deposition.  It is a

5       document -- a ten-page document.  The front page

6       says, "Exhibit 29 to Defendants' Opposition to

7       Plaintiffs' Motion for Class Certification."  And if

8       you go to page 2, you will see the document is

9       captioned, "Declaration of Michael Humphries."  And

10      if you go to the last page, you will see what

11      purports to be your signature.

12                  Is this a true and correct copy of your

13      February 11th Declaration that you provided in this

14      case?

15         A.   Yes, it is.

16         Q.   Who asked you to provide a Declaration in

17      connection with this case?

18                  MS. SHINNERS:  Objection.  To the

19      extent it would reveal the contents of

20      communications with counsel, I would instruct you

21      not to answer.

22                  MR. LEV:  I'm not asking for any

23      content of communication, other than the "who."

24                  Your objection still stands, Katie?

25                  MS. SHINNERS:  Yeah.  I mean, I



Page 31

```
1    think -- I think that if you're asking who asked you

2    to do a particular thing, I think that reveals the

3    contents of communications, if it was counsel.  I --

4              MR. LEV:  I'll move on to another

5    question.

6    BY MR. LEV:

7        Q.   Who drafted this Declaration, Mr. Humphries?

8        A.   I provided the answers, and then I believe

9    counsel wrote -- wrote it up.

10       Q.   Okay.  And then did you edit it after it was

11   drafted?

12             MS. SHINNERS:  Objection.

13             I think this is getting into work

14   product in terms of things that are done in -- for

15   the purposes of litigation by a party or at the

16   direction of counsel, so I'm going to instruct the

17   witness not to answer.

18   BY MR. LEV:

19       Q.   Are you going to follow your counsel's

20   instruction, Mr. Humphries?

21       A.   I am.

22       Q.   Did you ever -- you said you answered

23   questions.

24             Were those questions that counsel posed to

25   you prior to their drafting of the Declaration?
```



Page 32

1      A.   Yes.

2      Q.   Did you ever share a draft of this

3 Declaration with anyone who was not a lawyer?

4      A.   No.

5           MR. LEV:  If we could turn to pages 1

6 to 3 of the Declaration.  It's on page 1 of the

7 Declaration, so it's going to be page 2 of the

8 document.

9 BY MR. LEV:

10     Q.   Those three paragraphs, do they accurately

11 and completely describe your employment history with

12 CBP from 2016 to the present?

13     A.   Yes.  In Paragraph 1, I've been in this role

14 since June 24th of 2018.  That was on a permanent

15 basis, but prior to that, I was the acting.

16     Q.   And when were you the acting from?

17     A.   From November of '17 through the

18 June 24th, '18.

19     Q.   And while you were the acting, were you also

20 serving in the role of Assistant Director for Border

21 Security at the Tucson Field Office?

22     A.   So at that time, they had an acting for me

23 as well.

24     Q.   Okay.  So Paragraph 3 where it says you

25 served as Assistant Director for Border Security



1    until June 24 of 2018, you actually weren't serving

2    in that role as of November of '17.  Is that right?

3        A.    That was my permanent role.  That was my

4    permanent position.

5        Q.    I understand.

6            So that was your title through June, but

7    your actual role you were fulfilling as of November

8    of 2017 was the acting Area Port Director in

9    Nogales; correct?

10       A.    Yes, but there was a time in there where I

11   had a temporary duty as well.

12       Q.    What is that temporary duty?

13       A.    Where I went on a TDY.

14       Q.    To what position?

15       A.    To CBP Headquarters.

16       Q.    And when was that?

17       A.    That was August of 2017 through November.  I

18   went to Nogales from -- from Headquarters.

19       Q.    And what were you doing at CBP Headquarters

20   from August until November of 2017?

21       A.    I was Acting Director of the Field Liaison

22   Division.

23       Q.    When you were the Area Port Director --

24   other than those roles as -- is what's listed in 1

25   to 3 accurate and complete, or were there other



Page 34

1    roles you had?

2         A.   Well, 1 through 3 goes back to 1980- --

3    March of 1987.

4         Q.   I'm sorry.

5              From 2016 to the present, is it accurate and

6    complete, with the addition of your acting Port

7    Director role and your acting Director of Field

8    Liaison Division?

9         A.   Yes.

10        Q.   When you were the Area Port Director in

11   Douglas from September of 2006 through

12   November 2014, what was your responsibility?

13        A.   I was in charge of the Port of Douglas

14   starting in 2006 and then the Naco -- responsibility

15   for the Naco Port of Entry was brought in in 2009 as

16   well, both Douglas and Naco.

17        Q.   And so you were responsible for both ports

18   of entry?

19        A.   Douglas only from 2006 to sometime, I

20   believe, in 2009, and then both Douglas and Naco

21   from 2009 through 2014.

22        Q.   And during that time period, did CBP engage

23   in queue management or metering at either of those

24   ports?

25                   MS. SHINNERS:  Objection.  Vague as to



Page 35

1    time period.

2    BY MR. LEV:

3        Q.    From 2006 through 2014 when you were serving

4    as the Port Director for Douglas and then for

5    Douglas and Naco, did CBP engage in metering at the

6    ports at which you were serving as Port Director?

7        A.    There was a period at the Douglas Port of

8    Entry where there were large groups, mostly from

9    India, coming in at the Douglas Port of Entry, but

10   they were brought in.

11       Q.    What do you mean "they were brought in"?

12       A.    They had entered -- they entered -- usually

13   they entered the pedestrian lane, and they were

14   brought in for processing.

15       Q.    So they weren't told that they had to wait

16   in Mexico because the Port was too full?

17       A.    No.

18       Q.    When you were Assistant Director for Border

19   Security at the Tucson Field Office, what were your

20   responsibilities in that role?

21       A.    I was in charge of -- or I had the Border

22   Security program for the -- all ports within the

23   Tucson Field Office, so the eight ports of entry

24   that are in the Tucson Field Office.

25       Q.    And what are those eight ports?



Page 36

1       A.   All the ports of Arizona, so Douglas, Naco,

2   Nogales, Sasabe, Lukeville, San Luis, Phoenix

3   Airport, Tucson Airport.

4       Q.   And the first six of those are border ports;

5   correct?

6       A.   Yes, sir.

7            MS. SHINNERS:  I'm going to object.  By

8   the way, I'm going to object to all these questions

9   pre-time frame, as outside the scope and as outside

10  the topics.  Thank you.

11           You can answer.

12  BY MR. LEV:

13      Q.   You said you were responsible for the Border

14  Security program.

15           Can you just explain what that means, what

16  your responsibility was?

17           MS. SHINNERS:  Same objection to scope.

18           You can answer, Mr. Humphries.

19           THE WITNESS:  Border Security includes

20  everything to do with operations at ports of entry.

21  BY MR. LEV:

22      Q.   That includes migrant processing at the

23  ports of entry; correct?

24           MS. SHINNERS:  Same objection as to

25  scope.



Page 37

1                    You can answer.

2                    THE WITNESS:  That does include migrant

3    processing.

4    BY MR. LEV:

5        Q.    The ports of entry you listed for me, the

6    six that are on the border, are they all classic

7    ports of entry?

8                    MS. SHINNERS:  Objection to scope.

9                    THE WITNESS:  Yes, they are.

10   BY MR. LEV:

11       Q.    I'm sorry.  You can answer, sir.

12       A.    They are.

13       Q.    So that means that they are capable of

14   handling the full operations of a POE; correct?

15                   MS. SHINNERS:  Scope objection.

16                   You can answer, Mr. Humphries.

17                   THE WITNESS:  They do.

18   BY MR. LEV:

19       Q.    Okay.  And when you were Assistant Director

20   of Border Security, did you have responsibility for

21   implementing any policy or guidance from CBP

22   regarding the metering of asylum seekers?

23                   MS. SHINNERS:  Scope objection.

24                   You can answer.

25                   THE WITNESS:  Can you repeat that



Page 38

1    question?

2    BY MR. LEV:

3        Q.    Well, while you were the Assistant Director

4    for Border Security -- and let's limit it to the

5    time period you were actually fulfilling that

6    role -- right? -- through August of 2017, before you

7    went on TDY -- did you have any responsibility for

8    implementing policy or guidance from CBP regarding

9    the metering of asylum seekers?

10        A.    Yes, I did.

11        Q.    And what was the nature of that

12    responsibility at the time?

13        A.    During that time frame was when -- somewhere

14    during that time frame was when there was large

15    groups of individuals from Haiti applying, and some

16    of the ports had very large numbers that were

17    affecting their abilities to safely process

18    individuals.

19        Q.    And there was guidance from CBP about how

20    those individuals should be metered?

21        A.    I don't remember guidance at the time, but

22    there were large groups coming in first to the

23    San Luis Port of Entry.  It was more -- more to the

24    western side of the state.

25        Q.    And was this after January of 2016?



Page 39

```
 1      A.   I'm trying to remember.  I believe it was --
 2   yes, I believe it was in 2016.
 3      Q.   And were those asylum seekers, Haitians, at
 4   San Luis Port told they needed to wait in Mexico
 5   because the port couldn't process them?
 6           MS. SHINNERS:  Objection.  Form.
 7   BY MR. LEV:
 8      Q.   You can answer.
 9      A.   Okay.  Can you repeat that again?
10      Q.   Sure.  Let me rephrase it.
11           Were those Haitians at San Luis metered?
12      A.   Well, what is your definition of "metered"?
13      Q.   Were they told to wait in Mexico because the
14   port was unable to process them at the time?
15      A.   So when -- when we first -- when the
16   Haitians started arriving in large numbers, they
17   would just come into the Port.  There got to be a
18   point where the facility was full, but they still
19   remained outside the port but on U.S. territory.
20      Q.   And then what happened?  How were they
21   handled from that point on?
22      A.   Well, we brought in -- we brought in
23   Porta Potties to be able to put there because of
24   issues that were occurring.  We brought in
25   additional folks to help with processing.  We got
```



Page 40

1    contracts for arrangements with local restaurants to

2    help provide food when the numbers were -- were very

3    high.  Stuff like that.

4        Q.   And all those individuals were then

5    processed such that they had their asylum -- you

6    took their asylum claims and put them through the

7    process?

8             MS. SHINNERS:  Objection.  Assumes

9    facts.

10   BY MR. LEV:

11       Q.   You can answer.

12       A.   They were brought in as processing

13   capability was available to receive them in the

14   building, and they were processed for their -- for

15   their asylum claims.

16       Q.   And while they were waiting, they were on

17   U.S. soil you testified?

18       A.   Up to a certain point, yes.

19       Q.   Was there a point where you told

20   undocumented migrants that they had to wait across

21   the border in Mexico?

22       A.   There was a point where officers were placed

23   at the actual international boundary and asked

24   people to wait there.

25       Q.   And when was that?



Page 41

1      A.    That was -- this whole process was, you

2   know, a period, I believe, in 2016, and it was

3   probably a two- -- a two- to three-month period

4   where this occurred, but those that were already in

5   the U.S. were all processed.  Nobody was pushed back

6   to Mexico.

7      Q.    And those who were stopped, as you say, at

8   the international boundary, how were they taken in?

9   What was the process for allowing them to enter the

10  port?

11     A.    Can you repeat that again?  You broke up a

12  little.

13     Q.    Sure.

14           You said that there was -- at some point in

15  time, officers were placed at the boundary and

16  migrants were told that they had to wait there;

17  correct?

18     A.    Yeah.  At one point, officers were placed at

19  the boundary, and as individuals came up that did

20  not have documents, they were told they didn't have

21  processing capability for them at that time, and

22  they waited there in the line at the -- at the

23  international boundary, along the fence line on a

24  sidewalk on the Mexican side.

25     Q.    And then were they brought in from that line



Page 42

1    in the order they were waiting in?

2       A.    Yes, they were.

3       Q.    And how long were the individuals -- how

4    long was there a line there on the other side of the

5    border?  How long did that last for?

6       A.    Well, again, I think this -- this time

7    period was probably maybe three months at the

8    longest, possibly two.

9             The Haitians, when they started coming up

10   kind of all at the San Ysidro in California, and

11   from there, they kind of started going west, so when

12   San Luis got them, none of the Arizona ports were

13   experiencing that, but at some point, they continued

14   to move west to the other ports.

15      Q.    And how did you decide each day how many

16   people in line could -- would be allowed to cross

17   the border and enter the port at San Luis at that

18   time?

19             MS. SHINNERS:  Objection.  Vague as to

20   geographic location.

21   BY MR. LEV:

22      Q.    You can answer.

23      A.    Can you repeat that one more time, please?

24      Q.    How did you decide how many people were

25   waiting in line on the other side of the border



Page 43

1     would be allowed to cross the border and enter the

2     port each day?

3          A.   Well, the number --

4               MS. SHINNERS:  Same objection.

5               Go ahead, Mr. Humphries.

6               THE WITNESS:  The number was -- had

7     gotten to very -- very high levels that were really

8     dangerous, not healthy, so we brought in as we're

9     able to.

10               The other thing I did is I brought a

11    team of specialized officers to add to the

12    capability to process at the San Luis Port of Entry,

13    so I brought in a team -- part of my Border Security

14    team, along with officers experienced in processing

15    from other ports on a TDY basis and set up an

16    additional area where we could process, so we -- we

17    were always processing.

18    BY MR. LEV:

19         Q.   Okay.  And would you agree that those

20    individuals who approached the border and were told

21    to wait in Mexico, they were attempting to enter the

22    United States; correct?

23         A.   I would say --

24               MS. SHINNERS:  Objection.  Calls for a

25    legal conclusion.



Page 44

1              You can answer.

2    BY MR. LEV:

3       Q.   You can answer.

4       A.   I would say that they -- they were

5    undocumented, and they were lining up along the

6    sidewalk of the port, and they were waiting to come

7    in.

8       Q.   And the only reason they were unable to come

9    in was because CBP officers stopped them allegedly

10   at the border line; correct?

11      A.   CBP officers stopped them because we had no

12   capacity to bring additional in at the time.

13      Q.   Okay.  Give me one second.  I'm sorry.

14           Did any other ports in Arizona engage in

15   metering while you were serving as the Assistant

16   Director of Border Security?

17      A.   As I mentioned --

18           MS. SHINNERS:  Object to the scope to

19   the extent it is before 2016.

20           But continue, Mr. Humphries.

21           THE WITNESS:  As I said before, the

22   Haitians, large groups started arriving in San

23   Ysidro.  From there, they kind of moved their way

24   west to Calexico.  Then San Luis.  At some point

25   after San Luis, Nogales began to -- to receive



Page 45

1    Haitians applying.

2              And I should say that when I brought in

3    the TDY folks to San Luis, they were all -- also

4    moving individuals to Nogales from San Luis for

5    processing.

6    BY MR. LEV:

7        Q.   And you were moving individuals from

8    San Luis to Nogales for processing because Nogales

9    actually had a greater capacity to handle them than

10   San Luis did at that time; correct?

11       A.   The large groups had started [indiscernible

12   audio] west, and when they were in San Luis, Nogales

13   weren't getting those large numbers as San Luis did,

14   and later it moved -- the Haitians kind of kept

15   moving west.

16       Q.   I understand.

17            But you said that at one point you were

18   taking migrants from San Luis to -- and bringing

19   them to Nogales for processing.

20            Did I understand you correctly?

21       A.   Yes.

22       Q.   And you did that because at that time there

23   were -- there was greater processing capability at

24   Nogales, and you were trying to implement a system

25   that would allow them to process the maximum number



Page 46

1    of people given your resources; correct?

2        A.    Nogales was not busy.  They were busy but

3    not as busy as San Luis was and in the numbers that

4    they were getting.

5        Q.    And so the reason you were taking migrants

6    from San Luis to Nogales for processing was to

7    increase the numbers that you could process at the

8    ports of entry in Arizona.  Is that correct?

9        A.    I would say that the reason they were taken

10   to Nogales was because the numbers in custody at

11   San Luis was unsafe, unhealthy, and we were trying

12   to get a better handle to be able to accommodate

13   those in our custody.

14       Q.    You were trying to solve a problem by using

15   your resources to process the greater number of

16   migrants than if you just left them all at San Luis.

17   Is that correct?

18       A.    I would say that, again, the numbers that

19   were in custody at San Luis was unhealthy and not

20   safe.  They were individuals in our custody who had

21   been in our custody for days and days who had not

22   been medically screened, who were sleeping outside

23   the port at San Luis.

24             And so to better manage the situation and to

25   try and -- in an attempt to try to make San Luis



Page 47

1    more safe so that the employees there could -- could

2    work safely, along with all those in our custody be

3    safe, we had asked Nogales to help accommodate.

4        Q.   Did Nogales engage in metering during that

5    time in 2016?

6             MS. SHINNERS:   Objection.   Vague as to

7    time.

8    BY MR. LEV:

9        Q.   Did Nogales engage in metering at any time

10   in 2016?

11       A.   I believe that's when the metering first

12   started at Nogales was late in 2016.

13       Q.   And -- okay.

14            In connection with the Haitian migrants?

15       A.   Correct.   And it wasn't only Haitian.   There

16   were -- there were Central American family units as

17   well and --

18       Q.   You testified that in November of 2017, you

19   became the acting Port Director for Nogales;

20   correct?

21       A.   On an acting basis, yes.

22       Q.   And then you stayed in that role and

23   continued and became the permanent Area Port

24   Director for Nogales in June of 2018; correct?

25       A.   Correct.



Page 48

1     Q.    And you're still in that role today?

2     A.    I am.

3     Q.    Okay.  And can you describe your

4  responsibility as the -- and I assume your

5  responsibility as Acting Area Port Director and as

6  Area Port Director were the same; correct?

7     A.    The responsibilities?

8     Q.    Yes.

9     A.    Yeah, the responsibilities are the same.

10  I'm responsible for overseeing all -- all activities

11  or all operations at Nogales to include the

12  commercial facility, the airport, the various

13  crossings at Nogales.

14     Q.    And that responsibility inclusive --

15  includes processing migrants?

16     A.    Yes, it does.

17     Q.    Okay.  And that responsibility would include

18  implementing CBP policy?

19     A.    Can you repeat that?

20     Q.    That responsibility would include

21  implementing CBP policy at Nogales?

22     A.    It would.

23     Q.    And that would include CBP policy regarding

24  the metering of asylum seekers?

25     A.    It would.



Page 49

1     Q.   Your -- Paragraph 2 of your Declaration

2   that's up on the screen refers to six facilities

3   that make up the Port of Nogales.

4         What are those six facilities?

5     A.   That would be the Morley Pedestrian

6   Crossing, the DeConcini Crossing, the Mariposa

7   Commercial Crossing, the Mariposa Vehicle Crossing,

8   the Nogales International Airport, and the Rio Rico

9   Train Yard.

10    Q.   At each of those facilities, I would just

11  like to understand where there is pedestrian

12  crossing for pedestrians coming from Mexico into the

13  United States.

14        I assume there's a pedestrian crossing at

15  the Morley pedestrian entrance?

16    A.   The Morley pedestrian entrance is strictly

17  pedestrian.

18    Q.   Okay.  DeConcini have a pedestrian entrance?

19    A.   DeConcini does have a pedestrian entrance.

20    Q.   What about Mariposa?  Does it have a

21  pedestrian entrance?

22    A.   Not the commercial facility, but the POV,

23  the privately owned vehicle noncommercial crossing,

24  yes.

25    Q.   Does Nogales Airport have a pedestrian



Page 50

1    entrance?

2        A.   No.  That's located a few miles north of the

3    border.

4        Q.   And does the Rio Rico Train Yard have a

5    pedestrian entrance?

6        A.   No.  That's strictly trains.

7        Q.   Okay.

8             MR. LEV:  If we could turn to the next

9    page of your declaration, please, Kevin -- well, let

10   me -- actually, can we go back to page 1?  I'm

11   sorry.

12   BY MR. LEV:

13       Q.   Paragraph 2, it states that you have a

14   particularly detailed firsthand knowledge of

15   operations at the Nogales Port of Entry.  Is that

16   correct?

17       A.   Yes.

18       Q.   Correct that you have that knowledge?

19       A.   Correct.

20       Q.   Okay.  And if we go to page 2 of the

21   Declaration, Paragraph 5 states that "Nogales POE

22   has a short-term hold capacity of approximately 65."

23            In fact, the hold capacity that's used per

24   CBP's reporting purposes is ███ correct?

25       A.   Yes.



Page 51

1      Q.   And then your Declaration goes on to set

2    forth various events that occurred at the Nogales

3    POE on various dates; correct?

4               MS. SHINNERS:  Objection.  Vague.

5               MR. LEV:  Kevin, we can unshrink

6    Paragraph 5, please.

7    BY MR. LEV:

8      Q.   Did you review this Declaration in

9    preparation for this deposition, Mr. Humphries?

10     A.   I did.

11     Q.   Okay.  Do you recall that it sets forth

12   occurrences, such as drug seizures, medical

13   interventions and the like that occurred on various

14   specific dates?

15     A.   It does.

16     Q.   Who made the decision to refer to those

17   particular dates in the Declaration?

18               MS. SHINNERS:  Objection.  To the

19   extent that this calls for decisions of counsel,

20   attorney work party, work product, I'm going to

21   instruct the witness not to answer.

22               I mean, Mr. Humphries, I am instructing

23   you not to answer.

24   BY MR. LEV:

25     Q.   Are you going to follow your counsel's



Page 52

1    instruction?

2        A.   Yes, I will.

3        Q.   Did you identify specific dates to include

4    in the Declaration?

5             MS. SHINNERS:  Objection.  Same

6    instruction.  Same objection.

7    BY MR. LEV:

8        Q.   Are you going to follow your counsel's

9    instruction?

10       A.   Yes, sir.

11       Q.   Mr. Humphries, did you look at any other

12   data to determine whether the dates that are

13   described in your Declaration are representative of

14   a typical day at Nogales?

15       A.   I looked -- I used --

16            MS. SHINNERS:  Go ahead.

17            You can answer, Mr. Humphries.

18            THE WITNESS:  Can you just repeat that

19   one more time, please?

20   BY MR. LEV:

21       Q.   Sure.

22            I want to know if you did anything to

23   determine whether the dates that are set forth in

24   your Declaration, if you did anything to determine

25   whether those dates were representative of a typical



Page 53

1    day at Nogales.

2        A.    It is not -- the dates that I selected are

3    probably dates that I remembered in my mind.  I

4    couldn't remember specific dates, but what I do

5    remember is there were several days where we had

6    four, five, six, seven, even one day eight, hard

7    narcotic seizures.  I didn't have those dates, but I

8    knew that they existed.

9        Q.    So these were dates that had stood out in

10    your mind because something notable had happened on

11    those dates.  Is that correct?

12        A.    What I was looking for was what I told

13    you --

14            MS. SHINNERS:  Objection.

15            So, Mr. Lev, these are questions that,

16    again, they go into the work product of preparing

17    this Declaration for the purposes of responding to a

18    motion.

19            So to the extent that you can ask

20    factual questions that do not go into what

21    Mr. Humphries did to prepare this Declaration,

22    either with or without counsel, I would not have the

23    same objection, but I'm going to instruct the

24    witness not to answer this question.

25            MR. LEV:  So I asked the question as to



Page 54

1    whether he had done anything to determine whether

2    the dates in his Declaration were typical days at

3    Nogales to which you did not object, and that was a

4    factual question about whether he had looked at

5    other dates, and he answered, and I was trying to

6    make sure I understood his answer, which I heard him

7    to be the dates in the Declaration were dates that

8    stood out to him for a notable reason.

9                MS. SHINNERS:  Sure.  And I should have

10   objected, and I missed the objection, but I do not

11   think that waives the objection to the next

12   question, so -- so --

13               MR. LEV:  So why don't I just ask the

14   --

15               (Simultaneous crosstalk.)

16               MR. LEV:  I'm going to ask one

17   particular factual question.  I just don't want to

18   spend the time on the discussion, Katie.  I

19   understand your point.

20   BY MR. LEV:

21      Q.   Mr. Humphries, is it fair to say that the

22   dates that you -- that are included in the

23   Declaration are dates that stood out -- dates on

24   which events stood out in your mind?

25      A.   They were dates that I saw we had high



Page 55

1    activities and dates that I wanted to highlight how

2    busy we were.

3        Q.   Okay.  And they were different from normal

4    days at the port; correct?

5                MS. SHINNERS:  Objection.  Vague.

6    BY MR. LEV:

7        Q.   You can answer.

8        A.   We're a very busy port.  Last year, we

9    seized about 10,000 pounds of meth, hundreds of

10   seizures, so I would say that, you know -- I believe

11   we had three seizures yesterday, so it is a

12   normal -- there are hardly any days that something

13   doesn't happen.

14       Q.   Did you -- did you do anything to look at

15   data to determine that these dates were

16   representative of the port's busyness that you just

17   described?

18               MS. SHINNERS:  Objection.  Calls for

19   work product.

20               Again, these questions are all framed

21   in terms of what Mr. Humphries did to prepare this

22   Declaration.

23   BY MR. LEV:

24       Q.   You can --

25               MR. LEV:  Are you instructing him not



Page 56

1    to answer, Katie?

2            MS. SHINNERS:  Yes.

3            Mr. Humphries, I am instructing you not

4    to answer this question.

5    BY MR. LEV:

6        Q.   Mr. Humphries, do you have any basis to

7    state that the dates in the Declarations are

8    representative of activity at the port generally?

9        A.   Nogales is a very busy port, as I just said.

10       Q.   That's not my question.

11            My question is whether you have any basis to

12   state that the dates in the Declaration are

13   representative of the typical day at Nogales in

14   terms of the number of incidents that occur.

15            It's a yes-or-no question.

16            MS. SHINNERS:  And, Mr. Humphries, if

17   you need to review the Declaration, you may do so.

18            THE WITNESS:  Are you referring to

19   Paragraph 5, sir?

20   BY MR. LEV:

21       Q.   No.

22            I'm referring more generally to the specific

23   dates you called out in your Declaration, and I'm

24   trying to understand whether there's any basis to

25   think that those dates are typical of other days at



Page 57

1    Nogales.

2        A.    There are many, many days that are like

3    those days.

4        Q.    What's the basis for that statement, sir?

5    Have you looked at any data to determine that?

6        A.    Again, we have hundreds and hundreds of

7    narcotic seizures.  We have processed thousands

8    of --

9        Q.    I understand that generally, sir.  I'm

10   asking you if you've reviewed any data to support

11   your statement --

12               MS. SHINNERS:  Ori, objection.  You

13   have to let the witness finish his answer.

14               MR. LEV:  Not when he's not answering

15   my question, Katie.

16   BY MR. LEV:

17       Q.    Have you looked at any data, sir, to

18   determine what a typical day at Nogales looks like

19   in terms of narcotic seizures?

20               MS. SHINNERS:  Object to the form.

21               THE WITNESS:  Pardon me?

22               MS. SHINNERS:  I objected to the form.

23               You can answer, Mr. Humphries.

24               THE WITNESS:  I regularly get stats

25   for -- for my port of entry for the -- for the Field



Page 58

```
 1    Office.
 2    BY MR. LEV:
 3        Q.    And based on those stats, you can tell me
 4    that the dates in your Declaration are
 5    representative of daily activity?
 6        A.    Again, I can tell you we're a very busy
 7    port.
 8        Q.    So you can't tell me that.
 9            MR. LEV:  Katie, has the government
10    produced all documents responsive to Document
11    Request 31, which calls for any documents referenced
12    in or relied upon when drafting any declaration or
13    affidavit?
14            MS. SHINNERS:  We can discuss -- I
15    mean, I believe our response to -- I would have to
16    look at our response to 31 and whether we agreed to
17    produce documents.  I'm happy to look at that on a
18    break.
19            MR. LEV:  Okay.  That's great.
20            MS. SHINNERS:  I think probably we
21    objected on -- I'm guessing we objected on work
22    product grounds to produce documents specifically in
23    response to that request.
24            I mean, that wouldn't mean we would
25    withhold otherwise responsive documents on that
```



Page 59

1    basis.  However, to the extent it seeks a separate

2    identification of documents that we used to conduct

3    this litigation, I'm guessing that that was our

4    objection, but I would have to check.

5                    MR. LEV:  Okay.  Why don't we take a

6    short break, if that works for everyone?

7                    THE WITNESS:  Yes.

8                    MR. LEV:  Want five minutes?  Ten

9    minutes?

10                   THE WITNESS:  I'm good with five.

11                   MR. LEV:  Okay.

12                   MS. SHINNERS:  Why don't we -- why

13   don't we take a ten-minute break?  That will give me

14   chance to get some food, and we can go --

15   Mr. Humphries, we could log out of here and go to

16   the other connection, if you have access to that.

17                   THE WITNESS:  I'm not sure that --

18   okay.

19                   MR. LEV:  So you want to come back

20   around the top of the hour, Katie?  If you want

21   longer, it doesn't matter to me.  I'm happy to do

22   whatever works.

