Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


AL OTRO LADO, INC., et al.,


                    Plaintiffs,


                    vs.                    Case No.

                                           17-cv-02366-BAS-KSC


KEVIN K. McALEENAN1, et al.,


                    Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~



          VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

                    MARIZA MARIN


               THURSDAY, MAY 28, 2020

                    8:37 A.M.



               SAN DIEGO, CALIFORNIA




Reported remotely by Megan M. Grossman-Sinclair,

               CSR No. 12586



Page 2

```
 1                    APPEARANCES OF COUNSEL
 2
 3          For Plaintiffs:
 4              MAYER BROWN LLP
                STEPHEN M. MEDLOCK, ESQ.
 5              (By Videoconference)
                1999 K Street, N.W.
 6              Washington, D.C.  20006
                T:  (202) 263-3000
 7              smedlock@mayerbrown.com
 8
                CENTER FOR CONSTITUTIONAL RIGHTS
 9              ANGELO GUISADO, ESQ.
                (By Videoconference)
10              666 Broadway
                7th Floor
11              New York, New York  10012
                T:  (212) 614-6464
12              aguisado@ccrjustice.org
13
14          For Defendants:
15              U.S. Department of Justice
                OFFICE OF IMMIGRATION LITIGATION
16              KATHERINE J. SHINNERS, ESQ.
                (By Videoconference)
17              SUSAN IMERMAN, ESQ.
                (By Telephone)
18              Ben Franklin Square
                P.O. Box 868
19              Washington, D.C.  20044
                T:  (202) 598-8259
20              katherine.j.shinners@usdoj.gov
21
22
23
24
25
```



Page 3

1                    APPEARANCES (Continued)

2

3          Also Present:

4                  JOSEPH NEW, Videographer
                   (By Videoconference)

5

                   KEVIN CRANFORD, technical support

6                  (By Videoconference)

7                  LOUISA SLOCUM, ESQ., CBP
                   (By Telephone)

8

                   STACEY FALKOFF, ESQ., CBP

9                  (By Telephone)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 4

1                    INDEX OF EXAMINATION

2      WITNESS:  MARIZA MARIN

3

4      EXAMINATION                           PAGE

5      By Mr. Medlock                        13, 303

6      By Mr. Guisado                        243

7      By Ms. Shinners                       308

8

9                INSTRUCTIONS NOT TO ANSWER

10                     PAGE     LINE

11                      29       25

12                      30       21

13                      31       11

14                      43        2

15                      84        4

16                      84       12

17                     263        9

18

19                INFORMATION REQUESTED

20                     PAGE     LINE

21                     (None)

22

23

24

25                       *  *  *



```
 1                    INDEX TO EXHIBITS
 2      MARKED                                    PAGE
 3      Exhibit 182  E-mail chain, top e-mail       23
                     from Robert Hood to Sidney
 4                   Aki, April 26, 2018.
                     (Bates AOL-DEF-00072448)
 5
        Exhibit 183  Definition of "Capacity"       79
 6                   from Ballentine's Law
                     Dictionary.
 7
        Exhibit 184  Exhibit 27 to Defendants'       80
 8                   Opposition to Plaintiffs'
                     Motion for Class
 9                   Certification.
10      Exhibit 185  Standard Operating Procedure    94
                     San Ysidro Port of Entry
11                   Admissibility Enforcement,
                     Date:  January 2017
12                   Review Date:  August 2017
                     Subject:  Admissibility
13                   Enforcement Unit Standard
                     Operating Procedure.
14
        Exhibit 186  U.S. Customs and Border        113
15                   Protection Directive,
                     August 8, 2008, Subject:
16                   Secure Detention, Transport
                     and Escort Procedures at
17                   Ports of Entry.
                     (Bates AOL-DEF-00372536 -
18                    00372570)
19      Exhibit 187  E-mail from Mariza Marin to    123
                     Robert Hood, April 18, 2018,
20                   Subject:  Intake.
                     (Bates AOL-DEF-00600149)
21
        Exhibit 188  E-mail chain, top e-mail       133
22                   from Robert Hood to Sidney
                     Aki, November 9, 2018,
23                   Subject: Re: Surge efforts
                     at SYS.
24                   (Bates AOL-DEF-00348763 -
                      00348764)
25
```



```
 1              INDEX TO EXHIBITS (Continuing)
 2       MARKED                                    PAGE
 3       Exhibit 189   E-mail chain, top e-mail      138
                       from Robert Hood to Sidney
 4                     Aki, November 9, 2018,
                       Subject: CBP UAC FMUA CAT
 5                     REPORT 6:15.
                       (Bates AOL-DEF-00072448)
 6
         Exhibit 190   E-mail chain, top e-mail      141
 7                     from Johnny Armijo to Robert
                       Hood, October 12, 2016,
 8                     Subject:  Capacity.
                       (Bates AOL-DEF-00062088 -
 9                      00062089)
10       Exhibit 191   E-mail chain, top e-mail      162
                       from Sidney Aki to Robert
11                     Hood and others, September
                       10, 2016, Subject:
12                     San Ysidro End of Day AEU
                       Reporting for September 9,
13                     2016.
                       (Bates AOL-DEF-00065872 -
14                      00065874)
15       Exhibit 192   E-mail from Justin Kelemen    163
                       to various recipients, July
16                     27, 2016, Subject:  San
                       Ysidro End of Day AEU
17                     Reporting for July 26, 2016.
                       (Bates AOL-DEF-00065048 -
18                      00065050)
19       Exhibit 193   E-mail chain, top e-mail      166
                       from Mariza Marin to Kylvin
20                     Gomez, September 8, 2018,
                       Subject:  Intake.
21                     (Bates AOL-DEF-00603278)
22       Exhibit 194   E-mail chain, top e-mail      176
                       from Eric Crouston to Sidney
23                     Aki and others, July 12,
                       2019, Subject:  SYS Daily
24                     Custody Intake and ERO
                       Movement 7/10/2019.
25                     (Bates AOL-DEF-00084038)
```



MAGNA
LEGAL SERVICES

```
 1              INDEX TO EXHIBITS (Continuing)
 2     MARKED                                        PAGE
 3     Exhibit 195  Admissibility Enforcement     155/227
                    Unit 24 Hour Reporting for
 4                  September 11, 2016.
                    (Bates AOL-DEF-00073938 -
 5                   00073940)
 6     Exhibit 196  Queue Management Report for      181
                    July 1st, 2019, spreadsheet.
 7                  (Bates AOL-DEF-00083448)
 8     Exhibit 197  Queue Management Report for      186
                    July 2nd, 2019, spreadsheet.
 9                  (Bates AOL-DEF-00523370)
10     Exhibit 200  Federal Rules of Evidence        190
                    1006 Summary Exhibit for
11                  San Ysidro Port of Entry:
                    Impact to Port Operations.
12
       Exhibit 201  Federal Rules of Evidence        191
13                  1006 Summary Exhibits for
                    Calexico Port of Entry:
14                  Impact to Port Operations.
15     Exhibit 202  Federal Rules of Evidence        192
                    1006 Summary Exhibits for
16                  Otay Mesa Port of Entry:
                    Impact to Port Operations.
17
       Exhibit 203  Lesson 11: Processing            199
18                  Expedited Removals.
                    (Bates AOL-DEF-01090765 -
19                   01090828)
20     Exhibit 204  Memorandum April 6, 2012         201
                    Subject:  Providing
21                  Inadmissible Travelers with
                    Documentation of an Adverse
22                  Action Case.
                    (Bates AOL-DEF-00596511 -
23                   00596513)
24
25
```



```
 1              INDEX TO EXHIBITS (Continuing)
 2      MARKED                                    PAGE
 3      Exhibit 205  Defendants' Supplemental and  207
                     Amended Responses to
 4                   Plaintiffs' Fourth Set of
                     Interrogatories to All
 5                   Defendants.
 6      Exhibit 206  San Ysidro Pedestrian         211
                     Facilities May 2018.
 7                   (Bates AOL-DEF-00036093 -
                      00036096)
 8
        Exhibit 207  E-mail from Mariza Marin to   215
 9                   Sidney Aki, November 9,
                     2018, Subject:  AEU
10                   Processing Plan.
                     (Bates AOL-DEF-00073676)
11
        Exhibit 208  E-mail chain, top e-mail      218
12                   from Mariza Marin to Robert
                     Hood, August 7, 2018,
13                   Subject:  AEU Data.
                     (Bates AOL-DEF-00072964)
14
        Exhibit 209  E-mail chain, top e-mail      220
15                   from Robert Hood to Sidney
                     Aki, September 1, 2017,
16                   Subject:  Streamlined
                     Withdrawals and I-275's.
17                   (Bates AOL-DEF-00069611 -
                      00069612)
18
        Exhibit 210  E-mail chain, top e-mail      223
19                   from Claudia Taitague to
                     various recipients,
20                   January 3, 2016, Subject:
                     SIGMA 5063573.
21                   (Bates AOL-DEF-00707315 -
                      00707316)
22
23
24
25
```



Page 9

```
 1                    INDEX TO EXHIBITS (Continuing)
 2      MARKED                                          PAGE
 3      211         E-mail chain, top e-mail             229
                    from Kevin McAleen to Todd
 4                  Owen, June 16, 2018,
                    Subject:  SWB Queue
 5                  Management Update.
                    (Bates AOL-DEF-00047772 -
 6                   00047773)
 7      212         Memorandum April 30, 2020            235
                    Subject:  Metering Guidance.
 8                  (Bates CBPALOTRO000314 -
                     000315)
 9
        213         E-mail chain, top e-mail             244
10                  from Robert Hood to Mariza
                    Marin, November 17, 2016,
11                  Subject:  **RFI** Please
                    Provide Response by COB
12                  today.
                    (Bates AOL-DEF-00030087)
13
        214         E-mail chain, top e-mail             244
14                  from Moises Castillo to
                    Robert Hood, November 17,
15                  2016, Subject:  **RFI**
                    Please Provide Response by
16                  COB today.
                    (Bates AOL-DEF-00706277 -
17                   00706278)
18      215         Letter from Katherine                256
                    Shinners, Esq., to Stephen
19                  Medlock, Esq., May 27, 2020.
20      216         U.S. Customs and Border              269
                    Protection and Mexico's
21                  National Migration Institute
                    Joint Pedestrian Pilot at
22                  the San Ysidro-El Chaparral
                    Port of Entry Pedestrian
23                  West Facility
                    January 25, 2018, Meeting
24                  Readout.
                    (Bates AOL-DEF-00243914 -
25                   00243918)
```



```
 1              INDEX TO EXHIBITS (Continuing)
 2     MARKED                                        PAGE
 3     217       E-mail from ███████████ to    275
                 Peter Flores and Mariza
 4               Marin, December 9, 2018,
                 ████████████████████████████
 5               ████████████████████████████
                 ████████████████████████████
 6               (Bates AOL-DEF-00036576)
 7     218       E-mail chain, top e-mail        282
                 from Edward Chavoya to
 8               Sidney Aki and others,
                 August 16, 2016, Subject:
 9               Numbers on the Mexico Side.
                 (Bates AOL-DEF-00065471)
10
       219       E-mail chain, top e-mail        285
11               from Robert Hood to various
                 recipients, May 8, 2017,
12               Subject:  AEU Detention
                 Space and Asylum Seekers.
13               (Bates AOL-DEF-00753684 -
                  00753685)
14
       220       E-mail chain, top e-mail        292
15               from Pete Flores to Mariza
                 Marin, January 29, 2019,
16               Subject:  Asylum Book.
                 (Bates AOL-DEF-00083821)
17
       221       Audio recording from            305
18               June 13, 2017.
                 (Bates ALOTROLADO 00018604)
19
20
21               PRIOR EXHIBITS REFERENCED
22                  Exhibit        Page
23                     3           229
24
25                        * * *
```



Page 11

1              SAN DIEGO, CALIFORNIA

2         THURSDAY, MAY 28, 2020; 8:37 A.M.

3

4              VIDEOGRAPHER:  We are now on the

5    record.  This begins video -- the video deposition

6    of Mariza Maria (sic) in the matter of Al Otro

7    Lado v. McAleenan in the United States District

8    Court, Southern District of California.  Today is

9    Thursday, May 28th, 2020.  The time is 8:38 a.m.

10   This deposition is being taken remotely at the

11   request of Mayer Brown.

12              The videographer is Joseph New, and

13   the court reporter is Megan Grossman-Sinclair of

14   Magna Legal Services.

15              Will counsel and all parties

16   present state their appearances and whom they

17   represent.

18              MR. MEDLOCK:  Good morning.  This

19   is Stephen Medlock, Mayer Brown LLP, on behalf of

20   plaintiffs and the putative class.

21              MR. GUISADO:  Good morning.  This

22   is Angelo Guisado, Center for Constitutional

23   Rights, on behalf of the plaintiffs and the

24   putative class.

25              MS. SHINNERS:  Good morning.  This



Page 12

1    is Katherine Shinners.  I am with the U.S.

2    Department of Justice, Office of Immigration

3    Litigation, on behalf of Defendant.  With me is my

4    colleague, Susan Imerman.

5                    Susan.

6                    MS. IMERMAN:  Yes.  Sorry.  This is

7    Susan Imerman with the U.S. Department of Justice.

8                    VIDEOGRAPHER:  Will the court

9    reporter please swear in the witness.

10                    THE COURT REPORTER:  My name is

11   Megan Grossman-Sinclair, a California Certified

12   Shorthand Reporter, and this deposition is being

13   held via videoconferencing equipment.  The witness

14   and reporter are not in the same room.  The

15   witness will be sworn in remotely pursuant to

16   agreement of all parties.  The parties stipulate

17   that the testimony is being given as if the

18   witness was sworn in person.

19                    So stipulated.

20                    MR. MEDLOCK:  So stipulated.

21                    MS. SHINNERS:  Yes.

22                    THE COURT REPORTER:  Also I'd like

23   to remind everyone it's very important not to

24   interrupt each other during question and answer as

25   well as colloquy because the technology cuts out



Page 13

1    and it increases the chances that I will miss

2    what's said.  Thank you.

3

4                        MARIZA MARIN,

5                having been first duly sworn,

6                    testifies as follows:

7

8                        EXAMINATION

9    BY MR. MEDLOCK:

10           Q.   Good morning, Ms. Marin.

11           A.   Good morning.

12           Q.   Can you please state and spell your

13    full name.

14           A.   Sure.  It's Mariza Marin,

15    M-a-r-i-z-a, M-a-r-i-n.

16           Q.   Have you ever gone by any other

17    name?

18           A.   No.

19           Q.   Are you presently employed?

20           A.   Yes.

21           Q.   Who are you employed by?

22           A.   U.S. Customs and Border Protection.

23           Q.   What is your present job title at

24    U.S. Customs and Border Protection?

25           A.   I am the assistant director of



Page 14

1    field operations in the San Diego field office.

2            Q.    Is the title assistant director of

3    field operations sometimes abbreviated ADFO?

4            A.    It is.

5            Q.    And is U.S. Customs and Border

6    Protection sometimes abbreviated CBP?

7            A.    Yes.

8            Q.    If I use those abbreviations today,

9    will you understand them?

10           A.    Yes.

11           Q.    How long have you worked at CBP?

12           A.    Since December of 2008.

13           Q.    Have you ever testified before in

14   court?

15           A.    I've testified once in a state

16   court for a criminal matter.

17           Q.    What state court did you testify

18   in?

19           A.    California.

20           Q.    What was the criminal matter about?

21           A.    It was a DUI in which I was the

22   primary officer to encounter the driver.

23           Q.    This is before your time at CBP?

24           A.    No.  I was the primary officer at

25   CBP.  He was making entry into the United States



Page 15

1    and driving under the influence.

2              Q.   I understand.

3              Do you recall when you testified in

4    court?

5              A.   I don't.  It would have been, like,

6    2011 or '12, I believe.

7              Q.   And would the state court have been

8    in the San Diego area?

9              A.   Yes.  I believe it was Chula Vista.

10              Q.   Understood.  Chula Vista,

11    California?

12              A.   Yes.

13              Q.   Besides the one time where you

14    testified in state court in Chula Vista,

15    California, have you testified in any other court?

16              A.   No.

17              Q.   Have you ever had your deposition

18    taken before?

19              A.   No.

20              Q.   Have you ever been involved in an

21    arbitration proceeding of any type?

22              A.   No.

23              Q.   Have you ever testified before a

24    governmental body such as the U.S. Congress?

25              A.   No.



Page 16

```
 1                Q.   Outside of this case, have you ever
 2     provided written testimony under oath in the form
 3     of an affidavit or a declaration?
 4                A.   That I can remember, there is one
 5     other declaration in a separate case outside of
 6     this one.
 7                Q.   Would that have been in Doe versus
 8     Wolfe?
 9                A.   I believe -- I think Christian Doe.
10                Q.   Yes.
11                A.   Yes.
12                Q.   Is that the other case you are
13     thinking of?
14                A.   Yes.
15                Q.   All right.  Since you haven't sat
16     for a deposition before, I want to go over a few
17     ground rules with you so that we are on the same
18     page today.
19                     A deposition is essentially a
20     conversation in which I ask questions and you
21     answer them.  I would have preferred to do this in
22     person, like I said before we went on the record,
23     but that's just not possible these days.  So
24     there's going to be a few extra ground rules that
25     go along with doing this over video.
```



Page 17

```
 1                    The first ground rule is that you

 2     need to give audible responses.  Our court

 3     reporter Megan is very good.  She can't take down

 4     shakes of the head, and sometimes the words

 5     "uh-huh" and "uh-uh" can sound similar.

 6                    So can you do me the favor today of

 7     answering my questions audibly?

 8              A.   Yes.

 9              Q.   Most importantly, if you don't

10     understand any of my questions today, just tell

11     me, and I will try to improve them.

12                    Can you do that today?

13              A.   Yes.

14              Q.   It's also important since we are

15     doing this over videoconferencing software today

16     that we don't talk over one another because the

17     audio can cut out and it can lead to a messy

18     record.  So I won't talk over you, and if you can

19     do your best not to talk over me.  Okay?

20              A.   Okay.

21              Q.   In addition, Kevin will be

22     assisting us with the displaying of exhibits on

23     the screen today.  If at any point you want to

24     zoom in on a part of a document or you want to

25     scroll through the document, just let Kevin know,
```



Page 18

1  and he is happy to facilitate that for you.  Okay?

2          A.   Okay.

3          Q.   From time to time your attorneys

4  from DOJ may object to my questions.  Objections

5  are something that the court generally rules on

6  later.  So unless you are instructed not to answer

7  one of my questions today, I will need you to

8  provide an answer.

9              Do you understand that?

10         A.   I understand.

11         Q.   We will take a break approximately

12  once an hour.  My -- or if you -- or earlier if

13  you need.  My only request is that if you have an

14  answer pending that you finish the answer before

15  we go on break.  Okay?

16         A.   Okay.

17         Q.   And because we are doing the

18  deposition over videoconference, sometimes

19  although not always, there can be a lag between

20  the video and the audio.  So it's helpful if you

21  pause just a couple of seconds before you answer

22  my questions, and I will pause a couple of seconds

23  to make sure you are done with your answer.  That

24  way we can make sure we really don't talk over

25  each other.  Okay?



Page 19

```
 1              A.   Okay.

 2              Q.   And if at any point you have any

 3    technological issues with the audio or video,

 4    please let us know, and we will try to get it

 5    sorted out as quickly as possible.  All right?

 6              A.   Got it.

 7              Q.   All right.  So unless I state

 8    otherwise today, my questions relate to the time

 9    period from January 1st, 2016, through today.

10              Do you understand that?

11              A.   I understand.

12              Q.   During this deposition, I am going

13    to refer to the U.S. Department of Homeland

14    Security as DHS.

15              Do you understand that acronym?

16              A.   Yes.

17              Q.   During the deposition, I am also

18    going to refer to the office of field operations

19    as OFO.  Do you understand that acronym?

20              A.   I do.

21              Q.   Do you understand you have taken an

22    oath to tell the truth today?

23              A.   I do.

24              Q.   Do you understand it's the same

25    oath that you would take if you were testifying in
```



Page 20

1    a courtroom?

2              A.    Yes.

3              Q.    And do you understand that there

4    are criminal consequences for lying under oath?

5              A.    I do.

6              Q.    Is there any reason that you cannot

7    testify fully and truthfully today?

8              A.    No.

9              Q.    Other than traffic offenses, have

10   you ever been convicted of a crime?

11             A.    So I was -- I was charged in

12   November of 2001, and I don't remember how it

13   resolved.  I know I had to pay a fine, but it was

14   the initial citation and I wasn't arrested.  I was

15   cited and released.  Was minor in possession of

16   alcohol, marijuana, and paraphernalia.

17                   Like I said, I don't know what the

18   final conviction or charge was.  I just remember

19   that I needed -- I had to pay a fine.

20             Q.    Okay.  And what court do you recall

21   that that was in front of?

22             A.    It was in the city of West Covina.

23   So Los Angeles.

24             Q.    Okay.  Los Angeles area of

25   West Covina; is that right?



Page 21

1           A.   Correct.

2           Q.   Besides that one incident, have you

3    ever been charged or cited with committing a

4    crime?

5           A.   No.

6           Q.   Have you ever been sued before in a

7    personal capacity?

8           A.   Excuse me.  No.

9           Q.   Have you ever been a party to a

10   lawsuit either in your personal capacity or in an

11   official capacity?

12          A.   No.

13          Q.   Have you ever been disciplined

14   during your time at CBP?

15          A.   No, not that I -- not that I can

16   recall.  There may have been, like, counseling as

17   an officer, but not that I specifically --

18          Q.   What do you mean -- what do you

19   mean by "counseling as an officer"?

20          A.   So sometimes as an officer if you

21   miss, like, a computer-generated instruction or

22   something like that, then a supervisor would

23   counsel you on, you know, better instruction on

24   not to do that again.  So there could be some

25   counseling as an officer, but anything more



Page 22

1     egregious than that, I don't recall.

2               Q.   Okay.  So to the best of your

3     recollection, the only type of discipline you

4     might have had when you were at CBP was counseling

5     by a superior; is that right?

6               A.   Yes.  To the best of my

7     recollection.  Correct.

8               Q.   Are you a member of any social

9     network platforms such as LinkedIn or Facebook?

10              A.   Yes.  Facebook and Instagram.

11              Q.   How long have you had a Facebook

12    account?

13              A.   Several years.

14              Q.   Are you a member of any Facebook

15    groups related to your work at CBP?

16              A.   No.

17              Q.   Have you ever been a member of a

18    Facebook group called "I'm 10-15"?

19              A.   I am not.

20              Q.   Have you ever seen posts from a

21    Facebook group call "I'm 10-15"?

22              A.   I remember hearing about that

23    group, but not that I saw, you know, myself

24    firsthand.

25              Q.   Do you agree with that group?



Page 23

```
 1                    A.   I am not familiar with it enough to

 2    know that I agree or disagree with it.

 3                    MR. MEDLOCK:  All right.  Kevin, if

 4    you could pull up Tab 1, please.

 5    BY MR. MEDLOCK:

 6                    Q.   Ms. Marin, I am showing you a

 7    document that's entitled "Plaintiffs' Notice of

 8    Federal Rule of Civil Procedure 30(b)(6)

 9    Deposition of U.S. Customs and Border Protection"

10    on the first page of the document.

11                    Do you see that document in front

12    of you on the screen?

13                    A.   I do.

14                    Q.   Have you ever seen a copy of this

15    document before?

16                    A.   Not that I recall.  I have looked

17    at several documents, though, so I may have.

18                    Q.   Okay.  You just don't recall one

19    way or the other whether you have seen this

20    document?

21                    A.   Right.

22                    Q.   Do you understand that you are

23    testifying as a Rule 30(b)(6) representative of

24    CBP today?

25                    A.   I do understand.
```



Page 24

1                   Q.   In your own words, what does it
2       mean to be a Rule 30(B)(6) representative of CBP?
3                   A.   That I will be testifying not only
4       on my knowledge in my individual capacity but as
5       the knowledge of CBP for the San Diego field
6       office.
7                   Q.   Correct.
8                   MR. MEDLOCK:  And if we can move to
9       Tab 7 that we will mark as 182 to the deposition.
10                  (Exhibit No. 182 was marked for
11                  identification by the shorthand
12                  reporter and is attached hereto.)
13      BY MR. MEDLOCK:
14                  Q.   Do you see a section that begins at
15      Line 17 of Page 7 entitled "Topics for
16      Examination"?
17                  A.   I do.
18                  Q.   Do you know which topics you are
19      here to testify on behalf of the San Diego field
20      office?
21                  A.   I do.
22                  Q.   Which topics are those, in your own
23      words?
24                  A.   For the implementation and steps
25      leading to metering and communications with INAMI.



Page 25

1                    MR. MEDLOCK:  All right.  And if we

2     can highlight Topic 2, Kevin, on this same page.

3     BY MR. MEDLOCK:

4              Q.   I put in front of you Topic 2 on

5     Page 7 of Exhibit 182.

6                    Is this one of the topics that you

7     are testifying about today, Ms. Marin?

8              A.   Yes, it is.

9                    MR. MEDLOCK:  All right.  And if

10    you could scroll in, Kevin, to Topic 15.

11    BY MR. MEDLOCK:

12             Q.   You have an enlarged Topic 15.

13                   Is this one of the topics that you

14    are testifying as a 30(b)(6) representative of the

15    San Diego field office today, Ms. Marin?

16             A.   Yes.

17             Q.   When did you find out that you

18    would be a 30(b)(6) witness in this case?

19             A.   I believe it was late January or

20    February.

21             Q.   Who told you you were going to be a

22    30(b) -- I'm sorry.  Go ahead.

23             A.   It could have been earlier than

24    that, but that's -- to my memory, it was earlier

25    in the year.



Page 26

1          Q.   Who told you that you were going to

2     be a 30(b)(6) representative?

3          A.   Agency counsel.

4          Q.   Do you recall which agency counsel

5     told you that?

6          A.   Yes.  It was my local agency

7     counsel, Stacey Falkoff.

8          Q.   Did that initial discussion with

9     local agency counsel occur via telephone, e-mail,

10    or in person?

11         A.   I believe -- and I don't know which

12    came first, if it was telephone or e-mail, but

13    both kind of occurred, and then subsequently there

14    was some discussion.

15         Q.   I don't want to get into the

16    substance of any discussion you had with

17    attorneys, but the initial discussion about you

18    being a 30(b)(6) representative that you had over

19    the telephone with local agency counsel, how long

20    did that conversation last?

21         A.   I don't remember exactly how long

22    it lasted, but it was a short conversation on, you

23    know, what a 30(b)(6) witness would be or what

24    would be required of me, and then --

25              MS. SHINNERS:  I am going to



Page 27

1    counsel the witness not to reveal the substance of

2    the conversation.

3                He is not asking for the substance

4    of your conversations with counsel.

5    BY MR. MEDLOCK:

6                Q.   When did you prepare -- begin

7    preparing to testify as the 30(b)(6) witness in

8    this case?

9                A.   About two weeks ago.

10               Q.   What did you do to prepare?

11               A.   So I met with local counsel a

12   couple hours, you know, first week of -- a couple

13   hours -- a couple days during that week, and then

14   during the last week, every day for a couple hours

15   kind of discussing and making sure that I had

16   adequate knowledge as a 30(b)(6) versus in my

17   individual capacity.

18               Q.   In total how many hours in the last

19   two weeks have you spent preparing for today's

20   deposition as a 30(b)(6) witness?

21               A.   So I couldn't say for sure.  I

22   would say maybe between 30 and 40 hours over

23   the --

24               Q.   Is that your best estimate?

25               A.   That is my best estimate.



Page 28

1           Q.   During the conversations that you

2    had, did you review -- I'm sorry -- during these

3    meetings you had, did you review any documents to

4    prepare you to testify as a Rule 30(b)(6) witness?

5           A.   I did look at some documents with

6    counsel, yes.

7           Q.   How many documents did you look at

8    with counsel?

9           A.   I don't know a number for sure.

10   There was no, like, page markings.  They were

11   consolidated electronic files, but there were

12   quite a few documents that I looked at, and some

13   required me to read in more detail than others.

14          Q.   Of the 30 or 40 hours you spent

15   preparing to be a 30(b)(6) witness, how much of

16   that time was spent reviewing documents with

17   counsel?

18          A.   I would say between a quarter and a

19   half.

20          Q.   Who selected the documents that you

21   reviewed with counsel?

22          A.   Local counsel.

23          Q.   Did you ever request to look at any

24   documents other than those that were selected for

25   you by the local counsel?



1            A.   I don't know that I specifically

2       requested to look at any documents, but I know

3       that, you know, some documents I looked at more

4       than once, duplicate times.  So there were times

5       when questions would come up, and to refresh my

6       memory I would request to look at a document that

7       I thought I had previously seen.

8            Q.   Did you take any notes concerning

9       the documents that you reviewed?

10           A.   No.

11           Q.   Were the documents that you

12      reviewed broken down into any categories?

13           A.   So just to sort them, they were

14      broken down by year.  So the group of documents by

15      the year that they were, I guess, generated or

16      that the events happened.

17           Q.   Did you discuss those documents

18      with anyone other than counsel?

19           A.   So I had two meetings with the DFO

20      regarding one of the documents.

21           Q.   When you say "the DFO," who was the

22      DFO that you met with?

23           A.   So Pete Flores is the director of

24      field operations for the San Diego field office.

25           Q.   And you said you had two meetings



Page 30

```
 1    with Mr. Flores.

 2                When did those two meetings occur?

 3          A.    Within the past week or two.

 4          Q.    How long did those meetings last

 5    for?

 6          A.    They were pretty short meetings, 15

 7    or 20 minutes.

 8          Q.    Besides yourself and Mr. Flores,

 9    who else attended those meetings?

10          A.    The deputy DFO may have been at one

11    of them, but that would have been it.

12          Q.    When you say "deputy DFO," who was

13    that?

14          A.    Her name is Anne Maricich.

15          Q.    Can you spell her last name?

16          A.    M-a-r-i-c-i-c-h.

17          Q.    I think that's right.  You didn't

18    know this was going to be a spelling test but --

19          A.    No, I think that's right.  I can

20    look it up, but I'm pretty sure that's how you

21    spell it.

22          Q.    Okay.  Did any legal counsel attend

23    either of your two meetings with Mr. Flores?

24          A.    No.

25          Q.    What did you discuss with
```



Page 31

1    Mr. Flores during those two meetings?

2                MS. SHINNERS:  So objection based

3    on work product.  These meetings while counsel was

4    not present were actually done at the direction of

5    counsel.

6                So, Ms. Marin, to the extent that

7    what was discussed was done at the direction of

8    counsel, I am going to instruct you not to answer

9    this question.  If you can -- if any of the

10   meetings were not conducted at the direction of

11   counsel, you can answer.

12               THE WITNESS:  Both were at the

13   direction --

14   BY MR. MEDLOCK:

15         Q.   Can you answer the question, then,

16   or are you going to follow your attorney's

17   instruction?

18         A.   I am going to follow my attorney's

19   instruction.  Both were done at the direction of

20   counsel.

21         Q.   What did you want to learn as the

22   result of the meeting with DFO Flores?

23               MS. SHINNERS:  Same objection.  I

24   will instruct -- same objection on work product.

25   I am going to instruct the witness not to answer.



Page 32

1    BY MR. MEDLOCK:

2            Q.   Are you going to follow your

3    attorney's instruction, Ms. Marin?

4            A.   Yes.

5            Q.   How many documents did you go over

6    with DFO Flores during those two meetings?

7            A.   We didn't go over the document.  We

8    just discussed -- we didn't go over any document

9    specifically.  We discussed some meetings

10    surrounding the document.

11            Q.   When you say "some meetings

12    surrounding the document," can you explain what

13    you mean?

14            MS. SHINNERS:  Objection.

15            Ms. Marin, I am going to instruct

16    you not to answer on the substance of the

17    conversation to the extent that they were directed

18    by counsel.  So I am going to instruct you not to

19    answer the question.

20    BY MR. MEDLOCK:

21            Q.   Are you going to follow your

22    attorney's instruction?

23            A.   Yes.

24            Q.   Besides meeting with DFO Flores,

25    Deputy DFO Maricich, and legal counsel, did you



Page 33

1    meet with anyone else to prepare for today's

2    deposition as a 30(b)(6) representative?

3              A.   I did.  I spoke with the APD and

4    watch commander at Calexico to ensure I have

5    proper knowledge of the events and relevant

6    information at that port of entry.  Counsel was

7    present at all of those meetings.

8              Q.   When you say "APD," what does that

9    acronym mean?

10             A.   I'm sorry.  Assistant port

11   director.

12             Q.   And who was the assistant port

13   director that you spoke with at Calexico?

14             A.   Ryan Koseor.

15             Q.   At one point was Mr. Koseor also

16   the deputy commander of the MCAT team at CBP?

17             A.   Yes.  He was detailed there for

18   some time.

19             Q.   And who was the watch commander at

20   Calexico that you spoke with to prepare for

21   today's deposition?

22             A.   His name is Gustavo Barretto.

23             Q.   Would you spell his last name?

24             A.   Yes.  B-a-r-r-e-t-t-o.

25             Q.   Was this just one conversation that



Page 34

1    you had with Mr. Koseor and Mr. Barretto, or was

2    it two different conversations?

3              A.   I think it was more than two.  It

4    may have been four or five different conversations

5    just trying to ensure I had enough detail as a

6    30(b)(6) because I don't have individual knowledge

7    to a great extent of Calexico.  So that was those

8    conversations.

9              Q.   Did these conversations happen in

10   person or over the telephone?

11             A.   They were telephonic.

12             Q.   And you said that counsel was

13   present for these conversations.

14                  Who was the counsel that was

15   present?

16             A.   It was Stacey Falkoff.

17             Q.   In total how long did these four or

18   five conversations with Mr. Koseor and

19   Mr. Barretto last?

20             A.   Some longer than others, but I

21   would say in total if it was four or five, no more

22   than four or five hours in total.

23             Q.   All right.  Is there anyone else

24   you spoke to to prepare yourself as a 30(b)(6)

25   representative of the San Diego field office?



Page 35

```
 1                  A.   I did speak with DOJ counsel on

 2        three occasions during that prep period, as well

 3        as CBP headquarters counsel, Louisa Slocum.

 4                  Q.   For the three occasions that you

 5        spoke with DOJ counsel, when did those

 6        conversations take place?

 7                  A.   One was this past Tuesday, and then

 8        the other two were the previous week, I believe

 9        Friday.  And I don't remember when the first one

10        was.

11                  Q.   Did those conversations take place

12        over the telephone or videoconference or by some

13        other means?

14                  A.   The first was telephone and two

15        were video.

16                  Q.   In total how much time did you

17        spend speaking with DOJ counsel?

18                  A.    I believe it was six or seven

19        hours.

20                  Q.   During those six or seven hours

21        that you spoke to DOJ counsel, were you shown any

22        documents?

23                  A.   I was.

24                  Q.   Approximately how many documents

25        were you shown by DOJ counsel during those six or
```



Page 36

1    seven hours of prep time?

2            A.   I don't remember how many, but it

3    was a small amount, maybe four or five documents.

4            Q.   And who selected those documents

5    that were shown to you?

6            A.   DOJ counsel.

7            Q.   And you mentioned that you also

8    spoke to agency counsel, Ms. Slocum.

9                 Was that also in connection with

10   the three times you spoke to DOJ, or were they

11   separate conversations?

12           A.   That was in connection -- at the

13   same time.

14           Q.   Did you review any deposition

15   transcripts to prepare yourself to testify as a

16   30(b)(6) witness in this case?

17           A.   I scanned through the deposition

18   transcripts of EAC Owen and XD Howe.

19           Q.   When you say you "scanned through,"

20   can you explain what you mean by that?

21           A.   So I didn't read them in their

22   entirety, but I did read parts of them during my

23   preparation.

24           Q.   Were you given the entire

25   deposition transcript by counsel, or were you just



Page 37

```
 1    given excerpts to read?

 2              A.   I have both transcripts in their

 3    entirety.

 4              Q.   Did you make notes or highlight or

 5    underline those transcripts in any way?

 6              A.   I did not.

 7              Q.   Did you ask to see any other

 8    deposition transcripts to prepare for your

 9    deposition today?

10              A.   I did not.

11              Q.   Did you review any responses to

12    interrogatories to prepare to testify as a

13    Rule 30(b)(6) witness in this case?

14              A.   I did.

15              Q.   Do you recall which interrogatory

16    responses you reviewed?

17              A.   So I have reviewed a few of them,

18    but the ones I have most recently been involved

19    with that I can remember are 18 and 19 and then 20

20    and 21.

21              Q.   These are the interrogatory

22    responses regarding how the limit-line position is

23    set up; is that right?

24              A.   Right.

25              Q.   How long did you spend reviewing
```



Page 38

1    those interrogatory responses to prepare yourself

2    to testify today?

3              A.   I didn't have to spend a lot of

4    time reviewing them, just to refresh my memory,

5    because I did assist in preparing those responses.

6              Q.   Did you take any notes or underline

7    or highlight any of the interrogatory responses in

8    order to prepare yourself to testify?

9              A.   I did not.

10             Q.   Did you speak to anyone at the

11   Otay Mesa port of entry, O-t-a-y, M-e-s-a, to

12   prepare yourself to testify as a Rule 30(b)(6)

13   witness in this case?

14             A.   I did not.  I have previous

15   knowledge of Otay Mesa.

16             Q.   How about the Tecate port of entry,

17   did you speak to anyone at that port of entry to

18   prepare yourself to testify as a Rule 30(b)(6)

19   witness in this case?

20             A.   So I did speak to the officer in

21   charge at Tecate with counsel regarding

22   preparation in this case.

23             Q.   Who was the officer in charge that

24   you spoke with?

25             A.   His name is Shawn Carroll.



Page 39

1              Q.   When did your conversation with
2    Mr. Carroll take place?
3              A.   I don't remember the exact day.
4    It's sometime in the last two weeks.
5              Q.   How long did the conversation with
6    Mr. Carroll last?
7              A.   About 15 or 20 minutes.
8              Q.   Was it over the phone?
9              A.   It was.
10             Q.   And you said that counsel was also
11   present for that conversation.
12                  Who was the counsel that was
13   present for the conversation?
14             A.   It was Stacey.
15             Q.   When you were either in meetings
16   with individuals or on the phone with other --
17   with individuals from CBP preparing to testify,
18   did you take any notes regarding your
19   conversations?
20             A.   I did not.
21             Q.   Besides Mr. Carroll, have you
22   spoken to anybody else at the Tecate port of entry
23   to prepare yourself to testify as a 30(b)(6)
24   witness in this case?
25             A.   I have not.



Page 40

1           Q.   Have you spoken to anybody at the
2    Andrade port of entry to prepare yourself to
3    testify as a 30(b)(6) witness in this case?
4           A.   No.
5           Q.   Did you make the decision not to
6    talk to anybody at Andrade?
7           A.   For 30(b)(6), it was my
8    understanding that Otay, Calexico, and San Ysidro
9    were what I would be required to have knowledge
10   over.
11          Q.   Did you review any documents that
12   were produced by Al Otro Lado, Incorporated, in
13   this litigation to prepare yourself to testify
14   today as a 30(b)(6) witness?
15          A.   I believe I have seen the
16   Complaints at some point in preparation.
17          Q.   Besides the Complaints, have you
18   seen any other documents that were -- I am
19   thinking of, like, e-mails that were produced by
20   Al Otro Lado during the course of this litigation
21   as you were preparing yourself to testify as a
22   30(b)(6) witness?
23          A.   Not that I can specifically
24   remember, no.
25          Q.   Do you have any personal views



Page 41

1    about Al Otro Lado as an organization?

2              MS. SHINNERS:  Object to the scope.

3    BY MR. MEDLOCK:

4          Q.   You can answer.

5          A.   I do not.

6          Q.   You don't have any opinions one way

7    or the other about them?

8              MS. SHINNERS:  Same objection to

9    scope.

10             THE WITNESS:  I don't.

11   BY MR. MEDLOCK:

12         Q.   Besides the Complaint that was

13   filed in this case, have you reviewed any other

14   documents that were filed with the court in this

15   case or to prepare yourself to testify as a

16   Rule 30(b)(6) witness?

17             MS. SHINNERS:  And, Ms. Marin, I am

18   going to counsel you not to answer to the extent

19   your answer would reveal the selection of

20   documents by counsel for preparation for this

21   deposition besides selection.  If you can answer

22   without revealing that, then you may do so.

23   BY MR. MEDLOCK:

24         Q.   Right now I am just looking for a

25   "yes" or a "no," so hopefully that won't reveal



Page 42

1    anything.

2              A.   I don't remember.  I mean, I have

3    looked at quite a few documents, so I don't

4    remember specifically what documents we reviewed.

5              Q.   Have you ever heard of an academic

6    by the name of Stephanie Leutert, L-e-u-t-e-r-t?

7              A.   I don't recall that name.

8              Q.   Have you reviewed any work done by

9    Ms. Leutert in connection with this case in order

10   to prepare yourself to testify as a 30(b)(6)

11   witness?

12             A.   I don't recall ever seeing that

13   name specifically, no.

14             Q.   Were you provided with any written

15   statements or documents to refer to during your

16   testimony today?

17             A.   Written statements?

18             Q.   Yes.

19             A.   Handwritten?

20             Q.   Or typed, yes.

21             A.    I'm not sure I understand what you

22   mean by "written statement."

23             Q.   Were you given by your attorneys

24   any written statements that you should read into

25   the record in response to any of my questions



Page 43

1    today?

2              A.    So are you asking if my -- if the

3    attorneys wrote statements?

4              Q.    Right, for you to read today.

5              A.    No.

6              Q.    We have talked about interviews you

7    did with CBP employees, meetings with agency

8    counsel and DOJ counsel and local counsel, and

9    documents and depositions and interrogatories that

10   you have reviewed.

11             Have you done anything else to

12   prepare yourself to testify as a Rule 30(b)(6)

13   witness in this case?

14             A.    No.

15             Q.    Outside of the meetings you had

16   with agency counsel, local counsel, and DOJ

17   counsel, have you met with any other -- and the

18   interviews we discussed, have you met with anyone

19   else to prepare yourself to testify today?

20             A.    No.

21             Q.    Did any of the documents that you

22   were shown either by agency counsel or DOJ counsel

23   jog your memory about CBP's policies with respect

24   to asylum seekers?

25             A.    Some of them, yes, they may have



Page 44

1    jogged my memory.

2            Q.   How so?

3            MS. SHINNERS:  Objection.  Again, I

4    have the same objection to this line of

5    questioning.  If the answer to the question would

6    reveal the selection of documents by counsel, then

7    instruct the witness not to answer.  The refreshed

8    recollection exception applies when the specific

9    information to which the witness's recollection

10   was refreshed is elicited via questioning.

11           MR. MEDLOCK:  I will thank you not

12   to make speaking objections.  As you know under

13   Rule 30(b), objections should be concise.  If you

14   are instructing the witness not to answer, that's

15   where the objection should stop, and beyond that

16   it becomes coaching.

17           I am trying to lay that foundation,

18   but it seems that you have cut me off.

19   BY MR. MEDLOCK:

20           Q.   So I will ask a different question,

21   Ms. Marin.

22           Were there facts relied to metering

23   or queue management that you did not remember

24   before viewing the documents that were shown to

25   you by counsel that you now remember as a result



Page 45

1     of having reviewed those documents?

2              A.   I remember recalling facts from

3     certain documents where, you know, I saw a

4     document and it was like, oh, I hadn't remembered

5     that that occurred, but specifics to which facts,

6     those were -- again, we reviewed a few documents

7     and went through quite a bit of information, so I

8     don't remember specifics on that.

9              Q.   So you know that your memory was

10    jogged, but you can't tell me as you sit here

11    today specifically how it was jogged because you

12    saw so many documents; is that right?

13             A.   Right.  I can't tell you, like,

14    what specific event was jogged.  There were a

15    couple documents that I previously didn't remember

16    and that in review I did remember seeing those

17    previously.

18             Q.   Have you read any news stories

19    regarding this lawsuit?

20             A.   Are we saying during preparation or

21    just ever?

22             Q.   Generally.

23             A.   I recall seeing some news stories

24    very early on in Al Otro Lado, but recently I have

25    not read anything.



Page 46

```
 1                    Q.   When was the last time you think
 2     you read a news story about this litigation?
 3                    A.   Well --
 4                    MS. SHINNERS:  Objection to scope.
 5                    You can answer.
 6                    THE WITNESS:  It's been a few years
 7     that I have seen anything regarding Al Otro Lado
 8     as far as a news story.
 9                    MR. MEDLOCK:  Katie, can you
10     explain your scope objections to me?  Because this
11     witness is here in both her personal capacity and
12     in the representative's.  So I don't understand
13     the scope objection.
14                    MS. SHINNERS:  So I am making a
15     scope objection if I think it's outside of the
16     30(b)(6) topics, and that is precisely so that is
17     clear whether we think she would be testifying in
18     her personal capacity versus her capacity as a
19     representative of CBP as a 30(b)(6)
20     representative.
21                    MR. MEDLOCK:  Okay.  Thank you for
22     explaining.
23     BY MR. MEDLOCK:
24                    Q.   Outside of the work you did to
25     prepare yourself to testify today, have you
```



Page 47

1    discussed the lawsuit filed by Al Otro Lado with

2    anyone, either inside or outside of CBP?

3                    MS. SHINNERS:  Object to the scope.

4                    THE WITNESS:  I have discussed the

5    fact that I have a disposition coming up with my

6    fiancé at home, but not with any specific detail

7    on, you know, what I needed to -- what I was

8    working on or talking about.

9    BY MR. MEDLOCK:

10                   Q.   Okay.  Besides your fiancé, you

11   haven't discussed this case outside of work you

12   have done to prepare with lawyers or other CBP

13   officials with anyone?

14                   A.   Well --

15                   MS. SHINNERS:  Object to the scope.

16                   THE WITNESS:  I have had

17   discussions with the port director, you know, in

18   the past just in general on metering.  So specific

19   to this case, I would say that crosses over, but,

20   you know, I have had conversations with him.

21   BY MR. MEDLOCK:

22                   Q.   And when you say "port director,"

23   you are referring to Sidney Aki?

24                   A.   I am.

25                   Q.   How many conversations have you had



Page 48

1    with Port Director Aki that could cross over into

2    the discussions about this litigation?

3              A.   Well, it's part of our everyday

4    operation.  So, I mean, it would have occurred

5    frequently just in the scope of our day-to-day

6    business.

7              Q.   When you say "it's part of our

8    everyday operations," what's the "it" that you are

9    referring to?

10             A.   Just queue management and, you

11   know, the processing of migrants without documents

12   in general.

13             Q.   And that's because the San Ysidro

14   port of entry has been metering or using queue

15   management for most of the time period from

16   January 1st, 2016, through the present; isn't that

17   right?

18             A.   San Ysidro started metering in May

19   of 2016.

20             Q.   Right.  And since then metering has

21   been fairly constant at the San Ysidro port of

22   entry; correct?

23             A.   Fairly constant but there was a

24   break.  So San Ysidro started metering in May of

25   '16 through February of '17 and did not start



Page 49

1    again till December of '17, but outside of those

2    windows, yes.

3              Q.   And it's still metering today;

4    correct?

5              A.   Correct.

6              Q.   What's the highest level of

7    education you have attained?

8              A.   I have a high school degree, but I

9    did attend four years of college.  Did not

10   graduate.

11             Q.   What college did you attend?

12             A.   The University of La Verne.

13             Q.   You received -- I'm sorry.  I

14   missed the name of it.

15             A.   University of La Verne.

16             Q.   Of La Verne.  Thank you.

17                  What was your major during the time

18   you were enrolled at the University of La Verne?

19             A.   I changed it a couple times.

20   Started as communications and changed to

21   philosophy.

22             Q.   And how many credits were you short

23   of graduating when you left after four years?

24             A.   I think it's probably six or eight.

25   I just never got back to finish them.



Page 50

1          Q.   Understood.

2               Have you ever taken or audited any

3     graduate-level courses since you left the

4     University of La Verne?

5          A.   Not yet.  I am scheduled to

6     participate in a leadership program through the

7     naval postgraduate school.  It was due to start

8     June 1st, but given the current travel -- yeah,

9     it's not, so...

10          Q.   I understand.

11               Starting from the time that you

12     left the University of La Verne up until the time

13     that you joined CBP, what was -- can you give me a

14     brief description of your career history?

15          A.   So at University of La Verne and

16     then -- I don't remember when I stopped working --

17     I worked in radio from high school up through

18     college, and then after college I was employed by

19     GEICO as a claims adjuster, and I left GEICO for

20     CBP.

21          Q.   When did you decide to join CBP?

22          A.   I believe I applied in 2005.

23     Initially it took a little while to kind of go

24     through the background and medical and all of, you

25     know, kind of clearance and physical fitness



Page 51

1    standards.  So -- but I believe I first tested in

2    2005 and then finally got hired in 2008.

3                    Q.    When did you begin training to

4    become a CBP officer?

5                    A.    I believe I left the academy in

6    January.  If it wasn't -- my entrance-on-duty date

7    was late December of 2008.  So I don't know if I

8    left right away for the academy for training or if

9    it was in January, but there was about a -- I

10   think it was a two-week kind of lag.  So may have

11   been early January of 2009.

12                   Q.    So you were on duty as CBP officer

13   before you did the standard training that every

14   officer gets; is that right?

15                   A.    Can you define what you mean by "on

16   duty as a CBP officer"?

17                   Q.    Yeah.  I guess what I am interested

18   is you said you entered on duty.

19                         What does that mean?

20                   A.    So when you are sworn in -- so when

21   officers come in to -- when they are hired, they

22   are sworn in locally and they have a bunch of

23   administrative work to do prior to leaving for the

24   academy.  So I wouldn't say --

25                   Q.    Okay.  I understand now.



Page 52

```
 1                    A.    I wasn't on duty as an officer, but
 2        I was employed at that point.
 3                    Q.    I got it.
 4                          Where did you complete your
 5        training?
 6                    A.    At FLETC?
 7                    Q.    Okay.  During that training, did
 8        you take any courses or any sort of training
 9        regarding U.S. asylum law?
10                    A.    I don't remember the specifics of
11        the training, but in general there were courses on
12        immigration law.
13                    Q.    Was there any coursework on how
14        noncitizens that request asylum at a port of entry
15        should be processed and inspected?
16                    A.    Again --
17                          MS. SHINNERS:  I just want to
18        object to the scope.  Just to clarify, she is not
19        testifying on behalf of CBP, the training.
20                          Go ahead.  You can answer.
21                          THE WITNESS:  I don't remember
22        specifically.  I remember learning aspects of
23        immigration law at the academy.  I don't remember
24        specifically, you know, which aspects we learned.
25        ///
```



Page 53

1    BY MR. MEDLOCK:

2              Q.    After your training, what was your

3    first job at CBP?

4              A.    I worked as an officer at the

5    Long Beach seaport.

6              Q.    And what year did you begin working

7    as an officer at the Long Beach seaport?

8              A.    It would have been in 2009 once the

9    academy was complete.

10             Q.    And how long did you work as an

11   officer at the Long Beach seaport?

12             A.    I believe I stayed in Long Beach.

13   I don't remember the last -- the exact date that I

14   transferred down to San Diego, but it was either

15   late -- or maybe mid 2011 or early 2012.

16             Q.    And when you transferred down to

17   San Diego, are you referring to the San Diego

18   field office?

19             A.    Yes.  So I transferred to the

20   Otay Mesa port of entry.  At the time the

21   Otay Mesa port of entry still fell under the San

22   Ysidro port of entry and port director.

23             Q.    I see.

24                   And when you went to work at the

25   Otay Mesa port of entry, what was your position at



Page 54

1    Otay Mesa?

2              A.   I was CBP officer.

3              Q.   And how long approximately did you

4    work at the Otay Mesa port of entry as CBP

5    officer?

6              A.   Until I was promoted to supervisory

7    CBP officer, and I have to check the exact date.

8    I believe it was 2014, but I am not positive.

9              Q.   Okay.  During the time you were a

10   CBP officer at the Otay Mesa port of entry, what

11   were your responsibilities?

12             A.   So I worked in passenger processing

13   initially.  So what we call "frontline position,"

14   kind of primary and secondary inspections.  And

15   then -- gosh, I don't remember what the time frame

16   was.  I did some work, switched out of primary and

17   secondary into what we call "hard secondary" or

18   "admissibility processing."

19             Q.   When you say "passenger

20   processing," primary and secondary, are you

21   referring to individuals that come through the

22   vehicle lane at Otay Mesa?

23             A.   Both vehicle and pedestrian.

24             Q.   Okay.  And explain to me the

25   difference between primary and secondary for



Page 55

1    purposes of processing.

2              A.    So primary is just the initial

3    encounter, and so the officers in a primary

4    position have a very short time to make a decision

5    on whether someone is admissible or potentially

6    conducting some type of illicit activity.  So the

7    officer will do some cursory interviews, also

8    system checks.  Again, very short time frame.

9              On primary if the officer feels or

10   if I felt as an officer that something warranted

11   further inspection, then the person would be

12   referred to secondary for more in-depth

13   examination.

14             Q.    And you mentioned sort of

15   post-secondary admissibility, doing some work in

16   that area.  Can you explain what you meant by

17   that?

18             MS. SHINNERS:  I just want to

19   object to the scope just for the same reason.

20   Thank you.

21             THE WITNESS:  So admissibility for

22   us, when someone is inadmissible, does not have

23   documents to enter the United States and they

24   require processing, whatever processing that is as

25   appropriate to whatever type of case is in front



Page 56

1    of you, then there is a specialty unit because

2    that is a special skill set that would process

3    that.  So that's what I meant by doing some work

4    in the admissibility unit.

5    BY MR. MEDLOCK:

6            Q.   And when you say the special unit

7    related to admissibility, in the Otay Mesa and

8    San Ysidro ports of entry, that's referred to as

9    the admissibility and enforcement unit, or AEU; is

10   that correct?

11           A.   That's correct.

12           Q.   You mentioned that you became a

13   supervisory CBP officer around 2014; is that

14   correct?

15           A.   Yeah.  I would have to double-check

16   the date, but I believe it was around 2014.

17           Q.   And you were a supervisory CBP

18   officer until approximately February 2016; is that

19   right?

20           A.   Again, I would have to

21   double-check, but I believe so.

22           Q.   Explain to me the difference

23   between a supervisory CBP officer and just a

24   regular CBP officer.

25                MS. SHINNERS:  Object to the scope.



Page 57

1              You can answer.

2              THE WITNESS:  So the supervisory

3    CBP officer is kind of the first level of

4    supervision over the CBP officer.  So they give

5    instructions.  They provide guidance.  They handle

6    plan cards.  It's the first level of supervision.

7    BY MR. MEDLOCK:

8              Q.   What were your responsibilities as

9    a supervisory CBP officer?

10             A.   So, again, it's oversight of the

11   operation.  I was assigned a team, and so

12   mentorship to that team, ensure we were following

13   policy.  Again, you know, processing any payroll,

14   leave requests, and really just being the first

15   line of supervision for the officers.

16             Q.   When you say you had oversight

17   over, quote, "the operation," what's the operation

18   you are referring to?

19             A.   So as a supervisor at San Ysidro,

20   we have several different areas where -- you know,

21   of inspection and processing.  And so there are

22   supervisors assigned in each area to ensure that

23   there is someone there for officers to reach out

24   to for any issues that arise.

25             Q.   And what was the area of inspection



Page 58

1     and processing that you were assigned to?

2               A.   So there are several, and it

3     rotates every day.  So I could have been over

4     schedules one day, you know, over vehicle

5     secondary another, over vehicle primary another,

6     pedestrian primary.  So it varied from day to day.

7               Q.   Around February 2016 you became the

8     watch commander at the San Ysidro port of entry;

9     is that correct?

10              A.   So I became a second-line chief

11    before watch commander.

12              Q.   Okay.  Explain to me what a

13    second-line chief does.

14              A.   So second-line chief --

15              MS. SHINNERS:  Objection to scope.

16              Go ahead, Ms. Marin.

17              THE WITNESS:  Sure.

18              A second-line -- and we refer to it

19    as chief, and it's referred to as different titles

20    in different -- at different ports and even

21    different field office, but they are the second

22    line.  So they have supervisory oversight over

23    the -- what we call "supervisory CBP officers"

24    with the SCBPOs, so first lines.

25                   And then part of their



Page 59

1    responsibilities, they do rotate into all those

2    positions that a first-line supervisor would

3    rotate into, and then there is an additional

4    responsibility in what we call the "operations

5    chief" which really kind of runs the shift as far

6    as vehicle traffic management, scheduling, what

7    staffing for the next shifts should look like,

8    what overtime should look like based on what they

9    have in front of them on that shift.

10   BY MR. MEDLOCK:

11        Q.   Do you recall when you became a

12   second-line chief?

13        A.   I have to double-check the dates on

14   that.  I know my declaration, one of them may

15   have -- we may have accidentally omitted that

16   second line to watch commander role.

17        Q.   Okay.

18        A.   From memory it was late in '15, and

19   then watch commander was January -- I believe

20   January.  And I have to -- I can track down or

21   double-check those dates, but I believe it was

22   January of '07.

23        Q.   And at some point you became watch

24   commander at San Ysidro; is that correct?

25        A.   Correct.



Page 60

```
 1              Q.   What does the -- what were the
 2      responsibilities you had as a watch commander?
 3              A.   So watch commander at San Ysidro
 4      really is who -- is really the commander of the
 5      shift.  Right?  So as events come up, they are
 6      responsible for reporting to -- you know, up to
 7      port leadership.  They are responsible for
 8      ensuring that the chiefs and supervisors and even,
 9      you know, the officers have any resources they
10      need.  They are responsible for maintaining the
11      traffic.  Again, they are writing any reports on
12      reportable events that occurred throughout each
13      shift.  So the watch commander is really the one
14      that runs the -- the operation on the shift in
15      that environment.
16              Q.   When you referred to shifts, the
17      San Ysidro port of entry is a 24-hour port of
18      entry; correct?
19              A.   Correct.
20              Q.   How many shifts does the San Ysidro
21      port of entry have during that 24-hour period?
22              A.   Three shifts.
23              Q.   When did those three shifts begin?
24              A.   And they have changed over the
25      years, but currently there is a shift that begins
```



Page 61

1    at 0600, at 6:00 in the morning.  The next shift

2    starts at 1400, 2:00 p.m., and then 2200 is 10:00

3    p.m.

4                Q.   And in -- approximately how many

5    CBP officers are assigned to each shift?

6                A.   So that all varies as well based on

7    what the workload looks like on any given shift.

8    I don't know the exact number.  I would have to

9    look at a schedule.  The last time I checked, I

10   believe it's about ████████, but I don't know

11   that for sure.

12               Q.   Who is responsible for deciding the

13   number of CBP officers that will be assigned to a

14   shift?

15               MS. SHINNERS:  Object to the scope.

16               THE WITNESS:  I think that I need a

17   little bit more specifics on your question.  And

18   so are we talking just in general or, you know --

19   so if I was the watch commander on a shift today

20   and I am looking at my traffic and for some reason

21   there are extended wait times, then I would decide

22   to augment staffing with overtime.  So it would be

23   the watch commander to make that decision.

24               Now, if we are talking just in

25   general what the staffing model should be, then



Page 62

```
 1    those are conversations held with port leadership.
 2    BY MR. MEDLOCK:
 3              Q.   Okay.  I think you answered my
 4    question, actually.
 5              So when you talked about extended
 6    wait times, have you ever heard of something
 7    called an "SIR" for wait times?
 8              A.   I have.
 9              Q.   What's an SIR?
10              A.   It's a significant --
11              MS. SHINNERS:  Object to the scope.
12              Go ahead, Ms. Marin.
13              THE WITNESS:  It's a significant
14    incident report.
15    BY MR. MEDLOCK:
16              Q.   Under what circumstances will a
17    significant incident report be issued regarding
18    wait times at the port of entry?
19              MS. SHINNERS:  Object to the scope.
20              THE WITNESS:  So there are certain
21    thresholds in which ports of entry are required to
22    generate an SIR based on those wait times.  And
23    offhand I just don't recall what the thresholds
24    are.
25    ///
```



Page 63

1    BY MR. MEDLOCK:

2              Q.   Are there specific thresholds for

3    pedestrian wait times for an SIR?

4                   MS. SHINNERS:  Object to the scope.

5                   THE WITNESS:  I would have to

6    double-check the SIR policy.  I'm not sure if

7    there are specifics for that.

8    BY MR. MEDLOCK:

9              Q.   Have you ever heard of something

10   called a "watch commander report"?

11             A.   I have.

12             Q.   Can you describe what a watch

13   commander report is as it's used at the CBP port

14   of entry?

15                  MS. SHINNERS:  Object to the scope.

16                  THE WITNESS:  So the watch

17   commander report is a report that is sent out to

18   all the other watch commanders at port leadership

19   on just the general -- the general flow of the

20   prior shift so that everyone gets a pass-down on,

21   you know, any occurring -- any events that

22   occurred on the previous shift.

23   BY MR. MEDLOCK:

24             Q.   And when you say "any events," that

25   could include narcotics interdiction, terrorist



Page 64

1    watch list hit, SIRs for wait times.

2                   Is there anything else?

3              A.    Yeah.  I would say --

4                   MS. SHINNERS:  Objection to scope

5    and form.

6                   THE WITNESS:  I wouldn't say it's

7    all inclusive of everything on the shift.  It

8    would be significant events that the previous --

9    that the following shift either needs to close out

10   or address.  So if there was, you know, a watch

11   list hit that was resolved all in one shift, that

12   wouldn't typically go on a watch commander's

13   report.  So it would really be if there was a

14   reason or a need for follow-up on that.

15   BY MR. MEDLOCK:

16             Q.    Okay.  So it's sort of like you are

17   telling the next watch commander, 'Here is what

18   I'm leaving you,' essentially?

19             A.    For the most part --

20                  MS. SHINNERS:  Objection to scope

21   and form.

22                  THE WITNESS:  For the most part.

23   It may have, you know, some info on previous

24   shift, but to the extent that a watch commander

25   report is all-inclusive, there is so much going on



Page 65

1    on any given day on any shift that I don't think
2    it's fair to think that any watch commander would
3    get every single thing that happened on a shift in
4    all the reports.
5    BY MR. MEDLOCK:
6              Q.   When did you become the assistant
7    director of field operations for the San Diego
8    field office?
9              A.   In September of '19.
10             Q.   What are your current
11    responsibilities as assistant director of field
12    operations for the San Diego field office?
13             A.   So I provide support to the DFO for
14    the board of security realm.  So the San Diego
15    field office is kind of in a realignment phase.
16    So I also still do quite a bit of work and work
17    under the division director for the enforcement
18    division in San Diego.  So in the tactical
19    environment, I kind of serve dual purpose in that
20    role as well.
21             Q.   Who is the enforcement director
22    that you work under?
23             A.   Her name is Rosa Hernandez.
24             Q.   And what's the responsibilities of
25    enforcement as opposed to border security?



1              MS. SHINNERS:  Object to the scope.

2              THE WITNESS:  So border security, a

3     lot of the enforcement teams, if you will, are

4     several units within the enforcement division.

5     Most fall under the scope of border security.  And

6     so there are several units kind of with specialty

7     skill sets within the enforcement division.

8     BY MR. MEDLOCK:

9              Q.   Let me just back out for a second

10    about the San Diego field office and make sure I

11    understand a couple things.

12             So there's four ports of entry in

13    the San Diego field office; is that correct?

14             A.   There are -- are we talking land

15    ports of entry?

16             Q.   Land ports of entry, that's

17    correct.

18             A.   There are five.

19             Q.   So there's San Ysidro, Otay Mesa,

20    Calexico West, Calexico East -- I'm sorry.  I see

21    what you are saying.  You have San Ysidro, Otay

22    Mesa, Calexico, Tecate, and Andrade.

23             Those are the five?

24             A.   Correct.

25             Q.   Have you ever heard the term



Page 67

1    "capacity" used with respect to any of those ports

2    of entry?

3              A.   Capacity in general or just have I

4    ever heard it?

5              Q.   Have you ever heard the term

6    "capacity" used with respect to inspecting and

7    processing noncitizens who present themselves at

8    those five land ports of entry?

9              A.   Yes, I have.

10             Q.   What does the term "capacity" mean

11   to you as it's used with respect to processing and

12   inspecting noncitizens that present themselves at

13   the five land ports of entry in the San Diego

14   field office?

15             MS. SHINNERS:  I just want to

16   clarify.  Are you asking her personally or asking

17   her view as a CBP?

18             MR. MEDLOCK:  So I am asking her

19   personally because I think that's not encompassed

20   in the two topics that she is being asked to

21   testify about.

22             MS. SHINNERS:  Okay.

23             THE WITNESS:  So I think we really

24   need to define "capacity," and so the term

25   "capacity," plus there are really two different



Page 68

1    terms for that.  There is a physical capacity

2    that's kind of a set number that's -- that really

3    is not operationally feasible.  There is an

4    operational capacity that fluctuates from day to

5    day, minute to minute.  So there are different

6    capacities of ports of entry.

7    BY MR. MEDLOCK:

8          Q.   To your knowledge, is the

9    distinction between physical capacity and

10   operational capacity memorialized in any sort of

11   regulation?

12              MS. SHINNERS:  Object to the scope.

13              THE WITNESS:  So to my knowledge, I

14   don't know that there is any regulation where

15   that's memorialized.

16   BY MR. MEDLOCK:

17         Q.   Is there any sort of statute that

18   makes a distinction between physical capacity and

19   operational capacity, to your knowledge?

20              MS. SHINNERS:  Object to the scope.

21              THE WITNESS:  My -- not to my

22   knowledge.

23   BY MR. MEDLOCK:

24         Q.   Is there any form of guidance from

25   OFO leadership that makes a distinction between



Page 69

1     physical capacity and operational capacity that

2     you are aware of?

3                    MS. SHINNERS:  Object to the scope.

4                    THE WITNESS:  So we have always had

5     an operational capacity, you know, for as long as

6     I have kind of worked in detention, and so that

7     there is specific guidance on what is and what is

8     not operational capacity, to my knowledge, no.

9     BY MR. MEDLOCK:

10                   Q.   So the answer is you are not aware

11    of any guidance from OFO leadership that defines

12    the difference between physical capacity and

13    operational capacity; is that right?

14                   MS. SHINNERS:  Object to the scope.

15                   THE WITNESS:  I'm not sure I

16    understand your question fully.

17    BY MR. MEDLOCK:

18                   Q.   Have you ever received a memorandum

19    from anybody in the leadership of OFO that

20    explained the difference between operational

21    capacity and physical capacity?

22                   MS. SHINNERS:  Object to the scope.

23                   THE WITNESS:  So I have seen a

24    memorandum that talks about operational capacity,

25    but to the extent that it defines it and gives us



Page 70

1    guidance on what that is, I would say it does not

2    do that.

3    BY MR. MEDLOCK:

4                 Q.   Have you ever seen a standard

5    operating procedure that defines the term

6    "operational capacity" and explains what it is?

7                 MS. SHINNERS:  Object to the scope.

8                 THE WITNESS:  That defines it, no.

9    And I'm not sure.  I would have to look back at

10   any of the standard operating procedures, but,

11   again, for as long as I have worked in detention

12   as a manager, going back to '15-'16, we have

13   always used operational capacity.

14   BY MR. MEDLOCK:

15                Q.   Have you ever seen a written muster

16   that defines the term "operational capacity"?

17                MS. SHINNERS:  Object to the scope.

18                THE WITNESS:  That defines

19   "operational capacity"?  Not that I can recall,

20   no.

21   BY MR. MEDLOCK:

22                Q.   Are you aware of any sort of

23   official document at CBP that defines the term

24   "operational capacity"?

25                MS. SHINNERS:  Object to the scope.



Page 71

```
 1                    THE WITNESS:  Again, I have seen

 2     documents that say "operational capacity" and

 3     discuss it, but that actually define what that is,

 4     I am not aware, no.

 5                    MS. SHINNERS:  Is now --

 6                    MR. MEDLOCK:  I have just got a

 7     couple more questions.  I have just got a couple

 8     more questions and we can take a break.  Thank

 9     you, Katie.

10     BY MR. MEDLOCK:

11          Q.   So that I understand, you

12     understand what the term "operational capacity"

13     means, but you have never seen any sort of

14     document at CBP that defines the term?

15                    MS. SHINNERS:  Object to the scope.

16                    THE WITNESS:  That specifically

17     define what exactly it is, I have not seen that.

18     BY MR. MEDLOCK:

19          Q.   There is no official guidance that

20     tells CBP employees how they should define the

21     term "operational capacity"; correct?

22                    MS. SHINNERS:  Object to the scope.

23                    THE WITNESS:  Again, in my

24     knowledge, no.

25     ///
```



Page 72

```
 1    BY MR. MEDLOCK:
 2            Q.   Do you know whether your definition
 3    of "operational capacity" is the same
 4    understanding of operational capacity that a CBP
 5    officer would have at the port of entry in Texas?
 6            MS. SHINNERS:  Object to the scope.
 7            THE WITNESS:  So all of the
 8    dynamics that go into operational capacity, it
 9    would not be the same understanding and it would
10    differ from port of entry to port of entry, from
11    day to day and sometimes by hour, you know, from
12    hour to hour because really ports of entry don't
13    know what's coming in towards them.
14    BY MR. MEDLOCK:
15            Q.   My question is a little different.
16            Have you ever spoken to somebody at
17    a port of entry in Texas to determine how they
18    define the term "operational capacity"?
19            A.   To define it --
20            MS. SHINNERS:  Object to the scope.
21    BY MR. MEDLOCK:
22            Q.   I couldn't hear you, Ms. Marin.
23    I'm sorry.
24            A.   I have not spoken to someone in
25    Texas to define "operational capacity."
```



Page 73

1              Q.   So you don't know how they define

2      it in the land ports of entry in Texas, do you?

3                   MS. SHINNERS:  Object to the scope.

4                   THE WITNESS:  I don't.

5      BY MR. MEDLOCK:

6              Q.   So "operational capacity" is a term

7      that has never been officially defined by CBP, as

8      far as you know?

9                   MS. SHINNERS:  Object to the scope.

10                  THE WITNESS:  As far as I know, it

11     has not been officially defined, no.

12                  MR. MEDLOCK:  Okay.  Now would be a

13     good time for a break.

14                  MS. SHINNERS:  Okay, great.  Thank

15     you.

16                  MR. MEDLOCK:  Want to take ten

17     minutes?

18                  MS. SHINNERS:  I think -- yeah.

19     Like, 10 or 12 would be great.

20                  MR. MEDLOCK:  Okay.

21                  VIDEOGRAPHER:  The time is 9:56

22     a.m.  We are now off the record.

23                  (Whereupon, a recess was held from

24                  9:56 a.m. to 10:12 a.m.)

25                  VIDEOGRAPHER:  The time is 12:13



Page 74

1    a.m.  We are now back on the record.

2    BY MR. MEDLOCK:

3              Q.    Welcome back, Ms. Marin.

4              During the break, did you discuss

5    the substance of your testimony with your counsel?

6              A.    I did.

7              Q.    Which counsel did you discuss the

8    substance of your testimony with?

9              A.    All of them.

10             Q.    And what was discussed about the

11   substance of your testimony?

12             MS. SHINNERS:  Objection.  Calls

13   for attorney-client communication.

14             MR. MEDLOCK:  No, it doesn't.  Hill

15   versus Clifton.  There is a lot of other cases

16   about this that when the witness is sworn in and

17   discusses the substance of their testimony during

18   the break, it is a -- it is proper grounds for

19   examination.  So I will ask my question again.

20             Sure, it's an Eastern District of

21   Pennsylvania case from, I believe, 1995, and

22   there's many, many cases that have followed it.

23             MS. SHINNERS:  Well, I am going to

24   ask what you mean by discussing the substance of

25   her testimony because otherwise I don't know



Page 75

1     whether that falls under this case.

2                    MR. MEDLOCK:  All right.

3     BY MR. MEDLOCK:

4          Q.   Ms. Marin, you answered "yes," that

5     you discussed the substance of your testimony with

6     your attorneys.

7                    What did you mean by that?

8          A.   We just discussed --

9                    MS. SHINNERS:  Object.  I think we

10    need a definition of "the substance of the

11    testimony" before I can let her answer without

12    instructing her not to answer about

13    attorney-client communications.  And the reason

14    for that is because there are other communications

15    that may not fall within the substance of her

16    testimony or that all the communications may not

17    fall within the substance of her testimony.

18                    MR. MEDLOCK:  All right.  She said

19    "yes," so I am entitled to inquire about it.

20                    Are you going to instruct her not

21    to answer, Katie?

22                    MS. SHINNERS:  I -- if you would --

23    if you would allow us to consult regarding the

24    privilege --

25                    MR. MEDLOCK:  Sure.  Do you want to



Page 76

```
 1    go off for a second and then talk to Ms. Marin,

 2    and then we will just wait here?

 3                    MS. SHINNERS:  Yes.  Yes.  Thank

 4    you.

 5                    MR. MEDLOCK:  All right.  Why don't

 6    we go off the record, then.

 7                    VIDEOGRAPHER:  Time is 10:15 a.m.

 8    We are now off the record.

 9                    (Whereupon, a recess was held from

10                    10:15 a.m. to 10:24 a.m.)

11                    VIDEOGRAPHER:  The time is 10:24

12    a.m.  We are now back on the record.

13    BY MR. MEDLOCK:

14              Q.   Ms. Marin, I want to go back to the

15    question I asked you right after the prior break.

16                    Did you have a conversation or

17    conversations with your attorneys during that

18    break regarding the substance of your testimony at

19    this deposition?

20              A.   So I had a conversation with the

21    attorneys, and I guess I over-generalized when I

22    said "yes" on substance.  It did not contain the

23    substance of the conversation.  It was a general

24    conversation about the way I was answering

25    questions.  I mean, we didn't go over what the
```



Page 77

1    testimony was.

2              Q.   Okay.  All right.

3              TECHNICAL ASSISTANT:  Steve, one

4    second.  Sorry to bother.  This is Kevin.

5              Nick -- or Joe, can you make sure

6    it's recording?  I see it's paused on my end here.

7              VIDEOGRAPHER:  Thank you so much.

8    I don't know -- it's recording on video.  But --

9    thank you.  If you want to repeat that first

10   question for the record, that would be wonderful.

11   Sorry about that.

12             MR. MEDLOCK:  No problem.

13   BY MR. MEDLOCK:

14             Q.   Ms. Marin, I would like to go back

15   to the question I asked you before the last break

16   which was if you had any conversations or

17   conversation with your attorneys during that break

18   regarding the substance of your testimony at this

19   deposition.

20             A.   So regarding the substance, no.

21             Q.   During your time at CBP, have you

22   received any training on the definition of the

23   term "operational capacity"?

24             MS. SHINNERS:  Object to the scope.

25             THE WITNESS:  Specific training,



Page 78

1     no.

2     BY MR. MEDLOCK:

3             Q.   During your time at CBP, have you

4     seen any public communication such as a press

5     release informing the public about the definition

6     of the term "operational capacity"?

7             A.   Not that I know of.

8             Q.   During your time at CBP, are you

9     aware of any testimony in written or oral form

10    that has been delivered to the United States

11    Congress explaining the definition of the term

12    "operational capacity"?

13                 MS. SHINNERS:  Object to the scope.

14                 THE WITNESS:  That I can recall,

15    no.

16    BY MR. MEDLOCK:

17            Q.   When migrants are metered, they are

18    told that a port of entry is at capacity and that

19    they should return at a later date; is that

20    correct?

21            A.   I don't know that they are always

22    told that it's at capacity, but they are told that

23    they should return.

24            Q.   Are there times that you are aware

25    of that the CBP offers at the limit line tell



Page 79

1    migrants that are being metered that the port of

2    entry is at capacity?

3              A.   I don't know of a specific officer

4    saying that, but it could have been said, yes.

5              Q.   Are you aware of any officer who

6    has explained to a migrant that is being metered

7    the difference between operational capacity and

8    physical capacity?

9              A.   No.

10             MS. SHINNERS:  Object to the scope.

11             Go ahead.

12   BY MR. MEDLOCK:

13             Q.   To your knowledge, CBP has never

14   told anyone in the public in any format about the

15   use of the term "operational capacity" and its

16   meaning; correct?

17             MS. SHINNERS:  Object to the --

18   object to the scope.

19             THE WITNESS:  To my knowledge, no.

20   BY MR. MEDLOCK:

21             Q.   And would you agree with me that

22   the simple English definition of the term

23   "capacity" just means holding space?

24             MS. SHINNERS:  Object to the scope.

25             THE WITNESS:  I want --



Page 80

1                    MS. SHINNERS:  Assumes facts not in

2       evidence.

3                    Sorry.  Go ahead.

4                    THE WITNESS:  When we are talking

5       just the definition of "capacity" like in a

6       dictionary or --

7                    MR. MEDLOCK:  Yeah.

8                    THE WITNESS:  Yeah, I would agree.

9                    MR. MEDLOCK:  Let's bring up Tab 2

10      if we could, Kevin.

11                   (Exhibit No. 183 was marked for

12                   identification by the shorthand

13                   reporter and is attached hereto.)

14      BY MR. MEDLOCK:

15                   Q.   So we put in front you what we are

16      going to mark as Exhibit 183 to your deposition.

17      It is a one-page definition of the term "capacity"

18      taken from Ballentine's law dictionary.  And if

19      you look at the definition, the first definition

20      that is offered for the phrase "capacity" is

21      "holding space as the capacity of a ship or

22      freight car."  Do you see that?

23                   A.   I do.

24                   Q.   And you would agree with me that

25      that's the common everyday definition of the term



Page 81

1    "capacity"; correct?

2                    MS. SHINNERS:  Object.  Object to

3    the scope.

4                    THE WITNESS:  Yes, I would agree.

5    BY MR. MEDLOCK:

6                    Q.   Do you recall giving a declaration,

7    submitting a declaration to the court in this

8    case?

9                    A.   I do.

10                   MR. MEDLOCK:  Can we please bring

11   up Tab 3, please?

12                   (Exhibit No. 184 was marked for

13                   identification by the shorthand

14                   reporter and is attached hereto.)

15   BY MR. MEDLOCK:

16                   Q.   All right.  Ms. Marin, we have put

17   in front of you what we will mark as Exhibit 184

18   to your deposition.

19                   MR. MEDLOCK:  Kevin, if you could

20   go in one page of the exhibit.

21   BY MR. MEDLOCK:

22                   Q.   This is a multi-page declaration.

23   At the top of the second page, it reads

24   "Declaration of Mariza Marin."

25                   Do you see that?



Page 82

```
 1                    A.   I do.

 2                    Q.   And I take it that you have seen

 3         this document before, Ms. Marin; is that correct?

 4                    A.   Yes, I have.

 5                    MR. MEDLOCK:  And if you flip to

 6         the last page of the document, Kevin.

 7         BY MR. MEDLOCK:

 8                    Q.   Is that your signature on the final

 9         page of the document, Ms. Marin?

10                    A.   Yes, it is.

11                    Q.   And your signature was executed on

12         this document October 9th, 2019; correct?

13                    A.   Yes.

14                    Q.   When did you first learn that you

15         would be providing a declaration in connection

16         with this litigation?

17                    A.   I don't recall specifically when I

18         learned that was going to occur.

19                    Q.   Do you recall whether it was in

20         October 2019 or September 2019?

21                    A.   It was probably October.

22                    MS. SHINNERS:  I will just

23         insert -- sorry.  I will wait for a question.

24                    MR. MEDLOCK:  Sure, no problem.

25
```



Page 83

1    BY MR. MEDLOCK:

2           Q.   Who asked you to provide this

3    declaration in connection with this litigation?

4           MS. SHINNERS:  Object to the scope.

5    And I will just assert that with respect to

6    general questions about this declaration unless I

7    say otherwise.

8           MR. MEDLOCK:  Okay.  Thank you.

9           THE WITNESS:  I'm sorry.  Can you

10   repeat the last question?

11   BY MR. MEDLOCK:

12          Q.   Sure, no problem.

13          Who asked you to provide this

14   declaration?

15          A.   Local counsel.

16          Q.   Was this declaration drafted by you

17   or by your attorneys?

18          A.   It was a product that we drafted

19   together with the court input.  We met to draft

20   it.

21          Q.   Who actually wrote down the words

22   in this declaration, you or your attorneys?

23          A.   My attorneys.

24          Q.   Did you ensure that this

25   declaration was as accurate as possible before you



Page 84

1     signed it?

2              A.   I believe I did, yes.

3              Q.   How long did you spend reviewing

4     the declaration to make sure it was accurate?

5              A.   I don't recall how long.

6              MR. MEDLOCK:  Kevin, if you could

7     turn to Paragraph 12 of the declaration?  It's on

8     Page 5.  Page 4, sorry.

9     BY MR. MEDLOCK:

10             Q.   So, Ms. Marin, we are at Page 4 of

11    your declaration.  I am focused on Paragraph 12.

12    That paragraph references the San Ysidro custody

13    log for July 1st and 2nd, 2019.

14             Do you see that?

15             A.   I do.

16             Q.   Who provided you with the custody

17    log for those days?

18             A.   The custody log is a log that's

19    created daily and stored on a local drive for

20    three admissibility enforcement units.

21             Q.   Did you access that custody log in

22    order to put this declaration together?

23             A.   I did.

24             Q.   Who made the decision to reference

25    July 1st and 2nd, 2019, in particular?



Page 85

```
 1                   A.   I don't recall who exactly made the

 2      decision.  We were just looking at a time frame to

 3      illustrate.

 4                   Q.   What factors did you use when

 5      selecting July 1st and 2nd as the dates that would

 6      be summarized in 2019, as the dates that would be

 7      summarized in this declaration?

 8                   MS. SHINNERS:  I am going to object

 9      to the question as calling for work product.  I am

10      going to instruct the witness not to answer.

11      BY MR. MEDLOCK:

12                   Q.   Were the dates of July 1st and

13      July 2nd, 2019, selected at random?

14                   MS. SHINNERS:  Same objection, and

15      instruct the witness not to answer.

16      BY MR. MEDLOCK:

17                   Q.   Are you following your attorney's

18      instruction for those last two questions?

19                   A.   Yes.

20                   Q.   Let's turn to Paragraph 6 of your

21      declaration if we can.  In Paragraph 6 of your

22      declaration, you state that:

23                        "Noncitizens without proper

24                        travel documents are eventually

25                        transferred to the custody of the
```



Page 86

```
 1                 U.S. Immigration and Customs
 2                 enforcement, otherwise known as
 3                 ICE, or the U.S.
 4                 Department of Health and Human
 5                 Services or another federal
 6                 agency."
 7                     Is that correct?
 8          A.   Correct.
 9          Q.   What are the other federal agencies
10    you are referring to there?
11          A.   It could be a myriad of them.  So
12    we have housed cases for FBI, for DEA, for ATF.
13    So it could have been any one of those of several
14    federal agencies.
15          Q.   Okay.  Noncitizens without proper
16    travel documents do not have to be processed as
17    expedited removals; correct?
18              MS. SHINNERS:  Object to the scope.
19              THE WITNESS:  They do not have to
20    be, no.
21    BY MR. MEDLOCK:
22          Q.   Noncitizens without proper travel
23    documents can be given as notice to appear,
24    otherwise known as an NTA; correct?
25          A.   Yes.
```



Page 87

1              Q.   Noncitizens without proper travel

2       documents can be paroled into the United States;

3       correct?

4              A.   There are limited authorities in

5       which we can parole noncitizens without proper

6       documents, but yes.

7              Q.   So the throughput of a port of

8       entry isn't entirely reliant on the capacity of

9       ICE, the U.S. Department of Health and Human

10      Services, and other federal agencies; correct?

11             A.   I wouldn't say that that is wholly

12      true.  So I would ask for more specifics on what

13      you mean why it's not wholly dependent on ICE or

14      HHS.

15             Q.   Well, it's not fully dependent

16      because you could be giving those noncitizens

17      notices to appear or paroling them and not

18      detaining them with ICE or HHS; correct?

19             A.   I don't agree with that statement.

20             Q.   You don't agree with that

21      statement?  Why don't you agree with that

22      statement?

23             A.   So even in circumstances where a

24      notice to appear is given, ICE assumes custody of

25      those noncitizens and has to -- has additional



Page 88

```
 1    work that is done on the back end of that notice
 2    to appear.  So a notice to appear is not provided
 3    and then the throughput is just done and they're
 4    allowed -- they are able to just, you know, exit
 5    the port of entry and enter the United States.
 6    There is additional documentation that ICE
 7    completes on the back end of that.
 8              And, you know, as I said before, in
 9    circumstances of parole, someone without documents
10    to -- sufficient to enter the United States, just
11    the mere fact that they don't have documents would
12    not authorize a parole.
13         Q.   The rules around who was eligible
14    for parole into the United States changed in
15    January 2017; correct?
16              MS. SHINNERS:  Objection; assumes
17    facts not in evidence, and object to the scope.
18    Sorry.
19              Go ahead.
20              THE WITNESS:  I am unaware of what
21    that rule change was.
22    BY MR. MEDLOCK:
23         Q.   Okay.  And you said that for
24    individuals who go through a notice-to-appear
25    process, ICE has some paperwork to do on the back
```



Page 89

1    end.  But ICE doesn't detain those individuals

2    indefinitely; correct?

3              A.    That is correct.

4              Q.    The only individuals who are deemed

5    detained indefinitely are noncitizens without

6    proper travel documents who are processed as

7    expedited removal cases; correct?

8                    MS. SHINNERS:  Object as

9    argumentative, object as vague, and object to the

10   scope.

11                   THE WITNESS:  I can't speak to who

12   ICE makes a decision to detain or not detain.  I

13   don't have knowledge on ICE policy.

14   BY MR. MEDLOCK:

15             Q.    So you don't know under what

16   circumstances ICE would decide to indefinitely

17   detain a noncitizen without proper travel

18   documents; is that right?

19                   MS. SHINNERS:  Object to -- as

20   vague, scope, and -- yeah.

21                   THE WITNESS:  That's correct.  I do

22   not know.

23   BY MR. MEDLOCK:

24             Q.    And so you don't know as you sit

25   here today whether a -- processing an individual



Page 90

```
 1    as expedited removal, notice to appear, or parole

 2    would -- whether that would cause any sort of

 3    bottleneck with respect to ICE; is that right?

 4              A.   I didn't -- can you clarify your

 5    question?

 6              Q.   Sure.  In your declaration, you

 7    talk about how ICE and HHS holding capacity affect

 8    a throughput of ports of entry; correct?

 9              A.   Correct.

10              Q.   You don't know the circumstances

11    under which ICE will decide to detain an

12    individual; correct?

13              MS. SHINNERS:  Object to the scope.

14              THE WITNESS:  Correct.

15    BY MR. MEDLOCK:

16              Q.   And you don't know the

17    circumstances under which HHS will decide to

18    detain or house an individual?

19              MS. SHINNERS:  Object to the scope.

20              THE WITNESS:  I do not.

21    BY MR. MEDLOCK:

22              Q.   So when you say that ICE and HHS

23    capacity affects the throughput of ports of entry,

24    you don't know the circumstances under which ICE

25    and HHS's capacity will be constrained?
```



Page 91

1                    MS. SHINNERS:  Object to the scope.

2                    THE WITNESS:  I only know whether

3       ICE has capacity or does not have capacity based

4       on what they tell me on any given day.  And based

5       on my time in custody at a port of entry, my

6       understanding is that ICE cannot keep up with the

7       throughput of individuals in CBP custody waiting

8       for transfer to ICE custody.

9       BY MR. MEDLOCK:

10                   Q.   And that's based solely on what ICE

11      is telling you; correct?

12                   A.   Correct.

13                   Q.   And do you receive any form of

14      regularly produced reports that show you the

15      capacity of ICE's facilities?

16                   A.   I do not.

17                   Q.   Do you receive any form of

18      regularly produced reports that show you the

19      capacity of HHS facilities?

20                   A.   I do not.

21                   Q.   Have you done anything either in

22      your work at CBP or in preparation for today's

23      deposition to investigate the actual capacity of

24      ICE facilities?

25                   A.   No.



Page 92

1          Q.    Have you done anything in your time

2     at CBP or in preparation for today's deposition to

3     investigate the actual capacities of HHS

4     facilities?

5          A.    No.

6               MS. SHINNERS:  And, again, are you

7     just -- you are asking her in her personal

8     capacity; correct?

9               MR. MEDLOCK:  Yes.

10              MS. SHINNERS:  Okay.

11    BY MR. MEDLOCK:

12         Q.    All right.  So I want to focus on

13    the sentence in Paragraph 6 after the phrase

14    "another federal agency" that begins with the

15    "short-term hold rooms."

16              Do you see that sentence,

17    Ms. Marin?

18         A.    Yes.

19         Q.    That sentence reads:

20              "The short-term hold rooms at

21              the San Ysidro POE are located

22              within that POE's AEU, and have

23              an aggregate designated capacity

24              of approximately 300."

25              Did I read that correctly?



Page 93

1          A.    Yes.

2          Q.    What does "designated capacity"

3    mean as you have used it in that sentence?

4          A.    For me that's physical capacity.

5          Q.    Who was that capacity designated

6    by?

7          A.    I don't know specifically who it

8    was designated by, but that's physical hold room,

9    and I'm not sure or positive to say if that was a

10   fire marshal or GSA, but that's the physical

11   designated capacity in that facility.

12         Q.    So you know that's the physical

13   designated capacity, but you don't know actually

14   who designated that capacity, that 300?

15         A.    I am not positive who did that.

16         Q.    Do you know what factors were used

17   to determine the designated capacity of the

18   short-term hold rooms at the San Ysidro port of

19   entry?

20         A.    I don't know for sure, no.

21         Q.    Do you know whether any legal

22   standards were used to determine the designated

23   capacity of the short-term hold rooms at the

24   San Ysidro port of entry?

25              MS. SHINNERS:  Object to the scope.



Page 94

1                        THE WITNESS:  I don't know.

2       BY MR. MEDLOCK:

3                Q.   Do you know whether any standards

4       or guidance were used whatsoever to determine the

5       designated capacity of the short-term hold rooms

6       at the San Ysidro port of entry?

7                        MS. SHINNERS:  Object to the scope.

8                        THE WITNESS:  I don't know.

9       BY MR. MEDLOCK:

10               Q.   As you sit here today, can you tell

11      me how the capacity, the designated capacity of

12      the short-term hold rooms at the San Ysidro port

13      of entry was calculated?

14               A.   I don't --

15                       MS. SHINNERS:  Object to the scope.

16      BY MR. MEDLOCK:

17               Q.   Do you know anybody at CBP who

18      could tell me how the capacity of these short-term

19      hold rooms at the San Ysidro port of entry was

20      calculated?

21               A.   I do not know.

22                       MR. MEDLOCK:  All right.  Let's

23      bring up Tab 4 if we can, Kevin.

24

25



Page 95

1              (Exhibit No. 185 was marked for

2              identification by the shorthand

3              reporter and is attached hereto.)

4    BY MR. MEDLOCK:

5              Q.   All right.  Ms. Marin, I am showing

6    you what we will mark as Exhibit 185 to your

7    deposition.  It's a multi-page document that bears

8    the Bates numbers AOL-DEF-00749854 through -66.

9    And on the front page, it has a date of January

10   2017, a review date of August 2017, and a subject

11   line, "Admissibility enforcement unit standard

12   operating procedure."

13             Do you recognize this exhibit,

14   Ms. Marin?

15             A.   I do.

16             Q.   Exhibit 185 is a copy of what is

17   standard operating procedure for the San Ysidro

18   port of entry's AEU; correct?

19             A.   Correct.

20             Q.   Did you participate in the drafting

21   of this document?

22             A.   Yes, I did.

23             Q.   Who else participated in the

24   drafting of this document?

25             A.   At the time it would have been the



Page 96

1    assistant port director over AEU -- well, over

2    tactical at San Ysidro which would have been

3    Robert Hood and the watch commander Moises

4    Castillo.

5            MS. SHINNERS:  If I may interject,

6    can you repeat the Bates number of this document?

7    I can't find it in the folder.

8            MR. MEDLOCK:  Sure.  It's

9    AOL-DEF-00749854.

10           MS. SHINNERS:  Thank you.

11   BY MR. MEDLOCK:

12       Q.   So at the time that you, Mr. Hood,

13   and Mr. Castillo drafted this document, you were

14   all employed by the CBP; correct?

15       A.   Correct.

16       Q.   And at the time you drafted this

17   document, you had knowledge of its contents; is

18   that right?

19       A.   Yes.

20       Q.   And this document is kept in the

21   regular course of CBP's business; correct?

22           MS. SHINNERS:  Object; vague, calls

23   for a legal conclusion, and scope.

24   BY MR. MEDLOCK:

25       Q.   Ms. Marin, is this document kept at



Page 97

1    CBP?

2              A.    Yes.

3              Q.    And creating standard operating

4    procedures like this one is something that CBP

5    does regularly; correct?

6              MS. SHINNERS:   Object to the scope.

7    BY MR. MEDLOCK:

8              Q.    You can answer.

9              A.    I don't know how regular and

10   depending on what units, but I imagine it is

11   created, yes.

12             Q.    Okay.  So I would like to turn to

13   the page that has the Bates number

14   AOL-DEF-00749858.  And I am focused on the section

15   that says "10: Detention in AEU."

16             Do you see that section, Ms. Marin?

17             A.    Yes.

18             Q.    And do you see Subsection 10.1?

19             A.    I do.

20             Q.    Can you please read Subsection 10.1

21   in for the record?

22             A.    Yes.  Detention maximum capacity in

23   AEU is ███

24             Q.    So in your declaration, you said

25   the designated capacity of the port was 300;



Page 98

1    correct?

2                  MS. SHINNERS:  Object.

3    Mischaracterizes declaration.

4    BY MR. MEDLOCK:

5          Q.   All right.  Let's go back to the

6    declaration, if we can, which is Tab 3.  And I

7    want to focus on Paragraph 6.  In your

8    declaration, you say that:

9              "The designated capacity of

10              short-term hold rooms is

11              approximately 300."

12              Correct?

13          A.   Correct.

14          Q.   And from looking at -- if we can

15    bring up Tab 4 again and go to Subsection 10, this

16    document that you participated in drafting in 2017

17    says that the detention capacity of the hold rooms

18    in the AEU is actually ▆▆▆ correct?

19          A.   Correct.

20          Q.   So when you said that the

21    designated capacity of the hold rooms was 300 in

22    your October 9th, 2019, declaration, that was

23    incorrect?

24                  MS. SHINNERS:  Object.

25    Mischaracterizes declaration.



Page 99

```
 1                        But you can answer.
 2                        THE WITNESS:  I believe
 3     approximately 300 and ███ are the same.
 4     BY MR. MEDLOCK:
 5              Q.   Okay.  So you could have been off
 6     by ███ but that's all within the ballpark; is that
 7     right?
 8              A.   Correct.
 9              Q.   Okay.  And --
10                        MS. SHINNERS:  If we can go off the
11     record for a moment?
12                        MR. MEDLOCK:  Oh, okay.
13                        MS. SHINNERS:  Actually, I take
14     that back.
15                        MR. MEDLOCK:  You want to go off
16     the record formally?  Oh, sorry.  Go ahead.
17                        You want us to continue?
18                        MS. SHINNERS:  No, that's okay.
19     You can continue.  It's not --
20                        MR. MEDLOCK:  Okay.  Let's, if we
21     can, on Exhibit 185 move to the page that's Bates
22     numbered AOL-DEF-00749860.
23     BY MR. MEDLOCK:
24              Q.   Ms. Marin, at the bottom of that
25     page, do you see a section labeled "11:  Overflow
```



Page 100

1     Contingency Plan"?

2               A.   Yes.

3               Q.   And beneath that there is a

4     Subsection 11.1; correct?

5               A.   Correct.

6               Q.   And Subsection 11.1 reads in part:

7                    "In instances where the

8               maximum capacity of ██ is

9               reached, an overflow contingency

10              plan will be activated."

11                   Did I read that correctly?

12              A.   Yes.

13              Q.   So the overflow contingency plan at

14    the San Ysidro port of entry does not kick in

15    until there are ██ individuals in detention;

16    correct?

17              A.   Correct.

18              Q.   And you said earlier that it's

19    impossible to actually hit the physical capacity

20    of a port of entry; correct?

21              A.   I don't believe I said it's

22    impossible to hit the capacity, no.

23              Q.   Okay.  But in any instance, the San

24    Diego field office decided that overflow

25    contingency measures would not kick in until ██



Page 101

```
 1    individuals were in the AEU; correct?

 2              A.    At the time this was drafted, yes.

 3              Q.    Do you have any explanation for why

 4    the overflow contingency doesn't consider

 5    operational capacity?

 6              MS. SHINNERS:  Object to the scope.

 7              You can answer.

 8              THE WITNESS:  Operational capacity

 9    is not -- for us is not a hard number or hard

10    ceiling.  It's a ballpark that we attempt to stay

11    around to safely have the resources available to

12    process and adequately care for people in our

13    custody.  That does not mean that that is a

14    maximum ceiling of capacity for us.

15    BY MR. MEDLOCK:

16              Q.    So the maximum ceiling of capacity

17    can be higher than operational capacity; correct?

18              A.    Right, because operational capacity

19    will vary each day based on all of those factors.

20              Q.    And it can be the case that the

21    port -- a port of entry can physically hold more

22    people than the operational capacity of the port;

23    is that right?

24              A.    Could physically hold more, but we

25    have to weigh the ability to humanely uphold all
```



Page 102

1    of the detention standards that are required of us

2    by policy.

3              Q.   If you wanted to humanely uphold

4    those policies, why doesn't the overflow

5    contingency plan shown in Subsection 11.1 of

6    Exhibit 185 reference operational capacity?

7                   MS. SHINNERS:  Object to the scope.

8                   THE WITNESS:  I don't know the

9    answer to that.

10                   MR. MEDLOCK:  Kevin, if you could

11   bring down the box for overflow contingency plan?

12   BY MR. MEDLOCK:

13             Q.   I am going to have Kevin flip

14   through this document, and please stop him when

15   you find a reference to the phrase "operational

16   capacity" anywhere in this AEU standard operating

17   procedure.

18                   (Document reviewed by witness on

19                   screen.)

20                   MS. SHINNERS:  Object to the scope.

21                   THE WITNESS:  I don't see it on

22   that page.

23                   MR. MEDLOCK:  Okay.  Let's move to

24   the second page of the exhibit.

25                   (Document reviewed by witness on



Page 103

```
 1              screen.)
 2      BY MR. MEDLOCK:
 3              Q.   Do you see a reference to the
 4      phrase "operational capacity" anywhere on the
 5      second page of Exhibit 185?
 6              MS. SHINNERS:  Object to the scope
 7      and for this line of questioning.
 8              THE WITNESS:  I do not see it.
 9      BY MR. MEDLOCK:
10              Q.   Okay.  Let's turn to the third page
11      of Exhibit 185.  Please let me know if you see the
12      phrase "operational capacity" mentioned anywhere
13      on the third page of Exhibit 185.
14              (Document reviewed by witness on
15              screen.)
16              THE WITNESS:  I do not see it
17      there.
18      BY MR. MEDLOCK:
19              Q.   Let's go to the next page of
20      Exhibit 185, and let me know whether you see a
21      reference to operational capacity on this page of
22      Exhibit 185.
23              (Document reviewed by witness on
24              screen.)
25              THE WITNESS:  I do not see it
```



Page 104

1      there.

2      BY MR. MEDLOCK:

3              Q.   Let's move to the next page of

4      Exhibit 185.  Let me know if you see the phrase

5      "operational capacity" referenced anywhere on this

6      page of Exhibit 185.

7              (Document reviewed by witness on

8              screen.)

9              THE WITNESS:  I do not see that

10     phrase.

11     BY MR. MEDLOCK:

12             Q.   All right.  Let's move to the next

13     page of Exhibit 185, and let me know if you see a

14     reference to the phrase "operational capacity" on

15     this page of Exhibit 185.

16             (Document reviewed by witness on

17             screen.)

18             THE WITNESS:  I do not see that

19     phrase.

20     BY MR. MEDLOCK:

21             Q.   Let's move to the next page of

22     Exhibit 185.  Do you see a reference to the phrase

23     "operational capacity" anywhere on this page of

24     Exhibit 185?

25             (Document reviewed by witness on



Page 105

```
 1              screen.)
 2                   THE WITNESS:  I do not see a
 3   reference to the phrase "operational capacity,"
 4   but I do see several reasons why physical capacity
 5   may not be reached.
 6   BY MR. MEDLOCK:
 7         Q.   But the phrase "operational
 8   capacity" is not used anywhere on that page, is
 9   it?
10         A.   It is not.
11         Q.   And there is no definition of
12   "operational capacity" anywhere on that page, is
13   there?
14         A.   There is not.
15         Q.   Okay.  Let's move to the next page.
16              Ms. Marin, do you see any reference
17   to the phrase "operational capacity" anywhere on
18   this page of Exhibit 185?
19              MS. SHINNERS:  I am just going to
20   reiterate the objection to scope to this line of
21   questioning which I previously stated.
22              (Document reviewed by witness on
23              screen.)
24              THE WITNESS:  I do not see the
25   phrase there.
```



Page 106

1    BY MR. MEDLOCK:

2              Q.   Let's move to the next page.

3                   Do you see a reference to

4    "operational capacity" anywhere on this page of

5    Exhibit 185?

6              (Document reviewed by witness on

7              screen.)

8              THE WITNESS:  I do not see it

9    there.

10   BY MR. MEDLOCK:

11             Q.   Let's move to the next page.

12                  And as before, let me know if you

13   see a reference to the phrase "operational

14   capacity" anywhere on this page of Exhibit 185.

15             (Document reviewed by witness on

16             screen.)

17             THE WITNESS:  I do not see it.

18   BY MR. MEDLOCK:

19             Q.   All right.  Let's move to the next

20   page.  Let me know whether you see a reference to

21   "operational capacity" on this page of

22   Exhibit 185.

23             (Document reviewed by witness on

24             screen.)

25             THE WITNESS:  No, I don't.



Page 107

1    BY MR. MEDLOCK:

2              Q.   Okay.   Let's move to the next page,

3    and let me know whether you see a reference to the

4    phrase "operational capacity" anywhere on the page

5    Bates numbered AOL-DEF-00749865.

6              (Document reviewed by witness on

7              screen.)

8              THE WITNESS:   I do not see it

9    there.

10   BY MR. MEDLOCK:

11             Q.   All right.   Let's move to the last

12   page of the document Bates numbered

13   ALO-DEF-00749866.

14             Let me know if you see the phrase

15   "operational capacity" mentioned anywhere on this

16   page of Exhibit 185.

17             (Document reviewed by witness on

18             screen.)

19             THE WITNESS:   I do not see it

20   there.

21   BY MR. MEDLOCK:

22             Q.   Okay.   So we have been through

23   every page of Exhibit 185, and the phrase

24   "operational capacity" appears nowhere in the

25   standard operating procedures for the San Ysidro



Page 108

1      port of entry's admissibility enforcement unit;

2      correct?

3                  A.    Correct.

4                  Q.    And you participated in drafting

5      this document in 2015; correct?

6                  A.    Correct.

7                  Q.    And at that time you understood

8      what the phrase -- you have already testified you

9      understand what the phrase "operational capacity"

10     meant; correct?

11                 A.    Correct.

12                 MS. SHINNERS:  Object to the scope.

13     BY MR. MEDLOCK:

14                 Q.    And do you believe that Mr. Hood

15     and Mr. Castillo also understood what "operational

16     capacity" meant?

17                 MS. SHINNERS:  Objection; calls for

18     speculation, scope.

19                 THE WITNESS:  I believe I did.

20     BY MR. MEDLOCK:

21                 Q.    Did you -- and you never included a

22     definition of the phrase "operational capacity"

23     anywhere in these standard operating procedures;

24     correct?

25                 MS. SHINNERS:  Object to the form,



Page 109

1    scope.

2                  THE WITNESS:  No.

3    BY MR. MEDLOCK:

4         Q.   Operational capacity, as you said,

5    is an important concept for the San Ysidro

6    admissibility enforcement unit; correct?

7         A.   It is.

8         Q.   It's an important concept for the

9    AEU, but it appears nowhere in the standard

10   operating procedures; is that right?

11                 MS. SHINNERS:  Object to the scope.

12                 THE WITNESS:  Correct.

13   BY MR. MEDLOCK:

14        Q.   So you expect the court in this

15   case to believe that operational capacity is so

16   important that it drives everything that's done on

17   a daily basis at the San Ysidro AEU but when it

18   was time to put together the standard operating

19   procedures that govern day-to-day business at that

20   AEU, the concept of operational capacity wasn't

21   mentioned once.

22                 Is that what you expect the court

23   to believe?

24                 MS. SHINNERS:  Object to the scope.

25   Argumentative.



Page 110

```
 1                    THE WITNESS:  That was a given for
 2       us.  Even during the drafting of that, we knew
 3       that we always had the discretion to operate
 4       within operational capacity.
 5       BY MR. MEDLOCK:
 6              Q.  So it was just a given, so you
 7       didn't write it down.
 8                    Is that your testimony?
 9                    MS. SHINNERS:  Object to the scope.
10                    THE WITNESS:  Yes.
11       BY MR. MEDLOCK:
12              Q.  Is it your testimony that
13       "operational capacity" never needed to be defined
14       because everybody understood what it meant and
15       acted accordingly?
16                    MS. SHINNERS:  Object to the scope.
17                    THE WITNESS:  I can't speak to what
18       everyone knew, whether it meant or not, but the
19       decision-makers in the unit clearly understood
20       what operational capacity was and that it
21       fluctuated on any given day on what the detention
22       capacity.
23       BY MR. MEDLOCK:
24              Q.  Can you explain to me why, if
25       operational capacity was such an important concept
```



Page 111

```
 1    for day-to-day operations of the admissibility

 2    enforcement unit at San Ysidro, why it was never

 3    defined or written down once?

 4                    MS. SHINNERS:  Object to the scope.

 5                    THE WITNESS:  I can't explain why

 6    it was never written down, but why it's not

 7    defined is that there isn't -- there isn't a

 8    concrete definition of what that is.  There are

 9    several factors that are always changing in

10    dynamic that would affect the capacity on any

11    given day.

12    BY MR. MEDLOCK:

13            Q.   Did anyone that you are aware of

14    any level at CBP ever write down what the factors

15    were that determined the operational capacity on

16    any given day?

17                    MS. SHINNERS:  Object to the scope.

18                    THE WITNESS:  Not to my knowledge.

19    BY MR. MEDLOCK:

20            Q.   And you certainly didn't do that in

21    the standard operating procedures for the

22    San Ysidro admissibility enforcement unit;

23    correct?

24                    MS. SHINNERS:  Object to the scope.

25                    THE WITNESS:  I did not.
```



Page 112

```
 1    BY MR. MEDLOCK:
 2              Q.   Are you aware of any form of
 3    official or unofficial document at CBP that lays
 4    out the factors to be considered when determining
 5    what operational capacity is?
 6              MS. SHINNERS:  Object to the scope.
 7              THE WITNESS:  I am not aware.
 8    BY MR. MEDLOCK:
 9              Q.   So to your knowledge, no policy
10    exists defining the factors to be used when
11    determining operational capacity?
12              MS. SHINNERS:  Object to the scope.
13              THE WITNESS:  To my knowledge, no.
14    BY MR. MEDLOCK:
15              Q.   So operational capacity is really
16    just an unwritten policy that's based on the gut
17    of the officials at a port of entry; correct?
18              MS. SHINNERS:  Object to the scope.
19              THE WITNESS:  Operational capacity
20    is not based on the gut of officials.  I would not
21    say that, no.  There are several factors that go
22    into operational capacity.  If I have a family
23    unit that comes in and they have -- one of the
24    children in the family unit has chicken pox, a
25    hold room that could hold 24 -- that's a family
```



Page 113

1    unit of four is going to affect my capacity that

2    day because I can't potentially put anyone else at

3    risk of contracting a contagious illness.  If they

4    have --

5    BY MR. MEDLOCK:

6            Q.   Okay.  And that's your testimony,

7    that's the actual policy of CBP that a family has

8    to be put into an isolation unit; is that correct?

9            MS. SHINNERS:  Object to the scope.

10           THE WITNESS:  I cannot speak to the

11   policy of CBP, but at San Ysidro in the

12   admissibility enforcement unit, if there is a

13   contagious illness, we will absolutely take every

14   step possible to make sure that the ill parties

15   are taken care of, but we also have a

16   responsibility to ensure that they are isolated

17   from the rest of the population to ensure that we

18   don't have an outbreak.

19   BY MR. MEDLOCK:

20           Q.   But you don't actually know what

21   the policy of CBP is on housing individuals with

22   chicken pox or another communicable disease, do

23   you?

24           MS. SHINNERS:  Object to the scope.

25           THE WITNESS:  I don't know the



Page 114

```
 1    specific policy on housing individuals with a

 2    communicable disease.

 3    BY MR. MEDLOCK:

 4              Q.   Isn't it true that an individual

 5    who appears ill should not be detained in a secure

 6    area like a detention cell?

 7              A.   To my knowledge, I have never seen

 8    that in a policy.

 9              Q.   Isn't it true that a person who

10    appears ill should actually be seen in the

11    secondary area under the direct supervision and

12    control of an officer?

13                   MS. SHINNERS:  Object to the scope.

14                   THE WITNESS:  I cannot recall

15    seeing that specifically in a policy.

16                   MR. MEDLOCK:  Okay.  Let's go to

17    Tab 15, please.

18              (Exhibit No. 186 was marked for

19              identification by the shorthand

20              reporter and is attached hereto.)

21    BY MR. MEDLOCK:

22              Q.   All right.  I have put in front of

23    you what we will mark as Exhibit 186 to your

24    deposition.  It is a multipage document.  It bears

25    the Bates numbers AOL-DEF-00372536 through
```



Page 115

1    -372570.  And on the first page, it has a CBP

2    directive number of 3340-030B, an effective date

3    of August 8th, 2008, and a subject line of "Secure

4    detention transport and escort procedures at ports

5    of entry."

6                   Have you ever seen this document

7    before, Ms. Marin?

8                   A.   Yes, I have.

9                   Q.   You would have received training on

10   this when you were training to become a CBP

11   officer; correct?

12                  A.   Yes.  It would have been in

13   training.

14                  Q.   Okay.  Let's turn, if we can, to

15   Page 7 of the document which bears the Bates

16   number AOL-DEF-00372542.  And I want to focus on

17   Subparagraph 8.3.  Ms. Marin, Subparagraph 8.3

18   reads:

19                   "Generally, no one who is

20                   pregnant, on life-sustaining or

21                   life-saving medication, or who

22                   appears ill shall be detained in

23                   a secure area (e.g., detention

24                   cell) within a POE.  They should

25                   be seated in the secondary area



Page 116

1                    under direct supervision and

2                    control of an officer or

3                    contracted guard services."

4                    Did I read that correctly,

5      Ms. Marin?

6              A.   You do.

7              Q.   Were you aware that it was -- it

8      was actually the policy of CBP to not put persons

9      who appear to be ill in detention cells?

10                  MS. SHINNERS:  Object to the scope,

11     form.

12                  THE WITNESS:  I was aware of the

13     policy, but operationally for us, AEU is still a

14     secondary area, and for the protection of the

15     overall population, the safest place for these --

16     for a person to be that is not requiring medical

17     care at the moment is in an isolation hold room.

18     Most have already seen a medical care provider

19     with instruction on how to adequately care for

20     them.

21     BY MR. MEDLOCK:

22              Q.   But you were aware that CBP's

23     official policy was that individuals who appeared

24     ill should not be put in a secure area such a

25     detention cell; correct?



Page 117

1              A.   Also --

2                   MS. SHINNERS:  Object to the scope.

3                   THE WITNESS:  I was aware.  I also

4    am aware that I have the discretion to make a

5    determination on a case-by-case basis given the

6    totality of circumstances in the operation that we

7    are running.

8    BY MR. MEDLOCK:

9              Q.   Do you have the discretion to

10   ignore the directives of CBP?

11                  MS. SHINNERS:  Objection.

12   BY MR. MEDLOCK:

13             Q.   Is that your testimony?

14                  MS. SHINNERS:  Argumentative,

15   scope.

16                  THE WITNESS:  My testimony is not

17   that I have discretion to ignore policy, no.

18   BY MR. MEDLOCK:

19             Q.   Did you seek a waiver of this

20   directive before placing individuals into

21   detention cells who appeared to be ill?

22             A.   I did not.

23             Q.   Are you aware of any instance in

24   which the San Ysidro port of entry has sought a

25   general waiver of this directive in order to place



Page 118

1    persons who appear to be ill in detention cells?

2                   MS. SHINNERS:  Object to the scope.

3                   THE WITNESS:  I am not.

4    BY MR. MEDLOCK:

5              Q.   Can you explain to me why the San

6    Ysidro port of entry is not following a directive

7    coming directly from CBP management specifically

8    explaining that individuals who appear to be ill

9    should not be placed in a detention cell?

10                  MS. SHINNERS:  Object to the scope,

11    mischaracterizes the document.

12                  THE WITNESS:  The sentence that was

13    not read following what you read to me was that

14    the determination to place these persons in a hold

15    room should be made on a case-by-case basis.  We

16    always have to weigh the risks of anyone in

17    detention contracting a contagious illness

18    versus -- every day on a case-by-case.  And we see

19    scabies and chicken pox regularly.

20                  On a case-by-case basis, we have to

21    review that in a way -- the risk to infecting the

22    rest of the population versus them going into a

23    hold room.  That's why the discretion is

24    available.

25



Page 119

1     BY MR. MEDLOCK:

2             Q.   But you would agree with me that

3     the general rule is that no one who appears ill

4     should go into a detention cell; correct?

5             MS. SHINNERS:  Object to the scope,

6     form.

7             THE WITNESS:  I agree that that is

8     what the policy states.

9     BY MR. MEDLOCK:

10            Q.   And you shouldn't be using your

11    discretion to place everyone who appears ill into

12    a hold room; correct?

13            MS. SHINNERS:  Object to the scope.

14            THE WITNESS:  I never said that

15    everyone goes into a hold room.

16    BY MR. MEDLOCK:

17            Q.   Isn't it true that as a general

18    matter individuals who are in the San Ysidro AEU

19    who have scabies or chicken pox are placed into a

20    detention cell?

21            MS. SHINNERS:  Object to the scope.

22            THE WITNESS:  I cannot say that

23    everyone is placed into a detention cell, no.

24    BY MR. MEDLOCK:

25            Q.   That wasn't my question.



Page 120

1                 My question is:  Isn't it generally

2      true that those individuals are placed in a

3      detention cell?

4                 A.   We review it on a case-by-case

5      basis, and many, yes, do go into a detention cell.

6                 Q.   What percentage go into a detention

7      cell?

8                 A.   I don't know.

9                 MS. SHINNERS:  Object to the scope.

10     BY MR. MEDLOCK:

11                Q.   Is it more than 50 percent?

12                MS. SHINNERS:  Same objection.

13                THE WITNESS:  I don't have that

14     number.

15     BY MR. MEDLOCK:

16                Q.   You can't tell me as you sit here

17     today what percentage of individuals that have

18     a -- that appear to be ill that are in the

19     San Ysidro AEU go into a detention cell; is that

20     right?

21                MS. SHINNERS:  Object to the scope.

22                THE WITNESS:  I don't have a number

23     that I can comfortably provide you.

24     BY MR. MEDLOCK:

25                Q.   And you can't even tell me whether



Page 121

1     it's greater or less than half of the individuals

2     who appear ill?

3                    MS. SHINNERS:  Object to the scope.

4                    THE WITNESS:  Again, that number

5     would depend on what the population is and what

6     the illness is.

7     BY MR. MEDLOCK:

8          Q.   Okay.  Let's say chicken pox.  What

9     percentage of individuals in the AEU that have

10    chicken pox are placed into a detention cell?  Are

11    you comfortable giving me that number?

12         A.   I don't know the percentage.

13                   MS. SHINNERS:  Object to the scope.

14    BY MR. MEDLOCK:

15         Q.   Do you know whether it's greater or

16    less than 50 percent?

17                   MS. SHINNERS:  Same objection.

18                   THE WITNESS:  If I had to make a

19    decision on that, I would say it's greater than

20    50 percent.

21    BY MR. MEDLOCK:

22         Q.   How about scabies, are individuals

23    with scabies, what -- are more than half of them

24    placed into detention cells at the San Ysidro AEU?

25                   MS. SHINNERS:  Object to the scope



Page 122

1    to this line of questioning.

2                    THE WITNESS:  Scabies is treated

3    upon arrival in AEU.

4    BY MR. MEDLOCK:

5                    Q.   And are those individuals placed

6    into a hold cell?

7                    A.   Yes, because the scabies has been

8    treated.

9                    Q.   Okay.  So for individuals that have

10   chicken pox, even though the rule is that

11   generally no one who appears ill should be placed

12   into a detention cell, over 50 percent of those

13   individuals are actually placed into detention

14   cells at the San Ysidro AEU?

15                   MS. SHINNERS:  Object to the scope.

16                   THE WITNESS:  Yes, because

17   operationally there is nowhere else safely to

18   protect the rest of the population.

19   BY MR. MEDLOCK:

20                   Q.   And for individuals with scabies,

21   even though the general rule is that no one who

22   appears ill should be placed into a detention

23   cell, all of those individuals are treated and

24   then placed into a detention cell?

25                   MS. SHINNERS:  Object to the scope.



Page 123

1          THE WITNESS:  I would submit that

2     if they have been treated and seen medical care,

3     then they should not appear ill when they are

4     entering a detention cell.

5     BY MR. MEDLOCK:

6          Q.   Right.  So there are some

7     individuals that you can treat quickly, place them

8     into a detention cell, and they are not a problem

9     even though they appeared ill at the border; is

10    that right?

11         MS. SHINNERS:  Object to the form,

12    scope.

13         THE WITNESS:  Can you repeat the

14    question?

15    BY MR. MEDLOCK:

16         Q.   Sure.  For some communicable

17    diseases like scabies, noncitizens without proper

18    travel documents who are going to the AEU at

19    San Ysidro who have scabies can be treated quickly

20    and effectively and then placed into a detention

21    cell; is that right?

22         A.   That's correct.

23         Q.   Now, isn't it true that you

24    considered ███ to be the number at which the San

25    Ysidro port of entry would need to put the intake



Page 124

1    of noncitizens into the AEU on hold?

2              MS. SHINNERS:  Object to the scope.

3              THE WITNESS:  I would ask what your

4    definition is -- of "on hold" is.

5    BY MR. MEDLOCK:

6         Q.   You can't -- you can't answer that

7    question without knowing what "on hold" means; is

8    that right?

9         A.   Well, I don't know what you mean by

10   putting the intake on hold.

11             Q.   Do you think that's vague?

12             A.   I do.

13             MR. MEDLOCK:  Okay.  Let's pull up

14   Tab 5, which we will mark as Exhibit 187 to your

15   deposition.

16             (Exhibit No. 187 was marked for

17             identification by the shorthand

18             reporter and is attached hereto.)

19   BY MR. MEDLOCK:

20        Q.   Exhibit 187 is a one-page e-mail

21   that bears the Bates numbers AOL-DEF-00600149.

22   It's an e-mail that you sent on April 18, 2018, at

23   6:35 p.m. to Robert Hood.

24             Do you see that?

25        A.   I do.



Page 125

1                    Q.   You would have drafted this e-mail

2       at about the time and date shown on the e-mail;

3       correct?

4                    A.   Yes.  Based on what it says, yes.

5                    Q.   Yeah.  And you drafted this as part

6       of your duties at CBP; correct?

7                    A.   Correct.

8                    Q.   E-mails like this to Mr. Hood was

9       part of your job at this point in 2018; correct?

10                   A.   Yes.

11                   Q.   And this e-mail would have been

12      maintained on your -- in your e-mail; correct?

13                   A.   Correct.

14                   Q.   Do you have any reason to believe

15      that this e-mail is inaccurate in any way?

16                   A.   No, I do not.

17                   Q.   The subject line of the e-mail is

18      "intake"; correct?

19                   A.   Right.

20                   Q.   In the context of this e-mail, what

21      does "intake" mean?

22                   A.   Bringing individuals without

23      documents to enter the U.S. into the custody of

24      AEU.

25                   Q.   Okay.  I want to focus on the



Page 126

```
 1      sentence that begins with "We have not hit" in
 2      your e-mail.  Do you see that sentence?
 3                  A.   Yes.
 4                  Q.   And you write:
 5                       "We have not hit capacity, so
 6                  anything that shows up at the
 7                  limit line will come in."
 8                       Did I read that correctly?
 9                  A.   Yes.
10                  Q.   By "anything," you meant a person;
11      correct?
12                  A.   Correct.
13                  Q.   Okay.  And you don't say
14      operational capacity here, do you?
15                  A.   I don't.
16                  Q.   You don't say detention capacity,
17      do you?
18                  A.   I do not.
19                  Q.   Do you recall Mr. Hood writing back
20      to you and say, 'I don't understand what you mean.
21      Do you mean operational capacity?'
22                  A.   No, I don't recall that.
23                  Q.   That's because you used the term
24      "capacity" in your -- in your everyday work at
25      CBP; correct?
```



Page 127

1          A.   Yes.

2          Q.   And when you use that term, you

3    don't distinguish to the person you are talking to

4    whether you are talking about operational capacity

5    or physical capacity, do you?

6               MS. SHINNERS:  Object to the scope.

7               THE WITNESS:  I can't say that I

8    never do, but in this e-mail I did not.

9    BY MR. MEDLOCK:

10         Q.   Okay.  And then you go on in the

11   next sentence to write:

12               "If we reach ███ tonight and

13               have to hold, I will send you

14               notification."

15               Did I read that correctly?

16         A.   Yes.

17         Q.   So in this e-mail, you stated that

18   ███ was the number at which the San Ysidro port of

19   entry would have to hold; correct?

20         A.   Correct.

21         Q.   So it was the actual maximum

22   capacity listed on the standard operating

23   procedure that determined when San Ysidro had to

24   hold intake; correct?

25         A.   ███, it appeared from this e-mail,



Page 128

```
 1     would have been what I decided that day to be my
 2     operational capacity.
 3               Q.    Okay.  So it's just a coincidence
 4     that the operational capacity that day was the
 5     actual maximum capacity at the AEU?
 6               A.    I can't speculate if it was
 7     coincidence or not.
 8               Q.    On how many days in a year is the
 9     actual operational capacity of the San Ysidro port
10     of entry ███?
11               A.    I don't have that number.
12               Q.    You couldn't tell me -- you
13     couldn't tell me a percentage of days in which ███
14     is the actual operational capacity in any given
15     year?
16               A.    I cannot.  And even on that day, we
17     could have reached ███ from the limit line, and
18     then four imposters and eight vehicle cases come
19     in, and my new operational capacity was ███.  So,
20     again, that number is fluid for us when I am
21     talking operational capacity.
22               Q.    Do you know if the operational
23     capacity of the San Ysidro port of entry changed
24     on April 18, 2018?
25               A.    At any time?
```



Page 129

1           Q.   Yeah.

2           A.   I don't know off the top of my

3     head, no.

4           Q.   Do you know if it changed after

5     6:35 p.m. on April 18, 2018?

6           A.   I don't know.

7           Q.   Can you, as you sit here today, go

8     back and reconstruct for me what the operational

9     capacity of the San Ysidro port of entry was on

10    any given day between May 2016 and the present?

11          A.   Are you asking me to reconstruct

12    the daily operational capacity?

13          Q.   Yes, correct.

14          A.   I cannot do that.

15          Q.   Do you know of anybody at CBP who

16    can do that?

17          A.   Again, that number --

18               MS. SHINNERS:   Object to the scope.

19               THE WITNESS:   That number is fluid

20    and varies from day to day.  So no, I do not

21    believe anyone can do that.

22    BY MR. MEDLOCK:

23          Q.   Do you know of any sort of report

24    or data that exists at CBP that would enable

25    anyone at CBP or otherwise to determine what the



Page 130

1    daily operational capacity of any port of entry

2    was?

3                    MS. SHINNERS:  Object to the scope.

4                    THE WITNESS:  I do not know of any

5    report that's going to give you a daily

6    operational capacity.  Again, that's fluid, it's

7    very dynamic, and it changes multiple times even

8    within a day.

9    BY MR. MEDLOCK:

10                    Q.   So let me get this straight.

11                    The operational capacity of a port

12    of entry is not defined in any official document;

13    correct?

14                    A.   To my knowledge --

15                    MS. SHINNERS:  Object to the scope.

16    BY MR. MEDLOCK:

17                    Q.   And you can't tell me what it is on

18    any given day; correct?

19                    A.   Correct.

20                    Q.   And you can't even tell me what the

21    factors were that would have led to the

22    operational capacity changing at any given point

23    in time, can you?

24                    A.   I can tell you several factors that

25    would change our operational capacity at any given



Page 131

1      time.

2                  Q.   But you can't tell me which factor

3      it was that caused the operational capacity to

4      change at any given time; correct?

5                  A.   Correct.

6                  MS. SHINNERS:  Object to the scope,

7      vague.

8      BY MR. MEDLOCK:

9                  Q.   I'm sorry.  I couldn't hear you,

10     Ms. Marin.  What was your answer to my question?

11                 A.   "Correct."

12                 Q.   So how do you expect the court in

13     this case to believe you that operational capacity

14     exists when it isn't written down, you can't tell

15     the court what it is, and you can't tell the court

16     how it changed?

17                 MS. SHINNERS:  Object to the scope.

18                 THE WITNESS:  I can only speak to

19     the facts that it changed every day.  There are

20     concrete reasons on why it would change, and that

21     is the reality of the operation that we work with.

22     BY MR. MEDLOCK:

23                 Q.   And was there ever any e-mail or

24     memorandum that was sent out that explained, our

25     operational capacity changed from ███ to 285 on



Page 132

1    this day and here is why?

2              A.   That I can recall, no.

3              Q.   So you can't recall anybody ever

4    documenting changes in operational capacity in a

5    contemporaneous format at any point in the time

6    you were working at CBP; is that right?

7              A.   So --

8              MS. SHINNERS:   Object to the scope.

9              Go ahead.

10             THE WITNESS:   So there have been

11   changes in what that operational ceiling looks

12   like that we spoke about earlier, that again is a

13   ballpark number.  I don't know if there are any

14   kind of documented e-mails regarding that, no.

15   BY MR. MEDLOCK:

16             Q.   Have you seen any?

17             A.   Not that I can recall off the top

18   of my head.

19             Q.   So you spent 30 to 40 hours

20   preparing for this deposition, reviewed lots of

21   documents, and you can't recall any documents that

22   contemporaneously documented changes in

23   operational capacity at any port of entry in the

24   San Diego field office; correct?

25             A.   That's correct.



Page 133

1                        MR. MEDLOCK:  We have been going

2       for more than an hour.  Why don't we take a break.

3                        MS. SHINNERS:  Okay.  That's fine.

4                        VIDEOGRAPHER:  Time is 11:38 a.m.

5       We are now off the record.

6                   (Whereupon, a recess was held from

7                   11:38 a.m. to 11:50 a.m.)

8                        VIDEOGRAPHER:  Time is 11:51 a.m.

9       We are now back on the record.

10      BY MR. MEDLOCK:

11                   Q.   Welcome back, Ms. Marin.

12                        Isn't it true that regardless of

13      the operational capacity of the San Ysidro port of

14      entry the port was under direct orders to reach

15      full capacity in all of its holding rooms in the

16      AEU?

17                        MS. SHINNERS:  Object; vague.

18                        THE WITNESS:  I've never received a

19      direct order to fill if I had circumstances,

20      again, based on operational capacity that would

21      prevent that.

22                        MR. MEDLOCK:  Okay.  Let's bring up

23      Tab 6, Kevin.

24

25



Page 134

```
 1                    (Exhibit No. 188 was marked for

 2                    identification by the shorthand

 3                    reporter and is attached hereto.)

 4       BY MR. MEDLOCK:

 5                    Q.    All right.  Ms. Marin, I am showing

 6       you what we've marked as Exhibit -- will be marked

 7       as Exhibit 188 to your deposition.  It's a

 8       two-page e-mail chain that bears the Bates numbers

 9       AOL-DEF-00348763 through -764.

10                    Have you ever seen a copy of

11       Exhibit 188 before?

12                    A.    I may have because my name is on

13       it, but I don't recall -- specifically recall

14       seeing it.

15                    Q.    When you say your "name is on it,"

16       at the very top of the e-mail chain, it looks like

17       you are CC'd on an e-mail from Robert Hood sent on

18       November 9th, 2018, at 9:31 p.m.; correct?

19                    A.    Correct.

20                    Q.    And the subject line of Mr. Hood's

21       e-mail was "Re: Surge efforts at SYS"; correct?

22                    A.    Correct.

23                    Q.    And SYS refers to San Ysidro;

24       correct?

25                    A.    Correct.
```



Page 135

```
 1              Q.   Okay.  So you would have received
 2    this e-mail on or about November 9, 2018, at 9:31;
 3    correct?
 4              A.   Correct.
 5              Q.   And you received this e-mail in the
 6    course of your duties as an employee of CBP;
 7    correct?
 8              A.   Yes.
 9              Q.   And receiving e-mails from Mr. Hood
10    was part of your job in November 2018; correct?
11              A.   It was.
12              Q.   And would you generally read
13    e-mails that Mr. Hood sent to you?
14              A.   Yes.
15              Q.   And this e-mail would have been
16    kept in your e-mail inbox at CBP; correct?
17              A.   Yes.
18              Q.   And do you have any reason to
19    believe that this e-mail chain is inaccurate in
20    any way?
21              A.   No.
22              Q.   So I want to focus on the second
23    page of Exhibit 188 which has the Bates number
24    AOL-DEF-00348-764, and I want to focus on the
25    e-mail that Todd Owen sent on November 9, 2018, at
```



Page 136

1    6:51 p.m.  Do you see that e-mail in front of you?

2              A.   I do.

3              Q.   All right.  And the e-mail is

4    addressed to Patrick Flanagan and Robert Perez.

5                   Do you know who those individuals

6    are?

7              A.   I do.

8              Q.   What were their roles at CBP at the

9    time this e-mail was sent?

10             A.   I am not positive what

11   Mr. Flanagan's role was, but Robert Perez was the

12   deputy commissioner.

13             Q.   Deputy commissioner of CBP;

14   correct?

15             A.   Correct.

16             Q.   And at the time this e-mail was

17   sent and still today, Todd Owen is the executive

18   assistant commissioner of CBP; correct?

19             A.   Correct.

20             Q.   He is the top career official at

21   OFO; correct?

22             A.   Yes.

23             Q.   So I want to focus on the beginning

24   of Mr. Owen's e-mail and specifically the first

25   paragraph in the first bullet point underneath it.



Page 137

1        He writes:

2                    "Deputy Patrick, I have

3                    advised DFO Flores to take

4                    immediate action to increase the

5                    level of migrant intake and

6                    processing at San Ysidro port of

7                    entry.  DFO Flores was advised

8                    to:"

9                    And then the first bullet point

10       reads:

11                   "Immediately increase migrant

12                   processing up to the point where

13                   the port has reached full

14                   capacity of the authorized

15                   temporary holding rooms."

16                   Did I read that correctly?

17       A.    Yes.

18       Q.    So in November of 2018, Todd Owen,

19       the head of OFO, directly ordered DFO Flores to

20       reach full capacity in the temporary holding rooms

21       at San Ysidro; correct?

22              A.    Correct.

23              Q.    And Mr. Owen doesn't say full

24       operational capacity, does he?

25              A.    No.



Page 138

```
 1              Q.   He says "full capacity"; correct?
 2              A.   Yes.
 3              Q.   And did you ever ask anybody for --
 4    to interpret what Mr. Owen was saying because you
 5    thought the phrase "full capacity" was vague?
 6              A.   No.  I don't recall ever asking for
 7    clarification.
 8              Q.   So in the -- November 2018, you
 9    would have understood that San Ysidro port of
10    entry's AEU needed to reach full capacity in each
11    of its holding rooms; correct?
12              A.   Yes.
13              Q.   Do you know whether Mr. Owen has
14    ever rescinded this guidance that he gave to DFO
15    Flores?
16              A.   I do not know.
17              Q.   Isn't it true that internally and
18    unofficially the real capacity of the San Ysidro
19    AEU is ██?
20              A.   Can you repeat the last number?
21              Q.   ████████.
22              A.   I have never seen a number of ██.
23              MR. MEDLOCK:  Okay.  Can we bring
24    up Tab 7, Kevin?
25
```



Page 139

```
 1                  (Exhibit No. 189 was marked for
 2                  identification by the shorthand
 3                  reporter and is attached hereto.)
 4     BY MR. MEDLOCK:
 5            Q.    All right.  I have put in front of
 6     you marked as Exhibit 189 to your deposition.  It
 7     is a one-page e-mail that bears the Bates number
 8     AOL-DEF-00072448.
 9                  Have you ever seen a copy of
10     Exhibit 189 before, Ms. Marin?
11            A.    I don't recall seeing this copy.
12            Q.    If you look at the top of the
13     e-mail chain, you were copied on an e-mail from
14     Robert Hood on April 26, 2018, at 10:06 a.m.;
15     Correct?
16            A.    Correct.
17            Q.    And as you testified earlier, this
18     is an e-mail -- you would have received e-mails
19     like this from Mr. Hood in the course of your
20     duties at CBP; correct?
21            A.    Correct.
22            Q.    And receiving e-mails like this
23     from Mr. Hood was part of your job; correct?
24            A.    Yes.
25            Q.    And you generally read e-mails that
```



Page 140

1    you received from Mr. Hood; correct?

2              A.   Yes.

3              Q.   All right.  So I want to focus on

4    the e-mail that Robert Hood sent on April 26,

5    2018, at 8:48 a.m.  All right.

6                   Do you see that e-mail in front of

7    you, Ms. Marin?

8              A.   I do.

9              Q.   Okay.  And that e-mail reads in

10   part:

11              "AEU remains at capacity

12              after last night's movement."

13              Did I read that correctly?

14             A.   Yes.

15             Q.   What does "movement" mean in the

16   context of this e-mail?

17             A.   I assume it's movement --

18             MS. SHINNERS:  Object to the --

19   object to -- calls for speculation.  Thank you.

20   BY MR. MEDLOCK:

21             Q.   Go ahead, Ms. Marin.

22             A.   I would have to assume because I

23   don't see the rest of the -- I don't know what the

24   context was, but typically when we say "movement,"

25   it's of people in custody, in CBP custody,



Page 141

1    movement of people out of CBP custody to the

2    custody of ICE ERO.

3              Q.   Let's move up the e-mail chain.  I

4    want to focus on an e-mail that Sidney Aki sent to

5    Mr. Hood on April 26, 2018, around 7:00 a.m.

6              Do you see that e-mail in front of

7    you?

8              A.   Yes.

9              Q.   At this time Mr. Aki was the port

10   director at San Ysidro; correct?

11             A.   Correct.

12             Q.   And he writes, in part:

13             "What is capacity?  ███  for

14             this time period, correct?"

15             Did I read that correctly?

16             A.   Yes.

17             Q.   And in his e-mail, Mr. -- Mr. Aki

18   doesn't distinguish between operational capacity

19   and detention capacity.  He just uses the word

20   "capacity"; right?

21             A.   Correct.

22             Q.   All right.  Let's move up the chain

23   again and look at the e-mail that Mr. Hood sent on

24   April 26, 2018, at 10:06 a.m., CC'ing you.

25             Mr. Hood lists the importance of



Page 142

1    this e-mail as high; correct?

2              A.   Yes.  All of his e-mails are marked

3    high.

4              Q.   Fair enough.  That's a way to get

5    attention, I suppose; right?

6              A.   Yeah.

7              Q.   And Mr. Hood writes in part:

8                   "Yes, but internally and

9                   unofficially, MCAT has our

10                  capacity at ▉."

11                  Correct?

12             A.   Correct.

13             Q.   Mr. Hood was telling the port

14   director at San Ysidro in April 2018 that

15   internally and unofficially the capacity of the

16   San Ysidro port of entry was actually ▉;

17   correct?

18             A.   Yes.  That's what he said.

19                  MR. MEDLOCK:  Whoever is typing, if

20   you can mute yourself, please?  Thank you.

21                  All right.  Kevin, can we bring up

22   Tab 8, please.

23                  (Exhibit No. 190 was marked for

24                  identification by the shorthand

25                  reporter and is attached hereto.)



Page 143

1    BY MR. MEDLOCK:

2              Q.   All right.  Ms. Marin, I am showing

3    you what we have marked as Exhibit -- will be

4    marked as Exhibit 190 to your deposition.  It's a

5    two-page e-mail that bears the Bates numbers

6    AOL-DEF-00062088 through -89.

7              And if you look at the top of the

8    e-mail chain, this is an October 12, 2016, e-mail

9    chain that at the top of it was sent from Johnny

10   Armijo to Robert Hood copying you, Moises

11   Castillo, Sidney Aki, Ryan Koseor, and others;

12   correct?

13             A.   Correct.

14             Q.   So you would have received this

15   e-mail from Mr. Armijo on or about October 12,

16   2016; correct?

17             A.   Correct.

18             Q.   At this time Mr. Armijo was the

19   assistant director of board of security for the

20   San Diego field office; correct?

21             A.   Correct.

22             Q.   And receiving e-mails from

23   individuals like Mr. Armijo was part of your job

24   at CBP; correct?

25             A.   Yes.



Page 144

1          Q.   And this e-mail would have been

2    maintained in your e-mail inbox at CBP; correct?

3          A.   Yes.

4          Q.   And receiving e-mails like this was

5    part of your job at the time; correct?

6          A.   Yes.

7          Q.   And do you have any reason to

8    believe that this e-mail is inaccurate in any way?

9          A.   I do not.

10          Q.   I would like to focus with you on

11    the e-mail that Robert Hood sent in this chain on

12    October 12, 2016, at 3:33 p.m.

13               MR. MEDLOCK:  Kevin, if you can

14    bring that e-mail up.

15    BY MR. MEDLOCK:

16          Q.   All right.  Ms. Marin, you were

17    also copied on this e-mail from Mr. Hood; correct?

18          A.   Correct.

19          Q.   And just like you said, he also

20    marked the importance of this e-mail as high;

21    right?

22          A.   Yeah.  He puts says high even for

23    some that's not, but yes.

24          Q.   Fair.  And Mr. Hood writes at the

25    top to Mr. Armijo:



MAGNA
LEGAL SERVICES

Page 145

1              "Johnny, our AEU detention

2         holding capacity is ███.  With

3         intake seating areas, it is a

4         maximum of ███ detainees."

5              Did I read that correctly?

6    A.   Yes.

7    Q.   And if you look, there is a table

8  beneath that statement in the e-mail; correct?

9    A.   Correct.

10   Q.   And that table lists ███ detention

11 cells at the San Ysidro AEU; correct?

12   A.   Yes.

13   Q.   And █ of those ███ detention cells

14 are actually isolation cells; correct?

15   A.   Yes.

16   Q.   And some of those isolation cells

17 can be for as few as one person; correct?

18   A.   Correct.

19   Q.   And there is a location at the top

20 of this table that says SS -- SYS AEU trailers.

21        Do you see that?

22   A.   I do.

23   Q.   What does the reference to trailers

24 mean?

25   A.   So during construction beginning



Page 146

```
 1    July of '16 and then until the current location of

 2    AEU was constructed, because the port of entry was

 3    under construction, there were temporary trailers

 4    built as a -- as a temporary AEU facility at

 5    Ped West.

 6              Q.   Okay.  So during the Ped West

 7    construction, the AEU was moved into trailers; is

 8    that right?

 9              A.   So Ped West was constructed.  It

10    was during the Ped East construction that

11    AEU moved --

12              Q.   Ped East.  Thank you.  Yeah.  Okay.

13              And the -- even when the AEU moved

14    into trailers, the holding capacity of those

15    trailers was still ███; correct?

16              A.   Yes.

17              Q.   So for each of the holding cells on

18    this chart, there is a notes column where it says:

19                   "All cell function can change

20              to reflect current population."

21              Did I read that correctly?

22              A.   Yes.

23              Q.   What does that phrase mean?

24              A.   So if you will look at the column

25    on the left that says "description" where, for
```



1    example, Cell No. 1 says family or FAMU, which for

2    us is family unit, Cell No. 2 is male ER.  What

3    that phrase means is, depending on my population,

4    if I need to adjust the function of that cell,

5    meaning change the demographics that go into that

6    cell, that's what that phrase means.  So --

7            Q.   And there are -- sorry.  Go ahead.

8    I didn't mean to interrupt you.

9            A.   So, for example, if I have -- let's

10   say looking at it right now we have listed three

11   cells as family unit but we have a significant --

12   a higher percentage of family units in our

13   population on any given day than we would adult

14   males or adult females, then we could change what

15   the configuration of that cell was for that day.

16           Q.   Okay.  And there's three areas

17   above those 16 cells on the -- in the table that

18   are called -- that have a description of audience;

19   correct?

20           A.   Correct.

21           Q.   And those are described as not a

22   hold room seated waiting area; correct?

23           A.   Correct.

24           Q.   And those ███████ audience areas have

25   a collective capacity of ████ persons; correct?



Page 148

1          A.    Yes.

2          Q.    So the holding cell capacity is

3    ███, and you add the ███ spaces for audience to

4    that.  That's how you get to ███; is that right?

5          A.    Correct.  But the audience is not

6    made for -- that's a short area for intake and

7    then placement to a holding cell.

8          Q.    Right.  But it's actually listed on

9    this chart as part of the capacity; correct?

10         A.    On this chart, yes.

11         Q.    And that where -- this chart lists

12   the maximum capacity as ███; correct?

13         A.    Yes.

14         Q.    So let's go back to your

15   declaration which is Tab 3.  And I want to focus

16   on Paragraph 6 of your declaration, on Page 2 of

17   it.  You tell the court that the short-term hold

18   rooms at San Ysidro have a designated capacity of

19   approximately 300; correct?

20         A.    Correct.

21         Q.    You never informed the court that

22   the -- the real number, designated number is ███;

23   correct?

24              MS. SHINNERS:  Objection;

25   argumentative.



Page 149

1                     THE WITNESS:  Correct.

2      BY MR. MEDLOCK:

3              Q.   And you didn't tell the court that

4      if you include the audience areas, the maximum

5      capacity is ███; correct?

6              A.   I did not.  However, the audience

7      area does not allow for us to hold even

8      short-term.  We can't count that as a space for --

9      to hold for processing.  That's an intake area.

10             Q.   Can you explain to me -- sorry.  Go

11     ahead.  I didn't mean to interrupt you.

12             A.   No, go ahead.

13             Q.   If that's the case, can you explain

14     to me why Robert Hood told the port director,

15     Sidney Aki, that internally and unofficially the

16     capacity of the San Ysidro port of entry's AEU is

17     ███?

18                     MS. SHINNERS:  Objection; calls for

19     speculation, scope.

20                     THE WITNESS:  I can't --

21     BY MR. MEDLOCK:

22             Q.   Can you explain that?

23             A.   Yeah.  I can't speculate as to why

24     he would say that, but it was very clear that

25     those spaces cannot be used for -- for the



Page 150

1    purposes of detention like a hold room would, but

2    there's nowhere to lay -- those are for very short

3    time to be able to get people into hold rooms.

4              Q.   Let's go back to Tab 7 and the top

5    of that e-mail chain.  So I am at Tab 7, Bates

6    number AOL-DEF-00072448.  You are on this e-mail.

7    Robert Hood says internally and unofficially the

8    capacity of the San Ysidro port of entry is ███.

9              Can you ever remember sending an

10   e-mail correcting him and saying, 'No, no.  It's

11   actually ███.  You can't count the hold -- you

12   can't count the audience spaces'?

13             MS. SHINNERS:  Object to the scope.

14             THE WITNESS:  I do not remember

15   sending him an e-mail correcting him, but I do

16   remember having a conversation with both him and

17   the port director explaining why ███ is not an

18   accurate number because the hold spaces don't meet

19   our TEDS standards.

20   BY MR. MEDLOCK:

21             Q.   And that would have come some time

22   around this e-mail in April 2018?

23             A.   Again, I would be speculating if I

24   knew when that conversation was, but I have had

25   that conversation with both of them.



Page 151

1              Q.   Did you document that conversation

2     in any way?

3                    MS. SHINNERS:  Object to the scope.

4                    THE WITNESS:  Not to my memory.  I

5     didn't document it, no.

6     BY MR. MEDLOCK:

7              Q.   Do you know where in the port of

8     entry that conversation took place?

9              A.   It would have taken place at the

10    head house at San Ysidro which is where their

11    offices are located.

12             Q.   Do you know who was present for

13    that conversation besides you, Sidney Aki, and

14    Robert Hood?

15                   MS. SHINNERS:  Same objection for

16    this line of questioning.

17                   Go ahead.

18                   THE WITNESS:  I believe Moises

19    Castillo may have been present as well.

20    BY MR. MEDLOCK:

21             Q.   Do you know if anybody took any

22    notes about that conversation?

23             A.   I do not know if they took notes.

24             Q.   Let's move back to Tab 8, which is

25    Exhibit 190, and I want to focus again on the



Page 152

1    e-mail that Robert Hood sent in the middle of this

2    e-mail chain.

3                    Did you have -- indeed have a

4    conversation with Mr. Hood in April of 2018?  Can

5    you explain to me why in or around -- let me get

6    this.  So in October 2016, he sends this e-mail

7    saying that the capacity is ███.  Did you talk to

8    him then in October 2016 to say this information

9    was incorrect?

10                   A.    I don't recall when I --

11                   MS. SHINNERS:  Object to the scope.

12                   THE WITNESS:  I would say the

13   asterisk on the bottom on the description column

14   where it says total actual holding capacity is

15   ███, I understand that to mean it's known that the

16   other ███ the audience seats, are not holding

17   capacity.

18                   MR. MEDLOCK:  Okay.  Move to strike

19   everything after the "no" as nonresponsive.

20   BY MR. MEDLOCK:

21                   Q.    My question was:  Do you recall

22   having a conversation with Mr. Hood around October

23   2016 about whether this maximum-capacity figure in

24   this chart was inaccurate?

25                   A.    I do not recall if I had a



Page 153

1    conversation with him or not.

2            Q.   So you don't recall that you had a

3    conversation with Mr. Hood at all now?

4            A.   I do not recall if I had a

5    conversation with him in October of 2016 or if it

6    was -- I don't recall when the conversation was.

7    I know that we had a conversation.

8            Q.   Okay.  So can you explain to me why

9    Mr. Hood was under the belief that the maximum

10   capacity of San Ysidro port of entry was ▆ in

11   2016 and why he repeated that belief in April 2018

12   if you had a conversation with him about that?

13               MS. SHINNERS:  Object.  Calls for

14   speculation, and scope.

15               THE WITNESS:  I do not know why he

16   documented that again.  I don't.

17   BY MR. MEDLOCK:

18           Q.   So over a two-year period, he seems

19   to be pretty consistent that the maximum capacity

20   is either ▆ or ▆; correct?

21               MS. SHINNERS:  Objection; assumes

22   facts not in evidence but -- and to scope.  Calls

23   for speculation.

24               THE WITNESS:  I would have to

25   assume so based on his messages.



Page 154

1    BY MR. MEDLOCK:

2           Q.    And going back to Tab 3,

3    Paragraph 6 of your declaration, nowhere here did

4    you inform the court that there are documents

5    listing the maximum capacity of the San Ysidro

6    port of entry, regardless of whether you agree

7    with that or not, ████████████ not approximately

8    300?

9           A.    My declaration was listing what the

10   hold rooms, which is consistent with TEDS policy,

11   would hold, and that was approximately 300 not

12   ████

13          Q.    But you never told the court that

14   if you close the audience areas it's actually ████

15              Do I have that right?

16          A.    I did not tell the court that, and

17   I would also like to state that this declaration

18   was written when the trailers no longer existed.

19          Q.    Did the audience room still exist?

20          A.    There is an audience at the new

21   facility.  I am not positive what it holds.  But

22   again, my focus was hold rooms where we could

23   sustain detention, not an intake room that's meant

24   to be for a short period of time, only a couple of

25   hours.



Page 155

1          Q.   Is there any written policy that

2     says the audience room is only to be used for a

3     short period of time, to your knowledge?

4               MS. SHINNERS:  Object to the scope.

5               THE WITNESS:  Not that I know of.

6     BY MR. MEDLOCK:

7          Q.   Are you aware of any muster or any

8     standard operating procedures that says that the

9     audience room is only to be used for a short

10    period of time?

11              MS. SHINNERS:  Object to the scope.

12              THE WITNESS:  I am aware that our

13    policy is to provide bedding, access to running

14    water, and restrooms in every hold room.  That's

15    not a hold room.  There is no bedding there.

16    There are bench seats.  So that is the reason we

17    don't consider that a long-term -- a longer-term

18    holding than just the time it takes to identify

19    people and get them into the appropriate hold

20    room.

21    BY MR. MEDLOCK:

22         Q.   Okay.  That is not my question.  I

23    will repeat my question to see if I can get an

24    answer to it.

25              My question is:  Are you aware of



Page 156

1    any standard operating procedure or muster where

2    it is written down that the audience room is

3    supposed to be used for only a short period of

4    time?

5                    MS. SHINNERS:  Object to the scope.

6                    THE WITNESS:  That I can recollect,

7    no.

8                    MR. MEDLOCK:  All right.  I would

9    like to pull up Tab 10, please, Kevin.

10                   Showing you what we've marked --

11   what will be marked as Exhibit 190 to your

12   deposition, it is a three-page e-mail that bears

13   the Bates numbers AOL-DEF-0073938 through -40.

14                   (Exhibit No. 190, later reassigned

15                   as Exhibit No. 195 on Page 227, was

16                   marked for identification by the

17                   shorthand reporter and is attached

18                   hereto.)

19   BY MR. MEDLOCK:

20            Q.   And if you look at the top of the

21   e-mail, it's sent from you to Sidney Aki on

22   September 16, 2016, at 8:31 p.m.

23                   Do you see that?

24            A.   I do.

25                   MR. MEDLOCK:  And if you can exit



Page 157

1    out of that blow-up, Kevin.

2    BY MR. MEDLOCK:

3             Q.   The top of the document or the

4    e-mail says:

5             "Admissibility enforcement

6             unit 24-hour reporting

7             September 11, 2016."

8             Do you see that?

9             A.   I do.

10            Q.   Have you created reports in this

11   format for Mr. Aki on a regular basis?

12            A.   Someone in the unit, typically a

13   supervisor, would create that report.

14            Q.   And what's the purpose of these

15   admissibility enforcement unit 24-hour reports?

16            A.   It's a daily report from port

17   leadership.  I believe it does go up to the field

18   office -- I don't know if it initially did -- but

19   on the status of what's going on in -- or what --

20   a 24-hour snapshot of AEU.

21            Q.   Okay.  Isn't it true that there

22   have been several days where the number of

23   migrants transported out of the AEU at San Ysidro

24   is substantially higher than the number of

25   migrants that the port intakes?


MAGNA
LEGAL SERVICES

Page 158

1           A.   I don't know the number of days,
2     but yes, that could have happened.
3           Q.   Okay.  So I want to focus on the
4     first page of this e-mail, and it has a table at
5     the top under current detainees in CBP custody.
6               And it shows that there are 349
7     individuals on site; correct?
8           A.   Correct.
9           Q.   And that refers to individuals at
10    the San Ysidro AEU; correct?
11          A.   Correct.
12          Q.   And then there is a reference to
13    individuals being held at Barracks 5.
14               What does that mean?
15          A.   Barracks 5 is a border patrol
16    facility at the Chula Vista station.
17          Q.   And there is a reference to
18    Brownfield, although it notes that there is nobody
19    being held there on this day.
20               What's Brownfield?
21          A.   Brownfield is another border patrol
22    station.
23          Q.   And then there is a reference to
24    Imperial Beach, and this report shows 36
25    individuals being held there.



Page 159

1               What is Imperial Beach?

2          A.   That's also a border patrol

3     station.

4          Q.   So on occasion the San Ysidro port

5     of entry has been able to house migrants that

6     would otherwise be at the AEU in Barracks 5,

7     Brownfield, or the Imperial Beach substations;

8     correct?

9          A.   Yes.

10         Q.   And then beneath that, there is a

11    reference to asylum line.

12              What does "asylum line" mean, to

13    your knowledge?

14         A.   So prior to the inception of

15    metering, when the AEU was full, non-U.S. citizens

16    without documents for admission would queue in an

17    area between the limit line at the port of entry

18    and the primary lanes to wait until there was

19    sufficient space in the unit to be -- for intake.

20         Q.   So there was a period in which

21    individuals who were metered were waiting in

22    asylum line on U.S. soil before they were metered;

23    correct?

24              MS. SHINNERS:  Objection;

25    mischaracterizes testimony.



Page 160

```
 1                    THE WITNESS:  That is not correct.
 2     There was a period prior to metering where
 3     individuals would wait in that asylum line on U.S.
 4     soil and be brought in to be processed.
 5     BY MR. MEDLOCK:
 6              Q.   When did the asylum line stop being
 7     used at the San Ysidro port of entry, to your
 8     knowledge?
 9              A.   The asylum line stop being used in
10     late May of 2016 when the number of non-U.S.
11     citizens without documents exceeded from primary
12     clear south into Mexico.  At that point the old --
13     we exhausted every effort to be able to expand any
14     additional processing and detention capacity.  And
15     at that point we had to stop intake at the
16     international boundary because that line stretched
17     all the way through the infrastructure and there
18     was no space for them.
19                    That was the first time we saw
20     large groups in the hundreds of -- primarily
21     Haitian nationals arrived at that time, but there
22     were already other nationalities at the front of
23     that queue on primary.
24                    And so at that point, we had to
25     intake all of those people to make sure they were
```



Page 161

1      not left in the elements, and at that point we had

2      to convert some additional space to be able to

3      take those people in -- the custody I believe was

4      about 1,076 at that point.

5                      So we were severely over what our

6      custody capacity was, and then we had to hold that

7      line.  From that point on, we had to stop intake

8      in Mexico, and there was not an asylum line after

9      that.

10                     Q.   Okay.  Move to strike everything

11     after "May 2016" as nonresponsive.

12                     My -- I do want to ask you:  The

13     events you described occurred in May 2016, but the

14     San Ysidro port of entry didn't actually start

15     metering until July 2016; correct?

16                     A.   We started metering in May of '16.

17                     Q.   So if an interrogatory response

18     says that the San Ysidro port of entry began

19     metering in July 2016, it's just simply wrong; is

20     that right?

21                     A.   That is right.  To the best of my

22     knowledge, we started in May of 2016.

23                     Q.   So I want to turn back to the

24     exhibit in front of you, Exhibit 190.  And if you

25     turn to the second page of the e-mail ending in



Page 162

1    939, there is a section called Detainee Movement.

2                    Do you see that?

3              A.    I do.

4              Q.    And at the bottom, it says the

5    total moved was 112; correct?

6              A.    Correct.

7              Q.    And then if you go to the next

8    section of the e-mail on the page, there's a

9    section called Total Intake; correct?

10                   MR. MEDLOCK:  If you can pull that

11   up, Kevin, the next section down.

12   BY MR. MEDLOCK:

13             Q.    So this is the next section, and it

14   lists total intake; correct?

15             A.    That is correct.

16             Q.    And the total intake for all

17   nationalities on that day was 38; correct?

18             A.    Yes.

19             Q.    So 112 people were moved out of the

20   AEU, and 38 came in by intake; correct?

21             A.    Correct.

22             Q.    So this is one of those days that

23   we are talking about where substantially more

24   people moved out of the AEU than came in by

25   intake; correct?



Page 163

```
 1                 A.    Yes.
 2                 Q.    All right.  Let's look at Tab 11
 3       which is Exhibit -- will be marked as Exhibit 191.
 4                 (Exhibit No. 191 was marked for
 5                 identification by the shorthand
 6                 reporter and is attached hereto.)
 7       BY MR. MEDLOCK:
 8                 Q.    It's a three-page e-mail that bears
 9       the Bates number AOL-DEF-00065872 through -74.
10                 And this is another admissibility
11       enforcement unit 24-hour reporting report for
12       September 9, 2016; correct?
13                 A.    Correct.
14                 Q.    Okay.  If you move to the second
15       page of the e-mail, which is Bates number
16       AOL-DEF-00065873, looking at the detainee movement
17       section, the total moved out of the AEU on that
18       day was 176; correct?
19                 A.    Correct.
20                 Q.    And then moving to the intake
21       section the -- and looking at the third page of
22       the e-mail ending in 874, there is a total intake
23       for all nationalities of 152; correct?
24                 A.    Correct.
25                 Q.    So, again, on this day the number
```



Page 164

```
 1     of individuals leaving the AEU was higher than the
 2     number of individuals coming in via intake;
 3     correct?
 4                A.   Correct.
 5                MR. MEDLOCK:  And let's pull up
 6     Tab 12, if you can, please, Kevin.
 7                (Exhibit No. 192 was marked for
 8                identification by the shorthand
 9                reporter and is attached hereto.)
10     BY MR. MEDLOCK:
11                Q.   So I am showing you Tab 12, the
12     document that will be marked as Exhibit 192 to
13     your deposition.
14                This is an AEU 24-hour reporting
15     for July 26, 2016; correct?
16                A.   Correct.
17                Q.   Okay.  I want to focus on the boxes
18     on the first page --
19                MS. SHINNERS:  I'm sorry,
20     Mr. Medlock.  Can you provide the Bates number?  I
21     need to find the document.
22                MR. MEDLOCK:  I'm sorry.  Yeah.
23     That's fine.  AOL-DEF-00065048 through -50.
24     Apologies.  I have been trying to be consistent,
25     but I missed it.
```



Page 165

1                    MS. SHINNERS:  All right.

2        BY MR. MEDLOCK:

3                    Q.   So in the first box on this, it has

4        "on site (including Otay)."

5                    Do you see that?

6                    A.   Yes.

7                    Q.   Why was the on-site numbers for the

8        San Ysidro AEU and the Otay AEU sometimes combined

9        in these reports, if you know?

10                    A.   Because -- excuse me.  So Otay does

11        not have the infrastructure that San Ysidro has.

12        So bodies at Otay that were not going to be moved

13        out of custody would need to come to San Ysidro

14        for overnight detention.  So we included that

15        number to account for those people.

16                    Q.   Okay.  Thanks for the explanation.

17        That helps.

18                    Moving to the second page of the

19        document -- of the e-mail which ends in 049, in

20        the detainee movement section, the total moved out

21        of the AEU was 167; correct?

22                    A.   Correct.

23                    Q.   And then moving down --

24                    MR. MEDLOCK:  Go ahead.

25                    MS. SHINNERS:  I was going to say,



Page 166

1      Ms. Marin, if you need time to look at the

2      document, you can do so.

3                     THE WITNESS:  Okay.

4      BY MR. MEDLOCK:

5             Q.   And then moving down to the total

6      intake section, if you look at that section, the

7      total intake or --

8                     MR. MEDLOCK:  Actually, if you can

9      go all the way to the bottom on that, Kevin.

10     BY MR. MEDLOCK:

11            Q.   The total intake for all

12     nationalities is 91; correct?

13            A.   Correct.

14            Q.   So, again, on this day 167 people

15     are moved out of the AEU but only 91 come in

16     through intake; correct?

17            A.   Correct.

18            Q.   Okay.  And these last three e-mails

19     we have been talking about, Exhibits 190 through

20     192, are indicative of what you were saying

21     earlier that there are some days where more people

22     leave the AEU than come into it by intake;

23     correct?

24            A.   Yes.  It depends what time they

25     leave and what time intake occurs.  So this is



Page 167

1    just a snapshot, right, on any given day, but yes,

2    that does happen.

3                Q.    Okay.  Isn't it true that the San

4    Ysidro port of entry has set a target detention

5    capacity number that is well below ███ individuals

6    on certain dates?

7                A.    Yes.  A ballpark for -- based on,

8    again, the operational capacity.

9                Q.    In -- well, let's take a look at

10   one of those e-mails.

11               MR. MEDLOCK:  Kevin, can you bring

12   up Tab 13, please?

13               (Exhibit No. 193 was marked for

14               identification by the shorthand

15               reporter and is attached hereto.)

16   BY MR. MEDLOCK:

17               Q.    All right.  Ms. Marin, I am showing

18   you a one-page e-mail that bears the Bates number

19   AOL-DEF-00603278, which will be marked as

20   Exhibit 193 to your deposition.

21               Do you recognize Exhibit 193?

22               A.    I do.

23               Q.    This is an e-mail chain between

24   yourself and Kylvin Gomez; correct?

25               A.    Yes.



Page 168

```
1                   Q.   What was Mr. Gomez's position at

2         CBP in September 2018?

3                   A.   He was a supervisor in the unit.

4                   Q.   These are -- when you say "the

5         unit," you mean the AEU?

6                   A.   Yes.

7                   Q.   And these are e-mails that you

8         drafted and received in the course of your work at

9         CBP; correct?

10                  A.   Yes.

11                  Q.   And you would have been

12        knowledgeable about the contents of these e-mails

13        at the time you sent and received them; correct?

14                  A.   Yes.

15                  Q.   And you maintained this e-mail

16        chain in your e-mail inbox at CBP; correct?

17                  A.   Yes.

18                  Q.   And sending e-mails like this with

19        Kylvin Gomez about intake was part of your job at

20        CBP at the time; correct?

21                  A.   Correct.

22                  Q.   Do you have any reason to believe

23        that this e-mail chain between yourself and

24        Mr. Gomez is inaccurate in any way?

25                  A.   No.
```



Page 169

```
 1                    Q.    Let's start with the e-mail that
 2       Mr. Gomez sent to you at 7:04 a.m. on
 3       September 8th, 2018, at the bottom of this box in
 4       front of you.  Do you see that e-mail?
 5                    A.    I do.
 6                    Q.    Mr. Gomez writes:
 7                    "We have 242 on site...61
 8              cases pending prep.  Can we not
 9              intake today, please?"
10                    Did I read that correctly?
11                    A.    Yes.
12                    Q.    And Mr. Gomez is essentially
13       stating that there are 300 -- approximately 303
14       cases that are either individually or on site or
15       going through some sort of prep; correct?
16                    A.    I do not take that sentence to mean
17       that.
18                    Q.    What do you take it to mean?
19                    A.    So I read that as he is -- we have
20       242 total on site; 61 are new intakes that have
21       not been prepped for process.
22                    Q.    Okay.  So there are only 242 people
23       on site at that point; correct?
24                    A.    Yeah.  Without -- that's what I
25       believe that e-mail to read to me.
```



Page 170

1                    Q.   Okay.  And you respond to him on

2        September 8, 2018, at 8:31 a.m.; Correct?

3                    A.   Yes.

4                    Q.   And you write:

5                    "Do 20 at 1430, please.  █████

6               queue management report."

7                    Did I read that correctly?

8                    A.   Yes.

9                    Q.   And when you say "do 20," you are

10       asking Mr. Gomez to intake 20 more individuals at

11       2:30 p.m.; correct?

12                   A.   Correct.

13                   Q.   And one of the reasons you are

14       asking to do that is because you know at 3:50 p.m.

15       the next queue management report for that day will

16       be run; correct?

17                   A.   That is incorrect.

18                   Q.   Okay.  What does the phrase "████

19       queue management report" mean?

20                   A.   ████ is what was waiting in the

21       queue.  So I was telling him what to put on the

22       report.

23                   Q.   Oh, okay.  So when you say "████

24       waiting in the queue," these are individuals that

25       are in shelters in Tijuana; correct?



Page 171

```
 1              A.   Correct.

 2              Q.   Okay.  And then he writes back to

 3    you at 8:32:

 4                   "Okay.  Thanks."

 5                   Is that right?

 6              A.   Yes.

 7              Q.   And then you write back to him at

 8    11:34 a.m. on the same day:

 9                   "275 is our new target

10                   number.  Don't stress, help is

11                   coming..."

12                   Did I read that correctly?

13              A.   Yes.

14              Q.   Whose responsibility at the San

15    Ysidro port of entry was it to set a target

16    number?

17              A.   I don't know that it was anyone's

18    responsibility to set a target number.  So

19    continuously it's my job with oversight of AEU to

20    be able to balance what we are intaking with what

21    we can process.  And we have processing

22    requirements and we have time frames in which

23    things need to be processed.  We only have a

24    finite budget and finite man-hours based on

25    what -- how much overtime officers in the unit can
```



Page 172

1    work.  And so I had to be able to balance that, be

2    able to meet the timely processing requirement

3    with workload.  So I would set a number for the

4    unit based on being able to meet those

5    expectations.

6            Q.   So you set the target number on

7    September 8th, 2018; is that right?

8            A.   I would have had discussions

9    with -- I think I was the watch commander at the

10   time in '18.  So I would have had discussions with

11   the AP and port director, part of making that --

12           Q.   Do you know who that would have

13   been at the time?

14           A.   The APD would have been

15   Robert Hood.  The port director would have been

16   Sidney Aki.

17           Q.   And on September 8, 2018, what were

18   the budget constraints that caused you to set the

19   target number at 275?

20           A.   I don't know what the budget

21   constraint offhand would have been.

22           Q.   On September 8, 2018, what were the

23   man-hours or overtime constraints that caused you

24   to set the target number at 275?

25           A.   So, again, I don't know exactly



Page 173

1    what the budget constraint was, but looking at

2    that date, we are at the end of a fiscal year in

3    September.  Statutorily, CBP officers are limited

4    in the number of overtime -- well, it's not just

5    overtime -- premium funds that they are allowed to

6    earn every year.

7                    And so if I have officers that have

8    reached -- and, again, I would have to go back and

9    verify these numbers, but based on the time frame

10   there, I would have had officers nearing what we

11   call the "cap" in what they can spend in overtime,

12   meaning I would not have had the adequate manpower

13   to continue a large intake and get them all

14   processed within the required time frame.

15                   Q.   On September 8, 2018, how many of

16   your officers were at the overtime cap?

17                   A.   I don't know that number offhand.

18                   Q.   Do you know what percentage of your

19   officers were at the overtime cap on September 8,

20   2018?

21                   A.   I don't know what percentage, but I

22   will say that for many years a very large

23   percentage of my officers are nearing the cap.

24                   Q.   Okay.  But when you say "a very

25   large percentage," you are guessing at that;



Page 174

1    correct?

2              A.   You are correct.  I do not know

3    offhand.

4              Q.   And you don't know as you sit here

5    today whether there were any other factors that

6    caused you to set the target number at 275,

7    correct, on September 8, 2018?

8              A.   I don't know.  I would be relying

9    strictly on memory which is not the greatest.  So

10   I don't know.

11             Q.   But you would agree with me that

12   275 is less than █; correct?

13             A.   Yes.

14             Q.   And 275 is also less than █

15   correct?

16             A.   Yes.

17             Q.   And are you aware of any public

18   statement that anyone at the San Ysidro port of

19   entry or San Diego field office made to the public

20   saying that 275 was the target number?

21             A.   No.

22             Q.   How long was the target number of

23   275 in place, to your knowledge?

24             A.   I do not remember.

25             Q.   Do you recall contacting anyone at



Page 175

1    CBP's office of chief counsel or your local

2    counsel when you set the target number at AEU of

3    275?

4             A.   No, I do not recall that.

5             Q.   Do you recall seeking any legal

6    advice before changing the target number to 275?

7             A.   Not that I recall.

8             Q.   At any point in which you changed

9    the target number for the San Ysidro AEU, did you

10   seek any legal advice about doing so?

11            A.   No, not that I recall.

12            Q.   Isn't it true that there were

13   several days in which the San Ysidro port of entry

14   has taken zero arriving noncitizens into its AEU?

15            A.   Yes, there have been days when we

16   took zero.

17            Q.   Are there days where the target

18   number has been set to zero?

19            A.   I can't say that there are days

20   when there was a target number set to zero, but if

21   we did not intake, it would have been for

22   operational capacity reasons.

23            Q.   But you can't tell me what those

24   operational capacity reasons are as you sit here

25   today that would have mandated intaking zero



Page 176

```
 1    arriving noncitizens?
 2              MS. SHINNERS:  Objection.  What
 3    date are you talking about?  Vague as to time
 4    frame.
 5    BY MR. MEDLOCK:
 6         Q.   So, Ms. Marin, my question is as
 7    follows:  You stated that there were some days in
 8    which the San Ysidro port of entry took zero
 9    arriving noncitizens into its AEU.
10              For those days can you tell me what
11    the operational constraints were that led the port
12    management to make the decision that they were
13    going to intake zero arriving noncitizens that
14    day?
15         A.   Without knowing the specific day, I
16    cannot answer that.
17         Q.   If I told you a specific day --
18              MS. SHINNERS:  It --
19              MR. MEDLOCK:  Go ahead.
20              MS. SHINNERS:  It's nearing
21    lunchtime, and I think it's really time to
22    probably get some lunch.
23              MR. MEDLOCK:  Okay.  Let's stop
24    there, then.  That's fine.
25              MS. SHINNERS:  Thanks.  Sorry.
```



Page 177

1                    MR. MEDLOCK:  Why don't we go off

2      the record.

3                    VIDEOGRAPHER:  Time is 1:50 p.m.

4      We are now off the record.

5                    (Whereupon, a luncheon recess was

6                    held from 12:49 p.m. to 2:01 p.m.)

7                    VIDEOGRAPHER:  Time is 2:02 p.m.

8      We are now back on the record.

9      BY MR. MEDLOCK:

10                   Q.   Ms. Marin, welcome back.  I hope

11     you had a good lunch.

12                   A.   Thanks.  You too.

13                   Q.   Isn't it true that on occasion the

14     San Ysidro port of entry has cut its target number

15     as low as 200?

16                   A.   Yes, but that's always -- that's

17     never an exact number.  It's just a ballpark to be

18     around.

19                   MR. MEDLOCK:  Okay.  Kevin, can you

20     bring up exhibit -- or Tab 14, please?

21                   (Exhibit No. 194 was marked for

22                   identification by the shorthand

23                   reporter and is attached hereto.)

24     BY MR. MEDLOCK:

25                   Q.   All right.  Ms. Marin, I put in



Page 178

1    front of you on the screen what's been marked or

2    will be marked as Exhibit 194 to your deposition.

3    It's a one-page e-mail that bears the Bates number

4    AOL-DEF-00084038.

5                And my first question to you is

6    whether you recognize Exhibit 194?

7                A.    I do recognize it.  It's a little

8    small and blurry, though, so if we can potentially

9    blow it up a little more?  But I do recognize it.

10                Q.    Sure.  And we will focus on the top

11    two e-mails of the chain for now.  If you look at

12    the top e-mail in the chain, it was sent to

13    yourself, Sidney Aki, and Robert Hood by Eric

14    Crouston on July 12th, 2019, at 12:27 a.m.

15                Do you see that?

16                A.    I do.

17                Q.    What was Mr. Crouston's position at

18    CBP at the time of this e-mail?

19                A.    He was a chief in the admissibility

20    enforcement unit.

21                Q.    He would have reported to you at

22    this time?

23                A.    Yes.

24                Q.    All right.  If we can move down to

25    the bottom e-mail in the chain, this is an e-mail



Page 179

```
 1    that was sent by Anthony Asher to several people
 2    including Todd Owen, John Wagner, and Randy Howe.
 3                    Who is Anthony Asher, if you know?
 4            A.    He is a supervisory CBP officer
 5    also over AEU.
 6            Q.    And there is a section in this
 7    e-mail called Custody Numbers.
 8                    Do you see that?
 9            A.    I do.
10            Q.    And he writes that -- the chart, I
11    should say, underneath that, shows that there are
12    currently 258 in custody; correct?
13            A.    Correct.
14            Q.    And it lists the capacity as 300
15    for the San Ysidro port of entry; correct?
16            A.    Correct.
17            Q.    This e-mail doesn't refer to
18    operational capacity or physical capacity.
19                    It just uses the word "capacity";
20    correct?
21            A.    Yes.
22            Q.    And then beneath that, there is a
23    percentage of capacity listed at 86 percent;
24    correct?
25            A.    Yes.
```



Page 180

1                    Q.   And, again, it doesn't say

2      operational capacity or physical capacity.

3                         It uses the word "capacity";

4      correct?

5                    A.   Correct.

6                    Q.   Okay.  Now, moving up in the chain,

7      Sidney Aki responds to this e-mail on July 11,

8      2019, at 9.14 p.m.

9                    MR. MEDLOCK:  Kevin, if you could

10     bring that e-mail up.

11     BY MR. MEDLOCK:

12                   Q.   And it's the bottom of these two

13     e-mails here.  And Mr. Aki writes:

14                        "May I ask why we took in 51?

15                        I thought we were reducing to

16                        200."

17                        Did I read that correctly?

18                   A.   Yes.

19                   Q.   And then Mr. Crouston replies,

20     stating in part:

21                        "We have a large number of

22                        single movement that will occur

23                        tonight, tomorrow and this

24                        weekend that will leave us below

25                        200."



Page 181

1           Did I read that correctly?

2           A.   Yes.

3           Q.   There is a reference here to single

4    movement.  That appears to mean the movement of

5    individuals who aren't part of family units or

6    large groups out of the AEU; correct?

7           A.   Correct.

8           Q.   I would like to go back to your

9    declaration which is Tab 3 and Exhibit 185.  And I

10   want to focus on Page 4, Paragraph 12 of your

11   declaration.  And we talked about this earlier

12   this morning.

13          You focus here on relaying

14   statistics about San Ysidro's AEU for July 1st and

15   2nd, 2019; correct?

16          A.   Yes, that's correct.

17          Q.   And you note that on -- that the

18   custody log reflects that there were 265

19   individuals in custody for approximately 85

20   percent capacity, in Paragraph 12(c); correct?

21          A.   So the 85 percent for me was not

22   referring to capacity.  It was 85 percent --

23          Q.   Number of hours; correct?

24          A.   Yeah.  85 percent of the

25   individuals in custody on that day were in custody



Page 182

 1    longer than 72 hours.

 2              Q.   And do you know what the number of

 3    individuals in custody on July 1st, 2019, at

 4    San Ysidro's AEU had any impact on port

 5    operations?

 6              A.   They had an impact on AEU

 7    operations, but specifically to a given day, the

 8    number of officers needed to work in AEU would

 9    have an impact on port operations.

10              MR. MEDLOCK:  Okay.  Let's go to

11    Tab 16, please, Kevin.

12              (Exhibit No. 196 was marked for

13              identification by the shorthand

14              reporter and is attached hereto.)

15    BY MR. MEDLOCK:

16              Q.   All right.  Ms. Marin, I put in

17    front of you a spreadsheet that bears the Bates

18    number AOL-DEF-00083448, which we have marked as

19    Exhibit 196 to your deposition.  This is a queue

20    management report for July 1st, 2019.

21              Do you see that?

22              A.   I do.

23              Q.   And this is one of the two days

24    that you discussed in Paragraph 12 of your

25    declaration; correct?



Page 183

1          A.   Correct.

2          Q.   And if you look at the chart for

3     the San Ysidro port of entry, it shows that there

4     were █████ detainees in custody at the port for 98

5     percent capacity; correct?

6          A.   Correct.

7          Q.   And it shows that there was no

8     impact to port operations on that day; correct?

9          A.   Correct.  But that was not the

10    intent of that column on the report.

11         Q.   Did you put this report together on

12    July 1st, 2019?

13         A.   It would have been one of the

14    supervisors in the unit.

15         Q.   Okay.  So you didn't put it

16    together; correct?

17         A.   I'm not sure if I did, but

18    typically it would be a supervisor working on duty

19    in that unit.  There are times when I have filled

20    it out as well, but...

21         Q.   Okay.  And the phrase "impact to

22    port operations" references whether the number of

23    detainees held at the AEU had an impact on port

24    operations; correct?

25         A.   We never defined that section to



Page 184

1    mean that in this report.

2            Q.   What did you define it to mean?

3            A.   For us that's an impact out of the

4    norm.  So we knew -- and when I say "we," you

5    know, AEU knew, port management knew, and field

6    office leadership knew there was a queue.  They

7    knew that the AEU was regularly operating at its

8    operational capacity and as did headquarters,

9    because they got these reports regularly.

10           We took that specific column to

11   mean anything out of the norm.  And for us, the Q

12   and our capacity, all of that is a norm for us.

13   So we would not report day to day that there was

14   an impact unless it was something out of the norm

15   for us.  A large group waiting south of the limit

16   line that was impeding traffic flow would be

17   something that we may report there.  But we would

18   not report just the fact that there was an impact

19   to port operations based on working at the, you

20   know, capacity of undocumented migrants and there

21   being a queue.  We would not report that there on

22   a day-to-day basis, no.

23           Q.   So you don't actually -- on this

24   Exhibit 196, you don't say nothing out of the

25   ordinary or normal; you say no impact; correct?



Page 185

 1              A.   Correct.

 2              Q.   And what you are defining the

 3    phrase "no impact" to mean is no impact out of

 4    what is normally going on; is that right?

 5              A.   Correct.

 6              Q.   And did you ever explain that to

 7    your management in an e-mail explaining what the

 8    phrase "no impact" meant?

 9              A.   I cannot recall putting that in an

10    e-mail.

11              Q.   And can you recall ever getting on

12    the phone with your management and saying, 'Look,

13    I know it says "no impact," but what it actually

14    means is no impact out of what is normal at

15    San Ysidro'?

16              A.   I do remember having conversations

17    with them, yes.  I don't know if it was on the

18    phone or in person in the AEU when this report

19    began to be generated and required.

20              Q.   Who did you have that conversation

21    with?

22              A.   At that time it would have been my

23    chief, Eric Crouston, and if there were

24    supervisors on duty, it probably would have been

25    in the supervisor's office.



Page 186

1           Q.    When did that conversation occur?

2           A.    It would have been shortly after

3    the inception of this report.  I don't know the

4    exact date.

5           Q.    Did you document that conversation

6    in any way?

7           A.    To my knowledge, I did not.

8           Q.    Did you ever given written guidance

9    to your direct reports saying how the phrase "no

10   impact" should be used on queue management

11   reports?

12          A.    I do not recall giving written

13   guidance on that.

14          Q.    Did you ever do anything to

15   document in writing what the phrase "no impact"

16   meant on a queue management report?

17          A.    To my knowledge --

18                MS. SHINNERS:  Object to the scope.

19   Object to the scope.

20                Are you -- continue.

21   BY MR. MEDLOCK:

22          Q.    I'm sorry.  What was your answer,

23   Ms. Marin?

24          A.    To my knowledge, I did not.

25                MR. MEDLOCK:  I am going to show



Page 187

```
 1      you Tab 17 --
 2                  Kevin.
 3                  -- which we will mark as
 4      Exhibit 197 to your deposition.  And Exhibit 197
 5      is a spreadsheet bearing the Bates number
 6      AOL-DEF-00523370.
 7                  (Exhibit No. 197 was marked for
 8                  identification by the shorthand
 9                  reporter and is attached hereto.)
10      BY MR. MEDLOCK:
11                  Q.  And my first question to you,
12      Ms. Marin, if this appears to be a queue
13      management report for July 2nd, 2019; correct?
14                  A.  Correct.
15                  Q.  And July 2nd, 2019, is the second
16      date that was mentioned in Paragraph 12 of your
17      declaration; correct?
18                  A.  Correct.
19                  Q.  And if you look in the row for
20      San Ysidro, it shows that there are ██
21      individuals in custody at the AEU for 98 percent
22      capacity; correct?
23                  A.  Yes.
24                  Q.  And by the way, in this chart it
25      says "percentage of capacity."  It doesn't say
```



Page 188

1      operational capacity.  It doesn't say physical

2      capacity.  It just says "capacity"; correct?

3                  A.    Correct.

4                  Q.    And then in the column for port

5      operations, it says "no impact"; correct?

6                  A.    Correct.

7                  Q.    Which you now claim means no impact

8      out of the ordinary; correct?

9                  A.    Correct.

10                 Q.    You could have written "no impact

11     out of the ordinary."  It's just three extra

12     words.  Why didn't you do that?

13                 A.    Again, I'm not sure that I wrote

14     the report or another supervisor wrote the report,

15     but we knew that what we meant by "no impact" was

16     no impact out of the normal, impact that everyone

17     knew about.  We didn't see a reason to continue to

18     report on a day-to-day basis.

19                 Q.    And you do want to be clear in the

20     communications that were going to management at

21     OFO; correct?

22                 A.    Correct.

23                 Q.    And you knew that management at OFO

24     saw a version of the queue management report;

25     correct?



Page 189

1          A.    Correct.

2          Q.    So if you wanted to be clear in

3    what you were communicating to your management and

4    senior leadership at OFO, why not just write the

5    three extra words to make this say "no impact out

6    of the ordinary"?

7          A.    It was our understanding that even

8    senior management knew "no impact" was -- were

9    things out of the ordinary for the port of entry

10   that was making the report.  So I can't speculate

11   as to why whoever filled out the report did not

12   write three extra words, but it was because we

13   knew that that's what that meant.

14         Q.    So you can't speculate as to why

15   they do it, but you knew that the reason why they

16   did that was -- why this just says "no impact" is

17   because everybody knew what "no impact" meant; is

18   that right?

19         A.    Correct.

20         Q.    Do you know what "no impact" means

21   when it's used with respect to Tecate?

22         A.    It would mean the same for all of

23   us.

24         MS. SHINNERS:  Sorry.  Object to

25   the scope.



Page 190

1              But go ahead.

2     BY MR. MEDLOCK:

3              Q.   Do you know what "no impact" means

4     with respect to Calexico?

5              A.   Yes.

6              Q.   Okay.  And does "no impact" mean no

7     impact out of the ordinary when it's used with

8     respect to Calexico?

9              A.   Yes.

10             Q.   Isn't it true that the queue

11    management reports said "no impact" to port

12    operations regardless of the number of people in

13    custody and the capacity of the port?

14             A.   Yes, that is true.

15             Q.   Okay.  Let's take a look at Tab 18,

16    which is an exhibit we will mark as Exhibit 198 to

17    your deposition.

18             THE COURT REPORTER:  Excuse me,

19    Counsel.  This is the reporter.  There have been a

20    few documents marked as the same exhibit.  There's

21    a bit of confusion with the exhibits.  I just

22    wanted to let you know.  I don't know if you want

23    to go off the record to figure it out.

24             MR. MEDLOCK:  Why don't we do this.

25    We will mark Tab 18 as Exhibit 200, and I know we



Page 191

1     haven't hit that number yet.

2              (Exhibit No. 200 was marked for

3              identification by the shorthand

4              reporter and is attached hereto.)

5     BY MR. MEDLOCK:

6              Q.   So, Ms. Marin, I have brought up

7     what we have marked as Exhibit 200 to your

8     deposition.  It's a multipage Federal Rule of

9     Evidence 1006 summary exhibit entitled "San Ysidro

10    Port of Entry Impact to Port Operations."  It

11    summarizes the capacity of the San Ysidro port of

12    entry on everyday approach.  We have a queue

13    management report and what is listed in the impact

14    to port operations column.  And I will have Kevin

15    scroll through the pages of this summary exhibit.

16              Please tell me when an actual

17    impact to port operations is listed.

18              (Document reviewed by witness on

19              screen.)

20    BY MR. MEDLOCK:

21              Q.   That's the last page.

22              So for every queue management

23    report that's listed, it always -- there is no

24    impact to port operations listed; correct?

25              A.   Correct.



Page 192

1              MS. SHINNERS:  Objection.

2     Assumes -- assumes the accuracy of the summary.

3              You can answer.

4     BY MR. MEDLOCK:

5         Q.   And isn't it the case that for Otay

6     Mesa and Calexico there was never an impact to

7     port operations listed on any queue management

8     report?

9         A.   I haven't memorized the queue

10    management reports, but I'd assume that it's

11    similar.

12             MR. MEDLOCK:  Kevin, can you bring

13    up Tab 40, which we will mark as Exhibit 201?

14             (Exhibit No. 201 was marked for

15             identification by the shorthand

16             reporter and is attached hereto.)

17    BY MR. MEDLOCK:

18        Q.   So, Ms. Marin, I am showing you a

19    summary exhibit that we have marked as Exhibit 201

20    to your deposition.  It shows the capacity and

21    impact to port operation columns for every queue

22    management report that we have for the Calexico

23    port of entry.

24             I will ask Kevin to scroll through

25    it so you can look at it, and once you've done



Page 193

1    that, my question will be:  Isn't it true that

2    there is never an impact to port operations listed

3    for Calexico in any queue management report?

4                MS. SHINNERS:  Objection to the

5    extent it assumes the accuracy of the summary,

6    which we have not had the chance to verify.

7                (Document reviewed by witness on

8                screen.)

9    BY MR. MEDLOCK:

10               Q.   Ms. Marin, isn't it true that there

11   is never an impact listed to port operations for

12   the Calexico port of entry in any of the queue

13   management reports that are summarized?

14               MS. SHINNERS:  Same objection.

15               THE WITNESS:  On the summary

16   exhibit, yes, that's true.

17               MR. MEDLOCK:  Okay.  And, Kevin,

18   can you please bring up Tab 41, which we will mark

19   as Exhibit 202 to this deposition.

20               (Exhibit No. 202 was marked for

21               identification by the shorthand

22               reporter and is attached hereto.)

23   BY MR. MEDLOCK:

24               Q.   Exhibit 202 is a Federal Rule of

25   Evidence 1006 summary exhibit that depicts the



Page 194

1    capacity and impact to port operations column for

2    every queue management report for Otay Mesa that

3    has been produced to us.

4                    I will ask Kevin to scroll through

5    the Federal Rule of Evidence 1006 exhibit.

6                    And after that, Ms. Marin, my

7    question to you will be:  Isn't it true that there

8    is never an impact to port operations listed on

9    any queue management report summarized for the

10    Otay Mesa port of entry?

11                    MS. SHINNERS:  Same objection.

12                    (Document reviewed by witness on

13                    screen.)

14    BY MR. MEDLOCK:

15            Q.   Ms. Marin, having looked at every

16    page of this summary exhibit, isn't it true that

17    for every queue management report that's

18    summarized for Otay Mesa, there is no impact to

19    port operations listed?

20                    MS. SHINNERS:  Same objection.

21                    THE WITNESS:  Based on the summary

22    exhibit, yes.

23    BY MR. MEDLOCK:

24            Q.   Now, for the court to believe your

25    testimony today, the court is going to have to



Page 195

```
1    believe that "capacity" means something other than

2    the normal definition of "capacity" and that "no

3    impact" means something other than the ordinary

4    meaning of the terms -- of the term "no impact";

5    isn't that right?

6                MS. SHINNERS:  Objection;

7    argumentative.

8    BY MR. MEDLOCK:

9                Q.   You can answer.

10               A.   Yes.

11               Q.   I would like to talk a little bit

12   more directly about how the metering works in

13   practice at the San Diego field office.

14               When a port of entry is engaged in

15   metering, CBP officers stand in positions at or

16   near the limit line between the U.S. and Mexico;

17   is that right?

18               A.   Yes.

19               Q.   And when a port of entry is engaged

20   in metering and a noncitizen without proper travel

21   documents arrive at or near the limit line, the

22   CBP officer is instructed to tell them that they

23   should return at a later time to be processed;

24   correct?

25               A.   Depending on what port of entry,
```



MAGNA
LEGAL SERVICES

Page 196

1    yes.

2              Q.    What do you mean by "depending on

3    what port of entry"?

4              A.    So Otay Mesa port of entry, for

5    instance, would redirect them to San Ysidro.

6              Q.    Okay.  So in the San Diego field

7    office, there is something called the "hub

8    concept"; correct?

9              A.    Correct.

10             Q.    And there are two hub ports.  There

11   is Calexico and San Ysidro; correct?

12             A.    Correct.

13             Q.    So the non-hub ports which would be

14   Otay Mesa, Tecate, and Andrade, will redirect

15   noncitizens without proper travel documents to the

16   hub ports; correct?

17             A.    Correct.

18             Q.    So at the hub port of San Ysidro

19   and Calexico, when they are engaged in metering,

20   when a noncitizen without proper travel documents

21   arrives at the limit line, a CBP officer will tell

22   them that they -- the "them" meaning the person

23   without the proper travel documents -- that they

24   should return at a later time to be processed; is

25   that right?



Page 197

1             A.    I can't say that they would tell

2      them to return at a later time, no.

3             Q.    They would tell them that they

4      can't be processed at that time; is that right?

5             A.    Yes.   They could have told them

6      that.

7             Q.    And in some instances, they may

8      tell them that the port is at capacity; correct?

9             A.    Yes.   That's a possibility.

10             Q.    You would agree with me that

11      noncitizens that are at the limit line who are

12      told that they can't be processed at that time are

13      attempting to set foot on U.S. soil; correct?

14             A.    In some instances, yes.

15             Q.    In what instances are they not

16      trying to set foot on U.S. soil?

17             A.    I'm not sure I understand your

18      question on trying to step foot.  If they are

19      stopped in Mexican soil, then they may not be

20      trying to set foot on U.S. soil.

21             Q.    Asylum seekers who make it to the

22      border between the U.S. and Mexico are attempting

23      to cross that border and step onto U.S. soil; is

24      that right?

25             A.    Generally, yes.



Page 198

```
 1                    Q.   You say "generally."

 2                         What are the instances in which

 3      asylum seekers who come to the U.S.-Mexico border

 4      are not attempting to cross from Mexican territory

 5      onto U.S. territory?

 6                    A.   Sorry.  I didn't hear the beginning

 7      of your question that you differentiated asylum

 8      seekers versus people without documents.

 9                    Q.   Oh, okay.  So my question is -- you

10      said generally asylum seekers who are at the

11      border are attempting to get onto U.S. soil.

12                         My question is:  You used the

13      qualifier "generally."  In what circumstances are

14      those asylum seekers not trying to get to U.S.

15      soil?

16                    A.   Right.

17                         MS. SHINNERS:  Objection to form

18      and object to the scope.  Object to the scope as

19      well.

20                         THE WITNESS:  So I initially heard

21      your question to say noncitizens or residents

22      without documents are attempting to step onto U.S.

23      soil.  I did not hear the differentiation to

24      asylum seekers.  So that's why I used the term

25      "generally."
```



Page 199

1    BY MR. MEDLOCK:

2              Q.   Okay.  So for asylum seekers that

3    are at the border, they want to make it onto U.S.

4    soil so they can claim asylum in the

5    United States; correct?

6              MS. SHINNERS:  Object to the scope

7    and calls for speculation.

8              THE WITNESS:  I would say yes,

9    probably.

10   BY MR. MEDLOCK:

11             Q.   Okay.  Why do you say "probably"?

12   What else are they there to do?

13             MS. SHINNERS:  Object to the scope.

14   Calls for speculation.

15             THE WITNESS:  I don't know what

16   else they would be there to do but I don't -- I

17   can't give a definitive answer onto someone's

18   intent to come to the United States.

19   BY MR. MEDLOCK:

20             Q.   Well, how many asylum seekers do

21   you see who just decide to sit down and have a

22   sandwich or have a picnic at the midpoint of the

23   bridge?  I mean, they want to keep walking and get

24   onto U.S. soil; right?

25             MS. SHINNERS:  Object to the scope.



Page 200

1     Same objection.  Speculation.

2                    THE WITNESS:  Yes.

3     BY MR. MEDLOCK:

4            Q.   Are you aware of the term --

5            A.   I'm sorry.  The audio broke up.

6            Q.   Oh, I'm sorry.  Have you ever heard

7     of the term "arriving alien"?

8            A.   Yes.

9            Q.   Have you received training on what

10    the term "arriving alien" means?

11                   MS. SHINNERS:  Object to the scope.

12                   THE WITNESS:  Yes.

13                   MR. MEDLOCK:  Kevin, can you please

14    bring up Tab 19, which we will mark as Exhibit 203

15    to Ms. Marin's deposition.

16                   (Exhibit No. 203 was marked for

17                   identification by the shorthand

18                   reporter and is attached hereto.)

19    BY MR. MEDLOCK:

20           Q.   Exhibit 203 is a selection of

21    training materials entitled "Lesson 11: Processing

22    Expedited Removals."  It bears the Bates numbers

23    AOL-DEF-01090765 through -828.  And I would like

24    to focus with you if I could, Ms. Marin, on

25    Line 11-4, which is Bates number AOL-DEF-01090768.



Page 201

```
 1    At the top of the slide, the slide title is
 2    "Definition of Arriving Alien."
 3              Do you see that, Ms. Marin?
 4         A.   I do.
 5         Q.   And there is a reference here to 8
 6    CFR 1.1 (q).  Do you see that?
 7         A.   Yes.
 8         Q.   And it says:
 9              "In order to be considered an
10              arriving alien, the applicant
11              must be..."
12              And then there's two prongs beneath
13    that bullet, and the first reads:
14              "Entering or attempting to
15              enter the United States at a
16              POE."
17              And the second is:
18              "Seeking transit through the
19              United States by other means."
20              Did I read that correctly?
21         A.   Yes.
22         Q.   Okay.  In your experiences, are
23    asylum seekers who are at the border between the
24    United States and Mexico attempting to enter the
25    United States at a port of entry?
```



Page 202

```
 1                    MS. SHINNERS:  Object to the scope,
 2     calls for a legal conclusion.
 3                    THE WITNESS:  Yes.
 4                    MR. MEDLOCK:  I would like to --
 5     BY MR. MEDLOCK:
 6           Q.   Actually, I have a follow-up
 7     question.  Isn't it the case that CBP officers are
 8     supposed to provide documentation to individuals
 9     who are denied entry to the U.S.?
10                    MS. SHINNERS:  Object to the scope.
11                    THE WITNESS:  Yes.
12                    MR. MEDLOCK:  Kevin, if we can pull
13     up Tab 20, which is -- we will mark as Exhibit 204
14     to Ms. Marin's deposition.
15               (Exhibit No. 204 was marked for
16               identification by the shorthand
17               reporter and is attached hereto.)
18     BY MR. MEDLOCK:
19           Q.   This Exhibit 204 is a three-page
20     memorandum dated April 6, 2012, that bears the
21     Bates numbers AOL-DEF-00586511 through -13.
22                    Ms. Marin, my first question is:
23     Have you ever seen a copy of this memorandum
24     before?
25           A.   Not that I --
```



Page 203

1              MS. SHINNERS:  I can't find -- I

2      apologize.  I can't find this document.  I can't

3      see it on the screen either.

4              MR. MEDLOCK:  Okay.  Hold on,

5      Katie, I will send it to you.

6              All right.  Katie, I e-mailed it to

7      you.  If you can let us know when you get it with

8      the server lag.  I'd appreciate it.  Katie, I

9      might have got the Bates numbers wrong.  So this

10     might be --

11             MS. SHINNERS:  Oh, that's probably

12     why.  That's probably why.

13             MR. MEDLOCK:  AOL-DEF-00596, not

14     586, 511 through -13.

15             MS. SHINNERS:  Okay.  Yeah, I have

16     it.  Okay.  Thank you.

17             MR. MEDLOCK:  Sorry.  All my fault.

18     All right.

19     BY MR. MEDLOCK:

20         Q.  Ms. Marin, have you ever seen a

21     copy of this memorandum before?

22         A.  I may have seen it.  I don't

23     specifically recall seeing it, though.

24         Q.  Okay.  The subject line of this

25     memorandum reads:



Page 204

1           "Providing inadmissible

2           travelers with documentation of

3           an adverse action case."

4               Did I read that correctly?

5       A.   Yes.

6       Q.   I just want to focus on the first

7   sentence of the first paragraph of the memorandum.

8   That sentence reads:

9           "U.S. Customs and Border

10          Protection CBP officers are under

11          statutory, regulatory, and

12          procedural requirements to

13          provide travelers who are denied

14          entry into the United States with

15          documentation of the adverse

16          action taken at the port of

17          entry."

18              Did I read that correctly?

19      A.   Yes.

20      Q.   And do you agree with that

21  statement?

22          MS. SHINNERS:  Object to the scope.

23          THE WITNESS:  Yes.

24  BY MR. MEDLOCK:

25      Q.   And then on the same paragraph, and



Page 205

```
 1        then looking at the last sentence of the
 2        paragraph, it reads:
 3                    "When CBP officers do not
 4                    provide travelers with copies of
 5                    their case, it creates a
 6                    significant burden on both CBP
 7                    and the applicant when
 8                    reconstructing the events that
 9                    occurred at the time the person
10                    was denied entry."
11                    Did I read that correctly?
12            A.   Yes.
13            Q.   Do you also agree with that
14        statement?
15                    MS. SHINNERS:  Object to the scope.
16                    THE WITNESS:  Yes.
17        BY MR. MEDLOCK:
18            Q.   Isn't it true that individuals who
19        are metered are not provided with any sort of
20        documentation by CBP?
21            A.   Yes.
22            Q.   Who made that decision, to your
23        knowledge?
24                    MS. SHINNERS:  Object to the scope.
25                    THE WITNESS:  I'm sorry.  Are you
```



Page 206

1    asking who made a decision to meter or who made a

2    decision --

3    BY MR. MEDLOCK:

4            Q.   Yeah, that's a good point.

5            Who made the decision not to give

6    documentation to individuals that were metered?

7            MS. SHINNERS:  Object to the scope.

8            THE WITNESS:  I don't know that

9    anyone specifically made a documentation -- or

10   made a decision not to give documentation to

11   individuals who are metered, but those individuals

12   have not been processed for an adverse action.

13   BY MR. MEDLOCK:

14           Q.   Right.  I understand that.

15           Did you receive any written

16   guidance regarding not providing individuals that

17   were metered with documentation regarding the fact

18   that they had been metered?

19           A.   That I can remember, I do not

20   remember receiving written guidance stating not to

21   provide documentation.

22           Q.   Did you receive any oral guidance

23   regarding not providing documentation to

24   individuals that were metered?

25           A.   I do not remember receiving oral



Page 207

1    guidance not to provide documentation.

2                Q.   Do you recall how CBP officers came

3    to understand that they should not provide

4    documentation to individuals that were metered at

5    the port of entry?

6                A.   I don't know that there was ever

7    specific guidance given one way or the other

8    regarding providing documents to individuals who

9    are metered.

10                Q.   It just so happens that no

11    documentation is provided; is that right?

12                A.   I'm sorry.  I don't understand your

13    question.

14                Q.   So my question is:  Is it just an

15    accident that individuals that are metered at land

16    ports of entry in the San Diego field office don't

17    receive documentation, or is that the result of

18    some choice made by management?

19                A.   I don't know what documentation we

20    would provide them.

21                Q.   Has there ever been any effort to

22    create documentation to provide the individuals

23    that are metered in the San Diego land ports of

24    entry and the San Diego field office?

25                A.   To my knowledge, no.



Page 208

```
 1                    MR. MEDLOCK:  All right.  I would
 2      like to mark, if I can, Tab 21 and mark that as
 3      Exhibit 205 to Ms. Marin's deposition.
 4                    (Exhibit No. 205 was marked for
 5                    identification by the shorthand
 6                    reporter and is attached hereto.)
 7      BY MR. MEDLOCK:
 8                    Q.   Ms. Marin, I am showing you what's
 9      been marked as Exhibit 205 to your deposition.
10      It's a multipage document that's entitled in the
11      bottom right corner "Descendent's [Sic] Amended
12      and Supplemental" -- sorry -- "Defendant's
13      Supplemental and Amended Response," the
14      plaintiff's forms of interrogatories to all
15      defendants.  Do you see that?
16                    A.   I do.
17                    MR. MEDLOCK:  And if we could flip
18      to Page 3 of Exhibit 205, please, Kevin.
19      BY MR. MEDLOCK:
20                    Q.   You will see that this starts off
21      under the section specific objections and
22      responses with Interrogatory No. 18.
23                    Do you see that, Ms. Marin?
24                    A.   I do.
25                    Q.   Are these the interrogatory
```



Page 209

1     responses that you testified about having reviewed

2     prior to today's deposition?

3                 A.    Yes.

4                 Q.    Okay.  I would like to go in

5     further to Page 5 of Exhibit 205 on about Line 7.

6                 Do you see the bold word

7     "response"?

8                 A.    Yes.

9                 Q.    And then beneath that, there is a

10    section that's labeled "San Ysidro."

11                Do you see that?

12                A.    I do.

13                Q.    I am on the second paragraph

14    underneath that section that begins with "At the

15    Ped East entrance."

16                Do you see that?

17                A.    Yes.

18                Q.    And that reads:

19                "At the Ped East entrance,

20                the limit line position is

21                approximately ███████████  to

22                ██████████  north of the

23                international boundary line

24                between the United States and

25                Mexico."



Page 210

1           Did I read that section correctly?

2        A.   Yes.

3        Q.   Is that still true today?

4        A.   It is.

5        Q.   So -- and do asylum seekers attempt

6    to enter the United States through the Ped East

7    entrance to San Ysidro, to your knowledge?

8           MS. SHINNERS:   Objection; calls for

9    a legal conclusion, and scope.

10          THE WITNESS:   So in few instances,

11   now they do.

12   BY MR. MEDLOCK:

13       Q.   Okay.   And if an officer is

14   standing at the limit-line position when that

15   occurs, they can be ███████████████████

16   away from that arriving noncitizen when they are

17   at the boundary line between the U.S. and Mexico;

18   correct?

19          A.   Correct.

20          Q.   So there may be instances in which

21   an asylum seeker steps onto U.S. soil at the Ped

22   East entrance before they get to the limit line

23   position and encounter a CBP officer; correct?

24          A.   I don't believe that that's

25   possible.   So the only reason that the officer is



Page 211

1    ████████████████████ north of the boundary

2    is that on the boundary there is a K-rail or

3    jersey barrier that is approximately ███████

4    ███████████████    So unless an asylum seeker

5    climbed over that railing, the officer would have

6    encountered that person while they are still on

7    Mexican soil.   Excuse me.

8             Q.    When the officer encounters that

9    person who's at the jersey barrier, they -- and

10    that person is metered, it's clear to you that the

11    person who is at the jersey barrier intends to

12    come into the United States; correct?

13             MS. SHINNERS:   Object to the scope,

14    calls for speculation.

15             THE WITNESS:   In most cases, I

16    would say yes, that's true.   I don't know -- if

17    they are an asylum seeker walking up to the

18    officer, then yes.

19    BY MR. MEDLOCK:

20             Q.    You would expect in every instance

21    where an asylum seeker walks up to a turnstile or

22    jersey barrier or a fence at the land border

23    between the U.S. and Mexico at a land port of

24    entry, that they are intending and attempting to

25    come into the U.S.; correct?



Page 212

1              MS. SHINNERS:  Object to the scope.

2     Calls for a legal conclusion -- calls for

3     speculation.

4              THE WITNESS:  Yes.

5              MR. MEDLOCK:  Let's pull up Exhibit

6     -- or, sorry -- Tab 22, Kevin, which we will mark

7     as Exhibit 206 to Ms. Marin's deposition.

8              (Exhibit No. 206 was marked for

9              identification by the shorthand

10             reporter and is attached hereto.)

11    BY MR. MEDLOCK:

12             Q.  Ms. Marin, I put in front of you

13    and marked Exhibit 206 to your deposition.  It's a

14    multipage document that begins with the Bates

15    number AOL-DEF-00036093 through -96.  And on the

16    first page, there is information about the

17    San Ysidro pedestrian facility.

18             Do you see that?

19             A.  Yes, I do.

20             Q.  And there's references to Ped East,

21    Ped West, and Cross-border Express; correct?

22             A.  Yes.

23             Q.  Can you explain to me what

24    Cross-border Express is?

25             A.  Cross-border Express is a facility,



Page 213

1     a pedestrian facility that connect the bridge to

2     the Tijuana airport, and so travelers can pay a

3     fee there to walk from the airport.  And it goes

4     both ways, northbound and southbound, back into

5     the United States to be cleared by CBP as opposed

6     to having to come through the land port of entry.

7          Q.   In your experience, are asylum

8     seekers typically encountered at the Cross-border

9     Express lanes?

10          A.   Typically they are not encountered

11    there.

12          Q.   There is reference here to

13    Cross-border Express having double-occupancy

14    lanes.  What does that mean?

15          A.   So those are lanes in which the

16    lane kind of opens to two officers.  There's two

17    officers at each -- in each lane.

18          Q.   Yeah, understood.

19               Since December 2015, isn't it true

20    that three new pedestrians crossings have opened

21    at the San Ysidro port of entry?

22          A.   I just want to define "three new."

23    So Cross-border Express and Pedestrian West are

24    new.  Pedestrian East was reconstructed, but it

25    never closed.  So it's not brand-new.



Page 214

```
 1              Q.   Yeah, let me put it this way.

 2              In December 2015 Cross-border

 3    Express opened; correct?

 4              A.   Correct.

 5              Q.   And 2016 the new Ped West facility

 6    opened as well; correct?

 7              A.   Yes.

 8              Q.   And then in 2018 the Ped East

 9    facility's reconstruction was completed; correct?

10              A.   Correct.

11              Q.   And the -- as a result of those

12    reconstruction or construction projects, the

13    number of workstations for primary processing of

14    pedestrians has increased; correct?

15              A.   Correct.

16              Q.   And as a result of those

17    construction projects, the number of lanes for

18    processing pedestrians at the San Ysidro port of

19    entry has increased; correct?

20              A.   Correct.

21              Q.   And isn't it also true that the

22    amount of funding that San Ysidro has received has

23    increased since December 2015?

24              MS. SHINNERS:  Object to the scope.

25              THE WITNESS:  I can't confirm
```



Page 215

1    whether that's true.

2    BY MR. MEDLOCK:

3            Q.   Do you know whether the number of

4    CBP officers assigned to the San Ysidro port of

5    entry has increased since December 2015?

6                MS. SHINNERS:  Same objection.

7                THE WITNESS:  I don't know if it's

8    increased.

9    BY MR. MEDLOCK:

10           Q.   You just don't know one way or the

11   other whether it's increased or decreased;

12   correct?

13           A.   Correct.  There are several -- I

14   mean, with attrition and, you know, all the

15   factors that come with staff load, I don't know if

16   it's true -- if it's truly increased.

17           Q.   Okay.  Understood.

18                Have you ever heard the term "TDY"

19   before?

20           A.   Yes.

21           Q.   What does "TDY" mean?

22           A.   It's a temporary duty assignment to

23   a location out of your home assignment.

24           Q.   Have you ever heard the term

25   "virtual processing" before?



Page 216

```
 1              A.   Yes.

 2              Q.   What is virtual processing?

 3              A.   Virtual processing is a lot like

 4     what we are doing now.  It's the -- you know,

 5     using technology to process in admissibility

 6     cases.

 7              Q.   Okay.  When you say "what we are

 8     doing now," you mean using videoconferencing

 9     technology?

10              A.   Yeah, using video conferencing

11     technology.

12              Q.   Okay.  Has the San Ysidro port of

13     entry ever utilized virtual processing, to your

14     knowledge?

15              A.   Yes, we have.

16              Q.   Has the San Ysidro port of entry

17     ever received TDY CBP officers?

18              A.   Yes.

19              MR. MEDLOCK:  I would like to pull

20     up, if we can, Tab 24, which we will mark as

21     Exhibit 207, I believe, to your deposition,

22     Ms. Marin.

23              (Exhibit No. 207 was marked for

24              identification by the shorthand

25              reporter and is attached hereto.)
```



Page 217

```
 1    BY MR. MEDLOCK:

 2              Q.   And Exhibit 207 is a one-page

 3    e-mail that bears the Bates numbers -- Bates

 4    number AOL-DEF-00073676.

 5              And my question to you is:  Have

 6    you ever seen a copy of this e-mail before,

 7    Ms. Marin?

 8              A.   I have.

 9              Q.   And this is a November 9, 2018,

10    e-mail that you sent to Sidney Aki and

11    Robert Hood; correct?

12              A.   Correct.

13              Q.   And the subject line of the e-mail

14    is "AEU processing plan"; correct?

15              A.   Correct.

16              Q.   And there are several bullet points

17    in your e-mail; correct?

18              A.   Yes.

19              Q.   Okay.  I want to focus on the fifth

20    one down that refers to average case processing

21    per day.  Do you see that bullet?

22              A.   Yes.

23              Q.   And you write:

24              "Average case processing per

25              day equals 75 (25 per shift)."
```



Page 218

```
 1                   Is that right?
 2             A.   Yes.
 3             Q.   And below that you list a
 4   processing capacity with 175 additional officers;
 5   correct?
 6             A.   Correct.
 7             Q.   And those 175 additional officers
 8   would be TDY officers; correct?
 9             A.   I believe so.  I am not positive,
10   but I believe so.
11             Q.   Okay.  And you have a bullet there
12   for increase in average case processing per day;
13   correct?
14             A.   Yes.
15             Q.   And you note that with the
16   additional 175 officers the AEU would be able to
17   process an additional 159 cases per day; correct?
18             A.   Yes.
19             Q.   So that would mean that the AEU, if
20   they had the 175 extra officers, could process a
21   total of 234 cases a day; correct?
22             A.   Yes.
23             Q.   And if that were the case, it would
24   only take 100 days to clear the queue that was in
25   the shelters in Tijuana; correct?
```



Page 219

```
 1                    A.   Correct.  Whatever that queue was.
 2       Again, assuming that ICE ERO were able to move
 3       people out of our custody so that I could intake
 4       more.
 5                    MR. MEDLOCK:  Okay.  Let's pull up
 6       Tab 25, which we will mark as Exhibit 208 to your
 7       deposition, Ms. Marin.
 8                    (Exhibit No. 208 was marked for
 9                    identification by the shorthand
10                    reporter and is attached hereto.)
11       BY MR. MEDLOCK:
12                    Q.   And Tab 25 is a one-page e-mail
13       that bears the Bates number AOL-DEF-00072964.
14                    And my first question is:  Have you
15       ever seen a copy of this e-mail before, Ms. Marin?
16                    A.   I would have seen it when it was
17       generated, but I don't specifically recall seeing
18       it.
19                    Q.   Okay.  This is an August 7, 2018,
20       e-mail exchange between you and Robert Hood;
21       correct?
22                    A.   Correct.
23                    Q.   And true to his nature, if you look
24       at the middle e-mail, Mr. Hood again lists the
25       importance of his e-mail as high; correct?
```



Page 220

1          A.   Yes.

2          Q.   The -- I want to focus on the

3     bottom e-mail of the chain.

4               In that e-mail you provide some

5     averages to Mr. Hood in the past 60 days for

6     intake processing and movement; correct?

7          A.   Correct.

8          Q.   And then he responds to your e-mail

9     on August 7, 2018, at 11:37 a.m., and he writes:

10              "Mariza, at this rate how

11              long will it take us to get rid

12              of the current backlog in

13              Mexico?"

14              Did I read that correctly?

15         A.   Yes.

16         Q.   And then you wrote back to him at

17    2:40 p.m. the same day, and you wrote, in part:

18              "Sir, 22 days, but that is

19              only regarding the 1150 there

20              now."

21              Did I read that correctly?

22         A.   Yes.

23         Q.   Have you ever heard of something

24    called a "streamline withdrawal of application for

25    admission"?



Page 221

1                    A.    I have.

2                    Q.    What is it?

3                    MS. SHINNERS:  Object to the --

4         object to the scope.

5                    THE WITNESS:  So it's a withdrawal

6         of application for admission that the San Diego

7         field office had permission to streamline the

8         regular I-275 withdrawal process when there

9         were -- when there was heavy traffic and org work.

10                   MR. MEDLOCK:  Let's, Kevin, please

11        pull up Tab, 26 which we will mark as Exhibit 209

12        to Ms. Marin's deposition.

13                   (Exhibit No. 209 was marked for

14                   identification by the shorthand

15                   reporter and is attached hereto.)

16        BY MR. MEDLOCK:

17                   Q.    Ms. Marin, this is a two-page

18        e-mail that bears the Bates numbers

19        AOL-DEF-00069611 through -12.  And it appears, if

20        you look at the bottom e-mail on this page, that

21        this is an e-mail chain in which you sent at least

22        one of the e-mails; correct?

23                   A.    Correct.

24                   Q.    And we are looking at a June 9,

25        2017, e-mail that you sent at 3:57 p.m. with high



Page 222

1    importance; correct?

2              A.   Correct.

3              Q.   And you don't always -- unlike

4    Mr. Hood, you don't always label your e-mails with

5    highly important; correct?

6              A.   Correct.

7              Q.   Okay.  And the subject line of this

8    e-mail is "Forward:  Streamlined withdrawals and

9    I-275s."  Did I read that correctly?

10             A.   Correct.

11             Q.   Okay.  I want to focus on the

12   second paragraph of your e-mail and the first

13   sentence.  You write:

14                  "A streamlined withdrawal of

15                  application for admission is to

16                  be used to mitigate overcrowding

17                  when we are at capacity and

18                  should be used during high

19                  volumes of apprehensions."

20                  Did I read that correctly?

21             A.   Yes.

22             Q.   From your perspective, is the

23   streamlined withdrawal of application for

24   admission process one way to deal with

25   overcrowding in the AEU?



Page 223

1           MS. SHINNERS:  Object to the scope.

2           THE WITNESS:  The streamlined

3      withdrawal doesn't apply only to AEU case work.

4      So it's just a way to expedite our processes when

5      we are busy.

6      BY MR. MEDLOCK:

7           Q.   Isn't it true that some of the CBP

8      officers did not understand management's guidances

9      regarding the withdrawal of applications for

10     admissions into the U.S.?

11          MS. SHINNERS:  Object to the scope.

12     Excuse me.  Object to the scope.

13          THE WITNESS:  I don't know if CBP

14     officers did or didn't understand.

15     BY MR. MEDLOCK:

16          Q.   Isn't it true that on at least one

17     occasion management felt that at least one migrant

18     was forced to withdraw their application for

19     admission to the U.S. by CBP officers?

20          MS. SHINNERS:  Object to the scope.

21          THE WITNESS:  I don't know if it's

22     true.  I don't recall a specific incident.

23          MR. MEDLOCK:  Kevin, if we can

24     bring up Tab 27, which we will mark as Exhibit 210

25     to Ms. Marin's deposition.



Page 224

```
 1                   (Exhibit No. 210 was marked for

 2                   identification by the shorthand

 3                   reporter and is attached hereto.)

 4       BY MR. MEDLOCK:

 5                   Q.   Ms. Marin, this is a copy of a

 6       two-page e-mail from Claudia Taitague dated

 7       January 3rd, 2016.  It bears the Bates numbers

 8       AOL-DEF-00707315 through -316.  And I want to just

 9       focus on the header portion of the e-mail for just

10       a second.

11                   If you look at the CC line of this

12       e-mail, you were copied on this e-mail; correct?

13                   A.   Correct.

14                   Q.   And the subject line is "Sigma

15       5063575"; correct?

16                   A.   Correct.

17                   Q.   What does "sigma" mean there if you

18       know?

19                   A.   Sigma --

20                   MS. SHINNERS:  Object to the scope.

21                   THE WITNESS:  Sigma is the database

22       that we process cases in.

23       BY MR. MEDLOCK:

24                   Q.   Okay.  I want to focus on the first

25       paragraph of Ms. Taitague's e-mail if I could.
```



MAGNA
LEGAL SERVICES

Page 225

1    The e-mail begins:

2              "Officers and supervisors, it

3         appears that you don't understand

4         or are not familiar with the

5         interim guidance on procedures to

6         allow someone to withdraw after

7         they initially made a claim of

8         fear."

9              Did I read that correctly?

10        A.   Yes.

11        Q.   Do you believe that is correct that

12   officers and supervisors did not understand that

13   interim guidance?

14             MS. SHINNERS:  Object to the scope.

15             THE WITNESS:  I would agree that if

16   Claudia was messaging it that she had a reason to

17   believe someone didn't understand.

18   BY MR. MEDLOCK:

19        Q.   Do you know Claudia?

20        A.   I do.

21        Q.   And you believe her to be a

22   trustworthy CBP officer?

23        A.   Yes.

24             MS. SHINNERS:  Object to the scope.

25



Page 226

1    BY MR. MEDLOCK:

2            Q.   I would like to focus on the last

3    paragraph on this page.  Ms. Taitague writes:

4                "These cases are sensitive

5                and must be done correctly.  I

6                did NOT sign this case as it

7                appeared to me that the adult

8                female was forced into a

9                withdrawal based on the first

10               record of sworn statement."

11               Did I read that correctly?

12           A.   Yes.

13           Q.   And Ms. Taitague bolded and

14    underlined the phrase "I did not sign"; correct?

15           A.   Correct.

16           Q.   And the word "not" is in all caps;

17    correct?

18           A.   Correct.

19           Q.   Do you have any reason to disagree

20    with Ms. Taitague's conclusion that it appeared

21    that an adult female was forced into withdrawing

22    the claim of credible fear?

23               MS. SHINNERS:  Object to the scope.

24               THE WITNESS:  Without knowing the

25    details of the case, I don't know if that's



Page 227

1     accurate or not.

2     BY MR. MEDLOCK:

3               Q.   Do you know Ms. Taitague to be a

4     person who makes up facts?

5               A.   No.

6               MS. SHINNERS:  Object to the scope.

7     BY MR. MEDLOCK:

8               Q.   If Ms. Taitague had a concern about

9     the way that a withdrawal of a credible-fear claim

10    was made, would you take that seriously?

11              A.   Yes.

12              MS. SHINNERS:  Object to the scope.

13              MR. MEDLOCK:  We have been going

14    for about an hour.  Why don't we take a quick

15    break.

16              MS. SHINNERS:  Okay.  Sounds good.

17              MR. MEDLOCK:  Shall we take about

18    ten minutes?

19              MS. SHINNERS:  That sounds good.

20              MR. MEDLOCK:  Okay.  Why don't we

21    go off the record, then.

22              VIDEOGRAPHER:  Time is 3:14 p.m.

23    We are now off the record.

24              (Whereupon, a recess was held from

25              3:14 p.m. to 3:26 p.m.)



Page 228

1                  VIDEOGRAPHER:  Time is 3:27 p.m.

2       We are now back on the record.

3                  MR. MEDLOCK:  All right.  I will

4       just take a second to deal with some housekeeping

5       matter with regard to exhibit numbers at the top

6       of this portion of the deposition.  I previously

7       marked both Tabs 8 and 10 in my outline as

8       Deposition Exhibit 190.  For purposes of clarity,

9       we will re-mark Tab 10, which was AOL-DEF-00073938

10      through -73940, as Deposition Exhibit 195.

11      BY MR. MEDLOCK:

12                 Q.   All right.  With that little boring

13      bit out of the way, Ms. Marin, I would like to

14      talk to you a little bit more about the metering

15      guidance.  Isn't it true that CBP leadership

16      believes that the only port of entry where asylum

17      seekers were a real challenge was San Ysidro?

18                 MS. SHINNERS:  Object to the scope.

19                 THE WITNESS:  I don't know that --

20      are you talking about headquarters senior

21      leadership or --

22                 MR. MEDLOCK:  Yes.

23                 THE WITNESS:  I'm not sure if they

24      felt that.

25                 MR. MEDLOCK:  Okay.  Kevin, can you



Page 229

1    bring up Tab 28, please.

2              (Exhibit No. 3 was previously marked

3              for identification.)

4    BY MR. MEDLOCK:

5              Q.   Ms. Marin, I have brought up --

6    we've brought up Tab 28 which was previously

7    marked as deposition Exhibit 3 way back when in

8    this case.  It's an April 27, 2018, memorandum for

9    distribution from Todd Owen; has the subject line

10   "Metering guidance."

11             Do you see that?

12             A.   I do.

13             MR. MEDLOCK:  And, Kevin, if you

14   could pull up distribution at the bottom of the

15   memorandum, please.

16   BY MR. MEDLOCK:

17             Q.   So this -- the distribution for

18   this memorandum is to the director of field

19   operations for El Paso, Laredo, San Diego, and

20   Tucson; correct?

21             A.   Correct.

22             Q.   And those are the four directors of

23   field operations with direct control over land

24   ports of entry on the U.S.-Mexico border; correct?

25             A.   Correct.



Page 230

1          Q.   And isn't it the case that the

2     metering guidance memorandum has been implemented

3     from time to time at the San Ysidro port of entry?

4          A.   The -- I'm sorry.  The memorandum

5     itself?

6          Q.   The process that's described in the

7     memorandum had been implemented from time to time

8     at the San Ysidro port of entry; is that right?

9          A.   Yes.

10          Q.   And the process that's described in

11     the metering guidance memorandum has on occasion

12     been implemented at the Otay Mesa port of entry;

13     correct?

14          A.   Correct.

15          Q.   And the process that's described in

16     this metering memorandum has been implemented from

17     time to time at the Calexico port of entry;

18     correct?

19          A.   Correct.

20          MR. MEDLOCK:  Kevin, can we pull up

21     Tab 29, which we will mark as Exhibit 211 to

22     Ms. Marin's deposition.

23          (Exhibit No. 211 was marked for

24          identification by the shorthand

25          reporter and is attached hereto.)



Page 231

1    BY MR. MEDLOCK:

2            Q.    This is a June 16 and 17, 2018,

3    e-mail chain that a bears the Bates number

4    AOL-DEF-00047772 through -73.  And I want to

5    focus, if I can, on the bottom e-mail in this

6    chain.  This is a June 16, 2018, e-mail from Ryan

7    Koseor to Randy Howe with others CC'd; correct?

8            A.    Correct.

9            Q.    And how is Mr. -- how is his last

10   name pronounced?  Is it "Koseor"?

11           A.    "Koseor."

12

13           Q.    "Koseor."  Thank you.

14                 And Mr. Koseor has a subject line

15   to this e-mail that reads "SWB queue management

16   update"; correct?

17           A.    Correct.

18           Q.    And "SWB" means southwest border;

19   correct?

20           A.    Correct.

21           Q.    And Mr. Koseor writes:

22                 "Good evening, sir.  Here is

23                 an uploaded report on queue

24                 management along the SWB."

25                     Correct?



Page 232

```
 1                    A.    Correct.

 2                    Q.    And beneath that is a queue

 3      management report; correct?

 4                    A.    Correct.

 5                    Q.    And for the San Ysidro port of

 6      operations, it lists ███ detainees in custody for

 7      63 percent capacity; correct?

 8                    A.    Correct.

 9                    Q.    And under impact to port

10      operations, it's listed as negative; correct?

11                    A.    Correct.

12                    Q.    And Mr. Koseor doesn't say this is

13      a -- this is queue management along the SWB, along

14      the southwestern border, but, you know, this

15      doesn't take into account operational capacity,

16      does he?

17                    A.    Not to my knowledge.

18                    MS. SHINNERS:  Object to the scope.

19      BY MR. MEDLOCK:

20                    Q.    Mr. Koseor doesn't say anything

21      about operational capacity being different from

22      physical capacity anywhere in his e-mail, does he?

23                    MS. SHINNERS:  Object to the scope.

24                    THE WITNESS:  No, not that I can

25      see.
```



Page 233

1    BY MR. MEDLOCK:

2              Q.   Okay.  As you move up in the e-mail

3    chain, next e-mail in time, that's sent from Randy

4    Howe on June 17, 2018, at 12:19 a.m. to Todd Owen;

5    correct?

6              A.   Correct.

7              Q.   And he writes:

8                   "EAC.  Below is the current

9                   status on queue management and

10                  migrant capacity along the SWB."

11                  Correct?

12             A.   Yes.

13             Q.   And Mr. Howe doesn't say migrant

14   capacity but not operational capacity, does he?

15                  MS. SHINNERS:  Object to the scope.

16                  THE WITNESS:  He does not.

17   BY MR. MEDLOCK:

18             Q.   He just uses the word "capacity"

19   without distinguishing between operational

20   capacity and physical capacity; correct?

21                  MS. SHINNERS:  Same objection to

22   scope.

23                  THE WITNESS:  Correct.

24   BY MR. MEDLOCK:

25             Q.   And let's move to the next e-mail



Page 234

```
 1        in time which is sent by Todd Owen on June 16,

 2        2018, at 7:23 p.m.; correct?

 3                    A.   Correct.

 4                    Q.   And he sends that e-mail to Kevin

 5        McAleenan; correct?

 6                    A.   Yes.

 7                    Q.   At the time Kevin McAleenan was the

 8        commissioner of CBP; correct?

 9                    A.   Yes.

10                    MS. SHINNERS:  Object to the scope.

11                    You can answer.

12        BY MR. MEDLOCK:

13                    Q.   And Mr. Owen writes to Commissioner

14        McAleenan:

15                         "Commissioner, current status

16                    along the SWB.  Another report

17                    will be provided tomorrow

18                    evening."

19                         Did I read that correctly?

20                    A.   You did.

21                    Q.   And Mr. Owen doesn't distinguish

22        between operational capacity and physical capacity

23        anywhere in this e-mail, does he?

24                    MS. SHINNERS:  Object to the scope.

25                    THE WITNESS:  He does not.
```



Page 235

1    BY MR. MEDLOCK:

2         Q.    Let's go to the top e-mail on the

3    chain, and this is an e-mail sent from Kevin

4    McAleenan on June 16, 2018, at 8:44 p.m. to Todd

5    Owen, CC'ing Patrick Flanagan and Randy Howe;

6    correct?

7         A.    Correct.

8         Q.    And Commissioner McAleenan writes:

9              "Really just a San Ysidro

10             challenge.  No one waiting at

11             Hidalgo or El Paso.  How often do

12             they do this report?"

13             Did I read that correctly?

14        A.    Yes.

15        Q.    Were you aware that Commissioner

16   McAleenan believed in June 2018 that queue

17   management was really just a San Ysidro challenge?

18             MS. SHINNERS:  Object to the scope.

19             THE WITNESS:  I was not aware.

20   BY MR. MEDLOCK:

21        Q.    Can you explain to me why the

22   metering guidance went out to all land ports of

23   entry on the border between the U.S. and Mexico on

24   April 27, 2018, if CBP's commissioner believed

25    that queue management was really just a San Ysidro



Page 236

```
 1    challenge?
 2                    MS. SHINNERS:  Object to the scope.
 3                    THE WITNESS:  No, I cannot explain
 4    why.
 5                    MR. MEDLOCK:  All right.  Kevin, if
 6    we can pull up Tab 39, please.
 7                    (Exhibit No. 212 was marked for
 8                    identification by the shorthand
 9                    reporter and is attached hereto.)
10    BY MR. MEDLOCK:
11            Q.   Okay.  Ms. Marin, I pulled up Tab
12    39, which we will mark as Exhibit 212 to your
13    deposition.  It bears the Bates numbers
14    CBPALOTRO-00000314 through -315.
15                    And this is an April 30th, 2020,
16    e-mail from Vanessa Stevens to yourself and
17    several others; correct?
18            A.   Correct.
19            Q.   And the -- if you look, there is an
20    attachment to the e-mail called "signed metering
21    guidance 2020"; correct?
22            A.   Correct.
23            Q.   And the subject line of this e-mail
24    is "Metering guidance"; correct?
25            A.   Correct.
```



Page 237

```
 1                      Q.   And in the body of the e-mail,
 2       there is a memorandum for the directors of field
 3       operations from Vernon Foret, who is the now
 4       executive director of operations for OFO; correct?
 5                      A.   Correct.
 6                      Q.   And this e-mail essentially
 7       restates the metering guidance that was issued by
 8       Todd Owen on April 27, 2018; correct?
 9                      A.   Correct.
10                      Q.   Do you know why the metering
11       guidance was effectively reissued on April 30th,
12       2020?
13                      A.   I believe it was part of an OIG
14       investigation close-out, but I don't have any
15       further details of that.
16                      Q.   So it's your belief that an OIG
17       investigation caused the metering to be reissued?
18                      A.   Yeah, I believe that's correct.
19                      Q.   Is that correct?
20                      A.   It was part of the kind of
21       suggested close-out for the OIG investigation.
22       That's my understanding of it.
23                      Q.   What's the OIG investigation that
24       you are referencing?
25                      A.   I don't have details on what it
```



Page 238

```
1    was.
2              Q.   Were you interviewed as a part of
3    that OIG investigation?
4              A.   I was not.
5              Q.   Were any of your colleagues
6    interviewed, to your knowledge, as a part of that
7    investigation?
8              A.   I don't know what investigation it
9    was, so I don't know if they were interviewed.
10              Q.   Do you know what the scope of the
11    OIG investigation was?
12              A.   I do not.
13              Q.   What led you to the --
14              MS. SHINNERS:  And I will note --
15              MR. MEDLOCK:  Sorry.
16              MS. SHINNERS:  I just want to note
17    that the -- for the record that the OIG
18    investigation is not within the scope of the
19    topics.  Thank you.
20    BY MR. MEDLOCK:
21              Q.   You reference an OIG investigation
22    or an OIG close-out of an investigation.
23              What led you to raise that in
24    response to my question?
25              A.   When this guidance came out, the
```



Page 239

```
 1    field office reached out to counsel on --

 2                    MS. SHINNERS:  If you -- I'm sorry.

 3    I have to ensure that the witness doesn't reveal

 4    attorney-client communications.

 5                    MR. MEDLOCK:  Do you want to

 6    confer?

 7                    MS. SHINNERS:  Would you like to

 8    confer, Ms. Marin?  Sorry.

 9                    THE WITNESS:  Yeah, please.

10                    MS. SHINNERS:  Thank you.

11                    MR. MEDLOCK:  We will wait here if

12    you guys want to confer in the other room.

13                    MS. SHINNERS:  Okay.  Great.

14    Thanks so much.

15                    MR. MEDLOCK:  Can we go off the

16    record?

17                    VIDEOGRAPHER:  Yeah.  Time is 3:43

18    p.m.  We are now off the record.

19              (Whereupon, a recess was held from

20              3:42 p.m. to 3:50 p.m.)

21                    VIDEOGRAPHER:  Time is 3:51 p.m.

22    We are now back on the record.

23    BY MR. MEDLOCK:

24              Q.  Ms. Marin, welcome back.  Before we

25    took a break so you could confer with your counsel
```



Page 240

1    regarding an issue related to privilege, my

2    question to you was that you stated that the

3    April 30th, 2020, version of the metering guidance

4    came about as a result of some form of OIG

5    investigation or the close-out of an OIG

6    investigation, and I asked how did you know that

7    fact.  Can you answer my question?

8              A.   I can't.  I learned that in a

9    discussion with counsel.

10             Q.   And who else was present for that

11   discussion with counsel?

12             A.   It was just myself and counsel.

13             Q.   And when did that discussion

14   between yourself and counsel take place?

15             A.   It would have been shortly after I

16   received that memorandum.

17             Q.   Okay.  Sometime in May 2020?

18             A.   Correct.

19             Q.   When you say "counsel," who was the

20   counsel that you were talking to?

21             A.   It was local counsel, Stacey.

22             Q.   Okay.  And the local agency counsel

23   that you were talking to, was this part of your

24   deposition preparation, or was this just a regular

25   course conversation that you had with her?



Page 241

```
 1                    A.    It was a conversation on legal
 2       advice.
 3                    Q.    Okay.  And are there any other
 4       facts that you learned about the April 30th, 2020,
 5       memorandum and the OIG investigation during that
 6       conversation that you are able to share with me?
 7                    A.    No.
 8                    Q.    I'm sorry.  I couldn't hear your
 9       answer.  Did you say "no"?
10                    A.    I did say "no."
11                    Q.    Okay.  And that's because you
12       consider those conversations to be privileged?
13                    A.    Yes.
14                    Q.    Besides counsel, is there anybody
15       else you know of in the San Diego field office who
16       would have direct knowledge of this OIG
17       investigation or OIG investigation close-out out
18       that led to the April 30th, 2020, metering
19       guidance?
20                    A.    I don't know which investigation it
21       involves, so I would not know if anyone else has
22       knowledge of it.
23                    Q.    Okay.  And to your knowledge, is
24       the investigation ongoing or is it completed?
25                    MS. SHINNERS:  Object to the scope.
```



Page 242

1              THE WITNESS:  I don't have any

2    additional details.  I have very limited details

3    on what this is.

4    BY MR. MEDLOCK:

5              Q.   Okay.  And are there any other

6    details that you can share with me without

7    violating attorney-client privilege regarding the

8    OIG investigation?

9              MS. SHINNERS:  Object to the scope.

10             THE WITNESS:  I don't have

11   any other information.

12   BY MR. MEDLOCK:

13             Q.   I'm sorry.  What did you say,

14   Ms. Marin?

15             A.   I said no, I don't have any other

16   details.

17             Q.   Okay.  To your knowledge, is this

18   April 30th, 2020, metering guidance still in

19   effect in the San Diego field office?

20             A.   We are still pre-decision on

21   whether that's going to be distributed or not in

22   the San Diego field office.

23             Q.   Okay.  But even if the April 30th,

24   2020, guidance is not distributed in the San Diego

25   field office, the April 27, 2018, metering



Page 243

1    guidance from Todd Owen still remains in effect;

2    correct?

3              A.   Yes, with the caveat that given the

4    current situation, it's not as permanent as it

5    normally would be.

6              MR. MEDLOCK:  Okay.  All right.  I

7    am going to pass the questioning over to my

8    colleague, Mr. Guisado, and he will pick up from

9    here.

10             Angelo, you are muted.

11             MR. GUISADO:  Well, that answered

12   my question.  Can you hear me all right?  Am I

13   coming through fine?

14             THE WITNESS:  Yes, you are.

15

16                  EXAMINATION

17   BY MR. GUISADO:

18             Q.   Great.  Good afternoon.  Thank you

19   for sitting with us today.  I know it's been quite

20   a long afternoon.  I promise I don't have nearly

21   as many questions as my colleague Mr. Medlock, but

22   I do have some questions for you.

23             I think the same ground rules

24   apply; verbal answers, same reference to time

25   frame unless I specify otherwise.  If you need a



Page 244

1    break at any time, just let me know; we will take

2    a break with the exception unless a question is

3    pending.

4                     So let's start with a very easy

5    question.  How would you like me to address you,

6    "Ms. Marin" or "Officer Marin"?

7              A.    "Ms. Marin" is fine.

8              Q.    Cool.  I am going to ask you some

9    questions related to Topic 15 of the 30(b)(6)

10   notice.

11                    Do you recall earlier Mr. Medlock

12   showed you the notice at around, I don't know,

13   9:00 a.m. relating to communications with the

14   Mexican government?  Do you remember that?

15             A.    I do.

16             Q.    Do you feel adequately prepared to

17   answer questions about that today?

18             A.    I do.

19             Q.    Okay.  Great.

20                    MR. GUISADO:  Kevin, please bring

21   up AG1 and AG2 side by side if possible.

22                    And I would ask the court reporter,

23   what was the last exhibit number?

24                    THE COURT REPORTER:  The last was

25   212, so this will be 213.



Page 245

1           MS. GUISADO:  All right.

2           (Exhibit Nos. 213 and 214 were

3           marked for identification by the

4           shorthand reporter and are attached

5           hereto.)

6    BY MR. GUISADO:

7           Q.   Okay.  Ms. Marin, I am showing you

8    what we have marked as Exhibits 213 and 214, which

9    bears the Bates numbers respectively

10   AOL-DEF-0030087.  That's the one on the left.  And

11   AOL-DEF-00706277 through -78.  Let's focus on

12   Exhibit 213 for now ending in dash 0087.

13          MR. GUISADO:  Kevin, please bring

14   up AG1 focusing on the very top of the e-mail.

15   Great.

16   BY MR. GUISADO:

17          Q.   Ms. Marin, I will represent to you

18   that the exhibit is a November 17, 2016, e-mail

19   chain between you and others at CBP with the

20   subject line "RFI."

21          Ms. Marin, that means request for

22   information?

23          A.   Yes.

24          MR. GUISADO:  Okay.  Kevin, if you

25   could zoom out and just leave the first page.



Page 246

```
 1    BY MR. MEDLOCK:
 2              Q.   Ms. Marin, can you read this all
 3    right if you zoom in, or is it too small?
 4              A.   It doesn't let me zoom in on my
 5    side.
 6              Q.   Okay.
 7              A.   I can read it from here.
 8              Q.   All right.  Okay.  Great.
 9              MS. SHINNERS:  And just one moment.
10    I actually don't believe I have this e-mail or
11    this exhibit.
12              MR. GUISADO:  It's marked as AG1 on
13    the box.com file.  I don't know if that went over.
14    If you don't have it, I will e-mail you all of my
15    exhibits right now.
16              MS. SHINNERS:  Okay.  That would be
17    great.  I apologize for the interruption.
18              MR. GUISADO:  No, no.
19              MS. SHINNERS:  I will let you know
20    when I receive it.
21              MR. GUISADO:  I may have to send it
22    in batches just for, like, size purposes.  So
23    excuse me if you get a series of e-mails from me.
24              MS. SHINNERS:  Okay.  Yeah.  Again,
25    I apologize for the interruption.
```



Page 247

1                        MR. GUISADO:  That's all right.

2                        MS. SHINNERS:  In the meantime I

3       might just try and pull up this particular

4       document.  Just going to --

5                        MR. GUISADO:  I just sent them.

6                        MS. SHINNERS:  Thanks.  You can go

7       forward with the questioning on this.  Thank you.

8                        MR. GUISADO:  Of course.

9       BY MR. GUISADO:

10                       Q.   Okay.  Ms. Marin, I would like to

11      direct your attention to the top e-mail from

12      Robert Hood sent at 10:32 a.m.  It's sent to you

13      and Moises Castillo, and Sidney Aki is CC'd.  It

14      says Mo -- is Mo short for Moises?

15                       A.   Yes.

16                       Q.   Okay.  It says:

17                            "We have six questions to

18                            respond to.  Please send me the

19                            responses, and I will forward you

20                            to Johnny -- and I will forward

21                            to Johnny.  Thanks."

22                            Do you see that?

23                       A.   I do.

24                       Q.   Do you remember this e-mail chain

25      by any chance?



Page 248

```
 1                  A.   I don't.
 2                  Q.   Okay.  I would like to turn your
 3      attention to the e-mail at the bottom of the
 4      document sent from CBP to -CAT at 9:22 a.m.
 5                  What's CBP-CAT, if you know?
 6                  A.   I believe it stands for crisis
 7      action team but I am not positive.
 8                  Q.   Okay.  Do you see that the six
 9      questions are listed below in the body of the
10      e-mail?  I presume, and correct me if I'm wrong,
11      that that seems to be the questions that
12      Robert Hood is asking either you or Moises
13      Castillo to answer.
14                  Does that seem to be correct?
15                  A.   It does.
16                  Q.   Thank you.
17                  MR. GUISADO:  Kevin, please take
18      away AG1 and bring up AG2.  That's Exhibit, I want
19      to say, 214.  Kevin, can you move to the second
20      page focusing on Question 6.  Great.
21      BY MR. GUISADO:
22                  Q.   Question 6 says:
23                  "If the metering is done by
24                  Mexico, how is the POE" -- port
25                  of entry -- "communicating the
```



Page 249

1              number of OTMs to be metered to

2              the POE?"

3                   Ms. Marin, what does "OTM" mean?

4         A.   Other than Mexican.

5         Q.   And the answer says:

6              "Grupo Beta contacts AEU

7              management and/or ILU via

8              WhatsApp or a phone call three to

9              five times a day."

10                  Can you explain who or what Grupo

11   Beta is?

12        A.   Grupo Beta is -- so you heard us

13   talk about kind of units in OFO San Diego.  So

14   Grupo Beta is a unit of part of INAMI, which is

15   Mexican immigration.  They are really good at the

16   humanitarian arm of INAMI, so very comparable to,

17   like, BORSTAR for border patrol that provide

18   humanitarian aid and assistance to migrants that

19   are encountered in Mexico.

20        Q.   Okay.  INAMI and INM generally mean

21   the same thing, I presume?

22        A.   Yes.

23        Q.   Okay.  Thank you.

24                  So it says here that "Grupo Beta

25   contacts AEU management."



Page 250

```
 1                      That's the administrative
 2    enforceability unit?
 3             A.   Yeah.   Admissibility enforceability
 4    unit.
 5             Q.   Admissibility enforceability.
 6    Thank you.
 7                      And the ILU is the International
 8    Liaison; right?
 9             A.   Correct.
10             Q.   Generally what are the roles and
11    responsibilities of people in the AEU?
12             A.   Are we talking officers or managers
13    or both?
14             Q.   Why don't you start with officers
15    and then get into managers.
16             A.   So officers are responsible for the
17    processing and care of anyone without documents
18    that enter the United States.  So that could
19    include asylum seekers.  It could include
20    imposters to genuine documents.  It could include
21    people attempting to enter without inspection.
22    But the officers within that unit would process
23    those cases, and also those officers are
24    responsible for the care of anyone in custody.
25             Q.   Got it.  Got it.  Okay.
```



Page 251

1                      And the international liaison unit,

2      what are their roles and responsibilities

3      generally?

4                      A.   So the international liaison unit

5      really starts as a liaison for several things, for

6      law enforcement counterparts in Mexico, but then

7      they are also liaison with other law enforcement

8      agencies in the U.S. that may not have a working

9      knowledge of the border.

10                      So if, for instance, FBI had

11     someone that was being extradited on a warrant,

12     the liaison unit would assist with that type of

13     communication as well.

14                      Q.   Okay.  And both groups as of 2016

15     contacted or were contacted by Grupo Beta; is that

16     correct?

17                      A.   Correct.  I wouldn't say

18     concurrently.  It would have been one or the

19     other.

20                      Q.   One or the other.

21                      Do you remember why they switched?

22     Sorry.  Go ahead.

23                      A.   Sure.  So ILU initially had the

24     contacts and the communication.  So when we

25     initially started to meter, it was ILU and



Page 252

1    specifically the chief of ILU who was ██████

2    ██████, who had made contact with Grupo Beta, but

3    he would always have to call me first because I

4    had -- I was the chief in AEU and I was working

5    with the supervisors to look at our numbers and

6    look at ERO movement to come up with a number for

7    intake.  And so typically ██████ would call me for

8    a number and then he would have to call

9    Grupo Beta.  So pretty early in the process, we

10   switched that to say it's just more efficient if I

11   reach out to them myself.

12              Q.   If you reached out to them

13   yourself.  Do you remember what year that was,

14   generally?

15              A.   That was in 2016.

16              Q.   In 2016.  Okay.

17              Since 2016 has anything changed

18   between the method or mode of communication

19   between Grupo Beta and CBP?

20              A.   Yeah.  So in 2016 up until, you

21   know, we stopped metering in '17, it was all

22   mostly WhatsApp.  There could have been a couple

23   phone calls, but for the most part, it was

24   WhatsApp.  I would say it would have been mostly

25   me, but it could have also been ILU if for some



Page 253

1    reason I was unavailable or on leave.

2                And then when we started again, we

3    began to meter again in December of '17.  It would

4    have been myself up until -- so I left AEU and was

5    promoted to watch commander in -- I think it was

6    January of '17.  It would have switched back to

7    ███████ of ILU to make those communications.

8                I went back to AEU in April of

9    2017.  It would have been myself up until -- and

10   again, that would have been for the most part

11   WhatsApp.  There is a time in 2019, and I cannot

12   recall exactly when, that INAMI asked that

13   communications be by phone and not WhatsApp.  And

14   so up until that point, it would have been

15   WhatsApp and then phone.

16               In July of 2019 the current chief

17   of AEU, who is Eric Crouston, took over those

18   communications.  Again, so it's a text message

19   every morning on what the number of intake is

20   going to be every day.  And he does that via text

21   since July of 2019.

22          Q.   So you were the primary person

23   responsible for contacting or being contacted by

24   Grupo Beta for intake in the years 2016 and 2017;

25   is that correct?



Page 254

1          A.    That's correct.

2          Q.    Okay.  And you resumed in 2018; is

3    that right?

4          A.    So during the brief time January of

5    '17 to April '17, I was no longer -- I wasn't in

6    AEU, and then April 2017 I went back into AEU, but

7    we were not metering at the time until December of

8    '17.

9          Q.    When did you resume, I guess,

10    habitual contact or regular contact with

11    Grupo Beta by WhatsApp with respect to intake?

12          A.    It would have been December of '17

13    when we began to meter again.

14          Q.    Until when?

15          A.    Again, I don't remember when they

16    asked that we not use WhatsApp, that we call, but

17    I do remember that being a very short time, but it

18    would have been sometime in '19.

19          Q.    Since --

20          A.    Right.  Again, I remember that

21    being a short window and then Eric Crouston took

22    over in July of '19.

23          Q.    July of '19.  Thank you.

24                Is that individual now the main

25    point of contact for CBP with respect to intake



Page 255

1      from Grupo Beta?

2              A.   He is.

3              Q.   Okay.  Great.  It says here that

4      Grupo Beta contacts AEU and/or ILU via WhatsApp or

5      a phone call three to five times a day.

6                   Is the three to five times a day

7      accurate?

8              A.   That may have been accurate

9      initially, but for the most part it's once in the

10     morning.  Unless there is a very large movement

11     and we are able to intake more in the afternoon,

12     there may be two, but I don't believe the three to

13     five to be accurate across the full span.

14             Q.   Okay.  You mentioned that INAMI

15     asked at some point that you switch from WhatsApp

16     to phone -- or telephonic communication, voice.

17             A.   Uh-huh.

18             Q.   Do you recall why?

19             A.   So they had a change in management,

20     and it was the delegado at the time who had

21     previously been removed and then returned who

22     instructed his staff that he did not want them to

23     use WhatsApp.

24             Q.   Okay.  Great.  Did -- during the

25     time in which you were the primary point of



Page 256

1    contact between CBP and Grupo Beta with respect to

2    intake, did anyone else at all communicate via

3    WhatsApp with Grupo Beta?

4              A.    Just in general or regarding

5    intake?

6              Q.    Regarding intake.

7              A.    Like I said, if there was a day

8    when I was unavailable, it could have been Chief

9    ██████████    as well.

10             Q.    Okay.   Thank you.

11                   When Grupo Beta would contact you

12   via WhatsApp or phone call, what would they say or

13   ask?

14             A.    So typically -- and again, just

15   depending, I guess, who got ahold of who fist, but

16   the communications were typically, 'Hey, what's

17   the number for today?'   The only time it really

18   varied outside of that, so if there were -- so,

19   for example, if I had requested 50 in the morning

20   to be brought to the port of entry, I would send

21   them a message and say, 'Hey, can you bring me 50

22   today at 1400?' or whatever time they were coming

23   in.   And then I may get a message from Grupo Beta

24   that says, 'Is it okay if it's 52?  Because the

25   last group was a family unit,' or if there was



Page 257

```
 1    someone with medical concerns that they wanted us

 2    to know about, but outside of those nuances, it

 3    was a number every day.

 4             Q.   Okay.  And you would tell them how

 5    many you -- CBP could process for intake on that

 6    given day or that given time frame, and Grupo Beta

 7    would respond okay, or they would -- they would do

 8    their best to meet that number; is that correct?

 9             A.   Correct.

10             MR. GUISADO:  Okay.  Kevin, please

11    bring up AGXX.

12             Okay.  Thank you.

13             (Exhibit No. 215 was marked for

14             identification by the shorthand

15             reporter and is attached hereto.

16    BY MR. GUISADO:

17             Q.   I am showing you what we have

18    marked as Exhibit 215, which is a letter DOJ

19    counsel sent to us, Plaintiff's counsel,

20    yesterday, May 27th, 2020.  I will represent to

21    you that Exhibit 215 is a letter regarding the use

22    of text and WhatsApp messaging by CBP officers

23    with respect to communications with Mexican

24    officials regarding metering or team management.

25    The document is pretty lengthy, and we don't need
```



Page 258

1    to get into all of it.

2                    MR. MEDLOCK:  Kevin, please cue up

3    the second paragraph, please.

4    BY MR. MEDLOCK:

5                    Q.   Take your time to read this,

6    Ms. Marin, and let me know when you are done.  I

7    hope you can see it.

8                    A.   I can see it.  I can see it.

9                    (Document reviewed by witness on

10                   screen.)

11                   THE WITNESS:  Okay.

12   BY MR. MEDLOCK:

13                   Q.   Is this paragraph accurate?

14                   A.   It is except that in February of --

15   or, I'm sorry -- February of '17, said that there

16   was a time when the numbers in the admissibility

17   enforcement unit dropped, so there were time

18   periods from about February '17 to December '17

19   where there would have been very -- almost no

20   communications because we weren't metering because

21   the numbers were low.

22                   Q.   Okay.  You mentioned in your

23   testimony just a few minutes ago that you were the

24   primary point of contact for CBP with respect to

25   Grupo Beta and intake for asylum seekers and other



Page 259

1     individuals without lawful documents.

2                    During that time frame, did you

3     save to any cloud, computer drive, or write down

4     anywhere any of the contents of the messages that

5     you had relayed to Grupo Beta or vice versa?

6                    A.   So I didn't save the messages or

7     back them up to a cloud.  The information as far

8     as intake from Grupo Beta and what that number

9     was, which is what would have been in those

10    messages, can be found in the AEU shift

11    {UNINTELLIGIBLE} or the AEU 24-hour report.  And

12    there have been different variations of those two

13    reports.  So it maybe, you know, that one of them

14    has that content for one period and the other has

15    it for another.

16                    Q.   Got it.

17                    MR. GUISADO:  Counsel, do you know

18    offhand if you have produced those logs, the AEU

19    shift logs, by any chance?

20                    MS. SHINNERS:  I believe we have.

21    I -- to the extent that as part of the review

22    process they came through, but I know we have

23    produced some iterations of those reports, yes.

24                    MR. GUISADO:  Thank you.

25



Page 260

1    BY MR. GUISADO:

2               Q.   Ms. Marin, you mentioned earlier

3    that you were the primary point of contact from

4    2016, with some breaks up till 2019, with Grupo

5    Beta regarding intake at San Ysidro.

6               Was that all you messaged

7    Grupo Beta about and vice versa, or were there

8    other subject matters?

9               A.   There could have been other

10   sub-matters.  Typically -- so I was on, like, a --

11   I drew a blank on what they are called in WhatsApp

12   now, ██████████████████████████████████████

13   ███████████████████████████████████████

14   ███████████████████████████████████████

15   █████████████████████    ███████████████,

16   ███████████████████████████████████████

17   ████████  ████████████████████████████████,

18   ███████████████████████████████████████

19   that we were running out of the field office.

20              Q.   Okay.  But primarily the content on

21   your WhatsApp account with Grupo Beta related to

22   the processing of asylum seekers and other

23   individuals without lawful documents between you,

24   a CBP officer, and Grupo Beta; is that correct?

25              MS. SHINNERS:  Object to the form.



Page 261

```
 1    BY MR. GUISADO:

 2              Q.   You can answer.

 3              A.   Can you just clarify it for me?

 4              Q.   Sure.  Is it your testimony today

 5    that the WhatsApp account that you administered

 6    primarily had messages with Grupo Beta regarding

 7    intake for a given day at the San Ysidro port of

 8    entry?

 9              A.   Yes.

10              Q.   Thank you.

11              MR. GUISADO:  Kevin, please pull up

12    the first of the last paragraph, please.

13    BY MR. GUISADO:

14              Q.   So because of the page split, I am

15    going to show you the next paragraph in two

16    different sets.  Let me know when you are done

17    with the first half, and then we will move on to

18    the second.

19              (Document reviewed by witness on

20              screen.)

21              THE WITNESS:  Okay.

22              MR. GUISADO:  Kevin, could you

23    please blow up the rest of the paragraph beginning

24    at the top of the next page.

25              (Document reviewed by witness on
```



Page 262

```
 1              screen.)
 2                   THE WITNESS:  Okay.
 3     BY MR. GUISADO:
 4              Q.   Ms. Marin, is this accurate?
 5              A.   It is.
 6              Q.   Okay.  I am going to ask you a few
 7     questions about CBP policies.  It's not out of
 8     malice or judgment.  People break and lose phones
 9     all the time.  I just want a couple answers on
10     what the policies are regarding losing or
11     misplacing a phone.
12                   Does CBP have policies relating to
13     government-issued mobile devices that you know of?
14              A.   Yes.
15                   MS. SHINNERS:  Object to the scope.
16     BY MR. GUISADO:
17              Q.   What are they?
18              A.   I would have to look at them to
19     have any good detail to answer that.
20              Q.   Do you recall any CBP policies
21     between 2016 and present that relate to
22     misplacement or loss of a government-issued mobile
23     phone?
24                   MS. SHINNERS:  Object to the scope.
25                   THE WITNESS:  I know I have seen
```



Page 263

1    policies.  I just -- I'm not familiar enough with

2    memorizing the details of those policies.

3    BY MR. GUISADO:

4            Q.   Generally what do you recall about

5    them?

6            A.   That we have to report it to the

7    lost-property officer and provide information

8    regarding the loss.

9            Q.   Are there any policies relating to

10   the content of what's on the government-issued

11   phone?

12           MS. SHINNERS:  Object to the scope.

13           THE WITNESS:  Specifically, I

14   cannot recall what those policies are.

15   BY MR. GUISADO:

16           Q.   And can you recall any policies

17   relating to backing the iPhones up, preservation

18   of data, something like that?

19           MS. SHINNERS:  Object to the scope.

20           THE WITNESS:  So I have seen

21   litigation holds that relate to the preservation

22   of data.

23   BY MR. GUISADO:

24           Q.   How many?

25           A.   I believe I have seen four in



Page 264

1    regards to this case.

2              Q.   Do you remember when the first one

3    was shown to you?

4              A.   I believe the first one was

5    November of 2017.

6              Q.   2007?

7              A.   '17.

8              Q.   '17.  Okay.  Thank you.

9                   And what did those litigation holds

10   say?

11              MS. SHINNERS:  Object that the

12   litigation hold memo itself is an attorney-client

13   privileged communication as well as work product,

14   and instruct the witness not to answer questions

15   that would reveal the specific content of the

16   litigation memo itself.

17   BY MR. GUISADO:

18              Q.   Without revealing the substance of

19   the memo included in the litigation hold, do you

20   recall what, if anything, the litigation hold

21   asked you to do?

22              MS. SHINNERS:  Objection.  I think

23   that asks for the same information.  So I instruct

24   Ms. Marin not to answer.

25



Page 265

```
1    BY MR. GUISADO:
2              Q.   Are you following your counsel's
3    advice, Ms. Marin?
4              A.   Yes.
5              Q.   All right.  Ms. Marin, do you or
6    did you carry any other phones separate and apart
7    from your government-issued phone during the time
8    frame in which you were messaging with Grupo Beta
9    about intake?
10             A.   Yes.  I do have a personal phone.
11             Q.   Did you ever use that personal
12   phone for CBP business?
13                  MS. SHINNERS:  Object to the scope.
14                  But go ahead.
15                  THE WITNESS:  I may have used it if
16   I couldn't get signal on my government phone, but
17   not that I specifically recall.
18   BY MR. GUISADO:
19             Q.   At any point when you lost or
20   misplaced your phone as articulated in the
21   highlighted text here, did you ever use that phone
22   to contact Grupo Beta?
23                  MS. SHINNERS:  Objection; vague.
24   Scope -- no, not scope.  Just vague.
25                  THE WITNESS:  I can't recall
```



Page 266

1    specifically if I did.

2    BY MR. GUISADO:

3              Q.    Okay.   It says here you lost or

4    misplaced your phone tree times between 2016 and

5    2019; is that correct?

6              A.    Correct.

7              Q.    How quickly were you able to get a

8    replacement government-issued phone, if you

9    recall?

10             A.    In my memory, it was pretty

11   quickly.

12             Q.    Like the next day?

13             A.    Typically, yes.   I don't remember

14   having to wait an extended time.

15             Q.    I suppose what I am getting at is:

16   At any point when you lost your phone, did you

17   ever have to use your personal device to contact

18   Grupo Beta about intake for any given day?

19             A.    When I lost my phone, I typically

20   would either ask ███████ or call them.

21             Q.    Ask ███████ or call them.

22                   You called them from a CBP phone;

23   is that correct?

24             A.    It would have either been my office

25   phone.   I could have used my personal to call



Page 267

1    them.

2                Q.    And do you happen to know or recall

3    what servicer the CBP-issued phone used or was?

4                    MS. SHINNERS:  Object to the scope.

5                    MR. GUISADO:  State your basis,

6    Counsel.

7                    MS. SHINNERS:  I don't think the

8    servicer of the phone used is within the scope of

9    the topic.  She can answer the question.

10                   MR. GUISADO:  Thank you.

11                   THE WITNESS:  So we have had two,

12   Verizon and FirstNet, which I'd assume would be

13   AT&T.  Well, it's FirstNet, but I think it's a

14   subsidiary of AT&T.  It's the most recent.  I

15   don't remember exactly which was -- which phone

16   was on which servicer.

17   BY MR. GUISADO:

18                Q.    Do you recall when it switched?

19                A.    I don't.

20                Q.    Do you know which servicer you

21   currently use?

22                   MS. SHINNERS:  Currently use.  Same

23   objection as to scope.

24                   MR. GUISADO:  You can answer.

25   Sorry.  I didn't hear you.



Page 268

 1                    MS. SHINNERS:  Just wait -- oh, go

 2      ahead.

 3      BY MR. GUISADO:

 4             Q.   Please answer.

 5             A.   Currently it's FirstNet.

 6             Q.   FirstNet.  Thank you.  Okay.

 7                  I just want to recap because we

 8      went over quite a lot.  And that was very helpful.

 9      Thank you.  Between 2016 and 2019 you were the

10      primary contact for CBP with respect to Grupo Beta

11      intake at ports of entry at San Ysidro.

12             A.   Correct.

13             Q.   And the primary method of

14      communication was generally WhatsApp messages on

15      your government-issued phone.

16             A.   Correct.

17             Q.   Though sometimes they would call;

18      is that correct?

19             A.   Correct.

20             Q.   Between 2016 and 2019, you lost or

21      misplaced your phone three times; is that correct?

22                    MS. SHINNERS:  Objection; misstates

23      testimony and letter.

24      BY MR. GUISADO:

25             Q.   You can answer.



Page 269

1              A.   So I lost or broke.

2              Q.   Lost or broke.  Thank you.

3                   In none of those times did you save

4     or back up that information contained in those

5     WhatsApp messages to Grupo Beta or from Grupo Beta

6     regarding intake to an iCloud or other document

7     storage platform; is that correct?

8              A.   I did not.

9              Q.   And you don't recall specifically

10    any CBP policies relating to document retention of

11    WhatsApp messages; is that correct?

12                  MS. SHINNERS:  Object to the scope.

13                  You can answer.

14                  THE WITNESS:  So specifically do I

15    recall CBP policy regarding the preservation of

16    messages?

17                  MR. GUISADO:  Yes.

18                  THE WITNESS:  I would like to ask

19    about privilege in litigation.

20    BY MR. GUISADO:

21             Q.   Outside of any litigation hold, do

22    you recall any CBP or DHS policy relating to the

23    preservation of telephonic messages from your

24    government-issued phone?

25                  MS. SHINNERS:  Objection; vague and



Page 270

1    scope.

2                    THE WITNESS:  Outside of those

3    holds, I do not recall, no.

4                    MR. GUISADO:  Thank you.

5                    Kevin --

6                    MS. SHINNERS:  Can we take a quick

7    break?

8                    MR. GUISADO:  Sure.

9                    MS. SHINNERS:  Thank you.  Go off

10   the record.

11                   VIDEOGRAPHER:  Time is 3- -- I'm

12   sorry -- 4:31 p.m.  We are now off the record.

13               (Whereupon, a recess was held from

14               4:31 p.m. to 4:43 p.m.)

15                   VIDEOGRAPHER:  The time is 4:44

16   p.m.  We are now back on the record.

17                   MR. GUISADO:  Thank you, Ms. Marin.

18                   Kevin, if you wouldn't mind, could

19   you load up AG3 focusing on the top third or top

20   half of the document.

21               (Exhibit No. 216 was marked for

22               identification by the shorthand

23               reporter and is attached hereto.)

24   BY MR. GUISADO:

25                   Q.   Ms. Marin, I am about to show you



Page 271

1    what we have marked as Exhibit 216 bearing the

2    Bates number AOL-DEF-00243914 through -918.  I

3    will represent to you that Exhibit 216 is a

4    meeting read-out or a summary of a joint meeting

5    between CBP and INM regarding the launch of a

6    joint pedestrian pilot and data-sharing project

7    that occurred on January 25th, 2018.

8                    Ms. Marin, do you remember this

9    meeting happening?

10                   A.   No.

11                   Q.   So you don't remember going to this

12   meeting or hearing about this meeting?

13                   A.   I do remember the pilot, but I

14   don't remember, like, specifics about the meeting.

15                   Q.   Was it unusual for CBP and INM to

16   have a joint meeting?

17                   A.   No.

18                   Q.   Generally how often would they

19   occur?

20                   A.   So it really depends what's going

21   on.  So we would meet with them -- yeah, I know I

22   have been to meetings with them regarding

23   repatriation issues on, you know, Mexican

24   nationals that -- you know, if there is an issue

25   with repatriation regarding Mexican nationals that



Page 272

```
 1    may have a medical issue.  It would depend if

 2    there is an issue to address or if it's just, you

 3    know, to discuss how the operations are running.

 4              Q.   Do you recall any meetings

 5    regarding metering or intake of asylum seekers

 6    between CBP and INM?

 7              A.   I do.

 8              Q.   How many, roughly, between 2016 and

 9    present?

10              A.   So I remember there were a couple

11    initial -- I don't know if it was one or two to

12    discuss what that process would look like.  And

13    then as issues, kind of logistical issues arose

14    during that time frame.  We have met, I would say,

15    I don't know.  I hate to narrow it down.  Maybe

16    five or ten times regarding metering.

17              Q.   Do you know where those meetings

18    were held?

19              A.   Some were held at the INAMI

20    facility; some were held at the CBP facility.  We

21    also had met a couple times at the Coffee Bean

22    outside of the pedestrian west facility.

23              Q.   That's on the U.S. side, though,

24    right, in that little plaza?  Mini mall, I guess?

25              A.   Right.  So Grupo Beta would say,
```



Page 273

1    'Hey, we want to talk about changing intake

2    times,' and we would meet for coffee.

3             Q.   Okay.  But sometimes CBP and INM

4    would meet in Mexico; is that correct?

5             A.   That is correct.

6             Q.   With what sort of frequency would

7    CBP officers go into Mexico to speak with INM or

8    Grupo Beta about issues relating to metering or

9    intake?

10            A.   I don't know that it was very

11   frequent.  Again, it was regarding logistical

12   issues.  If there were new surges, if there was a

13   caravan coming to town, that type of meeting.

14            Q.   Would CBP officers ever go into any

15   of the Tijuana shelters that housed asylum seekers

16   ever, if you know?

17            A.   To my knowledge, I know that there

18   were -- there was a tour, and I don't remember if

19   it was the DFO import director or just the DFO at

20   some point early on in metering where they did see

21   the shelters.

22            Q.   Okay.  Do you know if CBP officers

23   between 2016 and 2019 ever went into Mexico to

24   witness the wait list?

25            MS. SHINNERS:  Objection; vague.



Page 274

1    BY MR. GUISADO:

2            Q.   Yeah.  Let me rephrase.

3                 Between 2016 and 2019, to your

4    knowledge, did any CBP officer ever go into Mexico

5    to witness the metering wait list or the asylum

6    process before intake was about to happen?

7                 MS. SHINNERS:  Objection; compound.

8    BY MR. GUISADO:

9            Q.   You can answer.

10           A.   So to my knowledge, ILU has gone

11   into Mexico on various occasions.  Specific to

12   look at the list, not to my knowledge.

13           Q.   It's correct that CBP officers in

14   the ILU unit went into Mexico to witness the

15   intake of asylum seekers; is that correct?

16           A.   So I would ask you to further

17   define what you mean by "witness the intake."

18           Q.   Sure.  And let me back up.

19                Is it your testimony that ILU

20   officers went into Mexico and actually had a

21   physical view of the notebook that held asylum

22   seekers' names and numbers?

23           A.   They may have had a view on

24   occasion.  I have seen the book physically at an

25   INAMI facility.  I did not see the names and



Page 275

1    numbers.

2              Q.   You saw the book?

3              A.   Yes.

4              Q.   Do you recall why you were in

5    Mexico on that particular occasion?

6              A.   We had a meeting scheduled in the

7    INAMI facility.

8              Q.   Do you recall what that meeting was

9    about?

10             A.   I don't specifically recall what it

11   was about.  It would have had something to do with

12   the logistics of either intake times, or it could

13   have had something to do with a caravan was

14   coming.  Because we did go, like I said, on more

15   than one occasion for different reasons.

16             Q.   Do you recall at that particular

17   meeting who had physical custody of the book?

18             A.   I don't recall.  So I saw it from a

19   distance.  I was, I don't know, 20 or 30 feet away

20   when I saw that book, but it was an INAMI

21   official.

22             MR. GUISADO:  Okay.  Kevin, could

23   you bring up AG4.

24             MS. SHINNERS:  I just want to note

25   that I have actually lost access to my computer,



Page 276

1    not the one that I am using.  I don't have the

2    ability to access documents either, so I may

3    ask -- if I need to look a little more closely at

4    the screen, I may ask as well.

5                MR. GUISADO:  Okay.  Of course.

6                (Exhibit No. 217 was marked for

7                identification by the shorthand

8                reporter and is attached hereto.)

9    BY MR. GUISADO:

10               Q.   Ms. Marin, I am showing you what's

11   been marked as Exhibit 217 bearing the Bates

12   numbers AOL-DEF-00036576.  I will represent to you

13   that Exhibit 217 is December 9th, 2018,

14   end-of-shift report from ███████████████████████

15   including a daily accountability report from ███

16   ██████████.  It was e-mailed to you and P. Flores,

17   among others.

18               MR. GUISADO:  Kevin, if you

19   wouldn't mind, could you highlight everything

20   below the -- the thing below the subject line.

21               Yeah.  That's good.

22   BY MR. GUISADO:

23               Q.   Is this big enough for you to read?

24               A.   It is.

25               Q.   All right.  Take your time and



Page 277

1    review and let me know when you are done.

2              (Document reviewed by witness on

3              screen.)

4              THE WITNESS:  Okay.  I am done.

5    BY MR. GUISADO:

6         Q.   Thank you.

7              Are you familiar with this type of

8    report?

9         A.   I am.

10        Q.   It says day shift, end-of-shift

11   report on one heading, and then the other heading

12   is daily accountability report.

13             Is it fair to assume that you would

14   get these type of reports every day?

15        A.   Yeah.  I think that's fair to

16   assume.

19        A.   So during operation secure line,

20   which was late --

21             MS. SHINNERS:  I'm sorry.  Object

22   to the scope.

23             You can answer, Ms. Marin.

24             THE WITNESS:  So late in 2018 there

25   was a caravan of Central American migrants that



Page 278

```
1        were coming into the United States.  There was a

2        lot of media and publicity around it.  And they

3        openly said they were going to incur the borders.
```

```
14                        MS. SHINNERS:  Counsel, can we go

15       off the record for a second?  I am having a

16       technical emergency.

17                        MR. GUISADO:  Yes, of course.  By

18       all means.

19                        VIDEOGRAPHER:  Time is 4:56 p.m.

20       We are now off the record.

21                 (Whereupon, a recess was held from

22                 4:55 p.m. to 5:08 p.m.)

23                        VIDEOGRAPHER:  Time is 5:09 p.m.

24       We are now back on the record.

25
```



Page 279

1    BY MR. GUISADO:

2             Q.   Ms. Marin, I believe we were

3    discussing the Tijuana area command center, who

4    they were and what they did.

5             MR. GUISADO:   Kevin, if you

6    wouldn't mind, could you please bring up AG4 once

7    more.

8    BY MR. GUISADO:

9             Q.   And I would like you to focus in on

10   the first bullet at 800 hours if possible.

11            Ms. Marin, it says here that the

12   ████████████████████████████████████████

13   ████████████████████████████████████████████

14   ████████████████████████████████████████████████

15   █████████████████████████████

16            Do you know how CBP got this

17   information?

18            A.   So again, the officer that compiles

19   this report, in this case it was ████████████,

20   ████████████████████████████████████████████

21   ███████████████████████████   ████████████████

22   ████████████████████████████████████████████████

23            Q.   ████████████████████████████████

24   ██████████████████████████████████   ██

25   ███████████████████████████████



Page 280



```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10          Q.    Do you -- sorry to interrupt.    Keep
11    going.
12          A.    No, go ahead.
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 281



6              MR. GUISADO:  Kevin, if you

7    wouldn't mind, could you focus in on the daily

8    accountability report that comprises the bottom

9    half of the page.

10   BY MR. GUISADO:

16              Q.   Were these types of reports sent to

17   CBP only during the caravan, or do you know if

18   they were sent before or after the caravan?

19              MS. SHINNERS:  Object to the scope.



Page 282

1       BY MR. GUISADO:





Page 283

10          Q.   Thank you.

11              MR. GUISADO:   Kevin, could you

12    bring up AG5, please.

13              (Exhibit No. 218 was marked for

14              identification by the shorthand

15              reporter and is attached hereto.)

16    BY MR. GUISADO:

17          Q.   Ms. Marin, I am showing you what we

18    have marked as Exhibit 218.   It bears the Bates

19    number AOL-DEF-0065471.   I will represent to you

20    that Exhibit 218 is an August 20 -- excuse me --

21    August 16, 2016, e-mail from Edward Chavoya to

22    you, among others.   The subject, Re numbers on the

23    Mexico side.

24              Please take your time to read it

25    and let me know when you are done.



Page 284

1               (Document reviewed by witness on

2          screen.)

3               THE WITNESS:  Okay.  I am done.

4     BY MR. GUISADO:





```
 6              Q.   Well, let's turn it around, then.

 7                   Are Mexicans subject to the

 8    metering process?

 9              A.   So currently, yes, they are.

10              Q.   Was there a time at which they were

11    not?

12              A.   There was.

13              Q.   When was that?

14              A.    I believe it was in late July or

15    early August, or it could have been late August or

16    early September.

20              Q.   How did Mexican individuals apply

21    for asylum then during that time?

22              A.   As they arrived at the port of

23    entry, they would be brought in.

24              Q.   What time frame was that for?

25              A.   So I'm not sure when that stopped.
```



Page 286

1    We -- you know, I tried to -- from memory, I don't

2    remember.  I tried to ascertain that.  I don't

3    remember when it stopped, but I know that it

4    started in late '16.

5                   Q.   Okay.  Thank you.

6                   MR. GUISADO:  Kevin, would you mind

7    bringing up AG9.

8                   (Exhibit No. 219 was marked for

9                   identification by the shorthand

10                  reporter and is attached hereto.)

11   BY MR. GUISADO:

12                  Q.   I am showing you what we have

13   marked as Exhibit 219, which bears the Bates

14   number AOL-DEF-00753684 through -685.  I will

15   represent to you that Exhibit 219 is a May 8th,

16   2017, e-mail exchange from Robert Hood to Moises

17   Castillo, among others, regarding AEU detention

18   space.

19                  MR. GUISADO:  Kevin, if you

20   wouldn't mind, could you focus on the top e-mail

21   with all the recipients.

22   BY MR. GUISADO:

23                  Q.   And, Ms. Marin, please take a

24   minute to review and let me know when you are

25   done.



Page 287

1           (Document reviewed by witness on

2           screen.)

3                THE WITNESS:  Okay.  Just the

4    portion with the recipients; correct?

5    BY MR. GUISADO:

6           Q.   And the body with the actual

7    message.  Thank you.

8           A.   Okay.

9           (Document reviewed by witness on

10          screen.)

11               THE WITNESS:  Okay.

12   BY MR. GUISADO:

13          Q.   The message from Robert Hood says,

14   and I quote:

15               "Space in AEU.  We are

16               accepting asylum applicants as

17               they arrive and we should not be

18               sending anyone back to Mexico to

19               Grupo Beta at this time."

20               Do you recall when this happened

21   specifically?

22          A.   When the e-mail happened

23   specifically or --

24          Q.   When there was space in the AEU and

25   that CBP was accepting asylum applicants as they



Page 288

1    arrive?

2              A.   Yeah.  So that would have been from

3    February of '17, and I believe we did not start

4    seeing an increase that that was going to cause --

5    cause us to slow intake or meter until December of

6    '17.

7              Q.   It says -- the e-mail says that a

8    muster should issue and to ensure that all

9    officers assigned to Ped West were briefed on this

10   topic.  At the time of this e-mail, May 8, 2017,

11   were you an officer at Ped West?

12             A.   I was not.

13             Q.   You were not.

14                  Where were you an officer, if you

15   were an officer?

16             A.   In May of '17 I believe I was a

17   watch commander and aide, well, over AEU and other

18   units, but a watch commander.

19             Q.   Thank you.

20                  Do you remember being briefed on

21   this topic at all?

22             A.   I do.

23             Q.   What do you remember about it?

24             A.   I remember that -- speaking with

25   Mr. Hood who I believe was the acting port



Page 289

1     director at the time and then -- but I remember

2     speaking with him about having adequate space in

3     AEU and not having to meter.

4                    Q.   Not having to meter.

5                        It says here that, and I quote:

6                        "We should not be sending

7                    anyone back to Mexico to

8                    Grupo Beta at this time."

9                        Is it fair to say that implies that

10    at a previous time CBP sent people back to Mexico

11    to Grupo Beta?  Is that fair?

12                   A.   I would ask you to define what you

13    mean by "send back to Mexico."

14                   Q.   Well, I'd ask you, if you can, to

15    define what Robert Hood means when he says, "We

16    should not be sending anyone back to Mexico to

17    Grupo Beta at this time."

18                   A.   So I take that to mean that we

19    should not be holding at the boundary.

20                   Q.   What do you mean by "holding at the

21    boundary"?

22                   A.   I mean that as asylum seekers

23    arrive and there is an officer at the limit line,

24    the officer should not be telling anyone to wait

25    or that they need to go to Grupo Beta.  They



Page 290

1    should be bringing them in because we have space,

2    adequate space to intake and process them.

3              Q.   Can you clarify what Robert Hood

4    meant when he said "send them back to Grupo Beta"

5    specifically?

6              MS. SHINNERS:   Objection; calls for

7    speculation.

8    BY MR. GUISADO:

9              Q.   If you know.

10             A.   I believe that that was just

11   uncareful or careless language to say "sending

12   back" because they would have still been in

13   Mexico.

14             Q.   But why Grupo Beta?

15             MS. SHINNERS:   Objection; vague.

16   BY MR. GUISADO:

17             Q.   If CBP were to send someone back,

18   taking your definition meaning they were already

19   in Mexico, if they were to send an asylum seeker

20   back, why would they send them back to Grupo Beta

21   specifically?

22             A.   If we were metering, then they

23   would be sent to Grupo Beta to get into the queue.

24             Q.   To get into the queue.

25             So before this e-mail, to the best



Page 291

1    of your knowledge, did anyone present at the port

2    of entry and CBP told them that they had to get in

3    the queue at Grupo Beta?

4          A.   To the best of my knowledge, when

5    we were not queueing, I have no knowledge that

6    that occurred.

7          Q.   Speaking specifically when you were

8    queueing or you were metering, do you recall CBP

9    telling asylum seekers to go to Grupo Beta to get

10   in the queue when they presented at a port of

11   entry seeking asylum?

12         A.   I don't specifically --

13              MS. SHINNERS:  Objection to the

14   form.  Go ahead.  Sorry.

15              Go ahead, Ms. Marin.  My apologies.

16              THE WITNESS:  Sorry.  I don't

17   remember them -- I don't know of any instances

18   where it was -- they were specifically told to go

19   back to Grupo Beta.  Again, I think it was

20   careless language on the part of Mr. Hood.

21   BY MR. GUISADO:

22         Q.   What do you recall them being told?

23         A.   So if they arrived at Ped East,

24   they were redirected to Chaparral.  Grupo Beta --

25   well, INAMI controlled the entrances at Chaparral.



Page 292

1    So if they arrived at Chaparral, they would be

2    asked to get in the queue.

3              Q.   So if an asylum seeker approached a

4    port of entry during the time in which CBP was

5    metering at Chaparral, CBP would refer that asylum

6    seeker at the port of entry to get in the queue

7    administered by Grupo Beta; is that correct?

8              A.   They would refer them to Chaparral.

9    Once they arrived at Chaparral, then they would

10   inevitably be placed in the queue.

11             Q.   I have been to Chaparral.

12             If an asylum seeker were at

13   Chaparral, went up the stairs, through the

14   passageway, to the port of entry, asked for asylum

15   in a period in which CBP was metering, would CBP

16   tell them that they could not process them but

17   instead send them to Grupo Beta to get in the

18   queue?

19             A.   They would tell them to wait.  And

20   I can't say that there has never been an instance.

21   I can't speculate if a CBP officer told them that

22   they had to go to Grupo Beta.  But they would be

23   told to wait at Grupo Beta because that is a

24   federal facility, and/or INAMI would do patrols in

25   that area to avoid anyone impeding the flow of



Page 293

1    traffic inside the Chaparral facility.

2            Q.   If an asylum seeker at Chaparral

3    went to the port of entry and they had not been on

4    the wait list or the queue, could they apply for

5    asylum during the period in which CBP was

6    metering?

7            A.   So at the arrival at the limit

8    line?

9            Q.   Yes.

10           A.   Unless they were part of a

11   vulnerable population, no.

12           Q.   Thank you.

13               MR. GUISADO:  Kevin, please bring

14   up AG10.

15               MS. SHINNERS:  How much time is

16   left in the seven hours?

17               VIDEOGRAPHER:  We are at 6:15 right

18   now.

19               MS. SHINNERS:  Okay.  Thank you.

20           (Exhibit No. 220 was marked for

21               identification by the shorthand

22               reporter and is attached hereto.)

23   BY MR. GUISADO:

24           Q.   Ms. Marin, I am showing you what we

25   have marked as Exhibit 220 bearing the Bates



Page 294

1    numbers AOL-DEF-00083821.  I will represent to you

2    that Exhibit 220 is an e-mail exchange from you to

3    Pete Flores, among others, regarding the asylum

4    book.  Please take a minute to review the e-mail

5    and Mr. Flores' response.

6              (Document reviewed by witness on

7               screen.)

8              THE WITNESS:  Okay.  I am done.

9              MS. SHINNERS:  I'm sorry.  Is this

10   one of the documents you sent me?

11             MR. GUISADO:  No, but if you will

12   grant me a brief indulgence, this is my last

13   document, and I will send it to you as soon as we

14   are done.

15             MS. SHINNERS:  I thought we agreed

16   that I would get the documents before you started

17   questioning generally in the remote deposition

18   protocol.

19             MR. GUISADO:  Generally, yes.  I

20   believe we sent you a box.com invite containing

21   all of our exhibits, but I will send it to you

22   right now.

23             MS. SHINNERS:  I'm sorry.  I will

24   check the folder.  I apologize.

25             Yes.  It is in the folder.  I



Page 295

 1     apologize.  Thank you.

 2                    MR. GUISADO:  You're welcome.

 3     BY MR. GUISADO:

 4            Q.   Ms. Marin, do you recall sending

 5     this e-mail?

 6            A.   I do.

 7            Q.   It says here that:

 8                 "INM communicates with NGOs

 9                 and shelters as to which numbers

10                 are next for intake.  And NGOs

11                 advise migrants as to the updated

12                 numbers.  When a migrant's intake

13                 day arrives, INM gathers the

14                 group at Chaparral and escorts

15                 them to Ped East for intake."

16                    Generally, is this a correct

17     understanding as to how the asylum process through

18     metering works at San Ysidro?

19                    MS. SHINNERS:  Object to the form.

20                    MR. GUISADO:  Which form, Counsel?

21                    MS. SHINNERS:  The term "asylum

22     process through metering" is vague, and I was

23     trying not to give a speaking objection, but

24     that's my objection.

25                    MR. GUISADO:  I am not totally



Page 296

1    understood.

2    BY MR. GUISADO:

3            Q.   Ms. Marin, do you understand what I

4    mean when I say "asylum process through metering"?

5            A.   I understand that you are talking

6    about migrants at shelters that are being metered.

7            Q.   Okay.  Let me ask a different

8    question.  You explained to me earlier that from

9    2016 to 2019 you or someone else would send a

10   WhatsApp message to INM or Grupo Beta under INM

11   advising them how much space you had on any given

12   day for intake for asylum processing and INM would

13   reply to you with how many individuals they would

14   bring to a particular port of entry at a

15   particular time; is that correct?

16           A.   Correct.

17           Q.   Do you know how that process came

18   about?

19           A.   Which process?

20           Q.   CBP contacting INAMI advising them

21   of how much -- how many asylum seekers they wished

22   to come to the port in any particular time and

23   Grupo Beta or INM responding with how many they

24   were bringing.

25           MS. SHINNERS:  Object to the form.



Page 297

```
 1                    THE WITNESS:  So when we spoke

 2      earlier and I spoke about the 1,076 that we had in

 3      custody and converting all the additional space to

 4      include a GSA workshop to account for the

 5      individuals without documents that arrived on that

 6      day, CBP had to stop intake.  We could not safely

 7      intake anyone else.  So we held the line at the

 8      international boundary at the Ped East.

 9                    As a result of that, the number of

10      migrants arriving started to camp out at the area

11      just south of that boundary.  My understanding of

12      the events that happened in the next day to couple

13      days was that the mayor of Tijuana had concerns

14      with the sanitary conditions in that area and the

15      migrants impeding the legitimate flow of regular

16      traffic.

17                    So my understanding is that the

18      mayor reached out to Tijuana PD who in turn

19      reached out to INAMI.  INAMI then made contact

20      with ILU, and the request was if we take these

21      people to shelters will CBP tell us, number one,

22      when you will begin to intake again; and, number

23      two, the number that we can bring from the shelter

24      each day.

25
```



Page 298

1       BY MR. GUISADO:

2                  Q.   Is it your -- thank you.

3                  A.   You're welcome.

4                  Q.   Is it your understanding that

5       Grupo Beta brings migrants to the port of entry

6       when their number on the queue comes up?

7                  A.   That's my understanding, yes.

8                  Q.   When I say "queue," it's also

9       referred to as the wait list.

10                  And that queue or wait list is

11      contained in a physical notebook; is that correct?

12                  A.   That's correct.

18                  Q.   Okay.  From 2016 to 2017, the

19      period during which CBP was metering, the way an

20      individual could present at a port of entry for

21      asylum would be to get on the wait list in the

22      physical notebook, wait for their turn to be

23      called.  CBP would contact Grupo Beta through

24      WhatsApp or phone call requesting the individuals

25      whose numbers in the book had come up.  Grupo Beta



Page 299

1    would then relay how many individuals they were

2    bringing to the port of entry, and only then could

3    they apply for asylum at that particular port of

4    entry.  Is that correct?

5              A.   So I would like to clarify that in

6    2016 I don't -- and I don't know when the book was

7    created, but in 2016 I believe there was a book.

8              Q.   Okay.  But aside from the portion

9    beginning at the time period in which the book was

10   created or came into use, the rest of that

11   statement was correct; right?

12             MS. SHINNERS:  I mean, you said it

13   a while ago, and it's a very long statement.  So I

14   am going to object.

15             MR. GUISADO:  All right.  That's

16   fair.

17   BY MR. GUISADO:

18             Q.   From 2016 to 2019 continuing to

19   present day, when CBP was metering, CBP would

20   contact Grupo Beta asking individuals to present

21   at the port of entry -- let me rephrase and let me

22   ask a better question.

23             CBP implemented a system known as

24   metering sometime in 2016 at the San Diego field

25   office Tijuana area; is that correct?



Page 300

1           A.   I ask you to be more specific on

2     what you mean by metering in Tijuana.

3           Q.   Sure.  In 2016 to facilitate the

4     entry process for asylum seekers at the San Ysidro

5     port of entry, CBP began metering individual

6     asylum seekers, and CBP would process those

7     individuals as capacity would allow; is that

8     correct?

9           A.   That's correct.

10          Q.   At some point the individuals who

11    were metered placed their names or had their names

12    placed in a physical notebook that contained the

13    name and number of asylum seekers who were waiting

14    to seek asylum at San Ysidro; is that correct?

15          A.   Since the inception of the book,

16    yes.

17          Q.   Since the inception of the book,

18    for an asylum seeker to present at a port of entry

19    to ask for asylum, CBP would have to relay to

20    Grupo Beta how much space it had.  Grupo Beta

21    would relay back how many individuals they were

22    bringing, and an individual whose name was in the

23    physical asylum notebook had to wait until

24    Grupo Beta would present them at the port of

25    entry.  Is that your understanding?



Page 301

1              A.   Yeah.  I would just like to
2    clarify.  It is, but I would like to clarify that
3    Grupo Beta would seldomly relay a different number
4    than what CBP said there was space for.
5              Q.   So CBP would tell Grupo Beta a
6    number that signified how much -- how many asylum
7    seekers to bring roughly, Grupo Beta would bring
8    that many asylum seekers, and those asylum seekers
9    had to have their name in the notebook
10   memorializing the wait-list process before they
11   could apply at the San Ysidro port of entry; is
12   that correct?
13             A.   CBP never verified with Grupo Beta
14   if they were on a list.  Whatever Grupo Beta
15   brought to us, what's in that number that we
16   requested would come in for intake.
17             Q.   And so this process or -- is it
18   fair to call it a "process"?
19             A.   I think that's fair.
20             Q.   Can I call it the "asylum-seeking
21   process at San Ysidro"; is that fair?
22             A.   There are individuals in the list
23   that arrive at a port of entry that do not always
24   seek asylum.
25             Q.   Okay.  Let's stick specifically to



Page 302

1      people who are seeking asylum.

2               A.   Okay.

3               Q.   Is it fair to state that this

4      process that we have been talking about, is it

5      fair to call it the "asylum-seeking process at

6      San Ysidro"?  If I said that, would you know what

7      I meant?

8               A.   Yes.

9               Q.   Was the asylum-seeking process or

10     any aspects of it in which CBP and INM would relay

11     to each other how many individuals were being

12     presented at the port of entry, was any of that

13     ever memorialized in any agreement, memorandum of

14     understanding, or contract?

15               A.   To my knowledge, no.

16               Q.   Do you know anyone who would?

17               A.   I don't, and I am fairly confident

18     if a contract or memorandum of understanding

19     existed, I would have seen it in the capacity of

20     my duties.

21               Q.   Okay.  You testified earlier that

22     when I said "asylum-seeking process," you knew

23     what I meant.  Is it fair to say that the

24     asylum-seeking process involving CBP and INM

25     communication to your knowledge was never



4                    MR. GUISADO:  Thank you.

5                    I have no further questions for the

6       witness.

7                    MR. MEDLOCK:  How much time do we

8       have left on the seven hours?

9                    VIDEOGRAPHER:  We just hit 6 hours

10      and 30 minutes.

11                   MR. MEDLOCK:  Okay.  Ms. Marin,

12      before we pass you back to Ms. Shinners to ask any

13      questions that she may have, I actually wanted to

14      follow up on something that Mr. Guisado asked.

15                   And I apologize.  I am having

16      trouble with my camera.  So I apologize about

17      that.

18

19                   FURTHER EXAMINATION

20      BY MR. MEDLOCK:

21           Q.   When did you say in 2017 that CBP

22      paused metering at the San Ysidro port of entry?

23           A.   I believe we saw a significant drop

24      in numbers in February of '17, and we did not see

25      a need to meter until December of '17.



Page 304

1          Q.   Okay.  So this should have been

2     during the summer of 2017, to your knowledge, no

3     one was metered at the San Ysidro port of entry;

4     is that right?

5          A.   To my knowledge, they were not.

6          Q.   Okay.  Isn't it true that CBP

7     officers have actually attempted to turn back

8     asylum seekers who have valid U.S. visas to

9     Grupo Beta in Mexico?

10         A.   I don't know of any specific

11    instances where someone with a valid entry

12    document was referred to Grupo Beta.

13         Q.   Isn't it true that in 2017, in fact

14    in June of 2017, CBP officers at the San Ysidro

15    port of entry told attorneys representing asylum

16    seekers to, quote, go back to Mexico?

17              MS. SHINNERS:  Object to the scope.

18              THE WITNESS:  I don't recall that

19    occurring.

20    BY MR. MEDLOCK:

21         Q.   Isn't it true that in 2017 CBP

22    officers at the San Ysidro port of entry accused

23    attorneys at the border of loitering?

24              MS. SHINNERS:  Object to the scope.

25              THE WITNESS:  I don't recall any



Page 305

1    accusations of loitering.

2    BY MR. MEDLOCK:

3            Q.   Isn't it true that when attorneys

4    insisted that arriving asylum seekers be inspected

5    and processed at ports of entry CBP officers have

6    threatened to have them removed from the San

7    Ysidro port of entry?

8            MS. SHINNERS:   Object to the scope.

9            THE WITNESS:   I don't recall

10   specific incidents of that.

11   BY MR. MEDLOCK:

12           Q.   Isn't it true that CBP officers at

13   the San Ysidro port of entry have told asylum

14   seekers standing on U.S. soil that they are,

15   quote, not admitted yet and need to go back to

16   Mexico to make contract with Grupo Beta?

17           MS. SHINNERS:   Object to the scope.

18           THE WITNESS:   I know of one

19   incidence where asylum seekers were returned from

20   San Ysidro back to U.S. soil.  The officer was out

21   of policy and was disciplined for that.

22   BY MR. MEDLOCK:

23           Q.   When did that occur?

24           A.   I would have to check the record.

25   I believe -- I would be misstating if I knew



Page 306

1    exactly what the date was.

2              Q.   Do you know whether it occurred in

3    2017?

4              A.   I don't.

5              Q.   Isn't it true that CBP officers

6    have told asylum seekers that Al Otro Lado staff

7    are, quote, trouble?

8              MS. SHINNERS:  Object to the scope.

9              THE WITNESS:  I don't know of

10   instances where CBP officers have said that.

11             MR. MEDLOCK:  Okay.  Kevin, could

12   you pull up Tab 38, please.

13             And, Madam Court Reporter, can you

14   let me know what exhibit number we're on?

15             THE COURT REPORTER:  Exhibit 221

16   will be Tab 38.

17             MR. MEDLOCK:  All right.  So we

18   will mark Tab 38 as Exhibit 221 to your

19   deposition, Ms. Marin.

20             (Exhibit No. 221 was marked for

21             identification by the shorthand

22             reporter and is attached hereto.)

23             MR. MEDLOCK:  And for the record,

24   Exhibit 221 is an audio recording of an

25   interaction that occurred with CBP on June 13,



Page 307

1      2017.  It bears the Bates number

2      AL OTRO LADO_00018604.

3                  Kevin, if you could please play the

4      audio recording.

5                  (Audio recording played from

6                  5:49 p.m. to 5:55 p.m.)

7      BY MR. MEDLOCK:

8                  Q.   Ms. Marin, can you explain to me

9      why an asylum seeker was turned back and told to

10     go to Grupo Beta in 2017 and is recorded -- and is

11     recorded -- the interaction had been recorded

12     during a time in which you previously testified

13     metering was not occurring?

14                 MS. SHINNERS:  Object to the scope.

15                 THE WITNESS:  I cannot explain to

16     you why that would have occurred.

17     BY MR. MEDLOCK:

18                 Q.   You would agree with me that you

19     don't tell someone to go back to Mexico if they

20     are already in Mexico; right?

21                 A.   Yes.

22                 Q.   So that would lead you to believe

23     that this interaction occurred on U.S. soil;

24     correct?

25                 A.   I don't know that it would directly



Page 308

```
 1    lead me to believe that without seeing where they

 2    were -- it could have been, again, careless

 3    language on the part of the person on the team.

 4             Q.    But you would agree with me that

 5    the CBP officers used the phrase "go back to

 6    Mexico" multiple times during the conversation;

 7    correct?

 8             A.    Yes, I would agree to that.

 9             MR. MEDLOCK:    All right.    I have no

10    further questions.    Thank you.

11             MS. SHINNERS:    Can we go off the

12    record briefly?

13             VIDEOGRAPHER:    Time is 5:37 p.m.

14    We are now off the record.

15             (Whereupon, a recess was held from

16             5:57 p.m. to 6:21 p.m.)

17             VIDEOGRAPHER:    Time is 6:22 p.m.

18    We are now back on the record.

19

20                    EXAMINATION

21    BY MS. SHINNERS:

22             Q.    Ms. Marin, I just have a few

23    questions for you.    I am going to --

24             MS. SHINNERS:    Kevin, could you

25    pull up Tab 13.
```



Page 309

     1              Great.  That's perfect.  Thank you.

     2    BY MS. SHINNERS:

     3              Q.   Ms. Marin, I am showing you what

     4    was previously marked as an exhibit to your

     5    deposition.  I cannot remember the exhibit number,

     6    but it is Bates labeled AOL-DEF-00603278.

     7              Do you recall seeing this document

     8    earlier in your deposition?

     9              A.   I do.

    10              Q.   I am going to refer you to the --

    11    the top e-mail from you to Kylvin F. Gomez that

    12    states:

    13              "275 is our new target

    14              number.  Don't stress.  Help is

    15              coming."

    16              Do you see what I'm referring to?

    17              A.   I do.

    18              Q.   When you said "275 is our new

    19    target number," what did you mean by "target

    20    number"?

    21              A.   So target number for me at that

    22    point, that was my operational capacity based on

    23    whatever was going on during that time.

    24              Q.   And is that a set number, the

    25    operational capacity?



Page 310

1                  A.   No.  The operational capacity is

2        always an ideal number.  It could go up or down

3        and even drastically at any time.  So if we had

4        intake from the queue to 275 and, you know, we got

5        20 or 30 fraud cases, that new number would be

6        295.  Again, it was -- depending on whatever was

7        going on during that time, and without having

8        accurate notes or memory on what was going on in

9        September of 2018, it could have been several

10       factors or just a few.

11                  But, you know, based on the

12       demographic, if I had, you be, limited cell

13       capacity based on, you know, UACs that had a huge

14       range of age ranges and I took two cells for UACs

15       versus one, if I had rival gang members and wasn't

16       able to adequately separate those from general

17       population.  If I had LGBTQ members, that would

18       affect that number.

19                  If ICE ERO had already indicated to

20       me that they were not going to be able to move any

21       subjects out of our custody within the next couple

22       days, then I would have to consider TC time and

23       the number of people already in custody needing

24       more space and as TC time increases, they require

25       more care and additional officers and resources to



Page 311

1    be able to accommodate that.  So it could have

2    been one of several or all of several factors.

3                    MR. MEDLOCK:  Move to strike

4    everything after the first sentence as

5    nonresponsive.  Also the question was leading.

6    BY MS. SHINNERS:

7            Q.    So earlier when Mr. Medlock asked

8    you as to the factors that may go into this 275

9    number, I believe you stated that it would have

10   been based on staffing and budget and/or overtime.

11                   Did I state your prior testimony

12   accurately?

13                   MR. MEDLOCK:  Objection; leading.

14                   THE WITNESS:  Yes, you did.  And

15   that would have been one of the factors to include

16   the others that I mentioned previously.

17                   MR. MEDLOCK:  Move to strike

18   everything after "you did" as nonresponsive.

19   BY MS. SHINNERS:

20           Q.    So are there any other factors that

21   would have played into the port of San Ysidro's

22   operational capacity on that or any other day?

23                   MR. MEDLOCK:  Objection; leading.

24   Objection; calls for speculation.  Objection;

25   foundation.



Page 312

```
 1                    THE WITNESS:  So, again, there are

 2      several factors that will affect our operational

 3      capacity on any given day.  Again, to include

 4      demographics, the health of detainees, the

 5      increased TC time due to ICE's inability to move

 6      them out of CBP custody in a timely manner, the

 7      ability of resources and man-hours.  So it's not

 8      just some monetary budget.  Again, officers have a

 9      set number of -- a finite number of man-hours that

10      they are able to work towards.

11                    So all of that would have played

12      into my decision to set a target on any given day.

13      And, again, that target is fluid and fluctuating

14      at any given time.

15                    MS. SHINNERS:  Okay.  Thank you,

16      Ms. Marin.

17                    I have no further questions for

18      Ms. Marin.

19                    MR. MEDLOCK:  All right.

20      Plaintiffs have no further questions.  I also

21      think we have run out of time anyway.

22                    MS. SHINNERS:  I just wanted to

23      state on the record that the witness would like to

24      read and sign and that the deposition transcript

25      is confidential for 30 days pending more specific
```



Page 313

1      confidentiality designations.

2                    THE COURT REPORTER:  Okay.  Thank

3      you.  And can I get transcript and video records

4      -- video orders on the record, please?

5                    MS. SHINNERS:  The defendants would

6      like to order --

7                    MR. MEDLOCK:  Sorry.  Go ahead.

8                    MS. SHINNERS:  The defendants would

9      like to order the transcript.

10                    MR. MEDLOCK:  And Plaintiffs have a

11     standing order that you can get from Canby Wood at

12     Magna Legal.

13                    THE COURT REPORTER:  Okay.  Thank

14     you very much.  Joseph is going to read us off the

15     record, and I'd ask that everyone stay on the line

16     just in case I have got a couple more questions

17     afterwards.  Thank you.

18                    Thanks, Joseph.

19                    VIDEOGRAPHER:  Time is 6:28 p.m.

20     This concludes the deposition of Mariza Marin.  We

21     are now off the record.

22

23         (Whereupon, at the hour of 6:29 p.m., the

24              proceedings were concluded.)

25                    --oo0oo--



Page 314

1                    REPORTER'S CERTIFICATION

2

3

4

5          I, Megan Grossman-Sinclair, Certified

6     Shorthand Reporter, in and for the State of

7     California, do hereby certify:

8

9          That the foregoing witness was by me duly

10    sworn; that the deposition was then taken before

11    me at the time and place herein set forth; that

12    said testimony and proceedings were reported

13    stenographically by me and later transcribed into

14    typewriting under my direction; that the foregoing

15    is a true record of the testimony and proceedings

16    taken at that time.

17

18         IN WITNESS WHEREOF, I have subscribed my name

19    this 10th day of June 2020.

20

21

22

23    Megan Grossman-Sinclair, CSR No. 12586

24

25



Page 315

```
 1              DEPOSITION ERRATA SHEET

 2

 3    AL OTRO LADO, INC., et al.

 4    vs. KEVIN K. McALEENAN1, et al.

 5

 6        DECLARATION UNDER PENALTY OF PERJURY I

 7    declare under penalty of perjury that I have read

 8    the entire transcript of my Deposition taken in

 9    the above captioned matter or the same has been

10    read to me, and the same is true and accurate,

11    save and except for changes and/or corrections, if

12    any, as indicated by me on the DEPOSITION ERRATA

13    SHEET hereof, with the understanding that I offer

14    these changes as if still under oath.

15

16    Signed on the       day of

17                   , 20     ,

18

19

20            MARIZA MARIN

21

22

23

24

25
```



Page 316

1               DEPOSITION ERRATA SHEET

2    Page No.     Line No.      Change to:

3    Reason for change:

4    Page No.     Line No.      Change to:

5    Reason for change:

6    Page No.     Line No.      Change to:

7    Reason for change:

8    Page No.     Line No.      Change to:

9    Reason for change:

10   Page No.     Line No.      Change to:

11   Reason for change:

12   Page No.     Line No.      Change to:

13   Reason for change:

14   Page No.     Line No.      Change to:

15   Reason for change:

16   Page No.     Line No.      Change to:

17   Reason for change:

18   Page No.     Line No.      Change to:

19   Reason for change:

20   Page No.     Line No.      Change to:

21   Reason for change:

22   Page No.     Line No.      Change to:

23   Reason for change:

24   SIGNATURE:                    DATE

25           MARIZA MARIN



Page 317

```
 1                    DEPOSITION ERRATA SHEET

 2      Page No.     Line No.      Change to:

 3      Reason for change:

 4      Page No.     Line No.      Change to:

 5      Reason for change:

 6      Page No.     Line No.      Change to:

 7      Reason for change:

 8      Page No.     Line No.      Change to:

 9      Reason for change:

10      Page No.     Line No.      Change to:

11      Reason for change:

12      Page No.     Line No.      Change to:

13      Reason for change:

14      Page No.     Line No.      Change to:

15      Reason for change:

16      Page No.     Line No.      Change to:

17      Reason for change:

18      Page No.     Line No.      Change to:

19      Reason for change:

20      Page No.     Line No.      Change to:

21      Reason for change:

22      Page No.     Line No.      Change to:

23      Reason for change:

24      SIGNATURE:                      DATE

25             MARIZA MARIN
```



**A**

abbreviated 14:3
14:6
abbreviations
14:8
ability 101:25
276:2 312:7
able 88:4 150:3
159:5 160:13
161:2 171:20
172:1,2,4
218:16 219:2
241:6 255:11
266:7 310:16
310:20 311:1
312:10
absolutely
113:13
academic 42:5
academy 51:5,8
51:24 52:23
53:9
accepting 287:16
287:25
access 84:21
155:13 275:25
276:2
accident 207:15
accidentally
59:15
accommodate
311:1
account 22:12
165:15 232:15
260:21 261:5
297:4
accountability
276:15 277:12
281:8,21
accuracy 192:2
193:5
accurate 83:25
84:4 150:18
227:1 255:7,8
255:13 258:13

262:4 310:8
315:10
accurately
311:12
accusations
305:1
accused 304:22
acronym 19:15
19:19 33:9
acted 110:15
acting 288:25
action 7:22 137:4
204:3,16
206:12 248:7
activated 100:10
activity 55:6
actual 91:23 92:3
113:7 127:21
128:5,9,14
152:14 191:16
287:6
add 148:3
addition 17:21
additional 59:3
87:25 88:6
160:14 161:2
218:4,7,16,17
242:2 297:3
310:25
address 64:10
244:5 272:2
addressed 136:4
173:12 289:2
290:2
adequately
101:12 116:19
244:16 310:16
ADFO 14:3
adjust 147:4
adjuster 50:19
administered
261:5 292:7
administrative
51:23 250:1
admissibility

5:11,12 7:3
54:18 55:15,21
56:4,7,9 84:20
95:11 108:1
109:6 111:1,22
113:12 157:5
157:15 163:10
178:19 216:5
250:3,5 258:16
admissible 55:5
admission 159:16
220:25 221:6
222:15,24
223:19
admissions
223:10
admitted 305:15
adult 147:13,14
226:7,21
adverse 7:21
204:3,15
206:12
advice 175:6,10
241:2 265:3
advise 295:11
advised 137:3,7
advising 296:11
296:20
AEU 6:12,16 8:9
8:13 10:12 56:9
92:22 95:18
96:1 97:15,23
98:18 101:1
102:16 109:9
109:17,20
116:13 119:18
120:19 121:9
121:24 122:3
122:14 123:18
124:1 125:24
128:5 133:16
138:10,19
140:11 145:1
145:11,20
146:2,4,7,11,13
149:16 157:20

157:23 158:10
159:6,15
162:20,24
163:17 164:1
164:14 165:8,8
165:21 166:15
166:22 168:5
171:19 175:2,9
175:14 176:9
179:5 181:6,14
182:4,6,8
183:23 184:5,7
185:18 187:21
217:14 218:16
218:19 222:25
223:3 249:6,25
250:11 252:4
253:4,8,17
254:6,6 255:4
259:10,11,18
286:17 287:15
287:24 288:17
289:3
affect 90:7
111:10 113:1
310:18 312:2
affidavit 16:3
afraid 260:15
afternoon 243:18
243:20 255:11
age 310:14
agencies 86:9,14
87:10 251:8
260:13
agency 26:3,4,6,9
26:19 36:8 43:7
43:16,22 86:6
92:14 240:22
aggregate 92:23
ago 27:9 258:23
299:13
agree 22:25 23:2
79:21 80:8,24
81:4 87:19,20
87:21 119:2,7
154:6 174:11

197:10 204:20
205:13 225:15
307:18 308:4,8
agreed 294:15
agreement 12:16
302:13 303:1
aguisado@ccrj...
2:12
AGXX 257:11
AG1 244:21
245:14 246:12
248:18
AG10 293:14
AG2 244:21
248:18
AG3 270:19
AG4 275:23
279:6
AG5 283:12
AG9 286:7
ahead 25:22
52:20 58:16
62:12 79:11
80:3 88:19
99:16 132:9
140:21 147:7
149:11,12
151:17 165:24
176:19 190:1
251:22 265:14
268:2 280:12
291:14,15
313:7
ahold 256:15
aid 249:18
aide 288:17
airport 213:2,3
280:20
Aki 5:4,22 6:4,10
6:23 8:9,15
10:8 47:23 48:1
141:4,9,17
143:11 149:15
151:13 156:21
157:11 172:16
178:13 180:7



180:13 217:10
247:13 284:5
**al** 1:4,4,8 11:6
40:12,20 41:1
45:24 46:7 47:1
306:6 307:2
315:3,3,4
**alcohol** 20:16
**alien** 200:7,10
201:2,10
**allow** 75:23
149:7 225:6
300:7
**allowed** 88:4
173:5
**all-inclusive**
64:25
**ALOTROLADO**
10:18
**ALO-DEF-007...**
107:13
**Amended** 8:3
208:11,13
**American** 277:25
**amount** 36:3
214:22
**Andrade** 40:2,6
66:22 196:14
**and/or** 249:7
255:4 292:24
311:10 315:11
**Angeles** 20:23,24
**Angelo** 2:9 11:22
243:10
**Anne** 30:14
**answer** 4:9 12:24
16:21 18:6,8,14
18:14,21,23
31:8,11,15,25
32:16,19 41:4
41:18,19,21
44:5,7,14 46:5
52:20 57:1
69:10 75:11,12
75:21 85:10,15
97:8 99:1 101:7

102:9 124:6
131:10 155:24
176:16 186:22
192:3 195:9
199:17 234:11
240:7 241:9
244:17 248:13
249:5 261:2
262:19 264:14
264:24 267:9
267:24 268:4
268:25 269:13
274:9 277:23
284:19
**answered** 62:3
75:4 243:11
**answering** 17:7
76:24
**answers** 243:24
262:9
**Anthony** 179:1,3
**anybody** 39:22
40:1,6 69:19
94:17 129:15
132:3 138:3
151:21 241:14
**anyone's** 171:17
**anyway** 312:21
**AOL-DEF-000...**
9:12
**AOL-DEF-000...**
8:7 212:15
**AOL-DEF-000...**
10:6 276:12
**AOL-DEF-000...**
9:5 231:4
**AOL-DEF-000...**
6:8 143:6
**AOL-DEF-000...**
6:17 164:23
10:9
**AOL-DEF-000...**
6:13 163:9
**AOL-DEF-000...**
163:16

**AOL-DEF-000...**
8:17 221:19
**AOL-DEF-000...**
5:4 6:5 139:8
150:6
**AOL-DEF-000...**
8:13 219:13
**AOL-DEF-000...**
8:10 217:4
**AOL-DEF-000...**
7:4 228:9
**AOL-DEF-000...**
7:7 182:18
**AOL-DEF-000...**
10:16 294:1
**AOL-DEF-000...**
6:25 178:4
**AOL-DEF-002...**
9:24 271:2
**AOL-DEF-003...**
245:10
**AOL-DEF-003...**
135:24
**AOL-DEF-003...**
5:24 134:9
**AOL-DEF-003...**
5:17 114:25
**AOL-DEF-003...**
115:16
**AOL-DEF-005...**
7:9 187:6
**AOL-DEF-005...**
202:21
**AOL-DEF-005...**
203:13
**AOL-DEF-005...**
7:22
**AOL-DEF-006...**
5:20 124:21
**AOL-DEF-006...**
6:21 167:19
309:6
**AOL-DEF-006...**
283:19
**AOL-DEF-007...**
9:16 245:11

**AOL-DEF-007...**
8:21 224:8
**AOL-DEF-007...**
156:13
**AOL-DEF-007...**
95:8 96:9
**AOL-DEF-007...**
97:14
**AOL-DEF-007...**
99:22
**AOL-DEF-007...**
107:5
**AOL-DEF-007...**
10:13 286:14
**AOL-DEF-010...**
7:18 200:23
**AOL-DEF-010...**
200:25
**AP** 172:11
**apart** 265:6
**APD** 33:3,8
172:14
**apologies** 164:24
291:15
**apologize** 203:2
246:17,25
294:24 295:1
303:15,16
**appear** 86:23
87:17,24 88:2,2
90:1 116:9
118:1,8 120:18
121:2 123:3
**appearances** 2:1
3:1 11:16
**appeared** 116:23
117:21 123:9
127:25 226:7
226:20
**appears** 107:24
109:9 114:5,10
115:22 119:3
119:11 122:11
122:22 181:4
187:12 221:19
225:3 281:11

**applicant** 201:10
205:7
**applicants**
284:21 287:16
287:25
**application**
220:24 221:6
222:15,23
223:18
**applications**
223:9
**applied** 50:22
**applies** 44:8
**apply** 223:3
243:24 285:20
293:4 299:3
301:11
**appreciate** 203:8
**apprehensions**
222:19
**approach** 191:12
**approached**
292:3
**appropriate**
55:25 155:19
**approximately**
18:11 35:24
54:3 56:18 61:4
92:24 98:11
99:3 148:19
154:7,11
169:13 181:19
209:21 211:3
284:20,22
**April** 5:4,19 7:20
9:7 124:22
128:24 129:5
139:14 140:4
141:5,24
142:14 150:22
152:4 153:11
202:20 229:8
235:24 236:15
237:8,11 240:3
241:4,18
242:18,23,25



253:8 254:5,6
**arbitration** 15:21
**area** 10:4 15:8
20:24 55:16
57:22,25 114:6
114:11 115:23
115:25 116:14
116:24 147:22
148:6 149:7,9
159:17 277:17
278:7 279:3,12
279:21,24
280:1,20
282:12 292:25
297:10,14
299:25
**areas** 57:20
145:3 147:16
147:24 149:4
154:14 281:13
**argumentative**
89:9 109:25
117:14 148:25
195:7
**Arlene** 280:5
**arm** 249:16
**Armijo** 6:7
143:10,15,18
143:23 144:25
**arose** 272:13
**arrested** 20:14
**arrival** 122:3
293:7
**arrive** 195:21
287:17 288:1
289:23 301:23
**arrived** 160:21
285:22 291:23
292:1,9 297:5
**arrives** 196:21
295:13
**arriving** 175:14
176:1,9,13
200:7,10 201:2
201:10 210:16
280:24 282:24

297:10 305:4
**articulated**
265:20
**ascertain** 286:2
**Asher** 179:1,3
**aside** 299:8
**asked** 67:20
76:15 77:15
83:2,13 240:6
253:12 254:16
255:15 264:21
282:14 283:3
292:2,14
303:14 311:7
**asking** 27:3 43:2
67:16,16,18
92:7 129:11
138:6 170:10
170:14 206:1
248:12 284:6
299:20
**asks** 264:23
**aspects** 52:22,24
302:10
**assert** 83:5
**assigned** 57:11
57:22 58:1 61:5
61:13 215:4
282:2 288:9
**assignment**
215:22,23
**assist** 38:5
251:12 285:17
**assistance** 249:18
**assistant** 13:25
14:2 33:10,12
65:6,11 77:3
96:1 136:18
143:19
**assisting** 17:22
**assume** 140:17
140:22 153:25
192:10 267:12
277:13,16
**assumes** 80:1
87:24 88:16

153:21 192:2,2
193:5
**assuming** 219:2
**asterisk** 152:13
**asylum** 10:12,16
43:24 52:9,14
159:11,12,22
160:3,6,9 161:8
197:21 198:3,7
198:10,14,24
199:2,4,20
201:23 210:5
210:21 211:4
211:17,21
213:7 228:16
250:19 258:25
260:22 272:5
273:15 274:5
274:15,21
280:24,25
281:1 283:7
285:21 287:16
287:25 289:22
290:19 291:9
291:11 292:3,5
292:12,14
293:2,5 294:3
295:17,21
296:4,12,21
298:21 299:3
300:4,6,13,14
300:18,19,23
301:6,8,8,24
302:1 304:8,15
305:4,13,19
306:6 307:9
**asylum-seeking**
301:20 302:5,9
302:22,24
**ATF** 86:12
**attached** 24:12
80:13 81:14
95:3 114:20
124:18 134:3
139:3 142:25
156:17 163:6

164:9 167:15
177:23 182:14
187:9 191:4
192:16 193:22
200:18 202:17
208:6 212:10
216:25 219:10
221:15 224:3
230:25 236:9
245:4 257:15
270:23 276:8
283:15 286:10
293:22 306:22
**attachment**
236:20
**attained** 49:7
**attempt** 101:10
210:5
**attempted** 304:7
**attempting**
197:13,22
198:4,11,22
201:14,24
211:24 250:21
**attend** 30:22 49:9
49:11
**attended** 30:9
**attention** 142:5
247:11 248:3
**attorneys** 18:3
26:17 42:23
43:3 75:6 76:17
76:21 77:17
83:17,22,23
304:15,23
305:3
**attorney's** 31:16
31:18 32:3,22
85:17
**attorney-client**
74:13 75:13
239:4 242:7
264:12
**attrition** 215:14
**AT&T** 267:13,14
**audible** 17:2

**audibly** 17:7
**audience** 147:18
147:24 148:3,5
149:4,6 150:12
152:16 154:14
154:19,20
155:2,9 156:2
**audio** 10:17
17:17 18:20
19:3 200:5
306:24 307:4,5
**audited** 50:2
**augment** 61:22
**August** 5:12,15
8:12 10:8 95:10
115:3 219:19
220:9 283:20
283:21 285:15
285:15
**authorities** 87:4
**authorize** 88:12
**authorized**
137:14
**available** 101:11
118:24
**average** 217:20
217:24 218:12
**averages** 220:5
**avoid** 292:25
**aware** 69:2,10
70:22 71:4 78:9
78:24 79:5
111:13 112:2,7
116:7,12,22
117:3,4,23
155:7,12,25
174:17 200:4
235:15,19
**a.m** 1:17 11:2,9
73:22,24,24
74:1 76:7,10,10
76:12 133:4,7,7
133:8 139:14
140:5 141:5,24
169:2 170:2
171:8 178:14



| | | | | |
|---|---|---|---|---|
| 220:9 233:4<br>244:13 247:12<br>248:4<br>**B**<br>**back** 49:25 66:9<br>70:9,12 74:1,3<br>76:12,14 77:14<br>88:1,7,25 98:5<br>99:14 126:19<br>129:8 133:9,11<br>148:14 150:4<br>151:24 154:2<br>161:23 171:2,7<br>173:8 177:8,10<br>181:8 213:4<br>220:16 228:2<br>229:7 239:22<br>239:24 253:6,8<br>254:6 259:7<br>269:4 270:16<br>274:18 278:24<br>287:18 289:7<br>289:10,13,16<br>290:4,12,17,20<br>290:20 291:19<br>300:21 303:12<br>304:7,16<br>305:15,20<br>307:9,19 308:5<br>308:18<br>**background**<br>50:24<br>**backing** 263:17<br>**backlog** 220:12<br>**balance** 171:20<br>172:1<br>**Ballentine's** 5:6<br>80:18<br>**ballpark** 99:6<br>101:10 132:13<br>167:7 177:17<br>**Barracks** 158:13<br>158:15 159:6<br>**Barretal** 279:13<br>**Barretto** 33:22 | 34:1,19<br>**barrier** 211:3,9<br>211:11,22<br>**based** 31:2 59:8<br>61:6 62:22 91:3<br>91:4,10 101:19<br>112:16,20<br>125:4 133:20<br>153:25 167:7<br>171:24 172:4<br>173:9 184:19<br>194:21 226:9<br>281:14 309:22<br>310:11,13<br>311:10<br>**basis** 109:17<br>117:5 118:15<br>118:20 120:5<br>157:11 184:22<br>188:18 267:5<br>**batches** 246:22<br>**Bates** 5:4,17,20<br>5:24 6:5,8,13<br>6:17,21,25 7:4<br>7:7,9,18,22 8:7<br>8:10,13,17,21<br>9:5,8,12,16,24<br>10:6,9,13,16,18<br>95:8 96:6 97:13<br>99:21 107:5,12<br>114:25 115:15<br>124:21 134:8<br>135:23 139:7<br>143:5 150:5<br>156:13 163:9<br>163:15 164:20<br>167:18 178:3<br>182:17 187:5<br>200:22,25<br>202:21 203:9<br>212:14 217:3,3<br>219:13 221:18<br>224:7 231:3<br>236:13 245:9<br>271:2 276:11<br>283:18 286:13 | 293:25 307:1<br>309:6<br>**Beach** 53:5,7,11<br>53:12 158:24<br>159:1,7<br>**Bean** 272:21<br>**bearing** 187:5<br>271:1 276:11<br>293:25<br>**bears** 95:7<br>114:24 115:15<br>124:21 134:8<br>139:7 143:5<br>156:12 163:8<br>167:18 178:3<br>182:17 200:22<br>202:20 217:3<br>219:13 221:18<br>224:7 231:3<br>236:13 245:9<br>283:18 286:13<br>307:1<br>**bedding** 155:13<br>155:15<br>**began** 161:18<br>185:19 253:3<br>254:13 300:5<br>**beginning** 136:23<br>145:25 198:6<br>261:23 299:9<br>**begins** 11:5 24:14<br>60:25 92:14<br>126:1 209:14<br>212:14 225:1<br>**behalf** 11:19,23<br>12:3 24:19<br>52:19<br>**belief** 153:9,11<br>237:16<br>**believe** 15:6,9<br>16:9 25:19<br>26:11 35:8,18<br>40:15 50:22<br>51:1,5 53:12<br>54:8 56:16,21<br>59:19,21 61:10 | 74:21 84:2 99:2<br>100:21 108:14<br>108:19 109:15<br>109:23 125:14<br>129:21 131:13<br>135:19 144:8<br>151:18 157:17<br>161:3 168:22<br>169:25 194:24<br>195:1 210:24<br>216:21 218:9<br>218:10 225:11<br>225:17,21<br>237:13,18<br>246:10 248:6<br>255:12 259:20<br>263:25 264:4<br>278:9 279:2<br>285:14 288:3<br>288:16,25<br>290:10 294:20<br>299:7 303:23<br>305:25 307:22<br>308:1 311:9<br>**believed** 235:16<br>235:24<br>**believes** 228:16<br>**Ben** 2:18<br>**bench** 155:16<br>**beneath** 100:3<br>145:8 159:10<br>179:22 201:12<br>209:9 232:2<br>**best** 17:19 22:2,6<br>27:24,25<br>161:21 257:8<br>280:12 290:25<br>291:4<br>**Beta** 249:6,11,12<br>249:14,24<br>251:15 252:2,9<br>252:19 253:24<br>254:11 255:1,4<br>256:1,3,11,23<br>257:6 258:25<br>259:5,8 260:5,7 | 260:17,21,24<br>261:6 265:8,22<br>266:18 268:10<br>269:5,5 272:25<br>273:8 282:15<br>282:17,22,24<br>283:6,7 284:16<br>287:19 289:8<br>289:11,17,25<br>290:4,14,20,23<br>291:3,9,19,24<br>292:7,17,22,23<br>296:10,23<br>298:5,23,25<br>299:20 300:20<br>300:20,24<br>301:3,5,7,13,14<br>304:9,12<br>305:16 307:10<br>**better** 21:23<br>299:22<br>**beyond** 44:15<br>**big** 276:23<br>**bit** 45:7 61:17<br>65:16 190:21<br>195:11 228:13<br>228:14<br>**blank** 260:11<br>**blow** 178:9<br>261:23<br>**blow-up** 157:1<br>**blurry** 178:8<br>**board** 65:14<br>143:19<br>**bodies** 165:12<br>**body** 15:24 237:1<br>248:9 287:6<br>**bold** 209:6<br>**bolded** 226:13<br>**book** 10:16<br>274:24 275:2<br>275:17,20<br>294:4 298:25<br>299:6,7,9<br>300:15,17<br>**border** 5:14 9:20 |



13:22,24 14:5
23:9 65:25 66:2
66:5 123:9
158:15,21
159:2 197:22
197:23 198:3
198:11 199:3
201:23 204:9
211:22 229:24
231:18 232:14
235:23 249:17
251:9 304:23
**borders** 278:3
**boring** 228:12
**BORSTAR**
249:17
**bother** 77:4
**bottleneck** 90:3
**bottom** 99:24
152:13 162:4
166:9 169:3
178:25 180:12
208:11 220:3
221:20 229:14
231:5 248:3
281:8 284:5
**boundary** 160:16
209:23 210:17
211:1,2 289:19
289:21 297:8
297:11
**box** 2:18 102:11
165:3 169:3
**boxes** 164:17
**box.com** 246:13
294:20
**brand-new**
213:25
**break** 18:11,15
48:24 71:8
73:13 74:4,18
76:15,18 77:15
77:17 133:2
227:15 239:25
244:1,2 262:8
270:7

**breaks** 260:4
**bridge** 199:23
213:1
**brief** 50:14 254:4
294:12
**briefed** 288:9,20
**briefly** 308:12
**bring** 80:9 81:10
94:23 98:15
102:11 133:22
138:23 142:21
144:14 167:11
177:20 180:10
192:12 193:18
200:14 223:24
229:1 244:20
245:13 248:18
256:21 257:11
275:23 279:6
283:12 293:13
296:14 297:23
301:7,7
**bringing** 125:22
285:18,18
286:7 290:1
296:24 299:2
300:22
**brings** 298:5
**Broadway** 2:10
**broke** 200:5
269:1,2
**broken** 29:12,14
**brought** 160:4
191:6 229:5,6
256:20 285:23
301:15
**Brown** 2:4 11:11
11:19
**Brownfield**
158:18,20,21
159:7 280:21
**budget** 171:24
172:18,20
173:1 311:10
312:8
**built** 146:4

**bullet** 136:25
137:9 201:13
217:16,21
218:11 279:10
**bunch** 51:22
**burden** 205:6
**business** 48:6
96:21 109:19
265:12
**busy** 223:5
**B-a-r-r-e-t-t-o**
33:24

---

## C

**calculated** 94:13
94:20
**Calexico** 7:13
33:4,13,20 34:7
40:8 66:20,20
66:22 190:4,8
192:6,22 193:3
193:12 196:11
196:19 230:17
**California** 1:2,19
11:1,8 12:11
14:19 15:11,15
314:7
**call** 22:21 54:13
54:17 58:23
59:4 173:11
249:8 252:3,7,8
254:16 255:5
256:12 266:20
266:21,25
268:17 298:24
301:18,20
302:5
**called** 22:18 62:7
63:10 147:18
162:1,9 179:7
196:7 220:24
236:20 260:11
266:22 278:11
298:23
**calling** 85:9
**calls** 74:12 96:22

108:17 140:19
149:18 153:13
153:22 199:7
199:14 202:2
210:8 211:14
212:2,2 252:23
290:6 311:24
**camera** 303:16
**camp** 297:10
**Canby** 313:11
**cap** 173:11,16,19
173:23
**capacities** 68:6
92:3
**capacity** 5:5 6:8
21:7,10,11 24:4
27:17 46:11,18
46:18 67:1,3,6
67:10,24,25
68:1,4,9,10,18
68:19 69:1,1,5
69:8,12,13,21
69:21,24 70:6
70:13,16,19,24
71:2,12,21 72:3
72:4,8,18,25
73:6 77:23 78:6
78:12,18,22
79:2,7,8,15,23
80:5,17,20,21
81:1 87:8 90:7
90:23,25 91:3,3
91:15,19,23
92:8,23 93:2,4
93:5,11,13,14
93:17,23 94:5
94:11,11,18
97:22,25 98:9
98:17,21 100:8
100:19,22
101:5,8,14,16
101:17,18,22
102:6,16 103:4
103:12,21
104:5,14,23
105:3,4,8,12,17

106:4,14,21
107:4,15,24
108:9,16,22
109:4,15,20
110:4,13,20,22
110:25 111:10
111:15 112:5
112:11,15,19
112:22 113:1
126:5,14,16,21
126:24 127:4,5
127:22 128:2,4
128:5,9,14,19
128:21,23
129:9,12 130:1
130:6,11,22,25
131:3,13,25
132:4,23
133:13,15,20
137:14,20,24
138:1,5,10,18
140:11 141:13
141:18,19,20
142:10,15
145:2 146:14
147:25 148:2,9
148:12,18
149:5,16 150:8
152:7,14,17
153:10,19
154:5 160:14
161:6 167:5,8
175:22,24
179:14,18,18
179:19,23
180:2,2,3
181:20,22
183:5 184:8,12
184:20 187:22
187:25 188:1,2
188:2 190:13
191:11 192:20
194:1 195:1,2
197:8 218:4
222:17 232:7
232:15,21,22



233:10,14,14
233:18,20,20
234:22,22
300:7 302:19
309:22,25
310:1,13
311:22 312:3
**caps** 226:16
**captioned** 315:9
**car** 80:22
**caravan** 273:13
275:13 277:25
279:22 281:12
281:17,18,22
**caravans** 260:14
**cards** 57:6
**care** 101:12
113:15 116:17
116:18,19
123:2 250:17
250:24 310:25
**career** 50:14
136:20
**careless** 290:11
291:20 308:2
**Carroll** 38:25
39:2,6,21
**carry** 265:6
**case** 1:7 7:22
16:1,5,12 25:18
27:8 36:16
37:13 38:13,19
38:22 39:24
40:3 41:13,15
42:9 43:13
47:11,19 55:25
74:21 75:1 81:8
101:20 109:15
131:13 149:13
192:5 202:7
204:3 205:5
217:20,24
218:12,23
223:3 226:6,25
229:8 230:1
264:1 279:19

313:16
**cases** 74:15,22
86:12 89:7
128:18 169:8
169:14 211:15
216:6 218:17
218:21 224:22
226:4 250:23
310:5
**case-by-case**
117:5 118:15
118:18,20
120:4
**Castillo** 9:14
96:4,13 108:15
143:11 151:19
247:13 248:13
286:17
**CAT** 6:4 248:4
**categories** 29:12
**cause** 90:2 288:4
288:5
**caused** 131:3
172:18,23
174:6 237:17
**caveat** 243:3
**CBP** 3:7,8 6:4
14:6,11,23,25
21:14 22:4,15
23:24 24:2,5
33:16 35:3
39:17 43:7
46:19 47:2,12
50:13,20,21
51:4,12,16
52:19 53:3 54:2
54:4,7,10 56:13
56:17,23,24
57:3,4,9 58:23
61:5,13 63:13
67:17 70:23
71:14,20 72:4
73:7 77:21 78:3
78:8,25 79:13
91:7,22 92:2
94:17 96:14

97:1,4 111:14
112:3 113:7,11
113:21 115:1
115:10 116:8
117:10 118:7
125:6 126:25
129:15,24,25
132:6 135:6,16
136:8,13,18
139:20 140:25
141:1 143:24
144:2 158:5
168:2,9,16,20
173:3 178:18
179:4 195:15
195:22 196:21
202:7 204:10
205:3,6,20
207:2 210:23
213:5 215:4
216:17 223:7
223:13,19
225:22 228:15
234:8 245:19
248:4 252:19
254:25 256:1
257:5,22
258:24 260:24
262:7,12,20
265:12 266:22
268:10 269:10
269:15,22
271:5,15 272:6
272:20 273:3,7
273:14,22
274:4,13
279:16,23,25
280:15 281:11
281:17 283:6,8
284:9 285:16
287:25 289:10
290:17 291:2,8
292:4,5,15,15
292:21 293:5
296:20 297:6
297:21 298:19

298:23 299:19
299:19,23
300:5,6,19
301:4,5,13
302:10,24
303:21 304:6
304:14,21
305:5,12 306:5
306:10,25
308:5 312:6
**CBPALOTRO...**
236:14
**CBPALOTRO...**
9:8
**CBP's** 43:23
96:21 116:22
175:1 235:24
**CBP-CAT** 248:5
**CBP-issued**
267:3
**CC** 224:11
**CC'd** 134:17
231:7 247:13
**CC'ing** 141:24
235:5
**ceiling** 101:10,14
101:16 132:11
**cell** 114:6 115:24
116:25 118:9
119:4,20,23
120:3,5,7,19
121:10 122:6
122:12,23,24
123:4,8,21
146:19 147:1,2
147:4,6,15
148:2,7 310:12
**cells** 116:9
117:21 118:1
121:24 122:14
145:11,13,14
145:16 146:17
147:11,17
310:14
**center** 2:8 10:5
11:22 276:14

277:18 278:5,6
278:7 279:3,12
279:21 280:19
280:21
**Central** 277:25
**certain** 45:3
62:20 167:6
**certainly** 111:20
**Certification** 5:9
314:1
**Certified** 12:11
314:5
**certify** 314:7
**CFR** 201:6
**chain** 5:3,21 6:3
6:6,10,19,22
8:11,14,18 9:3
9:9,13 10:7,10
10:14 134:8,16
135:19 139:13
141:3,22 143:8
143:9 144:11
150:5 152:2
167:23 168:16
168:23 178:11
178:12,25
180:6 220:3
221:21 231:3,6
233:3 235:3
245:19 247:24
**challenge** 228:17
235:10,17
236:1
**chance** 193:6
247:25 259:19
**chances** 13:1
**change** 88:21
130:25 131:4
131:20 146:19
147:5,14
255:19 316:2,3
316:4,5,6,7,8,9
316:10,11,12
316:13,14,15
316:16,17,18
316:19,20,21



316:22,23
317:2,3,4,5,6,7
317:8,9,10,11
317:12,13,14
317:15,16,17
317:18,19,20
317:21,22,23
**changed** 49:19
49:20 60:24
88:14 128:23
129:4 131:16
131:19,25
175:8 252:17
**changes** 130:7
132:4,11,22
315:11,14
**changing** 111:9
130:22 175:6
273:1
**Chaparral** 9:22
291:24,25
292:1,5,8,9,11
292:13 293:1,2
295:14
**charge** 20:18
38:21,23
**charged** 20:11
21:3
**chart** 146:18
148:9,10,11
152:24 179:10
183:2 187:24
**chat** 260:12
■■■■■ 10:7
280:6 283:21
■■■■■
284:19
**check** 54:7
294:24 305:24
**checked** 61:9
**checks** 55:8
**chicken** 112:24
113:22 118:19
119:19 121:8
121:10 122:10
**chief** 58:10,13,14

58:19 59:5,12
175:1 178:19
185:23 252:1,4
253:16 256:8
**chiefs** 60:8
**children** 112:24
**choice** 207:18
**Christian** 16:9
**Chula** 15:9,10,14
158:16
**circumstances**
62:16 87:23
88:9 89:16
90:10,17,24
117:6 133:19
198:13
**citation** 20:14
**cited** 20:15 21:3
**citizens** 159:15
160:11
**city** 20:22
**Civil** 23:8
**claim** 188:7
199:4 225:7
226:22 227:9
**claims** 50:19
**clarification**
138:7
**clarify** 52:18
67:16 90:4
261:3 290:3
299:5 301:2,2
**clarity** 228:8
**class** 5:8 11:20,24
**Claudia** 8:19
224:6 225:16
225:19
**clear** 46:17
149:24 160:12
188:19 189:2
211:10 218:24
**clearance** 50:25
**cleared** 213:5
**clearly** 110:19
**Clifton** 74:15
**climbed** 211:5

**close** 64:9 154:14
**closed** 213:25
**closely** 276:3
**close-out** 237:14
237:21 238:22
240:5 241:17
**cloud** 259:3,7
**coaching** 44:16
**COB** 9:11,16
**coffee** 272:21
273:2
**coincidence**
128:3,7
**colleague** 12:4
243:8,21
**colleagues** 238:5
**collective** 147:25
**college** 49:9,11
50:18,18
**colloquy** 12:25
**column** 146:18
146:24 152:13
183:10 184:10
188:4 191:14
194:1
**columns** 192:21
**combined** 165:8
**come** 29:5 51:21
54:21 60:5
126:7 128:18
150:21 165:13
166:15,22
198:3 199:18
211:12,25
213:6 215:15
252:6 296:22
298:25 301:16
**comes** 112:23
298:6
**comfortable**
121:11
**comfortably**
120:23
**coming** 47:5
72:13 118:7
164:2 171:11

243:13 256:22
260:14 273:13
275:14 278:1
284:13 309:15
**command** 10:5
276:14 277:18
278:6,7 279:3
279:12,21
280:20
**commander** 33:4
33:16,19 58:8
58:11 59:16,19
59:24 60:2,3,4
60:13 61:19,23
63:10,13,17
64:17,24 65:2
96:3 172:9
253:5 288:17
288:18
**commanders**
63:18
**commander's**
64:12
**commissioner**
136:12,13,18
234:8,13,15
235:8,15,24
**committing** 21:3
**common** 80:25
**communicable**
113:22 114:2
123:16
**communicate**
256:2 281:24
**communicated**
282:9
**communicates**
295:8
**communicating**
189:3 248:25
**communication**
74:13 78:4
251:13,24
252:18 255:16
264:13 268:14
302:25

**communications**
24:25 49:20
75:13,14,16
188:20 239:4
244:13 253:7
253:13,18
256:16 257:23
258:20
**comparable**
249:16
**compiles** 279:18
**Complaint** 41:12
**Complaints**
40:16,17
**complete** 52:4
53:9
**completed** 214:9
241:24
**completes** 88:7
**compound** 274:7
**comprises** 281:8
**computer** 259:3
275:25
**computer-gene...**
21:21
**concept** 109:5,8
109:20 110:25
196:8
**concern** 227:8
**concerning** 29:8
**concerns** 257:1
297:13
**concise** 44:13
**concluded**
313:24
**concludes** 313:20
**conclusion** 96:23
202:2 210:9
212:2 226:20
**concrete** 111:8
131:20
**concurrently**
251:18
**conditions**
297:14
**conducted** 31:10



conducting 55:6
confer 239:6,8,12
  239:25
conferencing
  216:10
confident 302:17
confidential
  312:25
confidentiality
  313:1
configuration
  147:15
confirm 214:25
confirmed
  279:12
confusion 190:21
Congress 15:24
  78:11
connect 213:1
connection 36:9
  36:12 42:9
  82:15 83:3
consequences
  20:4
consider 101:4
  155:17 241:12
  310:22
considered 112:4
  123:24 201:9
consistent 153:19
  154:10 164:24
consolidated
  28:11
constant 48:21
  48:23
Constitutional
  2:8 11:22
constrained
  90:25
constraint
  172:21 173:1
constraints
  172:18,23
  176:11
constructed
  146:2,9

construction
  145:25 146:3,7
  146:10 214:12
  214:17
consult 75:23
contact 252:2
  254:10,10,25
  256:1,11
  258:24 260:3
  265:22 266:17
  268:10 297:19
  298:23 299:20
contacted 251:15
  251:15 253:23
contacting
  174:25 253:23
  296:20
contacts 249:6,25
  251:24 255:4
contagious 113:3
  113:13 118:17
contain 76:22
contained 269:4
  298:11 300:12
containing
  294:20
contemporane...
  132:5
contemporane...
  132:22
content 259:14
  260:20 263:10
  264:15
contents 96:17
  168:12 259:4
context 125:20
  140:16,24
  285:4
contingency
  100:1,9,13,25
  101:4 102:5,11
continue 99:17
  99:19 173:13
  186:20 188:17
Continued 3:1
continuing 6:1

7:1 8:1 9:1 10:1
  299:18
continuously
  171:19
contract 302:14
  302:18 303:2
  305:16
contracted 116:3
contracting
  113:3 118:17
control 114:12
  116:2 229:23
  279:13
controlled
  291:25
conversation
  16:20 26:20,22
  27:2 32:17
  33:25 39:1,5,11
  39:13 76:16,20
  76:23,24 77:17
  150:16,24,25
  151:1,8,13,22
  152:4,22 153:1
  153:3,5,6,7,12
  185:20 186:1,5
  240:25 241:1,6
  308:6
conversations
  27:4 28:1 34:2
  34:4,8,9,13,18
  35:6,11 36:11
  39:19 47:20,25
  62:1 76:17
  77:16 185:16
  241:12
convert 161:2
converting 297:3
convicted 20:10
conviction 20:18
Cool 244:8
copied 139:13
  144:17 224:12
copies 205:4
copy 23:14 95:16
  134:10 139:9

139:11 202:23
  203:21 217:6
  219:15 224:5
copying 143:10
corner 208:11
correct 21:1 22:7
  24:7 48:22 49:4
  49:5 56:10,11
  56:14 58:9
  59:24,25 60:18
  60:19 66:13,17
  66:24 71:21
  78:20 79:16
  81:1 82:3,12
  86:7,8,17,24
  87:3,10,18
  88:15 89:2,3,7
  89:21 90:8,9,12
  90:14 91:11,12
  92:8 95:18,19
  96:14,15,21
  97:5 98:1,12,13
  98:18,19 99:8
  100:4,5,16,17
  100:20 101:1
  101:17 108:2,3
  108:5,6,10,11
  108:24 109:6
  109:12 111:23
  112:17 113:8
  115:11 116:25
  119:4,12
  123:22 125:3,6
  125:7,9,12,13
  125:18 126:11
  126:12,25
  127:19,20,24
  129:13 130:13
  130:18,19
  131:4,5,11
  132:24,25
  134:18,19,21
  134:22,24,25
  135:3,4,7,10,16
  136:14,15,18
  136:19,21

137:21,22
  138:1,11
  139:15,16,20
  139:21,23
  140:1 141:10
  141:11,14,21
  142:1,11,12,17
  143:12,13,16
  143:17,20,21
  143:24 144:2,5
  144:17,18
  145:8,9,11,14
  145:17,18
  146:15 147:19
  147:20,22,23
  147:25 148:5,9
  148:12,19,20
  148:23 149:1,5
  153:20 158:7,8
  158:10,11
  159:8,23 160:1
  161:15 162:5,6
  162:9,14,15,17
  162:20,21,25
  163:12,13,18
  163:19,23,24
  164:3,4,15,16
  165:21,22
  166:12,13,16
  166:17,23
  167:24 168:9
  168:13,16,20
  168:21 169:15
  169:23 170:2
  170:11,12,16
  170:25 171:1
  174:1,2,7,12,15
  179:12,13,15
  179:16,20,24
  180:4,5 181:6,7
  181:15,16,20
  181:23 182:25
  183:1,5,6,8,9
  183:16,24
  184:25 185:1,5
  187:13,14,17



187:18,22
188:2,3,5,6,8,9
188:21,22,25
189:1,19
191:24,25
195:24 196:8,9
196:11,12,16
196:17 197:8
197:13 199:5
210:18,19,23
211:12,25
212:21 214:3,4
214:6,9,10,14
214:15,19,20
215:12,13
217:11,12,14
217:15,17
218:5,6,8,13,17
218:21,25
219:1,21,22,25
220:6,7 221:22
221:23 222:1,2
222:5,6,10
224:12,13,15
224:16 225:11
226:14,15,17
226:18 229:20
229:21,24,25
230:13,14,18
230:19 231:7,8
231:16,17,19
231:20,25
232:1,3,4,7,8
232:10,11
233:5,6,11,20
233:23 234:2,3
234:5,8 235:6,7
236:17,18,21
236:22,24,25
237:4,5,8,9,18
237:19 240:18
243:2 248:10
248:14 250:9
251:16,17
253:25 254:1
257:8,9 260:24

266:5,6,23
268:12,16,18
268:19,21
269:7,11 273:4
273:5 274:13
274:15 280:25
281:13,15
283:8,9 284:25
287:4 292:7
295:16 296:15
296:16 298:11
298:12,16,17
299:4,11,25
300:8,9,14
301:12 307:24
308:7
**correcting**
150:10,15
**corrections**
315:11
**correctly** 92:25
100:11 116:4
126:8 127:15
137:16 140:13
141:15 145:5
146:21 169:10
170:7 171:12
180:17 181:1
201:20 204:4
204:18 205:11
210:1 220:14
220:21 222:9
222:20 225:9
226:5,11
234:19 235:13
**counsel** 2:1 11:15
21:23 26:3,4,7
26:9,19 27:1,4
27:11 28:6,8,17
28:21,22,25
29:18 30:22
31:3,5,8,11,20
32:18,25 33:6
34:12,14 35:1,3
35:5,17,21,25
36:6,8,25 38:21

39:10,12 41:18
41:20 43:8,8,8
43:16,16,17,22
43:22 44:6,25
74:5,7 83:15
175:1,2 190:19
239:1,25 240:9
240:11,12,14
240:19,20,21
240:22 241:14
257:19,19
259:17 267:6
278:14 295:20
**counseling** 21:16
21:19,25 22:4
**counsel's** 265:2
**count** 149:8
150:11,12
**counterparts**
251:6 278:9
**couple** 18:21,22
27:12,12,13,14
45:15 49:19
66:11 71:7,7
154:24 252:22
260:16 262:9
272:10,21
297:12 310:21
313:16
**course** 40:20
96:21 135:6
139:19 168:8
240:25 247:8
276:5 278:17
**courses** 50:3 52:8
52:11
**coursework**
52:13
**court** 1:1 11:8,13
12:8,10,22
14:14,16,17
15:4,7,14,15
17:2 18:5 20:20
41:14 81:7
83:19 109:14
109:22 131:12

131:15,15
148:17,21
149:3 154:4,13
154:16 190:18
194:24,25
244:22,24
306:13,15
313:2,13
**courtroom** 20:1
**coverage** 280:7
**Covina** 20:22,25
**CRANFORD** 3:5
**create** 157:13
207:22
**created** 84:19
97:11 157:10
299:7,10
**creates** 205:5
**creating** 97:3
**credible** 226:22
**credible-fear**
227:9
**credits** 49:22
**crime** 20:10 21:4
**criminal** 14:16
14:20 20:4
**crisis** 248:6
**cross** 48:1 197:23
198:4
**crosses** 47:19
**crossings** 213:20
**Cross-border**
212:21,24,25
213:8,13,23
214:2
**Crouston** 6:22
178:14 180:19
185:23 253:17
254:21
**Crouston's**
178:17
**CSR** 1:25 314:23
**cue** 258:2
**current** 50:8
65:10 146:1,20
158:5 220:12

233:8 234:15
243:4 253:16
280:5
**currently** 60:25
179:12 267:21
267:22 268:5
285:9
**cursory** 55:7
**custody** 6:24
84:12,16,18,21
85:25 87:24
91:5,7,8 101:13
125:23 140:25
140:25 141:1,2
158:5 161:3,6
165:13 179:7
179:12 181:18
181:19,25,25
182:3 183:4
187:21 190:13
219:3 232:6
250:24 275:17
297:3 310:21
310:23 312:6
**Customs** 5:14
9:20 13:22,24
14:5 23:9 86:1
204:9
**cut** 17:17 44:18
177:14
**cuts** 12:25

**D**
**daily** 6:23 84:19
109:17 129:12
130:1,5 157:16
276:15 277:12
280:16 281:7
281:21
**dash** 245:12
**data** 8:13 129:24
263:18,22
**database** 224:21
**data-sharing**
271:6
**date** 5:11,12 51:6



53:13 54:7
56:16 78:19
95:9,10 115:2
125:2 173:2
176:3 186:4
187:16 306:1
316:24 317:24
**dated** 202:20
224:6
**dates** 59:13,21
85:5,6,12 167:6
**day** 6:12,16
27:14 39:3 58:3
58:4,6,6 65:1
68:4,5 72:11,11
91:4 101:19
110:21 111:11
111:16 113:2
118:18 128:1,4
128:16 129:10
129:20,20
130:8,18
131:19 132:1
147:13,15
158:19 162:17
163:18,25
166:14 167:1
170:15 171:8
176:14,15,17
181:25 182:7
183:8 184:13
184:13 217:21
217:25 218:12
218:17,21
220:17 249:9
253:20 255:5,6
256:7 257:3,6
261:7 266:12
266:18 277:10
277:14 282:20
282:23 283:2
295:13 296:12
297:6,12,24
299:19 311:22
312:3,12
314:19 315:16

**days** 16:23 27:13
84:17 128:8,13
157:22 158:1
162:22 166:21
175:13,15,17
175:19 176:7
176:10 182:23
218:24 220:5
220:18 297:13
310:22 312:25
**day-to-day** 48:5
109:19 111:1
184:22 188:18
**DEA** 86:12
**deal** 222:24
228:4
**December** 10:4
14:12 49:1 51:7
213:19 214:2
214:23 215:5
253:3 254:7,12
258:18 276:13
288:5 303:25
**decide** 50:21
61:21 89:16
90:11,17
199:21
**decided** 100:24
128:1
**deciding** 61:12
**decision** 40:5
55:4 61:23
84:24 85:2
89:12 121:19
176:12 205:22
206:1,2,5,10
312:12
**decision-makers**
110:19
**declaration** 16:3
16:5 59:14 81:6
81:7,22,24
82:15 83:3,6,14
83:16,22,25
84:4,7,11,22
85:7,21,22 90:6

97:24 98:3,6,8
98:22,25
148:15,16
154:3,9,17
181:9,11
182:25 187:17
315:6
**declare** 315:7
**decreased** 215:11
**DEEF** 260:18
**deemed** 89:4
**Defendant** 12:3
**defendants** 1:10
2:14 5:7 8:3,5
208:15 313:5,8
**Defendant's**
208:12
**define** 51:15
67:24 71:3,17
71:20 72:18,19
72:25 73:1
184:2 213:22
274:17 289:12
289:15
**defined** 73:7,11
110:13 111:3,7
130:12 183:25
**defines** 69:11,25
70:5,8,16,18,23
71:14
**defining** 112:10
185:2
**definition** 5:5
72:2 75:10
77:22 78:5,11
79:22 80:5,17
80:19,19,25
105:11 108:22
111:8 124:4
195:2 201:2
290:18
**definitive** 199:17
**degree** 49:8
**delegado** 255:20
**delivered** 78:10
**demographic**

310:12
**demographics**
147:5 312:4
**denied** 202:9
204:13 205:10
**Department** 2:15
12:2,7 19:13
86:4 87:9
**depend** 121:5
272:1 284:11
**dependent** 87:13
87:15
**depending** 97:10
147:3 195:25
196:2 256:15
310:6
**depends** 166:24
271:20
**depicts** 193:25
**deposition** 1:13
11:5,10 12:12
15:17 16:16,19
18:18 19:12,17
23:9 24:9 27:20
33:2,21 36:14
36:17,25 37:8,9
41:21 76:19
77:19 80:16
81:18 91:23
92:2 95:7
114:24 124:15
132:20 134:7
139:6 143:4
156:12 164:13
167:20 178:2
182:19 187:4
190:17 191:8
192:20 193:19
200:15 202:14
208:3,9 209:2
212:7,13
216:21 219:7
221:12 223:25
228:6,8,10
229:7 230:22
236:13 240:24

294:17 306:19
309:5,8 312:24
313:20 314:10
315:1,8,12
316:1 317:1
**depositions** 43:9
**deputy** 30:10,12
32:25 33:16
136:12,13
137:2
**Descendent's**
208:11
**describe** 63:12
**described** 147:21
161:13 230:6
230:10,15
**description** 50:14
146:25 147:18
152:13
**designated** 92:23
93:2,5,8,11,13
93:14,17,22
94:5,11 97:25
98:9,21 148:18
148:22
**designations**
313:1
**detail** 28:13 34:5
47:6 262:19
280:22
**detailed** 33:17
**details** 226:25
237:15,25
242:2,2,6,16
263:2
**detain** 89:1,12,12
89:17 90:11,18
**detained** 89:5
114:5 115:22
**detainee** 162:1
163:16 165:20
**detainees** 145:4
158:5 183:4,23
232:6 312:4
**detaining** 87:18
**detention** 5:16



10:12 69:6
70:11 97:15,22
98:17 100:15
102:1 110:21
114:6 115:4,23
116:9,25
117:21 118:1,9
118:17 119:4
119:20,23
120:3,5,6,19
121:10,24
122:12,13,22
122:24 123:4,8
123:20 126:16
141:19 145:1
145:10,13
150:1 154:23
160:14 165:14
167:4 286:17
**determination**
117:5 118:14
**determine** 72:17
93:17,22 94:4
129:25
**determined**
111:15 127:23
**determining**
112:4,11
**device** 266:17
**devices** 262:13
**DFO** 29:19,21,22
30:10,12 31:22
32:6,24,25
65:13 137:3,7
137:19 138:14
273:19,19
**DHS** 19:14
269:22
**dictionary** 5:6
80:6,18
**Diego** 1:19 11:1
14:1 15:8 24:5
24:19 25:15
29:24 34:25
53:14,17,17
65:7,12,14,18

66:10,13 67:13
100:24 132:24
143:20 174:19
195:13 196:6
207:16,23,24
221:6 229:19
241:15 242:19
242:22,24
249:13 278:4,6
280:20,20
299:24
**differ** 72:10
**difference** 54:25
56:22 69:12,20
79:7
**different** 34:2,4
44:20 57:20
58:19,20,20,21
67:25 68:5
72:15 232:21
259:12 261:16
275:15 281:12
296:7 301:3
**differentiated**
198:7
**differentiation**
198:23
**direct** 114:11
116:1 133:14
133:19 186:9
229:23 241:16
247:11 284:18
**directed** 32:17
**direction** 31:4,7
31:10,13,19
314:14
**directive** 5:15
115:2 117:20
117:25 118:6
**directives** 117:10
**directly** 118:7
137:19 195:12
307:25
**director** 13:25
14:2 29:23
33:11,13 47:17

47:22 48:1
53:22 65:7,11
65:17,21 96:1
141:10 142:14
143:19 149:14
150:17 172:11
172:15 229:18
237:4 273:19
289:1
**directors** 229:22
237:2
**disagree** 23:2
226:19
**discipline** 22:3
**disciplined** 21:13
305:21
**discretion** 110:3
117:4,9,17
118:23 119:11
**discuss** 29:17
30:25 71:3 74:4
74:7 272:3,12
**discussed** 31:7
32:8,9 43:18
47:1,4,11 74:10
75:5,8 182:24
**discusses** 74:17
**discussing** 27:15
74:24 279:3
**discussion** 26:8
26:14,16,17
240:9,11,13
**discussions** 47:17
48:2 172:8,10
**disease** 113:22
114:2
**diseases** 123:17
**displaying** 17:22
**disposition** 47:5
**distance** 275:19
**distinction** 68:9
68:18,25
**distinguish** 127:3
141:18 234:21
**distinguishing**
233:19

**distributed**
242:21,24
**distribution**
229:9,14,17
**District** 1:1,2
11:7,8 74:20
**division** 65:17,18
66:4,7
**document** 17:24
17:25 23:7,10
23:11,15,20
29:6 32:7,8,10
32:12 45:4
70:23 71:14
82:3,6,9,12
95:7,21,24 96:6
96:13,17,20,25
98:16 102:14
102:18,25
103:14,23
104:7,16,25
105:22 106:6
106:15,23
107:6,12,17
108:5 112:3
114:24 115:6
115:15 118:11
130:12 151:1,5
157:3 164:12
164:21 165:19
166:2 186:5,15
191:18 193:7
194:12 203:2
208:10 212:14
247:4 248:4
257:25 258:9
261:19,25
269:6,10
270:20 277:2
284:1 287:1,9
294:6,13
304:12 309:7
**documentation**
7:21 88:6 202:8
204:2,15
205:20 206:6,9

206:10,17,21
206:23 207:1,4
207:11,17,19
207:22
**documented**
132:14,22
153:16
**documenting**
132:4
**documents** 23:17
28:3,5,7,12,16
28:20,24 29:2,3
29:9,11,14,17
29:20 32:5
35:22,24 36:3,4
40:11,18 41:14
41:20 42:3,4,15
43:9,21 44:6,24
45:1,3,6,12,15
48:11 55:23
71:2 85:24
86:16,23 87:2,6
88:9,11 89:6,18
123:18 125:23
132:21,21
154:4 159:16
160:11 190:20
195:21 196:15
196:20,23
198:8,22 207:8
250:17,20
259:1 260:23
276:2 294:10
294:16 297:5
**Doe** 16:7,9
**doing** 16:25
17:15 18:17
55:15 56:3
175:10 216:4,8
**DOJ** 18:4 35:1,5
35:17,21,25
36:6,10 43:8,16
43:22 257:18
**domiciles** 282:17
**domicile-specific**
282:13



double-check
  56:15,21 59:13
  59:21 63:6
double-occupa...
  213:13
draft 83:19
drafted 83:16,18
  96:13,16 101:2
  125:1,5 168:8
drafting 95:20,24
  98:16 108:4
  110:2
drastically 310:3
drew 260:11
drive 84:19 259:3
driver 14:22
drives 109:16
driving 15:1
drop 303:23
dropped 258:17
dual 65:19
due 50:7 312:5
DUI 14:21
duly 13:5 314:9
duplicate 29:4
duties 125:6
  135:6 139:20
  302:20
duty 51:12,16,18
  52:1 183:18
  185:24 215:22
dynamic 111:10
  130:7
dynamics 72:8
D.C 2:6,19

_____

E

EAC 36:18 233:8
earlier 18:12
  25:23,24
  100:18 132:12
  139:17 166:21
  181:11 244:11
  260:2 284:23
  296:8 297:2
  298:13 302:21

  309:8 311:7
early 45:24 51:11
  53:15 252:9
  273:20 285:15
  285:16
earn 173:6
East 66:20
  146:10,12
  209:15,19
  210:6,22
  212:20 213:24
  214:8 291:23
  295:15 297:8
Eastern 74:20
easy 244:4
education 49:7
Edward 10:7
  280:6 283:21
  284:18
effect 242:19
  243:1
effective 115:2
effectively
  123:20 237:11
efficient 252:10
effort 160:13
  207:21
efforts 5:23
  134:21
egregious 22:1
eight 49:24
  128:18
either 21:10
  30:23 39:15
  43:22 47:2
  53:14 64:9
  91:21 153:20
  169:14 203:3
  248:12 266:20
  266:24 275:12
  276:2 280:18
El 229:19 235:11
  279:13
electronic 28:11
elements 161:1
elicited 44:10

eligible 88:13
emergency 278:5
  278:16 280:19
employed 13:19
  13:21 50:18
  52:2 96:14
employee 135:6
employees 43:7
  71:20
enable 129:24
encompassed
  67:19
encounter 14:22
  55:3 210:23
encountered
  211:6 213:8,10
  249:19
encounters 211:8
ends 165:19
end-of-shift
  276:14 277:10
enforceability
  250:2,3,5
enforcement
  5:11,13 7:3
  56:9 65:17,21
  65:25 66:3,4,7
  84:20 86:2
  95:11 108:1
  109:6 111:2,22
  113:12 157:5
  157:15 163:11
  178:20 251:6,7
  258:17 260:12
engaged 195:14
  195:19 196:19
English 79:22
enlarged 25:12
enrolled 49:18
ensure 33:4 34:5
  57:12,22 83:24
  113:16,17
  239:3 288:8
ensuring 60:8
enter 55:23 88:5
  88:10 125:23

  201:15,24
  210:6 250:18
  250:21
entered 51:18
entering 123:4
  201:14
entire 36:24
  315:8
entirely 87:8
entirety 36:22
  37:3
entitled 23:7
  24:15 75:19
  191:9 200:21
  208:10
entrance 209:15
  209:19 210:7
  210:22
entrances 291:25
entrance-on-d...
  51:6
entries 298:15
entry 5:10,17
  7:11,13,16 9:22
  14:25 33:6
  38:11,16,17
  39:22 40:2
  48:14,22 52:14
  53:20,21,22,25
  54:4,10 56:8
  58:8 60:17,18
  60:21 62:18,21
  63:14 66:12,15
  66:16 67:2,8,13
  68:6 72:5,10,10
  72:12,17 73:2
  78:18 79:2 87:8
  88:5 90:8,23
  91:5 93:19,24
  94:6,13,19
  100:14,20
  101:21 112:17
  115:5 117:24
  118:6 123:25
  127:19 128:10
  128:23 129:9

  130:1,12
  132:23 133:14
  137:7 142:16
  146:2 150:8
  151:8 153:10
  154:6 159:5,17
  160:7 161:14
  161:18 167:4
  171:15 174:19
  175:13 176:8
  177:14 179:15
  183:3 189:9
  191:10,12
  192:23 193:12
  194:10 195:14
  195:19,25
  196:3,4 201:25
  202:9 204:14
  204:17 205:10
  207:5,16,24
  211:24 213:6
  213:21 214:19
  215:5 216:13
  216:16 228:16
  229:24 230:3,8
  230:12,17
  235:23 248:25
  256:20 261:8
  268:11 285:19
  285:23 291:2
  291:11 292:4,6
  292:14 293:3
  296:14 298:5
  298:20 299:2,4
  299:21 300:4,5
  300:18,25
  301:11,23
  302:12 303:22
  304:3,11,15,22
  305:5,7,13
entry's 95:18
  108:1 138:10
  149:16
environment
  60:15 65:19
EOSR 10:5



equals 217:25
equipment 12:13
ER 147:2
Eric 6:22 178:13
    185:23 253:17
    254:21
ERO 6:24 141:2
    219:2 252:6
    310:19
ERRATA 315:1
    315:12 316:1
    317:1
escort 5:16 115:4
escorts 295:14
Esq 2:4,9,16,17
    3:7,8 9:18,19
essentially 16:19
    64:18 169:12
    237:6
estimate 27:24
    27:25
et 1:4,8 315:3,4
Evan 10:3 276:15
    279:19 280:4
evening 231:22
    234:18
event 45:14
events 29:16 33:5
    60:5,12 63:21
    63:24 64:8
    161:13 205:8
    297:12
eventually 85:24
everybody
    110:14 189:17
everyday 48:3,8
    80:25 126:24
    191:12
evidence 7:10,12
    7:15 80:2 88:17
    153:22 191:9
    193:25 194:5
exact 39:3 53:13
    54:7 61:8
    177:17 186:4
exactly 26:21

71:17 85:1
    172:25 253:12
    267:15 306:1
examination 4:1
    4:4 13:8 24:16
    55:13 74:19
    243:16 303:19
    308:20
example 147:1,9
    256:19
exceeded 160:11
exception 44:8
    244:2
excerpts 37:1
exchange 219:20
    286:16 294:2
excuse 21:8
    165:10 190:18
    211:7 223:12
    246:23 280:17
    283:20
executed 82:11
executive 136:17
    237:4
exhausted 160:13
exhibit 5:3,5,7,7
    5:10,14,19,21
    6:3,6,10,15,19
    6:22 7:3,6,8,10
    7:10,12,15,17
    7:20 8:3,6,8,11
    8:14,18 10:22
    24:10 25:5
    80:11,16 81:12
    81:17,20 95:1,6
    95:13,16 99:21
    102:6,24 103:5
    103:11,13,20
    103:22 104:4,6
    104:13,15,22
    104:24 105:18
    106:5,14,22
    107:16,23
    114:18,23
    124:14,16,20
    134:1,6,7,11

135:23 139:1,6
    139:10 142:23
    143:3,4 151:25
    156:11,14,15
    161:24,24
    163:3,3,4 164:7
    164:12 167:13
    167:20,21
    177:20,21
    178:2,6 181:9
    182:12,19
    184:24 187:4,4
    187:7 190:16
    190:16,20,25
    191:2,7,9,15
    192:13,14,19
    192:19 193:16
    193:19,20,24
    193:25 194:5
    194:16,22
    200:14,16,20
    202:13,15,19
    208:3,4,9,18
    209:5 212:5,7,8
    212:13 216:21
    216:23 217:2
    219:6,8 221:11
    221:13 223:24
    224:1 228:5,8
    228:10 229:2,7
    230:21,23
    236:7,12
    244:23 245:2
    245:12,18
    246:11 248:18
    257:13,18,21
    270:21 271:1,3
    276:6,11,13
    283:13,18,20
    286:8,13,15
    293:20,25
    294:2 306:14
    306:15,18,20
    306:24 309:4,5
exhibits 5:1 6:1
    7:1,13,15 8:1

9:1 10:1,21
    17:22 166:19
    190:21 245:8
    246:15 294:21
exist 154:19
existed 154:18
    302:19
exists 112:10
    129:24 131:14
exit 88:4 156:25
expand 160:13
expect 109:14,22
    131:12 211:20
expectations
    172:5
expedite 223:4
expedited 7:18
    86:17 89:7 90:1
    200:22
experience 213:7
    280:3,8
experiences
    201:22
explain 32:12
    36:20 46:10
    54:24 55:16
    56:22 58:12
    110:24 111:5
    118:5 149:10
    149:13,22
    152:5 153:8
    185:6 212:23
    235:21 236:3
    249:10 307:8
    307:15
explained 69:20
    79:6 131:24
    296:8
explaining 46:22
    78:11 118:8
    150:17 185:7
explains 70:6
explanation
    101:3 165:16
Express 212:21
    212:24,25

213:9,13,23
    214:3
extended 61:21
    62:5 266:14
extent 31:6 32:17
    34:7 41:18
    64:24 69:25
    193:5 259:21
    282:25
extra 16:24
    188:11 189:5
    189:12 218:20
extradited
    251:11
e-mail 5:3,3,19
    5:21,21 6:3,3,6
    6:6,10,10,15,19
    6:19,22,22 8:8
    8:11,11,14,14
    8:18,18 9:3,3,9
    9:9,13,13 10:3
    10:7,7,10,10,14
    10:14 26:9,12
    124:20,22
    125:1,2,11,12
    125:15,17,20
    126:2 127:8,17
    127:25 131:23
    134:8,16,17,21
    135:2,5,15,16
    135:19,25
    136:1,3,9,16,24
    139:7,13,13,18
    140:4,6,9,16
    141:3,4,6,17,23
    142:1 143:5,8,8
    143:15 144:1,2
    144:8,11,14,17
    144:20 145:8
    150:5,6,10,15
    150:22 152:1,2
    152:6 156:12
    156:21 157:4
    158:4 161:25
    162:8 163:8,15
    163:22 165:19



167:18,23
168:15,16,23
169:1,4,25
178:3,12,18,25
178:25 179:7
179:17 180:7
180:10 185:7
185:10 217:3,6
217:10,13,17
219:12,15,20
219:24,25
220:3,4,8
221:18,20,21
221:25 222:8
222:12 224:6,9
224:12,12,25
225:1 231:3,5,6
231:15 232:22
233:2,3,25
234:4,23 235:2
235:3 236:16
236:20,23
237:1,6 245:14
245:18 246:10
246:14 247:11
247:24 248:3
248:10 283:21
284:5 286:16
286:20 287:22
288:7,10
290:25 294:2,4
295:5 309:11
**e-mailed** 203:6
276:16
**e-mails** 40:19
125:8 132:14
135:9,13
139:18,22,25
142:2 143:22
144:4 166:18
167:10 168:7
168:12,18
178:11 180:13
221:22 222:4
246:23
**e.g** 115:23

**F**

**F** 309:11
**Facebook** 22:9
22:10,11,14,18
22:21
**facilitate** 18:1
300:3
**facilities** 8:6
91:15,19,24
92:4
**facility** 9:23
93:11 146:4
154:21 158:16
212:17,25
213:1 214:5
272:20,20,22
274:25 275:7
292:24 293:1
**facility's** 214:9
**fact** 47:5 88:11
184:18 206:17
240:7 304:13
**factor** 131:2
**factors** 85:4
93:16 101:19
111:9,14 112:4
112:10,21
130:21,24
174:5 215:15
310:10 311:2,8
311:15,20
312:2
**facts** 44:22 45:2,5
80:1 88:17
131:19 153:22
227:4 241:4
**fair** 65:2 142:4
144:24 277:13
277:15 282:19
289:9,11
299:16 301:18
301:19,21
302:3,5,23
**fairly** 48:21,23
302:17

**Falkoff** 3:8 26:7
34:16
**fall** 66:5 75:15,17
**falls** 75:1
**familiar** 23:1
225:4 263:1
277:7
**family** 112:22,24
112:25 113:7
147:1,2,11,12
181:5 256:25
**FAMU** 147:1
**far** 46:8 59:5
73:8,10 259:7
**fault** 203:17
**favor** 17:6
**FBI** 86:12 251:10
**fear** 225:8 226:22
**feasible** 68:3
**February** 25:20
48:25 56:18
58:7 258:14,15
258:18 288:3
303:24
**federal** 7:10,12
7:15 23:8 86:5
86:9,14 87:10
92:14 191:8
193:24 194:5
278:9,10
279:14,15
292:24
**fee** 213:3
**feel** 244:16
**feels** 55:9
**feet** 209:22
210:15 211:1,4
275:19 298:15
**fell** 53:21
**felt** 55:10 223:17
228:24
**female** 226:8,21
**females** 147:14
**fence** 211:22
**fiancé** 47:6,10
**field** 14:1,1,3

19:18 24:5,19
25:15 29:24,24
34:25 53:18
58:21 65:7,8,11
65:12,15 66:10
66:13 67:14
100:24 132:24
143:20 157:17
174:19 184:5
195:13 196:6
207:16,24
221:7 229:18
229:23 237:2
239:1 241:15
242:19,22,25
260:19 278:4
279:24 299:24
**fifth** 217:19
**figure** 152:23
190:23
**file** 246:13
**filed** 41:13,14
47:1
**files** 28:11
**fill** 133:19
**filled** 183:19
189:11
**final** 20:18 82:8
**finally** 51:2
**find** 25:17 96:7
102:15 164:21
203:1,2
**fine** 20:13,19
133:3 164:23
176:24 243:13
244:7
**finish** 18:14
49:25
**finite** 171:24,24
312:9
**fire** 93:10
**first** 13:5 17:1
23:10 26:12
27:12 35:9,14
51:1 53:3 57:3
57:6,14 58:24

77:9 80:19
82:14 115:1
136:24,25
137:9 158:4
160:19 164:18
165:3 178:5
187:11 201:13
202:22 204:6,7
212:16 219:14
222:12 224:24
226:9 245:25
252:3 261:12
261:17 264:2,4
279:10 311:4
**firsthand** 22:24
**FirstNet** 267:12
267:13 268:5,6
**first-line** 59:2
**fiscal** 173:2
**fist** 256:15
**fitness** 50:25
**five** 34:4,18,21
34:22 36:3
66:18,23 67:8
67:13 249:9
255:5,6,13
272:16 280:13
**Flanagan** 136:4
235:5
**Flanagan's**
136:11
**FLETC** 52:6
**flip** 82:5 102:13
208:17
**Floor** 2:10
**Flores** 10:3,15
29:23 30:1,8,23
31:1,22 32:6,24
137:3,7,19
138:15 276:16
294:3,5
**flow** 63:19
184:16 292:25
297:15
**fluctuated**
110:21



fluctuates 68:4
fluctuating
312:13
fluid 128:20
129:19 130:6
312:13
FMUA 6:4
focus 92:12 98:7
115:16 125:25
135:22,24
136:23 140:3
141:4 144:10
148:15 151:25
154:22 158:3
164:17 178:10
181:10,13
200:24 204:6
217:19 220:2
222:11 224:9
224:24 226:2
231:5 245:11
279:9 281:7
286:20
focused 84:11
97:14
focusing 245:14
248:20 270:19
folder 96:7
294:24,25
follow 31:16,18
32:2,21 303:14
followed 74:22
following 57:12
64:9 85:17
118:6,13 265:2
follows 13:6
176:7
follow-up 64:14
202:6
foot 197:13,16,18
197:20
forced 223:18
226:8,21
foregoing 314:9
314:14
Foret 237:3

form 16:2 64:5
64:21 68:24
78:9 91:13,17
108:25 112:2
116:11 119:6
123:11 198:17
240:4 260:25
291:14 295:19
295:20 296:25
formally 99:16
format 79:14
132:5 157:11
forms 208:14
forth 314:11
forward 222:8
247:7,19,20
found 259:10
foundation 44:17
311:25
four 34:4,17,21
34:22 36:3 49:9
49:23 66:12
113:1 128:18
229:22 263:25
Fourth 8:4
frame 54:15 55:8
85:2 173:9,14
176:4 243:25
257:6 259:2
265:8 272:14
285:24
frames 171:22
Franklin 2:18
fraud 310:5
freight 80:22
frequency 273:6
frequent 273:11
frequently 48:5
Friday 35:9
front 20:21 23:11
25:4 55:25 59:9
80:15 81:17
95:9 114:22
136:1 139:5
140:6 141:6
160:22 161:24

169:4 178:1
182:17 212:12
frontline 54:13
full 13:13 133:15
137:13,20,23
138:1,5,10
159:15 255:13
279:13
fully 20:7 69:16
87:15
function 146:19
147:4
funding 214:22
funds 173:5
further 55:11
209:5 237:15
274:16 303:5
303:19 308:10
312:17,20

## G

gang 310:15
gather 281:2
gathers 295:13
GEICO 50:19,19
general 47:18
48:12 52:11
61:18,25 63:19
63:19 67:3
76:23 83:6
117:25 119:3
119:17 122:21
256:4 282:12
310:16
generally 18:5
45:22 115:19
120:1 122:11
135:12 139:25
197:25 198:1
198:10,13,25
249:20 250:10
251:3 252:14
263:4 268:14
271:18 294:17
294:19 295:16
generate 62:22

generated 29:15
185:19 219:17
genuine 250:20
getting 185:11
266:15 284:12
give 17:2 50:13
57:4 130:5
199:17 206:5
206:10 295:23
given 12:17
36:24 37:1
42:23 50:8 61:7
65:1 86:23
87:24 91:4
110:1,6,21
111:11,16
117:5 128:14
129:10 130:18
130:22,25
131:4 147:13
167:1 182:7
186:8 207:7
243:3 257:6,6
261:7 266:18
296:11 312:3
312:12,14
gives 69:25
giving 81:6 87:16
121:11 186:12
go 16:16,25 18:15
25:22 32:5,7,8
50:23 52:20
58:16 62:12
64:12 72:8 76:1
76:6,14,25
77:14 79:11
80:3 81:20
88:19,24 98:5
98:15 99:10,15
99:16 103:19
112:21 114:16
119:4 120:5,6
120:19 127:10
129:7 132:9
140:21 147:5,7
148:14 149:10

149:12 150:4
151:17 157:17
162:7 165:24
166:9 173:8
176:19 177:1
181:8 182:10
190:1,23 209:4
227:21 235:2
239:15 247:6
251:22 265:14
268:1 270:9
273:7,14 274:4
275:14 278:14
280:12 289:25
291:9,14,15,18
292:22 304:16
305:15 307:10
307:19 308:5
308:11 310:2
311:8 313:7
goes 119:15
213:3
going 16:24
19:12,18 25:21
26:1,25 30:18
31:8,16,18,25
32:2,15,18,21
41:18 64:25
70:12 74:23
75:20 80:16
82:18 85:8,10
102:13 105:19
113:1 118:22
123:18 130:5
133:1 154:2
157:19 165:12
165:25 169:15
176:13 185:4
186:25 188:20
194:25 227:13
242:21 243:7
244:8 247:4
253:20 261:15
262:6 271:11
271:20 278:3
280:11 288:4



299:14 308:23
309:10,23
310:7,8,20
313:14
**Gomez** 6:20
167:24 168:19
168:24 169:2,6
169:12 170:10
309:11
**Gomez's** 168:1
**good** 11:18,21,25
13:10,11 17:3
73:13 177:11
206:4 227:16
227:19 231:22
243:18 249:15
262:19 276:21
**gosh** 54:15
**govern** 109:19
**government**
244:14 265:16
279:14
**governmental**
15:24
**government-is...**
262:13,22
263:10 265:7
266:8 268:15
269:24
**graduate** 49:10
**graduate-level**
50:3
**graduating** 49:23
**grant** 294:12
**great** 34:7 73:14
73:19 239:13
243:18 244:19
245:15 246:8
246:17 248:20
255:3,24 309:1
**greater** 121:1,15
121:19
**greatest** 174:9
**Grossman-Sin...**
1:24 11:13
12:11 314:5,23

**ground** 16:17,24
17:1 243:23
**grounds** 74:18
**group** 22:18,21
22:23,25 29:14
184:15 256:25
260:15,17
295:14
**groups** 22:15
160:20 181:6
251:14 260:16
282:24 283:1
**Grupo** 249:6,10
249:12,14,24
251:15 252:2,9
252:19 253:24
254:11 255:1,4
256:1,3,11,23
257:6 258:25
259:5,8 260:4,7
260:17,21,24
261:6 265:8,22
266:18 268:10
269:5,5 272:25
273:8 282:15
282:17,22,24
283:6,7 284:16
287:19 289:8
289:11,17,25
290:4,14,20,23
291:3,9,19,24
292:7,17,22,23
296:10,23
298:5,23,25
299:20 300:20
300:20,24
301:3,5,7,13,14
304:9,12
305:16 307:10
**GSA** 93:10 297:4
**guard** 116:3
**guess** 29:15
51:17 76:21
254:9 256:15
272:24
**guessing** 173:25

**guidance** 9:7
57:5 68:24 69:7
69:11 70:1
71:19 94:4
138:14 186:8
186:13 206:16
206:20,22
207:1,7 225:5
225:13 228:15
229:10 230:2
230:11 235:22
236:21,24
237:7,11
238:25 240:3
241:19 242:18
242:24 243:1
**guidances** 223:8
**Guisado** 2:9 4:6
11:21,22 243:8
243:11,17
244:20 245:1,6
245:13,16,24
246:12,18,21
247:1,5,8,9
248:17,21
257:10,16
259:17,24
260:1 261:1,11
261:13,22
262:3,16 263:3
263:15,23
264:17 265:1
265:18 266:2
267:5,10,17,24
268:3,24
269:17,20
270:4,8,17,24
274:1,8 275:22
276:5,9,18,22
277:5 278:17
279:1,5,8 281:6
281:10 282:1
283:11,16
284:4 286:6,11
286:19,22
287:5,12 290:8

290:16 291:21
293:13,23
294:11,19
295:2,3,20,25
296:2 298:1
299:15,17
303:4,14
**Gustavo** 33:22
**gut** 112:16,20
**guys** 239:12
██████ 252:2
256:9 280:4

**H**

**habitual** 254:10
**Haitian** 160:21
**half** 28:19 121:1
121:23 209:21
210:15 211:1,4
261:17 270:20
281:9
**handle** 57:5
**Handwritten**
42:19
**happen** 34:9
167:2 267:2
274:6
**happened** 29:16
65:3 158:2
287:20,22
297:12
**happening** 271:9
**happens** 207:10
**happy** 18:1
**hard** 54:17 101:9
101:9
**hate** 272:15
**head** 17:4 129:3
132:18 137:19
151:10
**header** 224:9
**heading** 277:11
277:11
**headquarters**
35:3 184:8
228:20

**health** 86:4 87:9
312:4
**hear** 72:22 131:9
198:6,23 241:8
243:12 267:25
**heard** 42:5 62:6
63:9 66:25 67:4
67:5 198:20
200:6 215:18
215:24 220:23
249:12
**hearing** 22:22
271:12 284:12
**heavy** 221:9
**held** 12:13 62:1
73:23 76:9
133:6 158:13
158:19,25
177:6 183:23
227:24 239:19
270:13 272:18
272:19,20
274:21 278:21
297:7 308:15
**help** 171:10
309:14
**helpful** 18:20
268:8
**helps** 165:17
**hereof** 315:13
**hereto** 24:12
80:13 81:14
95:3 114:20
124:18 134:3
139:3 142:25
156:18 163:6
164:9 167:15
177:23 182:14
187:9 191:4
192:16 193:22
200:18 202:17
208:6 212:10
216:25 219:10
221:15 224:3
230:25 236:9
245:5 257:15



270:23 276:8
283:15 286:10
293:22 306:22
**Hernandez** 65:23
**Hey** 256:16,21
273:1
**HHS** 87:14,18
90:7,17,22
91:19 92:3
**HHS's** 90:25
**Hidalgo** 235:11
**high** 49:8 50:17
142:1,3 144:20
144:22 219:25
221:25 222:18
**higher** 101:17
147:12 157:24
164:1
**highest** 49:6
**highlight** 25:2
37:4 38:7
276:19
**highlighted**
265:21
**highly** 222:5
**Hill** 74:14
**hired** 51:2,21
**history** 50:14
**hit** 64:1,11
100:19,22
126:1,5 191:1
303:9
**hold** 92:15,20
93:8,18,23 94:5
94:12,19 98:10
98:17,21
101:21,24
112:25,25
116:17 118:14
118:23 119:12
119:15 122:6
124:1,4,7,10
127:13,19,24
147:22 148:17
149:7,9 150:1,3
150:11,18

154:10,11,22
155:14,15,19
161:6 203:4
264:12,19,20
269:21
**holding** 79:23
80:21 90:7
133:15 137:15
137:20 138:11
145:2 146:14
146:17 148:2,7
152:14,16
155:18 289:19
289:20
**holds** 154:21
263:21 264:9
270:3
**home** 47:6
215:23
**Homeland** 19:13
**Hood** 5:3,19,22
6:3,7,11 8:12
8:15 9:10,14
10:11 96:3,12
108:14 124:23
125:8 126:19
134:17 135:9
135:13 139:14
139:19,23
140:1,4 141:5
141:23,25
142:7,13
143:10 144:11
144:17,24
149:14 150:7
151:14 152:1,4
152:22 153:3,9
172:15 178:13
217:11 219:20
219:24 220:5
222:4 247:12
248:12 286:16
287:13 288:25
289:15 290:3
291:20
**Hood's** 134:20

**hope** 177:10
258:7
**hopefully** 41:25
**hour** 7:3 18:12
72:11,12,12
133:2 227:14
313:23
**hours** 27:12,13
27:14,18,22
28:14 34:22
35:19,20 36:1
132:19 154:25
181:23 182:1
279:10 293:16
303:8,9
**house** 90:18
151:10 159:5
**housed** 86:12
273:15
**housekeeping**
228:4
**housing** 113:21
114:1
**Howe** 36:18
179:2 231:7
233:4,13 235:5
**hub** 196:7,10,16
196:18
**huge** 310:13
**Human** 86:4 87:9
**humanely** 101:25
102:3
**humanitarian**
249:16,18
**hundred** 61:10
**hundreds** 160:20

———————————
**I**
———————————
**ICE** 86:3 87:9,13
87:18,24 88:6
88:25 89:1,12
89:13,16 90:3,7
90:11,22,24
91:3,6,8,10,24
141:2 219:2
310:19

**ICE's** 91:15
312:5
**iCloud** 269:6
**ideal** 310:2
**identification**
24:11 80:12
81:13 95:2
114:19 124:17
134:2 139:2
142:24 156:16
163:5 164:8
167:14 177:22
182:13 187:8
191:3 192:15
193:21 200:17
202:16 208:5
212:9 216:24
219:9 221:14
224:2 229:3
230:24 236:8
245:3 257:14
270:22 276:7
283:14 286:9
293:21 306:21
**identify** 155:18
**ignore** 117:10,17
**ill** 113:14 114:5
114:10 115:22
116:9,24
117:21 118:1,8
119:3,11
120:18 121:2
122:11,22
123:3,9
**illicit** 55:6
**illness** 113:3,13
118:17 121:6
**illustrate** 85:3
**ILU** 10:4 249:7
250:7 251:23
251:25 252:1
252:25 253:7
255:4 274:10
274:14,19
278:8 280:3,5,8
297:20

**imagine** 97:10
**Imerman** 2:17
12:4,6,7
**immediate** 137:4
**Immediately**
137:11
**immigration**
2:15 12:2 52:12
52:23 86:1
249:15
**impact** 7:11,14
7:16 182:4,6,9
183:8,21,23
184:3,14,18,25
185:3,3,8,13,14
186:10,15
188:5,7,10,15
188:16,16
189:5,8,16,17
189:20 190:3,6
190:7,11
191:10,13,17
191:24 192:6
192:21 193:2
193:11 194:1,8
194:18 195:3,4
232:9
**impeding** 184:16
292:25 297:15
**Imperial** 158:24
159:1,7
**implementation**
24:24
**implemented**
230:2,7,12,16
299:23
**implies** 289:9
**import** 273:19
**importance**
141:25 144:20
219:25 222:1
**important** 12:23
17:14 109:5,8
109:16 110:25
222:5
**importantly** 17:9



impossible
100:19,22
imposters 128:18
250:20
improve 17:11
inability 312:5
inaccurate
125:15 135:19
144:8 152:24
168:24
inadmissible
7:21 55:22
204:1
INAMI 24:25
249:14,16,20
253:12 255:14
272:19 274:25
275:7,20
278:11 281:25
282:3 285:16
285:17 291:25
292:24 296:20
297:19,19
inbox 135:16
144:2 168:16
inception 159:14
186:3 300:15
300:17
incidence 305:19
incident 21:2
62:14,17
223:22
incidents 305:10
include 63:25
149:4 250:19
250:19,20
281:1 297:4
311:15 312:3
included 108:21
165:14 264:19
including 165:4
179:2 276:15
inclusive 64:7
Incorporated
40:12
incorrect 98:23

152:9 170:17
increase 137:4,11
218:12 288:4
increased 214:14
214:19,23
215:5,8,11,16
312:5
increases 13:1
310:24
incur 278:3
incursion 260:15
incursions
278:13 281:3,5
indefinitely 89:2
89:5,16
INDEX 4:1 5:1
6:1 7:1 8:1 9:1
10:1
indicated 310:19
315:12
indicative 166:20
individual 24:4
27:17 34:6
89:25 90:12,18
114:4 254:24
298:15,20
300:5,22
individually
169:14
individuals 39:16
39:17 54:21
88:24 89:1,4
91:7 100:15
101:1 113:21
114:1 116:23
117:20 118:8
119:18 120:2
120:17 121:1,9
121:22 122:5,9
122:13,20,23
123:7 125:22
136:5 143:23
158:7,9,13,25
159:21 160:3
164:1,2 167:5
170:10,24

181:5,19,25
182:3 187:21
202:8 205:18
206:6,11,11,16
206:24 207:4,8
207:15,22
259:1 260:23
285:20 296:13
297:5 298:24
299:1,20 300:7
300:10,21
301:22 302:11
indulgence
294:12
inevitably 292:10
infecting 118:21
influence 15:1
info 64:23
inform 154:4
information 4:19
33:6 44:9 45:7
152:8 212:16
242:11 245:22
259:7 263:7
264:23 269:4
279:17 280:16
280:23 282:3
282:20,25
284:10
informed 148:21
informing 78:5
infrastructure
160:17 165:11
initial 20:14 26:8
26:17 55:2
272:11
initially 50:23
54:13 157:18
198:20 225:7
251:23,25
255:9
INM 249:20
271:5,15 272:6
273:3,7 279:14
295:8,13
296:10,10,12

296:23 302:10
302:24
input 83:19
inquire 75:19
insert 82:23
inside 47:2 293:1
insisted 305:4
inspected 52:15
305:4
inspecting 67:6
67:12
inspection 55:11
57:21,25
250:21
inspections 54:14
Instagram 22:10
instance 100:23
117:23 196:5
211:20 251:10
292:20
instances 100:7
197:7,14,15
198:2 210:10
210:20 291:17
304:11 306:10
Institute 9:21
instruct 31:8,24
31:25 32:15,18
44:7 75:20
85:10,15
264:14,23
instructed 18:6
195:22 255:22
instructing 44:14
75:12
instruction 21:21
21:23 31:17,19
32:3,22 85:18
116:19
instructions 4:9
57:5
intake 5:20 6:20
6:24 123:25
124:10 125:18
125:21 127:24
137:5 145:3

148:6 149:9
154:23 159:19
160:15,25
161:7 162:9,14
162:16,20,25
163:20,22
164:2 166:6,7
166:11,16,22
166:25 168:19
169:9 170:10
173:13 175:21
176:13 219:3
220:6 252:7
253:19,24
254:11,25
255:11 256:2,5
256:6 257:5
258:25 259:8
260:5 261:7
265:9 266:18
268:11 269:6
272:5 273:1,9
274:6,15,17
275:12 282:10
288:5 290:2
295:10,12,15
296:12 297:6,7
297:22 301:16
310:4
intakes 157:25
169:20
intaking 171:20
175:25
intel 260:13,17
intelligence
278:12 281:3
284:12
intending 211:24
intends 211:11
intent 183:10
199:18
interaction
306:25 307:11
307:23
interdiction
63:25



interested 51:17
interim 225:5,13
interject 96:5
internally 138:17
  142:8,15
  149:15 150:7
international
  160:16 209:23
  250:7 251:1,4
  297:8
interpret 138:4
interrogatories
  8:4 37:12 43:9
  208:14
interrogatory
  37:15,21 38:1,7
  161:17 208:22
  208:25
interrupt 12:24
  147:8 149:11
  280:10
interruption
  246:17,25
interviewed
  238:2,6,9
interviews 43:6
  43:18 55:7
investigate 91:23
  92:3
investigation
  237:14,17,21
  237:23 238:3,7
  238:8,11,18,21
  238:22 240:5,6
  241:5,17,17,20
  241:24 242:8
invite 294:20
involved 15:20
  37:18
involves 241:21
involving 302:24
in-depth 55:12
iPhones 263:17
isolated 113:16
isolation 113:8
  116:17 145:14

145:16
issue 240:1
  271:24 272:1,2
  288:8
issued 62:17
  237:7
issues 19:3 57:24
  271:23 272:13
  272:13 273:8
  273:12
iterations 259:23
I-275 221:8
I-275s 222:9
I-275's 8:16

_____

**J**

J 2:16
January 5:11
  8:20 9:23 10:15
  19:9 25:19
  48:16 51:6,9,11
  59:19,20,22
  88:15 95:9
  224:7 253:6
  254:4 271:7
jersey 211:3,9,11
  211:22
job 13:23 53:3
  125:9 135:10
  139:23 143:23
  144:5 168:19
  171:19
Joe 77:5
jog 43:23
jogged 44:1
  45:10,11,14
John 179:2
Johnny 6:7 143:9
  145:1 247:20
  247:21
join 50:21
joined 50:13
joint 9:21 271:4,6
  271:16
Joseph 3:4 11:12
  313:14,18

judgment 262:8
July 6:15,17,23
  7:6,8 84:13,25
  85:5,12,13
  146:1 161:15
  161:19 164:15
  178:14 180:7
  181:14 182:3
  182:20 183:12
  187:13,15
  253:16,21
  254:22,23
  285:14
June 9:4 10:18
  50:8 221:24
  231:2,6 233:4
  234:1 235:4,16
  304:14 306:25
  314:19
Justice 2:15 12:2
  12:7
Justin 6:15

_____

**K**

K 1:8 2:5 315:4
Katherine 2:16
  9:18 12:1
katherine.j.shi...
  2:20
Katie 46:9 71:9
  75:21 203:5,6,8
keep 91:6 199:23
  280:10
Kelemen 6:15
kept 96:20,25
  135:16
Kevin 1:8 3:5 9:3
  17:21,25 23:3
  25:2,10 77:4
  80:10 81:19
  82:6 84:6 94:23
  102:10,13
  133:23 138:24
  142:21 144:13
  156:9 157:1
  162:11 164:6

166:9 167:11
177:19 180:9
182:11 187:2
191:14 192:12
192:24 193:17
194:4 200:13
202:12 208:18
212:6 221:10
223:23 228:25
229:13 230:20
234:4,7 235:3
236:5 244:20
245:13,24
248:17,19
257:10 258:2
261:11,22
270:5,18
275:22 276:18
279:5 281:6
283:11 286:6
286:19 293:13
306:11 307:3
308:24 315:4
kick 100:14,25
kind 26:13 27:15
  50:23,25 51:10
  54:14 57:3 59:5
  65:15,19 66:6
  68:2 69:6
  132:14 213:16
  237:20 249:13
  272:13
knew 110:2,18
  150:24 184:4,5
  184:5,6,7
  188:15,17,23
  189:8,13,15,17
  302:22 305:25
know 17:25 19:4
  20:13,17 21:23
  22:23 23:2
  24:18 26:11,23
  27:12 28:9 29:1
  29:2,3 30:18
  44:12 45:3,9
  47:7,17,20

48:11 50:25
51:7 52:24
57:13,20 58:4
59:14 60:6,9
61:8,10,18
63:21 64:10,23
68:14 69:5 72:2
72:11,13 73:1,8
73:10 74:25
77:8 78:7,21
79:3 88:4,8
89:15,22,24
90:10,16,24
91:2 93:7,12,13
93:16,20,21
94:1,3,8,17,21
97:9 102:8
103:11,20
104:4,13
106:12,20
107:3,14
113:20,25
120:8 121:12
121:15 124:9
128:22 129:2,4
129:6,15,23
130:4 132:13
136:5 138:13
138:16 140:23
151:7,12,21,23
153:7,15 155:5
157:18 158:1
165:9 170:14
171:17 172:12
172:20,25
173:17,18,21
174:2,4,8,10
179:3 182:2
184:5,20
185:13,17
186:3 189:20
190:3,22,22,25
199:15 203:7
206:8 207:6,19
211:16 215:3,7
215:10,14,15



MAGNA ▶
LEGAL SERVICES

216:4 223:13
223:21 224:18
225:19 226:25
227:3 228:19
232:14 237:10
238:8,9,10
240:6 241:15
241:20,21
243:19 244:1
244:12 246:13
246:19 248:5
252:21 257:2
258:6 259:13
259:17,22
261:16 262:13
262:25 267:2
267:20 271:21
271:23,24
272:3,11,15,17
273:10,16,17
273:22 275:19
277:1,18
278:10 279:16
279:23,25
280:15,17
281:17 282:16
283:1,25 285:2
285:3 286:1,3
286:24 290:9
291:17 296:17
299:6 302:6,16
304:10 305:18
306:2,9,14
307:25 310:4
310:11,13
**knowing** 124:7
176:15 226:24
**knowledge** 24:4
24:5 27:16 33:5
34:6 38:15 40:9
68:8,13,19,22
69:8 71:24
79:13,19 89:13
96:17 111:18
112:9,13 114:7
130:14 155:3

159:13 160:8
161:22 174:23
186:7,17,24
205:23 207:25
210:7 216:14
232:17 238:6
241:16,22,23
242:17 251:9
273:17 274:4
274:10,12
280:13 281:20
291:1,4,5
302:15,25
303:3 304:2,5
**knowledgeable**
168:12
**known** 86:2,24
152:15 299:23
**Koseor** 33:14,15
34:1,18 143:11
231:7,10,11,13
231:14,21
232:12,20
**Kylvin** 6:19
167:24 168:19
309:11
**K-rail** 211:2

_____
**L**
**La** 49:12,15,16
49:18 50:4,12
50:15
**label** 222:4
**labeled** 99:25
209:10 309:6
**Lado** 1:4 11:7
40:12,20 41:1
45:24 46:7 47:1
306:6 315:3
**LADO_000186...**
307:2
**lag** 18:19 51:10
203:8
**land** 66:14,16
67:8,13 73:2
207:15,23

211:22,23
213:6 229:23
235:22
**lane** 54:22
213:16,17
**lanes** 159:18
213:9,14,15
214:17
**language** 290:11
291:20 308:3
**Laredo** 229:19
**large** 160:20
173:13,22,25
180:21 181:6
184:15 255:10
282:23 283:1
284:13
**lasted** 26:22
**late** 25:19 51:7
53:15 59:18
160:10 277:20
277:24 285:14
285:15 286:4
**launch** 271:5
**law** 5:6 52:9,12
52:23 80:18
251:6,7 260:12
**lawful** 259:1
260:23
**lawsuit** 21:10
45:19 47:1
**lawyers** 47:12
**lay** 44:17 150:2
**lays** 112:3
**lead** 17:17
307:22 308:1
**leadership** 50:6
60:7 62:1 63:18
68:25 69:11,19
157:17 184:6
189:4 228:15
228:21
**leading** 24:25
311:5,13,23
**learn** 31:21 82:14
**learned** 52:24

82:18 240:8
241:4
**learning** 52:22
**leave** 57:14
166:22,25
180:24 245:25
253:1
**leaving** 51:23
64:18 164:1
**led** 130:21
176:11 238:13
238:23 241:18
**left** 49:23 50:3,12
50:19 51:5,8
146:25 161:1
245:10 253:4
293:16 303:8
**legal** 11:14 30:22
32:25 93:21
96:23 175:5,10
202:2 210:9
212:2 241:1
313:12
**legitimate** 297:15
**lengthy** 257:25
**Lesson** 7:17
200:21
**letter** 9:18
257:18,21
268:23
**let's** 80:9 85:20
94:22 98:5
99:20 102:23
103:10,19
104:3,12,21
105:15 106:2
106:11,19
107:2,11
114:16 115:14
121:8 124:13
133:22 141:3
141:22 147:9
148:14 150:4
151:24 163:2
164:5 167:9
169:1 176:23

182:10 190:15
212:5 219:5
221:10 233:25
235:2 244:4
245:11 285:6
301:25
**Leutert** 42:6,9
**level** 49:6 57:3,6
111:14 137:5
**LGBTQ** 310:17
**liaison** 250:8
251:1,4,5,7,12
**life-saving**
115:21
**life-sustaining**
115:20
**limit** 78:25 126:7
128:17 159:17
184:15 195:16
195:21 196:21
197:11 209:20
210:22 289:23
293:7
**limited** 87:4
173:3 242:2
310:12
**limit-line** 37:22
210:14
**line** 4:10,20
24:15 44:4
57:15 58:22
59:16 78:25
95:11 103:7
105:20 115:3
122:1 125:17
126:7 128:17
134:20 151:16
159:11,12,17
159:22 160:3,6
160:9,16 161:7
161:8 184:16
195:16,21
196:21 197:11
200:25 203:24
209:5,20,23
210:17,22



217:13 222:7
224:11,14
229:9 231:14
236:23 245:20
276:20 277:19
284:7 289:23
293:8 297:7
313:15 316:2,4
316:6,8,10,12
316:14,16,18
316:20,22
317:2,4,6,8,10
317:12,14,16
317:18,20,22
**lines** 58:24
**LinkedIn** 22:9
**list** 64:1,11 218:3
273:24 274:5
274:12 281:12
293:4 298:9,10
298:21 301:14
301:22
**listed** 127:22
147:10 148:8
179:23 191:13
191:17,23,24
192:7 193:2,11
194:8,19
232:10 248:9
**listing** 154:5,9
**lists** 141:25
145:10 148:11
162:14 179:14
219:24 232:6
**litigation** 2:15
12:3 40:13,20
46:2 48:2 82:16
83:3 263:21
264:9,12,16,19
264:20 269:19
269:21
**little** 50:23 61:17
72:15 178:7,9
195:11 228:12
228:14 272:24
276:3

**LLP** 2:4 11:19
**load** 215:15
270:19
**local** 26:6,9,19
27:11 28:22,25
43:8,16 83:15
84:19 175:1
240:21,22
**locally** 51:22
**located** 92:21
151:11
**location** 145:19
146:1 215:23
278:7
**log** 84:13,17,18
84:18,21
181:18
**logistical** 272:13
273:11
**logistics** 275:12
**logs** 259:18,19
**loitering** 304:23
305:1
**long** 14:11 22:11
26:19,21 30:4
34:17 37:25
39:5 53:5,7,10
53:11,12 54:3
69:5 70:11 84:3
84:5 174:22
220:11 243:20
299:13
**longer** 34:20
154:18 182:1
254:5
**longer-term**
155:17
**long-term** 155:17
**look** 28:5,7,23
29:2,6 30:20
59:7,8 61:9
70:9 80:19
139:12 141:23
143:7 145:7
146:24 156:20
163:2 166:1,6

167:9 178:11
183:2 185:12
187:19 190:15
192:25 219:23
221:20 224:11
236:19 252:5,6
262:18 272:12
274:12 276:3
**looked** 23:16
28:12 29:3 42:3
194:15
**looking** 41:24
61:20 85:2
98:14 147:10
163:16,21
173:1 205:1
221:24
**looks** 61:7 132:11
134:16
**Los** 20:23,24
**lose** 262:8
**losing** 262:10
**loss** 262:22 263:8
**lost** 265:19 266:3
266:16,19
268:20 269:1,2
275:25
**lost-property**
263:7
**lot** 38:3 66:3
74:15 216:3
268:8 278:2
**lots** 132:20
**Louisa** 3:7 35:3
**low** 177:15
258:21
**lunch** 176:22
177:11
**luncheon** 177:5
**lunchtime** 176:21
**lying** 20:4
**L-e-u-t-e-r-t** 42:6

———————
**M**
**M** 1:24 2:4
**Madam** 306:13

**Magna** 11:14
313:12
**main** 254:24
**maintained**
125:12 144:2
168:15
**maintaining**
60:10
**major** 49:17
**making** 14:25
27:15 46:14
172:11 189:10
**male** 147:2
**males** 147:14
**malice** 262:8
**mall** 272:24
**management** 7:6
7:8 9:5 44:23
48:10,15 59:6
118:7 170:6,15
170:19 176:12
182:20 184:5
185:7,12
186:10,16
187:13 188:20
188:23,24
189:3,8 190:11
191:13,22
192:7,10,22
193:3,13 194:2
194:9,17
207:18 223:17
231:15,24
232:3,13 233:9
235:17,25
249:7,25
255:19 257:24
**management's**
223:8
**manager** 70:12
**managers** 250:11
250:15
**mandated** 175:25
**manner** 312:6
**manpower**
173:12

**man-hours**
171:24 172:23
312:7,9
**Maria** 11:6
**Maricich** 30:14
32:25
**marijuana** 20:16
**Marin** 1:14 4:2
5:19 6:19 8:8
8:12 9:10 10:4
10:15 13:4,10
13:14 23:6 25:7
25:15 31:6 32:3
32:15 41:17
44:21 58:16
62:12 72:22
74:3 75:4 76:1
76:14 77:14
81:16,24 82:3,9
84:10 92:17
95:5,14 96:25
97:16 99:24
105:16 115:7
115:17 116:5
131:10 133:11
134:5 139:10
140:7,21 143:2
144:16 166:1
167:17 176:6
177:10,25
182:16 186:23
187:12 191:6
192:18 193:10
194:6,15
200:24 201:3
202:22 203:20
208:8,23
212:12 216:22
217:7 219:7,15
221:17 224:5
228:13 229:5
236:11 239:8
239:24 242:14
244:6,6,7 245:7
245:17,21
246:2 247:10



249:3 258:6
260:2 262:4
264:24 265:3,5
270:17,25
271:8 276:10
277:23 279:2
279:11 281:11
283:17 286:23
291:15 293:24
295:4 296:3
303:11 306:19
307:8 308:22
309:3 312:16
312:18 313:20
315:20 316:25
317:25
**Marin's** 200:15
202:14 208:3
212:7 221:12
223:25 230:22
**Mariza** 1:14 4:2
5:19 6:19 8:8
8:12 9:10 10:3
10:15 11:6 13:4
13:14 81:24
220:10 313:20
315:20 316:25
317:25
**mark** 24:9 80:16
81:17 95:6
114:23 124:14
187:3 190:16
190:25 192:13
193:18 200:14
202:13 208:2,2
212:6 216:20
219:6 221:11
223:24 230:21
236:12 306:18
**marked** 5:2 6:2
7:2 8:2 9:2 10:2
24:10 80:11
81:12 95:1
114:18 124:16
134:1,6,6 139:1
139:6 142:2,23

143:3,4 144:20
156:10,11,16
163:3,4 164:7
164:12 167:13
167:19 177:21
178:1,2 182:12
182:18 187:7
190:20 191:2,7
192:14,19
193:20 200:16
202:15 208:4,9
212:8,13
216:23 219:8
221:13 224:1
228:7 229:2,7
230:23 236:7
245:3,8 246:12
257:13,18
270:21 271:1
276:6,11
283:13,18
286:8,13
293:20,25
306:20 309:4
**markings** 28:10
**marshal** 93:10
**mass** 260:15
**materials** 200:21
**matter** 11:6
14:16,20
119:18 228:5
315:9
**matters** 260:8
**maximum** 97:22
100:8 101:14
101:16 127:21
128:5 145:4
148:12 149:4
153:9,19 154:5
**maximum-cap...**
152:23
**Mayer** 2:4 11:11
11:19
**mayor** 297:13,18
**McAleen** 9:3
**McAleenan** 11:7

234:5,7,14
235:4,8,16
**McALEENAN1**
1:8 315:4
**MCAT** 33:16
142:9
**mean** 21:18,19
24:2 32:13 33:9
36:20 42:2,22
48:4 51:15,19
67:10 74:24
75:7 76:25
87:13 93:3
101:13 124:9
125:21 126:20
126:21 140:15
145:24 146:23
147:8 149:11
152:15 158:14
159:12 168:5
169:16,18
170:19 181:4
184:1,2,11
185:3 189:22
190:6 196:2
199:23 213:14
215:14,21
216:8 218:19
224:17 249:3
249:20 274:17
289:13,18,20
289:22 296:4
299:12 300:2
309:19
**meaning** 79:16
147:5 173:12
195:4 196:22
290:18
**means** 35:13
71:13 79:23
124:7 147:3,6
185:14 188:7
189:20 190:3
195:1,3 200:10
201:19 231:18
245:21 278:18

289:15
**meant** 55:16 56:3
108:10,16
110:14,18
126:10 154:23
185:8 186:16
188:15 189:13
189:17 290:4
302:7,23
**measures** 100:25
**media** 278:2
**medical** 50:24
116:16,18
123:2 257:1
272:1
**medication**
115:21
**Medlock** 2:4 4:5
9:19 11:18,19
12:20 13:9 23:3
23:5 24:8,13
25:1,3,9,11
27:5 31:14 32:1
32:20 41:3,11
41:23 44:11,19
46:9,21,23 47:9
47:21 53:1 56:5
57:7 59:10 62:2
62:15 63:1,8,23
64:15 65:5 66:8
67:18 68:7,16
68:23 69:9,17
70:3,14,21 71:6
71:10,18 72:1
72:14,21 73:5
73:12,16,20
74:2,14 75:2,3
75:18,25 76:5
76:13 77:12,13
78:2,16 79:12
79:20 80:7,9,14
81:5,10,15,19
81:21 82:5,7,24
83:1,8,11 84:6
84:9 85:11,16
86:21 88:22

89:14,23 90:15
90:21 91:9 92:9
92:11 94:2,9,16
94:22 95:4 96:8
96:11,24 97:7
98:4 99:4,12,15
99:20,23
101:15 102:10
102:12,23
103:2,9,18
104:2,11,20
105:6 106:1,10
106:18 107:1
107:10,21
108:13,20
109:3,13 110:5
110:11,23
111:12,19
112:1,8,14
113:5,19 114:3
114:16,21
116:21 117:8
117:12,18
118:4 119:1,9
119:16,24
120:10,15,24
121:7,14,21
122:4,19 123:5
123:15 124:5
124:13,19
127:9 129:22
130:9,16 131:8
131:22 132:15
133:1,10,22
134:4 138:23
139:4 140:20
142:19 143:1
144:13,15
149:2,21
150:20 151:6
151:20 152:18
152:20 153:17
154:1 155:6,21
156:8,19,25
157:2 160:5
162:10,12



163:7 164:5,10
164:20,22
165:2,24 166:4
166:8,10
167:11,16
176:5,19,23
177:1,9,19,24
180:9,11
182:10,15
186:21,25
187:10 190:2
190:24 191:5
191:20 192:4
192:12,17
193:9,17,23
194:14,23
195:8 199:1,10
199:19 200:3
200:13,19
202:4,5,12,18
203:4,13,17,19
204:24 205:17
206:3,13 208:1
208:7,17,19
210:12 211:19
212:5,11 215:2
215:9 216:19
217:1 219:5,11
221:10,16
223:6,15,23
224:4,23
225:18 226:1
227:2,7,13,17
227:20 228:3
228:11,22,25
229:4,13,16
230:20 231:1
232:19 233:1
233:17,24
234:12 235:1
235:20 236:5
236:10 238:15
238:20 239:5
239:11,15,23
242:4,12 243:6
243:21 244:11

246:1 258:2,4
258:12 303:7
303:11,20
304:20 305:2
305:11,22
306:11,17,23
307:7,17 308:9
311:3,7,13,17
311:23 312:19
313:7,10
**meet** 33:1 150:18
172:2,4 257:8
271:21 273:2,4
**meeting** 9:23
31:22 32:24
271:4,4,9,12,12
271:14,16
273:13 275:6,8
275:17 285:16
**meetings** 28:3
29:19,25 30:2,4
30:6,9,23 31:1
31:3,10 32:6,9
32:11 33:7
39:15 43:7,15
271:22 272:4
272:17
**Megan** 1:24
11:13 12:11
17:3 314:5,23
**member** 22:8,14
22:17
**members** 278:8
310:15,17
**memo** 264:12,16
264:19
**memorandum**
7:20 9:7 69:18
69:24 131:24
202:20,23
203:21,25
204:7 229:8,15
229:18 230:2,4
230:7,11,16
237:2 240:16
241:5 302:13

302:18 303:1
**memorialized**
68:10,15
302:13 303:1
**memorializing**
301:10
**memorized** 192:9
**memorizing**
263:2
**memory** 25:24
29:6 38:4 43:23
44:1 45:9 59:18
151:4 174:9
266:10 286:1
310:8
**mention** 285:1,4
**mentioned** 36:7
55:14 56:12
103:12 107:15
109:21 187:16
255:14 258:22
260:2 311:16
**mentorship**
57:12
**mere** 88:11
**Mesa** 7:16 38:11
38:15 53:20,21
53:25 54:1,4,10
54:22 56:7
66:19,22 192:6
194:2,10,18
196:4,14
230:12
**message** 253:18
256:21,23
287:7,13
296:10
**messaged** 260:6
**messages** 153:25
259:4,6,10
261:6 268:14
269:5,11,16,23
**messaging**
225:16 257:22
265:8
**messy** 17:17

**met** 27:11 29:22
43:17,18 83:19
272:14,21
**meter** 206:1
251:25 253:3
254:13 288:5
289:3,4 303:25
**metered** 78:17
79:1,6 159:21
159:22 205:19
206:6,11,17,18
206:24 207:4,9
207:15,23
211:10 249:1
296:6 300:11
304:3
**metering** 9:7
24:25 44:22
47:18 48:14,18
48:20,24 49:3
159:15 160:2
161:15,16,19
195:12,15,20
196:19 228:14
229:10 230:2
230:11,16
235:22 236:20
236:24 237:7
237:10,17
240:3 241:18
242:18,25
248:23 252:21
254:7 257:24
258:20 272:5
272:16 273:8
273:20 274:5
285:8 290:22
291:8 292:5,15
293:6 295:18
295:22 296:4
298:19 299:19
299:24 300:2,5
303:22 307:13
**method** 252:18
268:13
**Mexican** 197:19

198:4 211:7
244:14 249:4
249:15 257:23
271:23,25
284:15 285:20
**Mexicans** 284:24
285:2,5,7,18
**Mexico** 10:9
160:12 161:8
195:16 197:22
198:3 201:24
209:25 210:17
211:23 220:13
229:24 235:23
248:24 249:19
251:6 273:4,7
273:23 274:4
274:11,14,20
275:5 278:9
281:13 283:23
284:6,21
287:18 289:7
289:10,13,16
290:13,19
304:9,16
305:16 307:19
307:20 308:6
**Mexico's** 9:20
**mid** 53:15
**middle** 152:1
219:24
**midpoint** 199:22
**migrant** 79:6
137:5,11
223:17 233:10
233:13
**migrants** 48:11
78:17 79:1
157:23,25
159:5 184:20
249:18 277:25
280:23 281:12
281:23 282:4
282:21 295:11
296:6 297:10
297:15 298:5



migrant's 295:12
Migration 9:21
military 279:15
mind 270:18
  276:19 279:6
  281:7 286:6,20
Mini 272:24
minor 20:15
minute 68:5,5
  286:24 294:4
minutes 30:7
  39:7 73:17
  227:18 258:23
  303:10
mischaracterizes
  98:3,25 118:11
  159:25
misplaced 265:20
  266:4 268:21
misplacement
  262:22
misplacing
  262:11
missed 49:14
  164:25
misstates 268:22
misstating
  305:25
mitigate 222:16
Mo 247:14,14
mobile 262:13,22
mode 252:18
model 61:25
Moises 9:14 96:3
  143:10 151:18
  247:13,14
  248:12 286:16
moment 99:11
  116:17 246:9
monetary 312:8
morning 11:18
  11:21,25 13:10
  13:11 61:1
  181:12 253:19
  255:10 256:19
Motion 5:8

move 24:8 99:21
  102:23 104:3
  104:12,21
  105:15 106:2
  106:11,19
  107:2,11 141:3
  141:22 151:24
  152:18 161:10
  163:14 178:24
  219:2 233:2,25
  248:19 261:17
  310:20 311:3
  311:17 312:5
moved 146:7,11
  146:13 162:5
  162:19,24
  163:17 165:12
  165:20 166:15
movement 6:24
  140:12,15,17
  140:24 141:1
  162:1 163:16
  165:20 180:22
  181:4,4 220:6
  252:6 255:10
  278:12
moving 163:20
  165:18,23
  166:5 180:6
multipage 114:24
  191:8 208:10
  212:14
multiple 130:7
  308:6
multi-page 81:22
  95:7
muster 70:15
  155:7 156:1
  288:8
mute 142:20
muted 243:10
myriad 86:11
M-a-r-i-c-i-c-h
  30:16
M-a-r-i-n 13:15
M-a-r-i-z-a 13:15

M-e-s-a 38:11

_____
N
_____
name 12:10
  13:13,17 30:14
  30:15 33:22,23
  38:25 42:6,7,13
  49:14 65:23
  134:12,15
  231:10 300:13
  300:22 301:9
  314:18
names 274:22,25
  300:11,11
narcotics 63:25
narrow 272:15
National 9:21
nationalities
  160:22 162:17
  163:23 166:12
nationals 160:21
  271:24,25
nature 219:23
naval 50:7
near 195:16,21
nearing 173:10
  173:23 176:20
nearly 243:20
need 17:2 18:7,13
  60:10 61:16
  64:14 67:24
  75:10 123:25
  147:4 164:21
  165:13 166:1
  171:23 243:25
  257:25 276:3
  289:25 303:25
  305:15
needed 20:19
  47:7 110:13
  138:10 182:8
needing 310:23
needs 64:9 280:7
negative 232:10
network 22:9
never 49:25

71:13 73:7
  79:13 108:21
  110:13 111:2,6
  114:7 119:14
  127:8 133:18
  138:22 148:21
  154:13 177:17
  183:25 192:6
  193:2,11 194:8
  213:25 281:22
  292:20 301:13
  302:25
new 2:11,11 3:4
  11:12 128:19
  154:20 169:20
  171:9 213:20
  213:22,24
  214:5 273:12
  309:13,18
  310:5
news 45:18,23
  46:2,8
NGOs 295:8,10
Nick 77:5
night's 140:12
noncitizen 89:17
  195:20 196:20
  210:16
noncitizens 52:14
  67:7,12 85:23
  86:15,22 87:1,5
  87:16,25 89:5
  123:17 124:1
  175:14 176:1,9
  176:13 196:15
  197:11 198:21
nonresponsive
  152:19 161:11
  311:5,18
non-hub 196:13
non-U.S 159:15
  160:10
norm 184:4,11
  184:12,14
  283:2
normal 184:25

185:14 188:16
  195:2
normally 185:4
  243:5
north 209:22
  211:1
northbound
  213:4
Nos 245:2
note 181:17
  218:15 238:14
  238:16 275:24
notebook 274:21
  298:11,14,22
  300:12,23
  301:9
notes 29:8 37:4
  38:6 39:18
  146:18 151:22
  151:23 158:18
  310:8
notice 23:7 86:23
  87:24 88:1,2
  90:1 244:10,12
notices 87:17
notice-to-appear
  88:24
notification
  127:14
November 5:22
  6:4 8:9 9:10,14
  20:12 134:18
  135:2,10,25
  137:18 138:8
  217:9 245:18
  264:5
NTA 86:24
nuances 257:2
number 28:9
  61:8,13 68:2
  96:6 97:13
  101:9 115:2,16
  120:14,22
  121:4,11
  123:24 127:18
  128:11,20



129:17,19
132:13 135:23
138:20,22
139:7 148:22
148:22 150:6
150:18 157:22
157:24 158:1
160:10 163:9
163:15,25
164:2,20
165:15 167:5
167:18 171:10
171:16,18
172:3,6,19,24
173:4,17 174:6
174:20,22
175:2,6,9,18,20
177:14,17
178:3 180:21
181:23 182:2,8
182:18 183:22
187:5 190:12
191:1 200:25
212:15 214:13
214:17 215:3
217:4 219:13
231:3 244:23
249:1 252:6,8
253:19 256:17
257:3,8 259:8
271:2 281:23
281:25 282:4
282:10,15,16
282:21 283:3,6
283:8,19
286:14 297:9
297:21,22,23
298:6 300:13
301:3,6,15
306:14 307:1
309:5,14,19,20
309:21,24
310:2,5,18,23
311:9 312:9,9
**numbered** 99:22
107:5,12

**numbers** 10:9
95:8 114:25
124:21 134:8
143:5 156:13
165:7 173:9
179:7 200:22
202:21 203:9
217:3 221:18
224:7 228:5
236:13 245:9
252:5 258:16
258:21 274:22
275:1 276:12
281:23 282:11
283:22 284:6,8
284:15 294:1
295:9,12
298:25 303:24
**N.W** 2:5

_____
**O**

**oath** 16:2 19:22
19:25 20:4
315:14
**object** 18:4 41:2
47:3,15 52:18
55:19 56:25
61:15 62:11,19
63:4,15 66:1
68:12,20 69:3
69:14,22 70:7
70:17,25 71:15
71:22 72:6,20
73:3,9 75:9
77:24 78:13
79:10,17,18,24
81:2,2 83:4
85:8 86:18
88:17 89:8,9,9
89:19 90:13,19
91:1 93:25 94:7
94:15 96:22
97:6 98:2,24
101:6 102:7,20
103:6 108:12
108:25 109:11

109:24 110:9
110:16 111:4
111:17,24
112:6,12,18
113:9,24
114:13 116:10
117:2 118:2,10
119:5,13,21
120:9,21 121:3
121:13,25
122:15,25
123:11 124:2
127:6 129:18
130:3,15 131:6
131:17 132:8
133:17 140:18
140:19 150:13
151:3 152:11
153:13 155:4
155:11 156:5
186:18,19
189:24 198:18
198:18 199:6
199:13,25
200:11 202:1
202:10 204:22
205:15,24
206:7 211:13
212:1 214:24
221:3,4 223:1
223:11,12,20
224:20 225:14
225:24 226:23
227:6,12
228:18 232:18
232:23 233:15
234:10,24
235:18 236:2
241:25 242:9
260:25 262:15
262:24 263:12
263:19 264:11
265:13 267:4
269:12 277:21
281:19 295:19
296:25 299:14

304:17,24
305:8,17 306:8
307:14
**objection** 31:2,23
31:24 32:14
41:8 44:3,4,15
46:4,13,15
58:15 64:4,20
74:12 85:14
88:16 105:20
108:17 117:11
120:12 121:17
148:24 149:18
151:15 153:21
159:24 176:2
192:1 193:4,14
194:11,20
195:6 198:17
200:1 210:8
215:6 233:21
264:22 265:23
267:23 268:22
269:25 273:25
274:7 290:6,15
291:13 295:23
295:24 311:13
311:23,24,24
**objections** 18:4
44:12,13 46:10
208:21
**occasion** 159:4
177:13 223:17
230:11 274:24
275:5,15
**occasions** 35:2,4
274:11
**occur** 26:9 30:2
82:18 180:22
186:1 271:19
284:14 305:23
**occurred** 26:13
45:5 48:4 60:12
63:22 161:13
205:9 271:7
291:6 306:2,25
307:16,23

**occurring** 63:21
304:19 307:13
**occurs** 166:25
210:15
**October** 6:7
82:12,20,21
98:22 143:8,15
144:12 152:6,8
152:22 153:5
**offenses** 20:9
**offer** 315:13
**offered** 80:20
**offers** 78:25
**offhand** 62:23
172:21 173:17
174:3 259:18
**office** 2:15 12:2
14:1 19:18 24:6
24:20 25:15
29:24 34:25
53:18 58:21
65:8,12,15
66:10,13 67:14
100:24 132:24
143:20 157:18
174:19 175:1
184:6 185:25
195:13 196:7
207:16,24
221:7 239:1
241:15 242:19
242:22,25
260:19 266:24
278:4 279:24
299:25
**officer** 14:22,24
21:17,19,20,25
38:20,23 51:4
51:12,14,16
52:1 53:4,7,11
54:2,5,7,10
55:7,9,10 56:13
56:18,23,24
57:3,4,9 72:5
79:3,5 114:12
115:11 116:2



179:4 195:22
196:21 210:13
210:23,25
211:5,8,18
225:22 244:6
260:24 263:7
274:4 279:18
282:2 288:11
288:14,15
289:23,24
292:21 305:20
**officers** 51:21
  55:3 57:15,23
  58:23 60:9 61:5
  61:13 171:25
  173:3,7,10,16
  173:19,23
  182:8 195:15
  202:7 204:10
  205:3 207:2
  213:16,17
  215:4 216:17
  218:4,7,8,16,20
  223:8,14,19
  225:2,12
  250:12,14,16
  250:22,23
  257:22 273:7
  273:14,22
  274:13,20
  280:3 288:9
  304:7,14,22
  305:5,12 306:5
  306:10 308:5
  310:25 312:8
**offices** 151:11
**official** 21:11
  70:23 71:19
  112:3 116:23
  130:12 136:20
  275:21
**officially** 73:7,11
**officials** 47:13
  112:17,20
  257:24
**OFO** 19:19 68:25

69:11,19
136:21 137:19
188:21,23
189:4 237:4
249:13
**oh** 45:4 99:12,16
  170:23 198:9
  200:6 203:11
  268:1
**OIG** 237:13,16
  237:21,23
  238:3,11,17,21
  238:22 240:4,5
  241:5,16,17
  242:8
**okay** 17:19,20
  18:1,2,15,16,25
  19:1 20:20,24
  22:2 23:18
  30:22 46:21
  47:10 51:25
  52:7 54:9,24
  58:12 59:17
  62:3 64:16
  67:22 73:12,14
  73:20 77:2 83:8
  86:15 88:23
  92:10 97:12
  99:5,9,12,18,20
  100:23 102:23
  103:10 105:15
  107:2,22 113:6
  114:16 115:14
  121:8 122:9
  124:13 125:25
  126:13 127:10
  128:3 133:3,22
  135:1 138:23
  140:9 146:6,12
  147:16 152:18
  153:8 155:22
  157:21 158:3
  161:10 163:14
  164:17 165:16
  166:3,18 167:3
  169:22 170:1

170:18,23
171:2,4 173:24
176:23 177:19
180:6 182:10
183:15,21
190:6,15
193:17 196:6
198:9 199:2,11
201:22 203:4
203:15,16,24
209:4 210:13
215:17 216:7
216:12 217:19
218:11 219:5
219:19 222:7
222:11 224:24
227:16,20
228:25 233:2
236:11 239:13
240:17,22
241:3,11,23
242:5,17,23
243:6 244:19
245:7,24 246:6
246:8,16,24
247:10,16
248:2,8 249:20
249:23 250:25
251:14 252:16
254:2 255:3,14
255:24 256:10
256:24 257:4,7
257:10,12
258:11,22
260:20 261:21
262:2,6 264:8
266:3 268:6
273:3,22
275:22 276:5
277:4,17 281:5
284:3 286:5
287:3,8,11
293:19 294:8
296:7 298:18
299:8 301:25
302:2,21

303:11 304:1,6
306:11 312:15
313:2,13
**old** 160:12
  ███████
**omitted** 59:15
**once** 14:15 18:12
  29:4 53:8
  109:21 111:3
  192:25 255:9
  279:6 282:8
  283:4,4,5,5
  284:16 292:9
**ones** 37:18
**one-page** 80:17
  124:20 139:7
  167:18 178:3
  217:2 219:12
**ongoing** 241:24
**on-site** 165:7
**oo0oo** 313:25
**opened** 213:20
  214:3,6
**openly** 278:3
**opens** 213:16
**operate** 110:3
**operating** 5:10
  5:13 70:5,10
  95:12,17 97:3
  102:16 107:25
  108:23 109:10
  109:18 111:21
  127:22 155:8
  156:1 184:7
**operation** 48:4
  57:11,17,17
  60:14 117:6
  131:21 192:21
  277:19 280:19
**operational** 68:4
  68:10,19 69:1,5
  69:8,13,20,24
  70:6,13,16,19
  70:24 71:2,12
  71:21 72:3,4,8
  72:18,25 73:6

77:23 78:6,12
79:7,15 101:5,8
101:17,18,22
102:6,15 103:4
103:12,21
104:5,14,23
105:3,7,12,17
106:4,13,21
107:4,15,24
108:9,15,22
109:4,15,20
110:4,13,20,25
111:15 112:5
112:11,15,19
112:22 126:14
126:21 127:4
128:2,4,9,14,19
128:21,22
129:8,12 130:1
130:6,11,22,25
131:3,13,25
132:4,11,23
133:13,20
137:24 141:18
167:8 175:22
175:24 176:11
179:18 180:2
184:8 188:1
232:15,21
233:14,19
234:22 309:22
309:25 310:1
311:22 312:2
**operationally**
  68:3 116:13
  122:17
**operations** 7:11
  7:14,16 14:1,3
  19:18 29:24
  48:8 59:4 65:7
  65:12 111:1
  182:5,7,9 183:8
  183:22,24
  184:19 188:5
  190:12 191:10
  191:14,17,24



192:7 193:2,11
194:1,8,19
229:19,23
232:6,10 237:3
237:4 272:3
278:5
**opinions** 41:6
**opposed** 65:25
213:5
**Opposition** 5:8
**oral** 78:9 206:22
206:25
**order** 38:8 42:9
84:22 117:25
133:19 201:9
313:6,9,11
**ordered** 137:19
**orders** 133:14
313:4
**ordinary** 184:25
188:8,11 189:6
189:9 190:7
195:3
**org** 221:9
**organization**
41:1
**Otay** 7:16 38:11
38:15 40:8
53:20,21,25
54:1,4,10,22
56:7 66:19,21
165:4,8,10,12
192:5 194:2,10
194:18 196:4
196:14 230:12
**OTM** 249:3
**OTMs** 249:1
284:22
**Otro** 1:4 11:6
40:12,20 41:1
45:24 46:7 47:1
306:6 307:2
315:3
**outbreak** 113:18
**outline** 228:7
**outside** 16:1,5

43:15 46:15,24
47:2,11 49:1
256:18 257:2
269:21 270:2
272:22 283:1,1
**overall** 116:15
**overcrowding**
222:16,25
**overflow** 99:25
100:9,13,24
101:4 102:4,11
**overnight** 165:14
**oversight** 57:10
57:16 58:22
171:19
**overtime** 59:8
61:22 171:25
172:23 173:4,5
173:11,16,19
311:10
**over-generalized**
76:21
**Owen** 9:4 36:18
135:25 136:17
137:18,23
138:4,13 179:2
229:9 233:4
234:1,13,21
235:5 237:8
243:1
**Owen's** 136:24
**O-t-a-y** 38:11

-----
**P**
**P** 276:16
**page** 4:4,10,20
5:2 6:2 7:2 8:2
9:2 10:2,22
16:18 23:10
24:15 25:2,5
28:10 81:20,23
82:6,9 84:8,8
84:10 95:9
97:13 99:21,25
102:22,24
103:5,10,13,19

103:21 104:3,6
104:13,15,21
104:23 105:8
105:12,15,18
106:2,4,11,14
106:20,21
107:2,4,12,16
107:23 115:1
115:15 135:23
148:16 156:15
158:4 161:25
162:8 163:15
163:21 164:18
165:18 181:10
191:21 194:16
208:18 209:5
212:16 221:20
226:3 245:25
248:20 261:14
261:24 281:9
316:2,4,6,8,10
316:12,14,16
316:18,20,22
317:2,4,6,8,10
317:12,14,16
317:18,20,22
**pages** 191:15
**paperwork** 88:25
**paragraph** 84:7
84:11,12 85:20
85:21 92:13
98:7 136:25
148:16 154:3
181:10,20
182:24 187:16
204:7,25 205:2
209:13 222:12
224:25 226:3
258:3,13
261:12,15,23
**paraphernalia**
20:16
**parole** 87:5 88:9
88:12,14 90:1
**paroled** 87:2
**paroling** 87:17

**part** 17:24 48:3,7
58:25 64:19,22
100:6 125:5,9
135:10 139:23
140:10 141:12
142:7 143:23
144:5 148:9
168:19 172:11
180:20 181:5
220:17 237:13
237:20 238:2,6
240:23 249:14
252:23 253:10
255:9 259:21
260:16 278:6
281:21 291:20
293:10 308:3
**participate** 50:6
95:20
**participated**
95:23 98:16
108:4
**particular** 84:25
247:3 275:5,16
296:14,15,22
299:3
**parties** 11:15
12:16,16
113:14
**parts** 36:22
**party** 21:9
**Paso** 229:19
235:11
**pass** 243:7
303:12
**passageway**
292:14
**passenger** 54:12
54:19
**pass-down** 63:20
**Patrick** 136:4
137:2 235:5
**patrol** 158:15,21
159:2 249:17
**patrols** 292:24
**pause** 18:21,22

**paused** 77:6
303:22
**pay** 20:13,19
213:2
**payroll** 57:13
**PD** 297:18
**Ped** 146:5,6,9,10
146:12 209:15
209:19 210:6
210:21 212:20
212:21 214:5,8
288:9,11
291:21 295:15
297:8
**pedestrian** 8:6
9:21,22 54:23
58:6 63:3
212:17 213:1
213:23,24
271:6 272:22
**pedestrians**
213:20 214:14
214:18
**penalty** 315:6,7
**pending** 18:14
169:8 244:3
312:25
**Pennsylvania**
74:21
**people** 101:12,22
140:25 141:1
150:3 155:19
160:25 161:3
162:19,24
165:15 166:14
166:21 169:22
179:1 190:12
198:8 219:3
250:11,21
262:8 289:10
297:21 302:1
310:23
**percent** 120:11
121:16,20
122:12 179:23
181:20,21,22



181:24 183:5
187:21 232:7
**percentage** 120:6
120:17 121:9
121:12 128:13
147:12 173:18
173:21,23,25
179:23 187:25
**Perez** 136:4,11
**perfect** 309:1
**period** 19:9 35:2
48:15 60:21
141:14 153:18
154:24 155:3
155:10 156:3
159:20 160:2
259:14 292:15
293:5 298:19
299:9
**periods** 258:18
**perjury** 315:6,7
**permanent** 243:4
**permission** 221:7
**person** 12:18
16:22 26:10
34:10 55:11
114:9 116:16
126:10 127:3
145:17 185:18
196:22 205:9
211:6,9,10,11
227:4 253:22
280:7 308:3
**personal** 21:7,10
40:25 46:11,18
92:7 265:10,11
266:17,25
**personally** 67:16
67:19
**persons** 116:8
118:1,14
147:25
**perspective**
222:22
**Pete** 10:15 29:23
294:3

**Peter** 10:3
**phase** 65:15
**philosophy** 49:21
**phone** 39:8,16
185:12,18
249:8 252:23
253:13,15
255:5,16
256:12 262:11
262:23 263:11
265:7,10,12,16
265:20,21
266:4,8,16,19
266:22,25
267:3,8,15
268:15,21
269:24 298:24
**phones** 262:8
265:6
**phonetic** 260:18
280:9
**phrase** 80:20
92:13 102:15
103:4,12 104:4
104:10,14,19
104:22 105:3,7
105:17,25
106:13 107:4
107:14,23
108:8,9,22
138:5 146:23
147:3,6 170:18
183:21 185:3,8
186:9,15
226:14 308:5
**physical** 50:25
68:1,9,18 69:1
69:12,21 79:8
93:4,8,10,12
100:19 105:4
127:5 179:18
180:2 188:1
232:22 233:20
234:22 274:21
275:17 298:11
298:22 300:12

300:23
**physically** 101:21
101:24 274:24
298:14
**pick** 243:8
**picnic** 199:22
**pilot** 9:21 260:18
271:6,13
**place** 35:6,11
39:2 116:15
117:25 118:14
119:11 123:7
151:8,9 174:23
240:14 314:11
**placed** 118:9
119:19,23
120:2 121:10
121:24 122:5
122:11,13,22
122:24 123:20
292:10 300:11
300:12
**placement** 148:7
**placing** 117:20
**plaintiffs** 1:5 2:3
5:8 8:4 11:20
11:23 23:7
312:20 313:10
**plaintiff's** 208:14
257:19
**plan** 8:10 57:6
100:1,10,13
102:5,11
217:14
**platform** 269:7
**platforms** 22:9
**play** 307:3
**played** 307:5
311:21 312:11
**plaza** 272:24
**please** 9:11,15
12:9 13:12 19:4
23:4 81:10,11
97:20 102:14
103:11 114:17
142:20,22

156:9 164:6
167:12 169:9
170:5 177:20
182:11 191:16
193:18 200:13
208:18 221:10
229:1,15 236:6
239:9 244:20
245:13 247:18
248:17 257:10
258:2,3 261:11
261:12,23
268:4 279:6
283:12,24
286:23 293:13
294:4 306:12
307:3 313:4
**plus** 67:25
**POE** 92:21
115:24 201:16
248:24 249:2
**POE's** 92:22
**point** 17:23 19:2
33:15 40:16
52:2 59:23
125:9 130:22
132:5 136:25
137:9,12
160:12,15,24
161:1,4,7
169:23 175:8
206:4 253:14
254:25 255:15
255:25 258:24
260:3 265:19
266:16 273:20
300:10 309:22
**points** 217:16
**police** 278:10
**policia** 279:14
**policies** 43:23
102:4 262:7,10
262:12,20
263:1,2,9,14,16
269:10
**policy** 57:13 63:6

89:13 102:2
112:9,16 113:7
113:11,21
114:1,8,15
116:8,13,23
117:17 119:8
154:10 155:1
155:13 269:15
269:22 305:21
**population**
113:17 116:15
118:22 121:5
122:18 146:20
147:3,13
293:11 310:17
**port** 5:10 7:11,11
7:13,14,16,16
9:22 33:6,10,12
38:11,16,17
39:22 40:2
47:17,22 48:1
48:14,21 52:14
53:20,21,22,22
53:25 54:4,10
58:8 60:7,17,17
60:21 62:1,18
63:13,18 72:5
72:10,10,17
78:18 79:1 87:7
88:5 91:5 93:18
93:24 94:6,12
94:19 95:18
96:1 97:25
100:14,20
101:21,21,22
108:1 112:17
117:24 118:6
123:25 127:18
128:9,23 129:9
130:1,11
132:23 133:13
133:14 137:6
137:13 138:9
141:9 142:13
142:16 146:2
149:14,16



150:8,17 151:7
153:10 154:6
157:16,25
159:4,17 160:7
161:14,18
167:4 171:15
172:11,15
174:18 175:13
176:8,11
177:14 179:15
182:4,9 183:3,4
183:8,22,23
184:5,19 188:4
189:9 190:11
190:13 191:10
191:10,11,14
191:17,24
192:7,21,23
193:2,11,12
194:1,8,10,19
195:14,19,25
196:3,4,18
197:8 201:25
204:16 207:5
211:23 213:6
213:21 214:18
215:4 216:12
216:16 228:16
230:3,8,12,17
232:5,9 248:24
256:20 261:7
285:19,22
288:25 291:1
291:10 292:4,6
292:14 293:3
296:14,22
298:5,20 299:2
299:3,21 300:5
300:18,24
301:11,23
302:12 303:22
304:3,15,22
305:7,13
311:21
**portion** 224:9
228:6 287:4

299:8
**ports** 5:17 56:8
58:20 62:21
66:12,15,16
67:1,8,13 68:6
72:12 73:2 90:8
90:23 115:4
196:10,13,16
207:16,23
229:24 235:22
268:11 305:5
**position** 37:22
53:25 54:13
55:4 168:1
178:17 209:20
210:14,23
**positions** 59:2
195:15
**positive** 54:8
93:9,15 136:10
154:21 218:9
248:7
**possession** 20:15
**possibility** 197:9
**possible** 16:23
19:5 83:25
113:14 210:25
244:21 278:12
279:10 281:3
**postgraduate**
50:7
**posts** 22:20
**post-secondary**
55:15
**potentially** 55:5
113:2 178:8
**pox** 112:24
113:22 118:19
119:19 121:8
121:10 122:10
**practice** 195:13
**precisely** 46:16
**preferred** 16:21
**pregnant** 115:20
**premium** 173:5
**prep** 35:2 36:1

169:8,15
**preparation**
36:23 38:22
40:16 41:20
45:20 91:22
92:2 240:24
**prepare** 27:6,10
28:4 33:1,20
34:24 36:15
37:8,12 38:1,8
38:12,18 39:23
40:2,13 41:15
42:10 43:12,19
46:25 47:12
**prepared** 244:16
**preparing** 27:7
27:19 28:15
38:5 39:17
40:21 132:20
**prepped** 169:21
**presence** 279:14
**present** 3:3 11:16
13:23 31:4 33:7
34:13,15 39:11
39:13 48:16
67:7,12 129:10
151:12,19
240:10 262:21
272:9 291:1
298:20 299:19
299:20 300:18
300:24
**presented** 291:10
302:12
**presently** 13:19
**preservation**
263:17,21
269:15,23
**press** 78:4
**presume** 248:10
249:21
**pretty** 30:6,20
153:19 252:9
257:25 266:10
**prevent** 133:21
**previous** 35:8

38:14 63:22
64:8,23 289:10
**previously** 29:7
45:15,17
105:21 228:6
229:2,6 255:21
307:12 309:4
311:16
**pre-decision**
242:20
**primarily** 160:20
260:20 261:6
**primary** 14:22
14:24 54:14,16
54:20,25 55:2,3
55:9 58:5,6
159:18 160:11
160:23 214:13
253:22 255:25
258:24 260:3
268:10,13
**prior** 10:21 51:23
63:20 76:15
159:14 160:2
209:2 311:11
**privilege** 75:24
240:1 242:7
269:19
**privileged** 241:12
264:13
**probably** 49:24
82:21 176:22
185:24 199:9
199:11 203:11
203:12
**problem** 77:12
82:24 83:12
123:8
**procedural**
204:12
**procedure** 5:10
5:13 23:8 70:5
95:12,17
102:17 127:23
156:1
**procedures** 5:16

70:10 97:4
107:25 108:23
109:10,19
111:21 115:4
155:8 225:5
**proceeding** 15:21
**proceedings**
313:24 314:12
314:15
**process** 56:2
88:25 101:12
169:21 171:21
216:5 218:17
218:20 221:8
222:24 224:22
230:6,10,15
250:22 252:9
257:5 259:22
272:12 274:6
285:8 290:2
292:16 295:17
295:22 296:4
296:17,19
300:4,6 301:10
301:17,18,21
302:4,5,9,22,24
**processed** 52:15
86:16 89:6
160:4 171:23
173:14 195:23
196:24 197:4
197:12 206:12
305:5
**processes** 223:4
**processing** 7:17
8:10 48:11
54:12,18,20
55:1,24,24
57:13,21 58:1
67:7,11 89:25
137:6,12 149:9
160:14 171:21
172:2 200:21
214:13,18
215:25 216:2,3
216:13 217:14



MAGNA
LEGAL SERVICES

217:20,24
218:4,12 220:6
250:17 260:22
296:12
**produced** 40:12
40:19 91:14,18
194:3 259:18
259:23
**product** 31:3,24
83:18 85:9
264:13
**program** 50:6
**project** 271:6
**projects** 214:12
214:17
**promise** 243:20
**promoted** 54:6
253:5
**prongs** 201:12
**pronounced**
231:10
**proper** 33:5
74:18 85:23
86:15,22 87:1,5
89:6,17 123:17
195:20 196:15
196:20,23
**protect** 122:18
**protection** 5:15
9:20 13:22,24
14:6 23:9
116:14 204:10
**protocol** 294:18
**provide** 9:11,15
18:8 57:5 65:13
83:2,13 120:23
155:13 164:20
202:8 204:13
205:4 206:21
207:1,3,20,22
220:4 249:17
263:7
**provided** 16:2
42:14 84:16
88:2 205:19
207:11 234:17

**provider** 116:18
**providing** 7:20
82:15 204:1
206:16,23
207:8
**public** 78:4,5
79:14 174:17
174:19
**publicity** 278:2
**pull** 23:4 124:13
156:9 162:10
164:5 202:12
212:5 216:19
219:5 221:11
229:14 230:20
236:6 247:3
261:11 306:12
308:25
**pulled** 236:11
**purpose** 65:19
157:14 281:2
**purposes** 55:1
150:1 228:8
246:22
**pursuant** 12:15
**put** 25:4 80:15
81:16 84:22
109:18 113:2,8
114:22 116:8
116:24 123:25
139:5 170:21
177:25 182:16
183:11,15
212:12 214:1
**putative** 11:20,24
**puts** 144:22
**putting** 124:10
185:9
**p.m** 61:2,3
124:23 129:5
134:18 136:1
144:12 156:22
170:11,14
177:3,6,6,7
180:8 220:17
221:25 227:22

227:25,25
228:1 234:2
235:4 239:18
239:20,20,21
270:12,14,14
270:16 278:19
278:22,22,23
307:6,6 308:13
308:16,16,17
313:19,23
**P.O** 2:18

## Q

**qualifier** 198:13
**quarter** 28:18
**question** 12:24
31:9,15 32:19
44:5,20 61:17
62:4 69:16
72:15 74:19
76:15 77:10,15
82:23 83:10
85:9 90:5
119:25 120:1
123:14 124:7
131:10 152:21
155:22,23,25
176:6 178:5
187:11 193:1
194:7 197:18
198:7,9,12,21
202:7,22
207:13,14
217:5 219:14
238:24 240:2,7
243:12 244:2,5
248:20,22
267:9 296:8
299:22 311:5
**questioning** 44:5
44:10 103:7
105:21 122:1
151:16 243:7
247:7 294:17
**questions** 16:20
17:7,10 18:4,7

18:22 19:8 29:5
42:25 71:7,8
76:25 83:6
85:18 243:21
243:22 244:9
244:17 247:17
248:9,11 262:7
264:14 303:5
303:13 308:10
308:23 312:17
312:20 313:16
**queue** 7:6,8 9:4
44:23 48:10,14
159:16 160:23
170:6,15,19,21
170:24 182:19
184:6,21
186:10,16
187:12 188:24
190:10 191:12
191:22 192:7,9
192:21 193:3
193:12 194:2,9
194:17 218:24
219:1 231:15
231:23 232:2
232:13 233:9
235:16,25
281:25 282:5
282:14,15,18
282:21 283:3,7
290:23,24
291:3,10 292:2
292:6,10,18
293:4 298:6,8
298:10 310:4
**queueing** 291:5,8
**quick** 227:14
270:6
**quickly** 19:5
123:7,19 266:7
266:11
**quite** 28:12 42:3
45:7 65:16
243:19 268:8
**quote** 57:17

287:14 289:5
304:16 305:15
306:7

## R

**radio** 50:17
**railing** 211:5
**raise** 238:23
**random** 85:13
**Randy** 179:2
231:7 233:3
235:5
**range** 310:14
**ranges** 310:14
**rate** 220:10
**reach** 57:23
127:12 133:14
137:20 138:10
252:11
**reached** 100:9
105:5 128:17
137:13 173:8
239:1 252:12
297:18,19
**read** 28:13 36:21
36:22 37:1
42:24 43:4
45:18,25 46:2
92:25 97:20
100:11 116:4
118:13,13
126:8 127:15
135:12 137:16
139:25 140:13
141:15 145:5
146:21 169:10
169:19,25
170:7 171:12
180:17 181:1
201:20 204:4
204:18 205:11
210:1 220:14
220:21 222:9
222:20 225:9
226:11 234:19
235:13 246:2,7



258:5 276:23
283:24 312:24
313:14 315:7
315:10
**Readout** 9:24
**reads** 81:23
92:19 100:6
115:18 137:10
140:9 201:13
203:25 204:8
205:2 209:18
231:15
**read-out** 271:4
**real** 138:18
148:22 228:17
**realignment**
65:15
**reality** 131:21
**really** 18:24
57:14 59:5 60:4
60:4,13 64:13
67:23,25 68:2
72:12 112:15
176:21 235:9
235:17,25
249:15 251:5
256:17 260:13
271:20
**realm** 65:14
**reason** 20:6
55:19 61:20
64:14 75:13
125:14 135:18
144:7 155:16
168:22 188:17
189:15 210:25
225:16 226:19
253:1 316:3,5,7
316:9,11,13,15
316:17,19,21
316:23 317:3,5
317:7,9,11,13
317:15,17,19
317:21,23
**reasons** 105:4
131:20 170:13

175:22,24
275:15
**reassigned**
156:14
**recall** 15:3 20:20
21:16 22:1
23:16,18 26:4
37:15 42:7,12
45:23 59:11
62:23 70:19
78:14 81:6
82:17,19 84:5
85:1 114:14
126:19,22
132:2,3,17,21
134:13,13
138:6 139:11
152:10,21,25
153:2,4,6
174:25 175:4,5
175:7,11 185:9
185:11 186:12
203:23 207:2
219:17 223:22
244:11 253:12
255:18 262:20
263:4,14,16
264:20 265:17
265:25 266:9
267:2,18 269:9
269:15,22
270:3 272:4
275:4,8,10,16
275:18 287:20
291:8,22 295:4
304:18,25
305:9 309:7
**recalling** 45:2
**recap** 268:7
**receive** 91:13,17
206:15,22
207:17 246:20
282:20
**received** 49:13
69:18 77:22
115:9 133:18

135:1,5 139:18
140:1 143:14
168:8,13 200:9
214:22 216:17
240:16 281:12
281:23
**receiving** 135:9
139:22 143:22
144:4 206:20
206:25
**recess** 73:23 76:9
133:6 177:5
227:24 239:19
270:13 278:21
308:15
**recipients** 6:15
8:19 10:11
286:21 287:4
**recognize** 95:13
167:21 178:6,7
178:9
**recollect** 156:6
**recollection** 22:3
22:7 44:8,9
**reconstruct**
129:8,11
**reconstructed**
213:24
**reconstructing**
205:8
**reconstruction**
214:9,12
**record** 11:5
16:22 17:18
42:25 73:22
74:1 76:6,8,12
77:10 97:21
99:11,16 133:5
133:9 177:2,4,8
190:23 226:10
227:21,23
228:2 238:17
239:16,18,22
270:10,12,16
278:15,20,24
305:24 306:23

308:12,14,18
312:23 313:4
313:15,21
314:15
**recorded** 307:10
307:11,11
**recording** 10:17
77:6,8 306:24
307:4,5
**records** 313:3
**redirect** 196:5,14
**redirected**
291:24
**reducing** 180:15
**refer** 19:13,18
42:15 58:18
179:17 292:5,8
309:10
**reference** 84:24
102:6,15 103:3
103:21 104:14
104:22 105:3
105:16 106:3
106:13,20
107:3 145:23
158:12,17,23
159:11 181:3
201:5 213:12
238:21 243:24
**referenced** 10:21
104:5
**references** 84:12
183:22 212:20
**referencing**
237:24
**referred** 55:12
56:8 58:19
60:16 298:9
304:12
**referring** 47:23
48:9 53:17
54:21 57:18
86:10 181:22
309:16
**refers** 134:23
158:9 217:20

**reflect** 146:20
**reflects** 181:18
**refresh** 29:5 38:4
**refreshed** 44:7
44:10
**regard** 228:5
**regarding** 29:20
37:22 38:21
39:18 45:19
46:7 52:9 62:17
75:23 76:18
77:18,20
132:14 206:16
206:17,23
207:8 220:19
223:9 240:1
242:7 256:4,6
257:21,24
260:5,14 261:6
262:10 263:8
269:6,15 271:5
271:22,25
272:5,16
273:11 280:23
282:3,5,10
286:17 294:3
**regardless**
133:12 154:6
190:12
**regards** 264:1
**regular** 56:24
96:21 97:9
157:11 221:8
240:24 254:10
297:15
**regularly** 91:14
91:18 97:5
118:19 184:7,9
**regulation** 68:11
68:14
**regulatory**
204:11
**reissued** 237:11
237:17
**reiterate** 105:20
**relate** 19:8



262:21 263:21
**related** 22:15
  56:7 240:1
  244:9 260:13
  260:21
**relating** 244:13
  262:12 263:9
  263:17 269:10
  269:22 273:8
**relay** 282:24
  299:1 300:19
  300:21 301:3
  302:10
**relayed** 259:5
**relaying** 181:13
**release** 78:5
**released** 20:15
**relevant** 33:5
**reliant** 87:8
**relied** 44:22
**relying** 174:8
**remains** 140:11
  243:1
**remember** 16:4
  20:12,18 22:22
  26:21 35:9 36:2
  37:19 39:3
  40:24 42:2,4
  44:23,25 45:2,8
  45:15,16 50:16
  52:10,21,22,23
  53:13 54:15
  150:9,14,16
  174:24 185:16
  206:19,20,25
  244:14 247:24
  251:21 252:13
  254:15,17,20
  264:2 266:13
  267:15 271:8
  271:11,13,14
  272:10 273:18
  286:2,3 288:20
  288:23,24
  289:1 291:17
  309:5

**remembered**
  45:4
**remind** 12:23
**remote** 294:17
**remotely** 1:24
  11:10 12:15
**removal** 89:7
  90:1
**removals** 7:18
  86:17 200:22
**removed** 255:21
  305:6
**repatriation**
  271:23,25
**repeat** 77:9 83:10
  96:6 123:13
  138:20 155:23
**repeated** 153:11
**rephrase** 274:2
  299:21
**replacement**
  266:8
**replies** 180:19
**reply** 296:13
**report** 6:5 7:6,8
  62:14,17 63:10
  63:13,17,17
  64:13,25
  129:23 130:5
  157:13,16
  158:24 163:11
  170:6,15,19,22
  182:20 183:10
  183:11 184:1
  184:13,17,18
  184:21 185:18
  186:3,16
  187:13 188:14
  188:14,18,24
  189:10,11
  191:13,23
  192:8,22 193:3
  194:2,9,17
  231:23 232:3
  234:16 235:12
  259:11 263:6

276:14,15
  277:8,11,12
  279:19 280:16
  281:8,14,21,25
**reportable** 60:12
**reported** 1:24
  178:21 314:12
**reporter** 11:13
  12:9,10,12,14
  12:22 17:3
  24:12 80:13
  81:14 95:3
  114:20 124:18
  134:3 139:3
  142:25 156:17
  163:6 164:9
  167:15 177:23
  182:14 187:9
  190:18,19
  191:4 192:16
  193:22 200:18
  202:17 208:6
  212:10 216:25
  219:10 221:15
  224:3 230:25
  236:9 244:22
  244:24 245:4
  257:15 270:23
  276:8 283:15
  286:10 293:22
  306:13,15,22
  313:2,13 314:6
**REPORTER'S**
  314:1
**reporting** 6:12
  6:17 7:3 60:6
  157:6 163:11
  164:14 282:17
**reports** 60:11
  65:4 91:14,18
  157:10,15
  165:9 184:9
  186:9,11
  190:11 192:10
  193:13 259:13
  259:23 277:14

280:22 281:2
  281:16 284:12
**represent** 11:17
  245:17 257:20
  271:3 276:12
  283:19 286:15
  294:1
**representative**
  23:23 24:2
  25:14 26:2,18
  33:2 34:25
  46:19,20
**representative's**
  46:12
**representing**
  304:15
**request** 11:11
  18:13 28:23
  29:6 52:14
  245:21 282:3
  282:20 297:20
**requested** 4:19
  29:2 256:19
  280:15 301:16
**requesting**
  298:24
**requests** 57:14
**require** 55:24
  310:24
**required** 26:24
  28:13 40:9
  62:21 102:1
  173:14 185:19
**requirement**
  172:2
**requirements**
  171:22 204:12
**requiring** 116:16
**rescinded** 138:14
**residents** 198:21
**resolved** 20:13
  64:11
**resources** 60:9
  101:11 310:25
  312:7
**respect** 43:23

67:1,6,11 83:5
  90:3 189:21
  190:4,8 254:11
  254:25 256:1
  257:23 258:24
  268:10
**respectively**
  245:9
**respond** 170:1
  247:18 257:7
**responding**
  296:23
**responds** 180:7
  220:8
**response** 9:11,15
  42:25 161:17
  208:13 209:7
  238:24 294:5
**responses** 8:3
  17:2 37:11,16
  37:22 38:1,5,7
  208:22 209:1
  247:19
**responsibilities**
  54:11 57:8 59:1
  60:2 65:11,24
  250:11 251:2
**responsibility**
  59:4 113:16
  171:14,18
**responsible** 60:6
  60:7,10 61:12
  250:16,24
  253:23
**rest** 113:17
  118:22 122:18
  140:23 261:23
  299:10
**restates** 237:7
**restrooms** 155:14
**result** 31:22
  44:25 207:17
  214:11,16
  240:4 297:9
**resume** 254:9
**resumed** 254:2



retention 269:10
return 78:19,23
  195:23 196:24
  197:2
returned 255:21
  305:19
reveal 27:1 41:19
  41:25 44:6
  239:3 264:15
revealing 41:22
  264:18
review 5:12 28:2
  28:3 36:14
  37:11 40:11
  45:16 95:10
  118:21 120:4
  259:21 277:1
  286:24 294:4
reviewed 28:21
  29:9,12 37:16
  37:17 41:13
  42:4,8 43:10
  45:1,6 102:18
  102:25 103:14
  103:23 104:7
  104:16,25
  105:22 106:6
  106:15,23
  107:6,17
  132:20 191:18
  193:7 194:12
  209:1 258:9
  261:19,25
  277:2 284:1
  287:1,9 294:6
reviewing 28:16
  37:25 38:4 84:3
re-mark 228:9
RFI 9:11,15
  245:20
rid 220:11
right 16:15 19:5
  19:7 20:25 22:5
  23:3,21 25:1,9
  30:17,19 34:23
  37:23,24 41:24

43:4 45:12,13
48:17,20 51:8
51:14 56:19
60:5 69:13 75:2
75:18 76:5,15
77:2 81:16
89:18 90:3
92:12 94:22
95:5 96:18 98:5
99:7 101:18,23
104:12 106:19
107:11 109:10
114:22 120:20
123:6,10,21
124:8 125:19
132:6 134:5
136:3 139:5
140:3,5 141:20
141:22 142:5
142:21 143:2
144:16,21
146:8 147:10
148:4,8 154:15
156:8 161:20
161:21 163:2
165:1 167:1,17
171:5 172:7
177:25 178:24
182:16 185:4
189:18 195:5
195:17 196:25
197:4,24
198:16 199:24
203:6,18
206:14 207:11
208:1,11 218:1
228:3,12 230:8
236:5 243:6,12
245:1 246:3,8
246:15 247:1
250:8 254:3,20
265:5 272:24
272:25 276:25
281:24 284:24
293:17 294:22
299:11,15

304:4 306:17
307:20 308:9
312:19
Rights 2:8 11:23
risk 113:3 118:21
risks 118:16
rival 310:15
Robert 5:3,19,22
  6:3,7,10 8:12
  8:15 9:10,14
  10:11 96:3
  124:23 134:17
  136:4,11
  139:14 140:4
  143:10 144:11
  149:14 150:7
  151:14 152:1
  172:15 178:13
  217:11 219:20
  247:12 248:12
  286:16 287:13
  289:15 290:3
  ███████ 280:5
role 59:16 65:20
  136:11
roles 136:8
  250:10 251:2
room 12:14 93:8
  112:25 116:17
  118:15,23
  119:12,15
  147:22 150:1
  154:19,23
  155:2,9,14,15
  155:20 156:2
  239:12
rooms 92:15,20
  93:18,23 94:5
  94:12,19 98:10
  98:17,21
  133:15 137:15
  137:20 138:11
  148:18 150:3
  154:10,22
Rosa 65:23
rotate 59:1,3

rotated 280:6,13
rotates 58:3
roughly 272:8
  301:7
row 187:19
rule 17:1 23:8,23
  24:2 28:4 37:13
  38:12,18 41:16
  43:12 44:13
  88:21 119:3
  191:8 193:24
  194:5
rules 7:10,12,15
  16:17,24 18:5
  88:13 243:23
run 170:16
  312:21
running 117:7
  155:13 260:19
  272:3
runs 59:5 60:14
Ryan 33:14
  143:11 231:6

S

safely 101:11
  122:17 297:6
safest 116:15
San 1:19 5:10
  6:12,16 7:11
  8:6 9:22 11:1
  14:1 15:8 24:5
  24:19 25:15
  29:24 34:25
  40:8 48:13,18
  48:21,24 53:14
  53:17,17,21
  56:8 57:19 58:8
  59:24 60:3,17
  60:20 65:7,12
  65:14,18 66:10
  66:13,19,21
  67:13 84:12
  92:21 93:18,24
  94:6,12,19

95:17 96:2
100:14,23
107:25 109:5
109:17 111:2
111:22 113:11
117:24 118:5
119:18 120:19
121:24 122:14
123:19,24
127:18,23
128:9,23 129:9
132:24 133:13
134:23 137:6
137:21 138:9
138:18 141:10
142:14,16
143:20 145:11
148:18 149:16
150:8 151:10
153:10 154:5
157:23 158:10
159:4 160:7
161:14,18
165:8,11,13
167:3 171:14
174:18,19
175:9,13 176:8
177:14 179:15
181:14 182:4
183:3 185:15
187:20 191:9
191:11 195:13
196:5,6,11,18
207:16,23,24
209:10 210:7
212:17 213:21
214:18,22
215:4 216:12
216:16 221:6
228:17 229:19
230:3,8 232:5
235:9,17,25
241:15 242:19
242:22,24
249:13 260:5
261:7 268:11



278:4,6 280:20
280:20 295:18
299:24 300:4
300:14 301:11
301:21 302:6
303:22 304:3
304:14,22
305:6,13,20
311:21
███████ 10:3
276:16 279:19
280:4
**sandwich** 199:22
**sanitary** 297:14
**Saro** 280:8
**sat** 16:15
**save** 259:3,6
269:3 315:11
**saw** 22:23 45:3
45:12 160:19
188:24 275:2
275:18,20
298:14 303:23
**saying** 45:20
66:21 79:4
138:4 150:10
152:7 166:20
174:20 185:12
186:9
**says** 97:15 98:17
125:4 138:1
144:22 145:20
146:18,25
147:1 150:7
152:14 155:2,8
157:4 161:18
162:4 185:13
187:25 188:2,5
189:16 201:8
247:14,16
248:22 249:5
249:24 255:3
256:24 266:3
277:10 279:11
284:19 287:13
288:7,7 289:5

289:15 295:7
**scabies** 118:19
119:19 121:22
121:23 122:2,7
122:20 123:17
123:19
**scanned** 36:17,19
**SCBPOs** 58:24
**schedule** 61:9
**scheduled** 50:5
275:6
**schedules** 58:4
**scheduling** 59:6
**school** 49:8 50:7
50:17
**scope** 41:2,9 46:4
46:10,13,15
47:3,15 48:5
52:18 55:19
56:25 58:15
61:15 62:11,19
63:4,15 64:4,20
66:1,5 68:12,20
69:3,14,22 70:7
70:17,25 71:15
71:22 72:6,20
73:3,9 77:24
78:13 79:10,18
79:24 81:3 83:4
86:18 88:17
89:10,20 90:13
90:19 91:1
93:25 94:7,15
96:23 97:6
101:6 102:7,20
103:6 105:20
108:12,18
109:1,11,24
110:9,16 111:4
111:17,24
112:6,12,18
113:9,24
114:13 116:10
117:2,15 118:2
118:10 119:5
119:13,21

120:9,21 121:3
121:13,25
122:15,25
123:12 124:2
127:6 129:18
130:3,15 131:6
131:17 132:8
149:19 150:13
151:3 152:11
153:14,22
155:4,11 156:5
186:18,19
189:25 198:18
198:18 199:6
199:13,25
200:11 202:1
202:10 204:22
205:15,24
206:7 210:9
211:13 212:1
214:24 221:4
223:1,11,12,20
224:20 225:14
225:24 226:23
227:6,12
228:18 232:18
232:23 233:15
233:22 234:10
234:24 235:18
236:2 238:10
238:18 241:25
242:9 262:15
262:24 263:12
263:19 265:13
265:24,24
267:4,8,23
269:12 270:1
277:22 281:19
304:17,24
305:8,17 306:8
307:14
**screen** 17:23
23:12 102:19
103:1,15,24
104:8,17 105:1
105:23 106:7

106:16,24
107:7,18 178:1
191:19 193:8
194:13 203:3
258:10 261:20
262:1 276:4
277:3 284:2
287:2,10 294:7
**scroll** 17:25
25:10 191:15
192:24 194:4
**seaport** 53:5,7,11
**seated** 115:25
147:22
**seating** 145:3
**seats** 152:16
155:16
**second** 58:21
59:16 66:9 76:1
77:4 81:23
102:24 103:5
135:22 161:25
163:14 165:18
187:15 201:17
209:13 222:12
224:10 228:4
248:19 258:3
261:18 278:15
**secondary** 54:14
54:17,17,20,25
55:12 58:5
114:11 115:25
116:14
**seconds** 18:21,22
**second-line** 58:10
58:13,14,18
59:12
**section** 24:14
97:14,16 99:25
162:1,8,9,11,13
163:17,21
165:20 166:6,6
179:6 183:25
208:21 209:10
209:14 210:1
**secure** 5:16 114:5

115:3,23
116:24 277:19
**security** 19:14
65:14,25 66:2,5
143:19
**see** 23:11 24:14
37:7 53:23
66:20 77:6
80:22 81:25
84:14 92:16
97:16,18 99:25
102:21 103:3,8
103:11,16,20
103:25 104:4,9
104:13,18,22
105:2,4,16,24
106:3,8,13,17
106:20 107:3,8
107:14,19
118:18 124:24
126:2 136:1
140:6,23 141:6
145:21 155:23
156:23 157:8
162:2 165:5
169:4 178:15
179:8 182:21
188:17 199:21
201:3,6 203:3
208:15,20,23
209:6,11,16
212:18 217:21
229:11 232:25
247:22 248:8
258:7,8,8
273:20 274:25
303:24 309:16
**seeing** 42:12
45:16,23
114:15 134:14
139:11 203:23
219:17 288:4
308:1 309:7
**seek** 117:19
175:10 280:24
284:9 300:14



301:24
**seeker** 210:21
211:4,17,21
290:19 292:3,6
292:12 293:2
300:18 307:9
**seekers** 10:12
43:24 197:21
198:3,8,10,14
198:24 199:2
199:20 201:23
210:5 213:8
228:17 250:19
258:25 260:22
272:5 273:15
274:15,22
280:24 281:1
283:7 289:22
291:9 296:21
300:4,6,13
301:7,8,8 304:8
304:16 305:4
305:14,19
306:6
**seeking** 175:5
201:18 291:11
302:1
**seen** 22:20 23:14
23:19 29:7
40:15,18 46:7
69:23 70:4,15
71:1,13,17 78:4
82:2 114:7,10
115:6 116:18
123:2 132:16
134:10 138:22
139:9 202:23
203:20,22
217:6 219:15
219:16 262:25
263:20,25
274:24 302:19
**seldomly** 301:3
**selected** 28:20,24
36:4 85:13
**selecting** 85:5

**selection** 41:19
41:21 44:6
200:20
**send** 127:13
203:5 246:21
247:18 256:20
289:13 290:4
290:17,19,20
292:17 294:13
294:21 296:9
**sending** 150:9,15
168:18 287:18
289:6,16
290:11 295:4
**sends** 152:6
234:4
**senior** 189:4,8
228:20
**sensitive** 226:4
**sent** 63:17 124:22
131:24 134:17
135:13,25
136:9,17 140:4
141:4,23 143:9
144:11 152:1
156:21 168:13
169:2 178:12
179:1 217:10
221:21,25
233:3 234:1
235:3 247:5,12
247:12 248:4
257:19 281:16
281:18 289:10
290:23 294:10
294:20
**sentence** 92:13
92:16,19 93:3
118:12 126:1,2
127:11 169:16
204:7,8 205:1
222:13 311:4
**separate** 16:5
36:11 265:6
310:16
**September** 6:11

6:12,20 7:4
8:15 65:9 82:20
156:22 157:7
163:12 168:2
169:3 170:2
172:7,17,22
173:3,15,19
174:7 285:16
310:9
█████ 252:1,7
253:7 256:9
266:20,21
280:4
**series** 246:23
**seriously** 227:10
**serve** 65:19
**server** 203:8
**servicer** 267:3,8
267:16,20
**services** 11:14
86:5 87:10
116:3
**set** 8:4 37:23 56:2
68:2 167:4
171:15,18
172:3,6,18,24
174:6 175:2,18
175:20 197:13
197:16,20
309:24 312:9
312:12 314:11
**sets** 66:7 261:16
**seven** 35:18,20
36:1 293:16
303:8
**severely** 161:5
**shakes** 17:4
**share** 241:6
242:6
**Shawn** 38:25
**SHEET** 315:1,13
316:1 317:1
**shelter** 279:13
282:12 297:23
**shelters** 170:25
218:25 273:15

273:21 285:18
285:19 295:9
296:6 297:21
**shift** 59:5,9 60:5
60:13,14,25
61:1,5,7,14,19
63:20,22 64:7,9
64:11,24 65:1,3
217:25 259:10
259:19 277:10
**shifts** 59:7 60:16
60:20,22,23
**Shinners** 2:16
4:7 9:18 11:25
12:1,21 26:25
31:2,23 32:14
41:2,8,17 44:3
46:4,14 47:3,15
52:17 55:18
56:25 58:15
61:15 62:11,19
63:4,15 64:4,20
66:1 67:15,22
68:12,20 69:3
69:14,22 70:7
70:17,25 71:5
71:15,22 72:6
72:20 73:3,9,14
73:18 74:12,23
75:9,22 76:3
77:24 78:13
79:10,17,24
80:1 81:2 82:22
83:4 85:8,14
86:18 88:16
89:8,19 90:13
90:19 91:1 92:6
92:10 93:25
94:7,15 96:5,10
96:22 97:6 98:2
98:24 99:10,13
99:18 101:6
102:7,20 103:6
105:19 108:12
108:17,25
109:11,24

110:9,16 111:4
111:17,24
112:6,12,18
113:9,24
114:13 116:10
117:2,11,14
118:2,10 119:5
119:13,21
120:9,12,21
121:3,13,17,25
122:15,25
123:11 124:2
127:6 129:18
130:3,15 131:6
131:17 132:8
133:3,17
140:18 148:24
149:18 150:13
151:3,15
152:11 153:13
153:21 155:4
155:11 156:5
159:24 164:19
165:1,25 176:2
176:18,20,25
186:18 189:24
192:1 193:4,14
194:11,20
195:6 198:17
199:6,13,25
200:11 202:1
202:10 203:1
203:11,15
204:22 205:15
205:24 206:7
210:8 211:13
212:1 214:24
215:6 221:3
223:1,11,20
224:20 225:14
225:24 226:23
227:6,12,16,19
228:18 232:18
232:23 233:15
233:21 234:10
234:24 235:18



236:2 238:14
238:16 239:2,7
239:10,13
241:25 242:9
246:9,16,19,24
247:2,6 259:20
260:25 262:15
262:24 263:12
263:19 264:11
264:22 265:13
265:23 267:4,7
267:22 268:1
268:22 269:12
269:25 270:6,9
273:25 274:7
275:24 277:21
278:14 281:19
290:6,15
291:13 293:15
293:19 294:9
294:15,23
295:19,21
296:25 299:12
303:12 304:17
304:24 305:8
305:17 306:8
307:14 308:11
308:21,24
309:2 311:6,19
312:15,22
313:5,8
**ship** 80:21
**short** 26:22 30:6
49:22 55:4,8
148:6 150:2
154:24 155:3,9
156:3 247:14
254:17,21
**shorthand** 12:12
24:11 80:12
81:13 95:2
114:19 124:17
134:2 139:2
142:24 156:17
163:5 164:8
167:14 177:22

182:13 187:8
191:3 192:15
193:21 200:17
202:16 208:5
212:9 216:24
219:9 221:14
224:2 230:24
236:8 245:4
257:14 270:22
276:7 283:14
286:9 293:21
306:21 314:6
**shortly** 186:2
240:15
**short-term** 92:15
92:20 93:18,23
94:5,12,18
98:10 148:17
149:8
**show** 91:14,18
186:25 261:15
270:25
**showed** 244:12
**showing** 23:6
95:5 134:5
143:2 156:10
164:11 167:17
192:18 208:8
245:7 257:17
276:10 283:17
286:12 293:24
309:3
**shown** 35:21,25
36:5 43:22
44:24 102:5
125:2 264:3
**shows** 126:6
158:6,24
179:11 183:3,7
187:20 192:20
**sic** 11:6 208:11
**side** 10:9 244:21
244:21 246:5
272:23 283:23
284:6,15
**Sidney** 5:3,22 6:3

6:10,22 8:9,15
10:8 47:23
141:4 143:11
149:15 151:13
156:21 172:16
178:13 180:7
217:10 247:13
284:5
**sigma** 8:20
224:14,17,19
224:21
**sign** 226:6,14
312:24
**signal** 265:16
**signature** 82:8,11
316:24 317:24
**signed** 84:1
236:20 315:16
**significant** 62:10
62:13,17 64:8
147:11 205:6
303:23
**signified** 301:6
**similar** 17:5
192:11
**simple** 79:22
**simply** 161:19
**single** 65:3
180:22 181:3
**sir** 62:7,9,22 63:3
63:6 220:18
231:22
**SIRs** 64:1
**sit** 45:10 89:24
94:10 120:16
129:7 174:4
175:24 199:21
278:8
**site** 158:7 165:4
169:7,14,20,23
**sitting** 243:19
**situation** 243:4
**six** 35:18,20,25
49:24 247:17
248:8
**six-zero** 138:21

**size** 246:22
**skill** 56:2 66:7
**slide** 201:1,1
**Slocum** 3:7 35:3
36:8
**slow** 288:5
**small** 36:3 178:8
246:3
**smedlock@ma...**
2:7
**snapshot** 157:20
167:1
**social** 22:8
**software** 17:15
**soil** 159:22 160:4
197:13,16,19
197:20,23
198:11,15,23
199:4,24
210:21 211:7
305:14,20
307:23
**solely** 91:10
**somebody** 72:16
**someone's**
199:17
**soon** 294:13
**sorry** 12:6 25:22
28:2 33:10
49:13 66:20
72:23 77:4,11
80:3 82:23 83:9
84:8 88:18
99:16 131:9
147:7 149:10
164:19,22
176:25 186:22
189:24 198:6
200:5,6 203:17
205:25 207:12
208:12 212:6
230:4 238:15
239:2,8 241:8
242:13 251:22
258:15 267:25
270:12 277:21

280:10 291:14
291:16 294:9
294:23 313:7
**sort** 29:13 52:8
55:14 64:16
68:10,17 70:22
71:13 90:2
129:23 169:15
205:19 273:6
**sorted** 19:5
**sought** 117:24
**sound** 17:5
**sounds** 227:16,19
**south** 160:12
184:15 297:11
**southbound**
213:4
**Southern** 1:2
11:8
**southwest** 231:18
**southwestern**
232:14
**space** 10:12
79:23 80:21
149:8 159:19
160:18 161:2
286:18 287:15
287:24 289:2
290:1,2 296:11
297:3 300:20
301:4 310:24
**spaces** 148:3
149:25 150:12
150:18
**span** 255:13
**speak** 35:1 38:10
38:17,20 89:11
110:17 113:10
131:18 273:7
**speaking** 35:17
44:12 288:24
289:2 291:7
295:23
**special** 56:2,6
**specialty** 56:1
66:6



specific 44:8
45:14 47:6,18
63:2 69:7 77:25
79:3 114:1
176:15,17
184:10 207:7
208:21 223:22
264:15 274:11
282:11,16
300:1 304:10
305:10 312:25
specifically 21:17
29:1 32:9 40:23
42:4,13 45:11
52:22,24 71:16
82:17 93:7
114:15 118:7
134:13 136:24
182:7 203:23
206:9 219:17
252:1 263:13
265:17 266:1
269:9,14
275:10 280:18
287:21,23
290:5,21 291:7
291:12,18
301:25
specifics 45:5,8
52:10 61:17
63:7 87:12
271:14
specify 243:25
speculate 128:6
149:23 189:10
189:14 292:21
speculating
150:23
speculation
108:18 140:19
149:19 153:14
153:23 199:7
199:14 200:1
211:14 212:3
290:7 311:24
spell 13:12 30:15

30:21 33:23
spelling 30:18
spend 35:17
37:25 38:3 84:3
173:11
spent 27:19
28:14,16
132:19
split 261:14
spoke 33:3,13,20
34:24 35:5,21
36:8,10 38:24
132:12 297:1,2
spoken 39:22
40:1 72:16,24
spreadsheet 7:6
7:8 182:17
187:5
Square 2:18
SS 145:20
Stacey 3:8 26:7
34:16 39:14
240:21
staff 215:15
255:22 306:6
staffing 59:7
61:22,25
311:10
stairs 292:13
stand 195:15
standard 5:10,13
51:13 70:4,10
95:11,17 97:3
102:16 107:25
108:23 109:9
109:18 111:21
127:22 155:8
156:1
standards 51:1
93:22 94:3
102:1 150:19
standing 210:14
305:14 313:11
stands 248:6
start 48:25 50:7
161:14 169:1

244:4 250:14
288:3
started 48:18,24
49:20 161:16
161:22 251:25
253:2 286:4
294:16 297:10
Starting 50:11
starts 61:2
208:20 251:5
state 11:16 13:12
14:15,17 15:7
15:14 19:7
85:22 154:17
267:5 302:3
311:11 312:23
314:6
stated 105:21
127:17 176:7
240:2 285:17
311:9
statement 42:22
87:19,21,22
145:8 174:18
204:21 205:14
226:10 299:11
299:13
statements 42:15
42:17,24 43:3
states 1:1 11:7
14:25 55:23
78:10 87:2 88:5
88:10,14 119:8
199:5,18
201:15,19,24
201:25 204:14
209:24 210:6
211:12 213:5
250:18 278:1
280:25 281:4
309:12
stating 169:13
180:20 206:20
station 158:16,22
159:3
statistics 181:14

status 157:19
233:9 234:15
statute 68:17
Statutorily 173:3
statutory 204:11
stay 101:10
313:15
stayed 53:12
stenographically
314:13
step 113:14
197:18,23
198:22
Stephanie 42:6
Stephen 2:4 9:18
11:19
steps 24:24
210:21
Steve 77:3
Stevens 236:16
stick 301:25
stipulate 12:16
stipulated 12:19
12:20
stood 278:4
284:23
stop 44:15
102:14 160:6,9
160:15 161:7
176:23 297:6
stopped 50:16
197:19 252:21
285:25 286:3
storage 269:7
stored 84:19
stories 45:18,23
story 46:2,8
straight 130:10
streamline
220:24 221:7
streamlined 8:16
222:8,14,23
223:2
Street 2:5
stress 171:10
309:14

stretched 160:16
strictly 174:9
strike 152:18
161:10 311:3
311:17
subject 5:12,15
5:20,23 6:4,8
6:11,16,20,23
7:20 8:9,13,16
8:20 9:4,7,11
9:15 10:4,8,12
10:16 95:10
115:3 125:17
134:20 203:24
217:13 222:7
224:14 229:9
231:14 236:23
245:20 260:8
276:20 283:22
285:7
subjects 310:21
submit 123:1
submitting 81:7
Subparagraph
115:17,17
subscribed
314:18
Subsection 97:18
97:20 98:15
100:4,6 102:5
subsequently
26:13
subsidiary
267:14
substance 26:16
27:1,3 32:16
74:5,8,11,17,24
75:5,10,15,17
76:18,22,23
77:18,20
264:18
substantially
157:24 162:23
substations 159:7
sub-matters
260:10



**sued** 21:6
**sufficient** 88:10
   159:19
**suggested** 237:21
**summarized** 85:6
   85:7 193:13
   194:9,18
**summarizes**
   191:11
**summary** 7:10
   7:13,15 191:9
   191:15 192:2
   192:19 193:5
   193:15,25
   194:16,21
   271:4
**summer** 304:2
**superior** 22:5
**supervision** 57:4
   57:6,15 114:11
   116:1
**supervisor** 21:22
   57:19 59:2
   157:13 168:3
   183:18 188:14
   280:5
**supervisors**
   57:22 60:8
   183:14 185:24
   225:2,12 252:5
**supervisory** 54:6
   56:13,17,23
   57:2,9 58:22,23
   179:4
**supervisor's**
   185:25
**Supplemental**
   8:3 208:12,13
**support** 3:5
   65:13
**suppose** 142:5
   266:15
**supposed** 156:3
   202:8
**sure** 13:14 18:23
   18:24 27:15,21

28:9 30:20
42:21 58:17
61:11 63:6
66:10 69:15
70:9 74:20
75:25 77:5
82:24 83:12
84:4 90:6 93:9
93:20 96:8
113:14 123:16
160:25 178:10
183:17 188:13
197:17 228:23
251:23 261:4
270:8 274:18
285:25 300:3
**Surge** 5:23
   134:21
**surges** 273:12
   284:8,13
**surrounding**
   32:10,12
**Susan** 2:17 12:4
   12:5,7
**sustain** 154:23
**SWB** 9:4 231:15
   231:18,24
   232:13 233:10
   234:16
**swear** 12:9
**switch** 255:15
**switched** 54:16
   251:21 252:10
   253:6 267:18
**sworn** 12:15,18
   13:5 51:20,22
   74:16 226:10
   314:10
**SYS** 5:23 6:23
   134:21,23
   145:20
**system** 55:8
   299:23

———————
**T**
**T** 2:6,11,19

**Tab** 23:4 24:9
   80:9 81:11
   94:23 98:6,15
   114:17 124:14
   133:23 138:24
   142:22 148:15
   150:4,5 151:24
   154:2 156:9
   163:2 164:6,11
   167:12 177:20
   181:9 182:11
   187:1 190:15
   190:25 192:13
   193:18 200:14
   202:13 208:2
   212:6 216:20
   219:6,12
   221:11 223:24
   228:9 229:1,6
   230:21 236:6
   236:11 306:12
   306:16,18
   308:25
**table** 145:7,10,20
   147:17 158:4
**Tabs** 228:7
**TACC** 277:18
   278:11 280:14
**tactical** 65:18
   96:2
**Taitague** 8:19
   224:6 226:3,13
   227:3,8
**Taitague's**
   224:25 226:20
**take** 17:3 18:11
   19:25 29:8 35:6
   35:11 38:6 39:2
   39:18 52:8 71:8
   73:16 82:2
   99:13 113:13
   133:2 137:3
   161:3 167:9
   169:16,18
   190:15 218:24
   220:11 227:10

227:14,17
228:4 232:15
240:14 244:1
248:17 258:5
270:6 276:25
283:24 286:23
289:18 294:4
297:20
**taken** 11:10
   15:18 19:21
   50:2 80:18
   113:15 151:9
   175:14 204:16
   315:8
**takes** 155:18
**talk** 17:16,18,19
   18:24 40:6 76:1
   90:7 152:7
   195:11 228:14
   249:13 273:1
**talked** 43:6 62:5
   181:11
**talking** 47:8
   61:18,24 66:14
   80:4 127:3,4
   128:21 162:23
   166:19 176:3
   228:20 240:20
   240:23 250:12
   296:5 302:4
**talks** 69:24
**target** 167:4
   171:9,15,18
   172:6,19,24
   174:6,20,22
   175:2,6,9,17,20
   177:14 309:13
   309:19,19,21
   312:12,13
**TC** 310:22,24
   312:5
**TDY** 215:18,21
   216:17 218:8
**team** 33:16 57:11
   57:12 248:7

257:24 308:3
**teams** 66:3
**Tecate** 38:16,21
   39:22 66:22
   189:21 196:14
**technical** 3:5
   77:3 278:16
**technological**
   19:3
**technology** 12:25
   216:5,9,11
**TEDS** 150:19
   154:10
**telephone** 2:17
   3:7,9 26:9,12
   26:19 34:10
   35:12,14
**telephonic** 34:11
   255:16 269:23
**tell** 17:10 19:22
   45:10,13 78:25
   91:4 94:10,18
   120:16,25
   128:12,13
   130:17,20,24
   131:2,14,15
   148:17 149:3
   154:16 175:23
   176:10 191:16
   195:22 196:21
   197:1,3,8 257:4
   283:8 292:16
   292:19 297:21
   301:5 307:19
**telling** 64:17
   91:11 142:13
   170:21 289:24
   291:9
**tells** 71:20
**temporary**
   137:15,20
   146:3,4 215:22
**ten** 73:16 227:18
   272:16
**term** 66:25 67:5
   67:10,24 70:5



70:16,23 71:12
71:14,21 72:18
73:6 77:23 78:6
78:11 79:15,22
80:17,25
126:23 127:2
195:4 198:24
200:4,7,10
215:18,24
295:21
**terms** 68:1 195:4
**territory** 198:4,5
**terrorist** 63:25
**test** 30:18
**tested** 51:1
**testified** 14:13,15
15:3,14,15,23
108:8 139:17
209:1 298:13
302:21 307:12
**testifies** 13:6
**testify** 14:17 20:7
24:19 27:7 28:4
36:15 37:12
38:2,8,12,18
39:17,23 40:3
40:13,21 41:15
42:10 43:12,19
46:25 67:21
**testifying** 19:25
23:23 24:3 25:7
25:14 46:17
52:19
**testimony** 12:17
16:2 42:16 74:5
74:8,11,17,25
75:5,11,16,17
76:18 77:1,18
78:9 110:8,12
113:6 117:13
117:16 159:25
194:25 258:23
261:4 268:23
274:19 311:11
314:12,15
**Texas** 72:5,17,25

73:2
**text** 253:18,20
257:22 265:21
**thank** 13:2 44:11
46:21 49:16
55:20 71:8
73:14 76:3 77:7
77:9 83:8 96:10
140:19 142:20
146:12 203:16
231:13 238:19
239:10 243:18
247:7 248:16
249:23 250:6
254:23 256:10
257:12 259:24
261:10 264:8
267:10 268:6,9
269:2 270:4,9
270:17 277:6
283:10 286:5
287:7 288:19
293:12,19
295:1 298:2
303:4 308:10
309:1 312:15
313:2,13,17
**Thanks** 165:16
171:4 176:25
177:12 239:14
247:6,21
313:18
**thing** 65:3 249:21
276:20
**things** 66:11
171:23 189:9
251:5
**think** 16:9 30:17
30:19 34:3 46:1
46:15,17 49:24
51:10 61:16
62:3 65:1,2
67:19,23 73:18
75:9 124:11
172:9 176:21
243:23 253:5

264:22 267:7
267:13 277:15
291:19 301:19
312:21
**thinking** 16:13
40:19
**third** 103:10,13
163:21 270:19
**thought** 29:7
138:5 180:15
294:15
**threatened** 305:6
**three** 35:2,4
36:10 60:22,23
84:20 147:10
147:16,24
166:18 188:11
189:5,12
213:20,22
249:8 255:5,6
255:12 268:21
**three-page**
156:12 163:8
202:19
**thresholds** 62:21
62:23 63:2
**throughput** 87:7
88:3 90:8,23
91:7
**Thursday** 1:16
11:2,9
**Tijuana** 10:4
170:25 213:2
218:25 273:15
276:14 277:17
278:7,8 279:3
279:12,21,22
280:24 281:24
282:4,18 283:2
284:13 297:13
297:18 299:25
300:2
**Tijuana/San**
279:24
**till** 49:1 260:4
**time** 11:9 14:23

15:13 18:3,3
19:8 21:14
28:16 33:18
35:16 36:1,13
38:4 46:1 48:15
49:17 50:11,12
53:20 54:9,15
55:4,8 61:9
73:13,21,25
76:7,11 77:21
78:3,8 85:2
91:5 92:1 95:25
96:12,16 101:2
108:7 109:18
125:2 128:25
130:23 131:1,4
132:5 133:4,8
136:9,16 141:9
141:14 143:18
144:5 150:3,21
154:24 155:3
155:10,18
156:4 160:19
160:21 166:1
166:24,25
168:13,20
171:22 172:10
172:13 173:9
173:14 176:3
176:21 177:3,7
178:18,22
185:22 195:23
196:24 197:2,4
197:12 205:9
227:22 228:1
230:3,3,7,7,17
230:17 233:3
234:1,7 239:17
239:21 243:24
244:1 253:11
254:4,7,17
255:20,25
256:17,22
257:6 258:5,16
258:17 259:2
262:9 265:7

266:14 270:11
270:15 272:14
276:25 278:19
278:23 279:22
280:1 282:9
283:24 285:10
285:21,24
287:19 288:10
289:1,8,10,17
292:4 293:15
296:15,22
299:9 303:7
307:12 308:13
308:17 309:23
310:3,7,22,24
312:5,14,21
313:19 314:11
314:16
**timely** 172:2
312:6
**times** 29:4,4
36:10 49:19
61:21 62:6,7,18
62:22 63:3 64:1
78:24 130:7
183:19 249:9
255:5,6 266:4
268:21 269:3
272:16,21
273:2 275:12
308:6
**title** 13:23 14:2
201:1
**titles** 58:19
**TJPD** 278:10
**today** 9:12,16
11:8 14:8 16:18
17:6,10,12,15
17:23 18:7 19:8
19:9,22 20:7
23:24 25:7,15
37:9 38:2 40:14
42:16 43:1,4,19
45:11 46:25
49:3 61:19
89:25 94:10



120:17 129:7
136:17 169:9
174:5 175:25
194:25 210:3
243:19 244:17
256:17,22
261:4
**today's** 27:19
33:1,21 91:22
92:2 209:2
**Todd** 9:3 135:25
136:17 137:18
179:2 229:9
233:4 234:1
235:4 237:8
243:1
**told** 25:21 26:1,5
78:18,22,22
79:14 149:14
154:13 176:17
197:5,12
284:23 291:2
291:18,22
292:21,23
304:15 305:13
306:6 307:9
**tomorrow** 180:23
234:17
**tonight** 127:12
180:23
**top** 5:3,21 6:3,6
6:10,19,22 8:11
8:14,18 9:3,9
9:13 10:7,10,14
81:23 129:2
132:17 134:16
136:20 139:12
143:7,9 144:25
145:19 150:4
156:20 157:3
158:5 178:10
178:12 201:1
228:5 235:2
245:14 247:11
261:24 270:19
270:19 286:20

309:11
**topic** 25:2,4,10
25:12 244:9
267:9 288:10
288:21
**topics** 24:15,18
24:22 25:6,13
46:16 67:20
238:19
**total** 27:18 34:17
34:21,22 35:16
152:14 162:5,9
162:14,16
163:17,22
165:20 166:5,7
166:11 169:20
218:21 282:3
282:16,21
**totality** 117:6
**totally** 295:25
**tour** 273:18
**town** 273:13
**track** 59:20
**traffic** 20:9 59:6
60:11 61:20
184:16 221:9
293:1 297:16
**trailers** 145:20
145:23 146:3,7
146:14,15
154:18
**training** 51:3,8
51:13 52:5,7,8
52:11,19 53:2
77:22,25 115:9
115:10,13
200:9,21
**transcribed**
314:13
**transcript** 36:25
312:24 313:3,9
315:8
**transcripts** 36:15
36:18 37:2,5,8
**transfer** 91:8
**transferred**

53:14,16,19
85:25
**transit** 201:18
**transport** 5:16
115:4
**transported**
157:23
**travel** 50:8 85:24
86:16,22 87:1
89:6,17 123:18
195:20 196:15
196:20,23
**travelers** 7:21
204:2,13 205:4
213:2
**treat** 123:7
**treated** 122:2,8
122:23 123:2
123:19
**tree** 266:4
**tried** 286:1,2
**trouble** 303:16
306:7
**true** 87:12 114:4
114:9 119:17
120:2 123:23
133:12 138:17
157:21 167:3
175:12 177:13
190:10,14
193:1,10,16
194:7,16
205:18 210:3
211:16 213:19
214:21 215:1
215:16 219:23
223:7,16,22
228:15 304:6
304:13,21
305:3,12 306:5
314:15 315:10
**truly** 215:16
**trustworthy**
225:22
**truth** 19:22
**truthfully** 20:7

**try** 17:11 19:4
247:3
**trying** 34:5 44:17
164:24 197:16
197:18,20
198:14 295:23
**Tucson** 229:20
**Tuesday** 35:7
**turn** 84:7 85:20
97:12 103:10
115:14 161:23
161:25 248:2
285:6 297:18
298:22 304:7
**turned** 307:9
**turnstile** 211:21
**twice** 284:16
**two** 27:9,19
29:19,25 30:2,3
30:23 31:1 32:6
34:2,3 35:8,14
39:4 67:20,25
85:18 178:11
180:12 182:23
196:10 201:12
▮▮▮▮ 213:16
213:16 255:12
259:12 261:15
267:11 272:11
282:8 283:4,6
297:23 310:14
**two-page** 134:8
143:5 221:17
224:6
**two-week** 51:10
**two-year** 153:18
**type** 15:21 22:3
55:6,25 251:12
273:13 277:7
277:14 284:9
**typed** 42:20
**types** 281:16
**typewriting**
314:14
**typically** 64:12

140:24 157:12
183:18 213:8
213:10 252:7
256:14,16
260:10 266:13
266:19 282:7
**typing** 142:19

**U**

**UAC** 6:4
**UACs** 310:13,14
**uh-huh** 17:5
255:17
**uh-uh** 17:5
**unavailable**
253:1 256:8
**unaware** 88:20
**uncareful** 290:11
**underline** 37:5
38:6
**underlined**
226:14
**underneath**
136:25 179:11
209:14
**understand** 14:9
15:2 17:10 18:9
18:10 19:10,11
19:15,19,21,24
20:3 23:22,25
42:21 46:12
50:10 51:25
66:11 69:16
71:11,12 108:9
126:20 152:15
197:17 206:14
207:3,12 223:8
223:14 225:3
225:12,17
296:3,5
**understanding**
40:8 72:4,9
91:6 189:7
237:22 295:17
297:11,17
298:4,7 300:25



302:14,18
303:2 315:13
**understood**
15:10 50:1
108:7,15
110:14,19
138:9 213:18
215:17 296:1
**undocumented**
184:20
**UNHCR** 260:18
**UNINTELLIG...**
259:11
**unit** 5:13 7:3 56:1
56:4,6,9 95:11
108:1 109:6
110:19 111:2
111:22 112:23
112:24 113:1,8
113:12 147:2
147:11 157:6
157:12,15
159:19 163:11
168:3,5 171:25
172:4 178:20
183:14,19
249:14 250:2,4
250:22 251:1,4
251:12 256:25
258:17 274:14
**United** 1:1 11:7
14:25 55:23
78:10 87:2 88:5
88:10,14 199:5
199:18 201:15
201:19,24,25
204:14 209:24
210:6 211:12
213:5 250:18
278:1 280:25
281:4
**units** 66:4,6
84:20 97:10
147:12 181:5
249:13 288:18
**University** 49:12

49:15,18 50:4
50:12,15
**unofficial** 112:3
**unofficially**
138:18 142:9
142:15 149:15
150:7
**unusual** 271:15
**unwritten** 112:16
**update** 9:5
231:16
**updated** 295:11
**updates** 280:23
**uphold** 101:25
102:3
**uploaded** 231:23
**USC** 260:18
**use** 14:8 79:15
85:4 127:2
254:16 255:23
257:21 265:11
265:21 266:17
267:21,22
299:10
**uses** 141:19
179:19 180:3
233:18
**usually** 283:4
**utilized** 216:13
**U.S** 2:15 5:14
9:20 12:1,7
13:22,24 14:5
15:24 19:13
23:9 52:9 86:1
86:3 87:9
125:23 159:22
160:3 195:16
197:13,16,20
197:22,23
198:3,5,11,14
198:22 199:3
199:24 202:9
204:9 210:17
210:21 211:23
211:25 223:10
223:19 229:24

235:23 251:8
272:23 278:13
304:8 305:14
305:20 307:23

---
**V**
---

**v** 11:7
**vague** 89:9,20
96:22 124:11
131:7 133:17
138:5 176:3
265:23,24
269:25 273:25
290:15 295:22
**valid** 304:8,11
**Vanessa** 236:16
**variations** 259:12
**varied** 58:6
256:18
**varies** 61:6
129:20
**various** 6:15 8:19
10:11 274:11
**vary** 101:19
**vehicle** 54:22,23
58:4,5 59:6
128:18
**verbal** 243:24
**verified** 301:13
**verify** 173:9
193:6
**Verizon** 267:12
**Verne** 49:12,15
49:16,18 50:4
50:12,15
**Vernon** 237:3
**versa** 259:5
260:7
**version** 188:24
240:3
**versus** 16:7 27:16
46:18 74:15
118:18,22
198:8 310:15
**vice** 259:5 260:7
**video** 11:5,5

16:25 18:20
19:3 35:15 77:8
216:10 313:3,4
**videoconference**
1:13 2:5,9,16
3:4,6 18:18
35:12
**videoconferenc...**
12:13 17:15
216:8
**videographer** 3:4
11:4,12 12:8
73:21,25 76:7
76:11 77:7
133:4,8 177:3,7
227:22 228:1
239:17,21
270:11,15
278:19,23
293:17 303:9
308:13,17
313:19
**VIDEOTAPED**
1:13
**view** 67:17
274:21,23
**viewing** 44:24
**views** 40:25
**violating** 242:7
**virtual** 215:25
216:2,3,13
**visas** 304:8
**Vista** 15:9,10,14
158:16
**voice** 255:16
**volumes** 222:19
**vs** 1:7 315:4
**vulnerable**
293:11

---
**W**
---

**Wagner** 179:2
**wait** 61:21 62:6,7
62:18,22 63:3
64:1 76:2 82:23
159:18 160:3

239:11 266:14
268:1 273:24
274:5 289:24
292:19,23
293:4 298:9,10
298:21,22
300:23
**waiting** 91:7
147:22 159:21
170:20,24
184:15 235:10
300:13
**wait-list** 301:10
**waiver** 117:19,25
**walk** 213:3
**walking** 199:23
211:17
**walks** 211:21
**want** 16:16 17:23
17:24 26:15
31:21 52:17
55:18 67:15
73:16 75:25
76:14 77:9
79:25 92:12
98:7 99:15,17
115:16 125:25
135:22,24
136:23 140:3
141:4 148:15
151:25 158:3
161:12,23
164:17 181:10
188:19 190:22
199:3,23 204:6
213:22 217:19
220:2 222:11
224:8,24 231:4
238:16 239:5
239:12 248:18
255:22 262:9
268:7 273:1
275:24 285:17
**wanted** 102:3
189:2 190:22
257:1 303:13



312:22
**warrant** 251:11
**warranted** 55:10
**Washington** 2:6
2:19
**wasn't** 20:14
51:6 52:1
109:20 119:25
254:5 283:2
310:15
**watch** 33:4,19
58:8,11 59:16
59:19,23 60:2,3
60:13 61:19,23
63:10,12,16,18
64:1,10,12,17
64:24 65:2 96:3
172:9 253:5
288:17,18
**water** 155:14
**way** 18:24 23:19
37:5 41:6 76:24
118:21 125:15
135:20 142:4
144:8 151:2
160:17 166:9
168:24 186:6
187:24 207:7
214:1 215:10
222:24 223:4
227:9 228:13
229:7 298:19
**ways** 213:4
**week** 27:12,13,14
30:3 35:8 282:8
283:4,5 284:17
**weekend** 180:24
**weeks** 27:9,19
39:4 282:8
283:4,6
**weigh** 101:25
118:16
**welcome** 74:3
133:11 177:10
239:24 295:2
298:3

**went** 16:22 45:7
53:24 235:22
246:13 253:8
254:6 268:8
273:23 274:14
274:20 292:13
293:3
**weren't** 258:20
**west** 9:23 20:22
20:25 66:20
146:5,6,9
212:21 213:23
214:5 272:22
288:9,11
**we're** 306:14
**we've** 134:6
156:10 229:6
**WhatsApp** 249:8
252:22,24
253:11,13,15
254:11,16
255:4,15,23
256:3,12
257:22 260:11
260:21 261:5
268:14 269:5
269:11 296:10
298:24
**whatsoever** 94:4
**WHEREOF**
314:18
**wholly** 87:11,13
**wide** 211:4
**window** 254:21
**windows** 49:2
**wished** 296:21
**withdraw** 223:18
225:6
**withdrawal**
220:24 221:5,8
222:14,23
223:3,9 226:9
227:9
**withdrawals** 8:16
222:8
**withdrawing**

226:21
**witness** 4:2 12:9
12:13,15,18
25:18 26:23
27:1,7,20 28:4
28:15 31:12,25
36:16 37:13
38:13,19 39:24
40:3,14,22
41:10,16 42:11
43:13 44:7,14
46:6,11 47:4,16
52:21 55:21
57:2 58:17
61:16 62:13,20
63:5,16 64:6,22
66:2 67:23
68:13,21 69:4
69:15,23 70:8
70:18 71:1,16
71:23 72:7 73:4
73:10 74:16
77:25 78:14
79:19,25 80:4,8
81:4 83:9 85:10
85:15 86:19
88:20 89:11,21
90:14,20 91:2
94:1,8 99:2
101:8 102:8,18
102:21,25
103:8,14,16,23
103:25 104:7,9
104:16,18,25
105:2,22,24
106:6,8,15,17
106:23,25
107:6,8,17,19
108:19 109:2
109:12 110:1
110:10,17
111:5,18,25
112:7,13,19
113:10,25
114:14 116:12
117:3,16 118:3

118:12 119:7
119:14,22
120:13,22
121:4,18 122:2
122:16 123:1
123:13 124:3
127:7 129:19
130:4 131:18
132:10 133:18
149:1,20
150:14 151:4
151:18 152:12
153:15,24
155:5,12 156:6
160:1 166:3
191:18 193:7
193:15 194:12
194:21 198:20
199:8,15 200:2
200:12 202:3
202:11 204:23
205:16,25
206:8 210:10
211:15 212:4
214:25 215:7
221:5 223:2,13
223:21 224:21
225:15 226:24
228:19,23
232:24 233:16
233:23 234:25
235:19 236:3
239:3,9 242:1
242:10 243:14
258:9,11
261:19,21,25
262:2,25
263:13,20
264:14 265:15
265:25 267:11
269:14,18
270:2 273:24
274:5,14,17
277:2,4,24
281:20 284:1,3
287:1,3,9,11

291:16 294:6,8
297:1 303:6
304:18,25
305:9,18 306:9
307:15 311:14
312:1,23 314:9
314:18
**witness's** 44:9
**Wolfe** 16:8
**wonderful** 77:10
**Wood** 313:11
**word** 141:19
179:19 180:3
209:6 226:16
233:18
**words** 17:4 24:1
24:23 83:21
188:12 189:5
189:12
**work** 22:15 31:3
31:24 42:8
46:24 47:11
51:23 53:10,24
54:4,16 55:15
56:3 65:16,16
65:22 85:9 88:1
91:22 126:24
131:21 168:8
172:1 182:8
221:9 223:3
264:13 312:10
**worked** 14:11
50:17 53:4
54:12 69:6
70:11
**working** 47:8
50:16 53:6
132:6 183:18
184:19 251:8
252:4 279:20
279:20,22,25
**workload** 61:7
172:3
**works** 195:12
295:18
**workshop** 297:4



workstations 214:13
wouldn't 51:24 64:6,12 87:11 251:17 270:18 276:19 279:6 281:7 286:20
write 110:7 111:14 126:4 127:11 170:4 171:7 189:4,12 217:23 222:13 259:3
writes 137:1 141:12 142:7 144:24 169:6 171:2 179:10 180:13 220:9 226:3 231:21 233:7 234:13 235:8
writing 60:11 126:19 186:15
written 16:2 42:14,17,22,24 70:15 78:9 111:3,6 131:14 154:18 155:1 156:2 186:8,12 188:10 206:15 206:20
wrong 161:19 203:9 248:10
wrote 43:3 83:21 188:13,14 220:16,17

_____

X

XD 36:18

_____

Y

yeah 50:8 51:17 56:15 64:3 73:18 80:7,8 89:20 125:5 129:1 142:6

144:22 146:12 149:23 164:22 169:24 181:24 203:15 206:4 213:18 214:1 216:10 237:18 239:9,17 246:24 250:3 252:20 271:21 274:2 276:21 277:15 280:2 288:2 301:1
year 25:25 29:14 29:15 53:6 128:8,15 173:2 173:6 252:13
years 22:13 46:6 49:9,23 60:25 173:22 253:24
yesterday 257:20
York 2:11,11
Ysidro 5:10 6:12 6:16 7:11 8:6 40:8 48:13,18 48:21,24 53:22 56:8 57:19 58:8 59:24 60:3,17 60:20 66:19,21 84:12 92:21 93:18,24 94:6 94:12,19 95:17 96:2 100:14 107:25 109:5 109:17 111:2 111:22 113:11 117:24 118:6 119:18 120:19 121:24 122:14 123:19,25 127:18,23 128:9,23 129:9 133:13 134:23 137:6,21 138:9 138:18 141:10 142:14,16 145:11 148:18

149:16 150:8 151:10 153:10 154:5 157:23 158:10 159:4 160:7 161:14 161:18 165:8 165:11,13 167:4 171:15 174:18 175:9 175:13 176:8 177:14 179:15 183:3 185:15 187:20 191:9 191:11 196:5 196:11,18 209:10 210:7 212:17 213:21 214:18,22 215:4 216:12 216:16 228:17 230:3,8 232:5 235:9,17,25 260:5 261:7 268:11 279:24 295:18 300:4 300:14 301:11 301:21 302:6 303:22 304:3 304:14,22 305:7,13,20
Ysidro's 181:14 182:4 311:21
Ysidro-El 9:22

_____

Z

zero 175:14,16 175:18,20,25 176:8,13
zoom 17:24 245:25 246:3,4

_____

0

00018604 10:18
000315 9:8
00036096 8:7
00047773 9:6

00062089 6:9
00065050 6:18
00065874 6:14
00069612 8:17
00073940 7:5
00243918 9:25
00348764 5:24
00372570 5:18
00596513 7:23
00706278 9:17
00707316 8:21
00753685 10:13
0087 245:12
01090828 7:19
049 165:19
0600 61:1
07 59:22

_____

1

1 8:15 23:4 147:1
1st 7:6 19:9 48:16 50:8 84:13,25 85:5,12 181:14 182:3,20 183:12
1,076 161:4 297:2
1.1 201:6
1:50 177:3
10 6:11 73:19 97:15 98:15 156:9 228:7,9
10th 314:19
10-15 22:18,21
10.1 97:18,20
10:00 61:2
10:06 139:14 141:24
10:12 73:24
10:15 76:7,10
10:24 76:10,11
10:32 247:12
100 218:24
10012 2:11
1006 7:10,13,15 191:9 193:25 194:5

11 4:13 7:4,17 99:25 157:7 163:2 180:7 200:21
11-4 200:25
11.1 100:4,6 102:5
11:34 171:8
11:37 220:9
11:38 133:4,7
11:50 133:7
11:51 133:8
112 162:5,19
113 5:14
1150 220:19
12 4:16 6:7,23 15:6 73:19 84:7 84:11 143:8,15 144:12 164:6 164:11 181:10 182:24 187:16 221:19
12th 178:14
12(c) 181:20
12-09-18 10:5
12:13 73:25
12:19 233:4
12:27 178:14
12:49 177:6
123 5:19
12586 1:25 314:23
13 4:5 10:18 167:12 202:21 203:14 306:25 308:25
133 5:21
138 6:3
14 177:20
1400 61:2 256:22
141 6:6
1430 170:5
15 25:10,12 30:6 39:7 59:18 70:12 114:17 244:9



**152** 163:23
**155/227** 7:3

**159** 218:17

**162** 6:10
**163** 6:15
**166** 6:19
**167** 165:21
  166:14
**17** 9:10,14 24:15
  48:25 49:1
  187:1 231:2
  233:4 245:18
  252:21 253:3,6
  254:5,5,8,12
  258:15,18,18
  264:7,8 288:3,6
  288:16 303:24
  303:25
**17-cv-02366-B...**
  1:7
**175** 218:4,7,16,20
**176** 6:22 163:18
**18** 5:19 37:19
  124:22 128:24
  129:5 172:10
  190:15,25
  208:22
**181** 7:6
**182** 5:3 24:9,10
  25:5
**183** 5:5 80:11,16
**184** 5:7 81:12,17
**185** 5:10 95:1,6
  95:16 99:21
  102:6 103:5,11
  103:13,20,22

104:4,6,13,15
104:22,24
105:18 106:5
106:14,22
107:16,23
181:9
**186** 5:14 7:8
  114:18,23
**187** 5:19 124:14
  124:16,20
**188** 5:21 134:1,7
  134:11 135:23
**189** 6:3 139:1,6
  139:10
**19** 37:19 65:9
  200:14 254:18
  254:22,23
**190** 6:6 7:10
  142:23 143:4
  151:25 156:11
  156:14 161:24
  166:19 228:8
**191** 6:10 7:12
  163:3,4
**192** 6:15 7:15
  164:7,12
  166:20
**193** 6:19 167:13
  167:20,21
**194** 6:22 177:21
  178:2,6
**195** 7:3 156:15
  228:10
**196** 7:6 182:12,19
  184:24
**197** 7:8 187:4,4,7
**198** 190:16
**199** 7:17
**1995** 74:21
**1999** 2:5

---
      **2**
---

**2** 4:14 25:2,4
  80:9 147:2
  148:16
**2nd** 7:8 84:13,25

85:5,13 181:15
187:13,15
**2:00** 61:2
**2:01** 177:6
**2:02** 177:7
**2:30** 170:11
**2:40** 220:17
**20** 30:7 37:19
  39:7 170:5,9,10
  202:13 275:19
  283:20 310:5
  315:17

**20006** 2:6
**2001** 20:12
**20044** 2:19
**2005** 50:22 51:2
**2007** 264:6
**2008** 5:15 14:12
  51:2,7 115:3
**2009** 51:11 53:8
**201** 7:12,20
  192:13,14,19
**2011** 15:6 53:15
**2012** 7:20 53:15
  202:20
**2014** 54:8 56:13
  56:16
**2015** 108:5
  213:19 214:2
  214:23 215:5
**2016** 6:7,11,13,16
  6:17 7:4 8:20
  9:10,15 10:8
  19:9 48:16,19
  56:18 58:7
  129:10 143:8
  143:16 144:12
  152:6,8,23
  153:5,11
  156:22 157:7
  160:10 161:11
  161:13,15,19

161:22 163:12
164:15 214:5
224:7 245:18
251:14 252:15
252:16,17,20
253:24 260:4
262:21 266:4
268:9,20 272:8
273:23 274:3
283:21 296:9
298:18 299:6,7
299:18,24
300:3
**2017** 5:11,12 8:15
  10:11,18 88:15
  95:10,10 98:16
  221:25 253:9
  253:24 254:6
  264:5 286:16
  288:10 298:18
  303:21 304:2
  304:13,14,21
  306:3 307:1,10
**2018** 5:4,19,22
  6:4,20 8:6,9,12
  9:4,23 10:4
  124:22 125:9
  128:24 129:5
  134:18 135:2
  135:10,25
  137:18 138:8
  139:14 140:5
  141:5,24
  142:14 150:22
  152:4 153:11
  168:2 169:3
  170:2 172:7,17
  172:22 173:15
  173:20 174:7
  214:8 217:9
  219:19 220:9
  229:8 231:2,6
  233:4 234:2
  235:4,16,24
  237:8 242:25
  254:2 271:7

276:13 277:24
310:9
**2019** 6:23 7:6,8
  10:15 82:12,20
  82:20 84:13,25
  85:6,13 98:22
  178:14 180:8
  181:15 182:3
  182:20 183:12
  187:13,15
  253:11,16,21
  260:4 266:5
  268:9,20
  273:23 274:3
  296:9 299:18
**202** 2:6,19 7:15
  193:19,20,24
**2020** 1:16 9:7,19
  11:2,9 236:15
  236:21 237:12
  240:3,17 241:4
  241:18 242:18
  242:24 257:20
  314:19
**203** 7:17 200:14
  200:16,20
**204** 7:20 202:13
  202:15,19
**205** 8:3 208:3,4,9
  208:18 209:5
**206** 8:6 212:7,8
  212:13
**207** 8:3,8 216:21
  216:23 217:2
**208** 8:11 219:6,8
**209** 8:14 221:11
  221:13
**21** 4:12 37:20
  208:2
**210** 8:18 223:24
  224:1
**211** 8:6 9:3
  230:21,23
**212** 2:11 9:7
  236:7,12
  244:25



ᆫ

**764** 134:9
**78** 245:11
**79** 5:5

---

**8**

**8** 5:15 6:20 10:11
    142:22 151:24
    170:2 172:17
    172:22 173:15
    173:19 174:7
    201:5 228:7
    288:10
**8th** 115:3 169:3
    172:7 286:15
**8.3** 115:17,17
**8:31** 156:22
    170:2
**8:32** 171:3
**8:37** 1:17 11:2
**8:38** 11:9
**8:44** 235:4
**8:48** 140:5
**80** 5:7
**800** 279:10
**828** 200:23
**84** 4:15,16
**85** 181:19,21,22
    181:24
**86** 179:23
**868** 2:18
**874** 163:22
**89** 143:6

---

**9**

**9** 4:17 5:22 6:4
    6:12 8:9 10:4
    135:2,25
    163:12 217:9
    221:24
**9th** 82:12 98:22
    134:18 276:13
**9.14** 180:8
**9:00** 244:13
**9:22** 248:4
**9:31** 134:18
    135:2

**9:56** 73:21,24
**91** 166:12,15
**918** 271:2
**939** 162:1
**94** 5:10
**96** 212:15
**98** 183:4 187:21

