1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

Al Otro Lado, Inc., *et al.*,

              Plaintiffs,

       v.

Chad F. Wolf,[1] *et al.*,

              Defendants.

Case No.:  17-cv-02366-BAS-KSC

**EXHIBIT 20 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**FILED UNDER SEAL**

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*, | Case No.: 17-cv-02366-BAS-KSC |
| Plaintiffs, | |
| v. | |
| Chad Wolf, *et al.*, | |
| Defendants. | |

## EXPERT REPORT OF STEPHANIE LEUTERT

1



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.    Introduction and Qualifications

1.    My name is Stephanie Leutert. I am the Director of the Central America & Mexico Policy Initiative ("CAMPI") at the Strauss Center for International Security and Law at the University of Texas. In this role, I lead the development and programming for CAMPI and conduct original research on the U.S.-Mexico border and Central American migration.

2.    I previously submitted declarations in connection with the Plaintiffs' September 26, 2019 motions for provisional class certification and preliminary injunction.[1]

3.    I am an expert on the practices of U.S. Customs and Border Protection ("CBP") officers and supervisors with respect to arriving asylum seekers at ports of entry ("POEs") on the U.S.-Mexico border from 2016 to the present. I am the lead author of the first-ever border-wide report on the U.S. Customs and Border Protection's ("CBP's") metering policy and the related asylum waitlists in Mexican border cities.

4.    I have also led the publication of four subsequent metering updates that document CBP's practices and the conditions faced by asylum seekers waiting in Mexican border cities.

---

[1] ECF Nos. 293-8, 294-5.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

5.      In addition to this work, I teach a graduate level course on Mexico's migration policy at the Lyndon B. Johnson School of Public Affairs at the University of Texas.

6.      Through my work at CAMPI, I have directly observed CBP's implementation of its turn-back policy at ports of entry ("POEs") on the U.S.-Mexico border. Since October 2018, I have personally conducted fieldwork in eight Mexican border cities[2] where asylum seekers affected by CBP's metering policy are forced to wait. In these cities, I have spoken directly with affected asylum seekers, along with migrant shelter staff, members of civil society organizations, and Mexican federal and local government officials. I have interviewed affected asylum seekers who were waiting on international bridges, affected asylum seekers who were sleeping in encampments near the international bridges, and affected asylum seekers waiting in migrant shelters. I have watched firsthand as asylum seekers arrived at the United States - Mexico international line and were turned back by CBP officers. I have seen copies of asylum waitlists in six Mexican border cities[3] and

---

[2] Those cities are Matamoros, Tamaulipas; Nuevo Progreso, Tamaulipas; Reynosa, Tamaulipas; Ciudad Miguel Alemán, Tamaulipas; Nuevo Laredo, Tamaulipas; Piedras Negras, Coahuila; Ciudad Acuña, Coahuila; Nogales, Sonora.

[3] Those cities are Matamoros, Tamaulipas; Nuevo Progreso, Tamaulipas; Reynosa, Tamaulipas; Piedras Negras, Coahuila; Ciudad Acuña, Coahuila; Ciudad Juárez, Chihuahua.

3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

have spoken to eight individuals in charge of running these lists.[4] I have also partnered with colleagues who conducted similar fieldwork in five additional Mexican border cities.[5]

7.    A copy of my current curriculum vitae, which includes a list of all publications that I have authored in the prior 10 years, is attached as **Exhibit A** to this report.

8.    My typical consulting rate is $300 an hour. I have elected to waive that fee in this case and will receive no compensation for my work in this litigation.

9.    I understand from Plaintiffs' counsel that I have been retained to offer opinions on issues related to class certification in this litigation. This report contains a complete statement of all of my opinions related to class certification and reasons for them. It also contains all of the exhibits that will be used to summarize or support those opinions. I understand that some depositions and document productions will occur after my report is submitted. I reserve the right to amend and revise this report and the exhibits to it if I should be made aware of information relevant to my

---

[4] These list managers were in the cities of Matamoros, Tamaulipas; Nuevo Progreso, Tamaulipas; Reynosa, Tamaulipas; Ciudad Miguel Alemán, Tamaulipas; Nuevo Laredo, Tamaulipas; Piedras Negras, Coahuila; and Ciudad Acuña, Coahuila (two list managers: individuals and families).

[5] Those cities are Ciudad Juárez, Chihuahua; Agua Prieta, Sonora; San Luís Rio Coloardo, Sonora; Mexicali, Baja California; and Tijuana, Baja California.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

opinions.[6]

## II.    Materials Considered

10.    I considered the following facts and data when forming the opinions expressed in this report.

11.    Since December 2018, CAMPI has published regular reports on CBP's metering practices and the conditions for asylum seekers in Mexican border cities (the "Reports"). These reports include: (a) *Asylum Processing and Waitlists at the U.S.-Mexico Border* (December 2018), (b) *Metering Update* (February 2019), (c) *Metering Update* (May 2019), (d) *Metering Update* (August 2019), (e) *Metering Update* (November 2019).

12.    The Reports are based on information that I, other members of CAMPI, and colleagues from the University of California San Diego and the Migration Policy Centre, have collected directly from field and phone interviews and direct observation on visits to Mexican border cities. These Reports are cited throughout this report.

13.    This expert report also references documents produced by the defendants in this litigation during discovery.[7] I considered over 1,500 documents

---

[6] This is the only case in which I have testified in the previous four years as an expert at trial or by deposition.

[7] I understand from plaintiffs' counsel that the current defendants in this litigation

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

that were produced by the defendants in this litigation when forming my opinions in this case. These documents were provided to me at my request by Plaintiffs' counsel. Plaintiffs' counsel did not refuse to produce any documents or data that I requested.

14.    In particular, to form the opinions expressed in this report and the reasons for them, I considered CBP's Southwest Border Daily Operations Reports, Migrant Action Crisis Team ("MCAT") Daily Reports, Queue Management Reports, and Admissibility Reports from CBP's San Diego Field Office. All of these documents provided information regarding the number of individuals being held in CBP custody at POEs. The MCAT Daily Reports and the Queue Management Reports also documented the available capacity at each port of entry.[8]

15.    Additionally, I considered CBP's Mass Migration Contingency Plans for the Laredo and San Diego Field Offices, CBP emails regarding port of entry capacity and its metering policy, and other internal CBP memos.

16.    When forming the opinions and analysis disclosed in this report, I also

---

are Chad Wolf, Acting Secretary of Homeland Security; Mark A. Morgan, Acting Commissioner of U.S. Customs and Border Protection; and Todd C. Owen, Executive Assistant Commissioner of the Office of Field Operations of U.S. Customs and Border Protection.

[8] There were inconsistencies across the data, with different numbers being reported for the same day across the MCAT Daily Reports and the Queue Management Reports. However, both sources reported similar overall port capacity numbers and followed the same general trends. Given these differences, each type of material was treated separately and there were no efforts to combine them.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

considered the transcripts of depositions of CBP officers and officials that have been taken in this litigation. I understand from Plaintiffs' counsel that one deposition has been taken by Plaintiffs thus far in this litigation.

17.    When forming the opinions expressed in this report, I also considered various open-source materials, including newspaper articles, reports from non-governmental organizations, and published legal documents. I did not accept the truth of these documents uncritically. Rather, I used my experience and observations on the ground to determine whether these open source materials were accurate.

18.    Finally, when forming the opinions in this report and the reasons for them, I relied upon my direct observation of how the turn back policy is implemented at the U.S.-Mexico border.

## III.    Methodology

19.    This expert report builds on fieldwork and research that I have conducted across the U.S.-Mexico border, both alone and in close collaboration with other researchers who also document turn-backs at POEs on the U.S.-Mexico border. During this fieldwork, I engaged in original data collection and relied on semi-structured interviews, observations, and a review of primary source materials. The opinions expressed in this report draw on recognized standards from the disciplines of political science and public policy. The findings from this fieldwork have been recognized and used in official publications by Mexico's Secretary of Foreign

7

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Relations and the Inter-American Human Rights Commission.

20.     Specifically, the opinions listed in this report are based on the following methods and techniques. First, I received questions from Plaintiffs' counsel that I was told to address. Second, I formed preliminary opinions regarding these questions based on my published fieldworks and research. Third, I analyzed documents and data produced in this litigation, depositions, and open source materials from the time period 2016 to the present to confirm the accuracy of my preliminary opinions.

21.     In the course of forming my opinions, I analyzed MCAT Daily Reports and Queue Management Reports produced by the defendants in this case. These reports include daily custody and capacity numbers, which I compiled into an excel spreadsheet for further analysis. The results from this analysis are included in the report and in the Appendix to this report.[9]

## IV.     Summary of Opinions

22.     Plaintiffs' counsel have asked me to address whether, between 2016 and the present, the United States government engaged in a systemic practice of denying non-citizens access to the asylum process at ports of entry on the U.S.-Mexico border.[10]

---

[9] I also understand that a copy of the work papers that I used to complete these analyses will be turned over to the defendants along with this report.

[10] I have only been asked to opine on turn-backs as described in Second Amended

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

23.    Based on my analysis to date, I have reached the following opinions:

a.    Beginning in 2016, U.S. Customs and Border Protection ("CBP") adopted a policy and practice of turning back asylum seekers that were arriving at ports of entry on the U.S.-Mexico border. Initially, turn-backs occurred at the San Ysidro port of entry, amid an increase in the number of Haitian and other asylum seekers.

b.    Between 2016 and April 2018, turn-backs were observed at numerous ports of entry on the U.S.-Mexico border, including in San Ysidro, Tecate, El Paso, Eagle Pass, Laredo, McAllen, and Brownsville.

c.    On April 27, 2018, CBP adopted a written "metering" policy that was distributed to all ports of entry on the U.S.-Mexico border. This policy states that the four directors of field operations on the U.S.-Mexico border may decide to meter the flow of asylum seekers processed and inspected at ports of entry on the U.S.-Mexico border. When engaging in metering, CBP officers were instructed to "inform the travelers that processing at the port of entry [was] currently at capacity and CBP is permitting travelers to enter the

---

Complaint. I offer no opinion on other U.S. government policies toward asylum seekers, such as the Migrant Protection Protocols or the regulations purporting to ban asylum for those who entered the United States without inspection or transited through a third country en route to the United States.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

port once there is sufficient space and resources to process them."[11] This policy was disseminated to CBP officers at POEs via written and oral musters and standard operating procedures.[12]

      d.     Since April 27, 2018, all ports of entry on the U.S.-Mexico border that accept pedestrian traffic have engaged in turn-backs or metering. This turn back policy has three prongs. First, the U.S. government has encouraged asylum seekers to arrive at POEs on the U.S.-Mexico border instead of entering the United States without inspection between POEs. Second, some smaller POEs redirected asylum seekers to larger POEs despite the fact that these smaller POEs were able to process and inspect asylum seekers. Third, larger POEs engaged in metering—i.e., turning arriving asylum seekers back to Mexico citing capacity constraints.

      e.     I understand from prior filings in this case that the defendants argue that there may be "legitimate factors" that caused CBP to engage in turn-backs.[13]  More specifically, the defendants argue that the capacity of a POE is not knowable because it varies on a day-to-day basis based on several

---

[11] ECF No. 283-1 (hereinafter, "Metering Policy").

[12]      Deposition, November 21, 2019.

[13] ECF No. 308 at 19.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

factors.[14] Due to these factors, defendants assert that there is no common method for determining whether the capacity utilization of a port of entry justified turning asylum seekers back to Mexico.[15] This is not the case.

f.      Tracking the capacity utilization and daily capacities of POEs was operationally important to CBP.[16] In daily MCAT and Queue Management reports, CBP tracked factors including the capacity utilization of POEs, whether the number of arriving asylum seekers was affecting port operations, and how many people were waiting to be processed at the port. Compiling and analyzing these reports provides a common method for analyzing whether the capacity of a POE might justify turning back asylum seekers.[17]

g.      Furthermore, ports of entry and CBP field offices create contingency plans that explain in detail how POEs can temporarily increase their capacity in response to an increased number of asylum seekers.

---

[14] Ibid.

[15] Ibid.

[16]        Deposition, November 21, 2019.

[17] I understand from Plaintiffs' counsel that they argue that every turn-back of an asylum seeker at a port of entry on the U.S.-Mexico border is illegal regardless of whether it is justified by the capacity utilization of a port of entry. I express no opinion on this legal theory.

11

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Comparing these contingency plans to the actual operation of POEs documented in MCAT and Queue Management reports offers a common method for determining whether POEs utilized the capacity available to them under these contingency plans when faced with increased migration numbers.

h.    When analyzed using this common methodology, the defendants' justifications of capacity are less convincing. From 2016 to 2019, most ports of entry consistently reported that they were below capacity. Further still, some ports of entry reported being consistently below 50 percent capacity. Similarly, smaller ports of entry also redirected asylum seekers to larger ports, including when they had the capacity to accept and process arriving asylum seekers. According to CBP's own analysis of the Queue Management data, 80 percent of the times when these ports of entry were redirecting asylum seekers, their facilities were completely empty (June 20, 2018 through November 8, 2018).[18] Finally, despite putting in place metering practices in ports of entry along the entire U.S. border, it does not appear that any port of entry activated a contingency plan related to the arrival of large numbers of asylum seekers.[19]

---

[18] AOL-DEF-00210504.

[19] There is at least one example of OFO working with Border Patrol to process a large number of asylum seekers that ran through the port's vehicle lanes. However,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

24.    This report will cover the first incidents of metering in 2016, the policy's evolution over the past four years, and how it relates to CBP's capacity levels at ports of entry. Overall, this report will seek to illustrate how the metering policy has systematically denied non-citizens access to the asylum process when they arrive to the border. Those subjected to metering are often denied access to the asylum process for months, and, for a smaller subset of asylum seekers, metering has resulted in permanent denial.

## V.    Reasons for Opinions

### A.    Key Terminology

25.    This report references several terms that are endemic to the U.S.-Mexico border.  Below I define those terms.

26.    "OFO" refers to CBP's Office of Field Operations, the organization that is directly responsible for the operations of ports of entry.

27.    "Class A" POEs are ports of entry that are designated to "process all aliens applying for admission into the United States," including asylum seekers that arrive on foot.[20]

28.    "Limit line" positions are located at or near the boundary line between

---

this does not appear to represent the activation of a contingency plan. AOL-DEF-00088390.

[20] *See* https://www.cbp.gov/sites/default/files/documents/Vol_49_No_50_Title.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the United States and Mexico. CBP officers stationed at the limit line are tasked with screening arriving pedestrian's travel documents before they can enter U.S. territory.[21]

29.    "Control stations" are the physical access controls located at the limit line.

30.    "Redirecting" is the practice of intercepting asylum seekers at a port's limit line position and instructing them to go to another port to apply for asylum.

31.    "Circumventors" are individuals, frequently asylum seekers, that enter U.S. territory through the vehicle lanes, instead of through the established pedestrian walkways.

### B.    Ports of Entry

32.    Along the U.S.-Mexico border, each U.S. port of entry has a different architectural design but follows the same general layout. For the portion of the U.S.-Mexico border that is delineated by the Rio Grande river (from Brownsville to El Paso), U.S. ports of entry are located at the north end of an international bridge. The

---

[21] The limit line position is not always located on the exact U.S.-Mexico border. For example, the limit line in Tecate is located roughly 10 feet into U.S. territory. "Investigation of Alleged Violations of immigration Laws at the Tecate, California, Port of Entry by U.S. Customs and Border Protection Personnel, U.S. Department of Homeland Security, Office of the Inspector General, September 26, 2019, https://www.oig.dhs.gov/sites/default/files/assets/2019-10/OIG-19-65-Sep19_0.pdf.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

U.S.-Mexico border is located at the midpoint of the Rio Grande, generally marked by a commemorative plaque on the bridge. By contrast, ports of entry that are located along land portions of the U.S.-Mexico border often place turnstiles at or near the actual border line, marking the entry into U.S. territory.

33.    At Class A POEs—the POES that allow for pedestrian traffic—non-asylum-seekers move freely across the U.S.-Mexico international dividing line and into the United States, either by walking across the bridge midpoints or by passing through a turnstile. These pedestrians then enter the port of entry's arrival hall, where they encounter a CBP officer at one of several desks. The CBP officer reviews their travel documents—a process known as "primary inspection"—and may admit the pedestrian into the United States or send the pedestrian to secondary inspection for further review.

34.    POEs are staffed by CBP officers and supervisors, including Port Directors, Assistant Port Directors, and first and second-level supervisors.[22] Larger POEs also have Admissibility Enforcement Units, or AEUs, that are designed to hold non-citizens requiring additional processing for a short period of time. Some POEs also have Criminal Enforcement Units, or CEUs, that investigate cases of

---

[22]          Deposition, November 21, 2019.

