Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

_____
                                )
AL OTRO LADO, INC., et al.,     )
                                )
        Plaintiffs,             ) Case Number:
                                )
vs.                             ) 17-cv-02366-BAS-KSC
                                )
CHAD F. WOLF, et al.,           )
                                )
        Defendants.             )
_____)

** CONFIDENTIAL **

DEPOSITION OF SCOTT GLABE

As 30(b)(6) Designee of

U.S. DEPARTMENT OF HOMELAND SECURITY

(Via videoconference)

Washington, DC

July 1, 2020

Reported by:  John L. Harmonson, RPR

Job No. 596757



Page 2

1

2

3

4

5                                    July 1, 2020

6                                    9:56 a.m.

7

8

9         Deposition of SCOTT GLABE, as 30(b)(6)

10  designee of the U.S. Department of Homeland

11  Security, taken via videoconference with all

12  parties appearing remotely, pursuant to the

13  Federal Rules of Civil Procedure, subject to such

14  stipulations as may be recited herein or attached

15  hereto, before John L. Harmonson, a Registered

16  Professional Reporter and Notary Public of the

17  District of Columbia, who officiated in

18  administering the oath to the witness.

19

20

21

22



Page 3

```
 1               A P P E A R A N C E S
 2
 3    On behalf of the Plaintiffs:
 4         MAYER BROWN, LLP
           1999 K Street, NW
 5         Washington, DC  20006
           202.263.3000
 6         (Via videoconference)
           BY:  STEPHEN M. MEDLOCK, ESQ.
 7              smedlock@mayerbrown.com
 8
 9
10    On behalf of the Defendants:
11         U.S. DEPARTMENT OF JUSTICE
           Office of Immigration Litigation
12         Ben Franklin Station, P.O. Box 868
           Washington, DC  20044
13         202.598.8259
           (Via videoconference)
14         BY:  KATHERINE J. SHINNERS, ESQ.
                ARI NAZAROV, ESQ.
15              LOUISA SLOCUM, ESQ.
                katherine.j.shinners@usdoj.gov
16
17         U.S. DEPARTMENT OF HOMELAND SECURITY
           Office of the Inspector General
18         395 E Street, SW
           Washington, DC  20024
19         (Via videoconference)
           BY:  JILLIAN CLOUSE, ESQ.
20              jillian.clouse@oig.dhs.gov
21
22
```



Page 4

1                    APPEARANCES (Cont.'d)

2

3        U.S. DEPARTMENT OF HOMELAND SECURITY

         2707 Martin Luther King Jr. Avenue, SE

4        Washington, DC  20032

         (Via videoconference)

5        BY:  AMBER NAPOLITANO, ESQ.

              amber.napolitano@hq.dhs.gov

6

7

8    ALSO PRESENT (via videoconference):

9        KEVIN CRANFORD, Webex Technician

10       NOAH FOX, Videographer

11

12

13

14

15

16

17

18

19

20

21

22



Page 5

1                   EXAMINATION INDEX

2    WITNESS                                      PAGE

3    SCOTT GLABE

4       Examination by Mr. Medlock               9

5       Examination by Ms. Shinners              182

6                         * * *

7

8                     EXHIBIT INDEX

9    EXHIBIT NO.                                  PAGE

10   Exhibit 320   Notice of Rule 30(b)(6)        17

11                 Deposition

12   Exhibit 321   World Bank report "Rapidly     66

13                 Assessing the Impact of

14                 Hurricane Matthew in Haiti"

15   Exhibit 322   E-mails, beginning Bates       67

16                 AOL-DEF-00802340

17   Exhibit 323   E-mails, beginning Bates       78

18                 AOL-DEF-00258173

19   Exhibit 324   PowerPoint:  U.S. Customs and  86

20                 Border Protection Crisis Action

21                 Team, November 29, 2016, Bates

22                 AOL-DEF-00815563



Page 6

1                   EXHIBIT INDEX (Cont.'d)

2    EXHIBIT NO.                                    PAGE

3    Exhibit 325   New York Times article           89

4    Exhibit 326   E-mails, beginning Bates         90

5                  AOL-DEF-00769118

6    Exhibit 327   E-mails, beginning Bates         94

7                  AOL-DEF-00272878

8    Exhibit 328   E-mail, Bates AOL-DEF-00353880   105

9    Exhibit 329   E-mail, beginning Bates          110

10                 AOL-DEF-002722938

11   Exhibit 330   E-mails, beginning Bates         119

12                 AOL-DEF-00280783

13   Exhibit 331   E-mails, beginning Bates         125

14                 AOL-DEF-00041757

15   Exhibit 332   Memorandum; Bates                131

16                 AOL-DEF-000402981

17   Exhibit 333   E-mails, beginning Bates         135

18                 AOL-DEF-00048048

19   Exhibit 334   Press release:  "Statement from  141

20                 Commissioner Kevin McAleenan on

21                 Operations at San Ysidro Port

22                 of Entry"



Page 7

1                    EXHIBIT INDEX (Cont.'d)

2     EXHIBIT NO.                                    PAGE

3     Exhibit 335   E-mails, Bates AOL-DEF-00047694   145

4     Exhibit 336   PowerPoint:  U.S.Customs and      146

5                   Border Protection Migration

6                   Crisis Action Team, April 29,

7                   2018, beginning Bates

8                   AOL-DEF-00048757

9     Exhibit 338   E-mail, beginning Bates           167

10                  AOL-DEF-00062567

11    Exhibit 339   E-mails and attachment,           173

12                  beginning Bates

13                  AOL-DEF-00273293

14                          * * *

15

16        REFERENCE TO PREVIOUSLY MARKED EXHIBITS

17    EXHIBIT                                        PAGE

18    Owen Exhibit 28 . . . . . . . . . . . . . .     61

19    Owen Exhibit 31 . . . . . . . . . . . . . .     98

20

21

22



Page 8

```
 1   ------------------------------------------------

 2                    P R O C E E D I N G S

 3                       9:56 a.m.

 4   ------------------------------------------------

 5            THE TECHNICIAN:  We  are now on the

 6       record.  This begins tape number 1 of the

 7       videotaped deposition of Scott Glabe, in the

 8       matter of Al Otro Lado v. McAleenan, in the

 9       United States District Court for the

10       Southern District of California.

11            Today's date is July 1, 2020.  The

12       time is 9:57 a.m.

13            This deposition is being taken

14       remotely at the request of Mayer Brown.  The

15       videographer today is Noah Fox of Magna

16       Legal Services, and the court reporter today

17       is John Harmonson of Magna Legal Services.

18            Will counsel please identify

19       themselves and state who they represent.

20       MR. MEDLOCK:  Good morning.  This is

21       Stephen Medlock from Mayer Brown, LLP.  I

22       represent the named plaintiffs and the
```



Page 9

1      class.

2            MS. SHINNERS:  And this is Katherine

3      Shinners from the U.S. Department of

4      Justice, Office of Immigration Litigation,

5      and I represent the defendant.

6            MR. NAZAROV:  This is Ari Nazarov,

7      also from the U.S. Department of Justice,

8      and I also represent the defendant.

9            MS. SHINNERS:  And this is Katherine

10     Shinners.  I note for the record that we do

11     have agency counsel from DHS and CBP present

12     here today.

13            THE TECHNICIAN:  Would the reporter

14     please swear in the witness.

15                    * * *

16                  SCOTT GLABE,

17     after having been first duly sworn or affirmed,

18     was examined and did testify under oath as

19     follows:

20                  EXAMINATION

21     BY MR. MEDLOCK:

22     Q.    Good morning, sir.  Can you please



Page 10

1    state and spell your full name for the record.

2         A.    First name is Scott, S-c-o-t-t.  Last

3    name Glabe, G-l-a-b-e.

4         Q.    Are you presently employed, sir?

5         A.    I am.

6         Q.    Who are you employed by?

7         A.    I am employed by the U.S. Department

8    of Homeland Security.

9         Q.    What is your present job title at the

10   U.S. Department of Homeland Security?

11        A.    Presently, I am the assistant

12   secretary for Trade and Economic Security in the

13   Office of Strategy, Policy and Plans at DHS.  I

14   am also serving in an acting capacity as the

15   assistant secretary for Border Security and

16   Immigration.

17        Q.    If I refer to the U.S. Department of

18   Homeland Security today as DHS, will you

19   understand that acronym, sir?

20        A.    I will.

21        Q.    How long have you worked at DHS, sir?

22        A.    I've worked at DHS since May 2019.



Page 11

1      Q.    Have you ever testified before in

2   court, sir?

3      A.    I have not.

4      Q.    Have you ever testified before in a

5   deposition?

6      A.    I have not.

7      Q.    Have you ever testified before in an

8   arbitration proceeding?

9      A.    No.

10     Q.    Have you ever testified before

11   Congress or any other governmental body?

12     A.    No.

13     Q.    I take it that you're a lawyer by

14   training; is that right, sir?

15     A.    Yes.

16     Q.    And you practiced law at Covington &

17   Burling at one point in your career; is that

18   correct, sir?

19     A.    Yes.

20     Q.    During that time, did you have

21   occasion to take depositions or sit in on them?

22     A.    No.



Page 12

1      Q.    Okay.  Have you ever provided a

2  written declaration under oath in the form of an

3  affidavit or declaration?

4      A.    Yes.

5      Q.    How many times, sir?

6      A.    To the best of my recollection, twice.

7      Q.    And do you recall in which cases you

8  submitted a written declaration or affidavit?

9      A.    To the best of my recollection, there

10  was one matter when I was employed by the U.S.

11  House of Representatives in which I submitted an

12  affidavit in a case between the House of

13  Representatives, and I believe the named

14  defendant was Bean, LLC.

15         More recently I signed a declaration

16  in ongoing litigation on behalf of DHS in a case

17  that pertains to the -- what's known as New York

18  State's green-light law.  I don't recall the

19  specifically named parties.

20      Q.    Okay.  Since it sounds like you

21  haven't had occasion to either be a witness or an

22  attorney at a deposition before, I'm going to go



Page 13

1    over a few ground rules, some of which may be

2    somewhat familiar to you.

3            A deposition is essentially a

4    conversation in which I ask questions and you

5    answer them.  Usually these would happen in

6    person but, given the current circumstances,

7    that's impossible.  So it's really important over

8    this Webex format that you give audible answers

9    to my questions today.  The court reporter is

10   very good, but he cannot take down shakes of the

11   head or nods of the head.  And sometimes the

12   words "uh-huh" and "huh-uh" can sound similar.

13   So I will need clear, audible responses to my

14   questions today.

15           Do you understand that, sir?

16       A.    Yes.

17       Q.    And most importantly, if you don't

18   understand any of my questions today, please say

19   so and I will do my best to improve my question.

20   All right?

21       A.    Understood.

22       Q.    Especially over videoconferencing,



Page 14

1    it's really important that we not talk over each

2    other because one of the limitations of Webex is

3    that really only one person's audio can come in

4    at a time.  So you've been doing just fine so

5    far, but I'll try not to step on your answers,

6    and if you can just wait until I'm done asking

7    the question before you answer.  All right?

8        A.    All right.

9        Q.    From time to time your attorneys here

10   may object to my questions.  As a general matter,

11   objections are something that a judge rules on

12   later in the case.  So unless your attorney

13   instructs you not to answer my questions during

14   today's deposition, I'll ask you to answer any

15   question despite the fact there is an objection

16   pending.

17           Do you see that?

18       A.    I do.

19       Q.    We willy try and take breaks

20   approximately once an hour, or at least I'll

21   check in with you to see if you need a break once

22   an hour.  My only request is that before we go on



Page 15

1    a break, if there is an answer pending to one of

2    my questions, that you finish your answer and

3    then we can go on the break.  Okay?

4         A.    Okay.

5         Q.    We'll be showing you exhibits

6    throughout the day today.  Our exhibit tech is

7    Kevin Cranford with Magna Legal.  He can expand

8    paragraphs to make them more legible or flip

9    through documents so that you can look at every

10   page.  If you have any questions relating to

11   documents, don't hesitate to ask Kevin to make

12   the document a little bit more legible for you as

13   you're answering questions about it.  Okay?

14        A.    Will do.

15        Q.    All right.  And if at any time today

16   you have any technological issues with audio or

17   video, please let me know.  We'll try to get it

18   corrected as soon as possible.  All right?

19        A.    Sounds good.

20        Q.    Okay.  So unless I state otherwise, my

21   questions today will relate to the time period

22   from January 1, 2016, through today's date,



Page 16

1    July 1, 2020.

2              Do you understand that, sir?

3         A.    I do.

4         Q.    Okay.  During the deposition I may

5    refer to U.S. Customs and Border Protection as

6    CBP.  Do you understand that, sir?

7         A.    Yes.

8         Q.    And I may refer to the Office of Field

9    Operations within CBP as OFO.  Are you familiar

10   with that acronym, sir?

11        A.    I am.

12        Q.    You understand that you've taken an

13   oath to tell the truth today, sir?

14        A.    I do understand, yes.

15        Q.    And you understand that that's the

16   same oath that you would take if you were

17   testifying in a courtroom; correct?

18        A.    I do, correct.

19        Q.    Is there any reason that you can't

20   testify fully and truthfully in answer to my

21   questions today?

22        A.    No.



Page 17

```
 1        Q.    I understand that you have legal

 2   counsel with you in the room that you're

 3   testifying from today.  Is that right?

 4        A.    Yes.

 5        Q.    You understand that you can't

 6   communicate with your attorney in the room with

 7   you during the questioning; is that right, sir?

 8        A.    I guess to -- could you tell me what

 9   you mean by that?

10        Q.    Sure.  You can't communicate regarding

11   how to answer my questions or what the substance

12   of your testimony should be outside of the need

13   to discuss the application of privileges.  Do you

14   understand that, sir?

15        A.    Okay.

16             MR. MEDLOCK:  Kevin, can we bring up

17        Tab 1, please.

18             (Exhibit 320 marked for identification

19        and attached hereto.)

20   BY MR. MEDLOCK:

21        Q.    Mr. Glabe, we've put in front of you

22   what will be marked as Exhibit 320 to your
```



Page 18

1    deposition.  It's a multipage document entitled

2    "Plaintiff's Notice of Federal Rules of Civil

3    Procedure 30(b)(6) Deposition of U.S. Department

4    of Homeland Security."

5             Do you see that, sir?

6        A.    I do.

7        Q.    Okay.  Have you seen this document

8    before, sir?

9        A.    I have.

10       Q.    When did you first see this document?

11       A.    I don't know exactly.

12       Q.    When you say you don't know exactly,

13   do you know if it was in June or if it was

14   sometime before June 2020?

15       A.    To the best of my recollection,

16   sometime in June 2020.

17       Q.    When you first saw this document, who

18   showed it to you?

19       A.    To the best of my recollection, DHS

20   agency counsel.

21       Q.    When you say DHS agency counsel, who

22   do you recall showing you this deposition notice?



Page 19

1          A.      Amber Napolitano.

2          Q.      When you were shown the deposition

3    notice by Ms. Napolitano, were you given a copy

4    of it, or did she just simply show it to you?

5          A.      I believe that she sent a copy to me

6    via e-mail.

7          Q.      Okay.   When you first received the

8    deposition notice by e-mail sometime around

9    June 2020, how long did you spend reviewing the

10   notice?

11         A.      I just looked over it very briefly

12   upon initial receipt.

13         Q.      You say very briefly.   What's your

14   best estimate of how long you spent reviewing the

15   notice?

16         A.      When -- when I first received it,

17   probably just five minutes or less to understand

18   what the document was because I was sort of

19   relying on Amber -- relying on counsel to walk me

20   through it subsequently.

21         Q.      Do you understand that you are

22   testifying as a Rule 30(b)(6) witness today?



Page 20

1      A.    I do.

2      Q.    In your own words, what does it mean

3  to be a 30(b)(6) witness?

4      A.    My understanding of a 30(b)(6) witness

5  is that I am testifying on behalf of the

6  Department of Homeland Security, DHS, rather than

7  in my personal capacity on behalf of myself.

8           MR. MEDLOCK:  Kevin, can you please

9           turn to page 7 of Exhibit 320.

10  BY MR. MEDLOCK:

11      Q.    So a little past halfway down the

12  page on page 7 at line 18, do you see a section

13  entitled "Topics for Examination," Mr. Glabe?

14      A.    Yes.

15      Q.    And pages 7 through 14 of this notice

16  lists the topics that plaintiffs have requested

17  testimony from DHS on.  Do you know which topics

18  you're here to testify about today?

19      A.    My understanding is that I am here to

20  testify about any of the topics listed on pages 7

21  through 14 unless there has been sort of

22  discussion or agreement between my counsel and



Page 21

1   you and potentially the court to exclude

2   particular topics from the scope of the

3   deposition.

4        Q.    Do you know as you sit here today

5   whether any particular topics have been excluded

6   from today's deposition?

7        A.    My understanding is that certain

8   topics, particularly those relating to certain

9   investigations, may have been excluded.  But I'm

10  relying on -- I have generally relied on

11  Ms. Shinners from DOJ.  Particularly given the

12  number of topics is voluminous, I'm relying on

13  counsel to -- in terms of the specific topics.

14       Q.    Whether the number of topics is

15  voluminous is sort of in the eyes of the

16  beholder, Mr. Glabe, but I'll take your view for

17  now.

18            When did you begin preparing to

19  testify as a Rule 30(b)(6) witness?

20       A.    Sometime in June 2020.

21       Q.    In total, how much time have you spent

22  preparing to testify as a Rule 30(b)(6) witness



Page 22

1    in this case?

2         A.    I'm not certain.

3         Q.    What's your best estimate?

4         A.    Best estimate would probably be

5    between, say, 15 to 20 hours specifically focused

6    on preparation.

7         Q.    In those 15 to 20 hours that you

8    estimate you spent on preparing for today's

9    deposition, what tasks did you do to prepare to

10   testify as a Rule 30(b)(6) witness?

11             MS. SHINNERS:  Objection; calls for

12        work product.  I'm going to instruct the

13        witness not to answer.

14             MR. MEDLOCK:  I don't understand the

15        objection, Katie.  I'm just asking generally

16        what did he do to prepare.

17             MS. SHINNERS:  Sure.  I mean, I think

18        the question, particularly given that it's

19        open-ended, it calls for potentially

20        delineating the tasks that were directed by

21        counsel and the substance of those tasks.

22        So I'm going to instruct the witness not to



Page 23

1          answer that question.

2     BY MR. MEDLOCK:

3          Q.    Mr. Glabe, are you following your

4     attorney's instruction?

5          A.    Sorry, could you repeat the question?

6          Q.    Sure.

7                Your counsel instructed you not to

8     answer the question.  My question is:  Are you

9     going to follow that instruction?

10         A.    Yes.

11         Q.    Mr. Glabe, did you review any

12    documents to prepare to testify as a Rule

13    30(b)(6) witness?

14         A.    Yes.

15         Q.    What's your best estimate of the

16    number of documents that you reviewed to prepare

17    to testify as a Rule 30(b)(6) witness?

18         A.    A best estimate would be a couple of

19    dozen documents.

20         Q.    Who provided those couple of dozen

21    documents to you?

22         A.    Counsel.



Page 24

1       Q.    When you say counsel, are you

2   referring to counsel for DHS or counsel from the

3   Office of Immigration Litigation?

4       A.    Documents were primarily provided by

5   counsel from DHS.  I also reviewed documents in

6   connection with -- or as part of discussions with

7   DOJ counsel.

8       Q.    What's your best estimate as to how

9   much time you spent reviewing those approximately

10  two dozen documents?

11      A.    Probably several -- several hours.  A

12  significant proportion of the overall preparation

13  time involved in one way or another reviewing

14  documents.

15      Q.    When you reviewed those documents, did

16  you highlight them, underline them, or make any

17  notes on them?

18      A.    No.  To the best of my recollection, I

19  reviewed documents electronically and did not

20  take any -- make any markings as you've described

21  on them.

22      Q.    Did you take any notes regarding what



Page 25

1    you learned from reviewing those documents?

2         A.   No, not to my recollection.

3         Q.   Were the documents that you reviewed

4    broken down into any categories, or were they

5    simply just provided to you?

6              MS. SHINNERS:  Objection; calls for

7         work product.  I'm going to instruct the

8         witness --

9              MR. MEDLOCK:  I'm just asking if they

10        were, not what the categories were.

11             MS. SHINNERS:  Okay, I'll allow that.

12             THE WITNESS:  Sorry, could you repeat

13        the question, please?

14   BY MR. MEDLOCK:

15        Q.   Sure.

16             You said that you got about

17   approximately two dozen documents and reviewing

18   those was the bulk of your preparation for

19   today's deposition.  What I wanted to know was

20   were the documents that you received broken down

21   into any categories?

22        A.   Yes.



Page 26

1          Q.     How many categories were there?

2          A.     Two.

3          Q.     Did you discuss the documents that you

4     were provided by counsel with anyone other than

5     attorneys?

6          A.     I had discussions with attorneys and

7     with other DHS colleagues concerning today's --

8     today's deposition, and such discussions did

9     include reference to some of the documents that I

10    was provided.

11         Q.     Who were the DHS colleagues that you

12    spoke with in preparation for today's deposition

13    that were not attorneys?

14         A.     The non-attorney DHS colleagues that I

15    spoke with in preparation for today's deposition

16    were Valerie Boyd and Michael Huston.

17         Q.     Could you spell Mr. Huston's last

18    name?

19         A.     Yes.  It's H-u-s-t-o-n.

20         Q.     All right.  When did you speak to

21    Valerie Boyd in preparation for today's

22    deposition?



Page 27

```
 1        A.    I spoke with her and with attorneys on

 2    both Monday, June 29th, and Tuesday, June 30th.

 3        Q.    And how about Mr. Huston?  When did

 4    you speak with him?

 5        A.    Tuesday, June 30th.

 6        Q.    Why did you want to speak to Valerie

 7    Boyd --

 8             MS. SHINNERS:  Objection.

 9    BY MR. MEDLOCK:

10        Q.    -- to prepare for today's deposition?

11             MS. SHINNERS:  Objection; calls for

12        work product and attorney-client

13        communications.  I'm going to instruct the

14        witness not to answer.

15    BY MR. MEDLOCK:

16        Q.    Are you going to follow your

17    attorney's advice, sir?

18        A.    Yes.

19        Q.    What did you discuss with Ms. Boyd in

20    preparation for today's deposition?

21             MS. SHINNERS:  Objection; calls for

22        work product and attorney-client
```



Page 28

1          communication.  I'm going to instruct the

2          witness not to answer.

3     BY MR. MEDLOCK:

4          Q.    Are you going to follow your

5     attorney's advice, sir?

6          A.    Yes.

7          Q.    How long did your conversation with

8     Ms. Boyd last?

9          A.    Are you referring to the conversation

10    on June 29th or June 30th?

11         Q.    That's a good clarification.  The

12    conversation on June 29th, how long did that

13    conversation last?

14         A.    Approximately 30 minutes.

15         Q.    Besides Ms. Boyd and yourself, who

16    else was present for that conversation?

17         A.    Amber Napolitano from DHS's Office of

18    General Counsel.

19         Q.    Was anyone else from the U.S.

20    Department of Justice present for that

21    conversation?

22         A.    No, not that I recall.



Page 29

1     Q.    Did that conversation take place in

2  person, over the phone, or over videoconference?

3     A.    Over the phone.

4     Q.    In that conversation, were you asking

5  questions or was Ms. Napolitano asking questions?

6         MS. SHINNERS:  Objection.  I think

7       vague.  I would imagine -- I'm going to

8       instruct the witness not to answer.  I think

9       this calls for work product.

10  BY MR. MEDLOCK:

11     Q.    Are you going to follow your

12  attorney's advice, sir?

13     A.    Yes.

14     Q.    Can you tell me anything about the

15  substance of what was discussed with Valerie Boyd

16  on June 29, 2020, in order to prepare for today's

17  deposition?

18         MS. SHINNERS:  Objection.  Same

19       objection.  It calls for work product and

20       attorney-client communication.

21         MR. MEDLOCK:  Are you instructing him

22       not to answer?



Page 30

1            MS. SHINNERS:  Yes, I'm going to

2        instruct Mr. Glabe not to answer.

3    BY MR. MEDLOCK:

4        Q.    Mr. Glabe, are you going to follow

5    that instruction?

6        A.    Yes.

7        Q.    Did you take any notes in your

8    conversation with Ms. Boyd on June 29th?

9        A.    No.

10        Q.    On June 30th, how long did you speak

11    with Ms. Boyd in preparation for today's

12    deposition?

13        A.    Approximately 30 minutes.

14        Q.    Who was present for that conversation

15    besides yourself and Ms. Boyd?

16        A.    The other participants in the

17    conversation were Mr. Huston, Ms. Napolitano and

18    Ms. Shinners.

19        Q.    And did this conversation take place

20    over the phone or videoconference or in person?

21        A.    Over the phone.

22        Q.    What's Michael Huston's current



Page 31

1    position at DHS, if you know?

2         A.    I don't know the precise -- his

3    precise title with certainty but I believe it's

4    something -- I believe it is or similar to

5    director for Mexico within the Office of

6    International Affairs within the Office of

7    Strategy, Policy and Plans.

8         Q.    That's a long title.  I can understand

9    why you had to give me your best estimate of what

10   it was.

11              And what's Ms. Boyd's current title at

12   DHS, if you know?

13        A.    She's the assistant secretary who

14   leads the Office of International Affairs, again

15   within the Office of Strategy, Policy and Plans.

16        Q.    Who made the decision to have this

17   phone call with Ms. Boyd and Mr. Huston on

18   June 30th?

19        A.    It was a decision reached in

20   consultation with counsel.

21        Q.    Is that the same with respect to the

22   June 29, 2020, conversation you had with



Page 32

1    Ms. Boyd?  Was that decision made in consultation

2    with counsel?

3         A.    Yes.

4         Q.    Did you take any notes or record what

5    was discussed with Ms. Boyd and Mr. Huston on

6    June 30, 2020, in any way?

7         A.    No.

8         Q.    Why did you want to speak to

9    Mr. Huston and Ms. Boyd on June 30, 2020?

10             MS. SHINNERS:  Objection.  Same

11        objection.  Calls for work product,

12        potentially attorney-client communications

13        as well.  I'm going to instruct the witness

14        not to answer.

15   BY MR. MEDLOCK:

16        Q.    Are you going to follow your

17   attorney's instruction, sir?

18        A.    Yes.

19        Q.    What topics were discussed during this

20   June 30, 2020, telephone conference with

21   Mr. Huston and Ms. Boyd?

22             MS. SHINNERS:  Same objection.  Calls



Page 33

1        for work product, potentially

2        attorney-client communications.  I'm going

3        to instruct the witness not to answer.

4    BY MR. MEDLOCK:

5        Q.    Are you going to follow your

6    attorney's instruction regarding that question,

7    sir?

8        A.    Yes.

9        Q.    Besides your conversations with

10   Ms. Boyd and Mr. Huston and your meetings with

11   attorneys, did you speak with anyone else at DHS,

12   CBP, or OFO in preparing to testify as a Rule

13   30(b)(6) witness today?

14       A.    Not to my recollection.

15       Q.    Did you review any deposition

16   transcripts in order to prepare to testify today?

17       A.    No.

18       Q.    Did you review any interrogatories in

19   order to prepare to testify today?

20       A.    No.

21       Q.    I'm sorry, I couldn't hear you, sir.

22       A.    No.



Page 34

1          Q.    Did you review any responses to

2    requests for admissions in order to prepare to

3    testify today?

4          A.    Not to my knowledge, no.

5          Q.    Did you review any documents that were

6    produced by the named plaintiffs or Al Otro Lado,

7    Inc., in this litigation in order to prepare to

8    testify today?

9          A.    When I was provided documents by my

10   attorneys, I was not specifically informed who

11   had -- who had provided which document.

12         Q.    That's fair.

13               Have you reviewed any orders that

14   Judge Bashant or the Ninth Circuit has issued in

15   this case in order to prepare to testify today?

16         A.    No, not to my recollection.

17         Q.    Have you reviewed a copy of any of the

18   pleadings, that is the complaint or the answer,

19   in order to prepare to testify today?

20         A.    I believe I may have -- I may have

21   been provided the complaint, but I don't recall

22   reviewing it in detail.



Page 35

1      Q.    Have you reviewed any motions that

2    were filed in this case such as motions to

3    dismiss or motions for class certification in

4    order to prepare to testify today?

5      A.    Not to my recollection, no.

6      Q.    Have you reviewed any expert reports

7    in order to prepare to testify today?

8      A.    No.

9      Q.    Have you reviewed any declarations or

10    affidavits that were submitted to the court in

11    this case in order to prepare to testify today?

12      A.    Not that I recall.

13      Q.    Have you done any independent research

14    regarding this case or the facts related to it in

15    order to prepare to testify today?

16      A.    I believe that I briefly sort of

17    looked up the case on the Internet.  I don't

18    recall reviewing particular details, but there

19    may have been a website.  I honestly wasn't even

20    certain whether it was the right case, but I may

21    have come across a website that listed some of

22    the documents.  Again, I don't recall reviewing



Page 36

1    specific documents in detail.

2            Additionally, one other thing that I

3    looked at on my own is the monthly and publicly

4    available order numbers that CBP generally makes

5    publicly available on the Internet.

6        Q.    Were those the apprehension numbers

7    that you were looking at?

8        A.    The format that CBP reports is, I

9    believe, captioned as enforcement actions, and

10   the primary subcomponents of enforcement actions

11   are U.S. Border Patrol apprehensions between

12   ports of entry, and the other portion of

13   enforcement actions would be aliens found to be

14   inadmissible at ports of entry.

15       Q.    As far as you know, CBP doesn't

16   publish public CBP numbers that break down

17   enforcement actions into apprehensions between

18   ports of entry and aliens found removable at

19   ports of entry; is that correct?

20            MS. SHINNERS:  Objection; vague.

21   BY MR. MEDLOCK:

22       Q.    I'm just asking in your review, did



Page 37

1    you find public facing data that CBP publishes

2    that breaks down the total number of enforcement

3    actions into its constituent parts, meaning

4    apprehensions and noncitizens that are found to

5    be removable at ports of entry?

6              MS. SHINNERS:  Objection; vague.

7              Mr. Glabe, you may answer, if you can.

8              THE WITNESS:  To repeat what I said

9         earlier, my understanding is that CBP on a

10        monthly basis provides publicly available

11        numbers of enforcement actions, and that

12        within enforcement actions there are two

13        primary categories: apprehensions of aliens

14        between ports of entry and aliens who are

15        deemed inadmissible -- aliens apprehended by

16        U.S. Border Patrol between ports of entry

17        and aliens deemed inadmissible at ports of

18        entry by OFO.  And inadmissible is how those

19        numbers are characterized.  I'm not sure how

20        inadmissible relates to or corresponds to

21        the other characterization that you gave

22        regarding removability.



Page 38

1    BY MR. MEDLOCK:

2         Q.    Okay, thank you.

3               When you say you briefly looked up

4    information about the case on the Internet, are

5    you saying that you Googled the case or that you

6    looked it up on PACER?

7         A.    Google.

8         Q.    Okay.  Without going into the

9    substance of any conversations you've had with

10   attorneys regarding this case, how many times

11   have you met with attorneys to prepare for

12   today's deposition?

13        A.    I'm not certain.

14        Q.    Was it more than five?

15        A.    I'm not sure.

16        Q.    Did you meet with attorneys to prepare

17   for today's deposition on June 30, 2020?

18        A.    By "meet" do you mean does "meet" also

19   encompass phone calls or other forms of

20   communication?

21        Q.    Correct.  Either phone call, in

22   person, or over videoconferencing.



Page 39

```
 1        A.    I believe that I certainly spoke

 2   with -- I spoke with attorneys on June 30th with

 3   Ms. Boyd and Mr. Huston.  I believe that I may

 4   have also had conversations just with attorneys

 5   but I'm not certain.

 6        Q.    And the attorneys that you spoke with,

 7   or at least were on a call with on June 30, 2020,

 8   were Ms. Napolitano and Ms. Shinners; is that

 9   correct?

10        A.    Yes.

11        Q.    And that prep session happened

12   completely over the phone; is that correct?

13        A.    The call with Ms. Shinners and

14   Ms. Napolitano, Mr. Huston and Ms. Boyd happened

15   via phone, yes.

16        Q.    Okay.  And how long -- you already

17   said you spoke to Mr. Huston and Ms. Boyd for 30

18   minutes, and I think you said you might have

19   spoken to an attorney in addition to that over

20   the phone.  How much time did you spend speaking

21   to attorneys on June 30, 2020, to prepare for

22   today's deposition?
```



Page 40

1        A.    I'm not certain.

2        Q.    Do you have a best estimate?

3        A.    Honestly, I don't specifically recall

4    whether I had conversations -- phone

5    conversations yesterday with attorneys additional

6    to the conversations that also included Ms. Boyd

7    and Mr. Huston.  So it's difficult for me to

8    provide an estimate of the time since I'm not 100

9    percent positive such conversations occurred.

10       Q.    Okay.  Was there ever a time in the

11   course of your preparation for today's deposition

12   where you sat down with just attorneys for a

13   certain amount of time to discuss today's

14   deposition and the substance of your testimony?

15       A.    Sorry.  Could you repeat the question?

16       Q.    Sure.

17             Did you ever have -- let me try and

18   improve the question.

19             Did you ever have a preparation

20   session that was just with attorneys, either from

21   DHS or from the U.S. Department of Justice, in

22   order to prepare for today's deposition?



Page 41

1          A.    Yes.

2          Q.    What date did that -- what day or days

3     did those preparation sessions occur on?

4          A.    To help me answer that question, is

5     there a specific meaning that "preparation

6     session" has that's different from the

7     conversation with attorneys?

8          Q.    No.  I'm just talking about the

9     vernacular.  When did you meet with attorneys to

10    prepare to testify for today's deposition?

11         A.    To the best -- to the best of my

12    recollection, each of the last several business

13    days dating back to sometime last week.

14         Q.    In total, how many -- how much time

15    did you spend meeting with attorneys to prepare

16    for today's deposition?

17         A.    I'm not certain.

18         Q.    What's your best estimate?

19         A.    A ballpark estimate would be somewhere

20    in the range of ten to 15 hours.

21         Q.    When you reviewed documents to prepare

22    for today's deposition, did you review those



Page 42

1  documents with attorneys present?

2      A.    Generally, yes.

3      Q.    On June 29, 2020, which was this past

4  Monday, did you meet with attorneys to prepare

5  for today's deposition?

6      A.    Yes.

7      Q.    Who were the attorneys who you met

8  with on June 29, 2020?

9      A.    Ms. Napolitano, Ms. Shinners.  I

10  believe, to the best of my recollection,

11  Mr. Nazarov also participated on the 29th.

12      Q.    And how long did you spend meeting

13  with your attorneys on the 29th?

14      A.    Several hours.

15      Q.    What's your best estimate of how many

16  hours you spent with them on the 29th?

17      A.    Three or four.  I don't recall

18  specifically.

19      Q.    Did you meet with your attorneys on

20  June 26, 2020, which would have been this past

21  Friday, to prepare for today's deposition?

22      A.    Yes.



Page 43

```
 1        Q.    Which attorneys were present for that

 2   meeting?

 3        A.    To the best of my recollection,

 4   Ms. Napolitano and Ms. Shinners.

 5        Q.    How long did that meeting last for?

 6        A.    Several hours.

 7        Q.    What's your best estimate?

 8        A.    Three to four hours.  I don't recall

 9   specifically.

10        Q.    The meetings that we just discussed on

11   June 29 and June 26, did those meetings happen

12   over the phone or via Webex or in person?

13        A.    The longer sessions I just described

14   on the 26th and the 29th occurred via Webex.

15        Q.    Were those longer sessions the bulk of

16   your preparation time with attorneys?

17        A.    Yes.

18        Q.    Do you recall whether you met with

19   attorneys on June 25, 2020, which would have been

20   this past Thursday, to prepare for your

21   deposition?

22        A.    To the best of my recollection, I met
```



Page 44

1    with or had conversations with agency counsel,

2    specifically Ms. Napolitano.

3         Q.    And what's your best estimate of how

4    long those conversations or meetings lasted with

5    Ms. Napolitano?

6         A.    On the -- does your question pertain

7    specifically to June 25th?

8         Q.    Yes.

9         A.    I'm not certain.

10        Q.    Do you know if it was longer than an

11   hour?

12        A.    I'm not sure.

13        Q.    Okay.  Have you read any news stories

14   about this lawsuit?

15        A.    Not that I recall.

16        Q.    Does anyone know that you're attending

17   today's deposition apart from yourself and your

18   attorneys?

