IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA


AL OTRO LADO, INC., et al.,    §

                                §

      Plaintiffs,    §

                                §

vs.    § CAUSE NO. 17-CV-02366-BAS-KSC

                                §

KEVIN K. McALEENAN, et al.,    §

                                §

      Defendants.    §


ORAL VIDEOTAPED DEPOSITION

MR. FRANK S. LONGORIA, JR.

June 18, 2020


    ORAL VIDEOTAPED DEPOSITION OF MR. FRANK S. LONGORIA, JR., produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on June 18, 2020, from 11:50 a.m. to 5:47 p.m., before Michelle Hartman, Certified Shorthand Reporter in and for the State of Texas and Registered Professional Reporter, reported by computerized stenotype machine via a Zoom videoconference, pursuant to the California Rules of Civil Procedure and the provisions stated on the record or attached hereto.



Page 2

```
 1                        APPEARANCES
 2
 3   FOR THE PLAINTIFFS:
 4        Mr. Angelo Guisado
          CENTER FOR CONSTITUTIONAL RIGHTS
 5        666 Broadway
          7th Floor
 6        New York, New York 10012
          Telephone: 212-614-6454
 7        E-mail: aguisado@ccrjustice.org
     and
 8        Ms. Sarah Rich
          SOUTHERN POVERTY LAW CENTER
 9        1101 17th Street, N.W.
          Suite 705
10        Washington, D.C. 20036
          Telephone:  202-355-4471
11        E-mail:  sarah.rich@splcenter.org
12   FOR THE DEFENDANTS:
13        Mr. Ari Nazarov
          U.S. DEPARTMENT OF JUSTICE - CIVIL DIVISION
14        Office of Immigration Litigation
          Ben Franklin Station, P.O. Box 868
15        Washington, DC 20044
          Telephone: 2020514-4120
16        E-Mail: ari.nazarov@usdoj.gov
17   ALSO PRESENT:
18        Ms. Zoe Ridolfi
19        Ms. Joanne Chou
20        Ms. Louisa Slocum, in-house attorney CBP
21        Mr. Benjamin Wolarsky, in-house attorney Defendants
22        Mr. Tyler Crotty, videographer
23        Mr. Erik Davidson, BU videographer
24
25
```



Page 3

```
 1                         INDEX
 2                                          PAGE
 3   MR. FRANK S. LONGORIA, JR.
 4   Examination by Mr. Guisado ........................7
     Examination by Mr. Nazarov ....................266
 5   Further Examination by Mr. Guisado ..............268
     Signature Page  ...............................270
 6   Signature Page  ...............................271
     Court Reporter's Certificate ...................272
 7
 8                        EXHIBITS
 9   EXHIBIT               DESCRIPTION             PAGE
10
11   Exhibit 298    CBP's metering guidance issued    35
                    by Todd Owen, executive
12                  assistant commissioner, Office
                    of Field Operations, April
13                  27th, 2018 e-mail chain, Bates
                    AOL-DEF 00011374 - 75
14
     Exhibit 299    AUGUST 28, 2018 E-mail Chain      51
15                  Re:  Queue Management
                    Communications at the Laredo
16                  Communication Office, AOL-DEF
                    00909720 TO 22
17
     Exhibit 300    Training video,                   57
18                  AOL-DEF-00390069
19   Exhibit 301    June 8th, 2018 e-mail chain       72
                    bearing the Bates AOL-DEF
20                  00190367 to 69
21   Exhibit 302    May 30th e-mail bearing Bates     85
                    AOL-DEF 00911036
22
     Exhibit 303    August 6th, 2018 e-mail chain     91
23                  that bears Bates AOL-DEF
                    00909668 TO 69
24
25
```



EXHIBITS (cont.)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 304 | August 3rd, 2018 e-mail from Raquel Garza to the Laredo operations center bearing Bates AOL-DEF 0002896 | 97 |
| Exhibit 305 | August 4th, 2018 e-mail to the Laredo operations center bearing Bates AOL-DEF 00059739 | 97 |
| Exhibit 306 | November 12th, 2016 and November 15th, 2016 e-mail chain, bears Bates AOL-DEF 00046133 to 36 | 105 |
| Exhibit 307 | November 14th, 2016 e-mail bearing Bates AOL-DEF 00576995 to 96 | 114 |
| Exhibit 308 | Bates AOL-DEF 1430 to 32 | 130 |
| Exhibit 309 | June 13th, 2018 e-mail chain, bears Bates AOL-DEF 00911232 | 163 |
| Exhibit 310 | May 18th to 19th, 2018 e-mail chain bearing Bates AOL-DEF 00303561 to 63 | 197 |
| Exhibit 311 | July 6th to July 9th, 2018 e-mail chain that bears Bates AOL-DEF 01205190 to 91 | 204 |
| Exhibit 312 | June to July 2018 e-mail chain bearing the Bates number, AOL-DEF 0137408 to 10 | 208 |
| Exhibit 313 | July 2018 e-mail chain bearing Bates AOL-DEF 00566075 to 76 | 215 |
| Exhibit 314 | Laredo Port of Entry Impact Port Operations" summarizing queue management reports from June 16th, 2018 to July 14, 2018 | 224 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



```
                                                     Page 5
 1                         EXHIBITS (cont.)
 2     EXHIBIT              DESCRIPTION                PAGE
 3     Exhibit 315    January 17, 2017 e-mail chain    228
                      bears Bates AOL-DEF 00577299 to
 4                    300
 5     Exhibit 316    June 8th, 2018 e-mail chain      235
                      bears Bates AOL-DEF 00565178 to
 6                    82
 7     Exhibit 317    * Skipped exhibit
 8     Exhibit 318    June 5th through 6th, 2018       251
                      e-mail chain that bears the
 9                    Bates numbers AOL-DEF 00767892
10     Exhibit 319    MCAT Report dated June 5         258
11     Exhibit 320    MCAT Report dated June 6         258
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 6

1                    THE VIDEOGRAPHER:  We are now on the

2     record.  This begins the deposition of Frank Longoria

3     in the matters of Al Otro Lado v. McAleenan in the

4     United States District Court for the Southern

5     District of California.

6                    Today is Thursday, June 18th, 2020,

7     and the time is approximately 11:50 a.m. -- I'm

8     sorry, Central time is 10:50 a.m.  The videographer

9     is Tyler Crotty of Magna Legal Services, and the

10    court reporter is Michelle Hartman of Magna Legal

11    Services.

12                    Counsel, at this time could you please

13    state your appearances and whom you represent for the

14    record.

15                    MR. GUISADO:  Angelo Guisado, Center

16    for Constitutional Rights for the Plaintiffs.

17                    MS. RICH:  Sarah Rich, Southern

18    Poverty Law Firm, also for the Plaintiffs.

19                    MR. NAZAROV:  Ari Nazarov of the

20    United States Department of Justice - Civil Division

21    for the Defendants.

22                    THE COURT REPORTER:  Okay.  Can I have

23    an agreement, on the record, please, from Counsel

24    that the court reporter may swear in the witness

25    remotely.



Page 7

```
 1                    MR. GUISADO:  So agreed.
 2                    MR. NAZAROV:  So agreed.
 3                    THE COURT REPORTER:  Mr. Longoria, can
 4    you raise your right hand so I can see it, please.
 5                    THE WITNESS:  (Complies).
 6                    THE COURT REPORTER:  Thank you.
 7                MR. FRANK S. LONGORIA, JR.,
 8    having been first duly sworn, testified as follows:
 9                         EXAMINATION
10                    THE COURT REPORTER:  You may put your
11    hand down.
12            Q.  (BY MR. GUISADO) Good morning,
13    Mr. Longoria.
14            A.  Good morning.
15            Q.  Can you hear me okay?
16            A.  Yes, sir.
17            Q.  Thank you.  My name is Angelo Guisado.
18    I'm a lawyer at the Center for Constitutional Rights.
19    I represent the plaintiffs in this action called
20    Al Otro Lado versus Wolf.
21                Can you please state and spell your
22    name.
23            A.  Frank, F-R-A-N-K; middle initial S,
24    like in Sam; Longoria, L-O-N, like in November,
25    G-O-R-I-A, Jr.
```



Page 8

1            Q.   Thank you, Mr. Longoria.

2                 It's all right if I refer to you as

3      "Mr. Longoria"?

4            A.   Yes, sir.

5            Q.   Okay.  Thank you.

6                 Have you ever gone by any other name?

7            A.   No.

8            Q.   Are you presently employed?

9            A.   No.

10           Q.   What was your last job title?

11           A.   Assistant director - field operations.

12           Q.   That was with Customs and Border

13     Protection?

14           A.   Yes, sir.

15           Q.   How -- if I refer to the Customs and

16     Border Protection as "CBP," you'll understand what I

17     mean?

18           A.   Yes, sir.

19           Q.   Okay.  We're going to talk about your

20     work and employment history in just a little bit.  I

21     would also like to thank you for remaining patient

22     this morning.  I'm sure you have other things you

23     would rather be doing today.

24                But today I'm going to go over some

25     ground rules about some questions I'm going to ask



Page 9

1   you.  If at any point you need to take a break, let

2   me know and we will go through with that.

3              So just some ground rules.  There is a

4   court reporter taking down everything we both say.

5   So in order for the court reporter to accurately

6   record your testimony, we need verbal answers.  So

7   things like "uh-huh" or "huh-uh" probably won't cut

8   it.  Do you understand?

9         A.  Yes.

10        Q.  The deposition is taking -- being taken

11  remotely.  So Counsel, the court reporter, we are all

12  in different locations and we are doing it via

13  web-based videoconference platform.  Given that the

14  Internet is what it is, there may be a slight lag

15  time.  So it's really important that we don't talk

16  over each other.  I'll do my best not to do so.  If

17  you could, please just wait until I'm totally

18  finished with my question before you answer, and I'll

19  try and do the same for you.

20              Is that understood?

21        A.  Understood.

22        Q.  Thank you.  If you don't understand any

23  of any questions, please feel free to say so.  I'll

24  repeat it or perhaps even rephrase it.

25              Understood?



Page 10

1              A.   Yes, sir.

2              Q.   If you do answer the question, I'm

3    going to assume that you understood that question.

4                   Do you understand?

5              A.   Yes.

6              Q.   Okay.  Objections:  From time to time

7    your Counsel, Mr. Nazarov, may object to one of my

8    questions.  Please wait until he's finished objecting

9    before you answer.  You will be able to, and should,

10   answer the questions, even if there is an objection,

11   unless your Counsel instructs you not to answer it,

12   generally on the basis of privilege.

13                  Do you understand?

14             A.   Yes.

15             Q.   Unless I state otherwise, my questions

16   relate to the time period starting from January 1st,

17   2016 through the present.

18                  Do you understand that?

19             A.   Yes.

20             Q.   Okay.  During this deposition, I'm

21   going to refer to the Department of Homeland Security

22   as "DHS."  I'll refer to Customs and Border

23   Protection as "CBP."

24                  Do you understand?

25             A.   Yes.



Page 11

1          Q.  I may also refer to a port of entry as

2    a "POE."  I may also refer to a Laredo field office

3    as "LFO."

4                 Is that understood?

5          A.  Yes.

6          Q.  Okay.  Great.  Do you understand that

7    you've taken an oath to tell the truth today?

8          A.  Yes.

9          Q.  Do you understand that oath is the same

10   oath you would take if you were giving testimony in a

11   courtroom?

12         A.  Yes.

13         Q.  Do you understand that there are

14   criminal consequences for lying under oath?

15         A.  Yes.

16         Q.  Is there any reason why you can't

17   testify truthfully today?

18         A.  No reason.

19         Q.  Do you understand that you are not

20   allowed to communicate privately with your attorneys

21   or anyone else during the course of the deposition

22   other than during breaks?

23         A.  Yes.

24         Q.  Do you understand that means you can't

25   be texting, e-mailing, or otherwise chatting with



Page 12

1    Counsel?

2              A.   Understood.

3              Q.   Thank you.  Have you ever testified in

4    court before?

5              A.   Yes.

6              Q.   When?

7              A.   When I was in the military in a court

8    martial.

9              Q.   Do you remember what year?

10             A.   It had to be sometime during the '80s.

11             Q.   What did you testify about?

12             A.   I was the security policeman that

13   respond to a barracks in which there was narcotics

14   on, and I had to testify as the law enforcement

15   discovering person.

16             Q.   Thank you.  Did you ever testify at any

17   other proceeding?

18             A.   No.

19             Q.   During the military court martial, you

20   weren't the individual marshaled, you were the

21   security officer, correct?

22             A.   Correct.

23             Q.   Okay.  Great.  Have you ever taken --

24   testified in a deposition before?

25             A.   No.



Page 13

1          Q.  This is your first one, okay.

2               Have you ever been involved in any

3     arbitration proceedings?

4          A.  No.

5          Q.  Have you ever testified before any

6     governmental body?

7          A.  No.

8          Q.  Not like the DHS, OIG?

9          A.  No.

10         Q.  Okay.  Outside of this case, have you

11    ever provided written testimony under oath in written

12    form?

13         A.  No.

14         Q.  No declarations in connection with any

15    cases?

16         A.  I'm going to try and understand the

17    question.

18         Q.  Right.

19         A.  I can give you the scenario and then we

20    can talk through it.  I believe --

21         Q.  Yeah.

22         A.  -- I provided written declarations in

23    EEO complaints.

24         Q.  Do you remember who you were working

25    for at that time?



Page 14

1          A.   CBP.

2          Q.   What year were those, roughly?

3          A.   Hopefully had to be about 2010, 2015,

4     somewhere in that time period.

5          Q.   Roughly 2015?

6          A.   Somewhere around there, yes, sir.

7          Q.   What were they regarding?

8          A.   An individual alleged that she was

9     discriminated against by the DFO.

10         Q.   Who was the DFO at that time?

11         A.   Mr. Higgerson.

12         Q.   Did you testify truthfully in that

13    declaration?

14         A.   Yes.

15         Q.   Do you still have the contents of that

16    declaration?

17         A.   No.

18         Q.   Do you remember what the result of the

19    EEO investigation was?

20         A.   No.

21         Q.   Okay.  Mr. Longoria, other than traffic

22    offenses, have you ever been charged with a crime?

23         A.   No.

24         Q.   Other than traffic offenses, have you

25    ever been convicted of a crime?



Page 15

1          A.  No.

2          Q.  Have you ever been arrested?

3          A.  No.

4          Q.  Have you ever been sued before?

5          A.  No.

6          Q.  Have you ever been a party to a

7     lawsuit?

8          A.  No.

9          Q.  Have you ever been disciplined for your

10    conduct at CBP?

11         A.  No.

12         Q.  Are you a member of any social

13    networking platforms, like LinkedIn or Facebook?

14         A.  No.

15              MR. GUISADO:  Tyler, if we can bring

16    up 20 to 430, Plaintiffs' Third Deposition

17    Notice.pdf.

18              THE VIDEOGRAPHER:  Yeah, just give me

19    one second, I'll have it on the screen.

20              And any specific part, Counsel?

21              MR. GUISADO:  Yeah, scroll down to the

22    second page.

23         Q.  (BY MR. GUISADO) Mr. Longoria --

24              MR. GUISADO:  No, the third one.  The

25    one you were on.  Sorry.  That's good.



Page 16

1                Q.  (BY MR. GUISADO) Mr. Longoria, can you

2      see that clearly?

3                A.  (Nods).

4                Q.  I'm showing you what we have marked as

5      Exhibit 5.  It's a multipage document entitled

6      Plaintiffs' Third Deposition Notice.

7                    Have you seen this before?

8                A.  You broke up, sir.  Would you repeat

9      the question?

10               Q.  Sure.  I'm showing you what we have

11     marked -- previously marked as Exhibit 5.  It is a

12     multipage document, and it's called Plaintiffs' Third

13     Deposition Notice.

14                   Have you seen this notice before?

15               A.  Is that the deposition addressed to me

16     with my name on it?

17               Q.  Yes.

18               A.  If it's the one that had my name on it,

19     yes, sir.

20               Q.  Okay.  Do you understand that you're

21     here today to testify with respect to this deposition

22     notice?

23               A.  Yes.

24               Q.  Are you being represented by any

25     attorneys in connection with this deposition?



Page 17

1          A.   Are you referring to Mr. Nazarov?

2          Q.   I am.

3          A.   Yes, sir.

4               MR. GUISADO:  We're getting some

5     feedback.  If not -- if everyone but me and

6     Mr. Longoria and Mr. Nazarov would mute their line, I

7     would appreciate that, everyone except those three.

8               And I'll apologize because my

9     neighbors are renovating their apartment with what

10    seems to be a jackhammer.  So if that comes in, I

11    apologize.

12         Q.   (BY MR. GUISADO) Other than

13    Mr. Nazarov, is anyone else representing you?

14         A.   No, sir.

15         Q.   Without going into any of the substance

16    of the conversations you've had with your attorneys

17    regarding this case, did you meet with anyone else in

18    prep -- preparation for this deposition?

19         A.   Other than Mr. Nazarov and -- and

20    Mr. Wolarsky and Ms. Slocum, no, sir.

21         Q.   Outside of your meeting with your

22    lawyers, did you do anything else to prepare for

23    today's deposition?

24         A.   No, sir.

25         Q.   Outside of conversations with your



Page 18

1    lawyers, have you discussed the deposition with

2    anyone else?

3            A.  No, sir.

4            Q.  Did you review any documents during the

5    course of your deposition preparation?

6            A.  Yes, sir.

7            Q.  Did your Counsel show you those

8    documents?

9            A.  Yes, sir.

10           Q.  Approximately how many documents did

11   you review?

12           A.  I believe 15.

13           Q.  Approximately how long did you spend

14   reviewing those documents?

15           A.  About two hours.

16           Q.  Two hours.  Do you know who selected

17   the documents that you reviewed in preparation for

18   your deposition?

19           A.  No, sir.

20           Q.  Did any of those documents in

21   particular refresh your recollection about facts

22   regarding queue management?

23           A.  Yes, sir.

24           Q.  What did you recall as a result of

25   reviewing those documents?



Page 19

1              A.   I don't understand the question.

2              Q.   When your Counsel -- and please don't

3    divulge anything you discussed with your Counsel or

4    they discussed with you.

5                   When they demonstrated or showed you a

6    document that refreshed your recollection as to queue

7    management, what exactly was refreshed?

8                   MR. NAZAROV:  Objection:  Form.

9              Q.   (BY MR. GUISADO) You can answer.

10             A.   Okay.  I can answer, sir?

11             Q.   Yes.

12             A.   Okay.  Basically it refreshed what I

13   seemed to remember.  Because I retired in 2018, so it

14   refreshed what I thought to be -- what I remembered

15   and that's it.

16             Q.   Had you misremembered anything --

17             A.   No, sir.

18             Q.   -- before you saw the document?  No.

19                  Can you recall any specific documents

20   in particular that refreshed your recollection or was

21   it just all of them?

22                  MR. NAZAROV:  I'm going to instruct

23   the witness not to answer that question because it --

24   it -- it would lead to the documents that were

25   selected by his Counsel.  But I won't -- if you ask



Page 20

1   it in a different way, I will not instruct him not to

2   answer.

3                  Right now I'm instructing him not to

4   answer because it does lead to work product and

5   attorney-client privilege.

6          Q.   (BY MR. GUISADO) Mr. Longoria, you just

7   testified that after you reviewed documents selected

8   by your Counsel, your recollection about queue

9   management was refreshed.

10                 Can you describe the documents that

11  refreshed your memory?

12                 MR. NAZAROV:  I'm going to instruct

13  again not to answer, because if -- if he tells you

14  what documents, then you know what documents his

15  Counsel had selected and to their state of mind.

16                 MR. GUISADO:  Yeah, but under the

17  Support V. Pile case, that's the -- under the 3rd

18  Circuit, and that's been followed pretty much

19  everywhere else, if a witness identifies a particular

20  document that refreshes his or her recollection, we

21  are allowed to cross-examine the witness about the

22  contents of that document.

23         Q.   (BY MR. GUISADO) So what I'm not asking

24  is:  Tell me the documents that your Counsel selected

25  for you, Mr. Longoria.



Page 21

```
 1                    What I'm asking you is:  Can you

 2       describe any of the documents that refreshed your

 3       recollection?

 4                    MR. NAZAROV:  So are you asking him

 5       kind of generally, not specific documents?  Is that

 6       what you're saying?

 7                    MR. GUISADO:  Yes.

 8                    MR. NAZAROV:  Okay.  But all these

 9       documents were provided by Counsel.  If -- I will

10       allow him to answer in kind of general -- general --

11       kind of in a general answer, but that's it, not

12       specific documents.

13              Q.  (BY MR. GUISADO) Mr. Longoria, you --

14       you testified Counsel showed you documents that had

15       refreshed your recollection as to queue management.

16                    Can you describe the documents

17       generally that refreshed your recollection?

18              A.  There was one -- there was no one

19       specific document.  They were in the totality that --

20       of documents that -- that helped me refresh my memory

21       as to what happened during queue management.

22              Q.  Can you describe what type of documents

23       they were?  Were they Word documents or were they

24       spreadsheets?

25                    MR. NAZAROV:  I'm sorry, Angelo, I'm
```



Page 22

1    going to instruct the witness not to answer.

2                        MR. GUISADO:  Are you --

3                        MR. NAZAROV:  I understand that class

4    of -- that case and, you know, we can fight about

5    that later, but right now I'm going to instruct him

6    not to answer, because it leads to, you know, the

7    attorney's preparation and -- and mindset.

8                        Q.  (BY MR. GUISADO) Mr. Longoria, you just

9    testified that some documents that your Counsel

10   showed you refreshed your recollection as to queue

11   management.

12                        What was your recollection about queue

13   management before they showed you the documents?

14                        A.  I don't understand what you're

15   specifically looking for when you say "what part of

16   queue management."

17                        Could you be more specific as to what

18   you're looking for, sir?

19                        Q.  Sure.  I'm trying to understand what it

20   is you had forgotten about or had forgotten that you

21   at one point once knew about queue management that

22   you all of a sudden remembered and recalled after

23   Counsel showed you the documents.

24                        Was it an "aha" moment:  Yes, this is

25   something that happened in 2018?



Page 23

```
 1                    Do you understand?
 2            A.  Well, I understand.  But I don't think
 3   I said that I forgot.  I remembered queue management,
 4   because it had been almost a year and a half, but the
 5   review of the documents confirmed what I seemed to
 6   remember, if that makes sense to you, sir.
 7            Q.  Yes, thank you.  And "forgot" was the
 8   wrong word.  "Recollection" is an unusual word, I'll
 9   admit.
10            What about queue management did --
11   what did the documents confirm about your memory with
12   respect to queue management?
13            A.  The intent of queue management and what
14   the officers were required to do doing their
15   functions as -- at the queue management point.
16            Q.  Okay.  We'll talk about that a little
17   bit later in the deposition.  As for right now, I
18   want to follow up about this lawsuit.
19            Have you read any news stories
20   regarding this lawsuit?
21            A.  No, sir.
22            Q.  Outside of your conversation with your
23   lawyers, have you discussed this lawsuit with anyone
24   else?
25            A.  No, sir.
```



Page 24

1              Q.  Does anyone know that you're attending

2    this deposition, apart from yourself and your

3    attorneys?

4              A.  My wife.

5              Q.  Thank you.  I would like to ask one

6    more question.

7                   Earlier I asked you:  Were you or are

8    you a member of Facebook or any social networking?

9                   Do you remember that?

10             A.  Yes.

11             Q.  You -- you said no?

12             A.  Yes.

13             Q.  Was there any point ever in which you

14   were a member of any social networking sites?

15             A.  On the examples that you gave me, like

16   Facebook or whatever you said, no, sir.

17             Q.  Thank you, Mr. Longoria.

18                  I'm going to ask you some questions

19   now briefly about your education and then your work

20   history.  Let's go back in time a bit.

21                  What's the highest level of education

22   you've ever received?

23             A.  Associates.

24             Q.  And where was that?

25             A.  At the Air Force Community College.



Page 25

1           Q.   Do you remember what year you
2    graduated?
3           A.   No, sir.
4           Q.   Roughly?  Can you give me a decade?  I
5    don't mean to date you here.
6           A.   1980s.
7           Q.   1980s, thank you.
8                What was your first job after you
9    graduated?
10          A.   After I graduated?  From --
11          Q.   Yes.
12          A.   Are you referring to my college degree,
13   the associates?
14          Q.   The associate's degree.
15          A.   I was -- I was in the military during
16   that timeframe.  The community college is something
17   that the air force provided you --
18          Q.   Uh-huh.
19          A.   -- and so I was already working.  I was
20   a member of the United States Air Force when I
21   acquired that associate's degree.
22          Q.   Okay.  Thank you.  How long were you
23   enlisted in the Air Force for?
24          A.   20 years.
25          Q.   20 years.  Do you remember when you



Page 26

1  left?

2           A.   1991.

3           Q.   What did you do for employment after

4  you left in 1991?

5           A.   I did security work.

6           Q.   How long did that last?

7           A.   About a year.

8           Q.   About a year.  Do you remember what

9  year you started with CBP?

10           A.   1992.

11           Q.   Did you have any jobs in between the

12  security that you did in 1991 and beginning with CBP

13  in 1992?

14           A.   No.

15           Q.   When did you become -- did you have to

16  undertake any training with CBP?

17           A.   Yes, sir.

18           Q.   Can you -- can you describe that

19  training?

20           A.   The training was ongoing, and it

21  depended on the job that I performed with customs,

22  and now known as CBP.

23                So would you like for me to describe

24  all the different training that I completed in

25  relations to those jobs?



Page 27

1          Q.  Let's talk about the trainings that you

2    may or may not have undertaken when you first started

3    in 1929.

4          A.  Customs inspector training, 1992 was

5    the first training I received.

6          Q.  At any point in your employment with

7    CBP, did you ever take trainings with respect to

8    asylum law?

9          A.  No, sir.

10         Q.  How -- how long were you employed at

11   CBP?

12         A.  27 years.

13         Q.  27 years.  So by my math, that's '92 to

14   2019?

15         A.  2018.

16         Q.  '18.  '18, okay.

17              And in those 27 years, you were never

18   trained any on aspects of asylum laws; is that

19   correct?

20         A.  No formal training, no, sir.

21         Q.  Okay.  At any point did you have any

22   training regarding the processing of non-citizens

23   without proper travel documentation at a port of

24   entry?

25         A.  Yes, sir.



Page 28

1          Q.  When did you take that course?

2          A.  Immigration law was a part of the

3   customs inspector training in 1992.  Well, the

4   training for customs inspector included

5   familiarization with immigration law.

6          Q.  Okay.  Did you receive any written

7   materials in connection with that course?

8          A.  To the best of my recollection, yes,

9   sir.

10         Q.  Okay.  Do you still have any of those,

11  by any chance?

12         A.  No, sir.

13         Q.  Okay.  After the 1992 training which

14  instructed you on processing non-citizens without

15  proper travel documents at a port of entry, did you

16  take any other trainings subsequent to that date on

17  the same topic?

18         A.  No.

19         Q.  That was a "no"?

20         A.  Yes.

21         Q.  Yes.  Do you remember when?

22         A.  No.  My response was "no."  And I

23  answered your question.

24         Q.  Thank you, Mr. Longoria.  I'm sorry,

25  there's a bit of a lag with the video, and so I



Page 29

1    appreciate you clarifying that for me.

2              What was your last job title with CBP?

3         A.   Assistant director of field operations.

4         Q.   The ADFO sometimes written?

5         A.   Yes.

6         Q.   When did you begin that position?

7         A.   To the best of my recollection, I

8    believe it was 2015.

9         Q.   2015.  Had you been promoted to the

10   ADFO?

11        A.   Yes.

12        Q.   From what position?

13        A.   Supervisory program manager.

14        Q.   How long were you supervisory program

15   manager?

16        A.   Approximately three years.

17        Q.   Before you were supervisory program

18   manager, what was your title?

19        A.   Program manager.

20        Q.   Program manager.  How long were you a

21   program manager, if you can remember?

22        A.   Approximately two years.

23        Q.   Two years.  Do you recall what your

24   position was before program manager?

25        A.   I was a field training representative.



Page 30

1          Q.  What are the duties of a field training

2    representative?

3          A.  During that assignment, I was assigned

4    to headquarters officer training and development, I

5    was still in the -- I was still in Laredo, but I

6    worked in the headquarters office of training and

7    development.  And what I basically did is I had a

8    region that I was responsible for for overseeing

9    their training program.

10         Q.  Can you talk to me and describe in a

11   little bit of detail what sort of training materials

12   you worked with or helped establish?

13         A.  It was during the timeframe of 9/11.

14   So I helped develop the -- the agency's

15   anti-terrorism program, and I helped to revamp the

16   agency's non-intrusive inspection training, referred

17   to as NII.  Those were about the two major

18   accomplishments that I had when I was -- was

19   training.

20         Q.  At any point, did you develop any

21   training materials with respect to the processing of

22   non-citizens without proper travel documents at ports

23   of entry?

24         A.  No, sir.

25         Q.  Thank you.  I would like to talk a



Page 31

1    little bit now about your role as the ADFO.

2                    What are the duties and

3    responsibilities of an ADFO?

4                    A.  As the ADFO, I was responsible for the

5    border security side of the house and that meant

6    overseeing the enforcement actions and the passenger

7    processing actions at every ports of entry.

8                    Q.  Did you have any direct responsibility

9    for the ports at U.S. -- at the U.S./Mexico border?

10                   A.  Would you repeat the question?

11                   Q.  Did you have any direct responsibility

12   for the operations of ports at the U.S./Mexico

13   border?

14                   A.  Yes, sir.

15                   Q.  Within the LFO?

16                   A.  Yes.

17                   Q.  Okay.  Which -- hold on.  Maybe I can

18   get this.

19                   In the Laredo field office, there are

20   eight ports of entry; is that correct?

21                   A.  Yes, correct.

22                   Q.  That's Brownsville, Del Rio, Eagle

23   Pass, Hidalgo, Laredo, Roma, Progreso, and

24   Rio Grande?

25                   A.  Yes, sir.



Page 32

```
 1            Q.  That's -- were those the eight ports
 2   that you were responsible for in your time as ADFO?
 3            A.  Yes, sir.
 4            Q.  Thank you, Mr. Longoria.  I would like
 5   to talk to you a little bit about pedestrian
 6   processing.
 7               When a pedestrian wants to enter the
 8   United States at a port of entry, isn't it true that
 9   the normal way, the normal process is to walk on a
10   pedestrian walkway from Mexico, across the
11   international boundary to the United States and enter
12   into a territory that's U.S. territory but not yet
13   beyond the port of entry?
14               Did I describe that correctly?
15            A.  Would you repeat it again?
16            Q.  Sure.  When a pedestrian wants to enter
17   into the United States at a port of entry, the normal
18   process is generally to walk along a pedestrian
19   walkway from Mexico, across an international boundary
20   into the United States.
21               That's an area that's on U.S.
22   territory but is not beyond the port of entry; is
23   that right?
24            A.  The only confusing part is towards the
25   end.  Are you talking about before they enter the
```



Page 33

1  federal inspection site, the FIS?

2            Q.   I think I may be.  But why don't you

3  describe to how me how a pedestrian wishing to enter

4  the United States at a port of entry within the LFO

5  would get there.

6            A.   You described it pretty accurately,

7  except towards the end.  So the pedestrian is walking

8  on the pedestrian walkway, crosses the international

9  boundary line, enters the United States, walks until

10 he reaches the federal inspection site, and then he

11 presents himself to an officer at -- at the primary

12 inspection site.

13           Q.   Thank you.  That's -- that was better

14 phrased than my question.  It's almost as if you had

15 been working there for 27 years.  Thank you,

16 Mr. Longoria.

17                When an individual wishes to enter

18 into the United States, they would walk until they

19 reach an inspection station, and there they would be

20 inspected by a CBP officer; is that correct?

21           A.   Correct.

22           Q.   Prior to 2016, was that the way that

23 pedestrians seeking asylum would be inspected at

24 ports of entry?

25           A.   Yes, sir.



Page 34

1          Q.  In all your years of experience, do you

2    know of any deviations to that process prior to 2016?

3          A.  Not that I'm aware of.

4          Q.  Are you aware of times prior to 2016

5    when that sort of general process didn't apply to

6    people seeking asylum?

7          A.  I'm not aware, sir.

8          Q.  Thank you, Mr. Longoria.

9              Mr. Longoria, do you know what the

10   term "metering" is?

11         A.  Yes, sir.

12         Q.  How would you define it?

13         A.  I would define it as the -- controlling

14   the flow of people requesting to enter the United

15   States without the necessary documents at -- at a

16   specific point and to -- to minimize the impact to

17   operations.

18         Q.  When did you first hear of the term

19   "metering"?

20         A.  Approximately 2016.

21         Q.  Is -- is it also sometimes referred to

22   as "queue management"?

23         A.  Yes, sir.

24         Q.  Was it referred to by any other names

25   other than "metering" and "queue management"?



Page 35

```
 1              A.  No, sir.
 2              Q.  I would like to talk a little bit more
 3   about metering within the Laredo field office.
 4                  Did the Laredo field office ever
 5   engage in metering?
 6              A.  Yes, sir.
 7              Q.  When did metering at the Laredo field
 8   office begin?
 9              A.  Approximately 2016.
10              Q.  2016.
11                  MR. GUISADO:  Tyler, if you could
12   bring up FL 1, Exhibit 298, AOL-DEF 00011374.
13                  (Exhibit 298 marked)
14                  MR. GUISADO:  Ari, let me know when
15   you receive the document and -- and I'll begin
16   questioning in earnest.
17                  MR. NAZAROV:  Yes, sir.
18                  While we wait for that, I just wanted
19   to make sure that Mr. Longoria sees the whole
20   document.
21                  Can you -- Mr. Longoria, can you see
22   it?
23                  THE WITNESS:  Yes, sir.
24                  MR. NAZAROV:  Are you able to read it?
25                  THE WITNESS:  I can read the -- about
```



Page 36

1   half at the start of the message.

2                   MR. NAZAROV:  Will you -- I would like

3   him just to keep, taking a look at the entire

4   document.

5                   Tyler, can you just -- can you blow it

6   up a little bit and go to the beginning of it, to the

7   bottom of it and just have Mr. Longoria read it.

8                   And, Mr. Longoria, if you can't see it

9   or you can't read it or it's unclear, you'll let me

10  know, right --

11                  THE WITNESS:  Yes, sir.

12                  MR. NAZAROV:  -- or Tyler know?

13                  We have got the document.  Thank you.

14                  And go ahead, Mr. Longoria, just take

15  a look at the entire document starting at the

16  beginning.  So I want you to see the entire document,

17  and take your time looking through it and then you

18  can answer Mr. Angelo's questions.

19                  THE WITNESS:  Okay.

20                  So the first -- the first page that

21  I'm looking at is the memorandum from Mr. Owen; is

22  that correct?

23          Q.   (BY MR. GUISADO) That's correct.  I'm

24  still -- sorry, go ahead.  I didn't mean to

25  interrupt.



Page 37

1                 A.   I would like to see the date at the top

2      of the memorandum, and then I would like to go down

3      to the bottom, please.

4                      THE VIDEOGRAPHER:  (Complies).

5                      THE WITNESS:  Can we go back to the

6      memorandum.

7                      THE VIDEOGRAPHER:  (Complies).

8                      THE WITNESS:  So there is no date on

9      the memorandum?

10                     MR. GUISADO:  Can you scroll to the

11     bottom, Tyler, and then scroll to the top of --

12     excuse me, at the very bottom of the first page.

13                     THE VIDEOGRAPHER:  (Complies).

14                     MR. GUISADO:  Right there is good.

15                Q.   (BY MR. GUISADO) Mr. Longoria, I'm

16     showing you what will be marked Exhibit 298 to your

17     deposition.  See the April --

18                A.   I see April 27th.

19                Q.   Thank you.  It's an April 27th, 2018

20     e-mail chain.  It bears the Bates stamp AOL-DEF

21     00011374 - 75.

22                A.   I see it.

23                Q.   Mr. Longoria --

24                     MR. NAZAROV:  I'm sorry to interrupt.

25                     MR. GUISADO:  No, it's all right.



Page 38

```
 1                    MR. NAZAROV:  I'm really sorry.  I
 2   just want to make sure people can see things.
 3                    And, Mr. Longoria, did you get to see
 4   the entire document?
 5                    THE WITNESS:  I have seen the
 6   memorandum.  Now we need to keep going up.
 7                    MR. NAZAROV:  Okay.  Let him just take
 8   a look, and then he's all yours.
 9                    Are you able to read the e-mails and
10   everything?
11                    THE WITNESS:  Yes, sir.  Basically
12   there's only two strings of e-mails.  So one that it
13   was sent to the DFOs, and then one from Mr. Skinner
14   to Mr. Higgerson copying me.
15                    MR. NAZAROV:  Okay.  And you're able
16   to read those clearly?
17                    THE WITNESS:  Yes, sir.
18                    MR. NAZAROV:  Okay.  Then I'm handing
19   you off to Angelo.
20                    THE WITNESS:  Okay.
21                    MR. NAZAROV:  Okay.
22                    MR. GUISADO:  Thank you, Ari.
23            Q.  (BY MR. GUISADO) Mr. Longoria, it
24   certainly wouldn't be any use if you couldn't read
25   it.  So if there's anything that's unclear, you need
```



Page 39

1    them to zoom in, just let me know.

2            A.  Okay.

3            Q.  As for right now, I'd like to focus in

4    a bit on the first -- the very top half of the second

5    page and part of the bottom of the first page.

6                    THE VIDEOGRAPHER:  (Complies).

7                    MR. GUISADO:  That's good for now.

8            Q.  (BY MR. GUISADO) Okay.  Mr. Longoria,

9    I'll represent to you that Exhibit 298 is a copy of

10   CBP's metering guidance issued by Todd Owen,

11   executive assistant commissioner, Office of Field

12   Operations.

13                   And I'm wondering if you have seen

14   this document before?

15           A.  Yes, sir.

16                   MR. GUISADO:  Tyler, if you could go

17   down displaying only the second page.

18                   THE VIDEOGRAPHER:  (Complies).

19                   MR. GUISADO:  Could you zoom in just a

20   little bit.

21                   THE VIDEOGRAPHER:  (Complies).

22           Q.  (BY MR. GUISADO) Mr. Longoria, you just

23   testified that you recognized this document.

24                   When had you seen it before?

25           A.  When -- when it came out.



Page 40

1            Q.  Back in April 27th, 2018?

2            A.  Yes, sir.

3            Q.  All right.  I would like to focus in on

4    the first sentence.  And I will read it out to you.

5                 "When necessary or appropriate to

6    facilitate orderly processing and maintain the

7    security of the port and safe and sanitary conditions

8    for the traveling public, DFOs may elect to meter the

9    flow of travelers at the land border to take into

10   account the port's processing capacity."

11                Does that accurately reflect what you

12   recall about this e-mail when you received it in

13   2018?

14           A.  Yes, sir.

15           Q.  Had you heard the term -- excuse me.

16   Let me ask a better question.

17                Does that sentence discuss the

18   practice of metering?

19           A.  Yes, sir.

20           Q.  You testified earlier that you had

21   heard about metering before you received this e-mail

22   in 2016; is that right?

23           A.  If your question is:  Were we metering

24   prior to this 2018 memo, is that your question?

25           Q.  No.  My question is:  You testified



Page 41

1    earlier that you had heard about metering before you

2    got this metering guidance e-mail; is that correct?

3            A.  Correct.

4            Q.  You had heard about it in 2016; is that

5    right?

6            A.  Correct.

7            Q.  Who did you hear it from?

8            A.  From -- let me -- let me think about

9    the response there.  It came down from headquarters

10   to the DFO and then down to me.

11           Q.  Do you remember who was working at

12   headquarters at that time?

13           A.  No, sir.

14           Q.  Okay.  Do you remember what

15   headquarters relayed to the DFO that was eventually

16   relayed to you about metering?

17           A.  I can -- I can answer what the DFO

18   relayed to me.  I couldn't answer as to what

19   headquarters spoke to the DFO about.

20           Q.  I think that's only fair.  Please go

21   ahead, Mr. Longoria.

22           A.  The guidance was to establish points

23   outside the FIS or the mid -- whatever was conducive

24   for the port directors to conduct this -- to meet the

25   metering guidance, they were to establish points



Page 42

1    where they were to identify people that were going

2    to -- had no documents and had intent of expressing

3    fear in returning back to their country, and then had

4    them wait until there was space for them to be

5    processed at the port of Mexico.

6                    They were not to be discouraged to

7    leave.  They could stand in line if they wanted to or

8    they could return to Mexico.  That was the process of

9    the metering.

10                   Q.  And that's what the DFO told you in

11   2016?

12                   A.  Yes, sir.

13                   Q.  Do you know if that information was

14   disseminated to other ports within the Laredo field

15   office?

16                   A.  Yes, sir.

17                   Q.  Was it given to the other ports in the

18   same kind of -- was the substance given to the other

19   ports the same as the one that you received, if you

20   know?

21                   A.  Yes, sir.

22                   Q.  Okay.

23                   MR. GUISADO:  Tyler, could you move us

24   to the top of the first page.

25                   THE VIDEOGRAPHER:  (Complies).



Page 43

 1                    MR. GUISADO:  Okay.  Zoom in.

 2                    THE VIDEOGRAPHER:  (Complies).

 3                    MR. GUISADO:  Yeah, scroll down just a

 4    little bit.

 5                    THE VIDEOGRAPHER:  (Complies).

 6                    MR. GUISADO:  Thank you.

 7          Q.  (BY MR. GUISADO) Mr. Longoria, I would

 8    like to read from the top page.

 9                    It appears Bradd Skinner e-mails to

10    David Higgerson at 5:43 p.m. on April 27th, 2018:  "I

11    think it useful to organize a teleconference this

12    afternoon with the port directors to hash out any

13    questions they may have at this time, confirm what is

14    currently taking place, and identify reporting

15    protocol.  ADFO Longoria is available and will lean

16    on his expertise and experience."

17                    Did I read that correctly?

18          A.  Yes.

19          Q.  On April 27th, 2018, David Higgerson

20    was the director of the LFO; is that right?

21          A.  Yes.

22          Q.  And Bradd Skinner was his deputy?

23          A.  Yes.

24          Q.  Do you recall the teleconference that

25    was to be organized that afternoon?



Page 44

```
 1          A.  No.

 2          Q.  Do you remember what may have been

 3   discussed at that teleconference, by any chance?

 4          A.  No.  Yeah, I don't remember what was

 5   discussed.  Any answer that I would give you would be

 6   based on what's in the memorandum.  So I'm sure the

 7   that the guidance identified in the memorandum was

 8   discussed and provided to all the port directors.

 9          Q.  Okay.  But, Mr. Longoria, it appears as

10   if -- wait.  Was Bradd Skinner your supervisor?

11          A.  Yes.

12          Q.  Okay.  And you remember receiving the

13   memorandum guidance on April 27th when it came out;

14   is that right?

15          A.  Yes, sir.

16          Q.  Your boss e-mails to his boss that you

17   were available to discuss implementing the metering

18   guidance because of your expertise and experience --

19          A.  Yes, sir.

20          Q.  -- is that right?

21          A.  Yes.

22          Q.  And you don't remember what you

23   discussed if there was a teleconference call; is that

24   right?

25          A.  My response is:  Not specifically.  I
```



Page 45

```
 1    don't remember all the details of the -- of the
 2    conference call.
 3              Q.   When --
 4              A.   That is my response.
 5              Q.   Okay.  That's fine.  That was -- that
 6    was sometime ago.  I certainly understand.
 7                   What -- do you know what expertise and
 8    experience your supervisor was referring to?
 9              A.   I had been dealing with the influx of
10    the unaccompanied aiding childrens (sic) since 2014,
11    and then we dealt with the influx of the family units
12    since 2016.  So that would be the expertise and
13    experience that he was referring to, sir.
14              Q.   Thank you.  So you have -- excuse me.
15    Let me rephrase.
16                   As the ADFO, you had been working with
17    processing unaccompanied, non-citizen children since
18    2014 and family units since 2016; is that right?
19              A.   Yes, sir.
20              Q.   Okay.  Can you talk to me a little bit
21    about how those individuals are processed at ports of
22    entry within the LFO.
23                   MR. NAZAROV:  Objection:  Form.
24              Q.   (BY MR. GUISADO) You can answer,
25    Mr. Longoria.
```



Page 46

```
 1              A.  Okay.  I'm not under -- sure I
 2    understand.  When Mr. Nazarov says "objection," so
 3    I'm just waiting for a response.
 4              Q.  No, no, when he objects, you can answer
 5    after he's done objecting unless he tells you "Don't
 6    answer that."
 7              A.  Okay.  Got it --
 8              MR. NAZAROV:  That's right.
 9              THE WITNESS:  -- I'm clear on that,
10    yeah.
11              MR. NAZAROV:  My apologies I didn't
12    clear that up.  I'm sorry.
13              Q.  (BY MR. GUISADO) Let me ask a better
14    question, Mr. Longoria.
15              Within the Laredo field office, when a
16    port of entry is engaged in metering, CBP officers
17    are placed at or near the limit line between the U.S.
18    and Mexico international boundary; is that right?
19              A.  I'm not familiar with the term "limit
20    line."  That was not something that we used within
21    the Laredo field office.
22              So I'm assuming that you mean the
23    queue management point or the point where the
24    officers were assigned to?
25              Q.  Yes.  What did you -- what did you
```



Page 47

1    refer to that point as?

2              A.   Just "queue management point."

3              Q.   Queue management point.

4                   And in relation to the U.S./Mexico

5    border, where is the queue management point?

6              A.   As close to the U.S./Mexico borderline

7    as possible operationally -- operationally feasible.

8              Q.   What -- what do you mean by

9    "operationally feasible"?

10             A.   Some of the ports of entry within the

11   Laredo field office have bridge spans that go two or

12   three miles.  So it wouldn't be operationally

13   feasible to have somebody out there in case somebody

14   uses it.  Because they were designed for pedestrians.

15             Q.   Hmm, we'll get -- we'll focus on that

16   in a little bit.  I would like to turn back to -- to

17   a little bit -- to a queue management line as it

18   was -- as it relates to the boundary.

19                  At some ports of entry within the

20   Laredo field office, is the queue management point at

21   the midpoint of the bridge?

22             A.   To the best of my recollection, I

23   believe, yes, sir.

24             Q.   To the best of your recollection, do

25   you know which of the eight ports had the queue



Page 48

1   management point at the mid point of the bridge, or

2   bridges if there are multiple?

3          A.   The Laredo port of entry Bridge Number

4   One, for sure, I believe the Hidalgo crossing and

5   Brownsville.

6                THE VIDEOGRAPHER:   Counsel, just to

7   interject, do you want me to take this down?

8                MR. GUISADO:   No, it's fine.   Leave it

9   up still --

10               THE VIDEOGRAPHER:   Okay.

11               MR. GUISADO:   -- for the next one.

12         Q.   (BY MR. GUISADO) Were you stationed

13  primarily at the Laredo field office?

14         A.   Yes, sir.

15         Q.   Okay.   And how many bridges are there

16  leading up to the U.S. entry point at the Laredo

17  field office?

18         A.   Repeat the question.

19         Q.   At the Laredo field office, how many

20  bridges are there that lead up to the United States

21  port of entry?

22         A.   Within the Laredo field office?

23         Q.   No, at -- excuse me.   At -- at the

24  Laredo port of entry.

25         A.   At the Laredo port of entry, four.



Page 49

1          Q.  Four.  And to the best of your

2    knowledge, the queue management point was at the

3    midpoint of each of those four bridges?

4          A.  I don't recall there being any officers

5    at the queue management point at Bridge Number Two

6    because that was not designed for pedestrians.  The

7    only pedestrian bridge we have at the Laredo port of

8    entry was Bridge Number One and there were people

9    there posted at delivery.

10         Q.  Okay.  Thank you.

11             At the Hidalgo port of entry, do you

12   know how many bridges there are?

13         A.  Three.

14         Q.  And are there queue management points

15   at each of the three bridges?

16         A.  I'm sure that Hidalgo had officers at

17   mid bridge, but I'm not clear if Reynosa does.

18         Q.  Okay.

19         A.  I don't recollect.

20         Q.  All right.  That's fine.  And I

21   certainly don't expect you to have a perfect

22   geographic understanding of each of the bridges at

23   each of the eight ports of entry.

24             To the best of your knowledge, how

25   many bridges are there at Brownsville?



Page 50

1          A.  To the best of my recollection, three.

2          Q.  And do you remember if there were queue

3  management points at each?

4          A.  No.

5          Q.  Okay.  Can you remember if there were

6  queue management points at at least one?

7          A.  Yes.

8          Q.  Okay.  Other --

9          A.  There were queue management points at

10  every bridge that had pedestrian -- major pedestrian

11  crossings.

12          Q.  Thank you, Mr. Longoria.

13              And the queue management point was as

14  close to the international boundary with Mexico as

15  possible unless it was operationally unfeasible to do

16  so; is that right?

17          A.  Correct.

18          Q.  And a port of entry is engaged in

19  metering when a non-citizen without proper industry

20  documents arrives at the international boundary, a

21  CBP officer tells them that the port is at capacity

22  and that they should return to be processed later; is

23  that correct?

24              MR. NAZAROV:  Objection:  Form.

25          Q.  (BY MR. GUISADO) You can answer.



Page 51

```
 1              MR. NAZAROV:  Uh-huh.
 2              THE WITNESS:  They -- they had the
 3    option of staying there, so the term "return" is not
 4    accurate, because when they were advised that the
 5    port was at capacity, they had the option of waiting
 6    at mid bridge or going back to Mexico and coming back
 7    later.
 8         Q.   (BY MR. GUISADO) Thank you,
 9    Mr. Longoria.
10              MR. GUISADO:  Tyler, could you bring
11    up FL 0, Exhibit 299, AOL-DEF 00909720.
12                   (Exhibit 299 marked)
13              MR. NAZAROV:  Sorry to chime in again.
14              I just want to make sure:
15    Mr. Longoria, can you see this document?
16              THE WITNESS:  I can see it.
17              MR. NAZAROV:  Okay.  I'm going to ask
18    Tyler to go -- I want you to see and make sure you're
19    able to read all of it.
20              So, yeah, Tyler, you're doing it.  Go
21    kind of to the bottom and just blow it up so --
22    before Angelo starts --
23              THE VIDEOGRAPHER:  (Complies).
24              MR. NAZAROV:  Yeah.  So, Mr. Longoria,
25    are you able to read it?
```



Page 52

```
 1                    THE WITNESS:  Yes, sir, I'm reading it
 2     now.
 3                    MR. NAZAROV:  Okay.  You take your
 4     time with just reading it, and ask Tyler to go up so
 5     you can read it going up, (indicates).
 6                    THE WITNESS:  Okay.
 7                    MR. NAZAROV:  Sorry to interrupt.
 8                    MR. GUISADO:  And we got it.  So thank
 9     you, sir.
10                    THE WITNESS:  Yeah, can you go up,
11     please.
12                    THE VIDEOGRAPHER:  (Complies).
13                    THE WITNESS:  Okay, go up, please.
14                    THE VIDEOGRAPHER:  (Complies).
15          Q.  (BY MR. GUISADO) Mr. Longoria --
16                    (Phone announcement)
17                    MR. GUISADO:  I hope that doesn't end
18     this Web-Ex.
19                    MR. NAZAROV:  No, I think it was the
20     call-in number.
21                    MR. GUISADO:  All right.
22          Q.  (BY MR. GUISADO) Mr. Longoria, are you
23     able to see that okay?  Are you able the read that
24     okay?
25          A.  Yes, sir, I'm still reading.
```



MAGNA
LEGAL SERVICES

Page 53

1          Q.  Okay.  Thank you, sir.

2               THE WITNESS:  Okay.  Please go down --

3     up.

4               THE VIDEOGRAPHER:  (Complies).

5               THE WITNESS:  Okay, I have read the

6     document.

7          Q.  (BY MR. GUISADO) Mr. Longoria, I have

8     showed you, and you have now read, what will be

9     marked as Exhibit 299 to your deposition.  It's an

10    August 28, 2018 e-mail chain bearing the Bates

11    numbers AOL-DEF 00909720 to 22.

12               Do you recognize Exhibit 299?

13         A.  Yes, sir.

14         Q.  When had you seen it before?

15         A.  When I was copied on it.

16         Q.  Back in 2018?

17         A.  Yes, sir.

18         Q.  Okay.  And I'll represent to you that

19    this exhibit is an August 28 -- 2018 e-mail chain

20    regarding queue management communications at the

21    Laredo communication office.

22               You're a recipient on this e-mail

23    chain, as you noted.  I would like to focus on the

24    second page of the e-mail, please.

25               THE VIDEOGRAPHER:  (Complies).



Page 54

1                    MR. GUISADO:  That's good.  Thank you.

2             Q.  (BY MR. GUISADO) Mr. Longoria, Rodney

3     Harris, the deputy ADFO, is that the person directly

4     beneath you?

5             A.  Yes, sir.

6             Q.  Thank you.

7                    Rodney Harris e-mails that the port of

8     Eagle Pass is using the telegram instant messaging

9     application between queue management sites --

10    individuals at queue management sites and their

11    supervisors and managers.

12                   Did I read that correctly?

13            A.  Yes.

14            Q.  Do you remember per the telegram

15    instant messaging application?

16            A.  No, sir.

17            Q.  Sorry, that was a "no," sir?

18            A.  Yes.

19            Q.  You had never heard about it before --

20            A.  No.

21            Q.  -- receiving this e-mail?

22            A.  No.

23            Q.  No, okay.

24                   MR. GUISADO:  Can you scroll up just a

25    little bit, Tyler.



Page 55

```
 1                     THE VIDEOGRAPHER:  (Complies).
 2                     MR. GUISADO:  Keep going.  Keep going.
 3     Keep going.
 4                     THE VIDEOGRAPHER:  (Complies).
 5                     MR. GUISADO:  Thank you.
 6             Q.  (BY MR. GUISADO) Mr. Longoria, it
 7     appears that -- and I hope I don't butcher this
 8     name -- Mucia Dovalina --
 9                     Did I pronounce that okay?
10             A.  Yes, sir.
11             Q.  -- forwarded this e-mail on to you on
12     August 28th, 2018.  You testified that you recalled
13     receiving it; is that right?
14             A.  Yes.
15             Q.  Did you hear about the telegram
16     messaging app at any date after receiving this
17     e-mail?
18             A.  Not to my recollection, no.
19             Q.  To your recollection, was the telegram
20     instant messaging app just an Eagle Pass thing?
21             A.  Yes, sir.  To the best of my
22     recollection, yes.
23                     And I would like to clarify something.
24             Q.  Please go ahead.
25             A.  The border security, Dovalina, didn't
```



Page 56

1    forward it to me.  She responded to Mr. Harris.  I

2    was just copied in the message, sir.

3              Q.  That's right.  I should be more

4    precise.

5                  You were copied on the message

6    discussing the queue management metering, and beneath

7    that was an e-mail discussing the telegram messaging

8    app; is that right?

9              A.  Correct.

10             Q.  Do you recall how long the Eagle Pass

11   port of industry used the telegram instant messaging

12   app?

13             A.  No, sir.

14             Q.  Do you know if they still use it today?

15             A.  No, sir.

16             Q.  So you saw this e-mail in 20 -- in

17   August 2018, and then you never heard about the

18   telegram messaging app until today?

19             A.  Yes, sir.

20             Q.  I would like to focus on Border

21   Security Coordinator Dovalina's sentence.

22                  "If that video should by any chance

23   get leaked, media would have a field day."

24                  Do you recall the video security

25   coordinator Dovalina's referring to?



Page 57

1          A.  No, sir.

2              MR. GUISADO:  Tyler, if you have the

3      capacity, please bring up the telegram training video

4      AOL-DEF 00390069.

5                   (Exhibit 300 marked)

6              THE VIDEOGRAPHER:  (Complies).

7              MR. GUISADO:  Could you pause just for

8      a second.

9              THE VIDEOGRAPHER:  Sorry, I'll start

10     it from the beginning.

11             MR. GUISADO:  That's cool.  Technology

12     is what it is.

13         Q.  (BY MR. GUISADO) Mr. Longoria, CBP

14     produced this document and this video --

15             MR. NAZAROV:  Sorry, Angelo, you kind

16     of -- there's a weird noise.

17             MR. GUISADO:  Yeah, I heard that, too.

18     I sure hope it's not me.

19             MR. NAZAROV:  Oh, okay.  I didn't know

20     who it was.

21             MR. GUISADO:  Yeah, me neither.

22         Q.  (BY MR. GUISADO) Mr. Longoria, I'll

23     represent to you that this is the video that

24     Coordinator Dovalina referenced in an e-mail that you

25     received August 28th, 2018.  I would like to play it



Page 58

1    for you.

2                    MR. GUISADO:  Tyler, if you wouldn't

3    mind.

4                    THE VIDEOGRAPHER:  (Complies).

5                    (Video plays)

6            Q.  (BY MR. GUISADO) Mr. Longoria, I

7    apologize that it's -- the video seems to lag a

8    little bit.

9                    MR. GUISADO:  And, Tyler, we're going

10   to go back to the video in just a second, so keep it

11   up if you don't mind.

12           Q.  (BY MR. GUISADO) Mr. Longoria, to your

13   knowledge, was it CBP's practice to video the queue

14   management point between 2016 and 2000 -- until the

15   present?

16           A.  Repeat the question.

17           Q.  Was it CBP's practice to record with

18   video the queue management point at the Eagle Pass

19   point of entry?

20           A.  No.

21           Q.  That's a "no," that you yourself have

22   affirmative knowledge that the port of Eagle Pass did

23   not video at any point the queue management point at

24   the port of entry?

25           A.  I think that -- I didn't understand



Page 59

1    that to be your question.

2           Q.   My question is:  At the Eagle Pass

3    point of entry, was it CBP's practice to record with

4    video the queue management point?

5           A.   I'm getting confused, because you talk

6    about the Eagle Pass port of entry and then you say

7    it -- was it CBP's practice.  That's where I'm

8    getting confused as to what the point is.

9                They were making videos to train their

10   staff, and the videos are a good training tool.  So

11   I'm not sure I understand your question or the

12   intent.

13               MR. GUISADO:  Tyler, if you could

14   queue the video at 40 seconds, play it to 45, and

15   then pause at 45.

16               THE VIDEOGRAPHER:  (Complies).

17               MR. GUISADO:  Thank you.

18          Q.   (BY MR. GUISADO) Mr. Longoria, in this

19   training video for the telegram messaging app, it

20   appears as if the video depicts an officer using a

21   video recording functionality to record interactions

22   at the queue management point, does it not?

23          A.   Yes.

24          Q.   The video states that managers are able

25   to view migrant arrivals immediately.



Page 60

1                    Does it state that?

2           A.   Yes.

3           Q.   Was it the practice at the Eagle Pass

4    port of entry to record with video interactions at

5    the queue management point?

6           A.   This particular instance, considering

7    that they were -- that there is a training video

8    available, then they actually would have to, yes.

9           Q.   It's not just a training video, is it;

10   it is an actual messaging platform, is it not?

11                MR. NAZAROV:   Objection:   Form.

12          Q.   (BY MR. GUISADO) You can still answer,

13   Mr. Longoria.

14          A.   No, I understand, sir.  But I -- I

15   would still identify it is as a training video.

16   Maybe that's my interpretation of it, but I mean,

17   it's intended to provide situational awareness of

18   mana -- managers of this app and how it could be

19   used.

20                So in my interpretation, I would

21   identify it as a training video, but clearly they're

22   using it to record the arriving aliens.

23          Q.   To your knowledge, did they use this

24   messaging app to record arriving aliens?

25          A.   Based on what you're showing me there,



Page 61

1    right there, yes, they used it to record arriving

2    aliens.

3              Q.   Thank you.

4              MR. GUISADO:  Tyler, can you go to 25

5    and pause it there.

6              THE VIDEOGRAPHER:  (Complies).

7              MR. GUISADO:  Maybe a half -- half

8    second after that.

9              THE VIDEOGRAPHER:  (Complies).

10             MR. GUISADO:  No, maybe 24 and a half.

11             THE VIDEOGRAPHER:  (Complies).

12             MR. GUISADO:  Actually, no, that's

13   good.  That's -- yeah, yeah, that's perfect.

14             Q.   (BY MR. GUISADO) Okay.  Mr. Longoria,

15   I'm showing you what appears to be a fictionalized

16   account of the use of the telegram messaging app.

17             It displays a Samsung telephone with a

18   contact called "Queuing."  Within the app is a photo

19   of a family and what appears to be the queue

20   management midpoint on some sort of bridge.  The text

21   reads, "Family from Cuba at Bridge Two at 1328 hours.

22   Not escorted."

23             MR. NAZAROV:  Hold on.  Hold on.

24             Q.   (BY MR. GUISADO) Can you --

25             MR. NAZAROV:  I just want to --



Page 62

1                Can you blow it up, Tyler, so

2     Mr. Longoria can see it.  Can you blow it up anymore?

3     Is that possible?

4                THE VIDEOGRAPHER:  (Complies).

5                MR. NAZAROV:  Okay, thank you.

6                Can you see that, Mr. Longoria?  Can

7     you see the writing?

8                THE WITNESS:  Yes, sir.

9                MR. NAZAROV:  Okay.

10               THE WITNESS:  Except at the very

11    bottom where -- the AS in red, I can't read that very

12    last one.

13               MR. NAZAROV:  Okay.

14          Q.  (BY MR. GUISADO) I'll --

15          A.  Account --

16          Q.  I'll let you know it says, "APD Gilbert

17    Sepulveda."  Is that a person that you recall?

18          A.  Yes, sir.

19          Q.  And he texts back, "Thank you."

20          A.  Okay.

21          Q.  I'll represent to you that that's what

22    the -- the screen shot of the video says.

23          A.  Yeah, I can read it.

24          Q.  Okay.  I'll represent to you that this

25    training video reflects how CBP officers could use



Page 63

1    the telegram messaging app.  It depicts a Cuban

2    family at Bridge Two at 1328 hours.

3              I'll ask you:  Did CBP officers at the

4    Eagle Pass port of entry use video or photo recording

5    at the queue management point?

6                   MR. NAZAROV:  Objection:  Form.

7                   THE WITNESS:  Yes.

8         Q.   (BY MR. GUISADO) Did they use video?

9                   MR. NAZAROV:  Form -- Objection:

10   Form.

11        Q.   (BY MR. GUISADO) You can answer,

12   Mr. Longoria.

13        A.   No, I understand.  And again, I keep

14   going back to the point I really don't understand.

15   You have -- you're showing me the Samsung.  I see the

16   pictures and I see the -- the messages underneath

17   there.

18              Now, this is a -- what they

19   communicate within the port of entry.  They took a

20   picture of the family units.  Yes, I understand that.

21   I'm getting confused when you keep referring to it as

22   video.  I'm just trying to make sure I understand

23   this in my mind so I can respond to your -- your

24   questions accurately.

25        Q.   Sure.





Page 64

1          A.  So --

2          Q.  Was it the --

3          A.  Your -- your -- your question is:  Is

4    this picture a video?

5          Q.  No.  My question is, and I'll flip them

6    this time:  Did CBP employees at the Eagle Pass port

7    of entry use the telegram messaging appear to

8    photograph individuals presenting at the queue

9    management point?

10         A.  Yes.

11         Q.  Did CBP employees at the Eagle Pass

12   port of entry ever use the telegram messaging app to

13   video record individuals approaching the queue

14   management point?

15         A.  Yes.

16         Q.  Do you know where the photos are stored

17   or were stored?

18         A.  No.

19         Q.  Do you know where the videos are stored

20   or were stored?

21         A.  No.

22         Q.  Did you yourself ever see any photos or

23   videos of individuals approaching the queue

24   management point at the Eagle Pass port of entry?

25         A.  Not to my recollection.



Page 65

1            MR. GUISADO:  Tyler, please play 49

2     seconds to 57 and stop at 57.

3            THE VIDEOGRAPHER:  (Complies).

4            MR. GUISADO:  Thank you.

5        Q.  (BY MR. GUISADO) The video depicts a

6     Brazilian father and daughter at the queue management

7     point on a bridge, which I presume to be at Eagle

8     Pass.  Let's presume, for the sake of this line of

9     questioning, that these two individuals have

10    presented at the queue management point to apply for

11    asylum in the United States.  They arrived at the

12    Piedras Negras, the Mexican city that borders Eagle

13    Pass.

14            Is it true that to apply for asylum,

15    they have to approach the queue management point

16    where CBP officers would be standing there?

17        A.  Yes.

18        Q.  To the extent that those CBP officers

19    were using the telegram messaging app, would those

20    officers at the Eagle Point port of entry queue

21    management point have taken photos of those

22    individuals applying for asylum?

23            MR. NAZAROV:  Objection:  Form.

24            THE WITNESS:  Yes.

25        Q.  (BY MR. GUISADO) Would they have taken



Page 66

1    a video of those individuals approaching the queue

2    management point at the Eagle Pass port of entry?

3                    MR. NAZAROV:  Objection:  Form.

4                    THE WITNESS:  Yes.

5                    MR. GUISADO:  Tyler, please play the

6    video through until 1:14 and then pause it.

7                    THE VIDEOGRAPHER:  (Complies).

8             Q.   (BY MR. GUISADO) Mr. Longoria, I'll

9    represent that what we just saw as the telegram

10   training video which purported to state that officers

11   using the telegram messaging app at the queue

12   management point could send photos and videos to

13   other officers working at the Eagle Pass port of

14   entry; is that right?

15            A.   Yes.

16                    MR. NAZAROV:  I just want -- I didn't

17   see -- you had technical difficulties.

18                    MR. GUISADO:  Yeah, Tyler, if you

19   could play that over again from 57 to 1:14.

20                    MR. NAZAROV:  Yeah, I did not see it.

21                    MR. GUISADO:  Did that work that time,

22   Ari?

23                    MR. NAZAROV:  Yeah.

24            Q.   (BY MR. GUISADO) Did you see that,

25   Mr. Longoria.



Page 67

1          A.   Yes, sir.

2          Q.   Okay.  Mr. Longoria, the video depicted

3   a time face overlaid onto the video and it said,

4   "Immediate awareness."

5               Is it your understanding that officers

6   manning the queue management point at the Eagle Pass

7   port of entry could provide immediate updates as to

8   individuals approaching the queue management point to

9   other CBP officers within the Eagle Pass port of

10  entry?

11              MR. NAZAROV:  Objection:  Form.

12              Go ahead you may answer.

13              THE WITNESS:  Yes.

14          Q.   (BY MR. GUISADO) It says here on the

15  phased video, "Chat conversation is viewed by all."

16              Is that right?

17          A.   Yes.

18              MR. GUISADO:  Tyler, please move to

19  1:23 -- or play it to 1:23 and then pause it.

20              THE VIDEOGRAPHER:  (Complies).

21              (Video plays)

22          Q.   (BY MR. GUISADO) Mr. Longoria, did you

23  see that okay?

24          A.   Yes.

25          Q.   All right?



Page 68

1          A.  Yeah.

2          Q.  Mr. Longoria, the video depicts

3    overlaid text that says, "Realtime awareness for

4    managers of both bridges."  Is that right?

5          A.  Yes.

6          Q.  That means that officers manning the

7    queue management point at either of the bridges at

8    the Eagle Pass port of entry could provide to their

9    managers realtime awareness of individuals

10   approaching the queue management point; is that

11   right?

12         A.  Yes.

13         Q.  To the best of your knowledge, you have

14   never seen any of these videos?

15         A.  I don't remember seeing it.

16         Q.  Thank you.

17             Let's talk a little bit about the

18   Laredo port of entry.  I presume that you did not use

19   the telegram messaging app at Laredo, did you?

20         A.  Not that I'm aware of.

21         Q.  How would officers manning the queue

22   management point at the Laredo port of entry

23   communicate updates to their managers?

24         A.  My response is only an assumption, and

25   they all -- they all have radios, so I'm assuming,



Page 69

1    you know, that it would be the radio.

2              Q.   Be on the radio.   Okay.

3              MR. NAZAROV:   Okay.   Let me jump in

4    here and just say -- or I'll ask.

5              We have been going about an hour and a

6    half.   Well, Mr. Longoria, do you need a break, or

7    are you doing okay?

8              THE WITNESS:   I'm doing okay, sir.

9              MR. NAZAROV:   Okay.

10             Q.   (BY MR. GUISADO) You were the assistant

11   director field of operations for the Laredo port of

12   entry from 2015 until 2018; is that right?

13             A.   Yes, sir.

14             Q.   And you were responsible, among other

15   things, for implementing CBP's policies with respect

16   to individuals non-citizens without travel documents

17   approaching the port of entry; is that right?

18             A.   I didn't establish the policy, so I --

19             Q.   No, I --

20             A.   The policy was there.   It's in the

21   statute.   It's in the INA.   So I'm not sure I

22   understand the question.

23             Q.   The question is:   Were you responsible

24   for overseeing what CBP or how CBP implemented those

25   policies within the Laredo field office?



Page 70

1          A.  Yes.

2          Q.  Did you ever talk to individuals

3    regarding queue management points?

4          A.  Yes.

5          Q.  Did you ever discuss implementing the

6    metering policy with any individuals who may or may

7    not have been -- who may have been stationed at the

8    queue management point?

9          A.  Did I discuss it with the people that

10   were assigned to the queue management point?

11         Q.  Yes.

12         A.  As the ADFO, I would visit the ports of

13   entry, whether it's Progreso or Hidalgo or Laredo,

14   and I may have on occasion gone out to delivery

15   points, so the queue management point, and spoke to

16   the officers and asked them how things were going, if

17   everything was going okay, was there anything that

18   can be done better.

19              So in that aspect, my response would

20   be yes.

21         Q.  Thank you, Mr. Longoria.  That's

22   exactly what I was looking for.

23              Can you recall generally how many

24   times between -- between your promotion to ADFO and

25   to your retirement, how many times did you go to a



Page 71

1    queue management point at a port of entry within a

2    Laredo field office?

3              A.   I couldn't give you a number.

4              Q.   More than ten?

5              A.   Less than ten.

6              Q.   Did you ever see in any of those visits

7    to the queue management points within Laredo field

8    office any non-citizens approach the queue management

9    point?

10             A.   Yes, sir.

11             Q.   Did you -- in any of those instances,

12   did you witness any CBP officer at the queue

13   management point contact anyone at the port itself at

14   the FIS?

15             A.   Repeat the question.

16             Q.   Sure.   In those instances or instance

17   in which you went to visit a queue management point

18   at a port of entry at the Laredo field office -- you

19   testified that you witnessed a non-citizen approach a

20   queue management point without proper documentation,

21   in those instances or instance -- did you ever see a

22   CBP officer that was at the queue management point

23   talk to or call in anything to the officers at the

24   actual port at the FIS?

25                       MR. NAZAROV:   Objection:   Form.



Page 72

1              THE WITNESS:  Yes.

2              Q.  (BY MR. GUISADO) Did they do so by

3    radio?

4              A.  Yes.

5              Q.  Did they use any other means of

6    communication?

7              A.  No.

8              Q.  And you never saw anyone use the

9    telegram instant messaging app at the queue

10   management point; is that right?

11             A.  Correct.

12             Q.  So, to the best of your knowledge, when

13   you were ADFO between 2015 and 2018, when you

14   personally witnessed a non-citizen approach a queue

15   management point, the officers would use a radio to

16   relay information from the queue management point to

17   the FIS; is that right?

18             A.  Yes.

19             Q.  Thank you.

20             MR. GUISADO:  Tyler, could you bring

21   up FL 2, please, Exhibit 301.

22                  (Exhibit 301 marked)

23             THE VIDEOGRAPHER:  (Complies).

24             MR. NAZAROV:  Hey, Angelo, I just want

25   to let you know that I'm going to ask for a break



Page 73

1    around 1:30.

2                    Is that okay?

3                    MR. GUISADO:  Yeah, that's great.

4    I've got to eat lunch, too, man.

5                    MR. NAZAROV:  Well, I was thinking

6    like a 15-minute break, not an hour.

7                    MR. GUISADO:  Whatever's best for you

8    and Mr. Longoria will be fine with me.

9                    MR. NAZAROV:  All right.  Thanks.

10                   All right.  I'm sorry to interject

11   myself in here again, but Tyler, could you just make

12   sure that -- especially since it's such a big

13   document, Mr. Longoria is able to see it all and read

14   it all.

15                   Mr. Longoria, I would like you to take

16   your time and just look at the bottom.  Go to the

17   bottom of the document and make sure you can read it.

18                   THE WITNESS:  Okay.  Are we going to

19   the top?  Okay.  So where -- this is the last

20   document.  I am going to read down, okay.  Can we go

21   down, please.

22                   THE VIDEOGRAPHER:  (Complies).

23                   THE WITNESS:  Okay.  Go down, please.

24                   THE VIDEOGRAPHER:  (Complies).

25                   THE WITNESS:  Stop right there.



Page 74

 1                    THE VIDEOGRAPHER:  (Complies).

 2                    THE WITNESS:  Okay.  Can we go back to

 3    the top.

 4                    THE VIDEOGRAPHER:  (Complies).

 5                    THE WITNESS:  Stop right there.

 6                    THE VIDEOGRAPHER:  (Complies).

 7                    THE WITNESS:  Okay.  Stop right there.

 8                    THE VIDEOGRAPHER:  (Complies).

 9                    THE WITNESS:  Okay.  Okay.

10          Q.   (BY MR. GUISADO) Thank you.

11               Mr. Longoria, I'm showing you what

12    will be marked Exhibit 301 to your deposition.  It's

13    a June 8th, 2018 e-mail chain bearing the Bates

14    numbers AOL-DEF 00190367 to 69.

15               Do you recognize this exhibit,

16    Mr. Longoria?

17          A.   Yes.

18          Q.   When was the last time you saw this

19    exhibit?

20          A.   When it came out.

21          Q.   I'll represent to you that this exhibit

22    is an e-mail chain regarding the LFO, the Laredo

23    field office, LFO field operations, queue management

24    process contingency plan.

25               I would like you to focus --



Page 75

 1                    MR. GUISADO:  And, Tyler, if you could

 2    focus on the bottom of the first page spilling onto

 3    the second.

 4                    THE VIDEOGRAPHER:  (Complies).

 5                    MR. GUISADO:  That's good.

 6            Q.  (BY MR. GUISADO) Under the heading

 7    "Laredo Field Office Queue Management Process

 8    Contingency Plan," it says, "Executive Summary."

 9                    It says that "On June 8th, 2018, all

10    ports within the Laredo field office have implemented

11    mid bridge queue management as of midnight June 8th,

12    2018."

13                    Is that what you remember about this

14    document?

15            A.  Yes.

16            Q.  Mid bridge queue management means what

17    exactly?

18            A.  That's where everybody had to post

19    their officers at -- close to the U.S./Mexico border

20    but on the U.S. side.  That's what "mid bridge queue

21    management" means.

22            Q.  Thank you.

23                    MR. GUISADO:  Tyler, could you bring

24    it to the top of the first page.

25                    THE VIDEOGRAPHER:  So, Counsel, do you



Page 76

1   want to scroll down?

2            MR. GUISADO:  No, no, up to the top of

3   the first page.

4            THE VIDEOGRAPHER:  (Complies).

5            MR. GUISADO:  There we go.  Thank you.

6       Q.  (BY MR. GUISADO) I would like to focus

7   on the e-mail from Bradd Skinner to David Higgerson

8   copying you.  On the third line or paragraph it says,

9   "Mike, thanks to ADFO Longoria and border security

10  crew for developing our strategy."

11           Do you recall what your strategy was?

12      A.  Yeah, that is identifying the

13  contingency plan.

14      Q.  Well, what were those?

15           MR. NAZAROV:  Objection:  Form.

16           THE WITNESS:  Can we go back to the

17  contingency plan?

18           MR. GUISADO:  State your basis for the

19  objection, Ari.

20           MR. NAZAROV:  Objection:  Form.

21           MR. GUISADO:  Yeah, I would like you

22  to specify.

23           MR. NAZAROV:  Repeat the question.

24  Repeat the question.  It was ambiguous.  Repeat it.

25  I'll -- I'll take it apart piece by piece.  Go ahead,



Page 77

1    repeat it.

2              Q.   (BY MR. GUISADO) Mr. Longoria, I had

3    asked you whether you recalled the strategy

4    referenced in the e-mail from Bradd Skinner to David

5    Higgerson.

6              Do you remember that?

7              A.   I remember developing the strategy.  I

8    don't remember what's in the document.  It's been

9    almost a year and a half.  So I would have to review

10   the document before I could answer your question.

11             Q.   I don't care about the document,

12   Mr. Longoria.  I'm wondering what you remember about

13   the strategy that you helped develop.

14             What do you recall about the strategy?

15             MR. NAZAROV:  I'm going to object to

16   the form because you're not specifying --

17             MR. GUISADO:  I am not asking you to

18   make a speaking objection, Ari.  You can either say

19   "Form -- vague, form, ambiguous."  I can -- I can go

20   the whole litany, but I would like you to state your

21   bases from now on.

22             MR. NAZAROV:  Okay.  I can say

23   "Objection:  Form, it was ambiguous," but I just want

24   to say that I apologize, I -- I didn't mean to do a

25   speak -- speaking objection.  I thought you wanted me



Page 78

1    to explain things, and I won't anymore.  I'll just

2    object in the shortest way not to interrupt your

3    questioning.

4                   MR. GUISADO:  Thank you.

5                   Q.  (BY MR. GUISADO) Mr. Longoria, what do

6    you recall about the strategy that you helped develop

7    that Bradd Skinner references in this e-mail to David

8    Higgerson?

9                   A.  Without reviewing the document,

10   nothing.  I can't -- I can't answer that.

11                  Q.  What do you --

12                  MR. NAZAROV:  He wants to look at the

13   exhibit.  That's all he's asking.  He's just asking

14   to look at the --

15                  MR. GUISADO:  You don't even know the

16   question here, Ari.  Thank you.

17                  MR. NAZAROV:  All right.

18                  Q.  (BY MR. GUISADO) Mr. Longoria, what do

19   you recall happening within the Laredo field office

20   with respect to queue management in June of 2018?

21                  A.  To the best of my recollection,

22   June 2018 is when Commissioner McAleenan changed the

23   operations to be from capacity to operational

24   capacity, so we had to look at all of that and

25   identify how we were going to do that.



Page 79

1          Q.  Thank you, Mr. Longoria.

2               Am I correct in understanding that you

3   helped develop the strategy to implement that change

4   for the Laredo field office within June 2018?

5          A.  Correct.

6          Q.  What do you remember about the

7   strategy?

8          A.  Not very much.

9          Q.  Did you discuss the strategy with

10  anyone?

11         A.  I'm getting confused with the question,

12  sir.  Of course it would have been discussed with

13  someone.  It would have been discussed with the port

14  directors.  So it would have been discussed with my

15  management:  Mr. Higgerson, Mr. Skinner, the port

16  directors, and anybody else that had involvement in

17  the process.

18         Q.  Thank you, Mr. Longoria.  That's what I

19  was asking.

20              Do you remember the substance of those

21  discussions?

22         A.  How to best implement what was being

23  asked of us by C1 and how to do that and best minimal

24  impact to the port operation.

25         Q.  C1, is -- is that commissioner --



Page 80

```
 1              A.   Yes.

 2              Q.   -- the CBP commissioner?

 3              A.   Yes.

 4              Q.   Thank you.

 5              A.   That was in --

 6              Q.   Did you ever discuss anyone from any

 7    other field offices implementing the strategy

 8    referenced here?

 9              A.   Not to my recollection.

10              Q.   Thank you, Mr. Longoria.

11                   MR. GUISADO:  Tyler, if you could go

12    to the second page, all the way at the bottom under

13    the heading "Moving forward."

14                   THE VIDEOGRAPHER:  (Complies).

15                   MR. GUISADO:  Can you scroll up a

16    little bit?  Can you --

17                   THE VIDEOGRAPHER:  Yeah.

18                   MR. GUISADO:  Maybe it's on the next

19    page.  Is it -- yeah, there we go.  Sorry, yes.

20                   MR. NAZAROV:  Okay.  I'm just going to

21    ask Mr. Longoria, if he can see it.

22                   Do you see it?  Do you need it blown

23    up?

24                   THE WITNESS:  No, I can read it.  The

25    "moving forward" is highlighted in yellow.
```



Page 81

```
 1                MR. NAZAROV:  Yeah, okay.

 2           Q.  (BY MR. GUISADO) Okay.  Under the

 3   heading "Moving forward," it states that "LFO will

 4   work with bridge owners and stakeholders to install

 5   turnstiles if/when received" by CB -- or "from CBP."

 6                Do you know who the bridge owners

 7   were, by any chance?

 8           A.  No, sir.

 9           Q.  Do you know who the stakeholders were,

10   by any chance?

11           A.  Not by name, just anybody who had a

12   vested interest in the -- the bridges.

13           Q.  Oh, so CBP would be one of them?

14           A.  Yes.

15           Q.  Probably Mexican Immigration would also

16   be one of them?

17           A.  Yes.

18           Q.  Okay.  Why would CBP want to install

19   turnstiles in the LFO?

20           A.  I can't answer that.  That direction

21   was coming from headquarters.

22           Q.  Do you remember any turnstiles being

23   installed from 2016 to present at any of the bridges

24   within the LFO?

25           A.  To the best of my recollection, the
```



Page 82

1    only bridge that had -- the only port of entry that

2    had a turnstile was in Brownsville.

3              Q.  In Brownsville.  Do you know where the

4    turnstile on the Brownsville bridge was?

5              A.  Not the exact location.

6              Q.  Was it on the Mexican side or the

7    American side?

8              A.  U.S. side.

9              Q.  The U.S. side.  And CBP installed it?

10             A.  Yes.

11             Q.  You don't remember --

12             A.  That we --

13             Q.  Sorry.

14             A.  That was way before the -- the metering

15   of queue management came.  That was just an action

16   ████████████████████████████████████████

17   ██████████████████████████████████████████

18   ██████████  ████████████████████████████████

19             Q.  If I told you that the Laredo bridge

20   had a turnstile, would that sound right to you?

21             A.  No, I don't remember them having one.

22             Q.  If I told you it was on the

23   Nuevo Laredo side, would you believe me?

24             A.  I would have no reason not to believe

25   you.



Page 83

```
 1                Q.  I have gone through it.
 2                     MR. GUISADO:  Mr. Longoria, I think
 3     your Counsel indicated that a 15-minute break would
 4     be appropriate at 1:30.  I really don't want to
 5     dishonor that.
 6                     Ari, is that okay with you?
 7                     MR. NAZAROV:  That's -- Mr. Longoria,
 8     is 15 minutes enough for you?
 9                     THE WITNESS:  Oh, that's fine, stir.
10                     MR. NAZAROV:  Okay.  Yeah, let's just
11     do a 15-minute break.
12                     Mr. Longoria, let's really quickly for
13     one minute go to the breakout room, and then we
14     will -- 1:45, we will reconvene.
15                     Angelo, does that work?
16                     MR. GUISADO:  That's perfect.  Thanks,
17     Ari, I really appreciate it.
18                     MR. NAZAROV:  Thank you.
19                     THE VIDEOGRAPHER:  We are going off
20     the record.  The time is 12:35 p.m.
21                          (Recess taken)
22                     THE VIDEOGRAPHER:  We are back on the
23     record.  The time is 12:47 p.m.
24                Q.  (BY MR. GUISADO) Good afternoon,
25     Mr. Longoria.
```



Page 84

1          A.   Good afternoon, sir.

2          Q.   Do you recall at the beginning of this

3   deposition you gave an oath, and you swore to tell

4   the whole truth, and nothing but the truth?

5          A.   Yes, sir.

6          Q.   Do you know that the oath still applies

7   even after breaks?

8          A.   Yes.

9          Q.   Thank you.  I would like to talk just a

10  little bit more about metering and queue management,

11  but I want to make sure I have it down right.

12               During the times in which the ports of

13  entry were metering or using queue management, the

14  ports would place officers at the queue management

15  point and close to the international boundaries

16  operationally feasible.

17               If an individual without proper travel

18  documents wished to apply for asylum and there was

19  not sufficient capacity, under the metering policy or

20  guidance, those officers would instruct those

21  individuals either to wait in the queue in the

22  physical line of the bridge or tell them to come back

23  at a later date; is that right?

24          A.   Yes.

25               MR. NAZAROV:  Objection:  Form.



Page 85

1                    You can answer, Mr. Longoria.

2                    THE WITNESS:  Yes.

3           Q.  (BY MR. GUISADO) Did any ports of entry

4     request to deviate from the metering guides?

5           A.  Not to my recollection.

6           Q.  If a port wanted to deviate, who would

7     they ask?

8           A.  The field office.

9           Q.  Who at the field office?

10          A.  Either me, but if they didn't feel

11    comfortable with me as port director, they could go

12    straight to Mr. Higgerson, who was their boss.

13          Q.  Why wouldn't they feel comfortable with

14    you?

15          A.  Can't answer that.

16          Q.  Good answer.

17               MR. GUISADO:  Now, Tyler, if you could

18    bring up FL 3, Exhibit 302 AOL-DEF 00911036.

19                    (Exhibit 302 marked)

20               If you could make sure Mr. Longoria

21    can read the document.

22               THE VIDEOGRAPHER:  (Complies).

23               MR. GUISADO:  I think that's good.

24          Q.  (BY MR. GUISADO) Mr. Longoria, can you

25    read that?



Page 86

```
 1              A.   Yes.
 2                   MR. NAZAROV:  Could I also ask him to
 3    just take -- take the opportunity and have him read
 4    it, the whole document?
 5                   Mr. Longoria, we'll take a few minutes
 6    and just read the entire document.  Like go to the
 7    bottom.
 8                   THE WITNESS:  Yes, sir.
 9                   MR. NAZAROV:  And you're able to see
10    it, right?  Okay.
11                   THE WITNESS:  Yes, sir.
12                   MR. NAZAROV:  Read it through.
13                   Okay, and we got it.  Thank you.
14                   THE WITNESS:  Okay.  Could we go up,
15    please.
16                   THE VIDEOGRAPHER:  That is it.  It's
17    just a one-page document.  It's seems like it's just
18    one e-mail.
19                   THE WITNESS:  Okay.  Okay, I have read
20    it.
21              Q.   (BY MR. GUISADO) Okay.  I'm showing you
22    what you -- what will be marked as Exhibit 302 to
23    your deposition, a May 30th e-mail bearing the Bates
24    numbers AOL-DEF 00911036.
25                   Do you recognize this e-mail,
```



Page 87

```
 1   Mr. Longoria?
 2              A.  Yes, sir.
 3              Q.  It appears as if you received it on
 4   May 30th, 2018?
 5              A.  Correct.
 6              Q.  You were -- you were still at -- you
 7   were still the ADFO at that time, right?
 8              A.  Yes.
 9              Q.  Sorry, you mentioned you had retired in
10   2018.  Do you recall what end that was?
11              A.  The last day of September.
12              Q.  The last day of September.  Thank you.
13                  Okay.  I'll represent to you that
14   Exhibit 302 is an e-mail regarding the Eagle Pass
15   port of entry requesting a metering exemption --
16   exemption --
17                    (Internet error)
18              MR. NAZAROV:  I'm sorry.  I'm sorry, I
19   didn't hear any of that because my Internet -- my
20   connection tied.  I'm really sorry.
21              MR. GUISADO:  That's okay.  I haven't
22   even asked --
23              MR. NAZAROV:  Oh, okay.
24              MR. GUISADO:  I didn't even ask a
25   question, but I'll represent to you that if you
```



Page 88

1    didn't hear me ask when Mr. Longoria retired, he told

2    me the last day of September 2018.

3              MR. NAZAROV:  Okay.

4         Q.  (BY MR. GUISADO) Mr. Longoria --

5              MR. NAZAROV:  Thank you.

6              MR. GUISADO:  Of course.

7         Q.  (BY MR. GUISADO) -- I will represent to

8    you that this e-mail is from Daniel Mercado.  He's

9    asking you and Bradd Skinner to deviate from the

10   metering guidance and relocate the metering point to

11   a location operationally feasible.

12              Do you remember this request?

13        A.  No.

14        Q.  You testified earlier that people --

15   CBP officers at individual ports could request an

16   exception or an exemption from the metering guidance

17   from you.

18              Do you remember saying that?

19        A.  Correct.

20        Q.  Would you agree that this is one of

21   those times?

22        A.  I would agree.

23        Q.  Do you remember if you granted

24   Mr. Mercado's request?

25        A.  I don't remember if I granted it, to be



Page 89

```
 1  honest.
 2            Q.   Do you remember any other similar
 3  requests?
 4            A.   No.
 5            Q.   No other requests to move the queue
 6  management point or the officer's physical location
 7  on the bridge to somewhere more operationally
 8  feasible?
 9            A.   I don't remember if I received anymore.
10            Q.   ████████████████████████████████
11  ████████████████████████████████████████████████████
12  ████████████████████████████████████████████████████
13            Is that correct?
14            A.   Yes.
15            Q.   ████████████████████████████████
16  ████████████████████████████████████████████████████
17  ████████████████████████████████████████
18            A.   That's what it says.
19            Q.   You told me earlier that the queue
20  management point was as close to the international
21  boundary as possible; is that right?
22            A.   Correct.
23            Q.   It appears here as if Mr. Mercado is
24  asking to move further away from the international
25  boundary and closer to the port of Eagle Pass; is
```



Page 90

1    that right?

2              A.   Correct.

3              Q.   If this request was granted, that means

4    that the queue management point would actually have

5    been in United States territory, would it not?

6              A.   If it was granted, yes.

7              Q.   If it was granted, individuals seeking

8    asylum without proper travel documents would have had

9    to cross the international boundary before they

10   reached the CBP officers; is that right?

11             A.   Yes.

12             Q.   You can't recall any other exemptions

13   granted at the Eagle Pass port of entry?

14             A.   No, I can't recall.

15             Q.   You can't recall other ports requesting

16   exemptions?

17             A.   There may have been, but I can't give

18   you any specifics.

19             Q.   If I told you Del Rio, the port of

20   entry at Dell Rio had requested a similar exemption,

21   would you have any reason to doubt that?

22                  MR. NAZAROV:  I'm just going to object

23   to scope.

24                  But you can answer, Mr. Longoria.

25                  THE WITNESS:  No reason to doubt your



Page 91

1    word, sir.

2          Q.   (BY MR. GUISADO) If I told you that an

3    exception was requested at Brownsville, you wouldn't

4    have any recollection about that?

5          A.   No, sir.

6          Q.   All right.

7               MR. GUISADO:  Tyler, if you could

8    queue up FL 4, please.  That's Exhibit 303, AOL-DEF

9    00909668.

10              (Exhibit 303 marked)

11              THE VIDEOGRAPHER:  (Complies).

12              MR. NAZAROV:  Okay.  Can I have Tyler

13   just go to the bottom of the document.

14              THE VIDEOGRAPHER:  (Complies).

15              MR. NAZAROV:  Yeah, and just make sure

16   that Mr. Longoria sees the entire document.

17              Is this the bottom of it?  The picture

18   of the guy in the -- yeah, okay.

19              Mr. Longoria, can you read what all of

20   that says above the picture of the guy what looks

21   like in a taxi?

22              THE WITNESS:  Yes, sir, I can read it.

23              MR. NAZAROV:  Okay.  So I want you

24   just to look at the document, as -- as Tyler will

25   move up the document, you tell him when you're ready



Page 92

1   to move up.  I want you to read the whole document

2   before you answer the questions.  Thank you.

3                  THE WITNESS:  Okay, can we go up,

4   please.

5                  THE VIDEOGRAPHER:  (Complies).

6                  THE WITNESS:  Okay, go on up.

7                  THE VIDEOGRAPHER:  (Complies).

8                  THE WITNESS:  Thanks.

9          Q.  (BY MR. GUISADO) Mr. Longoria, I'm

10  showing you what will be marked Exhibit 303 to your

11  deposition.  It's an August 6th, 2018 e-mail chain

12  that bears the Bates numbers AOL-DEF 00909668 to 69.

13                 Do you recognize this exhibit?

14         A.  Yes.

15         Q.  How do you recognize it?

16         A.  In this particular instance, I got

17  personally involved.

18         Q.  What do you remember about it?

19         A.  As indicated in the traffic -- the

20  e-mail traffic, the Port of Hidalgo was catching the

21  visas of taxi drivers that brought in undocumented

22  aliens, FIS.  In other words, they made it all the

23  way to the -- the primary inspection point.  And they

24  were returning them back to the queue point, which is

25  clearly in violation of the policy.



Page 93

1          Q.  Thank you, Mr. Longoria.

2               MR. GUISADO:  I would like to bring up

3     the e-mail on the last page -- or I guess the second

4     page.  It's a report from an incident on August 3rd,

5     2018.  The second page.  And zoom in if you can.

6               THE VIDEOGRAPHER:  (Complies).

7               MR. NAZAROV:  Mr. Longoria, do you

8     need some time to read it?

9               THE WITNESS:  No, I read it already,

10    sir.

11              MR. NAZAROV:  Okay.

12         Q.  (BY MR. GUISADO) This report indicates

13    that a taxi driver attempted to two non-citizens

14    claiming fear at the port of entry; is that right?

15         A.  Yes, sir.

16         Q.  Have you yourself been to the Hidalgo

17    port of entry?

18         A.  Yes.

19         Q.  Can you help me understand where on the

20    bridge this taxi would have been inspected?

21         A.  At the primary inspection point.

22         Q.  Is that past the midpoint?

23         A.  Yes.

24         Q.  That's in U.S. territory?

25         A.  Yes.



Page 94

1          Q.  Okay.  It says that these individuals
2    were directed to the Hidalgo queue station to await
3    processing.  Do you know who directed them or would
4    have directed them?
5          A.  I don't know this specific individual.
6    It would have to be a manager or a supervisor.
7          Q.  Do you know who the supervisor of the
8    Hidalgo queue station was on August 3rd, 2018?
9          A.  No.
10          Q.  That's fine.  So on August 3rd, 2018,
11    so I have this correctly, two Cuban nationals in a
12    taxi crossed the international boundary line with the
13    intent to apply for asylum in the United States.  CBP
14    directed them back into Mexico in violation of the
15    metering guidance; is that correct?
16                MR. NAZAROV:  Objection:  Form.
17                You can answer.
18                THE WITNESS:  Yes.
19                MR. GUISADO:  Tyler, can you bring up
20    the bottom of the first page.
21                THE VIDEOGRAPHER:  (Complies).
22                MR. GUISADO:  That's good.  A little
23    bit -- zoom in just a little bit.
24                THE VIDEOGRAPHER:  (Complies).
25          Q.  (BY MR. GUISADO) Who is Enrique Garcia?



Page 95

1          A.  He was on my staff, a member of the

2  border security staff at the LFO.

3          Q.  He e-mails to Rodney Harris copying

4  you:  "Sir, as I was reviewing this message further

5  today, and while I agree with canceling visas of the

6  taxi driver to deter others from doing the same,

7  returning the aliens requesting asylum onto U.S. soil

8  to the back of the queue, the middle of the bridge

9  should not be happening."

10          Would you agree that that violates the

11  metering guidance?

12          A.  Yes.

13          Q.  If I told you that Randy Howe, the

14  executive director of the OFO, had e-mailed your

15  bosses four months earlier to this incident telling

16  them that this part of the metering guidance in which

17  you are not to return an individual that's already in

18  the U.S. to Mexico had to be strictly adhered to,

19  would you have any reason to doubt that?

20          MR. NAZAROV:  Objection:  Form.

21          THE WITNESS:  No.

22          Q.  (BY MR. GUISADO) Do you remember E.D.

23  Howe e-mailing the OFO -- individuals within the OFO

24  that that part of the guidance had to be strictly

25  adhered to?



Page 96

1          A.   Yes.

2          Q.   Mr. Longoria, I have to ask you:  Why

3    weren't these individuals just processed once they

4    got to the front of the line?

5          A.   I can't answer for the actions taken at

6    the port.

7               MR. GUISADO:  Tyler, could you bring

8    up 4X and 4Y, please.  If it's possible to lay them

9    side by side, that would be great.  If not, we can do

10   them in tandem.

11              THE VIDEOGRAPHER:  Unfortunately, I'll

12   have to do them in tandem.  So I'll start with 4X, if

13   that's okay.

14              MR. GUISADO:  That's all right.

15              MR. NAZAROV:  All right.  I just

16   wanted to turn --

17              Is that a two-page document?

18              MR. GUISADO:  I sure hope not.

19   They're both one-page documents.

20              MR. NAZAROV:  One page.  Okay.

21              Mr. Longoria, are you able to see it

22   okay?

23              THE WITNESS:  I can see one from

24   Raquel Garza dated August 3rd.

25              MR. NAZAROV:  Okay.  And you're able



Page 97

1    to read all the -- the little spreadsheet thing from

2    there with -- okay.

3                    THE WITNESS:  Yes.

4                    MR. NAZAROV:  Okay.  Go ahead.  Yeah.

5                    MR. GUISADO:  Tyler, could you put up

6    4Y as well.

7                    THE VIDEOGRAPHER:  (Complies).

8                    THE WITNESS:  Okay.  It's a different

9    one dated August 4th from the same person.  Okay, I

10   have read it.

11           Q.  (BY MR. GUISADO) Okay.  Thanks.

12                    MR. GUISADO:  Tyler, go back to 4X, if

13   you don't mind.

14                    THE VIDEOGRAPHER:  (Complies).

15           Q.  (BY MR. GUISADO) Mr. Longoria, I'm

16   showing you two documents:  One will be marked as

17   Exhibit 304 to your deposition.  It's an August 3rd,

18   2018 e-mail from Raquel Garza to the Laredo

19   operations center bearing the Bates number AOL-DEF

20   0002896.

21                    And the other, which will be marked as

22   Exhibit 305 to your deposition, it's essentially the

23   same document, an August 4th, 2018 e-mail to the

24   Laredo operations center bearing the Bates number

25   AOL-DEF 00059739.



Page 98

```
 1              (Exhibits 304 and 305 marked)
 2              Q.  (BY MR. GUISADO) Do you recognize
 3    either of these documents?
 4              A.  Yes, sir.  I mean, not individually,
 5    but I know that the reports were being submitted to
 6    the Laredo operations center daily.
 7              Q.  Did -- did you used to receive these
 8    reports?
 9              A.  The final product.
10              Q.  So -- so you -- I'll represent to you
11    that the document reflects the queue management daily
12    report containing a chart that lists the field
13    service office, the port, the number of detained
14    persons within the port, what percentage of capacity
15    that was, the number of individuals in the queue at
16    the boundary line, and the impact to port operations;
17    is that right?
18              A.  Yes, sir.
19              Q.  And you used to receive these types of
20    reports regularly in your job with CBP?
21              A.  Yes, sir.
22              Q.  In the previous exhibit we were
23    examining an incident on August 3rd where two Cuban
24    nationals approached the port of entry, sought
25    asylum, and were returned to the queue point in
```



Page 99

1    Mexico.  Do you recall that?

2            A.  Yes, sir.

3            Q.  In your experience as the assistant

4    director of the field office, were individuals who

5    presented for asylum ever told that they couldn't be

6    processed immediately because of a lack of capacity?

7            MR. NAZAROV:  Objection:  Form.

8            THE WITNESS:  Prior to the June 2018

9    memo -- and before I respond, can you ask the

10   question again, please?

11           Q.  (BY MR. GUISADO) Yes, of course.

12           During your time as ADFO from 2016 to

13   the present, was there ever a time in which

14   individuals, non-citizens without proper entry

15   documents, sought asylum at a port of entry within a

16   Laredo field office but were told they could not be

17   processed because of lack of capacity?

18           MR. NAZAROV:  Objection:  Scope.

19           Mr. Longoria retired two years ago.

20           MR. GUISADO:  Yeah, and I'm asking him

21   if at any time in between 2016 and the present he

22   ever had any understanding, any time within that, of

23   any individuals being told that they couldn't be

24   processed for asylum because of a lack of capacity.

25           MR. NAZAROV:  That's a fair question,



Page 100

1    but you said "present," and he's not presently in

2    that position.

3                    MR. GUISADO:  Ari, I'll let you know

4    that within that date range is 2016 to the end of

5    December 2018.

6                    MR. NAZAROV:  Okay.

7            Q.  (BY MR. GUISADO) Mr. Longoria, between

8    2016 and the end of September 2018, do you recall CBP

9    officers ever telling asylum seekers that they could

10   not be processed for asylum because there wasn't

11   sufficient capacity?

12           A.  Yes, sir, that would be prior to the

13   June 2018 memo from Mr. McAleenan when we shifted

14   from capacity to operational capacity.

15           Q.  I'm going to ask you about this

16   document.  It says, "Report date:  August 3rd, 2018;"

17   the field office is Laredo; the port is Hidalgo.

18                    What does the total number of

19   detainees mean?

20           A.  The total -- the total number in the

21   FIS being processed or have been processed awaiting

22   placement.

23           Q.  It says, "Percent of capacity:

24   44 percent."

25                    44 percent of what?



Page 101

 1               A.   44 percent of the port's holding

 2     capacity.  This is --

 3               Q.   What port?

 4               A.   -- this is where they can put

 5     individuals.

 6               Q.   Okay.  And the number in the queue at

 7     the boundary line is ten.  What does that mean?

 8               A.   That's the numbers that are pending

 9     processing, that are on the Mexico side awaiting

10     processing.

11               Q.   Mr. Longoria, do you recall what

12     Hidalgo's holding capacity was on August 3rd, 2018?

13               A.   Not off the top of my head.

14               Q.   If I told you that I did the math

15     before and that ████████████████████ would you

16     have any reason to doubt me?

17               A.   No.

18               Q.   Mr. Longoria, we were just examining a

19     document in which two Cuban asylum seekers presented

20     at the port of entry on August 3rd, 2018.

21                    Do you think that they were returned

22     to the queue management point because of a lack of

23     capacity?

24               A.   At that particular time we were not

25     processing based on physical capacity.  We were



Page 102

1    processing on operational capacity, and that decision

2    is made by the port of entry.  It depended on what

3    other actions they had going on at that particular

4    time, sir.

5              Q.  Well, we'll get to operational

6    capacity.  I'm asking you if they were not processed

7    because of a lack of holding capacity?

8              A.  Based on the way you worded the

9    question, no, sir.

10             Q.  Would you agree with me that on

11   August 3rd, 2018, if this chart is to be believed,

12   that the Laredo -- that the Hidalgo port of entry had

13   ███ individuals in detention with a holding capacity

14   of ██?  Is that right?

15             MR. NAZAROV:  Objection:  Form.

16             Q.  (BY MR. GUISADO) You can answer.

17             A.  Yes.

18             Q.  Would you agree with me that at the

19   time on August 3rd, there were ten individuals at the

20   queue in Mexico awaiting processing?

21             Is that right?

22             A.  Yes.

23             Q.  Is it true that on August 3rd, the

24   officers at the Hidalgo port of entry could have

25   processed the ten individuals in the queue at the



Page 103

1    boundary line, the two Cuban individuals who had

2    sought asylum in the taxi, and that the Hidalgo port

3    of entry still would not have reached its maximum

4    holding capacity?

5            MR. NAZAROV:  Objection:  Form.

6            But you can answer.

7            THE WITNESS:  If the guidance on

8    operational capacity had been -- not been in place,

9    the answer would be yes.

10           Q.  (BY MR. GUISADO) I -- you know, we'll

11   discuss operational capacity.

12           A.  I got it.  But that's my response, sir.

13           Q.  Okay.  I'm going to ask you yes or no:

14   Assuming that the total holding capacity of the

15   Hidalgo port of entry is ██ on August 3rd, 2018,

16   with ██ people detained, ten people in the queue at

17   the boundary line, and the two people in the taxi, if

18   on August 3rd, the officers at the Hidalgo port of

19   entry took all of those people, would Hidalgo have

20   reached its maximum holding capacity?

21           MR. NAZAROV:  Objection:  Form.

22           Q.  (BY MR. GUISADO) You can answer.

23           A.  No.

24           Q.  Thank you.

25           MR. GUISADO:  I am done with 304 and


MAGNA
LEGAL SERVICES

Page 104

1    305.

2             Q.   (BY MR. GUISADO) Mr. Longoria, I would

3    just like to talk a little bit about INM's role in

4    all of this.

5             When I say "INM," you know I refer to

6    the Mexican Immigration agency, Instituto Nacional de

7    Migración?

8             A.   Yes.

9             Q.   Okay.  It's sometimes referred to as

10   INAMI?

11            A.   Correct.

12            Q.   Did you ever -- in person ever discuss

13   metering or queue management with anyone at INM?

14            A.   I discussed it, yes.

15            Q.   Did any of your, to your knowledge,

16   supervisors ever discuss metering or queue management

17   with INM?

18            A.   All the port directors were directed to

19   meet with the INAMI counterparts.

20            Q.   Did any of your subordinates ever meet

21   with INM to discuss metering queue management?

22            A.   Yes, but I can't give specifics because

23   I don't remember.

24            Q.   That's okay.  That was a long time ago.

25   I understand.



Page 105

```
 1                    MR. GUISADO:  Tyler, could you bring
 2    up FL 7, please.  That's Exhibit 306, AOL-DEF
 3    00046133.
 4                    (Exhibit 306 marked)
 5                    MR. NAZAROV:  Yeah, Tyler, thank you.
 6    If you could go to the bottom of the document, I just
 7    want to make sure Mr. Longoria can -- can -- has time
 8    to review it and can see it.
 9                    Mr. Longoria, can you see that?
10                    THE WITNESS:  Yes, sir.
11                    MR. NAZAROV:  Okay.  Are you able to
12    read it?
13                    THE WITNESS:  Yes.
14                    MR. NAZAROV:  Okay.  Will you take a
15    minute and read it, please.
16                    THE WITNESS:  Okay.  Can we go down to
17    the bottom of this page.
18                    THE VIDEOGRAPHER:  Okay.
19                    THE WITNESS:  Okay, so that's it.
20    Okay, can we go up?
21                    THE VIDEOGRAPHER:  (Complies).
22                    THE WITNESS:  Up.
23                    THE VIDEOGRAPHER:  (Complies).  I'm
24    sorry, did you say "go up"?  You cut off a little.
25                    THE WITNESS:  Okay, we can go up.  Go
```



Page 106

1   up.

2                   THE VIDEOGRAPHER:  (Complies).

3                   THE WITNESS:  Okay.  Okay.  Okay.

4   Okay.  Is that it?

5                   THE VIDEOGRAPHER:  Yes, that's the end

6   of the document.

7                   THE WITNESS:  All right.

8           Q.  (BY MR. GUISADO) Could you focus on the

9   last page, please.

10                  Mr. Longoria, I'm showing you what

11  we -- will be marked as Exhibit 306 to your

12  deposition.  It's a November 12th, 2016 and

13  November 15th, 2016 e-mail chain.  It bears the Bates

14  numbers AOL-DEF 00046133 through 36.

15                  Do you recognize this document?

16          A.  Yes.

17          Q.  What do you recognize about it?

18          A.  That was my message during November

19  that I sent out to the port directors on the meeting

20  that -- on the request by headquarters that they meet

21  with their INAMI counterparts.

22          Q.  As you have mentioned, I'll represent

23  that Exhibit 306 is an e-mail chain with the subject

24  line "Meet with INM," in which you're copied and you

25  send an e-mail.



Page 107

1                I would like to focus a little bit on

2    the e-mail that starts at the top of the bottom of

3    the third page.

4                MR. GUISADO:  Tyler, if you could blow

5    that up just a little bit.

6                THE VIDEOGRAPHER:  (Complies).

7          Q.   (BY MR. GUISADO) The e-mail, a large

8    recipient list of port directors.

9                "At the request of C1 and C2, you are

10   to meet with your INM counterpart and you're

11   requested to control the flow of aliens into the port

12   of entry."

13               We established earlier that C1 was the

14   commissioner and C2 the deputy commissioner?

15         A.   Yes.

16         Q.   So C1 would be -- 2016, was that Gill

17   Kerlikowske?

18         A.   I don't remember, sir.

19         Q.   What about Kevin McAleenan, was he C1

20   or C2?

21         A.   I don't remember.

22         Q.   At any point, was Gill Kerlikowske C1

23   or C2 that you can recall?

24         A.   The name sounds familiar, but I don't

25   know.



Page 108

1           Q.   What about Kevin McAleenan, does that
2    name ring a bell?
3           A.   Yes, sir.
4           Q.   What do you remember about Kevin
5    McAleenan?
6           A.   He was the commissioner.
7           Q.   So at one point he was C1; is that
8    right?
9           A.   Yes.
10          Q.   But you don't know that he was C1 when
11   this e-mail was sent out?
12          A.   No.
13          Q.   Do you remember speaking with C1 and C2
14   before you sent out this e-mail to the port
15   directors?
16          A.   No.
17          Q.   But you do remember sending out the
18   e-mail?
19          A.   Yes.
20          Q.   Do you have any reason to doubt the
21   veracity of your own statement?
22              MR. NAZAROV:  Objection:  Form.
23              THE WITNESS:  The guidance that I
24   received to generate this e-mail, then the
25   information reflected on there was from CFO



Page 109

1   Higgerson.

2              Q.  (BY MR. GUISADO) You wouldn't -- you

3   wouldn't lie to your port directors, would you,

4   Mr. Longoria?

5              A.  No.

6              Q.  So you have no reason to doubt that

7   this was coming at the request of C1 and C2?

8              A.  No reason to doubt my boss.

9              Q.  You state that you were to meet with

10  your INM counterpart and request that they flow --

11  control the flow of aliens to the port of entry.

12                  Do you remember who eventually ended

13  up metering with INM?

14             A.  Not by name.  I just know that it was

15  either the port director or the designated

16  representative at each of the ports of entry.

17             Q.  So all eight -- so for each eight, the

18  commissioner and deputy commissioner had asked that

19  individuals from each of those eight ports were to

20  meet with INM and request that INM "Control the flow

21  of aliens to the port of entry;" is that right?

22             A.  Yes.

23             Q.  You go on the note that "if INM cannot

24  or will not control the flow."  I just have a

25  question about that.



Page 110

1                Did there come a time where INM ever

2    did not control the flow of non-citizens seeking

3    asylum at the LFO?

4           A.  Not to my recollection.

5           Q.  Okay.  So, to your recollection, at the

6    request of C1 and C2, port directors or someone from

7    each of the eight ports told INM to control the flow

8    of non-citizens to the port of entry, and INM did

9    so --

10          A.  Yes.

11          Q.  -- is that right?

12              Thank you.  I'm going to ask you to

13   speculate here, and it's okay if you don't remember.

14              Do you remember how many meetings each

15   port had with their INM counterparts?

16          A.  I don't know.

17              MR. GUISADO:  Tyler, can you scroll

18   down just a little bit.

19              THE VIDEOGRAPHER:  (Complies).

20          Q.  (BY MR. GUISADO) I would like to focus

21   on the penultimate paragraph.

22              It says here in your e-mail, "Please

23   schedule a meeting with your INM counterparts ASAP.

24   Let us know the date and time of the meeting as soon

25   as it's scheduled.  We will also need a summary of



Page 111

1    your meeting to include who you met with, what was

2    discussed, what was agreed to, issues, concerns and

3    timeline."

4                Do you recall receiving summaries of

5    those meetings?

6         A.   Yes.

7         Q.   What do you recall about them?

8         A.   That they responded as requested by

9    myself and the DFO, they provided a summary of their

10   meeting, that -- that everybody did it, and they

11   identified what -- how the discussion went.

12               I cannot give you specifics because I

13   don't recall, but I can guarantee you that they all

14   responded because it was a priority for the DFO.

15        Q.   Thank you, Mr. Longoria.

16               You testified earlier that you had no

17   reason to doubt -- let me rephrase that.

18               You testified earlier that you don't

19   recall any instance in which INM was -- had refused

20   to control the flow of non-citizens to the port of

21   entry?

22        A.   I don't remember.

23        Q.   Do you recall anything --

24        A.   I don't --

25        Q.   Thank you.



Page 112

███████████████████████████████████████

A.    ████████████████████████████████

███

        Q.    To the best of your knowledge, in all
of the summaries that you were given from port of
directors or one of their co -- colleagues, do you
recall that INM specifically agreed to control the
port -- control the flow of non-citizens to the port
of entry?

        A.    To the best of my recollection, they
were all supportive.

        Q.    So CBP asked INM to control the amount
of individuals that would present at any given one
time to the port of entry and the LFO and the INM
agreed to that after you sent out this e-mail; is
that right?

                MR. NAZAROV:  Objection:  Form.

                THE WITNESS:  Repeat the question.

        Q.    (BY MR. GUISADO) So, as I understand
it, CBP requested that INM control the flow of
individuals presenting at a port of entry and that
request came from C1 and C2, and to your knowledge,



Page 113

1    that request was agreed to by INM?

2                    MR. NAZAROV:  Objection:  Form.

3                    THE WITNESS:  To the best of my

4    information --

5            Q.  (BY MR. GUISADO) You can answer.

6            A.  -- within the Laredo field office, yes.

7            Q.  Thank you.

8                    MR. GUISADO:  Can you bring up FL 8,

9    please.

10                   THE VIDEOGRAPHER:  (Complies).

11                   MR. NAZAROV:  All right.  Yeah, Tyler,

12   if you can go down and let Mr. Longoria read the

13   entire document starting I guess right there.  That's

14   the bottom of it.

15                   Mr. Longoria, can you see it?

16                   THE WITNESS:  Yes, sir.

17                   MR. NAZAROV:  Okay.

18                   THE WITNESS:  Yeah, we can go up.

19           Q.  (BY MR. GUISADO) This is 307.

20                   MR. NAZAROV:  We haven't gotten it

21   yet, but I'm sure it's coming.

22                   THE WITNESS:  Okay.  You can go up.

23                   THE VIDEOGRAPHER:  (Complies).

24                   THE WITNESS:  Okay.  Okay.  Okay.

25           Q.  (BY MR. GUISADO) I'm showing you what



Page 114

1    will be marked as Exhibit 307 to your deposition.

2    It's a November 14th, 2016 e-mail bearing the Bates

3    numbers AOL-DEF 00576995 to 96.

4                    (Exhibit 307 marked)

5              Q.   (BY MR. GUISADO) Do you recognize this

6    exhibit, Mr. Longoria?

7              A.   Yes.

8                    MR. NAZAROV:  Could we just take one

9    second?  We have not received it yet.  Just -- okay.

10                   MR. GUISADO:  I saw it.  Eric sent it

11   to you.  So, like, I'll just wait until the Internet

12   does its thing.

13                   MR. NAZAROV:  It's going to hit in one

14   second.  Oh, okay.  Yeah, why don't you go ahead,

15   because my client has it.

16                   MR. GUISADO:  Okay.

17                   MR. NAZAROV:  I didn't have it, but

18   that doesn't mean anything.  So, go ahead, yeah,

19   that's fine.

20             Q.   (BY MR. GUISADO) I'll represent to you

21   that this exhibit is an e-mail chain with the subject

22   line "Forward" from -- excuse me, with the subject

23   line "Re:  Meeting with INM."

24                   I would like to focus on the e-mail at

25   the bottom of the first page that eventually spills



Page 115

1    onto the second.

2                MR. GUISADO:  Yeah, yeah, that's good.

3    Well, scroll up a little bit.

4                THE VIDEOGRAPHER:  (Complies).

5                MR. GUISADO:  Thank you.

6                MR. NAZAROV:  Mr. Longoria, can you --

7    can you see that?

8                THE WITNESS:  Yes, sir.

9                MR. NAZAROV:  Okay.

10           Q.   (BY MR. GUISADO) Mr. Longoria, this is

11   an e-mail from Juan Chavez, the assistant port

12   director.  At which port, if you know?

13           A.   Laredo.

14           Q.   Laredo, okay.  I'll represent to you

15   that Chavez e-mails you, among others, informing you

16   that "CBP held a metering on November 14th, 2016 with

17   Mexican officials regarding processing migrants."

18                Do you see that?

19           A.   Yes.

20           Q.   I would like to focus on the paragraph

21   beneath the summary, which "CBP officials advise

22   Mexican officials on the new processing guidelines

23   for immigrants arriving at the PLE for processing."

24                MR. GUISADO:  Tyler, I think that's on

25   the second page.



Page 116

1              MR. NAZAROV:  Yeah, I now see that.

2      Okay.  Okay.

3              MR. GUISADO:  Yeah, that's good.  And

4      just for ease of --

5              THE VIDEOGRAPHER:  (Complies and zooms

6      in).

7              MR. NAZAROV:  Thank you, that's what I

8      was going to say.

9              Mr. Longoria, can you -- can you see

10     that?

11             THE WITNESS:  Yes, sir.

12             MR. NAZAROV:  Do you want some time to

13     read it?

14             THE WITNESS:  No, sir.

15             MR. NAZAROV:  Okay.

16             THE WITNESS:  I've read it.

17             MR. NAZAROV:  Okay.

18        Q.   (BY MR. GUISADO) Okay.  So Juan Chavez

19     e-mails you with a summary about his meeting with

20     INM.

21             Do you recall during the last exhibit

22     I was asking you if you remember receiving any

23     summaries of the meetings with INM at the request of

24     C1 and C2?  Do you remember that?

25        A.   Yes.



Page 117

1          Q.  I'll represent to you that this is Juan

2     Chavez's report back.  Do you have any reason to

3     doubt that?

4          A.  No.

5          Q.  Okay.  He states that "Duty Port

6     Director Flores and" Associate Port Director -- or

7     "Assistant Port Director Chavez advised Mexican

8     officials on the new processing guidelines for

9     immigrants arriving at the PLE for processing."

10               What were the new processing

11     guidelines for immigrants arriving at the point of

12     entry?  And I'll remind you that this e-mail was sent

13     on November 14th, 2016.

14          A.  Those were the metering guidelines in

15     2016 as to where they were to process only by

16     capacity.  So if an alien arrived, an individual

17     without documents arrived and there was no capacity,

18     they were full, they were being advised that they

19     could either wait until there was space or go back to

20     Mexico to be processed.

21          Q.  What do you mean by "capacity," do you

22     mean holding capacity?

23          A.  Yes.  During 2016 --

24          Q.  Were you --

25          A.  -- during 2016 --



Page 118

1          Q.  Go ahead.

2          A.  -- they were being processed as holding

3    capacity.

4          Q.  So when you say "capacity," and with

5    respect to this, you told the INM that there were --

6    or excuse me.

7              CBP employees told INM that there were

8    new processing guidelines for migrants that depended

9    on how many individuals a port could physically hold;

10   is that right?

11         A.  Correct.

12         Q.  It says here that "SAT," which I

13   presume is Mexican Customs, "and INAMI officials

14   advised that they are on board with the new

15   procedures and are willing to help out in any way

16   possible to initiate the plan."

17             Do you know how or in what form SAT

18   and INAMI were willing to help out?

19         A.  Not specifically, no.

20         Q.  Do you remember any specific instances

21   in your tenure as ADFO in which INAMI or SAT or

22   Ruoleta helped out to initiate the plan that was

23   implemented November 2016?

24         A.  Repeat the question.

25         Q.  We're discussing a new plan or new



Page 119

1   processing guidelines in 2016 -- November 2016, are

2   we not?

3          A.  Yes.

4          Q.  Okay.  It says here that INAMI

5   officials advised that they're onboard with these new

6   processing guidelines and they're willing to help out

7   in any way possible.

8               Do you recall any times during your

9   tenure as ADFO in which INAMI specifically helped

10  initiate or implement the new processing guidelines?

11         A.  The processing guidelines were

12  established by CBP.  We're talking about the metering

13  of Mexico.

14         Q.  Uh-huh.

15         A.  INAMI just supported our plans.  So in

16  other words, if they reelected to return to Mexico,

17  they would assist us in in releasing those

18  individuals when we were ready for them.

19         Q.  Okay.  And you testified earlier that

20  this plan came down from the commissioner and deputy

21  commissioner; is that right?

22         A.  That was my response, yes.

23         Q.  And that was border-wide on the

24  southern border; is that right?

25         A.  Correct.



Page 120

```
 1              Q.  Do you know if other ports along the

 2    southern border also had meetings with INM?

 3                   MR. NAZAROV:  Objection:  Form.

 4                   MR. GUISADO:  That's a good objection.

 5              Q.  (BY MR. GUISADO) Do you know if any

 6    other ports or field offices along the southern

 7    border had meetings with INM to discuss the

 8    implementation of the plan laid down by the

 9    commissioner and deputy commissioner in

10    November 2016?

11                   MR. NAZAROV:  Objection:  Form.

12                   THE WITNESS:  My response is yes, but

13    that wouldn't be the subject considering it came down

14    from headquarters applicable to the entire southwest

15    border.

16              Q.  (BY MR. GUISADO) So you're assuming

17    that because it came down from the commissioner and

18    deputy commissioner that it went to all field offices

19    across the southwest border?

20              A.  Yes, sir.  Because I don't know it as a

21    fact.

22              Q.  Okay.  Thank you.

23                   MR. NAZAROV:  I just want to --

24    Angelo, I just want to warn you in about ten minutes,

25    I'm going to ask for a break.
```



Page 121

1                    MR. GUISADO:  Is that a lunch break?

2                    MR. NAZAROV:  Mr. Longoria, how long

3    would you need if we take a break in ten minutes?

4                    THE WITNESS:  I don't need a lot of

5    time, sir.

6                    MR. NAZAROV:  I was thinking 15

7    minutes.

8                    THE WITNESS:  That's fine.

9                    MR. NAZAROV:  We can do longer if you

10   want.

11                   THE WITNESS:  No, 15 is fine.

12                   MR. NAZAROV:  And, Angelo, what do you

13   need?  Do you need more time to eat lunch?

14                   MR. GUISADO:  No, 15's okay with me.

15                   MR. NAZAROV:  Okay.

16                   MR. GUISADO:  Tyler, could you bring

17   up FL 10.  Wait, sorry.  Just kidding.  Just kidding.

18                   Could we go back to the exhibit, 307.

19   Can you scroll down a bit.

20                   THE VIDEOGRAPHER:  (Complies).

21                   MR. GUISADO:  Okay.  Thank you.  You

22   can stop there.

23                   MR. NAZAROV:  Can you see that?  I'm

24   sorry, I just want to make sure he can see

25   everything.



Page 122

1                 Can you see -- can you see that e-mail

2       again, the November 12th e-mail, 2016?

3                       THE WITNESS:  Yes, sir.

4                       MR. NAZAROV:  Okay.  Do you need some

5       time to read it, or are you okay?

6                       THE WITNESS:  No, I'm okay.

7                       MR. NAZAROV:  Okay.

8                 Q.   (BY MR. GUISADO) Mr. Longoria, I'll

9       represent to you that you sent this e-mail in

10      November 2016 and you said, "At the request of C1 and

11      C2, you are to meet with your INM counterpart," and

12      we discussed that.

13                You then said that "If INM cannot or

14      will not control the flow" -- I presume of

15      non-citizens to the port of entry -- "your staff is

16      to provide the alien with a piece of paper

17      identifying a date and time for an appointment and

18      return them to Mexico.  This is similar to what

19      San Diego is doing."

20                Do you have any reason to doubt the

21      truth or veracity of your statement back then?

22                A.   No.

23                Q.   It says, "We understand the alien may

24      express a fear of returning Mexico.  We will address

25      as this situation dictates."



Page 123

1                       Did you ever address that situation?

2            A.  No, it never arose.

3            Q.  Would CBP contact INM before it

4   returned essential an American or other asylum seeker

5   to Mexico?

6                    MR. NAZAROV:  Objection:  Form.

7                    THE WITNESS:  To the best of my

8   recollection, no.

9            Q.  (BY MR. GUISADO) One second.

10                   MR. GUISADO:  Could you scroll up a

11  bit, Tyler, please, to the e-mail that we were just

12  looking at.

13                   THE VIDEOGRAPHER:  (Complies).

14                   MR. GUISADO:  There we go.

15           Q.  (BY MR. GUISADO) This is the e-mail

16  again from Juan Chavez.  It says, "CBP Watch

17  Commander Jésus Pereda advised" INAMI -- "advised

18  that INAMI would be contacted telephonically before

19  any Central Americans were returned to Mexico."

20                   Mr. Longoria, do you have any reason

21  to doubt the truth of that statement?

22                   MR. NAZAROV:  Can you see it,

23  Mr. Longoria?

24                   I just want to make sure he can see it

25  okay.



Page 124

 1                    THE WITNESS:  I can see it.

 2                    MR. NAZAROV:  Okay.

 3                    THE WITNESS:  Okay.  Your question,

 4     sir?

 5            Q.   (BY MR. GUISADO) It says here that "CBP

 6     Watch Commander Jesus Barrera advised that INAMI

 7     would be contacted telephonically before any Central

 8     Americans were returned to Mexico."

 9                    Do you have any reason to doubt the

10     truth or veracity of that statement?

11            A.   No reason.

12            Q.   In your experience, do you recall

13     Central Americans ever being returned to Mexico?

14            A.   Yes.

15            Q.   Was it CBP policy to contact INAMI

16     before they returned the Central American asylum

17     seeker to Mexico?

18            A.   The question one more time, sir?

19            Q.   Was it CBP policy or practice to

20     contact INAMI telephonically before any Central

21     American asylum seeker was sent to Mexico as detailed

22     by Assistant Port Director Chavez in the C rank?

23            A.   I don't believe it was CBP policy.  I'm

24     not clear on that, I'm not sure.

25            Q.   Did you know Assistant Port Director



Page 125

 1  Chavez?

 2          A.  Yes.

 3          Q.  Was he a liar?

 4          A.  No, not to my knowledge.

 5              MR. NAZAROV:  Objection:  Form.

 6              THE WITNESS:  Let me rephrase that.

 7  Not to my knowledge.

 8          Q.  (BY MR. GUISADO) Do you have any reason

 9  to doubt that he was telling the truth in this case?

10          A.  No reason to doubt.

11          Q.  But you yourself, the ADFO of the

12  entire Laredo field office, didn't know that it was

13  CBP policy or practice to contact INAMI before any

14  Central American asylum seeker was returned to

15  Mexico?

16          A.  I'm not sure I understand your

17  statement, sir.

18          Q.  You were the assistant director of

19  field operations for CBP from 2015 until 2018; is

20  that right?

21          A.  Correct, for the Laredo field office.

22          Q.  You oversaw eight field offices; is

23  that right?

24          A.  Eight ports of entry, yes, sir.

25          Q.  Excuse me, eight ports of entry.



Page 126

1           You were responsible for a number of

2    things, including non-citizens presenting at the port

3    of entry asking for asylum; is that right?

4           A.   Correct.

5           Q.   You yourself went to the queue

6    management point at at least one port of entry; is

7    that right?

8           A.   Correct.

9           Q.   You testified earlier that you had

10   witnessed a non-citizen present at the port of entry

11   and witnessed a CBP officer at the queue management

12   point contact the port of entry via radio; is that

13   right?

14          A.   Yes, sir.

15          Q.   You can't say with any certainty that

16   you don't recall if it was CBP policy or practice for

17   a CBP officer to contact INAMI before any Central

18   American asylum seekers were returned to Mexico as

19   detailed in Juan Chavez's e-mail?

20               MR. NAZAROV:  Objection:  Form.

21               MR. GUISADO:  What's your basis?

22               MR. NAZAROV:  My basis is it's a

23   compound question; it's confusing.

24               MR. GUISADO:  Thank you.

25          Q.   (BY MR. GUISADO) You can answer,



Page 127

1    Mr. Longoria.

2              A.  I cannot clearly indicate whether there

3    was any policy.  I don't remember that.  Now, whether

4    they communicated with Central Americans, I think

5    they communicated with INAMI before Central Americans

6    were sent back.  If he said it was done, then it was

7    done.  I have no doubt to doubt it.

8              Q.  You looked at a document --

9              A.  But whether it was communicated --

10             Q.  Well, please finish.  I'm very sorry.

11             A.  I'm finished.

12             Q.  You had asked at the behest of C1 and

13   C2 that port directors or their assistants or someone

14   else within the port scheduled meetings with INAMI to

15   discuss the new non-citizen processing guidelines; is

16   that right?

17             A.  Correct.

18             Q.  And you asked for summaries of those

19   meetings; is that right?

20             A.  Correct.

21             Q.  And you actually received the summary

22   in 2016; is that right?

23             A.  Correct.

24             Q.  And Juan Chavez told you that Watch

25   Commander Barrera told INAMI that they were going to



Page 128

1    contact them before any Central American was returned

2    to Mexico; is that right?

3           A.   Correct.

4           Q.   But you don't remember if that was

5    instituted as a policy or practice?

6           A.   No, my confusion is because you're

7    asking if it's CBP.  Maybe I'm losing you, because

8    CBP to me represents the agency as a whole.  Now, if

9    you're talking about the Laredo field office and the

10   port of entry, yes.

11          Q.   It was the Laredo field office's policy

12   or practice to advise INAMI telephonically before any

13   Central American asylum seekers were returned to

14   Mexico; is that right?

15          A.   It was not Laredo field office policy.

16   It was something that was worked out at the port

17   locally, and at that particular time on this date, I

18   didn't see anything wrong with it.

19          Q.   Do you know of any other ports within

20   the Laredo Field office that contacted INAMI

21   telephonically before a Central American asylum

22   seeker was returned to Mexico?

23          A.   I don't recall.

24               MR. NAZAROV:  Form.

25               Will you record my objection to form,



Page 129

1  please.

2              Q.   (BY MR. GUISADO) Please bring up FL 10.

3  That's Exhibit 308, AOL-DEF 00814130.

4              MR. NAZAROV:  Hey, how about after

5  this exhibit, we take a break?

6              MR. GUISADO:  Sounds good to me.

7              MR. NAZAROV:  Unless you have like

8  three hours of questions about this exhibit.

9              MR. GUISADO:  Oh, no, it's a very

10  natural breaking point after this exhibit.

11              MR. NAZAROV:  Okay.  Tyler, can you

12  just go to the bottom and make sure Mr. Longoria can

13  see everything and read everything.

14              THE VIDEOGRAPHER:  (Complies).

15              THE WITNESS:  Okay, I'm good.

16              MR. NAZAROV:  Okay.  Do you want him

17  to move up?

18              THE WITNESS:  Yes.

19              MR. NAZAROV:  Okay.

20              THE VIDEOGRAPHER:  (Complies).

21              THE WITNESS:  Okay.  Okay.  Okay.  I'm

22  good.

23              Q.   (BY MR. GUISADO) So, Mr. Longoria, I'm

24  showing you what we marked as Exhibit 307 to your

25  deposition.  It's a November 14th and 15th, 2016



Page 130

1  e-mail chain bearing the Bates numbers AOL-DEF

2  00576995 and 96.

3              (Exhibit 308 marked)

4              THE VIDEOGRAPHER:  Counsel, sorry to

5  interject.  It's actually 308.

6              MR. GUISADO:  308, thank you.  Boy.

7          Q.  (BY MR. GUISADO) Bates number AOL-DEF

8  1430 to; 32.

9              MR. GUISADO:  And thanks to the

10  videographer for that save.

11          Q.  (BY MR. GUISADO) Mr. Longoria, do you

12  recognize this exhibit?

13          A.  Yes.

14          Q.  I'll represent to you that this

15  exhibit's an e-mail chain from the November 2016

16  meetings with INM that we have just been discussing.

17              You're e-mailing your boss, David

18  Higgerson.  Do you see that?

19          A.  Yes.

20          Q.  Okay.  I would like to focus on the

21  below e-mail because you're forwarding another e-mail

22  to your boss.

23              THE VIDEOGRAPHER:  Thank you.

24              MR. NAZAROV:  Now, Mr. Longoria, do

25  you need some type to read that or do you got it?



Page 131

 1                    THE WITNESS:  I got it.

 2                    MR. NAZAROV:  Okay.

 3          Q.   (BY MR. GUISADO) You're forwarding an

 4   e-mail from James Hutton, who is the deputy executive

 5   director of admissibility of passenger programs in

 6   Washington.

 7                    Is that within headquarters or that's

 8   a different office?

 9          A.   Headquarters.

10          Q.   Headquarters, okay.  So you're

11   forwarding an e-mail to your boss from headquarters.

12                    It says, "If an individual arrives at

13   a POE, we cannot just send them back to Mexico to

14   wait to be processed but must process them upon

15   arrival."  And that's HQ forwarding that to you.

16                    Do you remember receiving that e-mail?

17          A.   Yes.

18                    MR. GUISADO:  And (inaudible), Tyler.

19          Q.   (BY MR. GUISADO) So it's within CBP

20   policy since at least November 2016 that once an

21   individual arrives at a port of entry, you can't send

22   them back to Mexico.  You e-mail your boss with the

23   text, "See below.  This is what I need to discuss

24   with you."

25                    Do you remember sending that e-mail?



Page 132

1          A.   Yes.

2          Q.   Why did you think you needed to discuss

3     that with him?

4          A.   Any time I received a call or a message

5     from headquarters in which the DFO was not copied, it

6     was my responsibility to make sure he was aware of it

7     so he doesn't get blindsided by his boss.

8          Q.   What did you talk about with him?

9          A.   The message from Mr. Hutton.

10         Q.   Do you remember anything specifically

11    about it?

12         A.   No, because the guidance was always --

13    the guidance was always very clear:  Should an

14    individual make it to the FIS, the federal inspection

15    site, and claim credible fear, he was to be

16    processed, he was not to be returned to Mexico.  That

17    was very clear from the very beginning.

18              Now, whether there -- were there

19    instances in which they were not?  Yes.  You get F1s,

20    the Cubans.

21         Q.   Can you think of any others?

22         A.   Not specifically, no.

23         Q.   Did you discuss the contents of James

24    Hutton's e-mail with anyone else other than David

25    Higgerson?



Page 133

1          A.  No.

2          Q.  Did you discuss it with Bradd Skinner?

3          A.  Don't remember, to be honest.

4          Q.  Did anyone disagree with you that once

5    an individual reached U.S. soil that the CBP could

6    not return them back to Mexico without violating CBP

7    policy?

8          A.  There may have been some discussion

9    about other processes that could be used, but again,

10   I don't remember specifics, but yes, there were other

11   people that felt that they could have been legally

12   returned back to Mexico.

13         Q.  Who were those people?

14         A.  The people that had extensive

15   immigration background throughout the Laredo field

16   office.  I can give you an example:  The APD out of

17   Hidalgo knows that it could be done but it was

18   something that was not done.

19         Q.  Do you remember who the APD of Hidalgo

20   was at that time?

21         A.  Sylvia Briones.

22         Q.  Sylvia Briones.  You said she had an

23   immigration background.

24              Do you remember anything specifically

25   about her background?



Page 134

1          A.   Well, other than that she was legacy

2    Immigration and Naturalization Service.

3          Q.   Her background was INS?

4          A.   Yes.

5          Q.   Okay.  And she had conveyed to you that

6    it was an acceptable practice to return an asylum

7    seeker to Mexico even though they had already reached

8    U.S. soil; is that right?

9          A.   Not an acceptable practice.  That it

10   could be done.

11         Q.   Well --

12         A.   Now, I'm not -- I wouldn't respond to

13   say that it was an acceptable practice, but those are

14   things that were done back in the legacy INS days,

15   and that was an alternative, but it wasn't something

16   that was being discussed in this process.

17         Q.   What was being discussed in this

18   process?

19         A.   The guidance and direction that we

20   received is that if they -- you're at capacity, then

21   you have them wait in Mexico or wait in line, it was

22   their option, but that you were not to exceed your

23   holding capacity.  Again, we're talking about 2016.

24   That's the capacity that we're talking about.

25                   And then also if they made it to the



Page 135

1    FIS -- if they actually made it to the FIS and they

2    claimed credible fear, you could not return them back

3    to Mexico, they had to be processed.

4              Q.  Did there ever come about a time where

5    CBP changed its policy wherein an asylum seeker could

6    reach U.S. soil and CBP could permissibly return them

7    to Mexico?

8              A.  Not that I'm aware of.

9              Q.  To the best of your knowledge, was

10   that -- was it CBP policy not to return asylum

11   seekers back to Mexico if they had already reached

12   U.S. soil from the date you started as ADFO up until

13   the day you retired?

14             A.  If -- if they arrived at the federal

15   inspection site, yes.

16             Q.  Thank you.

17             MR. GUISADO:  All right.  This is a

18   natural stopping point.

19                  THE WITNESS:  Yes.

20             MR. GUISADO:  How long do you want?

21             MR. NAZAROV:  Can we have until --

22   like 20 minutes up until 3:10?

23             MR. GUISADO:  That sounds good.

24             MR. NAZAROV:  Is that enough time for

25   you, Mr. Longoria?



Page 136

1              THE WITNESS:  Yes, sir.

2              MR. NAZAROV:  Okay.

3              THE VIDEOGRAPHER:  We are going off

4    the record.  The time is 1:51 p.m.

5                   (Recess taken)

6              THE VIDEOGRAPHER:  We are back on the

7    record.  The time is 2:18 p.m.

8              MR. NAZAROV:  I'm sorry, I had myself

9    off on mute.  Sorry about that.  Back in.

10             Q.  (BY MR. GUISADO) Good afternoon,

11   Mr. Longoria.  Welcome back.

12             A.  Yes, sir.

13             Q.  I would just like to remind you that

14   you're under oath, the same oath that you took this

15   morning.  Is that understood?

16             A.  Yes.

17             Q.  Okay.  I would like to move a little

18   bit to discuss capacity, but before I do so, I think

19   I myself just need some help defining, you know, or

20   help geographically with ports of entry and what --

21   you testified earlier that CBP officers were often

22   stationed at the queue management point which was

23   sometimes about the middle of the bridge within the

24   Laredo field office; is that right?

25             A.  Yes, sir.



Page 137

1          Q.  And they were positioned as close to

2    the international boundary with Mexico as possible;

3    is that right?

4          A.  Yes, sir.

5          Q.  Can we take an example?

6              Can you name a port of entry that has

7    a bridge that has officers -- or had officers

8    stationed at the queue management point along the

9    international boundary?

10         A.  Laredo.

11         Q.  Laredo, okay.  So you testified earlier

12   that per the 20 -- November 2016 guidance that CBP

13   was not to return individuals to Mexico had they

14   reached U.S. soil; is that correct?

15         A.  They reached the federal inspection

16   site, FIS.

17         Q.  My question to you is:  Doesn't it

18   violate the metering guidance to return an individual

19   to Mexico once they have stepped foot on U.S. soil?

20             MR. NAZAROV:  Objection:  Form.

21             THE WITNESS:  No, sir.

22         Q.  (BY MR. GUISADO) Why not?

23         A.  Because they hadn't reached the federal

24   inspection site.

25         Q.  One second.



Page 138

1                    MR. NAZAROV:  Did you note my

2    objection?

3                    THE COURT REPORTER:  (Nods).

4                    MR. NASAROV:  Thank you.

5                    MR. GUISADO:  Tyler, can you bring up

6    FL 1 one more time.

7                    MR. NAZAROV:  What exhibit is this?

8                    MR. GUISADO:  That is Exhibit 298.

9                    MR. NAZAROV:  And scroll down, please.

10   Let him just familiarize himself with it.

11                   Mr. Longoria -- Mr. Longoria, do you

12   remember this exhibit?  You wanted to take a look at

13   it again.

14                   THE WITNESS:  No, I remember it.

15                   MR. NAZAROV:  Okay.  Were you able to

16   read everything clearly?

17                   THE WITNESS:  Yes, sir.

18        Q.  (BY MR. GUISADO) Mr. Longoria, does FIS

19   appear in Todd Owens metering guidance in November of

20   2016?

21        A.  I don't see it.

22                   MR. GUISADO:  Tyler, could you bring

23   up FL 10.  That is Exhibit 308.

24                   THE VIDEOGRAPHER:  It is up now.

25                   MR. GUISADO:  Thank you.  Please



Page 139

1    scroll to the bottom, the second page.

2                    MR. NAZAROV:  Hold on a second.  308?

3                    Mr. Longoria, do you want to look at

4    the exhibit and familiarize yourself with it again?

5                    MR. GUISADO:  I think you should.

6                    THE WITNESS:  No, I remember it.

7                    MR. NAZAROV:  Okay.

8            Q.   (BY MR. GUISADO) Mr. Longoria, I think

9    you should read it.

10                   MR. NAZAROV:  Why don't we go to the

11   the bottom and you can just re-skim it again, reread

12   it again.

13                   THE WITNESS:  Okay.  Go up.

14                   MR. GUISADO:  Scroll up -- scroll up

15   to the next e-mail.

16                   THE VIDEOGRAPHER:  (Complies).

17                   THE WITNESS:  Okay.

18                   MR. GUISADO:  Scroll up to the next

19   e-mail.

20                   MR. NAZAROV:  Okay, hold on.  Scroll

21   down.  Let him read it.

22                   THE VIDEOGRAPHER:  (Complies).

23                   THE WITNESS:  Okay.

24            Q.   (BY MR. GUISADO) Mr. Longoria, does FIS

25   appear anywhere on this e-mail chain?



Page 140

1           A.   No.   But it does make reference to the

2    point of entry.

3           Q.   Mr. Longoria, who told you that an

4    individual could not be turned back -- could be

5    turned back to Mexico once they had crossed the

6    international boundary but had not yet reached the

7    FIS?

8                MR. NAZAROV:   Objection:   Form.

9                THE WITNESS:   That was the guidance

10   and direction provided to us during 2016.   Where it

11   came from other than my boss, I couldn't answer that.

12          Q.   (BY MR. GUISADO) Mr. Longoria, we just

13   looked at the guidance in Exhibit 298.   You have also

14   looked at what C1 and C2, the commissioner and deputy

15   commissioner, advised with respect to processing

16   asylum seekers and involving INAMI.

17               I'm asking you:   Specifically who told

18   you that it would be permissible under CBP policy to

19   send individuals back to Mexico once they had crossed

20   the international boundary but had not yet reached

21   the port of entry?

22               MR. NAZAROV:   Objection:   Form.

23               THE WITNESS:   You made reference to

24   exhibits what again?

25          Q.   (BY MR. GUISADO) You didn't see FIS



Page 141

1   anywhere in either of those exhibits, did you?

2            A.  No.

3            Q.  You've worked for -- or you worked for

4   CBP for 27 years; is that right?

5            A.  Yes.

6            Q.  You told me that you received training

7   in 1992 on customs and inspections; is that right?

8            A.  Yes.

9            Q.  You told me at some point during your

10  27-year tenure at CBP, you received training on

11  processing asylum seekers; is that right?

12           A.  No.

13           Q.  You've never received --

14           A.  No training.

15           Q.  No training in --

16           A.  I advised you that I had received

17  familiarization in INS when I was a customs inspector

18  in training in 1991 -- 1992.

19           Q.  In your 27 years, including three as

20  assistant field officer, a tenure of three years as a

21  supervising program manager, and two years as a

22  program manager -- do I have that correct?

23           A.  Yes.

24           Q.  -- in all of those years, can you

25  recall who specifically told you you could return



Page 142

1    Mexican -- excuse me, Central American asylum seekers

2    to Mexico once they had crossed the international

3    boundary but had not yet reached the FIS?

4              MR. NAZAROV:  Objection:  Form.

5              THE WITNESS:  I cannot remember

6    specifically who.

7         Q.  (BY MR. GUISADO) Can you remember when?

8              MR. NAZAROV:  Objection:  Form.

9              THE WITNESS:  My best guess is during

10   2016 when we started meeting.

11        Q.  (BY MR. GUISADO) But didn't we just

12   look at the 2016 guidance, Mr. Longoria?

13             MR. NAZAROV:  Objection:  Form.

14             THE WITNESS:  Yes, we did.

15        Q.  (BY MR. GUISADO) And nowhere in the

16   guidance does it mention that you can turn an asylum

17   seeker back to Mexico once they cross the

18   international boundary but haven't yet reached the

19   FIS; is that right?

20             MR. NAZAROV:  Form.

21             THE WITNESS:  That's correct.

22        Q.  (BY MR. GUISADO) Mr. Longoria, have you

23   ever heard the term "detention capacity" before?

24        A.  Yes.

25        Q.  Have you heard it used with respect to



Page 143

1    processing asylum seekers at port of entries on the

2    U.S./Mexico border?

3          A.   Yes.

4          Q.   What do you understand "detention

5    capacity" to mean in that context?

6          A.   The number of temporary holding cells

7    in holding areas that you have at the -- at the port

8    of entry.

9          Q.   Do you know how CBP defines it or

10   defined it during your tenure?

11         A.   Not verbatim, but it's identified in --

12   in the record.

13         Q.   Is it your understanding that it's

14   basically the same definition that you just gave me?

15              MR. NAZAROV:  Form.

16              THE WITNESS:  That's correct.

17         Q.   (BY MR. GUISADO) Do you remember when

18   CBP started using "detention capacity" as a metric?

19         A.   No, not the exact date.

20         Q.   Could you ballpark it for me?

21         A.   Is it limited to what we're discussing

22   right now, the influx?

23         Q.   No.

24         A.   So repeat the question.

25         Q.   Do you remember when you first heard



Page 144

1    the term "detention capacity" in your tenure at CBP?

2             A.  No.

3             Q.  Do you know who's --

4                 THE WITNESS:  I'm hearing -- I'm

5    hearing -- there is an echo.

6                 MR. NAZAROV:  What's going on?  What's

7    going on?

8                 THE WITNESS:  There's an echo when

9    somebody talks -- again -- we didn't have it --

10                MR. GUISADO:  I am sure it's

11   temporary.  It happens to me all the time.  If it

12   becomes a problem, let me know.

13                MR. NAZAROV:  Hold on.  Let's --

14                Tyler, can you get rid of the echo?

15                THE VIDEOGRAPHER:  Yeah, that echo's

16   happening on my end, too.

17                MR. NAZAROV:  Okay.  Yeah, it's gone.

18                MR. GUISADO:  It's gone.  Tyler, I

19   don't know what you did, but thank you.

20                MR. NAZAROV:  Thank you.  Thank you.

21                THE VIDEOGRAPHER:  It's still slightly

22   doing it.

23                MR. NASAROV:  It's back.

24                MR. GUISADO:  Okay.  Mr. Longoria,

25   if -- if you have a problem understanding me, let me



Page 145

1    know.

2                    THE WITNESS:  I will.  It's just that

3    the echo is very distracting.

4                    MR. GUISADO:  Ideally we would be

5    doing this in person, but this isn't ideal.  So I

6    would like to continue, if that's all right with you.

7                    THE WITNESS:  Sure.  I'm just letting

8    you know that I may ask you to repeat it because of

9    this connection.

10                   MR. GUISADO:  And I may ask you to

11   repeat it, too.  We're going to work together to

12   through this, I promise.

13                   MR. NASAROV:  I would just like to

14   point out that Mr. Longoria's took time off today and

15   is currently in this deposition at 22 hours, but I

16   think he's retired and, you know, we had to wait two

17   hours to get going in the capacity with the record.

18   It is a problem because it is not his fault.  I want

19   the record to note that.  I don't know how long you

20   plan to go on, I just -- I would like to note that

21   for the record.

22                   MR. GUISADO:  Let the record so

23   reflect.  I would like to ask the court reporter if

24   they're having any difficulty transcribing what's

25   going on because of the echo.



Page 146

 1                    THE WITNESS:  It seems to be gone now.

 2                    MR. NAZAROV:  Ms. Hartman, did you

 3    hear all that?  Yeah, did you hear all that, what

 4    Angelo just said?  I can't hear.  I can't hear her.

 5    Can you hear her?

 6                    THE VIDEOGRAPHER:  I can't either.

 7                    MR. GUISADO:  She's on mute.

 8                    THE COURT REPORTER:  How about now?

 9                    MR. GUISADO:  Yes.

10                    THE COURT REPORTER:  It was really bad

11    when the witness was talking and then with Mr. Ari it

12    cleared up for some reason.

13                    MR. NAZAROV:  Okay.

14                    (Discussion off record)

15                    THE VIDEOGRAPHER:  Let me go off the

16    video record.  The time is 2:30 p.m.

17                       (Recess taken)

18                    THE VIDEOGRAPHER:  We are back on

19    record.  The time is 2:31 p.m.

20            Q.  (BY MR. GUISADO) Mr. Longoria, am I

21    coming in clearly?

22            A.  Yes, sir.

23            Q.  Thank you for your patience today and

24    being willing to sit for this deposition.  I am sure

25    it's not what you had planned on your Thursday, but I



Page 147

1    appreciate it sincerely.
2              We were just discussing your
3    understanding of the definition of "detention
4    capacity."  You told me that you don't remember when
5    CBP started using it; is that correct?
6         A.  No, I don't remember.  You were asking
7    me when I became aware of the detention capacity or
8    something like that.  You can ask the question again.
9         Q.  Do you remember when you first heard
10   in -- during your employment at CBP the term
11   "detention capacity"?
12        A.  No, because the term "detention
13   capacity" was used prior to 2016, so I wouldn't
14   remember the exact date, because it was -- it could
15   be used in relationship to other issues.
16        Q.  What other issues?
17        A.  Day-to-day port operations.  The number
18   of people that are being processed in immigration
19   other than the asylum seeker, people that are being
20   detained for narcotics.
21              So again, it would not be so confusing
22   to me if it wasn't part of the dialogue that we use
23   on a daily basis in an enforcement action,
24   enforcement arena.  So that is the confusion, sir.
25        Q.  Did you have a working understanding



Page 148

1    during your time as ADFO of what "detention capacity"

2    meant?

3                A.  Yes, sir.

4                Q.  What was that one more time?  And I'm

5    sorry if you already said that.

6                A.  Detention capacity is the number of --

7    of holding -- temporary holding area, the detention

8    cells, everything that's available for CBP to

9    temporarily hold individuals while they're pending

10   processing or have them processed in a way you can

11   turn over to another individual.

12               Q.  Did you ever -- do you think that

13   individuals within the Laredo field office shared

14   your understanding of that definition of "detention

15   capacity"?

16               MR. NAZAROV:  Objection:  Form.

17               You can answer.

18               THE WITNESS:  Yes, sir.

19               MR. GUISADO:  Tyler, please bring up

20   Howe 89, ALO-DEF 0089300.

21               THE VIDEOGRAPHER:  (Complies).

22               Q.  (BY MR. GUISADO) I would like,

23   Mr. Longoria, to --

24               MR. GUISADO:  Ari, direct him as

25   necessary.



Page 149

```
 1                    MR. NAZAROV:  Thank you, sir.
 2                    Yeah, Tyler, if you could just go -- I
 3      think it's only two pages, this document.
 4                    THE VIDEOGRAPHER:  Correct.
 5                    MR. NAZAROV:  Go to the bottom and
 6      have Mr. Longoria make sure that he can read it.
 7                    Can you -- can you -- can you read
 8      everything there, Mr. -- Mr. Longoria?
 9                    THE WITNESS:  Yes.
10                    MR. GUISADO:  Okay.
11                    MR. NAZAROV:  Okay.
12                    THE WITNESS:  Okay.  Up, please.
13                    THE VIDEOGRAPHER:  (Complies).
14                    THE WITNESS:  Okay.
15           Q.  (BY MR. GUISADO) Mr. Longoria, I'm
16      showing you what we previously marked as Exhibit 89
17      to Randy Howe's deposition earlier this year in
18      January in D.C. It bears a Bates number
19      AOL-DEF 00899300.
20                    Do you recognize this exhibit?
21           A.  Yes.
22           Q.  How do you recognize it?
23           A.  It has my name on it.
24           Q.  When's the last time you saw this
25      document?
```



Page 150

 1                A.   Probably when I received it in

 2    June 8th, 2018.

 3                Q.   I'll represent to you that Exhibit 89

 4    is an e-mail chain with the subject line "Queue

 5    Management."

 6                     You're the author of the top e-mail,

 7    correct?

 8                A.   That's correct.

 9                Q.   You're e-mailing Javier Vásquez, the

10    assistant port director of Laredo; is that right?

11                A.   That's correct.

12                Q.   I would like to direct your attention

13    to the bottom e-mail from Mr. Vásquez to you and

14    Bradd Skinner.  The subject line is "Queue

15    Management."

16                     Queue management on June 8th, 2011,

17    Mr. Vásquez says, "I don't understand why ports are

18    doing queue management if they are not at capacity.

19    There was no confusion on yesterday's LFO guidance

20    call."

21                     Do you remember the LFO guidance call

22    on June 7th, 2018?

23                A.   Not the specifics.

24                Q.   Generally talk to me, what do you

25    remember about it?



Page 151

1            MR. NAZAROV:  Objection:  Form.

2            THE WITNESS:  Without looking at the

3    date on Mr. McAleenan's guidance letter on

4    prioritization, I would say that it was in

5    relationship to shifting from capacity to operational

6    capacity.

7            Q.  (BY MR. GUISADO) It says here that

8    Mr. Vásquez says, "There was no confusion on

9    yesterday's guidance call."

10           Do you understand what he's

11   referencing here?

12           A.  My interpretation is that why are we

13   doing queue management and holding people at the line

14   if we have the capacity to -- to process them in the

15   detention capacity.

16           Q.  Is -- did you have any reason to doubt

17   that Javier Vásquez was representing the truth on

18   this e-mail?

19           MR. NAZAROV:  Objection:  Form.

20           THE WITNESS:  He's representing his

21   opinion.

22           Q.  (BY MR. GUISADO) Uh-huh.  And his

23   opinion is that he doesn't understand why the ports

24   were engaged in metering if they were not at

25   100 percent capacity; is that right?



Page 152

```
 1            A.  Right.

 2                  MR. NAZAROV:  Objection:  Form.

 3                  Will you note my objection,

 4      Ms. Reporter?

 5                  THE COURT REPORTER:  (Nods).

 6                  MR. NAZAROV:  Thank you.

 7            Q.  (BY MR. GUISADO) If there is no

 8      confusion as per Mr. Vásquez, you would agree that

 9      there was agreement that ports should not be doing

10      queue management if they were not at full capacity;

11      is that right?

12                  MR. NAZAROV:  Objection:  Form.

13                  THE WITNESS:  Repeat the question.

14            Q.  (BY MR. GUISADO) Mr. Vásquez states

15      here that there's no confusion; is that right?

16            A.  That's what it says.

17            Q.  He's referencing his opinion that he

18      doesn't understand why ports would do queue

19      management if they were not at capacity; is that

20      right?

21            A.  Yes, sir.

22                  MR. NAZAROV:  Objection:  Form.

23                  THE WITNESS:  That's what he says.

24            Q.  (BY MR. GUISADO) Thank you.

25                  MR. GUISADO:  Please scroll up, Tyler.
```



Page 153

```
 1                THE VIDEOGRAPHER:  (Complies).
 2           Q.  (BY MR. GUISADO) You state here, "No
 3      argument from me."
 4                Does that mean that you agreed with
 5      Javier Vásquez's opinion?
 6           A.  No.
 7           Q.  Why not?
 8           A.  He was expressing an opinion, and we
 9      work off guidance and directions from headquarters
10      and we do what we're instructed to do, what we feel
11      and what we think is the right way.  If we disagree,
12      it doesn't matter, we have to implement the direction
13      and guidance that we receive from headquarters.
14           Q.  Mr. Vásquez's opinion is that he did
15      not understand why ports were engaged in metering if
16      they were at less than 100 percent capacity; is that
17      right?
18                MR. NAZAROV:  Objection:  Form.
19           Q.  (BY MR. GUISADO) And you respond to the
20      him by saying, "No argument from me."
21                Is that right?
22                MR. NAZAROV:  Was that a question?
23      Because he hasn't responded.
24                MR. GUISADO:  Yes.
25           Q.  (BY MR. GUISADO) The question is:  Did
```



Page 154

1    you reply to his e-mail saying, "No argument from

2    me"?

3            A.  Yes.

4            Q.  You didn't CC Mr. Skinner on your

5    reply.  Why was that?

6            A.  I didn't see a need to.

7            Q.  Why not?

8            A.  I answered your question.  I -- I

9    didn't see a need why he needed to be copied.

10           Q.  And I'm asking you to speculate why he

11   (sic) didn't feel a need to.

12               MR. NAZAROV:  Objection:  Form.

13               THE WITNESS:  I don't know how to

14   answer that.

15           Q.  (BY MR. GUISADO) Okay.  Let's break it

16   down.

17               On Friday, June 8th, 2018, Javi --

18   Javier Vásquez e-mails you with the subject "queue

19   management."  Am I right?

20           A.  That's correct.

21           Q.  He references an LFO guidance call; is

22   that right?

23           A.  Yes.

24           Q.  It appears that you were on that call

25   even though you don't specifically remember it; is



Page 155

1    that right?

2              MR. NAZAROV:  Objection:  Form.

3              THE WITNESS:  It looks like, yeah, I

4    was on the call.

5         Q.  (BY MR. GUISADO) Most likely you were

6    on a call, okay.  Thank you.

7              You had testified that it was Javier

8    Vásquez's opinion that he didn't understand why ports

9    were doing queue management if they were not at

10   100 percent capacity; is that right?

11             MR. NAZAROV:  Objection:  Form.

12             THE WITNESS:  Yes.

13        Q.  (BY MR. GUISADO) You responded to his

14   e-mail saying, "No argument from me."  Is that right?

15        A.  Yes.

16        Q.  You didn't CC Bradd Skinner; is that

17   right?

18        A.  Correct.

19        Q.  You didn't CC Bradd Skinner, who was

20   your boss; is that correct?

21        A.  Yes.

22        Q.  Did you share Javier Vásquez's opinion

23   that you were unsure why ports were doing queue

24   management if they were not at 100 percent capacity?

25             MR. NAZAROV:  Objection:  Form.



Page 156

 1                    MR. GUISADO:  State your basis,

 2    Counsel.

 3                    MR. NAZAROV:  It's a compound

 4    question, asked and answered; it is confusing; and

 5    you're badgering the witness.  He's answered the

 6    question.

 7                    MR. GUISADO:  No, I'm not.

 8                    MR. NAZAROV:  Ask the question again.

 9    Now he can answer the best he can, but you're

10    badgering him.

11            Q.  (BY MR. GUISADO) Mr. Longoria, I

12    apologize if I'm badgering you.

13                    The question, once again, is:  Did

14    you -- did you share the opinion of Javier Vásquez

15    that you didn't understand why ports were doing queue

16    management if they were not at 100 percent capacity?

17                    MR. NAZAROV:  Objection:  Form.

18                    He can answer, if he can.

19                    THE WITNESS:  The only issue I have

20    with your question is that I was not unsure of the

21    guidance.  No, I was very clear on the guidance, and

22    the guidance was what it is, what is -- was written.

23    As far as processing at operational capacity versus

24    detention capacity, that was very clear.  I was not

25    unsure of the guidance.



Page 157

```
 1                    I was just responding to Javier
 2    Vásquez's messages telling me he was not going to get
 3    any argument from me.  That was his opinion.  I had
 4    nothing to discuss with him on it, period.
 5              Q.   (BY MR. GUISADO) What was Javier
 6    Vásquez's opin -- position at that time?
 7              A.   He was overseeing assistant -- he was
 8    assistant port director.
 9              Q.   In your role as assistant director of
10    field operations, did you supervise assistant port
11    directors?
12              A.   No.
13              Q.   Did you supervise port directors?
14              A.   No.
15              Q.   Who did you supervise?
16              A.   Staff assigned to border security.
17    Port directors report directly to the DFO.
18              Q.   Did you ever have occasion to discuss
19    capacity with any port director or assistant port
20    director?
21              A.   Yes.
22              Q.   Can you recall any specific instances?
23              A.   No.
24              Q.   If an assistant port director or port
25    director had asked you for clarification regarding --
```



Page 158

1    regarding guidance with respect to metering, would

2    you have answered their question?

3              A.   Yes.

4                   MR. NAZAROV:  Objection:  Form.

5                   Will you note my objection, please.

6                   THE COURT REPORTER:  (Nods).

7                   THE WITNESS:  Yes.

8              Q.   (BY MR. GUISADO) Mr. Longoria, it

9    appears as if Javier Vásquez is unsure about the

10   guidance with respect to queue management capacity;

11   is that right?

12             A.   I don't think he's unsure.  He just

13   doesn't understand why they're doing it.

14             Q.   How do you understand the definition of

15   "unsure"?

16             A.   Not clear on what's expected.

17             Q.   Is that similar to not understanding?

18                  MR. NAZAROV:  Objection:  Form.

19                  THE WITNESS:  Yes.

20             Q.   (BY MR. GUISADO) Thank you,

21   Mr. Longoria.

22                  You testified earlier to my question.

23   My question was:  If an assistant port director or

24   port director approached you with confusion regarding

25   metering guidance or guidance relating to capacity,



Page 159

 1  that you would help clear that up for them.

 2                 MR. NAZAROV:  Objection:  Form.

 3          Q.  (BY MR. GUISADO) Do you remember

 4  testifying to that?

 5          A.  Yes.

 6          Q.  An assistant port director e-mailed you

 7  on January 8th, 2018, testifying that he -- or,

 8  excuse me -- expressing that he didn't understand

 9  something about queue management and capacity.

10                 Did you clear up that confusion for

11  him?

12          A.  I don't think he was requesting

13  clarification.  He was just --

14          Q.  No, that's not my question.  That's not

15  my question.

16          A.  Well, that's my answer, sir.

17          Q.  So you did not clear up an assistant

18  port director's confusion regarding --

19                 MR. NAZAROV:  Objection:  Form.

20          Q.  (BY MR. GUISADO) -- capacity?

21                 MR. NAZAROV:  Angelo, you're just

22  badgering him.  He's answered your question.

23                 MR. GUISADO:  No, I'm focusing on a

24  document.  I'll refrain -- I would ask you to refrain

25  from speaking objections, please.



Page 160

 1                  MR. NAZAROV:  Well, okay, that's fair

 2      enough.  But when you're asking the same question, he

 3      said -- he's done the best to answer it and you keep

 4      asking, it's badgering.  I have to protect the

 5      witness a little bit.  I have told you, we waited two

 6      hours for the deposition.  He's retired.  It's late

 7      in the deposition.  You get to ask your questions but

 8      not to badger him.

 9                  MR. GUISADO:  You requested this

10      deposition, Ari.  It is three hours and 30 minutes,

11      roughly by my count.  We still have halfway to go.

12             Q.   (BY MR. GUISADO) Mr. Longoria, I

13      appreciate your patience in this matter, and I'm

14      going to instruct your Counsel to stop giving

15      speaking objections.

16                  The last question on this document is:

17      Is it true that Javier Vásquez e-mailed you regarding

18      his misunderstanding about queue management and

19      capacity and you did not clarify that confusion for

20      him?  Is that right?

21                  MR. NAZAROV:  Objection:  Form.

22                  THE WITNESS:  And my response is you

23      have to understand the relationship between Javier

24      Vásquez and myself.  That was not simply a DFO to

25      assistant port director.  You have to understand



Page 161

1    that.  And if you're not willing to listen to that,

2    then my answer -- my response stands.

3                     MR. GUISADO:  Move to strike the

4    answer as nonresponsive.

5                     Tyler, please put the document to the

6    side.

7                     THE VIDEOGRAPHER:  (Complies).

8        Q.  (BY MR. GUISADO) Mr. Longoria, when did

9    CBP start using the term "operational capacity"?

10       A.  2018.

11       Q.  Do you know who at CBP came up with

12   that term?

13       A.  No.

14       Q.  Do you know why they came up with that

15   term?

16       A.  No.

17       Q.  Did the definition or its usage change

18   over time?

19       A.  Not to my knowledge.

20       Q.  Is the definition of "operational

21   capacity" anywhere in a statute?

22       A.  Not to my knowledge.

23       Q.  You're not aware of any regulation that

24   defines the term "operational capacity"?

25       A.  I'm not aware of any.



Page 162

1          Q.   You're not aware of any internal
2    memorandum that defines "operational capacity"?
3          A.   What's your question?
4          Q.   Are you aware of any internal
5    memorandum that defines "operational capacity"?
6          A.   No.
7          Q.   Are you aware of any guidance that
8    defines "operational capacity"?
9          A.   Defines, no.
10         Q.   Are you aware of any muster that
11   defines "operational capacity"?
12         A.   No.
13              MR. GUISADO:  Please queue up FL 11.
14   That's Exhibit 309 AOL-DEF 00911232.
15         Q.   (BY MR. GUISADO) Take your time with
16   the document, Mr. Longoria.
17              MR. NAZAROV:  Mr. Longoria, can you
18   see that?
19              THE WITNESS:  Yes, sir.
20              MR. NAZAROV:  Okay.  Are you able to
21   read it?
22              THE WITNESS:  Yes, sir.
23              MR. NAZAROV:  All right.  We haven't
24   gotten it yet, so if you could give me a minute.
25   Okay.



Page 163

1            Q.   (BY MR. GUISADO) Mr. Longoria, let me

2    know when you've read the document.

3                 MR. NAZAROV:  It's two e-mails, right,

4    Angelo?

5                 MR. GUISADO:  That's correct.

6                 MR. NAZAROV:  Yeah, have you read both

7    of them, Mr. Longoria?

8                 THE WITNESS:  Yes.

9                 MR. NAZAROV:  Okay.

10                 (Exhibit 309 marked)

11            Q.   (BY MR. GUISADO) Mr. Longoria, I am

12   showing you what will be marked Exhibit 309 to your

13   deposition.  It is a June 13th, 2018 e-mail chain

14   that bears the Bates number AOL-DEF 00911232.

15                 Do you recognize this document?

16                 THE VIDEOGRAPHER:  Sorry, Counsel,

17   it's 3 -- 310, not 309.

18                 MR. GUISADO:  310, thank you very

19   much.

20                 MR. NAZAROV:  I have it as 309.  Hold

21   on.  Am I looking at --

22                 MR. GUISADO:  We marked it 309.

23                 THE VIDEOGRAPHER:  The last document

24   that we used was 309.  So I would make this one 310.

25   I don't believe it's been marked yet.



Page 164

1              MR. GUISADO:  No, no, the last --

2              MS. RICH:  I --

3              MR. GUISADO:  Yeah, Sarah, go ahead.

4              MS. RICH:  Yeah.  The last -- the last

5    document was previously marked exhibit from another

6    deposition.

7              THE VIDEOGRAPHER:  Oh, okay.  That's

8    my mistake.

9              MS. RICH:  We are doing consecutive

10   numbering.

11             THE VIDEOGRAPHER:  I understand.  No

12   problem.  Thank you for clarifying.

13             MR. NAZAROV:  So it is 309?  Okay.

14        Q.  (BY MR. GUISADO) Mr. Longoria, do you

15   recognize Exhibit 309?

16        A.  Yes.

17        Q.  How do you recognize it?

18        A.  It has my name on it.

19        Q.  When's the last time you saw this

20   document?

21        A.  The day I generated it.

22        Q.  I'll represent to you that this exhibit

23   is an e-mail from you to Bradd Skinner regarding the

24   implementation of queue management at the Laredo

25   field office.



Page 165

1            The second line of the e-mail reads,

2    "Do we need to revisit since we have moved from

3    detention capacity to operational capacity?"

4            Did I read that right?

5        A.  Yes.

6        Q.  So did CBP move from detention capacity

7    to operational capacity in 2018?

8        A.  Yes.

9        Q.  Makes -- you would agree with me that

10   it makes no sense to move from detention capacity to

11   operational capacity if you've always been using

12   operational capacity; is that right?

13           MR. NAZAROV:  Objection.

14           Go ahead, you can answer.

15           THE WITNESS:  I didn't understand the

16   question.

17       Q.  (BY MR. GUISADO) You would agree with

18   me that it makes no sense to move from detention

19   capacity to operational capacity if you had always

20   been using operational capacity; is that right?

21           MR. NAZAROV:  Objection:  Form.

22           THE WITNESS:  No, because in the

23   context of processing the arriving aliens claiming

24   incredible fear or expressing the fear of returning,

25   we went from detention capacity to operational



Page 166

1    capacity.

2             Q.   (BY MR. GUISADO) Right.  But if you had

3    already -- if you had always been using operational

4    capacity, you wouldn't need to make the switch; is

5    that right?

6             MR. NAZAROV:  Objection:

7    Argumentative.

8             Q.   (BY MR. GUISADO) You can answer.

9             A.   We were using detention capacity.

10            Q.   Okay.  Thank you, Mr. Longoria.

11                 Can you read the third line of this

12   e-mail that you sent to Bradd Skinner for me.

13            A.   The one that starts with "recommend"?

14            Q.   Yes, please.

15            A.   "Recommend we send to the ports for

16   their review and comment before we go final.  This

17   way we can have port directors tell us what

18   operational capacity means to them.

19                 What say you?"

20            Q.   Why did you need port directors to tell

21   you what "operational capacity" meant to them?

22            A.   I wanted to have input as to what the

23   definition is and that we were all on the same --

24   operating off the same understanding.

25            Q.   So you were looking for a more complete



Page 167

1    understanding of what "operational capacity" meant;

2    is that right?

3                   MR. NAZAROV:  Objection:  Form.

4                   THE WITNESS:  You get more buy-in when

5    you're changing a process if you have input from the

6    people that are going to be responsible for

7    implementing.

8                   Did I need their input?  Did we need

9    their input at the field office?

10                   Not necessarily, but the process works

11   better if they feel that they were involved in the

12   decision-making process.

13                   Q.   (BY MR. GUISADO) All right.  Was it

14   possible that the port directors would have had a

15   different understanding of what "operational

16   capacity" meant than you did?

17                   MR. NAZAROV:  Objection:  Form.

18                   THE WITNESS:  It's possible.

19                   Q.   (BY MR. GUISADO) Did you know of anyone

20   else that had a different understanding than you did?

21                   A.   No.

22                   Q.   You didn't know what "operational

23   capacity" really meant in 20 -- 2018, did you?

24                   MR. NAZAROV:  Objection:  Form.

25                   Q.   (BY MR. GUISADO) You can answer.



Page 168

1          A.   I am thinking, sir.

2          Q.   All right.  Take your time.

3          A.   I was not familiar with the term.

4          Q.   And you asked for the port director's

5     understanding to get a more fulsome understanding of

6     what operational capacity meant; is that right?

7          A.   We asked for their input, yes, sir.

8          Q.   Thank you.

9               MR. NAZAROV:  Angelo, I just want to

10    let you know that I'm going to ask in ten minutes for

11    a ten-minute break.

12              MR. GUISADO:  Take your time.

13              Tyler, could you queue 85, please.

14    That's Howe 85.

15              THE VIDEOGRAPHER:  (Complies).

16              MR. NAZAROV:  Hold on.  Is this an old

17    exhibit or a new one?

18              MR. GUISADO:  This is old.  We

19    introduced it at Mr. Howe's deposition on the 9th of

20    January, 2020, in D.C.

21              MR. NAZAROV:  Okay.  Now, what I meant

22    to say was you -- you didn't bring it up before,

23    right, in this deposition?

24              MR. GUISADO:  No.  No, no, no.  I

25    brought up Howe 89.



Page 169

 1                    MR. NAZAROV:  Okay.

 2                    MR. GUISADO:  I'm going to use a few

 3     Howe exhibits, actually.

 4                    MR. NAZAROV:  Okay.  So I just want

 5     Mr. Longoria to go to the bottom of it and just make

 6     sure he can read everything and scroll up and give

 7     him like five minutes to just read the whole document

 8     and make sure he knows what -- what this is.

 9                    Tyler, can you -- this is the bottom

10     of it, right?  I can't tell.

11                    THE VIDEOGRAPHER:  This is the bottom,

12     yes.

13                    MR. NAZAROV:  Okay.  Mr. Longoria, can

14     you read that?

15                    THE WITNESS:  Yes, sir.

16                    MR. NAZAROV:  Is that -- okay.  All

17     right.  Why don't you just read it, and when you're

18     ready to scroll up, let us know.  And when you're

19     done with the document -- take your time -- let us

20     know, and we'll continue with the questioning, okay?

21                    THE WITNESS:  Yes, sir.

22                    MR. NAZAROV:  Thank you.

23                    THE WITNESS:  You can move up, please.

24                    THE VIDEOGRAPHER:  (Complies).

25                    THE WITNESS:  Okay.  Right there.  A



Page 170

1    little bit down.

2                    THE VIDEOGRAPHER:  (Complies).

3                    THE WITNESS:  Can we go up?

4                    THE VIDEOGRAPHER:  (Complies).

5                    THE WITNESS:  Okay.  Stop right there.

6                    THE VIDEOGRAPHER:  (Complies).

7                    THE WITNESS:  Okay.  Go up.

8                    THE VIDEOGRAPHER:  (Complies).

9                    THE WITNESS:  Okay.  Okay.

10                    MR. NAZAROV:  I still haven't gotten

11   it.  Just give us a few minutes, yeah.  Well, he's

12   reading it anyway, so that's great.

13                    THE WITNESS:  Okay.  You can go up,

14   please.

15                    THE VIDEOGRAPHER:  (Complies).

16                    THE WITNESS:  Okay.  Okay.  Okay.  All

17   right.

18           Q.  (BY MR. GUISADO) I'm showing you what

19   will be marked as Exhibit 309.

20                    MR. GUISADO:  Is that right, Tyler?

21                    THE VIDEOGRAPHER:  This one would be

22   310.  But since this was previously marked, do you

23   still want to mark it?

24                    MR. GUISADO:  No, I don't.  Thank you.

25                    THE VIDEOGRAPHER:  Okay.



Page 171

```
 1              Q.   (BY MR. GUISADO) I am showing you what
 2     we have marked as Exhibit 85 to Randy Howe's
 3     deposition, bearing the Bates numbers ALO-DEF
 4     00899313 to 315.
 5                   Do you recognize this exhibit,
 6     Mr. Longoria?
 7              A.   Yes.
 8              Q.   How do you recognize it?
 9              A.   I'm involved in the trafficking of -- I
10     am familiar with it.
11              Q.   I'll represent to you that Exhibit 95
12     is an e-mail 25 chain with the subject line "Traffic
13     and asylum claims at the Roma port of entry."
14                   I would like to direct your attention
15     to the second e-mail at the top of the first page in
16     which you e-mail the -- Ryan Koseor, deputy commander
17     of the MCAT, on June 11th, 2018.
18                   What is the MCAT?
19                   MR. NAZAROV:  Okay.  Hold on one
20     second.  Where are you?
21                   MR. GUISADO:  Keep scrolling.  That's
22     the one.
23                   MR. NAZAROV:  June 11th?
24                   MR. GUISADO:  Yeah.  There we go,
25     11:41 a.m.
```



Page 172

1                    MR. NAZAROV:  Okay.  Hold on one

2       second.

3                    MR. GUISADO:  Take your time.

4                    MR. NAZAROV:  The one that starts,

5       "You need to clear up."  Okay.

6                    You can see that okay, Mr. Longoria?

7                    THE WITNESS:  Yes, sir.

8                    MR. NAZAROV:  Okay.

9            Q.   (BY MR. GUISADO) Mr. Longoria, you

10      e-mail Ryan Koseor of MCAT.  That's the Migration

11      Crisis Action Team; is that right?

12           A.   Correct.

13           Q.   That's in D.C.?

14           A.   Correct.

15           Q.   Is that part of headquarters?

16           A.   Yes.

17           Q.   You e-mail Ryan Koseor of headquarters

18      that he needed to clear up the operational capacity

19      issue; is that right?

20           A.   Yes.

21           Q.   I will represent to you that this

22      e-mail was sent two days before the previous exhibit,

23      which was sent on July -- excuse me -- on June 13th,

24      2018.

25                    Do you recall testifying about that



Page 173

1    particular date in which you just told me that you

2    were requesting the definition of "operational

3    capacity" from other port directors?

4              Do you remember that?

5              MR. NAZAROV:  Objection:  Form.

6              THE WITNESS:  I wasn't requesting the

7    definition, I was requesting their input as to what

8    they believed the definition should be.

9         Q.   (BY MR. GUISADO) You testified earlier

10   that in addition to requesting input from the port

11   directors, that you were unclear about the definition

12   and that you were asking for their understanding to

13   get a more fulsome understanding of what operational

14   capacity meant; is that right?

15        A.   Right.

16             MR. NAZAROV:  Objection:  Form.

17        Q.   (BY MR. GUISADO) Thank you.

18             So this e-mail is two days prior to

19   that; is that right?

20        A.   I don't remember the date of the last

21   one, but I have no reason to doubt you.

22        Q.   All right.  Thank you.

23             And you're asking Ryan Koseor of

24   headquarters that he needs to clear up the

25   operational capacity issue; is that right?



Page 174

1          A.  Yes.

2          Q.  You state that "Ports of entry should

3    use detention capacity, not operational capacity,

4    because detention capacity is an objective and

5    clearly defined number."

6               Is that right?

7          A.  That's correct.

8          Q.  With operational capacity, leaving it

9    up to the discretion of the port; is that right?

10         A.  That's correct.

11         Q.  Why did you suggest to Ryan Koseor that

12   you should use detention capacity as opposed to

13   operational capacity?

14              MR. NAZAROV:  Objection:  Form.

15         Q.  (BY MR. GUISADO) You can answer.  Take

16   your time.

17         A.  I think I answered that question in my

18   message when you were leaving it up to the discretion

19   of the ports.  They can define what "operational

20   capacity" is for them and that create -- it created

21   problems.

22         Q.  What kind of problems?

23         A.  They identified how much they could

24   process at their ports based on their priority

25   submissions that they have, another priority mission.



Page 175

1          Q.  We'll get to that in a second.

2               You just said that leaving it up to

3    the discretion of the ports meant that -- does that

4    mean the different ports could have different

5    understandings of what "operational capacity" was?

6          A.  No, not different understandings.  They

7    all have different operations.  They need to know

8    what they're responsible for.

9          Q.  So each port could have different

10   responsibilities for the same operational capacity;

11   is that right?

12               MR. NAZAROV:  Objection:  Form.

13               THE WITNESS:  That would be yes.  For

14   example, Brownsville has a seaport.  The other seven

15   ports of entry have no seaport.  Not all the ports

16   have cargo facilities.  Not all the port have limits

17   of alcohol.

18               So, again, it's up to each individual

19   port.  They know their ports of entry.  They know

20   what they're responsible for.  They know what the

21   threats are.  So it's clearly up to them to identify

22   what their operational capacity is and what their

23   priorities are.

24          Q.  (BY MR. GUISADO) And it was your

25   opinion that detention capacity should be the metric,



Page 176

1   not operational capacity; is that right?

2          A.   That was my opinion.

3          Q.   Did anyone at the Laredo field office

4   agree with you?

5          A.   I don't remember.

6          Q.   You don't remember?

7               MR. NAZAROV:  Objection:  Form.

8          Q.   (BY MR. GUISADO) Mr. Longoria, I'd like

9   to point you to the paragraph just above that of the

10  sentence -- a few sentences.

11              It says, "There is confusion on this

12  point" -- the point being operational capacity --

13  "and the field keeps alluding to the fact that

14  immigration processing is not our priority anymore."

15              What did you mean when you sent that?

16         A.   The priority, as outlined in

17  Commissioner McAleenan's memo, was antiterrorism,

18  drug interdiction, trade facilitation.

19              I can't give you verbatim what they

20  were, but their priorities for the field were

21  identified in that -- that memo.

22         Q.   You say in this e-mail, "There is

23  confusion on this point, and the field keeps alluding

24  to the fact."

25              What is "the field"?



Page 177

1                A.   The field of the ports of entries.

2                Q.   Did you agree with this illusion that

3     immigration processing was not the priority anymore?

4                     MR. NAZAROV:   Objection:   Form.

5                     THE WITNESS:   Repeat the question.

6                Q.   (BY MR. GUISADO) Did you agree with the

7     illusion that the field made that immigration

8     processing was not the priority anymore?

9                A.   No.

10                    MR. NAZAROV:   Objection:   Form.

11                    THE WITNESS:   No.

12               Q.   (BY MR. GUISADO) Did the field agree

13    with you that they should use detention capacity and

14    not operational capacity?

15               A.   No.

16               Q.   Were you the only person in the LFO

17    that thought you should use detention capacity, to

18    the extent of your knowledge?

19               A.   To the best of my knowledge, I don't

20    know.  I don't remember.

21                    MR. GUISADO:   I'd like to scroll up to

22    the next e-mail.

23               Q.   (BY MR. GUISADO) Ryan Koseor responds,

24    "I think the idea is to give the ports more

25    flexible" -- I think he means flexibility -- "to



Page 178

1    decide what operations they want to conduct."

2                    Is that your understanding of

3    "operational capacity"?

4                    MR. NAZAROV:  Objection:  Form.

5                    THE WITNESS:  Yes.

6            Q.  (BY MR. GUISADO) So ports can conduct

7    whatever operations that they best see fit under

8    operational capacities; is that correct?

9                    MR. NAZAROV:  Objection:  Form.

10                   THE WITNESS:  You have the discretion

11   to identify what their threats are and prioritize and

12   work based on that.

13           Q.  (BY MR. GUISADO) Is immigration

14   processing one of those operations?

15           A.  To the best of my recollection, it was

16   not identified as one of the four priorities in

17   Commissioner McAleenan's memo.  It is part of the

18   work that we do, but I don't believe it was

19   identified in the memorandum.

20           Q.  So it's your testimony that you agree

21   that per Kevin McAleenan's guidance, immigration

22   processing was de-prioritized?

23                   MR. NAZAROV:  Objection:  Form.

24                   MR. GUISADO:  You can say it as loud

25   as you want.  It doesn't change anything.



Page 179

1          Q.   (BY MR. GUISADO) You can answer.

2          A.   No, it was not de-prioritized.  I think

3     that's a term that you used.  It's still a priority,

4     but it's not the top priority.

5          Q.   Okay.  It's the -- it's at least --

6     it's no higher than the fifth priority if you had to

7     rank all of the priority; is that right?

8               MR. NAZAROV:  Objection:  Form.

9          Q.   (BY MR. GUISADO) You can answer.

10         A.   Again, I will -- sir, again, I made

11    reference to the Commissioner McAleenan's memo:  If

12    there's four priorities on there, and there are, then

13    of course it would be number five.

14         Q.   Thank you, Mr. Longoria.

15              Is -- is drug interdiction one of

16    those priorities?

17         A.   Yes.

18         Q.   Under operational capacity, a port

19    would have a discretion to do more or less drug

20    interdiction; is that right?

21              MR. NAZAROV:  Objection:  Form.

22              THE WITNESS:  Right, yes, sir.

23         Q.   (BY MR. GUISADO) Could they just stop

24    doing drug interdiction entirely if they so chose?

25         A.   No.



Page 180

1          Q.   Why not?

2          A.   That is part of their job.

3          Q.   It says that they're -- it says under

4    operational capacity -- strike that.

5               Under operational capacity, ports have

6    the discretion to allocate resources to whatever

7    operations they see fit; is that right?

8               MR. NAZAROV:  Objection:  Form.

9               THE WITNESS:  Repeat the question.

10         Q.   (BY MR. GUISADO) You testified that

11   under operational capacity, it was up to the port's

12   discretion to allocate resources to the operations as

13   they saw fit; is that right?

14         A.   If there was a threat and it was

15   identified as one of our four priorities, yes, sir.

16         Q.   And inspection and processing of

17   non-citizens is one of those operations, even if it

18   wasn't within one of the four priorities listed by

19   Mr. McAleenan; is that right?

20              MR. NAZAROV:  Objection:  Form.

21              THE WITNESS:  I didn't understand the

22   question.

23         Q.   (BY MR. GUISADO) You testified that

24   there were -- that it was up to the discretion of the

25   port to allocate resources to their operations as



Page 181

1  they saw fit under operational capacity; is that

2  right?

3         A.  Yes.

4         Q.  Is the processing of migrants or

5  non-citizens without proper entry documents one of

6  those operations?

7         A.  Yes.

8         Q.  Under the discretion afforded under

9  operational capacity, could a port move resources

10  away from immigration processing towards another

11  operation?

12         A.  Yes.

13         Q.  Is that what was happening within the

14  Laredo field office?

15         A.  Yes.

16         Q.  Mr. Koseor states in his e-mail at 1:00

17  p.m., "If ████████████ allows Roma to continue to

18  process traffic and conduct enforcement, then that is

19  your -- that is your capacity."

20            Did I read that right?

21         A.  That's correct.

22         Q.  In other words, the capacity of the

23  Roma port of entry is what the Roma port of entry

24  assesses it to be; is that right?

25         A.  Correct.



Page 182

1          Q.  It's up to them to define how many

2     immigrants they can process in any given day under

3     operational capacity; is that right?

4          A.  Yes.

5          Q.  When you e-mailed Ryan Koseor on this

6     bottom e-mail at 11:41 a.m., what did you mean when

7     you said, "You need to clear up the operational

8     capacity issue"?

9          A.  Could we go back to it?

10              THE VIDEOGRAPHER:  (Complies).

11              THE WITNESS:  Okay.

12              MR. GUISADO:  It's at -- it's at the

13     bottom.  If you could zoom in, Tyler, I'd appreciate

14     that.

15              THE VIDEOGRAPHER:  (Complies).

16              THE WITNESS:  Oh, I see it.  I see it.

17              MR. GUISADO:  Okay.

18              MR. NAZAROV:  Do you need some time to

19     read it again, Mr. Longoria?

20              THE WITNESS:  No, sir.

21              As a representative of the migration

22     crisis action team and working for headquarters, I

23     was just recommending to him that they may want to

24     look more closely at the operational capacity issue.

25          Q.  (BY MR. GUISADO) Why did you say, "It



Page 183

1    should be detention capacity because that's a clearly

2    defined number"?

3              A.  Well, that's what I believed.

4              Q.  What did you think would happen if they

5    left it at detention capacity and didn't switch to

6    operational capacity?

7              A.  Things would continue as they were

8    prior to that.

9              Q.  What did you --

10             A.  They would process as detention

11   capacity.

12             Q.  What did you think would happen if they

13   instituted the switch to operational capacity?

14             A.  The number of people being processed

15   would drop.

16             Q.  Thank you, Mr. Longoria.

17                  MR. NAZAROV:  I'm going to ask for --

18   do you have a lot of more questions about this

19   document?

20                  MR. GUISADO:  No, that's my last

21   question on this document.  We can take a break if

22   you want.

23                  MR. NAZAROV:  At the beginning of this

24   deposition -- again, I just want to go on the

25   record -- you were asked how long you're going to go,



Page 184

1    and you said 6:00 p.m. Eastern.  And I'm going to

2    hold you to that because Mr. Longoria's retired, we

3    have to wait two hours to start this deposition.

4    Okay?

5                    So let's take a quick break so you

6    have all the time, and I'm not going to -- I mean, if

7    you go over --

8                    MR. GUISADO:  I have seven hours under

9    the Federal Rules of Civil Procedure, and if I have

10    to take the seven hours, I will, and if we have to

11    call chambers, we'll --

12                    MR. NAZAROV:  Okay.  We can call

13    chambers, that's fine by me.  Again, I'm just telling

14    that -- you were asked at the beginning how long we

15    were going to go, you said 6:00 Eastern.  I'm not

16    going to hold you to it.  We can go a little over,

17    whatever.

18                    We waited -- it's not Mr. Longoria's

19    fault that we had to wait two hours to get started.

20    Okay?  It's not his fault.  And I can tell he's

21    getting tired.

22                    So, okay, let's take a quick -- is ten

23    minutes enough for you, Mr. Longoria?

24                    THE WITNESS:  Yes, sir.

25                    MR. NAZAROV:  Okay.  Let's take a



Page 185

1    ten-minute break.  We'll be back at 4:30.

2                    Is that okay?

3                    THE WITNESS:  Yes, sir.

4                    THE VIDEOGRAPHER:  We're going off the

5    record.  The time is 3:20 p.m.

6                    (Recess taken)

7                    THE VIDEOGRAPHER:  We're back on

8    record.  The time is 3:33 p.m.

9            Q.  (BY MR. GUISADO) Welcome back,

10   Mr. Longoria.

11           A.  Yes, sir.

12           Q.  I would just like to remind you that

13   the same oath that you took at the beginning of the

14   deposition is still in effect.

15                    Do you understand?

16           A.  (Nods).

17           Q.  We need a verbal answer.  Sorry if I

18   didn't hear it.

19           A.  Yes.

20           Q.  Thank you, Mr. Longoria.

21                    Mr. Longoria, you testified before the

22   break that you were concerned that the switch from

23   detention capacity to operational capacity would mean

24   that you may -- or the LFO may process fewer

25   immigrants; is that right?



Page 186

1           A.   Correct.

2           Q.   Did anyone at the LFO share that view,

3    if you know?

4           A.   No.

5           Q.   You were the only one?

6           A.   No.   I don't know if anybody else

7    shared my view.

8           Q.   Thank you.

9                Do you know if the Laredo field office

10   actually processed fewer immigrants after the switch

11   to operational capacity?

12          A.   Yes.

13               MR. GUISADO:   Could we bring up

14   Howe 87, please.

15               THE VIDEOGRAPHER:   (Complies).

16               MR. NAZAROV:   Okay.   I'm going to ask

17   again -- and I think you were okay with this,

18   Angelo -- that, Tyler, you just go to the bottom of

19   the document, and let -- well, not that quickly --

20   and let him guide -- let Longoria guide you when he's

21   ready to.   Okay.

22               Mr. Longoria, can you see that

23   clearly?

24               THE WITNESS:   Yes, sir.

25               MR. GUISADO:   Okay.



Page 187

 1                    MR. NAZAROV:  Okay.  Are you able to

 2      read it and everything?

 3                    THE WITNESS:  Yes, sir.

 4                    MR. NAZAROV:  Okay.  I want you to

 5      take your time and read the entire document before

 6      the questions begin.  Okay?

 7                    THE WITNESS:  Yes, sir.

 8                    You can start going up.

 9                    THE VIDEOGRAPHER:  (Complies).

10                    THE WITNESS:  Okay.  Okay.  Go up a

11      little bit.

12                    THE VIDEOGRAPHER:  (Complies)

13                    THE WITNESS:  Right there.  Okay.

14      Okay.

15           Q.   (BY MR. GUISADO) Have you read the

16      e-mail, Mr. Longoria -- or the e-mails?

17           A.   Yes.

18           Q.   I'm showing you what we have previously

19      marked as Howe Exhibit 87 bearing the Bates numbers

20      AOL-DEF 01037220 in -- in sequence.

21                    I'll represent to you that Exhibit 87

22      is an e-mail chain; the subject line, "Laredo field

23      office Roma port of entry."

24                    You're the author of the e-mail on the

25      bottom of the first page --



Page 188

```
1                    MR. GUISADO:  Which I'd like to focus

2    on, if that's okay, Tyler.

3              Q.  (BY MR. GUISADO) -- e-mail June 2nd,

4    2018, to --

5                    MR. NAZAROV:  Hold on.  Okay.

6                    Can you see that, Mr. Longoria?

7                    I'm sorry, Angelo.

8                    Do you see that?

9                    THE WITNESS:  Yes, sir.

10                   MR. NAZAROV:  Do you need a second to

11   read it?

12             Q.  (BY MR. GUISADO) Mr. Longoria, do you

13   need a second to read it?

14             A.  No, I'm fine.

15                   MR. NAZAROV:  Okay.

16             Q.  (BY MR. GUISADO) You e-mailed June 2nd,

17   2018 to ^Sabri Dickman and Ryan Koseor, among others,

18   that, "The May 28 numbers for Roma do not reflect an

19   increase in arriving undocumented aliens expressing

20   credible fear when compared to the previous month.

21   In fact, that the numbers indicate a significant

22   decrease."

23                   Do you recall sending this e-mail?

24             A.  Yes, sir.

25             Q.  What do you recall about it?
```



Page 189

1          A.  It is reflected in the -- in the

2    message, sir.

3          Q.  Do you recall --

4              MR. NAZAROV:  I'm going to object.

5    I'm just going to have a standing objection so that

6    I don't interrupt your questioning, but I'm going to

7    have a scope objection.

8              MR. GUISADO:  Just -- that's fine.

9          Q.  (BY MR. GUISADO) Mr. Longoria, did you

10   recall the particular decrease in May 2018?

11         A.  No, sir.  I mean, other than what's

12   reflected in the memo, I don't remember anything

13   outside in the e-mail traffic.  I don't remember

14   anything else other than what's reflected here

15   because I'm reading it.

16         Q.  Thank you.  But the e-mail states that

17   immigration -- or "Immigrant processing numbers for

18   the Roma port of entry for May 2018 were

19   significantly down from the previous month."

20              Is that right?

21         A.  That's correct.

22         Q.  Okay.  You mention in the e-mail that

23   this e-mail is in response to questions regarding the

24   Roma port of entry and the fact that they had 41

25   undocumented aliens on the bridge pending processing;



Page 190

1    is that right?

2              A.   That's correct.

3              Q.   Who was asking those questions, if you

4    can recall?

5              A.   I don't recall.

6              Q.   Do you remember what the questions were

7    about?

8              A.   No.  Not specifically, no.

9              Q.   You go on to say in the e-mail that the

10   best response you can provide today as to why there

11   are 41 UVAs at the Roma metering point is because of

12   the current guidance that mandates entry are not to

13   exceed temporary holding cell capacity, which is ■

14   for Roma; is that right?

15             A.   That's correct.

16             Q.   And that references detention or

17   holding capacity; is that right?

18             A.   Yes.

19             Q.   And not operational capacity --

20             A.   That's correct.

21             Q.   -- is that correct?

22                  You testified earlier that you were

23   concerned that a switch to operational capacity would

24   mean that you would process fewer immigrants; is that

25   right?



Page 191

1          A.  That's correct.

2          Q.  So if I have it correct, you were

3  reflecting here that you were concerned -- or not

4  concerned.  I'll rephrase question.

5              In this e-mail in June 2nd, 2018, you

6  state that because of the detention or holding

7  capacity of the Roma port of entry, there were 41

8  undocumented non-citizens waiting in the queue; is

9  that right?

10         A.  That's what it says, yes, sir.

11         Q.  And then the Roma port of entry moved

12  to utilize operational capacity; is that right?

13         A.  Yes.

14         Q.  Does that mean that they would have

15  processed even fewer immigrants than they already

16  were?  Is that right?

17         A.  That's correct.

18             MR. GUISADO:  Can we move to Howe 86,

19  please.

20             THE VIDEOGRAPHER:  (Complies).

21             THE WITNESS:  Okay.  Scroll up.

22             MR. NAZAROV:  Hold on.  I want him

23  to --

24         Q.  (BY MR. GUISADO) Do you see the entire

25  document?  Let's start at the bottom.



Page 192

1              A.  It starts with Kelly Smith, and it's a

2    conference call access number and I.D.

3                   MR. NAZAROV:  Yeah.  Yeah, I think

4    that's the bottom of it.

5                   You can see all that clearly?

6                   THE WITNESS:  Yes.

7                   MR. NAZAROV:  Okay.  Why don't we go

8    up and make sure you can see everything.

9                   THE WITNESS:  Yes, sir.

10                   Shall we go up?

11                   THE VIDEOGRAPHER:  (Complies).

12                   THE WITNESS:  Stop right there.

13                   THE VIDEOGRAPHER:  (Complies).

14                   THE WITNESS:  Okay.  Okay.  Okay.  You

15   can go up.  Okay.

16              Q.  (BY MR. GUISADO) Mr. Longoria, have you

17   had time to sufficiently read the e-mail?

18              A.  Yes.

19              Q.  I'm showing you what we have previously

20   marked as Exhibit 86 to Randy Howe's deposition.  It

21   was the Bates number AOL-DEF 0037849 through 50.

22                   Do you recognize this document?

23              A.  Yes, sir.

24              Q.  Exhibit 86 is a June 17th, 2018 e-mail

25   to you, Ryan Koseor, Shane Campbell, among others; is



Page 193

1    that right?

2             A.  You're referring to the bottom of this?

3             Q.  No, no.  The top e-mail that's on the

4    screen right now, it's an e-mail to Randy Howe, Ryan

5    Koseor, and you're cc'd; is that right?

6             A.  Yes, sir.

7             Q.  And it reflects that Laredo field

8    office queue management report for June 17th, 2018;

9    is that right?

10             A.  Correct.

11             Q.  And it displays a chart with each port

12    in the Laredo field office, a number of detained

13    individuals, what percentage of migrant capacity they

14    were at, the number of individuals in the queue at

15    the boundary line; is that right?

16             A.  That's correct, sir.

17             Q.  And it also has a column for impact to

18    port operations; is that right?

19             A.  Correct.

20             Q.  Okay.  It's true that the queue

21    management report shows that the Roma port of entry

22    had zero undocumented non-citizens in custody; is

23    that right?

24             A.  Yes.

25             Q.  It shows that Hidalgo had 14 detained



Page 194

1    individuals; is that right?

2            A.   Yes.

3            Q.   And -- and one in the queue?

4            A.   Correct.

5            Q.   Laredo had 20 individuals detained; is

6    that right?

7            A.   Correct.

8            Q.   And seven in the queue; is that right?

9            A.   Yes.

10           Q.   So neither Hidalgo nor Laredo had

11   100 percent detention capacity on June 7th, 2018; is

12   that right?

13           A.   That's correct.

14           Q.   And yet they were still metering

15   individuals; is that right?

16           A.   Yes.

17           Q.   Okay.  And then at some point you

18   switched from detention capacity to operational

19   capacity; is that right?

20           A.   Just prior to this, yes.

21           Q.   Well, around the same time.

22               Is that fair?

23           A.   Around the same time, yes.

24           Q.   And you were concerned that the switch

25   from detention capacity to operational capacity would



Page 195

1    mean that the LFO would process fewer immigrants; is

2    that right?

3                    MR. NAZAROV:  Objection:  Form.

4                    THE WITNESS:  Yes.

5            Q.  (BY MR. GUISADO) And you testified that

6    the LF -- within the LFO, after the switch to

7    operational capacity they actually did, in fact,

8    process fewer immigrants; is that right?

9            A.  That's correct.

10           Q.  And that's despite the fact that they

11   were still metering individuals at less than

12   100 percent capacity; is that right?

13                   MR. NAZAROV:  Objection:  Vague.

14                   THE WITNESS:  Yes.

15           Q.  (BY MR. GUISADO) The e-mail has a

16   column to the right of total number of detainees that

17   says "Percent of CF migrant capacity."

18                   What does "CF" stand for?

19           A.  Credible fear.

20           Q.  Why -- why would you need to list

21   credible fear?

22           A.  I can't answer that.  I don't know.

23           Q.  Okay.  That's fine.  Do you --

24           A.  I don't remember.

25           Q.  That's totally okay.



Page 196

 1                    Do you know who might know?

 2            A.  Headquarters are the ones that

 3    generated this spreadsheet, I'm assuming.

 4            Q.  Thank you, Mr. Longoria.

 5                    MR. GUISADO:  Tyler, can we bring up

 6    FL 13.  That's Exhibit -- I want to say it is 310,

 7    but I could be wrong.

 8                    (Exhibit 310 marked)

 9                    MR. GUISADO:  Ari, let me know when

10    you get it.

11                    THE VIDEOGRAPHER:  And 310 is prior to

12    that.

13                    MR. GUISADO:  So this is 311?

14                    THE VIDEOGRAPHER:  No, I meant that

15    310 is this one.

16                    MR. GUISADO:  Okay, cool.  Thank you,

17    Tyler.

18            Q.  (BY MR. GUISADO) Mr. Longoria,

19    obviously take your time to read this document.

20            A.  Sure.

21                    MR. NAZAROV:  You can see everything

22    okay, Mr. Longoria?

23                    THE WITNESS:  Yes, sir.

24                    MR. NAZAROV:  Okay.

25                    THE WITNESS:  Okay.



Page 197

1              MR. NAZAROV:  I just got it.

2              MR. GUISADO:  Cool.  Thank you, Ari.

3              THE WITNESS:  Okay.

4         Q.  (BY MR. GUISADO) Have you read the

5    document, Mr. Longoria -- oh, there's a top e-mail.

6    Don't let me interrupt.

7              MR. NAZAROV:  Yeah, take your time,

8    Mr. Longoria.

9              THE WITNESS:  Yes.

10             Okay.  Is that it?

11             Okay.  Can you go back down, please.

12             THE VIDEOGRAPHER:  (Complies).

13             THE WITNESS:  More.

14             THE VIDEOGRAPHER:  (Complies).

15             THE WITNESS:  Okay.  All right.

16        Q.  (BY MR. GUISADO) I'm showing you what

17   will be marked as Exhibit 310 to your deposition, a

18   May 18th to 19th, 2018 e-mail chain bearing the Bates

19   number, AOL-DEF 00303561 to 63.

20             Do you recognize Exhibit 310?

21        A.  Yes.

22        Q.  I'll represent to you that Exhibit 310

23   is an e-mail chain in which you're copied regarding

24   capacity at the Hidalgo port of entry.  I would like

25   to focus on the e-mail on the bottom of the page.



Page 198

 1                    Mr. Richard Diaz, watch commander at

 2    the Hidalgo port of entry, he states that the port

 3    continues to meter at this time, noting that two

 4    metered individuals, "Are waiting on the bridge and

 5    will be processed as a space becomes available."

 6                    Did I read that correctly?

 7         A.   Yes.

 8         Q.   The e-mail reflects that there are 13

 9    non-citizens currently in custody at the Hidalgo port

10    of entry.

11                    MR. NAZAROV:  Objection.

12                    THE WITNESS:  Aliens.

13                    MR. GUISADO:  Ari --

14                    MR. NAZAROV:  I withdraw my objection.

15                    MR. GUISADO:  Thank you.

16                    MR. NAZAROV:  Mr. Longoria, take your

17    time to look at this document.  And I just want to

18    make sure you're familiar with it, you can see it

19    clearly.  Okay?

20                    THE WITNESS:  Yes, sir.

21                    MR. NAZAROV:  Okay.  Go ahead, Angelo.

22                    MR. GUISADO:  Thank you.

23         Q.   (BY MR. GUISADO) The e-mail reflects

24    that are 13 non-citizens currently in custody at the

25    Hidalgo port of entry, snapshot below.



Page 199

```
 1                    Do you see that?
 2          A.  Yes.
 3                    MR. NAZAROV:  Objection to form.
 4               It doesn't say "non-citizens."  It
 5     says "aliens."  You may continue.
 6               Q.  (BY MR. GUISADO) Mr. Longoria, I would
 7     like to direct you to the e-mail directly above that.
 8          A.  Okay.
 9               Q.  You reply to Mr. Diaz that "Your
10     capacity is greater than 13.  If I remember
11     correctly, you should be at ████████
12                    Did I read that right?
13          A.  Yes.
14               Q.  Do you recall the Hidalgo port of entry
15     in May 2018 having a detention capacity of ████
16     individuals?
17          A.  What was the question?
18               Q.  Do you recall the Hidalgo port of entry
19     in May of 2018 having a detention capacity of ████
20     █ individuals?
21          A.  That's what I seem to remember, yes.
22               Q.  And not --
23          A.  And as reflected in the e-mail.
24               Q.  Thank you.
25                    And not 13; is that right?
```



Page 200

1          A.  Correct.

2          Q.  Why was the Hidalgo port of entry

3  metering two individuals when its capacity was just

4  barely over 50 percent?

5          A.  I can't answer that.  That's why I

6  generated the e-mail.

7          Q.  You would agree with me, then, that the

8  Hidalgo port of entry had a capacity greater than 13

9  and still metered individuals despite having 13

10  people in custody?

11          A.  Yes.

12          Q.  Do you think the port of entry should

13  have processed those individuals in May of 2018?

14          A.  As to the guidance that was in place

15  during that timeframe, yes.

16          Q.  Do you know which Mexican town borders

17  Hidalgo?

18          A.  I used to, but I don't remember it.

19          Q.  Do you know what state, Mexican state,

20  borders Hidalgo?

21          A.  I don't remember.

22          Q.  If I told you it was Tamaulipas, would

23  that ring a bell?

24          A.  I remember that it extended all the way

25  down there, but I'll take your word for it.



Page 201

```
 1              Q.  Have you ever visited the Mexican side
 2    of the border at any ports within the LFO?
 3              A.  The only one would be Laredo.
 4              Q.  Is Nuevo Laredo dangerous, in your
 5    opinion?
 6              A.  Yes.
 7              Q.  Are other Mexican border towns also
 8    dangerous --
 9              A.  Yes.
10              Q.  -- to the extent that you know?
11              A.  Yes.
12              Q.  Was it a danger to keep two migrants
13    waiting on the other side of Hidalgo in 2018?
14                   MR. NAZAROV:  Objection:  Form.
15                   THE WITNESS:  Yes.
16              Q.  (BY MR. GUISADO) Were there cartels and
17    gangs operating in the state of Tamaulipas in May of
18    2018?
19                   MR. NAZAROV:  Objection:  Form.
20                   THE WITNESS:  Yes.
21              Q.  (BY MR. GUISADO) To the best of your
22    knowledge, were those two individuals, the migrants
23    who were being metered, in danger waiting in Mexico?
24                   MR. NAZAROV:  Objection:  Form.
25                   THE WITNESS:  Can we go down to the
```



Page 202

 1  bottom.

 2                    THE VIDEOGRAPHER:  (Complies).

 3                    THE WITNESS:  I don't think they were

 4  waiting in Mexico.  They were on the bridge.  That is

 5  on the bridge.

 6           Q.  (BY MR. GUISADO) That's not my

 7  question.

 8                    MR. NAZAROV:  I'm sorry.  Is that echo

 9  loud?

10                    THE VIDEOGRAPHER:  Yeah, that echo was

11  happening again.

12                    MR. GUISADO:  What about now, is that

13  better?

14                    MR. NAZAROV:  You were coming --

15                    THE VIDEOGRAPHER:  It seems to be.

16                    MR. NAZAROV:  I'm -- do I still have

17  an echo?

18           Q.  (BY MR. GUISADO) Mr. Longoria, can you

19  hear me clearly?

20           A.  Yes.

21           Q.  Can the court reporter hear me clearly?

22                    THE COURT REPORTER:  Yes.

23                    MR. GUISADO:  Thank you.

24           Q.  (BY MR. GUISADO) Mr. Longoria, if these

25  individuals had to wait longer than a day to be



Page 203

1    processed at the Hidalgo port of entry while waiting

2    in Mexico, would they be in danger?

3                    MR. NAZAROV:  Objection:  Form.

4                    THE WITNESS:  If they were in Mexico,

5    yes.

6            Q.   (BY MR. GUISADO) Thank you.

7                    MR. GUISADO:  Can we please bring up

8    FL 15.

9                    THE VIDEOGRAPHER:  (Complies).

10                   MR. NAZAROV:  All right.  I want to

11   ask for the same thing, Tyler, that you go down to

12   the bottom of the document and have Mr. Longoria just

13   take a look.

14                   Mr. Longoria, I want to make sure that

15   you can read everything clearly.  Or did you want him

16   to blow it up?

17                   THE WITNESS:  I can read it at the

18   size it is now.

19                   MR. NAZAROV:  Okay.

20                   THE WITNESS:  Can we go up?

21                   THE VIDEOGRAPHER:  (Complies).

22                   THE WITNESS:  Stop right there.

23                   THE VIDEOGRAPHER:  (Complies).

24                   MR. NAZAROV:  Hold on.

25                   Was there a page in between, Tyler?



Page 204

```
 1                    Mr. Longoria, did you see the page in
 2    between?
 3                    THE VIDEOGRAPHER:  There is, but you
 4    have to read this top first.
 5                    THE WITNESS:  It is, but you have to
 6    go down.
 7                    MR. NAZAROV:  I will stay out of it.
 8    Sorry.
 9                    THE WITNESS:  Can you go down, please.
10                    THE VIDEOGRAPHER:  (Complies).
11                    THE WITNESS:  Can you go up.
12                    THE VIDEOGRAPHER:  (Complies).
13                    THE WITNESS:  Okay.  All right.
14            Q.  (BY MR. GUISADO) Mr. Longoria, I'm
15    showing you what will be marked as Exhibit 311 to
16    your deposition.  It is a July 6th to July 9th, 2018
17    e-mail chain that bears the Bates numbers
18    AOL-DEF 01205190 to dash 91.
19                    (Exhibit 311 marked)
20            Q.  (BY MR. GUISADO) Do you recognize this
21    exhibit?
22            A.  Yes.
23            Q.  How do you recognize it?
24            A.  It has my name on it.
25            Q.  I'll represent to you that Exhibit 311
```



Page 205

1    is an e-mail chain regarding a 30-day retrospective

2    on queue management at the Laredo field office.  So

3    it roughly started on July 9th, 2018, if this e-mail

4    is correct.

5                  Does that sound about right?

6         A.  Yes.

7         Q.  I would like to focus on the e-mail on

8    the last page, which you sent on July 6th, 2018.

9                  You e-mail a number of CBP officers,

10   port directors:  "It's been approximately 30 days

11   since we initiated queue management strategy.  It

12   shifted from detention capacity to operational

13   capacity.  We'll need to provide LFO an assessment in

14   the very near future on the impact the strategy has

15   had at the LFO port of entries."

16                  Did I read that correctly?

17        A.  Yes.

18        Q.  Do you recall sending this request?

19        A.  Yes.

20        Q.  Do you recall the answers that you

21   received?

22                  MR. NAZAROV:  Mr. Longoria --

23   Longoria, take your time reading through it again if

24   you need to.

25                  THE WITNESS:  No, I can -- I'm



Page 206

1    familiar with the document, and -- but I don't recall

2    each and everybody's individual response.  That's

3    been too long.

4             Q.   (BY MR. GUISADO) And that would be

5    unreasonable for me to expect that.  Can you tell me

6    generally what the responses were.

7             A.   If I remember correctly, it was

8    positive.

9             Q.   Can you tell me what the impact

10   strategy to move from detention to operational

11   capacity had at the LFO ports of entry?

12            A.   It allowed port management to shift

13   resources that had been tied up in processing the

14   ERCF cases to conduct other operations such as --

15   again, we discussed it already -- enforcement

16   operations, passenger processing operations, straight

17   operations, reduce the overtime.  So an overall

18   positive impact, if I remember correctly, based on

19   the responses.

20            Q.   Is it fair to say that one impact the

21   strategy -- to move from detention capacity to

22   operational capacity, one impact it had was to shift

23   resources away from immigration processing and to

24   other operations?

25            A.   No, they were not shifting resources



Page 207

1    away from immigration to other operations.  The

2    people that had been pulled from those operations

3    to -- to support immigration processing were allowed

4    to go back and continue the enforcement operations.

5                    Does that make sense?

6         Q.  It does.  Thank you.

7                    I just -- I just want to clarify for

8    the record that the strategy to shift from detention

9    capacity to operational capacity had the effect of

10   the Laredo field office processing fewer immigrants

11   because of a shift in resources; is that right?

12                   MR. NAZAROV:  Objection:  Form.

13   Objection:  Form.

14                   THE WITNESS:  Yes.

15                   MR. GUISADO:  Tyler, can we move to FL

16   16, please.

17                   THE VIDEOGRAPHER:  (Complies).

18                   MR. NAZAROV:  Okay.  Is that the

19   bottom of the document, Tyler?

20                   THE VIDEOGRAPHER:  Yes, that is the

21   bottom.

22                   MR. NAZAROV:  Okay.  Mr. Longoria,

23   take your time and make sure everything is -- you can

24   read it.

25                   And, Tyler, we'll go off the document



Page 208

1    as we have been doing.

2                     THE WITNESS:  Yes, sir.

3                     Yeah, you can go up.

4                     THE VIDEOGRAPHER:  (Complies).

5                     THE WITNESS:  Okay.  Okay.  Okay.

6            Q.   (BY MR. GUISADO) Let me know when you

7    finish reading it.

8                     MR. NAZAROV:  I have a quick question.

9    Maybe this is for -- is this Exhibit 312?

10                    MR. GUISADO:  Yes.

11                    MR. NAZAROV:  Okay.

12                    THE WITNESS:  Okay, I have read it.

13           Q.   (BY MR. GUISADO) Thank you,

14   Mr. Longoria.

15                    I'm showing you what's been marked --

16   or will be marked as Exhibit 312 to your deposition.

17   It's a June to July 2018 e-mail chain bearing the

18   Bates number, AOL-DEF 0137408 - 10.

19                    (Exhibit 312 marked)

20           Q.   (BY MR. GUISADO) Do you recognize this

21   exhibit?

22           A.   No.

23           Q.   I'll represent to you that Exhibit 312

24   is an e-mail chain regarding queue management.

25                    This top e-mail is from Bradd Skinner



Page 209

1    to David Higgerson.  Mr. Skinner relays that he had

2    spoken with Bryan Koseor of MCAT and HQ, and he

3    relayed, among other things, that:  "The view is that

4    we S/B processing up to 70 percent of

5    detention/holding capacity depending upon what is

6    coming on -- coming at us on any given day.  ATFO

7    Longoria is asking the PDs for an update on queue

8    management and what is trending with other ports.

9    We'll discuss further with you on Monday."

10                  Mr. Longoria, I'll represent to you

11   that S/B means "should be."

12                  Is that a fair reading of the

13   sentence?

14        A.  Again, I have no idea what S/B -- but

15   I'll -- I'll take that as "should be."

16        Q.  I will take it as "should be," too.

17                  So he's relaying here from Ryan Koseor

18   at HQ that HQ said that:  "We" -- which I presume to

19   mean LFO -- "should be processing up to 70 percent of

20   detention/holding capacity."

21                  Is that a -- is that how you read that

22   sentence?

23        A.  Yes.

24        Q.  So this was sent on July 6th.

25                  We have looked at the previous e-mail,


MAGNA
LEGAL SERVICES

Page 210

1    which was a 30-day retrospective on queue management

2    which was sent on July 9th or so.

3                    Does that sound right?

4                    MR. NAZAROV:  Objection:  Form.

5                    Where is this?

6                    MR. GUISADO:  Previous Exhibit 311, FL

7    15.

8                    MR. NAZAROV:  Okay.  Well, you need to

9    put that to him.

10                    MR. GUISADO:  We were just talking

11    about it, but you're right.

12                    THE WITNESS:  Let me see the date of

13    the message that I generated.  Go up a little bit,

14    please.

15                    THE VIDEOGRAPHER:  (Complies).

16                    THE WITNESS:  July 6th, okay.

17            Q.  (BY MR. GUISADO) Please go back to

18    1602.

19            A.  Okay.  It's the same thing.  And so,

20    yeah, his statement is correct, and I'm checking with

21    the points of entry.  That's correct.

22            Q.  Okay.  So after 30 days of queue

23    management, Ryan Koseor of HQ spoke with Bradd

24    Skinner.  Is that -- does that appear, correct?

25            A.  Yes.



Page 211

1          Q.  And according to Bradd Skinner, who's

2    your boss, he said that HQ told him that they should

3    be processing up to 70 percent of detention holding

4    capacity; is that right?

5          A.  That's what I understand.

6          Q.  Had you ever heard that anyone had set

7    a percentage number of how many immigrants the Laredo

8    field office and its ports should be processing on

9    any given day?

10         A.  No.

11         Q.  Did anyone ever tell you or show you

12   the contents of this e-mail?

13         A.  No.

14         Q.  So it's entirely possible that this was

15   a decision that was made over your head?

16         A.  Yes.

17         Q.  And do you ever recall a time in which

18   any of the ports, prior to the institution of

19   operational capacity, had processed a hundred percent

20   of holding capacity?

21              MR. NAZAROV:  Objection:  Form.

22              THE WITNESS:  Repeat the question,

23   please.

24         Q.  (BY MR. GUISADO) Do you ever recall a

25   time before the implementation of operational



Page 212

1   capacity in which any port within the LFO was

2   processing 100 percent of their detention or holding

3   capacity?

4                MR. NAZAROV:  The same objection.

5                THE WITNESS:  A hundred and over, sir.

6        Q.  (BY MR. GUISADO) A hundred and over.

7            So you're processing more than the

8   space that you actually had?

9        A.  Yes.

10       Q.  And now it appears as if D.C. or

11  headquarters is telling the LFO that they should only

12  be processing 70 percent; is that right?

13       A.  I don't think -- I don't read it that

14  way.

15       Q.  The document says, "We should be

16  processing up to 70 percent of detention/holding

17  capacity depending upon what is coming at us on any

18  given day."

19           Did I read that right?

20       A.  That's correct.

21       Q.  Is that to say that CBP headquarters

22  told your boss that the Laredo field office should be

23  processing 70 percent of detention holding capacity?

24           Is that right?

25                MR. NAZAROV:  Objection:  Form.



Page 213

```
 1                    THE WITNESS:  Yes.
 2              Q.   (BY MR. GUISADO) And you testified that
 3    earlier, before operational capacity ever became a
 4    thing -- strike that.
 5                    You testified that before you had
 6    heard the term "operational capacity," ports within
 7    the LFO had processed up to 100 percent and higher of
 8    detention or holding capacity; is that right?
 9              A.   That's correct.
10              Q.   You testified earlier that you had
11    feared that operational capacity would mean that the
12    LFO would process fewer immigrants than it had been;
13    is that right?
14              A.   That was my opinion.
15              Q.   Do you think that HQ set a 70 percent
16    detention holding capacity quota for the processing
17    of immigrants when it began using operational
18    capacity?
19                    MR. NAZAROV:  Objection:  Form.
20                    THE WITNESS:  Repeat the question.
21              Q.   (BY MR. GUISADO) Do you think that CBP
22    headquarters told your bosses at the Laredo field
23    office under operational capacity they should only be
24    processing 70 percent of holding capacity; is that
25    right?
```



Page 214

1          A.  I don't know.

2          Q.  You never heard anyone else reference

3    the 70 percent metric?

4          A.  The first time I've ever seen it, let

5    alone heard about it.

6          Q.  You testified earlier -- and, in fact,

7    we -- we had an e-mail that I showed to you stating

8    that you believed detention capacity was a better

9    metric than operational capacity.

10              Do you remember that?

11         A.  That's correct.

12         Q.  And here they're using detention and

13   holding capacity; is that right?

14         A.  That's correct.

15         Q.  Why did they use operational capacity?

16            MR. NAZAROV:  Objection:  Form.

17         Q.  (BY MR. GUISADO) Wouldn't they process

18   fewer asylum seekers?

19         A.  I -- I -- I can't answer that.

20         Q.  Why not?

21         A.  Because I can't put myself in the mind

22   of headquarters.  The policy came down from

23   headquarters, and I can't respond to their thought

24   process.

25         Q.  Thank you, Mr. Longoria.



Page 215

1                    MR. GUISADO:  Can we bring up FL 18.

2     That's Exhibit 313.

3                    MR. NAZAROV:  All right.  Tyler, you

4     know the drill, right?  Yep, blow it up.

5                    THE VIDEOGRAPHER:  (Complies.)

6                    MR. NAZAROV:  Mr. Longoria, make sure

7     you can see everything.  And Tyler is going to go up

8     the document.

9                    THE WITNESS:  That's good, Tyler, for

10    right now.  Okay.  Okay.  Okay.  Okay.  All right.

11            Q.  (BY MR. GUISADO) Mr. Longoria, have you

12    read the document?

13            A.  Yes.

14            Q.  I would represent to you that

15    Exhibit 313 is a July 2018 e-mail chain bearing the

16    Bates numbers AOL-DEF 00566075 to 76.

17                    (Exhibit 313 marked)

18            Q.  (BY MR. GUISADO) Do you recognize this

19    exhibit?

20            A.  Yes.

21            Q.  I'll represent to you that that this is

22    an e-mail chain regarding detention statistics

23    throughout the Laredo field office in July 26, 2018.

24                    You're the e-mail -- you're the author

25    of the e-mail on the top of the first page, and we'll



Page 216

1   get to that in a second.

2               I would like to focus on the e-mail at

3   the bottom of the first page spilling out onto the

4   second.  In the e-mail is a chart.

5               MR. GUISADO:  Could you scroll down a

6   little bit more so the chart shows.

7               THE VIDEOGRAPHER:  (Complies).

8               MR. GUISADO:  Thank you.

9        Q.   (BY MR. GUISADO) This e-mail is on

10  July 26, 2018, that reflects that CBP had begun using

11  operational capacity at that point.  Is that right?

12       A.   Yes.

13       Q.   Okay.  And it's a chart that includes

14  the field office, the port, a number of individuals

15  detained at the port, percent of capacity at the

16  port, and the number in the queue at the boundary

17  line, and the last column, impact to port operations;

18  is that right?

19       A.   Yes, sir.

20       Q.   It appears as if there are three ports

21  in which individuals are waiting in the queue despite

22  the ports not reaching full capacity; is that right?

23       A.   Correct.

24       Q.   So Hidalgo has 74 percent capacity; is

25  that right?



Page 217

 1          A.  Yes.

 2          Q.  And it has 40 people waiting in the

 3   queue?

 4          A.  Yes.

 5          Q.  Why didn't Hidalgo simply process the

 6   remaining individuals until it went to 100 percent

 7   capacity?

 8          A.  This chart was never updated to reflect

 9   operational capacity.  It still reflected detention

10   capacity.  That's why you reach -- you see those

11   numbers.

12          Q.  Well, what percent would 31 be of

13   operational capacity?  What's the operation -- I'll

14   withdraw the question.

15              What is the operational capacity of

16   Hidalgo in July of 2018?

17              MR. NAZAROV:  Objection:  Form.

18              THE WITNESS:  I can't answer that.

19          Q.  (BY MR. GUISADO) Why not?

20          A.  I don't know.

21          Q.  Is it because operational capacity is

22   just a made-up number and it depends on the

23   discretion of the port?

24          A.  I don't know if it is a made-up number,

25   but it's a discretion to the port.



Page 218

1          Q.  There's 40 people waiting in the queue

2     at the boundary line at Hidalgo, which is only at

3     74 percent of detention capacity; is that right?

4          A.  Yes.

5          Q.  The Mexican town on the other side of

6     Hidalgo is Reynosa.

7               Does that sound right to you?

8          A.  Yes.

9          Q.  If I told you Reynosa is one of the

10    most dangerous cities in the Western hemisphere,

11    would you believe me?

12              MR. NAZAROV:  Objection:  Form.

13              THE WITNESS:  I believe you because

14    I've read the -- I've read up on it.

15         Q.  (BY MR. GUISADO) Having been to Nuevo

16    Laredo, do you have any intention on going to Reynosa

17    at any time soon?

18         A.  Not me.

19         Q.  Neither do I.

20              Was it safe to keep 40 people waiting

21    in the queue at the boundary line in Reynosa on

22    July 26th, 2018?

23         A.  In my opinion, no.

24         Q.  Thank you, Mr. Longoria.

25              I would like to focus on the top



Page 219

1    e-mail at the very top of the first page.

2              Mr. Longoria, you sent this to Andres

3    Guerra on July 30th, 2018.  You note, "Port Director

4    Guerra, please have someone respond to the LOC.  It's

5    my understanding that they tried several times but no

6    one is answering.  I understand you're having a

7    retirement ceremony ongoing, but someone should be

8    working."

9              Do you remember sending that e-mail?

10         A.   I don't remember, but it is there.

11         Q.   Did you go to Mr. Guerra's retirement

12    ceremony?  Or was that his?

13         A.   No, not his retirement.

14         Q.   Whose was it?

15         A.   I don't recall.

16         Q.   Did you ever have a retirement

17    ceremony?

18         A.   Yes.

19         Q.   That was in late September 2018?

20         A.   Yes, sir.

21         Q.   Why did you retire from CBP?

22         A.   It was time.

23         Q.   Time for what?

24         A.   To retire.

25         Q.   Did they institute a maximum age?



Page 220

1           A.   No, sir.

2           Q.   Did you -- did you want to go do

3    something else?

4           A.   No.   It was my second career, so it was

5    time to retire.

6           Q.   Were you dissatisfied with the way CBP

7    had operated after the implementation of the

8    operational capacity guidance?

9           A.   No, sir.   I -- I -- I love my job.   I

10   wish I could have kept doing it forever, but I can't.

11   There comes a time when people need to retire, and it

12   was my time.   But as far as the job I did for CBP, I

13   was proud of the work that I did; and this specific

14   issue, it was needed.

15          Q.   Thank you, Mr. Longoria.

16               MR. GUISADO:   Can we bring up FL 20?

17               MR. NAZAROV:   Can we take a

18   five-minute break?

19               MR. GUISADO:   Sure.

20               MR. NAZAROV:   Five minutes.

21               MR. GUISADO:   Yeah, yeah, it's cool.

22               THE VIDEOGRAPHER:   We are going off

23   the record.   If time is 4:18 p.m.

24                    (Recess taken)

25               THE VIDEOGRAPHER:   We're back on the



Page 221

1    record.  The time is 4:27 p.m.

2              Q.  (BY MR. GUISADO) Mr. Longoria, welcome

3    back.

4              A.  Yes, sir.

5              Q.  Do you recall we were talking earlier

6    about an e-mail from CBP headquarters, your bosses,

7    in which it appeared as if HQ had told your bosses

8    that they should be processing 70 percent of

9    detention or holding capacity?

10             Do you remember that?

11             A.  Yes, sir.

12             Q.  And that was for the Laredo field

13   office; is that right?

14             MR. NAZAROV:  I would just interject

15   and say that he's not looking at the exhibit.

16             MR. GUISADO:  Okay.  I'll ask a

17   different question.

18             Q.  (BY MR. GUISADO) You e-mailed it to

19   your bosses; is that right?

20             A.  Yes.

21             Q.  And -- and they work within the Laredo

22   field office; is that right?

23             A.  Mr. Skinner?

24             Q.  Yes.

25             A.  Yes.



Page 222

        1           Q.   Thank you.

        2                MR. GUISADO:  Tyler, can you pull up

        3    FL 20.  That's Exhibit 314.  It's a Federal Of

        4    Evidence 1006 summary exhibit for Laredo.  This is a

        5    hell of a document.

        6                   (Exhibit 314 marked)

        7                MR. GUISADO:  And I'm just going to

        8    say, Ari, and, Mr. Longoria, you don't have to read

        9    it, but I'm going to ask you to look for something as

       10    we scroll through slowly.

       11                Ari, with your indulgence, I would

       12    like to just ask the question and then he can scroll

       13    through it looking for what I'm asking.

       14                Is that okay?

       15                MR. NAZAROV:  That's fine, but let him

       16    kind of look at the whole document.

       17                MR. GUISADO:  Okay.  Yeah, that's

       18    fine.  Go ahead.

       19                MR. NAZAROV:  If he's ever seen it,

       20    you know, and then -- then he can kind of like wrap

       21    his head around it.

       22                MR. GUISADO:  Okay.

       23                MR. NAZAROV:  And I want to make sure

       24    he can clearly see everything.

       25                MR. GUISADO:  That's fair.



Page 223

1              MR. NAZAROV:  And I want to make sure

2    we get it, too.  I've seen you guys pull these things

3    out in depositions, so I'm familiar with it, but I'm

4    not sure that Mr. Longoria is.

5              Q.  (BY MR. GUISADO) Mr. Longoria, take

6    your time.

7              MR. NAZAROV:  Yeah.

8              MR. GUISADO:  Tyler, if you could

9    scroll through so he gets to see the document.

10             THE VIDEOGRAPHER:  (Complies).

11   Mr. Longoria, just let know me know when you want me

12   to scroll down.

13             THE WITNESS:  Okay, you can scroll

14   down.

15             THE VIDEOGRAPHER:  (Complies).

16             THE WITNESS:  Okay.

17             MR. NAZAROV:  Will you explain to him

18   what it is.

19             Q.  (BY MR. GUISADO) Yeah.  You know, I

20   generally give the spiel after the witness has

21   reviewed it and I represent to them what the document

22   is, but --

23             MR. NAZAROV:  That's fine.

24             Q.  (BY MR. GUISADO) -- Mr. Longoria, this

25   is a multipage summary exhibit -- that's a lawyer's



Page 224

1    term -- entitled "Laredo Port of Entry Impact Port

2    Operations."  The document summarizes the capacity

3    and impact to port operations from every queue

4    management report from June 16th, 2018, to July 14th,

5    2019.

6                   And once you have a handle on what the

7    document is, I'm going to ask you to look for

8    something in the document.

9                   MR. NAZAROV:  I just want to state my

10   objection, for -- objection on scope because this

11   ends in July 15th, 2019.  But I'm just going to have

12   a standing objection as to scope as not to interrupt

13   your direct examination.

14                  MR. GUISADO:  Thank you.

15                  THE WITNESS:  All right, sir.

16        Q.   (BY MR. GUISADO) Okay.  This document

17   summarizes the impact to port operations, a queue

18   management report from Laredo from June 16th to

19   July 14th, 2019.  So that's about a year.

20                  MR. GUISADO:  Tyler, can you go to the

21   top of the first page.

22        Q.   (BY MR. GUISADO) So I would like for

23   you to focus on the capacity column.  And I'm going

24   to ask Tyler to sort of scroll through pretty slowly

25   from the front page of the document all the way to



Page 225

1    the end, and I'm going to ask you to see if there is

2    any capacity that exceeds 70 percent and to stop the

3    document scrolling when you see that.

4              A.   Exceeds 70 percent, correct?

5              Q.   Exceeds, yes, higher than 70.

6              A.   Yes.

7                   THE WITNESS:  Okay.  You can scroll

8    slowly.

9                   THE VIDEOGRAPHER:  (Complies).

10                   THE WITNESS:  Okay.  You can stop

11   after September.  I was gone by then.

12              Q.   (BY MR. GUISADO) Well, I would ask you

13   to identify after September if you can see --

14              A.   Okay.

15              Q.   -- any capacity over 70 percent.

16              A.   Okay.

17                   THE WITNESS:  Keep going, then.

18                   THE VIDEOGRAPHER:  (Complies).

19                   THE WITNESS:  Scroll down just a

20   little bit.

21                   THE VIDEOGRAPHER:  (Complies).

22              Q.   (BY MR. GUISADO) Mr. Longoria, now

23   scroll through the summary of all the queue

24   management reports for June 16th, 2000 -- June 16th,

25   2018, to July 14th, 2019.



Page 226

1                    Did the port of Laredo ever exceed

2     70 percent capacity?

3              A.  I didn't see it.

4              Q.  You testified earlier that you saw an

5     e-mail in which your boss represented that CBP

6     borders instructed the ports within the LFO should be

7     processing up to 70 percent of capacity; is that

8     right?

9              A.  It should be, yes.

10             Q.  And based on the --

11             A.  I have to go back to the message to

12     make sure that I got the -- the terminology right.

13             Q.  And based on this chart, you didn't see

14     a time in which Laredo port of entry exceeded

15     70 percent, did you?

16             A.  No.  The highest I saw was 70.

17                  MR. GUISADO:  Can we scroll all the

18     way back to the top, Tyler.

19                  THE VIDEOGRAPHER:  (Complies).

20             Q.  (BY MR. GUISADO) What does "impact to

21     port operations" mean?

22             A.  Was there anything going on during that

23     specific reporting period that impacted port

24     operations?  That's the best definition I can give

25     you.



Page 227

 1            Q.  That's a pretty good definition, and

 2     thank you for that, Mr. Longoria.

 3                 You testified earlier that before

 4     operational capacity that ports within the Laredo

 5     field office at times exceeded 100 percent of their

 6     holding capacity; is that right?

 7            A.  That's correct.

 8            Q.  Would that have impacted port

 9     operations?

10            A.  Yes.

11                 MR. GUISADO:  I'm going to ask Tyler

12     to scroll down to the impact of port operations

13     column --

14                 THE VIDEOGRAPHER:  (Complies).

15                 MR. GUISADO:  -- as you did with

16     capacity.

17            Q.  (BY MR. GUISADO) And let me know when

18     there was an impact to port operations as you

19     understand it.

20                 THE WITNESS:  Can you do that a little

21     bit faster, and I'll tell you to stop or slow down --

22     or slow down.

23                 THE VIDEOGRAPHER:  (Complies).

24                 MR. GUISADO:  Great.

25            Q.  (BY MR. GUISADO) Was there an impact to



Page 228

1    port operations listed in that time period?

2             A.   None that I saw.

3                  MR. GUISADO:  Tyler, can you bring up

4    FL 22.  That's Exhibit 315, AOL-DEF 00577299.

5                  MR. NAZAROV:  Okay.  This is a new

6    document?

7                  MR. GUISADO:  (Nods).

8                  MR. NAZAROV:  Okay.

9                  MR. GUISADO:  Yes.

10                 MR. NAZAROV:  Tyler, will you go down

11   and make sure that Mr. Longoria has read it.

12                 THE VIDEOGRAPHER:  (Complies).

13                 THE WITNESS:  Okay.  You can go up.

14                 THE VIDEOGRAPHER:  (Complies).

15                 THE WITNESS:  Okay.  Okay.  Okay.  Is

16   that it?

17                 MR. GUISADO:  Yes, Mr. Longoria.

18           Q.  (BY MR. GUISADO) I'm showing you what

19   will be marked Exhibit 315 to your deposition.  It is

20   a January 17, 2017 e-mail chain.  It bears the Bates

21   numbers AOL-DEF 00577299 through 300.

22                 (Exhibit 315 marked)

23           Q.  (BY MR. GUISADO) Do you recognize this

24   exhibit?

25           A.   Only because it has my name on it.



Page 229

1          Q.  I'll represent to you that Exhibit 315

2     is an e-mail chain regarding a complaint regarding

3     asylum denials filed by the American Immigration

4     Council.  I'll let you know that they're co-counsel

5     in this lawsuit.

6          A.  Yes.

7          Q.  You're the author on the top of the

8     page, but I would like to focus on the e-mail on the

9     bottom of the first page spilling over into the

10    second.

11              MR. GUISADO:  Perfect.

12          Q.  (BY MR. GUISADO) The subject line is

13    "Asylum Denial" -- well, or parentheses, Washington

14    Post.  It's from Ryan Levine, program manager of the

15    Tucson field office and the LFO.

16              He says, "Attached is the complaint

17    filed by the American Immigration Council."  And the

18    article mentions Nogales.  This complaint lists

19    specific instances in Reynosa, San Isidro, La Mesa,

20    El Paso, and Laredo.  There's a link to the complaint

21    in the article.

22              Is it fair to say that the complaint

23    or this email references specific instances of asylum

24    denial within the Laredo field office?

25              MR. NAZAROV:  Objection:  Form.



Page 230

 1                    THE WITNESS:  Yes.

 2                    Q.  (BY MR. GUISADO) Do you remember

 3    receiving this e-mail?

 4                    MR. NASAROV:  Objection:  Form.

 5                    THE WITNESS:  No --

 6                    MR. GUISADO:  Can you --

 7                    THE WITNESS:  -- I don't remember

 8    seeing it, but my name is there.

 9                    MR. GUISADO:  Can you scroll up just a

10    little bit.

11                    THE VIDEOGRAPHER:  (Complies).

12                    MR. GUISADO:  Keep going until the

13    next full e-mail is displayed.

14                    THE VIDEOGRAPHER:  (Complies).

15                    MR. GUISADO:  Another one.

16                    THE VIDEOGRAPHER:  (Complies).

17                    MR. GUISADO:  Another one.

18                    THE VIDEOGRAPHER:  (Complies).

19                    MR. GUISADO:  Okay.

20                    Q.  (BY MR. GUISADO) You're forwarding

21    along the original e-mail and you write to Greg

22    Alvarez, Alberto Flores, and Juan Chavez, "Your

23    situational awareness/visibility for the Laredo

24    scenario starts on page five."

25                    Do you remember the Laredo scenario



Page 231

1    referenced in this complaint?

2              A.  No, sir.

3              Q.  You don't recall anything about it?

4              A.  No.

5              Q.  Did allegations of asylum denials ever

6    change CBP policy or practice at any point in your

7    tenure at CBP?

8                   MR. NAZAROV:  Object to the form.

9                   THE WITNESS:  I don't understand the

10   question.

11             Q.  (BY MR. GUISADO) Okay.  Here we have a

12   Washington Post article about a complaint filed by

13   the American Immigration Council; is that right?

14                  MR. NAZAROV:  Objection:  Form.

15                  THE WITNESS:  Yes.

16             Q.  (BY MR. GUISADO) You can answer.

17             A.  Yes.

18             Q.  And within that complaint are

19   allegations of asylum denials; is that right?

20                  MR. NASAROV:  Objection:  Form.

21                  He doesn't see the complaint.

22                  THE WITNESS:  I mean, that's my -- my

23   issue.  I mean, maybe if I saw the complaint, it

24   would trigger my memory, but right now I just have to

25   base myself on what's in the e-mail.



Page 232

 1                    MR. GUISADO:  Okay.

 2            Q.  (BY MR. GUISADO) Well, what's the

 3    subject of the e-mail?

 4            A.  Asylum denials.

 5            Q.  Is it fair to presume that the

 6    complaint references asylum denials?

 7            A.  Yes.

 8                    MR. NASAROV:  I'm going to -- will you

 9    lodge my objection to form, please.  His answer can

10    stand.

11                    THE COURT REPORTER:  (Nods).

12            Q.  (BY MR. GUISADO) So at some point,

13    someone from CBP forwarded to you a Washington Post

14    article with the subject line "asylum denials"

15    regarding a complaint filed by the American

16    Immigration Council; is that right?

17            A.  Correct.

18            Q.  In that complaint one would have to

19    assume that there were allegations of asylum denials;

20    is that right?

21                    MR. NAZAROV:  Objection:  Form.

22            Q.  (BY MR. GUISADO) You can answer,

23    Mr. Longoria.

24            A.  Yes, sir, I will.

25                    The issue I'm having is that CBP



Page 233

1    officers at the port of entry do not adjudicate an

2    asylum claim.  That's up to U.S. CIS.  So the -- the

3    title "asylum denial" is completely

4    un-(unintelligible).

5          Q.  Okay.  What do you suspect the

6    complaint was about if the subject of the e-mail is

7    "asylum denial"?

8          MR. NAZAROV:  Objection:  Form.

9          THE WITNESS:  I can only speculate

10   that it was somebody that arrived at the Laredo port

11   of entry and was not processed in accordance with the

12   existing policy and procedure.

13         Q.  (BY MR. GUISADO) Thank you,

14   Mr. Longoria.

15         If I take your very accurate and long

16   answer and refer to it as "asylum denial" for the

17   purpose of questioning you with respect to this

18   document, will you know what I mean?

19         MR. NAZAROV:  Objection:  Form.

20         THE WITNESS:  Yes.

21         Q.  (BY MR. GUISADO) Did allegations of

22   asylum denials ever change CBP policy or practice in

23   the Laredo field office during your tenure?

24         MR. NASAROV:  Objection:  Form.

25         THE WITNESS:  No.



Page 234

1            Q.   (BY MR. GUISADO) Did negative publicity

2     about CBP ever change policy or practice within the

3     Laredo field office during your tenure?

4            A.   No.

5                 MR. GUISADO:  Can we bring up FL 14,

6     please.

7                 MR. NAZAROV:  Okay.  Tyler, can we go

8     down to the bottom, wherever that is, so he can see

9     it.  It seems like a bunch of e-mails.

10                 THE VIDEOGRAPHER:  (Complies).

11                 THE WITNESS:  Okay.  Go up.

12                 THE VIDEOGRAPHER:  (Complies).

13                 THE WITNESS:  Go up.

14                 THE VIDEOGRAPHER:  (Complies).

15                 THE WITNESS:  Okay.  Okay.  Okay.

16     Okay.  Okay.  Okay.  Okay.  Okay.  Okay.  Okay.

17                 MR. NAZAROV:  So, Angelo, I -- you're

18     welcome to show the document to Mr. Longoria and ask

19     your questions.  I'm just going to lodge a general

20     objection to scope -- objection as to scope.  And I'm

21     not going to -- it's just going to be over all your

22     questions so I don't interrupt your questioning.

23                 MR. GUISADO:  Why do you think this

24     document is outside the scope of the deposition?

25                 MR. NAZAROV:  Yeah, I think we



Page 235

1   weren't -- the scope is limited to Laredo, Hidalgo,

2   and Brownsville, and Roma is outside of that.  That's

3   our position.

4                  But you can ask him his questions.

5                  Q.  (BY MR. GUISADO) Mr. Longoria, have you

6   finished reading the document?

7                  A.  Yes.

8                  Q.  I'm showing you what will be marked as

9   Exhibit 316 to your deposition, a June 8th, 2018

10  e-mail chain that bears the Bates numbers AOL-DEF

11  00565178 to 82.

12                 (Exhibit 316 marked)

13                 Q.  (BY MR. GUISADO) Do you recognize this

14  exhibit?

15                 A.  Yes.

16                 Q.  You recognize that's an e-mail chain

17  regarding traffic and asylum claims at the Roma port

18  of entry.  You're the author of the e-mail at the top

19  of the page.

20                 At this point, though, I would like to

21  focus on the e-mail at the very bottom of the first

22  page.  It's dated June 7th, 2018.  It's from Patrick

23  Schmidt.

24                 MR. GUISADO:  Scroll up a little bit.

25                 THE VIDEOGRAPHER:  (Complies).



Page 236

1                    MR. GUISADO:  Ooh.  Maybe it's the

2       bottom of the second page, then.

3                    THE VIDEOGRAPHER:  (Complies).

4                    MR. GUISADO:  No.  The bottom of the

5       third page?

6                    THE VIDEOGRAPHER:  (Complies).

7                    MR. NAZAROV:  What about the fourth?

8                    THE VIDEOGRAPHER:  (Complies).

9                    MR. NAZAROV:  Is there a fifth?

10                   THE VIDEOGRAPHER:  (Complies).

11                   MR. GUISADO:  Yes, there we go.  The

12      fifth time is the charm.

13                   MR. NASAROV:  Can you see that okay,

14      Mr. Longoria?

15                   THE WITNESS:  Yes.

16                   MR. NASAROV:  Okay.

17           Q.  (BY MR. GUISADO) Patrick Schmidt

18      e-mails David Alvarez.  Patrick Schmidt is the chief

19      of staff in your governmental public liaison at CBP

20      and DHS.  The e-mail is referencing inquiries about

21      traffic at the Roma port of entry citing an L.A.

22      Times report on the matter.  He asks for information

23      regarding traffic and asylum at the possible port of

24      entry.

25                   Did I summarize his e-mail fairly?



Page 237

1           A.  Yes.

2                MR. GUISADO:  Okay.  Can you scroll up

3    to the next e-mail, please.

4                THE VIDEOGRAPHER:  (Complies).

5           Q.  (BY MR. GUISADO) And Mr. Guerra

6    forwards --

7                MR. GUISADO:  Oh, go down just a

8    little bit.

9                THE VIDEOGRAPHER:  (Complies).

10               MR. GUISADO:  Thank you.

11          Q.  (BY MR. GUISADO) Mr. Guerra forwards

12   that e-mail on to David Higgerson, Bradd Skinner, and

13   yourself.  Do you recall receiving that e-mail?

14          A.  I don't recall it, but it's there in

15   the e-mail string, so --

16          Q.  Do you recall anything about the L.A.

17   Times article mentioned in the e-mail?

18          A.  No, not the article itself.

19               MR. GUISADO:  Can you scroll up to the

20   next e-mail.

21               THE VIDEOGRAPHER:  (Complies).

22          Q.  (BY MR. GUISADO) You e-mail to Ryan

23   Koseor of HQ that you thought it best if MCAT address

24   that request.  Why is that?

25          A.  If I remember correctly, it was because



Page 238

1    that's what they were set up for.

2              Q.   What was what they were set up for?

3              A.   To -- to address media requests so they

4    would have a consistent response.

5              Q.   Okay.  Now --

6              A.   To the best of my recollection, that's

7    the best answer I have.

8              Q.   Thank you, Mr. Longoria.  That answer

9    will do.

10              In the next e-mail, Ryan Koseor

11   e-mails back to you and Bradd Skinner, "Good

12   afternoon.  I talked to Mr. Schmidt and I was able to

13   answer most of his questions.  I worked on messaging

14   with Executive Director Howe on Monday to ensure

15   we're all on the same page.  They did have a couple

16   of questions that he needed help on."

17              MR. GUISADO:  Let me -- can we scroll

18   up to the next e-mail.

19              THE VIDEOGRAPHER:  (Complies).

20              Q.   (BY MR. GUISADO) You respond to Andres

21   Guerra and David Alvarez, "Gentlemen" -- and cc'ing

22   Rodney Harris -- "Gentlemen, please provide a

23   response to each of the questions below ASAP.  The

24   MCAT report I forwarded this morning reflects your

25   detention capacity as ■ and you have four in



Page 239

1    custody."  You ask whether the number's correct.

2                    Did I read that correctly?

3            A.   Yes.

4            Q.   I would like to focus on the response

5    of the e-mail just above that sent by David Alvarez.

6                    The response to the question number

7    three, David Alvarez writes -- well, the question

8    states:  "Is Roma at maximum capacity?  The report

9    states 25 percent."

10                   The answer is:  "Capacity is based on

11   the composition of the claimants and available

12   resources (I.E. processing officers)."

13                   If the report did state 25 percent,

14   what's the maximum capacity at the Roma port of

15   entry, if you know?

16           A.   Okay.  So there were four people being

17   processed?  I would have to go back to -- to the

18   message.

19           Q.   It says in the line --

20           A.   Yeah.

21           Q.   May -- maybe this will help,

22   Mr. Longoria.  And if it doesn't, we can go back.

23                   It says, "At this time, even though we

24   have a maximum capacity of ▇ claimants."

25                   If I told you that the capacity of


MAGNA
LEGAL SERVICES

Page 240

```
 1    Roma was ██, does that sound right to you?
 2             A.   I don't remember.  But let's just move
 3    forward.  Let's just say it was ██
 4             Q.   If the capacity at Roma was ██ --
 5    excuse me, strike that.
 6                  If the maximum capacity of the Roma
 7    port of entry was ██ and they held ██ people in
 8    detention --
 9             A.   25 percent.
10             Q.   -- that would be 25 percent?
11             A.   Yes.
12             Q.   So they would be at less than full
13    capacity; is that right?
14             A.   Correct.
15             Q.   Full capacity would be ██
16             A.   Yes.
17             Q.   What are you basing the ██ off of?
18    What does ██ refer to?
19             A.   The detention capacity.
20             Q.   Yeah, but it's -- the detention
21    capacity is ██   ██ what?
22             A.   ██ individuals.
23             Q.   Could Roma just simply decide that
24    maximum capacity wasn't ██ on any given day?
25             A.   No, that's identified.  Again, once the
```



Page 241

1    port identifies their detention -- remember, we're

2    talking about detention capacity.  Once they identify

3    the detention capacity, that's what's available at

4    the port of entry.

5           Q.  So why does he state "Capacity is based

6    on composition of the claimants and available

7    resources" if you're correct in saying the capacity

8    is based on the amount of people you can hold in a

9    detention cell?

10          A.  Just because the port of entry has

11   capacity for ██ individuals doesn't mean that they

12   can put ██ individuals in there.  It depends on the

13   composition of the people that are being processed.

14              If you have a UAC or a group of UACs,

15   you have to separate the males from the females.

16   They can't be put together.  If you have an

17   unaccompanied alien family, you keep them away from

18   the UAC.

19              So it really depends on the

20   composition of the people being processed because you

21   can't lump them all into one, two or three rooms.

22   You have to take into account the composition of

23   the -- of the family unit or whether it's a UAC male

24   or female.

25          Q.  Well, why have a detention capacity at



Page 242

1   all?

2           A.  Because a detention capacity wasn't

3   identified for this type of situation.  It was

4   identified for what you have available at the port to

5   detain people that are detained for smuggling

6   narcotics or false immigration claims, a myriad of

7   responsibilities that the port have -- are

8   responsible for enforcing.

9           Q.  Mr. Longoria, I showed you a document

10  earlier in this deposition in which you told me that

11  you didn't understand why they were switching from

12  detention capacity to operational capacity because

13  detention capacity is an objective number; is that

14  right?

15          A.  Yes.

16          Q.  The objective number here is ███ is

17  that right?

18          A.  Yes.

19          Q.  And you're telling me now that Roma

20  could simply change whatever its capacity was under

21  operational capacity and choose to process fewer

22  because of claimants and available resources; is that

23  right?

24          A.  I don't understand your question.

25          Q.  That's fine.  I withdraw it.



Page 243

```
 1                    It says here in this e-mail that:
 2    "The third room is empty due to not having officers
 3    to process a third case."  Is that right?
 4           A.   That's correct.
 5           Q.   So there's physical space for someone,
 6    but there's no one employed to handle them.
 7                    Did I -- did I say that all right?
 8           A.   Basically, yes.
 9           Q.   Thank you.  You testified earlier in
10    this deposition that the field keeps alluding to the
11    fact that immigration processing is not our priority
12    anymore.  Do you remember that e-mail?
13                    MR. NASAROV:  Objection:  Form.
14                    THE WITNESS:  Yes.
15           Q.   (BY MR. GUISADO) You testified earlier
16    that you were concerned that with the switch to
17    operational capacity or to the FLMO, we're going to
18    process fewer immigrants; is that right?
19           A.   Yes.
20           Q.   Is the third room empty because of
21    operational capacity?
22                    MR. NAZAROV:  Objection:  Form.
23                    THE WITNESS:  Yes.
24           Q.   (BY MR. GUISADO) Thank you,
25    Mr. Longoria.
```



Page 244

 1                    MR. GUISADO:  I would like to move up

 2    to David Alvarez's e-mail sent at 2:11 p.m.

 3                    THE VIDEOGRAPHER:  (Complies).

 4                    MR. NAZAROV:  Mr. Longoria, do you

 5    need time to read it, or do you --

 6                    THE WITNESS:  I don't think this is

 7    the top of the e-mail, is it?

 8                    MR. GUISADO:  No, it's not.  There it

 9    is.

10                    Thanks, Tyler.

11           Q.  (BY MR. GUISADO) The e-mail is sent to

12    you, among others, indicating 43 bodies at queue

13    management.

14                    Do you see that?

15           A.  Yes.

16           Q.  Does that reference the queue

17    management point that we've been talking about the

18    whole day?

19           A.  Yes.

20           Q.  Is it safe to say that there are 43

21    individuals, non-citizens, awaiting processing at the

22    port of entry?

23           A.  Yes.

24           Q.  Within the 43 bodies, there's eight

25    family units highlighted; is that right?



Page 245

1          A.  Yes.

2          Q.  And they've all been waiting at least

3     two weeks; is that correct?

4          A.  Yes.

5          Q.  I would like to focus on the e-mail

6     just above at 2:26 p.m. that you sent in response to

7     David Alvarez.  You say, "I need to make sure I

8     understand what you've just reported below.  You have

9     eight family units that you have had in queue

10    management for over 14 days."

11              Is that right?

12         A.  Yes.

13         Q.  Why did you e-mail that to him?

14         A.  Why?

15         Q.  Yes.

16         A.  Because I wanted to make sure that I

17    understood the information.

18              Was he reporting to the Laredo field

19    office that he had a family who'd been in there over

20    14 days?  I wanted clarification.  I wanted to make

21    sure I understood what I was reading.

22         Q.  Were you surprised that he had eight

23    family units in management for over 14 days?

24         A.  Yes.

25         Q.  Why?



Page 246

1              A.   I should have been made aware of it.

2              Q.   Why would you need to be made aware of

3    that?  Is it the length of time or the number of

4    family units?

5              A.   The length of time.

6              Q.   Was 14 days a long time to wait in the

7    queue management unit -- or at the queue management

8    line?

9              A.   Yes.

10             Q.   How long is too long in your

11   estimation?

12             A.   It depends on the composition of the

13   people requesting asylum claim.  For a UAC, one hour

14   is too long, one day is too long.  Just it -- there's

15   too many variables involved in this for me to give

16   you an honest answer.

17             Q.   No, that's -- that's very helpful.

18             You said for a UAC one day is too

19   long.  What -- what about a family unit of four:  Two

20   parents, two kids?

21             MR. NAZAROV:  Objection:  Form.

22             THE WITNESS:  Again, there are

23   variables.  Are there children, young children, are

24   they teenagers?  Sir, like I indicated, there's too

25   many variables to give you an honest answer, and I



Page 247

1    can't go into each and every scenario.

2              Q.  (BY MR. GUISADO) If I told you

3    individuals in Tijuana had to wait upwards of two

4    months, would that be too long?

5              A.  In my opinion, yes.

6              Q.  Thank you.

7              MR. GUISADO:  Can we scroll up to the

8    e-mail above that.

9              THE VIDEOGRAPHER:  (Complies).

10             MR. GUISADO:  And then the e-mail

11   above that.

12             THE VIDEOGRAPHER:  (Complies).

13             Q.  (BY MR. GUISADO) Mr. Longoria, you

14   e-mailed Andres Guerra and others, including your

15   boss, Bradd Skinner:  "Based on the negative

16   publicity of interests by NGOs and CBP and

17   governmental public liaison in the length of time

18   that UDAs have been at the Roma international

19   crossing, I recommend you to bring in the number that

20   will take you to your holding capacity.  You should

21   now be at six and you can bring in ten more,

22   depending on how you segregate."

23             Do you still agree with that?

24             A.  Yes.

25             Q.  If they hadn't made the switch to



Page 248

1    operational capacity and an officer could have

2    supervised the third room, would 43 individuals be

3    waiting for that long?

4            A.   Probably not.

5            Q.   Mr. Longoria, you testified that in

6    reference to the AIC complaint that CBP never changed

7    policy or practice because of negative publicity or

8    allegations of asylum denials.

9                 Do you recall that?

10           A.   I understood that to be the asylum

11   process, not this situation.  I know what I responded

12   to, but it was in response to the asylum processing,

13   the metering, the queue management, the -- once you

14   arrive at the FIF.  This was an extreme situation

15   which required immediate action, which is why I took

16   this one.  This was an isolated incident.

17           Q.   Do you really believe it's an isolated

18   incident, Mr. Longoria?

19           A.   For that length of time, yes, sir.

20           Q.   If I told you that thousands of people,

21   upwards of 10,000, waited in Tijuana, in Nuevo

22   Laredo, in El Paso, all along the southwest border

23   waiting for weeks, months on end, many of whom were

24   young children and parents --

25                 MR. NAZAROV:  Objection.



Page 249

1            Q.   (BY MR. GUISADO) -- would you believe

2     that it was still an isolated incident?

3                 MR. NASAROV:  Objection:

4     Argumentative.

5            Q.   (BY MR. GUISADO) You can answer.

6            A.   All right.  This situation didn't

7     involve people waiting in Mexico.  These were people

8     waiting on the bridge.

9            Q.   And you took action based on the

10    negative publicity and interest by NGOs; is that

11    right?

12           A.   A recommendation that they expedite the

13    processing as much as possible and deviate and bring

14    in as many people as they can, yes, sir.  Considering

15    that they had been out there for so long, I felt I

16    had no other choice but to do that.

17           Q.   Thank you, Mr. Longoria.

18                MR. GUISADO:  Can we take this off,

19    and bring up FL 21, please.

20                THE VIDEOGRAPHER:  (Complies).

21                MR. NAZAROV:  Okay.  The same drill,

22    yeah, if you could just have Mr. Longoria take a look

23    at it, be able to --

24                Can you see clearly, Mr. Longoria?

25                THE WITNESS:  Not really.  Can we go



Page 250

 1   down all the way to the bottom?

 2                   THE VIDEOGRAPHER:  (Complies).

 3                   THE WITNESS:  Okay.  Now we're good to

 4   go.  Can you go up.

 5                   THE VIDEOGRAPHER:  (Complies).

 6                   THE WITNESS:  Keep going up.

 7                   THE VIDEOGRAPHER:  (Complies).

 8                   THE WITNESS:  Okay.  Stop right there.

 9                   THE VIDEOGRAPHER:  (Complies).

10                   MR. NAZAROV:  Are you able to read it,

11   Mr. Longoria?

12                   THE WITNESS:  Yes.

13                   MR. NAZAROV:  Okay.

14                   THE WITNESS:  Can we go up?

15                   THE VIDEOGRAPHER:  (Complies).

16                   THE WITNESS:  Keep going.

17                   THE VIDEOGRAPHER:  (Complies).

18                   THE WITNESS:  Stop right there.

19                   Okay.  Go on up.

20                   THE VIDEOGRAPHER:  (Complies).

21                   THE WITNESS:  Is that it?

22                   THE VIDEOGRAPHER:  That's the end of

23   the document, yeah.

24                   THE WITNESS:  Okay.  I'm ready.

25                   Q.  (BY MR. GUISADO) I'm showing you what



Page 251

1    will be marked as Exhibit 318 to your deposition.

2    It's a June 5th through 6th, 2018 e-mail chain that

3    bears the Bates numbers AOL-DEF 00767892.

4                    (Exhibit 318 marked)

5            Q.   (BY MR. GUISADO) Do you recognize it?

6            A.   Yes.

7            Q.   I'll represent to you that Exhibit 318

8    is an e-mail chain regarding a Guatemalan family unit

9    seeking asylum at the Hidalgo port of entry.  You're

10   the author of the e-mail at the top of the page.  I

11   would like to focus on the e-mail at the bottom of

12   the first page that's highlighted in yellow.

13                It reports that a Guatemalan family

14   unit was encountered in the FIS on lane one at the

15   far international bridge; is that right?

16           A.   Yes.

17           Q.   It displays what I believe is a photo

18   of the Guatemalan family unit that CBP encountered;

19   is that right?

20           A.   Correct.

21                MR. GUISADO:  Can you scroll down just

22   a little bit.

23                THE VIDEOGRAPHER:  (Complies).

24           Q.   (BY MR. GUISADO) There's kind of like a

25   map below.  Okay.  It displays a number of red arrows



Page 252

1    on this map.  I presume that's the route that the

2    Central American family took to get to the FIS; is

3    that right?

4              A.  Correct.

5              Q.  And that's marked by a red star towards

6    the left-hand portion of the document?

7              A.  Correct.

8              Q.  The report details that the family was

9    transported to the Hidalgo bridge and elected to wait

10   for service at the end of the metering.

11             Was transporting them to the end of

12   the Hidalgo bridge in violation of CBP policy at that

13   time?

14             A.  Yes.

15             Q.  Do you know who would have transported

16   them?

17             A.  CBP.

18             Q.  Yeah.  But who at CBP, if you know?

19             A.  The people working the bridges.  I

20   don't know who the port may have sent to pick them

21   up.

22             Q.  Okay.

23             A.  They were transported by officers of

24   the operation authority.  I'm pretty positive on

25   that.



Page 253

1          Q.  Okay.  Thank you.

2              MR. GUISADO:  Can you scroll up to the

3      top of the page, the first page, Tyler.

4              THE VIDEOGRAPHER:  (Complies).

5          Q.  (BY MR. GUISADO) You e-mail to Carlos

6      Rodriguez -- who is Carlos Rodriguez?

7          A.  The port director.

8          Q.  Port director -- "Carlos, I feel really

9      uncomfortable with the action taken here, but it may

10     be because I don't have all the facts."

11             Why were you really uncomfortable?

12         A.  Because based on what I saw, without

13     all the facts, it looked like they were in violation

14     of the -- the current guidance.  This was in 2018, so

15     it would have been probably the metering guidance,

16     yeah, because they were talking about detention

17     capacity.

18             So, again, do you remember we talked

19     about if they made it to the FIS, they were to be

20     processed?  This particular instance, they arrived at

21     the far international bridge.  They encountered CBP.

22             If you look at the map again at the

23     primary inspection sites for the cargo facility, then

24     they were transported to Hidalgo.  So they were

25     definitely in the U.S.  They definitely arrived at



Page 254

1    the FIS, then they were transported to Hidalgo and

2    escorted to the end of the line at the metering.

3                 So based on what I had seen,

4    without -- and just like I said there, they -- that

5    was in violation of what they were supposed to do,

6    that family should have been processed.

7                 Q.  Why weren't they processed?

8                 A.  I can't answer that.

9                 Q.  Can you guess?

10                MR. NASAROV:  Objection:  Form.

11                THE WITNESS:  I can only speculate

12   that they didn't have a full understanding of -- of

13   the -- of the guidance.

14                Q.  (BY MR. GUISADO) Well, what if they

15   were at maximum capacity?

16                A.  What's that?

17                Q.  What if they were at maximum capacity?

18                A.  It didn't matter.  They -- they had

19   arrived at the FIS, they had expressed fear, and in

20   accordance with the metering guidance, they were

21   supposed to be processed when their time was -- when

22   they were next up in the -- after the people that

23   were already detained.

24                MR. GUISADO:  Tyler, can you bring up

25   25 and 26 next to each other.  And I guess we'll show



Page 255

1    them one at a time.

2              THE VIDEOGRAPHER:  (Complies).

3              MR. GUISADO:  So for just a second,

4    can we go back to FL 21.

5              THE VIDEOGRAPHER:  (Complies).

6         Q.  (BY MR. GUISADO) I'll represent to you

7    that this incident --

8              MR. GUISADO:  Can you scroll down just

9    a little bit.

10             THE VIDEOGRAPHER:  (Complies).

11        Q.  (BY MR. GUISADO) -- happened on

12   June 5th, 2018, at -- at Hidalgo.

13             MR. GUISADO:  Would you go back to 25,

14   please.

15             THE VIDEOGRAPHER:  (Complies).

16             MR. NASAROV:  Will you get my --

17        Q.  (BY MR. GUISADO) Take a moment to

18   review 25.  And I'll represent to you that 26 is the

19   same document, just on a different day.

20             MR. NAZAROV:  Okay.  Are you going to

21   be sending those over?

22             MR. GUISADO:  I sure as hell hope so.

23             MR. NASAROV:  Thank you, sir.

24             MR. GUISADO:  Coming right up.

25        Q.  (BY MR. GUISADO) Is it --


MAGNA
LEGAL SERVICES

Page 256

1           A.   So this is the only page, or there is

2      more?

3           Q.   Oh, no.

4                MR. GUISADO:   Keep scrolling.

5                MR. NAZAROV:   Okay.  I want him to go

6      down and we can go up.  Okay?  So that --

7                Mr. Longoria, can you see everything?

8                THE WITNESS:   Yes, sir.

9                MR. NAZAROV:   Okay.  Are you able to

10     read it okay?

11               THE WITNESS:   (Nods).

12               MR. NAZAROV:   Okay.

13               THE WITNESS:   Yes, sir.

14               MR. NAZAROV:   Yeah, take him through

15     the whole document so he knows what this is about,

16     please.

17               THE WITNESS:   You can start scrolling

18     down.

19               THE VIDEOGRAPHER:   (Complies).

20               THE WITNESS:   Okay.  Okay.  Stop.

21               THE VIDEOGRAPHER:   (Complies).

22               THE WITNESS:   Okay.  Keep going.

23               THE VIDEOGRAPHER:   (Complies).

24               THE WITNESS:   Okay.  Okay.  Keep

25     going.



Page 257

1                    THE VIDEOGRAPHER:  (Complies).

2                    THE WITNESS:  Okay.

3                    MR. NAZAROV:  This is on its side.

4                    THE VIDEOGRAPHER:  Yeah, Counsel, I

5    don't know if you want to go off the record, I could

6    probably rotate it.

7                    MR. GUISADO:  All right.  Ari, I'm

8    only going to be asking him about the statistics on

9    page two of the MCAT report.

10                   THE WITNESS:  I wasn't too concerned

11   about this because they appeared to be the whole LFO

12   border patrol.

13                   MR. GUISADO:  Yeah, I'm not concerned

14   about that.  And also, you know, the scope objection

15   would be relevant.  I'm only interested on the second

16   page.

17                   MR. NASAROV:  Okay.  Well, what's the

18   second page?  I mean, I don't know if he can answer

19   the questions without seeing the entire document.

20                   And for the record, the document is on

21   its side.  Okay, what's the second page?

22                   MR. GUISADO:  No, I'm going to --

23   that's it.  That's it right there.

24                   And I'm going to ask him about Hidalgo

25   port of entry in connection with the previous exhibit



Page 258

1    on the same day about the capacity, number in

2    custody, and the percentage capacity.

3                    MR. NASAROV:  Okay.  Mr. Longoria,

4    since you haven't seen the whole document fully in

5    process, are you okay with answering this question?

6                    THE WITNESS:  As it applies to these

7    ports of entry, yes, sir.

8                    MR. NAZAROV:  Okay.

9            Q.  (BY MR. GUISADO) Mr. Longoria, I'm

10   showing you what will be marked as Exhibits 319 and

11   320 to your deposition.  It's a June 5th --

12                   MR. NAZAROV:  Wait.  Where is 320?

13   There's another exhibit?

14                   MR. GUISADO:  Yeah, yeah.

15              (Exhibits 319 and 320 marked)

16                   MR. GUISADO:  Can you -- Tyler, do me

17   a favor, go to FL 26.  That's the same document.

18   Scroll to the second page.

19                   THE VIDEOGRAPHER:  (Complies).

20                   MR. GUISADO:  And it has --

21                   Thank you.

22                   It has the same information.  In fact,

23   I'll represent to both of you that the statistics for

24   the Hidalgo, Texas port of entry held 27 individuals

25   in custody at the same percentage capacity the same



Page 259

1  two days, June 5th and 6th.

2             MR. NAZAROV:  Okay.  Do you see that,

3  Mr. Longoria?

4             THE WITNESS:  Yes.  So what I'm going

5  to be looking at -- or I am looking at, I'm looking

6  at two different documents, one dated June 5th, one

7  dated June 6th, in which Hidalgo has the same

8  capacity in custody and the percentage of capacity,

9  correct?

10            Q.  (BY MR. GUISADO) Right.

11            A.  Okay.

12            Q.  Had you seen these MCAT reports before

13  in your tenure?

14            A.  I hadn't.

15            Q.  Thank you.  Do you recall in the

16  previous exhibit a family unit was encountered at the

17  FIS of Hidalgo June 5th?  Is that right?

18            A.  Yes.

19            Q.  And they were sent back to the queue

20  line of Mexico instead of being processed; is that

21  correct?

22            A.  Yes, correct.

23            Q.  That's despite the fact that according

24  to the statistics, Hidalgo's port capacity was only

25  64 percent; is that right?



Page 260

1          A.  Correct.

2          Q.  I'll ask you again:  Why wasn't that

3    family simply just processed?

4          A.  I can't answer that.

5          Q.  Why was there a queue if there is 27

6    individuals in custody and there's a capacity of 42?

7          A.  I would have to refresh my memory on

8    when the memo for the operational capacity was

9    generated and compare it to these dates.

10         Q.  Isn't it true that CBP was metering

11   within the Laredo field office even before

12   operational capacity was ever a thing?

13         A.  Yes, sir.  They were metering since

14   2016.

15         Q.  And they were metering even though

16   ports were operating at less than 100 percent

17   capacity; is that right?

18         A.  Repeat the question, because I'm not

19   sure.

20         Q.  They were metering at ports on days in

21   which capacity was less than 100 percent; is that

22   right?

23              MR. NAZAROV:  Objection:  Form.

24              THE WITNESS:  I don't recall that

25   because they were supposed to be processing in



Page 261

1   accordance with the detention capacity, which if they

2   had the space, they were bringing them in.  And at

3   times they exceeded the -- the -- the maximum

4   detention capacity, as I informed you, prior to the

5   operational capacity.

6              MR. GUISADO:  Tyler, can you bring up

7   Howe 87, please.  Actually, never mind.

8              Can you bring up -- sorry.  Can you

9   bring up FL 13.

10             THE VIDEOGRAPHER:  (Complies).

11             MR. NAZAROV:  What number is that?

12             MR. GUISADO:  That is Exhibit 310.

13  Focus on the bottom e-mail.

14             THE WITNESS:  Okay, I --

15             MR. GUISADO:  Scroll up.

16             MR. NAZAROV:  Okay.  I want him to

17  have the opportunity to look at it.

18             MR. GUISADO:  Me, too.

19             THE WITNESS:  Okay.  Go up.

20             THE VIDEOGRAPHER:  (Complies).

21             THE WITNESS:  Okay.

22         Q.   (BY MR. GUISADO) Mr. Longoria, do

23  remember -- I know I've showed you a lot of documents

24  today.  Do you remember me asking you about this

25  particular document?



Page 262

1          A.   Yes.

2          Q.   This document is from May 18th, 2018;

3    is that right?

4          A.   Yes.

5          Q.   And that was before CBP started using

6    operational capacity; is that right?

7          A.   Correct.  The e-mail depicts -- or

8    states that there are two metered individuals waiting

9    on the bridge and will be processed as space becomes

10   available; is that right?

11         A.   Correct.

12              MR. GUISADO:  Can you please scroll

13   up.

14              THE VIDEOGRAPHER:  (Complies).

15              MR. GUISADO:  That's good.  Thank you.

16         Q.   (BY MR. GUISADO) You respond to the

17   e-mail telling Carlos Rodriguez that the capacity is

18   greater than 13, and if you remember correctly, he

19   should be at 22 or 23.

20              Why should he have been at 22 or 23?

21              MR. NASAROV:  Objection:  Form.

22              THE WITNESS:  Because during this time

23   frame, they were supposed to be working at detention

24   capacity.  So if he had room for 22 or 23, that's

25   what he should have been showing.



Page 263

1          Q.  (BY MR. GUISADO) So he should not have

2    been metering individuals when he still had capacity

3    for nine or ten more individuals; is that right?

4          A.  Correct.

5          Q.  Eventually CBP told individuals at

6    ports -- scratch that.

7              Eventually, sometime in June of 2018,

8    CBP headquarters relayed to David Higgerson and Bradd

9    Skinner they should be processing up to 70 percent of

10   capacity; is that right?

11             MR. NASAROV:  Objection:  Form

12   Objection:  Form.

13             THE WITNESS:  Based on the information

14   you provided me that I hadn't seen before, yes.

15         Q.  (BY MR. GUISADO) So in May of 2018, CBP

16   should have ports of entry at CBP and the LFO --

17   scratch that.

18             In May 2018, ports of entry within the

19   LFO should have been as close to maximum detention

20   capacity as possible.  Is that what you're telling

21   me?

22             MR. NASAROV:  Objection:  Form.

23             THE WITNESS:  Yes.

24         Q.  (BY MR. GUISADO) And then they moved in

25   June of 2018 to process only up to 70 percent of



Page 264

1  capacity; is that right?

2         A.  No.

3         Q.  In June of 2018, CBP headquarters

4  e-mailed your bosses at the LFO indicating that they

5  should be processing up to 70 percent of detention

6  capacity; is that right?

7         A.  That was a conversation between Deputy

8  Skinner and -- I forget the individual's name.  I

9  don't believe that was official policy from

10 headquarters.  That was just a conversation between

11 Skinner and that individual.  I don't know if

12 anything ever came of it.

13        Q.  So --

14        A.  By that time, operational capacity was

15 at the discretion of the ports.

16        Q.  So there's no official policy for

17 operational capacity?

18        A.  There is a memo from Commissioner

19 McAleenan.  Although it doesn't specifically

20 reference operational capacity or identify -- define

21 operational capacity, there is a memo from

22 headquarters, Commissioner McAleenan, that identifies

23 our priorities.

24        Q.  But there's no -- you have never seen

25 any document indicating a specific target or quota;



Page 265

1    is that right?

2                MR. NAZAROV:  Objection:  Form.

3                THE WITNESS:  A quota for what, sir?

4          Q.  (BY MR. GUISADO) How much a particular

5    port within the LFO should be processing.

6          A.  No, sir, not under operational

7    capacity.

8          Q.  But before that, as referenced in this

9    e-mail here, May 18th, 2018, they should have been

10   processing up to a hundred percent; is that right?

11               MR. NAZAROV:  Objection:  Form.

12               THE WITNESS:  Yes.

13               MR. GUISADO:  I have no further

14   questions.

15               THE WITNESS:  Okay.

16               MR. NAZAROV:  Mr. Longoria, so now

17   what we're going to do is I'm going to get together

18   real quick, I need a 10-minute break, 15-minute

19   break -- no, make it 10, with Ben and Luisa, and we

20   might have one or two redirect questions, okay?  And

21   then it will be over.

22               Unless you have some re -- redirect,

23   but --

24               Okay?

25               THE WITNESS:  Yes, sir.



Page 266

 1                    MR. GUISADO:  See you back in 10

 2     minutes.

 3                    THE VIDEOGRAPHER:  We are going off

 4     the record.  The time is 5:28 p.m.

 5                    (Recess taken)

 6                    THE VIDEOGRAPHER:  We are back on

 7     record.  The time is 5:44 p.m.

 8                         EXAMINATION

 9          Q.  (BY MR. NAZAROV) I just have two very

10     quick questions.

11                    Based on your understanding, what

12     factors go into operational capacity?

13          A.  The ports have to make sure that they

14     identify the right resources to address the agency's

15     priority, which, of course, number one is terrorism.

16     So they have to make sure that they have assets

17     dedicated to reconnaissance intervention.

18                    They also have to prioritize trade

19     facilitation.  And there's another one, but I believe

20     that two of the priorities are both related to

21     something, but those are the factors that need to be

22     taken into account.

23                    Is immigration processing important?

24     Definitely.  But they also have to make sure they

25     provide the necessary resources to focus -- to



Page 267

1    continue focus on those priorities that are outlined

2    in the Commission McAleenan's memo.

3            Q.   Okay.  My second question is:  You

4    testified that some ports of entry were operating at

5    100 percent or more of capacity.

6                 Was that something that was

7    sustainable for a long period of time?

8            A.   No, sir.  That was -- I've been dealing

9    with this in 2014.  That was priority of metering

10   starting, and that the ports were just doing a

11   fantastic job of bringing in people as they could and

12   processing them as fast as they could.  But you had

13   people sleeping on -- on the floors.  You had people

14   uncomfortable sitting in chairs for long periods of

15   time.

16               So there was not only a hazard or a

17   safety concern for the arriving aliens, but it was

18   also a safety concern for the general public, the

19   traveling public.  There was a concern for the CBP

20   officers.

21               So it really was not a condition that

22   could be attainable for a long time:  UACs sleeping

23   in cots for days on time, one right next to each

24   other, there's no places to bathe, there's no -- it

25   was just a terrible condition.  So it could not be



Page 268

1    sustained for a long period of time.

2                    MR. NAZAROV:  Okay.  I pass the

3    witness.

4                    MR. GUISADO:  Thank you.

5                    MR. NAZAROV:  Thank you, Mr. Longoria.

6                    MR. GUISADO:  Mr. Longoria, I only

7    have two questions.

8                    FURTHER EXAMINATION

9         Q.  (BY MR. GUISADO) With respect to

10   Mr. Nazarov's first question, you detailed that

11   Commissioner McAleenan outlined four priorities in

12   his memorandum; is that right?

13        A.  That's correct.

14        Q.  Was the processing of asylum seekers

15   one of those priorities?

16        A.  No, sir.

17                    MR. GUISADO:  I have no further

18   questions.  I would like to thank you specifically

19   for your time, and I would like to apologize for the

20   lag with the court reporter and the videos and the

21   echo.  And I would like to thank you for your time

22   coming out of retirement to answer my questions

23   today.  I really appreciate it.

24                    MR. NAZAROV:  I would like to second

25   that, what Angelo said.  Thank you for your time



Page 269

1    today.  It was a long deposition.  We really

2    appreciate it.

3                    Angelo, we would like to review and

4    sign.  And can I order a transcript from the court

5    reporter?

6                    THE COURT REPORTER:  Yes, that is

7    fine.

8                    THE VIDEOGRAPHER:  Let me just close

9    out the video.  This is the end.  We're going off the

10   record.  The time is 5:47.

11                   (Proceedings concluded at 5:47 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 270

1                          CHANGES AND SIGNATURE

2       PAGE LINE  CHANGE                    REASON

3       _____

4       _____

5       _____

6       _____

7       _____

8       _____

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      _____

23      _____

24      _____

25      _____



Page 271

1

2

3

4

5

6

7      I declare under penalty of perjury that the

8   foregoing is true and correct.

9

10                              _____

11                              MR. FRANK S. LONGORIA, JR.

12

13

14      SUBSCRIBED AND SWORN TO BEFORE ME, the

15   undersigned authority, by the witness, MR. FRANK S.

16   LONGORIA, JR., on this the _____ day of

17   _____, 2020.

18

19                              _____

20                              NOTARY PUBLIC IN AND FOR

21                              THE STATE OF _____

22

23   My Commission Expires: _____

24

25



Page 272

1    STATE OF TEXAS

2    COUNTY OF HARRIS

3

4                    REPORTER'S CERTIFICATE

5              ORAL VIDEOTAPED DEPOSITION OF

6                 MR. FRANK S. LONGORIA, JR.

7                      June 18, 2020

8

9              I, Michelle Hartman, the undersigned

10   Certified Shorthand Reporter in and for the State of

11   Texas and Registered Professional Reporter, certify

12   that the facts stated in the foregoing pages are true

13   and correct.

14              I further certify that I am neither

15   attorney or counsel for, related to, nor employed by

16   any parties to the action in which this testimony is

17   taken and, further, that I am not a relative or

18   employee of any counsel employed by the parties

19   hereto or financially interested in the action.

20              That the deposition transcript was duly

21   submitted on _____ to the witness or to

22   the attorney for the witness for examination,

23   signature, and returned to me by _____.

24

25



Page 273

1          SUBSCRIBED AND SWORN TO under my hand and

2     seal of office on this _____ day of July, 2020.

3

4

5          _____

6          Michelle Hartman, CSR, RPR

           Texas CSR 7093

7          Expiration:  12/31/21

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**A**

**able** 10:9 35:24
  38:9,15 51:19
  51:25 52:23,23
  59:24 73:13
  86:9 96:21,25
  105:11 138:15
  162:20 187:1
  238:12 249:23
  250:10 256:9
**above-styled**
  1:16
**acceptable**
  134:6,9,13
**access** 192:2
**accomplishme...**
  30:18
**account** 40:10
  61:16 62:15
  241:22 266:22
**accurate** 51:4
  233:15
**accurately** 9:5
  33:6 40:11
  63:24
**acquired** 25:21
**action** 7:19
  82:15 147:23
  172:11 182:22
  248:15 249:9
  253:9 272:16
  272:19
**actions** 31:6,7
  96:5 102:3
**actual** 60:10
  71:24
**addition** 173:10
**address** 122:24
  123:1 237:23
  238:3 266:14
**addressed** 16:15
**ADFO** 29:4,10
  31:1,3,4 32:2
  43:15 45:16

54:3 70:12,24
  72:13 76:9
  87:7 99:12
  118:21 119:9
  125:11 135:12
  148:1
**adhered** 95:18
  95:25
**adjudicate**
  233:1
**admissibility**
  131:5
**admit** 23:9
**advise** 115:21
  128:12
**advised** 51:4
  117:7,18
  118:14 119:5
  123:17,17
  124:6 140:15
  141:16
**affirmative**
  58:22
**afforded** 181:8
**afternoon** 43:12
  43:25 83:24
  84:1 136:10
  238:12
**age** 219:25
**agency** 104:6
  128:8
**agency's** 30:14
  30:16 266:14
**ago** 45:6 99:19
  104:24
**agree** 88:20,22
  95:5,10 102:10
  102:18 112:2
  152:8 165:9,17
  176:4 177:2,6
  177:12 178:20
  200:7 247:23
**agreed** 7:1,2
  111:2 112:10

112:18 113:1
  153:4
**agreement** 6:23
  152:9
**aguisado@ccr...**
  2:7
**aha** 22:24
**ahead** 36:14,24
  41:21 55:24
  67:12 76:25
  97:4 114:14,18
  118:1 164:3
  165:14 198:21
  222:18
**AIC** 248:6
**aiding** 45:10
**air** 24:25 25:17
  25:20,23
**al** 1:2,2,5 6:3
  7:20
**Alberto** 230:22
**alcohol** 175:17
**alien** 117:16
  122:16,23
  241:17
**aliens** 60:22,24
  61:2 92:22
  95:7 107:11
  109:11,21
  165:23 188:19
  189:25 198:12
  199:5 267:17
**allegations**
  231:5,19
  232:19 233:21
  248:8
**alleged** 14:8
**allocate** 180:6
  180:12,25
**allow** 21:10
**allowed** 11:20
  20:21 206:12
  207:3
**allows** 181:17

**alluding** 176:13
  176:23 243:10
**ALO-DEF**
  148:20 171:3
**alternative**
  134:15
**Alvarez** 230:22
  236:18 238:21
  239:5,7 245:7
**Alvarez's** 244:2
**ambiguous**
  76:24 77:19,23
**American** 82:7
  123:4 124:16
  124:21 125:14
  126:18 128:1
  128:13,21
  142:1 229:3,17
  231:13 232:15
  252:2
**Americans**
  123:19 124:8
  124:13 127:4,5
**amount** 112:15
  241:8
**Andres** 219:2
  238:20 247:14
**Angelo** 2:4 6:15
  7:17 21:25
  38:19 51:22
  57:15 72:24
  83:15 120:24
  121:12 146:4
  159:21 163:4
  168:9 186:18
  188:7 198:21
  234:17 268:25
  269:3
**Angelo's** 36:18
**announcement**
  52:16
**answer** 9:18
  10:2,9,10,11
  19:9,10,23

20:2,4,13
  21:10,11 22:1
  22:6 36:18
  41:17,18 44:5
  45:24 46:4,6
  50:25 60:12
  63:11 67:12
  77:10 78:10
  81:20 85:1,15
  85:16 90:24
  92:2 94:17
  96:5 102:16
  103:6,9,22
  113:5 126:25
  140:11 148:17
  154:14 156:9
  156:18 159:16
  160:3 161:2,4
  165:14 166:8
  167:25 174:15
  179:1,9 185:17
  195:22 200:5
  214:19 217:18
  231:16 232:9
  232:22 233:16
  238:7,8,13
  239:10 246:16
  246:25 249:5
  254:8 257:18
  260:4 268:22
**answered** 28:23
  154:8 156:4,5
  158:2 159:22
  174:17
**answering**
  219:6 258:5
**answers** 9:6
  205:20
**antiterrorism**
  176:17
**anti-terrorism**
  30:15
**anybody** 79:16
  81:11 186:6



MAGNA
LEGAL SERVICES

anymore 62:2
78:1 89:9
176:14 177:3,8
243:12
anyway 170:12
AOL-DEF 3:13
3:16,19,21,23
4:4,6,8,10,12
4:13,15,17,19
4:21 5:3,5,9
35:12 37:20
51:11 53:11
57:4 74:14
85:18 86:24
91:8 92:12
97:19,25 105:2
106:14 114:3
129:3 130:1,7
149:19 162:14
163:14 187:20
192:21 197:19
204:18 208:18
215:16 228:4
228:21 235:10
251:3
AOL-DEF-00...
3:18
apart 24:2 76:25
apartment 17:9
APD 62:16
133:16,19
apologies 46:11
apologize 17:8
17:11 58:7
77:24 156:12
268:19
app 55:16,20
56:8,12,18
59:19 60:18,24
61:16,18 63:1
64:12 65:19
66:11 68:19
72:9
appear 64:7

138:19 139:25
210:24
appearances 2:1
6:13
appeared 221:7
257:11
appears 43:9
44:9 55:7
59:20 61:15,19
87:3 89:23
154:24 158:9
212:10 216:20
applicable
120:14
application 54:9
54:15
applies 84:6
258:6
apply 34:5
65:10,14 84:18
94:13
applying 65:22
appointment
122:17
appreciate 17:7
29:1 83:17
147:1 160:13
182:13 268:23
269:2
approach 65:15
71:8,19 72:14
approached
98:24 158:24
approaching
64:13,23 66:1
67:8 68:10
69:17
appropriate
40:5 83:4
approximately
6:7 18:10,13
29:16,22 34:20
35:9 205:10
April 3:12 37:17

37:18,19 40:1
43:10,19 44:13
arbitration 13:3
area 32:21
148:7
areas 143:7
arena 147:24
argument 153:3
153:20 154:1
155:14 157:3
Argumentative
166:7 249:4
Ari 2:13 6:19
35:14 38:22
66:22 76:19
77:18 78:16
83:6,17 100:3
146:11 148:24
160:10 196:9
197:2 198:13
222:8,11 257:7
ari.nazarov@...
2:16
arose 123:2
arrested 15:2
arrival 131:15
arrivals 59:25
arrive 248:14
arrived 65:11
117:16,17
135:14 233:10
253:20,25
254:19
arrives 50:20
131:12,21
arriving 60:22
60:24 61:1
115:23 117:9
117:11 165:23
188:19 267:17
arrows 251:25
article 229:18
229:21 231:12
232:14 237:17

237:18
ASAP 110:23
238:23
asked 24:7
70:16 77:3
79:23 87:22
109:18 112:15
127:12,18
156:4 157:25
168:4,7 183:25
184:14
asking 20:23
21:1,4 77:17
78:13,13 79:19
88:9 89:24
99:20 102:6
116:22 126:3
128:7 140:17
147:6 154:10
160:2,4 173:12
173:23 190:3
209:7 222:13
257:8 261:24
asks 236:22
aspect 70:19
aspects 27:18
assesses 181:24
assessment
205:13
assets 266:16
assigned 30:3
46:24 70:10
157:16
assignment 30:3
assist 119:17
assistant 3:12
8:11 29:3
39:11 69:10
99:3 115:11
117:7 124:22
124:25 125:18
141:20 150:10
157:7,8,9,10
157:19,24

158:23 159:6
159:17 160:25
assistants
127:13
Associate 117:6
associates 24:23
25:13
associate's
25:14,21
assume 10:3
232:19
assuming 46:22
68:25 103:14
120:16 196:3
assumption
68:24
asylum 27:8,18
33:23 34:6
65:11,14,22
84:18 90:8
94:13 95:7
98:25 99:5,15
99:24 100:9,10
101:19 103:2
110:3 123:4
124:16,21
125:14 126:3
126:18 128:13
128:21 134:6
135:5,10
140:16 141:11
142:1,16 143:1
147:19 171:13
214:18 229:3
229:13,23
231:5,19 232:4
232:6,14,19
233:2,3,7,16
233:22 235:17
236:23 246:13
248:8,10,12
251:9 268:14
ATFO 209:6
attached 1:23



229:16
**attainable**
267:22
**attempted** 93:13
**attending** 24:1
**attention** 150:12
171:14
**attorney** 2:20,21
272:15,22
**attorneys** 11:20
16:25 17:16
24:3
**attorney's** 22:7
**attorney-client**
20:5
**August** 3:14,22
4:3,5 53:10,19
55:12 56:17
57:25 92:11
93:4 94:8,10
96:24 97:9,17
97:23 98:23
100:16 101:12
101:20 102:11
102:19,23
103:15,18
**author** 150:6
187:24 215:24
229:7 235:18
251:10
**authority**
252:24 271:15
**available** 43:15
44:17 60:8
148:8 198:5
239:11 241:3,6
242:4,22
262:10
**await** 94:2
**awaiting** 100:21
101:9 102:20
244:21
**aware** 34:3,4,7
68:20 132:6

135:8 147:7
161:23,25
162:1,4,7,10
246:1,2
**awareness**
60:17 67:4
68:3,9
**awareness/vis...**
230:23
**a.m** 1:17 6:7,8
171:25 182:6

---
**B**
**back** 24:20 37:5
40:1 42:3
47:16 51:6,6
53:16 58:10
62:19 63:14
74:2 76:16
82:17 83:22
84:22 92:24
94:14 95:8
97:12 117:2,19
121:18 122:21
127:6 131:13
131:22 133:6
133:12 134:14
135:2,11 136:6
136:9,11 140:4
140:5,19
142:17 144:23
146:18 182:9
185:1,7,9
197:11 207:4
210:17 220:25
221:3 226:11
226:18 238:11
239:17,22
255:4,13
259:19 266:1,6
**background**
133:15,23,25
134:3
**bad** 146:10

**badger** 160:8
**badgering** 156:5
156:10,12
159:22 160:4
**ballpark** 143:20
**barely** 200:4
**barracks** 12:13
**Barrera** 124:6
127:25
**base** 231:25
**based** 44:6
60:25 101:25
102:8 174:24
178:12 206:18
226:10,13
239:10 241:5,8
247:15 249:9
253:12 254:3
263:13 266:11
**bases** 77:21
**basically** 19:12
30:7 38:11
143:14 243:8
**basing** 240:17
**basis** 10:12
76:18 126:21
126:22 147:23
156:1
**Bates** 3:13,19,21
3:23 4:4,6,8,10
4:12,13,15,17
4:19,21 5:3,5,9
37:20 53:10
74:13 86:23
92:12 97:19,24
106:13 114:2
130:1,7 149:18
163:14 171:3
187:19 192:21
197:18 204:17
208:18 215:16
228:20 235:10
251:3
**bathe** 267:24

**bearing** 3:19,21
4:4,6,10,15,19
4:20 53:10
74:13 86:23
97:19,24 114:2
130:1 171:3
187:19 197:18
208:17 215:15
**bears** 3:23 4:8
4:13,17 5:3,5,8
37:20 92:12
106:13 149:18
163:14 204:17
228:20 235:10
251:3
**began** 213:17
**beginning** 26:12
36:6,16 57:10
84:2 132:17
183:23 184:14
185:13
**begins** 6:2
**begun** 216:10
**behest** 127:12
**believe** 13:20
18:12 29:8
47:23 48:4
82:23,24
124:23 163:25
178:18 218:11
218:13 248:17
249:1 251:17
264:9 266:19
**believed** 102:11
173:8 183:3
214:8
**bell** 108:2
200:23
**Ben** 2:14 265:19
**beneath** 54:4
56:6 115:21
**Benjamin** 2:21
**best** 9:16 28:8
29:7 47:22,24

49:1,24 50:1
55:21 68:13
72:12 73:7
78:21 79:22,23
81:25 112:7,13
113:3 123:7
135:9 142:9
156:9 160:3
177:19 178:7
178:15 190:10
201:21 226:24
237:23 238:6,7
**better** 33:13
40:16 46:13
70:18 167:11
202:13 214:8
**beyond** 32:13,22
**big** 73:12
**bit** 8:20 23:17
24:20 28:25
30:11 31:1
32:5 35:2 36:6
39:4,20 43:4
45:20 47:16,17
54:25 58:8
68:17 80:16
84:10 94:23,23
104:3 107:1,5
110:18 115:3
121:19 123:11
136:18 160:5
170:1 187:11
210:13 216:6
225:20 227:21
230:10 235:24
237:8 251:22
255:9
**blindsided**
132:7
**blow** 36:5 51:21
62:1,2 107:4
203:16 215:4
**blown** 80:22
**board** 118:14



MAGNA
LEGAL SERVICES

**bodies** 244:12
244:24
**body** 13:6
**border** 8:12,16
10:22 31:5,9
31:13 40:9
47:5 55:25
56:20 75:19
76:9 95:2
119:24 120:2,7
120:15,19
143:2 157:16
201:2,7 248:22
257:12
**borderline** 47:6
**borders** 65:12
200:16,20
226:6
**border-wide**
119:23
**boss** 44:16,16
85:12 109:8
130:17,22
131:11,22
132:7 140:11
155:20 211:2
212:22 226:5
247:15
**bosses** 95:15
213:22 221:6,7
221:19 264:4
**bottom** 36:7
37:3,11,12
39:5 51:21
62:11 73:16,17
75:2 80:12
86:7 91:13,17
94:20 105:6,17
107:2 113:14
114:25 129:12
139:1,11 149:5
150:13 169:5,9
169:11 182:6
182:13 186:18

187:25 191:25
192:4 193:2
197:25 202:1
203:12 207:19
207:21 216:3
229:9 234:8
235:21 236:2,4
250:1 251:11
261:13
**boundaries**
84:15
**boundary** 32:11
32:19 33:9
46:18 47:18
50:14,20 89:21
89:25 90:9
94:12 98:16
101:7 103:1,17
137:2,9 140:6
140:20 142:3
142:18 193:15
216:16 218:2
218:21
**Box** 2:14
**Boy** 130:6
**Bradd** 43:9,22
44:10 76:7
77:4 78:7 88:9
133:2 150:14
155:16,19
164:23 166:12
208:25 210:23
211:1 237:12
238:11 247:15
263:8
**Brazilian** 65:6
**break** 9:1 69:6
72:25 73:6
83:3,11 120:25
121:1,3 129:5
154:15 168:11
183:21 184:5
185:1,22
220:18 265:18

265:19
**breaking** 129:10
**breakout** 83:13
**breaks** 11:22
84:7
**bridge** 47:11,21
48:1,3 49:5,7,8
49:17 50:10
51:6 61:20,21
63:2 65:7
75:11,16,20
81:4,6 82:1,4
82:19 84:22
89:7 93:20
95:8 136:23
137:7 189:25
198:4 202:4,5
249:8 251:15
252:9,12
253:21 262:9
**bridges** 48:2,15
48:20 49:3,12
49:15,22,25
68:4,7 81:12
81:23 252:19
**briefly** 24:19
**bring** 15:15
35:12 51:10
57:3 72:20
75:23 85:18
93:2 94:19
96:7 105:1
113:8 121:16
129:2 138:5,22
148:19 168:22
186:13 196:5
203:7 215:1
220:16 228:3
234:5 247:19
247:21 249:13
249:19 254:24
261:6,8,9
**bringing** 261:2
267:11

**Briones** 133:21
133:22
**Broadway** 2:5
**broke** 16:8
**brought** 92:21
168:25
**Brownsville**
31:22 48:5
49:25 82:2,3,4
91:3 175:14
235:2
**Bryan** 209:2
**BU** 2:23
**bunch** 234:9
**butcher** 55:7
**buy-in** 167:4

_____
**C**
**C** 124:22
**California** 1:1
1:21 6:5
**call** 44:23 45:2
71:23 132:4
150:20,21
151:9 154:21
154:24 155:4,6
184:11,12
192:2
**called** 7:19
16:12 61:18
**call-in** 52:20
**Campbell**
192:25
**canceling** 95:5
**canopy** 89:15
**capacities** 178:8
**capacity** 40:10
50:21 51:5
57:3 78:23,24
84:19 98:14
99:6,17,24
100:11,14,14
100:23 101:2
101:12,23,25

102:1,6,7,13
103:4,8,11,14
103:20 117:16
117:17,21,22
118:3,4 134:20
134:23,24
136:18 142:23
143:5,18 144:1
145:17 147:4,7
147:11,13
148:1,6,15
150:18 151:5,6
151:14,15,25
152:10,19
153:16 155:10
155:24 156:16
156:23,24
157:19 158:10
158:25 159:9
159:20 160:19
161:9,21,24
162:2,5,8,11
165:3,3,6,7,10
165:11,12,19
165:19,20,25
166:1,4,9,18
166:21 167:1
167:16,23
168:6 172:18
173:3,14,25
174:3,3,4,8,12
174:13,20
175:5,10,22,25
176:1,12
177:13,14,17
178:3 179:18
180:4,5,11
181:1,9,19,22
182:3,8,24
183:1,5,6,11
183:13 185:23
185:23 186:11
190:13,17,19
190:23 191:7



191:12 193:13
194:11,18,19
194:25,25
195:7,12,17
197:24 199:10
199:15,19
200:3,8 205:12
205:13 206:11
206:21,22
207:9,9 209:5
209:20 211:4
211:19,20
212:1,3,17,23
213:3,6,8,11
213:16,18,23
213:24 214:8,9
214:13,15
216:11,15,22
216:24 217:7,9
217:10,13,15
217:21 218:3
220:8 221:9
224:2,23 225:2
225:15 226:2,7
227:4,6,16
238:25 239:8
239:10,14,24
239:25 240:4,6
240:13,15,19
240:21,24
241:2,3,5,7,11
241:25 242:2
242:12,12,13
242:20,21
243:17,21
247:20 248:1
253:17 254:15
254:17 258:1,2
258:25 259:8,8
259:24 260:6,8
260:12,17,21
261:1,4,5
262:6,17,24
263:2,10,20

264:1,6,14,17
264:20,21
265:7 266:12
267:5
**care** 77:11
**career** 220:4
**cargo** 175:16
253:23
**Carlos** 253:5,6,8
262:17
**cartels** 201:16
**case** 13:10 17:17
20:17 22:4
47:13 125:9
243:3
**cases** 13:15
206:14
**catching** 92:20
**cause** 1:4,16
**CB** 81:5
**CBP** 2:20 8:16
10:23 14:1
15:10 26:9,12
26:16,22 27:7
27:11 29:2
33:20 46:16
50:21 57:13
62:25 63:3
64:6,11 65:16
65:18 67:9
69:24,24 71:12
71:22 80:2
81:5,13,18
82:9 88:15
90:10 94:13
98:20 100:8
112:15,23
115:16,21
118:7 119:12
123:3,16 124:5
124:15,19,23
125:13,19
126:11,16,17
128:7,8 131:19

133:5,6 135:5
135:6,10
136:21 137:12
140:18 141:4
141:10 143:9
143:18 144:1
147:5,10 148:8
161:9,11 165:6
205:9 212:21
213:21 216:10
219:21 220:6
220:12 221:6
226:5 231:6,7
232:13,25
233:22 234:2
236:19 247:16
248:6 251:18
252:12,17,18
253:21 260:10
262:5 263:5,8
263:15,16
264:3 267:19
**CBP's** 3:11
39:10 58:13,17
59:3,7 69:15
112:2
**CC** 154:4
155:16,19
**cc'd** 193:5
**cc'ing** 238:21
**cell** 190:13
241:9
**cells** 143:6
148:8
**center** 2:4,8 4:4
4:6 6:15 7:18
97:19,24 98:6
**Central** 6:8
123:19 124:7
124:13,16,20
125:14 126:17
127:4,5 128:1
128:13,21
142:1 252:2

**ceremony** 219:7
219:12,17
**certainly** 38:24
45:6 49:21
**certainty** 126:15
**Certificate** 3:6
272:4
**Certified** 1:18
272:10
**certify** 272:11
272:14
**CF** 195:17,18
**CFO** 108:25
**chain** 3:13,14,19
3:22 4:8,13,15
4:17,18,20 5:3
5:5,8 37:20
53:10,19,23
74:13,22 92:11
106:13,23
114:21 130:1
130:15 139:25
150:4 163:13
171:12 187:22
197:18,23
204:17 205:1
208:17,24
215:15,22
228:20 229:2
235:10,16
251:2,8
**chairs** 267:14
**chambers**
184:11,13
**chance** 28:11
44:3 56:22
81:7,10
**change** 79:3
161:17 178:25
231:6 233:22
234:2 242:20
270:2
**changed** 78:22
135:5 248:6

**CHANGES**
270:1
**changing** 167:5
**charged** 14:22
**charm** 236:12
**chart** 98:12
102:11 193:11
216:4,6,13
217:8 226:13
**Chat** 67:15
**chatting** 11:25
**Chavez** 115:11
115:15 116:18
117:7 123:16
124:22 125:1
127:24 230:22
**Chavez's** 117:2
126:19
**checking** 210:20
**chief** 236:18
**children** 45:17
246:23,23
248:24
**childrens** 45:10
**chime** 51:13
**choice** 249:16
**choose** 242:21
**chose** 179:24
**Chou** 2:19
**Circuit** 20:18
**CIS** 233:2
**cities** 218:10
**citing** 236:21
**city** 65:12
**Civil** 1:22 2:13
6:20 184:9
**claim** 132:15
233:2 246:13
**claimants**
239:11,24
241:6 242:22
**claimed** 135:2
**claiming** 93:14
165:23



claims 171:13
235:17 242:6
clarification
157:25 159:13
245:20
clarify 55:23
160:19 207:7
clarifying 29:1
164:12
class 22:3
clear 46:9,12
49:17 124:24
132:13,17
156:21,24
158:16 159:1
159:10,17
172:5,18
173:24 182:7
cleared 146:12
clearly 16:2
38:16 60:21
92:25 127:2
138:16 146:21
174:5 175:21
183:1 186:23
192:5 198:19
202:19,21
203:15 222:24
249:24
client 114:15
close 47:6 50:14
75:19 84:15
89:20 137:1
263:19 269:8
closely 182:24
closer 89:25
colleagues 112:9
college 24:25
25:12,16
column 193:17
195:16 216:17
224:23 227:13
come 84:22
110:1 135:4

comes 17:10
220:11
comfortable
85:11,13
coming 51:6
81:21 109:7
113:21 146:21
202:14 209:6,6
212:17 255:24
268:22
commander
123:17 124:6
127:25 171:16
198:1
comment
166:16
Commission
267:2 271:23
commissioner
3:12 39:11
78:22 79:25
80:2 107:14,14
108:6 109:18
109:18 119:20
119:21 120:9,9
120:17,18
140:14,15
176:17 178:17
179:11 264:18
264:22 268:11
communicate
11:20 63:19
68:23
communicated
127:4,5,9
communication
3:16 53:21
72:6
communicatio...
3:15 53:20
community
24:25 25:16
compare 260:9
compared

188:20
complaint 229:2
229:16,18,20
229:22 231:1
231:12,18,21
231:23 232:6
232:15,18
233:6 248:6
complaints
13:23
complete 166:25
completed
26:24
completely
233:3
Complies 7:5
37:4,7,13 39:6
39:18,21 42:25
43:2,5 51:23
52:12,14 53:4
53:25 55:1,4
57:6 58:4
59:16 61:6,9
61:11 62:4
65:3 66:7
67:20 72:23
73:22,24 74:1
74:4,6,8 75:4
76:4 80:14
85:22 91:11,14
92:5,7 93:6
94:21,24 97:7
97:14 105:21
105:23 106:2
107:6 110:19
113:10,23
115:4 116:5
121:20 123:13
129:14,20
139:16,22
148:21 149:13
153:1 161:7
168:15 169:24
170:2,4,6,8,15

182:10,15
186:15 187:9
187:12 191:20
192:11,13
197:12,14
202:2 203:9,21
203:23 204:10
204:12 207:17
208:4 210:15
215:5 216:7
223:10,15
225:9,18,21
226:19 227:14
227:23 228:12
228:14 230:11
230:14,16,18
234:10,12,14
235:25 236:3,6
236:8,10 237:4
237:9,21
238:19 244:3
247:9,12
249:20 250:2,5
250:7,9,15,17
250:20 251:23
253:4 255:2,5
255:10,15
256:19,21,23
257:1 258:19
261:10,20
262:14
composition
239:11 241:6
241:13,20,22
246:12
compound
126:23 156:3
computerized
1:20
concern 267:17
267:18,19
concerned
185:22 190:23
191:3,4 194:24

243:16 257:10
257:13
concerns 111:2
concluded
269:11
condition
267:21,25
conditions 40:7
conducive 41:23
conduct 15:10
41:24 178:1,6
181:18 206:14
conference 45:2
192:2
confirm 23:11
43:13
confirmed 23:5
confused 59:5,8
63:21 79:11
confusing 32:24
126:23 147:21
156:4
confusion 128:6
147:24 150:19
151:8 152:8,15
158:24 159:10
159:18 160:19
176:11,23
connection
13:14 16:25
28:7 87:20
145:9 257:25
consecutive
164:9
consequences
11:14
considering
60:6 120:13
249:14
consistent 238:4
Constitutional
2:4 6:16 7:18
cont 4:1 5:1
contact 61:18



71:13 123:3
124:15,20
125:13 126:12
126:17 128:1
**contacted**
123:18 124:7
128:20
**containing**
98:12
**contents** 14:15
20:22 132:23
211:12
**context** 143:5
165:23
**contingency**
74:24 75:8
76:13,17
**continue** 145:6
169:20 181:17
183:7 199:5
207:4 267:1
**continues** 198:3
**control** 107:11
109:11,20,24
110:2,7 111:20
112:3,10,11,15
112:23 122:14
**controlling**
34:13
**conversation**
23:22 67:15
264:7,10
**conversations**
17:16,25
**conveyed** 134:5
**convicted** 14:25
**cool** 57:11
196:16 197:2
220:21
**coordinator**
56:21,25 57:24
**copied** 53:15
56:2,5 106:24
132:5 154:9

197:23
**copy** 39:9
**copying** 38:14
76:8 95:3
**correct** 12:21,22
27:19 31:20,21
33:20,21 36:22
36:23 41:2,3,6
50:17,23 56:9
72:11 79:2,5
87:5 88:19
89:13,22 90:2
94:15 104:11
118:11 119:25
125:21 126:4,8
127:17,20,23
128:3 137:14
141:22 142:21
143:16 147:5
149:4 150:7,8
150:11 154:20
155:18,20
163:5 172:12
172:14 174:7
174:10 178:8
181:21,25
186:1 189:21
190:2,15,20,21
191:1,2,17
193:10,16,19
194:4,7,13
195:9 200:1
205:4 210:20
210:21,24
212:20 213:9
214:11,14
216:23 225:4
227:7 232:17
239:1 240:14
241:7 243:4
245:3 251:20
252:4,7 259:9
259:21,22
260:1 262:7,11

263:4 268:13
271:8 272:13
**correctly** 32:14
43:17 54:12
94:11 198:6
199:11 205:16
206:7,18
237:25 239:2
262:18
**cots** 267:23
**Council** 229:4
229:17 231:13
232:16
**counsel** 6:12,23
9:11 10:7,11
12:1 15:20
18:7 19:2,3,25
20:8,15,24
21:9,14 22:9
22:23 48:6
75:25 83:3
130:4 156:2
160:14 163:16
257:4 272:15
272:18
**count** 160:11
**counterpart**
107:10 109:10
122:11
**counterparts**
104:19 106:21
110:15,23
**country** 42:3
**COUNTY** 272:2
**couple** 238:15
**course** 11:21
18:5 28:1,7
79:12 88:6
99:11 179:13
266:15
**court** 1:1 3:6 6:4
6:10,22,24 7:3
7:6,10 9:4,5,11
12:4,7,19

138:3 145:23
146:8,10 152:5
158:6 202:21
202:22 232:11
268:20 269:4,6
**courtroom**
11:11
**co-counsel**
229:4
**create** 174:20
**created** 174:20
**credible** 132:15
135:2 188:20
195:19,21
**crew** 76:10
**crime** 14:22,25
**criminal** 11:14
**crisis** 172:11
182:22
**cross** 90:9
142:17
**crossed** 94:12
140:5,19 142:2
**crosses** 33:8
**crossing** 48:4
247:19
**crossings** 50:11
**cross-examine**
20:21
**Crotty** 2:22 6:9
**CSR** 273:6,6
**Cuba** 61:21
**Cuban** 63:1
94:11 98:23
101:19 103:1
**Cubans** 132:20
**current** 190:12
253:14
**currently** 43:14
145:15 198:9
198:24
**custody** 193:22
198:9,24
200:10 239:1

258:2,25 259:8
260:6
**customs** 8:12,15
10:22 26:21
27:4 28:3,4
118:13 141:7
141:17
**cut** 9:7 105:24
**C1** 79:23,25
107:9,13,16,19
107:22 108:7
108:10,13
109:7 110:6
112:25 116:24
122:10 127:12
140:14
**C2** 107:9,14,20
107:23 108:13
109:7 110:6
112:25 116:24
122:11 127:13
140:14

**D**
**daily** 98:6,11
147:23
**danger** 201:12
201:23 203:2
**dangerous**
201:4,8 218:10
**Daniel** 88:8
**dash** 204:18
**date** 25:5 28:16
37:1,8 55:16
84:23 100:4,16
110:24 122:17
128:17 135:12
143:19 147:14
151:3 173:1,20
210:12
**dated** 5:10,11
96:24 97:9
235:22 259:6,7
**dates** 260:9



daughter 65:6
David 43:10,19
  76:7 77:4 78:7
  130:17 132:24
  209:1 236:18
  237:12 238:21
  239:5,7 244:2
  245:7 263:8
Davidson 2:23
day 56:23 87:11
  87:12 88:2
  135:13 164:21
  181:17 182:2
  202:25 209:6
  211:9 212:18
  240:24 244:18
  246:14,18
  255:19 258:1
  271:16 273:2
days 134:14
  172:22 173:18
  205:10 210:22
  245:10,20,23
  246:6 259:1
  260:20 267:23
Day-to-day
  147:17
DC 2:15
de 104:6
dealing 45:9
  267:8
dealt 45:11
decade 25:4
December 100:5
decide 178:1
  240:23
decision 102:1
  211:15
decision-maki...
  167:12
declaration
  14:13,16
declarations
  13:14,22

declare 271:7
decrease 188:22
  189:10
dedicated
  266:17
Defendants 1:6
  2:12,21 6:21
define 34:12,13
  174:19 182:1
  264:20
defined 143:10
  174:5 183:2
defines 143:9
  161:24 162:2,5
  162:8,9,11
defining 136:19
definitely
  253:25,25
  266:24
definition
  143:14 147:3
  148:14 158:14
  161:17,20
  166:23 173:2,7
  173:8,11
  226:24 227:1
degree 25:12,14
  25:21
Del 31:22 90:19
delivery 49:9
  70:14
Dell 90:20
demonstrated
  19:5
denial 229:13,24
  233:3,7,16
denials 229:3
  231:5,19 232:4
  232:6,14,19
  233:22 248:8
Department
  2:13 6:20
  10:21
depended 26:21

102:2 118:8
depending
  209:5 212:17
  247:22
depends 217:22
  241:12,19
  246:12
depicted 67:2
depicts 59:20
  63:1 65:5 68:2
  262:7
deposition 1:9
  1:13 6:2 9:10
  10:20 11:21
  12:24 15:16
  16:6,13,15,21
  16:25 17:18,23
  18:1,5,18
  23:17 24:2
  37:17 53:9
  74:12 84:3
  86:23 92:11
  97:17,22
  106:12 114:1
  129:25 145:15
  146:24 149:17
  160:6,7,10
  163:13 164:6
  168:19,23
  171:3 183:24
  184:3 185:14
  192:20 197:17
  204:16 208:16
  228:19 234:24
  235:9 242:10
  243:10 251:1
  258:11 269:1
  272:5,20
depositions
  223:3
deputy 43:22
  54:3 107:14
  109:18 119:20
  120:9,18 131:4

140:14 171:16
  264:7
describe 20:10
  21:2,16,22
  26:18,23 30:10
  32:14 33:3
described 33:6
DESCRIPTI...
  3:9 4:2 5:2
designated
  109:15
designed 47:14
  49:6
despite 195:10
  200:9 216:21
  259:23
detail 30:11
detailed 124:21
  126:19 268:10
details 45:1
  252:8
detain 242:5
detained 98:13
  103:16 147:20
  193:12,25
  194:5 216:15
  242:5 254:23
detainees
  100:19 195:16
detention
  102:13 142:23
  143:4,18 144:1
  147:3,7,11,12
  148:1,6,7,14
  151:15 156:24
  165:3,6,10,18
  165:25 166:9
  174:3,4,12
  175:25 177:13
  177:17 183:1,5
  183:10 185:23
  190:16 191:6
  194:11,18,25
  199:15,19

205:12 206:10
  206:21 207:8
  211:3 212:2,23
  213:8,16 214:8
  214:12 215:22
  217:9 218:3
  221:9 238:25
  240:8,19,20
  241:1,2,3,9,25
  242:2,12,13
  253:16 261:1,4
  262:23 263:19
  264:5
detention/hol...
  209:5,20
  212:16
deter 95:6
develop 30:14
  30:20 77:13
  78:6 79:3
developing
  76:10 77:7
development
  30:4,7
deviate 85:4,6
  88:9 249:13
deviations 34:2
de-prioritized
  178:22 179:2
DFO 14:9,10
  41:10,15,17,19
  42:10 111:9,14
  132:5 157:17
  160:24
DFOs 38:13
  40:8
DHS 10:22 13:8
  236:20
dialogue 147:22
Diaz 198:1
  199:9
Dickman
  188:17
dictates 122:25



**Diego** 122:19
**different** 9:12
    20:1 26:24
    97:8 131:8
    167:15,20
    175:4,4,6,7,9
    221:17 255:19
    259:6
**difficulties**
    66:17
**difficulty**
    145:24
**direct** 31:8,11
    148:24 150:12
    171:14 199:7
    224:13
**directed** 94:2,3
    94:4,14 104:18
**direction** 81:20
    134:19 140:10
    153:12
**directions** 153:9
**directly** 54:3
    157:17 199:7
**director** 8:11
    29:3 43:20
    69:11 85:11
    95:14 99:4
    109:15 115:12
    117:6,6,7
    124:22,25
    125:18 131:5
    150:10 157:8,9
    157:19,20,24
    157:25 158:23
    158:24 159:6
    160:25 219:3
    238:14 253:7,8
**directors** 41:24
    43:12 44:8
    79:14,16
    104:18 106:19
    107:8 108:15
    109:3 110:6

112:9 127:13
    157:11,13,17
    166:17,20
    167:14 173:3
    173:11 205:10
**director's**
    159:18 168:4
**disagree** 133:4
    153:11
**disciplined** 15:9
**discouraged**
    42:6
**discovering**
    12:15
**discretion** 174:9
    174:18 175:3
    178:10 179:19
    180:6,12,24
    181:8 217:23
    217:25 264:15
**discriminated**
    14:9
**discuss** 40:17
    44:17 70:5,9
    79:9 80:6
    103:11 104:12
    104:16,21
    120:7 127:15
    131:23 132:2
    132:23 133:2
    136:18 157:4
    157:18 209:9
**discussed** 18:1
    19:3,4 23:23
    44:3,5,8,23
    79:12,13,14
    104:14 111:2
    122:12 134:16
    134:17 206:15
**discussing** 56:6
    56:7 118:25
    130:16 143:21
    147:2
**discussion**

111:11 133:8
    146:14
**discussions**
    79:21
**dishonor** 83:5
**displayed**
    230:13
**displaying**
    39:17
**displays** 61:17
    193:11 251:17
    251:25
**dissatisfied**
    220:6
**disseminated**
    42:14
**distracting**
    145:3
**District** 1:1,1
    6:4,5
**Division** 2:13
    6:20
**divulge** 19:3
**document** 16:5
    16:12 19:6,18
    20:20,22 21:19
    35:15,20 36:4
    36:13,15,16
    38:4 39:14,23
    51:15 53:6
    57:14 73:13,17
    73:20 75:14
    77:8,10,11
    78:9 85:21
    86:4,6,17
    91:13,16,24,25
    92:1 96:17
    97:23 98:11
    100:16 101:19
    105:6 106:6,15
    113:13 127:8
    149:3,25
    159:24 160:16
    161:5 162:16

163:2,15,23
    164:5,20 169:7
    169:19 183:19
    183:21 186:19
    187:5 191:25
    192:22 196:19
    197:5 198:17
    203:12 206:1
    207:19,25
    212:15 215:8
    215:12 222:5
    222:16 223:9
    223:21 224:2,7
    224:8,16,25
    225:3 228:6
    233:18 234:18
    234:24 235:6
    242:9 250:23
    252:6 255:19
    256:15 257:19
    257:20 258:4
    258:17 261:25
    262:2 264:25
**documentation**
    27:23 71:20
**documents** 18:4
    18:8,10,14,17
    18:20,25 19:19
    19:24 20:7,10
    20:14,14,24
    21:2,5,9,12,14
    21:16,20,22,23
    22:9,13,23
    23:5,11 28:15
    30:22 34:15
    42:2 50:20
    69:16 84:18
    90:8 96:19
    97:16 98:3
    99:15 117:17
    181:5 259:6
    261:23
**doing** 8:23 9:12
    23:14 51:20

69:7,8 95:6
    122:19 144:22
    145:5 150:18
    151:13 152:9
    155:9,23
    156:15 158:13
    164:9 179:24
    208:1 220:10
    267:10
**doubt** 90:21,25
    95:19 101:16
    108:20 109:6,8
    111:17 117:3
    122:20 123:21
    124:9 125:9,10
    127:7,7 151:16
    173:21
**Dovalina** 55:8
    55:25 57:24
**Dovalina's**
    56:21,25
**drill** 215:4
    249:21
**driver** 93:13
    95:6
**drivers** 92:21
**drop** 183:15
**drug** 176:18
    179:15,19,24
**due** 243:2
**duly** 1:15 7:8
    272:20
**duties** 30:1 31:2
**Duty** 117:5
**D.C** 2:10 149:18
    168:20 172:13
    212:10

----

**E**

**Eagle** 31:22
    54:8 55:20
    56:10 58:18,22
    59:2,6 60:3
    63:4 64:6,11



64:24 65:7,12
65:20 66:2,13
67:6,9 68:8
87:14 89:12,25
90:13
earlier 24:7
40:20 41:1
88:14 89:19
95:15 107:13
111:16,18
119:19 126:9
136:21 137:11
149:17 158:22
173:9 190:22
213:3,10 214:6
221:5 226:4
227:3 242:10
243:9,15
earnest 35:16
ease 116:4
Eastern 184:1
184:15
eat 73:4 121:13
echo 144:5,8,14
145:3,25 202:8
202:10,17
268:21
echo's 144:15
education 24:19
24:21
EEO 13:23
14:19
effect 185:14
207:9
eight 31:20 32:1
47:25 49:23
109:17,17,19
110:7 125:22
125:24,25
244:24 245:9
245:22
either 68:7
77:18 84:21
85:10 98:3

109:15 117:19
141:1 146:6
EI 229:20
248:22
elect 40:8
elected 252:9
email 229:23
employed 8:8
27:10 243:6
272:15,18
employee
272:18
employees 64:6
64:11 118:7
employment
8:20 26:3 27:6
147:10
empty 243:2,20
encountered
251:14,18
253:21 259:16
ended 109:12
ends 224:11
enforcement
12:14 31:6
147:23,24
181:18 206:15
207:4
enforcing 242:8
engage 35:5
engaged 46:16
50:18 151:24
153:15
enlisted 25:23
Enrique 94:25
ensure 238:14
enter 32:7,11,16
32:25 33:3,17
34:14
enters 33:9
entire 36:3,15
36:16 38:4
86:6 91:16
113:13 120:14

125:12 187:5
191:24 257:19
entirely 179:24
211:14
entitled 16:5
224:1
entries 143:1
177:1 205:15
entry 4:22 11:1
27:24 28:15
30:23 31:7,20
32:8,13,17,22
33:4,24 45:22
46:16 47:10,19
48:3,16,21,24
48:25 49:8,11
49:23 50:18
58:19,24 59:3
59:6 60:4 63:4
63:19 64:7,12
64:24 65:20
66:2,14 67:7
67:10 68:8,18
68:22 69:12,17
70:13 71:1,18
82:1 84:13
85:3 87:15
90:13,20 93:14
93:17 98:24
99:14,15
101:20 102:2
102:12,24
103:3,15,19
107:12 109:11
109:16,21
110:8 111:21
112:4,12,17,24
117:12 122:15
125:24,25
126:3,6,10,12
128:10 131:21
136:20 137:6
140:2,21 143:8
171:13 174:2

175:15,19
181:5,23,23
187:23 189:18
189:24 190:12
191:7,11
193:21 197:24
198:2,10,25
199:14,18
200:2,8,12
203:1 206:11
210:21 224:1
226:14 233:1
233:11 235:18
236:21,24
239:15 240:7
241:4,10
244:22 251:9
257:25 258:7
258:24 263:16
263:18 267:4
ERCF 206:14
Eric 114:10
Erik 2:23
error 87:17
escorted 61:22
254:2
especially 73:12
essential 123:4
essentially
97:22
establish 30:12
41:22,25 69:18
established
107:13 119:12
estimation
246:11
et 1:2,5
eventually
41:15 109:12
114:25 263:5,7
everybody
75:18 111:10
everybody's
206:2

Evidence 222:4
exact 82:5
143:19 147:14
exactly 19:7
70:22 75:17
examination 3:4
3:4,5 7:9
224:13 266:8
268:8 272:22
examining
98:23 101:18
example 133:16
137:5 175:14
examples 24:15
exceed 134:22
190:13 226:1
exceeded 226:14
227:5 261:3
exceeds 225:2,4
225:5
exception 88:16
91:3
excuse 37:12
40:15 45:14
48:23 114:22
118:6 125:25
142:1 159:8
172:23 240:5
executive 3:11
39:11 75:8
95:14 131:4
238:14
exemption
87:15,16 88:16
90:20
exemptions
90:12,16
exhibit 3:9,11
3:14,17,19,21
3:22 4:2,3,5,7
4:10,12,13,14
4:16,18,20,22
5:2,3,5,7,7,8
5:10,11 16:5



16:11 35:12,13
37:16 39:9
51:11,12 53:9
53:12,19 57:5
72:21,22 74:12
74:15,19,21
78:13 85:18,19
86:22 87:14
91:8,10 92:10
92:13 97:17,22
98:22 105:2,4
106:11,23
114:1,4,6,21
116:21 121:18
129:3,5,8,10
129:24 130:3
130:12 138:7,8
138:12,23
139:4 140:13
149:16,20
150:3 162:14
163:10,12
164:5,15,22
168:17 170:19
171:2,5,11
172:22 187:19
187:21 192:20
192:24 196:6,8
197:17,20,22
204:15,19,21
204:25 208:9
208:16,19,21
208:23 210:6
215:2,15,17,19
221:15 222:3,4
222:6 223:25
228:4,19,22,24
229:1 235:9,12
235:14 251:1,4
251:7 257:25
258:13 259:16
261:12
**exhibits** 3:8 4:1
5:1 98:1

140:24 141:1
169:3 258:10
258:15
**exhibit's** 130:15
**existing** 233:12
**expect** 49:21
206:5
**expected** 158:16
**expedite** 249:12
**experience** 34:1
43:16 44:18
45:8,13 99:3
124:12
**expertise** 43:16
44:18 45:7,12
**Expiration**
273:7
**Expires** 271:23
**explain** 78:1
223:17
**express** 122:24
**expressed**
254:19
**expressing** 42:2
153:8 159:8
165:24 188:19
**extended** 200:24
**extensive**
133:14
**extent** 65:18
177:18 201:10
**extreme** 248:14
**e-mail** 2:7,11,16
3:13,14,19,21
3:22 4:3,5,8,10
4:13,14,17,18
4:20 5:3,5,8
37:20 40:12,21
41:2 53:10,19
53:22,24 54:21
55:11,17 56:7
56:16 57:24
74:13,22 76:7
77:4 78:7

86:18,23,25
87:14 88:8
92:11,20 93:3
97:18,23
106:13,23,25
107:2,7 108:11
108:14,18,24
110:22 112:18
114:2,21,24
115:11 117:12
122:1,2,9
123:11,15
126:19 130:1
130:15,21,21
131:4,11,16,22
131:25 132:24
139:15,19,25
150:4,6,13
151:18 154:1
155:14 163:13
164:23 165:1
166:12 171:12
171:15,16
172:10,17,22
173:18 176:22
177:22 181:16
182:6 187:16
187:22,24
188:3,23
189:13,16,22
189:23 190:9
191:5 192:17
192:24 193:3,4
195:15 197:5
197:18,23,25
198:8,23 199:7
199:23 200:6
204:17 205:1,3
205:7,9 208:17
208:24,25
209:25 211:12
214:7 215:15
215:22,24,25
216:2,4,9

219:1,9 221:6
226:5 228:20
229:2,8 230:3
230:13,21
231:25 232:3
233:6 235:10
235:16,18,21
236:20,25
237:3,12,13,15
237:17,20,22
238:10,18
239:5 243:1,12
244:2,7,11
245:5,13 247:8
247:10 251:2,8
251:10,11
253:5 261:13
262:7,17 265:9
**e-mailed** 95:14
159:6 160:17
182:5 188:16
221:18 247:14
264:4
**e-mailing** 11:25
95:23 130:17
150:9
**e-mails** 38:9,12
43:9 44:16
54:7 95:3
115:15 116:19
154:18 163:3
187:16 234:9
236:18 238:11
**E.D** 95:22

—————
**F**

**face** 67:3
**Facebook** 15:13
24:8,16
**facilitate** 40:6
**facilitation**
176:18 266:19
**facilities** 175:16
**facility** 253:23

**fact** 120:21
176:13,24
188:21 189:24
195:7,10 214:6
243:11 258:22
259:23
**factors** 266:12
266:21
**facts** 18:21
253:10,13
272:12
**fair** 41:20 99:25
160:1 194:22
206:20 209:12
222:25 229:22
232:5
**fairly** 236:25
**false** 242:6
**familiar** 46:19
107:24 168:3
171:10 198:18
206:1 223:3
**familiarization**
28:5 141:17
**familiarize**
138:10 139:4
**family** 45:11,18
61:19,21 63:2
63:20 181:17
241:17,23
244:25 245:9
245:19,23
246:4,19 251:8
251:13,18
252:2,8 254:6
259:16 260:3
**fantastic** 267:11
**far** 156:23
220:12 251:15
253:21
**fast** 267:12
**faster** 227:21
**father** 65:6
**fault** 145:18



184:19,20
favor 258:17
fear 42:3 93:14
    122:24 132:15
    135:2 165:24
    165:24 188:20
    195:19,21
    254:19
feared 213:11
feasible 47:7,9
    47:13 84:16
    88:11 89:8
federal 33:1,10
    132:14 135:14
    137:15,23
    184:9 222:3
feedback 17:5
feel 9:23 85:10
    85:13 153:10
    154:11 167:11
    253:8
felt 133:11
    249:15
female 241:24
females 241:15
fewer 185:24
    186:10 190:24
    191:15 195:1,8
    207:10 213:12
    214:18 242:21
    243:18
fictionalized
    61:15
field 3:12 8:11
    11:2 29:3,25
    30:1 31:19
    35:3,4,7 39:11
    42:14 46:15,21
    47:11,20 48:13
    48:17,19,22
    56:23 69:11,25
    71:2,7,18
    74:23,23 75:7
    75:10 78:19

79:4 80:7 85:8
    85:9 98:12
    99:4,16 100:17
    113:6 120:6,18
    125:12,19,21
    125:22 128:9
    128:11,15,20
    133:15 136:24
    141:20 148:13
    157:10 164:25
    167:9 176:3,13
    176:20,23,25
    177:1,7,12
    181:14 186:9
    187:22 193:7
    193:12 205:2
    207:10 211:8
    212:22 213:22
    215:23 216:14
    221:12,22
    227:5 229:15
    229:24 233:23
    234:3 243:10
    245:18 260:11
FIF 248:14
fifth 179:6
    236:9,12
fight 22:4
filed 229:3,17
    231:12 232:15
final 98:9
    166:16
financially
    272:19
fine 45:5 48:8
    49:20 73:8
    83:9 94:10
    114:19 121:8
    121:11 184:13
    188:14 189:8
    195:23 222:15
    222:18 223:23
    242:25 269:7
finish 127:10

208:7
finished 9:18
    10:8 127:11
    235:6
Firm 6:18
first 7:8 13:1
    25:8 27:2,5
    34:18 36:20,20
    37:12 39:4,5
    40:4 42:24
    75:2,24 76:3
    94:20 114:25
    143:25 147:9
    171:15 187:25
    204:4 214:4
    215:25 216:3
    219:1 224:21
    229:9 235:21
    251:12 253:3
    268:10
FIS 33:1 41:23
    71:14,24 72:17
    92:22 100:21
    132:14 135:1,1
    137:16 138:18
    139:24 140:7
    140:25 142:3
    142:19 251:14
    252:2 253:19
    254:1,19
    259:17
fit 178:7 180:7
    180:13 181:1
five 169:7
    179:13 220:20
    230:24
five-minute
    220:18
FL 35:12 51:11
    72:21 85:18
    91:8 105:2
    113:8 121:17
    129:2 138:6,23
    162:13 196:6

203:8 207:15
    210:6 215:1
    220:16 222:3
    228:4 234:5
    249:19 255:4
    258:17 261:9
flexibility
    177:25
flexible 177:25
flip 64:5
FLMO 243:17
Floor 2:5
floors 267:13
Flores 117:6
    230:22
flow 34:14 40:9
    107:11 109:10
    109:11,20,24
    110:2,7 111:20
    112:3,11,23
    122:14
focus 39:3 40:3
    47:15 53:23
    56:20 74:25
    75:2 76:6
    106:8 107:1
    110:20 114:24
    115:20 130:20
    188:1 197:25
    205:7 216:2
    218:25 224:23
    229:8 235:21
    239:4 245:5
    251:11 261:13
    266:25 267:1
focusing 159:23
follow 23:18
followed 20:18
follows 7:8
foot 137:19
force 24:25
    25:17,20,23
foregoing 271:8
    272:12

forever 220:10
forget 264:8
forgot 23:3,7
forgotten 22:20
    22:20
form 13:12 19:8
    45:23 50:24
    60:11 63:6,9
    63:10 65:23
    66:3 67:11
    71:25 76:15,20
    77:16,19,19,23
    84:25 94:16
    95:20 99:7
    102:15 103:5
    103:21 108:22
    112:20 113:2
    118:17 120:3
    120:11 123:6
    125:5 126:20
    128:24,25
    137:20 140:8
    140:22 142:4,8
    142:13,20
    143:15 148:16
    151:1,19 152:2
    152:12,22
    153:18 154:12
    155:2,11,25
    156:17 158:4
    158:18 159:2
    159:19 160:21
    165:21 167:3
    167:17,24
    173:5,16
    174:14 175:12
    176:7 177:4,10
    178:4,9,23
    179:8,21 180:8
    180:20 195:3
    199:3 201:14
    201:19,24
    203:3 207:12
    207:13 210:4



211:21 212:25
213:19 214:16
217:17 218:12
229:25 230:4
231:8,14,20
232:9,21 233:8
233:19,24
243:13,22
246:21 254:10
260:23 262:21
263:11,12,22
265:2,11
**formal** 27:20
**forward** 56:1
80:13,25 81:3
114:22 240:3
**forwarded**
55:11 232:13
238:24
**forwarding**
130:21 131:3
131:11,15
230:20
**forwards** 237:6
237:11
**four** 48:25 49:1
49:3 95:15
178:16 179:12
180:15,18
238:25 239:16
■■■■ 246:19
268:11
**fourth** 236:7
**frame** 262:23
**Frank** 1:10,13
3:3 6:2 7:7,23
271:11,15
272:6
**Franklin** 2:14
**free** 9:23
**Friday** 154:17
**front** 96:4
224:25
**full** 117:18

152:10 216:22
230:13 240:12
240:15 254:12
**fully** 258:4
**fulsome** 168:5
173:13
**functionality**
59:21
**functions** 23:15
**further** 3:5
89:24 95:4
209:9 265:13
268:8,17
272:14,17
**future** 205:14
**F-R-A-N-K**
7:23
**F1s** 132:19

### G

**gangs** 201:17
**Garcia** 94:25
**Garza** 4:3 96:24
97:18
**general** 21:10
21:10,11 34:5
234:19 267:18
**generally** 10:12
21:5,17 32:18
70:23 150:24
206:6 223:20
**generate** 108:24
**generated**
164:21 196:3
200:6 210:13
260:9
**Gentlemen**
238:21,22
**geographic**
49:22
**geographically**
136:20
**getting** 17:4
59:5,8 63:21

79:11 184:21
**Gilbert** 62:16
**Gill** 107:16,22
**give** 13:19 15:18
25:4 44:5 71:3
90:17 104:22
111:12 133:16
162:24 169:6
170:11 176:19
177:24 223:20
226:24 246:15
246:25
**given** 9:13 42:17
42:18 112:8,16
182:2 209:6
211:9 212:18
240:24
**giving** 11:10
160:14
**go** 8:24 9:2
24:20 36:6,14
36:24 37:2,5
39:16 41:20
47:11 51:18,20
52:4,10,13
53:2 55:24
58:10 61:4
67:12 70:25
73:16,20,23
74:2 76:5,16
76:25 77:19
80:11,19 83:13
85:11 86:6,14
91:13 92:3,6
97:4,12 105:6
105:16,20,24
105:25,25
109:23 113:12
113:18,22
114:14,18
117:19 118:1
121:18 123:14
129:12 139:10
139:13 145:20

146:15 149:2,5
160:11 164:3
165:14 166:16
169:5 170:3,7
170:13 171:24
182:9 183:24
183:25 184:7
184:15,16
186:18 187:10
190:9 192:7,10
192:15 197:11
198:21 201:25
203:11,20
204:6,9,11
207:4,25 208:3
210:13,17
215:7 219:11
220:2 222:18
224:20 226:11
228:10,13
234:7,11,13
236:11 237:7
239:17,22
247:1 249:25
250:4,4,14,19
255:4,13 256:5
256:6 257:5
258:17 261:19
266:12
**going** 8:19,24,25
10:3,21 13:16
17:15 19:22
20:12 22:1,5
24:18 38:6
42:1 51:6,17
52:5 55:2,2,3
58:9 63:14
69:5 70:16,17
72:25 73:18,20
77:15 78:25
80:20 83:19
90:22 100:15
102:3 103:13
110:12 114:13

116:8 120:25
127:25 136:3
144:6,7 145:11
145:17,25
157:2 160:14
167:6 168:10
169:2 183:17
183:25 184:1,6
184:15,16
185:4 186:16
187:8 189:4,5
189:6 215:7
218:16 220:22
222:7,9 224:7
224:11,23
225:1,17
226:22 227:11
230:12 232:8
234:19,21,21
243:17 250:6
250:16 255:20
256:22,25
257:8,22,24
259:4 265:17
265:17 266:3
269:9
**good** 7:12,14
15:25 37:14
39:7 54:1
59:10 61:13
75:5 83:24
84:1 85:16,23
94:22 115:2
116:3 120:4
129:6,15,22
135:23 136:10
215:9 227:1
238:11 250:3
262:15
**gotten** 113:20
162:24 170:10
**governmental**
13:6 236:19
247:17



| | | | | |
|---|---|---|---|---|
| **graduated** 25:2 | 190:12 200:14 | 75:1,5,6,23 | 146:7,9,20 | 204:14,20 |
| 25:9,10 | 220:8 253:14 | 76:2,5,6,18,21 | 148:19,22,24 | 206:4 207:15 |
| **Grande** 31:24 | 253:15 254:13 | 77:2,17 78:4,5 | 149:10,15 | 208:6,10,13,20 |
| **granted** 88:23 | 254:20 | 78:15,18 80:11 | 151:7,22 152:7 | 210:6,10,17 |
| 88:25 90:3,6,7 | **guide** 186:20,20 | 80:15,18 81:2 | 152:14,24,25 | 211:24 212:6 |
| 90:13 | **guidelines** | 83:2,16,24 | 153:2,19,24,25 | 213:2,21 |
| **great** 11:6 12:23 | 115:22 117:8 | 85:3,17,23,24 | 154:15 155:5 | 214:17 215:1 |
| 73:3 96:9 | 117:11,14 | 86:21 87:21,24 | 155:13 156:1,7 | 215:11,18 |
| 170:12 227:24 | 118:8 119:1,6 | 88:4,6,7 91:2,7 | 156:11 157:5 | 216:5,8,9 |
| **greater** 199:10 | 119:10,11 | 92:9 93:2,12 | 158:8,20 159:3 | 217:19 218:15 |
| 200:8 262:18 | 127:15 | 94:19,22,25 | 159:20,23 | 220:16,19,21 |
| **Greg** 230:21 | **guides** 85:4 | 95:22 96:7,14 | 160:9,12 161:3 | 221:2,16,18 |
| **ground** 8:25 9:3 | **Guisado** 2:4 3:4 | 96:18 97:5,11 | 161:8 162:13 | 222:2,7,17,22 |
| **group** 241:14 | 3:5 6:15,15 | 97:12,15 98:2 | 162:15 163:1,5 | 222:25 223:5,8 |
| **guarantee** | 7:1,12,17 | 99:11,20 100:3 | 163:11,18,22 | 223:19,24 |
| 111:13 | 15:15,21,23,24 | 100:7 102:16 | 164:1,3,14 | 224:14,16,20 |
| **Guatemalan** | 16:1 17:4,12 | 103:10,22,25 | 165:17 166:2,8 | 224:22 225:12 |
| 251:8,13,18 | 19:9 20:6,16 | 104:2 105:1 | 167:13,19,25 | 225:22 226:17 |
| **Guerra** 219:3,4 | 20:23 21:7,13 | 106:8 107:4,7 | 168:12,18,24 | 226:20 227:11 |
| 237:5,11 | 22:2,8 35:11 | 109:2 110:17 | 169:2 170:18 | 227:15,17,24 |
| 238:21 247:14 | 35:14 36:23 | 110:20 112:22 | 170:20,24 | 227:25 228:3,7 |
| **Guerra's** 219:11 | 37:10,14,15,25 | 113:5,8,19,25 | 171:1,21,24 | 228:9,17,18,23 |
| **guess** 93:3 | 38:22,23 39:7 | 114:5,10,16,20 | 172:3,9 173:9 | 229:11,12 |
| 113:13 142:9 | 39:8,16,19,22 | 115:2,5,10,24 | 173:17 174:15 | 230:2,6,9,12 |
| 254:9,25 | 42:23 43:1,3,6 | 116:3,18 120:4 | 175:24 176:8 | 230:15,17,19 |
| **guidance** 3:11 | 43:7 45:24 | 120:5,16 121:1 | 177:6,12,21,23 | 230:20 231:11 |
| 39:10 41:2,22 | 46:13 48:8,11 | 121:14,16,21 | 178:6,13,24 | 231:16 232:1,2 |
| 41:25 44:7,13 | 48:12 50:25 | 122:8 123:9,10 | 179:1,9,23 | 232:12,22 |
| 44:18 84:20 | 51:8,10 52:8 | 123:14,15 | 180:10,23 | 233:13,21 |
| 88:10,16 89:11 | 52:15,17,21,22 | 124:5 125:8 | 182:12,17,25 | 234:1,5,23 |
| 94:15 95:11,16 | 53:7 54:1,2,24 | 126:21,24,25 | 183:20 184:8 | 235:5,13,24 |
| 95:24 103:7 | 55:2,5,6 57:2,7 | 129:2,6,9,23 | 185:9 186:13 | 236:1,4,11,17 |
| 108:23 132:12 | 57:11,13,17,21 | 130:6,7,9,11 | 186:25 187:15 | 237:2,5,7,10 |
| 132:13 134:19 | 57:22 58:2,6,9 | 131:3,18,19 | 188:1,3,12,16 | 237:11,19,22 |
| 137:12,18 | 58:12 59:13,17 | 135:17,20,23 | 189:8,9 191:18 | 238:17,20 |
| 138:19 140:9 | 59:18 60:12 | 136:10 137:22 | 191:24 192:16 | 243:15,24 |
| 140:13 142:12 | 61:4,7,10,12 | 138:5,8,18,22 | 195:5,15 196:5 | 244:1,8,11 |
| 142:16 150:19 | 61:14,24 62:14 | 138:25 139:5,8 | 196:9,13,16,18 | 247:2,7,10,13 |
| 150:21 151:3,9 | 63:8,11 65:1,4 | 139:14,18,24 | 197:2,4,16 | 249:1,5,18 |
| 153:9,13 | 65:5,25 66:5,8 | 140:12,25 | 198:13,15,22 | 250:25 251:5 |
| 154:21 156:21 | 66:18,21,24 | 142:7,11,15,22 | 198:23 199:6 | 251:21,24 |
| 156:21,22,25 | 67:14,18,22 | 143:17 144:10 | 201:16,21 | 253:2,5 254:14 |
| 158:1,10,25,25 | 69:10 72:2,20 | 144:18,24 | 202:6,12,18,23 | 254:24 255:3,6 |
| 162:7 178:21 | 73:3,7 74:10 | 145:4,10,22 | 202:24 203:6,7 | 255:8,11,13,17 |



255:22,24,25
256:4 257:7,13
257:22 258:9
258:14,16,20
259:10 261:6
261:12,15,18
261:22 262:12
262:15,16
263:1,15,24
265:4,13 266:1
268:4,6,9,17
**guy** 91:18,20
**guys** 223:2
**G-O-R-I-A** 7:25

---

**H**

**half** 23:4 36:1
39:4 61:7,7,10
69:6 77:9
**halfway** 160:11
**hand** 7:4,11
273:1
**handing** 38:18
**handle** 224:6
243:6
**happen** 183:4
183:12
**happened** 21:21
22:25 255:11
**happening**
78:19 95:9
144:16 181:13
202:11
**happens** 144:11
**Harris** 54:3,7
56:1 95:3
238:22 272:2
**Hartman** 1:18
6:10 146:2
272:9 273:6
**hash** 43:12
**hazard** 267:16
**hazards** 89:17
**head** 101:13

211:15 222:21
**heading** 75:6
80:13 81:3
**headquarters**
30:4,6 41:9,12
41:15,19 81:21
106:20 120:14
131:7,9,10,11
132:5 153:9,13
172:15,17
173:24 182:22
196:2 212:11
212:21 213:22
214:22,23
221:6 263:8
264:3,10,22
**hear** 7:15 34:18
41:7 55:15
87:19 88:1
146:3,3,4,4,5
185:18 202:19
202:21
**heard** 40:15,21
41:1,4 54:19
56:17 57:17
142:23,25
143:25 147:9
211:6 213:6
214:2,5
**hearing** 144:4,5
**held** 115:16
240:7 258:24
**hell** 222:5
255:22
**help** 93:19
118:15,18
119:6 136:19
136:20 159:1
238:16 239:21
**helped** 21:20
30:12,14,15
77:13 78:6
79:3 118:22
119:9

**helpful** 246:17
**hemisphere**
218:10
**hereto** 1:23
272:19
**Hey** 72:24 129:4
**Hidalgo** 31:23
48:4 49:11,16
70:13 92:20
93:16 94:2,8
100:17 102:12
102:24 103:2
103:15,18,19
133:17,19
193:25 194:10
197:24 198:2,9
198:25 199:14
199:18 200:2,8
200:17,20
201:13 203:1
216:24 217:5
217:16 218:2,6
235:1 251:9
252:9,12
253:24 254:1
255:12 257:24
258:24 259:7
259:17
**Hidalgo's**
101:12 259:24
**Higgerson**
14:11 38:14
43:10,19 76:7
77:5 78:8
79:15 85:12
109:1 130:18
132:25 209:1
237:12 263:8
**higher** 179:6
213:7 225:5
**highest** 24:21
226:16
**highlighted**
80:25 244:25

251:12
**history** 8:20
24:20
**hit** 114:13
**Hmm** 47:15
**hold** 31:17
61:23,23 118:9
139:2,20
144:13 148:9
163:20 168:16
171:19 172:1
184:2,16 188:5
191:22 203:24
241:8
**holding** 101:1
101:12 102:7
102:13 103:4
103:14,20
117:22 118:2
134:23 143:6,7
148:7,7 151:13
190:13,17
191:6 211:3,20
212:2,23 213:8
213:16,24
214:13 221:9
227:6 247:20
**Homeland**
10:21
**honest** 89:1
133:3 246:16
246:25
**hope** 52:17 55:7
57:18 96:18
255:22
**Hopefully** 14:3
**hour** 69:5 73:6
246:13
**hours** 18:15,16
61:21 63:2
129:8 145:15
145:17 160:6
160:10 184:3,8
184:10,19

**house** 31:5
**Howe** 95:13,23
148:20 168:14
168:25 169:3
186:14 187:19
191:18 193:4
238:14 261:7
**Howe's** 149:17
168:19 171:2
192:20
**HQ** 131:15
209:2,18,18
210:23 211:2
213:15 221:7
237:23
**huh-uh** 9:7
**hundred** 211:19
212:5,6 265:10
**Hutton** 131:4
132:9
**Hutton's** 132:24

---

**I**

**idea** 177:24
209:14
**ideal** 145:5
**Ideally** 145:4
**identified** 44:7
111:11 143:11
174:23 176:21
178:16,19
180:15 240:25
242:3,4
**identifies** 20:19
241:1 264:22
**identify** 42:1
43:14 60:15,21
78:25 175:21
178:11 225:13
241:2 264:20
266:14
**identifying**
76:12 122:17
**if/when** 81:5



illusion 177:2,7
immediate 67:4
   67:7 248:15
immediately
   59:25 99:6
Immigrant
   189:17
immigrants
   115:23 117:9
   117:11 182:2
   185:25 186:10
   190:24 191:15
   195:1,8 207:10
   211:7 213:12
   213:17 243:18
immigration
   2:14 28:2,5
   81:15 104:6
   133:15,23
   134:2 147:18
   176:14 177:3,7
   178:13,21
   181:10 189:17
   206:23 207:1,3
   229:3,17
   231:13 232:16
   242:6 243:11
   266:23
impact 4:22
   34:16 79:24
   98:16 193:17
   205:14 206:9
   206:18,20,22
   216:17 224:1,3
   224:17 226:20
   227:12,18,25
impacted
   226:23 227:8
implement 79:3
   79:22 119:10
   153:12
implementation
   120:8 164:24
   211:25 220:7

implemented
   69:24 75:10
   118:23
implementing
   44:17 69:15
   70:5 80:7
   167:7
important 9:15
   266:23
INA 69:21
INAMI 104:10
   104:19 106:21
   118:13,18,21
   119:4,9,15
   123:17,18
   124:6,15,20
   125:13 126:17
   127:5,14,25
   128:12,20
   140:16
inaudible
   131:18
incident 93:4
   95:15 98:23
   248:16,18
   249:2 255:7
include 111:1
included 28:4
includes 216:13
including 126:2
   141:19 247:14
increase 188:19
incredible
   165:24
INDEX 3:1
indicate 127:2
   188:21
indicated 83:3
   92:19 246:24
indicates 52:5
   93:12
indicating 112:2
   244:12 264:4
   264:25

individual 12:20
   14:8 33:17
   84:17 88:15
   94:5 95:17
   117:16 131:12
   131:21 132:14
   133:5 137:18
   140:4 148:11
   175:18 206:2
   264:11
individually
   98:4
individuals
   45:21 54:10
   64:8,13,23
   65:9,22 66:1
   67:8 68:9
   69:16 70:2,6
   84:21 90:7
   94:1 95:23
   96:3 98:15
   99:4,14,23
   101:5 102:13
   102:19,25
   103:1 109:19
   112:16,24
   118:9 119:18
   137:13 140:19
   148:9,13
   193:13,14
   194:1,5,15
   195:11 198:4
   199:16,20
   200:3,9,13
   201:22 202:25
   216:14,21
   217:6 240:22
   241:11,12
   244:21 247:3
   248:2 258:24
   260:6 262:8
   263:2,3,5
individual's
   264:8

indulgence
   222:11
industry 50:19
   56:11
influx 45:9,11
   143:22
information
   42:13 72:16
   108:25 113:4
   236:22 245:17
   258:22 263:13
informed 261:4
informing
   115:15
initial 7:23
initiate 118:16
   118:22 119:10
initiated 205:11
INM 104:5,13
   104:17,21
   106:24 107:10
   109:10,13,20
   109:20,23
   110:1,7,8,15
   110:23 111:19
   112:2,10,15,17
   112:23 113:1
   114:23 116:20
   116:23 118:5,7
   120:2,7 122:11
   122:13 123:3
   130:16
INM's 104:3
input 166:22
   167:5,8,9
   168:7 173:7,10
inquiries 236:20
INS 134:3,14
   141:17
inspected 33:20
   33:23 93:20
inspection 30:16
   33:1,10,12,19
   92:23 93:21

132:14 135:15
   137:15,24
   180:16 253:23
inspections
   141:7
inspector 27:4
   28:3,4 141:17
install 81:4,18
installed 81:23
   82:9
instance 1:14
   60:6 71:16,21
   92:16 111:19
   253:20
instances 71:11
   71:16,21
   118:20 132:19
   157:22 229:19
   229:23
instant 54:8,15
   55:20 56:11
   72:9
institute 219:25
instituted 128:5
   183:13
institution
   211:18
Instituto 104:6
instruct 19:22
   20:1,12 22:1,5
   84:20 160:14
instructed 28:14
   153:10 226:6
instructing 20:3
instructs 10:11
intended 60:17
intent 23:13
   42:2 59:12
   82:18 94:13
intention 218:16
interactions
   59:21 60:4
interdiction
   176:18 179:15



179:20,24
**interest** 81:12
249:10
**interested**
257:15 272:19
**interests** 247:16
**interject** 48:7
73:10 130:5
221:14
**internal** 162:1,4
**international**
32:11,19 33:8
46:18 50:14,20
84:15 89:20,24
90:9 94:12
137:2,9 140:6
140:20 142:2
142:18 247:18
251:15 253:21
**Internet** 9:14
87:17,19
114:11
**interpretation**
60:16,20
151:12
**interrupt** 36:25
37:24 52:7
78:2 189:6
197:6 224:12
234:22
**intervention**
266:17
**introduced**
168:19
**investigation**
14:19
**involve** 249:7
**involved** 13:2
92:17 167:11
171:9 246:15
**involvement**
79:16
**involving**
140:16

**in-house** 2:20,21
**Isidro** 229:19
**isolated** 248:16
248:17 249:2
**issue** 156:19
172:19 173:25
182:8,24
220:14 231:23
232:25
**issued** 3:11
39:10
**issues** 111:2
147:15,16
**I.D** 192:2
**I.E** 239:12

_____
**J**
**jackhammer**
17:10
**James** 131:4
132:23
**January** 5:3
10:16 149:18
159:7 168:20
228:20
**Javi** 154:17
**Javier** 150:9
151:17 153:5
154:18 155:7
155:22 156:14
157:1,5 158:9
160:17,23
**Jesus** 124:6
**Joanne** 2:19
**job** 8:10 25:8
26:21 29:2
98:20 180:2
220:9,12
267:11
**jobs** 26:11,25
**Jr** 1:10,14 3:3
7:7,25 271:11
271:16 272:6
**Juan** 115:11

116:18 117:1
123:16 126:19
127:24 230:22
**July** 4:16,16,18
4:20,23 172:23
204:16,16
205:3,8 208:17
209:24 210:2
210:16 215:15
215:23 216:10
217:16 218:22
219:3 224:4,11
224:19 225:25
273:2
**jump** 69:3
**June** 1:11,16
3:19 4:13,18
4:23 5:5,8,10
5:11 6:6 74:13
75:9,11 78:20
78:22 79:4
99:8 100:13
150:2,16,22
154:17 163:13
171:17,23
172:23 188:3
188:16 191:5
192:24 193:8
194:11 208:17
224:4,18
225:24,24
235:9,22 251:2
255:12 258:11
259:1,6,7,17
263:7,25 264:3
272:7
**Justice** 2:13
6:20
**Jésus** 123:17

_____
**K**
**K** 1:5
**keep** 36:3 38:6
55:2,2,3 58:10

63:13,21 160:3
171:21 201:12
218:20 225:17
230:12 241:17
250:6,16 256:4
256:22,24
**keeps** 176:13,23
243:10
**Kelly** 192:1
**kept** 220:10
**Kerlikowske**
107:17,22
**Kevin** 1:5
107:19 108:1,4
178:21
**kidding** 121:17
121:17
**kids** 246:20
**kind** 21:5,10,11
42:18 51:21
57:15 174:22
222:16,20
251:24
**knew** 22:21
**know** 9:2 18:16
20:14 22:4,6
24:1 34:2,9
35:14 36:10,12
39:1 42:13,20
45:7 47:25
49:12 56:14
57:19 62:16
64:16,19 69:1
72:25 78:15
81:6,9 82:3
84:6 94:3,5,7
98:5 100:3
103:10 104:5
107:25 108:10
109:14 110:16
110:24 115:12
118:17 120:1,5
120:20 124:25
125:12 128:19

136:19 143:9
144:3,12,19
145:1,8,16,19
154:13 161:11
161:14 163:2
167:19,22
168:10 169:18
169:20 175:7
175:19,19,20
177:20 186:3,6
186:9 195:22
196:1,1,9
200:16,19
201:10 208:6
214:1 215:4
217:20,24
222:20 223:11
223:11,19
227:17 229:4
233:18 239:15
248:11 252:15
252:18,20
257:5,14,18
261:23 264:11
**knowledge** 49:2
49:24 58:13,22
60:23 68:13
72:12 104:15
112:7,25 125:4
125:7 135:9
161:19,22
177:18,19
201:22
**known** 26:22
**knows** 133:17
169:8 256:15
**Koseor** 171:16
172:10,17
173:23 174:11
177:23 181:16
182:5 188:17
192:25 193:5
209:2,17
210:23 237:23



238:10

**L**

**La** 229:19
**lack** 99:6,17,24
  101:22 102:7
**Lado** 1:2 6:3
  7:20
**lag** 9:14 28:25
  58:7 268:20
**laid** 120:8
**land** 40:9
**lane** 251:14
**Laredo** 3:15 4:3
  4:6,22 11:2
  30:5 31:19,23
  35:3,4,7 42:14
  46:15,21 47:11
  47:20 48:3,13
  48:16,19,22,24
  48:25 49:7
  53:21 68:18,19
  68:22 69:11,25
  70:13 71:2,7
  71:18 74:22
  75:7,10 78:19
  79:4 82:19,23
  97:18,24 98:6
  99:16 100:17
  102:12 113:6
  115:13,14
  125:12,21
  128:9,11,15,20
  133:15 136:24
  137:10,11
  148:13 150:10
  164:24 176:3
  181:14 186:9
  187:22 193:7
  193:12 194:5
  194:10 201:3,4
  205:2 207:10
  211:7 212:22
  213:22 215:23

218:16 221:12
221:21 222:4
224:1,18 226:1
226:14 227:4
229:20,24
230:23,25
233:10,23
234:3 235:1
245:18 248:22
260:11
**large** 107:7
**late** 160:6
  219:19
**law** 2:8 6:18
  12:14 27:8
  28:2,5
**laws** 27:18
**lawsuit** 15:7
  23:18,20,23
  229:5
**lawyer** 7:18
**lawyers** 17:22
  18:1 23:23
**lawyer's** 223:25
**lay** 96:8
**lead** 19:24 20:4
  48:20
**leading** 48:16
**leads** 22:6
**leaked** 56:23
**lean** 43:15
**leave** 42:7 48:8
**leaving** 174:8,18
  175:2
**left** 26:1,4 183:5
**left-hand** 252:6
**legacy** 134:1,14
**Legal** 6:9,10
**legally** 133:11
**length** 246:3,5
  247:17 248:19
**letter** 151:3
**letting** 145:7
**let's** 24:20 27:1

65:8 68:17
83:10,12
  144:13 154:15
  184:5,22,25
  191:25 240:2,3
**level** 24:21
**Levine** 229:14
**LF** 195:6
**LFO** 11:3 31:15
  33:4 43:20
  45:22 74:22,23
  81:3,19,24
  95:2 110:3
  112:17 150:19
  150:21 154:21
  177:16 185:24
  186:2 195:1,6
  201:2 205:13
  205:15 206:11
  209:19 212:1
  212:11 213:7
  213:12 226:6
  229:15 257:11
  263:16,19
  264:4 265:5
**liaison** 236:19
  247:17
**liar** 125:3
**lie** 109:3
**limit** 46:17,19
**limited** 143:21
  235:1
**limits** 175:16
**line** 17:6 33:9
  42:7 46:17,20
  47:17 65:8
  76:8 84:22
  94:12 96:4
  98:16 101:7
  103:1,17
  106:24 114:22
  114:23 134:21
  150:4,14
  151:13 165:1

166:11 171:12
187:22 193:15
216:17 218:2
218:21 229:12
232:14 239:19
246:8 254:2
259:20 270:2
**link** 229:20
**LinkedIn** 15:13
**list** 107:8 195:20
**listed** 180:18
  228:1
**listen** 161:1
**lists** 98:12
  229:18
**litany** 77:20
**Litigation** 2:14
**little** 8:20 23:16
  30:11 31:1
  32:5 35:2 36:6
  39:20 43:4
  45:20 47:16,17
  54:25 58:8
  68:17 80:16
  84:10 94:22,23
  97:1 104:3
  105:24 107:1,5
  110:18 115:3
  136:17 160:5
  170:1 184:16
  187:11 210:13
  216:6 225:20
  227:20 230:10
  235:24 237:8
  251:22 255:9
**LOC** 219:4
**locally** 128:17
**location** 82:5
  88:11 89:6,17
**locations** 9:12
**lodge** 232:9
  234:19
**long** 18:13 25:22
  26:6 27:10

29:14,20 56:10
104:24 121:2
135:20 145:19
183:25 184:14
206:3 233:15
246:6,10,10,14
246:14,19
247:4 248:3
249:15 267:7
267:14,22
268:1 269:1
**longer** 121:9
  202:25
**Longoria** 1:10
  1:14 3:3 6:2
  7:3,7,13,24 8:1
  8:3 14:21
  15:23 16:1
  17:6 20:6,25
  21:13 22:8
  24:17 28:24
  32:4 33:16
  34:8,9 35:19
  35:21 36:7,8
  36:14 37:15,23
  38:3,23 39:8
  39:22 41:21
  43:7,15 44:9
  45:25 46:14
  50:12 51:9,15
  51:24 52:15,22
  53:7 54:2 55:6
  57:13,22 58:6
  58:12 59:18
  60:13 61:14
  62:2,6 63:12
  66:8,25 67:2
  67:22 68:2
  69:6 70:21
  73:8,13,15
  74:11,16 76:9
  77:2,12 78:5
  78:18 79:1,18
  80:10,21 83:2



83:7,12,25
85:1,20,24
86:5 87:1 88:1
88:4 90:24
91:16,19 92:9
93:1,7 96:2,21
97:15 99:19
100:7 101:11
101:18 104:2
105:7,9 106:10
109:4 111:15
113:12,15
114:6 115:6,10
116:9 121:2
122:8 123:20
123:23 127:1
129:12,23
130:11,24
135:25 136:11
138:11,11,18
139:3,8,24
140:3,12
142:12,22
144:24 146:20
148:23 149:6,8
149:15 156:11
158:8,21
160:12 161:8
162:16,17
163:1,7,11
164:14 166:10
169:5,13 171:6
172:6,9 176:8
179:14 182:19
183:16 184:23
185:10,20,21
186:20,22
187:16 188:6
188:12 189:9
192:16 196:4
196:18,22
197:5,8 198:16
199:6 202:18
202:24 203:12

203:14 204:1
204:14 205:22
205:23 207:22
208:14 209:7
209:10 214:25
215:6,11
218:24 219:2
220:15 221:2
222:8 223:4,5
223:11,24
225:22 227:2
228:11,17
232:23 233:14
234:18 235:5
236:14 238:8
239:22 242:9
243:25 244:4
247:13 248:5
248:18 249:17
249:22,24
250:11 256:7
258:3,9 259:3
261:22 265:16
268:5,6 271:11
271:16 272:6
**Longoria's**
145:14 184:2
184:18
**look** 36:3,15
38:8 73:16
78:12,14,24
91:24 138:12
139:3 142:12
182:24 198:17
203:13 222:9
222:16 224:7
249:22 253:22
261:17
**looked** 127:8
140:13,14
209:25 253:13
**looking** 22:15
22:18 36:17,21
70:22 123:12

151:2 163:21
166:25 221:15
222:13 259:5,5
259:5
**looks** 91:20
155:3
**losing** 128:7
**lot** 121:4 183:18
261:23
**loud** 178:24
202:9
**Louisa** 2:20
**love** 220:9
**Luisa** 265:19
**lump** 241:21
**lunch** 73:4
121:1,13
**lying** 11:14
**L-O-N** 7:24
**L.A** 236:21
237:16

_____

**M**
**machine** 1:20
**made-up** 217:22
217:24
**Magna** 6:9,10
**maintain** 40:6
89:16
**major** 30:17
50:10
**making** 59:9
**male** 241:23
**males** 241:15
**man** 73:4
**mana** 60:18
**management**
3:15 4:23
18:22 19:7
20:9 21:15,21
22:11,13,16,21
23:3,10,12,13
23:15 34:22,25
46:23 47:2,3,5

47:17,20 48:1
49:2,5,14 50:3
50:6,9,13
53:20 54:9,10
56:6 58:14,18
58:23 59:4,22
60:5 61:20
63:5 64:9,14
64:24 65:6,10
65:15,21 66:2
66:12 67:6,8
68:7,10,22
70:3,8,10,15
71:1,7,8,13,17
71:20,22 72:10
72:15,16 74:23
75:7,11,16,21
78:20 79:15
82:15 84:10,13
84:14 89:6,20
90:4 98:11
101:22 104:13
104:16,21
126:6,11
136:22 137:8
150:5,15,16,18
151:13 152:10
152:19 154:19
155:9,24
156:16 158:10
159:9 160:18
164:24 193:8
193:21 205:2
205:11 206:12
208:24 209:8
210:1,23 224:4
224:18 225:24
244:13,17
245:10,23
246:7,7 248:13
**manager** 29:13
29:15,18,19,20
29:21,24 94:6
141:21,22

229:14
**managers** 54:11
59:24 60:18
68:4,9,23
**mandates**
190:12
**manning** 67:6
68:6,21
**map** 251:25
252:1 253:22
**mark** 170:23
**marked** 16:4,11
16:11 35:13
37:16 51:12
53:9 57:5
72:22 74:12
85:19 86:22
91:10 92:10
97:16,21 98:1
105:4 106:11
114:1,4 129:24
130:3 149:16
163:10,12,22
163:25 164:5
170:19,22
171:2 187:19
192:20 196:8
197:17 204:15
204:19 208:15
208:16,19
215:17 222:6
228:19,22
235:8,12 251:1
251:4 252:5
258:10,15
**marshaled**
12:20
**martial** 12:8,19
**materials** 28:7
30:11,21
**math** 27:13
101:14
**matter** 153:12
160:13 236:22



254:18
matters 6:3
maximum 103:3
  103:20 219:25
  239:8,14,24
  240:6,24
  254:15,17
  261:3 263:19
McALEENAN
  1:5 6:3 78:22
  100:13 107:19
  108:1,5 180:19
  264:19,22
  268:11
McAleenan's
  151:3 176:17
  178:17,21
  179:11 267:2
MCAT 5:10,11
  171:17,18
  172:10 209:2
  237:23 238:24
  257:9 259:12
mean 8:17 25:5
  36:24 46:22
  47:8 60:16
  77:24 98:4
  100:19 101:7
  114:18 117:21
  117:22 143:5
  153:4 175:4
  176:15 182:6
  184:6 185:23
  189:11 190:24
  191:14 195:1
  209:19 213:11
  226:21 231:22
  231:23 233:18
  241:11 257:18
means 11:24
  68:6 72:5
  75:16,21 90:3
  166:18 177:25
  209:11

meant 31:5
  148:2 166:21
  167:1,16,23
  168:6,21
  173:14 175:3
  196:14
media 56:23
  238:3
meet 17:17
  41:24 104:19
  104:20 106:20
  106:24 107:10
  109:9,20
  122:11
meeting 17:21
  106:19 110:23
  110:24 111:1
  111:10 114:23
  116:19 142:10
meetings 110:14
  111:5 116:23
  120:2,7 127:14
  127:19 130:16
member 15:12
  24:8,14 25:20
  95:1
memo 40:24
  99:9 100:13
  176:17,21
  178:17 179:11
  189:12 260:8
  264:18,21
  267:2
memorandum
  36:21 37:2,6,9
  38:6 44:6,7,13
  162:2,5 178:19
  268:12
memory 20:11
  21:20 23:11
  231:24 260:7
mention 142:16
  189:22
mentioned 87:9

106:22 237:17
mentions
  229:18
Mercado 88:8
  89:23
Mercado's
  88:24 89:10
Mesa 229:19
message 36:1
  56:2,5 95:4
  106:18 132:4,9
  174:18 189:2
  210:13 226:11
  239:18
messages 63:16
  157:2
messaging 54:8
  54:15 55:16,20
  56:7,11,18
  59:19 60:10,24
  61:16 63:1
  64:7,12 65:19
  66:11 68:19
  72:9 238:13
met 111:1
meter 40:8
  198:3
metered 198:4
  200:9 201:23
  262:8
metering 3:11
  34:10,19,25
  35:3,5,7 39:10
  40:18,21,23
  41:1,2,16,25
  42:9 44:17
  46:16 50:19
  56:6 70:6
  82:14 84:10,13
  84:19 85:4
  87:15 88:10,10
  88:16 89:11
  94:15 95:11,16
  104:13,16,21

109:13 115:16
  117:14 119:12
  137:18 138:19
  151:24 153:15
  158:1,25
  190:11 194:14
  195:11 200:3
  248:13 252:10
  253:15 254:2
  254:20 260:10
  260:13,15,20
  263:2 267:9
metric 143:18
  175:25 214:3,9
Mexican 65:12
  81:15 82:6
  104:6 115:17
  115:22 117:7
  118:13 142:1
  200:16,19
  201:1,7 218:5
Mexico 31:9,12
  32:10,19 42:5
  42:8 46:18
  47:4,6 50:14
  51:6 75:19
  82:18 94:14
  95:18 99:1
  101:9 102:20
  117:20 119:13
  119:16 122:18
  122:24 123:5
  123:19 124:8
  124:13,17,21
  125:15 126:18
  128:2,14,22
  131:13,22
  132:16 133:6
  133:12 134:7
  134:21 135:3,7
  135:11 137:2
  137:13,19
  140:5,19 142:2
  142:17 143:2

201:23 202:4
  203:2,4 249:7
  259:20
Michelle 1:17
  6:10 272:9
  273:6
mid 41:23 48:1
  49:17 51:6
  75:11,16,20
middle 7:23
  95:8 136:23
midnight 75:11
midpoint 47:21
  49:3 61:20
  93:22
Migración
  104:7
migrant 59:25
  193:13 195:17
migrants 115:17
  118:8 181:4
  201:12,22
migration
  172:10 182:21
Mike 76:9
miles 47:12
military 12:7,19
  25:15
mind 20:15 58:3
  58:11 63:23
  97:13 214:21
  261:7
mindset 22:7
minimal 79:23
minimize 34:16
minute 83:13
  105:15 162:24
minutes 83:8
  86:5 120:24
  121:3,7 135:22
  160:10 168:10
  169:7 170:11
  184:23 220:20
  266:2



**misremember...**
 19:16
**mission** 174:25
**mistake** 164:8
**misunderstan...**
 160:18
**moment** 22:24
 255:17
**Monday** 209:9
 238:14
**month** 188:20
 189:19
**months** 95:15
 247:4 248:23
**morning** 7:12
 7:14 8:22
 136:15 238:24
**move** 42:23
 67:18 89:5,24
 91:25 92:1
 129:17 136:17
 161:3 165:6,10
 165:18 169:23
 181:9 191:18
 206:10,21
 207:15 240:2
 244:1
**moved** 165:2
 191:11 263:24
**moving** 80:13
 80:25 81:3
**Mucia** 55:8
**multipage** 16:5
 16:12 223:25
**multiple** 48:2
**muster** 162:10
**mute** 17:6 136:9
 146:7
**myriad** 242:6

———————
N
———————
**Nacional** 104:6
**name** 7:17,22
 8:6 16:16,18

55:8 81:11
107:24 108:2
109:14 137:6
149:23 164:18
204:24 228:25
230:8 264:8
**names** 34:24
**narcotics** 12:13
147:20 242:6
**NASAROV**
138:4 144:23
145:13 230:4
231:20 232:8
233:24 236:13
236:16 243:13
249:3 254:10
255:16,23
257:17 258:3
262:21 263:11
263:22
**nationals** 94:11
98:24
**natural** 129:10
135:18
**Naturalization**
134:2
**Nazarov** 2:13
3:4 6:19,19
7:2 10:7 17:1
17:6,13,19
19:8,22 20:12
21:4,8,25 22:3
35:17,24 36:2
36:12 37:24
38:1,7,15,18
38:21 45:23
46:2,8,11
50:24 51:1,13
51:17,24 52:3
52:7,19 57:15
57:19 60:11
61:23,25 62:5
62:9,13 63:6,9
65:23 66:3,16

66:20,23 67:11
69:3,9 71:25
72:24 73:5,9
76:15,20,23
77:15,22 78:12
78:17 80:20
81:1 83:7,10
83:18 84:25
86:2,9,12
87:18,23 88:3
88:5 90:22
91:12,15,23
93:7,11 94:16
95:20 96:15,20
96:25 97:4
99:7,18,25
100:6 102:15
103:5,21 105:5
105:11,14
108:22 112:20
113:2,11,17,20
114:8,13,17
115:6,9 116:1
116:7,12,15,17
120:3,11,23
121:2,6,9,12
121:15,23
122:4,7 123:6
123:22 124:2
125:5 126:20
126:22 128:24
129:4,7,11,16
129:19 130:24
131:2 135:21
135:24 136:2,8
137:20 138:1,7
138:9,15 139:2
139:7,10,20
140:8,22 142:4
142:8,13,20
143:15 144:6
144:13,17,20
146:2,13
148:16 149:1,5

149:11 151:1
151:19 152:2,6
152:12,22
153:18,22
154:12 155:2
155:11,25
156:3,8,17
158:4,18 159:2
159:19,21
160:1,21
162:17,20,23
163:3,6,9,20
164:13 165:13
165:21 166:6
167:3,17,24
168:9,16,21
169:1,4,13,16
169:22 170:10
171:19,23
172:1,4,8
173:5,16
174:14 175:12
176:7 177:4,10
178:4,9,23
179:8,21 180:8
180:20 182:18
183:17,23
184:12,25
186:16 187:1,4
188:5,10,15
189:4 191:22
192:3,7 195:3
195:13 196:21
196:24 197:1,7
198:11,14,16
198:21 199:3
201:14,19,24
202:8,14,16
203:3,10,19,24
204:7 205:22
207:12,18,22
208:8,11 210:4
210:8 211:21
212:4,25

213:19 214:16
215:3,6 217:17
218:12 220:17
220:20 221:14
222:15,19,23
223:1,7,17,23
224:9 228:5,8
228:10 229:25
231:8,14
232:21 233:8
233:19 234:7
234:17,25
236:7,9 243:22
244:4 246:21
248:25 249:21
250:10,13
255:20 256:5,9
256:12,14
257:3 258:8,12
259:2 260:23
261:11,16
265:2,11,16
266:9 268:2,5
268:24
**Nazarov's**
268:10
**near** 46:17
205:14
**necessarily**
167:10
**necessary** 34:15
40:5 148:25
266:25
**need** 9:1,6 38:6
38:25 69:6
80:22 93:8
110:25 121:3,4
121:13,13
122:4 130:25
131:23 136:19
154:6,9,11
165:2 166:4,20
167:8,8 172:5
175:7 182:7,18



185:17 188:10
188:13 195:20
205:13,24
210:8 220:11
244:5 245:7
246:2 265:18
266:21
**needed** 132:2
154:9 172:18
220:14 238:16
**needs** 173:24
**negative** 234:1
247:15 248:7
249:10
**Negras** 65:12
**neighbors** 17:9
**neither** 57:21
194:10 218:19
272:14
**networking**
15:13 24:8,14
**never** 27:17
54:19 56:17
68:14 72:8
123:2 141:13
214:2 217:8
248:6 261:7
264:24
**new** 2:6,6
115:22 117:8
117:10 118:8
118:14,25,25
119:5,10
127:15 168:17
228:5
**news** 23:19
**NGOs** 247:16
249:10
**NII** 30:17
**nine** 263:3
**Nods** 16:3 138:3
152:5 158:6
185:16 228:7
232:11 256:11

**Nogales** 229:18
**noise** 57:16
**nonresponsive**
161:4
**non-citizen**
45:17 50:19
71:19 72:14
126:10 127:15
**non-citizens**
27:22 28:14
30:22 69:16
71:8 93:13
99:14 110:2,8
111:20 112:3
112:11 122:15
126:2 180:17
181:5 191:8
193:22 198:9
198:24 199:4
244:21
**non-intrusive**
30:16
**normal** 32:9,9
32:17
**NOTARY**
271:20
**note** 109:23
138:1 145:19
145:20 152:3
158:5 219:3
**noted** 53:23
**notice** 16:6,13
16:14,22
**Notice.pdf**
15:17
**noting** 198:3
**November** 4:7,8
4:10 7:24
106:12,13,18
114:2 115:16
117:13 118:23
119:1 120:10
122:2,10
129:25 130:15

131:20 137:12
138:19
**Nuevo** 82:23
201:4 218:15
248:21
**number** 4:19
48:3 49:5,8
52:20 71:3
97:19,24 98:13
98:15 100:18
100:20 101:6
126:1 130:7
143:6 147:17
148:6 149:18
163:14 174:5
179:13 183:2
183:14 192:2
192:21 193:12
193:14 195:16
197:19 205:9
208:18 211:7
216:14,16
217:22,24
239:6 242:13
242:16 246:3
247:19 251:25
258:1 261:11
266:15
**numbered** 1:16
**numbering**
164:10
**numbers** 5:9
53:11 74:14
86:24 92:12
101:8 106:14
114:3 130:1
171:3 187:19
188:18,21
189:17 204:17
215:16 217:11
228:21 235:10
251:3
**number's** 239:1
**N.W** 2:9

**O**

**oath** 11:7,9,10
11:14 13:11
84:3,6 136:14
136:14 185:13
**object** 10:7
77:15 78:2
90:22 189:4
231:8
**objecting** 10:8
46:5
**objection** 10:10
19:8 45:23
46:2 50:24
60:11 63:6,9
65:23 66:3
67:11 71:25
76:15,19,20
77:18,23,25
84:25 94:16
95:20 99:7,18
102:15 103:5
103:21 108:22
112:20 113:2
120:3,4,11
123:6 125:5
126:20 128:25
137:20 138:2
140:8,22 142:4
142:8,13
148:16 151:1
151:19 152:2,3
152:12,22
153:18 154:12
155:2,11,25
156:17 158:4,5
158:18 159:2
159:19 160:21
165:13,21
166:6 167:3,17
167:24 173:5
173:16 174:14
175:12 176:7
177:4,10 178:4

178:9,23 179:8
179:21 180:8
180:20 189:5,7
195:3,13
198:11,14
199:3 201:14
201:19,24
203:3 207:12
207:13 210:4
211:21 212:4
212:25 213:19
214:16 217:17
218:12 224:10
224:10,12
229:25 230:4
231:14,20
232:9,21 233:8
233:19,24
234:20,20
243:13,22
246:21 248:25
249:3 254:10
257:14 260:23
262:21 263:11
263:12,22
265:2,11
**objections** 10:6
159:25 160:15
**objective** 174:4
242:13,16
**objects** 46:4
**obviously**
196:19
**occasion** 70:14
157:18
**offenses** 14:22
14:24
**office** 2:14 3:12
3:16 11:2 30:6
31:19 35:3,4,8
39:11 42:15
46:15,21 47:11
47:20 48:13,17
48:19,22 53:21



69:25 71:2,8
71:18 74:23
75:7,10 78:19
79:4 85:8,9
98:13 99:4,16
100:17 113:6
125:12,21
128:9,15,20
131:8 133:16
136:24 148:13
164:25 167:9
176:3 181:14
186:9 187:23
193:8,12 205:2
207:10 211:8
212:22 213:23
215:23 216:14
221:13,22
227:5 229:15
229:24 233:23
234:3 245:19
260:11 273:2
**officer** 12:21
30:4 33:11,20
50:21 59:20
71:12,22
126:11,17
141:20 248:1
**officers** 23:14
46:16,24 49:4
49:16 62:25
63:3 65:16,18
65:20 66:10,13
67:5,9 68:6,21
70:16 71:23
72:15 75:19
84:14,20 88:15
89:11,16 90:10
100:9 102:24
103:18 136:21
137:7,7 205:9
233:1 239:12
243:2 252:23
267:20

**officer's** 89:6
**offices** 80:7
120:6,18
125:22
**office's** 128:11
**official** 264:9,16
**officials** 115:17
115:21,22
117:8 118:13
119:5
**OFO** 95:14,23
95:23
**oh** 57:19 81:13
83:9 87:23
114:14 129:9
164:7 182:16
197:5 237:7
256:3
**OIG** 13:8
**okay** 6:22 7:15
8:5,19 10:6,20
11:6 12:23
13:1,10 14:21
16:20 19:10,12
21:8 23:16
25:22 27:16,21
28:6,10,13
31:17 36:19
38:7,15,18,20
38:21 39:2,8
41:14 42:22
43:1 44:9,12
45:5,20 46:1,7
48:10,15 49:10
49:18 50:5,8
51:17 52:3,6
52:13,23,24
53:1,2,5,18
54:23 55:9
57:19 61:14
62:5,9,13,20
62:24 67:2,23
69:2,3,7,8,9
70:17 73:2,18

73:19,20,23
74:2,7,9,9
77:22 80:20
81:1,2,18 83:6
83:10 86:10,13
86:14,19,19,21
87:13,21,23
88:3 91:12,18
91:23 92:3,6
93:11 94:1
96:13,20,22,25
97:2,4,8,9,11
100:6 101:6
103:13 104:9
104:24 105:11
105:14,16,18
105:19,20,25
106:3,3,3,4
110:5,13
113:17,22,24
113:24,24
114:9,14,16
115:9,14 116:2
116:2,15,17,18
117:5 119:4,19
120:22 121:14
121:15,21
122:4,5,6,7
123:25 124:2,3
129:11,15,16
129:19,21,21
129:21 130:20
131:2,10 134:5
136:2,17
137:11 138:15
139:7,13,17,20
139:23 144:17
144:24 146:13
149:10,11,12
149:14 154:15
155:6 160:1
162:20,25
163:9 164:7,13
166:10 168:21

169:1,4,13,16
169:20,25
170:5,7,9,9,13
170:16,16,16
170:25 171:19
172:1,5,6,8
179:5 182:11
182:17 184:4
184:12,20,22
184:25 185:2
186:16,17,21
186:25 187:1,4
187:6,10,10,13
187:14 188:2,5
188:15 189:22
191:21 192:7
192:14,14,14
192:15 193:20
194:17 195:23
195:25 196:16
196:22,24,25
197:3,10,11,15
198:19,21
199:8 203:19
204:13 207:18
207:22 208:5,5
208:5,11,12
210:8,16,19,22
215:10,10,10
215:10 216:13
221:16 222:14
222:17,22
223:13,16
224:16 225:7
225:10,14,16
228:5,8,13,15
228:15,15
230:19 231:11
232:1 233:5
234:7,11,15,15
234:15,16,16
234:16,16,16
234:16,16
236:13,16

237:2 238:5
239:16 249:21
250:3,8,13,19
250:24 251:25
252:22 253:1
255:20 256:5,6
256:9,10,12,20
256:20,22,24
256:24 257:2
257:17,21
258:3,5,8
259:2,11
261:14,16,19
261:21 265:15
265:20,24
267:3 268:2
**old** 168:16,18
**onboard** 119:5
**once** 22:21 96:3
131:20 133:4
137:19 140:5
140:19 142:2
142:17 156:13
224:6 240:25
241:2 248:13
**ones** 196:2
**one-page** 86:17
96:19
**ongoing** 26:20
219:7
**Ooh** 236:1
**operated** 220:7
**operating**
166:24 201:17
260:16 267:4
**operation** 79:24
181:11 217:13
252:24
**operational**
78:23 100:14
102:1,5 103:8
103:11 151:5
156:23 161:9
161:20,24



162:2,5,8,11
165:3,7,11,12
165:19,20,25
166:3,18,21
167:1,15,22
168:6 172:18
173:2,13,25
174:3,8,13,19
175:5,10,22
176:1,12
177:14 178:3,8
179:18 180:4,5
180:11 181:1,9
182:3,7,24
183:6,13
185:23 186:11
190:19,23
191:12 194:18
194:25 195:7
205:12 206:10
206:22 207:9
211:19,25
213:3,6,11,17
213:23 214:9
214:15 216:11
217:9,13,15,21
220:8 227:4
242:12,21
243:17,21
248:1 260:8,12
261:5 262:6
264:14,17,20
264:21 265:6
266:12
**operationally**
47:7,7,9,12
50:15 84:16
88:11 89:7
**operations** 3:12
4:4,6,22 8:11
29:3 31:12
34:17 39:12
69:11 74:23
78:23 89:12

**overall** 206:17
**overlaid** 67:3
68:3
**oversaw** 125:22
**overseeing** 30:8
31:6 69:24
157:7
**overtime** 206:17
**Owen** 3:11
36:21 39:10
**Owens** 138:19
**owners** 81:4,6

——————
**P**
**page** 3:2,5,6,9
4:2 5:2 15:22
36:20 37:12
39:5,5,17
42:24 43:8
53:24 75:2,24
76:3 80:12,19
93:3,4,5 94:20
96:20 105:17
106:9 107:3
114:25 115:25
139:1 171:15
187:25 197:25
203:25 204:1
205:8 215:25
216:3 219:1
224:21,25
229:8,9 230:24
235:19,22
236:2,5 238:15
251:10,12
253:3,3 256:1
257:9,16,18,21
258:18 270:2
**pages** 149:3
272:12
**paper** 122:16
**paragraph** 76:8
110:21 115:20
176:9

97:19,24 98:6
98:16 125:19
147:17 157:10
175:7 178:1,7
178:14 180:7
180:12,17,25
181:6 193:18
206:14,16,16
206:17,24
207:1,2,4
216:17 224:2,3
224:17 226:21
226:24 227:9
227:12,18
228:1
**opin** 157:6
**opinion** 151:21
151:23 152:17
153:5,8,14
155:8,22
156:14 157:3
175:25 176:2
201:5 213:14
218:23 247:5
**opportunity**
86:3 261:17
**opposed** 174:12
**option** 51:3,5
134:22
**ORAL** 1:9,13
272:5
**order** 9:5 269:4
**orderly** 40:6
**organize** 43:11
**organized** 43:25
**original** 230:21
**Otro** 1:2 6:3
7:20
**outlined** 176:16
267:1 268:11
**outside** 13:10
17:21,25 23:22
41:23 189:13
234:24 235:2

**parentheses**
229:13
**parents** 246:20
248:24
**part** 15:20 22:15
28:2 32:24
39:5 95:16,24
147:22 172:15
178:17 180:2
**particular** 18:21
19:20 20:19
60:6 92:16
101:24 102:3
128:17 173:1
189:10 253:20
261:25 265:4
**parties** 272:16
272:18
**party** 15:6
**Paso** 229:20
248:22
**pass** 31:23 54:8
55:20 56:10
58:18,22 59:2
59:6 60:3 63:4
64:6,11,24
65:8,13 66:2
66:13 67:6,9
68:8 87:14
89:12,25 90:13
268:2
**passenger** 31:6
131:5 206:16
**patience** 146:23
160:13
**patient** 8:21
**Patrick** 235:22
236:17,18
**patrol** 257:12
**pause** 57:7
59:15 61:5
66:6 67:19
**PDs** 209:7
**pedestrian** 32:5

32:7,10,16,18
33:3,7,8 49:7
50:10,10 82:17
**pedestrians**
33:23 47:14
49:6
**penalty** 271:7
**pending** 101:8
148:9 189:25
**penultimate**
110:21
**people** 34:6,14
38:2 42:1 49:8
70:9 88:14
103:16,16,17
103:19 133:11
133:13,14
147:18,19
151:13 167:6
183:14 200:10
207:2 217:2
218:1,20
220:11 239:16
240:7 241:8,13
241:20 242:5
246:13 248:20
249:7,7,14
252:19 254:22
267:11,13,13
**percent** 100:23
100:24,25
101:1,15
151:25 153:16
155:10,24
156:16 194:11
195:12,17
200:4 209:4,19
211:3,19 212:2
212:12,16,23
213:7,15,24
214:3 216:15
216:24 217:6
217:12 218:3
221:8 225:2,4



225:15 226:2,7
226:15 227:5
239:9,13 240:9
240:10 259:25
260:16,21
263:9,25 264:5
265:10 267:5
**percentage**
98:14 193:13
211:7 258:2,25
259:8
**Pereda** 123:17
**perfect** 49:21
61:13 83:16
229:11
**performed**
26:21
**period** 10:16
14:4 157:4
226:23 228:1
267:7 268:1
**periods** 267:14
**perjury** 271:7
**permissible**
140:18
**permissibly**
135:6
**person** 12:15
54:3 62:17
97:9 104:12
145:5 177:16
**personally**
72:14 92:17
**persons** 98:14
**phased** 67:15
**Phone** 52:16
**photo** 61:18
63:4 251:17
**photograph**
64:8
**photos** 64:16,22
65:21 66:12
**phrased** 33:14
**physical** 84:22

89:6 101:25
243:5
**physically** 118:9
**pick** 252:20
**picture** 63:20
64:4 91:17,20
**pictures** 63:16
**piece** 76:25,25
122:16
**Piedras** 65:12
**Pile** 20:17
**place** 43:14
84:14 103:8
200:14
**placed** 46:17
**placement**
100:22
**places** 267:24
**plaintiffs** 1:3,15
2:3 6:16,18
7:19 15:16
16:6,12
**plan** 74:24 75:8
76:13,17
118:16,22,25
119:20 120:8
145:20
**planned** 146:25
**plans** 119:15
**platform** 9:13
60:10
**platforms** 15:13
**play** 57:25 59:14
65:1 66:5,19
67:19
**plays** 58:5 67:21
**PLE** 115:23
117:9
**please** 6:12,23
7:4,21 9:17,23
10:8 19:2 37:3
41:20 52:11,13
53:2,24 55:24
57:3 65:1 66:5

67:18 72:21
73:21,23 86:15
91:8 92:4 96:8
99:10 105:2,15
106:9 110:22
113:9 123:11
127:10 129:1,2
138:9,25
148:19 149:12
152:25 158:5
159:25 161:5
162:13 166:14
168:13 169:23
170:14 186:14
191:19 197:11
203:7 204:9
207:16 210:14
210:17 211:23
219:4 232:9
234:6 237:3
238:22 249:19
255:14 256:16
261:7 262:12
**POE** 11:2
131:13
**point** 9:1 22:21
23:15 24:13
27:6,21 30:20
34:16 46:23,23
47:1,2,3,5,20
48:1,1,16 49:2
49:5 50:13
58:14,18,19,23
58:23 59:3,4,8
59:22 60:5
63:5,14 64:9
64:14,24 65:7
65:10,15,20,21
66:2,12 67:6,8
68:7,10,22
70:8,10,15
71:1,9,13,17
71:20,22 72:10
72:15,16 84:15

88:10 89:6,20
90:4 92:23,24
93:21 98:25
101:22 107:22
108:7 117:11
126:6,12
129:10 135:18
136:22 137:8
140:2 141:9
145:14 176:9
176:12,12,23
190:11 194:17
216:11 231:6
232:12 235:20
244:17
**points** 41:22,25
49:14 50:3,6,9
70:3,15 71:7
210:21
**policeman**
12:12
**policies** 69:15
69:25
**policy** 69:18,20
70:6 84:19
92:25 124:15
124:19,23
125:13 126:16
127:3 128:5,11
128:15 131:20
133:7 135:5,10
140:18 214:22
231:6 233:12
233:22 234:2
248:7 252:12
264:9,16
**port** 4:22,22
11:1 27:23
28:15 32:8,13
32:17,22 33:4
40:7 41:24
42:5 43:12
44:8 46:16
48:3,21,24,25

49:7,11 50:18
50:21 51:5
54:7 56:11
58:22,24 59:6
60:4 63:4,19
64:6,12,24
65:20 66:2,13
67:7,9 68:8,18
68:22 69:11,17
71:1,13,18,24
79:13,15,24
82:1,16,16,17
85:6,11 87:15
89:12,25 90:13
90:19 92:20
93:14,17 96:6
98:13,14,16,24
99:15 100:17
101:3,20 102:2
102:12,24
103:2,15,18
104:18 106:19
107:8,11
108:14 109:3
109:11,15,21
110:6,8,15
111:20 112:4,8
112:11,11,17
112:24 115:11
115:12 117:5,6
117:7 118:9
122:15 124:22
124:25 126:2,6
126:10,12
127:13,14
128:10,16
131:21 137:6
140:21 143:1,7
147:17 150:10
157:8,10,13,17
157:19,19,24
157:24 158:23
158:24 159:6
159:18 160:25



MAGNA
LEGAL SERVICES

166:17,20
167:14 168:4
171:13 173:3
173:10 174:9
175:9,16,19
179:18 180:25
181:9,23,23
187:23 189:18
189:24 191:7
191:11 193:11
193:18,21
197:24 198:2,2
198:9,25
199:14,18
200:2,8,12
203:1 205:10
205:15 206:12
212:1 216:14
216:15,16,17
217:23,25
219:3 224:1,1
224:3,17 226:1
226:14,21,23
227:8,12,18
228:1 233:1,10
235:17 236:21
236:23 239:14
240:7 241:1,4
241:10 242:4,7
244:22 251:9
252:20 253:7,8
257:25 258:24
259:24 265:5
**portion** 252:6
**ports** 30:22 31:7
31:9,12,20
32:1 33:24
42:14,17,19
45:21 47:10,19
47:25 49:23
70:12 75:10
84:12,14 85:3
88:15 90:15
109:16,19

110:7 120:1,6
125:24,25
128:19 136:20
150:17 151:23
152:9,18
153:15 155:8
155:23 156:15
166:15 174:2
174:19,24
175:3,4,15,15
175:19 177:1
177:24 178:6
180:5 201:2
206:11 209:8
211:8,18 213:6
216:20,22
226:6 227:4
258:7 260:16
260:20 263:6
263:16,18
264:15 266:13
267:4,10
**port's** 40:10
101:1 180:11
**position** 29:6,12
29:24 100:2
157:6 235:3
**positioned**
137:1
**positive** 206:8
206:18 252:24
**possible** 47:7
50:15 62:3
89:21 96:8
118:16 119:7
137:2 167:14
167:18 211:14
236:23 249:13
263:20
**post** 75:18
229:14 231:12
232:13
**posted** 49:9
**Poverty** 2:8 6:18

**practice** 40:18
58:13,17 59:3
59:7 60:3
124:19 125:13
126:16 128:5
128:12 134:6,9
134:13 231:6
233:22 234:2
248:7
**precise** 56:4
**prep** 17:18
**preparation**
17:18 18:5,17
22:7
**prepare** 17:22
**present** 2:17
10:17 58:15
81:23 99:13,21
100:1 112:16
126:10
**presented** 65:10
99:5 101:19
**presenting** 64:8
112:24 126:2
**presently** 8:8
100:1
**presents** 33:11
**presume** 65:7,8
68:18 118:13
122:14 209:18
232:5 252:1
**pretty** 20:18
33:6 224:24
227:1 252:24
**prevent** 82:16
**previous** 98:22
172:22 188:20
189:19 209:25
210:6 257:25
259:16
**previously**
16:11 149:16
164:5 170:22
187:18 192:19

**primarily** 48:13
**primary** 33:11
92:23 93:21
253:23
**prior** 33:22 34:2
34:4 40:24
99:8 100:12
147:13 173:18
183:8 194:20
196:11 211:18
261:4
**priorities**
175:23 176:20
178:16 179:12
179:16 180:15
180:18 264:23
266:20 267:1
268:11,15
**prioritization**
151:4
**prioritize**
178:11 266:18
**priority** 111:14
174:24,25
176:14,16
177:3,8 179:3
179:4,6,7
243:11 266:15
267:9
**privately** 11:20
**privilege** 10:12
20:5
**probably** 9:7
81:15 150:1
248:4 253:15
257:6
**problem** 144:12
144:25 145:18
164:12
**problems**
174:21,22
**procedure** 1:22
184:9 233:12
**procedures**

118:15
**proceeding**
12:17
**proceedings**
13:3 269:11
**process** 32:9,18
34:2,5 42:8
74:24 75:7
79:17 117:15
131:14 134:16
134:18 151:14
167:5,10,12
174:24 181:18
182:2 183:10
185:24 190:24
195:1,8 213:12
214:17,24
217:5 242:21
243:3,18
248:11 258:5
263:25
**processed** 42:5
45:21 50:22
96:3 99:6,17
99:24 100:10
100:21,21
102:6,25
117:20 118:2
131:14 132:16
135:3 147:18
148:10 183:14
186:10 191:15
198:5 200:13
203:1 211:19
213:7 233:11
239:17 241:13
241:20 253:20
254:6,7,21
259:20 260:3
262:9
**processes** 133:9
**processing**
27:22 28:14
30:21 31:7



32:6 40:6,10
45:17 94:3
101:9,10,25
102:1,20
115:17,22,23
117:8,9,10
118:8 119:1,6
119:10,11
127:15 140:15
141:11 143:1
148:10 156:23
165:23 176:14
177:3,8 178:14
178:22 180:16
181:4,10
189:17,25
206:13,16,23
207:3,10 209:4
209:19 211:3,8
212:2,7,12,16
212:23 213:16
213:24 221:8
226:7 239:12
243:11 244:21
248:12 249:13
260:25 263:9
264:5 265:5,10
266:23 267:12
268:14
**produced** 1:14
57:14
**product** 20:4
98:9
**Professional**
1:19 272:11
**program** 29:13
29:14,17,19,20
29:21,24 30:9
30:15 141:21
141:22 229:14
**programs** 131:5
**Progreso** 31:23
70:13
**promise** 145:12

**promoted** 29:9
**promotion**
70:24
**pronounce** 55:9
**proper** 27:23
28:15 30:22
50:19 71:20
84:17 90:8
99:14 181:5
**protect** 160:4
**Protection** 8:13
8:16 10:23
**protocol** 43:15
**proud** 220:13
**provide** 60:17
67:7 68:8
122:16 190:10
205:13 238:22
266:25
**provided** 13:11
13:22 21:9
25:17 44:8
111:9 140:10
263:14
**provisions** 1:22
**public** 40:8
236:19 247:17
267:18,19
271:20
**publicity** 234:1
247:16 248:7
249:10
**pull** 222:2 223:2
**pulled** 207:2
**purported**
66:10
**purpose** 233:17
**pursuant** 1:21
**put** 7:10 89:11
97:5 101:4
161:5 210:9
214:21 241:12
241:16
**p.m** 1:17 43:10

83:20,23 136:4
136:7 146:16
146:19 181:17
184:1 185:5,8
220:23 221:1
244:2 245:6
266:4,7 269:11
**P.O** 2:14

---

## Q

**question** 9:18
10:2,3 13:17
16:9 19:1,23
24:6 28:23
31:10 33:14
40:16,23,24,25
46:14 48:18
58:16 59:1,2
59:11 64:3,5
69:22,23 71:15
76:23,24 77:10
78:16 79:11
87:25 99:10,25
102:9 109:25
112:21 118:24
124:3,18
126:23 137:17
143:24 147:8
152:13 153:22
153:25 154:8
156:4,6,8,13
156:20 158:2
158:22,23
159:14,15,22
160:2,16 162:3
165:16 174:17
177:5 180:9,22
183:21 191:4
199:17 202:7
208:8 211:22
213:20 217:14
221:17 222:12
231:10 239:6,7
242:24 258:5

260:18 267:3
268:10
**questioning**
35:16 65:9
78:3 169:20
189:6 233:17
234:22
**questions** 8:25
9:23 10:8,10
10:15 24:18
36:18 43:13
63:24 92:2
129:8 160:7
183:18 187:6
189:23 190:3,6
234:19,22
235:4 238:13
238:16,23
257:19 265:14
265:20 266:10
268:7,18,22
**queue** 3:15 4:23
18:22 19:6
20:8 21:15,21
22:10,12,16,21
23:3,10,12,13
23:15 34:22,25
46:23 47:2,3,5
47:17,20,25
49:2,5,14 50:2
50:6,9,13
53:20 54:9,10
56:6 58:13,18
58:23 59:4,14
59:22 60:5
61:19 63:5
64:8,13,23
65:6,10,15,20
66:1,11 67:6,8
68:7,10,21
70:3,8,10,15
71:1,7,8,12,17
71:20,22 72:9
72:14,16 74:23

75:7,11,16,20
78:20 82:15
84:10,13,14,21
89:5,19 90:4
91:8 92:24
94:2,8 95:8
98:11,15,25
101:6,22
102:20,25
103:16 104:13
104:16,21
126:5,11
136:22 137:8
150:4,14,16,18
151:13 152:10
152:18 154:18
155:9,23
156:15 158:10
159:9 160:18
162:13 164:24
168:13 191:8
193:8,14,20
194:3,8 205:2
205:11 208:24
209:7 210:1,22
216:16,21
217:3 218:1,21
224:3,17
225:23 244:12
244:16 245:9
246:7,7 248:13
259:19 260:5
**Queuing** 61:18
**quick** 184:5,22
208:8 265:18
266:10
**quickly** 83:12
186:19
**quota** 213:16
264:25 265:3

---

## R

**radio** 69:1,2
72:3,15 126:12



radios 68:25
raise 7:4
Randy 95:13
    149:17 171:2
    192:20 193:4
range 100:4
rank 124:22
    179:7
Raquel 4:3
    96:24 97:18
reach 33:19
    135:6 217:10
reached 90:10
    103:3,20 133:5
    134:7 135:11
    137:14,15,23
    140:6,20 142:3
    142:18
reaches 33:10
reaching 216:22
read 23:19
    35:24,25 36:7
    36:9 38:9,16
    38:24 40:4
    43:8,17 51:19
    51:25 52:5,23
    53:5,8 54:12
    62:11,23 73:13
    73:17,20 80:24
    85:21,25 86:3
    86:6,12,19
    91:19,22 92:1
    93:8,9 97:1,10
    105:12,15
    113:12 116:13
    116:16 122:5
    129:13 130:25
    138:16 139:9
    139:21 149:6,7
    162:21 163:2,6
    165:4 166:11
    169:6,7,14,17
    181:20 182:19
    187:2,5,15

188:11,13
    192:17 196:19
    197:4 198:6
    199:12 203:15
    203:17 204:4
    205:16 207:24
    208:12 209:21
    212:13,19
    215:12 218:14
    218:14 222:8
    228:11 239:2
    244:5 250:10
    256:10
reading 52:1,4
    52:25 170:12
    189:15 205:23
    208:7 209:12
    235:6 245:21
reads 61:21
    165:1
ready 91:25
    119:18 169:18
    186:21 250:24
real 265:18
really 9:15 38:1
    63:14 83:4,12
    83:17 87:20
    146:10 167:23
    241:19 248:17
    249:25 253:8
    253:11 267:21
    268:23 269:1
realtime 68:3,9
reason 11:16,18
    82:24 90:21,25
    95:19 101:16
    108:20 109:6,8
    111:17 117:2
    122:20 123:20
    124:9,11 125:8
    125:10 146:12
    151:16 173:21
    270:2
recall 18:24

19:19 29:23
    40:12 43:24
    49:4 56:10,24
    62:17 70:23
    76:11 77:14
    78:6,19 84:2
    87:10 90:12,14
    90:15 99:1
    100:8 101:11
    107:23 111:4,7
    111:13,19,23
    112:1,10
    116:21 119:8
    124:12 126:16
    128:23 141:25
    157:22 172:25
    188:23,25
    189:3,10 190:4
    190:5 199:14
    199:18 205:18
    205:20 206:1
    211:17,24
    219:15 221:5
    231:3 237:13
    237:14,16
    248:9 259:15
    260:24
recalled 22:22
    55:12 77:3
receive 28:6
    35:15 98:7,19
    153:13
received 24:22
    27:5 40:12,21
    42:19 57:25
    81:5 87:3 89:9
    108:24 114:9
    127:21 132:4
    134:20 141:6
    141:10,13,16
    150:1 205:21
receiving 44:12
    54:21 55:13,16
    111:4 116:22

131:16 230:3
    237:13
Recess 83:21
    136:5 146:17
    185:6 220:24
    266:5
recipient 53:22
    107:8
recognize 53:12
    74:15 86:25
    92:13,15 98:2
    106:15,17
    114:5 130:12
    149:20,22
    163:15 164:15
    164:17 171:5,8
    192:22 197:20
    204:20,23
    208:20 215:18
    228:23 235:13
    235:16 251:5
recognized
    39:23
recollect 49:19
recollection
    18:21 19:6,20
    20:8,20 21:3
    21:15,17 22:10
    22:12 23:8
    28:8 29:7
    47:22,24 50:1
    55:18,19,22
    64:25 78:21
    80:9 81:25
    85:5 91:4
    110:4,5 112:13
    123:8 178:15
    238:6
recommend
    166:13,15
    247:19
recommendat...
    249:12
recommending

182:23
reconnaissance
    266:17
reconvene 83:14
record 1:23 6:2
    6:14,23 9:6
    58:17 59:3,21
    60:4,22,24
    61:1 64:13
    83:20,23
    128:25 136:4,7
    143:12 145:17
    145:19,21,22
    146:14,16,19
    183:25 185:5,8
    207:8 220:23
    221:1 257:5,20
    266:4,7 269:10
recording 59:21
    63:4
red 62:11
    251:25 252:5
redirect 265:20
    265:22
reduce 206:17
reelected 119:16
refer 8:2,15
    10:21,22 11:1
    11:2 47:1
    104:5 233:16
    240:18
reference 140:1
    140:23 179:11
    214:2 244:16
    248:6 264:20
referenced
    57:24 77:4
    80:8 231:1
    265:8
references 78:7
    154:21 190:16
    229:23 232:6
referencing
    151:11 152:17



236:20
**referred** 30:16
  34:21,24 104:9
**referring** 17:1
  25:12 45:8,13
  56:25 63:21
  193:2
**reflect** 40:11
  145:23 188:18
  217:8
**reflected** 108:25
  189:1,12,14
  199:23 217:9
**reflecting** 191:3
**reflects** 62:25
  98:11 193:7
  198:8,23
  216:10 238:24
**refrain** 159:24
  159:24
**refresh** 18:21
  21:20 260:7
**refreshed** 19:6,7
  19:12,14,20
  20:9,11 21:2
  21:15,17 22:10
**refreshes** 20:20
**refused** 111:19
**regarding** 14:7
  17:17 18:22
  23:20 27:22
  53:20 70:3
  74:22 87:14
  115:17 157:25
  158:1,24
  159:18 160:17
  164:23 189:23
  197:23 205:1
  208:24 215:22
  229:2,2 232:15
  235:17 236:23
  251:8
**region** 30:8
**Registered** 1:19

272:11
**regularly** 98:20
**regulation**
  161:23
**relate** 10:16
**related** 266:20
  272:15
**relates** 47:18
**relating** 158:25
**relation** 47:4
**relations** 26:25
**relationship**
  147:15 151:5
  160:23
**relative** 272:17
**relay** 72:16
**relayed** 41:15
  41:16,18 209:3
  263:8
**relaying** 209:17
**relays** 209:1
**releasing** 119:17
**relevant** 257:15
**relocate** 88:10
**remaining** 8:21
  217:6
**remember** 12:9
  13:24 14:18
  19:13 23:6
  24:9 25:1,25
  26:8 28:21
  29:21 41:11,14
  44:2,4,12,22
  45:1 50:2,5
  54:14 68:15
  75:13 77:6,7,8
  77:12 79:6,20
  81:22 82:11,21
  88:12,18,23,25
  89:2,9 92:18
  95:22 104:23
  107:18,21
  108:4,13,17
  109:12 110:13

110:14 111:22
  112:5 116:22
  116:24 118:20
  127:3 128:4
  131:16,25
  132:10 133:3
  133:10,19,24
  138:12,14
  139:6 142:5,7
  143:17,25
  147:4,6,9,14
  150:21,25
  154:25 159:3
  173:4,20 176:5
  176:6 177:20
  189:12,13
  190:6 195:24
  199:10,21
  200:18,21,24
  206:7,18
  214:10 219:9
  219:10 221:10
  230:2,7,25
  237:25 240:2
  241:1 243:12
  253:18 261:23
  261:24 262:18
**remembered**
  19:14 22:22
  23:3
**remind** 117:12
  136:13 185:12
**remotely** 6:25
  9:11
**renovating** 17:9
**repeat** 9:24 16:8
  31:10 32:15
  48:18 58:16
  71:15 76:23,24
  76:24 77:1
  112:21 118:24
  143:24 145:8
  145:11 152:13
  177:5 180:9

211:22 213:20
  260:18
**rephrase** 9:24
  45:15 111:17
  125:6 191:4
**reply** 154:1,5
  199:9
**report** 5:10,11
  93:4,12 98:12
  100:16 117:2
  157:17 193:8
  193:21 224:4
  224:18 236:22
  238:24 239:8
  239:13 252:8
  257:9
**reported** 1:20
  245:8
**reporter** 1:18,19
  6:10,22,24 7:3
  7:6,10 9:4,5,11
  138:3 145:23
  146:8,10 152:4
  152:5 158:6
  202:21,22
  232:11 268:20
  269:5,6 272:10
  272:11
**Reporter's** 3:6
  272:4
**reporting** 43:14
  226:23 245:18
**reports** 4:23
  98:5,8,20
  225:24 251:13
  259:12
**represent** 6:13
  7:19 39:9
  53:18 57:23
  62:21,24 66:9
  74:21 87:13,25
  88:7 98:10
  106:22 114:20
  115:14 117:1

122:9 130:14
  150:3 164:22
  171:11 172:21
  187:21 197:22
  204:25 208:23
  209:10 215:14
  215:21 223:21
  229:1 251:7
  255:6,18
  258:23
**representative**
  29:25 30:2
  109:16 182:21
**represented**
  16:24 226:5
**representing**
  17:13 151:17
  151:20
**represents**
  128:8
**request** 85:4
  88:12,15,24
  89:10 90:3
  106:20 107:9
  109:7,10,20
  110:6 112:3,25
  113:1 116:23
  122:10 205:18
  237:24
**requested** 90:20
  91:3 107:11
  111:8 112:23
  160:9
**requesting**
  34:14 87:15
  90:15 95:7
  159:12 173:2,6
  173:7,10
  246:13
**requests** 89:3,5
  238:3
**required** 23:14
  248:15
**reread** 139:11



resources 180:6
180:12,25
181:9 206:13
206:23,25
207:11 239:12
241:7 242:22
266:14,25
respect 16:21
23:12 27:7
30:21 69:15
78:20 118:5
140:15 142:25
158:1,10
233:17 268:9
respond 12:13
63:23 99:9
134:12 153:19
214:23 219:4
238:20 262:16
responded 56:1
111:8,14
153:23 155:13
248:11
responding
157:1
responds 177:23
response 28:22
41:9 44:25
45:4 46:3
68:24 70:19
103:12 119:22
120:12 160:22
161:2 189:23
190:10 206:2
238:4,23 239:4
239:6 245:6
248:12
responses 206:6
206:19
responsibilities
31:3 175:10
242:7
responsibility
31:8,11 132:6

responsible 30:8
31:4 32:2
69:14,23 126:1
167:6 175:8,20
242:8
result 14:18
18:24
retire 219:21,24
220:5,11
retired 19:13
87:9 88:1
99:19 135:13
145:16 160:6
184:2
retirement
70:25 219:7,11
219:13,16
268:22
retrospective
205:1 210:1
return 42:8
50:22 51:3
95:17 119:16
122:18 133:6
134:6 135:2,6
135:10 137:13
137:18 141:25
returned 98:25
101:21 123:4
123:19 124:8
124:13,16
125:14 126:18
128:1,13,22
132:16 133:12
272:23
returning 42:3
82:17 92:24
95:7 122:24
165:24
revamp 30:15
review 18:4,11
23:5 77:9
105:8 166:16
255:18 269:3

reviewed 18:17
20:7 223:21
reviewing 18:14
18:25 78:9
95:4
revisit 165:2
Reynosa 49:17
218:6,9,16,21
229:19
re-skim 139:11
Rich 2:8 6:17,17
164:2,4,9
Richard 198:1
rid 144:14
Ridolfi 2:18
right 7:4 8:2
13:18 20:3
22:5 23:17
32:23 36:10
37:14,25 39:3
40:3,22 41:5
43:20 44:14,20
44:24 45:18
46:8,18 49:20
50:16 52:21
55:13 56:3,8
61:1 66:14
67:16,25 68:4
68:11 69:12,17
72:10,17 73:9
73:10,25 74:5
74:7 78:17
82:20 84:11,23
86:10 87:7
89:17,21 90:1
90:10 91:6
93:14 96:14,15
98:17 102:14
102:21 106:7
108:8 109:21
110:11 112:19
113:11,13
118:10 119:21
119:24 125:20

125:23 126:3,7
126:13 127:16
127:19,22
128:2,14 134:8
135:17 136:24
137:3 141:4,7
141:11 142:19
143:22 145:6
150:10 151:25
152:1,11,15,20
153:11,17,21
154:19,22
155:1,10,14,17
158:11 160:20
162:23 163:3
165:4,12,20
166:2,5 167:2
167:13 168:2,6
168:23 169:10
169:17,25
170:5,17,20
172:11,19
173:14,15,19
173:22,25
174:6,9 175:11
176:1 179:7,20
179:22 180:7
180:13,19
181:2,20,24
182:3 185:25
187:13 189:20
190:1,14,17,25
191:9,12,16
192:12 193:1,4
193:5,9,15,18
193:23 194:1,6
194:8,12,15,19
195:2,8,12,16
197:15 199:12
199:25 203:10
203:22 204:13
205:5 207:11
210:3,11 211:4
212:12,19,24

213:8,13,25
214:13 215:3,4
215:10,10
216:11,18,22
216:25 218:3,7
221:13,19,22
224:15 226:8
226:12 227:6
231:13,19,24
232:16,20
240:1,13
242:14,17,23
243:3,7,18
244:25 245:11
249:6,11 250:8
250:18 251:15
251:19 252:3
255:24 257:7
257:23 259:10
259:17,25
260:17,22
262:3,6,10
263:3,10 264:1
264:6 265:1,10
266:14 267:23
268:12
Rights 2:4 6:16
7:18
ring 108:2
200:23
Rio 31:22,24
90:19,20
Rodney 54:2,7
95:3 238:22
Rodriguez
253:6,6 262:17
role 31:1 104:3
157:9
Roma 31:23
171:13 181:17
181:23,23
187:23 188:18
189:18,24
190:11,14



191:7,11
193:21 235:2
235:17 236:21
239:8,14 240:1
240:4,6,23
242:19 247:18
**room** 83:13
243:2,20 248:2
262:24
**rooms** 241:21
**rotate** 257:6
**roughly** 14:2,5
25:4 160:11
205:3
**route** 252:1
**RPR** 273:6
**rules** 1:21 8:25
9:3 184:9
**runners** 82:16
82:17
**Ruoleta** 118:22
**Ryan** 171:16
172:10,17
173:23 174:11
177:23 182:5
188:17 192:25
193:4 209:17
210:23 229:14
237:22 238:10

―――――
**S**
**S** 1:10,13 3:3 7:7
7:23 271:11,15
272:6
**Sabri** 188:17
**safe** 40:7 218:20
244:20
**safety** 89:16
267:17,18
**sake** 65:8
**Sam** 7:24
**Samsung** 61:17
63:15
**San** 122:19

229:19
**sanitary** 40:7
**Sarah** 2:8 6:17
164:3
**sarah.rich@s...**
2:11
**SAT** 118:12,17
118:21
**save** 130:10
**saw** 19:18 56:16
66:9 72:8
74:18 114:10
149:24 164:19
180:13 181:1
226:4,16 228:2
231:23 253:12
**saying** 21:6
88:18 153:20
154:1 155:14
241:7
**says** 46:2 62:16
62:22 67:14
68:3 75:8,9
76:8 89:18
91:20 94:1
100:16,23
110:22 118:12
119:4 122:23
123:16 124:5
131:12 150:17
151:7,8 152:16
152:23 176:11
180:3,3 191:10
195:17 199:5
212:15 229:16
239:19,23
243:1
**scenario** 13:19
230:24,25
247:1
**schedule** 110:23
**scheduled**
110:25 127:14
**Schmidt** 235:23

236:17,18
238:12
**scope** 90:23
99:18 189:7
224:10,12
234:20,20,24
235:1 257:14
**scratch** 263:6,17
**screen** 15:19
62:22 193:4
**scroll** 15:21
37:10,11 43:3
54:24 76:1
80:15 110:17
115:3 121:19
123:10 138:9
139:1,14,14,18
139:20 152:25
169:6,18
177:21 191:21
216:5 222:10
222:12 223:9
223:12,13
224:24 225:7
225:19,23
226:17 227:12
230:9 235:24
237:2,19
238:17 247:7
251:21 253:2
255:8 258:18
261:15 262:12
**scrolling** 171:21
225:3 256:4,17
**seal** 273:2
**seaport** 175:14
175:15
**second** 15:19,22
39:4,17 53:24
57:8 58:10
61:8 75:3
80:12 93:3,5
114:9,14 115:1
115:25 123:9

137:25 139:1,2
165:1 171:15
171:20 172:2
175:1 188:10
188:13 216:1,4
220:4 229:10
236:2 255:3
257:15,18,21
258:18 267:3
268:24
**seconds** 59:14
65:2
**security** 10:21
12:12,21 26:5
26:12 31:5
40:7 55:25
56:21,24 76:9
95:2 157:16
**see** 7:4 16:2
35:21 36:8,16
37:1,17,18,22
38:2,3 51:15
51:16,18 52:23
62:2,6,7 63:15
63:16 64:22
66:17,20,24
67:23 71:6,21
73:13 80:21,22
86:9 96:21,23
105:8,9 113:15
115:7,18 116:1
116:9 121:23
121:24 122:1,1
123:22,24
124:1 128:18
129:13 130:18
131:23 138:21
140:25 154:6,9
162:18 172:6
178:7 180:7
182:16,16
186:22 188:6,8
191:24 192:5,8
196:21 198:18

199:1 204:1
210:12 215:7
217:10 222:24
223:9 225:1,3
225:13 226:3
226:13 231:21
234:8 236:13
244:14 249:24
256:7 259:2
266:1
**seeing** 68:15
112:5 230:8
257:19
**seeker** 123:4
124:17,21
125:14 128:22
134:7 135:5
142:17 147:19
**seekers** 100:9
101:19 126:18
128:13 135:11
140:16 141:11
142:1 143:1
214:18 268:14
**seeking** 33:23
34:6 90:7
110:2 251:9
**seen** 16:7,14
38:5 39:13,24
53:14 68:14
214:4 222:19
223:2 254:3
258:4 259:12
263:14 264:24
**sees** 35:19 91:16
**segregate**
247:22
**selected** 18:16
19:25 20:7,15
20:24
**send** 66:12
106:25 131:13
131:21 140:19
166:15



sending 108:17
 131:25 188:23
 205:18 219:9
 255:21
sense 23:6
 165:10,18
 207:5
sent 38:13
 106:19 108:11
 108:14 112:18
 114:10 117:12
 122:9 124:21
 127:6 166:12
 172:22,23
 176:15 205:8
 209:24 210:2
 219:2 239:5
 244:2,11 245:6
 252:20 259:19
sentence 40:4,17
 56:21 176:10
 209:13,22
sentences
 176:10
separate 241:15
September
 87:11,12 88:2
 100:8 219:19
 225:11,13
Sepulveda
 62:17
sequence 187:20
service 98:13
 134:2 252:10
Services 6:9,11
set 211:6 213:15
 238:1,2
seven 175:14
 184:8,10 194:8
shade 89:15
Shane 192:25
share 155:22
 156:14 186:2
shared 148:13

186:7
shift 206:12,22
 207:8,11
shifted 100:13
 205:12
shifting 151:5
 206:25
shortest 78:2
Shorthand 1:18
 272:10
shot 62:22
show 18:7
 211:11 234:18
 254:25
showed 19:5
 21:14 22:10,13
 22:23 53:8
 214:7 242:9
 261:23
showing 16:4,10
 37:16 60:25
 61:15 63:15
 74:11 86:21
 92:10 97:16
 106:10 113:25
 129:24 149:16
 163:12 170:18
 171:1 187:18
 192:19 197:16
 204:15 208:15
 228:18 235:8
 250:25 258:10
 262:25
shows 193:21,25
 216:6
sic 45:10 154:11
side 31:5 75:20
 82:6,7,8,9,23
 96:9,9 101:9
 161:6 201:1,13
 218:5 257:3,21
███████████
sign 269:4
signature 3:5,6

270:1 272:23
significant
 188:21
significantly
 189:19
similar 89:2
 90:20 122:18
 158:17
simply 160:24
 217:5 240:23
 242:20 260:3
sincerely 147:1
sir 7:16 8:4,14
 8:18 10:1 14:6
 16:8,19 17:3
 17:14,20,24
 18:3,6,9,19,23
 19:10,17 22:18
 23:6,21,25
 24:16 25:3
 26:17 27:9,20
 27:25 28:9,12
 30:24 31:14,25
 32:3 33:25
 34:7,11,23
 35:1,6,17,23
 36:11 38:11,17
 39:15 40:2,14
 40:19 41:13
 42:12,16,21
 44:15,19 45:13
 45:19 47:23
 48:14 52:1,9
 52:25 53:1,13
 53:17 54:5,16
 54:17 55:10,21
 56:2,13,15,19
 57:1 60:14
 62:8,18 67:1
 69:8,13 71:10
 79:12 81:8
 84:1,5 86:8,11
 87:2 91:1,5,22
 93:10,15 95:4

98:4,18,21
 99:2 100:12
 102:4,9 103:12
 105:10 107:18
 108:3 113:16
 115:8 116:11
 116:14 120:20
 121:5 122:3
 124:4,18
 125:17,24
 126:14 136:1
 136:12,25
 137:4,21
 138:17 146:22
 147:24 148:3
 148:18 149:1
 152:21 159:16
 162:19,22
 168:1,7 169:15
 169:21 172:7
 179:10,22
 180:15 182:20
 184:24 185:3
 185:11 186:24
 187:3,7 188:9
 188:24 189:2
 189:11 191:10
 192:9,23 193:6
 193:16 196:23
 198:20 208:2
 212:5 216:19
 219:20 220:1,9
 221:4,11
 224:15 231:2
 232:24 246:24
 248:19 249:14
 255:23 256:8
 256:13 258:7
 260:13 265:3,6
 265:25 267:8
 268:16
sit 146:24
site 33:1,10,12
 132:15 135:15

137:16,24
sites 24:14 54:9
 54:10 253:23
sitting 267:14
situation 122:25
 123:1 242:3
 248:11,14
 249:6
situational
 60:17 230:23
six 247:21
size 203:18
Skinner 38:13
 43:9,22 44:10
 76:7 77:4 78:7
 79:15 88:9
 133:2 150:14
 154:4 155:16
 155:19 164:23
 166:12 208:25
 209:1 210:24
 211:1 221:23
 237:12 238:11
 247:15 263:9
 264:8,11
Skipped 5:7
sleeping 267:13
 267:22
slight 9:14
slightly 144:21
Slocum 2:20
 17:20
slow 227:21,22
slowly 222:10
 224:24 225:8
Smith 192:1
smuggling
 242:5
snapshot 198:25
social 15:12
 24:8,14
soil 95:7 133:5
 134:8 135:6,12
 137:14,19



**somebody** 47:13
47:13 144:9
233:10
**soon** 110:24
218:17
**sorry** 6:8 15:25
21:25 28:24
36:24 37:24
38:1 46:12
51:13 52:7
54:17 57:9,15
73:10 80:19
82:13 87:9,18
87:18,20
105:24 121:17
121:24 127:10
130:4 136:8,9
148:5 163:16
185:17 188:7
202:8 204:8
261:8
**sort** 30:11 34:5
61:20 224:24
**sought** 98:24
99:15 103:2
**sound** 82:20
205:5 210:3
218:7 240:1
**sounds** 107:24
129:6 135:23
**southern** 1:1 2:8
6:4,17 119:24
120:2,6
**southwest**
120:14,19
248:22
**space** 42:4
117:19 198:5
212:8 243:5
261:2 262:9
**spans** 47:11
**speak** 77:25
**speaking** 77:18
77:25 108:13

159:25 160:15
**specific** 15:20
19:19 21:5,12
21:19 22:17
34:16 94:5
118:20 157:22
220:13 226:23
229:19,23
264:25
**specifically**
22:15 44:25
112:10 118:19
119:9 132:10
132:22 133:24
140:17 141:25
142:6 154:25
190:8 264:19
268:18
**specifics** 90:18
104:22 111:12
133:10 150:23
**specify** 76:22
**specifying** 77:16
**speculate**
110:13 154:10
233:9 254:11
**spell** 7:21
**spend** 18:13
**spiel** 223:20
**spilling** 75:2
216:3 229:9
**spills** 114:25
**spoke** 41:19
70:15 210:23
**spoken** 209:2
**spreadsheet**
97:1 196:3
**spreadsheets**
21:24
**staff** 59:10 95:1
95:2 122:15
157:16 236:19
**stakeholders**
81:4,9

**stamp** 37:20
**stand** 42:7
195:18 232:10
**standing** 65:16
189:5 224:12
**stands** 161:2
**star** 252:5
**start** 36:1 57:9
96:12 161:9
184:3 187:8
191:25 256:17
**started** 26:9
27:2 135:12
142:10 143:18
147:5 184:19
205:3 262:5
**starting** 10:16
36:15 113:13
267:10
**starts** 51:22
107:2 166:13
172:4 192:1
230:24
**state** 1:19 6:13
7:21 10:15
20:15 60:1
66:10 76:18
77:20 109:9
153:2 156:1
174:2 191:6
200:19,19
201:17 224:9
239:13 241:5
271:21 272:1
272:10
**stated** 1:22
272:12
**statement**
108:21 122:21
123:21 124:10
125:17 210:20
**states** 1:1 6:4,20
25:20 32:8,11
32:17,20 33:4

33:9,18 34:15
48:20 59:24
65:11 81:3
89:10 90:5
94:13 117:5
152:14 181:16
189:16 198:2
239:8,9 262:8
**stating** 214:7
**station** 2:14
33:19 94:2,8
**stationed** 48:12
70:7 136:22
137:8
**statistics** 215:22
257:8 258:23
259:24
**statute** 69:21
161:21
**stay** 204:7
**staying** 51:3
**stenotype** 1:20
**stepped** 137:19
**stir** 83:9
**stop** 65:2 73:25
74:5,7 121:22
160:14 170:5
179:23 192:12
203:22 225:2
225:10 227:21
250:8,18
256:20
**stopping** 135:18
**stored** 64:16,17
64:19,20
**stories** 23:19
**straight** 85:12
206:16
**strategy** 76:10
76:11 77:3,7
77:13,14 78:6
79:3,7,9 80:7
205:11,14
206:10,21

207:8
**Street** 2:9
**strictly** 95:18,24
**strike** 161:3
180:4 213:4
240:5
**string** 237:15
**strings** 38:12
**subject** 106:23
114:21,22
120:13 150:4
150:14 154:18
171:12 187:22
229:12 232:3
232:14 233:6
**submissions**
174:25
**submitted** 98:5
272:21
**subordinates**
104:20
**SUBSCRIBED**
271:14 273:1
**subsequent**
28:16
**substance** 17:15
42:18 79:20
**sudden** 22:22
**sued** 15:4
**sufficient** 84:19
100:11
**sufficiently**
192:17
**suggest** 174:11
**Suite** 2:9
**summaries**
111:4 112:2,8
116:23 127:18
**summarize**
236:25
**summarizes**
224:2,17
**summarizing**
4:22



summary 75:8
110:25 111:9
115:21 116:19
127:21 222:4
223:25 225:23
supervise
157:10,13,15
supervised
248:2
supervising
141:21
supervisor
44:10 45:8
94:6,7
supervisors
54:11 104:16
supervisory
29:13,14,17
support 20:17
207:3
supported
119:15
supportive
112:14
supposed 254:5
254:21 260:25
262:23
sure 8:22 16:10
22:19 32:16
35:19 38:2
44:6 46:1 48:4
49:16 51:14,18
57:18 59:11
63:22,25 69:21
71:16 73:12,17
84:11 85:20
91:15 96:18
105:7 113:21
121:24 123:24
124:24 125:16
129:12 132:6
144:10 145:7
146:24 149:6
169:6,8 192:8

196:20 198:18
203:14 207:23
215:6 220:19
222:23 223:1,4
226:12 228:11
245:7,16,21
255:22 260:19
266:13,16,24
surprised
245:22
suspect 233:5
sustainable
267:7
sustained 268:1
swear 6:24
switch 166:4
183:5,13
185:22 186:10
190:23 194:24
195:6 243:16
247:25
switched 194:18
switching
242:11
swore 84:3
sworn 1:15 7:8
271:14 273:1
Sylvia 133:21,22
S/B 209:4,11,14

——————
T
take 9:1 11:10
27:7 28:1,16
36:14,17 38:7
40:9 48:7 52:3
73:15 76:25
86:3,3,5
105:14 114:8
121:3 129:5
137:5 138:12
162:15 168:2
168:12 169:19
172:3 174:15
183:21 184:5

184:10,22,25
187:5 196:19
197:7 198:16
200:25 203:13
205:23 207:23
209:15,16
220:17 223:5
233:15 241:22
247:20 249:18
249:22 255:17
256:14
taken 1:15 9:10
11:7 12:23
65:21,25 82:16
83:21 96:5
136:5 146:17
185:6 220:24
253:9 266:5,22
272:17
talk 8:19 9:15
13:20 23:16
27:1 30:10,25
32:5 35:2
45:20 59:5
68:17 70:2
71:23 84:9
104:3 132:8
150:24
talked 238:12
253:18
talking 32:25
119:12 128:9
134:23,24
146:11 210:10
221:5 241:2
244:17 253:16
talks 144:9
Tamaulipas
200:22 201:17
tandem 96:10
96:12
target 264:25
taxi 91:21 92:21
93:13,20 94:12

95:6 103:2,17
team 172:11
182:22
technical 66:17
Technology
57:11
teenagers
246:24
teleconference
43:11,24 44:3
44:23
telegram 54:8
54:14 55:15,19
56:7,11,18
57:3 59:19
61:16 63:1
64:7,12 65:19
66:9,11 68:19
72:9
telephone 2:6,10
2:15 61:17
telephonically
123:18 124:7
124:20 128:12
128:21
tell 11:7 20:24
84:3,22 91:25
166:17,20
169:10 184:20
206:5,9 211:11
227:21
telling 95:15
100:9 125:9
157:2 184:13
212:11 242:19
262:17 263:20
tells 20:13 46:5
50:21
temporarily
148:9
temporary
143:6 144:11
148:7 190:13
ten 71:4,5 101:7

102:19,25
103:16 120:24
121:3 168:10
184:22 247:21
263:3
tenure 118:21
119:9 141:10
141:20 143:10
144:1 231:7
233:23 234:3
259:13
ten-minute
168:11 185:1
term 34:10,18
40:15 46:19
51:3 142:23
144:1 147:10
147:12 161:9
161:12,15,24
168:3 179:3
213:6 224:1
terminology
226:12
terrible 267:25
territory 32:12
32:12,22 90:5
93:24
terrorism
266:15
testified 7:8
12:3,24 13:5
20:7 21:14
22:9 39:23
40:20,25 55:12
71:19 88:14
111:16,18
119:19 126:9
136:21 137:11
155:7 158:22
173:9 180:10
180:23 185:21
190:22 195:5
213:2,5,10
214:6 226:4



227:3 243:9,15
248:5 267:4
**testify** 11:17
12:11,14,16
14:12 16:21
**testifying** 159:4
159:7 172:25
**testimony** 9:6
11:10 13:11
178:20 272:16
**Texas** 1:19
258:24 272:1
272:11 273:6
**text** 61:20 68:3
131:23
**texting** 11:25
**texts** 62:19
**thank** 7:6,17 8:1
8:5,21 9:22
12:3,16 23:7
24:5,17 25:7
25:22 28:24
30:25 32:4
33:13,15 34:8
36:13 37:19
38:22 43:6
45:14 49:10
50:12 51:8
52:8 53:1 54:1
54:6 55:5
59:17 61:3
62:5,19 65:4
68:16 70:21
72:19 74:10
75:22 76:5
78:4,16 79:1
79:18 80:4,10
83:18 84:9
86:13 87:12
88:5 92:2 93:1
103:24 105:5
110:12 111:15
111:25 113:7
115:5 116:7

120:22 121:21
126:24 130:6
130:23 135:16
138:4,25
144:19,20,20
146:23 149:1
152:6,24 155:6
158:20 163:18
164:12 166:10
168:8 169:22
170:24 173:17
173:22 179:14
183:16 185:20
186:8 189:16
196:4,16 197:2
198:15,22
199:24 202:23
203:6 207:6
208:13 214:25
216:8 218:24
220:15 222:1
224:14 227:2
233:13 237:10
238:8 243:9,24
247:6 249:17
253:1 255:23
258:21 259:15
262:15 268:4,5
268:18,21,25
**thanks** 73:9
76:9 83:16
92:8 97:11
130:9 244:10
**thing** 55:20 97:1
114:12 203:11
210:19 213:4
260:12
**things** 8:22 9:7
38:2 69:15
70:16 78:1
126:2 134:14
183:7 209:3
223:2
**think** 23:2 33:2

41:8,20 43:11
52:19 58:25
83:2 85:23
101:21 115:24
127:4 132:2,21
136:18 139:5,8
145:16 148:12
149:3 153:11
158:12 159:12
174:17 177:24
177:25 179:2
183:4,12
186:17 192:3
200:12 202:3
212:13 213:15
213:21 234:23
234:25 244:6
**thinking** 73:5
121:6 168:1
**third** 15:16,24
16:6,12 76:8
107:3 166:11
236:5 243:2,3
243:20 248:2
**thought** 19:14
77:25 177:17
214:23 237:23
**thousands**
248:20
**threat** 180:14
**threats** 175:21
178:11
**three** 17:7 29:16
47:12 49:13,15
50:1 129:8
141:19,20
160:10 216:20
239:7 241:21
**Thursday** 6:6
146:25
**tied** 87:20
206:13
**Tijuana** 247:3
248:21

**time** 6:7,8,12
9:15 10:6,6,16
13:25 14:4,10
24:20 32:2
36:17 41:12
43:13 52:4
64:6 66:21
67:3 73:16
74:18 83:20,23
87:7 93:8
99:12,13,21,22
101:24 102:4
102:19 104:24
105:7 110:1,24
112:17 116:12
121:5,13 122:5
122:17 124:18
128:17 132:4
133:20 135:4
135:24 136:4,7
138:6 144:11
145:14 146:16
146:19 148:1,4
149:24 157:6
161:18 162:15
164:19 168:2
168:12 169:19
172:3 174:16
182:18 184:6
185:5,8 187:5
192:17 194:21
194:23 196:19
197:7 198:3,17
205:23 207:23
211:17,25
214:4 218:17
219:22,23
220:5,11,12,23
221:1 223:6
226:14 228:1
236:12 239:23
244:5 246:3,5
246:6 247:17
248:19 252:13

254:21 255:1
262:22 264:14
266:4,7 267:7
267:15,22,23
268:1,19,21,25
269:10
**timeframe**
25:16 30:13
200:15
**timeline** 111:3
**times** 34:4 70:24
70:25 84:12
88:21 119:8
219:5 227:5
236:22 237:17
261:3
**tired** 184:21
**title** 8:10 29:2
29:18 233:3
**today** 6:6 8:23
8:24 11:7,17
16:21 56:14,18
95:5 145:14
146:23 190:10
261:24 268:23
269:1
**today's** 17:23
**Todd** 3:11 39:10
138:19
**told** 42:10 82:19
82:22 88:1
89:19 90:19
91:2 95:13
99:5,16,23
101:14 110:7
118:5,7 127:24
127:25 140:3
140:17 141:6,9
141:25 147:4
160:5 173:1
200:22 211:2
212:22 213:22
218:9 221:7
239:25 242:10



247:2 248:20
263:5
**tool** 59:10
**top** 37:1,11 39:4
42:24 43:8
73:19 74:3
75:24 76:2
101:13 107:2
150:6 171:15
179:4 193:3
197:5 204:4
208:25 215:25
218:25 219:1
224:21 226:18
229:7 235:18
244:7 251:10
253:3
**topic** 28:17
**total** 100:18,20
100:20 103:14
195:16
**totality** 21:19
**totally** 9:17
195:25
**town** 200:16
218:5
**towns** 201:7
**trade** 176:18
266:18
**traffic** 14:21,24
92:19,20
171:12 181:18
189:13 235:17
236:21,23
**trafficking**
171:9
**train** 59:9
**trained** 27:18
**training** 3:17
26:16,19,20,24
27:4,5,20,22
28:3,4,13
29:25 30:1,4,6
30:9,11,16,19

30:21 57:3
59:10,19 60:7
60:9,15,21
62:25 66:10
141:6,10,14,15
141:18
**trainings** 27:1,7
28:16
**transcribing**
145:24
**transcript** 269:4
272:20
**transported**
252:9,15,23
253:24 254:1
**transporting**
252:11
**travel** 27:23
28:15 30:22
69:16 84:17
90:8
**travelers** 40:9
**traveling** 40:8
267:19
**trending** 209:8
**tried** 219:5
**trigger** 231:24
**true** 32:8 65:14
102:23 160:17
193:20 260:10
271:8 272:12
**truth** 11:7 84:4
84:4 122:21
123:21 124:10
125:9 151:17
**truthfully** 11:17
14:12
**try** 9:19 13:16
**trying** 22:19
63:22
**Tucson** 229:15
**turn** 47:16
96:16 142:16
148:11

**turned** 140:4,5
**turnstile** 82:2,4
82:18,20
**turnstiles** 81:5
81:19,22
**two** 18:15,16
29:22,23 30:17
38:12 47:11
49:5 61:21
63:2 65:9
93:13 94:11
97:16 98:23
99:19 101:19
103:1,17
141:21 145:16
149:3 160:5
163:3 172:22
173:18 184:3
184:19 198:3
200:3 201:12
201:22 241:21
245:3 246:19
246:20 247:3
257:9 259:1,6
262:8 265:20
266:9,20 268:7
**two-page** 96:17
**Tyler** 2:22 6:9
15:15 35:11
36:5,12 37:11
39:16 42:23
51:10,18,20
52:4 54:25
57:2 58:2,9
59:13 61:4
62:1 65:1 66:5
66:18 67:18
72:20 73:11
75:1,23 80:11
85:17 91:7,12
91:24 94:19
96:7 97:5,12
105:1,5 107:4
110:17 113:11

115:24 121:16
123:11 129:11
131:18 138:5
138:22 144:14
144:18 148:19
149:2 152:25
161:5 168:13
169:9 170:20
182:13 186:18
188:2 196:5,17
203:11,25
207:15,19,25
215:3,7,9
222:2 223:8
224:20,24
226:18 227:11
228:3,10 234:7
244:10 253:3
254:24 258:16
261:6
**type** 21:22
130:25 242:3
**types** 98:19

──────────
**U**

**UAC** 241:14,18
241:23 246:13
246:18
**UACs** 241:14
267:22
**UDAs** 247:18
**uh-huh** 9:7
25:18 51:1
119:14 151:22
**un** 233:4
**unaccompanied**
45:10,17
241:17
**unclear** 36:9
38:25 173:11
**uncomfortable**
253:9,11
267:14
**underneath**

63:16
**undersigned**
271:15 272:9
**understand**
8:16 9:8,22
10:4,13,18,24
11:6,9,13,19
11:24 13:16
16:20 19:1
22:3,14,19
23:1,2 45:6
46:2 58:25
59:11 60:14
63:13,14,20,22
69:22 93:19
104:25 112:22
122:23 125:16
143:4 150:17
151:10,23
152:18 153:15
155:8 156:15
158:13,14
159:8 160:23
160:25 164:11
165:15 180:21
185:15 211:5
219:6 227:19
231:9 242:11
242:24 245:8
**understanding**
49:22 67:5
79:2 99:22
143:13 144:25
147:3,25
148:14 158:17
166:24 167:1
167:15,20
168:5,5 173:12
173:13 178:2
219:5 254:12
266:11
**understandings**
175:5,6
**understood** 9:20



9:21,25 10:3
11:4 12:2
136:15 245:17
245:21 248:10
**undertake**
26:16
**undertaken**
27:2
**undocumented**
92:21 188:19
189:25 191:8
193:22
**unfeasible** 50:15
**Unfortunately**
96:11
**unintelligible**
233:4
**unit** 241:23
246:7,19 251:8
251:14,18
259:16
**United** 1:1 6:4
6:20 25:20
32:8,11,17,20
33:4,9,18
34:14 48:20
65:11 90:5
94:13
**units** 45:11,18
63:20 244:25
245:9,23 246:4
**unreasonable**
206:5
**unsure** 155:23
156:20,25
158:9,12,15
**unusual** 23:8
**update** 209:7
**updated** 217:8
**updates** 67:7
68:23
**upwards** 247:3
248:21
**usage** 161:17

**use** 38:24 56:14
60:23 61:16
62:25 63:4,8
64:7,12 68:18
72:5,8,15
147:22 169:2
174:3,12
177:13,17
214:15
**useful** 43:11
**uses** 47:14
**utilize** 191:12
**UVAs** 190:11
**U.S** 2:13 31:9,9
31:12 32:12,21
46:17 47:4,6
48:16 75:19,20
82:8,9 93:24
95:7,18 133:5
134:8 135:6,12
137:14,19
143:2 233:2
253:25

_____

**V**

**v** 6:3 20:17
**vague** 77:19
195:13
**variables**
246:15,23,25
**veracity** 108:21
122:21 124:10
**verbal** 9:6
185:17
**verbatim**
143:11 176:19
**versus** 7:20
156:23
**vested** 81:12
**video** 3:17 28:25
56:22,24 57:3
57:14,23 58:5
58:7,10,13,18
58:23 59:4,14

59:19,20,21,24
60:4,7,9,15,21
62:22,25 63:4
63:8,22 64:4
64:13 65:5
66:1,6,10 67:2
67:3,15,21
68:2 146:16
269:9
**videoconferen...**
1:21 9:13
**videographer**
2:22,23 6:1,8
15:18 37:4,7
37:13 39:6,18
39:21 42:25
43:2,5 48:6,10
51:23 52:12,14
53:4,25 55:1,4
57:6,9 58:4
59:16 61:6,9
61:11 62:4
65:3 66:7
67:20 72:23
73:22,24 74:1
74:4,6,8 75:4
75:25 76:4
80:14,17 83:19
83:22 85:22
86:16 91:11,14
92:5,7 93:6
94:21,24 96:11
97:7,14 105:18
105:21,23
106:2,5 107:6
110:19 113:10
113:23 115:4
116:5 121:20
123:13 129:14
129:20 130:4
130:10,23
136:3,6 138:24
139:16,22
144:15,21

146:6,15,18
148:21 149:4
149:13 153:1
161:7 163:16
163:23 164:7
164:11 168:15
169:11,24
170:2,4,6,8,15
170:21,25
182:10,15
185:4,7 186:15
187:9,12
191:20 192:11
192:13 196:11
196:14 197:12
197:14 202:2
202:10,15
203:9,21,23
204:3,10,12
207:17,20
208:4 210:15
215:5 216:7
220:22,25
223:10,15
225:9,18,21
226:19 227:14
227:23 228:12
228:14 230:11
230:14,16,18
234:10,12,14
235:25 236:3,6
236:8,10 237:4
237:9,21
238:19 244:3
247:9,12
249:20 250:2,5
250:7,9,15,17
250:20,22
251:23 253:4
255:2,5,10,15
256:19,21,23
257:1,4 258:19
261:10,20
262:14 266:3,6

269:8
**videos** 59:9,10
64:19,23 66:12
68:14 268:20
**VIDEOTAPED**
1:9,13 272:5
**view** 59:25
186:2,7 209:3
**viewed** 67:15
**violate** 137:18
**violates** 95:10
**violating** 133:6
**violation** 92:25
94:14 252:12
253:13 254:5
**visas** 92:21 95:5
**visit** 70:12 71:17
**visited** 201:1
**visits** 71:6
**vs** 1:4
**Vásquez** 150:9
150:13,17
151:8,17 152:8
152:14 154:18
156:14 158:9
160:17,24
**Vásquez's** 153:5
153:14 155:8
155:22 157:2,6

_____

**W**

**wait** 9:17 10:8
35:18 42:4
44:10 84:21
114:11 117:19
121:17 131:14
134:21,21
145:16 184:3
184:19 202:25
246:6 247:3
252:9 258:12
**waited** 160:5
184:18 248:21
**waiting** 46:3



51:5 191:8
198:4 201:13
201:23 202:4
203:1 216:21
217:2 218:1,20
245:2 248:3,23
249:7,8 262:8
**walk** 32:9,18
33:18
**walking** 33:7
**walks** 33:9
**walkway** 32:10
32:19 33:8
**want** 23:18
36:16 38:2
48:7 51:14,18
61:25 66:16
72:24 76:1
77:23 81:18
83:4 84:11
91:23 92:1
105:7 116:12
120:23,24
121:10,24
123:24 129:16
135:20 139:3
145:18 168:9
169:4 170:23
178:1,25
182:23 183:22
183:24 187:4
191:22 196:6
198:17 203:10
203:14,15
207:7 220:2
222:23 223:1
223:11 224:9
256:5 257:5
261:16
**wanted** 35:18
42:7 77:25
85:6 96:16
138:12 166:22
245:16,20,20

**wants** 32:7,16
78:12
**warn** 120:24
**Washington**
2:10,15 131:6
229:13 231:12
232:13
**wasn't** 100:10
134:15 147:22
173:6 180:18
240:24 242:2
257:10 260:2
**watch** 123:16
124:6 127:24
198:1
**way** 20:1 32:9
33:22 78:2
80:12 82:14
92:23 102:8
118:15 119:7
148:10 153:11
166:17 200:24
212:14 220:6
224:25 226:18
250:1
**web-based** 9:13
**Web-Ex** 52:18
**weeks** 245:3
248:23
**weird** 57:16
**welcome** 136:11
185:9 221:2
234:18
**went** 71:17
111:11 120:18
126:5 165:25
217:6
**weren't** 12:20
96:3 235:1
254:7
**Western** 218:10
**we'll** 23:16
47:15,15 86:5
102:5 103:10

169:20 175:1
184:11 185:1
205:13 207:25
209:9 215:25
254:25
**we're** 8:19 17:4
58:9 118:25
119:12 134:23
134:24 143:21
145:11 153:10
185:4,7 220:25
238:15 241:1
243:17 250:3
265:17 269:9
**we've** 244:17
**Whatever's**
73:7
**When's** 149:24
164:19
**wife** 24:4
**willing** 118:15
118:18 119:6
146:24 161:1
**wish** 220:10
**wished** 84:18
**wishes** 33:17
**wishing** 33:3
**withdraw**
198:14 217:14
242:25
**witness** 1:14
6:24 7:5 19:23
20:19,21 22:1
35:23,25 36:11
36:19 37:5,8
38:5,11,17,20
46:9 51:2,16
52:1,6,10,13
53:2,5 62:8,10
63:7 65:24
66:4 67:13
69:8 71:12
72:1 73:18,23
73:25 74:2,5,7

74:9 76:16
80:24 83:9
85:2 86:8,11
86:14,19 90:25
91:22 92:3,6,8
93:9 94:18
95:21 96:23
97:3,8 99:8
103:7 105:10
105:13,16,19
105:22,25
106:3,7 108:23
112:21 113:3
113:16,18,22
113:24 115:8
116:11,14,16
120:12 121:4,8
121:11 122:3,6
123:7 124:1,3
125:6 129:15
129:18,21
131:1 135:19
136:1 137:21
138:14,17
139:6,13,17,23
140:9,23 142:5
142:9,14,21
143:16 144:4,8
145:2,7 146:1
146:11 148:18
149:9,12,14
151:2,20
152:13,23
154:13 155:3
155:12 156:5
156:19 158:7
158:19 160:5
160:22 162:19
162:22 163:8
165:15,22
167:4,18
169:15,21,23
169:25 170:3,5
170:7,9,13,16

172:7 173:6
175:13 177:5
177:11 178:5
178:10 179:22
180:9,21
182:11,16,20
184:24 185:3
186:24 187:3,7
187:10,13
188:9 191:21
192:6,9,12,14
195:4,14
196:23,25
197:3,9,13,15
198:12,20
201:15,20,25
202:3 203:4,17
203:20,22
204:5,9,11,13
205:25 207:14
208:2,5,12
210:12,16
211:22 212:5
213:1,20 215:9
217:18 218:13
223:13,16,20
224:15 225:7
225:10,17,19
227:20 228:13
228:15 230:1,5
230:7 231:9,15
231:22 233:9
233:20,25
234:11,13,15
236:15 243:14
243:23 244:6
246:22 249:25
250:3,6,8,12
250:14,16,18
250:21,24
254:11 256:8
256:11,13,17
256:20,22,24
257:2,10 258:6



| | | | | |
|---|---|---|---|---|
| 259:4 260:24 | **wrap** 222:20 | 26:8,9 77:9 | **00566075** 4:21 | 265:18 |
| 261:14,19,21 | **write** 230:21 | 149:17 224:19 | 215:16 | **10:50** 6:8 |
| 262:22 263:13 | **writes** 239:7 | **years** 25:24,25 | **00576995** 4:10 | **100** 151:25 |
| 263:23 265:3 | **writing** 62:7 | 27:12,13,17 | 114:3 130:2 | 153:16 155:10 |
| 265:12,15,25 | **written** 13:11,11 | 29:16,22,23 | **00577299** 5:3 | 155:24 156:16 |
| 268:3 271:15 | 13:22 28:6 | 33:15 34:1 | 228:4,21 | 194:11 195:12 |
| 272:21,22 | 29:4 156:22 | 99:19 141:4,19 | **00767892** 5:9 | 212:2 213:7 |
| **witnessed** 71:19 | **wrong** 23:8 | 141:20,21,24 | 251:3 | 217:6 227:5 |
| 72:14 126:10 | 128:18 196:7 | **yellow** 80:25 | **00814130** 129:3 | 260:16,21 |
| 126:11 | | 251:12 | **0089300** 148:20 | 267:5 |
| **Wolarsky** 2:21 | **Y** | **Yep** 215:4 | **00899300** | **10012** 2:6 |
| 17:20 | **yeah** 13:21 | **yesterday's** | 149:19 | **1006** 222:4 |
| **Wolf** 7:20 | 15:18,21 20:16 | 150:19 151:9 | **00899313** 171:4 | **105** 4:7 |
| **wondering** | 43:3 44:4 | **York** 2:6,6 | **00909668** 3:23 | |
| 39:13 77:12 | 46:10 51:20,24 | **young** 246:23 | 91:9 92:12 | |
| **word** 21:23 23:8 | 52:10 57:17,21 | 248:24 | **00909720** 3:16 | 162:13 |
| 23:8 91:1 | 61:13,13 62:23 | | 51:11 53:11 | **11th** 171:17,23 |
| 200:25 | 66:18,20,23 | **Z** | **00911036** 3:21 | **11:41** 171:25 |
| **worded** 102:8 | 68:1 73:3 | **zero** 193:22 | 85:18 86:24 | 182:6 |
| **words** 92:22 | 76:12,21 80:17 | **Zoe** 2:18 | **00911232** 4:13 | **11:50** 1:17 6:7 |
| 119:16 181:22 | 80:19 81:1 | **zoom** 1:20 39:1 | 162:14 163:14 | **1101** 2:9 |
| **work** 8:20 20:4 | 83:10 91:15,18 | 39:19 43:1 | **01037220** | **114** 4:10 |
| 24:19 26:5 | 97:4 99:20 | 93:5 94:23 | 187:20 | **12th** 4:7 106:12 |
| 66:21 81:4 | 105:5 113:11 | 182:13 | **01205190** 4:17 | 122:2 |
| 83:15 145:11 | 113:18 114:14 | **zooms** 116:5 | 204:18 | **12/31/21** 273:7 |
| 153:9 178:12 | 114:18 115:2,2 | | **0137408** 4:19 | **12:35** 83:20 |
| 178:18 220:13 | 116:1,3 144:15 | **0** | 208:18 | **12:47** 83:23 |
| 221:21 | 144:17 146:3 | **0** 51:11 | | **13** 196:6 198:8 |
| **worked** 30:6,12 | 149:2 155:3 | **00011374** 3:13 | **1** | 198:24 199:10 |
| 128:16 141:3,3 | 163:6 164:3,4 | 35:12 37:21 | **1** 35:12 89:12 | 199:25 200:8,9 |
| 238:13 | 170:11 171:24 | **0002896** 4:4 | 138:6 | 261:9 262:18 |
| **working** 13:24 | 192:3,3 197:7 | 97:20 | **1st** 10:16 | **13th** 4:13 |
| 25:19 33:15 | 202:10 208:3 | **00046133** 4:9 | **1:00** 181:16 | 163:13 172:23 |
| 41:11 45:16 | 210:20 220:21 | 105:3 106:14 | **1:14** 66:6,19 | **130** 4:12 |
| 66:13 147:25 | 220:21 222:17 | **00059739** 4:6 | **1:23** 67:19,19 | **1328** 61:21 63:2 |
| 182:22 219:8 | 223:7,19 | 97:25 | **1:30** 73:1 83:4 | **14** 4:23 193:25 |
| 252:19 262:23 | 234:25 239:20 | **00190367** 3:20 | **1:45** 83:14 | 234:5 245:10 |
| **works** 167:10 | 240:20 249:22 | 74:14 | **1:51** 136:4 | 245:20,23 |
| **wouldn't** 38:24 | 250:23 252:18 | **00303561** 4:15 | **10** 4:19 121:17 | 246:6 |
| 47:12 58:2 | 253:16 256:14 | 197:19 | 129:2 138:23 | **14th** 4:10 114:2 |
| 85:13 91:3 | 257:4,13 | **0037849** 192:21 | 208:18 265:19 | 115:16 117:13 |
| 109:2,3 120:13 | 258:14,14 | **00390069** 57:4 | 266:1 | 129:25 224:4 |
| 134:12 147:13 | **year** 12:9 14:2 | **00565178** 5:5 | **10,000** 248:21 | 224:19 225:25 |
| 166:4 214:17 | 23:4 25:1 26:7 | 235:11 | **10-minute** | **1430** 4:12 130:8 |



**15** 18:12 83:8
121:6,11 203:8
210:7
**15th** 4:8 106:13
129:25 224:11
**15's** 121:14
**15-minute** 73:6
83:3,11 265:18
▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮
**16th** 4:23 224:4
224:18 225:24
225:24
**1602** 210:18
**163** 4:13
**17** 5:3 228:20
**17th** 2:9 192:24
193:8
**17-CV-02366-...**
1:4
**18** 1:11,16 27:16
27:16 215:1
272:7
**18th** 4:14 6:6
197:18 262:2
265:9
**19th** 4:14
197:18
**1929** 27:3
**197** 4:14
**1980s** 25:6,7
**1991** 26:2,4,12
141:18
**1992** 26:10,13
27:4 28:3,13
141:7,18

——— **2** ———

**2** 72:21 89:12
**2nd** 188:3,16
191:5
**2:11** 244:2
**2:18** 136:7
**2:26** 245:6
**2:30** 146:16
**2:31** 146:19
**20** 15:16 25:24
25:25 56:16
135:22 137:12
167:23 194:5
220:16 222:3
**2000** 58:14
225:24
**20036** 2:10
**20044** 2:15
**2010** 14:3
**2011** 150:16
**2014** 45:10,18
267:9
**2015** 14:3,5 29:8
29:9 69:12
72:13 125:19
**2016** 4:7,8,10
10:17 33:22
34:2,4,20 35:9
35:10 40:22
41:4 42:11
45:12,18 58:14
81:23 99:12,21
100:4,8 106:12
106:13 107:16
114:2 115:16
117:13,15,23
117:25 118:23
119:1,1 120:10
122:2,10
127:22 129:25
130:15 131:20
134:23 137:12
138:20 140:10
142:10,12
147:13 260:14

**2017** 5:3 228:20
**2018** 3:13,14,19
3:22 4:3,5,13
4:14,16,18,20
4:23,24 5:5,8
19:13 22:25
27:15 37:19
40:1,13,24
43:10,19 53:10
53:16,19 55:12
56:17 57:25
69:12 72:13
74:13 75:9,12
78:20,22 79:4
87:4,10 88:2
92:11 93:5
94:8,10 97:18
97:23 99:8
100:5,8,13,16
101:12,20
102:11 103:15
125:19 150:2
150:22 154:17
159:7 161:10
163:13 165:7
167:23 171:17
172:24 188:4
188:17 189:10
189:18 191:5
192:24 193:8
194:11 197:18
199:15,19
200:13 201:13
201:18 204:16
205:3,8 208:17
215:15,23
216:10 217:16
218:22 219:3
219:19 224:4
225:25 235:9
235:22 251:2
253:14 255:12
262:2 263:7,15
263:18,25

**264:3** 265:9
**2019** 27:14
224:5,11,19
225:25
**202-355-4471**
2:10
**2020** 1:11,16 6:6
168:20 271:17
272:7 273:2
**2020514-4120**
2:15
**204** 4:16
**208** 4:18
**21** 249:19 255:4
**212-614-6454**
2:6
**215** 4:20
**22** 3:16 53:11
145:15 ▮▮▮▮
▮▮▮▮▮▮▮▮
228:4 262:19
262:20,24
**224** 4:22
**228** 5:3
**23** ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮
262:19,20,24
**235** 5:5
**24** 61:10
**25** 61:4 ▮▮▮▮
▮▮▮▮▮▮▮▮
171:12 239:9
239:13 240:9
240:10 254:25
255:13,18
**251** 5:8
**258** 5:10,11
**26** 215:23
216:10 254:25
255:18 258:17
**26th** 218:22
**266** 3:4
**268** 3:5
**27** 27:12,13,17
33:15 141:4,19

**258:24** 260:5
**27th** 3:13 37:18
37:19 40:1
43:10,19 44:13
**27-year** 141:10
**270** 3:5
**271** 3:6
**272** 3:6
**28** 3:14 53:10,19
188:18
**28th** 55:12
57:25
**298** 3:11 35:12
35:13 37:16
39:9 138:8
140:13
**299** 3:14 51:11
51:12 53:9,12

——— **3** ———

**3** 85:18 163:17
**3rd** 4:3 20:17
93:4 94:8,10
96:24 97:17
98:23 100:16
101:12,20
102:11,19,23
103:15,18
**3:10** 135:22
**3:20** 185:5
**3:33** 185:8
**30** 160:10
205:10 210:22
**30th** 3:21 86:23
87:4 219:3
**30-day** 205:1
210:1
**300** 3:17 5:4
57:5 228:21
**301** 3:19 72:21
72:22 74:12
**302** 3:21 85:18
85:19 86:22
87:14



**303** 3:22 91:8,10
  92:10
**304** 4:3 97:17
  98:1 103:25
**305** 4:5 97:22
  98:1 104:1
**306** 4:7 105:2,4
  106:11,23
**307** 4:10 113:19
  114:1,4 121:18
  129:24
**308** 4:12 129:3
  130:3,5,6
  138:23 139:2
**309** 4:13 162:14
  163:10,12,17
  163:20,22,24
  164:13,15
  170:19
**31** 217:12
**310** 4:14 163:17
  163:18,24
  170:22 196:6,8
  196:11,15
  197:17,20,22
  261:12
**311** 4:16 196:13
  204:15,19,25
  210:6
**312** 4:18 208:9
  208:16,19,23
**313** 4:20 215:2
  215:15,17
**314** 4:22 222:3,6
**315** 5:3 171:4
  228:4,19,22
  229:1
**316** 5:5 235:9,12
**317** 5:7
**318** 5:8 251:1,4
  251:7
**319** 5:10 258:10
  258:15
**32** 4:12 130:8

**320** 5:11 258:11
  258:12,15
**35** 3:11
**36** 4:9 106:14

**4**
**4** 91:8
**4th** 4:5 97:9,23
**4X** 96:8,12
  97:12
**4Y** 96:8 97:6
**4:18** 220:23
**4:27** 221:1
**4:30** 185:1
**40** 59:14 217:2
  218:1,20
**41** 189:24
  190:11 191:7
**42** 260:6
**43** 244:12,20,24
  248:2
**430** 15:16
**44** 100:24,25
  101:1,15
**45** 59:14,15
**49** 65:1

**5**
**5** 5:10 16:5,11
**5th** 5:8 251:2
  255:12 258:11
  259:1,6,17
**5:28** 266:4
**5:43** 43:10
**5:44** 266:7
**5:47** 1:17 269:10
  269:11
**50** 192:21 200:4
**51** 3:14
**57** 3:17 65:2,2
  66:19

**6**
**6** 5:11
**6th** 3:22 4:16

  5:8 92:11
  204:16 205:8
  209:24 210:16
  251:2 259:1,7
**6:00** 184:1,15
**63** 4:15 197:19
**64** 259:25
**666** 2:5
**69** 3:20,23 74:14
  92:12

**7**
**7** 3:4 105:2
**7th** 2:5 150:22
  194:11 235:22
**70** 209:4,19
  211:3 212:12
  212:16,23
  213:15,24
  214:3 221:8
  225:2,4,5,15
  226:2,7,15,16
  263:9,25 264:5
**705** 2:9
**7093** 273:6
**72** 3:19
**74** 216:24 218:3
**75** 3:13 37:21
**76** 4:21 215:16

**8**
**8** 113:8
**8th** 3:19 5:5
  74:13 75:9,11
  150:2,16
  154:17 159:7
  235:9
**80s** 12:10
**82** 5:6 235:11
**85** 3:21 168:13
  168:14 171:2
**86** 191:18
  192:20,24
**868** 2:14

**87** 186:14
  187:19,21
  261:7
**89** 148:20
  149:16 150:3
  168:25

**9**
**9th** 4:16 168:19
  204:16 205:3
  210:2
**9/11** 30:13
**91** 3:22 4:17
  204:18
**92** 27:13
**95** 171:11
**96** 4:11 114:3
  130:2
**97** 4:3,5