23                   MS. SHINNERS:  No.  That sounds good.

24   I think ten minutes -- approximately ten minutes is

25   fine.  We may have trouble getting into this other



Page 60

1    room, but that -- we'll see.  Thank you.

2                MR. LEV:  Okay.

3                THE VIDEOGRAPHER:  Off the record --

4    off the record -- oh, my gosh.

5                Off the record at 9:52 a.m.

6                (Recess taken.)

7                THE VIDEOGRAPHER:  Back on the record

8    at 11 -- sorry -- 10:11 a.m.

9    BY MR. LEV:

10       Q.   Mr. Humphries, you understand that you're

11   still under oath?

12       A.   Yes.

13       Q.   Did you speak with anyone other than counsel

14   during our break?

15       A.   No.

16       Q.   I would like to discuss how metering has

17   been implemented in the Tucson Field Office --

18                MS. SHINNERS:  If I may, I just -- I'm

19   very sorry.  Mr. Humphries has something he wanted

20   to potentially clarify from his prior testimony.

21                Before you start questioning, is that

22   okay if he does so?

23                MR. LEV:  Sure.

24   BY MR. LEV:

25       Q.   Go ahead, sir.



Page 61

1          What did you -- I understand you wanted to

2    clarify something.

3       A.   Yeah.

4          So back when we talked about preparation,

5    and I believe there was a conference call where

6    counsel was present where EAC Irwin had made the

7    call, and counsel was in on the call.

8       Q.   Okay.  Thank you.

9          Is that it?

10      A.   That's it.

11      Q.   Okay.  Thank you.  I appreciate that.

12         I would like to discuss how metering is --

13   has been implemented in the CBP in the Tucson Field

14   Office.  Before doing so, I want to define a term.

15         If I say "limit line," I am referring to the

16   location in which CBP officers stand or they are

17   assigned to conduct queue management operations out

18   in the field.

19         Do you understand that?

20      A.   Yes.

21      Q.   Okay.  And is that consistent with how you

22   would use the term "limit line"?

23      A.   I think it's different, but . . .

24      Q.   How would you use the term "limit line"?

25   How would you define it?



Page 62

```
 1      A.   Well, I would think that other folks

 2   potentially would, you know, for example,

 3   [indiscernible audio].  There's a lot of really --

 4   reached the POE.  Particularly, in Nogales, the

 5   limit line is really the international boundary line

 6   too.

 7      Q.   We're going to talk about that, but I want

 8   to -- I want to make the distinction between the

 9   international boundary line and the limit line being

10   where the CBP officer stand when they are assigned

11   to that duty.

12           Okay?

13      A.   When they're assigned to --

14      Q.   To conduct queue management operations.

15      A.   Okay.

16      Q.   Do you understand that?

17      A.   Yes.

18      Q.   Okay.  From 2016 to the present, has asylum

19   seekers been metered at Sasabe?

20      A.   Sasabe.

21      Q.   Sasabe, excuse me.

22      A.   I don't believe so.

23      Q.   Okay.  From 2016 to the present, have asylum

24   seekers been metered at Naco?

25      A.   Naco.
```



Page 63

1       Q.    Naco.

2       A.    Not that I'm aware of.

3       Q.    Okay.  From 2016 to the present, have asylum

4    seekers been metered at Lukeville?

5       A.    I know that they got some cases.  I'm not

6    sure of the large groups leaving there and if they

7    were metered.

8       Q.    You say "they got some cases."

9             That means that there were some asylum

10   seekers who came to Lukeville?

11      A.    Right.

12      Q.    And you're not sure whether or not Lukeville

13   has conducted any metering since 2016?

14      A.    To my understanding or my recollection, they

15   were brought in and processed.

16      Q.    What about at Douglas?  From 2016 to the

17   present, have asylum seekers been metered at

18   Douglas?

19                 MS. SHINNERS:  Object to the scope.

20                 I did object -- this is -- I did object

21   to all the previous questions about -- and to form

22   to all those previous questions beginning with

23   Sasabe to scope and form.  I was on mute.

24                 MR. LEV:  Okay.

25                 MS. SHINNERS:  Just stating that for



Page 64

1    the record.

2              You may answer, Mr. Humphries.  I

3    apologize.

4              THE WITNESS:  Okay.  If I -- if I may

5    clarify, in 2016, I was, again, Assisting Director

6    for Border Security at Tucson, but November of 2016,

7    I was at Nogales.  And so from that point on, I have

8    sort of, I guess, less knowledge of activities at

9    the other ports, but I would say at Douglas, yes,

10   there was people who were asked to wait in line.

11   BY MR. LEV:

12   Q.   Okay.  When was -- when did that occur that

13   people were asked to wait in line at Douglas?

14             MS. SHINNERS:  Objection to scope.

15             You can answer.

16             THE WITNESS:  I believe it was when the

17   Haitians kept moving west and when they got -- when

18   they got to the eastern part of Arizona, Douglas.

19   BY MR. LEV:

20   Q.   So this would have been in 2016?

21   A.   It may have been very late 2016.  It may

22   have been early 2017 possibly.

23   Q.   Okay.  And when this occurred, do you know

24   what the asylum seekers were told when they

25   approached the port?



Page 65

1                MS. SHINNERS:  Object to the form and

2     scope.

3                You may answer.

4                THE WITNESS:  I would guess that they

5     were told that they didn't have the capability to

6     process them at that time.

7     BY MR. LEV:

8        Q.   And were they told to wait in line?

9        A.    Not -- I'm not sure what Douglas would have

10    said, but my guess would be they would have told

11    them that they were full.  They couldn't be received

12    at that time because they didn't have the capability

13    to process them at that time.

14       Q.   But you don't know what -- what Douglas

15    said?

16                MS. SHINNERS:  Object to the

17    scope and -- well, object to scope.

18                THE WITNESS:  I really don't know what

19    Douglas did.

20    BY MR. LEV:

21       Q.   Do you know where a migrant would first

22    encounter a CBP officer at Douglas during the time

23    period when, in your words, they were being told to

24    wait in line?

25                MS. SHINNERS:  Scope objection.



Page 66

1            THE WITNESS:  I would say that they

2    were probably at the international boundary line.

3    BY MR. LEV:

4        Q.   Do you know that, or are you guessing?

5        A.   I believe that to be true, but I don't have

6    specific knowledge of whether they did.

7        Q.   And what's the basis for your belief that

8    they were standing in the national boundary lines as

9    opposed to just a few feet north of it?

10       A.   I've got, I guess, a little bit of

11   recollection.  I know the Douglas Port well, and I

12   would believe that the officers were standing at the

13   international boundary line, which is the sidewalk

14   that leads up to the pedestrian lane.

15       Q.   Is there only one pedestrian entrance at

16   Douglas?

17            MS. SHINNERS:  Object to the scope.

18            THE WITNESS:  There is.  There is

19   one -- there is one crossing at Douglas, and the

20   pedestrian lane is next to the vehicle lanes.

21            MR. LEV:  Katie, can I just clarify?

22   Are your scope objections because you understand Mr.

23   Humphries to be a 30(b)(6) witness with respect to

24   the Nogales port of Entry only?

25            MS. SHINNERS:  Yes, and also to our



Page 67

1    longstanding objection to all of the topics that we

2    were only going to prepare for the eight particular

3    Ports of Entry that have been the subject of

4    discovery, and that's been an objection in our

5    30(b)(6) objections.

6              So, again, I'm objecting to the scope,

7    but -- that's fine, but, of course, Mr. Humphries

8    can answer to the -- to the degree that he can know

9    the answer.

10   BY MR. LEV:

11       Q.   Mr. Humphries, when you prepared for today's

12   deposition, did you prepare to -- did you review

13   information regarding the implementation of metering

14   at all TFO Ports of Entry, or did you limit your

15   preparation to just the Nogales port?

16              MS. SHINNERS:  Object as to the extent

17   it calls for work product.

18              You can answer, Mr. Humphries.

19              THE WITNESS:  I prepared more for

20   Nogales, but I had knowledge of some of the other

21   ports.

22   BY MR. LEV:

23       Q.   Were you told that your testimony was going

24   to be limited to the Nogales port of Entry?

25       A.   I believe I was.



Page 68

1     Q.   I'm sorry.

2          You said you believe you were?

3     A.   I believe that -- I believe that I was

4   mainly testifying or giving the deposition about

5   Nogales.

6     Q.   Going back to the metering that occurred at

7   Douglas in late 2016, early 2017, do you know how

8   long that metering occurred for?

9          MS. SHINNERS:  Same objection to scope.

10  I'm just going to -- if I could have a standing

11  objection just to the specifics about the other

12  ports of Entry?

13         MR. LEV:  That would be great.  Thank

14  you.

15         MS. SHINNERS:  Thank you.  It will be

16  less disruptive for everyone.  Okay.  Thank you.

17         THE WITNESS:  So I'm not sure that

18  their numbers were at the time, if they were

19  exceeding capacity or not at all times.  So there

20  may have been times where they couldn't bring them

21  in, but there may have been times where they had the

22  capacity or the space to be able to process.

23         I'm not sure on their numbers at that

24  time.

25  ///



Page 69

1    BY MR. LEV:

2        Q.    Do you know how long -- I'll rephrase that.

3              Do you know if migrants were being told to

4    wait in Mexico or were being redirected to another

5    port of Entry when this metering was occurring in

6    late 2016, early 2017?

7        A.    Not that I'm aware of.

8        Q.    I'm sorry.  Let me ask it again.  It was

9    sort of two options, or if there's a third, tell me.

10             But my question was, did you know whether

11   migrants were being told to wait in Mexico or,

12   instead, whether they were being redirected to other

13   Ports of Entry when this metering was occurring in

14   late 2016, early 2017 at Douglas?

15       A.    Undocumented persons arriving at the port

16   would be told -- if they were at capacity, they

17   would be told that they didn't have space to process

18   them at this time and they could wait.

19       Q.    So they would not have been redirected by

20   CBP to go to another port?

21       A.    Not that I'm aware of, no.

22       Q.    Other than that time period when the -- as

23   you put it, the Haitians were moving east and there

24   was metering at Douglas in late 2016, early 2017,

25   did the Douglas Port of Entry engage in metering at



Page 70

1    any other time from 2016 to the present?

2        A.   Not that I'm aware of, no.

3        Q.   Has the Douglas Port of Entry engaged in

4    metering subsequent to the issuance of the

5    April 2018 metering memo?

6        A.   I don't think so.

7        Q.   Okay.  And when I say "metering," I'm

8    referring to either telling asylum seekers to wait

9    in Mexico or directing them to go to another port.

10           Do you understand that?

11               MS. SHINNERS:  Object to the form.

12   BY MR. LEV:

13       Q.   Sir, do you understand that that's -- well,

14   let me ask -- let me ask a different question.

15           When I say "metering," I'm referring to

16   telling asylum seekers to wait in Mexico, and I'm

17   also referring to telling asylum seekers they have

18   to go to another Port of Entry to seek asylum.

19           And with that understanding, I'm going to

20   just ask the same question again to make sure your

21   answer didn't change.

22           Has the Douglas Port of Entry engaged in

23   metering since the issuance of the April 2018

24   metering memorandum?

25               MS. SHINNERS:  Object to the form.



Page 71

1              You can answer.  You can answer,

2    Mr. Humphries.

3              THE WITNESS:  They may have at times.

4    I have no specific knowledge that they were.

5              MR. LEV:  Okay.  Can we look at

6    Exhibit 141, please.

7              (Whereupon, Exhibit No. 141 was marked

8    for identification.)

9    BY MR. LEV:

10    Q.   So I'm showing you what's been labeled

11    Exhibit 141.  This is a July 2nd, 2019, e-mail from

12    Guadalupe Ramirez, and it is being -- it was

13    forwarded to you by Margaret Baldenegro, and the

14    subject is "FW:  Asylum Processing."

15              The first sentence of that e-mail reads, 'We

16    have been granted permission to re-route asylum

17    seekers from Douglas, Naco, and Lukeville to either

18    Nogales or San Luis for processing."  And two

19    sentences later it says, "Asylum seekers approaching

20    your ports" -- excuse me.  It says, "Asylum seekers

21    approaching your ports from the Mexican side of the

22    border must be informed that if they want to apply

23    for asylum at a port of entry, they must go to

24    either Nogales or San Luis."

25              Does this refresh your recollection as to



Page 72

1    whether asylum seekers were redirected from Douglas,

2    Naco, and Lukeville to other ports of entry?

3        A.   I don't recall this specific e-mail, and I

4    don't remember any being re-routed to Nogales.

5        Q.   So you believe that notwithstanding the fact

6    that this e-mail says that asylum seekers that

7    approach those ports must be informed that they need

8    to apply in Nogales or San Luis, that, in fact, that

9    did not occur?

10       A.   I'm saying that I have no recollection of

11   any being referred from Douglas or Naco to go to

12   apply at the Nogales port.  I just don't remember

13   that occurring.

14       Q.   Do you remember it occurring from Lukeville?

15       A.   Well, Lukeville would be closer to San Luis,

16   but I don't -- I don't remember that either.

17       Q.   So you don't recall one way or another?

18       A.   I don't recall of anybody being told to go

19   to the -- to the Nogales Port of Entry.  We had

20   individuals transferred on the U.S. side to Nogales

21   but not through Mexico.

22       Q.   How would you know if an asylum seeker

23   presents himself at the Nogales Port of Entry,

24   whether or not they've been redirected by CBP

25   personnel from Douglas, Naco, or Lukeville?



Page 73

1          MS. SHINNERS:  Object to the form.

2          You can answer.

3          THE WITNESS:  My guess would be that

4   during the question and answer, that they may have

5   asked their itinerary, travel itinerary, when

6   they -- when they -- where -- their travel route.

7   BY MR. LEV:

8     Q.   And you as the port Director would know if

9   this occurred based on that question and answer?

10    A.   I would not read that Q and A, no.

11    Q.   It sounds to me like as you sit here today,

12  the fact is you just don't know whether this did or

13  did not occur at these Ports of entry.  Is that

14  right?

15    A.   Correct.  I wasn't told that -- that any

16  were re-routed from Douglas or Naco that I remember,

17  or Lukeville for that matter.

18    Q.   Okay.  Are you aware of other instances in

19  which ports of entry have re-routed asylum seekers?

20          MS. SHINNERS:  Object to the form.

21          THE WITNESS:  I did read the OIT

22  report, I think, involving the Naco Port of Entry.

23  BY MR. LEV:

24    Q.   Okay.  Are you aware of any ports in Arizona

25  re-routing asylum seekers from -- when they approach



Page 74

1    a port, them being told that they need to go to a

2    different port of entry to seek asylum?

3        A.   I have no recollection of that happening.

4        Q.   I would like to talk about San Luis for a

5    little bit.

6             From 2016 to the present, have asylum

7    seekers been metered at San Luis?

8             MS. SHINNERS:  And just for the record,

9    same objection as to scope as to the specifics of

10   implementation at San Luis.

11            Thank you.

12   BY MR. LEV:

13       Q.   You can answer, sir.

14       A.   There were -- at San Luis, yes, there

15   were -- individuals were asked to leave.

16       Q.   And when did that occur?

17       A.   Again, with the arrival of the Haitians,

18   largely Haitians [indiscernible audio], family units

19   as well sometime -- sometime in 2016.

20       Q.   Okay.  Other than sometime in 2016, has the

21   San Luis port of entry metered asylum seekers?

22       A.   Not positive, but my guess would be yes.

23       Q.   When -- when did that occur?

24       A.   Well, it may have gone into early 2017 with

25   the Haitians.  Beyond that, I'm not sure.



Page 75

1    Q.   When migrants are metered at San Luis, are

2    they told to wait in Mexico, or are they directed to

3    another port of entry?

4    A.   Based on this e-mail here, it says they will

5    be directed to either Nogales or San Luis.  I don't

6    think San Luis would redirect anybody.

7    Q.   But you don't know.  You're just surmising;

8    correct?

9    A.   I wouldn't think that San Luis would

10   redirect anybody to another port.

11   Q.   So that's your testimony on behalf of CBP is

12   that San Luis did not direct anybody to another

13   port?

14   A.   To the best of my recollection, San Luis did

15   not ask somebody to go to another port.

16   Q.   When migrants are -- approach the port at

17   San Luis, where do they first encounter a CBP

18   officer if metering is taking place?

19   A.   At that sidewalk, the sidewalk that leads up

20   to the pedestrian lane that is located at the

21   international boundary.

22   Q.   So where would the CBP officer be standing

23   in relation to the international boundary?

24   A.   He is standing at that same -- where the

25   fence is, the actual border fence.



Page 76

1    Q.   So that -- the border fence crosses the

2    pedestrian entrance there?

3    A.   Well, it comes up to the pedestrian

4    entrance.

5    Q.   Perpendicular to the pedestrian entrance,

6    and then there's a pedestrian entrance?

7    A.   Right.  And there's an opening in the fence

8    where the sidewalk is, which is the pedestrian

9    entrance.

10   Q.   And it's your testimony that when San Luis

11   engaged in metering, the CBP officer would be

12   stationed right next to that fence?

13   A.   I did mention earlier where many were

14   waiting on port property when we brought in the

15   porta Potties and such, so at one point, there were

16   individuals on U.S. territory waiting to be

17   processed.  Later, it was moved to where the

18   officers were standing at the -- at the

19   international boundary.

20   Q.   Do you know what the officers tell asylum

21   seekers who approach that opening in the fence at

22   San Luis when metering took place?

23   A.   Depending on what their capacity or their

24   ability to accept at the time, they may be told

25   that, "We're not able to receive you at this time.



Page 77

1    You're going to have to wait."

2        Q.    Do you know what they're told, or are you

3    just telling me what they might have been told?

4        A.    I wasn't there, but that's my guess.

5        Q.    Okay.  Are those -- are there written

6    instructions telling officers what they're to tell

7    asylum seekers when they're being metered at San

8    Luis?

9        A.    There was a point, yes, where there was

10   instructions to, No. 1, not -- once somebody is on

11   U.S. territory, don't return them.  You can't return

12   them.  They must be processed.  No. 2 is if you're

13   unable to take anybody, you would mention that,

14   "We're not able to process you at this point."

15       Q.    Are you referring to the April 2018 metering

16   memo from CBP, or is there specific written guidance

17   from San Luis about what asylum seekers are told?

18       A.    I believe that's the April metering

19   guidance.

20       Q.    Are you aware of any other written

21   instructions to CBP officers in San Luis about what

22   they're supposed to tell asylum seekers when they're

23   metered?

24       A.    Can you repeat that?

25       Q.    Are you aware of any other written guidance





Page 78

1    that's given to San Luis CBP officers about what

2    they're supposed to tell asylum seekers when they

3    are metered?

4        A.   I think I need to talk to my counsel before

5    I answer.

6        Q.   Okay.

7             MS. SHINNERS:  Do you have a question

8    about privilege, Mr. Humphries?

9             THE WITNESS:  Yes.

10             MR. LEV:  Want to go off the record,

11    Katie?

12             MS. SHINNERS:  Yeah.  Why don't we go

13    off the record?  Thank you, Ori.

14             THE VIDEOGRAPHER:  We are off the

15    record at 10:36 a.m.

16             (Recess taken.)

17             THE VIDEOGRAPHER:  Back on the record

18    at 10:49 a.m.

19    BY MR. LEV:

20        Q.   Mr. Humphries, I believe that before we went

21    off the record I asked you whether there was any

22    written guidance provided to CBP officers at San

23    Luis regarding what they should tell asylum seekers

24    who were being metered other than the April 2018

25    metering memo.



MAGNA
LEGAL SERVICES

Page 79

 1      A.    Yes.

 2      Q.    Was there such written guidance?

 3      A.    I've seen, I believe it was a standard

 4  operating procedure, an SOP.

 5      Q.    And was that limited to San Luis, or did it

 6  have a broader applicability?

 7      A.    I believe that was specific to San Luis Port

 8  of Entry.

 9      Q.    And what did it instruct -- what did that

10  SOP cover?

11      A.    I believe -- and I can't remember exactly,

12  but I think it mirrored the metering memo from

13  April of '18, I believe.

14      Q.    Did it provide any more detail about what

15  CBP officers are supposed to tell asylum seekers

16  when they're being metered?

17      A.    I can't remember the -- I remember there was

18  a document.  I don't remember a lot of the details

19  in the document.

20      Q.    Let's talk a little bit about Nogales now.

21  Asylum seekers have been consistently metered at

22  Nogales since the limit line was established and

23  staffed on a full-time basis in June of 2018;

24  correct?

25              MS. SHINNERS:  Object to the form.



Page 80

1            THE WITNESS:  DeConcini Crossing in

2     Nogales has had somebody at the boundary line or the

3     limit line since --

4            MR. LEV:  I'm sorry.  There was some

5     background noise.

6            (Court reporter's phone was

7     disconnected.  Upon reconnecting, there was a

8     discussion off the written record.  It was agreed

9     upon by counsel and the court reporter to type in

10    the missed testimony with the audio from the

11    videographer.)

12            MR. LEV:  Okay.  So are we back on the

13    record and good to go?

14            THE COURT REPORTER:  Yes.

15    BY MR. LEV:

16    Q.   Mr. Humphries, you just testified that since

17    June of 2018, there's been a CBP officer stated at

18    the limit line at the DeConcini entrance; correct?

19    A.   Yes, sir.

20    Q.   And that means that any asylum seeker

21    approaching that entrance since that time would have

22    been turned back and told to wait in Mexico;

23    correct?

24            MS. SHINNERS:  Object to the form.

25            THE WITNESS:  I would say that there



Page 81

1    was an officer at the international boundary, and so

2    I would -- I don't know what your definition of

3    "turnback" is, but nobody was turned back from the

4    U.S. territory.

5    BY MR. LEV:

6        Q.    Okay.  So let me ask the question a

7    different way.

8            Since the limit line position has been

9    staffed on a full-time basis at the DeConcini

10   entrance, any migrants were told that they could not

11   enter the port and had to wait in Mexico.  Is that

12   correct?

13           Let me rephrase it one more time.

14           Since the DeConcini entrance was staffed on

15   a full-time basis at the limit line in June of 2018,

16   any asylum seeker approaching that entrance would be

17   told that they could not enter the port and they

18   need to wait in Mexico.  Is that correct?

19               MS. SHINNERS:  Object to the form.

20               THE WITNESS:  There are instances where

21   somebody would be brought in without being told to

22   wait in line.  There could have been times as well

23   when the port had the ability to process at that

24   time.

25   ///



Page 82

1    BY MR. LEV:

2       Q.   So that -- and let's not talk about what

3    could have been.  Let's talk about what did happen,

4    and we're talking about the Nogales Port of Entry

5    where you are the Port Director and where even your

6    counsel agrees you are testifying on behalf of CBP

7    today regarding the implementation of metering.

8            Since that limit line position has been

9    staffed at the DeConcini entrance on a full-time

10   basis, have asylum seekers been let in when they

11   approach, or are they all told they have to wait in

12   Mexico?

13               MS. SHINNERS:  Object to the form.

14               THE WITNESS:  Some are let in.  Some

15   are told they need to wait.

16   BY MR. LEV:

17      Q.   And what determines who is let in and who is

18   told they need to wait?

19      A.   For example, an unaccompanied alien child is

20   not going to be told to wait in line.  Somebody with

21   a bullet wound or a stab wound is going to be

22   immediately brought in.  If the port was not at

23   capacity at the time, they would be brought in.

24           So when the port -- go ahead.

25      Q.   When -- has there been times since June of



Page 83

1    2018 when the port was, in your words, not at

2    capacity such that they -- asylum seekers would have

3    been brought in?

4                (Court Reporter's audio was

5    disconnected from WebEx.)

6                (Recess taken.)

7                THE VIDEOGRAPHER:  Back on the record

8    at 10:58 a.m.

9    BY MR. LEV:

10    Q.   So, Mr. Humphries, the question is whether

11    there's been times since June of 2018 when the port

12    was, quote, not at capacity such that asylum seekers

13    were being allowed in at the DeConcini entrance, as

14    opposed to being told to wait in Mexico?

15                MS. SHINNERS:  Object to the form.

16                THE WITNESS:  Those rare occasions,

17    which I mentioned -- not rare, but maybe not as

18    frequent, the UACs and others.  They were --

19    BY MR. LEV:

20    Q.   I'm sorry to interrupt, sir, but that wasn't

21    my question.

22                You had identified two categories of people

23    who would be allowed to enter.  There was the --

24                MS. SHINNERS:  He was getting -- he was

25    trying to answer your question.



Page 84

1              MR. LEV:  Okay.  Well, he wasn't

2     actually answering it, and --

3              MS. SHINNERS:  But you didn't let him

4     finish.  I just ask -- I just ask that you -- that

5     you let him finish his answer.  Thank you.

6     BY MR. LEV:

7        Q.   Okay.  Do you want to finish your answer,

8     sir, or do you want me to ask the question again?

9        A.   Re-ask the question, please.

10       Q.   Has there been times since June of 2018

11    when, quote, the port was not at capacity such that

12    asylum seekers were permitted to enter at the

13    DeConcini pedestrian crossing?

14              And just to be clear, I'm not talking about

15    the special cases you referenced earlier, which I

16    understand would be allowed in regardless of the

17    capacity, but whether there were periods when the

18    port was, in your words, not at capacity such that

19    any asylum seeker who would approach the DeConcini

20    entrance would be allowed in?

21              MS. SHINNERS:  Object to the form.

22              THE WITNESS:  Are you talking

23    specifically -- I'm a bit confused.  There are

24    instances where somebody gets by and gets onto

25    U.S. territory, such as, you know, running up the



Page 85

1    lane, and so they're not returned.  They are taken

2    in.

3            Or are you just referring to those at

4    the pedestrian lane that otherwise are waiting to

5    come in?

6    BY MR. LEV:

7    Q.    I'm referring to an asylum seeker at the

8    pedestrian lane and whether there was a time period

9    since June of 2018 where, because the port was,

10    quote, not at capacity, CBP was allowing such people

11    to enter.

12            Not those who ran up in the vehicle lane but

13    came to the pedestrian lane and CBP allowed them to

14    enter because it was a time period when the port was

15    not at capacity.

16            You identified that as a possible time when

17    folks would not be told to wait in Mexico, and I'm

18    trying to understand if that, in fact, occurred or

19    if that was just a theoretical possibility.

20    A.    Well, it did occur with the UACs and those

21    other special ones we talked about.  Outside of

22    that, we would bring in those when we had the

23    capacity and capability to process.

24    Q.    Who are "those" -- when you say you would

25    "bring in those," who are you referring to?



Page 86

```
 1        A.    Travelers without documents that were
 2   waiting in line.
 3        Q.    Where were they waiting in line, sir?
 4        A.    They were waiting in line on the Mexican --
 5   Mexican side, directly south of the pedestrian lane.
 6        Q.    They were physically waiting there until the
 7   a day came when you said you had capacity to take
 8   some people, and then you would let in a few people
 9   from the front of the line.  Is that right?
10        A.    As we would have the capability to process,
11   and it could be several times throughout the day, we
12   would bring in as we were able to process
13   additional --
14        Q.    And is it your testimony that the
15   individuals who were brought in were those that were
16   physically present and waiting on the Mexican side
17   of the entrance?
18        A.    At some -- when the people waited on the
19   south side, just south of the pedestrian turnstiles,
20   they were brought in in the order that they were
21   waiting.
22        Q.    Did the port rely on waiting lists that were
23   established and maintained by any government or
24   nongovernmental groups in Mexico to determine who
25   should be allowed to enter?
```


MAGNA
LEGAL SERVICES

Page 87

1      A.   At the time, I believe we brought in from

2   the line people at the front of the line.  At some

3   point, there was a waiting list established

4   [simultaneous crosstalk].

5      Q.   Okay.  At what point in time was a waiting

6   list established?

7      A.   I believe it was sometime in -- starting

8   sometime in possibly June of 2018.

9      Q.   So before June of 2018, metering was

10   implemented by allowing in those who were physically

11   present on the other side of the DeConcini entrance?

12      A.   Yes.

13      Q.   And there was no reliance on waiting lists

14   prior to that date?

15      A.   At the DeConcini crossing, no.

16      Q.   Was there reliance on waiting lists at any

17   crossing at the Nogales POE prior to that date?

18      A.   No.

19      Q.   Okay.  And then in June of 2018, you began

20   to rely on a waiting list to determine who was

21   allowed to come in?

22      A.   We didn't rely on a waiting list.  We

23   contacted a person when we had the ability to accept

24   more.