15

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

trafficking and the use of fraudulent entry documents.[23]

35.    Front-line CBP officers work in shifts at a POE.[24]  These officers are assigned to duty stations, including at primary inspection, secondary inspection, and at "limit line" positions at or near the boundary line between the United States and Mexico.[25]  From time to time, these officers receive written or oral instructions on how to execute their jobs, known as "musters" or "standard operating procedures."[26]

36.    Prior to CBP's use of turn-backs or metering, asylum seekers approaching CBP's ports of entry would pass into U.S. territory, walk into the POE's arrival hall, approach a CBP officer at one of their desks, and request asylum. CBP officers would then send these asylum seekers to the secondary inspection area, where they would then be processed.[27]

---

[23]          Deposition, November 21, 2019.

[24]          Deposition, November 21, 2019.

[25]          Deposition, November 21, 2019.

[26]          Deposition, November 21, 2019.

[27] OFO processes an asylum seeker by entering them into expedited removal proceedings, after the asylum seeker has been found inadmissible and has claimed credible fear. OFO takes a sworn statement regarding the fear that the asylum seeker has of returning to his or her home country and then refers the person for an interview to UCSIS. This is different than being "inspected", which is OFO's process for determining the nationality and identity of an individual, along with their admissibility based on the requirements of U.S. immigration law.

16

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

37.     There is one deviation from this general processing procedure. By March 2016, CBP officers in the San Ysidro port in San Diego had created a separate line for asylum seekers, who had to wait in the line until it was their turn to be processed.[28] This dual line structure would soon become part of the San Diego port of entry's first metering system.

### C.    Initial Metering Practices

38.     On May 26, 2016, CBP implemented the first iteration of its metering system in the San Ysidro Port of Entry in San Diego. On this date, CBP reported that its facility was at capacity amid an increase in the number of Haitians and other asylum seekers arriving at the port of entry. At the time, local news outlets reported that there were more than 200 asylum seekers waiting in line inside U.S. territory in the port of entry's pedestrian entrance and another dozen on the Mexican side of the turnstile.[29] In response, CBP officers worked with their counterparts at the National Migration Institute (*Instituto Nacional de Migración*, INM) to take the waiting

---

[28] "Re: Denial of Food to Asylum Seekers Awaiting Processing at San Ysidro Port of Entry," American Civil Liberties Union, March 23, 2016, https://www.aclusandiego.org/wp-content/uploads/2016/03/2016-03-23-Ltr-re-Denial-of-Food-at-SYS-POE-FINAL.pdf.

[29] Sandra Dibble, "Surge of Haitians at San Ysidro Port of Entry," *The San Diego Union – Tribune*, May 26, 2016, https://www.sandiegouniontribune.com/news/border-baja-california/sdut-haitians-flood-san-ysidro-port-entry-2016may26-story.html.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

asylum seekers to Tijuana migrant shelters. Asylum seekers were told to return at a certain time for appointments.

39.    In the following months, CBP officers continued this process and began streamlining the system. First CBP undertook measures to ensure that asylum seekers stayed in Mexico while they waited. On June 27, 2016, the San Ysidro Port of Entry watch commander wrote in an email "It's even more important that when traffic is free flowing that the limit line officers ask for and check documents to ensure that groups that may be seeking asylum are directed to remain in the waiting area on the Mexican side."[30] Second, CBP also outlined and formalized its metering procedures. A document issued after July 2016 notes that "In coordination with the GoM [Government of Mexico] we have identified two (2) periods throughout the day to intake asylum claims into our custody (8am and 4 pm). At each period, we intake approximately [redacted] applicants, with a daily intake total of approximately [redacted] applicants. If an applicant does not meet these intake time periods, they are requested to remain in-line in Mexico until the next intake period."[31]

40.    As CBP officers in San Diego implemented this first metering system,

_____

[30] CBPALORT000114.

[31] CBPALORT000103 to 106.

18

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

individuals arriving at the San Ysidro and Otay Mesa ports of entry began to report
being turned back to Mexico. At the Ped-West crossing—a pedestrian crossing for
northbound travelers in the San Ysidro port of entry—asylum seekers were told that
they had to speak with Mexican immigration officials before their asylum claims
could be processed in the United States.[32] In July 2016, the American Immigration
Council documented the case of a Mexican man being returned to Tijuana, and the
following month another three teenage Guatemalans and a 21 year old Guatemalan
man were also turned back.[33]

41.    The San Diego metering system soon spread across the border. It first
spread to nearby cities, such as Calexico (in the San Diego sector) and Nogales (in
the Tucson sector), where metering systems were put in place after the arrival of a
large number of Haitian asylum seekers in a short period of time. In September 2016,
large numbers of Haitians arrived in Mexicali (across the border from Calexico) and
Grupo Beta, the humanitarian agency inside Mexico's National Migration Institute,
began organizing a list for the waiting Haitians as well as providing them with dates

---

[32] "Re: U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum
Seekers at Ports of Entry on U.S.-Mexico Border, American Immigration Council,
January                              13,                              2017,
https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/
cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf.

[33] Ibid.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

for when they should show up at the U.S. port of entry.[34] By October 19, 2016, a line

of Haitian asylum seekers was also waiting at the Nogales port of entry. In Nogales,

Sonora (across the border from Nogales, Arizona), the municipal government

created a waitlist for the asylum seekers.[35] Yet, by December 2016 the list had

dissolved, as CBP officers processed the waiting Haitians in the city and stopped

metering.

42.     Around the same time, metering also expanded to the other end of the

border. It first spread to the Laredo sector, which was experiencing an increase in

the number of Cubans arriving to Nuevo Laredo in the final months of 2016.[36] On

November 12, 2016, the Assistant Director of Field Operations for the Laredo Field

Office wrote an email to all Laredo sector port directors,[37] asking them to meet with

---

[34] "Asylum Processing and Waitlists at the U.S.-Mexico Border," Strauss Center for International Security and Law, Center for U.S.-Mexican Studies, & Migration Policy Centre, December 2018, https://www.strausscenter.org/images/strauss/18-19/MSI/AsylumReport_190308.pdf; "Mexicans Respond To Haitians, Africans With Unusual Hospitality," September 22, 2016, https://www.youtube.com/watch?v=UzaCrd8R_LA.

[35] Curt Prendergast, "Haitians hoping for US asylum gather at Nogales border crossing," *Arizona Daily Star*, October 26, 2016 https://tucson.com/news/local/border/haitians-hoping-for-us-asylum-gather-at-nogales-border-crossing/article_7c401363-f48e-540b-9cf8-4390b1ce7b55.html.

[36] "Southwest Border Inadmissibles by Field Office FY2017," U.S. Customs and Border Protection, accessed December 6, 2019, https://www.cbp.gov/newsroom/stats/ofo-sw-border-inadmissibles-fy2017.

[37] This includes port directors in Brownsville, Del Rio, Eagle Pass, Hidalgo, Laredo,

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

their INM counterparts and request that INM "control the flow of aliens to the port of entry."[38] It added that "if INM cannot or will not control the flow, your staff is to provide the alien with a piece of paper identifying a date and time for an appointment and return then [sic] to Mexico. This is similar to what San Diego is doing."[39] This was followed up by additional internal CBP emails discussing this metering guidance. For example, on November 22, 2016, an internal email noted that the instructions from the Laredo Field Office is that "we will only accept 'what we can handle/process. All others will be turned back to Mexico with an appointment date/time if possible."[40]

43.     Soon after these emails circulated in CBP, there was an increase in the number of reported turn-backs in the Laredo sector. On November 24, 2016, a Salvadoran woman and her three year old son reported that they were turned back at the Hidalgo port of entry,[41] while on November 30, 2016, a Honduran woman and

---

Progreso, Rio Grande, and Roma.

[38] CBPALORT000034.

[39] CBPALORT000034.

[40] CBPALORT000017.

[41] "Re: U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border, American Immigration Council, January                    13,                    2017, https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

her four year old daughter reported that they were turned back in Laredo.[42]

Additional turn-back reports also began to emerge around this time, including in the

El Paso sector on November 20, 2016, expanding the practice of turn-backs into all

four Customs and Border Protection sectors.[43] A September 2019 DHS Office of the

Inspector General (OIG) Report also notes an interview in which a witness stated

that CBP's turn-backs of asylum seekers began in Tecate (in the San Diego sector)

in 2016.[44] However, the OIG did not discover any documentation of turn-backs at

Tecate until February 2017. None of the asylum seekers turned back from these ports

of entry were provided with appointments.

44.     During these initial turn-backs, asylum seekers arriving at U.S. ports of

entry would generally cross into U.S. territory before CBP officers told them that

they had to return to Mexico. According to turned back asylum seekers' testimony,

they were generally intercepted by CBP officers while already walking on the U.S.

_____

cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf.

[42] Ibid.

[43] Ibid.

[44] "Investigation of Alleged Violations of immigration Laws at the Tecate, California, Port of Entry by U.S. Customs and Border Protection Personnel, U.S. Department of Homeland Security, Office of the Inspector General, September 26, 2019,     https://www.oig.dhs.gov/sites/default/files/assets/2019-10/OIG-19-65-Sep19_0.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

side of the bridge or sent back to Mexico after approaching CBP officers at their desks in the port of entry's main hall. In December 2016, large groups of Cubans arrived to the Brownsville and Hidalgo ports of entry and spent several days waiting on or near the bridge before CBP processed the groups. Photos and video footage show the Cubans entering and lining up in U.S. territory on the Hidalgo international bridge.[45] A review of some of the first publicly recorded turn-backs confirms these initial locations.

**Table 1: Data and Location of First Publicly Recorded Turn-back (by Port of Entry)**

| Cities | Date of First Publicly Recorded Turn-back | Location of Turn-back |
|---|---|---|
| San Ysidro | July 11, 2016[46] | POE Entry Hall |

---

[45] Daniela Reyes, "Más de 50 cubanos se encuentran varados en elpuente de Reynosa," *Cuba en Miami*, December 5, 2016, https://www.cubaenmiami.com/mas-de-50-cubanos-se-encuentran-varados-en-el-puente-de-reynosa/; Marco Rodríguez, "Logran acceder a territorio estadounidense cubanos varados en Matamoros," *Hoy Tamaulipas*, December 14, 2016, https://www.hoytamaulipas.net/notas/273750/Logran-acceder-a-territorio-estadounidense-cubanos-varados-en-Matamoros.html. "Cubanos están 'atrapados' en el Puente Reynosa-Hidalgo," *Posta*, December 5, 2016, https://www.posta.com.mx/tamaulipas/cubanos-estan-atrapados-en-el-puente-reynosa-hidalgo.

[46] There were prior accusations of Mexican asylum seekers being returned to Mexico. However, this appears to be a separate issue from CBP metering. "Re: U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border, American Immigration Council, January 13, 2017, https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

| El Paso | November 20, 2016[47] | U.S. side of the International Bridge |
|---|---|---|
| Hidalgo | November 24, 2016[48] | POE Entry Hall |
| Otay Mesa | February 2017[49] | U.S. territory |
| Hidalgo | March 2017[50] | POE Entry Hall |

45.    The turn-backs were often paired with language explaining why the individual was not going to be allowed to seek asylum into the United States. These explanations were not standardized and included descriptions such as "We're not accepting any more people"[51] and "[CBP wasn't] receiving people from Honduras."[52] Despite turn-backs occurring now across the length of the U.S.-Mexico border, CBP officials were not using a uniform explanation for why they were taking

---

[47] Ibid.

[48] Ibid.

[49] "Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers," Human Rights First, May 2017, https://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf.

[50] Ibid.

[51] "Re: U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border, American Immigration Council, January                13,                2017, https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf.

[52] Ibid.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

place.

46.    On January 13, 2017, a memorandum from the Laredo Field Office formalized the sector's metering policy, stating that officers could conduct metering "at the middle of the bridge" and that "all foreign nationals seeking a benefit are given an appointment window to return for processing."[53] However, no appointments were ever provided to arriving asylum seekers and it does not appear that CBP officers were regularly stationed at the middle of the bridge. Rather, some asylum seekers continued to be turned back to Mexico after entering the United States throughout 2017 and through the early part of 2018.[54] These turn-backs continued in spite of CBP experiencing "historic lows in illegal immigration," according to a May 19, 2017 CBP Memorandum.[55] CBP's publicly available statistics on apprehensions and inadmissibles also reflect the fewer migrants and asylum seekers arriving to the U.S.-Mexico border during this period of continued

---

[53] CBPALORT000003.

[54] In December 2017, a line of asylum seekers once again formed in Tijuana. This line would morph into the notebook waitlist in April 2018. Kate Morrisey, "One year after notebook appears in Tijuana, confusion and anxiety continue in asylum line," *The San Diego Union Tribune*, April 28, 2019, https://www.sandiegouniontribune.com/news/immigration/story/2019-04-26/one-year-after-notebook-appears-in-tijuana-confusion-and-anxiety-continue-in-asylum-line.

[55] AOL-DEF-00090108.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

turn-backs  (see Graph 1).

**Graph 1: CBP Apprehensions and Inadmissibles at the Southwest Border[56]**



47.     While metering was not standardized during this timeframe, there were

continued cases of metering in San Ysidro. A May 2017 Human Rights First report

noted that the metering system in San Ysidro continued through early 2017 and that

in April 2017 CBP officers at the port of entry were continuing to tell arriving asylum

seekers to first go to Grupo Beta for an appointment.[57] A CBP email from December

8, 2017 noted that in the San Diego sector, "we have been metering on and off the

---

[56] Data comes from apprehensions and inadmissibles: "Southwest Border Migration
FY 2020," U.S. Customs and Border Protection, accessed December 6, 2019,
https://www.cbp.gov/newsroom/stats/sw-border-migration.

[57] "Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers," Human
Rights First, May 2017, https://www.humanrightsfirst.org/sites/default/files/hrf-
crossing-the-line-report.pdf.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

past couple days based on our numbers hitting capacity."[58]

### D.    Current Metering Practices

48.    On April 27, 2018, the Executive Assistant Commissioner of the Office of Field Operations issued a "Metering Guidance" memo to the agency's four Field Office Directors on the U.S.-Mexico border. The guidance allowed directors to "meter the flow of travelers at the land border," and said that they could "establish and operate physical access controls at the borderline, including as close to the U.S.-Mexico border as operationally feasible."[59] While the memo noted that CBP could not create a separate line for asylum seekers, it does allow for "lines for those with appropriate travel documents and those without such documents," which operationally creates the same outcome. It also noted that ports should "inform the waiting travelers that processing at the port is currently at capacity," finally providing CBP officers with a standardized explanation.[60] However, there appears to be widespread acknowledgement among CBP officers that this guidance was aimed to specifically target asylum seekers.[61]

---

[58] AOL-DEF-00071011.

[59] "Metering Guidance," Office of Field Operations, April 27, 2018. AOL-DEF-00196460.

[60] Ibid.

[61] ▮▮▮▮▮ Deposition, November 21, 2019.

27

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

49.    The context surrounding the timing of the Metering Guidance memo is relevant to understanding its purpose. The memo was introduced as a caravan of hundreds[62] of asylum seekers traveled through Mexico to the United States border and was sent to port directors with the written message that it served as "processing guidance during surge events."[63] However, in the weeks following the Metering Guidance memo's issuance, CBP began implementing the guidance across the entire U.S.-Mexico border, and not only at the San Ysidro and Calexico port of entries ████████████████████████████████████████.[64] This was different from the previous metering instances, which were geographically limited and generally appeared to be responding to a sudden increase in migration numbers.

50.    During the summer months of 2018, CBP officers set up control stations[65] at or near the limit line in ports of entry. While other pedestrians could still travel freely over the international line or through the turnstiles with their travel

---

[62] The caravan reached a size of 1,450 to 1,550 participants from March 31, 2018 to April 1, 2018. It then splintered into smaller groups of several hundred individuals. AOL-DEF-00196741.

[63] CBP email correspondence. AOL-DEF-00011883.

[64] AOL-DEF-00196723.

[65] In these controls, CBP officers are generally stationed in pairs at the midpoint and they may have additional mobile infrastructure, such as fans or something to cover them from the sun.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

documents in hand, CBP began systematically blocking asylum seekers from ever reaching the U.S. side of the bridge or the port of entry's entrance hall.

51.   When a pedestrian approaches the U.S.-Mexico dividing line, CBP officers stand at the "control stations" on the international line or right behind it and ask for the individual's migration paperwork. If the pedestrian does not have a U.S. passport or visa to enter the United States, CBP officers often physically block their passage into U.S. territory by standing in the center of the pedestrian walkway. CBP officers then tell arriving asylum seekers[66] that there is no capacity at the port of entry and the asylum seekers cannot currently be processed, which is also the explanation laid out in the "Metering Guidance." At times, these stationed CBP officers may also instruct the arriving asylum seekers to contact officials on the Mexican side of the border, to go to local Mexican shelters, or to first get on an asylum waitlist.

52.   After being turned away from the U.S. port of entry, asylum seekers must figure out where to stay in the Mexican border city and how to get in line to ask for asylum in the United States. In the weeks and months after the "Metering Guidance" memo, asylum seekers generally held their place in line by waiting in

---

[66] The CBP officers know that the person is an asylum seeker based on their lack of appropriate migratory documents or if they preemptively announce that they would like to seek asylum to the CBP officers stationed at the limit line.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

physical lines on international bridges or outside the ports of entry. These initial lines were reported on the bridges outside ports of entry in Brownsville[67], Hidalgo[68],

---

[67] Aurora Orozco, "Familias de inmigrantes esperan bajo inclmencias en puentes internacionales," *El Nuevo Herald*, June 19, 2018, http://www.elnuevoheraldo.com/el_valle/noticias_locales/familias-de-inmigrantes-esperan-bajo-inclemencias-en-puentes-internacionales/article_69abbd70-73dc-11e8-aa87-4b8d72916648.html.