19        A.    Yes.

20        Q.    And who knows that?

21        A.    I certainly couldn't say definitively

22   everyone who might know that.



Page 45

1        Q.    Let me ask you a better question.

2              Who have you told that you're going to

3   be at a deposition today?

4        A.    DHS colleagues.  My wife.  What

5   appears to be a mutual friend of ours that you

6   mentioned before we got started.

7        Q.    I'm sure he'll be happy he got into

8   the transcript.

9              Besides what we've talked about in

10  answer to my prior questions, is there anything

11  else that you can think of that you did to

12  prepare for today's deposition?

13             MS. SHINNERS:  And I just want counsel

14        and Mr. Glabe just not to reveal the

15        substance of attorney-client communications

16        or work that was done in consultation with

17        or at the direction of counsel.

18             THE WITNESS:  Could you please repeat

19        the question?

20  BY MR. MEDLOCK:

21        Q.    Sure.

22             Just to be clear, I'm not going into



Page 46

1    any -- I don't want to get into the substance of

2    any conversations you've had with attorneys.  But

3    we've covered several things that you did to

4    prepare for today's deposition including doing

5    some independent research, reviewing documents,

6    meeting with counsel, and having conversations

7    with Ms. Boyd and Mr. Huston.

8            Is there anything else that you did to

9    prepare for today's deposition that you can think

10   of?

11   A.    Other than the items I mentioned,

12   summarized, or that we discussed and thinking

13   about the deposition, no, there is nothing

14   that -- that I specifically recall.

15   Q.    Okay.  We're at a break in my

16   deposition outline, and we've gone close to an

17   hour.  Do you want to take a quick break or do

18   you want to keep going?

19   A.    I would like to take a quick break,

20   please.

21           MR. MEDLOCK:  Okay.  Why don't we go

22       off the record.



Page 47

1                THE TECHNICIAN:  All right.  We are

2         going off the record.  The time is now

3         10:49.

4                (Recess taken.)

5                THE TECHNICIAN:  The time is 11:06 and

6         we are back on the record.

7    BY MR. MEDLOCK:

8         Q.    Welcome back, Mr. Glabe.

9                Isn't it true that DHS has been

10   presented with the option of continuing metering

11   or increasing the capacity of ports of entry on

12   multiple occasions?

13        A.    I'm not certain exactly what you mean

14   or what occasions you're referring to.

15        Q.    Isn't it true that in October and

16   November of 2016 DHS had a choice between

17   expanding metering or increasing the capacity of

18   ports of entry?

19        A.    I'm not -- I'm not certain, again,

20   exactly what you're referring to.

21        Q.    Isn't it true that in 2016 DHS

22   believed that it could have added 1,000 to 3,000


MAGNA ▶
LEGAL SERVICES

Page 48

1    extra temporary beds for asylum seekers near

2    ports of entry?

3         A.    That's not something that I'm

4    specifically aware of.  But I do think -- you

5    know, understand that there have been questions

6    about space and resources raised at various

7    times.

8         Q.    Isn't it true that in 2018 DHS was

9    presented with the option -- with an option that

10   would have increased the capacity of the San

11   Ysidro port of entry to handle asylum seekers

12   threefold but decided to continue metering

13   instead?

14            MS. SHINNERS:  Objection.  I believe

15        that's -- to the extent that you're asking

16        for pre-decisional deliberations or

17        recommendations that were not adopted, this

18        would fall within the deliberative process

19        privilege.

20            MR. MEDLOCK:  Are you going to

21        instruct the witness not to answer, Katie?

22            MS. SHINNERS:  I mean, I think that I



Page 49

1    have to instruct him not to answer to the

2    extent it would reveal pre-decisional

3    deliberations.  I think you're trying to --

4         MR. MEDLOCK:  I think the magistrate

5    judge ruled on this directly, and you're in

6    violation of a direct order from a

7    magistrate judge.  I understand you have

8    objected to it, but that doesn't stop me

9    from asking a question about it.  So are you

10   going to ask him not to answer the question?

11        MS. SHINNERS:  So is it your position

12   that the claw-back is not valid at this

13   point while we have an appeal pending on the

14   issue?

15        MR. MEDLOCK:  Correct.  Because an

16   appeal under Rule 72(a) does not stop the --

17   does not affect the magistrate judge's order

18   until Judge Bashant rules otherwise.

19        MS. SHINNERS:  The protective order --

20   one moment.  I would like to pull up the ESI

21   protocol in this case because I believe that

22   the ESI protocol does prevent -- does impose



Page 50

1          obligations in this regard.

2               MR. MEDLOCK:  Do you need a moment to

3          go off the record to look at it?

4               MS. SHINNERS:  I think that would be

5          helpful.  Thank you.

6               MR. MEDLOCK:  Okay.  Let's go off the

7          record.

8               THE TECHNICIAN:  We are going off the

9          record.  The time is now 11:10.

10              (Off the record.)

11              (Recess taken.)

12              THE TECHNICIAN:  We are back on the

13         record.  The time is now 11:27.

14              MR. MEDLOCK:  Welcome back, Mr. Glabe.

15              Could the court reporter please read

16         back the last substantive question.

17              (The record was read back by the

18         reporter as follows:

19              "Question:  Isn't it true that in 2018

20         DHS was presented with the option -- with an

21         option that would have increased the

22         capacity of the San Ysidro port of entry to



Page 51

1          handle asylum seekers threefold but decided

2          to continue metering instead?")

3    BY MR. MEDLOCK:

4          Q.    Can you answer that question?

5          A.    DHS is constantly evaluating and

6    deliberating on various options in conjunction

7    with CBP when it comes to ports of entry and sort

8    of constantly deliberating on various policies

9    and operational options including with respect to

10   metering.

11         Q.    Sure.  My question was a little bit

12   more specific, though.

13   ████████████████████████████████████████

14   ████████████████████████████████████████

15   ████████████████████████████████████████

16   ████████████████████████████████████████

17   ████████████████████████████████████████

18   ████████████████████████████████████████

19   ████████████████

20         MS. SHINNERS:  Objection.  The

21   question incorporates privileged

22   recommendations that were not final.  I'm



Page 52

1        going to allow the witness to answer, but I

2        object to the question and its incorporation

3        of the use of the documents that are still

4        under dispute.

5   BY MR. MEDLOCK:

6        Q.    Go ahead, Mr. Glabe.  You can answer,

7   and then I will make a statement of my own.

8        A.    Could you repeat the question, please?

9        Q.    Sure.

10       ████████████████████████    ██████████████

11   ████████████████████████████████████████████

12   ███████████████████████████████████████

13   ██████████████████████████████████████████████

14   ██████████████████████████████████████

15   ████████████████████████████████████████

16   ████████████████████████████████████████

17            MS. SHINNERS:  Same objection.

18            You can answer.

19            THE WITNESS:  Right.  So without

20   getting into specific deliberative or

21   pre-decisional conversations, my

22   understanding is that the decision was made



Page 53

1          by DHS to continue metering in 2018 and

2          during the reference time period.

3     BY MR. MEDLOCK:

4          Q.    And continue metering instead of

5     ████████████████████████████████████████

6     ████████████████████████████████████████████

7     ██████████████████████████████████████████

8     ████████████

9               MS. SHINNERS:  Same objection.

10              You can answer.

11              THE WITNESS:  Okay.  So without sort

12         of necessarily agreeing to the specific

13         characterization, again, my understanding is

14         that a variety of options were deliberated

15         and discussed, and the decision was made to

16         continue the -- to continue the metering.

17    BY MR. MEDLOCK:

18         Q.    Okay.  Let's just try to make this

19    very concrete.

20              MR. MEDLOCK:  Kevin, can you please

21         bring up Tab 21.

22              MS. SHINNERS:  Mr. Medlock, we have



Page 54

```
 1        discussed off the record, and I will say on

 2        the record, Tab 21 has the same content as

 3        the document that has been clawed back.  And

 4        we're happy to provide a redacted version

 5        for use in the deposition.  We object to the

 6        use of the document in unredacted form at

 7        the deposition.

 8             MR. MEDLOCK:  Sure.  And I'll make our

 9        position very clear.  Tab 21 was subject to

10        a claw-back motion.  Magistrate Judge

11        Crawford ruled on that claw-back motion in

12        plaintiffs' favor and that the document

13        should nevertheless be disclosed.  And we

14        understand that there is an objection to

15        that -- to that ruling pending, but that in

16        no way deprives Magistrate Judge Crawford's

17        opinion of full effect and force.

18             I will refer you to Great-West Life &

19        Annuity Insurance Company v. American

20        Economy Insurance Company.  It's a case that

21        is reported at 2013 US 5th Lexis 159027 from

22        the District of Nevada, an opinion issued
```



Page 55

1          November 6, 2013.  And it deals directly

2          with this issue.  It says in relevant part:

3          "Certainly an aggrieved party has the

4          opportunity to file and serve timely

5          objections to an order issued by a

6          magistrate judge on a non-dispositive

7          pretrial motion, but such objections do not

8          serve to automatically stay the

9          implementation of the order."

10             I will also refer you to In Re Air

11         Crash at Taipei, Taiwan, a case reported at

12         2002 Westlaw 3 215 5477.  It's from the

13         Central District of California in 2002.  It

14         reads in relevant part, quote:  "Such an

15         interpretation is more consistent with the

16         magistrate judge's goals of facilitating the

17         quick and final resolution of preferred

18         pretrial matters.  If an objection operates

19         as a stay of the order, not only is the

20         losing litigant given an artificial

21         incentive to object, but the magistrate

22         judge's decision-making ability is eroded.



Page 56

1     It should be remembered that the magistrate

2     judge is empowered to determine pretrial

3     matters.  A magistrate judge's order will

4     not determine anything if it can be

5     automatically stayed by filing an

6     objection."

7          And I can refer you to other cases as

8     well.  De Leon v. CIT Group reported at 2013

9     Westlaw 950527, again District of Nevada

10    2013.  Quote:  "The filing of objections to

11    a magistrate judge's order on a

12    non-dispositive matter does not stay the

13    order's operation."

14         So that is our position.

15         MS. SHINNERS:  Defendant's position,

16    having not had an opportunity to review the

17    case law by plaintiff, taking it at face

18    value, defendant's position is regardless of

19    whether filing of Rule 72(a) objections

20    automatically stays the magistrate judge's

21    initial order or not, that the parties have

22    agreed and the magistrate judge has endorsed



Page 57

1      an ESI protocol that provides claw-back

2      procedures.  Those claw-back procedures

3      provide:  "If at the conclusion of the

4      meet-and-confer process the parties are

5      still not in agreement, then they bring the

6      issue to the court.  The receiving party's

7      motion challenging the decision must not

8      publicly disclose the information claimed to

9      be privileged.  Any further briefing by any

10     party shall also not publicly disclose the

11     information claimed to be privileged if the

12     privilege claim remains unresolved or is

13     resolved in the producing party's favor.

14     Specifically, pending resolution of the

15     judicial determination or resolution between

16     the parties, the parties shall both preserve

17     and refrain from using the challenged

18     information for any purpose and shall not

19     disclose it to any person other than those

20     required by law to be served with a copy of

21     any motion filed under seal in accordance

22     with the applicable rules."



Page 58

1           This, in addition with the -- so this

2      in conjunction with the defendant's pending

3      Rule 72 objection and the magistrate judge

4      determination, we understand the parties

5      have agreed not to use these documents in

6      briefing or in furtherance of the case, at

7      least the portions that have been redacted

8      or are proposed to be redacted.

9           Accordingly, we object to the use of

10     an unredacted version of Tab 21 of this

11     exhibit.  We're happy to provide a redacted

12     version for use.

13          MR. MEDLOCK:  We disagree

14     wholeheartedly with that.  Magistrate Judge

15     Crawford has made a judicial determination.

16     We understand you disagree with it, but you

17     have a judicial determination.  The document

18     can and will be used.

19          Are you going -- are you saying that

20     you will not allow the witness to answer any

21     questions about this unredacted document?

22          MS. SHINNERS:  Yes.  And we are happy



Page 59

1          to provide a redacted version for use.

2                  MR. MEDLOCK:  Okay.  Can we go off the

3          record for five or ten minutes?

4                  MS. SHINNERS:  Yes.

5                  THE TECHNICIAN:  We are going off the

6          record.  The time is now 11:38.

7                  (Off the record.)

8                  (Recess taken.)

9                  THE TECHNICIAN:  We are back on the

10         record.  The time is 12:13.

11                 MR. MEDLOCK:  All right, Mr. Glabe,

12         welcome back.

13                 I understand from your counsel,

14         Ms. Shinners, that she has had a chance to

15         think over your position, and my

16         understanding from Ms. Shinners is that the

17         government is going to stand on its position

18         that the plaintiffs cannot use Tab 21 or

19         question the witness about the unredacted

20         version of Tab 21 during this deposition.

21                 Is that correct, Ms. Shinners?

22                 MS. SHINNERS:  That is correct.  Our



Page 60

1       position was stated previously and the

2       reasons therefor.  We've also, as I stated

3       previously, provided a version of Tab 21

4       with redactions consistent with those

5       proposed and pending the magistrate judge

6       ruling.

7            MR. MEDLOCK:  And I will just state

8       that we have already made our positions

9       clear on the record.  I'll just state I have

10      had a chance to look at the redacted version

11      of Tab 21.  It basically redacts many of the

12      issues that I would have wanted to question

13      Mr. Glabe about.

14           Moreover, we don't think any redaction

15      is necessary because Judge Crawford has

16      already ruled on this issue, as we've

17      already stated.  So we reserve all rights to

18      move to compel and seek sanctions.

19           I'll also state by way of an offer of

20      proof, I had about 15 -- well, actually, 18

21      pages of questions about this document in my

22      outline.  They would have included questions



Page 61

1    ████████████████████████████████

2    ██████████████████████████████████

3    ███████ who was involved at DHS in making

4    this decision and other questions along

5    those lines.  But I have been prevented from

6    asking those questions and receiving answers

7    to them by the objection that plaintiffs

8    believe is wholly unfounded.  So I make that

9    by way of an offer of proof.

10            Ms. Shinners, do you have anything to

11    add before we continue with the examination?

12            MS. SHINNERS:  Just only that the

13    redacted version of Tab 21 does address some

14    aspects of decisions made, and that's all.

15            MR. MEDLOCK:  Okay.  Kevin, can we

16    please bring up Tab 28, please.

17            (Owen Exhibit 28, previously marked

18            for identification, is attached hereto.)

19    BY MR. MEDLOCK:

20    Q.    I have put in front of you what was

21    previously marked during Todd Owen's deposition

22    as Deposition Exhibit 28.  It is a September 16,



Page 62

1    2016, e-mail exchange that bears the leading

2    Bates number AOL-DEF-00762523.

3            Do you see that document in front of

4    you, sir?

5        A.    I do.

6        Q.    I want to focus on the e-mail that

7    Todd Hoffman sent on September 16, 2016, at

8    3:13 p.m.  It's towards the bottom of the first

9    page of Exhibit 28.  Please let me know when

10   you've found that e-mail, sir.

11       A.    I've located it.

12       Q.    All right.  In this e-mail Mr. Hoffman

13   writes in part, quote:  "As you know, the C2 went

14   to a Deputies Committee meeting at the National

15   Security Council today to discuss the Haitian

16   surge."

17           Did I read that correctly, sir?

18       A.    Yes.

19       Q.    And C2 refers to the deputy

20   commissioner of U.S. Customs and Border

21   Protection, correct?

22       A.    That's my understanding, yes.



Page 63

1        Q.    And at this time, the deputy

2    commissioner of U.S. Customs and Border

3    Protection would have been Kevin McAleenan; is

4    that right?

5              MS. SHINNERS:  Object to the scope.

6              You can answer.

7              THE WITNESS:  That's my understanding,

8        yes.

9    BY MR. MEDLOCK:

10       Q.    Who, if anyone, from DHS attended this

11   Deputies Committee meeting of the National

12   Security Council on September 16, 2016?

13             MS. SHINNERS:  Object to the scope.

14             You can answer.

15             THE WITNESS:  I'm not sure.

16   BY MR. MEDLOCK:

17       Q.    During your deposition preparation,

18   did you do anything to figure out who, if anyone,

19   from DHS attended this September 16, 2016,

20   meeting at the National Security Council to

21   discuss the Haitian surge?

22             MS. SHINNERS:  Object to scope.



Page 64

1              THE WITNESS:  Can you repeat?

2    BY MR. MEDLOCK:

3        Q.    Sure.

4              During your deposition preparation,

5    did you do anything to determine who, if anyone,

6    from DHS attended the September 16, 2016, meeting

7    of the Deputies Committee at the National

8    Security Council to discuss the Haitian surge?

9        A.    No.

10       Q.    Before I showed you Exhibit 28, had

11   you ever seen it before today?

12       A.    Not to my recollection.

13       Q.    Do you know if any final decisions

14   were reached about the, quote-unquote, Haitian

15   surge during the September 16, 2016, Deputies

16   Committee meeting of the National Security

17   Council?

18             MS. SHINNERS:  Object to the scope.

19             THE WITNESS:  I am not sure.

20   BY MR. MEDLOCK:

21       Q.    Do you know whether anyone at DHS was

22   briefed about this meeting of the Deputies



Page 65

1    Committee of the National Security Council

2    concerning the Haitian surge?

3              MS. SHINNERS:  Object to the scope.

4              THE WITNESS:  I'm not certain.

5    BY MR. MEDLOCK:

6         Q.    Have you done anything to determine

7    whether anyone at DHS was briefed about this

8    Deputies Committee meeting that occurred on

9    September 16, 2016?

10             MS. SHINNERS:  Object to the scope.

11             THE WITNESS:  No.

12             MR. MEDLOCK:  Katie, you can have just

13        a running objection to the scope, if that's

14        all right.

15             MS. SHINNERS:  That's fine.  I will

16        object to this line of questions.

17   BY MR. MEDLOCK:

18        Q.    Are you aware, sir, that in early

19   October 2016, Hurricane Matthew struck the

20   country of Haiti?

21        A.    I don't have specific recollection of

22   that fact, but I'm happy to take your word for



Page 66

 1    it.

 2        Q.    Well, you don't have to take my word

 3    for it.  I'll refresh your recollection.

 4            MR. MEDLOCK:  Kevin, can we bring up

 5        Tab 29, please?

 6            (Exhibit 321 marked for identification

 7        and attached hereto.)

 8            MR. MEDLOCK:  And if you can go to the

 9        second page, please, Kevin.

10    BY MR. MEDLOCK:

11        Q.    All right, sir.  I've put in front of

12    you what we will mark as Exhibit 321 to your

13    deposition.  It is a multipage report from the

14    World Bank that is entitled "Rapidly Assessing

15    the Impact of Hurricane Matthew in Haiti."

16            I'm just showing you this to refresh

17    your recollection.

18            MR. MEDLOCK:  So if you could turn to

19        page 3, please, Kevin.

20    BY MR. MEDLOCK:

21        Q.    And I'm focused on the section that

22    reads "Challenge."  Do you see that section, sir?



Page 67

 1          A.    I do.

 2          Q.    Okay.  And that section begins, quote:

 3     "Hurricane Matthew struck Haiti on October 4,

 4     2016, as a Category 4 hurricane.  The combined

 5     effects of wind, coastal flooding and rain caused

 6     heavy flooding, landslides, and the destruction

 7     of a great deal of infrastructure, agricultural

 8     crops and natural ecosystems."

 9               Did I read that correctly, sir?

10          A.    Yes.

11          Q.    Does that refresh your recollection

12     that on October 4, 2016, Hurricane Matthew struck

13     Haiti and did a considerable amount of damage to

14     the country?

15               MS. SHINNERS:  I just want to note

16          again I still have an objection to the scope

17          on this line of questioning.

18               Go ahead.

19               THE WITNESS:  Yes.

20               MR. MEDLOCK:  All right.  Kevin, can

21          you please bring up Tab 30.

22               (Exhibit 322 marked for identification



Page 68

1          and attached hereto.)

2     BY MR. MEDLOCK:

3          Q.    Sir, I've put in front of you what

4     will be marked Exhibit 322 to your deposition.

5     It's a two-page e-mail chain from October 18 --

6     sorry, from October 13 through October 19, 2016,

7     that has the leading Bates number

8     AOL-DEF-00802340.

9               Do you see that document in front of

10    you, sir?

11         A.    Yes.

12         Q.    Okay.  I want to focus on the e-mail

13    that Kevin McAleenan sent on October 18, 2016, at

14    2:41 p.m., which should be the second e-mail on

15    the first page of Exhibit 321.

16              Do you see that e-mail in front of

17    you, sir?

18         A.    I do.

19         Q.    That e-mail is addressed to Todd Owen

20    and his team; correct?

21         A.    It's addressed to -- yeah, the

22    salutation is to EAC Owen and team, and there's a



Page 69

1    variety of CBP folks on the "to" and "cc" line of

2    this e-mail.

3         Q.    And EAC Owen is Todd Owen, the

4    executive assistant commissioner of CBP; correct?

5         A.    Todd Owen is among the CBP executive

6    assistant commissioners.  He is the EAC who leads

7    the Office of Field Operations.

8         Q.    Okay.  I'm focused on the paragraph

9    below the salutation that you referenced.  It

10   reads, quote:  "The Commissioner and Secretary

11   have both approved initiating this effort and

12   establishing a temporary Haitian processing

13   capability in El Centro.  ICE has promised full

14   partnership and support in this joint effort.

15   DHS CFO has advised that we should track our

16   expenses for potential reimbursement after we

17   have a full FY 17 budget."

18            Did I read that correctly?

19            (Interruption due to technical

20        difficulties.)

21            (Recess taken.)

22



Page 70

```
 1    --------------------------------------------------

 2                      AFTERNOON SESSION

 3                        1:20 p.m.

 4    --------------------------------------------------

 5              THE TECHNICIAN:  We are now back on

 6         the record.  The time is 1:20.

 7    BY MR. MEDLOCK:

 8         Q.   Thank you for bearing with us during

 9    some technical issues, Mr. Glabe?

10              MR. MEDLOCK:  Kevin, can we please

11         bring back up Tab 30 again, please.

12    BY MR. MEDLOCK:

13         Q.   Sir, I've put in front of you again

14    what we were talking about before we took a break

15    which has been marked as Exhibit 322 to your

16    deposition.  And I'm focused on the section under

17    the salutation in Kevin McAleenan's October 18,

18    2016, email that he sent at 2:41 p.m.

19              Do you see that paragraph, sir?

20         A.   Yes.

21         Q.   Okay.  And that paragraph begins,

22    quote:  "The Commissioner and Secretary have both
```



Page 71

1   approved initiating this effort and establishing

2   a temporary Haitian processing capability in El

3   Centro."

4            Did I read that correctly?

5   A.      Yes, that's what the document says.

6   Q.      During your deposition preparation,

7   have you done anything to investigate what

8   occurred with this temporary Haitian processing

9   capability in El Centro?

10  A.      Not to my recollection, no.

11  Q.      Do you know if CBP or OFO currently

12  have a Haitian processing capability, or any sort

13  of processing capability, located in El Centro,

14  California?

15           MS. SHINNERS:  And just for the

16       record, when you use the term "you" in this

17       context you're talking about DHS?

18           MR. MEDLOCK:  Correct.

19           THE WITNESS:  I'm not sure I totally

20       understand the question in terms of -- by

21       "currently," do you mean today to process

22       aliens generally?  To process aliens above



Page 72

1        and beyond normal capacity?  To process

2        particular nationalities?  I'm not sure

3        exactly what you're asking.

4   BY MR. MEDLOCK:

5        Q.    Sure.  I'll ask it a little bit

6   better.

7              Does OFO currently have today a

8   processing capability for inspecting and

9   processing noncitizens without proper travel

10  documents in El Centro, California?

11             MS. SHINNERS:  Object to the scope

12        unless you're specifying DHS.  This topic is

13        limited to DHS's knowledge.

14             You can answer, Mr. Glabe.

15             THE WITNESS:  Understood.  Sorry,

16        could you repeat or rephrase the question?

17  BY MR. MEDLOCK:

18        Q.    Sure.

19             My question is whether you, as in DHS,

20  are aware of whether as of today OFO has a

21  capability of processing and inspecting

22  noncitizens without proper travel documents in El



Page 73

 1    Centro, California.

 2        A.    So our understanding, DHS's

 3    understanding, is that CBP OFO processes aliens

 4    without travel documents at a number of ports of

 5    entry, land ports of entry along the Southwest

 6    border.  I would understand that El Centro would

 7    be among them and don't have any reason to

 8    believe that there is any reason that CBP

 9    wouldn't be processing aliens at that port.

10            However, from the headquarters

11    perspective, the sort of day-by-day, port-by-port

12    processing is really within the cognizance of CBP

13    and CBP officers on the ground rather than --

14    rather than something that's sort of managed or

15    directed out of headquarters.  That level of

16    granularity is really something that CBP OFO

17    leads and manages on the ground.

18        Q.    You believe that El Centro is one of

19    the land ports of entry on the U.S.-Mexico

20    border; is that right?

21            MS. SHINNERS:  Same objection to

22        scope.



Page 74

1            You can answer.

2            THE WITNESS:  Yeah, my understanding

3        is that -- and again, with respect to

4        specific sectors or ports, you know,

5        that's -- normally the details of that are

6        done by -- are done by CBP.

7    BY MR. MEDLOCK:

8        Q.    Okay.  My question is a little

9    different.

10            Is DHS's understanding that El Centro

11    is a land port of entry, or that it is something

12    else?

13        A.    Yeah, I'm not sure I totally fully

14    understand the question.

15        Q.    Is El Centro a land port of entry?

16            MS. SHINNERS:  I object to the scope.

17        I just want to note for the record that

18        there are various topics that we had

19        necessarily said were sort of within CBP's

20        primary knowledge, and I know we're going

21        forward on this, but to the extent that you

22        can figure out which land ports of entry are



Page 75

1          for CBP, that is something that CBP has

2          provided testimony and information on.

3               MR. MEDLOCK:  As you know, Rule 30(b)

4          says that all objections should be stated

5          concisely.  I've given you a lot of leeway

6          on that.  That was a speaking objection, and

7          it coaches the witness on how to answer the

8          question.  So I won't tolerate it any

9          further.  So please refrain from that.

10   BY MR. MEDLOCK:

11        Q.    My question to you, Mr. Glabe, is:  Is

12   El Centro a land port of entry on the U.S.-Mexico

13   border?

14        A.    So to sort of correct what I stated

15   before, my understanding is that El Centro is the

16   name of a sector but is not a port -- does not

17   reference a port of entry.

18        Q.    When you say "sector," you're

19   referring to a U.S. Border Patrol sector; is that

20   right?

21        A.    That's right.

22        Q.    Okay.  And there is a reference here



Page 76

1    to the commissioner and the secretary having

2    approved this effort.  At this time, in

3    October 2016, the secretary of Homeland Security

4    would have been Jeh Johnson; is that right?

5        A.    Yes.

6        Q.    And at the time of this e-mail,

7    October 18, 2016, the commissioner of CBP would

8    have been Gil Kerlikowske; is that right?

9        A.    That's my recollection, yes.

10       Q.    To your knowledge, and I should say to

11   DHS's knowledge, when did Secretary Johnson

12   approve the El Centro processing capability?

13            MS. SHINNERS:  I'm going to object to

14       the scope.

15            You can answer.

16            THE WITNESS:  It appears, based on the

17       document, that that would have occurred --

18       based on the context of this e-mail, it

19       appears it would have occurred shortly

20       before it was -- this e-mail was sent on

21       October 18th, and I have no reason to

22       dispute the CBP characterization of the



Page 77

1          secretary's approval.  But I'm not aware of

2          separate DHS records documenting the

3          approval.

4     BY MR. MEDLOCK:

5          Q.    All right.  I would like to focus with

6     you on the last paragraph of Mr. McAleenan's

7     e-mail.  That begins, quote:  "I recognize the

8     burden of this effort with costs, TDY resources,

9     et cetera, but this appears to be our best

10    near-term option given the already challenging

11    ops tempo and custody situation at SYS, CLX, and

12    San Luis POEs."

13              Did I read that correctly?

14         A.    That's what the document says, yes.

15         Q.    Do you know what SYS and CLX refer to?

16              MS. SHINNERS:  Object to the scope.

17              THE WITNESS:  Again, I would have to

18         defer to what was meant -- to know for

19         certain, I would defer to CBP.  But my

20         understanding is that SYS and CLX would

21         refer to San Ysidro and Calexico POEs

22         respectively.



Page 78

```
 1                MR. MEDLOCK:  Kevin, please bring up
 2       Tab 22.
 3  BY MR. MEDLOCK:
 4       Q.    Sir, I have put in front of you what
 5  we will mark Exhibit 323 to your deposition.
 6                (Exhibit 323 marked for identification
 7       and attached hereto.)
 8  BY MR. MEDLOCK:
 9       Q.    It is a multipage e-mail that begins
10  on October 30, 2016, and goes through to
11  October 31, 2016.  It has the leading Bates
12  number AOL-DEF-00258173.
13                Do you have that document in front of
14  you, sir?
15       A.    Yes.
16       Q.    Okay.  I want to focus on the e-mail
17  that Gloria Chavez sent on October 31, 2016, at
18  9:40 p.m.  Do you see that e-mail on the first
19  page of Exhibit 323?
20       A.    I do.
21       Q.    Okay.  There is a -- the salutation on
22  this e-mail is to EAC Alles and all.  Do you see
```



Page 79

1    that, sir?

2         A.    Yes.  And I believe the named

3    recipient is pronounced Alles.

4         Q.    Right.  That's Randolph "Tex" Alles?

5         A.    That's correct.

6         Q.    Okay.  And at the time of this e-mail,

7    Tex Alles was in charge of the Enterprise

8    Division of CBP; is that right?

9         A.    He had numerous positions within the

10   department over many years, so I'm not sure I

11   have his entire career path memorized.  But I'm

12   happy to move forward with that understanding.

13        Q.    Okay, that's fine.

14              And the subject line of this e-mail is

15   "CBP CAT update:  Facilities and TDY costs."

16              Did I read that correctly?

17        A.    Yes, that's what the document says.

18        Q.    Okay.  There is a section of this

19   e-mail that has the header "FEMA Tent City."  Do

20   you see that, sir?

21        A.    Yes.

22        Q.    And the first sentence before the



Page 80

1    redaction in that paragraph reads, quote:  "After

2    today's meeting at the NAC, C1 and S1 have

3    approved moving forward with the plan to

4    establish the infrastructure that would support

5    ███████████████████████████████."

6              Did I read that correctly?

7         A.    There is actually typo where it says

8    "after today," apostrophe, "meeting" as opposed

9    to "after today's meeting."

10        Q.    I see.  So I fixed that in my head.

11   But with that one change, I read that correctly;

12   is that right?

13        A.    Yes.

14        Q.    Okay.  NAC refers to the Nebraska

15   Avenue Complex; is that right?

16              MS. SHINNERS:  Objection; calls for

17         speculation.

18              But you can answer.

19              THE WITNESS:  The former DHS

20         headquarters was known as -- is known as the

21         Nebraska Avenue Complex, which is frequently

22         abbreviated as the NAC.  And so my



Page 81

1          assumption would be that the reference to

2          the NAC in this e-mail amongst -- many CBP

3          personnel would refer to the Nebraska Avenue

4          Complex, yes.

5     BY MR. MEDLOCK:

6          Q.    Okay.  And at the time of this e-mail,

7     October 31, 2016, the Nebraska Avenue Complex

8     would have been DHS's headquarters; is that

9     right?

10         A.    That's right.

11         Q.    Okay.  During your deposition

12    preparation did you do anything to investigate

13    the decision made around October 31, 2016, to

14    move forward with plans to establish

15    infrastructure that would support ███████████

16    ████████████████?

17         A.    Not that I recall.

18         Q.    Do you have any reason to dispute that

19    this decision was actually made on or around

20    October 31, 2016?

21         A.    No.  I mean, again, this -- or I

22    should say this e-mail is, the best I can tell,



Page 82

1    exclusively between and amongst CBP personnel.

2    But I have no reason to -- no reason to dispute

3    the approval referenced in terms of an approval

4    made at the headquarters level by then Secretary

5    Johnson.

6           Q.    Have you made any efforts to find any

7    document in DHS's possession, custody or control

8    regarding this decision made on or around

9    October 31, 2016, to establish infrastructure for

10   ████████████████████████████████?

11          MS. SHINNERS:  Object to the scope.

12      Object to the extent -- actually, that's

13      all.

14          You can answer.

15          THE WITNESS:  No, for the reason --

16      no.

17   BY MR. MEDLOCK:

18          Q.    Okay.  Let's move to the second page

19   of the exhibit.  I want to focus on the -- I'm

20   sorry, to the third page of the exhibit.  I want

21   to focus on the e-mail sent by Tex Alles on

22   October 30, 2016, at 11:56 a.m.



Page 83

1                    Do you see that e-mail, sir?

2          A.    I do.

3          Q.    Okay.  And Mr. Alles writes:  "Folks,

4    direction from C1 is to continue El Centro work

5    and the new task of looking and bringing the

6    Nogales facility from 2014 back on line."

7                    Did I read that correctly?

8          A.    That's what the document says, yes.

9          Q.    Do you know whether DHS was consulted

10   about any decision to bring the Nogales

11   processing facility back on line in October or

12   November 2016?

13         A.    I don't know.  I would highlight that

14   this is an internal CBP e-mail referencing

15   direction from C1, so the commissioner of CBP,

16   and it refers to operational matters that are

17   sort of consistent with what my understanding of

18   what would -- the sort of thing that CBP might

19   be, particularly in terms of looking at doing

20   something.  It wouldn't necessarily have risen to

21   the cognizance of headquarters leadership.

22         Q.    Would headquarters leadership be



Page 84

1   briefed about a decision to reopen a closed

2   processing facility?

3        A.    I think it would -- I'm not certain.

4   I think it could depend on a variety of facts and

5   circumstances.

6        Q.    Isn't it the case that when DHS and

7   CBP decide to move forward with processing and

8   detention facilities they can do so?  They can

9   build those facilities in a matter of days?

10       A.    Sorry, could you repeat the question?

11            MS. SHINNERS:  Object to -- sorry.

12       Object to the scope.

13            Go ahead.

14  BY MR. MEDLOCK:

15       Q.    Isn't it the case that when DHS and

16  CBP decide to move forward with building

17  temporary processing or detention facilities,

18  they can do so, they can build those facilities

19  in a matter of days?

20       A.    I'm not sure I necessarily agree with

21  that characterization.  I mean, I do know there

22  have been instances when the department or CBP



Page 85

1    within the department has constructed, you know,

2    temporary facilities.  If and when a decision is

3    made to construct such facilities, the objective

4    would be to do so as quickly as possible.  And

5    yeah, there's a wide variation in what type of

6    facilities you might be referring to and

7    therefore how long it might take to construct

8    such a facility.  But I'm not certain I can give

9    a definitive answer to that.

10        Q.   Okay.  Are you familiar with the

11   temporary processing facility that was created

12   near Donna, Texas, in 2016?

13            MS. SHINNERS:  Object to the scope.

14            THE WITNESS:  You said in 2016?

15   BY MR. MEDLOCK:

16        Q.   Correct.

17        A.   I don't have specific knowledge of

18   that, although I do know that Donna is among the

19   locations at which temporary facilities have

20   been -- have been constructed at various times.

21        Q.   Okay.

22            MR. MEDLOCK:  Why don't we bring up



Page 86

```
 1        Tab 31, please, Kevin.

 2              Kevin, is that the first page of

 3        Tab 31?

 4              THE TECHNICIAN:  I have Tab 31 as a

 5        PowerPoint exhibit.

 6              MR. MEDLOCK:  Right.  Is that the

 7        first page of it?

 8              Okay, thank you.

 9   BY MR. MEDLOCK:

10        Q.   Mr. Glabe, I have put in front of you

11   what we'll mark as Exhibit 324 to your

12   deposition.

13              (Exhibit 324 marked for identification

14        and attached hereto.)

15   BY MR. MEDLOCK:

16        Q.   It is a 14-page presentation dated

17   November 29, 2016, from the U.S. Customs and

18   Border Protection Crisis Action Team that has the

19   Bates number AOL-DEF-00815563.

20              My first question for you, sir, is:

21   Have you ever seen this document before?

22        A.   I don't have specific recollection of
```



Page 87

1    seeing this particular document with the

2    particular date of November 29, 2016.  But I am

3    sort of familiar with the Crisis Action Team

4    documents that appear to be similar to this

5    produced by CBP.

6         Q.    Okay.  Let's go into the document and

7    see if any of it refreshes your recollection.

8              MR. MEDLOCK:  Kevin, can you please

9         turn to slide 7.