25      Q.   Who would you contact?



Page 88

```
 1      A.    Initially, I believe it was a person named
 2   ████████

 3      Q.    With what organization was ███████

 4      A.    I'm not sure.  I believe at that time it was

 5   the City of Nogales possibly, in coordination with

 6   the shelters or the NGOs.  I'm not really sure

 7   who -- who she worked for.

 8      Q.    So you were the Port Director of the Nogales

 9   Port of Entry and you're determining which asylum

10   seekers should be allowed to enter the United States

11   and make the claim for asylum, and you're talking to

12   ███████, but you don't know who she works for?

13      A.    Well, my guess -- again, I don't know

14   exactly who she works for, but she was coordinating

15   with the City of Nogales at the time.

16      Q.    Who made the decision to move to a wait

17   list, as opposed to accepting people who were

18   physically waiting across the entrance?

19            MS. SHINNERS:  Objection.  Misstates

20   testimony.

21   BY MR. LEV:

22      Q.    You can answer.

23      A.    Those were decisions made by the Mexican

24   government, I believe, on those waiting on their

25   property.
```



Page 89

1     Q.   I'm sorry.

2          You made the decision as to who you were

3     going to allow to enter the United States; correct?

4     A.   No.  We allowed the next person that was in

5     the line to enter the United States.

6     Q.   All right.  When you determined that you had

7     capacity to process asylum seekers, you made a

8     determination as to which individual would be

9     allowed to enter the United States; correct?

10    A.   We did not know who the individuals were.

11         MS. SHINNERS:  Object to the form.

12    BY MR. LEV:

13    Q.   Well, you made a choice to call ███████ in

14    one day and get the individual's name, as opposed to

15    taking an individual who might have been physically

16    waiting across the border; right?

17    A.   When that began, there was no longer anybody

18    waiting on the border.  I believe they were all

19    taken to shelters, and there was nobody waiting at

20    that point.  I believe the Mexican government didn't

21    allow anybody to wait at that time.

22    Q.   And who made the decision to coordinate with

23    ███████ about who should be allowed in the United

24    States?

25    A.   I believe the City of Nogales, Sonora, was



Page 90

1    in charge of that, and I believe they named her as

2    the DOC.

3        Q.    So you're referring to the City of Nogales

4    in Mexico, not in Arizona; correct?

5        A.    In Mexico, Sonora.

6        Q.    And, I'm sorry.  I'm trying to understand.

7              Who in the United States made the decision

8    that they were going to coordinate with ████ about

9    who could enter the port?

10       A.    I believe somebody in Mexico made that

11   decision.

12       Q.    Sure.

13             Somebody in Mexico decided that, on their

14   side, ████ was going to be a POE, but somebody on

15   the United States side must have determined that,

16   "Gee, we can take in some asylum seekers today.

17   What should we do?  Well, let's call somebody on the

18   Mexican side."

19             Who made that decision, that as opposed to

20   accepting people who were physically present, you

21   were going to coordinate with somebody on the

22   Mexican side?

23                  MS. SHINNERS:  Object to the form.

24                  THE WITNESS:  Again, at the time, there

25   was -- Mexico had removed everybody waiting on that



Page 91

1    side.  There was nobody waiting.  We coordinated

2    with the City Government of Mexico.  I believe their

3    contact was ████.

4    BY MR. LEV:

5        Q.   Okay.  You're not going to answer my

6    question.  I'm going to move on.

7             Who made the decision that you were going to

8    coordinate with Mexico?  Did you make that decision

9    as the -- as the Port Director, or did somebody else

10   make the decision, that since there were no people

11   physically waiting, you needed to coordinate with

12   somebody on the Mexican side?

13       A.   I believe there were meetings amongst the

14   City, the Consulate, INAMI, and others to -- to

15   figure out, I guess, a way to accept those waiting.

16       Q.   And how would you determine that you were

17   able to take in additional asylum seekers in a given

18   day?

19             MS. SHINNERS:  Object to the form.

20             THE WITNESS:  Whenever we had the

21   capacity to bring in more, we would bring in more.

22   BY MR. LEV:

23       Q.   When you say "capacity," do you mean -- I'm

24   sorry.  Go ahead.

25       A.   So whenever we could bring in more, we would



Page 92

1    bring in more based on how many we had at the time,

2    based on whether ICE, ERO, was timely accepting

3    those that had already been processed.  Based on

4    many, many factors.

5        Q.   Are you talking about detention capacity,

6    sir, or operational capacity?

7        A.   I'm talking about just capacity to bring

8    more in.  I constantly brought in more throughout

9    that period.

10       Q.   Did you measure your capacity to bring in

11   more in any way?

12       A.   Did I measure my capacity?  Can you maybe

13   clarify it?

14       Q.   Were you keeping -- were you keeping track

15   of the capacity in any way?

16       A.   We had daily reports that go out that show

17   what our capacity is.

18       Q.   Is that the capacity you're referring to,

19   the capacity that's referenced in those daily

20   reports?

21       A.   The capacity that's in those daily reports

22   is -- yes.

23       Q.   Okay.  And what capacity would you need to

24   be at to allow additional asylum seekers in?

25       A.   As we discussed earlier, the port's capacity



Page 93

1  was ███   During that period, there were times we

2  were over that.  During that period, there were

3  times we were under that.

4      Q.   And if you were under that, that's when you

5  would allow additional asylum seekers in, as you had

6  additional capacity?

7      A.   I would bring in additional if we were able

8  to provide the care that was needed and have the

9  space to do that.

10     Q.   Based on those numbers that you were

11  reporting daily?

12          If you --

13              MR. LEV:  Can we look at --

14              MS. SHINNERS:  I'm sorry.  Is there a

15  question?  I think the question was trying to

16  answer.  You just said, "Based on those numbers that

17  you were reporting daily," and the witness didn't

18  get a chance to answer that question.

19  BY MR. LEV:

20     Q.   Correct, sir?

21     A.   We brought in people based on our ability

22  to -- to provide healthy care without -- keeping in

23  mind the spread of disease and viruses.  There were

24  times there were chickenpox and measles, head lice,

25  scabies, those kind of things, so that all went into


MAGNA
LEGAL SERVICES

Page 94

1    the numbers that we could bring in.

2        Q.    I guess I'm confused.

3             You testified a few minutes ago that you

4    tracked your capacity on a daily basis and that that

5    was the capacity that determined whether you could

6    bring in additional asylum seekers; correct?

7        A.    I said that the MCAT report says that our

8    capacity is ██    I know that I safely cannot put ██

9    in that area.

10       Q.    You could never put -- safely put ██ in that

11   area?

12       A.    I can't, because ██ -- ██ mats for sleeping

13   do not fit in that area.

14       Q.    Were you ever told to keep your capacity at

15   20 percent?

16       A.    Depending on special circumstances, we were

17   told to be ready and aware, you know, such as when

18   large groups had entered from Central America into

19   Mexico and had torn down or broke through the port

20   of entry down there and were heading north.

21            There was probably times I was told that we

22   could -- you know, "Watch your numbers, you know, in

23   case a large number show up and breach -- breach the

24   port."

25       Q.    It's your testimony that you were never



Page 95

1  directed to keep your capacity at 20 percent?

2      A.   I remember an e-mail mentioning 20 percent,

3  and I think we were high at that time, but that was,

4  again, in response to a large number -- large groups

5  coming up near the port.

6              MR. LEV:  Can we take a look at

7  Exhibit 153, please?  Can we enlarge that at all?

8              (Whereupon, Exhibit No. 153 was marked

9  for identification.)

10 BY MR. LEV:

11     Q.   Okay.  Well, I'm showing you Exhibit 153,

12 which is an e-mail from October 23rd of 2018 from

13 Petra Horne to you, John Schwamm, Margaret

14 Baldenegro, Peter Bachelier, and Kenneth Baxter.

15 The subject line is, "Forward MCAT Daily Report for

16 October 23rd."

17          So those recipients, are they all the Port

18 Directors in the Tucson Field Office?

19     A.   They are -- the are the ones at the -- at

20 the land border crosses.  Not the airports.

21     Q.   Okay.  And the e-mail reads, "We need you to

22 hold the line until we clear what you have in

23 custody to allow [sic] 20 percent hold."

24          That was a directive from the director of

25 the Tucson Field Office to the border ports of



Page 96

1    entry, "Do not accept any more asylum seekers for

2    processing until the port's detention capacity was

3    20 percent"; correct?

4                MS. SHINNERS:  Object to the form.

5                THE WITNESS:  Correct.

6    BY MR. LEV:

7       Q.   Okay.  And you just told me that you don't

8    think there's any way you could safely keep █

9    detainees in the Nogales Port of Entry; correct?

10      A.   ████████ sleeping mats do not fit -- do not

11   fit in that area.

12               MR. LEV:  Can we take a look at

13   Exhibit 143, please?

14               (Whereupon, Exhibit No. 143 was marked

15   for identification.)

16   BY MR. LEV:

17      Q.   This is an October 26, 2016, e-mail

18   exchange.  It has the subject line, "Re: SWB POE

19   Holding Capacity."

20               MR. LEV:  And if we could look at the

21   bottom of page 1 real quickly.  All the way at the

22   bottom, there's just a header there.  You can see

23   there's an e-mail at the bottom -- oh, yeah.

24               The bottom of page 1, the top of

25   page 2.  Perfect.  That e-mail.



Page 97

1    BY MR. LEV:

2        Q.    This is an e-mail from Beverly Good to a

3    number of people, and you're cc'd on it, and it

4    reads, "I know you are probably all sick of hearing

5    from me, but this mitigation [sic] issue going on we

6    are constantly being asked for numbers."  And then

7    it says, "I need for each DFO to verify capacity for

8    your field office or port if it is incorrect."

9            Did I read that correctly?

10       A.    Yes, that's what it says.

11       Q.    Okay.  And then if you go to the middle of

12   the first page, there's an e-mail from you to Bonnie

13   Arellano and Joe Agosttini.  It's forwarding the

14   incoming e-mail.

15               MR. LEV:  It's below that, Kevin.

16   Yeah, above that.

17   BY MR. LEV:

18       Q.    And you say, "How many can lay down and

19   sleep in each cell with space in between would be a

20   good gauge for capacity.  Joe, can you look at this

21   quickly?"

22           Did I read that correctly?

23       A.    Yes.

24       Q.    Okay.  And at the top of the page, Jeffrey

25   Niverson responds to your inquiry by saying "these



Page 98

1    numbers came from the Fire Marshal when the area was

2    inspected and what we attempt to maintain."

3          He goes on to note that, "When you see

4    higher numbers on our 'total in-custody' the excess

5    is lodged at SCCSO."  And then he lists the table,

6    and it reads, "DeConcini -- ██, Mariposa -- ██.

7    Total:  ██"

8          Did I read that correctly?

9    A.   You did.

10   Q.   So according to the Fire Marshal, the

11   Nogales POE can hold up to██ detainees safely;

12   correct?

13   A.   That's according to the e-mail, yes.

14   Q.   Okay.  So when you said in your Declaration

15   that the Nogales POE's upper ceiling for detainees

16   was approximately 65, in fact, that wasn't true;

17   correct?

18   A.   There are ██ in the area in Mariposa, that

19   is -- that area is no longer used.

20   Q.   When did that area stop being used?

21   A.   Sometime in 2018.

22   Q.   When?

23   A.   I'm not positive, but maybe later --

24   maybe -- I guess maybe September.  I'm not sure.

25   Q.   What was -- what did they do with it instead



Page 99

1    of using it?

2        A.    It's an unused area right now.

3        Q.    So it's not being used for a different

4    purpose?  It's just not being used as a detention

5    space?

6        A.    Correct.

7        Q.    So if you wanted to detain people there, you

8    could?

9        A.    There were -- there were issues with that.

10       Q.    What issues were there with that?

11       A.    That Mariposa is not a 24-hour port; open

12   6 a.m. to 10 p.m.  That meant that officers were

13   isolated there with detainees overnight in a locked

14   facility.  The gates were locked around the -- the

15   perimeter.

16            The medical unit that was later built and

17   brought in was at DeConcini.  It required the

18   splitting of resources, showers needing built for

19   the detainees were built at the DeConcini crossing

20   in the PCU.  There was no supervisory or chief

21   oversight at Mariposa.  All were assigned at

22   DeConcini, which was a main processing area.  Many

23   reasons.

24       Q.    But the facility at Mariposa, the physical

25   facility, still exists as it existed back when this



Page 100

1    e-mail was written; correct?

2        A.    The facility is still there.

3        Q.    Okay.  And so CBP made the decision to close

4    detention space at the Nogales POE sometime in 2018;

5    correct?

6        A.    Sometime in 2018.

7        Q.    Okay.  Where are the █ capacity spaces

8    currently at the Nogales POE?

9        A.    This is before I -- this e-mail is before I

10   took over as Port Director of Nogales.  Again, I had

11   mats laid out and, really, comfortably you couldn't

12   get beyond -- in the detention holding areas, you

13   couldn't get beyond █mats or -- or █if you

14   placed them without room for anybody to stand up

15   in-between them.

16       Q.    The current capacity for the Nogales POE

17   that's used for MCAT reporting purposes is █;

18   correct?

19       A.    Correct.

20       Q.    Are all █of those spaces in DeConcini?

21       A.    I really don't know, but I've been vocal

22   about it, that I didn't agree with those numbers for

23   a long, long time.

24       Q.    And so as you sit here today as CBP's

25   witness, you don't know what that number █



Page 101

1    represents in terms of where within the Nogales POE

2    those ■ detainees are supposed to be held if you

3    were at 100 percent capacity?

4        A.   Yeah, I do know.  This one is the Fire

5    Marshal who is the local --

6        Q.   Sorry.  I'm not asking you about the e-mail.

7    I'm asking you about the capacity -- sorry to

8    interrupt you, but the capacity numbers for MCAT are

9    ■; correct?

10       A.   Correct.

11       Q.   And you're telling me that you don't know

12   what that ■ number is based on.  You don't know

13   which cells in which buildings are supposed to hold

14   how many detainees that add up to ■.  Is that

15   correct?

16       A.   What I'm telling you is we cannot physically

17   fit ■ mats.

18       Q.   That's not my question, sir.

19            My question is whether you know what the

20   basis for the MCAT numbers are.

21       A.   I don't know where they --

22            MS. SHINNERS:  I understand your

23   frustration, but you have to let him finish the

24   question.

25            MR. LEV:  No, I don't, Katie.  My job



Page 102

1  is to ask questions.  His job is to answer them.

2  And if he's not answering them, I'm entitled to ask

3  him the question so that he answers it.

4  BY MR. LEV:

5      Q.   Go ahead, sir.

6              MS. SHINNERS:  That's fine, but I

7  please ask that you let him finish answering the

8  question to the best of his ability.  Thank you.

9              THE WITNESS:  I don't know how they

10  came up with the number ▆.  It was pre me being

11  there.

12  BY MR. LEV:

13      Q.   Okay.  This e-mail also references the fact

14  that the excess is lodged at SCCSO.

15          Do you see that?

16      A.   Yes, I do.

17      Q.   And SCCSO is the Santa Cruz County Sheriff's

18  Office; correct?

19      A.   Correct.

20      Q.   And, in fact, using the Sheriff's Office for

21  excess lodging is part of the Nogales Port of

22  Entry's contingency program; correct?

23      A.   Correct, but there's limitations.

24      Q.   And so if you added the detention capacity

25  at the Santa Cruz County Sheriff's Office to the



Page 103

1    capacity that the Nogales Port of Entry has, the

2    upper ceiling of detainees would be more than the

3    approximately 65 set forth in your Declaration;

4    correct?

5         A.   I would not agree with that, no.

6         Q.   And why would you not agree with that?

7         A.   First of all, the Santa Cruz County

8    Sheriff's Office has to have space themselves.

9    Secondly, they don't -- they only accept singles,

10   singles, single adults, so family units will not go

11   to SCCSO.  UACs will not go there.  Only single

12   adults and within family units do not go there.

13   Only single males, single female adults can be

14   housed at Santa Cruz County.

15                MR. LEV:  Okay.  Why don't we take --

16   can we take a short break, please?  Maybe five

17   minutes.

18                MS. SHINNERS:  That's fine with me,

19   yeah.  Is it fine with you?

20                THE WITNESS:  Sure.

21                MR. LEV:  Thanks.

22                THE VIDEOGRAPHER:  Off the record at

23   11:27 a.m.

24                (Recess taken.)

25                THE VIDEOGRAPHER:  Back on the record



Page 104

1    at 11:42 a.m.

2    BY MR. LEV:

3        Q.    Mr. Humphries, during your tenure as the

4    Port Director at Nogales, has CBP ever sent asylum

5    seekers back to Mexico who had already physically

6    crossed the border into the United States?

7        A.    Not during my tenure.

8                MR. LEV:  Can we take a look at

9    Exhibit 158, please?

10               (Whereupon, Exhibit No. 158 was marked

11   for identification.)

12   BY MR. LEV:

13       Q.    Exhibit 158 is a February 21st, 2019, e-mail

14   from Ricardo Briseno.  His signature blocks indicate

15   he's part of the Use of Force Incident Team at

16   Nogales.  It's directed to you and several other

17   recipients, and the subject of the email is, "Asylum

18   Claim from large groups" -- sorry.  "Asylum claims

19   from large groups of Mexican Nationals at the POE."

20               And if you look at it, you see the first

21   paragraph of the e-mail states that, quote, Last

22   week we had a large group of 15 subjects enter

23   through the Mariposa Pedestrian and claim asylum to

24   CBP Officers."

25               And then the third paragraph reads, "Also,



Page 105

1    yesterday we had a group of 15 Mexican Nationals

2    again enter through the Mariposa Pedestrian and all

3    claims asylum to CBP Officers."

4           Did I read that correctly?

5    A.    Yes.

6    Q.    What does it mean that an individual entered

7    through Mariposa Pedestrian?

8    A.    They walked up the -- from Mexico into the

9    pedestrian lane at Mariposa.

10   Q.    And in this case, they actually entered into

11   the United States; correct?

12   A.    Correct.  They came into the pedestrian area

13   at the Mariposa crossing.

14   Q.    And if you look at the last paragraph of

15   this e-mail, it says, "For us all to be on the same

16   page and to provide clear guidance to the

17   Supervisors and Officers, are we continuing" -- "are

18   we to continue taking any Mexican Nationals that

19   show up and claim asylum to the door or to any of

20   the Officers conducting borderline security,"

21   question mark.

22          What does it mean to take asylum seekers to

23   the door?

24   A.    One second, please.

25   Q.    Sure.  Take your time.



Page 106

1        A.   So I think he's saying, "Are we to continue

2    taking Mexican Nationals that show up and claim

3    asylum to the door," which I'm guessing he may be

4    referring to the turnstiles where CBP officers

5    conducting boundary line security.

6        Q.   That -- that means, should we continue

7    bringing Mexican Nationals to the -- to the border;

8    correct?

9        A.   Correct.

10                MS. SHINNERS:  Objection.  Vague.

11                THE WITNESS:  In this case, all those

12   that were brought in were on U.S. territory and were

13   processed.

14   BY MR. LEV:

15       Q.   How do you know that?

16       A.   Because our instructions were -- are, once

17   somebody is on U.S. territory, you do not return

18   them.

19       Q.   What is the practice he's referring to in

20   asking whether they should continue the practice of

21   taking Mexican Nationals to the door or to an

22   officer conducting border line security?  What was

23   that practice?

24       A.   I believe that -- that practice was that

25   Mexican Nationals were claiming fear of Mexico, we



Page 107

1    would take them; not Central American or other

2    countries.

3        Q.   It's not -- isn't it correct that this is

4    referring to Mexican Nationals who had not gotten

5    themselves on wait lists in Mexico but, instead, had

6    walked through Mariposa and were then sent back to

7    Mexico because they had entered out of turn?

8        A.   Well, it's true that they did enter out of

9    turn, but they were taken in and processed.

10       Q.   Well, what is it -- what is taking them to

11   the door or to an officer, how is that part of

12   processing if an officer conducted -- I'm sorry.

13            How is taking them to the door or to an

14   officer conducting border line security part of

15   asylum processing, sir?

16            MS. SHINNERS:  Objection.

17   Characterization of document.

18            THE WITNESS:  I would -- those that

19   came up where they say lane 8 in Mariposa Pedestrian

20   were never returned.  They came up, and we brought

21   them in and processed them.  We didn't return them.

22   They were processed.

23   BY MR. LEV:

24       Q.   So what does it mean -- what part of -- what

25   does it mean to take someone to the door or to an


MAGNA
LEGAL SERVICES

Page 108

1   officer conducting boundary line security as part of

2   asylum processing?

3        What part of the processing entails taking

4   somebody to the door or to an officer conducting

5   border line security -- boundary line security?

6   A.   Yeah.  I don't -- I think it's a poorly

7   written -- or I wouldn't have written it this way.

8   I don't know what he's referring to by "the door."

9   I can assume that it's somebody at the turnstile at

10  DeConcini possibly.  The officers conducting

11  boundary line security are the officers standing at

12  the international boundary.

13  Q.   And it's your testimony that this did not

14  involve returning Mexican Nationals who had entered

15  out of turn back to Mexico?

16  A.   Absolutely not.

17  Q.   Okay.  I would like to go back to your

18  Declaration, which is Exhibit 120, and on page 4 of

19  that Declaration, at Paragraph 9 --

20            MR. LEV:  Next page.  Sorry.

21  BY MR. LEV:

22  Q.   -- you see it says that, "Individual cases

23  alone can also require significant manpower and

24  affect our ability to process and hold other

25  aliens"?



Page 109

1           Did I read that correctly?

2      A.    Yes.

3      Q.    And then the paragraph goes on to describe

4  how an asylum seeker who arrived at the POE on

5  August 24th, 2019, required hospitalization, and it

6  describes the resources it took to drive him to the

7  hospital and watch over him.

8           Do you see that?

9      A.    Yes, I do.

10     Q.    What records did you review to identify the

11 information that sets -- that is set forth in

12 Paragraph 9?

13     A.    Those are probably situational awareness

14 updates to us.

15     Q.    Would they be in e-mails, or are they in

16 some kind of log?

17     A.    There -- there would be -- probably in a

18 shift update.

19     Q.    Which is an e-mail or a --

20     A.    Yeah, every shift, an e-mail.

21     Q.    Okay.  Thank you.

22           MR. LEV:  And if we could take a look

23 at Exhibit 128, and we're going to be toggling back

24 and forth to 120 a bunch, and if we could, yeah,

25 expand that.  Thank you.



Page 110

1                    (Whereupon, Exhibit No. 128 was marked

2      for identification.)

3      BY MR. LEV:

4      Q.   This is an August 24, 2019, e-mail from

5      Claudia Zamora to NOG Command Staff and Nogales

6      Chiefs.  The subject is "MCAT Report 8/24/19."

7                    And this, in fact, is the Nogales MCAT

8      report for that day; correct?

9      A.   Correct.

10     Q.   And that report indicates that on the

11     morning of the day we were just talking about in

12     Paragraph 9 of your Declaration, August 24, the

13     Nogales POE was at 45 percent capacity; correct?

14     A.   There were ■ in our custody, yes.

15     Q.   And it says "45 percent of capacity";

16     correct?

17     A.   Yes, it does.

18     Q.   And this report, in fact, goes to CBP

19     headquarters; correct?

20     A.   Correct.

21     Q.   On a daily basis?

22     A.   Correct.

23     Q.   So they rely on the statistics and

24     information you're reporting here; correct?

25     A.   Yes, they do.



Page 111

1      Q.    Okay.  And if you look up about six columns

2  in, there's a column labeled, "Impact to Port

3  Operations."

4           Do you see that?

5      A.    Yes.

6      Q.    And for Nogales on that day, the entry is

7  "Negative"; right?

8      A.    That's what the entry says, yes.

9      Q.    It says the report was that there was no

10  impact -- no negative impact to port operations on

11  the date when this report was sent; correct?

12                MS. SHINNERS:  Objection to form.

13                THE WITNESS:  That -- that report is

14  sent at about 6 o'clock in the morning, so it

15  doesn't show all the activities that happened

16  throughout that day.

17  BY MR. LEV:

18      Q.    As of the time of the report, there had been

19  no impact to port operations; correct?

20      A.    That's what it says.

21           Go ahead.

22      Q.    No.  Go ahead.  I'm sorry.

23      A.    I know it says 9:50 a.m. there, but I think

24  that must have been 9:50 a.m. Eastern Time because

25  this report goes out very early in the morning.



Page 112

1      Q.   Okay.  But it is reporting that as of very

2   early in the morning on August 24, 2019, there was

3   no impact to port operations; correct?

4      A.   Yes.

5      Q.   And I'm assuming that's reflecting the prior

6   day; correct?

7      A.   That's -- that's reflect -- yes.

8              MR. LEV:  And if we could take a look

9   at Exhibit 129, please.

10             (Whereupon, Exhibit No. 129 was marked

11   for identification.)

12   BY MR. LEV:

13     Q.   And this is the MCAT report from the next

14   day, August 25th, 2019; correct?

15     A.   Yes.

16     Q.   And it is also showing where -- it's

17   showing, in fact, that for Nogales, you were at

18   55 percent capacity; correct?

19     A.   Correct.

20     Q.   And, again, it's indicating that there was

21   still no impact to port operations; correct?

22             MS. SHINNERS:  Object to the form.

23   This is not actually -- I just want to note that

24   that's -- the -- object to the form.  I don't want

25   to --



Page 113

1           Go ahead.  You can answer.

2           MR. LEV:  Let me re-ask the question.

3    BY MR. LEV:

4    Q.   The report indicates there was still no

5    impact to port operations, notwithstanding the need

6    to oversee the hospitalized individual you described

7    in Paragraph 9 of your Declaration; correct?

8    A.   That's what the report indicates as the

9    negative impact to --

10   Q.   Okay.  Thank you.

11          MR. LEV:  If we can go back to Exhibit

12   120 and Paragraph 10 of your Declaration on page 5?

13   I'm sorry.  It's document page 5, so it's probably

14   PDF page 6.

15   BY MR. LEV:

16   Q.   And Paragraph 10 states that -- about

17   halfway through, it says, "We can encounter multiple

18   seizures on the same day, requiring multiple

19   individuals involved to remain in custody and

20   processed for criminal prosecution."

21          Do you see that?

22   A.   Yes.

23   Q.   Okay.  And the paragraph -- and you would

24   have reviewed the same sort of shift logs for the

25   information in this paragraph?



Page 114

1      A.   Correct.

2      Q.   The paragraph then goes on to state that --

3  it gives a couple days of examples.  Among them, it

4  says, "On June 16th, 2019 and June 26th, 2019, we

5  processed three narcotic seizures and four narcotic

6  seizures, respectively."

7           Did I read that correctly?

8      A.   Yes.

9      Q.   And then it goes on to state "that the port

10 had to dedicate a portion of its holding capacity to

11 detain these individuals pending their criminal

12 prosecution, instead of using that space to detain

13 inadmissible aliens."

14          Did I read that correctly?

15     A.   You did.

16     Q.   And is it your testimony that had you not

17 had to detain these narcotics traffickers, you would

18 have processed additional asylum seekers on that

19 day?

20     A.   It is my testimony that we were -- we were

21 tasked with other responsibilities that day, part of

22 which included -- some of these would have to be

23 processed, to cancel their Visas before they would

24 go to -- to jail.

25          So they would be in the -- they would be in



Page 115

1    the -- gone through the detention to the Passport

2    Control Unit, had their visa canceled, and then they

3    would usually go on with the HSI agent to jail.

4        Q.    And let me ask the question a different way,

5    because I asked it poorly.

6            The last sentence there indicates that you

7    had to dedicate a portion of the holding capacity to

8    detain these individuals, and then my question for

9    you is whether the port would have processed

10   additional asylum seekers had it not had to detain

11   these individuals?

12       A.    I believe that we have to have space

13   reserved for contingencies that could happen over

14   the period of a day.

15       Q.    So I'll take that as a no.

16            MR. LEV:  If we can take a look at

17   Exhibit 130, please.

18            (Whereupon, Exhibit No. 130 was marked

19   for identification.)

20   BY MR. LEV:

21       Q.    This is a June 17th MCAT report from

22   Nogales; correct?

23       A.    Yes.

24       Q.    And the report indicates that on the morning

25   after the first date we were just talking about --



Page 116

1   right?  We talked about June 16th in your

2   Declaration.  There were three narcotic seizures

3   that necessitated detention.  On the morning after

4   that date, the POE was only at 73 percent capacity;

5   correct?

6       A.   Yes, with ■ in custody.

7       Q.   Yeah.

8            And that there was no impact to port

9   operations on that day, notwithstanding these

10  additional detentions; correct?

11           MS. SHINNERS:  Object to the form.

12           THE WITNESS:  I don't think this was

13  where they would report such things as three

14  narcotic loads for MCAT reporting purposes.

15  BY MR. LEV:

16      Q.   Right.

17           But this is where they would report any

18  negative impact to the port operations; correct?

19      A.   That's what it says there, but I don't think

20  they took into consideration the three loads they

21  had the day before I guess is what I'm saying.

22      Q.   Okay.  So the three loads the day before did

23  negatively impact port operations --

24      A.   No.  We were able to handle it.

25      Q.   -- or it did not negatively impact port


MAGNA
LEGAL SERVICES

Page 117

1   operations?

2       A.   The Chief there reported negative impact to

3   operations.

4       Q.   Do you have any reason -- do you have any

5   reason to think that the Chief was reporting things

6   incorrectly?