[68] Sandra Tovar, "'Toman' migrantes Puente en busca de asilo en EU," *El Mañana*, May 22, 2018, https://www.elmanana.com/toman-migrantes-puente-busca-asilo-eu-puente-internacional-migrantes-asilo-politico/4415659.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Roma[69], Laredo[70], Eagle Pass[71], Nogales[72], El Paso[73], and San Diego[74]. In the following months, due to local residents' concerns, hygiene issues, inclement weather, or disputes regarding fairness, Mexican officials, non-governmental organizations, or asylum seekers themselves began waitlists to allow people to hold their place in line with their name instead of physical presence. These asylum

---

[69] Silvia Foster-Frau, "Asylum seekers denied legal entry into U.S. are camping out on bridges," *San Antonio Express News*, June 6, 2018, https://www.expressnews.com/news/local/article/Asylum-seekers-denied-legal-entry-into-U-S-are-12973965.php.

[70] Meredith Hoffman, "The Horrible Conditions Endured by Migrants Hoping to Enter the US Legally," *Vice News*, July 3, 2018, https://www.vice.com/en_us/article/59qny3/migrants-hoping-to-get-us-asylum-forced-to-wait-on-bridge.

[71] "Incomoda a automovilistas y peatones presencia de migrantes en puentes internacionales de Piedras Negras," La Rancherita del Aire, July 26, 2018, https://www.rancherita.com.mx/noticias/detalles/53790/incomoda-a-automovilistas-y-peatones-presencia-de-migrantes-en-puentes-internacionales-de-piedras-negras.html#.XcjjtudKjGJ.

[72] "Simon Romero & Miriam Jordan, "On the Border, a Discouraging New Message for Asylum Seekers: Wait," *New York Times*, June 12, 2018, https://www.nytimes.com/2018/06/12/us/asylum-seekers-mexico-border.html.

[73] Silvia Foster-Frau, "Asylum seekers denied legal entry into U.S. are camping out on bridges," *San Antonio Express-News*, June 6, 2018, https://www.expressnews.com/news/local/article/Asylum-seekers-denied-legal-entry-into-U-S-are-12973965.php#photo-15680354.

[74] "Asylum seekers wait days and weeks at U.S.-Mexico border," *Associated Press*, June 7, 2018, https://www.cbsnews.com/news/asylum-seekers-wait-days-and-weeks-at-u-s-mexico-border/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

waitlists have no standardized procedure or structure. These waitlists are still in place in every city with waiting asylum seekers, and may be managed by the asylum seekers themselves, Mexican government officials, or humanitarian workers.

**Table 2: Groups that Run the Asylum Waitlist (November 2019)[75]**

| List Managers | Number of Lists | Lists by City |
|---|---|---|
| Non-governmental organization | 9 | Nuevo Laredo (6), Reynosa, Agua Prieta, San Luis Río Colorado |
| Grupo Beta | 3 | Tijuana, Mexicali, Ciudad Acuña |
| Asylum Seekers | 5 | Ciudad Juárez (3), Brownsville (2) |
| National Migration Institute | 1 | Brownsville |
| Civil Protection | 2 | Ciudad Acuña, Nogales |
| State Population Agency | 1 | Ciudad Juárez |
| Municipal Government | 1 | Piedras Negras |

53.    Similarly, there is no standardized Mexican or U.S. regulation of the asylum waitlists nor their managers.[76] There are also no controls to guarantee that these waitlists are being run transparently or without corruption. Due to this lack of oversight, asylum seekers and civil society organizations have alleged that some list managers charge asylum seekers to get on the asylum waitlist, including in Piedras

---

[75] Cities may be listed in multiple categories if the city contains multiple waitlists. For example, in Ciudad Juárez, there are currently three Mexican asylum waitlists (one at each international bridge) and a non-Mexican asylum waitlist.

[76] Despite Mexican government entities managing the lists in certain cities, there does not appear to be any standardized guidance. This is evidenced by the different list formats and processes in different cities even when the same federal government agency is running the asylum waitlist.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Negras[77], Reynosa[78], and Matamoros[79]. This makes seeking asylum at a U.S. port of entry dependent on whether asylum seekers and their loved ones can pay hundreds or thousands of dollars.

54.     Additionally, the lack of regulations means that some cities can stop asylum seekers from joining waitlists altogether. For example, in Ciudad Acuña—opposite from Del Rio, Texas—the asylum waitlists for both individuals and families have been "closed" since March 2019.[80] This means that list managers (Civil

---

[77] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

[78] Emily Green, "Mexican officials are extorting thousands of dollars from migrants applying for asylum," *Vice News*, May 13, 2019, https://www.vice.com/en_us/article/kzdy4e/exclusive-mexican-officials-are-extorting-thousands-of-dollars-from-migrants-to-apply-for-asylum; Carolina Garza, "Cubanos denuncian a INM de corrupción en trámite de asilo humanitario," *Milenio*, June 5, 2019, https://www.milenio.com/politica/cubanos-denuncian-inm-corrupcion-tramite-asilo-humanitario.

[79] Molly Hennessy-Fiske, "Asylum seeker blocked at Texas border bridges say Mexican officials are demanding money to let them pass," *Los Angeles Times*, November 22, 2018, https://www.latimes.com/nation/la-fg-asylum-list-border-2018-story.html.

[80] There were also reports that the Piedras Negras was periodically closed throughout 2019. "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Protection for adults and Grupo Beta for families) are not accepting any additional asylum seekers onto the waitlists. While CBP officers are not involved in managing these lists, in certain cities such as Reynosa[81], Piedras Negras[82], and Mexicali[83], the list managers reportedly share asylum seekers' information with CBP officers before the asylum seekers return to the U.S. border to seek asylum.

55.    Once asylum seekers get on a waitlist, they have to wait until their number is called. Every day, a CBP official communicates the number of people that they will receive that day to an individual in Mexico. This exact process depends on the port of entry and the waitlist structure in each Mexican city. According to list managers in cities such as Ciudad Juárez, Ciudad Acuña, and Piedras Negras, CBP officers directly call the Mexican individuals who manage the lists.[84] In other cities,

---

[81] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

[82] "Barred at the Border," Human Rights First, April 2019, https://www.humanrightsfirst.org/sites/default/files/BARRED_AT_THE_BORDER.pdf.

[83] "Asylum Processing and Waitlists at the U.S.-Mexico Border," Strauss Center for International Security and Law, Center for U.S.-Mexican Studies, & Migration Policy Centre, December 2018, https://www.strausscenter.org/images/strauss/18-19/MSI/AsylumReport_190308.pdf.

[84] In Ciudad Juárez, the list manager is a representative from the State Population Council (*Consejo Estatal de Población*, COESPO); in Ciudad Acuña, it is a representative from the city's Civil Protection agency (Protección Civil); and in

34

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

CBP officers provide their numbers directly to waiting asylum seekers. This was the case in the Roma and Progreso ports of entry, where asylum seekers waited on the international bridges because those Mexican cities do not have any migrant shelters. (As of November 2019, there were no longer asylum seekers waiting at these two ports of entry.) More recently, Mexican asylum seekers have also created their own lists in Matamoros and Ciudad Juárez and communicate directly with CBP officers stationed at the international line.

56.    In specific circumstances, there are cases of asylum seekers who are able to circumvent the official list. These include unaccompanied minors and individuals who were able to pay a bribe to corrupt list managers. There are also a small number of asylum seekers who are able to avoid metering by appearing at the limit line with a severe medical need or after being accompanied by an advocate. Similarly, a small number of asylum seekers have made it past the limit line and into U.S. territory by evading stationed CBP officers' detection or by running into U.S. territory through the port of entry's vehicle lanes. However, most asylum seekers are forced to put their names on an asylum waitlist and wait until their number is called.

57.    Asylum seekers may have to wait for months on asylum waitlists. Over the last year, the Reports have documented the wait times on asylum waitlists. From

---

Piedras Negras, it is a representative of the municipal government.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

December to August 2019, wait times continuously increased, and most of these lists

reached their peak levels around August 2019 (as seen in Table 3). However, as of

November 2019, asylum seekers were still waiting for months in Mexican cities to

cross at the ports of entry in Brownsville, Eagle Pass, El Paso, Douglas, Nogales,

Yuma, Calexico, and San Diego.

**Table 3: Peak Wait Times (August 2019)**

| Ports of Entry | Average Wait Time |
|---|---|
| Brownsville | 1 to 2 months |
| Hidalgo | 2 to 3 months |
| Roma | 9 days |
| Laredo | 1 month |
| Eagle Pass | 2 months |
| Del Rio | 4 months (adults) / 2 months (families) |
| El Paso | 3.5 to 6 months |
| Douglas | 2 months |
| Nogales | 2 to 3 months |
| San Luis | 3 months |
| Calexico | 6 to 12 months |
| San Ysidro | 6 to 9 months |

58.    To skip these wait times, some individuals or groups of asylum seekers

have sought alternative ways to enter U.S. territory. Some asylum seekers cross

between ports of entry[85] and others enter U.S. territory by running down the vehicle

lanes at ports of entry (as previously referenced). CBP refers to the individuals who

---

[85] "Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy," Department of Homeland Security, Office of the Inspector General, September 27, 2018, https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

run through vehicle lanes as "circumventors," and they are processed for expedited removal and as individuals who entered without inspection (EWI).[86] There are published reports of circumventors in multiple ports of entry, including in Rio Grande City[87], Tecate[88], Eagle Pass[89], Nogales[90], and Hidalgo[91]. These actions are a direct result of turn-backs and metering.

59.    On November 8, 2018, CBP operated controls at or near the midpoint of international bridges and turnstiles in at least 24 ports of entry along the U.S.-

---

[86]         Deposition, November 21, 2019.

[87] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

[88]         Deposition, November 21, 2019.

[89] "Podrían cerrar puentes internacionales, si migrantes intentan cruzar de forma irregular a EU: Enlace municipal," *La Rancherita del Aire*, May 13, 2019, https://rancherita.com.mx/noticias/detalles/66407/podrian-cerrar-puentes-internacionales-si-migrantes-intentan-cruzar-de-forma-irregular-a-eu-enlace-municipal.html#.Xef45TJKjGl.

[90] Astrid Galvan, "Asylum seekers jam US border crossings to evade Trump policy," *Associated Press*, December 3, 2019, https://www.washingtonpost.com/business/asylum-seekers-jam-us-border-crossings-to-evade-trump-policy/2019/12/03/24d6d30c-160f-11ea-80d6-d0ca7007273f_story.html.

[91] AOL-DEF-00088390.

37

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Mexico border that allow for pedestrian traffic.[92] One year later, in early November 2019, the November Metering Update report confirmed that these controls remained in place at every port of entry covered in the report (totaling 14 ports of entry).

60.    The presence of these controls is constant, regardless of the numbers of asylum seekers waiting at the international line or arriving at the port. For example, in November 2019, asylum seekers arriving in Reynosa, Tamaulipas—which had a low number of waiting asylum seekers—still had to first go to the local migrant shelter to put their name on the asylum waitlist instead of traveling directly to the Hidalgo port of entry to ask for asylum.[93] Other ports of entry such as Progreso and Roma no longer have any asylum seekers waiting on the international bridges (and have not for months), but CBP officials remain stationed at the midpoint. While the email introducing CBP's metering guidelines to port directors describes the limit line position and metering as a response to "surge events"[94], the policy has remained in place even when there are no waiting asylum seekers.

---

[92] AOL-DEF-00210508.

[93] Given the low numbers, shelter staff noted that most arriving asylum seekers were processed the following day (after the shelter registered them and sent their information to CBP). "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

[94] AOL-DEF-00196458.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

E.    **CBP's MCAT and Queue Management Reports Provide a Common Method For Analyzing Defendants' Capacity Explanation**

61.    Since May 2016, CBP has justified its turn-back and metering policy as necessary due to a lack of capacity within ports of entry. Port capacity is a fluid number, both since CBP could allocate more personnel and other resources to process asylum seekers and thereby increase capacity,[95] and since other incidents at the port could pull some of these resources away from asylum processing. Changes to port infrastructure may also increase or decrease capacity, and certain groups of asylum seekers or other individuals may need to be held in distinct areas, limiting capacity. Indeed, within MCAT Reports, the stated capacity levels for ports of entry shifted multiple times from 2016 through 2019. (See Table 8 in the Appendix.)

62.    However, despite this fluidity, there is a common method for analyzing whether the capacity of a port of entry might justify turning back asylum seekers. CBP's MCAT and Queue Management Reports[96] were compiled daily to measure capacity at ports of entry along the border. These reports record operationally important information, such as the number of people in custody, the percent capacity

---

[95] This is discussed is noted in CBP's Mass Migration Contingency documents and in additional CBP documents. *See* AOL-DEF-00196723; AOL-DEF-00057105.

[96] The requirement to submit daily Queue Management Reports began on June 18, 2018. *See* AOL-DEF-00053604.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

being utilized at of each port of entry, and the number of people waiting to enter the port of entry. Using this data, it is possible to see a port of entry's capacity levels over time and to track whether this capacity might justify turning back asylum seekers.

63.    The first finding from reviewing CBP's MCAT and Queue Management Reports is that most ports of entry consistently reported that they were below capacity from 2016 to 2019. Further still, some ports of entry reported being consistently below 50 percent capacity. For example, from June 18, 2018 to July 15, 2019,[97] Queue Management Reports showed that 18 of the 24 ports of entry were at or below 50 percent capacity for more than half of the days for which there was data. Cities such as Otay Mesa, Tecate, Calexico East, and Andrade all reported that the ports of entry were at or below 50 percent capacity for every single day with available data.[98]

64.    The second finding was that there is a wide variation in utilized capacity levels among ports of entry. While in 2019, there was a group of ports of entry that were consistently at or below 50 percent capacity, there was also a smaller number

---

[97] June 18, 2018 is the first day with available data. July 15, 2019 is the last day with available data.

[98] I reviewed the MCAT and Queue Management Reports that were provided to me. Table 4 provides the total number with relevant data by port of entry.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

of ports of entry that were often near or above capacity. According to the Queue

Management Data, the ports of entry in Eagle Pass, El Paso, Hidalgo, and Douglas

were most frequently at or above capacity.[99] Both Eagle Pass and Douglas are non-

redirecting small ports of entry with capacities of ▮ and ▮, respectively. However,

the El Paso and Hidalgo ports of entry are larger.

65.     El Paso' high utilized capacity numbers in 2018 and 2019 appear to be

related to the port of entry's varying total capacity levels. From November 30, 2016

through July 13, 2019, MCAT Reports listed three different capacity numbers for El

Paso: ▮ (November 30, 2016 – April 27, 2018), ▮ (May 4, 2018 – June 10, 2018,

and ▮ (June 5, 2018 – July 13, 2019). The majority of the days where the El Paso

port of entry's capacity exceeded 100 percent took place after the stated capacity

numbers decreased to ▮ For example, on May 15, 2018, El Paso OFO reported

that ▮ people were in custody, which totaled a 56 percent utilized capacity.[100] A

little more than a year later, on June 17, 2019, El Paso OFO also reported that ▮

---

[99] In June 2018, CBP in Eagle Pass specified a reason why metering was affecting
port capacity in the Queue Management Reports, writing: "Recurring Issue: EGP is
now staffing queue management point at POE#1 during non-operational hours
(2300-700hrs) to prevent additional groups claiming CF [credible fear] from
entering the US. This has caused additional staffing/OT expenditures for EGP.
Staffing requires 2 CBPO officer / 1 CBP vehicle." AOL-DEF-00095740.

[100] AOL-DEF-00102654.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

people were in custody, but this time it reported that it was at 148 percent capacity.[101]

**Graph 2: El Paso's Total Capacity Levels and Number of Persons in OFO Custody (November 2016 – July 2019)**



66.    At the Hidalgo port of entry, it is possible that the high utilized capacity

numbers are related to an increase in circumventors entering U.S. territory via the

port's vehicle lanes, given that the port of entry's numbers peaked from March 2019

to July 2019 (in the available data), and CBP emails confirm that there were large

numbers of circumventors entering the port of entry during that time period.[102]

**Graph 3: Number of People in Custody in the Hidalgo Port of Entry (MCAT)**

---

[101] AOL-DEF-00082489.

[102] This was discussed as a contributing factor for high capacity numbers in a March 2019 CBP email. AOL-DEF-00088390.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



67.    Table 4 shows the capacity levels at each port of entry, using Queue
Management Reports from June 2018 to July 2019. (MCAT data from 2016 through
2019 is in the Appendix).