10   BY MR. MEDLOCK:

11        Q.    All right, sir, slide 7 at the top has

12   a title of "Donna, Texas, Processing Facility."

13   Do you see that?

14        A.    I do.

15        Q.    And beneath the photograph of a map

16   showing where Donna, Texas, is there is a bullet

17   noting that the vendor contract for the facility

18   was signed on November 23, 2016.  Is that right,

19   sir?

20        A.    Yes, that's what it says.

21        Q.    Okay.  And then beneath that there is

22   a bullet that indicated that the Donna, Texas,



Page 88

1    processing facility was scheduled to become

2    operational on December 9, 2016; is that right?

3        A.    Yes, that's what it says.

4        Q.    Okay.  So this presentation indicates

5    that it would take 16 days from signing the

6    vendor contract to the Donna, Texas, facility

7    becoming operational; is that right?

8            MS. SHINNERS:  Object to the scope.

9            You can answer.

10            THE WITNESS:  Yes, that's what it

11        appears to indicate.

12    BY MR. MEDLOCK:

13        Q.    Okay.  I would like to bring -- well,

14    before I bring up this exhibit, I just want to

15    make sure that I understand and we all agree on a

16    fact.

17            On November 8, 2016, you're aware that

18    Donald Trump became the president elect of the

19    United States; correct?

20            MS. SHINNERS:  Object to the scope.

21            You can answer.

22            THE WITNESS:  I confess to not



Page 89

1          recalling off the top of my head exactly

2          what the election date was in 2016.

3     BY MR. MEDLOCK:

4          Q.    I thought you might, but let me

5     refresh your recollection.

6               MR. MEDLOCK:  Can we bring up Tab 26,

7          please, Kevin.

8               (Exhibit 325 marked for identification

9          and attached hereto.)

10    BY MR. MEDLOCK:

11         Q.    This is an article from The New York

12    Times entitled "Donald Trump is Elected President

13    in Stunning Repudiation of the Establishment."

14    It has an article date of October 9, 2016.

15              Does this refresh your recollection

16    that the U.S. presidential election occurred on

17    Tuesday, November 8, 2016?

18              MS. SHINNERS:  Object to the scope.

19              You can answer.

20              THE WITNESS:  Yes.  Yes.

21              MR. MEDLOCK:  All right.  I don't have

22         a lot of questions on that one.



Page 90

1              Can we bring up Tab 7, please, Kevin.

2    BY MR. MEDLOCK:

3         Q.    This is Tab 7, which we will -- I

4    should note the prior tab was Exhibit 325.  We

5    will be marking Tab 7 as Exhibit 326.

6              (Exhibit 326 marked for identification

7         and attached hereto.)

8    BY MR. MEDLOCK:

9         Q.    It's a multipage e-mail chain from

10   November 9, 2016.  It has leading Bates number

11   AOL-DEF-00769118.

12             Do you have that document in front of

13   you, sir?

14        A.    Yes.

15        Q.    Okay.  I want to focus on the e-mail

16   that Gloria Chavez sent on November 9, 2016, at

17   11:25 p.m.  The header for the e-mail begins on

18   the bottom of the first page and then it

19   continues on through the entirety of the second

20   page.

21             Do you see that e-mail, sir?

22        A.    Yes.



Page 91

1        Q.    Okay.  And I would like to in

2  particular focus on the section that is about a

3  third of the way down the page on the second page

4  of Exhibit 326 that begins with "El Centro

5  Processing Facility."

6              Do you see that section, sir?

7        A.    Is the header -- are you referring to

8  the header, the indented bullet that says "El

9  Centro ICE Facility"?

10       Q.    Yes, that's correct.

11       A.    Yes, I see that.

12       Q.    Okay.  And I want to focus on the

13  fourth bullet under that subsection that begins

14  with "El Centro Facility."  Do you see that

15  section, sir?

16       A.    I do.

17       Q.    Okay.  And that section reads, quote:

18  "El Centro Facility will not have a soft opening

19  of 11/14 and will not go live on 11/28.  Planning

20  and contracting will continue but no TDY

21  personnel from OFO and ICE will be deployed.  CBP

22  will continue to work and have facility ready for



Page 92

1    when trigger is pulled to staff it."

2              Did I read that correctly?

3        A.    That is what the document says, yes.

4        Q.    Is DHS aware of whether the El

5    Centro -- the temporary El Centro processing

6    facility was ever opened?

7              MS. SHINNERS:  Object to the scope.

8              You can answer.

9              THE WITNESS:  I'm not sure.

10   BY MR. MEDLOCK:

11       Q.    Okay.  And if you look at the bullet

12   immediately below "El Centro ICE Facility," it

13   indicates that rental furniture was actually

14   delivered to the building on November 9, 2016.

15   Is that right?

16       A.    Yes.

17       Q.    Okay.  So on November 9, 2016, the day

18   after the presidential election, the decision was

19   made to not open the El Centro facility in

20   mid-November 2016 even though the building was

21   built and there was furniture in that building;

22   is that right?



Page 93

1           MS. SHINNERS:  Objection; scope and

2      characterization.

3           You can answer.

4           THE WITNESS:  Could you repeat the

5      question, please?

6  BY MR. MEDLOCK:

7      Q.    Sure.

8           From November 9, 2016, which is the

9  day after the U.S. presidential election, this

10 e-mail indicates that the decision was made to

11 not open the El Centro processing facility on

12 November 14th even though the building was

13 already there and had furniture in it?

14          MS. SHINNERS:  Same objection.

15          THE WITNESS:  So the e-mail does say

16     that the facility would not have a soft

17     opening on 11/14.  It doesn't, insofar as I

18     can see, specify when such a determination

19     was made, or at least in this e-mail, or by

20     whom.

21 BY MR. MEDLOCK:

22     Q.    Isn't it the case that senior



Page 94

1    officials at CBP and DHS were not told about the

2    decision to put the El Centro processing facility

3    on hold before the decision was made?

4              MS. SHINNERS:  Object to the scope.

5              THE WITNESS:  I'm not sure.

6              MR. MEDLOCK:  Kevin, can we bring up

7        Tab 23, please.

8    BY MR. MEDLOCK:

9        Q.    All right, sir, I've put in front of

10   you what we will mark as Exhibit 327 to your

11   deposition.

12             (Exhibit 327 marked for identification

13        and attached hereto.)

14   BY MR. MEDLOCK:

15       Q.    It is a multipage e-mail exchange from

16   November 9, 2016, with the leading Bates number

17   AOL-DEF-00272878.

18             I would like to focus with you on the

19   first page of Exhibit 327 on the e-mail from

20   November 9, 2016, at 11:30 p.m. from Todd Owen to

21   Beverly Good.

22             MS. SHINNERS:  One moment.  Sorry,



Page 95

1       what tab is this?

2              MR. MEDLOCK:  This is Tab 23.

3              MS. SHINNERS:  Thank you.  I

4       apologize.

5              MR. MEDLOCK:  No problem.  No worries.

6    BY MR. MEDLOCK:

7       Q.    Do you see the e-mail?

8       A.    Yeah.  So which -- sorry, which tab

9    were we on before this?

10      Q.    Before this, we were on Tab 7.

11      A.    Sorry.  This is the same e-mail?

12      Q.    No, it's a continuation of the e-mail

13   chain.

14             Do you see the November 9, 2016,

15   e-mail from Todd Owen to Beverly Good?

16      A.    Right.  Yes, I do.

17      Q.    And at this time Todd Owen was the

18   executive assistant commissioner in charge of

19   OFO; is that right?

20      A.    At that time and, to the best of my

21   knowledge, to the present day.

22      Q.    Okay.  And he writes in his e-mail,



Page 96

1    quote:  "Bev:  So this report says El Centro is

2    on hold?  We should notify the TDYs tomorrow to

3    stand down temporarily, with a likely future

4    deployment."

5              Did I read that correctly?

6        A.    That's what the document says, yes.

7        Q.    Do you understand what TDYs means?

8              MS. SHINNERS:  Object to the scope.

9              Sorry, you can answer.

10             THE WITNESS:  My understanding is that

11        TDY is generally used as an abbreviation for

12        temporary duty, and so the TDY plural, while

13        literally meaning temporary duties, would

14        mean personnel on or designated for

15        temporary duty.

16   BY MR. MEDLOCK:

17       Q.    All right.  So according to this

18   e-mail, staff had already been designated for

19   temporary duty at the El Centro processing

20   facility and had to be told to stand down because

21   the facility would not be having its soft opening

22   in mid-November 2016; is that right?



Page 97

1           MS. SHINNERS:  Object to the scope.

2           THE WITNESS:  Could you repeat the

3      question, please?

4  BY MR. MEDLOCK:

5      Q.    Yeah.  So according to this e-mail,

6  staff who were supposed to be on TDY duty at the

7  El Centro facility had to be told to stand down

8  on or around November 9, 2016, because the

9  facility in El Centro would not be opening in

10 mid-November 2016; is that right?

11          MS. SHINNERS:  Same objection.

12          THE WITNESS:  So I generally agree.

13      Just to rephrase, it appears that Todd Owen

14      is directing Beverly Good to ask the TDYs to

15      stand down on November 10th, and it appears

16      to be responsive to the statement we

17      previously discussed as a result of the fact

18      that the El Centro facility would not have a

19      soft opening on 11/14.

20 BY MR. MEDLOCK:

21      Q.    Okay.  So within 24 hours of the U.S.

22 presidential election, the El Centro facility is



Page 98

1    put on hold; is that right?

2              MS. SHINNERS:  Object to the scope.

3              Go ahead.

4              THE WITNESS:  The Crisis Migration

5         Action Team report for November 9, 2016,

6         indicates that the El Centro facility will

7         not have a soft opening of 11/14.  But as I

8         said earlier, the document doesn't appear to

9         specify when such a determination was made

10        or for what reason.

11             MR. MEDLOCK:  Okay.  Kevin, can we

12        please bring up Tab 27.

13             (Owen Exhibit 31, previously marked

14        for identification, is attached hereto.)

15   BY MR. MEDLOCK:

16        Q.    All right, sir.  I've put in front of

17   you what was marked as Exhibit 31 to the

18   deposition of Todd Owen.  It's a multipage e-mail

19   chain from November 10/20/16.

20             Do you have that document in front of

21   you, sir?

22        A.    This is a document marked Exhibit 31



Page 99

1    and then with the Bates number AOL-DEF-00272936?

2        Q.    That is right.

3        A.    Yes.

4        Q.    Okay.  So I want to focus in on the

5    e-mail that Gloria Chavez sent to Beverly Good

6    with copies to Enrique Tamayo and Patrick

7    Flanagan on November 10, 2016, at 2:48 p.m.

8              Do you see that e-mail, sir?

9        A.    Yes.

10       Q.    Okay.  And the subject line of that

11   e-mail is, quote, "Metering FMUAs at the TX CBP

12   POEs."

13             Did I read that correctly?

14       A.    Yes.

15       Q.    And FMUAs are family units; correct?

16       A.    FMUAs would be referring to family

17   unit aliens, so aliens who are members of family

18   units, which in turn I understand to be defined

19   as family units being beyond the point of

20   encounter with CBP, being aliens comprised of one

21   or more minors under the age of 18 and one or

22   more parents or legal guardians.



Page 100

1      Q.    Okay.  Thank you for that

2   clarification.

3            I'm focused on the first paragraph of

4   the e-mail which begins with "Beverly."

5            Do you see that paragraph, sir?

6      A.    Yes.

7      Q.    That paragraph begins, quote:

8   "Beverly:  One other topic that C2 discussed at

9   the NAC meeting today was the ability to meter

10   the flow of FMUAs at the POE bridges (at the

11   middle of the bridge) at some of our Texas POEs

12   to prevent the overflow at the actual POEs."

13            Did I read that correctly, sir?

14      A.    That is what the document says, yes.

15      Q.    Do you know -- does DHS know who from

16   DHS attended the meeting -- the November 10,

17   2016, meeting with Deputy Commissioner Kevin

18   McAleenan referenced in that sentence?

19            MS. SHINNERS:  Object to the scope.

20            THE WITNESS:  I don't know.

21   BY MR. MEDLOCK:

22      Q.    All right.  In your preparation for



Page 101

1    today's deposition, were you able to locate any

2    documentation in the possession, custody or

3    control of DHS regarding this November 10, 2016,

4    meeting with Deputy Commissioner Kevin McAleenan

5    that occurred at the NAC?

6            MS. SHINNERS:  Object to the scope.

7            THE WITNESS:  No.  Not beyond this

8        e-mail, no.

9    BY MR. MEDLOCK:

10       Q.    Okay.  Let's move down to the second

11   paragraph.  Ms. Chavez writes, quote:  "I just

12   received word from Commissioner's staff that this

13   proposal that C2 introduced to S1 for

14   consideration earlier today was approved by S1

15   and to make notification to OFO."

16           Did I read that correctly?

17       A.    Yes.

18       Q.    All right.  So this e-mail indicates

19   that on November 10, 2016, DHS Secretary Jeh

20   Johnson approved a proposal from Deputy

21   Commissioner Kevin McAleenan to extend metering

22   of FMUAs to some ports of entry in Texas.  Is



Page 102

1    that right?

2         A.    Yeah, the e-mail does appear to

3    indicate that then Secretary Johnson approved a

4    proposal to meter family unit aliens at Texas

5    ports of entry.

6         Q.    Have you done anything to investigate

7    which ports of entry Secretary Johnson approved

8    OFO metering at?

9              MS. SHINNERS:  Object to the scope.

10             You can answer.

11             THE WITNESS:  Not specifically, no.

12   BY MR. MEDLOCK:

13        Q.    You say not specifically.  Did you do

14   anything to investigate this issue generally?

15             MS. SHINNERS:  Object to the extent

16             that it would reveal work product or

17             communications with counsel.  I'm going to

18             instruct the witness not to answer to the

19             extent it would reveal communications with

20             counsel or work product in his preparation.

21             THE WITNESS:  Yeah, I don't have

22             anything to add beyond conversations with



Page 103

```
1        counsel that I believe would be covered by

2        attorney-client privilege.

3   BY MR. MEDLOCK:

4        Q.    Okay.  So within 48 hours of Donald

5   Trump becoming the president elect, DHS and CBP

6   had decided to put the soft opening of the El

7   Centro processing facility on hold and had

8   decided to extend metering to ports of entry in

9   Texas; is that right?

10       A.    Could you repeat the question?

11       Q.    Sure.

12             Within 48 hours of Donald Trump

13  becoming the president elect of the United

14  States, DHS and CBP had decided to put the

15  opening of the El Centro, California, processing

16  facility on hold and had decided to expand

17  metering to ports of entry in Texas; is that

18  right?

19             MS. SHINNERS:  Object; argumentative.

20       Object to the scope in certain respects.

21             You can answer.

22             THE WITNESS:  So let me -- you sort of
```



Page 104

```
 1      asked about two things.  So taking them in

 2      reverse order, this CBP internal e-mail

 3      indicates -- and I have no reason to dispute

 4      Secretary Johnson, President Obama's DHS

 5      secretary, on November 10 approved a

 6      proposal by then Deputy Commissioner

 7      McAleenan who, to the best of my knowledge

 8      at that point in time, assigned a courier

 9      position to expand metering of family units

10      to POEs at the Texas -- at Texas ports of

11      entry.

12           And then with respect to the first

13      thing you asked me about, as we discussed

14      previously, there is documentation that a

15      Migration Crisis Action Team report on

16      November 9th indicating that the soft

17      opening of the El Centro facility had been

18      put on hold, although again it doesn't -- at

19      least the document we discussed earlier

20      doesn't specifically indicate when such a

21      determination was made.

22           MR. MEDLOCK:  Okay.  Let's bring up
```



Page 105

1        Tab 8, please, Kevin.

2    BY MR. MEDLOCK:

3        Q.    All right, sir, I've put in front of

4    you what will be marked as Exhibit 328 to your

5    deposition.

6              (Exhibit 328 marked for identification

7        and attached hereto.)

8    BY MR. MEDLOCK:

9        Q.    It is a single e-mail that has the

10   Bates number AOL-DEF-00353880.

11             Do you see that e-mail in front of

12   you, sir?

13       A.    I do.

14       Q.    Okay.  And this is an e-mail that

15   Kevin McAleenan sent on November 11, 2016, at

16   2:48 p.m. to Todd Owen and John Wagner.

17             Do you see that, sir?

18       A.    I do see that, yes.

19       Q.    Okay.  And the subject line of this

20   e-mail is "Metering in TX"; correct?

21       A.    That's correct.

22       Q.    TX means Texas there; is that right?



Page 106

1        A.    Yes, I share your understanding.

2        Q.    Okay.  In his e-mail then Deputy

3    Commissioner McAleenan writes, quote:  "Just

4    wanted to touch base directly because I'm not

5    sure it was conveyed with full clarity from CAT.

6    C1 and I briefed S1 that we wanted to increase

7    efforts to meter arrivals of non-UAC, non-Mexican

8    CF cases mid-bridge.  If INAMI is not willing to

9    help, we will push up the line and hold them back

10   there.  This will be mostly CENTAM families.

11   Please advise if you have concerns and let me

12   know how the implementation goes."

13               Did I read that correctly?

14       A.    I believe -- not to be pedantic, but

15   the last clause is "let me know how

16   implementation goes" rather than "how the

17   implementation goes."  But yes.

18       Q.    I don't take you to be pedantic; I

19   take you to be correct.  Other than that, I read

20   the e-mail correctly; is that right?

21       A.    I believe so, yes.

22       Q.    Okay.  What does UAC mean as used in



Page 107

1     this e-mail?

2               MS. SHINNERS:  Object to the scope.

3               You can answer.

4               THE WITNESS:  My understanding is that

5     UAC would denote an unaccompanied alien

6     child, or unaccompanied alien children in

7     the plural, which term is defined or the

8     incorporation from -- it's an incorporated

9     term within legislation known as the GBTRA

10    which in turn I think references a

11    definition of the Homeland Security Act.

12    The upshot of it being a UAC would be an

13    alien under the age of 18 who would have

14    encountered ICE who is not accompanied at

15    that time by a parent or legal guardian.  So

16    basically, if you're talking about minor

17    aliens, the terms UAC and FMUA are

18    complementary.  A minor encountered by CBP

19    would either be a member of a family unit

20    and therefore a family unit alien or, if not

21    accompanied by a parent or legal guardian, a

22    UAC.



Page 108

1    BY MR. MEDLOCK:

2        Q.    There is a reference in here to CF

3    cases.  Is it your understanding that that refers

4    to credible fear cases?

5        A.    That would be my -- based on the

6    context, that would be my understanding, yes.

7        Q.    And there is also a reference in this

8    e-mail to INAMI.  What is INAMI?

9        A.    I'm not sure I could -- I'm not a

10   Spanish speaker, and I'm not sure I could tell

11   you --

12       Q.    Nor am I, and I won't hold you to it.

13       A.    -- what each letter in the acronym

14   specifically denotes in Spanish, but I think

15   INAMI to be the Mexican immigration law

16   enforcement agency.

17       Q.    Does this e-mail refresh your

18   recollection that it was both Commissioner

19   Kerlikowske and Deputy Commissioner McAleenan who

20   briefed Secretary Johnson regarding extending

21   metering to certain ports in Texas on

22   November 10, 2016?



Page 109

1        A.    What was the previous tab number?

2        Q.    The previous tab number was Tab 8.

3    I'm sorry, it would be -- I'm on the wrong one.

4    It would be Tab 27, which was Exhibit 31.

5        A.    So I guess I would say I would to some

6    extent let the documents speak for themselves in

7    terms of it's not -- I don't have -- I'm not

8    certain that the briefing referenced in the

9    e-mail on Tab 8 is necessarily the same one that

10   is referenced on Tab 27.  But at the same time, I

11   don't have any reason to dispute that proposal

12   that "C2 introduced to S1" referenced at Tab 27

13   refers to the same meeting as "C1 and I briefed

14   S1."  So I don't know for sure whether that was

15   two discussions or one.  But it certainly seems

16   from the context like it could -- both of those

17   e-mails or documents could be referring to the

18   same discussion.

19       Q.    Okay.  So it's possible that both

20   Exhibit 328 and Exhibit 31 refer to the same

21   meeting, but you don't know if that's correct as

22   you sit here today?



Page 110

1        A.    I think that's a fair

2    characterization, yes.

3              MR. MEDLOCK:  Okay.  Kevin, can we

4        please pull up Tab 25.

5    BY MR. MEDLOCK:

6        Q.    All right, sir.  I've put in front of

7    you what will be marked as Exhibit 329 to your

8    deposition.

9              (Exhibit 329 marked for identification

10       and attached hereto.)

11   BY MR. MEDLOCK:

12       Q.    It is a multipage e-mail from

13   November 15, 2016, that has the leading Bates

14   number AOL-DEF-002722938.

15             And I want to focus with you on the

16   second page of this e-mail in Exhibit 329, and in

17   particular focus on the section called "J4

18   Logistics."

19             Do you see that section, sir?

20       A.    I do.

21       Q.    Okay.  Can I focus on the Nogales

22   processing center section?  Do you see that?



Page 111

1    A.    Yes.

2    Q.    Okay.  And I'm focused on the first

3    sentence in the first bullet under "Nogales

4    Processing Center."  That reads, quote:  "As of

5    this evening, 11/15/16, CBP leadership has

6    decided to place the Nogales Processing Center on

7    hold status until further notice."

8            Did I read that correctly?

9    A.    Yes.

10   Q.    Okay.  Was anyone from DHS briefed

11   about the decision to put the Nogales processing

12   center on hold?

13           MS. SHINNERS:  Object to the scope.

14           You can answer.

15           THE WITNESS:  This document only

16       indicates that it was a CBP leadership

17       decision and doesn't reference any

18       notification to or decision by DHS

19       headquarters.

20   BY MR. MEDLOCK:

21   Q.    Did you do anything to determine

22   whether DHS headquarters was involved in the



Page 112

1  decision-making on putting the Nogales processing

2  center on hold?

3          MS. SHINNERS:  Object to the scope.

4          You can answer.

5          THE WITNESS:  I don't recall doing so,

6      no.

7  BY MR. MEDLOCK:

8      Q.   So as you sit here today, you don't

9  know whether DHS might have been involved in the

10  decision-making on putting the Nogales processing

11  center on hold until further notice; is that

12  right?

13      A.   That's correct.

14      Q.   So we have now looked at a series of

15  exhibits that occurred -- decisions that were

16  made or reported out within a week after the

17  results of the presidential election in the

18  United States were announced on November 8, 2016.

19  And these e-mails show that on November 9, 2016,

20  an internal CBP e-mail reported the fact that the

21  El Centro processing facility would be put on

22  hold on November 10, 2016.  The secretary of



Page 113

1    Homeland Security, Jeh Johnson, approved

2    expanding the ports of entry in Texas.  And on

3    November 15, 2016, the decision was made to put

4    the Nogales processing center on hold.  Is that

5    correct, sir?

6           MS. SHINNERS:  Object; argumentative.

7       Object to the characterization.

8           You can answer.

9           THE WITNESS:  Sorry, could you repeat

10      the question?

11          MR. MEDLOCK:  I probably couldn't if I

12      tried.  How about the court reporter read it

13      back?

14          (The record was read back by the

15      reporter as follows:

16          "Question:  So we have now looked at a

17      series of exhibits that occurred --

18      decisions that were made or reported out

19      within a week after the results of the

20      presidential election in the United States

21      were announced on November 8, 2016.  And

22      these e-mails show that on November 9, 2016,



Page 114

1    an internal CBP e-mail reported the fact

2    that the El Centro processing facility would

3    be put on hold on November 10, 2016.  The

4    secretary of Homeland Security, Jeh Johnson,

5    approved expanding the ports of entry in

6    Texas.  And on November 15, 2016, the

7    decision was made to put the Nogales

8    processing center on hold.  Is that correct,

9    sir?")

10         MS. SHINNERS:  Objection.  Same

11    objections, and also compound.

12         THE WITNESS:  Should I --

13         MS. SHINNERS:  Yes, you should answer.

14         THE WITNESS:  Since it's a multipart

15    question, let me try my best with a

16    multipart answer here.

17         So one, just as a technical matter, I

18    believe the first part referred to the

19    presidential election results being

20    announced on November 8th, and I think that

21    another document we looked at earlier, a New

22    York Times article from November 9th, made



Page 115

1          reference to the then candidate Clinton

2          conceding on or about 3:00 a.m. on the 9th.

3          So I believe -- and I guess the results

4          would have been announced on a rolling basis

5          on the 8th and 9th, but I believe the

6          overall results of the election weren't

7          known until the morning of November 9th.

8                  Setting that aside, I think we've

9          discussed three different -- three different

10         determinations that were made, all based on

11         sort of internal CBP documents.  One

12         referenced sort of putting on hold the El

13         Centro facility.  Again, as we discussed

14         previously, that was on November 9th.  The

15         e-mail says the information was communicated

16         on November 9th.  I'm unclear when the

17         decision was made.

18                  The second was with respect to

19         metering in Texas, and the CBP records

20         indicate that it was approved at the

21         department level by then Secretary Johnson,

22         and I have no reason to dispute that but



Page 116

1          would just highlight the CBP

2          characterization -- the headquarters

3          characterization.

4                    And then the third piece that we just

5          discussed was with reference to Nogales

6          which is explicitly characterized as a CBP

7          determination rather than a DHS

8          determination.

9                    And then while true that this is sort

10          of a matter and the calendar and the clock,

11          each of the three things that we've

12          discussed occurred in the sort of --

13          occurred or were communicated in the

14          November 9th to I believe it was

15          November 15th time frame.  I'm not aware of

16          the connection between -- either in the

17          documents or otherwise between those --

18          those actions taken by President Obama's DHS

19          and CBP leadership and the fact of a

20          presidential election on November 8th.

21                    MR. MEDLOCK:  Okay.  We've been going

22          for a little over an hour.  Do you want to



Page 117

1      take a quick break?

2              THE WITNESS:  Sure.

3              MS. SHINNERS:  That's fine with me.

4              MR. MEDLOCK:  Why don't we go off the

5      record.

6              THE TECHNICIAN:  We are going off the

7      record.  The time is now 2:27.

8              (Recess taken.)

9              THE TECHNICIAN:  We are back on the

10     record.  The time is now 2:42.

11  BY MR. MEDLOCK:

12     Q.    Sir, I would like to shift gears for a

13  moment.  Are you aware that in April 2018 Todd

14  Owen issued a memorandum containing metering

15  guidance to the directors of field operations at

16  OFO?

17              MS. SHINNERS:  And just for the

18     record -- go ahead.

19  BY MR. MEDLOCK:

20     Q.    I just couldn't hear your answer.  Was

21  that a yes?

22     A.    I know Katie was trying to jump in, so



Page 118

1    sorry for talking over each other.

2            MS. SHINNERS:  When you say you, are

3        you speaking to Mr. Glabe personally or DHS?

4        I want to make sure I understood the

5        question.

6            MR. MEDLOCK:  DHS.

7    BY MR. MEDLOCK:

8        Q.    Was DHS aware of the April 2018

9    metering guidance memorandum issued by Todd Owen?

10       A.    Yes.

11       Q.    Did anyone at DHS play a role in

12   drafting that memorandum?

13       A.    Do you have -- would it be possible to

14   look at the document while we're discussing it?

15       Q.    Yeah, I can get there.  I just wanted

16   to get your understanding before we get to the

17   document, if you have an independent

18   understanding without looking at the document as

19   to who at DHS, if anyone, would have played a

20   role in drafting that April 2018 metering

21   guidance.

22       A.    I think looking at the document would



Page 119

1    help me provide the best testimony.

2        Q.    Okay, no problem.  I'll show you the

3    document in a minute.  I'll give you some other

4    documents to give you some context.

5              MR. MEDLOCK:  Kevin, can you please

6         bring up Tab 12?

7    BY MR. MEDLOCK:

8        Q.    Sir, I have put in front of you Tab 12

9    which will be marked as Exhibit 330 to your

10   deposition.

11             (Exhibit 330 marked for identification

12        and attached hereto.)

13   BY MR. MEDLOCK:

14       Q.    It is a multipage e-mail chain that

15   has the leading Bates number AOL-DEF-00280783.

16             And I want to focus on the second page

17   which ends in the Bates number 784.  The e-mail

18   that Ian Saunders sent on April 23, 2018, at

19   9:11 a.m.

20             Do you see that e-mail in front of

21   you, sir?

22       A.    I do.



Page 120

1          Q.     The subject line of that e-mail is

2     "Re:  General update on migrant caravan."

3     Correct?

4          A.     Yes.

5          Q.     According to the footer of this

6     e-mail, at this time Ian Saunders was the acting

7     assistant commissioner in the Office of

8     International Affairs at CBP; correct?

9          A.     That's what it says, yes.

10         Q.     Okay.  And in the body of his e-mail

11    he writes, quote:  "Just out of a meeting with C1

12    and other senior leaders about the caravan.  The

13    Department has given some instructions in terms

14    of how individuals arriving as part of the

15    caravan will be processed on arrival."

16              Did I read that correctly?

17         A.     That's what it says, yes.

18         Q.     What, if any, instructions did DHS

19    give to CBP regarding how individuals that were

20    arriving as part of a migrant caravan in

21    April 2018 should be processed upon their

22    arrival?



Page 121

1          MS. SHINNERS:  Object to the scope.

2      Not one of the topics.

3          THE WITNESS:  Should I answer?

4          MS. SHINNERS:  Yes.  Unless I say

5      otherwise, Mr. Glabe, you can answer.  I'll

6      try to say you can answer afterwards, but

7      unless I instruct you not to answer, you can

8      go forward.

9          THE WITNESS:  Sir, I'm just taking a

10     minute to review the document.

11  BY MR. MEDLOCK:

12     Q.    Sure.

13     A.    Apologies for the delay.  Would you

14  mind repeating the question?

15     Q.    Sure.

16         This e-mail from Ian Saunders on

17  April 23, 2018, indicates that the department

18  gave some instructions on how individuals

19  arriving as part of the caravan would be

20  processed upon arrival.

21         What, if any, instructions did DHS

22  give to CBP regarding processing individuals that



Page 122

1    were arriving as part of the caravan?

2              MS. SHINNERS:  Object to the scope.

3              THE WITNESS:  I have no -- no specific

4         knowledge of that, sitting here today.

5    BY MR. MEDLOCK:

6         Q.    Have you done anything to investigate

7    that question?

8              MS. SHINNERS:  Object to the scope.

9              You can answer, Mr. Glabe.

10             THE WITNESS:  May I have a moment to

11        consult with agency counsel with respect to

12        privilege?

13             MR. MEDLOCK:  Sure.  Why don't we go

14        off the record so you can do that.

15             MS. SHINNERS:  Sure.  Thank you.

16             THE TECHNICIAN:  The time is 2:50.

17             (The witness and counsel confer.)

18             (Recess taken.)

19             THE TECHNICIAN:  We are now back on

20        the record.  The time is now 2:58.

21    BY MR. MEDLOCK:

22        Q.    Welcome back, Mr. Glabe.  Before you



Page 123

1    took a break to consult with your counsel

2    regarding a question of privilege, I was asking

3    you whether you've done anything to investigate

4    instructions that may have been given to -- from

5    DHS to CBP regarding how individuals that were

6    part of a migrant caravan should have been

7    processed on arrival.

8             Are you able to answer that question,

9    sir?

10             MS. SHINNERS:  And we did discuss

11        privilege issues.  I just wanted to instruct

12        the witness not to answer to the extent it

13        would reveal attorney-client communications

14        or mental impressions of counsel in

15        preparation.  But he can answer to the

16        extent he can without revealing such

17        communications.

18             THE WITNESS:  The way I would address

19        this issue or the underlying question is I

20        know that -- not really.  I don't really

21        feel like I can get into preparation without

22        getting into attorney-client privilege



Page 124

1       issues.  But in terms of what I understand

2       to be the underlying question, I know that

3       the caravan -- the circumstances of the

4       caravans generated significant concerns both

5       to CBP and headquarters, and that there were

6       a lot of -- you know, a lot of concerns

7       about officer safety, impact of caravans on

8       port operations and ability to conduct duty

9       missions.  And so I know there was a lot

10      of -- the caravan was generating a lot of

11      headquarters interest.

12           But with respect to this document

13      saying the department has given some

14      instructions in terms of how individuals

15      arriving as part of the caravan will be

16      processed on arrival, I don't know, sitting

17      here today, exactly what instructions are

18      being referred to, assuming this internal

19      CBP characterization is correct.

20  BY MR. MEDLOCK:

21      Q.    Okay.  Earlier you said that there was

22  concern at CBP and headquarters.  That's



Page 125

1    headquarters of DHS?

2         A.    Yes.

3         Q.    Okay.  Thank you for that

4    clarification.

5              MR. MEDLOCK:  Kevin, can we pull up

6         Tab 14, please.  Actually, can you pull up

7         Tab 13, please.

8    BY MR. MEDLOCK:

9         Q.    All right, sir.  I've put in front of

10   you a multipage e-mail chain that begins on

11   April 24, 2018, and goes forward to April 25,

12   2018.  It has a leading Bates number of

13   AOL-DEF-00041757.

14              And I would like to focus with you on

15   the e-mail that Kevin McAleenan sent on the

16   second page of Tab 14, which I should note for

17   the record will be marked as Exhibit 331.

18              (Exhibit 331 marked for identification

19         and attached hereto.)

20   BY MR. MEDLOCK:

21         Q.    All right, sir.  Do you see the e-mail

22   that Kevin McAleenan sent on April 24, 2018, at



Page 126

1    8:26 p.m.?

2         A.    This is the one that begins -- or has

3    a header "For official use only/pre-decisional/

4    deliberative"?

5         Q.    Yes.

6         A.    Yes, I see the e-mail here.

7         Q.    I'm focused on this first paragraph of

8    Mr. McAleenan's e-mail.  He writes that the CBP

9    has been recommending strong posture changes for

10   S1 decision.

11              Do you see that, sir?

12        A.    Yes.

13        Q.    Okay.  Do you know what those strong

14   posture changes for S1 decision refers to?

15              MS. SHINNERS:  Objection.  That calls

16         for the revelation of pre-decisional

17         recommendation by CBP.

18              MR. MEDLOCK:  It would if I asked him

19         what they were.  I'm just asking him if he

20         knows what it refers to.

21              MS. SHINNERS:  Okay, that's fair.  I

22         would instruct the witness not to answer to



Page 127

1          the extent it would reveal the substance of

2          those recommendations to the extent they are

3          pre-decisional.

4    BY MR. MEDLOCK:

5          Q.    I'll just clarify, Mr. Glabe.  My

6    question is pretty much just a yes-or-no

7    question.

8               When then Commissioner McAleenan

9    writes, quote:  "Recommending strong posture

10   changes for S1 decision," yes or no, do you know

11   what he is referring to there?

12              MS. SHINNERS:  I'm just going to also

13         assert an objection to the scope to the

14         extent it's outside the topics.

15              You can answer, Mr. Glabe.

16              THE WITNESS:  So my answer is --

17         because this is -- my answer is I do not

18         know exactly what is meant by "strong

19         posture changes for S1 decision," sitting

20         here today.  Nor do I know -- and again,

21         without getting into the substance of

22         anything pre-decision or deliberative, nor



Page 128

1          is it apparent from the construction of "we

2          are working to recommend" -- if you sort of

3          parse the sentence -- "we are working to

4          recommending strong posture changes for S1

5          decision" where those recommendations are in

6          the deliberative process vis-a-vis whether

7          or not these things that are referenced

8          would have at this point actually have yet

9          been presented to the secretary.

10   BY MR. MEDLOCK:

11       Q.    Okay.  I want to focus on the second

12   paragraph that begins with "That said."  And I am

13   about four lines down at the sentence that begins

14   with "Please confirm."

15           Do you see that sentence, sir?

16       A.    Yes.  Sorry, there's two sentences

17   that begin with "Please confirm.

18       Q.    Sir, I'm on the first sentence that

19   begins with "Please confirm."

20           Do you see that?

21       A.    I do.

22       Q.    Okay.  That sentence reads, quote:



Page 129

1    "Please confirm that you have sent out guidance

2    regarding state processing and port security and

3    capacity issues relating to queue management."

4              Did I read that correctly, sir?

5         A.    Yes.

6         Q.    Okay.  Do you have an understanding --

7    does DHS have an understanding of what the term

8    "queue management" means?

9         A.    Yes.

10        Q.    Is queue management basically

11   synonymous with metering?

12        A.    I'm not certain exactly what you mean

13   by "metering" or by "queue management."  So I'm

14   not trying to be difficult but --

15        Q.    Sure.  And I'm not trying to make it a

16   philosophical exercise.  Do people at DHS use the

17   terms "queue management" and "metering"

18   interchangeably?