7       A.   No, I don't.  I think that he didn't take

8   into mind that there are three loads, but he

9   reported negative impact then.  I'm fine with that.

10      Q.   Do you have any reason to think that he was

11  reporting things incorrectly, sir?

12      A.   Not on this day, no.

13      Q.   Okay.  And if we go back to --

14           MR. LEV:  I'm sorry.  Can we go to

15  Exhibit 131, please?

16           (Whereupon, Exhibit No. 131 was marked

17  for identification.)

18  BY MR. LEV:

19      Q.   And if we go to the second page of this

20  exhibit, this is the MCAT report from the Tucson

21  Field Office from June 7, 2019 [sic]; correct?

22      A.   That's -- that's the report from the Nogales

23  Port of Entry; not the Tucson Field Office.

24      Q.   Okay.  Thank you.  Correct.

25           So this is the report from the Nogales Port



Page 118

1    of Entry from June 27th, 2019, which is the day

2    after the second date we were discussing in your

3    Declaration.  You had a number of narcotic seizures

4    on June 26th.

5          And on that -- on June 27th, the port's

6    capacity was only 55 percent; correct?

7        A.   Correct.

8        Q.   And, again, there was no negative impact to

9    port operations as a result of these narcotic

10   seizures; correct?

11       A.   Correct.

12       Q.   Let's go to Paragraph 13 of your

13   Declaration.

14              MR. LEV:  And, I'm sorry.  That would

15   be -- I didn't write down the page numbers.  I'll

16   try page 7.

17   BY MR. LEV:

18       Q.   Paragraph 13 states that you're sending --

19   you're offering the information in the subsequent

20   subparagraphs to, quote, illustrate why the PO --

21   the Nogales POE may be limited in its ability to

22   process aliens without documents for lawful entry to

23   the United States at any given day.

24              Did I read that correctly?

25       A.   That's the top paragraph?



Page 119

1    Q.   Yes.  The second sentence of that top

2    paragraph.

3    A.   Yes.

4    Q.   Did the events that you describe in

5    Paragraphs 13(a), 13(b), and 13(c), in fact, limit

6    the Nogales Port of Entry's ability to process

7    asylum seekers on the dates described?

8    A.   They all illustrate that the port has many

9    responsibilities and to take 21 aliens in custody

10   for medical screening where the emergency room has

11   asked us to only take two at a time, that all --

12   that all affects our ability to operate.  We didn't

13   take 21 at a time.  We probably took two or three at

14   a time.

15   Q.   Right.

16        And you're referring to Paragraph 13(a)

17   where you talk about April 24th, 2019, when you took

18   21 aliens into custody, were taken for medical

19   screening?

20   A.   Correct.

21   Q.   Okay.

22        MR. LEV:  Can we take a look at

23   Exhibit 132, please?

24        (Whereupon, Exhibit No. 132 was marked

25   for identification.)



Page 120

```
 1    BY MR. LEV:

 2        Q.    And this is an MCAT report from the Nogales

 3    POE for April 25th, 2019; correct?

 4        A.    Yes, it is.

 5        Q.    And that report indicates that on the

 6    morning after these medical incidents we've just

 7    talked about in Paragraph 13(a), the POE was only at

 8    79 percent capacity; correct?

 9        A.    █████████ in custody, 79 percent.

10        Q.    And it also indicates that there was no

11    impact to port operations on that date,

12    notwithstanding the need for these medical

13    transports; correct?

14                  MS. SHINNERS:  Objection.  Form.

15                  THE WITNESS:  Correct.  That's what it

16    says.

17                  MR. LEV:  Why don't we take -- can we

18    take another five-minute break for us to regroup for

19    our final stretch here?

20                  MS. SHINNERS:  That's fine.  That works

21    for me.

22                  Mr. Humphries, maybe we can take a

23    quick break in the separate connection as well.

24                  THE WITNESS:  Okay.

25                  MR. LEV:  Thank you.
```



Page 121

1          THE VIDEOGRAPHER:  Off the record at

2    12:04 p.m.

3              (Recess taken.)

4          THE VIDEOGRAPHER:  We're back on the

5    record at 12:17 p.m.

6                   EXAMINATION

7    BY MS. WALTERS:

8     Q.   Good afternoon, Mr. Humphries.  My name is

9    Karolina, or Caroline, Walters, and I also represent

10   plaintiffs in this case, which we've mentioned.

11    A.   Good afternoon.

12    Q.   Good afternoon.

13         You previously testified that you understood

14   that you were designated as a CBP representative to

15   speak to Topic 15 on the 30(b)(6) Deposition Notice

16   that Mr. Lev showed you; correct?

17    A.   Yes.

18    Q.   Okay.  So my role here today is I'm going to

19   ask you questions about CBP's communications with

20   Mexican government agencies concerning metering,

21   queue management, or turnback, as is covered by

22   Topic 15.

23         Understood?

24    A.   Yes.

25    Q.   Great.



Page 122

1          So the same rules that Mr. Lev outlined at

2     the start of the deposition apply to my questioning

3     as well.

4          Understood?

5     A.   Yes.

6     Q.   Great.

7          And in particular, my questioning, if I ask

8     a question about your knowledge or your

9     understanding, I'm asking about your knowledge or

10    understanding in your professional capacity as a CBP

11    representative.  Okay?

12    A.   Okay.

13    Q.   Wonderful.

14         So I'm going to start by showing you what we

15    have marked as Exhibit 152, which bears the Bates

16    number AOL-DEF-00793546 through 547, and I'll

17    represent to you that Exhibit 152 is an

18    August 24, 2016, e-mail exchange from Joe Gonzalez

19    to you, among others, with the subject, "Forward:

20    San Luis FAMU surge."

21              (Whereupon, Exhibit No. 152 was marked

22    for identification.)

23              MS. WALTERS:  Kevin, if you can

24    highlight the first full e-mail in that chain, or

25    the e-mail at the top.



Page 123

1    BY MS. WALTERS:

2       Q.   Mr. Humphries, I'm going to ask you to take

3    a moment to review that first page of the e-mail and

4    just let me know verbally --

5       A.   Okay.

6       Q.   -- when you've done so --

7       A.   Okay.

8       Q.   Okay.  So this e-mail from Joe Gonzalez

9    responds to a request for information about a recent

10   surge of immigrants at the San Luis POE; correct?

11      A.   Correct.

12      Q.   And about halfway down the first page in the

13   middle of the bulletin points in blue, it says,

14   Mexican Immigration, quote, is unable to meter the

15   flow of migrants, end quote.

16           Did I read that correctly?

17      A.   You did.

18      Q.   So why would Mexican Immigration meter the

19   flow of migrants to the United States?

20      A.   I am not sure.

21           (Whereupon, Exhibit No. 142 was marked

22   for identification.)

23   BY MS. WALTERS:

24      Q.   Okay.  I would like to show you what we have

25   marked now as Exhibit 142, which bears the Bates



Page 124

1    No. AOL-DEF-00793564, and I'll represent to you that

2    Exhibit 142 is a November 22, 2016, e-mail from

3    Brian Levin to you, forwarding an e-mail from

4    William Brooks, with the subject, "Metering Flow."

5           So I would like to draw your attention to

6    the first full sentence of the second paragraph of

7    Mr. Brooks' initial e-mail.  It states, and I quote,

8    HQ asked that each port management work with their

9    Mexican counterparts to meter the follow -- I think

10   that's meant to be flow -- of Haitians, South, and

11   Central Americans.

12          Did I read that correctly?

13      A.  You read the follow -- yes.

14      Q.  So CBP asked Mexican Immigration to help

15   meter migrants; correct?

16      A.  "HQ asked that port management work with

17   Mexican counterparts," is what it says.

18      Q.  Yes, but work with Mexican counterparts to

19   meter?

20      A.  To meter, yes.

21      Q.  Okay.  So going back to Exhibit 152 -- just

22   so you have it before you, I'll wait for the screen

23   to come up.

24          But you said you didn't -- you testified

25   that you didn't know why Mexican Immigration was



Page 125

1     unable to meter the flow, but what does that mean,

2     that they're unable to meter the flow?

3          A.   I don't understand --

4               MS. SHINNERS:  Objection.

5     Mischaracterizes the question and answer.

6               But you can answer.

7               THE WITNESS:  I don't quite

8     understand -- let me -- I really can't remember what

9     Mexican Immigration would do to meter the flow other

10    than managing the list.

11    BY MS. WALTERS:

12         Q.   Okay.  And what do you mean by "managing the

13    list"?

14         A.   Well, if there was a list of those waiting

15    in line.

16         Q.   And Mexican Immigration would manage that

17    list?

18         A.   Mexican Immigration would have a list, yes.

19         Q.   And so what is that a list of?

20         A.   Those waiting to enter the U.S. without

21    documents.

22         Q.   And what would Mexican Immigration do with

23    the information on that list?

24         A.   I believe -- I believe they would wait for

25    the Port of San Luis to contact them to send over a



Page 126

1    certain number when they were able to process

2    additional.

3         Q.   And the CBP officers at the Port of San Luis

4    would accept or process the individuals that Mexican

5    Immigration sent over.  Is that correct?

6              MS. SHINNERS:  Object to the scope

7    since it's specific to San Luis.

8    BY MS. WALTERS:

9         Q.   You may answer unless, Katherine,

10   you're instructing him not to.

11        A.   With respect to San Luis?

12        Q.   Yes.

13             The CBP officers at the Port of San Luis

14   would accept the individuals that Mexican

15   Immigration sent over from the list?

16        A.   That's correct, but I'm not sure that there

17   was a -- August of 2016, I'm not sure there was a

18   list at that time.

19        Q.   Okay.  And when are you sure that there was

20   a list?

21        A.   Well, I think once the Haitians came in,

22   which was probably September of 2016 probably, I

23   remember lists being -- there being a list at that

24   time.

25        Q.   And has there been a list since that time,



Page 127

1    September of 2016?

2        A.   I wouldn't think that there --

3             MS. SHINNERS:   Object to the scope.

4    BY MS. WALTERS:

5        Q.   Let me rephrase.

6             Has there been a list since September of

7    2016 for the Port of San Luis?

8             MS. SHINNERS:   Same objection as to

9    scope.  It's the same -- same one as it supports

10   specific practices, and I won't repeat it each time

11   it supports specific practice.  Thank you.

12            MS. WALTERS:   Understood.

13   BY MS. WALTERS:

14       Q.   You may answer, Mr. Humphries.

15       A.   I'm not sure that they have a list at this

16   time.

17       Q.   For how long are you sure that they had a

18   list?

19       A.   I was there during a period of September and

20   October 2016.  After that, the Haitian flow kind of

21   went further to the east to the Port of Nogales, and

22   I think San Luis' numbers subsided at that time, so

23   there was no need for a list.

24       Q.   Were you aware of a list at the Port of San

25   Luis anytime after October 2016?



Page 128

1    A.    It may have continued a little beyond that,

2    but I -- I do remember -- or I do believe that the

3    numbers subsided, and I don't think there was a need

4    to continue the list.  I'm not 100 percent positive.

5    Q.    Okay.  And you testified, Mr. Humphries,

6    that CBP -- or Mexican Immigration would receive a

7    call from CBP.

8          Is that how CBP officers communicate with

9    Mexican Immigration at the San Luis POE?

10   A.    I'm not sure how it is at the San Luis POE.

11   I was referring to the Nogales.

12   Q.    Okay.  So that's a good point.

13         So how do CBP officers communicate with

14   Mexican Immigration at the Nogales POE?

15   A.    By telephone.

16   Q.    Any other method of communication?

17   A.    Not that I'm aware of.

18   Q.    Just because you said "telephone," I'm going

19   to follow up with, are you aware of any text

20   messaging or that type of use of telephones as well?

21   A.    Not that I'm aware of.  I believe phone

22   calls to a person.

23   Q.    And is that as of 2016?

24   A.    No.  That's probably as of August of 2019, I

25   believe.



Page 129

1    Q.   So CBP officers at the Nogales Port of Entry

2    did not communicate with Mexican Immigration by

3    telephone prior to August 2019?

4    A.   I don't think they contacted Mexican --

5    INAMI for the purpose of bringing undocumented

6    individuals to the port before then.

7    Q.   So, first of all, could you please tell me

8    what INAMI is?

9    A.   INAMI is Mexican Immigration service.

10   Q.   Is it the only Mexican Immigration service?

11   A.   It is, I believe, their Mexican Immigration

12   service.  I think they have different divisions, but

13   I think INAMI is the -- the agency at the federal

14   level.

15   Q.   And who's Grupo or Grupo Beta?

16   A.   So Grupo Beta, I believe, is one of the

17   those other parts of INAMI.  I believe they are

18   INAMI, but they're a separate group that really work

19   on -- on the exterior of the ports.  Between the

20   ports of entry, I believe.

21                 (Whereupon, Exhibit No. 155 was marked

22   for identification.)

23   BY MS. WALTERS:

24   Q.   All right.  At this point, I would like to

25   show you Exhibit 155.



Page 130

```
 1            So this exhibit bears the leading

 2    Bates No. AOL-DEF-01267493 through 494.  I'll

 3    represent to you that Exhibit 155 is a

 4    November 17, 2016, e-mail exchange from Jesus Cruz,

 5    or perhaps Jesus Cruz, directed to you, with the

 6    subject, "Regarding asterisk, asterisk, asterisk,

 7    RFI, asterisk, asterisk, asterisk, Please Provide

 8    Response by COB today."

 9        A.   Yes.

10        Q.   Do you see that?

11        A.   Yes.

12        Q.   And Jesus Cruz was the Watch Commander of

13    the Nogales POE at the time.  Is that correct?

14        A.   I believe at the time he was -- yes, he was

15    a Watch Commander then.

16        Q.   And do you have any reason to question the

17    accuracy of the answers he provides in this e-mail?

18        A.   Can I read it first?

19        Q.   Yes.  I'm sorry.  Please take a moment, and

20    let me know when you've done so.

21        A.   And can I read the whole thing or just -- I

22    need to read just this area?

23        Q.   No.  You may read the whole thing,

24    absolutely.

25        A.   I just want to see what the ask was, it
```



Page 131

1    looks like, from headquarters.

2        Q.    Sure.

3             MS. WALTERS:  Kevin, perhaps if you

4    could -- yes.  It might extend onto the -- yeah.

5    BY MS. WALTERS:

6        Q.    So do you see the question -- it's actually

7    on this highlighted portion Kevin has up for us

8    right now -- is the POE/crossing metering OTMs,

9    question mark, Question No. 1?

10       A.    Yes.

11       Q.    And what does "OTM" stand for?

12       A.    "Other than Mexican."

13       Q.    Okay.  And the response to the question in

14   part is, "the Port of Nogales is metering OTMs."

15            Did I read that correctly?

16       A.    Yes.

17       Q.    And in response to Question 2, which is,

18   "Who was doing the metering?  CBP or Mexico?"

19   Mr. Cruz or Officer Cruz responds, "The metering is

20   done by Mexican Immigration in Nogales, Mexico."

21            Did I read that correctly?

22       A.    Yes.

23       Q.    And, finally, in response to Question 5, "If

24   the metering is done by Mexico, how is the POE

25   communicating the number of OTMs to be metered to



Page 132

1   the POE?"

2          The response from Nogales in 2016 is, "We

3   met with Mexican Immigration and agreed that we

4   would call them on the phone used for repatriations

5   and they would send an officer to meet us.  We tell

6   them how many persons we can take, and they will

7   bring the person to the pedestrian area for us to

8   take in."

9          Did I read that correctly?

10   A.    Yes.

11   Q.    So in 2016, CBP at Nogales was communicating

12   with Mexican Immigration to help meter the flow.

13   Isn't that correct?

14   A.    Yes.  I believe at the port of entry.

15             (Whereupon, Exhibit No. 154 was marked

16   for identification.)

17   BY MS. WALTERS:

18   Q.    Okay.  And now I would like to show you

19   Exhibit 154, which bears the

20   Bates No. AOL-DEF-01266769.

21          I'll represent to you that this exhibit is a

22   November 16, 2006 [sic], e-mail from David Figueroa

23   to John Schwamm, cc'ing you, among others, with the

24   subject, "San Luis-UDAs in custody/seizure activity

25   for 11/16/2006 [sic] Day Shift."



Page 133

 1              What does "UDA" stand for?

 2       A.    "Undocumented aliens."

 3       Q.    And David Figueroa is a supervisory CBP

 4  officer - admissibility at this Port of San Luis,

 5  Arizona; correct?

 6       A.    Supervisory CBP officer, yes.

 7       Q.    And do you have any reason to doubt the

 8  accuracy of the information he provides in this

 9  e-mail?

10       A.    No.

11       Q.    Okay.  So about halfway down the page,

12  there's a sentence that reads, quote, "A total of 28

13  bodies were summoned from Grupo Beta and will be

14  arriving shortly."

15              MS. WALTERS:  Kevin, can you highlight

16  that?  It's maybe a third of the way down the page.

17  BY MS. WALTERS:

18       Q.    Did I read that correctly?

19       A.    You read that correctly.

20       Q.    And is "bodies" a reference to asylum

21  seekers?

22              MS. SHINNERS:  Object to the form.

23              You may answer.

24              THE WITNESS:  I believe they were

25  asking for 28 undocumented persons to be taken to



Page 134

```
 1    the port for processing.
 2    BY MS. WALTERS:
 3        Q.   And would those undocumented persons include
 4    asylum seekers?
 5        A.   Yes.  I think they would all be asylum
 6    seekers in the end.
 7        Q.   Okay.  And now towards the bottom of the
 8    page, directly above the word "Seizures," there's a
 9    sentence that reads, "Approximately 112 asylum
10    seekers waiting to enter per Luis from BETA."
11            Did I read that correctly?
12        A.   You did.
13        Q.   And is "BETA" short for Grupo Beta?
14        A.   I am guessing yes.
15        Q.   Okay.  And who is "Luis"?
16        A.   Luis is probably an employee of Grupo Beta.
17    Again, I'm just guessing.
18        Q.   But based on your knowledge, that's a --
19    that's your guess.  Is that correct?
20        A.   Based on reading this, I mean, it makes
21    sense that Luis is an employee of INAMI, their Grupo
22    Beta.
23        Q.   Okay.  And so, to your knowledge, does Luis
24    or another member of Grupo Beta regularly report to
25    San Luis CBP officers about the number of migrants
```



Page 135

1    waiting to be processed by CBP?

2        A.    I don't know the answer to that.

3        Q.    Okay.  What was the process for CBP to

4    summon a certain number of asylum seekers at the San

5    Luis POE?

6        A.    I'm not positive.  Maybe they would go to

7    the line and ask or maybe they made a phone call.

8    I'm not positive.  I'm not sure.

9        Q.    And when you say "they would go to the

10   line," do you mean CBP would go to the line?

11       A.    Right, to the international boundary line

12   where people were waiting.  I'm not even sure there

13   were people waiting.  If not, they would probably --

14   you know, I'm speculating here.

15       Q.    Okay.  So for Nogales, did INAMI report the

16   number of migrants waiting to be processed at the

17   Nogales POE?

18       A.    I think Nogales -- at Nogales, from time to

19   time, we were given numbers waiting at the shelters.

20       Q.    And when you say "from time to time," over

21   what time period?

22       A.    From definitely and for sure in 2019.  I'm

23   not sure previous to that.  Possibly.

24       Q.    And when you say "for sure in 2019," how

25   frequently in 2019 were you given -- was the Port of



Page 136

1    Nogales given this information regarding the number

2    of migrants waiting to be processed?

3        A.   So I believe at one point it was given

4    weekly, just a number of those in shelters are

5    waiting.

6        Q.   Can anybody hear me?

7        A.   Yeah, I hear you.

8                MS. WALTERS:  I'm so sorry.  I'm having

9    a bit of a computer issue.  I can hear you, but I

10   can't see you, sir.

11               THE WITNESS:  Can anybody else see me?

12               MR. LEV:  I can see you.

13               MS. WALTERS:  I'm sorry.  I think my

14   computer did something.

15               MS. SHINNERS:  Should we go off the

16   record for a moment, Caroline?

17               MS. WALTERS:  Can we just go off for

18   one second?

19               THE VIDEOGRAPHER:  Off the record at

20   12:41.

21               (Recess taken.)

22               THE VIDEOGRAPHER:  We're back on the

23   record at 12:46 p.m.

24   BY MS. WALTERS:

25       Q.   So apologies for the interruption.  Thank



Page 137

1    you for your patience.

2            Mr. Humphries, I'm just going to ask one

3    more time because of the disruption.

4            So you said from time to time in 2019, and I

5    was wondering if you could be a little more specific

6    about that, how frequently INAMI would report the

7    number of migrants waiting to be processed to the

8    Nogales POE?

9    A.   So I believe we would get an update from

10   them weekly.  I think it was every Monday.  Not --

11   not positive.

12   Q.   But, Mr. Humphries, you are the 30(b)(6) for

13   communications on this Topic 15 at Nogales from 2016

14   to the present.  Is that correct?

15   A.   Correct.

16           (Whereupon, Exhibit No. 156 was marked

17   for identification.)

18   BY MS. WALTERS:

19   Q.   Okay.  And -- so at this point, I would like

20   to show you Exhibit 156, which bears the leading

21   Bates No. AOL-DEF-00788035 through 88036.  I'll

22   represent to you that 156 is an August 21, 2019,

23   e-mail between George Campos and Bonnie Arellano,

24   cc'ing you, among others, with the subject,

25   "Shelters and Metering."



Page 138

1          And I'm going to ask you to just pause a

2    little bit between the initial e-mail, which is

3    found at the bottom of the second page of

4    Exhibit 156 from Bonnie Arellano, and then the last

5    e-mail at the bottom of the first page.

6              MS. WALTERS:  So for right now, Kevin,

7    if you could just allow Mr. Humphries to review this

8    e-mail from Mrs. Arellano.

9    BY MS. WALTERS:

10    Q.   And just let me know when you've done so,

11   Mr. Humphries.

12    A.   Okay.  Okay.

13    Q.   So Question 2 in Ms. Arellano's e-mail there

14   is, quote, Who manages the metering -- is it an

15   entity within the GOM or a shelter entity?

16          Did I read that correctly?

17    A.   Yes.

18    Q.   And "GOM" stands for "Government of Mexico";

19   correct?

20    A.   Correct.

21    Q.   And now if you could look at Officer Campos'

22   response, which is at the bottom of the first page

23   of Exhibit 156, and I'll let you read the whole

24   e-mail, and just let me know when you've done so.

25    A.   Okay.



Page 139

1       Q.    And Officer Campos' response to Question 2

2   is, "The PCU Chief will coordinate with INAMI."

3             Did I read that correctly?

4       A.    Yes.

5       Q.    And what does "PCU" stand for?

6       A.    The Passport Control Unit.

7       Q.    Okay.  Now, going back to the e-mail at the

8   top of the second page from Ms. Arellano, Question 3

9   is, "What coordination does your port do with GOM

10  related to metering?"

11            Did I read that correctly?

12      A.    Yes.

13      Q.    And apologies, Kevin, but going back to

14  Officer Campos' response at the bottom of the first

15  page of Exhibit 156, his response is, "PCU Chief

16  communicates with INAMI, and they will contact the

17  coordinator for the shelters."

18            Did I read that correctly?

19      A.    Yes.

20      Q.    And what happens after INAMI contacts the

21  coordinator for the shelters?

22      A.    Well, INAMI is a Mexican federal agency, and

23  I really don't know what they're doing.  We contact

24  INAMI, and at some point the persons are brought to

25  the port of entry.



Page 140

```
 1        Q.    Okay.  And so CBP relies on the information

 2    from INAMI regarding who to process in order to

 3    process the asylum seekers that arrive.  Is that

 4    correct?

 5        A.    Well, INAMI is -- INAMI are the ones that

 6    bring people to the port for processing.

 7        Q.    And so you rely on that information.  You

 8    process those people.  Is that correct?

 9        A.    If they come with INAMI --

10              MS. SHINNERS:  Objection.  Compound.

11              Go ahead.

12    BY MS. WALTERS:

13        Q.    You may answer.

14        A.    If INAMI brings them over, we're going to

15    take them in, if we've called INAMI to bring over

16    some.

17        Q.    Okay.  And so in 2000- -- at least as

18    recently as August 2019, CBP officers in Nogales

19    regularly communicated with INAMI by phone to

20    coordinate metering.  Is that correct?

21        A.    From 2000- -- August of 2019, the PCU for

22    CBP Nogales Port of Entry will communicate with

23    INAMI to bring people for processing as we're able

24    to receive them.

25        Q.    And that communication is done by phone.  Is
```



Page 141

1    that correct?

2         A.   Yes.

3         Q.   And similar communication was also done in

4    2016.  Is that correct?

5         A.   According to -- yes, according to the

6    previous exhibit.

7         Q.   And, again, you're the 30(b)(6) for

8    communications at Nogales from 2016 to the present,

9    so if that were incorrect, you would know that;

10   correct?

11        A.   Well, I hadn't seen --

12             MS. SHINNERS:  Object to the form.

13   BY MS. WALTERS:

14        Q.   You may answer.

15        A.    I hadn't seen that previous exhibit until

16   now, and I didn't go to the Nogales Port of Entry

17   until November of 2019, but this was the first time

18   I had seen that one e-mail --

19        Q.   But you are designated as the 30(b)(6)?

20        A.   -- from 2016.

21        Q.   Yes.

22             But, sire, you're designated as the 30(b)(6)

23   representative on Topic 15 from 2016 to the present

24   for Nogales.  Is that correct?

25        A.   That's correct.



Page 142

```
1                    MS. WALTERS:  Okay.  So at this moment,
2       Katie, I see that -- at least according to my
3       calculations, I believe we've reached the
4       agreed-upon time for plaintiffs' portion of this
5       deposition, and so I think at this point we need to
6       stop our questioning.
7                    MS. SHINNERS:  Okay.  We agree with
8       that.
9                    MS. WALTERS:  Okay.
10                   MS. SHINNERS:  If perhaps we can go off
11      the record and take a quick break or maybe a longer
12      break?
13                   MS. WALTERS:  Yes, certainly.
14                   Do you want -- do you want to give us a
15      sense of how long you may need so that we're not
16      just constantly checking back in?
17                   MS. SHINNERS:  Sure.  Why don't we go
18      off the record and then we can discuss.  Is that
19      okay?
20                   MS. WALTERS:  How long -- I'm just
21      asking, do you need like a half an hour or -- so we
22      can go --
23                   MS. SHINNERS:  I'm thinking about --
24                   MS. WALTERS:  Off the record, yeah.  My
25      apologies.
```



Page 143

1          THE VIDEOGRAPHER:  Off the record at

2    12:54 p.m.

3          (Recess taken.)

4          THE VIDEOGRAPHER:  We're back on the

5    record at 1:37 p.m.

6                    EXAMINATION

7    BY MS. SHINNERS:

8      Q.   Mr. Humphries, good afternoon.  I'm just

9    going to ask you a few question to follow up on some

10   of the topics that plaintiffs' discussed --

11   plaintiffs' counsel discussed with you earlier

12   today.

13          First, is it typical for the Nogales Port of

14   Entry to be at 100 percent detention or physical

15   capacity?

16     A.   No, it isn't.

17     Q.   And why is that?

18     A.   Well, the way our detention is set up, we

19   have to be -- there may be cases, such as

20   transgenders that identify as females, transgenders

21   that identify as males, unaccompanied alien

22   children, they -- they all have to be isolated from

23   the general population.

24          There's family units headed by a male,

25   family units headed by females.  There's single



Page 144

1    adult males, single adult females.  And then

2    there's -- we've had cases of HIV, chickenpox, head

3    lice, scabies.

4          So in those cases, somebody that -- you

5    know, an area that can hold seven is going to hold

6    one, and so that kind of affects the numbers we're

7    able to have in detention at that particular moment.

8    Q.   If you were -- if you were at 100 percent

9    capacity or more, would there be any negative impact

10   on detainees?

11   A.   Well --

12             MR. LEV:  Objection.  Calls for

13   speculation.

14             You can answer.

15             THE WITNESS:  I want to make sure that

16   everybody -- that we're providing the proper care to

17   everybody in our custody, that there are no

18   incidents.  We don't want any spread of virus or

19   anybody getting sick or -- or being sick and

20   spreading it in our custody.

21             We have to make sure that, for example,

22   the vulnerable population, such as the transgenders,

23   we have to take the utmost care and give them the

24   most protection available.

25   ///



Page 145

 1    BY MS. SHINNERS:

 2        Q.   Are there -- are there other impacts of

 3    being at 100 percent more capacity on detainees or

 4    on port operations?

 5                    MR. LEV:  Objection.  Vague.

 6                    THE WITNESS:  Can you repeat it?

 7    BY MS. SHINNERS:

 8        Q.   Sure.

 9             If Nogales were at -- if the Nogales Port of

10    Entry were at 100 percent capacity or greater, are

11    there any other impacts on detainees in custody that

12    you would experience?