**Table 4: Field Queue Management Reports (2018-2019)**

| Sector | Port of Entry | Days with Data | 0-50% Capacity | 51-100% Capacity | >100% Capacity |
|--------|---------------|----------------|----------------|------------------|----------------|
| Laredo | Brownsville | 314 | 86% | 14% | 0% |
| | Progreso | 314 | 93% | 6% | 1% |
| | Hidalgo | 314 | 46% | 26% | 28% |
| | Rio Grande | 314 | 96% | 4% | 0% |
| | Roma | 314 | 88% | 12% | 0% |
| | Laredo | 314 | 89% | 11% | 0% |
| | Eagle Pass | 314 | 9% | 47% | 44% |
| | Del Rio | 312 | 82% | 17% | 0% |
| El Paso | Port of El Paso | 213 | 6% | 66% | 28% |
| | Santa Teresa | 213 | 74% | 20% | 6% |
| | Columbus | 212 | 97% | 3% | 0% |
| | Tornillo | 213 | 99% | 1% | 0% |
| | Presidia | 213 | 91% | 8% | 1% |
| Tucson | Douglas | 213 | 60% | 19% | 21% |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

| | | | | | |
|---|---|---|---|---|---|
| | Lukerville | 213 | 80% | 9% | 11% |
| | Naco | 213 | 92% | 4% | 4% |
| | Nogales | 213 | 25% | 61% | 14% |
| | San Luis | 214 | 62% | 38% | 0% |
| San Diego | San Ysidro | 219 | 5% | 89% | 5% |
| | Otay Mesa | 219 | 100% | 0% | 0% |
| | Tecate | 219 | 100% | 0% | 0% |
| | Calexico West | 219 | 29% | 69% | 1% |
| | Calexico East | 218 | 100% | 0% | 0% |
| | Andrade | 219 | 100% | 0% | 0% |

*Total percent may not equal 100% due to rounding.*

68.    This finding is consistent with CBP's own evaluation of its Queue Management data from June 2018 through November 2018. In this evaluation, CBP followed a similar methodology to the one that was used to create this expert report: CBP extracted its Queue Management Reports from emails within senior CBP personnel's official email accounts and entered the data into an excel spreadsheet.[103] Using this methodology, CBP's first conclusion was also that there exists a large deviation among the ports of entry, writing that "some ports are never close to capacity but still have aliens waiting and a few other ports (Eagle Pass, El Paso, and

---

[103] Also, similar to CBP, I also calculated the POE capacity based on the stated percent at capacity of each port of entry and using MCAT's reported capacity numbers. Similar to CBP, I also discovered multiple errors in CBP's capacity percentages, which often stated 100 percent capacity despite reporting low numbers of individuals in custody. I did not attempt to fix these errors in my calculations. AOL-DEF-00210504.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Santa Teresa[104]) routinely exceed capacity."[105]

69.     The Queue Management Reports also include the number of people waiting at the "limit line," which is at or near the international boundary. This number serves to show that CBP was aware that asylum seekers were waiting in Mexican border cities. However, despite this recognition, multiple ports of entry continued to operate with capacity levels at or below 50 percent. For example, in the 313 Queue Management Reports from June 18, 2018 through July 15, 2019 that provide data for the Laredo port of entry, 227 of them noted that CBP was aware that there was a line of asylum seekers waiting in Nuevo Laredo. However, in 201 of those days (89 percent), the Laredo port of entry both reported that it had a line of asylum seekers waiting to enter the United States and that its utilized port capacity was at or below 50 percent. Table 5 contains the information for each port of entry. (Table 9 in the Appendix contains the percent of days at each port of entry where there was a reported line and the port capacity was at or below 75 percent).

**Table 5: Days with Reported Queues at the Limit Line and Port of Entry Capacity Levels Below 50 Percent**

---

[104] In the reviewed data, CBP calculated that Santa Teresa's average capacity was 48 percent for the period in question. Its data shows that Santa Teresa exceeded full capacity (defined as greater than 100 percent) in 10 out of the 95 days. This means that the Santa Teresa POE exceeded its capacity 10.5 percent of the time. By comparison, the Eagle Pass port of entry exceeded capacity 42.1 percent of the time and the El Paso port of entry exceeded capacity 22 percent of the time.

[105] AOL-DEF-00210504.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| City | # of Days with Data | # of Days with Reported Line | # of Days with Reported Line & Port Capacity at or Below 50% | Percent of Days with Reported Line Where Port Capacity at or Below 50% |
|---|---|---|---|---|
| Laredo | 313 | 227 | 201 | 89% |
| Rio Grande | 312 | 17 | 15 | 88% |
| Progreso | 313 | 105 | 90 | 86% |
| Brownsville | 313 | 247 | 207 | 84% |
| Roma | 313 | 95 | 65 | 68% |
| Del Rio | 312 | 92 | 48 | 52% |
| Nogales | 214 | 76 | 24 | 32% |
| Douglas | 214 | 13 | 4 | 31% |
| Eagle Pass | 313 | 145 | 13 | 9% |
| Hidalgo | 313 | 117 | 10 | 9% |
| El Paso | 214 | 123 | 7 | 6% |

70.     Additionally, despite uniformly implementing turn-backs and metering, no port of entry appears to have activated a contingency plan for addressing mass migration or used OFO triggers to process additional people.[106] These contingency plans exist to provide roadmaps for ports of entry when they experience larger than normal migration numbers, allowing the ports to be flexible in their capacity and response.

---

[106] In an April 18, 2018 email, an Assistant Port Director in the San Diego Field Office sent an email outlining San Ysidro's Mass Migration Plan and the triggers in place to double OFO's daily processing capacity from ▮▮▮▮ It appears that on April 18, 2018, this plan was beginning to be put in place, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ After the Metering Guidance issuance, there were no additional documents discussing measures to increase capacity. AOL-DEF-00196691; AOL-DEF-00196695; AOL-DEF-00196745.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

71.    For example, the April 5, 2018 DHS Integrated Concept of Operations

report—which is a document that was created for the Southern California Region to

lay out a plan for addressing an arriving refugee caravan—notes that in an



72.    

---

[107] AOL-DEF-00196723.

[108] AOL-DEF-00196723.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

These measures show that CBP has the structures in place to increase capacity at a port of entry or across all ports of entry to allow for additional processing if necessary. These measures were never activated.[110]

73.    Instead, it appears that there were conscious decisions at times to not expand capacity at ports of entry. On April 21, 2018, the Executive Director for Operations in the Office of Field Operations wrote an email regarding "high capacity in Laredo."[111] On that day the MCAT Reports noted that there were ____ people in custody, putting the port of entry at 132 percent capacity according to CBP's measurements.[112] However, the Laredo Field Office did not activate its Contingency

---

[109] AOL-DEF-00196723.

[110] There are isolated examples in the CBP documents that show OFO cooperating with Border Patrol to create space. However, these do not appear to be part of a larger activation of a contingency plan. AOL-DEF-00088390.

[111] AOL-DEF-00196623.

[112] AOL-DEF-00196624.

48

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Plan[113] to increase capacity.[114] Instead, the Executive Director noted, "Remember that we should not convert space to accommodate … and should hold at the line if necessary."[115]

74.     Lastly, the third finding was that certain ports of entry in the Laredo and San Diego sectors appear to have redirected or to be currently redirecting asylum seekers to nearby larger ports. According to the Queue Management Reports, these ports of entry include the Progreso, Rio Grande, and Roma ports in the Laredo sector and the Otay Mesa, Tecate, Calexico East, and Andrade ports of entry in the San Diego sector. Some of this redirecting appears to have been outlined in musters. For example, a September 4, 2018 muster in Tecate formalized this practice, noting "Due to the facility and operating hour limitations, this necessitates that we redirect asylum seekers to our processing hubs in Calexico West or San Ysidro PedWest."[116]

75.     The POEs engaging in redirecting and the recipient POEs are listed in Table 6. The date ranges are based on the availability of written confirmation of the

---

[113] AOL-DEF-00011011.

[114] The email from the Executive Director did ask if the Laredo port of entry was ██████████████████████ which is listed in the Laredo Contingency Plan as a step to take when the port's capacity is strained. It does not appear that any other part of the Contingency Plan was activated.

[115] AOL-DEF-00196623.

[116] ███████ Deposition, November 21, 2019.

49

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

redirecting practice—generally from Queue Management Reports—and should not be viewed as the exact dates that redirecting occurred. For example, despite Queue Management Reports from June 22, 2019 through July 15, 2019[117] that noted that no ports of entry were redirecting asylum seekers, the Otay Mesa, Tecate, Calexico East, and Andrade ports of entry all continued to report that they had zero individuals in custody. Similarly, the September 2019 DHS Office of the Inspector General Report and _____ deposition both affirm that the redirecting practice continued in Tecate through September 2019 and December 2019, respectively.[118]

**Table 6: Redirecting Ports of Entry and their Recipient Ports of Entry**

| Date[119] | Redirecting POE | Recipient POE |
|---|---|---|
| June 20, 2018 – May 8, 2019 | Progreso | Brownsville |
| June 20, 2018 – May 8, 2019 | Rio Grande | Hidalgo |
| June 20, 2018 – May 8, 2019 | Roma | Hidalgo |
| June 20, 2018 – June 21, 2019 | Otay Mesa | San Ysidro |
| July 9, 2019 – June 21, 2019 | Tecate | San Ysidro or Calexico West |
| June 20, 2018 – June 21, 2019 | Calexico East | Calexico West |
| June 20, 2018 – June 21, 2019 | Andrade | Calexico West |

76.    However, there is variation among the redirecting ports of entry. In the

---

[117] The July 15, 2019 report was the latest available report.

[118] _____ Deposition, November 21, 2019.

[119] The start dates are from AOL-DEF-00210508 and the end dates are from Queue Management Reports. May 8, 2019: AOL-DEF-00087047 and June 21, 2019: AOL-DEF-00086326.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Laredo sector, the Queue Management Reports from June 20, 2018 through May 8, 2019 noted that the redirecting ports continued to accept asylum seekers and noted that they redirected "when necessary." By comparison, the ports of entry in the San Diego sector continuously reported that they had zero intakes of asylum seekers. According to CBP's own analysis of the Queue Management Reports, between June 20, 2018 and November 8, 2018, the redirecting ports continuously turned away arriving asylum seekers despite their detention facilities being completely empty on 80 percent of the days.[120] This finding corresponds with ▬▬▬▬ deposition, where he confirmed that CBP officers in Tecate were instructed to tell arriving asylum seekers that the port of entry was at capacity even when they were aware that the port had sufficient capacity to process asylum seekers.[121]

## F.    Scope of Population Affected by Turn-backs and Metering

77.    From May 2016 through April 2018, asylum seekers were metered at the San Diego port of entry, and periodically at ports of entry along the entire border. However, since April 2018, turn-backs and metering have applied to the vast majority of asylum seekers arriving at the U.S.-Mexico border without a visa to enter

---

[120] AOL-DEF-00210504.

[121] ▬▬▬ Deposition, November 21, 2019.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

the United States.[122]

78.     It is not possible to provide a precise figure regarding the total number of people who have been turned back and metered since the policy began. CBP does not document when it turns people away from ports of entry or when it tells them that the port of entry is at capacity. However, it is possible to provide rough estimates for certain cities in specific time frames. For example, from October 2018 through November 26, 2019, at least 22,000 people signed up on asylum waitlists in Ciudad Juárez.[123] From April 2018 through December 6, 2019, 35,640 people had been processed through the Tijuana waiting list.[124]

79.     The Reports also document periodic snapshots of the number of people

---

[122] The exemptions include unaccompanied minors, individuals who were able to pay a bribe to corrupt list managers and circumvent the asylum waitlist, or asylum seekers who are able to avoid metering by appearing at the limit line with a severe medical need or after being accompanied by an advocate.

[123] 19,180 people have signed up on the asylum waitlists in Ciudad Juárez, and 3,000 Mexicans in the city created their own waitlists at each international bridge. Hérika Martínez Prado, "No se presentan a llamado de EU," *El Diario de Juárez*, December 2, 2019, https://diario.mx/juarez/no-se-presentan-a-llamado-de-eu-20191201-1594784.html; "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

[124] The latest list number in Tijuana is published on "elnumerodelalista.com". On Friday, December 6, 2019, the latest number was 3,564. There are 10 people for each number, totaling 35,640. The total number of people on the list is even larger. http://www.elnumerodelalista.com/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

who had been metered and were waiting on asylum waiting lists at the time of each

Report's publication. The November 2018 report counted 6,000 people[125] on

metering waitlists in 6 cities; the February 2019 update counted 4,800 people[126] in 8

cities; the May 2019 update counted 19,000 people[127] in 13 cities, the August 2019

update counted 26,000[128] in 12 cities, and the November report counted 21,400

people[129] in 11 cities. This creates a combined total of 77,200 people counted on

asylum waitlists, although these numbers only capture snapshots of various lists and

do not cover all ports of entry. Additionally, the number is further complicated since

---

[125] "Asylum Processing and Waitlists at the U.S.-Mexico Border," Strauss Center for International Security and Law, Center for U.S.-Mexican Studies, & Migration Policy Centre, December 2018, https://www.strausscenter.org/images/strauss/18-19/MSI/AsylumReport_190308.pdf.

[126] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, February 2019, https://www.strausscenter.org/images/MSI/MeteringUpdate_190808.pdf.

[127] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, May 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/Metering-Report-May-2019-MSI_5.20.pdf.

[128] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, August 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MSI_MeteringUpdate_190215.pdf.

[129] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

some of these individuals may be repeated in multiple updates, given the long wait

times. Overall, it's clear that tens of thousands of people have been metered along

the U.S.-Mexico border.

**Graph 4: Number of People on Asylum Waitlists (November 2018 – November 2019)**



*Data from the Reports.*

80.    Additionally, the asylum waitlists and the Reports' counts of

individuals waiting in Mexico only include the asylum seekers who signed up on a

waitlist. They do not count unaccompanied minors, who are often excluded from

waitlists and are at times allowed to bypass CBP's metering policy. They also do not

include asylum seekers who were turned back to Mexico after seeking asylum at port

of entry and never joined a list.

81.    Some of these individuals crossed between ports of entry. In January

2017, the American Immigration Council provided three examples from 2016 of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

turn-backs that led to asylum seekers crossing into the United States between ports of entry near Laredo, Reynosa, and El Paso (during that time period, there were no asylum waitlists in the corresponding Mexican cities).[130] And the Department of Homeland Security's Office of the Inspector General published a report in September 2018 that covered metering, writing "OIG saw evidence that limiting the volume of asylum-seekers entering at ports of entry leads some aliens who would otherwise seek legal entry into the United States to cross the border illegally."[131] These asylum seekers' experiences with turn-backs and metering are not recorded, and their number is unknown. Similarly, there have been allegations in Tijuana that black asylum seekers were at times excluded from waitlists, and as such would not be counted.

## G.    Systematic Denial

82.    Metering serves as a denial of access to the United States' asylum process at the moment that an asylum seeker is sent back to Mexico. This initial

---

[130] "Re: U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border, American Immigration Council, January                                    13,                                    2017, https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf.

[131] "Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy," Department of Homeland Security, Office of the Inspector               General,               September               27,               2018, https://www.oig.dhs.gov/sites/default/files/assets/2018-10/OIG-18-84-Sep18.pdf.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

denial can become permanent. As mentioned earlier, in order to be gain access to the U.S. asylum process, asylum seekers in many Mexican cities must join asylum waitlists that are run by unregulated list managers. At least two of these lists have been "closed" since March 2019 and have not allowed arriving asylum seekers to join.[132] Other lists have required the payment of hundreds or thousands of dollars for asylum seekers to access them. This means that accessing the U.S. asylum process in these locations has become dependent on the structure of an unregulated list system in Mexico or the ability to pay large sums of money to a third party.

83.    Second, due to metering, asylum seekers are now waiting weeks or months in precarious or dangerous conditions before even having a chance to ask for asylum. The cities of Matamoros, Nuevo Progreso, Reynosa, Ciudad Miguel Alemán, and Nuevo Laredo are all located in the Mexican state of Tamaulipas, which the U.S. State Department has given a Level 4 advisory of "Do Not Travel." The U.S. travel advisory warns that in Tamaulipas "Violent crime, such as murder, armed robbery, carjacking, kidnapping, extortion, and sexual assault, is common."[133] Three

---

[132] These include the individual and family lists in Ciudad Acuña. There have been reports that the Piedras Negras list was periodically closed in 2019.

[133] It also notes that "Gang activity, including gun battles and blockades, is widespread. Armed criminal groups target public and private passenger buses as well as private automobiles traveling through Tamaulipas, often taking passengers hostage and demanding ransom payments. Federal and state security forces have limited capability to respond to violence in many parts of the state." "Mexico Travel

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

other Mexican border states—Coahuila, Chihuahua, and Sonora—have a Level 3 State Department travel advisory of "Reconsider Travel."[134] Baja California has a Level 2 travel advisory of "Exercise Increased Caution."[135]

84.    While asylum seekers wait in Mexican border cities, some have been targeted for crimes, such as robberies, assault, and frequently kidnappings. In 2019, Human Rights First documented a case in Nuevo Laredo where a Guatemalan man on the asylum waitlist was kidnapped after leaving a migrant shelter to search for temporary employment.[136] In January 2019, I also documented a case where a Salvadoran family was kidnapped in Piedras Negras in July 2018 while waiting for their number to be called on the waitlist. When this family was released by Coahuila State Police, they were sent to the National Migration Institute, which began

---

Advisory," U.S. State Department, accessed November 11, 2019, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html.