19        A.    I think they generally -- again, not

20   knowing subjectively what any person means,

21   generally they would understood them to be

22   synonyms or closely related terms.



Page 130

1        Q.    At this point, April 24, 2018, was

2    anyone at DHS briefed about the decision to send

3    out guidance regarding queue management?

4        A.    I'm not certain.  I would say that

5    general guidance that would go from EAC Owen to

6    the field would not be -- would generally be

7    something that DHS headquarters defers to CBP

8    with respect to the -- how the OFO conducts its

9    field operations.

10            MR. MEDLOCK:  Okay.  Kevin, can you

11        bring up --

12            THE WITNESS:  I think -- I think, just

13        to kind of expand upon what I said earlier

14        in terms of the broader issues here about --

15        when I said earlier that the caravan

16        certainly got interest at DHS as well as

17        CBP, if we look at the three issues that are

18        delineated here -- safe processing, port

19        security, and capacity -- that's sort of

20        consistent with the understanding of the

21        types of caravan-related issues that would

22        have been briefed to headquarters in general



Page 131

```
 1      terms.

 2            But again, to my knowledge, the

 3      guidance relating to those issues was

 4      generally something that would sort of be

 5      within -- largely within the discretion of

 6      CBP.

 7            MR. MEDLOCK:  Okay.  Let's bring up

 8      Tab 14, please, Kevin.

 9  BY MR. MEDLOCK:

10      Q.    Sir, I've put in front of you a

11  one-page document.  It has the Bates number

12  AOL-DEF-000402981.  We'll mark this as Deposition

13  Exhibit 332.

14            (Exhibit 332 marked for identification

15      and attached hereto.)

16  BY MR. MEDLOCK:

17      Q.    This is an April 27, 2018, memorandum

18  entitled "Metering Guidance."  Is that correct,

19  sir?

20      A.    Yes.

21      Q.    Okay.  Was anyone at DHS consulted

22  about this metering guidance before it was issued
```



Page 132

1  by Mr. Owen to the field?

2      A.    I'm not certain.  I would reiterate

3  what I said earlier, that as a general matter

4  guidance such as this, which is on CBP letterhead

5  and appears to be responsive to direction from

6  the then deputy commissioner, would be sort of

7  generally CBP -- it's internal to CBP, but I'm

8  not certain as to whether or not anyone at DHS

9  headquarters was consulted.

10     Q.    After this metering guidance was

11 issued to the field on April 27, 2018, was anyone

12 at DHS provided with a copy of this memorandum?

13     A.    I'm not certain, but I think that it

14 would have been -- it would not be -- I'm not

15 certain sitting here today.  I think providing

16 this sort of document on sort of an informational

17 basis, given interest in -- given interest at the

18 time related to the caravans, it wouldn't be

19 surprising for me to learn that this document had

20 been provided after the fact on a sort of an

21 informational or FYI basis.  But I'm not certain.

22     Q.    Do you know who at CBP would have



Page 133

1    provided this guidance on a formal or informal

2    basis to anyone at DHS?

3         A.    I'm not sure, but I would expect

4    that -- yeah, I'm not sure.

5         Q.    Do you know when someone from CBP

6    would have given this guidance -- a copy of this

7    guidance, either formally or informally, to

8    anyone at DHS?

9         A.    I'm not sure.

10        Q.    If this guidance was given to anybody

11   at DHS on a formal or informal basis, did DHS

12   ever provide any comments regarding this metering

13   guidance?

14        A.    Sorry.  Could you repeat that last

15   question?

16        Q.    Sure.

17            If in fact this metering guidance was

18   provided to someone at DHS, did DHS ever provide

19   any comments regarding the guidance to anyone at

20   CBP?

21        A.    I'm not sure, and I'm hesitant to

22   speculate.



Page 134

1        Q.    Do you know whether anyone at DHS

2    currently has a copy of this metering guidance?

3              MS. SHINNERS:  Objection; scope.

4              THE WITNESS:  I mean, obviously we --

5         myself and others have it in the context of

6         this litigation, but I'm not sure beyond

7         that.

8    BY MR. MEDLOCK:

9        Q.    All right.  So this memorandum is

10   dated April 27, 2018; is that right?

11       A.    Yes.

12       Q.    Does DHS ever review press statements

13   or press releases that CBP issues before or after

14   they are issued?

15             MS. SHINNERS:  Object to the scope.

16             THE WITNESS:  Yes.

17             MR. MEDLOCK:  All right.  Kevin, can

18        you please bring up Tab 15.

19   BY MR. MEDLOCK:

20       Q.    All right, sir, I have put in front of

21   you what will be marked as Exhibit 333 to your

22   deposition.



Page 135

1          (Exhibit 333 marked for identification

2      and attached hereto.)

3   BY MR. MEDLOCK:

4      Q.    It is a multipage e-mail chain that

5   has the leading Bates number AOL-DEF-00048048.

6          I want to focus with you on the second

7   e-mail on the first page of Exhibit 333.  That

8   appears to be an e-mail from Mario Villarreal

9   sent on Saturday, April 28, 2018, at 2:06 p.m.

10  Is that correct, sir?

11     A.    Yes.

12     Q.    Okay.  And the subject line of that

13  e-mail is "Re:  Press Statement for SYS."

14         Did I read that correctly?

15     A.    Yes.

16     Q.    And as we talked about earlier, SYS

17  refers to San Ysidro; correct?

18     A.    That's my understanding, yes.

19     Q.    Okay.  And this is a statement, a

20  press statement from both Pete Flores, the

21  director of field operations for the San Diego

22  field office, and Rodney Scott, the San Diego



Page 136

1    chief -- the San Diego sector chief for U.S.

2    Border Protection; is that correct?

3        A.    Yes, at the time indicated here, Chief

4    Scott was the chief patrol agent for San Diego

5    for Border Patrol.

6        Q.    Okay.  I want to focus on Chief

7    Scott's press statement.  And I'm looking at the

8    third full paragraph that begins -- I'm sorry,

9    the fourth full paragraph that begins with "We

10   are very welcoming."  Do you see that?

11       A.    Yes.

12       Q.    Okay.  That paragraph reads, quote:

13   "We are a very welcoming country but just like

14   your own house, we expect everyone to enter

15   through our front door and answer questions

16   honestly.  On a national level, that front door

17   is the ports of entry.  If you enter the United

18   States at any place other than a port of entry,

19   it is a crime."

20            Did I read that correctly?

21       A.    Yes.

22       Q.    So this is a press statement that's



Page 137

1    being issued the day after the metering guidance

2    was issued, and in that press statement Chief

3    Patrol Agent Rodney Scott is encouraging migrants

4    to come to ports of entry; is that right?

5             MS. SHINNERS:  Object to the scope.

6        Object to the characterization.  Compound.

7             You can answer.

8             THE WITNESS:  I would characterize it

9        as Chief Scott discouraging aliens from

10       entering the country illegally between ports

11       of entry and --

12   BY MR. MEDLOCK:

13       Q.   Okay.  But -- sorry.  Go ahead.  I

14   didn't mean to interrupt.

15       A.   Oh, that's all right.

16       Q.   If you're discouraging people from

17   entering between the ports, by the very nature of

18   that you're also encouraging them to try to enter

19   through the ports; is that right?

20            MS. SHINNERS:  Objection;

21       argumentative.  Scope.

22            You can answer.



Page 138

1              THE WITNESS:  So what I would say is

2        that in general -- well, between the two, if

3        the question is somebody entering illegally

4        between ports of entry and presenting at a

5        port of entry, certainly between the two the

6        preference would be for an alien to present

7        at a port of entry.

8              That being said, there are also --

9        just like Border Patrol has concerns about

10       illegal entry between ports of entry, just

11       because it's preferred that someone present

12       at a port of entry than enter illegally

13       between ports doesn't mean we don't also

14       have legitimate concerns or issues to

15       address with respect to entry at ports,

16       including, as referenced earlier -- and

17       particularly when we're talking about large

18       groups coming at once -- issues related to

19       port security, safety and capacity.

20             So while preferrable that someone

21       present at a port rather than enter

22       illegally between ports, there are a number



Page 139

1          of issues to address with respect to aliens

2          presenting without documents at ports of

3          entry, particularly when doing so in large

4          numbers or large groups.

5     BY MR. MEDLOCK:

6          Q.    Okay.  I think my question was a

7     little bit more focused.

8                We agree that in this e-mail Chief

9     Control Agent Rodney Scott is discouraging

10    noncitizens attempting to enter the United States

11    between ports of entry; is that right?

12               MS. SHINNERS:  Object to the scope.

13               You can answer.

14               THE WITNESS:  I think he's stating --

15          stating the fact that entering between --

16          yeah, entering between ports of entry is

17          illegal and also can be extremely dangerous.

18    BY MR. MEDLOCK:

19         Q.    Was DHS consulted about this press

20    statement before it was issued?

21         A.    I certainly hope not.

22         Q.    Why would you hope not?



Page 140

1          A.    It would be pretty embarrassing if

2    headquarters had been consulted and had failed to

3    notice the fact that the secretary's name is

4    misspelled in the third paragraph.

5          Q.    Fair enough.

6                Other than the misspelling, do you

7    know whether or not DHS was actually consulted

8    about this press release?

9          A.    I don't know for sure.  What I will

10   say is that you asked me earlier whether

11   headquarters is consulted on CBP press releases.

12   The answer is sometimes, yes.  I would expand

13   that answer by saying that's generally -- first

14   of all, I don't think we're consulted on every

15   CBP -- I know we're not consulted on every CBP

16   press or media statement.  And in general, when

17   we are consulted, it is a CBP headquarters press

18   statement, so statements made by the commissioner

19   or headquarters officials.

20               So in my knowledge and experience, it

21   would be unusual for headquarters to be consulted

22   on a press statement that's issued by a sort of



Page 141

1    regional -- regional CBP leadership.

2              MR. MEDLOCK:  All right.  Let's bring

3         up Tab 16, please, Kevin.  We'll mark this

4         as Exhibit 334 to your deposition, sir.

5              (Exhibit 334 marked for identification

6         and attached hereto.)

7    BY MR. MEDLOCK:

8         Q.    It's technically two pages, but that's

9    only because a part of the footer got moved over

10   to a second page.  In effect it's a one-page

11   statement from then commissioner of CBP Kevin

12   McAleenan dated April 29, 2018.

13             Do you see that, sir?

14        A.    I do.

15        Q.    Is this the sort of press statement

16   that you were mentioning earlier that DHS would

17   be consulted about?

18             MS. SHINNERS:  Object to the scope.

19             THE WITNESS:  I don't know for sure.

20        It's certainly -- I would say it's the sort

21        of statement that we might or might not be

22        consulted about.  But I'm not certain



Page 142

1          whether headquarters was consulted.

2     BY MR. MEDLOCK:

3          Q.    You don't know whether -- you don't

4     know whether DHS was actually consulted about

5     this specific press release; is that right?

6               MS. SHINNERS:  Object to the scope.

7               THE WITNESS:  Sitting here today, no.

8     BY MR. MEDLOCK:

9          Q.    And if you look at the third paragraph

10    of the press release, they did get the spelling

11    of the secretary's last name correct, didn't

12    they?

13         A.    They did.  I noticed that as well.

14         Q.    Okay.  So at least within 24 hours

15    they improved on the spelling; is that right?

16         A.    Well, they -- without digressing too

17    far, I think it's grammatically better written.

18    It's certainly true that CBP regional officials

19    enjoy significant discretion for operations, but

20    also it appears for media engagement.

21               So who knows the degree to which the

22    regional statement was fully coordinated within



Page 143

1    CBP.  But I realize that's more of an aside.  So

2    sorry, go ahead.

3        Q.    Sitting here as the DHS 30(b)(6)

4    representative, you don't know the degree to

5    which CBP internally coordinated on the document

6    we were looking at in Exhibit 333; is that right?

7        A.    That's right.

8             MS. SHINNERS:  Object to the scope.

9             Go ahead.  You said --

10            THE WITNESS:  Sorry.  That's right, I

11       would defer to CBP.

12   BY MR. MEDLOCK:

13       Q.    Okay.  I want to focus on the first

14   paragraph of Commissioner McAleenan's statement.

15   It reads, quote:  "At this time, we have reached

16   capacity at the San Ysidro port of entry for CBP

17   officers to be able to bring additional persons

18   traveling without appropriate entry documents

19   into the port of entry for processing."

20            Did I read that correctly?

21       A.    Yes.

22       Q.    Okay.  Do you know whether that



Page 144

1    statement is true?

2              MS. SHINNERS:  Object to the scope.

3              You can answer.

4              THE WITNESS:  I have no reason to

5         doubt it.

6    BY MR. MEDLOCK:

7         Q.   Would DHS allow the commissioner of

8    CBP to put out a false public statement?

9              MS. SHINNERS:  Object to the scope.

10             You can answer.

11             THE WITNESS:  Again, not knowing for

12        certain whether headquarters was consulted

13        or not, it feels like a little bit of an

14        argumentative characterization.  But no, I

15        think we would want to ensure that any

16        information we put out publicly was true and

17        correct.

18             MR. MEDLOCK:  Let's bring up Tab 17,

19        please, Kevin.

20   BY MR. MEDLOCK:

21        Q.   All right, sir.  I've put in front of

22   you what we'll mark as Exhibit 335 to your



Page 145

1    deposition.

2              (Exhibit 335 marked for identification

3        and attached hereto.)

4    BY MR. MEDLOCK:

5        Q.    It is an April 29, 2018, e-mail chain

6    between Kevin McAleenan, Pete Flores and others

7    at CBP.  I want to focus on the e-mail that Pete

8    Flores sent on April 29, 2018, at 3:20 p.m.

9              Do you see that e-mail, sir?

10       A.    Yes.

11       Q.    Okay.  And this was sent on the same

12   day that the press release from Commissioner

13   McAleenan that we looked at in Exhibit 334 was

14   sent out to the public; is that right?

15       A.    Yes.

16       Q.    Okay.  And Pete Flores in this e-mail

17   writes directly to Commissioner McAleenan and

18   others stating, quote:  "No caravan subjects have

19   arrived at the San Ysidro port."

20             Did I read that correctly?

21       A.    That's what it says, right.

22             MR. MEDLOCK:  And, Kevin, can we bring



Page 146

1          up Tab 18, please.

2     BY MR. MEDLOCK:

3          Q.    So I've put in front of you what we'll

4     mark as Exhibit 336 to your deposition.

5               (Exhibit 336 marked for identification

6          and attached hereto.)

7     BY MR. MEDLOCK:

8          Q.    It is a multipage presentation.  The

9     leading Bates number is AOL-DEF-00048757.  This

10    appears to be a Migration Crisis Action Team

11    report from April 29, 2018.

12              Do you see that, sir?

13         A.    Yes.

14         Q.    Okay.  Have you seen Migration Crisis

15    Action Team reports similar to this one before,

16    sir?

17         A.    Yes.

18         Q.    Okay.  I would like to move to the

19    third page of Exhibit 336, which is a page that

20    has the Bates number ending in 759.

21              The top of this page is titled

22    "Southwest Holding."  Do you see that, sir?



Page 147

1      A.    Yes.

2      Q.    On the right side there are two tables

3  that show percentages of capacity for OFO;

4  correct?

5      A.    Yes.

6            MS. SHINNERS:  Object to the scope.

7            But go ahead.

8  BY MR. MEDLOCK:

9      Q.    And the bottom one of those two tables

10  on the right side of the third page of

11  Exhibit 336 shows the capacity percentages for

12  ports of entry; correct?

13            MS. SHINNERS:  Object to the scope.

14      Foundation.

15            You can answer.

16            THE WITNESS:  Yes.

17  BY MR. MEDLOCK:

18      Q.    And do you see the listing for the San

19  Ysidro port of entry?

20      A.    I do.

21      Q.    Okay.  And it shows that San Ysidro at

22  the time this report was run had ███ individuals



Page 148

1    in custody; correct?

2         A.    That's right.

3              MS. SHINNERS:  Object to the scope.

4         Foundation.

5              Go ahead.

6    BY MR. MEDLOCK:

7         Q.    And the capacity listed for the San

8    Ysidro port of entry is ███ persons; correct?

9         A.    Correct.

10        Q.    And the percentage capacity for the

11   San Ysidro port of entry for this April 29, 2018,

12   report is 91 percent; correct?

13        A.    Yes, at the time the report was run at

14   6:44 a.m. as reflected on page 2.

15        Q.    Yes.  6:44 a.m. on April 29, 2018;

16   correct?

17        A.    Correct.

18        Q.    The report was run on the same date as

19   Commissioner McAleenan's press release that we

20   looked at in Exhibit 334; correct?

21        A.    That's correct.

22              MS. SHINNERS:  Object to the scope.



Page 149

1           THE WITNESS:  Sorry.

2           MS. SHINNERS:  That's okay.  You can

3      answer.

4  BY MR. MEDLOCK:

5      Q.    Sir, are you aware of a June 5, 2018,

6  memorandum from Secretary Kirstjen Nielsen to

7  Kevin McAleenan called "Prioritization-Based

8  Queue Management"?

9      A.    Yes.  But if we're going to move on

10  from the CAT report, can I make another comment

11  about it?

12      Q.    If you're -- you can make a comment

13  about it, I suppose.  What's your comment?

14      A.    I mean, the implication of the line of

15  questioning seems to be that the statement that

16  we had reached capacity at the San Ysidro port of

17  entry made at some unspecified point later on

18  April 29th is incorrect because the CAT report of

19  that morning at 6:44 a.m. references a 91 percent

20  characterization, and I just would like to -- to

21  the extent the implication you're making, I want

22  to say I don't necessarily -- state for the



Page 150

1    record I don't necessarily agree with it.  The

2    CAT reports are run, as indicated on page 2 here,

3    early in the morning.

4              And also on page 2 we see the previous

5    day's inadmissibles had been 395.  And so if you

6    sort of assume that -- or sort of based on my

7    understanding, if you're -- and the 21-day

8    average is 470.  So if you're talking about

9    getting 400 inadmissibles a day, while I don't

10   know for certain, it seems -- I don't know for

11   certain and I would defer to CBP on the

12   particulars.

13             It certainly seems within the realm of

14   possibility if not likely that you could start at

15   91 percent capacity at 6:00 in the morning and

16   then as additional folks, as aliens arrive during

17   the day, showing up for the first time or being

18   processed from the queue, that you could start at

19   91 percent capacity in the morning and then reach

20   100 percent capacity during the day.

21             I just wanted to...

22        Q.    Sure.  And let me just follow up on



Page 151

1    that, actually.

2              MR. MEDLOCK:  Kevin, can you pull

3         Tab 16 back up, please.

4    BY MR. MEDLOCK:

5         Q.   So I've put Tab 16, which was marked

6    as Exhibit 334, back in front of you, sir.  This

7    is the statement from Commissioner McAleenan.

8              Can you tell me from looking at this

9    document what time of day this statement was

10   issued?

11             MS. SHINNERS:  Object to the scope.

12             THE WITNESS:  No.  It's not reflected

13        on the document.

14   BY MR. MEDLOCK:

15        Q.   Do you know as you sit here today when

16   on April 29, 2018, this statement was issued?

17        A.   No, I'm not sure.

18             MS. SHINNERS:  Object to the scope.

19             THE WITNESS:  I'm fairly confident

20        based on understanding and experience that

21        it would have been later than -- later than

22        6:44 in the morning, but I do not know for



Page 152

1    certain.

2    BY MR. MEDLOCK:

3        Q.    Okay.  And let's pull -- when you say

4    you're confident based on your understanding,

5    what's your general understanding as to when

6    press releases are issued by CBP?  Is there a

7    particular time that they're issued?

8            MS. SHINNERS:  Object to the scope.

9        Foundation.

10            THE WITNESS:  It -- it could vary

11        wildly.  I'm hesitant to speculate.  But I

12        would say as a general matter, press

13        statements are customarily issued during the

14        business day or sometimes in the evening

15        based on events.

16    BY MR. MEDLOCK:

17        Q.    So it could vary widely and you don't

18    actually know when this particular press

19    statement shown in Exhibit 334 was actually

20    issued?

21            MS. SHINNERS:  Object to the scope.

22            THE WITNESS:  The main thing -- the



Page 153

1          main thing I wanted to emphasize was that

2          the -- just highlight is that the CAT report

3          is a static report and that the numbers sort

4          of vary -- can vary throughout the day.

5    BY MR. MEDLOCK:

6          Q.    Okay.  Let's turn back to the MCAT

7    report, which is Tab 18 and Exhibit 336.  And I

8    want to look at the second page of the document

9    which has the Bates number ending in 758.

10              It lists a report run date of

11    4/29/2018, 6:44 a.m.  Do you see that, sir?

12         A.    Yes.

13         Q.    So 6:44 a.m. Eastern time?  Pacific

14    time?  Do you know what time zone that refers to?

15              MS. SHINNERS:  Object to the scope.

16              THE WITNESS:  I'm not certain.

17    BY MR. MEDLOCK:

18         Q.    Okay.  So it could be that this was

19    run 6:44 a.m. Pacific time but it was actually

20    run -- so it actually came out at 9:44 -- let me

21    back up.

22              If this report was run 6:44 a.m.



Page 154

1    Pacific time, that would mean that it was run

2    effectively at 9:44 a.m. Eastern time; is that

3    right?

4            MS. SHINNERS:  Object.  Same objection

5        to scope.

6            You can answer.

7            THE WITNESS:  You're correct that it

8        doesn't specify the time zone.  If the

9        6:44 refers to Pacific, then that would be

10       9:44 in the Eastern time zone.  While not

11       knowing for certain sitting here today,

12       based on my knowledge and experience, I

13       think it's most likely that the 6:44 refers

14       to Eastern time, including sort of based on

15       experience of when these reports are

16       often transmitted.  But it is correct I

17       don't know for certain what time zone this

18       is referring to.

19   BY MR. MEDLOCK:

20       Q.   Okay.  And you referred to data on the

21   second page of this exhibit as showing that it

22   was possible that the San Ysidro port of entry



Page 155

1    was over 100 percent capacity at some point on

2    April 29, 2018; is that right?

3            MS. SHINNERS:  Object to the scope.

4            You can answer.

5            THE WITNESS:  Yes.

6    BY MR. MEDLOCK:

7        Q.    I think you returned to the 21-day

8    average for the -- at the bottom of page 2; is

9    that right?

10       A.    Yes.

11       Q.    Okay.  And is that 21-day average

12   specific to San Ysidro, or is that for the entire

13   Southwest border?

14           MS. SHINNERS:  Object to the scope.

15           THE WITNESS:  For the Southwest

16       border.

17   BY MR. MEDLOCK:

18       Q.    Okay.  So if you look at page 3 of the

19   document which ends in Bates number 759, and if

20   you look at the "Field Office" section at the top

21   right, it shows that the total capacity for all

22   ports of entry on the Southwest border is ▮▮▮▮



Page 156

1    persons; correct?

2           MS. SHINNERS:  Object to the scope.

3           Foundation.

4           You can answer.

5           THE WITNESS:  I'm not a hundred

6           percent certain about the degree to which

7           the capacities by port and the capacities by

8           field office coincide.

9    BY MR. MEDLOCK:

10    Q.   Okay.  So can you tell me as you sit

11    here today what the number of individuals in

12    custody at San Ysidro was at 7:44 a.m. on

13    April 29, 2018?

14           MS. SHINNERS:  Object to the scope.

15           THE WITNESS:  No.  However, again, the

16           point that I was trying to make was you've

17           got -- and unfortunately, the totals aren't

18           provided by port.  But this report reflects

19           that as of 6:44 there were ███ individuals

20           in custody at the San Ysidro port, and that

21           was -- again, because the total is not

22           listed, I'm estimating here based on the



Page 157

1          other numbers that was approximately

2          44 percent of the total in custody across

3          the Southwest border at ports of entry.

4                  And then if you look, then, at the

5          daily average at that time in the ballpark

6          of 400, the 21-day average is 470, the

7          previous day had been 395.  If you take,

8          again, just a ballpark figure but for

9          purposes of illustration, if you take 400

10         and assume that they were distributed

11         consistent with the in-custody distribution

12         in the morning, you're talking about an

13         influx of potentially 160 people into San

14         Ysidro per day at this point in time.

15                 Again, these are ballpark figures.

16         But when you're talking about early in the

17         morning they are ███ short of capacity, 400

18         people coming in per day and a significant

19         fraction of them coming to San Ysidro, it's

20         easy to imagine that the capacity would

21         reach 100 percent during the course of the

22         day, although I do not know for certain.



Page 158

1    BY MR. MEDLOCK:

2         Q.    Okay.  So you said -- let me break

3    down your math.  Your assumption is that San

4    Ysidro represents 44 percent of all noncitizens

5    that are in custody at ports of entry; is that

6    right?

7              MS. SHINNERS:  Object to the scope.

8              THE WITNESS:  Sorry, could you repeat

9         the question?

10   BY MR. MEDLOCK:

11        Q.    Sure.  I'm just trying to understand

12   your math.

13             I think you said that San Ysidro

14   represents 44 percent of all persons that are in

15   custody at the port of entry according to this

16   report.  Isn't that right?

17             MS. SHINNERS:  Object to the scope.

18             THE WITNESS:  Again, the total is not

19        listed under the OFO port table.  But if you

20        take the number listed as in custody for San

21        Ysidro port of entry, which is ████ on this

22        report, and add up the numbers from all the



Page 159

1    other POEs in that same column, I believe

2    that the ███ represents approximately

3    44 percent of the total at this point in

4    time.

5  BY MR. MEDLOCK:

6        Q.    Okay.  And then you took that and you

7  referred to the -- are you referring to the

8  21-day average or "Inadmissibles Previous Day"

9  column to get your approximately 160 number of

10 individuals arriving per day?

11            MS. SHINNERS:  Object to the scope.

12            I have a standing objection to this

13       line of questioning about analyzing the MCAT

14       reports and capacity.

15            Go ahead, Mr. Glabe.

16            THE WITNESS:  So as indicated on

17       page 2, there were 395 inadmissibles that

18       CBP reported for the previous day and the

19       21-day average was reported as 470.

20            And I was just saying for the purpose

21       of discussion -- I don't have the MCAT

22       report in front of me for the subsequent



Page 160

1      day, but based on this 21-day average, I was

2      saying if one assumed or for the purposes of

3      discussion we posited -- or hypothesize that

4      there were 400 inadmissibles on this day,

5      CBP encountered on the 29th, that it seems

6      likely or plausible based on the

7      distribution on page 3 that a significant

8      fraction of them might have come to San

9      Ysidro POE.

10   BY MR. MEDLOCK:

11      Q.    But this is hypothetical.  You don't

12   know how many noncitizens without proper travel

13   documents showed up at the San Ysidro port of

14   entry on April 29, 2018; is that right?

15      A.    That's right.  I was just -- the

16   hypothetical supports the statement that this

17   report is a snapshot in time and that the numbers

18   vary throughout the day and could have reached

19   100 percent or more on this -- on the 29th of

20   April 2018, although I do not, sitting here

21   today, know for certain.

22      Q.    Okay.  And if you turn back to Tab 17,



Page 161

1    which was Exhibit 335, you don't have to be

2    hypothetical about this.  The real-time

3    information that Pete Flores provided to Kevin

4    McAleenan on April 29, 2018, was that no caravan

5    subjects had actually arrived at the San Ysidro

6    port of entry; correct?

7            MS. SHINNERS:  Objection;

8        argumentative.  Assumes facts not in

9        evidence.  Mischaracterizes all documents.

10           You can answer.  Scope, but you can

11       answer.

12           MR. MEDLOCK:  You already have a

13       standing objection.  I'm asking a question

14       and I expect an answer.

15           THE WITNESS:  Could you --

16           MS. SHINNERS:  Excuse me?  I'm sorry.

17       I didn't tell him not to answer.  I was

18       making an objection.

19           MR. MEDLOCK:  So your objection is

20       overbroad.  You said I was mischaracterizing

21       all the documents.  I don't know how I could

22       mischaracterize all of the documents.



Page 162

1          Second --

2               MS. SHINNERS:  That's fair.

3               MR. MEDLOCK:  You have given

4          consistently speaking objections throughout

5          this deposition that suggests the answers to

6          questions.  I've already warned you about it

7          once.  I expect it to stop.  And if I need

8          the basis for an objection, I'll let you

9          know.  But I think the proper thing to do is

10         to stop giving speaking objections.

11    BY MR. MEDLOCK:

12         Q.    So, Mr. Glabe, my question was:  The

13    realtime data that we do have that's shown in

14    Exhibit 335 in an e-mail from Pete Flores to

15    Kevin McAleenan at 3:20 p.m., not 6:44 a.m., on

16    April 29, 2018, saying that no caravan subjects

17    had actually arrived at the San Ysidro port of

18    entry.  You don't dispute that, do you?

19              MS. SHINNERS:  Object to the scope.

20         Foundation.

21              THE WITNESS:  So I don't dispute that

22         Mr. Flores's e-mail indicates that no



Page 163

1          caravan subjects arrived at the port.  But I

2          am not sure I understand how that has any

3          bearing on the question of whether or not

4          the POE was at capacity at this -- at

5          3:20 p.m. on whatever time zone on

6          April 29th.

7                  In fact, if you look at the next

8          bullet, it says that "INM has stated they

9          will hold subjects at the entrance to their

10         facility and allow small groups to the

11         limited line so we can notify the subjects

12         we are at capacity."

13                 So to me, the intent to notify

14         subjects we are at capacity is indicative --

15         from the DFO is indicative although not

16         dispositive necessarily of the fact that the

17         reason is they were at capacity, and that's

18         why they intended to notify the subjects of

19         such.

20     BY MR. MEDLOCK:

21         Q.    Do you know whether the port was

22     actually at capacity at any given point on



Page 164

1   April 29, 2018?

2           MS. SHINNERS:  Object to the scope.

3           THE WITNESS:  I do not know for

4       certain, but based on the DFO's statement of

5       intent to notify the subjects that we are at

6       capacity and the statement that went out

7       under the name of Commissioner McAleenan,

8       who I know to be a person of integrity, I

9       don't have any reason to dispute the

10      truthfulness of the statement in the press

11      release that at this time we have reached

12      capacity at the San Ysidro port of entry.

13  BY MR. MEDLOCK:

14      Q.    And you think that -- you're surmising

15  that as many as over a hundred individuals could

16  have come to the port of entry for intake on

17  April 29, 2018; is that right?

18          MS. SHINNERS:  Object to the scope.

19          THE WITNESS:  So let me -- what I

20      would say is that as of -- according to

21      Tab 18, page 3, as of 6:46 in the morning

22      San Ysidro reported as being -- is reflected



Page 165

1       as being █aliens short of 100 percent

2       capacity.  And taking the contextual

3       evidence of several hundred aliens arriving

4       at ports of entry and being found to be

5       inadmissible per day based on the

6       information on page 2, and the proportion of

7       such aliens who are in custody across the

8       Southwest border, a significant proportion

9       or plurality being at San Ysidro, it sort of

10      provides circumstantial architectural

11      evidence supporting the statement, the

12      public statement of the commissioner that

13      they had reached capacity as stated in the

14      press release.

15  BY MR. MEDLOCK:

16      Q.   Do you know how many individuals

17  without proper travel documents the San Ysidro

18  port of entry actually took in on April 29, 2018?

19          MS. SHINNERS:  Objection; scope.

20      Asked and answered.

21          THE WITNESS:  No.

22  BY MR. MEDLOCK:



Page 166

```
 1        Q.    Okay.  Would it surprise you to know

 2   that it was less than ten people?

 3              MS. SHINNERS:  Objection; assumes

 4        facts.  Scope.

 5              You can answer.

 6              THE WITNESS:  I would be happy to look

 7        at any information you have that would

 8        substantiate that.

 9              MR. MEDLOCK:  Sure.  Why don't we take

10        a break.  I need to send a couple of

11        exhibits to counsel.  But yeah, we can take

12        a look at that data.  Let's take a quick

13        break for five minutes.

14              THE TECHNICIAN:  We are going off the

15        record.  The time is now 3:58.

16              (Recess taken.)

17              THE TECHNICIAN:  We are back on the

18        record.  The time is 4:15.

19   BY MR. MEDLOCK:

20        Q.    All right, sir, welcome back.

21              I would like to put in front of you a

22   document that I just sent to your counsel.
```



Page 167

1          MR. MEDLOCK:  Kevin, if you could put

2       that on the screen.

3   BY MR. MEDLOCK:

4       Q.    This is a two page e-mail that bears

5   the leading Bates number AOL-DEF-00062567, which

6   we'll mark as Exhibit 338 to your deposition.

7          (Exhibit 338 marked for identification

8       and attached hereto.)

9   BY MR. MEDLOCK:

10      Q.    This is an Admissibility Enforcement

11  Unit report for April 29, 2018.  Have you ever

12  seen an Admissibility Enforcement Unit report

13  before, sir?

14          MS. SHINNERS:  Object to the scope.

15          THE WITNESS:  Not to my recollection.

16       This appears to be a pretty granular field

17       level CBP document.  So I don't recall

18       seeing such a document previously.

19          MR. MEDLOCK:  Okay.  And, Kevin, if

20       you could, towards the bottom of the first

21       page, there is a section called "Total Daily

22       Intake."  Could you please expand that



1        section.

2    BY MR. MEDLOCK:

3        Q.    All right, sir.  Do you see this

4    section called "Total Daily Intake," sir?

5        A.    Yes.

6        Q.    Okay.

7              MR. MEDLOCK:  And beneath that, if you

8         go to the next page, the second page of

9         Exhibit 338, please, Kevin.

10   BY MR. MEDLOCK:

11       Q.    There is a section that's called

12   "Total Daily Intake for All Nationalities."  Do

13   you see that?

14       A.    Yes.

15       Q.    And that lists the total daily intake

16   for all nationalities as five; correct?

17       A.    That's right.

18             MS. SHINNERS:  Object to the scope.

19         Foundation.

20             MR. MEDLOCK:  Kevin, can we please

21         move on to Tab 19.

22             THE WITNESS:  I'm, sorry.  On this



Page 169

```
 1        document, Kevin, could you put up the box,

 2        the very top box on the first page of the

 3        document?

 4             So the other thing I noted when

 5        reviewing this document in addition to total

 6        daily intake for all nationalities of five

 7        is on-site at the top, which is 330.  And

 8        again, this is not necessarily a daily

 9        report with which I'm familiar, but the 330

10        jumped out at me because the capacity listed

11        on the MCAT report we discussed earlier is

12        ██.  So that would suggest potentially,

13        depending on exactly what is meant by

14        on-site, that the capacity was exceeded.

15        And so I think that is sort of -- at least

16        two points I would like to make.

17             One is looking at the headquarters

18        level, we do our best to get the data and

19        get the numbers to inform decision-making,

20        but it is a dynamic situation and therefore

21        if -- the first point is that just looking

22        at -- let me back up for a second.
```



Page 170

```
 1              If you look at the capacities on

 2       page 18 -- I'm sorry, Tab 18, page 3, San

 3       Ysidro was at 91 percent at the time the

 4       report was run according to the inputs here.

 5       Others -- most of the others are at much

 6       lower.  So just to sort of clarify, and I

 7       probably should have mentioned earlier, the

 8       fact of sort of -- it's not that anything

 9       short of 100 percent is unconcerning.

10       100 percent -- and again, I'd defer to CBP

11       on exactly how they do their capacities.

12       But 100 percent would sort of be bursting at

13       the seams.  But even these percentages of

14       short of 100 percent, particularly as you

15       get in the 90s, would be sort of concerning

16       based on my understanding from a

17       headquarters perspective.

18              Second, looking at the -- you've got

19       the 289 in the MCAT report; you've got a

20       reference to 330 on this document.  The

21       numbers vary dynamically at headquarters.

22       But in general, in terms of what is going on
```



Page 171

1       in the field, DHS headquarters defers to

2       CBP.

3              So I understand there's different

4       numbers flying around.  If CBP says or the

5       commissioner says we're full at the port of

6       entry, then DHS would credit and generally

7       defer to that assessment by the operational

8       leadership and his folks on the ground.

9              MR. MEDLOCK:  Move to strike as

10      nonresponsive.  There is literally no

11      question pending.  But I will follow up on

12      one point that you raised, sir.

13   BY MR. MEDLOCK:

14      Q.   You don't know what "on-site" means in

15   this document, do you?

16              MS. SHINNERS:  Object to the scope.

17              THE WITNESS:  I'm not certain, no.

18   BY MR. MEDLOCK:

19      Q.   Okay.  And if we could go back to the

20   MCAT report, which I believe was Exhibit 336.

21   Sorry, 337.  I apologize.  And if we could go to

22   the third page.