13                    MR. LEV:  Objection.  Calls for

14    speculation.

15                    THE WITNESS:  I would answer that,

16    saying that in order to give the utmost care and

17    proper care to everybody, we have our detention area

18    set up where Hospice can pretty much see everybody

19    in our custody.

20                    When we start getting up to those

21    larger numbers, you can't feed everybody, you know,

22    above 100 percent that are in our custody at all

23    times.

24                    The other problem I see or I know is

25    that if we get to a number in a rather, you know,


MAGNA
LEGAL SERVICES

Page 146

1   fast period or a short period of time, not all --

2   we're not able to give them all a medical -- a

3   medical screening, medical exam.

4              And so we have to -- we have to make

5   sure that, No. 1, everybody in our custody is safe

6   and secure and we're medically not spreading disease

7   or anything or need other issues that require

8   further medical care or hospitalization.

9   BY MS. SHINNERS:

10    Q.    Okay.  Mr. Humphries, earlier Mr. Lev of

11   plaintiffs' counsel showed you an e-mail from the

12   Director of Field Operations, including a request to

13   go to 20 percent capacity.

14              Do you recall that document?

15    A.    Yes, I do.

16    Q.    Okay.  And was that document reflecting a

17   request to permanently go to 20 percent capacity?

18    A.    No, it was not.

19    Q.    What is your understanding of the context of

20   that request and the reason why it was made?

21    A.    That was during the time when there was

22   large groups of individuals heading up from --

23   through Central America and Mexico to get to the

24   U.S. border.

25              It was widely publicized in the media to




Page 147

1    include when the port of entry on the

2    Mexico/Guatemala border was compromised, gates were

3    knocked down, and -- and so we had to prepare for

4    that.  And I think Bill was saying those large

5    groups were headed our way, so we had to be ready to

6    take those into custody if there was a rush at the

7    port.

8          It was a temporary thing.

9    Q.    Okay.  Thank you, Mr. Humphries.

10          MS. SHINNERS:  One moment.

11          All right.  I have no further questions

12    for you, Mr. Humphries.  Thank you so much for your

13    time.

14          THE WITNESS:  Thank you.

15          MR. NAZAROV:  Thank you for your time,

16    sir.

17          THE WITNESS:  Thank you.

18          MR. LEV:  Thank you, Mr. Humphries.  I

19    appreciate your time.

20          Katie, we're going to keep the

21    deposition open for three reasons.  One is

22    Mr. Humphries' lack of knowledge of communications

23    at Nogales prior to his tenure there.  The second is

24    the production of text messages that we understand

25    are still forthcoming and that we don't have, and



Page 148

1     the third is our broader dispute regarding whether

2     this testimony should be limited to Nogales, as

3     opposed to the other ports of entry in the southwest

4     Border.

5               MS. SHINNERS:  Okay.  Well, we can

6     disagree, but we don't need to get into that there.

7     You're requesting to keep the deposition open, and

8     we disagree with that request, but we can work that

9     out at another time.

10              I do want to note that to the extent

11    that you are concerned about questions that relate

12    to ports of entry beyond Nogales, were you able to

13    ask the questions that you wanted to ask?

14              MR. LEV:  I was able to ask the

15    questions I was wanting to ask.  I just didn't -- I

16    wasn't getting informed answers from Mr. Humphries

17    because he indicated he didn't really know what was

18    happening at the --

19              MS. SHINNERS:  Okay.  All right.  Thank

20    you for your position.

21              The witness would like to take the

22    opportunity to read and sign the transcript.  And I

23    think that's it, then.  Correct, Ori?

24              MR. LEV:  I think so, yeah.  Thank you

25    very much, Mr. Humphries.



Page 149

1          THE VIDEOGRAPHER:  Off the record at

2     1:45 p.m.

3              (Deposition concluded at 1:45 p.m.)

4

5

           MICHAEL HUMPHRIES

6     30(B)(6) U.S. CUSTOMS AND BORDER PROTECTION

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 150

1    STATE OF ARIZONA    )

2    COUNTY OF MARICOPA )

3           BE IT KNOWN the foregoing deposition was

4    taken by me pursuant to stipulation of counsel; that

5    I was then and there a Certified Reporter of the

6    State of Arizona, and by virtue thereof authorized to

7    administer an oath; that the witness before me

8    testifying was duly sworn by me to testify to the

9    whole truth; pursuant to request, notification was

10   provided that the deposition is available for review

11   and signature; that the questions propounded by

12   counsel and the answers of the witness thereto were

13   taken down by me in shorthand and thereafter

14   transcribed into typewriting under my direction; that

15   the foregoing pages are a full, true, and accurate

16   transcript of all proceedings and testimony had and

17   adduced upon the taking of said deposition, all to

18   the best of my skill and ability.

19           I FURTHER CERTIFY that I am in no way

20   related to nor employed by any parties hereto nor am

21   I in any way interested in the outcome hereof.

22           DATED at Phoenix, Arizona, this 10th day of

23   May, 2020.

24

                   Alisa Smith, AZ CR

25                 AZ Certified Reporter No. 50712



**A**

**abilities** 38:17
**ability** 76:24
  81:23 87:23
  93:21 102:8
  108:24 118:21
  119:6,12
  150:18
**able** 39:23 43:9
  46:12 68:22
  76:25 77:14
  86:12 91:17
  93:7 116:24
  126:1 140:23
  144:7 146:2
  148:12,14
**absolutely**
  108:16 130:24
**accept** 76:24
  87:23 91:15
  96:1 103:9
  126:4,14
**accepting** 88:17
  90:20 92:2
**access** 59:16
**accommodate**
  46:12 47:3
**account** 14:4,6
**accuracy** 130:17
  133:8
**accurate** 6:21
  33:25 34:5
  150:15
**accurately** 32:10
**acting** 32:15,16
  32:19,22 33:8
  33:21 34:6,7
  47:19,21 48:5
**activities** 48:10
  55:1 64:8
  111:15
**activity** 28:13
  56:8 58:5
  132:24
**actual** 33:7 40:23

75:25
**add** 43:11 101:14
**added** 102:24
**addition** 34:6
**additional** 39:25
  43:16 44:12
  86:13 91:17
  92:24 93:5,6,7
  94:6 114:18
  115:10 116:10
  126:2
**adduced** 150:17
**administer** 150:7
**administrative**
  12:3
**admissibility**
  133:4
**adoption** 15:7
**adult** 144:1,1
**adults** 103:10,12
  103:13
**affect** 108:24
**affidavit** 12:16
  12:17 58:13
**afternoon** 121:8
  121:11,12
  143:8
**agencies** 15:14
  121:20
**agency** 21:4,6
  129:13 139:22
**agency's** 11:17
**agent** 115:3
**ago** 94:3
**Agosttini** 97:13
**agree** 7:13 43:19
  100:22 103:5,6
  142:7
**agreed** 58:16
  80:8 132:3
**agreed-upon**
  142:4
**agrees** 82:6
**Aguirre** 26:4,14
**ahead** 43:5 52:16
  60:25 82:24

91:24 102:5
  111:21,22
  113:1 140:11
**airport** 36:3,3
  48:12 49:8,25
**airports** 95:20
**al** 1:4,4,8 5:3
  17:4 22:8,11,15
  22:16,18 23:1,5
**alien** 82:19
  143:21
**aliens** 108:25
  114:13 118:22
  119:9,18 133:2
**Alisa** 1:24 2:5
  5:11 150:24
**allegedly** 44:9
**allow** 45:25 89:3
  89:21 92:24
  93:5 95:23
  138:7
**allowed** 9:17
  42:16 43:1
  83:13,23 84:16
  84:20 85:13
  86:25 87:21
  88:10 89:4,9,23
**allowing** 41:9
  85:10 87:10
**America** 94:18
  146:23
**American** 2:14
  5:18 47:16
  107:1
**Americans**
  124:11
**and/or** 15:5
**Angeles** 2:12
**answer** 6:20 7:8
  7:11,17,18,24
  18:2,5 21:16
  22:23 23:12,14
  23:16 27:12
  30:21 31:17
  36:11,18 37:1
  37:11,16,24

39:8 40:11
  42:22 44:1,3
  51:21,23 52:17
  53:24 54:6 55:7
  56:1,4 57:13,23
  64:2,15 65:3
  67:8,9,18 70:21
  71:1,1 73:2,4,9
  74:13 78:5
  83:25 84:5,7
  88:22 91:5
  93:16,18 102:1
  113:1 125:5,6
  126:9 127:14
  133:23 135:2
  140:13 141:14
  144:14 145:15
**answered** 31:22
  54:5
**answering** 7:7
  57:14 82:2
  102:2,7
**answers** 31:8
  102:3 130:17
  148:16 150:12
**anybody** 22:5
  26:18 72:18
  75:6,10,12
  77:13 89:17,21
  100:14 136:6
  136:11 144:19
**anytime** 127:25
**AOL-DEF-O1...**
  130:2
**AOL-DEF-007...**
  137:21
**AOL-DEF-007...**
  122:16
**AOL-DEF-007...**
  124:1
**AOL-DEF-012...**
  132:20
**APD** 25:24,25
**apologies** 136:25
  139:13 142:25
**apologize** 64:3

**appearances**
  5:14
**appearing** 2:4,9
**applicability**
  79:6
**apply** 71:22 72:8
  72:12 122:2
**applying** 38:15
  45:1
**appreciate** 61:11
  147:19
**approach** 72:7
  73:25 75:16
  76:21 82:11
  84:19
**approached**
  43:20 64:25
**approaching**
  71:19,21 80:21
  81:16
**approximately**
  7:22 50:22
  59:24 98:16
  103:3 134:9
**April** 1:14 2:3
  5:6 70:5,23
  77:15,18 78:24
  79:13 119:17
  120:3
**area** 10:15 33:8
  33:23 34:10
  43:16 47:23
  48:5,6 94:9,11
  94:13 96:11
  98:1,18,19,20
  99:2,22 105:12
  130:22 132:7
  144:5 145:17
**areas** 100:12
**Arellano** 97:13
  137:23 138:4,8
  139:8
**Arellano's**
  138:13
**Ari** 2:18 5:24
**Arizona** 1:15 2:6



MAGNA
LEGAL SERVICES

10:15 36:1
42:12 44:14
46:8 64:18
73:24 90:4
133:5 150:1,6
150:22
**arrangements**
40:1
**arrested** 13:10
**arrival** 74:17
**arrive** 140:3
**arrived** 109:4
**arriving** 39:16
44:22 69:15
133:14
**article** 28:21 29:4
29:4
**articles** 28:16,20
29:1
**asked** 16:24
19:12 23:13,15
23:15,22,24
26:6 30:16 31:1
40:23 47:3
53:25 64:10,13
73:5 74:15
78:21 97:6
115:5 119:11
124:8,14,16
**asking** 6:15
16:14 26:12
30:22 31:1
57:10 101:6,7
106:20 122:9
133:25 142:21
**assigned** 61:17
62:10,13 99:21
**Assistant** 19:3
25:22 32:20,25
35:18 37:19
38:3 44:15
**Assisting** 64:5
**assume** 7:11 48:4
49:14 108:9
**Assumes** 40:8
**assuming** 112:5

**asterisk** 130:6,6
130:6,7,7,7
**asylum** 3:23 4:18
37:22 38:9 39:3
40:5,6,15 48:24
62:18,23 63:3,9
63:17 64:24
70:8,16,17,18
71:14,16,19,20
71:23 72:1,6,22
73:19,25 74:2,6
74:21 76:20
77:7,17,22 78:2
78:23 79:15,21
80:20 81:16
82:10 83:2,12
84:12,19 85:7
88:9,11 89:7
90:16 91:17
92:24 93:5 94:6
96:1 104:4,17
104:18,23
105:3,19,22
106:3 107:15
108:2 109:4
114:18 115:10
119:7 133:20
134:4,5,9 135:4
140:3
**attaching** 3:13,15
3:17,19,21
**attempt** 46:25
98:2
**attempting** 43:21
**attention** 124:5
**attorney** 51:20
**attorneys** 7:15
9:18
**audible** 6:22
**audio** 6:24 45:12
62:3 74:18
80:10 83:4
**August** 33:17,20
38:6 109:5
110:4,12 112:2
112:14 122:18

126:17 128:24
129:3 137:22
140:18,21
**authorized** 150:6
**available** 12:25
20:5 40:13
144:24 150:10
**Avenue** 2:12,20
**aware** 63:2 69:7
69:21 70:2
73:18,24 77:20
77:25 94:17
127:24 128:17
128:19,21
**awareness**
109:13
**AZ** 1:24,25
150:24,25
**A-g** 26:4
**A-g-u-i-r-r-e**
26:4
**a.m** 2:3 5:7 60:5
60:8 78:15,18
83:8 99:12
103:23 104:1
111:23,24

---

**B**

**Bachelier** 95:14
**back** 16:12 17:20
17:21 23:23
34:2 41:5 50:10
59:19 60:7 61:4
68:6 78:17
80:12,22 81:3
83:7 99:25
103:25 104:5
107:6 108:15
108:17 109:23
113:11 117:13
121:4 124:21
136:22 139:7
139:13 142:16
143:4
**background** 80:5
**backpack** 20:9

**Baldenegro**
71:13 95:14
**based** 58:3 73:9
75:4 92:1,2,3
93:10,16,21
101:12 134:18
134:20
**basis** 32:15 43:15
47:21 56:6,11
56:24 57:4 59:1
66:7 79:23 81:9
81:15 82:10
94:4 101:20
110:21
**Bates** 122:15
123:25 130:2
132:20 137:21
**Baxter** 95:14
**bears** 122:15
123:25 130:1
132:19 137:20
**began** 44:25
87:19 89:17
**beginning** 63:22
**begins** 5:2
**behalf** 15:12,20
75:11 82:6
**belief** 66:7
**believe** 12:17
14:21 17:1,7,13
26:21 27:2 29:3
31:8 34:20 39:1
39:2 41:2 47:11
55:10 58:15
61:5 62:22
64:16 66:5,12
67:25 68:2,3,3
72:5 77:18
78:20 79:3,7,11
79:13 87:1,7
88:1,4,24 89:18
89:20,25 90:1
90:10 91:2,13
106:24 115:12
125:24,24
128:2,21,25

129:11,16,17
129:20 130:14
132:14 133:24
136:3 137:9
142:3
**Bequette** 26:15
**best** 75:14 102:8
150:18
**Beta** 129:15,16
133:13 134:10
134:13,13,16
134:22,24
**better** 18:15,15
46:12,24
**Beverly** 97:2
**beyond** 74:25
100:12,13
128:1 148:12
**Bill** 147:4
**bit** 10:19 14:11
66:10 74:5
79:20 84:23
136:9 138:2
**blocks** 104:14
**blue** 123:13
**bodies** 133:13,20
**body** 11:24 12:2
**Bonnie** 97:12
137:23 138:4
**border** 1:13 2:2
3:3 6:5 8:12
14:19 32:20,25
35:18,21 36:4
36:13,19 37:6
37:20 38:4
40:21 42:5,17
42:25 43:1,13
43:20 44:10,16
50:3 64:6 71:22
75:25 76:1
89:16,18 95:20
95:25 104:6
106:7,22
107:14 108:5
146:24 147:2
148:4 149:6



**borderline**
105:20
**bottom** 96:21,22
96:23,24 134:7
138:3,5,22
139:14
**boundary** 40:23
41:8,15,19,23
62:5,9 66:2,8
66:13 75:21,23
76:19 80:2 81:1
106:5 108:1,5
108:11,12
135:11
**breach** 94:23,23
**break** 7:23,25
58:18 59:6,13
60:14 103:16
120:18,23
142:11,12
**breaks** 7:22 9:20
9:24
**Brenda** 88:2,3,12
89:13,23 90:8
90:14 91:3
**Brian** 124:3
**bring** 44:12
68:20 85:22,25
86:12 91:21,21
91:25 92:1,7,10
93:7 94:1,6
132:7 140:6,15
140:23
**bringing** 45:18
106:7 129:5
**brings** 140:14
**Briseno** 104:14
**broader** 79:6
148:1
**broke** 41:11
94:19
**Brooks** 124:4,7
**brought** 20:1,4
34:15 35:10,11
35:14 39:22,22
39:24 40:12

41:25 43:8,10
43:13 45:2
63:15 76:14
81:21 82:22,23
83:3 86:15,20
87:1 92:8 93:21
99:17 106:12
107:20 139:24
**Brown** 2:11 5:10
5:16
**building** 40:14
**buildings** 101:13
**built** 99:16,18,19
**bullet** 82:21
**bulletin** 123:13
**bunch** 109:24
**busy** 46:2,2,3
55:2,8 56:9
58:6
**busyness** 55:16
**B-e-q-e-t-t-e**
26:17

─────────────
        **C**
─────────────
**calculations**
142:3
**Calexico** 44:24
**California** 1:2
2:12 5:5 42:10
**call** 26:20 61:5,7
61:7 89:13
90:17 128:7
132:4 135:7
**called** 14:9 56:23
140:15
**calls** 43:24 51:19
55:18 58:11
67:17 128:22
144:12 145:13
**Campos** 25:25
26:1,13 137:23
138:21 139:1
139:14
**cancel** 114:23
**canceled** 115:2
**capability** 40:13

41:21 43:12
45:23 65:5,12
85:23 86:10
**capable** 37:13
**capacity** 4:5
44:12 45:9
50:22,23 68:19
68:22 69:16
76:23 82:23
83:2,12 84:11
84:17,18 85:10
85:15,23 86:7
89:7 91:21,23
92:5,6,7,10,12
92:15,17,18,19
92:21,23,25
93:6 94:4,5,8
94:14 95:1 96:2
96:19 97:7,20
100:7,16 101:3
101:7,8 102:24
103:1 110:13
110:15 112:18
114:10 115:7
116:4 118:6
120:8 122:10
143:15 144:9
145:3,10
146:13,17
**captioned** 14:17
30:9
**care** 18:13 19:8
27:5 93:8,22
144:16,23
145:16,17
146:8
**Caroline** 121:9
136:16
**case** 11:16 12:14
12:18,19 15:24
17:4 30:14,17
94:23 105:10
106:11 121:10
**cases** 11:3,8 12:5
13:1 63:5,8
84:15 108:22

143:19 144:2,4
**categories** 83:22
**CBP** 8:12,20
10:11,16 14:2
15:13,20 32:12
33:15,19 34:22
35:5 37:21 38:8
38:19 44:9,11
48:18,21,23
61:13,16 62:10
65:22 69:20
72:24 75:11,17
75:22 76:11
77:16,21 78:1
78:22 79:15
80:17 82:6
85:10,13 100:3
104:4,24 105:3
106:4 110:18
121:14 122:10
124:14 126:3
126:13 128:6,7
128:8,13 129:1
131:18 132:11
133:3,6 134:25
135:1,3,10
140:1,18,22
**CBP's** 8:25 15:4
50:24 100:24
121:19
**cc'd** 97:3
**cc'ing** 132:23
137:24
**ceiling** 98:15
103:2
**cell** 97:19
**cells** 101:13
**Central** 47:16
94:18 107:1
124:11 146:23
**certain** 15:13
40:18 126:1
135:4
**certainly** 142:13
**Certification**
30:7

**Certified** 1:25
2:5 6:7 150:5
150:25
**CERTIFY**
150:19
**chain** 122:24
**challenged** 11:18
**chance** 59:14
93:18
**change** 70:21
**Chapo** 11:6
**Characterizati...**
107:17
**charge** 34:13
35:21 90:1
**charged** 11:10
13:8
**check** 59:4
**checking** 142:16
**chickenpox**
93:24 144:2
**chief** 17:13 19:4
25:23,24 26:3
99:20 117:2,5
139:2,15
**Chiefs** 110:6
**child** 11:21 82:19
**children** 143:22
**choice** 89:13
**circumstances**
94:16
**City** 88:5,15
89:25 90:3 91:2
91:14
**Civ.P** 14:18
**claim** 88:11
104:18,23
105:19 106:2
**claiming** 106:25
**claims** 4:18 11:25
12:1 40:6,15
104:18 105:3
**clarify** 12:2
15:19 28:9
60:20 61:2 64:5
66:21 92:13



**Class** 30:7
**classic** 37:6
**Claudia** 110:5
**clear** 84:14 95:22
 105:16
**Clinic** 19:6
**close** 100:3
**closer** 72:15
**COB** 4:14 130:8
**collected** 19:16
**collections** 19:22
**column** 111:2
**columns** 111:1
**come** 39:17 44:6
 44:8 59:19 85:5
 87:21 124:23
 140:9
**comes** 76:3
**comfortably**
 100:11
**coming** 35:9
 38:22 42:9
 49:12 95:5
**Command** 110:5
**Commander**
 130:12,15
**commencing** 2:3
**commercial**
 48:12 49:7,22
**communicate**
 9:18 128:8,13
 129:2 140:22
**communicated**
 140:19
**communicates**
 139:16
**communicating**
 9:23 131:25
 132:11
**communication**
 30:23 128:16
 140:25 141:3
**communications**
 15:14 30:20
 31:3 121:19
 137:13 141:8

147:22
**complete** 33:25
 34:6
**completely** 5:9
 32:11
**Compound**
 140:10
**compromised**
 147:2
**computer** 136:9
 136:14
**concerned** 18:11
 18:11 148:11
**concerning**
 121:20
**concluded** 149:3
**conclusion** 43:25
**conduct** 14:2
 59:2 61:17
 62:14
**conducted** 63:13
 107:12
**conducting**
 105:20 106:5
 106:22 107:14
 108:1,4,10
**conference** 26:20
 61:5
**confused** 84:23
 94:2
**congress** 12:2,9
**connection** 30:17
 47:14 59:16
 120:23
**consequences**
 9:12
**consideration**
 25:6 116:20
**considered** 11:15
**consistent** 61:21
**consistently**
 79:21
**constantly** 92:8
 97:6 142:16
**Consulate** 91:14
**contact** 87:25

91:3 125:25
 139:16,23
**contacted** 87:23
 129:4
**contacts** 139:20
**content** 30:23
**contents** 30:19
 31:3
**context** 146:19
**contingencies**
 115:13
**contingency**
 102:22
**continue** 44:20
 105:18 106:1,6
 106:20 128:4
**continued** 42:13
 47:23 128:1
**continuing**
 105:17
**contracts** 40:1
**Control** 18:22
 115:2 139:6
**conversation**
 6:19
**conversations**
 24:15
**convicted** 13:5
**coordinate** 89:22
 90:8,21 91:8,11
 139:2 140:20
**coordinated** 91:1
**coordinating**
 88:14
**coordination**
 88:5 139:9
**coordinator** 2:22
 139:17,21
**copies** 12:20
**copy** 12:23 30:12
**correct** 8:20 9:5
 10:12 20:23
 24:3 27:21
 30:12 33:9 36:5
 36:23 37:14
 41:17 43:22

44:10 45:10
 46:1,8,17 47:15
 47:20,24,25
 48:6 50:16,18
 50:19,24 51:3
 53:11 55:4
 73:15 75:8
 79:24 80:18,23
 81:12,18 89:3,9
 90:4 93:20 94:6
 96:3,5,9 98:12
 98:17 99:6
 100:1,5,18,19
 101:9,10,15
 102:18,19,22
 102:23 103:4
 105:11,12
 106:8,9 107:3
 110:8,9,13,16
 110:19,20,22
 110:24 111:11
 111:19 112:3,6
 112:14,18,19
 112:21 113:7
 114:1 115:22
 116:5,10,18
 117:21,24
 118:6,7,10,11
 119:20 120:3,8
 120:13,15
 121:16 123:10
 123:11 124:15
 126:5,16
 130:13 132:13
 133:5 134:19
 137:14,15
 138:19,20
 140:4,8,20
 141:1,4,10,24
 141:25 148:23
**correctly** 45:20
 97:9,22 98:8
 105:4 109:1
 114:7,14
 118:24 123:16
 124:12 131:15

131:21 132:9
 133:18,19
 134:11 138:16
 139:3,11,18
**Council** 2:14
 5:19
**counsel** 2:9 5:13
 9:23 16:4 17:13
 17:13 18:4
 20:11 21:14
 22:17,22 23:2,7
 23:13 25:20,21
 26:21,24 27:8
 27:22,23 28:1
 30:20 31:3,9,16
 31:24 51:19
 53:22 60:13
 61:6,7 78:4
 80:9 82:6
 143:11 146:11
 150:4,12
**counsel's** 23:11
 31:19 51:25
 52:8
**counterparts**
 124:9,17,18
**countries** 107:2
**County** 102:17
 102:25 103:7
 103:14 150:2
**couple** 23:22
 28:16 114:3
**course** 9:19
 22:10 67:7
**court** 1:1 5:5,11
 5:22 6:2,7,20
 7:4 10:21 11:23
 12:4 80:6,9,14
 83:4
**courtroom** 9:8
**cover** 79:10
**covered** 121:21
**covering** 8:3
**COVID-19** 27:4
**CR** 1:24 150:24
**Cranford** 2:22



29:20,24
**crime** 13:5,8
**criminal** 9:11
  11:6,20,22
  12:13,19
  113:20 114:11
**criminally** 11:10
**cross** 42:16 43:1
**crossed** 104:6
**crosses** 76:1
  95:20
**crossing** 49:6,6,7
  49:7,12,14,23
  66:19 80:1
  84:13 87:15,17
  99:19 105:13
**crossings** 48:13
**crosstalk** 54:15
  87:4
**Cruz** 102:17,25
  103:7,14 130:4
  130:5,12
  131:19,19
**current** 10:14
  100:16
**currently** 100:8
**custody** 4:12
  18:14 19:8 25:7
  46:10,13,19,20
  46:21 47:2
  95:23 110:14
  113:19 116:6
  119:9,18 120:9
  144:17,20
  145:11,19,22
  146:5 147:6
**custody/seizure**
  132:24
**Customs** 1:13 2:2
  3:3 6:5 8:11
  14:19 149:6
**C-a-m-p-o-s** 26:1

———————
**D**
**D** 3:1
**daily** 4:9 58:5

92:16,19,21
93:11,17 94:4
95:15 110:21
**dangerous** 43:8
**data** 52:12 55:15
  57:5,10,17
**date** 18:22 27:7
  27:14,21 87:14
  87:17 111:11
  115:25 116:4
  118:2 120:11
**dated** 3:14,16,18
  3:20,22,23 4:3
  4:6,7,10,12,14
  4:17,19 150:22
**dates** 17:21 51:3
  51:14,17 52:3
  52:12,23,25
  53:2,3,4,7,9,11
  54:2,5,7,7,22
  54:23,23,25
  55:1,15 56:7,12
  56:23,25 58:4
  119:7
**David** 132:22
  133:3
**day** 42:15 43:2
  52:14 53:1,6
  56:13 57:18
  86:7,11 89:14
  91:18 110:8,11
  111:6,16 112:6
  112:14 113:18
  114:19,21
  115:14 116:9
  116:21,22
  117:12 118:1
  118:23 132:25
  150:22
**days** 46:21,21
  53:5 54:2 55:4
  55:12 56:25
  57:2,3 114:3
**DC** 2:20 5:10
**decide** 42:15,24
**decided** 90:13

**decision** 51:16
  88:16 89:2,22
  90:7,11,19 91:7
  91:8,10 100:3
**decisions** 51:19
  88:23
**declaration**
  12:16 30:9,13
  30:16 31:7,25
  32:3,6,7 49:1
  50:9,21 51:1,8
  51:17 52:4,13
  52:24 53:17,21
  54:2,7,23 55:22
  56:12,17,23
  58:4,12 98:14
  103:3 108:18
  108:19 110:12
  113:7,12 116:2
  118:3,13
**declarations**
  12:23 56:7
**DeConcini** 49:6
  49:18,19 80:1
  80:18 81:9,14
  82:9 83:13
  84:13,19 87:11
  87:15 98:6
  99:17,19,22
  100:20 108:10
**dedicate** 114:10
  115:7
**defendant** 13:18
**defendants** 1:9
  2:17 3:12 5:23
  6:1 30:6
**define** 61:14,25
**definitely** 135:22
**definition** 39:12
  81:2
**degree** 67:8
**Department** 2:19
  5:21,25 8:7
**Depending** 76:23
  94:16
**deposition** 1:12

2:1 5:2,8 6:16
  8:22 9:19 12:11
  14:19 17:3,24
  18:10,19 19:23
  20:2,15,21
  21:10,15,24
  22:3,4,8,20
  24:8,15 25:13
  25:19 26:9,13
  26:19,24 27:9
  28:1,8 30:4
  51:9 67:12 68:4
  121:15 122:2
  142:5 147:21
  148:7 149:3
  150:3,10,17
**depositions** 22:2
  22:5
**describe** 11:3
  32:11 48:3
  109:3 119:4
**described** 52:13
  55:17 113:6
  119:7
**describes** 109:6
**DESCRIPTION**
  3:11 4:2
**designated** 15:3
  121:14 141:19
  141:22
**destroy** 19:19,21
**detail** 79:14
**detailed** 50:14
**details** 79:18
**detain** 99:7
  114:11,12,17
  115:8,10
**detainees** 96:9
  98:11,15 99:13
  99:19 101:2,14
  103:2 144:10
  145:3,11
**detention** 92:5
  96:2 99:4 100:4
  100:12 102:24
  115:1 116:3