[134] The ports of entry in Coahuila are Eagle Pass and Del Rio. The ports of entry in Chihuahua are El Paso, Santa Teresa, Tornillo, and Columbus. The ports of entry in Sonora are Douglas, Lukeville, Naco, Nogales, and San Luis.

[135] The ports of entry in Baja Californa are Andrade, Calexico East, Calexico West, Tecate, Otay Mesa, and San Ysidro.

[136] "Barred at the Border," Human Rights First, April 2019, https://www.humanrightsfirst.org/sites/default/files/BARRED_AT_THE_BORDER.pdf.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

deportation proceedings to send them back to El Salvador.[137]

    85.    Given that Mexican law enforcement are legally mandated to channel anyone in the country without migratory paperwork to the National Migration Institute (regardless of whether or not they are waiting on an asylum waitlist), there are surely other cases where kidnapped asylum seekers were channeled into deportation proceedings.[138] Additionally, asylum seekers waiting on metering lists are not provided any legal documents to remain in Mexico, and, according to Article 98 of Mexico's 2011 Migratory Law, any foreigner detected that does not have the documents accrediting their regular migratory status in the country will be subject to apprehension.[139]

    86.    Third, there are also cases of turn-backs and metering that have led to

---

[137] Stephanie Leutert and Shaw Drake, "'We are Full': What Asylum Seekers Are Told," *The New York Times*, January 28, 2019, https://www.nytimes.com/2019/01/28/opinion/asylum-border-immigrants-trump-.html.

[138] Only the National Migration Institute is authorized to check an individual's migratory paperwork. The 2011 Migratory Law outlines that the Federal Police (and now the National Guard) can assist the National Migration Institute in its migration enforcement efforts when their assistance is requested. However, unauthorized migrants that are discovered during routine law enforcement work are generally channeled to the National Migration Institute.

[139] Ley de Migración, Congreso General de los Estados Unidos Mexicanos, May 2011, http://www.diputados.gob.mx/LeyesBiblio/ref/lmigra/LMigra_orig_25may11.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

an effective end to asylum seekers' claims, and even their lives. In June 25, 2019,
Oscar and Valerie Martinez made headlines when they drowned in the Rio Grande
river in Matamoros. The family had been living in a camp of asylum seekers near
the international bridge, waiting for their asylum numbers to be called.[140] After a
month of waiting, they grew discouraged and decided to cross the river to ask for
asylum from Border Patrol agents, which is when they drowned in the swift current.
Similarly, a Honduran woman and her two year old son also drowned in the Rio
Grande near Ciudad Acuña after waiting in a tent camp in that city and then
attempting to cross.[141] There are additional cases of individuals and children dying
after being metered.[142] These asylum seekers were unable to access the U.S. asylum
process in the moment when they arrived to the U.S.-Mexico border, and died before
ever being able to access it.

---

[140] Julia Le Duc, "Migrante salvadoreño y su hija mueren en el intent de cruzar a
EU," La Jornada, June 25, 2019, https://www.jornada.com.mx/sin-
fronteras/2019/06/24/migrante-salvadoreno-y-su-hija-mueren-en-el-intento-de-
cruzar-a-eu-9107.html.

[141] Andy Torres, "Honduran migrant and her two year old son drown while
attempting to swim across the Rio Grande from Mexico to reunite with her husband
and two daughters in the US," *Daily Mail*, September 17, 2019,
https://www.dailymail.co.uk/news/article-7473969/Honduran-migrant-two-year-
old-son-drown-attempting-swim-Mexico.html.

[142] Riane Roldan, "Border Patrol searches for missing 2-year-old girl in Rio Grande,"
Texas Tribune, July 3, 2019, https://www.texastribune.org/2019/07/03/border-
patrol-searches-missing-2-year-old-girl-rio-grande/.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

87.    Finally, CBP has increasingly denied access to the U.S. asylum process for Mexican nationals. CBP's April 2018 Metering Guidance explicitly names Mexican nationals as a group that should not be stopped from entering U.S. territory, writing "DFOs should be particularly aware of any INAMI controls that are preventing U.S. citizens, LPRs, or Mexican nationals (some of whom may intend to claim fear) from entering the United States."[143] However, the November 2019 Metering Report Update counted 11,040 Mexicans who had been turned back from U.S. ports of entry and were waiting at the U.S.-Mexico border, making up 52 percent of people then on asylum waitlists.[144] These asylum seekers were forced to wait in the very country that they are attempting to flee. In Ciudad Juárez and Matamoros, these asylum seekers have created their own separate waitlists, so as not to be in contact with Mexican government officials.[145]

## VI.    Conclusion

88.    Beginning in May 2016, the U.S. government began turning back asylum seekers who were arriving at ports of entry on the U.S.-Mexico border. This

---

[143] AOL-DEF-00196460.

[144] "Metering Update," Strauss Center for International Security and Law and the Center for U.S.-Mexican Studies, November 2019, https://www.strausscenter.org/images/strauss/18-19/MSI/MeteringUpdate_191107.pdf.

[145] In Matamoros, the National Migration Institute runs the asylum waitlist at the Gateway Bridge. In El Paso, the State Population Council runs the asylum waitlist.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

practice began at the San Ysidro port of entry and spread relatively rapidly to the rest of the U.S.-Mexico border. By April 2018, CBP formally established this policy in a formal Metering Guidance memo that was then disseminated to CBP officers via a series of written and oral musters and standard operating procedures. Today, turn-backs on the U.S.-Mexico border are ubiquitous and systemic. Smaller ports of entry redirect asylum seekers to larger ports of entry, even though the smaller ports of entry have the ability to process asylum seekers. Larger ports of entry turn back asylum seekers, directing them to shelters and waitlists maintained on the Mexican side of the border.

89.    Due to these turn-backs, asylum seekers wait for weeks, if not months, to access the U.S. asylum process, often times in dangerous conditions. CBP's MCAT and Queue Management Reports offer a common method for determining whether capacity constraints prevented a port of entry from inspecting and processing an asylum seeker without resorting to turn-backs. Using this method, I have determined that the standardized use of turn-backs cannot be justified by capacity constraints at the majority of ports of entry.

90.    The data includes many instances when ports of entry reach capacity but since April 2018, these ports of entry have never used their previously-approved contingency plans that would have temporarily expanded capacity within the port of entry during times of increased migration. Additionally, metering practices and turn-

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

backs have remained in place regardless of the migration level at the port of entry.

91.    If metering and turn-backs were only a response to greater numbers of arriving asylum seekers, then we could expect that the limit line positions, turn-backs, and metering processes would disappear in ports of entry that were experiencing low migration numbers or had no individuals waiting in Mexico to seek entry. Yet, CBP's documents, extensive fieldwork, the September 2019 OIG report regarding Tecate, and ███████ testimony all illustrate that these policies continue to be in place at pedestrian ports of entry along the entire U.S. border, unchanged by the ebbs and flows of migration numbers.

Signed this 10th day of December, 2019:

Stephanie Leutert

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Exhibits/Attachments/Figures

**Table 7: CBP Documents Containing Data on Capacity**

| Report Name | Number of Reports | Date Range |
|---|---|---|
| MCAT Daily Reports | 547 | 11/30/2016 – 7/13/2019 |
| Field Queue Management Reports | 314 | 6/18/2018 – 7/15/2019 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Table 8: Port Capacity Over Time (MCAT Reports)

| City | Date Range | | | | |
|------|-----------|---|---|---|---|
| | 11/30/2016 - 3/23/2018 | 4/2/2018 – 4/27/2018 | 5/4/2018 – 6/4/2018 | 6/5/2018 – 7/13/2019 | 7/7/2019 – 7/13/09 |
| Brownsville | | | | | |
| Hidalgo | | | | | |
| Roma | | | | | |
| Laredo | | | | | |
| Eagle Pass | | | | | |
| El Paso | | | | | |
| Tornillo | | | | | |
| Nogales | | | | | |
| San Luis | | | | | |
| Calexico | | | | | |
| San Ysidro | | | | | |
| Otay Mesa | | | | | |

---

[146] The capacity drops to ▮ on March 23, 2018. Since this only occurs for one day, it could be an error.

[147] The capacity switched from to ▮ on July 30, 2018.

[148] The capacity switched from ▮ to ▮ on October 31, 2018.

[149] The capacity switched from ▮ to ▮ on June 19, 2018.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Table 9: Days with Reported Queues at the Limit Line and Port of Entry Capacity Levels at or Below 75 Percent**

| City | # of Days with Data | # of Days with Reported Line | # of Days with Reported Line & Port Capacity at or Below 75% | Percent of Days with Reported Line & Port Capacity at or Below 75% |
|---|---|---|---|---|
| Laredo | 313 | 227 | 226 | 100% |
| Rio Grande | 312 | 17 | 17 | 100% |
| Brownsville | 313 | 247 | 244 | 99% |
| Roma | 313 | 95 | 94 | 99% |
| Progreso | 313 | 105 | 99 | 94% |
| Del Rio | 312 | 92 | 77 | 84% |
| Nogales | 214 | 76 | 47 | 62% |
| Douglas | 214 | 13 | 7 | 54% |
| Hidalgo | 313 | 117 | 45 | 38% |
| Port of El Paso | 214 | 123 | 40 | 33% |
| Eagle Pass | 313 | 145 | 30 | 21% |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Table 10: MCAT Capacity Data (November 30, 2016 – July 19, 2019)

| | Days with Data | 0-50% Capacity | 51-100% Capacity | >100% Capacity |
|---|---|---|---|---|
| Brownsville | 483 | 92% | 7% | 1% |
| Calexico, CA | 536 | 61% | 34% | 5% |
| El Paso | 537 | 52% | 27% | 21% |
| Hidalgo | 521 | 66% | 17% | 17% |
| Laredo | 530 | 93% | 7% | 0% |
| Nogales | 530 | 55% | 41% | 4% |
| San Luis | 497 | 87% | 13% | 0% |
| San Ysidro | 537 | 44% | 53% | 3% |
| Eagle Pass | 220 | 5% | 38% | 57% |
| Otay Mesa | 265 | 87% | 11% | 2% |
| Roma | 220 | 73% | 26% | 0% |
| Tornillo | 232 | 96% | 3% | 1% |

*Total percent may not equal 100% due to rounding.*

66

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Exhibit C: Materials Considered

In addition to the materials cited in the body of my report, I considered the following materials when forming the opinions expressed in my report.

### Pleadings
- Plaintiffs' Second Amended Complaint
- Defendants' Answer to Second Amended Complaint
- Exhibit 1 to Defendants' Answer to Second Amended Complaint

### Court Orders
- Order Denying in Part and Granting in Part Defendants' Motion to Dismiss Second Amended Complaint
- Amended Order Denying in Part and Granting in Part Defendants' Motion to Dismiss Second Amended Complaint

### Discovery Requests
- Plaintiffs' First Set of Requests for Production
- Defendants' Responses and Objections to Plaintiffs' First Set of Requests for Production
- Plaintiffs' Second Set of Requests for Production
- Defendants' Responses and Objections to Plaintiffs' Second Set of Requests for Production
- Plaintiffs' Third Set of Requests for Production
- Defendants' Responses and Objections to Plaintiffs' Third Set of Requests for Production
- Plaintiffs' Fourth Set of Requests for Production
- Defendants' Responses and Objections to Plaintiffs' Fourth Set of Requests for Production
- Plaintiffs' Fifth Set of Requests for Production
- Defendants' Responses and Objections to Plaintiffs' Fifth Set of Requests for Production
- Plaintiffs' First Set of Interrogatories
- Defendants' Responses and Objections to Plaintiffs' First Set of Interrogatories
- Plaintiffs' Second Set of Interrogatories
- Defendants' Responses and Objections to Plaintiffs' Second Set of Interrogatories
- Plaintiffs' First Deposition Notice

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Plaintiffs' Rule 30(b)(6) Deposition Notice to CBP

**Briefs**
- Plaintiffs' Motion for Preliminary Injunction, Brief, and Supporting Exhibits
- Defendants' Opposition to Motion for Preliminary Injunction and Supporting Exhibits
- Plaintiffs Reply in Support of their Motion for Preliminary Injunction and Supporting Exhibits
- Plaintiffs' Motion for Provisional Class Certification, Brief, and Supporting Exhibits
- Defendants' Opposition to Motion for Provisional Class Certification and Supporting Exhibits
- Plaintiffs' Reply in Support of their Motion for Provisional Class Certification and Supporting Exhibits

**Depositions and Exhibits to Depositions**
- ▮▮▮▮▮▮▮▮▮▮ November 21, 2019

**Documents**
- AOL-DEF-00010309
- AOL-DEF-00010580
- AOL-DEF-00010628
- AOL-DEF-00010630
- AOL-DEF-00010632
- AOL-DEF-00010634
- AOL-DEF-00010637
- AOL-DEF-00010640
- AOL-DEF-00010764
- AOL-DEF-00011011
- AOL-DEF-00011235
- AOL-DEF-00011371
- AOL-DEF-00011376
- AOL-DEF-00011372
- AOL-DEF-00011876
- AOL-DEF-00011883
- AOL-DEF-00012000
- AOL-DEF-00012012
- AOL-DEF-00012014

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00012018
- AOL-DEF-00012019
- AOL-DEF-00012020
- AOL-DEF-00012021
- AOL-DEF-00012022
- AOL-DEF-00012032
- AOL-DEF-00012033
- AOL-DEF-00012041
- AOL-DEF-00012061
- AOL-DEF-00012071
- AOL-DEF-00012081
- AOL-DEF-00012099
- AOL-DEF-00012109
- AOL-DEF-00012119
- AOL-DEF-00012129
- AOL-DEF-00012144
- AOL-DEF-00012154
- AOL-DEF-00012164
- AOL-DEF-00012175
- AOL-DEF-00012186
- AOL-DEF-00012196
- AOL-DEF-00012206
- AOL-DEF-00012217
- AOL-DEF-00012227
- AOL-DEF-00012236
- AOL-DEF-00012246
- AOL-DEF-00012256
- AOL-DEF-00012266
- AOL-DEF-00012284
- AOL-DEF-00012307
- AOL-DEF-00012317
- AOL-DEF-00012335
- AOL-DEF-00012345
- AOL-DEF-00012355
- AOL-DEF-00012365
- AOL-DEF-00012376
- AOL-DEF-00012394

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00012419
- AOL-DEF-00012433
- AOL-DEF-00012445
- AOL-DEF-00012457
- AOL-DEF-00012469
- AOL-DEF-00012483
- AOL-DEF-00012495
- AOL-DEF-00012506
- AOL-DEF-00012517
- AOL-DEF-00012527
- AOL-DEF-00012537
- AOL-DEF-00012548
- AOL-DEF-00012560
- AOL-DEF-00012572
- AOL-DEF-00012583
- AOL-DEF-00012594
- AOL-DEF-00012606
- AOL-DEF-00012617
- AOL-DEF-00012633
- AOL-DEF-00012643
- AOL-DEF-00012653
- AOL-DEF-00012666
- AOL-DEF-00012676
- AOL-DEF-00012685
- AOL-DEF-00012694
- AOL-DEF-00012703
- AOL-DEF-00012712
- AOL-DEF-00012721
- AOL-DEF-00012978
- AOL-DEF-00012987
- AOL-DEF-00012996
- AOL-DEF-00013005
- AOL-DEF-00013014
- AOL-DEF-00013023
- AOL-DEF-00013023
- AOL-DEF-00013041
- AOL-DEF-00013049

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00013052
- AOL-DEF-00013059
- AOL-DEF-00013071
- AOL-DEF-00013075
- AOL-DEF-00013085
- AOL-DEF-00013090
- AOL-DEF-00013103
- AOL-DEF-00013107
- AOL-DEF-00013110
- AOL-DEF-00013116
- AOL-DEF-00013122
- AOL-DEF-00013128
- AOL-DEF-00013141
- AOL-DEF-00013155
- AOL-DEF-00013160
- AOL-DEF-00013164
- AOL-DEF-00013168
- AOL-DEF-00013179
- AOL-DEF-00013189
- AOL-DEF-00013194
- AOL-DEF-00013209
- AOL-DEF-00013215
- AOL-DEF-00013229
- AOL-DEF-00013232
- AOL-DEF-00013235
- AOL-DEF-00013238
- AOL-DEF-00013241
- AOL-DEF-00013244
- AOL-DEF-00013869
- AOL-DEF-00013871
- AOL-DEF-00013889
- AOL-DEF-00013906
- AOL-DEF-00013908
- AOL-DEF-00013924
- AOL-DEF-00013926
- AOL-DEF-00013930
- AOL-DEF-00013932