Page 172

1           When this report lists capacities for

2   ports of entry, you don't know what that word

3   "capacity" actually refers to, do you?

4       A.    I mean, capacity, I would say we

5   understand it to generally reference sort of

6   overall physical capacity as opposed to

7   peripheral capacity.  But in terms of assessing

8   the capacity numbers, that is something that DHS

9   generally defers to CBP on.  So CBP would be the

10  best place to discuss that in detail.

11      Q.    Okay.  Is that ████ capacity for San

12  Ysidro, is that the capacity for the holding

13  rooms or is that the capacity for the holding

14  rooms plus the seated secondary inspection areas?

15          MS. SHINNERS:  Object to the scope.

16          THE WITNESS:  I'm uncertain on that.

17      I would defer to CBP.

18  BY MR. MEDLOCK:

19      Q.    Okay.

20          MR. MEDLOCK:  Kevin, can we please

21      bring up Tab 19.

22  BY MR. MEDLOCK:



Page 173

1      Q.    All right, sir.  I have put in front

2   of you what we'll mark as Exhibit 339 to your

3   deposition.

4              (Exhibit 339 marked for identification

5        and attached hereto.)

6   BY MR. MEDLOCK:

7      Q.    It's a one-page e-mail chain with an

8   attachment, an attached memorandum.  The lead

9   Bates number on the cover e-mail is

10  AOL-DEF-00273293.  We'll mark this as

11  Exhibit 339.

12             I would like to focus on the second

13  page of Exhibit 339 which is the memorandum

14  that's attached to the e-mail.  This is a June 5,

15  2018, memorandum from Secretary Nielsen to

16  Commissioner McAleenan entitled

17  "Prioritization-Based Queue Management."

18             Do you see that, sir?

19     A.    I do.

20     Q.    Who at DHS was involved in drafting

21  this memorandum?

22     A.    My understanding is that the



Page 174

1   memorandum was actually drafted in the first

2   instance by CBP, but without -- without getting

3   into deliberative matters, it's my understanding

4   or my assessment that the secretary's -- both

5   advisors would have been involved in sort of

6   potentially reviewing, editing and finalizing the

7   memo.

8        Q.    When did CBP begin work drafting this

9   memorandum?

10           MS. SHINNERS:  Let me object to the

11      scope.

12           Go ahead.

13           THE WITNESS:  Go ahead, Katie.

14           MS. SHINNERS:  I just asserted a scope

15      objection.  You can answer.

16           THE WITNESS:  I do not know for

17      certain, and CBP would be the best place to

18      answer that question.  So I would be

19      inclined to defer to them.

20   BY MR. MEDLOCK:

21        Q.    When did DHS begin reviewing a draft

22   of this memorandum?



Page 175

1          MS. SHINNERS:  Object to the scope.

2          You can answer.

3          THE WITNESS:  I'm not certain.  In

4      general, the timeline for something like

5      this can vary pretty significantly.  So I'm

6      not sure.

7  BY MR. MEDLOCK:

8      Q.   Who specifically at DHS other than

9  Secretary Nielsen reviewed a copy of this

10 memorandum before it was issued?

11         MS. SHINNERS:  Object to the scope.

12         THE WITNESS:  Can I have a moment to

13     consult with counsel about privilege issues?

14         MR. MEDLOCK:  Sure.

15         MS. SHINNERS:  Okay.  We'll just take

16     a moment and convene on the other line.

17     Thank you.

18         THE TECHNICIAN:  We are going off the

19     record.  The time is now 4:27.

20         (The witness and counsel confer.)

21         THE TECHNICIAN:  We are now back on

22     the record.  The time is 4:35.



Page 176

1    BY MR. MEDLOCK:

2         Q.    Mr. Glabe, welcome back.

3              Before you broke to consult with your

4    counsel about an issue related to privilege, my

5    question to you I believe was:  When did DHS

6    begin reviewing a draft of this memorandum?

7              Are you able to answer that question,

8    sir?

9              MS. SHINNERS:  Just noting for the

10             record, I think the question might have been

11             different.  But that said, I'm going to make

12             a scope objection and allow the witness to

13             answer.

14             THE WITNESS:  I don't know for

15             certain, but my best estimate would be, you

16             know, days to weeks in terms of

17             headquarters' involvement in the memo.  Or

18             maybe weeks for the overall drafting

19             timeline, but my understanding is

20             headquarters' involvement would have been at

21             or near the end of that process.

22   BY MR. MEDLOCK:



Page 177

```
 1          Q.    When you say weeks, do you know how

 2    many weeks?

 3               MS. SHINNERS:  Objection; scope.

 4               THE WITNESS:  I'm not sure.

 5    BY MR. MEDLOCK:

 6          Q.    Who first came up with the idea of

 7    prioritization-based queue management?

 8               MS. SHINNERS:  Object.  Calls for

 9          pre-decisional deliberation.  Instruct the

10          witness not to answer.

11    BY MR. MEDLOCK:

12          Q.    Are you going to follow your

13    attorney's instruction?

14          A.    Yes.

15          Q.    Did the idea for prioritization-based

16    queue management come from CBP or DHS?

17               MS. SHINNERS:  You can answer.

18               THE WITNESS:  Yeah, my understanding

19          is the -- I guess I hesitate to speculate

20          about ideas and subject of impressions, but

21          my understanding is this memo or the work

22          stream that resulted in this memo originated
```



Page 178

1          from CBP.

2                  And prioritization-based queue

3          management refers -- specifically to this

4          2018 memo, I understand that queue

5          management is among the operational tools

6          that CBP has had available to it for some

7          time.

8     BY MR. MEDLOCK:

9          Q.    Does CBP currently have a queue

10    management tool that is available to it today?

11         A.    Sorry, you were breaking up a little

12    bit.  Repeat the question.

13         Q.    Sure.

14                Does -- you mention that queue

15    management is an operational tool that CBP has.

16    Is prioritization-based queue management still an

17    operational tool for CBP today?

18         A.    In terms of being available, I would

19    say yes.  The deployment or use of the tool could

20    vary significantly based on a variety of

21    circumstances, but a short answer would be yes.

22         Q.    Was either the Office of Chief Counsel



Page 179

1    at CBP or DHS agency counsel involved in drafting

2    the prioritization-based queue management

3    memorandum that appears in this exhibit?  And

4    that's simply a yes-or-no question.  I don't want

5    you to get into communications with lawyers.

6                MS. SHINNERS:  Object to the scope.

7                You can answer, Mr. Glabe.

8                THE WITNESS:  I can't say for certain,

9          but typically something like a secretary's

10          memo would have Office of General Counsel

11          review.

12   BY MR. MEDLOCK:

13        Q.    When this memorandum from Secretary

14   Nielsen was presented to Secretary Nielsen for

15   her signature, was there any other information

16   that was provided to the secretary by way of an

17   issue paper or supplemental memoranda?

18        A.    I'm not certain.  It is customary

19   for -- it is not unusual for deliberative

20   pre-decisional or briefing materials to be

21   provided to the secretary in conjunction with

22   signing a document like this.  And there are also



Page 180

1    times when the document is just presented as a

2    stand-alone.

3        Q.    Do you know whether the secretary

4    received an oral briefing regarding this

5    prioritization-based queue management memorandum

6    before she reviewed and signed it?

7        A.    I'm not sure.

8        Q.    Do you know who would have been

9    involved at DHS in providing information to the

10   secretary regarding this prioritization-based

11   queue management memorandum before she signed it?

12       A.    So in terms of substantive information

13   that would have primarily come from CBP, as

14   stated earlier, I would expect that Secretary

15   Nielsen's -- her office staff would have been

16   involved in any discussions related to signature.

17   And then as sort of a technical matter, providing

18   information, packages containing memos and

19   documents like this would be transmitted by and

20   ultimately returned to our executive secretary,

21   as reflected by the fact that page 1 of Tab 19

22   shows the transmission -- the transmission from



Page 181

1    headquarters to CBP and ICE was made by the

2    Office of the Executive Secretary.

3        Q.    Did Commissioner McAleenan play any

4    role in providing substantive information

5    concerning this prioritization-based queue

6    management memorandum to Secretary Nielsen before

7    she signed the memorandum?

8            MS. SHINNERS:  Object to the scope.

9            THE WITNESS:  So the memo is from

10           Commissioner McAleenan to Secretary

11           Nielsen -- or sorry.  The memo -- strike

12           that.

13           While the memo is from Secretary

14           Nielsen to Commissioner McAleenan, my

15           understanding is that the substantive

16           information was provided in the first

17           instance and compiled by Commissioner

18           McAleenan and the team at CBP.  So the

19           information contained in the memo itself, to

20           the best of my understanding, reflects --

21           reflects that information.  Beyond the four

22           corners of the document itself, I'm not



Page 182

1       certain -- I'm not certain what deliberative

2       discussions the commissioner and the

3       secretary might have had prior to signature.

4               MR. MEDLOCK:  Okay.  That's all the

5       questions I have for you at this time, sir.

6       I think that Ms. Shinners wanted to go off

7       the record and confer before she determines

8       whether she has any questions to ask you.

9               MS. SHINNERS:  Yes, that's correct.

10      If we could go off the record, that would be

11      great.

12              THE TECHNICIAN:  All right.  We are

13      going off the record.  The time is now 4:44.

14              (Recess taken.)

15              THE TECHNICIAN:  We are back on the

16      record.  The time is 5:16.

17                      EXAMINATION

18  BY MS. SHINNERS:

19      Q.    All right, Mr. Glabe.  This is

20  Katherine Shinners on behalf of defendants.  I'm

21  just going to be asking you a few questions to

22  follow up from your testimony today.



Page 183

1          MS. SHINNERS:  First, Kevin, can you

2     pull up what's been marked as Exhibit 326,

3     or Tab 7.  The lead Bates number is

4     AOL-DEF-00769118.  And if we can go to the

5     bottom of the second page, which is the page

6     ending in 119.  And there is a section that

7     says "J9 Liaison."  If you can blow that

8     section up.  That's at the very bottom of

9     the page.

10  BY MS. SHINNERS:

11     Q.    Mr. Glabe, do you recall Mr. Medlock

12  showing you this document that's been marked as

13  Exhibit 326 earlier today?

14     A.    I do.

15     Q.    Do you recall discussing an El Centro

16  facility that was put on hold in November 2016?

17     A.    Yes.

18     Q.    Okay.  And so the section of this

19  document I pulled up that you looked at earlier,

20  it says:  "CBP CAT discussed El Centro facility

21  plans with ERO.  ERO will not be able to fulfill

22  a commitment of daily ███ transfers out of El



Page 184

1    Centro facility due to not being able to secure

2    the Cibola County Detention Center in New Mexico

3    as a viable option to hold Haitians.  Therefore,

4    as noted above, the El Centro facility will be

5    placed on pause for TDY personnel until further

6    notice."

7              Did I read those two sentences --

8    excuse me, those three sentences accurately?

9         A.   Yes.

10             MR. MEDLOCK:  Objection; leading.

11        Scope.

12             THE WITNESS:  Yes.  I understand ERO

13        as used here refers to Enforcement and

14        Removal Operations within ICE.

15   BY MS. SHINNERS:

16        Q.   Okay.  Do you have any reason to

17   believe that the statement that Enforcement and

18   Removal Operations within ICE will not be able to

19   fulfill the commitment of daily ███ transfers out

20   of El Centro facility is inaccurate?

21        A.   No.

22             MS. SHINNERS:  Objection; leading.



Page 185

1          Scope.

2                    THE WITNESS:  No.  And indeed, I think

3          when thinking about CBP processing

4          capacities used at ports of entry, it's

5          important to bear in mind the fact that sort

6          of coordination with ICE is key,

7          particularly when arranging for onward

8          transport of aliens.  So certainly ERO

9          ability to accept transfers would be a key

10         consideration.

11                   MR. MEDLOCK:  Move to strike

12         everything after "No" as nonresponsive.

13  BY MS. SHINNERS:

14         Q.    So does it make sense to you that ICE

15  ERO ability to transfer would be a reason that

16  the temporary processing facility in El Centro

17  would have been put on hold at that time?

18                   MS. SHINNERS:  Objection; leading.

19         Scope.

20                   THE WITNESS:  Yes.  And specifically

21         based on the explicit cross-reference to "as

22         noted above," I read that to mean that the



Page 186

```
 1        reason the El Centro facility was put on

 2        hold was due to the -- was due to ICE not

 3        being able to fulfill the commitment of

 4        transfers due to the inability to secure the

 5        detention center.  The reason -- that would

 6        be the reason that, as expressed within the

 7        same document, El Centro facility would not

 8        have its soft opening on November 14.

 9             That fact would also explain it sort

10        of emanated from the ground up via ICE to

11        the CAT where it appears on page 1 of this

12        document that EAC Owen -- this appears to be

13        new information to him because it's

14        something that came from the bottom up.  And

15        that would also sort of explain why the TDYs

16        would be notified to stand down, which

17        corresponds almost exactly to the statement

18        that the El Centro facility would be placed

19        on pause for TDY personnel.

20             And then I would further note that

21        would also explain why it appears that the

22        DHS headquarters, at least the secretary,
```



Page 187

```
 1          had not yet been notified or made aware of

 2          this development because it's something that

 3          emanated from the ground up as opposed to

 4          the top down.

 5                 MR. MEDLOCK:  Also, objection for lack

 6          of foundation.

 7   BY MS. SHINNERS:

 8          Q.    Okay.  I would like to move on to a

 9   document that has been marked as Exhibit 334.

10                 MS. SHINNERS:  Can we bring that

11          exhibit up?  Thank you, Kevin.

12   BY MS. SHINNERS:

13          Q.    Do you recall Mr. Medlock showing you

14   this document earlier today, Mr. Glabe?

15          A.    I do.

16          Q.    Okay.  And in particular, I believe he

17   asked you questions about the statement in the

18   first sentence of the document under the

19   subheading "Release Date" that says:  "At this

20   time, we have reached capacity at the San Ysidro

21   port of entry for CBP officers to be able to

22   bring additional persons traveling without
```



Page 188

1    appropriate entry documentation into the port of

2    entry for processing."

3            Do you recall Mr. Medlock asking you

4    questions about that sentence?

5        A.    I do.

6        Q.    Okay.  Who between CBP and DHS is, in

7    DHS's opinion, in the best position to determine

8    the capacity of the San Ysidro port of entry?

9            MR. MEDLOCK:  Objection; leading.

10    Lacks foundation.

11            THE WITNESS:  CBP.

12    BY MS. SHINNERS:

13        Q.    And why is that?

14        A.    Because issues of capacity at ports of

15    entry are something that, while sort of --

16    sometimes, you know, information is provided from

17    CBP to headquarters.  In certain circumstances,

18    it's something that is -- it's an operational

19    issue that's managed by CBP operational personnel

20    and is something squarely within their cognizance

21    to assess capacity.

22            MS. SHINNERS:  Thank you, Mr. Glabe.



Page 189

1          That's all the questions I have.

2                MR. MEDLOCK:  No further questions

3          from plaintiffs.  Thank you, sir.

4                MS. SHINNERS:  Thank you, Mr. Glabe.

5                I would just like to note before we go

6          off the record that the witness would like

7          the opportunity to read and sign, and that

8          the transcript is deemed confidential for 30

9          days.

10                THE TECHNICIAN:  All right.  Just

11          before we go off the record, does anybody

12          have any video request?

13                MS. SHINNERS:  No.

14                MR. MEDLOCK:  No.  We have a standing

15          order.

16                THE TECHNICIAN:  Okay, great.

17                We are going off the record.  The time

18          is now 5:24.

19                (Deposition adjourned at 5:24 p.m.)

20

21

22



Page 190

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3         I, SCOTT GLABE, have read or have had the

 4    foregoing testimony read to me and hereby certify

 5    that it is a true and correct transcription of my

 6    testimony with the exception of any attached

 7    corrections or changes.

 8

 9

10    _____

11    SCOTT GLABE

12    [ ] No corrections

13    [ ] Correction sheet(s) enclosed

14

15         SUBSCRIBED AND SWORN TO BEFORE ME, the

16    undersigned authority, by the witness, SCOTT

17    GLABE, on this the _____ day of

18    _____, _____.

19

20

21

22
```



Page 191

1               C E R T I F I C A T E

2    DISTRICT OF COLUMBIA

3               I, JOHN L. HARMONSON, a Notary Public

4    within and for the District of Columbia, do

5    hereby certify:

6               That the witness whose deposition is

7    hereinbefore set forth, was duly sworn or

8    affirmed by me and that such deposition is a true

9    record of the testimony given by such witness.

10              That before completion of the

11   proceedings, review and signature of the

12   transcript was requested.

13              I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage; and that I am in no way interested in

16   the outcome of this matter.

17              IN WITNESS WHEREOF, I have hereunto set

18   my hand this 2nd day of July, 2020.

19

20              _____

21              JOHN L. HARMONSON, RPR

                My commission expires: 11/14/20

22



```
                                                    Page 192
  1                      ERRATA SHEET

  2   CASE:     Al Otro Lado, Inc. v. Wolf

      DATE:     July 1, 2020

  3   WITNESS:  SCOTT GLABE

  4   Reason Codes:

  5          1.  To clarify the record.

             2.  To conform to the facts.

  6          3.  To correct transcription errors.

  7   Pg. Ln.  Now Reads          Should Read        Reason

  8   ___ ___  _____    _____    _____

  9   ___ ___  _____    _____    _____

 10   ___ ___  _____    _____    _____

 11   ___ ___  _____    _____    _____

 12   ___ ___  _____    _____    _____

 13   ___ ___  _____    _____    _____

 14   ___ ___  _____    _____    _____

 15   ___ ___  _____    _____    _____

 16   ___ ___  _____    _____    _____

 17
                               _____
 18                            Signature of Deponent