143:14,18
  144:7 145:17
**detentions**
  116:10
**determination**
  89:8
**determine** 52:12
  52:23,24 54:1
  55:15 57:5,18
  86:24 87:20
  91:16
**determined** 89:6
  90:15 94:5
**determines** 82:17
**determining** 88:9
**development**
  15:6
**DFO** 97:7
**DHS** 8:8
**different** 23:22
  55:3 61:23
  70:14 74:2 81:7
  99:3 115:4
  129:12
**direct** 16:21
  75:12
**directed** 75:2,5
  95:1 104:16
  130:5
**directing** 70:9
**direction** 31:16
  150:14
**directive** 95:24
**directly** 25:16
  86:5 134:8
**director** 10:15
  16:7,17 19:3
  24:6 25:22
  32:20,25 33:8
  33:21,23 34:7,7
  34:10 35:4,6,18
  37:19 38:3
  44:16 47:19,24
  48:5,6 64:5
  73:8 82:5 88:8
  91:9 95:24



100:10 104:4
146:12
**Directors** 95:18
**disagree** 148:6,8
**disciplined** 14:1
**disconnected**
80:7 83:5
**discovery** 22:10
67:4
**discuss** 19:7
26:21 58:14
60:16 61:12
142:18
**discussed** 92:25
143:10,11
**discussing** 118:2
**discussion** 54:18
80:8
**discussions** 17:9
24:20
**disease** 93:23
146:6
**dispute** 148:1
**disruption** 137:3
**disruptive** 68:16
**distinction** 62:8
**distractions**
24:19
**District** 1:1,2 5:4
5:5,22
**Division** 33:22
34:8
**divisions** 129:12
**Dobson** 2:22 5:10
**DOC** 90:2
**document** 14:17
14:20 30:5,5,8
32:8 58:10
79:18,19
107:17 113:13
146:14,16
**documents** 17:22
17:23 18:3,8,12
18:17 19:2,25
20:3,10,11,14
20:16 21:7,12

21:13,13 22:7
22:11,12,14,16
22:17,19,22,25
23:1,1,5,6,16
41:20 58:10,11
58:17,22,25
59:2 86:1
118:22 125:21
**doing** 29:22
33:19 61:14
131:18 139:23
**door** 105:19,23
106:3,21
107:11,13,25
108:4,8
**doubt** 133:7
**Douglas** 34:11,13
34:16,19,20
35:4,5,7,9 36:1
63:16,18 64:9
64:13,18 65:9
65:14,19,22
66:11,16,19
68:7 69:14,24
69:25 70:3,22
71:17 72:1,11
72:25 73:16
**dozen** 10:25 11:1
11:2
**draft** 32:2
**drafted** 31:7,11
**drafting** 31:25
58:12
**draw** 124:5
**drive** 109:6
**drug** 51:12
**duly** 6:6 150:8
**duty** 33:11,12
62:11
**D.C** 2:15

___
**E**
___

**E** 3:1
**EAC** 22:3 61:6
**earlier** 25:9 29:9
76:13 84:15

92:25 143:11
146:10
**early** 26:20 27:2
64:22 68:7 69:6
69:14,24 74:24
111:25 112:2
**east** 69:23 127:21
**eastern** 64:18
111:24
**edit** 31:10
**EEO** 11:14,25
12:1,5,18
**effect** 28:25
**effort** 7:8
**eight** 35:23,25
53:6 67:2
**either** 11:9 12:18
13:18 34:23
53:22 70:8
71:17,24 72:16
75:5
**El** 11:6
**email** 104:17
**emergency** 19:6
119:10
**employed** 10:11
150:20
**employee** 134:16
134:21
**employees** 25:8
47:1
**employment**
32:11
**encounter** 65:22
75:17 113:17
**engage** 34:22
35:5 44:14 47:4
47:9 69:25
**engaged** 70:3,22
76:11
**enlarge** 95:7
**ensure** 7:5 18:13
**entails** 108:3
**enter** 41:9 42:17
43:1,21 81:11
81:17 83:23

84:12 85:11,14
86:25 88:10
89:3,5,9 90:9
104:22 105:2
107:8 125:20
134:10
**entered** 35:12,12
35:13 94:18
105:6,10 107:7
108:14
**entitled** 102:2
**entity** 138:15,15
**entrance** 49:15
49:16,18,19,21
50:1,5 66:15
76:2,4,5,6,9
80:18,21 81:10
81:14,16 82:9
83:13 84:20
86:17 87:11
88:18
**entry** 8:15 15:5
15:21 28:23
29:7 34:15,18
35:8,9,23 36:20
36:23 37:5,7
38:23 43:12
46:8 50:15
57:25 66:24
67:3,14,24
68:12 69:5,13
69:25 70:3,18
70:22 71:23
72:2,19,23
73:13,19,22
74:2,21 75:3
79:8 82:4 88:9
94:20 96:1,9
103:1 111:6,8
117:23 118:1
118:22 129:1
129:20 132:14
139:25 140:22
141:16 143:14
145:10 147:1
148:3,12

**Entry's** 102:22
119:6
**ERO** 92:2
**especially** 7:2
**essentially** 6:18
**established** 79:22
86:23 87:3,6
**et** 1:4,7
**events** 51:2 54:24
119:4
**everybody** 18:14
25:7 90:25
144:16,17
145:17,18,21
146:5
**exactly** 28:19
79:11 88:14
**exam** 146:3
**Examination** 3:5
3:6,7 6:9 14:25
121:6 143:6
**examined** 6:7
**example** 19:4
62:2 82:19
144:21
**examples** 114:3
**exceeding** 68:19
**excess** 98:4
102:14,21
**exchange** 96:18
122:18 130:4
**excuse** 62:21
71:20
**exhibit** 2:22 3:11
3:12,12,13,15
3:17,19,21,23
4:2,3,5,7,9,11
4:13,16,18
14:14,17 16:13
29:12,13,17
30:4,6 71:6,7
71:11 95:7,8,11
96:13,14 104:9
104:10,13
108:18 109:23
110:1 112:9,10



113:11 115:17
115:18 117:15
117:16,20
119:23,24
122:15,17,21
123:21,25
124:2,21
129:21,25
130:1,3 132:15
132:19,21
137:16,20
138:4,23
139:15 141:6
141:15
**EXHIBITS** 3:10
4:1
**exist** 20:7
**existed** 53:8
99:25
**exists** 99:25
**expand** 109:25
**experience**
145:12
**experienced**
43:14
**experiencing**
42:13
**explain** 36:15
**extend** 131:4
**extent** 18:3 23:16
30:19 44:19
51:19 53:19
59:1 67:16
148:10
**exterior** 129:19
**e-mail** 3:13,15,17
3:19,21,23 4:3
4:5,7,11,13,16
4:18 71:11,15
72:3,6 75:4
95:2,12,21
96:17,23,25
97:2,12,14
98:13 100:1,9
101:6 102:13
104:13,21

105:15 109:19
109:20 110:4
122:18,24,25
123:3,8 124:2,3
124:7 130:4,17
132:22 133:9
137:23 138:2,5
138:8,13,24
139:7 141:18
146:11
**e-mailing** 9:23
**e-mails** 4:9 17:22
18:18,18,20,24
19:9,10,22
20:14 109:15

_____

**F**

**Facebook** 14:6,9
**facilities** 49:2,4
49:10
**facility** 39:18
48:12 49:22
99:14,24,25
100:2
**fact** 50:23 72:5,8
73:12 85:18
98:16 102:13
102:20 110:7
110:18 112:17
119:5
**factors** 92:4
**facts** 40:9
**factual** 53:20
54:4,17
**fading** 25:15
**fair** 54:21
**family** 11:20
47:16 74:18
103:10,12
143:24,25
**FAMU** 4:7
122:20
**fast** 146:1
**fear** 106:25
**February** 16:2
30:13 104:13

**federal** 129:13
139:22
**Fed.R** 14:18
**feed** 145:21
**feet** 66:9
**female** 103:13
**females** 143:20
143:25 144:1
**fence** 41:23 75:25
75:25 76:1,7,12
76:21
**Fewer** 10:25
**field** 16:7,17 24:7
32:21 33:21
34:7 35:19,23
35:24 57:25
60:17 61:13,18
95:18,25 97:8
117:21,23
146:12
**Fifty-two** 120:9
**Figueroa** 132:22
133:3
**figure** 91:15
**final** 120:19
**finally** 131:23
**find** 15:17,23
19:11 28:16
**fine** 59:25 67:7
102:6 103:18
103:19 117:9
120:20
**finish** 7:8 57:13
84:4,5,7 101:23
102:7
**finished** 7:6
**Fire** 98:1,10
101:4
**first** 6:6 19:7
36:4 38:22
39:15 47:11
65:21 71:15
75:17 97:12
103:7 104:20
115:25 122:24
123:3,12 124:6

129:7 130:18
138:5,22
139:14 141:17
143:13
**firsthand** 50:14
**fit** 94:13 96:10,11
101:17
**five** 27:15,16,20
27:24 28:3 53:6
59:8,10 103:16
**five-minute**
120:18
**Floor** 2:12
**flow** 4:3 25:5
123:15,19
124:4,10 125:1
125:2,9 127:20
132:12
**folders** 19:1,10
**folks** 29:6 39:25
45:3 62:1 85:17
**follow** 23:11
31:19 51:25
52:8 124:9,13
128:19 143:9
**follows** 6:8
**food** 40:2 59:14
**Force** 104:15
**foregoing** 150:3
150:15
**forgot** 19:24
**form** 12:15 39:6
57:20,22 63:21
63:23 65:1
70:11,25 73:1
73:20 79:25
80:24 81:19
82:13 83:15
84:21 89:11
90:23 91:19
96:4 111:12
112:22,24
116:11 120:14
133:22 141:12
**format** 7:2
**forth** 51:2,11

52:23 103:3
109:11,24
**forthcoming**
147:25
**Forward** 95:15
122:19
**forwarded** 71:13
**forwarding**
97:13 124:3
**found** 138:3
**four** 53:6 114:5
**frame** 36:9 38:13
38:14
**framed** 55:20
**frequent** 83:18
**frequently**
135:25 137:6
**front** 30:5 86:9
87:2
**frustration**
101:23
**fulfilling** 33:7
38:5
**full** 35:16 37:14
39:18 65:11
122:24 124:6
150:15
**full-time** 79:23
81:9,15 82:9
**further** 17:9
127:21 146:8
147:11 150:19
**FW** 3:23 4:3,7,9
71:14

_____

**G**

**G** 2:15
**gates** 99:14 147:2
**gauge** 97:20
**Gee** 90:16
**general** 24:22
143:23
**generally** 56:8,22
57:9
**geographic** 42:20
**George** 25:25



137:23
**getting** 31:13
45:13 46:4
59:25 83:24
144:19 145:20
148:16
**give** 6:22 17:3
44:13 59:13
142:14 144:23
145:16 146:2
**given** 7:2 46:1
78:1 91:17
118:23 135:19
135:25 136:1,3
**gives** 114:3
**giving** 68:4
**go** 6:17 16:12
18:24 23:23
24:4 27:3 30:8
30:10 43:5
50:10,20 52:16
53:16,20 59:14
59:15 60:25
69:20 70:9,18
71:23 72:11,18
74:1 75:15
78:10,12 80:13
82:24 91:24
92:16 97:11
102:5 103:10
103:11,12
108:17 111:21
111:22 113:1
113:11 114:24
115:3 117:13
117:14,19
118:12 135:6,9
135:10 136:15
136:17 140:11
141:16 142:10
142:17,22
146:13,17
**goes** 34:2 51:1
98:3 109:3
110:18 111:25
114:2,9

**going** 6:14 7:11
8:7,11,15,23
16:14 17:6
19:21 21:11
22:22 23:11
24:2,4,9,14,17
25:5 27:1,3
28:14 30:3
31:16,19 32:7
36:7,8 42:11
51:20,25 52:8
53:23 54:16
62:7 67:2,23
68:6,10 70:19
77:1 82:20,21
89:3 90:8,14,21
91:5,6,7 97:5
109:23 121:18
122:14 123:2
124:21 128:18
137:2 138:1
139:7,13
140:14 143:9
144:5 147:20
**GOM** 138:15,18
139:9
**Gonzalez** 122:18
123:8
**good** 5:15,17
6:11 59:10,23
80:13 97:2,20
121:8,11,12
128:12 143:8
**gosh** 60:4
**gotten** 43:7 107:4
**government**
11:24 12:2
15:14 22:11,12
22:15 58:9
86:23 88:24
89:20 91:2
121:20 138:18
**Grand** 2:12
**granted** 71:16
**great** 58:19 68:13
121:25 122:6

**greater** 45:9,23
46:15 145:10
**ground** 6:18
**grounds** 58:22
**group** 14:9
104:22 105:1
129:18
**groups** 4:19 35:8
38:15,22 44:22
45:11 63:6
86:24 94:18
95:4 104:18,19
146:22 147:5
**Grupo** 129:15,15
129:16 133:13
134:13,16,21
134:24
**Guadalupe** 16:10
24:12 71:12
**guess** 12:5 18:15
24:22,24 64:8
65:4,10 66:10
73:3 74:22 77:4
88:13 91:15
94:2 98:24
116:21 134:19
**guessing** 58:21
59:3 66:4 106:3
134:14,17
**guidance** 37:21
38:8,19,21
77:16,19,25
78:22 79:2
105:16

---

**H**

**Haiti** 38:15
**Haitian** 47:14,15
127:20
**Haitians** 39:3,11
39:16 42:9
44:22 45:1,14
64:17 69:23
74:17,18,25
124:10 126:21
**half** 142:21

**halfway** 113:17
123:12 133:11
**handle** 45:9
46:12 116:24
**handled** 39:21
**handling** 18:13
37:14
**happen** 55:13
82:3 115:13
**happened** 25:10
25:12 39:20
53:10 111:15
**happening** 13:24
74:3 148:18
**happens** 139:20
**happy** 58:17
59:21
**hard** 53:6
**head** 6:22 93:24
144:2
**headed** 143:24
143:25 147:5
**header** 96:22
**heading** 94:20
146:22
**headquarters**
33:15,18,19
110:19 131:1
**health** 25:6
**healthy** 43:8
93:22
**hear** 9:25 136:6,7
136:9
**heard** 6:12 7:5
54:6
**hearing** 11:14
97:4
**held** 101:2
**help** 23:23 39:25
40:2 47:3
124:14 132:12
**hereof** 150:21
**hereto** 150:20
**hesitated** 13:20
13:22
**high** 40:3 43:7

54:25 95:3
**higher** 98:4
**highlight** 55:1
122:24 133:15
**highlighted**
131:7
**history** 10:18
32:11
**HIV** 144:2
**hold** 50:22,23
95:22,23 98:11
101:13 108:24
144:5,5
**holding** 4:5 96:19
100:12 114:10
115:7
**Homeland** 8:8
**Horne** 95:13
**Hospice** 145:18
**hospital** 19:5
109:7
**hospitalization**
109:5 146:8
**hospitalized**
113:6
**hour** 7:22 27:18
59:20 142:21
**hours** 27:13,15
27:15,16,20,24
28:2,3,4,5
**housed** 103:14
**Howell's** 22:4
**HQ** 124:8,16
**HSI** 115:3
**huh-uhs** 6:23
**Humphries** 3:3
5:3 6:4,11 10:6
10:7 14:16
15:19 18:6 30:9
31:7,20 36:18
37:16 43:5
44:20 51:9,22
52:11,17 53:21
54:21 55:21
56:3,6,16 57:23
59:15 60:10,19



64:2 66:23 67:7
67:11,18 71:2
78:8,20 80:16
83:10 104:3
120:22 121:8
123:2 127:14
128:5 137:2,12
138:7,11 143:8
146:10 147:9
147:12,18,22
148:16,25
149:5
**hundreds** 55:9
57:6,6
**H-u-m-p-h-r-i-...**
10:7

### I

**ICE** 92:2
**identification**
29:14 59:2 71:8
95:9 96:15
104:11 110:2
112:11 115:19
117:17 119:25
122:22 123:22
129:22 132:16
137:17
**identified** 83:22
85:16
**identify** 52:3
109:10 143:20
143:21
**identifying** 18:24
**illustrate** 118:20
119:8
**immediately**
82:22
**immigrants**
123:10
**immigration**
2:14,19 5:18,22
11:10 123:14
123:18 124:14
124:25 125:9
125:16,18,22

126:5,15 128:6
128:9,14 129:2
129:9,10,11
131:20 132:3
132:12
**impact** 111:2,10
111:10,19
112:3,21 113:5
113:9 116:8,18
116:23,25
117:2,9 118:8
120:11 144:9
**impacts** 145:2,11
**implement** 45:24
**implementation**
15:8 67:13
74:10 82:7
**implemented**
21:21 60:17
61:13 87:10
**implementing**
37:21 38:8
48:18,21
**important** 7:3
27:5
**improve** 26:11
**inadmissible**
114:13
**INAMI** 91:14
129:5,8,9,13,17
129:18 134:21
135:15 137:6
139:2,16,20,22
139:24 140:2,5
140:5,9,14,15
140:19,23
**Incident** 104:15
**incidents** 56:14
120:6 144:18
**include** 37:2
48:11,17,20,23
52:3 134:3
147:1
**included** 54:22
114:22
**includes** 36:19,22

48:15
**including** 15:6
146:12
**inclusive** 48:14
**incoming** 97:14
**incorrect** 97:8
141:9
**incorrectly** 117:6
117:11
**increase** 46:7
**increased** 28:23
**independent**
28:12
**India** 35:9
**indicate** 104:14
**indicated** 24:6
28:22 148:17
**indicates** 110:10
113:4,8 115:6
115:24 120:5
120:10
**indicating** 112:20
**indiscernible**
6:24 45:11 62:3
74:18
**individual** 11:9
89:8,15 105:6
108:22 113:6
**individuals** 11:9
38:15,18,20
40:4 41:19 42:3
43:20 45:4,7
46:20 72:20
74:15 76:16
86:15 89:10
113:19 114:11
115:8,11 126:4
126:14 129:6
146:22
**individual's**
11:19 89:14
**information**
67:13 109:11
110:24 113:25
118:19 123:9
125:23 133:8

136:1 140:1,7
**informed** 24:9
71:22 72:7
148:16
**informing** 24:13
**initial** 27:7 124:7
138:2
**initially** 16:8
17:20 23:24
88:1
**inquired** 19:3
**inquiry** 97:25
**inspected** 98:2
**instance** 18:21
**instances** 73:18
81:20 84:24
**instruct** 7:17
18:2 22:23
30:20 31:16
51:21 53:23
79:9
**instructed** 19:18
**instructing** 51:22
55:25 56:3
126:10
**instruction** 23:12
23:19 31:20
52:1,6,9
**instructions** 77:6
77:10,21
106:16
**interest** 24:2
**interested** 150:21
**internal** 22:16
**international**
40:23 41:8,23
49:8 62:5,9
66:2,13 75:21
75:23 76:19
81:1 108:12
135:11
**interrogatories**
21:18,20
**interrogatory**
21:9
**interrupt** 83:20

101:8
**interruption**
136:25
**interventions**
51:13
**involve** 108:14
**involved** 20:16
113:19
**involving** 11:8
17:4 73:22
**in-between**
100:15
**in-box** 19:10
**in-custody** 98:4
**Irwin** 61:6
**isolated** 99:13
143:22
**issuance** 70:4,23
**issue** 11:18 97:5
136:9
**issues** 39:24 99:9
99:10 146:7
**itinerary** 73:5,5

### J

**J** 2:18
**jail** 114:24 115:3
**January** 8:3
15:25 38:25
**Jeffrey** 26:15
97:24
**Jesus** 130:4,5,12
**job** 10:14 101:25
102:1
**Joe** 97:13,20
122:18 123:8
**John** 95:13
132:23
**Jose** 26:4
**July** 71:11
**June** 32:14,18
33:1,6 47:24
79:23 80:17
81:15 82:25
83:11 84:10
85:9 87:8,9,19



MAGNA
LEGAL SERVICES

**114**:4,4 **115**:21
**116**:1 **117**:21
**118**:1,4,5
**Justice** 2:19 5:21
5:25

---

**K**

**K** 1:7 5:4
**Karolina** 2:14
5:18 121:9
**Katherine** 2:18
5:20 126:9
**katherine.j.shi...**
2:21
**Katie** 23:18 24:4
30:24 54:18
56:1 57:15 58:9
59:20 66:21
78:11 101:25
142:2 147:20
**keep** 94:14 95:1
96:8 147:20
148:7
**keeping** 92:14,14
93:22
**Kendra** 2:22
5:10
**Kenneth** 95:14
**kept** 45:14 64:17
**Kevin** 1:7 2:22
5:4 16:12 29:11
29:19,20,24
50:9 51:5 97:15
122:23 131:3,7
133:15 138:6
139:13
**kind** 11:21 12:4
27:2,4 42:10,11
44:23 45:14
93:25 109:16
127:20 144:6
**kinds** 11:3 19:2
25:1
**knew** 24:22 27:3
53:8
**knocked** 147:3

**know** 7:11,24
11:14,21 19:4,4
20:22 24:1 25:3
27:17,19 28:11
41:2 52:22
55:10 62:2 63:5
64:23 65:14,18
65:21 66:4,11
67:8 68:7 69:2
69:3,10 72:22
73:8,12 75:7
76:20 77:2 81:2
84:25 88:12,13
89:10 94:8,17
94:22,22 97:4
100:21,25
101:4,11,12,19
101:21 102:9
106:15 108:8
111:23 123:4
124:25 130:20
135:2,14
138:10,24
139:23 141:9
144:5 145:21
145:24,25
148:17
**knowledge** 8:23
8:25 50:14,18
64:8 66:6 67:20
71:4 122:8,9
134:18,23
147:22
**KNOWN** 150:3
**kwalters@im...**
2:16

---

**L**

**labeled** 71:10
111:2
**lack** 147:22
**Lado** 1:4 5:3 17:4
22:8,12,15,16
22:18 23:1,5
**laid** 100:11
**land** 95:20

**lane** 35:13 66:14
66:20 75:20
85:1,4,8,12,13
86:5 105:9
107:19
**lanes** 66:20
**large** 4:18 35:8
38:14,16,22
39:16 44:22
45:11,13 63:6
94:18,23 95:4,4
104:18,19,22
146:22 147:4
**largely** 74:18
**larger** 145:21
**lasted** 27:18
**late** 47:12 64:21
68:7 69:6,14,24
**lawful** 118:22
**lawsuit** 13:14,17
13:23 22:16
24:23,24 26:7
**lawyer** 32:3
**lay** 97:18
**leading** 130:1
137:20
**leads** 66:14 75:19
**leave** 74:15
**leaving** 63:6
**left** 46:16
**legal** 1:20 5:12
43:25
**let's** 10:3 38:4
79:20 82:2,3
90:17 118:12
**Lev** 2:11 3:5 5:15
5:16 6:10,13
14:13,15 15:22
16:12,16 18:7
21:19 22:24
23:10,18 24:1,5
27:11 29:11,15
29:18,22 30:1,2
30:22 31:4,6,18
32:5,9 35:2
36:12,21 37:4

37:10,18 38:2
39:7 40:10
42:21 43:18
44:2 45:6 47:8
50:8,12 51:5,7
51:24 52:7,20
53:15,25 54:13
54:16,20 55:6
55:23,25 56:5
56:20 57:14,16
58:2,9,19 59:5
59:8,11,19 60:2
60:9,23,24
63:24 64:11,19
65:7,20 66:3,21
67:10,22 68:13
69:1 70:12 71:5
71:9 73:7,23
74:12 78:10,19
80:4,12,15 81:5
82:1,16 83:9,19
84:1,6 85:6
88:21 89:12
91:4,22 93:13
93:19 95:6,10
96:6,12,16,20
97:1,15,17
101:25 102:4
102:12 103:15
103:21 104:2,8
104:12 106:14
107:23 108:20
108:21 109:22
110:3 111:17
112:8,12 113:2
113:3,11,15
115:16,20
116:15 117:14
117:18 118:14
118:17 119:22
120:1,17,25
121:16 122:1
136:12 144:12
145:5,13
146:10 147:18
148:14,24

**level** 129:14
**levels** 43:7
**Levin** 124:3
**Liaison** 33:21
34:8
**lice** 93:24 144:3
**limit** 38:4 61:15
61:22,24 62:5,9
67:14 79:22
80:3,18 81:8,15
82:8 119:5
**limitations**
102:23
**limited** 15:6
67:24 79:5
118:21 148:2
**line** 14:24 41:22
41:23,25 42:4
42:16,25 44:10
61:15,22,24
62:5,5,9,9
64:10,13 65:8
65:24 66:2,13
79:22 80:2,3,18
81:8,15,22 82:8
82:20 86:2,3,4
86:9 87:2,2
89:5 95:15,22
96:18 106:5,22
107:14 108:1,5
108:5,11
125:15 135:7
135:10,10,11
**lines** 66:8
**lining** 44:5
**LinkedIn** 14:4
**list** 21:13 87:3,6
87:20,22 88:17
125:10,13,14
125:17,18,19
125:23 126:15
126:18,20,23
126:25 127:6
127:15,18,23
127:24 128:4
**listed** 15:15



MAGNA
LEGAL SERVICES

33:24 37:5
**lists** 86:22 87:13
  87:16 98:5
  107:5 126:23
**litigation** 2:19
  5:22 6:14 31:15
  59:3
**little** 10:19 11:2
  14:11 41:12
  66:10 74:5
  79:20 128:1
  137:5 138:2
**LLP** 2:11 5:10
**loads** 116:14,20
  116:22 117:8
**local** 40:1 101:5
**located** 50:2
  75:20
**location** 42:20
  61:16
**locked** 99:13,14
**lodged** 98:5
  102:14
**lodging** 102:21
**log** 59:15 109:16
**logs** 113:24
**long** 10:16 42:3,4
  42:5 68:8 69:2
  100:23,23
  127:17 142:15
  142:20
**longer** 59:21
  89:17 98:19
  142:11
**longest** 42:8
**longstanding**
  67:1
**look** 17:20 18:12
  18:19,25 20:15
  20:24 21:2
  28:12,15 52:11
  55:14 58:16,17
  71:5 93:13 95:6
  96:12,20 97:20
  104:8,20
  105:14 109:22

111:1 112:8
  115:16 119:22
  138:21
**looked** 18:17
  19:2,9 20:16,18
  20:20 21:3,3,7
  28:11 29:2
  52:15 54:4 57:5
  57:17
**looking** 18:20
  26:10 28:20,22
  53:12
**looks** 57:18 131:1
**Los** 2:12
**lot** 25:4 62:3
  79:18
**Luis** 4:7,11 36:2
  38:23 39:4,11
  42:12,17 43:12
  44:24,25 45:3,4
  45:8,10,12,13
  45:18 46:3,6,11
  46:16,19,23,25
  71:18,24 72:8
  72:15 74:4,7,10
  74:14,21 75:1,5
  75:6,9,12,14,17
  76:10,22 77:8
  77:17,21 78:1
  78:23 79:5,7
  122:20 123:10
  125:25 126:3,7
  126:11,13
  127:7,22,25
  128:9,10 133:4
  134:10,15,16
  134:21,23,25
  135:5
**Luis-UDAs**
  132:24
**Lukeville** 36:2
  63:4,10,12
  71:17 72:2,14
  72:15,25 73:17
**lying** 9:12

---
### M
---
**Magna** 1:20 5:11
**main** 21:8 99:22
**maintain** 98:2
**maintained**
  86:23
**male** 143:24
**males** 103:13
  143:21 144:1
**manage** 46:24
  125:16
**managed** 25:5
**management**
  15:5 20:25
  34:23 61:17
  62:14 121:21
  124:8,16
**manages** 138:14
**managing** 125:10
  125:12
**manpower**
  108:23
**March** 27:2,7,14
  27:21 34:3
**Margaret** 71:13
  95:13
**MARICOPA**
  150:2
**Mariposa** 19:6
  49:6,7,20 98:6
  98:18 99:11,21
  99:24 104:23
  105:2,7,9,13
  107:6,19
**mark** 105:21
  131:9
**marked** 3:10 4:1
  14:14 29:13,16
  30:3 71:7 95:8
  96:14 104:10
  110:1 112:10
  115:18 117:16
  119:24 122:15
  122:21 123:21
  123:25 129:21