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00014010
- AOL-DEF-00014030
- AOL-DEF-00014033
- AOL-DEF-00014038
- AOL-DEF-00014041
- AOL-DEF-00014136
- AOL-DEF-00014173
- AOL-DEF-00014547
- AOL-DEF-00014659
- AOL-DEF-00014669
- AOL-DEF-00014682
- AOL-DEF-00014717
- AOL-DEF-00014720
- AOL-DEF-00014724
- AOL-DEF-00014762
- AOL-DEF-00014832
- AOL-DEF-00014854
- AOL-DEF-00014870
- AOL-DEF-00014875
- AOL-DEF-00014878
- AOL-DEF-00014881
- AOL-DEF-00014893
- AOL-DEF-00014895
- AOL-DEF-00014909
- AOL-DEF-00014922
- AOL-DEF-00014925
- AOL-DEF-00014942
- AOL-DEF-00014963
- AOL-DEF-00014977
- AOL-DEF-00014996
- AOL-DEF-00015339
- AOL-DEF-00016004
- AOL-DEF-00016564
- AOL-DEF-00016577
- AOL-DEF-00016589
- AOL-DEF-00016601
- AOL-DEF-00016631

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00016643
- AOL-DEF-00016653
- AOL-DEF-00016665
- AOL-DEF-00016672
- AOL-DEF-00016683
- AOL-DEF-00016691
- AOL-DEF-00016705
- AOL-DEF-00016715
- AOL-DEF-00016723
- AOL-DEF-00016733
- AOL-DEF-00016735
- AOL-DEF-00016773
- AOL-DEF-00016774
- AOL-DEF-00016777
- AOL-DEF-00016779
- AOL-DEF-00016780
- AOL-DEF-00016781
- AOL-DEF-00016782
- AOL-DEF-00016813
- AOL-DEF-00016820
- AOL-DEF-00016823
- AOL-DEF-00016828
- AOL-DEF-00016831
- AOL-DEF-00016836
- AOL-DEF-00016839
- AOL-DEF-00016844
- AOL-DEF-00016847
- AOL-DEF-00016852
- AOL-DEF-00016855
- AOL-DEF-00016860
- AOL-DEF-00016863
- AOL-DEF-00016870
- AOL-DEF-00016874
- AOL-DEF-00016875
- AOL-DEF-00016876
- AOL-DEF-00016877
- AOL-DEF-00016880

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00016888
- AOL-DEF-00016891
- AOL-DEF-00016896
- AOL-DEF-00016899
- AOL-DEF-00016923
- AOL-DEF-00016926
- AOL-DEF-00016931
- AOL-DEF-00016934
- AOL-DEF-00016939
- AOL-DEF-00016942
- AOL-DEF-00016947
- AOL-DEF-00016950
- AOL-DEF-00016960
- AOL-DEF-00016963
- AOL-DEF-00016974
- AOL-DEF-00016977
- AOL-DEF-00016992
- AOL-DEF-00016995
- AOL-DEF-00017000
- AOL-DEF-00017003
- AOL-DEF-00017008
- AOL-DEF-00017011
- AOL-DEF-00017016
- AOL-DEF-00017019
- AOL-DEF-00017099
- AOL-DEF-00017102
- AOL-DEF-00017163
- AOL-DEF-00017168
- AOL-DEF-00017175
- AOL-DEF-00017177
- AOL-DEF-00017208
- AOL-DEF-00017213
- AOL-DEF-00017241
- AOL-DEF-00017246
- AOL-DEF-00017355
- AOL-DEF-00017358
- AOL-DEF-00017365

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00017367
- AOL-DEF-00017374
- AOL-DEF-00017376
- AOL-DEF-00017383
- AOL-DEF-00017385
- AOL-DEF-00017392
- AOL-DEF-00017395
- AOL-DEF-00017400
- AOL-DEF-00017401
- AOL-DEF-00017402
- AOL-DEF-00017407
- AOL-DEF-00017414
- AOL-DEF-00017417
- AOL-DEF-00017424
- AOL-DEF-00017426
- AOL-DEF-00017434
- AOL-DEF-00017437
- AOL-DEF-00017444
- AOL-DEF-00017448
- AOL-DEF-00017455
- AOL-DEF-00017460
- AOL-DEF-00017467
- AOL-DEF-00017470
- AOL-DEF-00017517
- AOL-DEF-00017521
- AOL-DEF-00017528
- AOL-DEF-00017531
- AOL-DEF-00017539
- AOL-DEF-00017542
- AOL-DEF-00017551
- AOL-DEF-00017553
- AOL-DEF-00017568
- AOL-DEF-00017576
- AOL-DEF-00017581
- AOL-DEF-00017586
- AOL-DEF-00017588
- AOL-DEF-00017595

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00017600
- AOL-DEF-00017605
- AOL-DEF-00017610
- AOL-DEF-00017615
- AOL-DEF-00017620
- AOL-DEF-00017625
- AOL-DEF-00017630
- AOL-DEF-00017635
- AOL-DEF-00017641
- AOL-DEF-00017646
- AOL-DEF-00017652
- AOL-DEF-00017657
- AOL-DEF-00017662
- AOL-DEF-00017667
- AOL-DEF-00017672
- AOL-DEF-00017677
- AOL-DEF-00017682
- AOL-DEF-00017687
- AOL-DEF-00017692
- AOL-DEF-00017697
- AOL-DEF-00017702
- AOL-DEF-00017707
- AOL-DEF-00017712
- AOL-DEF-00017717
- AOL-DEF-00017722
- AOL-DEF-00017727
- AOL-DEF-00017732
- AOL-DEF-00017737
- AOL-DEF-00017742
- AOL-DEF-00017747
- AOL-DEF-00017751
- AOL-DEF-00017761
- AOL-DEF-00017766
- AOL-DEF-00017771
- AOL-DEF-00017776
- AOL-DEF-00017781
- AOL-DEF-00017786

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00017791
- AOL-DEF-00017796
- AOL-DEF-00017801
- AOL-DEF-00017807
- AOL-DEF-00017812
- AOL-DEF-00017817
- AOL-DEF-00017822
- AOL-DEF-00017827
- AOL-DEF-00017832
- AOL-DEF-00017837
- AOL-DEF-00017842
- AOL-DEF-00017847
- AOL-DEF-00017852
- AOL-DEF-00017857
- AOL-DEF-00017862
- AOL-DEF-00017867
- AOL-DEF-00017872
- AOL-DEF-00017877
- AOL-DEF-00017882
- AOL-DEF-00017887
- AOL-DEF-00017892
- AOL-DEF-00017897
- AOL-DEF-00017902
- AOL-DEF-00017907
- AOL-DEF-00017912
- AOL-DEF-00017917
- AOL-DEF-00017922
- AOL-DEF-00017927
- AOL-DEF-00017932
- AOL-DEF-00017937
- AOL-DEF-00017942
- AOL-DEF-00017947
- AOL-DEF-00017952
- AOL-DEF-00017957
- AOL-DEF-00017962
- AOL-DEF-00017967
- AOL-DEF-00017972

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00017977
- AOL-DEF-00017982
- AOL-DEF-00017987
- AOL-DEF-00017992
- AOL-DEF-00017997
- AOL-DEF-00018002
- AOL-DEF-00018009
- AOL-DEF-00018014
- AOL-DEF-00018019
- AOL-DEF-00018024
- AOL-DEF-00018029
- AOL-DEF-00018034
- AOL-DEF-00018039
- AOL-DEF-00018044
- AOL-DEF-00018049
- AOL-DEF-00018054
- AOL-DEF-00018059
- AOL-DEF-00018064
- AOL-DEF-00018069
- AOL-DEF-00018074
- AOL-DEF-00018079
- AOL-DEF-00018084
- AOL-DEF-00018087
- AOL-DEF-00018089
- AOL-DEF-00018094
- AOL-DEF-00018099
- AOL-DEF-00018104
- AOL-DEF-00018109
- AOL-DEF-00018114
- AOL-DEF-00018119
- AOL-DEF-00018124
- AOL-DEF-00018129
- AOL-DEF-00018134
- AOL-DEF-00018139
- AOL-DEF-00018144
- AOL-DEF-00018149
- AOL-DEF-00018154

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00018159
- AOL-DEF-00018164
- AOL-DEF-00018169
- AOL-DEF-00018174
- AOL-DEF-00018179
- AOL-DEF-00018184
- AOL-DEF-00018189
- AOL-DEF-00018194
- AOL-DEF-00018199
- AOL-DEF-00018204
- AOL-DEF-00018209
- AOL-DEF-00018212
- AOL-DEF-00018219
- AOL-DEF-00018224
- AOL-DEF-00018229
- AOL-DEF-00018234
- AOL-DEF-00018239
- AOL-DEF-00018244
- AOL-DEF-00018249
- AOL-DEF-00018254
- AOL-DEF-00018259
- AOL-DEF-00018264
- AOL-DEF-00018269
- AOL-DEF-00018276
- AOL-DEF-00018281
- AOL-DEF-00018286
- AOL-DEF-00018291
- AOL-DEF-00018296
- AOL-DEF-00018301
- AOL-DEF-00018306
- AOL-DEF-00018311
- AOL-DEF-00018313
- AOL-DEF-00018315
- AOL-DEF-00018317
- AOL-DEF-00018345
- AOL-DEF-00018347
- AOL-DEF-00018353

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00018355
- AOL-DEF-00018362
- AOL-DEF-00018364
- AOL-DEF-00018388
- AOL-DEF-00018399
- AOL-DEF-00018401
- AOL-DEF-00018406
- AOL-DEF-00018408
- AOL-DEF-00018414
- AOL-DEF-00019150
- AOL-DEF-00019162
- AOL-DEF-00019285
- AOL-DEF-00019307
- AOL-DEF-00019314
- AOL-DEF-00019375
- AOL-DEF-00019403
- AOL-DEF-00019435
- AOL-DEF-00019447
- AOL-DEF-00019452
- AOL-DEF-00019468
- AOL-DEF-00019495
- AOL-DEF-00019505
- AOL-DEF-00019524
- AOL-DEF-00019542
- AOL-DEF-00019571
- AOL-DEF-00019689
- AOL-DEF-00019876
- AOL-DEF-00019898
- AOL-DEF-00019923
- AOL-DEF-00019950
- AOL-DEF-00019965
- AOL-DEF-00020023
- AOL-DEF-00020113
- AOL-DEF-00020130
- AOL-DEF-00020147
- AOL-DEF-00020168
- AOL-DEF-00020196

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00020215
- AOL-DEF-00020254
- AOL-DEF-00020272
- AOL-DEF-00020290
- AOL-DEF-00020308
- AOL-DEF-00020326
- AOL-DEF-00020385
- AOL-DEF-00020406
- AOL-DEF-00020426
- AOL-DEF-00020445
- AOL-DEF-00020463
- AOL-DEF-00020481
- AOL-DEF-00020499
- AOL-DEF-00020520
- AOL-DEF-00020538
- AOL-DEF-00020557
- AOL-DEF-00020575
- AOL-DEF-00020594
- AOL-DEF-00020612
- AOL-DEF-00020630
- AOL-DEF-00020648
- AOL-DEF-00020666
- AOL-DEF-00020685
- AOL-DEF-00020704
- AOL-DEF-00020722
- AOL-DEF-00020740
- AOL-DEF-00020758
- AOL-DEF-00020776
- AOL-DEF-00020794
- AOL-DEF-00020812
- AOL-DEF-00020831
- AOL-DEF-00020849
- AOL-DEF-00020867
- AOL-DEF-00020885
- AOL-DEF-00020903
- AOL-DEF-00020921
- AOL-DEF-00020940

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00020959
- AOL-DEF-00020977
- AOL-DEF-00020995
- AOL-DEF-00021013
- AOL-DEF-00021031
- AOL-DEF-00021050
- AOL-DEF-00021068
- AOL-DEF-00021087
- AOL-DEF-00021105
- AOL-DEF-00021125
- AOL-DEF-00021144
- AOL-DEF-00021162
- AOL-DEF-00021181
- AOL-DEF-00021199
- AOL-DEF-00021219
- AOL-DEF-00021237
- AOL-DEF-00021255
- AOL-DEF-00021275
- AOL-DEF-00021293
- AOL-DEF-00021312
- AOL-DEF-00021331
- AOL-DEF-00021350
- AOL-DEF-00021369
- AOL-DEF-00021387
- AOL-DEF-00022783
- AOL-DEF-00023095
- AOL-DEF-00027364
- AOL-DEF-00027464
- AOL-DEF-00028451
- AOL-DEF-00028455
- AOL-DEF-00028457
- AOL-DEF-00032387
- AOL-DEF-00032389
- AOL-DEF-00034787
- AOL-DEF-00036001
- AOL-DEF-00036004
- AOL-DEF-00036343

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00036355
- AOL-DEF-00038275
- AOL-DEF-00038916
- AOL-DEF-00038921
- AOL-DEF-00038923
- AOL-DEF-00038925
- AOL-DEF-00038927
- AOL-DEF-00038929
- AOL-DEF-00038931
- AOL-DEF-00039125
- AOL-DEF-00039580
- AOL-DEF-00039582
- AOL-DEF-00040299
- AOL-DEF-00040302
- AOL-DEF-00040333
- AOL-DEF-00040336
- AOL-DEF-00041176
- AOL-DEF-00042399
- AOL-DEF-00042510
- AOL-DEF-00042648
- AOL-DEF-00042759
- AOL-DEF-00044050
- AOL-DEF-00050864
- AOL-DEF-00053043
- AOL-DEF-00053062
- AOL-DEF-00053073
- AOL-DEF-00053593
- AOL-DEF-00053604
- AOL-DEF-00053764
- AOL-DEF-00054004
- AOL-DEF-00054017
- AOL-DEF-00054227
- AOL-DEF-00054402
- AOL-DEF-00054409
- AOL-DEF-00054418
- AOL-DEF-00055146
- AOL-DEF-00055183

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00055211
- AOL-DEF-00055423
- AOL-DEF-00055468
- AOL-DEF-00055481
- AOL-DEF-00055496
- AOL-DEF-00056071
- AOL-DEF-00056080
- AOL-DEF-00056089
- AOL-DEF-00056098
- AOL-DEF-00056108
- AOL-DEF-00056224
- AOL-DEF-00056233
- AOL-DEF-00056293
- AOL-DEF-00056302
- AOL-DEF-00056328
- AOL-DEF-00056341
- AOL-DEF-00056574
- AOL-DEF-00056803
- AOL-DEF-00056823
- AOL-DEF-00056832
- AOL-DEF-00056858
- AOL-DEF-00057073
- AOL-DEF-00057083
- AOL-DEF-00057095
- AOL-DEF-00057105
- AOL-DEF-00057111
- AOL-DEF-00057127
- AOL-DEF-00057469
- AOL-DEF-00058870
- AOL-DEF-00058873
- AOL-DEF-00058897
- AOL-DEF-00058900
- AOL-DEF-00058927
- AOL-DEF-00058954
- AOL-DEF-00059045
- AOL-DEF-00059291
- AOL-DEF-00059330

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00059486
- AOL-DEF-00059496
- AOL-DEF-00059531
- AOL-DEF-00059808
- AOL-DEF-00059884
- AOL-DEF-00059886
- AOL-DEF-00060550
- AOL-DEF-00060618
- AOL-DEF-00060687
- AOL-DEF-00060695
- AOL-DEF-00060705
- AOL-DEF-00060742
- AOL-DEF-00060789
- AOL-DEF-00060799
- AOL-DEF-00060811
- AOL-DEF-00060821
- AOL-DEF-00060830
- AOL-DEF-00060839
- AOL-DEF-00060848
- AOL-DEF-00060857
- AOL-DEF-00060866
- AOL-DEF-00060875
- AOL-DEF-00060883
- AOL-DEF-00060901
- AOL-DEF-00060910
- AOL-DEF-00060919
- AOL-DEF-00060928
- AOL-DEF-00060971
- AOL-DEF-00060980
- AOL-DEF-00060989
- AOL-DEF-00060742
- AOL-DEF-00061006
- AOL-DEF-00061292
- AOL-DEF-00061301
- AOL-DEF-00061312
- AOL-DEF-00061327
- AOL-DEF-00061644

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00061655
- AOL-DEF-00061664
- AOL-DEF-00061678
- AOL-DEF-00061687
- AOL-DEF-00061696
- AOL-DEF-00061709
- AOL-DEF-00061734
- AOL-DEF-00061744
- AOL-DEF-00061754
- AOL-DEF-00061763
- AOL-DEF-00061788
- AOL-DEF-00061813
- AOL-DEF-00061822
- AOL-DEF-00061847
- AOL-DEF-00067434
- AOL-DEF-00068394
- AOL-DEF-00068969
- AOL-DEF-00069311
- AOL-DEF-00069317
- AOL-DEF-00069350
- AOL-DEF-00069370
- AOL-DEF-00069622
- AOL-DEF-00069799
- AOL-DEF-00069802
- AOL-DEF-00069817
- AOL-DEF-00069819
- AOL-DEF-00069838
- AOL-DEF-00069840
- AOL-DEF-00070496
- AOL-DEF-00070472
- AOL-DEF-00070511
- AOL-DEF-00070514
- AOL-DEF-00070558
- AOL-DEF-00070599
- AOL-DEF-00070606
- AOL-DEF-00070608
- AOL-DEF-00070622