 19

 20   SUBSCRIBED AND SWORN BEFORE ME

 21   THIS ___ DAY OF _____, _____

 22   _____
```



## A

**abbreviated** 80:22
**abbreviation** 96:11
**ability** 55:22 100:9 124:8 185:9,15
**able** 101:1 123:8 143:17 176:7 183:21 184:1 184:18 186:3 187:21
**accept** 185:9
**accompanied** 107:14,21
**accurately** 184:8
**ACKNOWLE...** 190:1
**acronym** 10:19 16:10 108:13
**Act** 107:11
**acting** 10:14 120:6
**action** 5:20 7:6 86:18 87:3 98:5 104:15 146:10 146:15 191:14
**actions** 36:9,10 36:13,17 37:3 37:11,12 116:18
**actual** 100:12
**add** 61:11 102:22 158:22
**added** 47:22
**addition** 39:19 58:1 169:5
**additional** 40:5 143:17 150:16 187:22
**Additionally** 36:2
**address** 61:13 123:18 138:15

139:1
**addressed** 68:19 68:21
**adjourned** 189:19
**administering** 2:18
**Admissibility** 167:10,12
**admissions** 34:2
**adopt** 52:16
**adopted** 48:17
**adopting** 51:18 53:5
**advice** 27:17 28:5 29:12
**advise** 106:11
**advised** 69:15
**advisors** 174:5
**Affairs** 31:6,14 120:8
**affect** 49:17
**affidavit** 12:3,8 12:12
**affidavits** 35:10
**affirmed** 9:17 191:8
**AFTERNOON** 70:2
**age** 99:21 107:13
**agency** 9:11 18:20,21 44:1 108:16 122:11 179:1
**agent** 136:4 137:3 139:9
**aggrieved** 55:3
**agree** 84:20 88:15 97:12 139:8 150:1
**agreed** 56:22 58:5
**agreeing** 53:12
**agreement** 20:22 57:5
**agricultural** 67:7

**ahead** 52:6 67:18 84:13 98:3 117:18 137:13 143:2,9 147:7 148:5 159:15 174:12,13
**Air** 55:10
**al** 1:5,5,8 8:8 34:6 192:2
**alien** 107:5,6,13 107:20 138:6
**aliens** 36:13,18 37:13,14,15,17 71:22,22 73:3,9 99:17,17,20 102:4 107:17 137:9 139:1 150:16 165:1,3 165:7 185:8
**Alles** 78:22 79:3 79:4,7 82:21 83:3
**allow** 25:11 52:1 58:20 144:7 163:10 176:12
**Amber** 4:5 19:1 19:19 28:17
**amber.napolit...** 4:5
**American** 54:19
**amount** 40:13 67:13
**analyzing** 159:13
**announced** 112:18 113:21 114:20 115:4
**Annuity** 54:19
**answer** 13:5 14:7 14:13,14 15:1,2 16:20 17:11 22:13 23:1,8 27:14 28:2 29:8 29:22 30:2 32:14 33:3 34:18 37:7 41:4 45:10 48:21

49:1,10 51:4 52:1,6,18 53:10 58:20 63:6,14 72:14 74:1 75:7 76:15 80:18 82:14 85:9 88:9 88:21 89:19 92:8 93:3 96:9 102:10,18 103:21 107:3 111:14 112:4 113:8 114:13 114:16 117:20 121:3,5,6,7 122:9 123:8,12 123:15 126:22 127:15,16,17 136:15 137:7 137:22 139:13 140:12,13 144:3,10 147:15 149:3 154:6 155:4 156:4 161:10 161:11,14,17 166:5 174:15 174:18 175:2 176:7,13 177:10,17 178:21 179:7
**answered** 165:20 189:11
**answering** 15:13
**answers** 13:8 14:5 61:6 162:5
**anybody** 133:10
**AOL-DEF-000...** 6:16 131:12
**AOL-DEF-000...** 6:14 125:13
**AOL-DEF-000...** 7:3
**AOL-DEF-000...** 6:18 135:5
**AOL-DEF-000...** 7:8 146:9

**AOL-DEF-000...** 7:10 167:5
**AOL-DEF-002...** 5:18 78:12
**AOL-DEF-002...** 6:10 110:14
**AOL-DEF-002...** 6:7 94:17
**AOL-DEF-002...** 99:1
**AOL-DEF-002...** 7:13 173:10
**AOL-DEF-002...** 6:12 119:15
**AOL-DEF-003...** 6:8 105:10
**AOL-DEF-007...** 62:2
**AOL-DEF-007...** 6:5 90:11 183:4
**AOL-DEF-008...** 5:16 68:8
**AOL-DEF-008...** 5:22 86:19
**apart** 44:17
**Apologies** 121:13
**apologize** 95:4 171:21
**apostrophe** 80:8
**apparent** 128:1
**appeal** 49:13,16
**appear** 87:4 98:8 102:2
**APPEARANC...** 4:1
**appearing** 2:12
**appears** 45:5 76:16,19 77:9 88:11 97:13,15 132:5 135:8 142:20 146:10 167:16 179:3 186:11,12,21
**applicable** 57:22
**application** 17:13
**apprehended**



37:15
**apprehension**
36:6
**apprehensions**
36:11,17 37:4
37:13
**appropriate**
143:18 188:1
**approval** 77:1,3
82:3,3
**approve** 76:12
**approved** 69:11
71:1 76:2 80:3
101:14,20
102:3,7 104:5
113:1 114:5
115:20
**approximately**
14:20 24:9
25:17 28:14
30:13 157:1
159:2,9
**April** 7:6 52:10
117:13 118:8
118:20 119:18
120:21 121:17
125:11,11,22
130:1 131:17
132:11 134:10
135:9 141:12
145:5,8 146:11
148:11,15
149:18 151:16
155:2 156:13
160:14,20
161:4 162:16
163:6 164:1,17
165:18 167:11
**arbitration** 11:8
**architectural**
165:10
**areas** 172:14
**argumentative**
103:19 113:6
137:21 144:14
161:8

**Ari** 3:14 9:6
**arranging** 185:7
**arrival** 120:15,22
121:20 123:7
124:16
**arrivals** 106:7
**arrive** 150:16
**arrived** 145:19
161:5 162:17
163:1
**arriving** 120:14
120:20 121:19
122:1 124:15
159:10 165:3
**article** 6:3 89:11
89:14 114:22
**artificial** 55:20
**aside** 115:8 143:1
**asked** 104:1,13
126:18 140:10
165:20 187:17
**asking** 14:6
22:15 25:9 29:4
29:5 36:22
48:15 49:9 61:6
72:3 123:2
126:19 161:13
182:21 188:3
**aspects** 61:14
**assert** 127:13
**asserted** 174:14
**assess** 188:21
**assessing** 5:13
66:14 172:7
**assessment** 171:7
174:4
**assigned** 104:8
**assistant** 10:11
10:15 31:13
69:4,6 95:18
120:7
**assume** 150:6
157:10
**assumed** 160:2
**assumes** 161:8
166:3

**assuming** 124:18
**assumption** 81:1
158:3
**asylum** 48:1,11
51:1,15 52:13
53:7
**attached** 2:14
17:19 61:18
66:7 68:1 78:7
86:14 89:9 90:7
94:13 98:14
105:7 110:10
119:12 125:19
131:15 135:2
141:6 145:3
146:6 167:8
173:5,8,14
190:6
**attachment** 7:11
173:8
**attempting**
139:10
**attended** 63:10
63:19 64:6
100:16
**attending** 44:16
**attorney** 12:22
14:12 17:6
39:19
**attorneys** 14:9
26:5,6,13 27:1
33:11 34:10
38:10,11,16
39:2,4,6,21
40:5,12,20 41:7
41:9,15 42:1,4
42:7,13,19 43:1
43:16,19 44:18
46:2
**attorney's** 23:4
27:17 28:5
29:12 32:17
33:6 177:13
**attorney-client**
27:12,22 29:20
32:12 33:2

45:15 103:2
123:13,22
**audible** 13:8,13
**audio** 14:3 15:16
**authority** 190:10
**automatically**
55:8 56:5,20
**available** 36:4,5
37:10 178:6,10
178:18
**Avenue** 4:3 80:15
80:21 81:3,7
**average** 150:8
155:8,11 157:5
157:6 159:8,19
160:1
**aware** 48:4 65:18
72:20 77:1
88:17 92:4
116:15 117:13
118:8 149:5
187:1
**a.m** 2:6 8:3,12
82:22 115:2
119:19 148:14
148:15 149:19
153:11,13,19
153:22 154:2
156:12 162:15

_____

**B**

**back** 41:13 47:6
47:8 50:12,14
50:16,17 54:3
59:9,12 70:5,11
83:6,11 106:9
113:13,14
117:9 122:19
122:22 151:3,6
153:6,21
160:22 166:17
166:20 169:22
171:19 175:21
176:2 182:15
**ballpark** 41:19
157:5,8,15

**Bank** 5:12 66:14
**base** 106:4
**based** 76:16,18
108:5 115:10
150:6 151:20
152:4,15
154:12,14
156:22 160:1,6
164:4 165:5
170:16 178:20
185:21
**Bashant** 34:14
49:18
**basically** 60:11
107:16 129:10
**basis** 37:10 115:4
132:17,21
133:2,11 162:8
**Bates** 5:15,17,21
6:4,6,8,9,11,13
6:15,17 7:3,7,9
7:12 62:2 68:7
78:11 86:19
90:10 94:16
99:1 105:10
110:13 119:15
119:17 125:12
131:11 135:5
146:9,20 153:9
155:19 167:5
173:9 183:3
**Bean** 12:14
**bear** 185:5
**bearing** 70:8
163:3
**bears** 62:1 167:4
**becoming** 88:7
103:5,13
**beds** 48:1 80:5
81:16 82:10
**beginning** 5:15
5:17 6:4,6,9,11
6:13,17 7:7,9
7:12
**begins** 8:6 67:2
70:21 77:7 78:9



100:4,7 125:10
126:2 128:12
128:13,19
136:8,9
**behalf** 3:3,10
12:16 20:5,7
182:20
**beholder** 21:16
**believe** 12:13
19:5 31:3,4
34:20 35:16
36:9 39:1,3
42:10 48:14
49:21 61:8 73:8
73:18 79:2
103:1 106:14
106:21 114:18
115:3,5 116:14
159:1 171:20
176:5 184:17
187:16
**believed** 47:22
**Ben** 3:12
**beneath** 87:15,21
168:7
**best** 12:6,9 13:19
18:15,19 19:14
22:3,4 23:15,18
24:8,18 31:9
40:2 41:11,11
41:18 42:10,15
43:3,7,22 44:3
77:9 81:22
95:20 104:7
114:15 119:1
169:18 172:10
174:17 176:15
181:20 188:7
**better** 45:1 72:6
142:17
**Bev** 96:1
**Beverly** 94:21
95:15 97:14
99:5 100:4,8
**beyond** 72:1
99:19 101:7

102:22 134:6
181:21
**bit** 15:12 51:11
72:5 139:7
144:13 178:12
**blood** 191:14
**blow** 183:7
**body** 11:11
120:10
**border** 5:20 7:5
10:15 16:5
36:11 37:16
62:20 63:2 73:6
73:20 75:13,19
86:18 136:2,5
138:9 155:13
155:16,22
157:3 165:8
**bottom** 62:8
90:18 147:9
155:8 167:20
183:5,8 186:14
**box** 3:12 169:1,2
**Boyd** 26:16,21
27:7,19 28:8,15
29:15 30:8,11
30:15 31:17
32:1,5,9,21
33:10 39:3,14
39:17 40:6 46:7
**Boyd's** 31:11
**break** 14:21 15:1
15:3 36:16
46:15,17,19
70:14 117:1
123:1 158:2
166:10,13
**breaking** 178:11
**breaks** 14:19
37:2
**bridge** 100:11
**bridges** 100:10
**briefed** 64:22
65:7 84:1 106:6
108:20 109:13
111:10 130:2

130:22
**briefing** 57:9
58:6 109:8
179:20 180:4
**briefly** 19:11,13
35:16 38:3
**bring** 17:16
53:21 57:5
61:16 66:4
67:21 70:11
78:1 83:10
85:22 88:13,14
89:6 90:1 94:6
98:12 104:22
119:6 130:11
131:7 134:18
141:2 143:17
144:18 145:22
172:21 187:10
187:22
**bringing** 83:5
**broader** 130:14
**broke** 176:3
**broken** 25:4,20
**Brown** 3:4 8:14
8:21
**budget** 69:17
**build** 84:9,18
**building** 84:16
92:14,20,21
93:12
**built** 92:21
**bulk** 25:18 43:15
**bullet** 87:16,22
91:8,13 92:11
111:3 163:8
**burden** 77:8
**Burling** 11:17
**bursting** 170:12
**business** 41:12
152:14

—————————
**C**
—————————
**C** 3:1 8:2 191:1,1
**calendar** 116:10
**Calexico** 77:21

**California** 1:2
8:10 55:13
71:14 72:10
73:1 103:15
**call** 31:17 38:21
39:7,13
**called** 110:17
149:7 167:21
168:4,11
**calls** 22:11,19
25:6 27:11,21
29:9,19 32:11
32:22 38:19
80:16 126:15
177:8
**candidate** 115:1
**capability** 69:13
71:2,9,12,13
72:8,21 76:12
**capacities** 156:7
156:7 170:1,11
172:1 185:4
**capacity** 10:14
20:7 47:11,17
48:10 50:22
53:6 72:1 129:3
130:19 138:19
143:16 147:3
147:11 148:7
148:10 149:16
150:15,19,20
155:1,21
157:17,20
159:14 163:4
163:12,14,17
163:22 164:6
164:12 165:2
165:13 169:10
169:14 172:3,4
172:6,7,8,11,12
172:13 187:20
188:8,14,21
**captioned** 36:9
**caravan** 120:2,12
120:15,20
121:19 122:1

123:6 124:3,10
124:15 130:15
145:18 161:4
162:16 163:1
**caravans** 124:4,7
132:18
**caravan-related**
130:21
**career** 11:17
79:11
**case** 1:6 12:12,16
14:12 22:1
34:15 35:2,11
35:14,17,20
38:4,5,10 49:21
51:13 52:11
54:20 55:11
56:17 58:6 84:6
84:15 93:22
192:2
**cases** 12:7 56:7
106:8 108:3,4
**CAT** 79:15 106:5
149:10,18
150:2 153:2
183:20 186:11
**categories** 25:4
25:10,21 26:1
37:13
**Category** 67:4
**caused** 67:5
**CBP** 9:11 16:6,9
33:12 36:4,8,15
36:16 37:1,9
51:7 69:1,4,5
71:11 73:3,8,12
73:13,16 74:6
75:1,1 76:7,22
77:19 79:8,15
81:2 82:1 83:14
83:15,18 84:7
84:16,22 87:5
91:21 94:1
99:11,20 103:5
103:14 104:2
107:18 111:5



111:16 112:20
114:1 115:11
115:19 116:1,6
116:19 120:8
120:19 121:22
123:5 124:5,19
124:22 126:8
126:17 130:7
130:17 131:6
132:4,7,7,22
133:5,20
134:13 140:11
140:15,15,17
141:1,11
142:18 143:1,5
143:11,16
144:8 145:7
150:11 152:6
159:18 160:5
167:17 170:10
171:2,4 172:9,9
172:17 174:2,8
174:17 177:16
178:1,6,9,15,17
179:1 180:13
181:1,18
183:20 185:3
187:21 188:6
188:11,17,19
**CBP's** 74:19
**cc** 69:1
**CENTAM**
106:10
**center** 110:22
111:4,6,12
112:2,11 113:4
114:8 184:2
186:5
**Central** 55:13
**Centro** 69:13
71:3,9,13 72:10
73:1,6,18 74:10
74:15 75:12,15
76:12 83:4 91:4
91:9,14,18 92:5
92:5,12,19

93:11 94:2 96:1
96:19 97:7,9,18
97:22 98:6
103:7,15
104:17 112:21
114:2 115:13
183:15,20
184:1,4,20
185:16 186:1,7
186:18
**certain** 21:7,8
22:2 35:20
38:13 39:5 40:1
40:13 41:17
44:9 47:13,19
65:4 77:19 84:3
85:8 103:20
108:21 109:8
129:12 130:4
132:2,8,13,15
132:21 141:22
144:12 150:10
150:11 152:1
153:16 154:11
154:17 156:6
157:22 160:21
164:4 171:17
174:17 175:3
176:15 179:8
179:18 182:1,1
188:17
**certainly** 39:1
44:21 55:3
109:15 130:16
138:5 139:21
141:20 142:18
150:13 185:8
**certainty** 31:3
**certification** 35:3
**certify** 190:4
191:5,13
**cetera** 77:9
**CF** 106:8 108:2
**CFO** 69:15
**CHAD** 1:8
**chain** 68:5 90:9

95:13 98:19
119:14 125:10
135:4 145:5
173:7
**Challenge** 66:22
**challenged** 57:17
**challenging** 57:7
77:10
**chance** 59:14
60:10
**change** 80:11
**changes** 126:9,14
127:10,19
128:4 190:7
**characterization**
37:21 53:13
76:22 84:21
93:2 110:2
113:7 116:2,3
124:19 137:6
144:14 149:20
**characterize**
137:8
**characterized**
37:19 116:6
**charge** 79:7
95:18
**Chavez** 78:17
90:16 99:5
101:11
**check** 14:21
**chief** 136:1,1,3,4
136:6 137:2,9
139:8 178:22
**child** 107:6
**children** 107:6
**choice** 47:16
**Cibola** 184:2
**Circuit** 34:14
**circumstances**
13:6 84:5 124:3
178:21 188:17
**circumstantial**
165:10
**CIT** 56:8
**City** 79:19

**Civil** 2:13 18:2
**claim** 57:12
**claimed** 57:8,11
**clarification**
28:11 100:2
125:4
**clarify** 127:5
170:6 192:5
**clarity** 106:5
**class** 9:1 35:3
**clause** 106:15
**clawed** 54:3
**claw-back** 49:12
54:10,11 57:1,2
**clear** 13:13 45:22
54:9 60:9
**Clinton** 115:1
**clock** 116:10
**close** 46:16
**closed** 84:1
**closely** 129:22
**CLOUSE** 3:19
**CLX** 77:11,15,20
**coaches** 75:7
**coastal** 67:5
**Codes** 192:4
**cognizance** 73:12
83:21 188:20
**coincide** 156:8
**colleagues** 26:7
26:11,14 45:4
**Columbia** 2:17
191:2,4
**column** 159:1,9
**combined** 67:4
**come** 14:3 35:21
137:4 160:8
164:16 177:16
180:13
**comes** 51:7
**coming** 138:18
157:18,19
**comment** 149:10
149:12,13
**comments**
133:12,19

**commission**
191:21
**commissioner**
6:20 62:20 63:2
69:4,10 70:22
76:1,7 83:15
95:18 100:17
101:4,21 104:6
106:3 108:18
108:19 120:7
127:8 132:6
140:18 141:11
143:14 144:7
145:12,17
148:19 151:7
164:7 165:12
171:5 173:16
181:3,10,14,17
182:2
**commissioners**
69:6
**Commissioner's**
101:12
**commitment**
183:22 184:19
186:3
**Committee** 62:14
63:11 64:7,16
65:1,8
**communicate**
17:6,10
**communicated**
115:15 116:13
**communication**
28:1 29:20
38:20
**communications**
27:13 32:12
33:2 45:15
102:17,19
123:13,17
179:5
**Company** 54:19
54:20
**compel** 60:18
**compiled** 181:17


MAGNA
LEGAL SERVICES

complaint 34:18
34:21
complementary
107:18
completely 39:12
completion
191:10
Complex 80:15
80:21 81:4,7
compound
114:11 137:6
comprised 99:20
conceding 115:2
concern 124:22
concerning 26:7
65:2 170:15
181:5
concerns 106:11
124:4,6 138:9
138:14
concisely 75:5
conclusion 57:3
concrete 53:19
conduct 124:8
conducts 130:8
confer 122:17
175:20 182:7
conference 32:20
confess 88:22
confident 151:19
152:4
confidential 1:11
189:8
confirm 128:14
128:17,19
129:1
conform 192:5
Congress 11:11
conjunction 51:6
58:2 179:21
connection 24:6
116:16
considerable
67:13
consideration
101:14 185:10

considered 61:1
consistent 55:15
60:4 83:17
130:20 157:11
consistently
162:4
constantly 51:5,8
constituent 37:3
construct 85:3,7
constructed 85:1
85:20
construction
128:1
consult 122:11
123:1 175:13
176:3
consultation
31:20 32:1
45:16
consulted 83:9
131:21 132:9
139:19 140:2,7
140:11,14,15
140:17,21
141:17,22
142:1,4 144:12
Cont 4:1 6:1 7:1
contained 181:19
containing
117:14 180:18
content 54:2
context 71:17
76:18 108:6
109:16 119:4
134:5
contextual 165:2
continuation
95:12
continue 48:12
51:2,18 52:15
53:1,4,16,16
61:11 83:4
91:20,22
continues 90:19
continuing 47:10
contract 87:17

88:6
contracting
91:20
control 82:7
101:3 139:9
convene 175:16
conversation
13:4 28:7,9,12
28:13,16,21
29:1,4 30:8,14
30:17,19 31:22
41:7
conversations
33:9 38:9 39:4
40:4,5,6,9 44:1
44:4 46:2,6
52:21 102:22
conveyed 106:5
coordinated
142:22 143:5
coordination
185:6
copies 99:6
copy 19:3,5 34:17
57:20 132:12
133:6 134:2
175:9
corners 181:22
correct 11:18
16:17,18 36:19
38:21 39:9,12
49:15 59:21,22
62:21 68:20
69:4 71:18
75:14 79:5
85:16 88:19
91:10 99:15
105:20,21
106:19 109:21
112:13 113:5
114:8 120:3,8
124:19 131:18
135:10,17
136:2 142:11
144:17 147:4
147:12 148:1,8

148:9,12,16,17
148:20,21
154:7,16 156:1
161:6 168:16
182:9 190:5
192:6
corrected 15:18
Correction
190:13
corrections 190:7
190:12
correctly 62:17
67:9 69:18 71:4
77:13 79:16
80:6,11 83:7
92:2 96:5 99:13
100:13 101:16
106:13,20
111:8 120:16
129:4 135:14
136:20 143:20
145:20
corresponds
37:20 186:17
costs 77:8 79:15
Council 62:15
63:12,20 64:8
64:17 65:1
counsel 8:18 9:11
17:2 18:20,21
19:19 20:22
21:13 22:21
23:7,22 24:1,2
24:2,5,7 26:4
28:18 31:20
32:2 44:1 45:13
45:17 46:6
59:13 102:17
102:20 103:1
122:11,17
123:1,14
166:11,22
175:13,20
176:4 178:22
179:1,10
country 65:20

67:14 136:13
137:10
County 184:2
couple 23:18,20
166:10
courier 104:8
course 40:11
157:21
court 1:1 8:9,16
11:2 13:9 21:1
35:10 50:15
57:6 113:12
courtroom 16:17
cover 173:9
covered 46:3
103:1
Covington 11:16
Cranford 4:9
15:7
Crash 55:11
Crawford 54:11
58:15 60:15
Crawford's
54:16
created 85:11
credible 108:4
credit 171:6
crime 136:19
Crisis 5:20 7:6
86:18 87:3 98:4
104:15 146:10
146:14
crops 67:8
cross-reference
185:21
current 13:6
30:22 31:11
currently 71:11
71:21 72:7
134:2 178:9
custody 77:11
82:7 101:2
148:1 156:12
156:20 157:2
158:5,15,20
165:7



**customarily**
152:13
**customary**
179:18
**Customs** 5:19
16:5 62:20 63:2
86:17
**C1** 80:2 83:4,15
106:6 109:13
120:11
**C2** 62:13,19
100:8 101:13
109:12

**D**

**d** 4:1 6:1 7:1 8:2
**daily** 157:5
167:21 168:4
168:12,15
169:6,8 183:22
184:19
**damage** 67:13
**dangerous**
139:17
**data** 37:1 154:20
162:13 166:12
169:18
**date** 8:11 15:22
41:2 87:2 89:2
89:14 148:18
153:10 187:19
192:2
**dated** 86:16
134:10 141:12
**dating** 41:13
**day** 15:6 41:2
92:17 93:9
95:21 137:1
145:12 150:9
150:17,20
151:9 152:14
153:4 157:7,14
157:18,22
159:8,10,18
160:1,4,18
165:5 190:17

191:18 192:21
**days** 41:2,13 84:9
84:19 88:5
176:16 189:9
**day's** 150:5
**day-by-day**
73:11
**DC** 1:17 3:5,12
3:18 4:4
**De** 56:8
**deal** 67:7
**deals** 55:1
**December** 88:2
**decide** 84:7,16
**decided** 48:12
51:1,17 52:15
103:6,8,14,16
111:6
**decision** 31:16,19
32:1 52:22
53:15 57:7 61:4
81:13,19 82:8
83:10 84:1 85:2
92:18 93:10
94:2,3 111:11
111:17,18
113:3 114:7
115:17 126:10
126:14 127:10
127:19 128:5
130:2
**decisions** 61:14
64:13 112:15
113:18
**decision-making**
55:22 112:1,10
169:19
**declaration** 12:2
12:3,8,15
**declarations** 35:9
**deemed** 37:15,17
189:8
**defendant** 9:5,8
12:14
**defendants** 1:9
3:10 182:20

**defendant's**
56:15,18 58:2
**defer** 77:18,19
143:11 150:11
170:10 171:7
172:17 174:19
**defers** 130:7
171:1 172:9
**defined** 99:18
107:7
**definition** 107:11
**definitive** 85:9
**definitively**
44:21
**degree** 142:21
143:4 156:6
**delay** 121:13
**deliberated**
53:14
**deliberating** 51:6
51:8
**deliberation**
177:9
**deliberations**
48:16 49:3
**deliberative**
48:18 52:20
126:4 127:22
128:6 174:3
179:19 182:1
**delineated**
130:18
**delineating** 22:20
**delivered** 92:14
**denote** 107:5
**denotes** 108:14
**department** 1:15
2:10 3:11,17
4:3 9:3,7 10:7
10:10,17 18:3
20:6 28:20
40:21 79:10
84:22 85:1
115:21 120:13
121:17 124:13
**depend** 84:4

**depending**
169:13
**deployed** 91:21
**deployment** 96:4
178:19
**Deponent** 190:1
192:18
**deposition** 1:13
2:9 5:11 8:7,13
11:5 12:22 13:3
14:14 16:4 18:1
18:3,22 19:2,8
21:3,6 22:9
25:19 26:8,12
26:15,22 27:10
27:20 29:17
30:12 33:15
38:12,17 39:22
40:11,14,22
41:10,16,22
42:5,21 43:21
44:17 45:3,12
46:4,9,13,16
54:5,7 59:20
61:21,22 63:17
64:4 66:13 68:4
70:16 71:6 78:5
81:11 86:12
94:11 98:18
101:1 105:5
110:8 119:10
131:12 134:22
141:4 145:1
146:4 162:5
167:6 173:3
189:19 191:6,8
**depositions** 11:21
**deprives** 54:16
**Deputies** 62:14
63:11 64:7,15
64:22 65:8
**deputy** 62:19
63:1 100:17
101:4,20 104:6
106:2 108:19
132:6

**described** 24:20
43:13
**designated** 96:14
96:18
**designee** 1:14
2:10
**despite** 14:15
**destruction** 67:6
**detail** 34:22 36:1
172:10
**details** 35:18
74:5
**detention** 84:8,17
184:2 186:5
**determination**
57:15 58:4,15
58:17 93:18
98:9 104:21
116:7,8
**determinations**
115:10
**determine** 56:2,4
64:5 65:6
111:21 188:7
**determines** 182:7
**development**
187:2
**DFO** 163:15
**DFO's** 164:4
**DHS** 9:11 10:13
10:18,21,22
12:16 18:19,21
20:6,17 24:2,5
26:7,11,14 31:1
31:12 33:11
40:21 45:4 47:9
47:16,21 48:8
50:20 51:5 53:1
61:3 63:10,19
64:6,21 65:7
69:15 71:17
72:12,19 77:2
80:19 83:9 84:6
84:15 92:4 94:1
100:15,16
101:3,19 103:5



103:14 104:4
111:10,18,22
112:9 116:7,18
118:3,6,8,11,19
120:18 121:21
123:5 125:1
129:7,16 130:2
130:7,16
131:21 132:8
132:12 133:2,8
133:11,11,18
133:18 134:1
134:12 139:19
140:7 141:16
142:4 143:3
144:7 171:1,6
172:8 173:20
174:21 175:8
176:5 177:16
179:1 180:9
186:22 188:6
**DHS's** 28:17
72:13 73:2
74:10 76:11
81:8 82:7 188:7
**Diego** 51:14
52:11 135:21
135:22 136:1,4
**different** 41:6
74:9 115:9,9
171:3 176:11
**difficult** 40:7
129:14
**difficulties** 69:20
**digressing**
142:16
**direct** 49:6
**directed** 22:20
73:15
**directing** 97:14
**direction** 45:17
83:4,15 132:5
**directly** 49:5
55:1 106:4
145:17
**director** 31:5

135:21
**directors** 117:15
**disagree** 58:13
58:16
**disclose** 57:8,10
57:19
**disclosed** 54:13
**discouraging**
137:9,16 139:9
**discretion** 131:5
142:19
**discuss** 17:13
26:3 27:19
40:13 62:15
63:21 64:8
123:10 172:10
**discussed** 29:15
32:5,19 43:10
46:12 53:15
54:1 97:17
100:8 104:13
104:19 115:9
115:13 116:5
116:12 169:11
183:20
**discussing**
118:14 183:15
**discussion** 20:22
109:18 159:21
160:3
**discussions** 24:6
26:6,8 109:15
180:16 182:2
**dismiss** 35:3
**dispositive**
163:16
**dispute** 52:4
76:22 81:18
82:2 104:3
109:11 115:22
162:18,21
164:9
**distributed**
157:10
**distribution**
157:11 160:7

**District** 1:1,2
2:17 8:9,10
54:22 55:13
56:9 191:2,4
**Division** 79:8
**document** 15:12
18:1,7,10,17
19:18 34:11
54:3,6,12 58:17
58:21 60:21
62:3 68:9 71:5
76:17 77:14
78:13 79:17
82:7 83:8 86:21
87:1,6 90:12
92:3 96:6 98:8
98:20,22
100:14 104:19
111:15 114:21
118:14,17,18
118:22 119:3
121:10 124:12
131:11 132:16
132:19 143:5
151:9,13 153:8
155:19 166:22
167:17,18
169:1,3,5
170:20 171:15
179:22 180:1
181:22 183:12
183:19 186:7
186:12 187:9
187:14,18
**documentation**
101:2 104:14
188:1
**documenting**
77:2
**documents** 15:9
15:11 23:12,16
23:19,21 24:4,5
24:10,14,15,19
25:1,3,17,20
26:3,9 34:5,9
35:22 36:1

41:21 42:1 46:5
52:3 58:5 72:10
72:22 73:4 87:4
109:6,17
115:11 116:17
119:4 139:2
143:18 160:13
161:9,21,22
165:17 180:19
**doing** 14:4 46:4
83:19 112:5
139:3
**DOJ** 21:11 24:7
**Donald** 88:18
89:12 103:4,12
**Donna** 85:12,18
87:12,16,22
88:6
**door** 136:15,16
**doubt** 144:5
**dozen** 23:19,20
24:10 25:17
**draft** 174:21
176:6
**drafted** 174:1
**drafting** 118:12
118:20 173:20
174:8 176:18
179:1
**due** 69:19 184:1
186:2,2,4
**duly** 9:17 191:7
**duties** 96:13
**duty** 96:12,15,19
97:6 124:8
**dynamic** 169:20
**dynamically**
170:21

---

**E**

---

**E** 3:1,1,18 8:2,2
191:1,1
**EAC** 68:22 69:3
69:6 78:22
130:5 186:12
**earlier** 37:9 98:8

101:14 104:19
114:21 124:21
130:13,15
132:3 135:16
138:16 140:10
141:16 169:11
170:7 180:14
183:13,19
187:14
**early** 65:18 150:3
157:16
**Eastern** 153:13
154:2,10,14
**easy** 157:20
**Economic** 10:12
**Economy** 54:20
**ecosystems** 67:8
**editing** 174:6
**effect** 54:17
141:10
**effectively** 154:2
**effects** 67:5
**effort** 69:11,14
71:1 76:2 77:8
**efforts** 82:6
106:7
**either** 12:21
38:21 40:20
107:19 116:16
133:7 178:22
**EI** 69:13 71:2,9
71:13 72:10,22
73:6,18 74:10
74:15 75:12,15
76:12 83:4 91:4
91:8,14,18 92:4
92:5,12,19
93:11 94:2 96:1
96:19 97:7,9,18
97:22 98:6
103:6,15
104:17 112:21
114:2 115:12
183:15,20,22
184:4,20
185:16 186:1,7



186:18
elect 88:18 103:5
103:13
Elected 89:12
election 89:2,16
92:18 93:9
97:22 112:17
113:20 114:19
115:6 116:20
electronically
24:19
email 70:18
emanated 186:10
187:3
embarrassing
140:1
emphasize 153:1
employed 10:4,6
10:7 12:10
empowered 56:2
enclosed 190:13
encompass 38:19
encounter 99:20
encountered
107:14,18
160:5
encouraging
137:3,18
endorsed 56:22
ends 119:17
155:19
enforcement
36:9,10,13,17
37:2,11,12
108:16 167:10
167:12 184:13
184:17
engagement
142:20
enjoy 142:19
Enrique 99:6
ensure 144:15
enter 136:14,17
137:18 138:12
138:21 139:10
entering 137:10

137:17 138:3
139:15,16
Enterprise 79:7
entire 79:11
155:12
entirety 90:19
entitled 18:1
20:13 66:14
89:12 131:18
173:16
entrance 163:9
entry 6:22 36:12
36:14,18,19
37:5,14,16,18
47:11,18 48:2
48:11 50:22
51:7,16 52:14
53:7 73:5,5,19
74:11,15,22
75:12,17
101:22 102:5,7
103:8,17
104:11 113:2
114:5 136:17
136:18 137:4
137:11 138:4,5
138:7,10,10,12
138:15 139:3
139:11,16
143:16,18,19
147:12,19
148:8,11
149:17 154:22
155:22 157:3
158:5,15,21
160:14 161:6
162:18 164:12
164:16 165:4
165:18 171:6
172:2 185:4
187:21 188:1,2
188:8,15
ERO 183:21,21
184:12 185:8
185:15
eroded 55:22

ERRATA 192:1
errors 192:6
ESI 49:20,22
57:1
Especially 13:22
ESQ 3:6,14,14,15
3:19 4:5
essentially 13:3
establish 80:4
81:14 82:9
establishing
69:12 71:1
Establishment
89:13
estimate 19:14
22:3,4,8 23:15
23:18 24:8 31:9
40:2,8 41:18,19
42:15 43:7 44:3
176:15
estimating
156:22
et 1:5,8 77:9
evaluating 51:5
evening 111:5
152:14
events 152:15
evidence 161:9
165:3,11
exactly 18:11,12
47:13,20 72:3
89:1 124:17
127:18 129:12
169:13 170:11
186:17
examination 5:1
5:4,5 9:20
20:13 61:11
182:17
examined 9:18
exceeded 169:14
exception 190:6
exchange 62:1
94:15
exclude 21:1
excluded 21:5,9

exclusively 82:1
excuse 161:16
184:8
executive 69:4,5
95:18 180:20
181:2
exercise 129:16
exhibit 5:8,9,10
5:12,15,17,19
6:1,2,3,4,6,8,9
6:11,13,15,17
6:19 7:1,2,3,4,9
7:11,17,18,19
15:6 17:18,22
20:9 58:11
61:17,22 62:9
64:10 66:6,12
67:22 68:4,15
70:15 78:5,6,19
82:19,20 86:5
86:11,13 88:14
89:8 90:4,5,6
91:4 94:10,12
94:19 98:13,17
98:22 105:4,6
109:4,20,20
110:7,9,16
119:9,11
125:17,18
131:13,14
134:21 135:1,7
141:4,5 143:6
144:22 145:2
145:13 146:4,5
146:19 147:11
148:20 151:6
152:19 153:7
154:21 161:1
162:14 167:6,7
168:9 171:20
173:2,4,11,13
179:3 183:2,13
187:9,11
exhibits 7:16
15:5 112:15
113:17 166:11

expand 15:7
103:16 104:9
130:13 140:12
167:22
expanding 47:17
113:2 114:5
expect 133:3
136:14 161:14
162:7 180:14
expenses 69:16
experience
140:20 151:20
154:12,15
expert 35:6
expires 191:21
explain 186:9,15
186:21
explicit 185:21
explicitly 116:6
expressed 186:6
extend 101:21
103:8
extending 108:20
extent 48:15 49:2
74:21 82:12
102:15,19
109:6 123:12
123:16 127:1,2
127:14 149:21
extra 48:1
extremely 139:17
eyes 21:15
e-mail 6:8,9 7:9
19:6,8 62:1,6
62:10,12 68:5
68:12,14,16,19
69:2 76:6,18,20
77:7 78:9,16,18
78:22 79:6,14
79:19 81:2,6,22
82:21 83:1,14
90:9,15,17,21
93:10,15,19
94:15,19 95:7
95:11,12,15,22
96:18 97:5



98:18 99:5,8,11
100:4 101:8,18
102:2 104:2
105:9,11,14,20
106:2,20 107:1
108:8,17 109:9
110:12,16
112:20 114:1
115:15 119:14
119:17,20
120:1,6,10
121:16 125:10
125:15,21
126:6,8 135:4,7
135:8,13 139:8
145:5,7,9,16
162:14,22
167:4 173:7,9
173:14
**e-mails** 5:15,17
6:4,6,11,13,17
7:3,11 109:17
112:19 113:22

---

**F**

**F** 1:8 191:1
**face** 56:17
**facilitating** 55:16
**facilities** 79:15
84:8,9,17,18
85:2,3,6,19
**facility** 83:6,11
84:2 85:8,11
87:12,17 88:1,6
91:5,9,14,18,22
92:6,12,19
93:11,16 94:2
96:20,21 97:7,9
97:18,22 98:6
103:7,16
104:17 112:21
114:2 115:13
163:10 183:16
183:20 184:1,4
184:20 185:16
186:1,7,18

**facing** 37:1
**fact** 14:15 65:22
88:16 97:17
112:20 114:1
116:19 132:20
133:17 139:15
140:3 163:7,16
170:8 180:21
185:5 186:9
**factors** 61:1
**facts** 35:14 84:4
161:8 166:4
192:5
**failed** 140:2
**fair** 34:12 110:1
126:21 140:5
162:2
**fairly** 151:19
**fall** 48:18
**false** 144:8
**familiar** 13:2
16:9 85:10 87:3
169:9
**families** 106:10
**family** 99:15,16
99:17,19 102:4
104:9 107:19
107:20
**far** 14:5 36:15
142:17
**favor** 54:12
57:13
**fear** 108:4
**Federal** 2:13
18:2
**feel** 123:21
**feels** 144:13
**FEMA** 79:19
**field** 16:8 51:14
52:12 69:7
117:15 130:6,9
132:1,11
135:21,22
155:20 156:8
167:16 171:1
**figure** 63:18

74:22 157:8
**figures** 157:15
**file** 55:4
**filed** 35:2 57:21
**filing** 56:5,10,19
**final** 51:22 55:17
64:13
**finalizing** 174:6
**find** 37:1 82:6
**fine** 14:4 65:15
79:13 117:3
**finish** 15:2
**first** 9:17 10:2
18:10,17 19:7
19:16 62:8
68:15 78:18
79:22 86:2,7,20
90:18 94:19
100:3 104:12
111:2,3 114:18
126:7 128:18
135:7 140:13
143:13 150:17
167:20 169:2
169:21 174:1
177:6 181:16
183:1 187:18
**five** 19:17 38:14
59:3 166:13
168:16 169:6
**fixed** 80:10
**Flanagan** 99:7
**flip** 15:8
**flooding** 67:5,6
**Flores** 51:14
52:11 61:2
135:20 145:6,8
145:16 161:3
162:14
**Flores's** 51:19
52:16 53:5
162:22
**flow** 100:10
**flying** 171:4
**FMUA** 
107:17

**FMUAs** 99:11,15
99:16 100:10
101:22
**focus** 62:6 68:12
77:5 78:16
82:19,21 90:15
91:2,12 94:18
99:4 110:15,17
110:21 119:16
125:14 128:11
135:6 136:6
143:13 145:7
173:12
**focused** 22:5
66:21 69:8
70:16 100:3
111:2 126:7
139:7
**folks** 69:1 83:3
150:16 171:8
**follow** 23:9 27:16
28:4 29:11 30:4
32:16 33:5
150:22 171:11
177:12 182:22
**following** 23:3
**follows** 9:19
50:18 113:15
**footer** 120:5
141:9
**force** 54:17
**foregoing** 190:4
**form** 12:2 54:6
**formal** 133:1,11
**formally** 133:7
**format** 13:8 36:8
**former** 80:19
**forms** 38:19
**forth** 191:7
**forward** 74:21
79:12 80:3
81:14 84:7,16
121:8 125:11
**found** 36:13,18
37:4 62:10
165:4

**foundation**
147:14 148:4
152:9 156:3
162:20 168:19
187:6 188:10
**four** 42:17 43:8
128:13 181:21
**fourth** 91:13
136:9
**Fox** 4:10 8:15
**fraction** 157:19
160:8
**frame** 116:15
**Franklin** 3:12
**frequently** 80:21
**Friday** 42:21
**friend** 45:5
**front** 17:21 61:20
62:3 66:11 68:3
68:9,16 70:13
78:4,13 86:10
90:12 94:9
98:16,20 105:3
105:11 110:6
119:8,20 125:9
131:10 134:20
136:15,16
144:21 146:3
151:6 159:22
166:21 173:1
**fulfill** 183:21
184:19 186:3
**full** 10:1 54:17
69:13,17 106:5
136:8,9 171:5
**fully** 16:20 74:13
142:22
**furniture** 92:13
92:21 93:13
**further** 57:9 75:9
111:7 112:11
184:5 186:20
189:2 191:13
**furtherance** 58:6
**future** 96:3
**FY** 69:17



**FYI** 132:21

---

**G**

**G** 8:2
**GBTRA** 107:9
**gears** 117:12
**general** 3:17
  14:10 28:18
  120:2 130:5,22
  132:3 138:2
  140:16 152:5
  152:12 170:22
  175:4 179:10
**generally** 21:10
  22:15 36:4 42:2