132:15 137:16
**Marshal** 98:1,10
  101:5
**materials** 29:8
**mats** 94:12 96:10
  100:11,13
  101:17
**matter** 5:3,23 6:1
  59:21 73:17
**matters** 12:21,24
  26:21
**maximum** 45:25
**Mayer** 2:11 5:9
  5:16
**McAleenan** 1:7
  5:4
**MCAT** 3:13,15
  3:17,19,21 4:9
  94:7 95:15
  100:17 101:8
  101:20 110:6,7
  112:13 115:21
  116:14 117:20
  120:2
**mean** 10:25
  11:13 17:20
  20:6 27:15
  30:25 35:11
  51:22 58:15,24
  58:24 91:23
  105:6,22
  107:24,25
  125:1,12
  134:20 135:10
**meaning** 20:7
**means** 9:22 36:15
  37:13 63:9
  80:20 106:6
**meant** 99:12
  124:10
**measles** 93:24
**measure** 92:10
  92:12
**media** 5:2 146:25
**medical** 18:21
  51:12 99:16

119:10,18
  120:6,12 146:2
  146:3,3,8
**medically** 46:22
  146:6
**meet** 132:5
**meetings** 91:13
**member** 134:24
**memo** 21:3 70:5
  77:16 78:25
  79:12
**memorandum**
  70:24
**memory** 25:10
  25:12
**mention** 25:3
  76:13 77:13
**mentioned** 11:25
  18:18 25:9,20
  44:17 83:17
  121:10
**mentioning** 95:2
**messages** 147:24
**messaging**
  128:20
**met** 19:5,6,7
  132:3
**meter** 123:14,18
  124:9,15,19,20
  125:1,2,9
  132:12
**metered** 38:20
  39:11,12 62:19
  62:24 63:4,7,17
  74:7,21 75:1
  77:7,23 78:3,24
  79:16,21
  131:25
**metering** 4:3,16
  15:4 20:24 21:3
  21:7,8,21 34:23
  35:5 37:22 38:9
  44:15 47:4,9,11
  48:24 60:16
  61:12 63:13
  67:13 68:6,8



69:5,13,24,25
70:4,5,7,15,23
70:24 75:18
76:11,22 77:15
77:18 78:25
79:12 82:7 87:9
121:20 124:4
131:8,14,18,19
131:24 137:25
138:14 139:10
140:20
**meth** 55:9
**method** 128:16
**Mexican** 15:14
41:24 71:21
86:4,5,16 88:23
89:20 90:18,22
91:12 104:19
105:1,18 106:2
106:7,21,25
107:4 108:14
121:20 123:14
123:18 124:9
124:14,17,18
124:25 125:9
125:16,18,22
126:4,14 128:6
128:9,14 129:2
129:4,9,10,11
131:12,20
132:3,12
139:22
**Mexico** 35:16
39:4,13 40:21
41:6 43:21
49:12 69:4,11
70:9,16 72:21
75:2 80:22
81:11,18 82:12
83:14 85:17
86:24 90:4,5,10
90:13,25 91:2,8
94:19 104:5
105:8 106:25
107:5,7 108:15
131:18,20,24

138:18 146:23
**Mexico/Guate...**
147:2
**Michael** 3:3 5:3
6:4 10:6 30:9
149:5
**microphone**
25:17
**middle** 14:23
97:11 123:13
**migrant** 36:22
37:2 65:21
**migrants** 40:20
41:16 45:18
46:5,16 47:14
48:15 69:3,11
75:1,16 81:10
123:15,19
124:15 134:25
135:16 136:2
137:7
**Mike** 10:10
**miles** 50:2
**mind** 53:3,10
54:24 93:23
117:8
**minutes** 27:18,19
59:8,9,24,24
94:3 103:17
**mirrored** 79:12
**Mischaracteriz...**
125:5
**missed** 54:10
80:10
**Misstates** 88:19
**mitigation** 97:5
**moment** 123:3
130:19 136:16
142:1 144:7
147:10
**Monday** 137:10
**months** 42:7
**Morley** 49:5,15
49:16
**morning** 5:15,17
6:11,12 110:11

111:14,25
112:2 115:24
116:3 120:6
**motion** 30:7
53:18
**move** 24:2 31:4
42:14 88:16
91:6
**moved** 44:23
45:14 76:17
**moving** 45:4,7,15
64:17 69:23
**multiple** 113:17
113:18
**mute** 63:23
**M-i-c-h-a-e-l**
10:6

_____

## N

**N** 3:1
**Naco** 34:14,15,16
34:20 35:5 36:1
62:24,25 63:1
71:17 72:2,11
72:25 73:16,22
**name** 6:13 10:5,6
10:8 24:11
26:16 89:14
121:8
**named** 13:17
88:1 90:1
**narcotic** 53:7
57:7,19 114:5,5
116:2,14 118:3
118:9
**narcotics** 114:17
**national** 66:8
**Nationals** 104:19
105:1,18 106:2
106:7,21,25
107:4 108:14
**nature** 17:5
38:11
**Nazarov** 2:18
5:24,24 147:15
**near** 95:5

**necessitated**
116:3
**need** 6:21 7:18,23
8:1 28:13 56:17
72:7 74:1 78:4
81:18 82:15,18
92:23 95:21
97:7 113:5
120:12 127:23
128:3 130:22
142:5,15,21
146:7 148:6
**needed** 17:2,3
39:4 91:11 93:8
**needing** 99:18
**negative** 111:7
111:10 113:9
116:18 117:2,9
118:8 144:9
**negatively**
116:23,25
**never** 94:10,25
107:20
**news** 28:16,20,21
29:1
**NGOs** 88:6
**Niverson** 97:25
**nods** 6:23
**NOG** 110:5
**Nogales** 10:15
15:21 17:21
21:22 28:23
29:7 33:9,18
36:2 44:25 45:4
45:8,8,12,19,24
46:2,6,10 47:3
47:4,9,12,19,24
48:11,13,21
49:3,8,25 50:15
50:21 51:2
52:14 53:1 54:3
56:9,13 57:1,18
62:4 64:7 66:24
67:15,20,24
68:5 71:18,24
72:4,8,12,19,20

72:23 75:5
79:20,22 80:2
82:4 87:17 88:5
88:8,15 89:25
90:3 96:9 98:11
98:15 100:4,8
100:10,16
101:1 102:21
103:1 104:4,16
110:5,7,13
111:6 112:17
115:22 117:22
117:25 118:21
119:6 120:2
127:21 128:11
128:14 129:1
130:13 131:14
131:20 132:2
132:11 135:15
135:17,18,18
136:1 137:8,13
140:18,22
141:8,16,24
143:13 145:9,9
147:23 148:2
148:12
**noise** 80:5
**noncommercial**
49:23
**nongovernmen...**
86:24
**normal** 55:3,12
**north** 50:2 66:9
94:20
**notable** 53:10
54:8
**note** 98:3 112:23
148:10
**notice** 14:18
20:21 121:15
**notification**
150:9
**notwithstanding**
7:18 72:5 113:5
116:9 120:12
**November** 11:5



MAGNA
LEGAL SERVICES

32:17 33:2,7,17
33:20 34:12
47:18 64:6
124:2 130:4
132:22 141:17
**number** 43:3,6
45:25 46:15
56:14 94:23
95:4 97:3
100:25 101:12
102:10 118:3
122:16 126:1
131:25 134:25
135:4,16 136:1
136:4 137:7
145:25
**numbers** 28:24
38:16 39:16
40:2 45:13 46:3
46:7,10,18
68:18,23 93:10
93:16 94:1,22
97:6 98:1,4
100:22 101:8
101:20 118:15
127:22 128:3
135:19 144:6
145:21
**NW** 2:15,20

**O**

**oath** 9:3,4,7,8,12
12:15 60:11
150:7
**object** 7:16 15:18
36:7,8 44:18
54:3 57:20
63:19,20,20
65:1,16,17
66:17 67:16
70:11,25 73:1
73:20 79:25
80:24 81:19
82:13 83:15
84:21 89:11
90:23 91:19

96:4 112:22,24
116:11 126:6
127:3 133:22
141:12
**objected** 54:10
57:22 58:21,21
**objecting** 67:6
**objection** 7:19
18:1 22:21 23:8
27:10 30:18,24
31:12 34:25
36:17,24 37:8
37:15,23 39:6
40:8 42:19 43:4
43:24 47:6 51:4
51:18 52:5,6
53:14,23 54:10
54:11 55:5,18
57:12 59:4
64:14 65:25
67:1,4 68:9,11
74:9 88:19
106:10 107:16
111:12 120:14
125:4 127:8
140:10 144:12
145:5,13
**objections** 66:22
67:5
**occasions** 83:16
**occur** 56:14
64:12 72:9
73:13 74:16,23
85:20
**occurred** 17:21
41:4 51:2,13
64:23 68:6,8
73:9 85:18
**occurrences**
51:12
**occurring** 39:24
69:5,13 72:13
72:14
**October** 4:10
95:12,16 96:17
127:20,25

**offenses** 13:4,7
**offering** 118:19
**office** 2:19 5:21
24:19 32:21
35:19,23,24
58:1 60:17
61:14 95:18,25
97:8 102:18,20
102:25 103:8
117:21,23
**officer** 62:10
65:22 75:18,22
76:11 80:17
81:1 106:22
107:11,12,14
108:1,4 131:19
132:5 133:4,6
138:21 139:1
139:14
**officers** 40:22
41:15,18 43:11
43:14 44:9,11
61:16 66:12
76:18,20 77:6
77:21 78:1,22
79:15 99:12
104:24 105:3
105:17,20
106:4 108:10
108:11 126:3
126:13 128:8
128:13 129:1
134:25 140:18
**offices** 2:5
**oh** 60:4 96:23
**OIT** 73:21
**okay** 11:16,23
13:25 14:8,22
15:11,17 16:1
16:11,21,23
17:15,23 19:18
20:6,10 21:9,20
22:25 24:13
26:23 29:8,22
30:1 31:10
32:24 37:19

39:9 43:19
44:13 47:13
48:3,17 49:18
50:7,20 51:11
55:3 58:19 59:5
59:11,18 60:2
60:22 61:8,11
61:21 62:12,15
62:18,23 63:3
63:24 64:4,12
64:23 68:16
70:7 71:5 73:18
73:24 74:20
77:5 78:6 80:12
81:6 84:1,7
87:5,19 91:5
92:23 95:11,21
96:7 97:11,24
98:14 100:3,7
102:13 103:15
108:17 109:21
111:1 112:1
113:10,23
116:22 117:13
117:24 119:21
120:24 121:18
122:11,12
123:5,7,8,24
124:21 125:12
126:19 128:5
128:12 131:13
132:18 133:11
134:7,15,23
135:3,15
137:19 138:12
138:12,25
139:7 140:1,17
142:1,7,9,19
146:10,16
147:9 148:5,19
**olev@mayerbr...**
2:13
**once** 77:10
106:16 126:21
**ones** 19:17 20:22
85:21 95:19

140:5
**one-way** 6:18
**open** 99:11
147:21 148:7
**opening** 76:7,21
**operate** 119:12
**operating** 79:4
**operational** 92:6
**operations** 16:7
16:18 22:13
24:7 36:20
37:14 48:11
50:15 61:17
62:14 111:3,10
111:19 112:3
112:21 113:5
116:9,18,23
117:1,3 118:9
120:11 145:4
146:12
**opportunity**
148:22
**opposed** 11:18
66:9 83:14
88:17 89:14
90:19 148:3
**Opposition** 3:12
30:6
**options** 69:9
**orally** 9:24
**order** 42:1 86:20
140:2 145:16
**organization**
88:3
**Ori** 2:11 5:15
6:13 57:12
78:13 148:23
**original** 27:21
**Originally** 27:1
**OTM** 131:11
**OTMs** 131:8,14
131:25
**Otro** 1:4 5:3 17:4
22:8,11,15,16
22:18 23:1,5
**outcome** 150:21



**outlined** 122:1
**outside** 12:14
  36:9,9 39:19
  46:22 85:21
**overnight** 99:13
**oversee** 113:6
**overseeing** 48:10
**oversight** 99:21
**Owen's** 22:3
**owned** 49:23
**o'clock** 111:14

**P**

**page** 3:2,11 4:2
  14:22,23,23
  15:11 30:5,8,10
  32:6,7 50:9,10
  50:20 96:21,24
  96:25 97:12,24
  105:16 108:18
  108:20 113:12
  113:13,14
  117:19 118:15
  118:16 123:3
  123:12 133:11
  133:16 134:8
  138:3,5,22
  139:8,15
**pages** 32:5
  150:15
**paragraph** 32:13
  32:24 49:1
  50:13,21 51:6
  56:19 104:21
  104:25 105:14
  108:19 109:3
  109:12 110:12
  113:7,12,16,23
  113:25 114:2
  118:12,18,25
  119:2,16 120:7
  124:6
**paragraphs**
  32:10 119:5
**Pardon** 57:21
**part** 22:15 43:13

64:18 102:21
104:15 107:11
107:14,24
108:1,3 114:21
131:14
**particular** 31:2
51:17 54:17
67:2 122:7
144:7
**particularly**
50:14 62:4
**parties** 2:4 5:13
150:20
**parts** 129:17
**party** 13:14,18
31:15 51:20
**Passport** 18:22
115:1 139:6
**patience** 6:12
137:1
**pause** 138:1
**PCU** 99:20 139:2
139:5,15
140:21
**PDF** 113:14
**pedestrian** 35:13
49:5,11,14,15
49:16,17,18,19
49:21,25 50:5
66:14,15,20
75:20 76:2,3,5
76:6,8 84:13
85:4,8,13 86:5
86:19 104:23
105:2,7,9,12
107:19 132:7
**pedestrians**
49:12
**pending** 7:25
23:21 114:11
**Pennsylvania**
2:20
**people** 28:10
40:24 42:16,24
46:1 64:10,13
83:22 85:10

86:8,8,18 87:2
88:17 90:20
91:10 93:21
97:3 99:7
135:12,13
140:6,8,23
**percent** 94:15
95:1,2,23 96:3
101:3 110:13
110:15 112:18
116:4 118:6
120:8,9 128:4
143:14 144:8
145:3,10,22
146:13,17
**Perfect** 96:25
**perimeter** 99:15
**period** 8:3 27:13
34:22 35:1,7
38:5 41:2,3
42:7 65:23
69:22 85:8,14
92:9 93:1,2
115:14 127:19
135:21 146:1,1
**periods** 84:17
**permanent** 32:14
33:3,4 47:23
**permanently**
146:17
**permission** 71:16
**permitted** 84:12
**Perpendicular**
76:5
**person** 87:23
88:1 89:4
128:22 132:7
**personal** 28:15
**personnel** 72:25
**persons** 19:8
69:15 132:6
133:25 134:3
139:24
**perspective**
15:20
**Peter** 95:14

**Petra** 95:13
**Phoenix** 1:15
36:2 150:22
**phone** 80:6
128:21 132:4
135:7 140:19
140:25
**photograph** 29:4
29:5,6
**physical** 99:24
143:14
**physically** 86:6
86:16 87:10
88:18 89:15
90:20 91:11
101:16 104:5
**place** 75:18 76:22
**placed** 40:22
41:15,18
100:14
**plaintiff** 13:18
**plaintiffs** 1:5
2:10 5:16,19
6:13 14:18 30:7
121:10 142:4
143:10,11
146:11
**please** 4:13 6:3
7:6,10,23 10:4
19:23 29:11,12
42:23 50:9 51:6
52:19 71:6 84:9
95:7 96:13
102:7 103:16
104:9 105:24
112:9 115:17
117:15 119:23
129:7 130:7,19
**PO** 118:20
**POE** 4:5 8:16
37:14 50:21
51:3 62:4 87:17
90:14 96:18
98:11 100:4,8
100:16 101:1
104:19 109:4

110:13 116:4
118:21 120:3,7
123:10 128:9
128:10,14
130:13 131:24
132:1 135:5,17
137:8
**POE's** 98:15
**POE/crossing**
131:8
**point** 39:18,21
40:18,19,22
41:14,18 42:13
44:24 45:17
54:19 64:7
76:15 77:9,14
87:3,5 89:20
128:12 129:24
136:3 137:19
139:24 142:5
**points** 123:13
**policies** 11:17
20:24 21:2
**policy** 21:4,6
37:21 38:8
48:18,21,23
**poorly** 108:6
115:5
**population**
143:23 144:22
**port** 8:15 10:15
15:21 19:3
25:22 28:23
29:7 33:8,23
34:6,10,13,15
35:4,6,7,9,16
38:23 39:4,5,14
39:17,19 41:10
42:17 43:2,12
44:6 46:23
47:19,23 48:5,6
49:3 50:15 55:4
55:8 56:8,9
57:25 58:7
64:25 66:11,24
67:15,24 69:5



69:15,20,25
70:3,9,18,22
71:23 72:12,19
72:23 73:8,22
74:1,2,21 75:3
75:10,13,15,16
76:14 79:7
81:11,17,23
82:4,5,22,24
83:1,11 84:11
84:18 85:9,14
86:22 88:8,9
90:9 91:9 94:19
94:24 95:5,17
96:9 97:8 99:11
100:10 102:21
103:1 104:4
111:2,10,19
112:3,21 113:5
114:9 115:9
116:8,18,23,25
117:23,25
118:9 119:6,8
120:11 124:8
124:16 125:25
126:3,13 127:7
127:21,24
129:1,6 131:14
132:14 133:4
134:1 135:25
139:9,25 140:6
140:22 141:16
143:13 145:4,9
147:1,7
**porta** 39:23
76:15
**portion** 114:10
115:7 131:7
142:4
**ports** 15:5 34:17
34:24 35:6,22
35:23,25 36:1,4
36:20,23 37:5,7
38:16 42:12,14
43:15 44:14
46:8 64:9 67:3

67:14,21 68:12
69:13 71:20,21
72:2,7 73:13,19
73:24 95:25
129:19,20
148:3,12
**port's** 55:16
92:25 96:2
118:5
**posed** 31:24
**position** 33:4,14
81:8 82:8
148:20
**positive** 74:22
98:23 128:4
135:6,8 137:11
**possibility** 85:19
**possible** 85:16
**possibly** 12:13
15:25 16:4
22:17 42:8
64:22 87:8 88:5
108:10 135:23
**posts** 14:8
**potentially** 60:20
62:2
**Potties** 39:23
76:15
**pounds** 55:9
**POV** 49:22
**prac** 15:4
**practice** 15:4,7
106:19,20,23
106:24 127:11
**practices** 127:10
**pre** 102:10
**premarked** 29:18
**preparation**
14:12 17:24
18:9,19 19:23
21:10,25 22:8
24:7 25:12,18
26:8,13,19,24
27:20 51:9 61:4
67:15
**prepare** 17:19

20:15 21:14,14
28:7 53:21
55:21 67:2,12
147:3
**prepared** 27:2
28:14 67:11,19
**preparing** 17:15
17:18 22:19
24:17 27:8 28:1
53:16
**present** 2:22 5:13
8:4 32:12 34:5
61:6 62:18,23
63:3,17 70:1
74:6 86:16
87:11 90:20
137:14 141:8
141:23
**presently** 10:11
**presents** 72:23
**pretty** 145:18
**previous** 63:21
63:22 135:23
141:6,15
**previously**
121:13
**pre-time** 36:9
**print** 19:14 29:1
**printed** 19:17,22
29:3,9
**prior** 12:21,24
31:25 32:15
60:20 87:14,17
112:5 129:3
147:23
**priorities** 21:4
**privately** 9:18
49:23
**privilege** 78:8
**probably** 12:18
17:17 21:8 25:3
28:2 41:3 42:7
53:3 58:20 66:2
94:21 97:4
109:13,17
113:13 119:13

126:22,22
128:24 134:16
135:13
**problem** 46:14
145:24
**procedure** 79:4
**procedures** 11:17
**proceeding** 12:3
**proceedings**
11:11 150:16
**process** 18:15
26:11 38:17
39:5,14 40:7
41:1,9 43:12,16
45:25 46:7,15
65:6,13 68:22
69:17 77:14
81:23 85:23
86:10,12 89:7
108:24 118:22
119:6 126:1,4
135:3 140:2,3,8
**processed** 40:5
40:14 41:5 57:7
63:15 76:17
77:12 92:3
106:13 107:9
107:21,22
113:20 114:5
114:18,23
115:9 135:1,16
136:2 137:7
**processing** 3:23
28:22 35:14
36:22 37:3
39:25 40:12
41:21 43:14,17
45:5,8,19,23
46:6 48:15
71:14,18 96:2
99:22 107:12
107:15 108:2,3
134:1 140:6,23
**produce** 58:17,22
**produced** 22:7
22:11,12 58:10

**product** 31:14
51:20 53:16
55:19 58:22
67:17
**production**
147:24
**professional**
122:10
**program** 35:22
36:14 102:22
**proper** 18:13
144:16 145:17
**property** 76:14
88:25
**propounded**
150:11
**prosecution**
113:20 114:12
**protection** 1:13
2:2 3:3 6:5 8:12
14:19 144:24
149:6
**provide** 4:13
30:16 40:2
79:14 93:8,22
105:16 130:7
**provided** 12:14
22:17 23:17
30:13 31:8
78:22 150:10
**provides** 130:17
133:8
**providing** 144:16
**publicized**
146:25
**purports** 30:11
**purpose** 99:4
129:5
**purposes** 31:15
50:24 53:17
100:17 116:14
**pursuant** 150:4,9
**pushed** 41:5
**put** 39:23 40:6
69:23 94:8,10
94:10



**p.m** 99:12 121:2
  121:5 136:23
  143:2,5 149:2,3

---

**Q**

**question** 7:5,9,10
  7:16,18,25 18:5
  19:24 23:20,23
  23:24 31:5 38:1
  53:24,25 54:4
  54:12,17 56:4
  56:10,11,15
  57:15 69:10
  70:14,20 73:4,9
  78:7 81:6 83:10
  83:21,25 84:8,9
  91:6 93:15,15
  93:18 101:18
  101:19,24
  102:3,8 105:21
  113:2 115:4,8
  122:8 125:5
  130:16 131:6,9
  131:9,13,17,23
  138:13 139:1,8
  143:9
**questioning**
  60:21 122:2,7
  142:6
**questions** 6:15,19
  8:2 16:14 23:22
  25:11 31:23,24
  36:8 53:15,20
  55:20 63:21,22
  102:1 121:19
  147:11 148:11
  148:13,15
  150:11
**queue** 15:4 20:25
  34:23 61:17
  62:14 121:21
**quick** 120:23
  142:11
**quickly** 96:21
  97:21
**quite** 10:24 125:7

**quote** 83:12
  84:11 85:10
  104:21 118:20
  123:14,15
  124:7 133:12
  138:14

---

**R**

**Ramirez** 16:10
  16:17 24:12
  71:12
**ran** 85:12
**rare** 83:16,17
**reached** 62:4
  142:3
**read** 73:10,21
  97:9,22 98:8
  105:4 109:1
  114:7,14
  118:24 123:16
  124:12,13
  130:18,21,22
  130:23 131:15
  131:21 132:9
  133:18,19
  134:11 138:16
  138:23 139:3
  139:11,18
  148:22
**readily** 21:5
**reading** 134:20
**reads** 71:15
  95:21 97:4 98:6
  104:25 133:12
  134:9
**ready** 94:17
  147:5
**real** 96:21
**really** 8:24 20:17
  43:7 62:3,5
  65:18 88:6
  100:11,21
  125:8 129:18
  139:23 148:17
**reason** 9:14 44:8
  46:5,9 54:8

117:4,5,10
  130:16 133:7
  146:20
**reasons** 15:7
  28:15 99:23
  147:21
**recall** 51:11 72:3
  72:17,18
  146:14
**receive** 40:13
  44:25 76:25
  128:6 140:24
**received** 65:11
**Recess** 60:6
  78:16 83:6
  103:24 121:3
  136:21 143:3
**recipients** 95:17
  104:17
**recollection**
  63:14 66:11
  71:25 72:10
  74:3 75:14
**reconnecting**
  80:7
**record** 5:2 6:21
  10:5 15:19 60:3
  60:4,5,7 64:1
  74:8 78:10,13
  78:15,17,21
  80:8,13 83:7
  103:22,25
  121:1,5 136:16
  136:19,23
  142:11,18,24
  143:1,5 149:1
**records** 109:10
**redirect** 75:6,10
**redirected** 69:4
  69:12,19 72:1
  72:24
**refer** 8:7,11,15
  8:23 20:1 51:16
**reference** 133:20
**referenced** 58:11
  84:15 92:19

**references**
  102:13
**referred** 72:11
**referring** 8:25
  28:18 56:18,22
  61:15 70:8,15
  70:17 77:15
  85:3,7,25 90:3
  92:18 106:4,19
  107:4 108:8
  119:16 128:11
**refers** 49:2
**reflect** 112:7
**reflecting** 112:5
  146:16
**refresh** 25:1,10
  25:12 71:25
**regarding** 15:13
  20:24 21:7
  37:22 38:8
  48:23 67:13
  78:23 82:7
  130:6 136:1
  140:2 148:1
**regardless** 84:16
**regroup** 120:18
**regularly** 57:24
  134:24 140:19
**relate** 8:3 21:21
  148:11
**related** 139:10
  150:20
**relates** 15:3
**relation** 75:23
**reliance** 87:13,16
**relied** 58:12
**relies** 140:1
**rely** 86:22 87:20
  87:22 110:23
  140:7
**remain** 113:19
**remained** 39:19
**remember** 12:8
  22:18 28:21
  38:21 39:1 53:4
  53:5 72:4,12,14

72:16 73:16
  79:11,17,17,18
  95:2 125:8
  126:23 128:2
**remembered**
  53:3
**remind** 21:12
**remote** 5:9
**removed** 90:25
**repatriations**
  132:4
**repeat** 23:3,18
  37:25 39:9
  41:11 42:23
  48:19 52:18
  77:24 127:10
  145:6
**rephrase** 39:10
  69:2 81:13
  127:5
**report** 3:13,15,17
  3:19,21 4:9
  16:18,18,20,21
  73:22 94:7
  95:15 110:6,8
  110:10,18
  111:9,11,13,18
  111:25 112:13
  113:4,8 115:21
  115:24 116:13
  116:17 117:20
  117:22,25
  120:2,5 134:24
  135:15 137:6
**reported** 1:24
  117:2,9
**reporter** 1:25 2:5
  5:11 6:3,7,20
  7:4 80:9,14
  150:5,25
**reporter's** 80:6
  83:4
**reporting** 50:24
  93:11,17
  100:17 110:24
  112:1 116:14



117:5,11
reports 92:16,20
92:21
represent 5:14
5:16,19,23,25
6:13 121:9
122:17 124:1
130:3 132:21
137:22
representative
8:20 52:13,25
55:16 56:8,13
58:5 121:14
122:11 141:23
representing
15:9
represents 101:1
request 5:9 58:11
58:23 123:9
146:12,17,20
148:8 150:9
requesting 148:7
require 108:23
146:7
required 99:17
109:5
requiring 113:18
research 28:12
reserved 115:13
resources 46:1
46:15 99:18
109:6
respect 15:13
66:23 126:11
respective 2:4
respectively
114:6
responding 53:17
responds 97:25
123:9 131:19
response 4:14
58:15,16,23
95:4 130:8
131:13,17,23
132:2 138:22
139:1,14,15

responses 6:22
21:10
responsibilities
35:20 48:7,9
114:21 119:9
responsibility
34:12,14 36:16
37:20 38:7,12
48:4,5,14,17,20
responsible
34:17 36:13
48:10
responsive 58:10
58:25
restaurants 40:1
result 118:9
return 77:11,11
106:17 107:21
returned 85:1
107:20
returning 108:14
reveal 18:3 21:12
30:19
reveals 31:2
review 17:24
18:9,9 21:9,17
21:20,24 22:2,7
51:8 56:17
67:12 109:10
123:3 138:7
150:10
reviewed 17:22
17:25 22:3,14
22:19 23:1,6
57:10 113:24
re-ask 23:23 84:9
113:2
re-route 71:16
re-routed 72:4
73:16,19
re-routing 73:25
RFI 4:13 130:7
Ricardo 104:14
Rico 49:8 50:4
right 7:17 12:8
13:24 19:25

21:5 33:2 38:6
63:11 73:14
76:7,12 86:9
89:6,16 99:2
111:7 116:1,16
119:15 129:24
131:8 135:11
138:6 147:11
148:19
Rio 49:8 50:4
role 16:24 32:13
32:20 33:2,3,7
34:7 35:20 38:6
47:22 48:1
121:18
roles 33:24 34:1
room 19:6 60:1
100:14 119:10
route 73:6
Rule 15:24
rules 6:18 122:1
running 84:25
rush 147:6

────────────
S
────────────
safe 18:13 46:20
47:1,3 146:5
safely 38:17 47:2
94:8,10 96:8
98:11
safety 25:6
San 4:7,11 36:2
38:23 39:4,11
42:10,12,17
43:12 44:22,24
44:25 45:3,4,8
45:10,12,13,18
46:3,6,11,16,19
46:23,25 71:18
71:24 72:8,15
74:4,7,10,14,21
75:1,5,6,9,12
75:14,17 76:10
76:22 77:7,17
77:21 78:1,22
79:5,7 122:20