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00070624
- AOL-DEF-00070663
- AOL-DEF-00070665
- AOL-DEF-00070679
- AOL-DEF-00070698
- AOL-DEF-00070700
- AOL-DEF-00070702
- AOL-DEF-00070768
- AOL-DEF-00070825
- AOL-DEF-00070982
- AOL-DEF-00070991
- AOL-DEF-00070995
- AOL-DEF-00070998
- AOL-DEF-00071011
- AOL-DEF-00071015
- AOL-DEF-00071136
- AOL-DEF-00071142
- AOL-DEF-00071149
- AOL-DEF-00071160
- AOL-DEF-00071202
- AOL-DEF-00071602
- AOL-DEF-00071651
- AOL-DEF-00073971
- AOL-DEF-00074023
- AOL-DEF-00074027
- AOL-DEF-00075871
- AOL-DEF-00075874
- AOL-DEF-00075901
- AOL-DEF-00075904
- AOL-DEF-00075931
- AOL-DEF-00075934
- AOL-DEF-00075959
- AOL-DEF-00075962
- AOL-DEF-00075989
- AOL-DEF-00075992
- AOL-DEF-00076017
- AOL-DEF-00076020

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00076045
- AOL-DEF-00076048
- AOL-DEF-00076074
- AOL-DEF-00076077
- AOL-DEF-00076105
- AOL-DEF-00076108
- AOL-DEF-00076133
- AOL-DEF-00076136
- AOL-DEF-00076164
- AOL-DEF-00076167
- AOL-DEF-00076193
- AOL-DEF-00076196
- AOL-DEF-00076221
- AOL-DEF-00076224
- AOL-DEF-00076247
- AOL-DEF-00076250
- AOL-DEF-00076274
- AOL-DEF-00076277
- AOL-DEF-00076301
- AOL-DEF-00076304
- AOL-DEF-00076315
- AOL-DEF-00076318
- AOL-DEF-00076331
- AOL-DEF-00076334
- AOL-DEF-00076361
- AOL-DEF-00076364
- AOL-DEF-00076390
- AOL-DEF-00076393
- AOL-DEF-00076416
- AOL-DEF-00076418
- AOL-DEF-00076441
- AOL-DEF-00076443
- AOL-DEF-00076466
- AOL-DEF-00076468
- AOL-DEF-00076491
- AOL-DEF-00076495
- AOL-DEF-00076523

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00076525
- AOL-DEF-00076551
- AOL-DEF-00076553
- AOL-DEF-00076579
- AOL-DEF-00076582
- AOL-DEF-00076606
- AOL-DEF-00076609
- AOL-DEF-00076633
- AOL-DEF-00076636
- AOL-DEF-00076660
- AOL-DEF-00076663
- AOL-DEF-00076687
- AOL-DEF-00076690
- AOL-DEF-00076714
- AOL-DEF-00076717
- AOL-DEF-00076741
- AOL-DEF-00076744
- AOL-DEF-00076768
- AOL-DEF-00076771
- AOL-DEF-00076795
- AOL-DEF-00076798
- AOL-DEF-00076822
- AOL-DEF-00076825
- AOL-DEF-00076850
- AOL-DEF-00076852
- AOL-DEF-00076867
- AOL-DEF-00076894
- AOL-DEF-00076925
- AOL-DEF-00076954
- AOL-DEF-00076981
- AOL-DEF-00076999
- AOL-DEF-00077002
- AOL-DEF-00077021
- AOL-DEF-00077048
- AOL-DEF-00077074
- AOL-DEF-00077090
- AOL-DEF-00077106

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00077138
- AOL-DEF-00078009
- AOL-DEF-00078076
- AOL-DEF-00078093
- AOL-DEF-00078111
- AOL-DEF-00078128
- AOL-DEF-00078145
- AOL-DEF-00078162
- AOL-DEF-00078179
- AOL-DEF-00078196
- AOL-DEF-00078213
- AOL-DEF-00078230
- AOL-DEF-00078247
- AOL-DEF-00078264
- AOL-DEF-00078282
- AOL-DEF-00078299
- AOL-DEF-00078315
- AOL-DEF-00078316
- AOL-DEF-00078332
- AOL-DEF-00078333
- AOL-DEF-00078351
- AOL-DEF-00078370
- AOL-DEF-00078390
- AOL-DEF-00078412
- AOL-DEF-00078434
- AOL-DEF-00078477
- AOL-DEF-00078500
- AOL-DEF-00078524
- AOL-DEF-00078547
- AOL-DEF-00078571
- AOL-DEF-00078591
- AOL-DEF-00078611
- AOL-DEF-00078631
- AOL-DEF-00078651
- AOL-DEF-00078671
- AOL-DEF-00078691
- AOL-DEF-00078714

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00078741
- AOL-DEF-00078769
- AOL-DEF-00078797
- AOL-DEF-00078825
- AOL-DEF-00078870
- AOL-DEF-00078915
- AOL-DEF-00078937
- AOL-DEF-00078959
- AOL-DEF-00078980
- AOL-DEF-00079003
- AOL-DEF-00079030
- AOL-DEF-00079079
- AOL-DEF-00079126
- AOL-DEF-00079157
- AOL-DEF-00079188
- AOL-DEF-00079219
- AOL-DEF-00079247
- AOL-DEF-00079276
- AOL-DEF-00079304
- AOL-DEF-00079395
- AOL-DEF-00079582
- AOL-DEF-00079642
- AOL-DEF-00079645
- AOL-DEF-00079707
- AOL-DEF-00079736
- AOL-DEF-00079754
- AOL-DEF-00079777
- AOL-DEF-00079795
- AOL-DEF-00079818
- AOL-DEF-00079853
- AOL-DEF-00079871
- AOL-DEF-00079889
- AOL-DEF-00079907
- AOL-DEF-00079925
- AOL-DEF-00079943
- AOL-DEF-00079961
- AOL-DEF-00079980

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00079999
- AOL-DEF-00080017
- AOL-DEF-00080035
- AOL-DEF-00080053
- AOL-DEF-00080071
- AOL-DEF-00080094
- AOL-DEF-00080111
- AOL-DEF-00080128
- AOL-DEF-00080145
- AOL-DEF-00080162
- AOL-DEF-00080179
- AOL-DEF-00080200
- AOL-DEF-00080217
- AOL-DEF-00080235
- AOL-DEF-00080254
- AOL-DEF-00080272
- AOL-DEF-00080290
- AOL-DEF-00080307
- AOL-DEF-00080324
- AOL-DEF-00080344
- AOL-DEF-00080362
- AOL-DEF-00080379
- AOL-DEF-00080396
- AOL-DEF-00080414
- AOL-DEF-00080433
- AOL-DEF-00080450
- AOL-DEF-00080472
- AOL-DEF-00080589
- AOL-DEF-00080608
- AOL-DEF-00080625
- AOL-DEF-00080642
- AOL-DEF-00080659
- AOL-DEF-00080676
- AOL-DEF-00080693
- AOL-DEF-00080710
- AOL-DEF-00080727
- AOL-DEF-00080744

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00080761
- AOL-DEF-00080778
- AOL-DEF-00080795
- AOL-DEF-00080813
- AOL-DEF-00080830
- AOL-DEF-00080847
- AOL-DEF-00080865
- AOL-DEF-00080882
- AOL-DEF-00080901
- AOL-DEF-00080922
- AOL-DEF-00080940
- AOL-DEF-00080959
- AOL-DEF-00080977
- AOL-DEF-00080997
- AOL-DEF-00081091
- AOL-DEF-00081104
- AOL-DEF-00081124
- AOL-DEF-00081164
- AOL-DEF-00081178
- AOL-DEF-00081210
- AOL-DEF-00081241
- AOL-DEF-00081418
- AOL-DEF-00081429
- AOL-DEF-00081536
- AOL-DEF-00081548
- AOL-DEF-00081557
- AOL-DEF-00081580
- AOL-DEF-00081589
- AOL-DEF-00081648
- AOL-DEF-00081677
- AOL-DEF-00081765
- AOL-DEF-00081774
- AOL-DEF-00081791
- AOL-DEF-00081843
- AOL-DEF-00081855
- AOL-DEF-00081864
- AOL-DEF-00081879

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00081894
- AOL-DEF-00081939
- AOL-DEF-00081948
- AOL-DEF-00081966
- AOL-DEF-00081975
- AOL-DEF-00081989
- AOL-DEF-00081998
- AOL-DEF-00082007
- AOL-DEF-00082022
- AOL-DEF-00082044
- AOL-DEF-00082063
- AOL-DEF-00082074
- AOL-DEF-00082085
- AOL-DEF-00082096
- AOL-DEF-00082107
- AOL-DEF-00082144
- AOL-DEF-00082230
- AOL-DEF-00082241
- AOL-DEF-00082263
- AOL-DEF-00082283
- AOL-DEF-00082294
- AOL-DEF-00082303
- AOL-DEF-00082316
- AOL-DEF-00082330
- AOL-DEF-00082361
- AOL-DEF-00082370
- AOL-DEF-00082384
- AOL-DEF-00082395
- AOL-DEF-00082407
- AOL-DEF-00082421
- AOL-DEF-00082430
- AOL-DEF-00082489
- AOL-DEF-00082504
- AOL-DEF-00082525
- AOL-DEF-00082549
- AOL-DEF-00082591
- AOL-DEF-00082640

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00082657
- AOL-DEF-00082674
- AOL-DEF-00082691
- AOL-DEF-00082697
- AOL-DEF-00082708
- AOL-DEF-00082723
- AOL-DEF-00082732
- AOL-DEF-00082741
- AOL-DEF-00082750
- AOL-DEF-00082771
- AOL-DEF-00082780
- AOL-DEF-00082789
- AOL-DEF-00082798
- AOL-DEF-00082807
- AOL-DEF-00082818
- AOL-DEF-00082841
- AOL-DEF-00082849
- AOL-DEF-00082852
- AOL-DEF-00082861
- AOL-DEF-00082867
- AOL-DEF-00082876
- AOL-DEF-00082885
- AOL-DEF-00082902
- AOL-DEF-00082911
- AOL-DEF-00082925
- AOL-DEF-00082938
- AOL-DEF-00082947
- AOL-DEF-00082956
- AOL-DEF-00082980
- AOL-DEF-00083005
- AOL-DEF-00083022
- AOL-DEF-00083041
- AOL-DEF-00083053
- AOL-DEF-00083065
- AOL-DEF-00083075
- AOL-DEF-00083084
- AOL-DEF-00083093

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00083126
- AOL-DEF-00083135
- AOL-DEF-00083144
- AOL-DEF-00083153
- AOL-DEF-00083162
- AOL-DEF-00083174
- AOL-DEF-00083196
- AOL-DEF-00084777
- AOL-DEF-00084791
- AOL-DEF-00084792
- AOL-DEF-00085652
- AOL-DEF-00085679
- AOL-DEF-00085682
- AOL-DEF-00085685
- AOL-DEF-00085700
- AOL-DEF-00085718
- AOL-DEF-00085738
- AOL-DEF-00085757
- AOL-DEF-00085767
- AOL-DEF-00085786
- AOL-DEF-00085820
- AOL-DEF-00085836
- AOL-DEF-00085865
- AOL-DEF-00085890
- AOL-DEF-00085906
- AOL-DEF-00085916
- AOL-DEF-00085929
- AOL-DEF-00085953
- AOL-DEF-00085977
- AOL-DEF-00086029
- AOL-DEF-00086046
- AOL-DEF-00086082
- AOL-DEF-00086117
- AOL-DEF-00086149
- AOL-DEF-00086162
- AOL-DEF-00086190
- AOL-DEF-00086222

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00086284
- AOL-DEF-00086297
- AOL-DEF-00086313
- AOL-DEF-00086326
- AOL-DEF-00086339
- AOL-DEF-00086353
- AOL-DEF-00086367
- AOL-DEF-00086382
- AOL-DEF-00086455
- AOL-DEF-00086468
- AOL-DEF-00086530
- AOL-DEF-00086596
- AOL-DEF-00086640
- AOL-DEF-00086662
- AOL-DEF-00086775
- AOL-DEF-00086807
- AOL-DEF-00086862
- AOL-DEF-00086887
- AOL-DEF-00086900
- AOL-DEF-00086969
- AOL-DEF-00087003
- AOL-DEF-00087013
- AOL-DEF-00087023
- AOL-DEF-00087047
- AOL-DEF-00087060
- AOL-DEF-00087124
- AOL-DEF-00087137
- AOL-DEF-00087160
- AOL-DEF-00087171
- AOL-DEF-00087181
- AOL-DEF-00087214
- AOL-DEF-00087254
- AOL-DEF-00087286
- AOL-DEF-00087303
- AOL-DEF-00087313
- AOL-DEF-00087386
- AOL-DEF-00087429

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00087449
- AOL-DEF-00087473
- AOL-DEF-00087531
- AOL-DEF-00087545
- AOL-DEF-00087550
- AOL-DEF-00087608
- AOL-DEF-00087623
- AOL-DEF-00087670
- AOL-DEF-00087710
- AOL-DEF-00087720
- AOL-DEF-00087744
- AOL-DEF-00087826
- AOL-DEF-00087855
- AOL-DEF-00087872
- AOL-DEF-00087916
- AOL-DEF-00087926
- AOL-DEF-00087950
- AOL-DEF-00087960
- AOL-DEF-00088147
- AOL-DEF-00088189
- AOL-DEF-00088202
- AOL-DEF-00088244
- AOL-DEF-00088261
- AOL-DEF-00088282
- AOL-DEF-00088299
- AOL-DEF-00088309
- AOL-DEF-00088325
- AOL-DEF-00088335
- AOL-DEF-00088345
- AOL-DEF-00088355
- AOL-DEF-00088373
- AOL-DEF-00088390
- AOL-DEF-00088393
- AOL-DEF-00088416
- AOL-DEF-00088443
- AOL-DEF-00088460
- AOL-DEF-00088501

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00089373
- AOL-DEF-00089377
- AOL-DEF-00089396
- AOL-DEF-00089408
- AOL-DEF-00089424
- AOL-DEF-00089440
- AOL-DEF-00089489
- AOL-DEF-00089966
- AOL-DEF-00089993
- AOL-DEF-00090040
- AOL-DEF-00090106
- AOL-DEF-00090108
- AOL-DEF-00090586
- AOL-DEF-00090904
- AOL-DEF-00091712
- AOL-DEF-00091858
- AOL-DEF-00091962
- AOL-DEF-00091965
- AOL-DEF-00095091
- AOL-DEF-00095092
- AOL-DEF-00095498
- AOL-DEF-00095672
- AOL-DEF-00095711
- AOL-DEF-00095714
- AOL-DEF-00095731
- AOL-DEF-00095734
- AOL-DEF-00095740
- AOL-DEF-00095743
- AOL-DEF-00095747
- AOL-DEF-00095749
- AOL-DEF-00095752
- AOL-DEF-00095756
- AOL-DEF-00095759
- AOL-DEF-00095762
- AOL-DEF-00095765
- AOL-DEF-00095768
- AOL-DEF-00095773

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00095776
- AOL-DEF-00095779
- AOL-DEF-00095782
- AOL-DEF-00095785
- AOL-DEF-00095788
- AOL-DEF-00095791
- AOL-DEF-00095794
- AOL-DEF-00095797
- AOL-DEF-00095801
- AOL-DEF-00095804
- AOL-DEF-00095807
- AOL-DEF-00095810
- AOL-DEF-00095813
- AOL-DEF-00095818
- AOL-DEF-00095821
- AOL-DEF-00095824
- AOL-DEF-00095829
- AOL-DEF-00095834
- AOL-DEF-00095837
- AOL-DEF-00095840
- AOL-DEF-00095842
- AOL-DEF-00095844
- AOL-DEF-00095847
- AOL-DEF-00095849
- AOL-DEF-00095851
- AOL-DEF-00095853
- AOL-DEF-00095855
- AOL-DEF-00095857
- AOL-DEF-00095859
- AOL-DEF-00095862
- AOL-DEF-00095865
- AOL-DEF-00095868
- AOL-DEF-00095871
- AOL-DEF-00095873
- AOL-DEF-00095876
- AOL-DEF-00095879
- AOL-DEF-00095882

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00095884
- AOL-DEF-00095887
- AOL-DEF-00095889
- AOL-DEF-00095892
- AOL-DEF-00095894
- AOL-DEF-00095896
- AOL-DEF-00095898
- AOL-DEF-00095900
- AOL-DEF-00095902
- AOL-DEF-00095904
- AOL-DEF-00095906
- AOL-DEF-00095908
- AOL-DEF-00095911
- AOL-DEF-00095913
- AOL-DEF-00095915
- AOL-DEF-00095917
- AOL-DEF-00095925
- AOL-DEF-00095927
- AOL-DEF-00095930
- AOL-DEF-00096079
- AOL-DEF-00096106
- AOL-DEF-00096133
- AOL-DEF-00096160
- AOL-DEF-00096186
- AOL-DEF-00096214
- AOL-DEF-00096255
- AOL-DEF-00096290
- AOL-DEF-00096334
- AOL-DEF-00096380
- AOL-DEF-00096410
- AOL-DEF-00096440
- AOL-DEF-00096478
- AOL-DEF-00096506
- AOL-DEF-00096534
- AOL-DEF-00096565
- AOL-DEF-00096593
- AOL-DEF-00096623