  71:22 96:11
  97:12 102:14
  129:19,21
  130:6 131:4
  132:7 140:13
  171:6 172:5,9
**generated** 124:4
**generating**
  124:10
**getting** 52:20
  123:22 127:21
  150:9 174:2
**Gil** 76:8
**give** 13:8 31:9
  85:8 119:3,4
  120:19 121:22
**given** 13:6 19:3
  21:11 22:18
  55:20 75:5
  77:10 120:13
  123:4 124:13
  132:17,17
  133:6,10 162:3
  163:22 191:9
**giving** 162:10
**Glabe** 1:13 2:9
  5:3 8:7 9:16
  10:3 17:21
  20:13 21:16
  23:3,11 30:2,4
  37:7 45:14 47:8

50:14 52:6
59:11 60:13
70:9 72:14
75:11 86:10
118:3 121:5
122:9,22 127:5
127:15 159:15
162:12 176:2
179:7 182:19
183:11 187:14
188:22 189:4
190:3,11,17
192:3
**Gloria** 78:17
90:16 99:5
**go** 12:22 14:22
15:3 46:21 50:3
50:6 52:6 59:2
66:8 67:18
84:13 87:6
91:19 98:3
117:4,18 121:8
122:13 130:5
137:13 143:2,9
147:7 148:5
159:15 168:8
171:19,21
174:12,13
182:6,10 183:4
189:5,11
**goals** 55:16
**goes** 78:10
106:12,16,17
125:11
**going** 12:22
22:12,22 23:9
25:7 27:13,16
28:1,4 29:7,11
30:1,4 32:13,16
33:2,5 38:8
45:2,22 46:18
47:2 48:20
49:10 50:8 52:1
58:19 59:5,17
74:20 76:13
102:17 116:21

117:6 127:12
149:9 166:14
170:22 175:18
176:11 177:12
182:13,21
189:17
**good** 8:20 9:22
13:10 15:19
28:11 94:21
95:15 97:14
99:5
**Google** 38:7
**Googled** 38:5
**government**
59:17
**governmental**
11:11
**grammatically**
142:17
**granular** 167:16
**granularity**
73:16
**great** 67:7 182:11
189:16
**Great-West**
54:18
**green-light** 12:18
**ground** 13:1
73:13,17 171:8
186:10 187:3
**Group** 56:8
**groups** 138:18
139:4 163:10
**guardian** 107:15
107:21
**guardians** 99:22
**guess** 17:8 109:5
115:3 177:19
**guidance** 117:15
118:9,21 129:1
130:3,5 131:3
131:18,22
132:4,10 133:1
133:6,7,10,13
133:17,19
134:2 137:1

**G-l-a-b-e** 10:3

---

**H**

**Haiti** 5:14 65:20
66:15 67:3,13
**Haitian** 62:15
63:21 64:8,14
65:2 69:12 71:2
71:8,12
**Haitians** 184:3
**halfway** 20:11
**hand** 191:18
**handle** 48:11
51:1
**happen** 13:5
43:11
**happened** 39:11
39:14
**happy** 45:7 54:4
58:11,22 65:22
79:12 166:6
**Harmonson** 1:21
2:15 8:17 191:3
191:21
**head** 13:11,11
80:10 89:1
**header** 79:19
90:17 91:7,8
126:3
**headquarters**
73:10,15 80:20
81:8 82:4 83:21
83:22 111:19
111:22 116:2
124:5,11,22
125:1 130:7,22
132:9 140:2,11
140:17,19,21
142:1 144:12
169:17 170:17
170:21 171:1
176:17,20
181:1 186:22
188:17
**hear** 33:21
117:20

**heavy** 67:6
**help** 41:4 106:9
119:1
**helpful** 50:5
**hereinbefore**
191:7
**hereto** 2:15 17:19
61:18 66:7 68:1
78:7 86:14 89:9
90:7 94:13
98:14 105:7
110:10 119:12
125:19 131:15
135:2 141:6
145:3 146:6
167:8 173:5
**hereunto** 191:17
**hesitant** 133:21
152:11
**hesitate** 15:11
177:19
**he'll** 45:7
**highlight** 24:16
83:13 116:1
153:2
**Hoffman** 62:7,12
**hold** 94:3 96:2
98:1 103:7,16
104:18 106:9
108:12 111:7
111:12 112:2
112:11,22
113:4 114:3,8
115:12 163:9
183:16 184:3
185:17 186:2
**holding** 146:22
172:12,13
**Homeland** 1:15
2:10 3:17 4:3
10:8,10,18 18:4
20:6 76:3
107:11 113:1
114:4
**honestly** 35:19
40:3 136:16



hope 139:21,22
hour 14:20,22
  44:11 46:17
  116:22
hours 22:5,7
  24:11 41:20
  42:14,16 43:6,8
  97:21 103:4,12
  142:14
house 12:11,12
  136:14
huh-uh 13:12
hundred 156:5
  164:15 165:3
hurricane 5:14
  65:19 66:15
  67:3,4,12
Huston 26:16
  27:3 30:17
  31:17 32:5,9,21
  33:10 39:3,14
  39:17 40:7 46:7
Huston's 26:17
  30:22
hypothesize
  160:3
hypothetical
  160:11,16
  161:2
H-u-s-t-o-n
  26:19

**I**

Ian 119:18 120:6
  121:16
ICE 69:13 91:9
  91:21 92:12
  107:14 181:1
  184:14,18
  185:6,14 186:2
  186:10
idea 51:15 52:12
  177:6,15
ideas 177:20
identification
  17:18 61:18

66:6 67:22 78:6
86:13 89:8 90:6
94:12 98:14
105:6 110:9
119:11 125:18
131:14 135:1
141:5 145:2
146:5 167:7
173:4
identify 8:18
illegal 138:10
  139:17
illegally 137:10
  138:3,12,22
illustration 157:9
imagine 29:7
  157:20
immediately
  92:12
immigration
  3:11 9:4 10:16
  24:3 108:15
impact 5:13
  66:15 124:7
implementation
  55:9 106:12,16
  106:17
implication
  149:14,21
important 13:7
  14:1 185:5
importantly
  13:17
impose 49:22
impossible 13:7
impressions
  123:14 177:20
improve 13:19
  40:18
improved 142:15
inability 186:4
inaccurate
  184:20
inadmissible
  36:14 37:15,17
  37:18,20 165:5

inadmissibles
  150:5,9 159:8
  159:17 160:4
INAMI 106:8
  108:8,8,15
incentive 55:21
inclined 174:19
include 26:9
included 40:6
  60:22
including 46:4
  51:9 138:16
  154:14
incorporated
  107:8
incorporates
  51:21
incorporation
  52:2 107:8
incorrect 149:18
increase 106:6
increased 48:10
  50:21 51:15
  52:13 53:6
increasing 47:11
  47:17
indented 91:8
independent
  35:13 46:5
  118:17
INDEX 5:1,8 6:1
  7:1
indicate 88:11
  102:3 104:20
  115:20
indicated 87:22
  136:3 150:2
  159:16
indicates 88:4
  92:13 93:10
  98:6 101:18
  104:3 111:16
  121:17 162:22
indicating 104:16
indicative 163:14
  163:15

individuals
  120:14,19
  121:18,22
  123:5 124:14
  147:22 156:11
  156:19 159:10
  164:15 165:16
influx 157:13
inform 169:19
informal 133:1
  133:11
informally 133:7
information 38:4
  57:8,11,18 75:2
  115:15 144:16
  161:3 165:6
  166:7 179:15
  180:9,12,18
  181:4,16,19,21
  186:13 188:16
informational
  132:16,21
informed 34:10
infrastructure
  67:7 80:4 81:15
  82:9
initial 19:12
  56:21
initiating 69:11
  71:1
INM 163:8
inputs 170:4
insofar 93:17
inspect 53:7
inspecting 72:8
  72:21
inspection
  172:14
Inspector 3:17
instance 174:2
  181:17
instances 84:22
instruct 22:12,22
  25:7 27:13 28:1
  29:8 30:2 32:13
  33:3 48:21 49:1

102:18 121:7
123:11 126:22
177:9
instructed 23:7
instructing 29:21
instruction 23:4
  23:9 30:5 32:17
  33:6 177:13
instructions
  120:13,18
  121:18,21
  123:4 124:14
  124:17
instructs 14:13
Insurance 54:19
  54:20
intake 164:16
  167:22 168:4
  168:12,15
  169:6
integrity 164:8
intended 163:18
intent 163:13
  164:5
interchangeably
  129:18
interest 124:11
  130:16 132:17
  132:17
interested 191:15
internal 83:14
  104:2 112:20
  114:1 115:11
  124:18 132:7
internally 143:5
International
  31:6,14 120:8
Internet 35:17
  36:5 38:4
interpretation
  55:15
interrogatories
  33:18
interrupt 137:14
Interruption
  69:19



**introduced**
  101:13 109:12
**investigate** 71:7
  81:12 102:6,14
  122:6 123:3
**investigations**
  21:9
**involved** 24:13
  61:3 111:22
  112:9 173:20
  174:5 179:1
  180:9,16
**involvement**
  176:17,20
**in-custody**
  157:11
**issue** 49:14 55:2
  57:6 60:16
  102:14 123:19
  176:4 179:17
  188:19
**issued** 34:14
  54:22 55:5
  117:14 118:9
  131:22 132:11
  134:14 137:1,2
  139:20 140:22
  151:10,16
  152:6,7,13,20
  175:10
**issues** 15:16
  60:12 70:9
  123:11 124:1
  129:3 130:14
  130:17,21
  131:3 134:13
  138:14,18
  139:1 175:13
  188:14
**items** 46:11

_____ **J** _____
**J** 3:14
**January** 15:22
**Jeh** 76:4 101:19
  113:1 114:4

**JILLIAN** 3:19
**jillian.clouse@...**
  3:20
**job** 1:22 10:9
**John** 1:21 2:15
  8:17 105:16
  191:3,21
**Johnson** 76:4,11
  82:5 101:20
  102:3,7 104:4
  108:20 113:1
  114:4 115:21
**joint** 69:14
**Jr** 4:3
**judge** 14:11
  34:14 49:5,7,18
  54:10,16 55:6
  56:2,22 58:3,14
  60:5,15
**judge's** 49:17
  55:16,22 56:3
  56:11,20
**judicial** 57:15
  58:15,17
**July** 1:18 2:5
  8:11 16:1
  191:18 192:2
**jump** 117:22
**jumped** 169:10
**June** 18:13,14,16
  19:9 21:20 27:2
  27:2,5 28:10,10
  28:12 29:16
  30:8,10 31:18
  31:22 32:6,9,20
  38:17 39:2,7,21
  42:3,8,20 43:11
  43:11,19 44:7
  149:5 173:14
**Justice** 3:11 9:4,7
  28:20 40:21
**J4** 110:17
**J9** 183:7

_____ **K** _____
**K** 3:4

**Katherine** 3:14
  9:2,9 182:20
**katherine.j.shi...**
  3:15
**Katie** 22:15
  48:21 65:12
  117:22 174:13
**keep** 46:18
**Kerlikowske**
  76:8 108:19
**Kevin** 4:9 6:20
  15:7,11 17:16
  20:8 53:20
  61:15 63:3 66:4
  66:9,19 67:20
  68:13 70:10,17
  78:1 86:1,2
  87:8 89:7 90:1
  94:6 98:11
  100:17 101:4
  101:21 105:1
  105:15 110:3
  119:5 125:5,15
  125:22 130:10
  131:8 134:17
  141:3,11
  144:19 145:6
  145:22 149:7
  151:2 161:3
  162:15 167:1
  167:19 168:9
  168:20 169:1
  172:20 183:1
  187:11
**key** 185:6,9
**kind** 130:13
**King** 4:3
**Kirstjen** 149:6
**know** 15:17
  18:11,12,13
  20:17 21:4
  25:19 31:1,2,12
  36:15 44:10,16
  44:22 48:5 62:9
  62:13 64:13,21
  71:11 74:4,20

  75:3 77:15,18
  83:9,13 84:21
  85:1,18 100:15
  100:15,20
  106:12,15
  109:14,21
  112:9 117:22
  123:20 124:2,6
  124:9,16
  126:13 127:10
  127:18,20
  132:22 133:5
  134:1 140:7,9
  140:15 141:19
  142:3,4 143:4
  143:22 150:10
  150:10 151:15
  151:22 152:18
  153:14 154:17
  157:22 160:12
  160:21 161:21
  162:9 163:21
  164:3,8 165:16
  166:1 171:14
  172:2 174:16
  176:14,16
  177:1 180:3,8
  188:16
**knowing** 129:20
  144:11 154:11
**knowledge** 34:4
  72:13 74:20
  76:10,11 85:17
  95:21 104:7
  122:4 131:2
  140:20 154:12
**known** 12:17
  80:20,20 107:9
  115:7
**knows** 44:20
  126:20 142:21

_____ **L** _____
**L** 1:21 2:15 191:3
  191:21
**lack** 187:5

**Lacks** 188:10
**Lado** 1:5 8:8 34:6
  192:2
**land** 73:5,19
  74:11,15,22
  75:12
**landslides** 67:6
**large** 138:17
  139:3,4
**largely** 131:5
**lasted** 44:4
**law** 11:16 12:18
  56:17 57:20
  108:15
**lawsuit** 44:14
**lawyer** 11:13
**lawyers** 179:5
**lead** 173:8 183:3
**leaders** 120:12
**leadership** 83:21
  83:22 111:5,16
  116:19 141:1
  171:8
**leading** 62:1 68:7
  78:11 90:10
  94:16 110:13
  119:15 125:12
  135:5 146:9
  167:5 184:10
  184:22 185:18
  188:9
**leads** 31:14 69:6
  73:17
**learn** 132:19
**learned** 25:1
**leeway** 75:5
**legal** 8:16,17 15:7
  17:1 99:22
  107:15,21
**legible** 15:8,12
**legislation** 107:9
**legitimate** 138:14
**Leon** 56:8
**letter** 108:13
**letterhead** 132:4
**let's** 50:6 53:18



82:18 87:6
101:10 104:22
131:7 141:2
144:18 152:3
153:6 166:12
**level** 73:15 82:4
115:21 136:16
167:17 169:18
**Lexis** 54:21
**Liaison** 183:7
**Life** 54:18
**limitations** 14:2
**limited** 72:13
163:11
**line** 20:12 65:16
67:17 69:1
79:14 83:6,11
99:10 105:19
106:9 120:1
135:12 149:14
159:13 163:11
175:16
**lines** 61:5 128:13
**listed** 20:20
35:21 148:7
156:22 158:19
158:20 169:10
**listing** 147:18
**lists** 20:16 153:10
168:15 172:1
**literally** 96:13
171:10
**litigant** 55:20
**litigation** 3:11
9:4 12:16 24:3
34:7 134:6
**little** 15:12 20:11
51:11 72:5 74:8
116:22 139:7
144:13 178:11
**live** 91:19
**LLC** 12:14
**LLP** 3:4 8:21
**Ln** 192:7
**locate** 101:1
**located** 62:11

71:13
**locations** 85:19
**Logistics** 110:18
**long** 10:21 19:9
19:14 28:7,12
30:10 31:8
39:16 42:12
43:5 44:4 85:7
**longer** 43:13,15
44:10
**look** 15:9 50:3
60:10 92:11
118:14 130:17
142:9 153:8
155:18,20
157:4 163:7
166:6,12 170:1
**looked** 19:11
35:17 36:3 38:3
38:6 112:14
113:16 114:21
145:13 148:20
183:19
**looking** 36:7 83:5
83:19 118:18
118:22 136:7
143:6 151:8
169:17,21
170:18
**losing** 55:20
**lot** 75:5 89:22
124:6,6,9,10
**LOUISA** 3:15
**lower** 170:6
**Luis** 77:12
**Luther** 4:3

───────
**M**
**M** 3:6
**magistrate** 49:4
49:7,17 54:10
54:16 55:6,16
55:21 56:1,3,11
56:20,22 58:3
58:14 60:5
**Magna** 8:15,17

15:7
**main** 152:22
153:1
**making** 61:3
149:21 161:18
**managed** 73:14
188:19
**management**
129:3,8,10,13
129:17 130:3
149:8 173:17
177:7,16 178:3
178:5,10,15,16
179:2 180:5,11
181:6
**manages** 73:17
**map** 87:15
**Mario** 135:8
**mark** 66:12 78:5
86:11 94:10
131:12 141:3
144:22 146:4
167:6 173:2,10
**marked** 7:16
17:18,22 61:17
61:21 66:6
67:22 68:4
70:15 78:6
86:13 89:8 90:6
94:12 98:13,17
98:22 105:4,6
110:7,9 119:9
119:11 125:17
125:18 131:14
134:21 135:1
141:5 145:2
146:5 151:5
167:7 173:4
183:2,12 187:9
**marking** 90:5
**markings** 24:20
**marriage** 191:15
**Martin** 4:3
**materials** 179:20
**math** 158:3,12
**matter** 8:8 12:10

14:10 56:12
84:9,19 114:17
116:10 132:3
152:12 180:17
191:16
**matters** 55:18
56:3 83:16
174:3
**Matthew** 5:14
65:19 66:15
67:3,12
**Mayer** 3:4 8:14
8:21
**McAleenan** 6:20
8:8 63:3 68:13
100:18 101:4
101:21 104:7
105:15 106:3
108:19 125:15
125:22 127:8
141:12 145:6
145:13,17
149:7 151:7
161:4 162:15
164:7 173:16
181:3,10,14,18
**McAleenan's**
70:17 77:6
126:8 143:14
148:19
**MCAT** 153:6
159:13,21
169:11 170:19
171:20
**mean** 17:9 20:2
22:17 38:18
47:13 48:22
71:21 81:21
84:21 96:14
106:22 129:12
134:4 137:14
138:13 149:14
154:1 172:4
185:22
**meaning** 37:3
41:5 96:13

**means** 96:7
105:22 129:8
129:20 171:14
**meant** 77:18
127:18 169:13
**media** 140:16
142:20
**Medlock** 3:6 5:4
8:20,21 9:21
17:16,20 20:8
20:10 22:14
23:2 25:9,14
27:9,15 28:3
29:10,21 30:3
32:15 33:4
36:21 38:1
45:20 46:21
47:7 48:20 49:4
49:15 50:2,6,14
51:3 52:5 53:3
53:17,20,22
54:8 58:13 59:2
59:11 60:7
61:15,19 63:9
63:16 64:2,20
65:5,12,17 66:4
66:8,10,18,20
67:20 68:2 70:7
70:10,12 71:18
72:4,17 74:7
75:3,10 77:4
78:1,3,8 81:5
82:17 84:14
85:15,22 86:6,9
86:15 87:8,10
88:12 89:3,6,10
89:21 90:2,8
92:10 93:6,21
94:6,8,14 95:2
95:5,6 96:16
97:4,20 98:11
98:15 100:21
101:9 102:12
103:3 104:22
105:2,8 108:1
110:3,5,11



111:20 112:7
113:11 116:21
117:4,11,19
118:6,7 119:5,7
119:13 121:11
122:5,13,21
124:20 125:5,8
125:20 126:18
127:4 128:10
130:10 131:7,9
131:16 134:8
134:17,19
135:3 137:12
139:5,18 141:2
141:7 142:2,8
143:12 144:6
144:18,20
145:4,22 146:2
146:7 147:8,17
148:6 149:4
151:2,4,14
152:2,16 153:5
153:17 154:19
155:6,17 156:9
158:1,10 159:5
160:10 161:12
161:19 162:3
162:11 163:20
164:13 165:15
165:22 166:9
166:19 167:1,3
167:9,19 168:2
168:7,10,20
171:9,13,18
172:18,20,22
173:6 174:20
175:7,14 176:1
176:22 177:5
177:11 178:8
179:12 182:4
183:11 184:10
185:11 187:5
187:13 188:3,9
189:2,14
**meet** 38:16,18,18
41:9 42:4,19

**meeting** 41:15
42:12 43:2,5
46:6 62:14
63:11,20 64:6
64:16,22 65:8
80:2,8,9 100:9
100:16,17
101:4 109:13
109:21 120:11
**meetings** 33:10
43:10,11 44:4
**meet-and-confer**
57:4
**member** 107:19
**members** 99:17
**memo** 174:7
176:17 177:21
177:22 178:4
179:10 181:9
181:11,13,19
**memoranda**
179:17
**memorandum**
6:15 117:14
118:9,12
131:17 132:12
134:9 149:6
173:8,13,15,21
174:1,9,22
175:10 176:6
179:3,13 180:5
180:11 181:6,7
**memorized** 79:11
**memos** 180:18
**mental** 123:14
**mention** 178:14
**mentioned** 45:6
46:11 170:7
**mentioning**
141:16
**met** 38:11 42:7
43:18,22
**meter** 100:9
102:4 106:7
**metering** 47:10
47:17 48:12

51:2,10,18
52:15 53:1,4,16
99:11 101:21
102:8 103:8,17
104:9 105:20
108:21 115:19
117:14 118:9
118:20 129:11
129:13,17
131:18,22
132:10 133:12
133:17 134:2
137:1
**Mexican** 108:15
**Mexico** 31:5
73:19 75:12
184:2
**Michael** 26:16
30:22
**middle** 100:11
**mid-bridge** 106:8
**mid-November**
92:20 96:22
97:10
**migrant** 120:2,20
123:6
**migrants** 137:3
**Migration** 7:5
98:4 104:15
146:10,14
**mind** 121:14
185:5
**minor** 107:16,18
**minors** 99:21
**minute** 119:3
121:10
**minutes** 19:17
28:14 30:13
39:18 59:3
166:13
**mischaracterize**
161:22
**Mischaracteriz...**
161:9
**mischaracteriz...**
161:20

**missions** 124:9
**misspelled** 140:4
**misspelling**
140:6
**moment** 49:20
50:2 94:22
117:13 122:10
175:12,16
**Monday** 27:2
42:4
**monthly** 36:3
37:10
**morning** 8:20
9:22 115:7
149:19 150:3
150:15,19
151:22 157:12
157:17 164:21
**motion** 54:10,11
55:7 57:7,21
**motions** 35:1,2,3
**move** 60:18
79:12 81:14
82:18 84:7,16
101:10 146:18
149:9 168:21
171:9 185:11
187:8
**moved** 141:9
**moving** 80:3
**multipage** 18:1
66:13 78:9 90:9
94:15 98:18
110:12 119:14
125:10 135:4
146:8
**multipart** 114:14
114:16
**multiple** 47:12
**mutual** 45:5

— **N** —

**N** 3:1 8:2
**NAC** 80:2,14,22
81:2 100:9
101:5

**name** 10:1,2,3
26:18 75:16
140:3 142:11
164:7
**named** 8:22
12:13,19 34:6
79:2
**Napolitano** 4:5
19:1,3 28:17
29:5 30:17 39:8
39:14 42:9 43:4
44:2,5
**national** 62:14
63:11,20 64:7
64:16 65:1
136:16
**nationalities** 72:2
168:12,16
169:6
**natural** 67:8
**nature** 137:17
**Nazarov** 3:14 9:6
9:6 42:11
**near** 48:1 85:12
176:21
**near-term** 77:10
**Nebraska** 80:14
80:21 81:3,7
**necessarily** 53:12
74:19 83:20
84:20 109:9
149:22 150:1
163:16 169:8
**necessary** 60:15
**need** 13:13 14:21
17:12 50:2
162:7 166:10
**Nevada** 54:22
56:9
**nevertheless**
54:13
**new** 6:3 12:17
83:5 89:11
114:21 184:2
186:13
**news** 44:13



Nielsen 51:17
52:15 61:3
149:6 173:15
175:9 179:14
179:14 181:6
181:11,14
Nielsen's 180:15
Ninth 34:14
Noah 4:10 8:15
nods 13:11
Nogales 83:6,10
110:21 111:3,6
111:11 112:1
112:10 113:4
114:7 116:5
noncitizens 37:4
72:9,22 139:10
158:4 160:12
nonresponsive
171:10 185:12
non-attorney
26:14
non-dispositive
55:6 56:12
non-Mexican
106:7
non-UAC 106:7
normal 72:1
normally 74:5
Notary 2:16
191:3
note 9:10 67:15
74:17 90:4
125:16 186:20
189:5
noted 169:4
184:4 185:22
notes 24:17,22
30:7 32:4
notice 5:10 18:2
18:22 19:3,8,10
19:15 20:15
111:7 112:11
140:3 184:6
noticed 142:13
notification

101:15 111:18
notified 186:16
187:1
notify 96:2
163:11,13,18
164:5
noting 87:17
176:9
November 5:21
47:16 55:1
83:12 86:17
87:2,18 88:17
89:17 90:10,16
92:14,17 93:8
93:12 94:16,20
95:14 97:8,15
98:5,19 99:7
100:16 101:3
101:19 104:5
104:16 105:15
108:22 110:13
112:18,19,22
113:3,21,22
114:3,6,20,22
115:7,14,16
116:14,15,20
183:16 186:8
number 1:6 8:6
21:12,14 23:16
37:2 62:2 68:7
73:4 78:12
86:19 90:10
94:16 99:1
105:10 109:1,2
110:14 119:15
119:17 125:12
131:11 135:5
138:22 146:9
146:20 153:9
155:19 156:11
158:20 159:9
167:5 173:9
183:3
numbers 36:4,6
36:16 37:11,19
139:4 153:3

157:1 158:22
160:17 169:19
170:21 171:4
172:8
numerous 79:9
NW 3:4

_____

**O**

O 8:2
oath 2:18 9:18
12:2 16:13,16
Obama's 104:4
116:18
object 14:10 52:2
54:5 55:21 58:9
63:5,13,22
64:18 65:3,10
65:16 72:11
74:16 76:13
77:16 82:11,12
84:11,12 85:13
88:8,20 89:18
92:7 94:4 96:8
97:1 98:2
100:19 101:6
102:9,15
103:19,20
107:2 111:13
112:3 113:6,7
121:1 122:2,8
134:15 137:5,6
139:12 141:18
142:6 143:8
144:2,9 147:6
147:13 148:3
148:22 151:11
151:18 152:8
152:21 153:15
154:4 155:3,14
156:2,14 158:7
158:17 159:11
162:19 164:2
164:18 167:14
168:18 171:16
172:15 174:10
175:1,11 177:8

179:6 181:8
objected 49:8
objection 14:15
22:11,15 25:6
27:8,11,21 29:6
29:18,19 32:10
32:11,22 36:20
37:6 48:14
51:20 52:17
53:9 54:14
55:18 56:6 58:3
61:7 65:13
67:16 73:21
75:6 80:16 93:1
93:14 97:11
114:10 126:15
127:13 134:3
137:20 154:4
159:12 161:7
161:13,18,19
162:8 165:19
166:3 174:15
176:12 177:3
184:10,22
185:18 187:5
188:9
objections 14:11
55:5,7 56:10,19
75:4 114:11
162:4,10
objective 85:3
obligations 50:1
obviously 134:4
occasion 11:21
12:21
occasions 47:12
47:14
occur 41:3
occurred 40:9
43:14 65:8 71:8
76:17,19 89:16
101:5 112:15
113:17 116:12
116:13
October 47:15
65:19 67:3,12

68:5,6,6,13
70:17 76:3,7,21
78:10,11,17
81:7,13,20 82:9
82:22 83:11
89:14
offer 60:19 61:9
office 3:11,17 9:4
10:13 16:8 24:3
28:17 31:5,6,14
31:15 51:14
52:12 69:7
120:7 135:22
155:20 156:8
178:22 179:10
180:15 181:2
officer 124:7
officers 73:13
143:17 187:21
official 126:3
officials 94:1
140:19 142:18
officiated 2:17
OFO 16:9 33:12
37:18 52:12
71:11 72:7,20
73:3,16 91:21
95:19 101:15
102:8 117:16
130:8 147:3
158:19
Oh 137:15
okay 12:1,20
15:3,4,13,20
16:4 17:15 18:7
19:7 25:11 38:2
38:8 39:16
40:10 44:13
46:15,21 50:6
53:11,18 59:2
61:15 67:2
68:12 69:8
70:21 74:8
75:22 78:16,21
79:6,13,18
80:14 81:6,11



82:18 83:3
85:10,21 86:8
87:6,21 88:4,13
90:15 91:1,12
91:17 92:11,17
95:22 97:21
98:11 99:4,10
100:1 101:10
103:4 104:22
105:14,19
106:2,22
109:19 110:3
110:21 111:2
111:10 116:21
119:2 120:10
124:21 125:3
126:13,21
128:11,22
129:6 130:10
131:7,21
135:12,19
136:6,12
137:13 139:6
142:14 143:13
143:22 145:11
145:16 146:14
146:18 147:21
149:2 152:3
153:6,18
154:20 155:11
155:18 156:10
158:2 159:6
160:22 166:1
167:19 168:6
171:19 172:11
172:19 175:15
182:4 183:18
184:16 187:8
187:16 188:6
189:16
**once** 14:20,21
138:18 162:7
**one-page** 131:11
141:10 173:7
**ongoing** 12:16
**only/pre-decisi...**

126:3
**onward** 185:7
**on-site** 169:7,14
171:14
**open** 92:19 93:11
**opened** 92:6
**opening** 91:18
93:17 96:21
97:9,19 98:7
103:6,15
104:17 186:8
**open-ended**
22:19
**operates** 55:18
**operation** 56:13
**operational** 51:9
83:16 88:2,7
171:7 178:5,15
178:17 188:18
188:19
**operations** 6:21
16:9 69:7
117:15 124:8
130:9 135:21
142:19 184:14
184:18
**opinion** 54:17,22
188:7
**opportunity** 55:4
56:16 189:7
**opposed** 80:8
172:6 187:3
**ops** 77:11
**option** 47:10 48:9
48:9 50:20,21
77:10 184:3
**options** 51:6,9
53:14
**oral** 180:4
**order** 29:16
33:16,19 34:2,7
34:15,19 35:4,7
35:11,15 36:4
40:22 49:6,17
49:19 55:5,9,19
56:3,11,21

104:2 189:15
**orders** 34:13
**order's** 56:13
**originated**
177:22
**Otro** 1:5 8:8 34:6
192:2
**outcome** 191:16
**outline** 46:16
60:22
**outside** 17:12
127:14
**overall** 24:12
115:6 172:6
176:18
**overbroad**
161:20
**overflow** 100:12
**Owen** 7:18,19
61:17 68:19,22
69:3,3,5 94:20
95:15,17 97:13
98:13,18
105:16 117:14
118:9 130:5
132:1 186:12
**Owen's** 61:21

**P**
**P** 3:1,1 8:2
**PACER** 38:6
**Pacific** 153:13,19
154:1,9
**packages** 180:18
**page** 5:2,9 6:2
7:2,17 15:10
20:9,12,12 62:9
66:9,19 68:15
78:19 82:18,20
86:2,7 90:18,20
91:3,3 94:19
110:16 119:16
125:16 135:7
141:10 146:19
146:19,21
147:10 148:14

150:2,4 153:8
154:21 155:8
155:18 159:17
160:7 164:21
165:6 167:4,21
168:8,8 169:2
170:2,2 171:22
173:13 180:21
183:5,5,9
186:11
**pages** 20:15,20
60:21 141:8
**paper** 179:17
**paragraph** 69:8
70:19,21 77:6
80:1 100:3,5,7
101:11 126:7
128:12 136:8,9
136:12 140:4
142:9 143:14
**paragraphs** 15:8
**parent** 107:15,21
**parents** 99:22
**parse** 128:3
**part** 24:6 55:2,14
62:13 114:18
120:14,20
121:19 122:1
123:6 124:15
141:9
**participants**
30:16
**participated**
42:11
**particular** 21:2,5
35:18 72:2 87:1
87:2 91:2
110:17 152:7
152:18 187:16
**particularly** 21:8
21:11 22:18
83:19 138:17
139:3 170:14
185:7
**particulars**
150:12

**parties** 2:12
12:19 56:21
57:4,16,16 58:4
191:14
**partnership**
69:14
**parts** 37:3
**party** 55:3 57:10
**party's** 57:6,13
**path** 79:11
**Patrick** 99:6
**patrol** 36:11
37:16 75:19
136:4,5 137:3
138:9
**pause** 184:5
186:19
**pedantic** 106:14
106:18
**pending** 14:16
15:1 49:13
54:15 57:14
58:2 60:5
171:11
**people** 129:16
137:16 157:13
157:18 166:2
**percent** 40:9
148:12 149:19
150:15,19,20
155:1 156:6
157:2,21 158:4
158:14 159:3
160:19 165:1
170:3,9,10,12
170:14
**percentage**
148:10
**percentages**
147:3,11
170:13
**period** 15:21
53:2
**peripheral** 172:7
**person** 13:6 29:2
30:20 38:22


MAGNA
LEGAL SERVICES

43:12 57:19 129:20 164:8
**personal** 20:7
**personally** 118:3
**personnel** 81:3 82:1 91:21 96:14 184:5 186:19 188:19
**persons** 143:17 148:8 156:1 158:14 187:22
**person's** 14:3
**perspective** 73:11 170:17
**pertain** 44:6
**pertains** 12:17
**Pete** 51:13 52:11 52:16 135:20 145:6,7,16 161:3 162:14
**Pg** 192:7
**philosophical** 129:16
**phone** 29:2,3 30:20,21 31:17 38:19,21 39:12 39:15,20 40:4 43:12
**photograph** 87:15
**physical** 172:6
**piece** 116:4
**place** 29:1 30:19 111:6 136:18 172:10 174:17
**placed** 184:5 186:18
**plaintiff** 56:17
**plaintiffs** 1:6 3:3 8:22 20:16 34:6 54:12 59:18 61:7 189:3
**Plaintiff's** 18:2
**plan** 51:19 52:16 53:5 80:3
**Planning** 91:19

**plans** 10:13 31:7 31:15 81:14 183:21
**plausible** 160:6
**play** 118:11 181:3
**played** 118:19
**pleadings** 34:18
**please** 8:18 9:14 9:22 13:18 15:17 17:17 20:8 25:13 45:18 46:20 50:15 52:8 53:20 61:16,16 62:9 66:5,9,19 67:21 70:10,11 75:9 78:1 86:1 87:8 89:7 90:1 93:5 94:7 97:3 98:12 105:1 106:11 110:4 119:5 125:6,7 128:14,17,19 129:1 131:8 134:18 141:3 144:19 146:1 151:3 167:22 168:9,20 172:20
**plural** 96:12 107:7
**plurality** 165:9
**plus** 172:14
**POE** 100:10 160:9 163:4
**POEs** 77:12,21 99:12 100:11 100:12 104:10 159:1
**point** 11:17 49:13 99:19 104:8 128:8 130:1 149:17 155:1 156:16 157:14 159:3 163:22

169:21 171:12
**points** 169:16
**policies** 51:8
**Policy** 10:13 31:7 31:15
**port** 6:21 48:11 50:22 51:16 52:14 53:6 73:9 74:11,15 75:12 75:16,17 124:8 129:2 130:18 136:18 138:5,7 138:12,19,21 143:16,19 145:19 147:19 148:8,11 149:16 154:22 156:7,18,20 158:15,19,21 160:13 161:6 162:17 163:1 163:21 164:12 164:16 165:18 171:5 187:21 188:1,8
**portion** 36:12
**portions** 58:7
**ports** 36:12,14,18 36:19 37:5,14 37:16,17 47:11 47:18 48:2 51:7 73:4,5,19 74:4 74:22 101:22 102:5,7 103:8 103:17 104:10 108:21 113:2 114:5 136:17 137:4,10,17,19 138:4,10,13,15 138:22 139:2 139:11,16 147:12 155:22 157:3 158:5 165:4 172:2 185:4 188:14
**port-by-port**

73:11
**posited** 160:3
**position** 31:1 49:11 54:9 56:14,15,18 59:15,17 60:1 104:9 188:7
**positions** 60:8 79:9
**positive** 40:9
**possession** 82:7 101:2
**possibility** 150:14
**possible** 15:18 85:4 109:19 118:13 154:22
**posture** 126:9,14 127:9,19 128:4
**potential** 69:16
**potentially** 21:1 22:19 32:12 33:1 157:13 169:12 174:6
**PowerPoint** 5:19 7:4 86:5
**practiced** 11:16
**precise** 31:2,3
**preference** 138:6
**preferrable** 138:20
**preferred** 55:17 138:11
**prep** 39:11
**preparation** 22:6 24:12 25:18 26:12,15,21 27:20 30:11 40:11,19 41:3,5 43:16 63:17 64:4 71:6 81:12 100:22 102:20 123:15,21
**prepare** 22:9,16 23:12,16 27:10 29:16 33:16,19

34:2,7,15,19 35:4,7,11,15 38:11,16 39:21 40:22 41:10,15 41:21 42:4,21 43:20 45:12 46:4,9
**preparing** 21:18 21:22 22:8 33:12
**present** 4:8 9:11 10:9 28:16,20 30:14 42:1 43:1 95:21 138:6,11 138:21
**presentation** 86:16 88:4 146:8
**presented** 47:10 48:9 50:20 128:9 179:14 180:1
**presenting** 138:4 139:2
**presently** 10:4,11
**preserve** 57:16
**president** 88:18 89:12 103:5,13 104:4 116:18
**presidential** 89:16 92:18 93:9 97:22 112:17 113:20 114:19 116:20
**press** 6:19 134:12 134:13 135:13 135:20 136:7 136:22 137:2 139:19 140:8 140:11,16,17 140:22 141:15 142:5,10 145:12 148:19 152:6,12,18 164:10 165:14
**pretrial** 55:7,18



56:2
**pretty** 127:6
140:1 167:16
175:5
**prevent** 49:22
100:12
**prevented** 61:5
**previous** 109:1,2
150:4 157:7
159:8,18
**previously** 7:16
60:1,3 61:17,21
97:17 98:13
104:14 115:14
167:18
**pre-decision**
127:22
**pre-decisional**
48:16 49:2
52:21 126:16
127:3 177:9
179:20
**primarily** 24:4
180:13
**primary** 36:10
37:13 74:20
**prior** 45:10 90:4
182:3
**prioritization-...**
149:7 173:17
177:7,15 178:2
178:16 179:2
180:5,10 181:5
**privilege** 48:19
57:12 103:2
122:12 123:2
123:11,22
175:13 176:4
**privileged** 51:21
57:9,11
**privileges** 17:13
**probably** 19:17
22:4 24:11
113:11 170:7
**problem** 95:5
119:2

**Procedure** 2:13
18:3
**procedures** 57:2
57:2
**proceeding** 11:8
**proceedings**
191:11
**process** 48:18
53:7 57:4 71:21
71:22 72:1
128:6 176:21
**processed** 120:15
120:21 121:20
123:7 124:16
150:18
**processes** 51:16
52:13 73:3
**processing** 69:12
71:2,8,12,13
72:8,9,21 73:9
73:12 76:12
83:11 84:2,7,17
85:11 87:12
88:1 91:5 92:5
93:11 94:2
96:19 103:7,15
110:22 111:4,6
111:11 112:1
112:10,21
113:4 114:2,8
121:22 129:2
130:18 143:19
185:3,16 188:2
**produced** 34:6
87:5
**producing** 57:13
**product** 22:12
25:7 27:12,22
29:9,19 32:11
33:1 102:16,20
**Professional** 2:16
**promised** 69:13
**pronounced** 79:3
**proof** 60:20 61:9
**proper** 72:9,22
160:12 162:9

165:17
**proportion** 24:12
165:6,8
**proposal** 61:2
101:13,20
102:4 104:6
109:11
**proposed** 58:8
60:5
**Protection** 5:20
7:5 16:5 62:21
63:3 86:18
136:2
**protective** 49:19
**protocol** 49:21
49:22 57:1
**provide** 40:8
54:4 57:3 58:11
59:1 119:1
133:12,18
**provided** 12:1
23:20 24:4 25:5
26:4,10 34:9,11
34:21 60:3 75:2
132:12,20
133:1,18
156:18 161:3
179:16,21
181:16 188:16
**provides** 37:10
57:1 165:10
**providing** 132:15
180:9,17 181:4
**public** 2:16 36:16
37:1 144:8
145:14 165:12
191:3
**publicly** 36:3,5
37:10 57:8,10
144:16
**publish** 36:16
**publishes** 37:1
**pull** 49:20 110:4
125:5,6 151:2
152:3 183:2
**pulled** 92:1

183:19
**purpose** 57:18
159:20
**purposes** 157:9
160:2
**pursuant** 2:12
**push** 106:9
**put** 17:21 61:2,20
66:11 68:3
70:13 78:4
86:10 94:2,9
98:1,16 103:6
103:14 104:18
105:3 110:6
111:11 112:21
113:3 114:3,7
119:8 125:9
131:10 134:20
144:8,16,21
146:3 151:5
166:21 167:1
169:1 173:1
183:16 185:17
186:1
**putting** 112:1,10
115:12
**p.m** 62:8 68:14
70:3,18 78:18
90:17 94:20
99:7 105:16
126:1 135:9
145:8 162:15
163:5 189:19
**P.O** 3:12

_____
**Q**
_____

**question** 13:19
14:7,15 22:18
23:1,5,8,8
25:13 33:6
40:15,18 41:4
44:6 45:1,19
49:9,10 50:16
50:19 51:4,11
51:21 52:2,8
59:19 60:12

71:20 72:16,19
74:8,14 75:8,11
84:10 86:20
93:5 97:3
103:10 113:10
113:16 114:15
118:5 121:14
122:7 123:2,8
123:19 124:2
127:6,7 133:15
138:3 139:6
158:9 161:13
162:12 163:3
171:11 174:18
176:5,7,10
178:12 179:4
**questioning** 17:7
67:17 149:15
159:13
**questions** 13:4,9
13:14,18 14:10
14:13 15:2,10
15:13,21 16:21
17:11 29:5,5
45:10 48:5
58:21 60:21,22
61:4,6 65:16
89:22 136:15
162:6 182:5,8
182:21 187:17
188:4 189:1,2
**queue** 129:3,8,10
129:13,17
130:3 149:8
150:18 173:17
177:7,16 178:2
178:4,9,14,16
179:2 180:5,11
181:5
**quick** 46:17,19
55:17 117:1
166:12
**quickly** 85:4
**quote** 55:14
56:10 62:13
67:2 69:10



70:22 77:7 80:1
91:17 96:1
99:11 100:7
101:11 106:3
111:4 120:11
127:9 128:22
136:12 143:15
145:18
**quote-unquote**
64:14

---
**R**

**R** 3:1 8:2 191:1
**rain** 67:5
**raised** 48:6
171:12
**Randolph** 79:4
**range** 41:20
**Rapidly** 5:12
66:14
**reach** 150:19
157:21
**reached** 31:19
64:14 143:15
149:16 160:18
164:11 165:13
187:20
**read** 44:13 50:15
50:17 62:17
67:9 69:18 71:4
77:13 79:16
80:6,11 83:7