123:10 125:25
126:3,7,11,13
127:7,22,24
128:9,10
132:24 133:4
134:25 135:4
Santa 102:17,25
103:7,14
Sasabe 36:2
62:19,20,21
63:23
saw 54:25
saying 72:10
97:25 106:1
116:21 145:16
147:4
says 14:24 30:6
32:24 71:19,20
72:6 75:4 94:7
97:7,10 105:15
108:22 110:15
111:8,9,20,23
113:17 114:4
116:19 120:16
123:13 124:17
scabies 93:25
144:3
SCCSO 98:5
102:14,17
103:11
Schwamm 95:13
132:23
scope 36:9,17,25
37:8,15,23
44:18 63:19,23
64:14 65:2,17
65:17,25 66:17
66:22 67:6 68:9
74:9 126:6
127:3,9
screen 14:17 49:2
124:22
screened 46:22
screening 119:10
119:19 146:3
second 44:13

105:24 117:19
118:2 119:1
124:6 136:18
138:3 139:8
147:23
Secondly 103:9
Section 5:22
secure 146:6
security 8:8
32:21,25 35:19
35:22 36:14,19
37:20 38:4
43:13 44:16
64:6 105:20
106:5,22
107:14 108:1,5
108:5,11
see 14:24 30:8,10
60:1 96:22 98:3
102:15 104:20
108:22 109:8
111:4 113:21
130:10,25
131:6 136:10
136:11,12
142:2 145:18
145:24
seeing 16:13
seek 70:18 74:2
seeker 72:22
80:20 81:16
84:19 85:7
109:4
seekers 37:22
38:9 39:3 48:24
62:19,24 63:4
63:10,17 64:24
70:8,16,17
71:17,19,20
72:1,6 73:19,25
74:7,21 76:21
77:7,17,22 78:2
78:23 79:15,21
82:10 83:2,12
84:12 88:10
89:7 90:16



91:17 92:24
93:5 94:6 96:1
104:5 105:22
114:18 115:10
119:7 133:21
134:4,6,10
135:4 140:3
**seeks** 59:1
**seen** 14:8,20 79:3
141:11,15,18
**seized** 55:9
**seizures** 51:12
53:7 55:10,11
57:7,19 113:18
114:5,6 116:2
118:3,10 134:8
**selected** 18:4,8
20:11,11 22:22
22:25 23:2,7
53:2
**selection** 18:3
21:13
**send** 29:25
125:25 132:5
**sending** 118:18
**sense** 134:21
142:15
**sent** 104:4 107:6
111:11,14
126:5,15
**sentence** 71:15
115:6 119:1
124:6 133:12
134:9
**sentences** 71:19
**separate** 59:1
120:23 129:18
**September** 34:11
98:24 126:22
127:1,6,19
**served** 32:25
**service** 129:9,10
129:12
**Services** 1:20
5:12
**serving** 32:20

33:1 35:3,6
44:15
**set** 43:15 51:1
52:23 103:3
109:11 143:18
145:18
**sets** 51:11 109:11
**seven** 53:6 144:5
**shakes** 6:23
**share** 32:2
**shelter** 138:15
**shelters** 4:16
88:6 89:19
135:19 136:4
137:25 139:17
139:21
**Sheriff's** 102:17
102:20,25
103:8
**shift** 109:18,20
113:24 132:25
**Shinners** 2:18
3:7 5:20,21
15:18 18:1
21:11 22:21
23:8,20 27:10
30:18,25 31:12
34:25 36:7,17
36:24 37:8,15
37:23 39:6 40:8
42:19 43:4,24
44:18 47:6 51:4
51:18 52:5,16
53:14 54:9 55:5
55:18 56:2,16
57:12,20,22
58:14,20 59:12
59:23 60:18
63:19,25 64:14
65:1,16,25
66:17,25 67:16
68:9,15 70:11
70:25 73:1,20
74:8 78:7,12
79:25 80:24
81:19 82:13

83:15,24 84:3
84:21 88:19
89:11 90:23
91:19 93:14
96:4 101:22
102:6 103:18
106:10 107:16
111:12 112:22
116:11 120:14
120:20 125:4
126:6 127:3,8
133:22 136:15
140:10 141:12
142:7,10,17,23
143:7 145:1,7
146:9 147:10
148:5,19
**short** 59:6 103:16
134:13 146:1
**shorthand**
150:13
**shortly** 17:17
133:14
**short-term** 50:22
**show** 14:13 29:12
92:16 94:23
105:19 106:2
111:15 123:24
129:25 132:18
137:20
**showed** 121:16
146:11
**showers** 99:18
**showing** 30:3
71:10 95:11
112:16,17
122:14
**shown** 29:16
**sic** 26:17 95:23
97:5 117:21
132:22,25
**sick** 97:4 144:19
144:19
**side** 38:24 41:24
42:4,25 71:21
72:20 86:5,16

86:19 87:11
90:14,15,18,22
91:1,12
**sidewalk** 41:24
44:6 66:13
75:19,19 76:8
**sign** 148:22
**signature** 30:11
104:14 150:11
**significant**
108:23
**similar** 141:3
**simultaneous**
54:15 87:4
**single** 103:10,11
103:13,13
143:25 144:1
**singles** 103:9,10
**sir** 10:9 36:6
37:11 52:10
56:19 57:4,9,17
60:25 70:13
74:13 80:19
83:20 84:8 86:3
92:6 93:20
101:18 102:5
107:15 117:11
136:10 147:16
**sire** 141:22
**sit** 73:11 100:24
**situation** 46:24
**situational**
109:13
**six** 36:4 37:6 49:2
49:4 53:6 111:1
**Sixty-six** 96:10
**skill** 150:18
**sleep** 97:19
**sleeping** 46:22
94:12 96:10
**Smith** 1:24 2:5
5:11 150:24
**soil** 40:17
**solve** 46:14
**somebody** 75:15
77:10 80:2

81:21 82:20
84:24 90:10,13
90:14,17,21
91:9,12 106:17
108:4,9 144:4
**Sonora** 89:25
90:5
**SOP** 79:4,10
**sorry** 14:23
25:16 34:4
37:11 44:13
50:11 60:8,19
68:1 69:8 80:4
83:20 89:1 90:6
91:24 93:14
101:6,7 104:18
107:12 108:20
111:22 113:13
117:14 118:14
130:19 136:8
136:13
**sort** 64:8 69:9
113:24
**sounds** 59:23
73:11
**south** 2:12 86:5
86:19,19
124:10
**Southern** 1:2 5:5
**southwest** 148:3
**space** 68:22
69:17 93:9
97:19 99:5
100:4 103:8
114:12 115:12
**spaces** 100:7,20
**speak** 25:16,18
26:12 60:13
121:15
**speaking** 15:12
15:20
**special** 84:15
85:21 94:16
**specialized** 43:11
**specific** 22:18
28:21 51:14



52:3 53:4 56:22
66:6 71:4 72:3
77:16 79:7
126:7 127:10
127:11 137:5
**specifically** 17:23
18:17 26:7,8
58:22 84:23
**specifics** 68:11
74:9
**speculating**
135:14
**speculation**
144:13 145:14
**spell** 10:4 26:16
**spend** 54:18
**spent** 27:8,25
**splitting** 99:18
**spoke** 24:6 26:15
26:18 29:9
**spoken** 26:23
28:10
**spread** 93:23
144:18
**spreading** 144:20
146:6
**stab** 82:21
**Staff** 110:5
**staffed** 79:23
81:9,14 82:9
**stand** 61:16
62:10 100:14
131:11 133:1
139:5
**standard** 79:3
**standing** 66:8,12
68:10 75:22,24
76:18 108:11
**stands** 30:24
138:18
**start** 7:9 17:15
19:12 60:21
122:2,14
145:20
**started** 10:3
18:21 27:4,6

39:16 42:9,11
44:22 45:11
47:12
**starting** 34:14
87:7
**state** 2:6 5:13 8:2
10:4 38:24 56:7
56:12 114:2,9
150:1,6
**stated** 80:17
**statement** 57:4
57:11
**states** 1:1 5:4
43:22 49:13
50:13,21 88:10
89:3,5,9,24
90:7,15 104:6
104:21 105:11
113:16 118:18
118:23 123:19
124:7
**stating** 63:25
**stationed** 76:12
**statistics** 110:23
**stats** 57:24 58:3
**status** 11:19
**stayed** 47:22
**sticker** 29:24
**stickered** 29:21
**stipulation** 150:4
**stood** 53:9 54:8
54:23,24
**stop** 98:20 142:6
**stopped** 41:7
44:9,11
**Street** 2:15
**stretch** 120:19
**strictly** 49:16
50:6
**studying** 20:4
**stuff** 25:4 26:10
28:17 40:3
**subject** 11:10
67:3 71:14
95:15 96:18
104:17 110:6

122:19 124:4
130:6 132:24
137:24
**subjects** 104:22
**submitted** 12:24
**subordinate**
25:22
**subparagraphs**
118:20
**subsequent** 70:4
118:19
**subsided** 127:22
128:3
**substance** 24:21
24:23
**sued** 13:12
**Suite** 2:15
**summon** 135:4
**summoned**
133:13
**Supervisors**
105:17
**supervisory**
99:20 133:3,6
**support** 11:21
57:10
**supports** 127:9
127:11
**supposed** 77:22
78:2 79:15
101:2,13
**sure** 12:1 16:4
20:18 23:13
25:5 39:10
41:13 52:21
54:6,9 59:17
60:23 63:6,12
65:9 68:17,23
70:20 74:25
88:4,6 90:12
98:24 103:20
105:25 123:20
126:16,17,19
127:15,17
128:10 131:2
135:8,12,22,23

135:24 142:17
144:15,21
145:8 146:5
**surge** 4:7 122:20
123:10
**surmising** 75:7
**SWB** 4:5 96:18
**swear** 6:3
**sworn** 6:6 150:8
**system** 45:24

**T**

**table** 98:5
**take** 7:22,25 9:8
27:5 59:5,13
77:13 86:7
90:16 91:17
95:6 96:12
103:15,16
104:8 105:22
105:25 107:1
107:25 109:22
112:8 115:15
115:16 117:7
119:9,11,13,22
120:17,18,22
123:2 130:19
132:6,8 140:15
142:11 144:23
147:6 148:21
**taken** 2:2 5:9 9:4
12:11 41:8 46:9
60:6 78:16 83:6
85:1 89:19
103:24 107:9
119:18 121:3
133:25 136:21
143:3 150:4,13
**talk** 7:3 14:11
24:25 62:7 74:4
78:4 79:20 82:2
82:3 119:17
**talked** 28:7 61:4
85:21 116:1
120:7
**talking** 7:7 82:4

84:14,22 88:11
92:5,7 110:11
115:25
**tasked** 114:21
**TDY** 33:13 38:7
43:15 45:3
**team** 43:11,13,14
104:15
**telephone** 128:15
128:18 129:3
**telephones**
128:20
**tell** 9:4 16:23
17:5 24:16 58:3
58:6,8 69:9
76:20 77:6,22
78:2,23 79:15
129:7 132:5
**telling** 70:8,16,17
77:3,6 101:11
101:16
**temporary** 33:11
33:12 147:8
**ten** 28:4,5 59:8
59:24,24
**tenure** 104:3,7
147:23
**ten-minute** 59:13
**ten-page** 30:5
**term** 61:14,22,24
**terms** 31:14
55:21 56:14
57:19 101:1
**territory** 39:19
76:16 77:11
81:4 84:25
106:12,17
**testified** 6:8
10:20 11:4,7,16
11:24 12:9 13:1
40:17 47:18
80:16 94:3
121:13 124:24
128:5
**testify** 9:15 15:3
16:25 17:3,3



MAGNA
LEGAL SERVICES

27:1 150:8
**testifying** 8:19
9:9 20:22 68:4
82:6 150:8
**testimony** 6:21
11:5,8,15,22
12:15,20 14:12
17:6,9,16 21:25
24:21 60:20
67:23 75:11
76:10 80:10
86:14 88:20
94:25 108:13
114:16,20
148:2 150:16
**text** 128:19
147:24
**texting** 9:22
**TFO** 67:14
**thank** 6:11 16:15
36:10 60:1 61:8
61:11 68:13,15
68:16 74:11
78:13 84:5
102:8 109:21
109:25 113:10
117:24 120:25
127:11 136:25
147:9,12,14,15
147:17,18
148:19,24
**Thanks** 103:21
**theme** 24:22
**theoretical** 85:19
**thereof** 150:6
**thereto** 150:12
**thing** 31:2 43:10
130:21,23
147:8
**things** 18:12,14
25:1,10,11 27:5
28:12 31:14
93:25 116:13
117:5,11
**think** 11:25
12:25 16:6

17:10,10 21:5,6
23:21 24:2,22
26:20 31:1,1,2
31:13 42:6
54:11 56:25
58:20 59:24
61:23 62:1 70:6
73:22 75:6,9
78:4 79:12
93:15 95:3 96:8
106:1 108:6
111:23 116:12
116:19 117:5,7
117:10 124:9
126:21 127:2
127:22 128:3
129:4,12,13
134:5 135:18
136:13 137:10
142:5 147:4
148:23,24
**thinking** 13:21
28:13 142:23
**third** 69:9 104:25
133:16 148:1
**Thirty-three**
10:17
**thought** 17:20
**thousands** 57:7
**three** 32:10 42:7
55:11 114:5
116:2,13,20,22
117:8 119:13
147:21
**three-month**
41:3
**time** 5:6 7:15,15
7:23 8:3 17:7,8
24:2 27:8,13,25
32:22 33:10
34:22 35:1 38:5
38:12,13,14,21
39:14 41:15,21
42:6,18,23
44:12 45:10,22
47:5,7,9 52:19

54:18 65:6,12
65:13,22 68:18
68:24 69:18,22
70:1 76:24,25
80:21 81:13,24
82:23 85:8,14
85:16 87:1,5
88:4,15 89:21
90:24 92:1 95:3
100:23 105:25
111:18,24
119:11,13,14
126:18,24,25
127:10,16,22
130:13,14
135:18,19,20
135:20,21
137:3,4,4
141:17 142:4
146:1,21
147:13,15,19
148:9
**timely** 92:2
**times** 10:23
26:23,25 68:19
68:20,21 71:3
81:22 82:25
83:11 84:10
86:11 93:1,3,24
94:21 145:23
**title** 10:14 33:6
**today** 4:14 5:5
8:20 9:5,15
48:1 73:11 82:7
90:16 100:24
121:18 130:8
143:12
**today's** 14:12
28:1,7 67:11
**toggling** 109:23
**told** 16:1,3,8
28:11 35:15
39:4,13 40:19
41:16,20 43:20
53:12 64:24
65:5,8,10,23

67:23 69:3,11
69:16,17 72:18
73:15 74:1 75:2
76:24 77:2,3,17
80:22 81:10,17
81:21 82:11,15
82:18,20 83:14
85:17 94:14,17
94:21 96:7
**top** 14:23 59:20
96:24 97:24
118:25 119:1
122:25 139:8
**Topic** 15:3,10,13
121:15,22
137:13 141:23
**topics** 14:24
17:11,12 20:17
20:17,19,21
36:10 67:1
143:10
**torn** 94:19
**total** 27:20 98:4,7
133:12
**track** 92:14
**tracked** 94:4
**traffic** 13:4,7
**traffickers**
114:17
**Train** 49:9 50:4
**trains** 50:6
**transcribed**
150:14
**transcript** 148:22
150:16
**transcripts** 21:25
**transferred**
72:20
**transgenders**
143:20,20
144:22
**transports**
120:13
**travel** 73:5,6
**Travelers** 86:1
**trial** 11:6 12:4

**trials** 11:22 12:13
**trouble** 59:25
**true** 30:12 66:5
98:16 107:8
150:15
**truth** 9:4 150:9
**truthfully** 9:15
13:2
**try** 25:16 28:16
46:25,25
118:16
**trying** 18:16 25:9
39:1 45:24
46:11,14 54:5
56:24 83:25
85:18 90:6
93:15
**Tucson** 17:14
32:21 35:19,23
35:24 36:3
60:17 61:13
64:6 95:18,25
117:20,23
**turn** 14:22 15:11
32:5 50:8 107:7
107:9 108:15
**turnback** 81:3
121:21
**turnbacks** 15:5
**turned** 80:22
81:3
**turnstile** 108:9
**turnstiles** 86:19
106:4
**two** 41:3,3 42:8
69:9 71:18
83:22 119:11
119:13
**type** 80:9 128:20
**typewriting**
150:14
**typical** 52:14,25
54:2 56:13,25
57:18 143:13
**Typically** 29:24



**U**

**UACs** 83:18
85:20 103:11
**UDA** 133:1
**UDAS** 4:11
**uh-huhs** 6:23
**unable** 9:14
39:14 44:8
77:13 123:14
125:1,2
**unaccompanied**
82:19 143:21
**understand** 6:25
7:10,20 8:5,9
8:13,17,19 9:1
9:3,4,7,11,17
10:1 15:2,9,12
18:16 33:5
45:16,20 49:11
54:19 56:24
57:9 60:10 61:1
61:19 62:16
66:22 70:10,13
84:16 85:18
90:6 101:22
125:3,8 147:24
**understanding**
8:24,25 63:14
70:19 122:9,10
146:19
**understood** 7:12
13:25 54:6
121:13,23
122:4 127:12
**undocumented**
19:8 29:6 40:20
44:5 69:15
129:5 133:2,25
134:3
**unhealthy** 46:11
46:19
**unit** 18:21,22
99:16 115:2
139:6
**United** 1:1 5:4

43:22 49:13
88:10 89:3,5,9
89:23 90:7,15
104:6 105:11
118:23 123:19
**units** 47:16 74:18
103:10,12
143:24,25
**unsafe** 46:11
**unshrink** 51:5
**unused** 99:2
**update** 109:18
137:9
**updates** 109:14
**upper** 98:15
103:2
**use** 61:22,24
104:15 128:20
**usually** 27:17
35:12 115:3
**utmost** 144:23
145:16
**U.S** 1:13 2:2,19
3:3 5:21 6:5
8:11 14:19
39:19 40:17
41:5 72:20
76:16 77:11
81:4 84:25
106:12,17
125:20 146:24
149:6

**V**

**v** 1:6 5:4
**Vague** 23:8 27:10
34:25 42:19
47:6 51:4 55:5
106:10 145:5
**various** 48:12
51:2,3,13
**vehicle** 49:7,23
66:20 85:12
**verbally** 123:4
**verify** 97:7
**videographer**

2:22 5:1,10 6:2
60:3,7 78:14,17
80:11 83:7
103:22,25
121:1,4 136:19
136:22 143:1,4
149:1
**VIDEOTAPED**
1:12 2:1
**VIRTUAL** 1:12
2:1
**virtually** 2:4
**virtue** 150:6
**virus** 144:18
**viruses** 93:23
**visa** 115:2
**Visas** 114:23
**vocal** 100:21
**voice** 25:14
**vulnerable**
144:22

**W**

**wait** 7:6,8 35:15
39:4,13 40:20
40:24 41:16
43:21 64:10,13
65:8,24 69:4,11
69:18 70:8,16
75:2 77:1 80:22
81:11,18,22
82:11,15,18,20
83:14 85:17
88:16 89:21
107:5 124:22
125:24
**waited** 41:22
86:18
**waiting** 29:7
40:16 42:1,25
44:6 76:14,16
85:4 86:2,3,4,6
86:16,21,22
87:3,5,13,16,20
87:22 88:18,24
89:16,18,19

90:25 91:1,11
91:15 125:14
125:20 134:10
135:1,12,13,16
135:19 136:2,5
137:7
**waives** 54:11
**walked** 105:8
107:6
**Walters** 2:14 3:6
5:17,18 6:14,19
121:7,9 122:23
123:1,23
125:11 126:8
127:4,12,13
129:23 131:3,5
132:17 133:15
133:17 134:2
136:8,13,17,24
137:18 138:6,9
140:12 141:13
142:1,9,13,20
142:24
**want** 15:19 23:18
52:22 54:17
59:8,19,20
61:14 62:7,8
71:22 78:10
84:7,8 112:23
112:24 130:25
142:14,14
144:15,18
148:10
**wanted** 17:19
18:2,12,25 25:1
55:1 60:19 61:1
99:7 148:13
**wanting** 148:15
**Washington** 2:15
2:20
**wasn't** 20:18
27:3 47:15
73:15 77:4
83:20 84:1
98:16 148:16
**watch** 94:22

109:7 130:12
130:15
**way** 24:3 36:8
44:23 72:17
81:7 91:15
92:11,15 96:8
96:21 108:7
115:4 133:16
143:18 147:5
150:19,21
**web** 7:2
**WebEx** 83:5
**Wednesday** 5:6
**week** 104:22
**weekly** 136:4
137:10
**went** 19:1 28:24
33:13,18 38:7
78:20 93:25
127:21
**weren't** 33:1
35:15 45:13
**west** 42:11,14
44:24 45:12,15
64:17
**western** 38:24
**we'll** 7:22 60:1
**we're** 43:8 55:8
58:6 62:7 76:25
77:14 82:4
109:23 121:4
136:22 140:14
140:23 142:15
143:4 144:6,16
146:2,6 147:20
**we've** 28:7 120:6
121:10 140:15
142:3 144:2
**widely** 146:25
**William** 124:4
**withhold** 58:25
**witness** 3:2 6:3,6
14:14 15:24
16:13 18:2
21:12,17 22:23
23:9 24:10,14



29:12 31:17
36:19 37:2,9,17
37:25 43:6
44:21 51:21
52:18 53:24
56:18 57:13,21
57:24 59:7,10
59:17 64:4,16
65:4,18 66:1,18
66:23 67:19
68:17 71:3 73:3
73:21 78:9 80:1
80:25 81:20
82:14 83:16
84:22 90:24
91:20 93:17
96:5 100:25
102:9 103:20
106:11 107:18
111:13 116:12
120:15,24
125:7 133:24
136:11 144:15
145:6,15
147:14,17
148:21 150:7
150:12
**Wonderful**
122:13
**wondering** 137:5
**word** 134:8
**words** 7:4 65:23
83:1 84:18
**work** 10:18 31:13
47:2 51:20,20
53:16 55:19
58:21 67:17
124:8,16,18
129:18 148:8
**worked** 10:16
26:6 88:7
**works** 24:18 59:6
59:22 88:12,14
120:20
**work-related**
11:12,13

**wouldn't** 27:16
58:24 75:9
108:7 127:2
**wound** 82:21,21
**write** 118:15
**written** 12:15
77:5,16,20,25
78:22 79:2 80:8
100:1 108:7,7
**wrote** 31:9,9
**www.MagnaL...**
1:22

**X**

**X** 3:1 28:14
**XD** 22:3

**Y**

**Yard** 49:9 50:4
**yeah** 24:24 27:23
30:25 41:18
48:9 61:3 78:12
96:23 97:16
101:4 103:19
108:6 109:20
109:24 116:7
131:4 136:7
142:24 148:24
**year** 15:25 55:8
**years** 10:17
**yesterday** 55:11
105:1
**yes-or-no** 56:15
**Ysidro** 42:10
44:23

**Z**

**Zamora** 110:5

**1**

**1** 5:2 8:3 32:5,6
32:13 33:24
34:2 50:10
77:10 96:21,24
131:9 146:5
**1:37** 143:5

**1:45** 149:2,3
**10** 27:19 99:12
113:12,16
**10th** 150:22
**10,000** 55:9
**10-15** 14:9
**10/23/2018** 4:10
**10/26/2016** 4:6
**10:11** 60:8
**10:36** 78:15
**10:49** 78:18
**10:58** 83:8
**100** 101:3 128:4
143:14 144:8
145:3,10,22
**104** 4:18
**11** 60:8
**11th** 30:13
**11/16/2006**
132:25
**11/16/2016** 4:12
**11/17/2016** 4:15
**11/22/2016** 4:4
**11:27** 103:23
**11:42** 104:1
**110** 3:13
**112** 3:15 134:9
**115** 3:17
**117** 3:19
**119** 3:21
**12:04** 121:2
**12:17** 121:5
**12:41** 136:20
**12:46** 136:23
**12:54** 143:2
**120** 3:12 29:12,13
29:17 30:4
108:18 109:24
113:12
**121** 3:6
**122** 4:7
**123** 4:3
**128** 3:13 109:23
110:1
**129** 3:15 4:13
112:9,10

**13** 118:12,18
**13(a)** 119:5,16
120:7
**13(b)** 119:5
**13(c)** 119:5
**130** 3:17 115:17
115:18
**131** 3:19 117:15
117:16
**132** 3:21 4:11
119:23,24
**1331** 2:15
**137** 4:16
**141** 3:23 71:6,7
71:11
**142** 4:3 123:21,25
124:2
**143** 3:7 4:5 96:13
96:14
**15** 15:13 20:18
27:19 104:22
105:1 121:15
121:22 137:13
141:23
**152** 4:7 122:15,17
122:21 124:21
**153** 4:9 95:7,8,11
**154** 4:11 132:15
132:19
**155** 4:13 129:21
129:25 130:3
**156** 4:16 137:16
137:20,22
138:4,23
139:15
**158** 4:18 104:9,10
104:13
**16** 132:22
**16th** 114:4 116:1
**17** 14:24 32:17
33:2 130:4
**17th** 115:21
**17-cv-02366-B...**
1:4
**18** 11:5 32:18
79:13

**1980** 34:2
**1987** 34:3

**2**

**2** 15:3,10 20:18
30:8 32:7 49:1
50:13,20 77:12
96:25 131:17
138:13 139:1
**2nd** 71:11
**2/21/2019** 4:19
**20** 94:15 95:1,2
95:23 96:3
146:13,17
**200** 2:15
**2000** 140:17,21
**20005** 2:15
**2006** 34:11,14,19
35:3 132:22
**2009** 34:15,20,21
**2014** 34:12,21
35:3
**2016** 8:3 32:12
34:5 38:25 39:2
41:2 44:19 47:5
47:10,12 62:18
62:23 63:3,13
63:16 64:5,6,20
64:21 68:7 69:6
69:14,24 70:1
74:6,19,20
96:17 122:18
124:2 126:17
126:22 127:1,7
127:20,25
128:23 130:4
132:2,11
137:13 141:4,8
141:20,23
**2017** 33:8,17,20
38:6 47:18
64:22 68:7 69:6
69:14,24 74:24
**2018** 32:14 33:1
47:24 70:5,23
77:15 78:24



79:23 80:17
81:15 83:1,11
84:10 85:9 87:8
87:9,19 95:12
98:21 100:4,6
**2019** 71:11
104:13 109:5
110:4 112:2,14
114:4,4 117:21
118:1 119:17
120:3 128:24
129:3 135:22
135:24,25
137:4,22
140:18,21
141:17
**2020** 1:14 2:3 5:6
150:23
**20530** 2:20
**21** 119:9,13,18
137:22
**21st** 104:13
**22** 124:2
**23** 4:10
**23rd** 95:12,16
**24** 33:1 110:4,12
112:2 122:18
**24th** 32:14,18
109:5 119:17
**24-hour** 99:11
**25th** 2:12 112:14
120:3
**26** 96:17
**26th** 114:4 118:4
**27th** 118:1,5
**28** 133:12,25
**29** 1:14 2:3 3:12
3:12 30:6
**29th** 5:6

---

**3**

**3** 32:6,24 33:25
34:2 139:8
**30** 98:6,18 110:14
**30(b)(6)** 1:12 2:1
3:3 6:5 14:18

15:24 17:2
66:23 67:5
121:15 137:12
141:7,19,22
149:6
**31** 58:11,16
**34** 100:13
**350** 2:12

---

**4**

**4** 108:18
**4/2/2019** 3:24
**4/25/2019** 3:22
**40** 100:13
**44** 98:6
**45** 27:18 110:13
110:15
**48** 116:6
**494** 130:2

---

**5**

**5** 50:21 51:6
56:19 113:12
113:13 131:23
**50712** 1:25
150:25
**547** 122:16
**55** 112:18 118:6

---

**6**

**6** 3:5 99:12
111:14 113:14
**6/17/2019** 3:18
**6/27/2019** 3:20
**65** 50:22 98:16
100:25 101:2
103:3
**66** 50:24 93:1
94:8,8,10,12,12
96:8 100:7,17
100:20 101:9
101:12,14,17
102:10

---

**7**

**7** 14:23,23 117:21

118:16
**71** 3:23
**73** 116:4
**74** 98:7,11
**79** 14:14,17 120:8
120:9

---

**8**

**8** 107:19
**8/21/2019** 4:17
**8/24/19** 110:6
**8/24/2016** 4:8
**8/24/2019** 3:14
**8/25/2019** 3:16
**8:41** 2:3 5:7
**866)624-6221**
1:21
**88036** 137:21

---

**9**

**9** 15:11 108:19
109:12 110:12
113:7
**9:50** 111:23,24
**9:52** 60:5
**90071** 2:12
**95** 4:9
**950** 2:20
**96** 4:5