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00096653
- AOL-DEF-00096681
- AOL-DEF-00096712
- AOL-DEF-00096741
- AOL-DEF-00096770
- AOL-DEF-00096800
- AOL-DEF-00096828
- AOL-DEF-00096857
- AOL-DEF-00096883
- AOL-DEF-00096911
- AOL-DEF-00096939
- AOL-DEF-00096966
- AOL-DEF-00096991
- AOL-DEF-00097016
- AOL-DEF-00097044
- AOL-DEF-00097073
- AOL-DEF-00097099
- AOL-DEF-00097190
- AOL-DEF-00097193
- AOL-DEF-00097196
- AOL-DEF-00097199
- AOL-DEF-00097203
- AOL-DEF-00097461
- AOL-DEF-00097492
- AOL-DEF-00097518
- AOL-DEF-00097532
- AOL-DEF-00097548
- AOL-DEF-00097577
- AOL-DEF-00097592
- AOL-DEF-00097619
- AOL-DEF-00097650
- AOL-DEF-00097712
- AOL-DEF-00097738
- AOL-DEF-00097745
- AOL-DEF-00097772
- AOL-DEF-00097799
- AOL-DEF-00097809

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00097835
- AOL-DEF-00097889
- AOL-DEF-00098399
- AOL-DEF-00098415
- AOL-DEF-00098431
- AOL-DEF-00099188
- AOL-DEF-00100054
- AOL-DEF-00101036
- AOL-DEF-00101039
- AOL-DEF-00101042
- AOL-DEF-00101045
- AOL-DEF-00101048
- AOL-DEF-00101051
- AOL-DEF-00101054
- AOL-DEF-00101057
- AOL-DEF-00101060
- AOL-DEF-00101063
- AOL-DEF-00101066
- AOL-DEF-00101069
- AOL-DEF-00101072
- AOL-DEF-00101079
- AOL-DEF-00101087
- AOL-DEF-00101090
- AOL-DEF-00101093
- AOL-DEF-00101095
- AOL-DEF-00101098
- AOL-DEF-00101101
- AOL-DEF-00101104
- AOL-DEF-00101107
- AOL-DEF-00101117
- AOL-DEF-00101119
- AOL-DEF-00101122
- AOL-DEF-00101134
- AOL-DEF-00101137
- AOL-DEF-00101140
- AOL-DEF-00101143
- AOL-DEF-00101146

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00101149
- AOL-DEF-00101152
- AOL-DEF-00101155
- AOL-DEF-00101158
- AOL-DEF-00101161
- AOL-DEF-00101164
- AOL-DEF-00101167
- AOL-DEF-00101170
- AOL-DEF-00101173
- AOL-DEF-00101176
- AOL-DEF-00101179
- AOL-DEF-00101182
- AOL-DEF-00101185
- AOL-DEF-00101188
- AOL-DEF-00101190
- AOL-DEF-00101193
- AOL-DEF-00101196
- AOL-DEF-00101199
- AOL-DEF-00101201
- AOL-DEF-00101204
- AOL-DEF-00101207
- AOL-DEF-00101210
- AOL-DEF-00101213
- AOL-DEF-00101216
- AOL-DEF-00101218
- AOL-DEF-00101221
- AOL-DEF-00101224
- AOL-DEF-00101231
- AOL-DEF-00101233
- AOL-DEF-00101236
- AOL-DEF-00101238
- AOL-DEF-00101240
- AOL-DEF-00101243
- AOL-DEF-00101245
- AOL-DEF-00101248
- AOL-DEF-00101250
- AOL-DEF-00101254

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00101258
- AOL-DEF-00101261
- AOL-DEF-00101264
- AOL-DEF-00101266
- AOL-DEF-00101270
- AOL-DEF-00101272
- AOL-DEF-00101275
- AOL-DEF-00101278
- AOL-DEF-00101281
- AOL-DEF-00101284
- AOL-DEF-00101287
- AOL-DEF-00101290
- AOL-DEF-00101293
- AOL-DEF-00101296
- AOL-DEF-00101299
- AOL-DEF-00101302
- AOL-DEF-00101305
- AOL-DEF-00101308
- AOL-DEF-00101311
- AOL-DEF-00101314
- AOL-DEF-00101317
- AOL-DEF-00101320
- AOL-DEF-00101323
- AOL-DEF-00101326
- AOL-DEF-00101328
- AOL-DEF-00101331
- AOL-DEF-00101341
- AOL-DEF-00101344
- AOL-DEF-00101347
- AOL-DEF-00101350
- AOL-DEF-00101353
- AOL-DEF-00101356
- AOL-DEF-00101359
- AOL-DEF-00101362
- AOL-DEF-00101382
- AOL-DEF-00101717
- AOL-DEF-00101738

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00101755
- AOL-DEF-00101772
- AOL-DEF-00101789
- AOL-DEF-00101806
- AOL-DEF-00101823
- AOL-DEF-00101840
- AOL-DEF-00101860
- AOL-DEF-00101877
- AOL-DEF-00101894
- AOL-DEF-00101911
- AOL-DEF-00101928
- AOL-DEF-00101945
- AOL-DEF-00101962
- AOL-DEF-00101979
- AOL-DEF-00101996
- AOL-DEF-00102013
- AOL-DEF-00102030
- AOL-DEF-00102047
- AOL-DEF-00102064
- AOL-DEF-00102081
- AOL-DEF-00102098
- AOL-DEF-00102115
- AOL-DEF-00102132
- AOL-DEF-00102149
- AOL-DEF-00102166
- AOL-DEF-00102183
- AOL-DEF-00102200
- AOL-DEF-00102217
- AOL-DEF-00102234
- AOL-DEF-00102251
- AOL-DEF-00102268
- AOL-DEF-00102285
- AOL-DEF-00102302
- AOL-DEF-00102319
- AOL-DEF-00102336
- AOL-DEF-00102353
- AOL-DEF-00102370

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00102387
- AOL-DEF-00102404
- AOL-DEF-00102421
- AOL-DEF-00102438
- AOL-DEF-00102455
- AOL-DEF-00102472
- AOL-DEF-00102489
- AOL-DEF-00102506
- AOL-DEF-00102523
- AOL-DEF-00102540
- AOL-DEF-00102557
- AOL-DEF-00102574
- AOL-DEF-00102603
- AOL-DEF-00102620
- AOL-DEF-00102637
- AOL-DEF-00102654
- AOL-DEF-00102671
- AOL-DEF-00102688
- AOL-DEF-00102705
- AOL-DEF-00102722
- AOL-DEF-00102739
- AOL-DEF-00102756
- AOL-DEF-00102773
- AOL-DEF-00102790
- AOL-DEF-00102807
- AOL-DEF-00102824
- AOL-DEF-00102926
- AOL-DEF-00102943
- AOL-DEF-00102960
- AOL-DEF-00102977
- AOL-DEF-00102994
- AOL-DEF-00103011
- AOL-DEF-00103028
- AOL-DEF-00103045
- AOL-DEF-00103062
- AOL-DEF-00103079
- AOL-DEF-00103096

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00103113
- AOL-DEF-00103130
- AOL-DEF-00103147
- AOL-DEF-00103181
- AOL-DEF-00103198
- AOL-DEF-00103215
- AOL-DEF-00103232
- AOL-DEF-00103249
- AOL-DEF-00103266
- AOL-DEF-00103283
- AOL-DEF-00103300
- AOL-DEF-00103317
- AOL-DEF-00103347
- AOL-DEF-00103364
- AOL-DEF-00103381
- AOL-DEF-00103398
- AOL-DEF-00103415
- AOL-DEF-00103423
- AOL-DEF-00103449
- AOL-DEF-00103466
- AOL-DEF-00103483
- AOL-DEF-00103500
- AOL-DEF-00103517
- AOL-DEF-00103534
- AOL-DEF-00103551
- AOL-DEF-00103568
- AOL-DEF-00103585
- AOL-DEF-00103602
- AOL-DEF-00103619
- AOL-DEF-00103636
- AOL-DEF-00103653
- AOL-DEF-00103670
- AOL-DEF-00103687
- AOL-DEF-00103704
- AOL-DEF-00103721
- AOL-DEF-00103738
- AOL-DEF-00103755

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00103772
- AOL-DEF-00103789
- AOL-DEF-00103806
- AOL-DEF-00103823
- AOL-DEF-00103840
- AOL-DEF-00103857
- AOL-DEF-00103874
- AOL-DEF-00103891
- AOL-DEF-00103908
- AOL-DEF-00103925
- AOL-DEF-00103942
- AOL-DEF-00103959
- AOL-DEF-00103976
- AOL-DEF-00103993
- AOL-DEF-00104010
- AOL-DEF-00104027
- AOL-DEF-00104044
- AOL-DEF-00104061
- AOL-DEF-00104078
- AOL-DEF-00104095
- AOL-DEF-00104112
- AOL-DEF-00104129
- AOL-DEF-00104146
- AOL-DEF-00104163
- AOL-DEF-00104180
- AOL-DEF-00104197
- AOL-DEF-00104214
- AOL-DEF-00104231
- AOL-DEF-00104248
- AOL-DEF-00104265
- AOL-DEF-00104282
- AOL-DEF-00104299
- AOL-DEF-00104316
- AOL-DEF-00104333
- AOL-DEF-00104350
- AOL-DEF-00104367
- AOL-DEF-00104384

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00104401
- AOL-DEF-00104418
- AOL-DEF-00104435
- AOL-DEF-00104452
- AOL-DEF-00104469
- AOL-DEF-00104486
- AOL-DEF-00104503
- AOL-DEF-00104520
- AOL-DEF-00104537
- AOL-DEF-00104554
- AOL-DEF-00104571
- AOL-DEF-00104558
- AOL-DEF-00104605
- AOL-DEF-00104622
- AOL-DEF-00104639
- AOL-DEF-00104656
- AOL-DEF-00104673
- AOL-DEF-00104690
- AOL-DEF-00104707
- AOL-DEF-00104724
- AOL-DEF-00104741
- AOL-DEF-00104758
- AOL-DEF-00104775
- AOL-DEF-00104792
- AOL-DEF-00104809
- AOL-DEF-00104826
- AOL-DEF-00104843
- AOL-DEF-00104860
- AOL-DEF-00104877
- AOL-DEF-00104894
- AOL-DEF-00104911
- AOL-DEF-00104928
- AOL-DEF-00104945
- AOL-DEF-00104962
- AOL-DEF-00104979
- AOL-DEF-00104996
- AOL-DEF-00105013

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00105030
- AOL-DEF-00105047
- AOL-DEF-00105064
- AOL-DEF-00105081
- AOL-DEF-00105098
- AOL-DEF-00105111
- AOL-DEF-00105132
- AOL-DEF-00105149
- AOL-DEF-00105166
- AOL-DEF-00105183
- AOL-DEF-00105220
- AOL-DEF-00105217
- AOL-DEF-00105251
- AOL-DEF-00111082
- AOL-DEF-00111099
- AOL-DEF-00111116
- AOL-DEF-00190367
- AOL-DEF-00190370
- AOL-DEF-00193436
- AOL-DEF-00196241
- AOL-DEF-00196358
- AOL-DEF-00196359
- AOL-DEF-00196360
- AOL-DEF-00196362
- AOL-DEF-00196367
- AOL-DEF-00196368
- AOL-DEF-00196369
- AOL-DEF-00196370
- AOL-DEF-00196371
- AOL-DEF-00196372
- AOL-DEF-00196373
- AOL-DEF-00196374
- AOL-DEF-00196375
- AOL-DEF-00196376
- AOL-DEF-00196377
- AOL-DEF-00196378
- AOL-DEF-00196379

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00196380
- AOL-DEF-00196381
- AOL-DEF-00196382
- AOL-DEF-00196384
- AOL-DEF-00196386
- AOL-DEF-00196387
- AOL-DEF-00196388
- AOL-DEF-00196390
- AOL-DEF-00196391
- AOL-DEF-00196392
- AOL-DEF-00196393
- AOL-DEF-00196394
- AOL-DEF-00196395
- AOL-DEF-00196396
- AOL-DEF-00196397
- AOL-DEF-00196398
- AOL-DEF-00196399
- AOL-DEF-00196400
- AOL-DEF-00196401
- AOL-DEF-00196402
- AOL-DEF-00196404
- AOL-DEF-00196407
- AOL-DEF-00196408
- AOL-DEF-00196409
- AOL-DEF-00196413
- AOL-DEF-00196414
- AOL-DEF-00196416
- AOL-DEF-00196421
- AOL-DEF-00196422
- AOL-DEF-00196428
- AOL-DEF-00196430
- AOL-DEF-00196435
- AOL-DEF-00196436
- AOL-DEF-00196439
- AOL-DEF-00196444
- AOL-DEF-00196446
- AOL-DEF-00196451

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00196452
- AOL-DEF-00196457
- AOL-DEF-00196458
- AOL-DEF-00196460
- AOL-DEF-00196523
- AOL-DEF-00196525
- AOL-DEF-00196574
- AOL-DEF-00196578
- AOL-DEF-00196584
- AOL-DEF-00196586
- AOL-DEF-00196592
- AOL-DEF-00196594
- AOL-DEF-00196600
- AOL-DEF-00196602
- AOL-DEF-00196606
- AOL-DEF-00196608
- AOL-DEF-00196613
- AOL-DEF-00196616
- AOL-DEF-00196623
- AOL-DEF-00196624
- AOL-DEF-00196640
- AOL-DEF-00196559
- AOL-DEF-00196661
- AOL-DEF-00196662
- AOL-DEF-00196664
- AOL-DEF-00196682
- AOL-DEF-00196686
- AOL-DEF-00196691
- AOL-DEF-00196695
- AOL-DEF-00196701
- AOL-DEF-00196707
- AOL-DEF-00196713
- AOL-DEF-00196715
- AOL-DEF-00196723
- AOL-DEF-00196733
- AOL-DEF-00196741
- AOL-DEF-00196745

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00196750
- AOL-DEF-00196751
- AOL-DEF-00196754
- AOL-DEF-00196759
- AOL-DEF-00196771
- AOL-DEF-00196779
- AOL-DEF-00196783
- AOL-DEF-00196784
- AOL-DEF-00196785
- AOL-DEF-00196786
- AOL-DEF-00196787
- AOL-DEF-00196789
- AOL-DEF-00196797
- AOL-DEF-00196805
- AOL-DEF-00202665
- AOL-DEF-00204497
- AOL-DEF-00205051
- AOL-DEF-00205389
- AOL-DEF-00205672
- AOL-DEF-00206312
- AOL-DEF-00206515
- AOL-DEF-00210351
- AOL-DEF-00210364
- AOL-DEF-00210384
- AOL-DEF-00210444
- AOL-DEF-00210493
- AOL-DEF-00210504
- AOL-DEF-00210508
- AOL-DEF-00210521
- AOL-DEF-00210524
- AOL-DEF-00216886
- AOL-DEF-00216887
- AOL-DEF-00216916
- AOL-DEF-00217062
- AOL-DEF-00221968
- AOL-DEF-00257383
- AOL-DEF-00259212

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- AOL-DEF-00259454
- AOL-DEF-00260202
- AOL-DEF-00269179
- AOL-DEF-00269193
- AOL-DEF-00269200
- AOL-DEF-00269837
- AOL-DEF-00272377
- AOL-DEF-00272378
- AOL-DEF-00273358
- AOL-DEF-00273364
- AOL-DEF-00276249
- AOL-DEF-00276251
- AOL-DEF-00277970
- AOL-DEF-00278195
- AOL-DEF-00278207
- AOL-DEF-00279055
- AOL-DEF-00279791
- AOL-DEF-00280804
- AOL-DEF-00284123
- AOL-DEF-00284127
- AOL-DEF-00284135
- AOL-DEF-00284282
- AOL-DEF-00284487
- AOL-DEF-00293018
- AOL-DEF-00293019
- AOL-DEF-00290016
- AOL-DEF-00296277
- AOL-DEF-00314355
- AOL-DEF-00328857
- AOL-DEF-00328861
- AOL-DEF-00336829
- AOL-DEF-00336833
- AOL-DEF-00336837
- AOL-DEF-00342510
- AOL-DEF-00361702
- AOL-DEF-00371158
- AOL-DEF-00373431

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

- AOL-DEF-00373490
- AOL-DEF-00377896
- AOL-DEF-00377901
- AOL-DEF-00379298
- AOL-DEF-00387778
- AOL-DEF-00387783
- AOL-DEF-00387787
- AOL-DEF-00387791
- AOL-DEF-00387795
- AOL-DEF-00387800
- AOL-DEF-00387804
- AOL-DEF-00527456
- AOL-DEF-00527486
- AOL-DEF-00527513
- AOL-DEF-00528388
- AOL-DEF-00529085
- AOL-DEF-00566881
- AOL-DEF-00702336