92:2 96:5 99:13
100:13 101:16
106:13,19
111:8 113:12
113:14 120:16
129:4 135:14
136:20 143:20
145:20 184:7
185:22 189:7
190:3,4 192:7
**reads** 55:14
66:22 69:10
80:1 91:17
111:4 128:22

136:12 143:15
192:7
**ready** 91:22
**realize** 143:1
**really** 13:7 14:1,3
73:12,16
123:20,20
**realm** 150:13
**realtime** 162:13
**real-time** 161:2
**reason** 16:19
73:7,8 76:21
81:18 82:2,2,15
98:10 104:3
109:11 115:22
144:4 163:17
164:9 184:16
185:15 186:1,5
186:6 192:4,7
**reasons** 60:2
**recall** 12:7,18
18:22 28:22
34:21 35:12,18
35:22 40:3
42:17 43:8,18
44:15 46:14
81:17 112:5
167:17 183:11
183:15 187:13
188:3
**recalling** 89:1
**receipt** 19:12
**received** 19:7,16
25:20 101:12
180:4
**receiving** 57:6
61:6
**Recess** 47:4
50:11 59:8
69:21 117:8
122:18 166:16
182:14
**recipient** 79:3
**recited** 2:14
**recognize** 77:7
**recollection** 12:6

12:9 18:15,19
24:18 25:2
33:14 34:16
35:5 41:12
42:10 43:3,22
64:12 65:21
66:3,17 67:11
71:10 76:9
86:22 87:7 89:5
89:15 108:18
167:15
**recommend**
128:2
**recommendation**
126:17
**recommendati...**
48:17 51:22
127:2 128:5
**recommending**
126:9 127:9
128:4
**record** 8:6 9:10
10:1 32:4 46:22
47:2,6 50:3,7,9
50:10,13,17
54:1,2 59:3,6,7
59:10 60:9 70:6
71:16 74:17
113:14 117:5,7
117:10,18
122:14,20
125:17 150:1
166:15,18
175:19,22
176:10 182:7
182:10,13,16
189:6,11,17
191:9 192:5
**records** 77:2
115:19
**redacted** 54:4
58:7,8,11 59:1
60:10 61:13
**redaction** 60:14
80:1
**redactions** 60:4

**redacts** 60:11
**refer** 10:17 16:5
16:8 54:18
55:10 56:7
77:15,21 81:3
109:20
**reference** 7:16
26:9 53:2 75:17
75:22 81:1
108:2,7 111:17
115:1 116:5
170:20 172:5
**referenced** 69:9
82:3 100:18
109:8,10,12
115:12 128:7
138:16
**references**
107:10 149:19
**referencing**
83:14
**referred** 114:18
124:18 154:20
159:7
**referring** 24:2
28:9 47:14,20
75:19 85:6 91:7
99:16 109:17
127:11 154:18
159:7
**refers** 62:19
80:14 83:16
108:3 109:13
126:14,20
135:17 153:14
154:9,13 172:3
178:3 184:13
**reflected** 148:14
151:12 164:22
180:21
**reflects** 156:18
181:20,21
**refrain** 57:17
75:9
**refresh** 66:3,16
67:11 89:5,15

108:17
**refreshes** 87:7
**regard** 50:1
**regarding** 17:10
24:22 33:6
35:14 37:22
38:10 82:8
101:3 108:20
120:19 121:22
123:2,5 129:2
130:3 133:12
133:19 180:4
180:10
**regardless** 56:18
**regional** 141:1,1
142:18,22
**Registered** 2:15
**reimbursement**
69:16
**reiterate** 132:2
**relate** 15:21
**related** 35:14
129:22 132:18
138:18 176:4
180:16 191:13
**relates** 37:20
**relating** 15:10
21:8 129:3
131:3
**release** 6:19
140:8 142:5,10
145:12 148:19
164:11 165:14
187:19
**releases** 134:13
140:11 152:6
**relevant** 55:2,14
**relied** 21:10
**relying** 19:19,19
21:10,12
**remains** 57:12
**remembered**
56:1
**remotely** 2:12
8:14
**removability**



37:22
**removable** 36:18
37:5
**Removal** 184:14
184:18
**rental** 92:13
**reopen** 84:1
**repeat** 23:5 25:12
37:8 40:15
45:18 52:8 64:1
72:16 84:10
93:4 97:2
103:10 113:9
133:14 158:8
178:12
**repeating** 121:14
**rephrase** 72:16
97:13
**report** 5:12 66:13
96:1 98:5
104:15 146:11
147:22 148:12
148:13,18
149:10,18
153:2,3,7,10,22
156:18 158:16
158:22 159:22
160:17 167:11
167:12 169:9
169:11 170:4
170:19 171:20
172:1
**reported** 1:21
54:21 55:11
56:8 112:16,20
113:18 114:1
159:18,19
164:22
**reporter** 2:16
8:16 9:13 13:9
50:15,18
113:12,15
**reports** 35:6 36:8
146:15 150:2
154:15 159:14
**represent** 8:19

8:22 9:5,8
**representative**
143:4
**Representatives**
12:11,13
**represents** 158:4
158:14 159:2
**Repudiation**
89:13
**request** 8:14
14:22 189:12
**requested** 20:16
191:12
**requests** 34:2
**required** 57:20
**research** 35:13
46:5
**reserve** 60:17
**resolution** 55:17
57:14,15
**resolved** 57:13
**resources** 48:6
77:8
**respect** 31:21
51:9 74:3
104:12 115:18
122:11 124:12
130:8 138:15
139:1
**respectively**
77:22
**respects** 103:20
**responses** 13:13
34:1
**responsive** 97:16
132:5
**result** 97:17
**resulted** 177:22
**results** 112:17
113:19 114:19
115:3,6
**returned** 155:7
180:20
**reveal** 45:14 49:2
102:16,19
123:13 127:1

**revealing** 123:16
**revelation** 126:16
**reverse** 104:2
**review** 23:11
33:15,18 34:1,5
36:22 41:22
56:16 121:10
134:12 179:11
191:11
**reviewed** 23:16
24:5,15,19 25:3
34:13,17 35:1,6
35:9 41:21
175:9 180:6
**reviewing** 19:9
19:14 24:9,13
25:1,17 34:22
35:18,22 46:5
169:5 174:6,21
176:6
**right** 11:14 13:20
14:7,8 15:15,18
17:3,7 26:20
35:20 47:1
52:19 59:11
62:12 63:4
65:14 66:11
67:20 73:20
75:20,21 76:4,8
77:5 79:4,8
80:12,15 81:9
81:10 86:6
87:11,18 88:2,7
89:21 92:15,22
94:9 95:16,19
96:17,22 97:10
98:1,16 99:2
100:22 101:18
102:1 103:9,18
105:3,22
106:20 110:6
112:12 125:9
125:21 134:9
134:10,17,20
137:4,15,19
139:11 141:2

142:5,15 143:6
143:7,10
144:21 145:14
145:21 147:2
147:10 148:2
154:3 155:2,9
155:21 158:6
158:16 160:14
160:15 164:17
166:20 168:3
168:17 173:1
182:12,19
189:10
**rights** 60:17
**risen** 83:20
**Rodney** 135:22
137:3 139:9
**role** 118:11,20
181:4
**rolling** 115:4
**room** 17:2,6
**rooms** 172:13,14
**RPR** 1:21 191:21
**Rule** 5:10 19:22
21:19,22 22:10
23:12,17 33:12
49:16 56:19
58:3 75:3
**ruled** 49:5 54:11
60:16
**rules** 2:13 13:1
14:11 18:2
49:18 57:22
**ruling** 54:15 60:6
**run** 147:22
148:13,18
150:2 153:10
153:19,20,22
154:1 170:4
**running** 65:13

― S ―
**S** 3:1 8:2
**safe** 130:18
**safety** 124:7
138:19

**salutation** 68:22
69:9 70:17
78:21
**San** 6:21 48:10
50:22 51:14,16
52:11,14 53:6
77:12,21
135:17,21,22
136:1,4 143:16
145:19 147:18
147:21 148:7
148:11 149:16
154:22 155:12
156:12,20
157:13,19
158:3,13,20
160:8,13 161:5
162:17 164:12
164:22 165:9
165:17 170:2
172:11 187:20
188:8
**sanctions** 60:18
**sat** 40:12
**Saturday** 135:9
**Saunders** 119:18
120:6 121:16
**saw** 18:17
**saying** 38:5 58:19
124:13 140:13
159:20 160:2
162:16
**says** 55:2 71:5
75:4 77:14
79:17 80:7 83:8
87:20 88:3 91:8
92:3 96:1,6
100:14 115:15
120:9,17
145:21 163:8
171:4,5 183:7
183:20 187:19
**scheduled** 88:1
**scope** 21:2 63:5
63:13,22 64:1
65:3,10,13



73:22 74:16
76:14 77:16
82:11 84:12
85:13 88:8,20
89:18 92:7 93:1
94:4 96:8 97:1
98:2 100:19
101:6 102:9
103:20 107:2
111:13 112:3
121:1 122:2,8
127:13 134:3
134:15 137:5
137:21 139:12
141:18 142:6
143:8 144:2,9
147:6,13 148:3
148:22 151:11
151:18 152:8
152:21 153:15
154:5 155:3,14
156:2,14 158:7
158:17 159:11
161:10 162:19
164:2,18
165:19 166:4
167:14 168:18
171:16 172:15
174:11,14
175:1,11
176:12 177:3
179:6 181:8
184:11 185:1
185:19
**Scott** 1:13 2:9 5:3
8:7 9:16 10:2
135:22 136:4
137:3,9 139:9
190:3,11,16
192:3
**Scott's** 136:7
**screen** 167:2
**SE** 4:3
**seal** 57:21
**seams** 170:13
**seated** 172:14

**second** 66:9
68:14 82:18
90:19 91:3
101:10 110:16
115:18 119:16
125:16 128:11
135:6 141:10
153:8 154:21
162:1 168:8
169:22 170:18
173:12 183:5
**secondary**
172:14
**secretary** 10:12
10:15 31:13
51:17 52:15
61:2 69:10
70:22 76:1,3,11
82:4 101:19
102:3,7 104:4,5
108:20 112:22
114:4 115:21
128:9 149:6
173:15 175:9
179:13,14,16
179:21 180:3
180:10,14,20
181:2,6,10,13
182:3 186:22
**secretary's** 77:1
140:3 142:11
174:4 179:9
**section** 20:12
66:21,22 67:2
70:16 79:18
91:2,6,15,17
110:17,19,22
155:20 167:21
168:1,4,11
183:6,8,18
**sector** 75:16,18
75:19 136:1
**sectors** 74:4
**secure** 184:1
186:4
**security** 1:15

2:11 3:17 4:3
10:8,10,12,15
10:18 18:4 20:6
62:15 63:12,20
64:8,16 65:1
76:3 107:11
113:1 114:4
129:2 130:19
138:19
**see** 14:17,21 18:5
18:10 20:12
62:3 66:22 68:9
68:16 70:19
78:18,22 79:20
80:10 83:1 87:7
87:13 90:21
91:6,11,14
93:18 95:7,14
99:8 100:5
105:11,17,18
110:19,22
119:20 125:21
126:6,11
128:15,20
136:10 141:13
145:9 146:12
146:22 147:18
150:4 153:11
168:3,13
173:18
**seeing** 87:1
167:18
**seek** 60:18
**seeker** 51:16
52:13
**seekers** 48:1,11
51:1 53:7
**seen** 18:7 64:11
86:21 146:14
167:12
**send** 130:2
166:10
**senior** 93:22
120:12
**sense** 185:14
**sent** 19:5 62:7

68:13 70:18
76:20 78:17
82:21 90:16
99:5 105:15
119:18 125:15
125:22 129:1
135:9 145:8,11
145:14 166:22
**sentence** 79:22
100:18 111:3
128:3,13,15,18
128:22 187:18
188:4
**sentences** 128:16
184:7,8
**separate** 77:2
**September** 61:22
62:7 63:12,19
64:6,15 65:9
**series** 112:14
113:17
**serve** 55:4,8
**served** 57:20
**Services** 8:16,17
**serving** 10:14
**session** 39:11
40:20 41:6 70:2
**sessions** 41:3
43:13,15
**set** 191:7,17
**Setting** 115:8
**shakes** 13:10
**share** 106:1
**SHEET** 192:1
**sheet(s)** 190:13
**shift** 117:12
**Shinners** 3:14
5:5 9:2,3,9,10
21:11 22:11,17
25:6,11 27:8,11
27:21 29:6,18
30:1,18 32:10
32:22 36:20
37:6 39:8,13
42:9 43:4 45:13
48:14,22 49:11

49:19 50:4
51:20 52:17
53:9,22 56:15
58:22 59:4,14
59:16,21,22
61:10,12 63:5
63:13,22 64:18
65:3,10,15
67:15 71:15
72:11 73:21
74:16 76:13
77:16 80:16
82:11 84:11
85:13 88:8,20
89:18 92:7 93:1
93:14 94:4,22
95:3 96:8 97:1
97:11 98:2
100:19 101:6
102:9,15
103:19 107:2
111:13 112:3
113:6 114:10
114:13 117:3
117:17 118:2
121:1,4 122:2,8
122:15 123:10
126:15,21
127:12 134:3
134:15 137:5
137:20 139:12
141:18 142:6
143:8 144:2,9
147:6,13 148:3
148:22 149:2
151:11,18
152:8,21
153:15 154:4
155:3,14 156:2
156:14 158:7
158:17 159:11
161:7,16 162:2
162:19 164:2
164:18 165:19
166:3 167:14
168:18 171:16



172:15 174:10
174:14 175:1
175:11,15
176:9 177:3,8
177:17 179:6
181:8 182:6,9
182:18,20
183:1,10
184:15,22
185:13,18
187:7,10,12
188:12,22
189:4,13
**short** 157:17
165:1 170:9,14
178:21
**shortly** 76:19
**show** 19:4 112:19
113:22 119:2
147:3
**showed** 18:18
64:10 160:13
**showing** 15:5
18:22 66:16
87:16 150:17
154:21 183:12
187:13
**shown** 19:2
152:19 162:13
**shows** 147:11,21
155:21 180:22
**side** 147:2,10
**sign** 189:7
**signature** 179:15
180:16 182:3
191:11 192:18
**signed** 12:15
87:18 180:6,11
181:7
**significant** 24:12
124:4 142:19
157:18 160:7
165:8
**significantly**
175:5 178:20
**signing** 88:5

179:22
**similar** 13:12
31:4 87:4
146:15
**simply** 19:4 25:5
179:4
**single** 105:9
**sir** 9:22 10:4,19
10:21 11:2,14
11:18 12:5
13:15 16:2,6,10
16:13 17:7,14
18:5,8 27:17
28:5 29:12
32:17 33:7,21
62:4,10,17
65:18 66:11,22
67:9 68:3,10,17
70:13,19 78:4
78:14 79:1,20
83:1 86:20
87:11,19 90:13
90:21 91:6,15
94:9 98:16,21
99:8 100:5,13
105:3,12,17
110:6,19 113:5
114:9 117:12
119:8,21 121:9
123:9 125:9,21
126:11 128:15
128:18 129:4
131:10,19
134:20 135:10
141:4,13
144:21 145:9
146:12,16,22
149:5 151:6
153:11 166:20
167:13 168:3,4
171:12 173:1
173:18 176:8
182:5 189:3
**sit** 11:21 21:4
109:22 112:8
151:15 156:10

**sitting** 122:4
124:16 127:19
132:15 142:7
143:3 154:11
160:20
**situation** 77:11
169:20
**slide** 87:9,11
**SLOCUM** 3:15
**small** 163:10
**smedlock@ma...**
3:7
**snapshot** 160:17
**soft** 91:18 93:16
96:21 97:19
98:7 103:6
104:16 186:8
**soft-sided** 80:5
81:16 82:10
**somebody** 138:3
**somewhat** 13:2
**soon** 15:18
**sorry** 23:5 25:12
33:21 40:15
52:10 68:6
72:15 82:20
84:10,11 94:22
95:8,11 96:9
109:3 113:9
118:1 128:16
133:14 136:8
137:13 143:2
143:10 149:1
158:8 161:16
168:22 170:2
171:21 178:11
181:11
**sort** 19:18 20:21
21:15 35:16
51:7 53:11
71:12 73:11,14
74:19 75:14
83:17,18 87:3
103:22 115:11
115:12 116:9
116:12 128:2

130:19 131:4
132:6,16,16,20
140:22 141:15
141:20 150:6,6
153:3 154:14
165:9 169:15
170:6,8,12,15
172:5 174:5
180:17 185:5
186:9,15
188:15
**sound** 13:12
**sounds** 12:20
15:19
**Southern** 1:2
8:10
**Southwest** 73:5
146:22 155:13
155:15,22
157:3 165:8
**space** 48:6
**Spanish** 108:10
108:14
**speak** 26:20 27:4
27:6 30:10 32:8
33:11 109:6
**speaker** 108:10
**speaking** 39:20
75:6 118:3
162:4,10
**specific** 21:13
36:1 41:5 51:12
52:20 53:12
65:21 74:4
85:17 86:22
122:3 142:5
155:12
**specifically** 12:19
22:5 34:10 40:3
42:18 43:9 44:2
44:7 46:14 48:4
57:14 102:11
102:13 104:20
108:14 175:8
178:3 185:20
**specify** 93:18

98:9 154:8
**specifying** 72:12
**speculate** 133:22
152:11 177:19
**speculation**
80:17
**spell** 10:1 26:17
**spelling** 142:10
142:15
**spend** 19:9 39:20
41:15 42:12
**spent** 19:14
21:21 22:8 24:9
42:16
**spoke** 26:12,15
27:1 39:1,2,6
39:17
**spoken** 39:19
**squarely** 188:20
**staff** 92:1 96:18
97:6 101:12
180:15
**stand** 59:17 96:3
96:20 97:7,15
186:16
**standing** 159:12
161:13 189:14
**stand-alone**
180:2
**start** 150:14,18
**started** 45:6
**state** 8:19 10:1
15:20 60:7,9,19
129:2 149:22
**stated** 60:1,2,17
75:4,14 163:8
165:13 180:14
**statement** 6:19
52:7 97:16
135:13,19,20
136:7,22 137:2
139:20 140:16
140:18,22
141:11,15,21
142:22 143:14
144:1,8 149:15



151:7,9,16
152:19 160:16
164:4,6,10
165:11,12
184:17 186:17
187:17
**statements**
134:12 140:18
152:13
**States** 1:1 8:9
88:19 103:14
112:18 113:20
136:18 139:10
**State's** 12:18
**static** 153:3
**stating** 139:14,15
145:18
**Station** 3:12
**status** 111:7
**stay** 55:8,19
56:12
**stayed** 56:5
**stays** 56:20
**step** 14:5
**Stephen** 3:6 8:21
**stipulations** 2:14
**stop** 49:8,16
162:7,10
**stories** 44:13
**Strategy** 10:13
31:7,15
**stream** 177:22
**Street** 3:4,18
**strike** 171:9
181:11 185:11
**strong** 126:9,13
127:9,18 128:4
**struck** 65:19 67:3
67:12
**Stunning** 89:13
**subcomponents**
36:10
**subheading**
187:19
**subject** 2:13 54:9
79:14 99:10

105:19 120:1
135:12 177:20
**subjectively**
129:20
**subjects** 145:18
161:5 162:16
163:1,9,11,14
163:18 164:5
**submitted** 12:8
12:11 35:10
**SUBSCRIBED**
190:15 192:20
**subsection** 91:13
**subsequent**
159:22
**subsequently**
19:20
**substance** 17:11
22:21 29:15
38:9 40:14
45:15 46:1
127:1,21
**substantiate**
166:8
**substantive**
50:16 180:12
181:4,15
**suggest** 169:12
**suggests** 162:5
**summarized**
46:12
**supplemental**
179:17
**support** 69:14
80:4 81:15
**supporting**
165:11
**supports** 160:16
**suppose** 149:13
**supposed** 97:6
**sure** 17:10 22:17
23:6 25:15
37:19 38:15
40:16 44:12
45:7,21 51:11
52:9 54:8 63:15

64:3,19 71:19
72:2,5,18 74:13
79:10 84:20
88:15 92:9 93:7
94:5 103:11
106:5 108:9,10
109:14 117:2
118:4 121:12
121:15 122:13
122:15 129:15
133:3,4,9,16,21
134:6 140:9
141:19 150:22
151:17 158:11
163:2 166:9
175:6,14 177:4
178:13 180:7
**surge** 62:16
63:21 64:8,15
65:2
**surmising** 164:14
**surprise** 166:1
**surprising**
132:19
**SW** 3:18
**swear** 9:14
**sworn** 9:17
190:15 191:7
192:20
**synonymous**
129:11
**synonyms** 129:22
**SYS** 77:11,15,20
135:13,16
**S-c-o-t-t** 10:2
**S1** 80:2 101:13
101:14 106:6
109:12,14
126:10,14
127:10,19
128:4

———————
**T**
———————
**T** 191:1,1
**tab** 17:17 53:21
54:2,9 58:10

59:18,20 60:3
60:11 61:13,16
66:5 67:21
70:11 78:2 86:1
86:3,4 89:6
90:1,3,4,5 94:7
95:1,2,8,10
98:12 105:1
109:1,2,2,4,9
109:10,12
110:4 119:6,8
125:6,7,16
131:8 134:18
141:3 144:18
146:1 151:3,5
153:7 160:22
164:21 168:21
170:2 172:21
180:21 183:3
**table** 158:19
**tables** 147:2,9
**Taipei** 55:11
**Taiwan** 55:11
**take** 11:13,21
13:10 14:19
16:16 21:16
24:20,22 29:1
30:7,19 32:4
46:17,19 65:22
66:2 85:7 88:5
106:18,19
117:1 157:7,9
158:20 166:9
166:11,12
175:15
**taken** 2:11 8:13
16:12 47:4
50:11 59:8
69:21 116:18
117:8 122:18
166:16 182:14
**talk** 14:1
**talked** 45:9
135:16
**talking** 41:8
70:14 71:17

107:16 118:1
138:17 150:8
157:12,16
**Tamayo** 99:6
**tape** 8:6
**task** 83:5
**tasks** 22:9,20,21
**TDY** 77:8 79:15
91:20 96:11,12
97:6 184:5
186:19
**TDYs** 96:2,7
97:14 186:15
**team** 5:21 7:6
68:20,22 86:18
87:3 98:5
104:15 146:10
146:15 181:18
**tech** 15:6
**technical** 69:19
70:9 114:17
180:17
**technically** 141:8
**Technician** 4:9
8:5 9:13 47:1,5
50:8,12 59:5,9
70:5 86:4 117:6
117:9 122:16
122:19 166:14
166:17 175:18
175:21 182:12
182:15 189:10
189:16
**technological**
15:16
**telephone** 32:20
**tell** 16:13 17:8
29:14 81:22
108:10 151:8
156:10 161:17
**tempo** 77:11
**temporarily** 96:3
**temporary** 48:1
69:12 71:2,8
84:17 85:2,11
85:19 92:5



96:12,13,15,19
185:16
**ten** 41:20 59:3
166:2
**Tent** 79:19
**term** 71:16 107:7
107:9 129:7
**terms** 21:13
71:20 82:3
83:19 107:17
109:7 120:13
124:1,14
129:17,22
130:14 131:1
170:22 172:7
176:16 178:18
180:12
**testified** 11:1,4,7
11:10
**testify** 9:18 16:20
20:18,20 21:19
21:22 22:10
23:12,17 33:12
33:16,19 34:3,8
34:15,19 35:4,7
35:11,15 41:10
**testifying** 16:17
17:3 19:22 20:5
**testimony** 17:12
20:17 40:14
75:2 119:1
182:22 190:4,6
191:9
**Tex** 79:4,7 82:21
**Texas** 85:12
87:12,16,22
88:6 100:11
101:22 102:4
103:9,17
104:10,10
105:22 108:21
113:2 114:6
115:19
**thank** 38:2 50:5
70:8 86:8 95:3
100:1 122:15

125:3 175:17
187:11 188:22
189:3,4
**therefor** 60:2
**thing** 36:2 83:18
104:13 152:22
153:1 162:9
169:4
**things** 46:3 104:1
116:11 128:7
**think** 22:17 29:6
29:8 39:18
45:11 46:9 48:4
48:22 49:3,4
50:4 59:15
60:14 84:3,4
107:10 108:14
110:1 114:20
115:8 118:22
129:19 130:12
130:12 132:15
132:15 139:6
139:14 140:14
142:17 144:15
154:13 155:7
158:13 162:9
164:14 169:15
176:10 182:6
185:2
**thinking** 46:12
185:3
**third** 82:20 91:3
116:4 136:8
140:4 142:9
146:19 147:10
171:22
**thought** 89:4
**three** 42:17 43:8
115:9,9 116:11
130:17 184:8
**threefold** 48:12
51:1,17 52:14
53:8
**Thursday** 43:20
**time** 8:12 11:20
14:4,9,9 15:15

15:21 21:21
24:9,13 39:20
40:8,10,13
41:14 43:16
47:2,5 50:9,13
53:2 59:6,10
63:1 70:6 76:2
76:6 79:6 81:6
95:17,20 104:8
107:15 109:10
116:15 117:7
117:10 120:6
122:16,20
132:18 136:3
143:15 147:22
148:13 150:17
151:9 152:7
153:13,14,14
153:19 154:1,2
154:8,10,14,17
157:5,14 159:4
160:17 163:5
164:11 166:15
166:18 170:3
175:19,22
178:7 182:5,13
182:16 185:17
187:20 189:17
**timeline** 175:4
176:19
**timely** 55:4
**times** 6:3 12:5
38:10 48:7
85:20 89:12
114:22 180:1
**title** 10:9 31:3,8
31:11 87:12
**titled** 146:21
**today** 8:15,16
9:12 10:18 13:9
13:14,18 15:6
15:15,21 16:13
16:21 17:3
19:22 20:18
21:4 33:13,16
33:19 34:3,8,15

34:19 35:4,7,11
35:15 45:3
62:15 64:11
71:21 72:7,20
80:8 100:9
101:14 109:22
112:8 122:4
124:17 127:20
132:15 142:7
151:15 154:11
156:11 160:21
178:10,17
182:22 183:13
187:14
**today's** 8:11
14:14 15:22
21:6 22:8 25:19
26:7,8,12,15,21
27:10,20 29:16
30:11 38:12,17
39:22 40:11,13
40:22 41:10,16
41:22 42:5,21
44:17 45:12
46:4,9 80:2,9
101:1
**Todd** 61:21 62:7
68:19 69:3,5
94:20 95:15,17
97:13 98:18
105:16 117:13
118:9
**told** 45:2 94:1
96:20 97:7
**tolerate** 75:8
**tomorrow** 96:2
**tool** 178:10,15,17
178:19
**tools** 178:5
**top** 87:11 89:1
146:21 155:20
169:2,7 187:4
**topic** 72:12 100:8
**topics** 20:13,16
20:17,20 21:2,5
21:8,12,13,14

32:19 74:18
121:2 127:14
**total** 21:21 37:2
41:14 155:21
156:21 157:2
158:18 159:3
167:21 168:4
168:12,15
169:5
**totally** 71:19
74:13
**totals** 156:17
**touch** 106:4
**track** 69:15
**Trade** 10:12
**training** 11:14
**transcript** 45:8
189:8 191:12
**transcription**
190:5 192:6
**transcripts** 33:16
**transfer** 185:15
**transfers** 183:22
184:19 185:9
186:4
**transmission**
180:22,22
**transmitted**
154:16 180:19
**transport** 185:8
**travel** 72:9,22
73:4 160:12
165:17
**traveling** 143:18
187:22
**tried** 113:12
**trigger** 92:1
**true** 47:9,15,21
48:8 50:19
116:9 142:18
144:1,16 190:5
191:8
**Trump** 88:18
89:12 103:5,12
**truth** 16:13
**truthfully** 16:20



**truthfulness**
164:10
**try** 14:5,19 15:17
40:17 53:18
114:15 121:6
137:18
**trying** 49:3
117:22 129:14
129:15 156:16
158:11
**Tuesday** 27:2,5
89:17
**turn** 20:9 66:18
87:9 99:18
107:10 153:6
160:22
**twice** 12:6
**two** 24:10 25:17
26:2 37:12
104:1 109:15
128:16 138:2,5
141:8 147:2,9
167:4 169:16
184:7
**two-page** 68:5
**TX** 99:11 105:20
105:22
**type** 85:5
**types** 130:21
**typically** 179:9
**typo** 80:7

——————
**U**
**UAC** ████ 106:22
107:5,12,17,22
**uh-huh** 13:12
**ultimately**
180:20
**unaccompanied**
107:5,6
**uncertain** 172:16
**unclear** 115:16
**unconcerning**
170:9
**underline** 24:16
**underlying**

123:19 124:2
**undersigned**
190:16
**understand**
10:19 13:15,18
16:2,6,12,14,15
17:1,5,14 19:17
19:21 22:14
31:8 48:5 49:7
54:14 58:4,16
59:13 71:20
73:6 74:14
88:15 96:7
99:18 124:1
158:11 163:2
171:3 172:5
178:4 184:12
**understanding**
20:4,19 21:7
37:9 52:22
53:13 59:16
62:22 63:7 73:2
73:3 74:2,10
75:15 77:20
79:12 83:17
96:10 106:1
107:4 108:3,6
118:16,18
129:6,7 130:20
135:18 150:7
151:20 152:4,5
170:16 173:22
174:3 176:19
177:18,21
181:15,20
**understood**
13:21 72:15
118:4 129:21
**unfortunately**
156:17
**unfounded** 61:8
**unit** 99:17 102:4
107:19,20
167:11,12
**United** 1:1 8:9
88:19 103:13

112:18 113:20
136:17 139:10
**units** 99:15,18,19
104:9
**unredacted** 54:6
58:10,21 59:19
**unresolved** 57:12
**unspecified**
149:17
**unusual** 140:21
179:19
**update** 79:15
120:2
**upshot** 107:12
**use** 52:3 54:5,6
58:5,9,12 59:1
59:18 71:16
126:3 129:16
178:19
**Usually** 13:5
**U.S** 1:15 2:10
3:11,17 4:3
5:19 9:3,7 10:7
10:10,17 12:10
16:5 18:3 28:19
36:11 37:16
40:21 62:20
63:2 73:19
75:12,19 86:17
89:16 93:9
97:21 136:1
**U.S.Customs** 7:4

——————
**V**
**v** 8:8 54:19 56:8
192:2
**vague** 29:7 36:20
37:6
**Valerie** 26:16,21
27:6 29:15
**valid** 49:12
**value** 56:18
**variation** 85:5
**variety** 53:14
69:1 84:4
178:20

**various** 48:6 51:6
51:8 74:18
85:20
**vary** 152:10,17
153:4,4 160:18
170:21 175:5
178:20
**vendor** 87:17
88:6
**vernacular** 41:9
**version** 54:4
58:10,12 59:1
59:20 60:3,10
61:13
**viable** 184:3
**video** 15:17
189:12
**videoconference**
1:16 2:11 3:6
3:13,19 4:4,8
29:2 30:20
**videoconferenc...**
13:22 38:22
**videographer**
4:10 8:15
**videotaped** 8:7
**view** 21:16
**Villarreal** 135:8
**violation** 49:6
**vis-a-vis** 128:6
**voluminous**
21:12,15
**vs** 1:7

——————
**W**
**Wagner** 105:16
**wait** 14:6
**walk** 19:19
**want** 27:6 32:8
45:13 46:1,17
46:18 62:6
67:15 68:12
74:17 78:16
82:19,20 88:14
90:15 91:12
99:4 110:15

116:22 118:4
119:16 128:11
135:6 136:6
143:13 144:15
145:7 149:21
153:8 179:4
**wanted** 25:19
60:12 106:4,6
118:15 123:11
150:21 153:1
182:6
**warned** 162:6
**Washington** 1:17
3:5,12,18 4:4
**wasn't** 35:19
**way** 24:13 32:6
54:16 60:19
61:9 91:3
123:18 179:16
191:15
**Webex** 4:9 13:8
14:2 43:12,14
**website** 35:19,21
**week** 41:13
112:16 113:19
**weeks** 176:16,18
177:1,2
**welcome** 47:8
50:14 59:12
122:22 166:20
176:2
**welcoming**
136:10,13
**went** 62:13 164:6
**weren't** 115:6
**Westlaw** 55:12
56:9
**we'll** 15:5,17
86:11 131:12
141:3 144:22
146:3 167:6
173:2,10
175:15
**we're** 46:15 54:4
58:11 74:20
118:14 138:17



140:14,15
149:9 171:5
**we've** 17:21 45:9
46:3,16 60:2,16
115:8 116:11
116:21
**WHEREOF**
191:17
**wholeheartedly**
58:14
**wholly** 61:8
**wide** 85:5
**widely** 152:17
**wife** 45:4
**wildly** 152:11
**willing** 106:8
**willy** 14:19
**wind** 67:5
**witness** 2:18 5:2
9:14 12:21
19:22 20:3,4
21:19,22 22:10
22:13,22 23:13
23:17 25:8,12
27:14 28:2 29:8
32:13 33:3,13
37:8 45:18
48:21 52:1,19
53:11 58:20
59:19 63:7,15
64:1,19 65:4,11
67:19 71:19
72:15 74:2 75:7
76:16 77:17
80:19 82:15
85:14 88:10,22
89:20 92:9 93:4
93:15 94:5
96:10 97:2,12
98:4 100:20
101:7 102:11
102:18,21
103:22 107:4
111:15 112:5
113:9 114:12
114:14 117:2

121:3,9 122:3
122:10,17
123:12,18
126:22 127:16
130:12 134:4
134:16 137:8
138:1 139:14
141:19 142:7
143:10 144:4
144:11 147:16
149:1 151:12
151:19 152:10
152:22 153:16
154:7 155:5,15
156:5,15 158:8
158:18 159:16
161:15 162:21
164:3,19
165:21 166:6
167:15 168:22
171:17 172:16
174:13,16
175:3,12,20
176:12,14
177:4,10,18
179:8 181:9
184:12 185:2
185:20 188:11
189:6 190:16
191:6,9,17
192:3
**Wolf** 1:8 192:2
**word** 65:22 66:2
101:12 172:2
**words** 13:12 20:2
**work** 22:12 25:7
27:12,22 29:9
29:19 32:11
33:1 45:16 83:4
91:22 102:16
102:20 174:8
177:21
**worked** 10:21,22
**working** 128:2,3
**World** 5:12
66:14

**worries** 95:5
**wouldn't** 73:9
83:20 132:18
**writes** 62:13 83:3
95:22 101:11
106:3 120:11
126:8 127:9
145:17
**written** 12:2,8
142:17
**wrong** 109:3

**Y**
**yeah** 68:21 74:2
74:13 85:5 95:8
97:5 102:2,21
118:15 133:4
139:16 166:11
177:18
**years** 79:10
**yesterday** 40:5
**yes-or-no** 127:6
179:4
**York** 6:3 12:17
89:11 114:22
**Ysidro** 6:21
48:11 50:22
51:16 52:14
53:6 77:21
135:17 143:16
145:19 147:19
147:21 148:8
148:11 149:16
154:22 155:12
156:12,20
157:14,19
158:4,13,21
160:9,13 161:5
162:17 164:12
164:22 165:9
165:17 170:3
172:12 187:20
188:8

**Z**
**zone** 153:14

154:8,10,17
163:5

**1**
**1** 1:18 2:5 8:6,11
15:22 16:1
17:17 180:21
186:11 192:2,5
████████
██████████
█████
**1:20** 70:3,6
**10** 99:7 100:16
101:3,19 104:5
108:22 112:22
114:3
**10th** 97:15
**10/20/16** 98:19
**10:49** 47:3
**100** 40:8 150:20
155:1 157:21
160:19 165:1
170:9,10,12,14
████████
**105** 6:8
**11** 105:15
**11/14** 91:19
93:17 97:19
98:7
**11/14/20** 191:21
**11/15/16** 111:5
**11/28** 91:19
**11:06** 47:5
**11:10** 50:9
**11:25** 90:17
**11:27** 50:13
**11:30** 94:20
**11:38** 59:6
**11:56** 82:22
**110** 6:9
**119** 6:11 183:6
**12** 119:6,8
**12:13** 59:10
**125** 6:13
**13** 68:6 125:7

**131** 6:15
**135** 6:17
**14** 20:15,21 125:6
125:16 131:8
186:8
**14th** 93:12
**14-page** 86:16
**141** 6:19
**145** 7:3
**146** 7:4
**15** 22:5,7 41:20
60:20 110:13
113:3 114:6
134:18
**15th** 116:15
**159** 027 54:21
**16** 61:22 62:7
63:12,19 64:6
64:15 65:9 88:5
141:3 151:3,5
**160** 157:13 159:9
**167** 7:9
**17** 5:10 69:17
144:18 160:22
**17-cv-02366-B...**
1:7
**173** 7:11
**18** 20:12 60:20
68:5,13 70:17
76:7 99:21
107:13 146:1
153:7 164:21
170:2,2
**18th** 76:21
**182** 5:5
**19** 68:6 168:21
172:21 180:21
**1999** 3:4

**2**
**2** 148:14 150:2,4
155:8 159:17
165:6 192:5
**2nd** 191:18
**2:06** 135:9
**2:27** 117:7



MAGNA
LEGAL SERVICES

**2:41** 68:14 70:18
**2:42** 117:10
**2:48** 99:7 105:16
**2:50** 122:16
**2:58** 122:20
**20** 22:5,7
**20006** 3:5
**2002** 55:12,13
**20024** 3:18
**20032** 4:4
**20044** 3:12
**2013** 54:21 55:1
56:8,10
**2014** 83:6
**2016** 5:21 15:22
47:16,21 62:1,7
63:12,19 64:6
64:15 65:9,19
67:4,12 68:6,13
70:18 76:3,7
78:10,11,17
81:7,13,20 82:9
82:22 83:12
85:12,14 86:17
87:2,18 88:2,17
89:2,14,17
90:10,16 92:14
92:17,20 93:8
94:16,20 95:14
96:22 97:8,10
98:5 99:7
100:17 101:3
101:19 105:15
108:22 110:13
112:18,19,22
113:3,21,22
114:3,6 183:16
**2018** 7:7 48:8
50:19 51:13
52:10 53:1
117:13 118:8
118:20 119:18
120:21 121:17
125:11,12,22
130:1 131:17
132:11 134:10

**135:9** 141:12
145:5,8 146:11
148:11,15
149:5 151:16
155:2 156:13
160:14,20
161:4 162:16
164:1,17
165:18 167:11
173:15 178:4
**2019** 10:22
**202.263.3000** 3:5
**202.598.8259**
3:13
**2020** 1:18 2:5
8:11 16:1 18:14
18:16 19:9
21:20 29:16
31:22 32:6,9,20
38:17 39:7,21
42:3,8,20 43:19
191:18 192:2
**21** 53:21 54:2,9
58:10 59:18,20
60:3,11 61:13
**21-day** 150:7
155:7,11 157:6
159:8,19 160:1
**215** 55:12
**22** 78:2
**23** 87:18 94:7
95:2 119:18
121:17
**24** 97:21 125:11
125:22 130:1
142:14
**25** 43:19 110:4
125:11
**25th** 44:7
**26** 42:20 43:11
89:6
**26th** 43:14
**27** 98:12 109:4,10
109:12 131:17
132:11 134:10
[redacted]

**2707** 4:3
**28** 7:18 61:16,17
61:22 62:9
64:10 135:9
[redacted]

**29** 5:21 7:6 29:16
31:22 42:3,8
43:11 66:5
86:17 87:2
141:12 145:5,8
146:11 148:11
148:15 151:16
155:2 156:13
160:14 161:4
162:16 164:1
164:17 165:18
167:11
**29th** 27:2 28:10
28:12 30:8
42:11,13,16
43:14 149:18
160:5,19 163:6

**3**
**3** 55:12 66:19
155:18 160:7
164:21 170:2
192:6
**3,000** 47:22 [redacted]
**3:00** 115:2
**3:13** 62:8
**3:20** 145:8
162:15 163:5
**3:58** 166:15
**30** 28:14 30:13
32:6,9,20 38:17
39:7,17,21
67:21 70:11
78:10 82:22
189:8
**30th** 27:2,5 28:10
30:10 31:18
39:2

**30(b)** 75:3
**30(b)(6)** 1:14 2:9
5:10 18:3 19:22
20:3,4 21:19,22
22:10 23:13,17
33:13 143:3
**31** 7:19 78:11,17
81:7,13,20 82:9
86:1,3,4 98:13
98:17,22 109:4
109:20
[redacted]

**320** 5:10 17:18,22
20:9
**321** 5:12 66:6,12
68:15
**322** 5:15 67:22
68:4 70:15
**323** 5:17 78:5,6
78:19
**324** 5:19 86:11,13
**325** 6:3 89:8 90:4
**326** 6:4 90:5,6
91:4 183:2,13
**327** 6:6 94:10,12
94:19
**328** 6:8 105:4,6
109:20
**329** 6:9 110:7,9
110:16
**330** 6:11 119:9,11
169:7,9 170:20
**331** 6:13 125:17
125:18
**332** 6:15 131:13
131:14
**333** 6:17 134:21
135:1,7 143:6
**334** 6:19 141:4,5
145:13 148:20
151:6 152:19
187:9
**335** 7:3 144:22
145:2 161:1
162:14

**336** 7:4 146:4,5
146:19 147:11
153:7 171:20
**337** 171:21
**338** 7:9 167:6,7
168:9
**339** 7:11 173:2,4
173:11,13
**395** 3:18 150:5
157:7 159:17

**4**
**4** 67:3,4,12
**4/29/2018** 153:11
**4:15** 166:18
**4:27** 175:19
**4:35** 175:22
**4:44** 182:13
**400** 150:9 157:6,9
157:17 160:4
**44** 157:2 158:4,14
159:3
**470** 150:8 157:6
159:19
**48** 103:4,12

**5**
**5** 149:5 173:14
**5th** 54:21
**5:16** 182:16
**5:24** 189:18,19
**5477** 55:12
**596757** 1:22

**6**
**6** 55:1
**6:00** 150:15
**6:44** 148:14,15
149:19 151:22
153:11,13,19
153:22 154:9
154:13 156:19
162:15
**6:46** 164:21
**61** 7:18
**66** 5:12



**67** 5:15

_____
**7**
**7** 20:9,12,15,20
  87:9,11 90:1,3
  90:5 95:10
  183:3
**7:44** 156:12
**72** 58:3
**72(a)** 49:16 56:19
**758** 153:9
**759** 146:20
  155:19
**78** 5:17
**784** 119:17

_____
**8**
**8** 88:17 89:17
  105:1 109:2,9
  112:18 113:21
**8th** 114:20 115:5
  116:20
**8:26** 126:1
**86** 5:19
**868** 3:12
**89** 6:3

_____
**9**
**9** 5:4 88:2 89:14
  90:10,16 92:14
  92:17 93:8
  94:16,20 95:14
  97:8 98:5
  112:19 113:22
**9th** 104:16
  114:22 115:2,5
  115:7,14,16
  116:14
**9:11** 119:19
**9:40** 78:18
**9:44** 153:20
  154:2,10
**9:56** 2:6 8:3
**9:57** 8:12
**90** 6:4
**90s** 170:15

**91** 148:12 149:19
  150:15,19
  170:3
**94** 6:6
**950527** 56:9
**98** 7:19

