Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| | ) IN THE DISTRICT COURT |
| AL OTRO LADO, INC., ET | ) |
| AL., | ) |
|    PLAINTIFFS, | ) CASE NO. |
| | ) 17-cv-02366-BAS-KSC |
| VS. | ) |
| | ) |
| | ) |
| KEVIN K. MCALEENAN, ET | ) |
| AL., | ) |
|    DEFENDANTS. | ) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIAL

ORAL AND VIDEOTAPED DEPOSITION OF

SAMUEL CLEAVES

MAY 20, 2020

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION of SAMUEL CLEAVES,
produced as a witness at the instance of the Plaintiff,
and duly sworn, was taken in the above-styled and
numbered cause on May 20, 2020, from 8:59 a.m. to 5:04
p.m., Mountain Time, before Delia Ordonez, CSR in and
for the State of Texas, reported by machine shorthand,
via Webex Magna LegalVision.

Magna Legal Services

866.624.6221

www.MagnaLS.com



Page 2

```
 1                  A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFFS:
 4         Matthew Fenn
           Sydney Fields
 5         Mayer Brown
           1999 K Street, N.W.
 6         Washington, D.C. 20006
           202.263.3221
 7         Mfenn@mayerbrown.com
           Sfields@mayerbrown.com
 8
      FOR THE DEFENDANTS:
 9
           Katherine J. Shinners
10         Ari Nazarov
           U.S. Department of Justice
11         Office of Immigration Litigation
           Ben Franklin Station, P.O. Box 868
12         Washington, D.C. 20044
           202.598.8259
13         Katherine.j.shinners@usdoj.gov
           Ari.Nazarov@usdoj.gov
14
           Rebecca Cassler
15         Southern Poverty Law Center
           1101 17th Street, N.W., Suite 705
16         Washington, D.C. 20036
           202.355.4471
17
18    ALSO PRESENT:
19         Evan McCulloch
20         Louisa Slocum, CBP
21    THE VIDEOGRAPHER:
22         Solange Tran
23    THE MAGNA LEGAL TECHNICIAN:
24         Kevin Cranford
25
```



1                          INDEX

             ORAL AND VIDEOTAPED DEPOSITION OF

2                      SAMUEL CLEAVES

                       MAY 20, 2020

3

4                  E X A M I N A T I O N

5    SAMUEL CLEAVES                          P A G E

6    Examination by Mr. Matthew E. Fenn....    7

7    Examination by Ms. Sydney Fields......  199

8    Examination by Ms. Katherine J. Shinners  246

9    Signature and Changes.................  250

10   Reporter's Certificate................  252

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
                                                          Page 4
 1                          EXHIBITS
              ORAL AND VIDEOTAPED DEPOSITION OF
 2                      SAMUEL CLEAVES
                        MAY 20, 2020
 3
 4    NO.             DESCRIPTION                  P A G E
 5    Exhibit 3       Metering Guidance           121
 6    Exhibit 79      30(b)(6) Notice              14
 7    Exhibit 86      AOL-DEF-00041455            183
 8    Exhibit 159     AOL-DEF-00090647             33
 9    Exhibit 160     AOL-DEF-00290938             32
10    Exhibit 161     AOL-DEF-00273818             68
11    Exhibit 162     AOL-DEF-00027382             81
12    Exhibit 163     FRE 1006 Summary of Impact to  83
                      Port Operation 2018
13
      Exhibit 164     Defendants' Supplemental and   90
14                    Amended Responses to
                      Plaintiffs' Fourth Set of
15                    Interrogatories to All
                      Defendants
16
      Exhibit 165     AOL-DEF-00047772            125
17
      Exhibit 166     AOL-DEF-01267496            132
18
      Exhibit 167     AOL-DEF-00272935            134
19
      Exhibit 168     AOL-DEF-00272936            141
20
      Exhibit 169     Defendants' Objections and  149
21                    Responses to Plaintiffs'
                      Fifth Set of Interrogatories
22                    to All Defendants
23    Exhibit 170     Human Rights First Report   155
24    Exhibit 171     AOL-DEF-00038270            163
25    Exhibit 172     AOL-DEF-00037758            171
```



Page 5

1                        EXHIBITS

          ORAL AND VIDEOTAPED DEPOSITION OF

2                     SAMUEL CLEAVES

                      MAY 20, 2020

3

4    NO.          DESCRIPTION                P A G E

5    Exhibit 173  Beto O'Rourke Twitter Video    175

6    Exhibit 174  AOL-DEF-00095574              189

7    Exhibit 175  AOL-DEF-00799450              200

8    Exhibit 176  AOL-DEF-00808783              206

9    Exhibit 177  AOL-DEF-00845774              214

10   Exhibit 178  AOL-DEF-00811791              218

11   Exhibit 179  AOL-DEF-00838795              224

12   Exhibit 180  AOL-DEF-00851607              236

13   Exhibit 181  AOL-DEF-00842504              241

14

15

16

17

18

19

20

21

22

23

24

25



Page 6

1          THE VIDEOGRAPHER:  We are now on the

2     record.  This begins Media No. 1 in the deposition of

3     Sam Cleaves in the matter of Al Otro Lado, Inc., et al.

4     versus Kevin K. McAleenan, et al., in the United States

5     District Court Southern District of California.

6               Today is Wednesday, May 20th, 2020, and the

7     time is 9:59 a.m.  This deposition is being held

8     remotely at the request of Mayer Brown, LLP.

9     Videographer is Solange Tran, our trial tech, Kevin

10    Cranford, and the court reporter is Delia Ordonez, all

11    through Magna Legal Services.

12              Will counsel and all parties present please

13    state their appearances and who they represent?

14          MR. FENN:  Matthew Fenn from Mayer Brown,

15    and I represent the plaintiffs.

16          MS. FIELDS:  Sydney Fields from Mayer

17    Brown, also for the plaintiffs.

18          MS. SHINNERS:  Katherine Shinners from U.S.

19    Department of Justice for the defendants.

20          MR. NAZAROV:  Ari Nazarov, also from the

21    U.S. Department of Justice, for the defendants.

22          MS. SHINNERS:  And we have agency counsel

23    present from U.S. Customs and Border Protection, Louisa

24    Slocum, and Evan McCulloch on the phone.

25              THE VIDEOGRAPHER:  Will the court reporter



Page 7

1   please swear in the witness?

2                    SAMUEL CLEAVES,

3   having been first duly sworn, testified as follows:

4                    EXAMINATION

5   BY MR. FENN:

6       Q.  Good morning, Mr. Cleaves.  Thank you for

7   taking the time to testify today -- we -- we appreciate

8   it -- under more challenging circumstances than -- than

9   normal.

10      A.  Yes, sir.

11      Q.  My name is Matt Fenn, and I represent the

12   plaintiffs in this action, as you just heard.  Before we

13   begin, I'd like to go over some ground rules.  This is a

14   one-way conversation in which I and my colleague,

15   Ms. Fields, will ask you questions, and you answer them.

16   So that the court reporter can accurately record your

17   testimony, you must give audible responses, no head

18   shakes, no "uh-huhs."  Do you understand that?

19      A.  Yes.

20      Q.  And as you've probably seen already, given the

21   web format and the slight time lag in the audio

22   transmission, it's even more important than usual that

23   we not talk over each other.  So if you could please

24   wait until I finish a question before answering it, I

25   will also do my best to wait for you to finish your



Page 8

1    answer before I ask the next question.  Do you

2    understand that?

3         A.  Understood.

4         Q.  If you don't understand a question, please tell

5    me.  Do you agree to do that?

6         A.  Yes.

7         Q.  If you do answer the question, I will assume

8    you understood it.  Do you understand that?

9         A.  Yes.

10         Q.  From time to time, your attorney, Ms. Shinners,

11    may object to my question, and that is their right.

12    However, unless you are instructed not to answer my

13    questions, you'll need to provide an answer despite the

14    objection.  Do you understand that?

15         A.  Yes.

16         Q.  We can take a break whenever you wish.  If you

17    need a break, please let me know; however, you must

18    answer any pending questions before we go on a break.

19              As a general rule, unless I state

20    otherwise, my questions relate to the time period

21    January 1st, 2016, through the present.  Do you

22    understand that?

23         A.  Yes.

24         Q.  During this deposition, I'm going to refer to

25    the U.S. Department of Homeland Security as DHS.  Do you



Page 9

1    understand that?

2        A.  Yes.

3        Q.  And I will also refer to U.S. Customs and

4    Border Protection as CBP.  Do you understand that?

5        A.  Yes.

6        Q.  During this deposition, I may refer to a port

7    of entry as a POE.  Do you understand that?

8        A.  Yes.

9        Q.  Do you understand that you are testifying both

10   as a representative of CBP and also in your personal

11   capacity today?

12       A.  Yes.

13       Q.  During this deposition, I'm going to refer to

14   "your knowledge" or "your understanding."  Unless I say

15   otherwise, you should assume that by "you" or "your," I

16   am referring to CBP.  If you are not sure who I am

17   asking about, please say so.  Do you agree to do that?

18       A.  Yes.

19       Q.  Do you understand that you've taken an oath to

20   tell the truth today?

21       A.  Yes.

22       Q.  Do you understand that the oath that you have

23   taken today is the same oath that you would take when

24   testifying in a courtroom?

25       A.  Yes.



Page 10

```
 1        Q.  Do you understand that there are criminal
 2   consequences for lying under oath?
 3        A.  Yes.
 4        Q.  Is there any reason that you cannot testify
 5   truthfully today?
 6        A.  No.
 7        Q.  Do you understand that you are not allowed to
 8   communicate privately with your attorneys or anyone else
 9   during the course of the deposition other than during
10   breaks?
11        A.  Yes.
12        Q.  Do you understand that means that you cannot be
13   texting, e-mailing, or otherwise communicating with
14   counsel other than during breaks or orally so that we
15   can all hear?
16        A.  Yes.
17        Q.  Okay.  Can you please state and spell your name
18   for the record?
19        A.  Samuel Cleaves.  Last name, C-L-E-A, V as in
20   Victor, E-S; first name, Samuel, S-A-M-U-E-L.
21        Q.  Have you ever gone by any other name?
22        A.  Sam.
23        Q.  Are you presently employed?
24        A.  Yes.
25        Q.  Who are you employed by?
```



Page 11

1       A.  Office of Field Operations, U.S. Customs and

2   Border Protection.

3       Q.  And what is your present job title?

4       A.  Assistant port director.

5       Q.  How long have you worked at CBP?

6       A.  Since 2003, the inception of the agency,

7   March 2003.  Before that, the legacy agencies, they

8   comprised CBP, I guess all in told, since December 1996.

9       Q.  Have you ever testified in court before?

10      A.  Yes.

11      Q.  What was the nature of that case?

12      A.  Criminal proceeding.

13      Q.  And what was the criminal proceeding about?

14      A.  Narcotic seizures.

15      Q.  Did you review a copy of the transcript of your

16  deposition in that case in preparation for this

17  deposition?

18      A.  No.

19      Q.  Do you still have a copy of that deposition

20  transcript?

21      A.  I never had a copy of those.

22      Q.  Have you ever testified at any other

23  depositions aside from that criminal matter that you

24  just talked about?

25      A.  No.



Page 12

1      Q.  Have you ever been involved in an arbitration

2    proceeding before?

3      A.  No.

4      Q.  Have you ever testified before a governmental

5    body before?

6      A.  No.

7      Q.  Outside of this case have you ever provided

8    written testimony under oath in an affidavit or

9    declaration?

10      A.  In EEO proceedings, unsworn declaration.

11      Q.  Unsworn declaration?

12      A.  Yes, sir.

13      Q.  When was that?

14      A.  I don't know.

15      Q.  Five years ago?  Ten years ago?

16      A.  At least five years ago.

17      Q.  And you said that was EEOC?

18      A.  There -- yeah, it was EEO filing by someone.

19      Q.  What was that filing regarding?

20      A.  There's been several.  Generally, officer is

21    discontent with whatever job they're doing and someone

22    else got something they didn't.

23      Q.  And, generally, what was your written testimony

24    about?

25      A.  Generally, it was my involvement, which was



Page 13

1    just simply because I worked in that area.  In each of

2    those cases, I don't remember being actively involved in

3    any of them and didn't know much about it.

4         Q.  And in all of those cases, did you testify

5    truthfully?

6         A.  Yes.

7         Q.  Other than traffic offenses, have you ever been

8    convicted of a crime?

9         A.  No.

10        Q.  Other than traffic offenses, have you ever been

11   charged with a crime?

12        A.  No.

13        Q.  Have you ever been arrested?

14        A.  No.

15        Q.  Have you ever been sued before?

16        A.  No.

17        Q.  Have you ever been a party to a lawsuit?

18        A.  No.

19        Q.  Have you ever been disciplined for your conduct

20   at CBP?

21        A.  No.

22        Q.  Are you a member of any social networking

23   platform, such as LinkedIn or Facebook?

24        A.  LinkedIn.

25        Q.  Is LinkedIn the only platform?



Page 14

1      A.  Yes.

2      Q.  So you do not have a Facebook account?

3      A.  I do not.

4      Q.  Have you ever had a Facebook account?

5      A.  No.

6      Q.  Okay.

7           MR. FENN:  Kevin, if we could pull up

8  Exhibit 79, please.

9      Q.  (BY MR. FENN)  Mr. Cleaves, I'm showing you

10 what's been previously marked as Exhibit 79.  It is a

11 document titled "Plaintiffs' Notice of Federal Rule of

12 Civil Procedure 30(b)(6) Deposition of U.S. Customs and

13 Border Protection."

14           Do you see that?

15     A.  Yes.

16     Q.  Have you seen this document before?

17     A.  Yes.

18     Q.  When have you seen it?

19     A.  I think within the last several weeks.

20     Q.  And who showed it to you?

21     A.  Counsel for DOJ or chief counsel, agency

22 counsel.

23     Q.  And when counsel showed you this document, was

24 that the first time that you saw it?

25     A.  Yes.



Page 15

```
 1          Q.  Do you understand that you are testifying as a

 2   Rule 30(b)(6) representative of CBP today?

 3          A.  Yes.

 4          Q.  Do you understand what it means to be a Rule

 5   30(b)(6) representative?

 6          A.  Yes.

 7               MS. SHINNERS:  Objection, calls for legal

 8   conclusion.

 9               MR. FENN:  Kevin, if we could flip to page

10   7 of the document.

11          Q.  (BY MR. FENN)  Mr. Cleaves, do you see a

12   section that is entitled "Topics for Examination"?

13          A.  Yes.

14          Q.  Do you understand that you've been designated

15   to testify on topics 2 and 15 on behalf of CBP?

16          A.  Yes.  But I can only -- I can only see Topic 2.

17          Q.  That's fair.  Let's -- let's take them one at a

18   time.

19               MR. NAZAROV:  And, Matt, can we go off the

20   record for one second?

21               MR. FENN:  Sure.

22               MR. NAZAROV:  Just so we --

23               THE VIDEOGRAPHER:  Hold on.

24               The time is 10:11 a.m.  We're going off the

25   record.
```



Page 16

1              (Off the record.)

2              THE VIDEOGRAPHER:  The time is 9:17 a.m.

3    Mountain Time.  We're back on the record.

4              MR. FENN:  And just to clarify, before I

5    resume questioning, the court reporter stated our start

6    time for the deposition in Central Time, 9:59 a.m.

7    Mr. Cleaves' time is Mountain Time, so that would be

8    8:59 a.m.

9         Q.  (BY MR. FENN)  Mr. Cleaves, thanks for your

10   patience.

11             MR. FENN:  Kevin, if we could pull back up

12   Exhibit 79 on the screen.

13        Q.  (BY MR. FENN)  And, Mr. Cleaves, on -- on

14   page 7 of the document, which you should be seeing now,

15   Topic No. 2 reads:  "Your practice of metering, queue

16   management, and/or Turnbacks at ports of entry,

17   including but not limited to the development of the

18   practice, the reasons for its adoption, and its

19   implementation."

20             Did I read that correctly?

21        A.  Yes.

22        Q.  Are you prepared to testify on that topic

23   today?

24        A.  Yes.

25             MR. FENN:  And, Kevin, if you could turn to



Page 17

1    page 9, please.

2         Q.  (BY MR. FENN)  Topic 15 reads:  "Your

3    communications with Instituto Nacional de Migración

4    ("INM"), Comisión Mexicana de Ayuda a Refugiados

5    ("COMAR") Grupos Beta, or any other Mexican government

6    agency concerning metering, queue management, or

7    Turnbacks."

8              Did I read that correctly, notwithstanding

9    my terrible Spanish accent?

10        A.  Yes, sir.

11        Q.  Are you prepared to testify on that topic

12   today?

13        A.  Yes.

14        Q.  When did you find out that you would be a Rule

15   30(b)(6) witness in this case?

16        A.  I think in February of 2020 it was mentioned,

17   and then everything was suspended with the public health

18   order.  And within the last few weeks, then it was

19   confirmed that I would be a representative for the Port

20   of El Paso in this matter.

21        Q.  And were you notified that you would be a

22   representative for the Port of El Paso or the El Paso

23   Field Office?

24        A.  Port of El Paso.

25        Q.  Who told you that you would be a Rule 30(b)(6)



Page 18

1    witness in this case?

2        A.   Chief counsel and DOJ.  Chief counsel first,

3    probably.

4        Q.   And did that discussion occur via telephone,

5    e-mail, or in person?

6        A.   Everything was by telephone or Webex recently.

7    The only in-person meeting was -- actually, it was both

8    by telephone and in person in February, where the first

9    meeting was being discussed.  That was in person with

10   local chief counsel and on the phone with chief counsel

11   in headquarters.

12       Q.   And when did you begin preparing to testify as

13   a Rule 30(b)(6) witness in this case?

14       A.   Within the last couple of weeks.

15       Q.   Did you review any documents to prepare to

16   testify as Rule 30(b)(6) witness?

17       A.   Yes.

18       Q.   If you had to guess, how many documents would

19   you say you previewed to prepare to testify?

20       A.   Best guess, maybe 100.  That's pages' worth of

21   documents maybe, so I -- I don't think it would be a

22   hundred separate documents, so...

23       Q.   100 pages?

24       A.   Yeah.

25       Q.   And when did you begin reviewing those



Page 19

1    documents?

2         A.  Within the last several weeks.

3         Q.  How long would you say you spent reviewing

4    those documents?

5         A.  I probably went over them a couple times,

6    several hours.

7         Q.  Did you take any notes concerning those

8    documents?

9         A.  No.

10        Q.  Were the documents that -- that you reviewed

11   broken down into categories?

12        A.  No.

13             MS. SHINNERS:  Objection, vague.

14             You can answer.

15        A.  Oh, I'm sorry.

16             No.  They were in chronological order, to

17   the best, I guess, of -- of their ability to put it that

18   way.  Other than that, no.

19             THE REPORTER:  I'm sorry.  Real quick.  The

20   objection is Ms. Shinners?

21             MS. SHINNERS:  Yes.

22             THE REPORTER:  It's just that I can't see

23   who it is.  Okay.

24             MS. SHINNERS:  Yes.  Yes, I'll be -- I'll

25   be the -- I'll be first-chair defending, so I'll be



Page 20

1    speaking and with the objections.

2                THE REPORTER:  Appreciate it.  Thank you.

3    I'm sorry.  Go ahead.

4        Q.  (BY MR. FENN)  Mr. Cleaves, was it your counsel

5    that provided those documents to you?

6        A.  Yes, sir.

7        Q.  Did you discuss those documents with anyone?

8        A.  With counsel.

9        Q.  Did you discuss the documents with anyone at

10   CBP?

11       A.  No.

12       Q.  Did you review any deposition transcripts to

13   prepare to testify as a Rule 30(b)(6) witness?

14       A.  Yes.

15       Q.  Which transcripts, if you remember?

16       A.  Mr. Owens and Mr. Howe.

17       Q.  And how much time would you say you spent

18   reviewing those deposition transcripts?

19       A.  Just the amount of time to read over them.

20       Q.  Did your counsel select those deposition

21   transcripts for you?

22       A.  Yes.

23       Q.  Did you -- did you take any notes regarding

24   those transcripts?

25       A.  No.





Page 21

1          Q.  Did you review any interrogatories to prepare

2    to testify today?

3          A.  Yes.

4          Q.  Do you recall which interrogatory responses you

5    reviewed?

6          A.  No.  They were provided by counsel.  I don't

7    know their names.  I don't know the names of the

8    interrogatories.

9          Q.  Do you recall what topics the interrogatory

10   responses touched on?

11         A.  Yes.  It was generally metering topics.

12         Q.  And did you take any notes regarding those

13   interrogatory responses?

14         A.  No.

15         Q.  Did you review any responses to requests for

16   admissions to prepare to testify today?

17         A.  Request for admission?

18         Q.  Yes.

19         A.  I don't know what you mean by that.

20         Q.  It's a different type of legal document

21   separate from interrogatories but similar.  Sounds like

22   you may not have reviewed any.

23         A.  No, I'm not familiar with that.

24         Q.  And I think you said earlier that you did not

25   speak to any CBP employees to prepare to testify today;



Page 22

1    is that correct?

2                    MS. SHINNERS:  Objection, misstates

3    testimony.

4          Q.  (BY MR. FENN)  You can answer.

5          A.  No, I didn't say that.

6          Q.  I'm sorry.

7                    Did you speak to any CBP -- CBP employees

8    to prepare to testify today?

9          A.  I did.

10          Q.  Which CBP employees did you speak to?

11          A.  I spoke to former watch commander Arnoldo

12    Gomez, and I spoke to some of the assistant port

13    directors at other ports within the El Paso Field

14    Office, although none of them were aware that I was --

15    it was for a deposition.  It was to confirm some

16    information to see if I was remembering things

17    correctly.

18          Q.  Who were the other assistant port directors

19    that you spoke to?

20          A.  I spoke to John Hawkins; Zeke Lopez; Maryann

21    Torres, who's a former assistant port director; and Alex

22    Leos.

23          Q.  Which -- for which port is Mr. Hawkins the

24    assistant port director?

25          A.  Santa Teresa.



Page 23

1      Q.   And how about Mr. Lopez?

2      A.   Columbus.

3      Q.   And Ms. Torres?

4      A.   Tornillo.

5      Q.   And the last person, I -- I missed their name.

6      A.   Mr. Leos, and he's the Presidio.

7      Q.   Could you spell his name for me?

8      A.   Yes, sir.  Last name, L-E-O-S, first name,

9  Alex.

10     Q.   Thank you.  And you said that you did

11  not -- you did not tell Mr. Hawkins or Mr. Lopez,

12  Ms. Torres, or Mr. Leos that you were speaking to them

13  in order to prepare for this deposition; is that

14  correct?

15     A.   That is correct.

16     Q.   Do you remember generally what topics you

17  discussed with Mr. Hawkins, with Mr. Lopez, Ms. Torres,

18  or Mr. Leos?

19     A.   Yes.  It was the same topic.  The phone

20  conversation was probably two to three minutes long for

21  each.  Because I don't work at those ports of entry, I

22  have limited knowledge on -- on the frequency of

23  metering conducted in management at those locations, so

24  I wanted to ask them what that was so I had some

25  knowledge.  Even though it's outside the scope of the



Page 24

1    Port of El Paso, I felt it was not a good idea to have

2    no knowledge of -- of that, so...

3         Q.  And what information were you able to find out

4    from Mr. Hawkins?

5         A.  The information he told me was they use

6    metering on operational consideration only when needed,

7    and they started around the same time as the Port of

8    El Paso, the spring or summer of 2018.

9         Q.  And did you -- were your discussions with

10   Mr. Lopez, Ms. Torres, and Mr. Leos also limited to

11   metering at those ports of entry, Columbus, Tornillo,

12   and Presidio?

13        A.  Yes.

14        Q.  And you said your discussion with each of those

15   assistant port directors or former assistant port

16   directors lasted approximately two to three minutes?

17        A.  Yes.

18        Q.  Were there any attorneys present during those

19   discussions?

20        A.  No, sir.

21        Q.  Did you take any notes during those

22   discussions?

23        A.  No.

24        Q.  Okay.  Did you review any documents that were

25   produced by Al Otro Lado in this litigation?



Page 25

1        A.   Not that I know of.

2        Q.   Have you reviewed any documents that were filed

3    with the court in this case in your preparation?

4        A.   Not that I know of.

5        Q.   Did you review any expert reports in this case

6    in preparing for your deposition today?

7        A.   No.

8        Q.   Did you speak with any consultants hired by the

9    defendants in preparing for your deposition today?

10       A.   No.

11       Q.   Were you provided with or do you have with you

12   any documents to refer to during your deposition today?

13       A.   No, I don't have anything with me.

14       Q.   And do you understand that you cannot refer to

15   any documents during the dep- -- the deposition today,

16   other than during breaks, without telling me that you

17   are doing so?

18       A.   Yes.

19       Q.   So that would include websites or digital

20   documents as well.  Do you understand that?

21       A.   Okay.  Understood.

22       Q.   Have you done any independent research to

23   prepare to testify today?

24       A.   Just the -- the stuff that I just told you

25   about.



Page 26

1      Q.  Did you, for instance, read any news articles?

2      A.  Oh, no.

3      Q.  Without going into the substance of any

4  conversations that you've had with your attorneys

5  regarding this case, have you met with your attorneys in

6  preparation for this deposition?  And by "meeting," I

7  include phone or video conference.

8      A.  Yes.

9      Q.  Who did you meet with?

10     A.  Ms. Shinners, Ari Nazarov, Elsie Reyes, Louisa

11  Slocum, and Evan McCulloch.

12     Q.  (BY MR. FENN)  And was that by telephone?

13     A.  Yes, and Webex.

14     Q.  How many times did you meet with your

15  attorneys?

16     A.  Four.

17     Q.  And how long did those meetings last?

18     A.  Between one hour and two hours.

19     Q.  Each or in total?

20     A.  No, each.

21     Q.  Were there any nonattorneys present at any of

22  the meetings that you had with your attorneys?

23     A.  No, besides myself.

24     Q.  Did anyone participate in your meeting

25  by -- with your attorneys by videoconference?



Page 27

1        A.   I think we all participated by videoconference

2   on some of the meetings.

3        Q.   Outside of your meetings with your lawyers, did

4   you do anything else to prepare for today's deposition

5   that we haven't discussed already?

6        A.   No.

7        Q.   And outside of your conversations with your

8   lawyers and the conversations that you mentioned with

9   Mr. Hawkins, Mr. Lopez, Ms. Torres, and Mr. Leos, have

10  you discussed this deposition with anyone else?

11       A.   No.

12       Q.   Have you read any news stories regarding this

13  lawsuit?

14       A.   No.

15       Q.   Okay.  I'd like to ask you a few questions

16  about your education and your work experience.  What is

17  the highest level of education you've obtained?

18       A.   Bachelor of science.

19       Q.   And where did you obtain your bachelor of

20  science?

21       A.   East Tennessee State University.

22       Q.   And what year did you graduate?

23       A.   Hmm.  1994, I think.

24       Q.   And do you recall your first place of

25  employment after you graduated?



Page 28

1       A.   Yes.

2       Q.   What was that?

3       A.   I think I worked for a restaurant.

4       Q.   Which restaurant was that?

5       A.   I think it was called the Bel-Air Grill.

6       Q.   And you testified earlier that you began

7   working for CBP at CBP's inception in December 2016; is

8   that correct?

9       A.   No, December 1996.

10      Q.   I'm sorry.  December 1996.  I misspoke.

11      A.   Yes, sir.

12      Q.   And prior to that, who did you work for?

13      A.   I was basically unemployed, and I worked at

14  restaurants until I could get a career, so it took a

15  year or so to do that.

16      Q.   When you began working for CBP in 1996, what

17  was your job title?

18      A.   Immigration inspector.

19      Q.   And after you were an immigration inspector,

20  what was your job title after that?

21      A.   I transferred to -- to U.S. Customs Service,

22  and it would have been customs inspector.

23      Q.   And I understand that you were a watch

24  commander for CBP at one point.  Do you recall what year

25  you took that title?



Page 29

1        A.   No, I don't recall the year.  Let me think.

2   Maybe 2009, 2010.

3        Q.   And in what year did you become the assistant

4   port director for the Port of El Paso?

5        A.   2017.

6        Q.   Okay.  When you were a watch commander for CBP,

7   you were a watch commander for the El Paso Field Office,

8   correct?

9        A.   Yes, part of the time.

10       Q.   And how about the rest of the time?

11       A.   I started off as a watch commander for the Port

12   of El Paso, and then I was a watch commander for the

13   El Paso Field Office after that.

14       Q.   Could you explain to me the difference between

15   those two roles?

16       A.   Yes.  The -- the ports of entry fall under the

17   field office.

18       Q.   And do you have different job responsibilities

19   as a watch commander for the El Paso Field Office as

20   compared to a watch commander for the Port of El Paso?

21       A.   Yes.  The -- the watch commander position at

22   the El Paso Field Office was more program management

23   oriented.

24       Q.   Can you explain what you mean by

25   pro- -- program management oriented?



Page 30

1       A.   Yeah.   I guess the only way I can describe it

2   is -- is to contrast it.   So for the port, you're a

3   field manager dealing with events, policy, procedures

4   of -- of that port.   For the field office, it would be

5   more program manager oriented.   In other words, my

6   program management was the Admissibility Advisory

7   Network, now called SEAL -- they renamed it -- Systems

8   Enforcement Admissibility Liaison, so immigration

9   programs and then other programs or tasks as assigned.

10      Q.   Were you a watch commander for the Port of

11  El Paso prior to your time as a watch commander for the

12  El Paso Field Office?

13      A.   Yes.

14      Q.   When you were a watch commander for the Port of

15  El Paso, who did you report to?

16      A.   To the port director.

17      Q.   And who was the port director at that time?

18      A.   There were more than one.   One was Hector

19  Mancha, and one was Bill Molaski.

20      Q.   And when you were a watch commander for the

21  Port of El Paso, did you have any CBP employees

22  reporting to you?

23      A.   Yes.

24      Q.   How many?

25      A.   I don't know.   That changes over time.   But a



Page 31

1    general figure, like during this deposition time, the

2    Port of El Paso had 700 armed officers, so that would be

3    around right.

4         Q.  Okay.  And as a watch commander in the El Paso

5    Field Office, who did you report to?

6         A.  I reported to the border security coordinator.

7         Q.  And who was that at the time?

8         A.  Fernando Thome.

9         Q.  And who reported directly to you?

10        A.  The only direct report I had was in the AN

11   office, and that changed over time.  There were several

12   people -- it was one person, and that one person changed

13   over time.

14        Q.  And what is the AN office?

15        A.  I guess immigration programs, immigration

16   oversight.

17        Q.  Okay.  Was it considered a promotion when you

18   transitioned from watch commander for the Port of

19   El Paso to watch commander for the El Paso Field Office?

20        A.  No.

21        Q.  Just a different role?

22        A.  Yes, sir.

23        Q.  And in your current role at CBP as an assistant

24   port director, who do you report to?

25        A.  The port director.



Page 32

1      Q.   And who is that currently?

2      A.   Beverly Good.

3      Q.   And who reports directly to you in your current

4   role?

5      A.   The watch commanders assigned to passenger

6   operations.

7      Q.   Is that just one person, or are there multiple

8   watch commanders reporting to you?

9      A.   It's currently three.

10     Q.   And what are their names?

11     A.   Ed Miranda, Joe Robles, and John Tobias.

12     Q.   Okay.

13          MR. FENN:   Kevin, if we can pull up

14   Exhibit 160, please.

15     Q.   (BY MR. FENN)  Mr. Cleaves, I'm showing you a

16   document that will be marked Exhibit 160, and you can

17   see it's Bates-labeled AOL-DEF-00290938.  If you'd like,

18   you're welcome to take your time and flip through this

19   document, but it's rather long, and I can direct you to

20   the relevant pages if that's easier.

21     A.   Yes, that'll be.

22     Q.   Okay.  And --

23          MS. SHINNERS:  And for the record -- for

24   the record, Counsel, defense counsel has not received

25   Exhibit 160.  You can go ahead.  I don't want to -- on



Page 33

1    this exhibit, but I just wanted to let you know we've

2    received Exhibit 159 but not 160.

3             MR. FENN:  Okay.

4             MS. SHINNERS:  But you can go ahead --

5             MR. FENN:  Thank you.

6             MS. SHINNERS:  -- for this -- for this

7    time.

8        Q.  (BY MR. FENN)  Mr. Cleaves, have you seen this

9    document before?

10       A.  No.

11       Q.  So I take it, then, that you did not have any

12   role in drafting or otherwise assembling this document?

13       A.  Correct.

14       Q.  I'd like to direct your attention to page 2 of

15   the document.  The title of the page says:  "Director,

16   Field Operations, Mr. Hector A. Mancha."

17             Is that correct?

18       A.  Yes.

19       Q.  Is Mr. Mancha still the director of field

20   operations for the El Paso Field Office?

21       A.  He is.

22       Q.  Do you interact with Mr. Mancha in your role as

23   assistant port director?

24       A.  Yes, from time to time.

25       Q.  Can you describe the nature of your



Page 34

1    interactions with Mr. Mancha?

2         A.  Generally, it's event reporting.

3         Q.  And by "event reporting," what do you mean?

4         A.  Something significant has occurred that the

5    port of -- director and the DFO would need to know

6    immediately.

7         Q.  Can you give us an example of what you mean by

8    something significant that would constitute an event

9    that you might need to speak to -- about with

10   Mr. Mancha?

11        A.  Yes.  Border violence, shooting near the port

12   of entry would be an example.

13        Q.  Did you speak with Mr. Mancha in preparation

14   for this deposition?

15        A.  No.

16        Q.  Okay.

17             MR. FENN:  If we could turn to the next

18   page of the document, please.

19        Q.  (BY MR. FENN)  The next page lists assistant

20   directors Ray Provencio and Christopher Saindon; is that

21   correct?

22        A.  Yes.

23        Q.  Are those two individuals still assistant

24   directors for the El Paso Field Office?

25        A.  They are.



Page 35

1            MR. FENN:  And, Kevin, if we could flip to

2     the next page, please.

3        Q.  (BY MR. FENN)  The next page lists Ms. Patricia

4     Aveitia.  I'm probably butchering that pronunciation,

5     but is she still an assistant director for the El Paso

6     Field Office?

7        A.  No, sir.

8        Q.  And who assumed her role, if anyone, as a third

9     assistant director?

10       A.  His name is Barry Miller.

11       Q.  Thank you.  Did you -- I'm sorry.  Strike that.

12            Do you interact with Mr. Provencio,

13    Mr. Saindon, or Barry Miller in your role as assistant

14    port director?

15       A.  From time to time, yes.

16       Q.  Can you describe the nature of your

17    interactions with them?

18       A.  Sure.  It's different for each one.  For

19    Mr. Provencio, he's over border security, so I interact

20    with him more often than the others, and it's generally

21    event reporting as well, sometimes policy and

22    procedures.  With Mr. Saindon, it's missions report

23    related, supplies, that -- that type of thing.  And --

24    and to be quite honest, I interact with his staff more

25    than I do him.  And with Mr. Miller, he's over trade.  I



Page 36

1    interact with him infrequently, rarely.

2          Q.  Do you recall when Mr. Miller assumed

3    Ms. Aveitia's role?

4          A.  No, sir.

5          Q.  Would you -- was it in the last year or prior

6    to that?

7          A.  I think a year is a good estimate.  It could

8    have been more than a year, though.

9          Q.  Okay.  Did you speak with Mr. Provencio,

10   Mr. Saindon, or Mr. Miller in preparation for your

11   deposition today?

12         A.  I did.  It was a phone call with Evan

13   McCulloch, counsel, and him briefly.

14         Q.  And you said "him."  Which of those three

15   assistant port directors -- I'm sorry -- assistant

16   directors for the El Paso Field Office did you speak

17   with?

18         A.  Yeah, I should have clarified that.

19   Mr. Provencio.

20         Q.  Thank you.  So did -- you did not speak with

21   Mr. Saindon or Mr. Miller in preparation for your

22   deposition?

23         A.  No, sir.

24         Q.  Generally, what did you speak about with

25   Mr. Provencio?



Page 37

1          MS. SHINNERS:  Objection.  I'm going to

2    instruct the witness not to answer.  This is related to

3    preparation for this deposition and communication with

4    counsel.

5         Q.  (BY MR. FENN)  Okay.  Mr. Cleaves, do you

6    intend to follow your counsel's instruction?

7         A.  Yes, sir.

8          MR. FENN:  Could we please flip to page 5

9    of the PDF?

10         Q.  (BY MR. FENN)  Is this a map of the El Paso

11    Field Office ports of entry?

12         A.  Yes.

13         Q.  And if you look at the key on the right side of

14    the map, it contains symbols for ports of entry and

15    symbols for border crossings.  Can you explain the

16    difference between ports of entry and border crossings?

17         A.  Yes.  Border crossings fall under an area port

18    of entry.  For example, if you want one, Fort Hancock is

19    a border crossing that falls under the Port of Tornillo.

20         Q.  Okay.  And does the same apply for Antelope

21    Wells would -- would be a border crossing for the Port

22    of Columbus?

23         A.  Yes.

24         Q.  The map lists Columbus, Santa Teresa, Paso del

25    Norte, Stanton, Bridge of the Americas, Ysleta,



Page 38

1    Tornillo, and Presidio as ports of entry; is that right?

2        A.  It does.

3        Q.  Are those all -- all of the ports of entry

4    within the El Paso Field Office?

5        A.  Yes.  Well, Albuquerque is also a port of entry

6    within the El Paso Field Office.

7        Q.  Okay.  Thank you.  When you refer specifically

8    to the Port of El Paso, as of the date this manual was

9    circulated, that encompassed Paso del Norte, Stanton,

10   Bridge of the Americas, and Ysleta; is that correct?

11       A.  Yes, and the El Paso airport, the El Paso

12   Foreign Trade Zone, and two railroad crossings in

13   El Paso as well.

14       Q.  Is Stanton a pedestrian port of entry?

15       A.  No.  Pedestrian outbound only, no inbound

16   pedestrian.

17       Q.  And is it the case that as of March 1st, 2020,

18   Ysleta became considered its own port of entry?

19       A.  It did.

20       Q.  Okay.

21            MR. FENN:  Kevin, could we flip to page 47

22   of the PDF, please?

23       Q.  (BY MR. FENN)  Mr. Cleaves, Ms. -- Mrs. Beverly

24   Good is listed as the port director for El Paso.  Do you

25   see that?



Page 39

1       A.  Yes.

2       Q.  Is she still in that position?

3       A.  She is.

4       Q.  Do you interact with Ms. Good in your role as

5   assistant port director?

6       A.  Yes.

7       Q.  Can you describe the nature of your

8   interactions with Ms. Good?

9       A.  Yes.  Daily operations of the port.

10      Q.  And when you say "daily operations," what would

11  that encompass?

12      A.  Everything.

13      Q.  Can you give us an example of -- an example or

14  two of the different types of operations that you might

15  speak to Ms. Good about?

16      A.  Sure.  Passenger operations, dealing in traffic

17  management of vehicles, pedestrians, narcotics seizures,

18  other types of contraband seizures, immigration

19  processing, intelligence collection, special operations,

20  enforcement operations, coordination with other

21  agencies.  And I can -- I think that's enough as

22  examples.

23      Q.  Did you speak to Ms. Good in preparation for

24  your deposition today?

25      A.  No.



Page 40

1     Q.  You said that you spoke to a couple of

2   assistant port directors and a former assistant port

3   director at other ports.  Did you speak to any port

4   directors of other ports in the El Paso Field Office to

5   prepare today?

6     A.  No.

7     Q.  Okay.

8             MR. FENN:  Could we flip to the next page

9   of the PDF, please?

10     Q.  (BY MR. FENN)  Mr. Cleaves, you are the first

11   assistant port director listed on this page, correct?

12     A.  Yes.

13     Q.  And next to your name it says "Paso Del Norte

14   border crossing" and then in parentheses "passenger."

15   Do you see that?

16     A.  Yes, sir.

17     Q.  Can you explain what the Paso del Norte border

18   crossing next to your name means?

19     A.  It's where, physically, my office is located.

20     Q.  Does that have any effect on your

21   responsibilities as an assistant port director as

22   compared to the other assistant port directors?

23     A.  No.  The only difference would be budget-wise.

24   Within the Port of El Paso, the budget's broken up by

25   geographic location.  Otherwise, my responsibilities are



Page 41

1    over passenger operations for the port.

2         Q.  So your responsibilities are over passenger

3    operations for the entire Port of El Paso and not just

4    Paso del Norte?

5         A.  Correct.

6         Q.  And then, on this page, there are two other

7    assistant port directors listed, Mr. Barry Miller and

8    Mr. Norman Bebon.  You mentioned earlier that Mr. Miller

9    is now assistant director for the El Paso field office;

10   is that right?

11        A.  Yes.

12        Q.  And who filled Mr. Miller's role?

13        A.  No one.

14        Q.  Is Mr. Bebon still in that -- in the role of

15   assistant port director?

16        A.  Yes.

17        Q.  Do you interact with Mr. -- Mr. Bebon in your

18   role as assistant port director?

19        A.  Yes.

20        Q.  And what are the nature of those interactions?

21        A.  From time to time, if there's events that occur

22   that affects cargo trade or tactical, then I'll let him

23   know.  We may briefly discuss it since that's his area

24   of operation.

25        Q.  And you can see that, on this page, tactical is



Page 42

1    listed next to Mr. Miller's name.

2         A.  Correct.

3         Q.  Did Mr. Bebon assume Mr. Miller's

4    responsibilities when Mr. Miller transitioned roles?

5         A.  Yes.  He has assumed those responsibilities.

6    We don't know if that position will ever be filled, so

7    at the current time, he's taken on the tactical

8    responsibilities as well.

9         Q.  Okay.  And have you had to take on any of

10   Mr. Miller's previous responsibilities?

11        A.  Not officially.

12        Q.  Do you know why Mr. Miller's position has not

13   and may not be filled?

14        A.  No, I don't know why.

15        Q.  Okay.  Earlier we listed all of the ports of

16   entry in the El Paso Field Office.  Outside of the Port

17   of El Paso, do you have any personal experience managing

18   the operations at other ports of entry within the

19   El Paso Field Office, so, for instance, at Presidio or

20   Tornillo or Columbus?

21        A.  No, not anymore.  I was a first line supervisor

22   in Columbus a long time ago, but I don't know the

23   operation of Columbus anymore.

24        Q.  How long ago was that, that you were a first

25   line supervisor?



Page 43

1          A.  I think it was 15, 14, 15 years ago.

2          Q.  And what does a first line supervisor do?

3          A.  Well, back then, since it's a small port of

4     entry, I had multiple roles, so mine was passenger

5     operations, the training department, and the criminal

6     prosecution unit.

7          Q.  Are you familiar with the operations of other

8     ports of entry within the El Paso Field Office outside

9     of the Port of El Paso?

10         A.  I have some familiarity, yes, but no direct

11    knowledge.

12         Q.  And is the familiarity that you mentioned a

13    result of your work experience or your preparation for

14    your deposition today?

15         A.  Work experience.

16         Q.  Are you familiar with the physical layout of

17    each of the ports of entry in the El Paso Field Office?

18         A.  To some degree, yes.

19         Q.  Are all of the ports of entry in the El Paso

20    Field Office Class A ports of entry?

21         A.  No.

22         Q.  Which of the POEs in the El Paso Field Office

23    are not Class A ports of entry?

24         A.  Antelope Wells --

25              MS. SHINNERS:  Object to the scope.



Page 44

1          You can go ahead.

2          THE WITNESS:  Yes, ma'am.

3     A.   Antelope Wells border crossing and Boquillas.

4     Q.   (BY MR. FENN)  If a port of entry is a Class A

5  port of entry, does that mean that it can handle the

6  full range of operations for a port of entry, including

7  processing claims for asylum?

8          MS. SHINNERS:  Object to the scope.

9          You can answer.

10    A.   I don't think a Class A port of entry is

11 defined on what it can handle.  I think it's defined on

12 the type of traveler that can apply there.  My

13 understanding is Class A port of entries can accept all

14 travelers and other classes of ports of entry cannot.

15    Q.   (BY MR. FENN)  Okay.  That's helpful.  Thank

16 you.

17          As an assistant port director for El Paso,

18 did you have responsibility for implementing policy or

19 guidance from CBP regarding metering asylum seekers?

20    A.   Yes.

21          MS. SHINNERS:  Object to the form.

22          You can answer.

23    A.   The answer is yes.

24    Q.   (BY MR. FENN)  What was your responsibility for

25 implementing that policy?



Page 45

1      A.  My responsibility is just to make sure it was

2   done correctly, just by policy and procedure and -- and

3   when necessary.

4      Q.  And how did you exercise that responsibility?

5      A.  By making sure we're -- we're doing it by the

6   correct policy and procedure.

7      Q.  What steps did you take to make sure that the

8   policy was being executed correctly?

9      A.  Well, we'll make sure the watch commanders and

10  the second line chiefs and supervisors understand it so

11  that they (sic) way they can schedule and have people

12  assigned to do the job appropriately.

13     Q.  Has it ever been your responsibility to track

14  the capacity of the ports of entry in the El Paso Field

15  Office?

16          MS. SHINNERS:  Objection, vague.

17     Q.  (BY MR. FENN)  You can answer.

18     A.  Yes.  I'm aware of the capacity of the port of

19  entry.  I don't know what you mean by track it.

20     Q.  Let me ask the question a different way.  Has

21  it ever been part of your responsibility to -- to

22  collect or compile data on the capacity of the ports of

23  entry in the El Paso Field Office?

24     A.  Yes.

25     Q.  How do you collect that data?



Page 46

1          A.   We count the people we -- we're holding.

2          Q.   And how frequently do you count the people that

3     you're holding?

4          A.   Three times a day.

5          Q.   And is that just at the Port of El Paso, or is

6     that at all of the ports of entry within the El Paso

7     field office?

8          A.   I don't know how the other ports in the field

9     office -- how often they count their people.  Some of

10    the ports of entry in the El Paso Field Office don't

11    have three shifts.

12         Q.   When you say you count the number of people

13    that you're holding -- strike that.

14              Did you report on the capacity data to

15    anyone else?

16         A.   I don't report the capacity data.  We do that

17    automatically so that information will be cascaded to

18    the watch commanders who will report that to us each

19    shift.  Now, their report does go to the El Paso

20    operations center, which is in -- in the El Paso Field

21    Office, if that's what you mean.

22         Q.   So if I understand you correctly, the data

23    is -- is recorded, and then it automatically gets

24    transmitted to others within -- within CBP at the Port

25    of El Paso; is that correct?



Page 47

1       A.   Yes.  It's -- it's provided to port leadership

2  and field office, their operations there.

3       Q.   And you said it -- it gets cascaded.  Does that

4  mean that it's an automated system?

5       A.   No.  I guess maybe that was a poor description.

6  It's by e-mail, so it gets e-mailed.

7       Q.   Okay.  And whose responsibility is it currently

8  to e-mail that data?

9       A.   The watch commander.

10      Q.   And who is in that role currently?

11      A.   It would be the passenger operations watch

12  commanders.  And some of the other watch commanders from

13  other areas also serve as an officer in charge for the

14  shift, so they will do it as well.

15      Q.   And when we're referring to a watch commander,

16  are we talking about a watch commander for the Port of

17  El Paso or the watch commander for the El Paso Field

18  Office?

19      A.   Watch commanders for the Port of El Paso.

20      Q.   Do watch commanders at other ports of entry in

21  the El Paso Field Office have the same responsibility

22  to --

23           MS. SHINNERS:  Object.

24      Q.   (BY MR. FENN)  -- to report capacity data?

25           MS. SHINNERS:  Object to the scope.



Page 48

 1                    You can answer.

 2       A.   There are no watch commanders at other ports of

 3  entry in the El Paso Field Office.

 4       Q.   (BY MR. FENN)  Understood.  So then, do you

 5  know whose responsibility it would be at other ports of

 6  entry within the El Paso Field Office to e-mail out data

 7  on capacity?

 8                    MS. SHINNERS:  Object to the scope.

 9                    You can answer.

10       A.   I don't, but it is likely their officer in

11  charge, whether they may do it or have someone else do

12  it.  And I don't know if they all do it by e-mail

13  exactly the way the Port of El Paso does it.

14       Q.   (BY MR. FENN)  Do you receive these reports on

15  capacity?

16       A.   Only from the Port of El Paso.

17       Q.   During your tenure as assistant port director,

18  did any ports of entry in the El Paso Field Office

19  direct asylum seekers to other ports of entry for

20  processing?

21       A.   No.

22       Q.   So if an asylum seeker showed up at the Port of

23  Tornillo, they would not be directed to Paso del Norte

24  for processing, for instance?

25       A.   Correct.



Page 49

1          MS. SHINNERS:  Object to the form.

2      Q.  (BY MR. FENN)  There are seven ports of entry

3  on the U.S.-Mexico border in the El Paso Field Office,

4  correct?

5      A.  Let me count them.  No.  There's five ports of

6  entry.  The border crossings -- now there's six

7  currently, used to be five.  The border crossings within

8  the Port of El Paso are referred to commonly as ports of

9  entry that you can see on the map that you showed me

10  previously.  So I guess if you -- depending on how you

11  look at it, I guess it could be yes and no.

12      Q.  Okay.  So are the six -- you said that there

13  were six ports of entry on the U.S.-Mexico border in the

14  El Paso Field Office.  Are those six Columbus, Santa

15  Teresa, Paso del Norte, Bridge of the Americas, Ysleta,

16  Tornillo, and Presidio?

17      A.  They would be Columbus, Santa Teresa, Port of

18  El Paso, Tornillo, Ysleta, and Presidio, with Paso del

19  Norte and Bridge of the Americas as border crossings

20  within the Port of El Paso currently.

21      Q.  Okay.  Have you ever heard the term "capacity"

22  used with respect to these six ports of entry?

23          MS. SHINNERS:  Objection, scope.

24      A.  I've heard the term --

25          MS. SHINNERS:  You can answer.



Page 50

```
 1        A.  -- capacity.  I -- I don't know or recall if
 2   I've ever heard it for the other ports of entry,
 3   although I assume they have one.
 4        Q.  (BY MR. FENN)  Does the El Paso Field Office
 5   have a definition of the term "capacity" as it is used
 6   with respect to these six ports of entry?
 7        A.  No, not a definition.
 8        Q.  So there's no definition memorialized in a
 9   statute?
10        A.  A statute of law?
11        Q.  Yes.
12        A.  The -- the -- no, the Port of El Paso doesn't
13   make its own laws.
14        Q.  Do you know if there's any definition of the
15   term "capacity" in a regulation governing the El Paso
16   Field Office?
17        A.  No.
18        Q.  How about any guidance from CBP or the El Paso
19   Field Office?
20        A.  No, no official guidance.  We use operational
21   considerations when trying to -- I guess trying to
22   define capacity, but no actual set definition.
23        Q.  Is there any definition of "capacity" in a CBP
24   or El Paso Field Office memorandum that you've seen?
25        A.  No.
```



Page 51

1        Q.   How about a standard operating procedure?   Any

2    definition of "capacity" in a standard operating

3    procedure?

4        A.   No, not that I know of.

5        Q.   How about musters, do you know whether the term

6    "capacity" has ever been defined in musters?

7        A.   No.

8        Q.   Do you know whether the term "capacity" has

9    ever been defined in any other sort of official document

10   that you've seen?

11       A.   I believe I've seen it mentioned in a memo from

12   headquarters about metering where -- where it just

13   mentions detention capacity and processing capacity and

14   operational capacity, but it doesn't define it.

15       Q.   Did you say you saw that in a memo from

16   headquarters?

17       A.   I think so.

18       Q.   Do you recall when that memo would have been

19   issued?

20       A.   April 2018.

21       Q.   And is the memo that you're referring to the

22   April 2018 memo from Todd Owen on metering?

23       A.   Yes, sir.

24       Q.   Okay.  We'll take a look at that memo in a bit.

25             Has the definition of the term "capacity,"



Page 52

1    as it is used with respect to these six ports of entry

2    that we were just discussing, has that changed -- has

3    that changed at any time?

4              MS. SHINNERS:  Objection, scope.

5         A.  I can't speak for any other ports of entry, but

6    for the Port of El Paso, I can answer that question, if

7    you want.

8         Q.  (BY MR. FENN)  Sure.

9         A.  Yes, for the Port of El Paso, it -- it has

10   changed.  In the beginning, we gave an inaccurate count

11   for capacity.  We were using the wrong parameters.  And

12   then, once that was realized, it had to be changed to

13   use the right parameters.

14              Our facilities were never designed for

15   overnight detention, so that became a central point of

16   what capacity means is what you can hold overnight.  We

17   were never designed to do it, so we had never had to ask

18   that question before, but that became exactly what

19   people were asking for.  Usually when they're asking us

20   that, it's:  "How many people can you hold overnight?"

21        Q.  And so how did the -- how did the definition of

22   capacity change -- strike that.

23              Do I understand your testimony to be that

24   previously the definition of capacity did not consider

25   how many people could be detained overnight?



Page 53

1        A.  Correct.

2               MS. SHINNERS:  Objection, vague.

3               You can answer.  It's -- it's vague, but

4    you can answer.

5        A.  Correct.  So capacity, you have to take it in

6    consideration both physical capacity, the actual

7    facility itself, and operational capacity, what you can

8    process and what's -- what's going on at the time

9    throughout the port and whether or not you can do it.

10   But in the beginning, the Port of El Paso thought that

11   it meant, like, some formal GSA occupancy rate, so they

12   counted everything, I think including even places that

13   weren't even cells, detention cells, and then we had to

14   live with that number for a while.

15              And -- and once it was realized, as the

16   surges continued, that migrant processing is different

17   from other types of violations -- they typically stay

18   overnight, whereas other violations don't, and we're not

19   built for that -- the capacity for migrant processing

20   had to include what you can do safely overnight.

21       Q.  (BY MR. FENN)  And you mentioned "in the

22   beginning."  Do you recall around what time the

23   definition of "capacity" changed?

24       A.  I don't really --

25              MS. SHINNERS:  Object- -- objection, vague.



Page 54

1            Go ahead.

2       A.  I don't remember the definition ever changing.

3   I remember us giving the wrong number and had to get

4   that fixed.  So it would be in 2016 when we started

5   using one number, and in 2018, when the surge started

6   happening again, we quickly realized we -- we have to

7   stop using that number.  We cannot hold that many people

8   overnight on a long-term basis, so it had to be revised.

9       Q.  (BY MR. FENN)  And was that just at the Port of

10  El Paso, or was that at all of the ports within the

11  El Paso Field Office?

12            MS. SHINNERS:  Object to the scope.

13      A.  That, I don't know.  I do know some information

14  on Tornillo.  We used to report Tornillo's capacity as a

15  very large number because that's the number we can stage

16  there at that time.  But that wasn't people coming from

17  other countries; that was people coming from other ports

18  of entry.  And they didn't have -- they're a small port

19  of entry.  They close.  They don't have the resources to

20  do that.  You have to give them the resources to do all

21  of that.  So I do remember theirs changing as well.  As

22  for the others, I don't remember.

23      Q.  (BY MR. FENN)  So if we looked at your data on

24  capacity from 2016 for the Port of El Paso, that would

25  not consider how many people can be detained overnight;



Page 55

1    is that correct?

2        A.  Correct.

3        Q.  Whereas if we looked at your data on capacity

4    from 2018, say July 2018, at the Port of El Paso, that

5    would consider how many people could be detained

6    overnight?

7        A.  Yes.

8        Q.  Do you recall who decided to make this change

9    in reporting?

10       A.  No.  It was a -- a lot of discussions on that,

11   so, no.

12       Q.  Were you involved in those discussions

13   personally?

14       A.  Yes, I was part of recommending that.  It

15   became obvious that the number they were using, we could

16   not over -- long-term hold that many people overnight.

17   So trying to do that was creating self-inflicted

18   overcrowding problem.

19       Q.  Does the El Paso Field Office distinguish

20   between operational capacity and detention capacity?

21       A.  We distinguish them by how you describe them,

22   but both of those measures are accounted for when --

23   when it comes to how many people we can accept and

24   process and hold.

25       Q.  And what is the difference between operational



Page 56

1    capacity and detention capacity?

2        A.  Well, detention capacity or physical capacity

3    is the facility itself.  Our facility was never designed

4    for overnight holding.  We don't have anything for that.

5    The cells aren't even a size to do that, so not all

6    cells can be used for overnight holds.  So that's

7    physical capacity or detention capacity.

8            So operational capacity is more complex.

9    That takes into account the Port of El Paso is very

10   spread out, it's very unique, so it has ten different

11   locations and processes.  So it takes into account all

12   of the operations that are ongoing and what it would

13   take for these operations to -- to, you know, operate

14   well and successfully.

15           So sometimes issues or workload issues and

16   any other operation could affect the other operations as

17   well, including admissibility processing because we're

18   not a detention facility and don't have any overnight

19   built in.  Those type of facilities usually have food

20   contracts, dining halls, medical, transport, people to

21   guard.  We don't have any of that.  So that's an

22   operational consideration as well.  As you get larger

23   numbers, you have to move people in from other areas to

24   account all of those services.

25           Operational capacity also takes into



Page 57

1    account the back end of the process, which I call ICE,

2    ICRO.  We turn over -- for asylum seekers, they're a

3    mandatory detention, so we turn them over to ICE, and

4    they will tell us whether or not they can be placed or

5    not and where.  That process takes time, and that

6    process is typically slower than we can take in or

7    process.  That is an operational capacity issue.

8              It gets a little more complex than that

9    sometimes.  For example, especially with family units,

10   we may have to process the same family more than once.

11   So ICRO may come back with the good news of they found

12   placement, but the bad news is now you have to reprocess

13   them again under a different proceeding.  That happens

14   quite commonly, so that creates -- I -- I'm sorry.  Go

15   ahead.

16       Q.  Sorry.  I didn't mean to interrupt you.

17              You mentioned "our facilities" in your

18   response.  When you -- when you said "our facilities,"

19   were you referring to the Port of El Paso?

20       A.  Yes, Port of El Paso.

21       Q.  When did the Port of El Paso begin

22   distinguishing between operational capacity and

23   detention capacity?  Was that in 2016 when you mentioned

24   before the -- the issue of detaining people overnight?

25              MS. SHINNERS:  Objection, vague.



Page 58

1      A.   I don't remember ever there -- there being a

2 distinguishing.  That's always been the case.

3      Q.   (BY MR. FENN)  So the Port of El Paso has

4 always distinguished between operational capacity and

5 detention capacity?

6      A.   The Port of El Paso has always considered both.

7 I don't really know what you mean by "distinguished."

8      Q.   Well, I think that you said earlier that there

9 are spaces within the Port of El Paso that might be used

10 to account for holding people but that, for whatever

11 reason, might not necessarily be appropriate to report

12 in your capacity numbers.  Is that correct?

13      A.   No.  In the beginning, for detention capacity,

14 physical capacity of the port, they were counting areas

15 that could not be used for overnight capacity.  But more

16 importantly, they were using, like, an occupancy rate,

17 room occupancy rate from GSA, that for two hours,

18 there's a certain amount of people GSA says you can put

19 in a room, but when they lay down and sleep, it's

20 impossible to put that many people in the room.  So that

21 was the difference.

22      Q.   You mentioned a few of the considerations that

23 you say go into operational capacity.  Are those

24 considerations memorialized in any statute that you know

25 of?



Page 59

1      A.   No.

2      Q.   Are those considerations memorialized in any

3   regulation that you're aware of?

4           MS. SHINNERS:   Object to the scope.

5      A.   I don't know of any operational consideration

6   whatsoever dealing with ports of entry that are in any

7   statute or regulation whatsoever.   I'm not aware of any

8   statute or regulation that goes into such depth of an

9   operation of one port of entry.

10     Q.   (BY MR. FENN)   Are the considerations that you

11  mentioned with respect to operational capacity

12  memorialized in any guidance that you've seen?

13     A.   Yeah, there's quite a bit of discussion and

14  guidance.   And I don't know -- it gets memorialized

15  formal?   No.   Informal discussion about the operational

16  capacity is quite often.   For example, if ICRO's

17  capacity on a certain type of detainee slows down or

18  stops, that affects us, so that's -- guidance would go

19  out on how to handle that.

20     Q.   Are there standard operating procedures, formal

21  standard operating procedures, that list the

22  considerations that you mentioned with respect to

23  operational capacity?

24     A.   I guess the only one I can think of are the

25  Flores guidance and -- and policy on time and custody.



Page 60

1    That's a -- a significant operational capacity

2    consideration.

3         Q.  Do you know whether the definition of

4    "detention capacity" is memorialized in a statute?

5         A.  I do not know.

6         Q.  How about a regulation?  Do you know whether

7    the term "detention capacity" is memorialized in a

8    regulation?

9              MS. SHINNERS:  Object to the scope.

10        A.  If it is, it's probably related to facilities

11   who were designed for detention.  So I'm -- I'm not

12   aware of -- of anything related to detention capacity in

13   a port of entry as we're not a detention facility.

14        Q.  (BY MR. FENN)  Do you know whether the

15   definition of "detention capacity" is memorialized in

16   any formal guidance?

17        A.  Definition, no.

18        Q.  How about any written memorandum?

19        A.  No, not that I know of.

20        Q.  Is the definition of "detention capacity"

21   memorialized in any formal standard operating procedure?

22        A.  No.

23        Q.  Is the definition of "detention capacity"

24   memorialized in any other official document that you've

25   seen?



Page 61

1            MS. SHINNERS:  Objection, vague, overbroad.

2       A.  Official policy document, no, not that I know

3   of, definition.

4       Q.  (BY MR. FENN)  Okay.  Is there any formula for

5   calculating the operational capacity of a port of entry?

6       A.  No.  But how -- some of the things that I

7   mentioned before go into that formula, so that would

8   change on a daily basis sometimes.

9       Q.  What does the operational capacity of a port of

10  entry have to be in order for it to begin metering?

11           MS. SHINNERS:  Object to the scope.

12      A.  For metering, we would use both the combination

13  of detention and operational capacity.  It could be one

14  or the other that is the impetus for metering, but we

15  always consider both.  And generally, it's -- it's both,

16  at least for the Port of El Paso, that we're considering

17  as the reason.

18      Q.  (BY MR. FENN)  Let's -- let's talk about

19  operational capacity first.  How high would the

20  operational capacity numbers have to be at a port of

21  entry in the El Paso Field Office in order for it to

22  begin metering?

23      A.  Large groups --

24           MS. SHINNERS:  Object to the -- object to the

25  the scope.  He is -- the specific practices, we object,



Page 62

1    and I just want to make sure I make this clear on the

2    record.  The specific practice of the particular other

3    ports within the El Paso Field Office, to the extent

4    they may differ are -- we have objected to discovery

5    from those specific ports.  So I just want to make sure

6    that the purpose of my scope objection is clear.

7             MR. FENN:  And I -- and I think it might be

8    beneficial for -- for everybody if that's a standing

9    objection as you made it during Mr. Humphries'

10   deposition.

11            MS. SHINNERS:  Yes, but the problem -- the

12   problem is your question is asking generally about the

13   El Paso Field Office and all the ports within the

14   El Paso Field Office.  So it -- if -- I'm concerned if I

15   don't actually make the objection that it -- it won't be

16   clear that we're talking about the port of -- that

17   he's -- well -- yeah, I don't want to be disruptive.  I

18   will -- I will make a standing objection to questions

19   that relate to specific practices of the specific other

20   ports other than the Port of El Paso.  Does that make

21   sense?

22            MR. FENN:  I think so.  But just for

23   clarity, Mr. Cleaves is the 30(b)(6) representative for

24   the El Paso Field Office, so I'm going to ask him

25   questions about other ports of entry within the El Paso



Page 63

1    Field Office besides from the Port of El Paso.

2              MS. SHINNERS:  Well, actually, that's a

3    little tricky.  I mean, I think that he is speaking on

4    behalf of the practices of the El Paso Field Office and

5    from the perspective of the El Paso Field Office.  But

6    we -- in terms of port-specific practices as to the

7    different ports, we've objected to providing information

8    about port-specific practices as to the other ports as a

9    matter of burden and proportionality and its preclass

10    certification in terms of preparing the witness to

11    testify.  So he will -- he is prepared to talk about

12    specific practices with relation to the Port of El Paso.

13              MR. FENN:  Okay.  Well, that's a dispute

14    that is ongoing, and it hasn't been resolved by the

15    court, so I'm going to ask him questions about other

16    ports of entry within the El Paso Field Office, and

17    you're entitled to make that objection.  But we may hold

18    Mr. Cleaves' deposition open if he's not prepared to

19    answer questions about other ports of entry within the

20    El Paso Field Office.

21              MS. SHINNERS:  Okay.  I -- again, the only

22    purpose of me saying this is just to make clear what my

23    scope objection means when you're talking about the

24    El Paso Field Office and port-specific practices with

25    relation to other ports within the El Paso Field Office.



Page 64

1            MR. FENN:  Understood.

2        Q.  (BY MR. FENN)  Mr. Cleaves, let me rephrase my

3    question.

4            At the Port of El Paso, what does the

5    operational capacity have to be in order for the port to

6    begin me- -- metering?

7        A.  Large groups give us a -- a problem.  So

8    normally, operational capacity, they can be done safely

9    and -- and -- and not involve detention standards, is

10   usually somewhere around ████ or below at a time, per

11   day, I guess.

12       Q.  So is there a -- when you say ████ is that a

13   number or a percentage?

14       A.  Number.

15       Q.  Is there a percentage that operational capacity

16   has to be at, at the Port of El Paso, for it to begin

17   metering?

18       A.  No.  I don't -- I don't even know what you mean

19   by "percentage."  We take into consideration -- and

20   they're not taken into consideration by itself.  So the

21   reason the operational capacity is around that number,

22   ████ is we tend to try and keep our detention capacity

23   around what the capacity is.  We exceed that capacity

24   frequently, so it drops down, goes above, around that.

25            But to do that, that means our operational



Page 65

1    capacity is -- is we can really only take in around ▮▮▮

2    or below at a time because they're -- they'll be at the

3    end of the queue within the port.  There are others

4    ahead of them already processed and waiting and moved

5    out.  And that's generally the reason why.  So -- yeah,

6    go ahead.  I'm sorry.

7         Q.  No problem.  If you were to tell your

8    supervisor that the El Paso Port of Entry was at its

9    operational capacity, how could your assertion be

10   verified?

11        A.  What we can do is -- operational capacity, the

12   number of cases that we have.  So it would be -- you

13   would have to take in the number of cases we have

14   overall, the number of people being held overall versus

15   the number we project being moved out or going to move

16   out or the capability of being moved out.  It would also

17   be the number that we can process, project to process.

18   That's a little bit complex because if -- depending on

19   budget restraints, we can process more sometimes;

20   sometimes we can't.

21             It also is operational capacity of what

22   else is going on in the port.  Are there other things

23   going on that's going to take away from admissibility

24   processing?  Are we -- are we intercepting other types

25   of violators other than migrants that are going to eat



Page 66

1    into operational capacity?  How many transports do we

2    have to do?  That takes two officers at a time.  And how

3    many emergent events are -- are occurring?  Port of

4    El Paso is quite large, and on the southern border, it

5    experiences significant events quite often.

6         Q.  Is it your testimony that the operational

7    capacity of the Port of El Paso could change from day to

8    day?

9         A.  It does.

10        Q.  And does CBP or does someone at the Port of

11   El Paso track what the operational capacity is on a

12   given day?

13        A.  No, because it is a culmination of multiple

14   factors.  Yeah, that would become impossible to track.

15   If you wrote it down, it would be different after you

16   get done writing it down.  That's an overexaggeration,

17   but...

18        Q.  So does the CBP or does somebody within the

19   Port of El Paso create any regular reports showing the

20   operational capacities for the Port of El Paso?

21        A.  No, not specific to operational capacity.  We

22   generally report numbers and where they are in the

23   processing, that type of thing, which may go into the

24   decision-making of operational capacity, but, no,

25   nothing specific.



Page 67

1      Q.  And is your answer the same for other ports of

2  entry within the El Paso Field Office?

3      A.  I don't know specifically the mechanics of how

4  they report it, but my understanding is, yes, they both

5  take into consideration detention capacity and

6  operational capacity when making those decisions.

7      Q.  But you would agree that there's a difference

8  between taking operational capacity into consideration

9  and recording data on operational capacity, correct?

10      A.  No, actually, I don't know the difference

11  between what you're asking.

12      Q.  I'm asking whether -- you said that -- strike

13  that.

14              You testified earlier that it would be too

15  difficult to record data on operational capacity for the

16  Port of El Paso, correct?

17              MS. SHINNERS:  Objection, misstates

18  testimony.

19      A.  We would record data on the events that are

20  occurring and how many people we have and where they are

21  in the processing.  But as for your question on

22  operational capacity, which is a complex decision on

23  determining exactly what was going on at the port in

24  multiple facets, no, I -- I don't think we have anything

25  that captures everything like that in a report.



Page 68

1      Q.   (BY MR. FENN)  Okay.  And my question is:  For

2   the other ports of entry in the El Paso Field Office, do

3   you know whether those ports of entry issue reports that

4   capture operational capacity?

5      A.   That captures everything that I was describing?

6   No, they don't.

7      Q.   Okay.

8           MR. FENN:  We've been going for about an

9   hour and a half, and we're kind of at a natural breaking

10  point.  Would this be a good time to take a short break?

11          MS. SHINNERS:  Yes.  That's perfect for me,

12  yeah.

13          MR. FENN:  Okay.

14          MS. SHINNERS:  Uh-huh.  Mr. Cleaves?

15          THE WITNESS:  Yes, that's fine.

16          THE VIDEOGRAPHER:  The time is 10:33 a.m.

17  We're going off the record.

18              (Break was taken.)

19          THE VIDEOGRAPHER:  The time is 10:54 a.m.

20  We are back on the record.

21          MR. FENN:  Kevin, if you could put

22  Exhibit 161 up on the screen.

23      Q.   (BY MR. FENN)  Mr. Cleaves, I'm showing you a

24  document that will be marked as Exhibit 161, and it is

25  Bates-labeled AOL-DEF-00273818.  This is a June 16th,



Page 69

1    2018, e-mail from Randy Howe to Todd Owen with subject

2    line "Forward SWB Queue Management Update."

3                Do you see that?

4        A.  Yes.

5        Q.  I'd like to direct your attention to the e-mail

6    at the bottom of the first page from Ryan Koseor to

7    Randy Howe, copying others.

8                Who is Ryan Koseor?

9        A.  I do not know.

10       Q.  Do you know whether in June of 2018 he would

11   have occasionally been responsible for compiling data on

12   capacity from various ports of entry along the

13   Southwestern border?

14               MS. SHINNERS:  Object to the scope.

15               You can answer.

16       A.  I think he was involved with the Migrant Crisis

17   Action Team which prepared reports like that, to the

18   best of my knowledge.

19       Q.  (BY MR. FENN)  Okay.  And if you look at his

20   e-mail, there is a chart.  Are you familiar with this

21   type of chart?

22       A.  No.

23       Q.  So you don't know whether this type of chart

24   might have a -- a name, like a queue management report?

25       A.  No, I don't know.



Page 70

1          Q.  Have you seen reports like this previously?

2          A.  No, not in this format that I know of.

3          Q.  Okay.  If you look at the fourth column from

4     the left in the chart, the heading is "Percent of

5     Capacity."  Do you see that?

6          A.  Yes.

7          Q.  Does it say operational capacity?

8          A.  It does not.

9          Q.  Does it say detention capacity?

10         A.  It does not.

11         Q.  So do you know what type of capacity this chart

12    refers to?

13         A.  Detention physical capacity.

14                   MS. SHINNERS:  Object to the scope.

15                   Go ahead.  Go ahead, Mr. Cleaves.  Sorry to

16    interrupt.

17                   THE WITNESS:  Oh, no problem.

18         A.  Detention physical capacity.

19         Q.  (BY MR. FENN)  And how do you know that if it

20    does not say detention physical capacity?

21         A.  The reports that I have seen that state a

22    capacity for a port of entry have always been the

23    physical capacity detention facility-wise.

24         Q.  So am I correct -- am I reading this report

25    correctly when I say that the El Paso Port of Entry held



Page 71

1    █ detainees on June 16th, 2018?

2            MS. SHINNERS:  Object to the scope.

3            Go ahead, Mr. Cleaves.

4            THE WITNESS:  Sure.

5        A.  At a certain point of time on that date, yes,

6    it would have been █.  It may have been higher in the

7    morning and higher late at night as we do most of our

8    transports at the Port of El Paso in the early morning

9    hours.  So around midday is -- is kind of our low water

10   mark, so to speak.  So it goes up and down throughout

11   the day.

12       Q.  (BY MR. FENN)  Okay.  And for the Port of

13   El Paso, █ detainees would mean 50 percent of capacity

14   according to this chart; is that correct?

15       A.  Yes.

16       Q.  So by my math, that means that as of June 16th,

17   2018, the total capacity of the El Paso Port of Entry

18   would have been █ detainees; is that correct?

19       A.  I think you may be rounding.  It's █

20       Q.  Okay.  And would that number encompass the

21   capacity at Paso del Norte, Bridge of the Americas, and

22   Ysleta?

23       A.  Yes, sir.

24       Q.  Do you know how this █ number was calculated?

25       A.  Yes, I do.



Page 72

1     Q.   Could you explain how it was calculated?

2     A.   Sure.  We took the number of cells that are

3  capable of overnight detention and then estimated the

4  number of adults that could sleep in that cell.

5     Q.   Are there more cells at the Port of El Paso

6  that are not suitable for overnight detention that would

7  not be included in this ███ number?

8     A.   There are, yes.

9     Q.   Do you have a rough estimate of how many that

10  might be?

11     A.   Yes, I do.  It is ██ cells.  These are in areas

12  that have no staffing for much -- a part of the time,

13  for example, the airport.  So there's three cells at the

14  airport, but we can't transport migrants into an airport

15  for holding.  There's no processing capability there, it

16  closes, there's no way to detain them, that type of

17  thing.  In other words, those cells are completely

18  unusable for long-term detention.

19     Q.   And that's because -- if I understood you

20  correctly, that's because of considerations like

21  staffing and transportation?

22     A.   Well, but also facility.  So if we catch a

23  violator at the airport, we may use those cells

24  temporarily until we can transport them to a place that

25  can process them and hold them for longer periods of


MAGNA ⏵
LEGAL SERVICES

Page 73

1   time.  So, you know, those type of cells would never be

2   used for longer than temporary holding.

3       Q.  Would it be possible to convert those cells to

4   make them suitable for overnight detention?

5       A.  I don't know.  We don't have any cells that are

6   designed for overnight detention.  We're just using some

7   of them for overnight detention that -- that -- that are

8   usable, adequate.  So I -- I don't know what it would

9   take to do that.

10      Q.  How -- what -- what makes a cell suitable for

11  overnight detention?

12      A.  There is space involved, and I don't know what

13  those space parameters are, but ICRO has told us

14  they're -- they have actual detention facilities, and

15  they are mandated an actual amount of space they tell me

16  they have to have per individual.  They also have to

17  have the support functions that go with it, medical,

18  food contracts, dining, you know, obviously security,

19  transport, none of which do we have.

20      Q.  Okay.  And you said that the ██ number for

21  capacity that's reported in this chart for the Port of

22  El Paso was based on the number of cells that were

23  suitable for overnight detention , correct?

24      A.  Yes.

25      Q.  Do you know who would have calculated that



Page 74

1    number?

2         A.   Port leadership, we at the Port of El Paso.

3         Q.   And specifically, was there one person or

4    multiple people who were responsible for that?

5         A.   Multiple people.

6         Q.   Were -- were you involved in calculating that

7    number?

8         A.   Part of it, yes.

9         Q.   What was your role?

10        A.   Just in determining which areas we can do.  And

11   actually, it was determined over -- over time.  And --

12   and -- and probably our mistake with the -- the other

13   number ███ gave us the experience of -- of what can be

14   used and what can't be used.  So over time, we -- we

15   learned what was usable and what wasn't.  So I guess it

16   was -- it would be more like experience over time.  The

17   cells weren't designed for this.  It took a while to

18   figure out what -- what you could do safely and -- and

19   what didn't work at all.

20        Q.   And you mentioned "the other number."  I think

21   you said ███ is that correct?

22        A.   I don't think I mentioned it in this

23   deposition, but, yes, ███ was the number, the other

24   number, yes, sir.

25        Q.   And when you say "the other number" and the ███



Page 75

1    number, are you referring to the capacity that was

2    reported before you determined that some of those cells

3    were not suitable for overnight detention?

4         A.   Yes.   That was the occupancy rate number that

5    they came up with.   That included not only cells that

6    were not usable, but it included spaces that weren't

7    even cells.   But more importantly, it included numbers

8    that could fit into a cell, you know, for an hour or two

9    for temporary processing that could not be used for

10   overnight.   Once people start laying down, that cuts

11   your capacity of that room down significantly, not in

12   half, more than half.   So that's something we learned

13   over time.

14        Q.   Okay.   And looking back at the chart, it looks

15   like on June 16th, 2018, there were ▇▇▇ detainees at

16   the Santa Teresa Port of Entry; is that correct?

17        A.   That's what it says, yes, sir.

18        Q.   And this equated to 58 percent capacity?

19        A.   Yes, sir.

20        Q.   So I will represent to you that, by my math and

21   according to these numbers, as of June 16th, 2018, the

22   total capacity of the Tornillo Port of Entry -- I'm

23   sorry -- the Santa Teresa Port of Entry was ▇▇▇  Does

24   that sound correct to you?

25        A.   It does.   Santa Teresa's physical detention



Page 76

1    capacity is -- is ███

2        Q.  Okay.  And according to this queue management

3    report, as of June 16th, 2018, there were no detainees

4    held at Columbus, Tornillo, or Presidio; is that

5    correct?

6        A.  Yes, the report says that.

7        Q.  Okay.  Before we turn from this document, I'd

8    also like to ask you about the column on the far right

9    side of the chart labeled "Impact to Port Operations."

10            Do you read this column to note any impact

11   that the number of detainees and the percent of capacity

12   at each port is having on that port on a given day?

13            MS. SHINNERS:  Object to the scope.

14            Go ahead, Mr. Cleaves.

15       A.  I think that's probably a portion of it.  But

16   in my line of work, when -- when they're talking about

17   impact to port operations, it's also considering other

18   things that are going on as well.  For example, if there

19   was something unusual going on, that may be reported as

20   well.  Just -- just in dealing with reports normally

21   with going back and forth with the field office and

22   headquarters, impact is usually what's going on at the

23   time, but it would definitely include that, what

24   you -- what you asked.

25       Q.  (BY MR. FENN)  Okay.  And just looking at this



Page 77

1   chart in front of us, it only details the number of

2   detainees, the percent of capacity, and the number in

3   the queue at the boundary line for each port of entry,

4   correct?

5        A.  There is a column for number and queue at the

6   boundary line, yes.

7        Q.  Do you know who would have been in -- in charge

8   of inputting a response in the Impact to Port Operations

9   column for the Port of El Paso as of June 2018?

10       A.  Yes.  Usually this type of information, this

11  type of report to MCAT -- I'm sorry -- Migrant Crisis

12  Action Team would be from the operation center in the

13  El Paso Field Office.

14       Q.  And -- I'm sorry.  You said the operation

15  center for the El Paso Field Office, correct?

16       A.  Correct.

17       Q.  Okay.  So would the CBP employees working in

18  the operation center for the El Paso Field Office be in

19  charge of inputting a response in that column that says

20  Impact to Port Operations for other ports of entry aside

21  from the Port of El Paso?

22       A.  Yes.  They would -- they would be doing that

23  for all the ports of entry in the El Paso Field Office.

24       Q.  And do you know how they would make the

25  determination as to what to input into that column,



Page 78

1    Impact to Port Operations?

2        A.   Yeah.   My understanding is they would -- the

3    default would probably be negative unless the port of

4    entry reported something specific to them.

5        Q.   And at the Port of El Paso, who would be

6    responsible for reporting something specific that might

7    influence their response in that column that says

8    "Impact to Port Operations"?

9        A.   It would be port leadership, and that would be

10   either the port director, the assistant port directors,

11   or the watch commanders.

12       Q.   Do you know whether the information in that

13   column is used by anybody in the El Paso Field Office to

14   make operational decision-making?

15       A.   No, I don't think it is.

16       Q.   Do you know what purpose the information in

17   that column might be used for?

18       A.   I believe this report in general --

19               MS. SHINNERS:   Objection to scope,

20   foundation.

21               Go ahead.

22       A.   I believe this report in general, the target

23   audience is for beyond the El Paso Field Office.   So we

24   wouldn't use this -- any of the -- the information in

25   this report outside of providing the information that



Page 79

1    goes into it.

2         Q.  (BY MR. FENN)  And when you say "beyond" --

3    "beyond the El Paso Field Office," do you know

4    specifically who the target audience for a report like

5    this might have been?

6         A.  It would be for --

7              MS. SHINNERS:  Same objection.

8              Go ahead.

9         A.  I'm sorry.  It would be for MCAT, Migrant

10   Crisis Action Team.

11        Q.  (BY MR. FENN)  How about OFO?

12        A.  Yes, I -- I do believe they put out

13   information -- MCAT puts out information for OFO.

14        Q.  Okay.  And does -- do you know whether MCAT or

15   OFO more generally uses the information in these reports

16   to make decisions about port operations or field office

17   operations?

18        A.  I do not know --

19             MS. SHINNERS:  Objection, scope.

20        Q.  (BY MR. FENN)  I'm sorry, Mr. Cleaves.  I

21   didn't hear your response.

22        A.  I do not know how they use the other reports.

23        Q.  Okay.  Looking back at the chart, on June 16th,

24   2018, the Impact to Port Operations is listed as

25   negative for El Paso; is that correct?



Page 80

1        A.  Yes.

2        Q.  Does that mean that the capacity numbers on

3   June 16th, 2018, were having no impact on port

4   operations?

5        A.  No, it doesn't mean that.

6        Q.  What does the negative mean then?

7        A.  I take the negative to mean that there's no

8   significant adverse impact to operations in general that

9   would affect migrant processing or the port in general.

10       Q.  Okay.  And on that same day, on June 16th,

11  2018, for all of the other ports of entry in the El Paso

12  Field Office, the Impact to Port Operations is listed as

13  not currently holding the line.  Do you see that?

14       A.  Yes, sir.

15       Q.  Can you explain or do you know what "not

16  currently holding the line" means?

17       A.  Yes.  I take that to mean those ports of entry

18  were not metering at the time.

19       Q.  Okay.  And is that because their capacity

20  numbers were sufficiently low that they not -- did not

21  need to meter on that date?

22            MS. SHINNERS:  Object to the scope.

23       A.  Yes.  I would take that, that both physical

24  detention capacity and operational capacity must have

25  been at the point to where they could -- they didn't



Page 81

1   need to meter.

2        Q.  (BY MR. FENN)  Okay.  But there's nothing in

3   this chart that specifically quantifies the operational

4   capacity on this day; is that correct?

5        A.  That's correct.  There's nothing in the chart

6   that quantifies operational capacity at all, I don't

7   think.

8        Q.  Okay.  Let's --

9             MR. FENN:  Kevin, if you could put up

10  Exhibit 162, please.

11       Q.  (BY MR. FENN)  Mr. Cleaves, I'm showing you

12  what's been marked as Exhibit 162 and is Bates-labeled

13  AOL-DEF-00027382.

14            Have you seen this document before?

15       A.  No.

16       Q.  Have you seen reports that resembled this

17  document before?

18       A.  I have seen something in this format before,

19  yes.

20       Q.  If I refer to this as a queue management

21  report, will you understand what I mean?

22       A.  Yes, I guess so, although -- yes.

23       Q.  Okay.  This queue management report is dated

24  November 5th, 2018; is that correct?

25       A.  Yes, it says that.



Page 82

1      Q.  Okay.

2           MR. FENN:  And, Kevin, if we could go to

3      the next page of the report.

4      Q.  (BY MR. FENN)  This report indicates that on

5      November 5th, 2018, the El Paso Port of Entry held █

6      detainees in custody; is that correct?

7      A.  It says that, yes.

8      Q.  And this amounted to 69 percent of the Port of

9      El Paso's capacity, correct?

10     A.  Yes, the report says that.

11     Q.  And if you look at the chart, the column on the

12     far right says:  "What are your issues and/or

13     challenges?"

14          Did I read that correctly?

15     A.  Yes.

16     Q.  For the Port of El Paso, the information in

17     this column states:  "Queue management in progress."

18          Is that correct?

19     A.  Yes.

20     Q.  Can you explain why queue management would have

21     been in progress if capacity at the El Paso Port of

22     Entry on this day was only at 69 percent?

23     A.  Yes.  It would be the operational capacity

24     considerations.

25     Q.  But if you look at the chart, you don't see the



Page 83

1  phrase "operational capacity" anywhere in -- in the

2  columns and information in this chart, do you?

3      A.  No.

4      Q.  There is a column that says:  "Do you have any

5  UDAs in line waiting on the Mexico side?  If yes, how

6  many?"

7          Do you see that column?

8      A.  Yes.

9      Q.  Can you explain to me what UDAs are?

10     A.  Undocumented aliens.

11     Q.  And this particular report indicates that the

12 Columbus Port of Entry has ███ detainees in custody,

13 which equates to 25 percent of the Columbus Port of

14 Entry's capacity; is that right?

15     A.  Yes.

16     Q.  So if my math is correct, as of the date of

17 this report, the capacity at the Columbus Port of Entry

18 was ██ detainees; is that correct?

19     A.  Yes.

20     Q.  Okay.

21         MR. FENN:  If we could pull up Exhibit 163,

22 please.

23     Q.  (BY MR. FENN)  I'm showing you what will be

24 marked as Exhibit 163 to your deposition.  It is a

25 multipage Federal Rule of Evidence 1006 Summary Exhibit



Page 84

1    entitled "El Paso Port of Entry:  Impact to Port

2    Operations."

3                Do you see that?

4        A.  I see the title, yes.

5        Q.  And I will represent to you that this document

6    summarizes the capacity and impact to port operations

7    portions of every queue management report produced by

8    defendants with data for the Port of El Paso from

9    June 16th, 2018, through December 31st, 2018.

10               Can you please look at the entry for

11   June 19th, 2018?

12       A.  Yes.

13       Q.  On that date, capacity for the Port of El Paso

14   was listed as 95 percent; is that correct?

15       A.  Yes.

16       Q.  But the Impact to Port Operations column lists

17   the impact to port operations for that day as "no

18   impact," correct?

19       A.  That's what it says.

20               MS. SHINNERS:  And objection.  This -- this

21   assumes the accuracy of the summary of the documents.

22               You can answer, Mr. Cleaves.

23       A.  Yes.

24               MR. FENN:  Okay.  Now I'd like to look at

25   the entries from July 17th, 2018, through July 20th,



Page 85

1    2018.  It should be on the next page of the exhibit.

2        Q.  (BY MR. FENN)  And again, we're looking at

3    July 17th, 2018, through July 20th, 2018.  On those

4    dates, the Port of El Paso was listed at 110 percent

5    capacity, 110 percent capacity, 85 percent capacity, and

6    97 percent capacity respectively; is that correct?

7        A.  Yes, that's what it says.

8        Q.  And yet the impact to port operations for those

9    days is listed as "minimal impact"; is that correct?

10        A.  That's what it says.

11        Q.  What does the word "minimal" mean to you in

12    ordinary conversation?

13        A.  Small.  However, this report is definitely not

14    used in ordinary conversation.

15        Q.  So if something is having a minimal con- -- a

16    minimal impact, will you agree that its impact is small?

17        A.  I would agree that whatever was happening at

18    the port at the time, we were able to handle it with

19    minimal impact to normal operations, which would include

20    everything at the port.

21        Q.  Okay.  I'd like to shift gears a little bit and

22    discuss the manner in which metering is implemented at

23    the ports of entry in the El Paso Field Office.

24            But before doing so, I'd like to define the

25    term "limit line."  If I use that term, I mean the



Page 86

1   location at which officers stand when assigned to

2   conduct queue management operations at a port of

3   operation.  Do you understand that?

4       A.  Yes, okay.

5       Q.  So let's talk about Paso del Norte first.  From

6   2016 to the present, at any time, have asylum seekers

7   been metered at Paso del Norte?

8               MS. SHINNERS:  Object to the form.

9               THE WITNESS:  I --

10              MS. SHINNERS:  Go ahead, Mr. Cleaves.

11              THE WITNESS:  I -- okay.  Yeah.  I just

12  wanted to make sure.

13      A.  From 2016 until now at the Paso del Norte

14  border crossing, metering has been conducted, yes.

15      Q.  (BY MR. FENN)  And do you know when metering

16  began at the Paso del Norte border crossing?

17      A.  Yes.  It was in November of 2016 for three

18  weeks, ended in December of 2016, began again in May of

19  2018.  It was pretty consistent until January of 2020.

20  And in February of 2020, we started pulling back on

21  metering, stopped metering periodically because the

22  Mexican Immigration had reported that we had reached the

23  end of the line.  So everyone that was waiting to be

24  processed had been processed.  They had no one else

25  left.  So throughout February, they would either have



Page 87

1  small numbers waiting or none at all of 20 --

2  February 2020.

3      Q.  And when you say you had -- you had "reached

4  the end of the line," are you referring to specifically

5  asylum seekers who are waiting at the Paso del Norte

6  crossing or at the El Paso Port of Entry in general?

7          MS. SHINNERS:  Objection, form.

8      A.  I should have clarified that, yes.  For the

9  Port of El Paso in general.  In other words, migrants

10 waiting in Ciudad Juárez for processing, Mexican

11 Immigration was reporting that we had reached the end of

12 those people waiting in late January of 2020.

13     Q.  (BY MR. FENN)  So in late January of 2020,

14 there was nobody -- there were no migrants waiting to

15 cross the border into the El Paso Port of Entry in

16 Ciudad Juárez?

17     A.  Yes.  Mexican Immigration, that's what they

18 reported.

19     Q.  When an asylum see- -- seeker approaches the

20 limit line at the Paso del Norte border crossing, are

21 they told to wait in Mexico?

22          MS. SHINNERS:  Object to the form.

23     A.  No, they're not given any specific location.

24 They're told that we're unable to take in any for

25 processing at this time, and they would have to wait.



Page 88

1    Where they wait is -- is up to them.

2         Q.  (BY MR. FENN)  Are they ever directed to

3    another border crossing?

4         A.  No.

5         Q.  Are the instructions for what a CBP officer who

6    is stationed at the limit line is supposed to tell a

7    migrant who is approaching the limit line written down

8    somewhere?

9         A.  It is mentioned in the EAC's memo from

10   April 2018.

11        Q.  And would those instructions also be the

12   subject of musters?

13        A.  Yes.  We -- we have told officers what to say

14   when they're asked or when people ask about coming in

15   and we're unable to take them.

16        Q.  When a pedestrian approaches the limit line,

17   how does the CBP officer who is stationed there --

18   strike that.

19             At the Paso del Norte border crossing, when

20   an asylum seeker approaches the limit line, how does the

21   CBP officer stationed there screen for whether the

22   migrant is a minor?

23             MS. SHINNERS:  Object to the form.

24             THE WITNESS:  And I assume I can continue?

25             MS. SHINNERS:  Yes.  Mr. Cleaves, unless I



Page 89

1    state otherwise, please go ahead and continue.  I

2    apologize.

3              THE WITNESS:  No.  I apologize for that.

4         A.  The same way anyone would screen for people

5    walking up to them and -- and be able to determine

6    whether they might be an adult or a minor.

7         Q.  (BY MR. FENN)  And when you say that the -- I

8    think you said -- said the same way that anyone would

9    determine whether they might be an adult, is that

10   a -- is that a visible inspection?

11        A.  Yeah, it's visual.

12        Q.  Are CBP officers who are stationed at the limit

13   line instructed to check migrants' documents for whether

14   they are a minor?

15        A.  They do check documents to see if they have a

16   document to proceed to primary, but they're not

17   screening documents to determine someone's age.

18   However, they are told to -- if it looks like someone

19   may be an unaccompanied alien child, to take that into

20   consideration, radio that down so that we know about it.

21        Q.  So in order to determine whether a migrant

22   might be an unaccompanied alien child, the officer

23   stationed at the limit line performs a visual inspection

24   ; is that correct?

25        A.  They do, and they may do additional actions as



Page 90

1    well.  So if they suspect someone's an unaccompanied

2    child, we want them to find that out.

3        Q.  Okay.

4            MR. FENN:  If we could pull up Exhibit 164,

5    please.

6        Q.  (BY MR. FENN)  We're showing you what will be

7    marked as Exhibit 164 and is titled "Supplemental and

8    Amended Responses to Plaintiffs' Fourth Set of

9    Interrogatories to all Defendants."

10           Have you seen this document before,

11   Mr. Cleaves?

12       A.  I think so.

13       Q.  And when you say you think so, is that because

14   you've seen responses to interrogatories, but you're not

15   sure if it was this particular response?

16       A.  Correct, yes, sir.

17       Q.  And I'm just looking for a yes-or-no answer on

18   this question.  Were you consulted regarding the facts

19   contained in this document?

20       A.  No.

21           MR. FENN:  I'd like to look at the bottom

22   of page 4, please.  Sorry.  That's page 4 of the --

23   numbered -- numbered page 3.  You were right the first

24   time, Kevin.  My mistake.

25       Q.  (BY MR. FENN)  And there's a heading there that



Page 91

1    says "Interrogatory No. 18."  Do you see that?

2         A.  Yes, sir.

3         Q.  The interrogatory reads:

4              "For each port of entry" -- I'm sorry --

5    "for each POE, describe your limit line position with as

6    much specificity as possible, including, without

7    limitation (a) the distance between the limit line

8    position and the boundary line between the U.S. and

9    Mexico, (b) any structures, whether permanent or

10   temporary, that are at the limit line position, (c) the

11   number of officers that are assigned to staff the limit

12   line position, and (d) the distance between where

13   officers stand when staffing the limit line position and

14   the boundary line between the U.S. and Mexico."

15             Did I read that correctly?

16        A.  Yes, sir.

17        Q.  Now I'd like to direct you to page 14 of the

18   document.  Under the underlined portion that says

19   "El Paso" -- do you see that?

20        A.  Yes, sir.

21        Q.  -- the description for Paso del Norte, which

22   starts at the second paragraph there under the El Paso

23   heading, reads:

24             "At the Paso del Norte bridge, the

25   pedestrian lane is segregated from the vehicle lanes by



Page 92

1    a steel railing, which ███████████████████████

2    ████████████████    Within the pedestrian lane there

3    is one (1) orange plastic Jersey barrier and three (3)

4    orange traffic cones placed immediately behind the

5    international boundary line.  These objects are parallel

6    to the international boundary line, facing an east-west

7    orientation.  The Jersey barrier and the traffic cones

8    span approximately half the width of the pedestrian lane

9    with the other half of the pedestrian lane unobstructed.

10   The limit line position is approximately ███████████

11   behind the Jersey barrier and traffic cones.  The

12   officers staffing the limit line stand directly behind

13   the open portion of the pedestrian."

14                Did I read that correctly?

15        A.  Yes, sir.

16        Q.  Does that description sound like an accurate

17   description of the pedestrian lane at the Paso del Norte

18   border crossing?

19        A.  Yes, that's accurate for times when there's a

20   lot of pedestrian traffic coming through, which is

21   often.

22        Q.  And, if you could, describe how does that

23   change -- I'm sorry.  Strike that.

24                How does the physical layout of the

25   pedestrian lane change when there is not a lot of



Page 93

1    pedestrian traffic?

2        A.  The physical layout doesn't really change, but

3    the officers may step back a few feet when there's no

4    pedestrians coming through, generally because we have a

5    little more shade behind them. █████████████████

6    ████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████

10       Q.  And when you say "step back," you mean step

11   back further into U.S. territory?

12       A.  Yes.

13       Q.  Since the limit line position at the Paso del

14   Norte border crossing is approximately ███████ ehind the

15   international boundary line, it's possible that asylum

16   seekers step foot onto U.S. soil at this particular

17   border crossing before they encounter a CBP officer at

18   the limit line position, correct?

19       A.  No.

20              MS. SHINNERS:  Object to the form.

21              Go ahead.

22       A.  No.

23       Q.  (BY MR. FENN)  The description states that

24   there is ███████ in between the -- hang on -- Jersey

25   barrier and traffic cones and the limit line; isn't that



Page 94

1   correct?

2        A.   I don't know.  Does it say the amount of feet

3   between the Jersey barriers?

4        Q.   If you look at --

5        A.   It says the traffic cones are placed

6   immediately behind the international boundary line,

7   according to what this says.

8        Q.   Right.  But then it says that:  "The limit line

9   position is approximately ███████ behind the Jersey

10  barrier and traffic cones."

11            Do you see that?

12       A.   Yes.  And as you described what limit line to

13  you means, that would be where the officers are

14  standing.

15       Q.   Correct.  So the officers are standing

16  approximately ████ behind the traffic cones; is that

17  correct?

18       A.   They're standing ████ behind the

19  international boundary.  They would be adjacent to the

20  traffic cones, so I -- I guess, yeah, technically,

21  that's behind, but not directly behind.

22       Q.   Okay.  But since there's ████ of space in

23  between the international boundary line and the limit

24  line, isn't it possible that an asylum seeker could step

25  foot into those ████ when they encounter the officer



Page 95

1    stationed at the limit line?

2        A.  No, not --

3            MS. SHINNERS:  Object to the form.

4        A.  Not without going around them, no.

5        Q.  (BY MR. FENN)  So there is no chance that an

6    asylum seeker could put their foot into that ████████

7    space before encountering the CBP officer at the limit

8    line?

9        A.  No.

10       Q.  Okay.  Has the physical setup of the pedestrian

11   lane at Paso del Norte border crossing, which we just

12   read together, changed at all since 2016?

13       A.  The physical layout.  You mean the

14   infrastructure itself or just the -- well, I guess I

15   should ask for clarification.  What do you mean?

16       Q.  The -- the physical setup of the pedestrian

17   lanes.  So that would include the Jersey barrier, the

18   traffic cones, where the limit line is in relationship

19   to the international boundary line.

20       A.  I think in general it's probably changed over

21   time.  We've used different types of canopies for shade.

22   I don't know if we always had orange cones and orange

23   barriers at the -- for the entire time.  I'm -- I'm sure

24   there's been some minimal change over time back and

25   forth.



Page 96

1      Q.   Okay.  Let's talk about Bridge of the Americas.

2   Bridge of the Americas is considered part of the El Paso

3   Port of Entry, correct?

4      A.   Yes.

5      Q.   From 2016 to the present, at any time, have

6   asylum seekers been metered at Bridge of the Americas?

7      A.   Yes.

8      Q.   Do you recall when metering began at Bridge of

9   the Americas?

10      A.   For the Port of El Paso, it would be

11   November 2016 for three weeks and then again in May of

12   2018.

13      Q.   And that was -- those dates that you just

14   indicated are the same dates as you earlier indicated

15   for the Paso del Norte crossing, correct?

16      A.   Correct.

17      Q.   And would your response be the same for the

18   Ysleta border crossing?

19      A.   Yes.

20      Q.   Have asylum seekers who approach the limit line

21   at Bridge of the Americas been told to wait in Mexico

22   for the time period 2016 to the present?

23      A.   They're not told a location of where to wait,

24   but they are told that they may have to wait if we're

25   unable to take them.



Page 97

1      Q.   Have they ever been directed to another border

2   crossing from Bridge of the Americas?

3      A.   No.

4      Q.   Okay.

5           MR. FENN:  I'd like to look at the top of

6   page 15 of the same document.

7      Q.   (BY MR. FENN)  And if you look at that first

8   full paragraph, it reads:  "At the Bridge of the

9   Americas, the pedestrian lane is segregated from the

10  vehicle lanes by a chain-link fence.  This chain-link

11  fence connects to the canopy above the pedestrian lane.

12  Within the pedestrian lane, there are no physical

13  barriers that have been placed between the international

14  boundary line and the limit line position.  The limit

15  line position is approximately ████████ behind the

16  international boundary line."

17          Did I read that correctly?

18     A.   Yes.

19     Q.   Does that description of the pedestrian lane at

20  Bridge of the Americas sound accurate to you?

21     A.   It does except for you take into your

22  definition of what limit line.  So if your definition of

23  limit line is where they officers are standing, then

24  they stand closer than that.  I know the -- the -- the

25  gate is about ████      The gate that you can close is



Page 98

1    about ███████ from the international boundary.

2        Q.   And so your testimony is that the officers are

3    sometimes stationed in between the gate and the

4    international boundary --

5        A.   They are.

6        Q.   -- is that correct?

7        A.   Yes.

8        Q.   How do the officers who are stationed at the

9    limit line at Bridge of Amer- -- Bridge of the Americas

10   determine where they are supposed to stand?

11       A.   They're supposed to stand as close to the

12   international boundary as possible without creating an

13   incursion accidently.

14       Q.   If a -- if a CBP officer is standing ████████

15   behind the international boundary line at the limit line

16   position, as indicated in this document, is it possible

17   that an asylum seeker could step foot onto U.S. soil at

18   Bridge of the Americas before encountering a CBP officer

19   at the limit line position?

20       A.   For that hypothetical, yes, but the officers

21   don't stand ██████ away from the international boundary

22   at Bridge of the Americas.

23       Q.   Okay.

24       A.   The -- the position of the officers is very

25   similar at Bridge of the Americas, Ysleta, and Paso del



Page 99

1   Norte, is they -- they're as close to the boundary as

2   they can get without going over.

3        Q.  So you would say that the sentence at the end

4   of the paragraph that we just read together, "the limit

5   line position is approximately ███████████ behind the

6   international boundary line," you would say that that's

7   inaccurate?

8        A.  If your -- if your definition of limit line is

9   where the officers stand, yes.  Yes, that would not be

10  accurate.

11       Q.  Okay.  And has the physical setup of the

12  pedestrian lane at Bridge of the Americas, which we just

13  read together, changed since 2016?

14       A.  The only significant difference is we put in

15  some ███████████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████

22       Q.  Okay.  And those changes wouldn't affect the

23  positioning of the limit line with respect to the

24  international boundary; is that correct?

25       A.  No, sir.  I guess there's another one that I


MAGNA ❯
LEGAL SERVICES

Page 100

1    thought of because I'd mentioned the gate.  We did

2    install some gates at the top of the bridges, actually

3    at all three locations, but at PD- -- at Paso del Norte

4    and Bridge of the Americas, it would be near the

5    international border.  And Ysleta, we installed a gate

6    as well; it's just not very close to the international

7    border.  So those would be changes to the pede- --

8    infrastructure at the pedestrian lanes.

9        Q.  Okay.  Let's talk about Ysleta.  We mentioned

10   earlier, and I think you agreed, that Ysleta was

11   considered a part of the El -- El Paso Port of Entry up

12   until March 2020 but is now considered its own port of

13   entry; is that correct?

14       A.  Yes, sir.

15            MR. FENN:  If we could please look at the

16   bottom paragraph on page 14 of this document.

17       Q.  (BY MR. FENN)  That paragraph reads:

18            "At the Ysleta POE, the pedestrian lane is

19   segregated from the vehicle lanes by a chain-link fence.

20   This chain-link fence connects to the canopy above the

21   pedestrian lane.  Within the pedestrian lane, there is

22   one (1) orange plastic Jersey barrier approximately █████

23   ████████ behind the international boundary line.  This

24   Jersey barrier is parallel to the international boundary

25   line facing in a northwest-southeast orientation.  This



Page 101

1    Jersey barrier spans approximately half the width of the

2    pedestrian line, with the other half of the pedestrian

3    lane unobstructed.  There is one (1) small aluminum

4    booth immediately behind the Jersey barrier to provide

5    CBP officers both shade and seating.  The limit line

6    position is adjacent to this booth."

7                Did I read this correctly?

8        A.   Yes, I think so.  Let me see if I can --

9        Q.   Oh, I'm sorry.  The description cut off there.

10               MR. FENN:  Could we move down to the next

11   page too, Kevin?

12       A.   Yes, sir.

13       Q.   (BY MR. FENN)  Okay.  Does that description

14   sound accurate to you?

15       A.   It does.

16       Q.   And is it correct that there is ███████ of space

17   between the limit line and the international boundary at

18   the Ysleta port of entry?

19       A.   In general, yes.  It's -- it's the same as the

20   other border crossings where the officers will be as

21   close to the limit -- to the international boundary as

22   possible without going over.

23       Q.   Is it -- is it similar to the Paso del Norte

24   crossing where at times the officers might be stationed

25   a little bit further into U.S. territory, depending on



Page 102

1    the weather or the conditions?

2         A.  It would be depending on pedestrian traffic.

3    So if there's no pedestrian traffic, they may step back.

4         Q.  But I think you also said earlier that if it

5    was particularly sunny or hot, there's a little bit more

6    shade further into U.S. territory; is that correct?

7         A.  Correct.

8         Q.  Okay.  Since the limit line position is

9    approximately ███████ behind the international boundary

10   line at Ysleta, is it possible that an asylum seeker set

11   foot onto U.S. soil before encountering a CBP officer at

12   the limit line?

13        A.  No, not without going around them.

14        Q.  But is it -- as a general matter, is it

15   possible that somebody's ████████████████████████████████

16   █████

17        A.  Hypothetically, a ██████████████████████████████

18   █████   But in the context that you're asking, no,

19   people would not be able to cross into the U.S. with

20   officers stationed that close to the international

21   boundary without attempting to get around them or go

22   through them.

23        Q.  Because it's physically impossible?

24        A.  Yes.

25        Q.  But you just agreed with me that it's possible



Page 103

1    for somebody's ███████████████████████?

2         A.  That's correct.  But the officers maintain an

3    officer presence.  They will be instructing people as

4    they come up the bridge.  They're not going to allow

5    them to get that close without instructions being given.

6    So, no, I don't think that's possible.

7         Q.  Has the physical setup of the pedestrian lane

8    at Ysleta changed since 2016?

9         A.  The -- the physical setup at Ysleta?

10        Q.  Yes.

11        A.  Yes.

12        Q.  How has it changed?

13        A.  That's pretty broad.  Did you mean pedestrian

14   or --

15        Q.  I'm sorry.  Yes.  And if I -- if I didn't say

16   "pedestrian lane," has the physical setup of the

17   pedestrian lane at the Ysleta Port of Entry changed

18   since 2016?

19        A.  Yes.  It -- it has a pedestrian -- the aluminum

20   booth was added, and then I'm sure we've swapped out,

21   you know, orange barricades or, you know, things for

22   weathering purposes.  They wear and tear.  And we did

23   add a gate to the entrance of the catwalk for

24   pedestrians, but that's not near the international

25   boundary.



Page 104

1      Q.  And so that -- those changes would not have

2   affected the physical distance or relationship between

3   the limit line and the international boundary; is that

4   correct?

5      A.  No, that would not have affected the distance

6   between the officers and the international boundary,

7   yes, sir.

8      Q.  Okay.  Let's talk about Tornillo.  From 2016 to

9   the present, have asylum seekers been metered at the

10  Tornillo Port of Entry?

11            MS. SHINNERS:  Object to the form and

12  scope.

13     A.  Yes.  Tornillo has used metering but extremely

14  rarely.  Almost never is the description I would use.

15     Q.  (BY MR. FENN)  Do you recall when this began at

16  Tornillo?

17     A.  Sometime after January of 2019.

18     Q.  So Tor- -- strike that.

19            So does that mean that there was no

20  metering at Tornillo before January of 2019?

21     A.  That is my understanding, yes, sir.

22     Q.  At the Tornillo Port of Entry, have asylum

23  seekers been told to wait in Mexico?

24     A.  No.

25            MS. SHINNERS:  Object to the form and



Page 105

1    scope.

2        A.  I don't think they've been given a location of

3    where to wait.  But when metering is conducted, they may

4    be told that they can't be taken at that time and

5    they'll have to wait.

6        Q.  (BY MR. FENN)  At the Tornillo Port of Entry,

7    have asylum seekers ever been directed to another port

8    of entry or border crossing?

9        A.  No.

10            MS. SHINNERS:  Object to the form and

11   scope.

12            Go ahead.

13       Q.  (BY MR. FENN)  Are you familiar with the

14   physical layout of Tornillo Port of Entry?

15       A.  Yes, sir.

16       Q.  If you could, could you describe the pedestrian

17   entrance to the Tornillo Port of Entry?

18            MS. SHINNERS:  And I'll just note the

19   standing objection to the scope as to port specifics.

20            Go ahead --

21            THE WITNESS:  All right.

22            MS. SHINNERS:  -- Mr. Cleaves.

23            THE WITNESS:  Yes, ma'am.

24       A.  Yes, the international boundary is quite a

25   distance from the port of entry, maybe -- I don't know



Page 106

1    how to explain it.  I was going to say quarter mile, but

2    maybe not that long.  Several hundred yards, and that's

3    about it.  They don't have much pedestrian traffic so

4    that they -- they use -- typically operate with one

5    pedestrian lane.

6        Q.  (BY MR. FENN)  And are there any physical

7    structures or physical markers close to the

8    international boundary line at the Tornillo Port of

9    Entry?

10       A.  There have been in the past.  I do not know if

11   they're still there or not.

12       Q.  Do you know how far from the international

13   boundary CBP officers are typically stationed at the

14   Tornillo Port of Entry?

15       A.  Yes.  If they're doing it, my understanding is

16   they stand as close to the international boundary as

17   they can get without going over.

18       Q.  But there's no physical structure for the

19   officer who is staffing the limit line to stand at; is

20   that correctly -- correct?

21       A.  On physical structures -- and this is a very

22   long period of time -- I know that there was Port

23   Hardney there at one time, and so there was some

24   physical structures right on the international boundary

25   at one time.  But as for the entire length of time what



Page 107

1    kind of structures they had there, if any at all, I do

2    not know.

3         Q.  If an asylum seeker approaches the limit line

4    at the Tornillo Port of Entry today, what is that asylum

5    seeker told by the officers who is -- who are staffing

6    the limit line?

7         A.  There's no metering today.  We're under a

8    public health order, so officers at the international

9    boundary are operating under that.  And that's for the

10   port of El Paso.  For the Port of Tornillo, I don't know

11   if they have anyone at the international boundary line

12   today or not.

13        Q.  How about in January of 2019?  Do you know what

14   an asylum seeker who approached the limit line at the

15   Port of Tornillo would have been told?

16        A.  Yes.

17             MS. SHINNERS:  Object to the form.

18        A.  Tornillo rarely does metering, but if it was

19   being done, they would have been told they were unable

20   to take them at this time and they would need to wait.

21        Q.  (BY MR. FENN)  And were -- what an officer who

22   was stationed at the limit line at the Port of Tornillo

23   was supposed to tell an asylum seeker who approached the

24   limit line in January of 2019, would that have been

25   written down somewhere?



Page 108

1        A.  No, not that I know of.

2        Q.  Do you know whether it would have been a

3   subject of musters?

4        A.  Yes.  I mean, the officers would need to be

5   told how to conduct themselves at the international

6   boundary.  So, yes, they would have been told.

7        Q.  Okay.  Let's turn to the Presidio Port of

8   Entry.  From 2016 to the present, have asylum seekers

9   been metered at the Presidio Port of Entry?

10        A.  Yes, sir.

11        Q.  Do you know when this practice of metering

12   began at the Presidio Port of Entry?

13        A.  Yes.  My understanding is it would be around

14   the spring of 2019.

15        Q.  And have asylum seekers been metered

16   consistently at the Presidio Port of Entry since that

17   time?

18        A.  That is my understanding, yes, sir.

19        Q.  And is your response the same for the Presidio

20   Port of Entry as for the other ports that we've already

21   discussed, that an asylum seeker would be told to wait,

22   but not necessarily in Mexico or at a specific place?

23        A.  Yes.

24             MS. SHINNERS:  Object to the form.

25        Q.  (BY MR. FENN)  Have asylum seekers between 2016



Page 109

1    and the present who approached the limit line at

2    Presidio ever been directed to another border crossing

3    or port -- port of entry?

4         A.  No, sir.

5         Q.  Are you fam- -- I'm sorry.

6              Are you familiar with the physical layout

7    of the Presidio Port of Entry?

8         A.  Yes, sir.

9         Q.  If you could, can you describe the pedestrian

10   entrance to the Presidio Port of Entry?

11        A.  This one is -- does have some distance from the

12   international boundary, and the port of entry, I think

13   it's quite a distance out.  For whatever reason, a

14   quarter mile comes into my mind as well, but I don't

15   know if it's actually that distance or not.  Their

16   pedestrian traffic is not very heavy either, so they

17   operate with only one or more pedestrian lanes, so it's

18   not very large.

19        Q.  I'm sorry.  Did you say either one or four

20   pedestrian lanes?

21        A.  No, one or more.

22        Q.  Oh, one or more.  Okay.

23              Depending on how heavy the pedestrian

24   traffic is?

25        A.  Yes, sir.



Page 110

1      Q.  Are there any physical structures in between

2  the international boundary line and the limit line at

3  the Presidio Port of Entry?

4      A.  Between 2016 and now, there were port-hardening

5  measures at one time.  I don't know if those measures

6  are still there, and I don't know specifically things

7  like orange barricades, like -- like had been mentioned

8  before for the Port of El Paso.  So specifically what

9  type of things they have, I don't know, especially over

10  that span of time.

11      Q.  You -- I think you mentioned the term

12  "port-hardening measures."  Did I hear that right?

13      A.  Yes, sir.

14      Q.  What are some of the measures -- port-hardening

15  measures that have been implemented at ports of entry in

16  the El Paso Field Office aside from a Jersey barrier or

17  orange cones or a chain-link fence?  Are there any other

18  different types of port-hardening measures?

19      A.  Yes, sir.  In February of 2019, the El Paso

20  Field Office started to have to implement some

21  additional port-hardening measures at these ports of

22  entry to be placed on the international boundary line

23  should it be necessary to close the port if it becomes

24  overwhelmed with people running through, large amounts

25  of people.



Page 111

1    So the -- what we fashioned were

2

3

4

5

6

7

8

9

10

11

12

13

14

15    Q.  And have those -- you mentioned that those

16    port-hardening measures have the ability to be closed in

17    the case of a large number of pedestrians rushing the

18    port; is that correct?

19    A.  Correct.

20    Q.  Has -- has that ever occurred at the El Paso

21    Field Office?  I'm sorry.  Strike that.

22           Has that ever occurred at any ports of

23    entry in the El Paso Field Office?

24    A.  Yes, sir.

25    Q.  On how many occasions?



Page 112

1        A.  It has occurred -- the actual rushing has

2   occurred twice, once on July 1st, 2019, and once in

3   January 25th, 2020.  Although the -- the one in the

4   January of 2020, it -- the people approaching the

5   boundary line that were rushing us, that was not their

6   intent.  They were engaged in a protest in Mexico and

7   just surprised everyone by coming up the bridge.  So no

8   one -- no one knew what their intent was at the time.

9   However, in July, their intent was to rush the bridge.

10       Q.  And were those instances at the Port of

11  El Paso?

12       A.  They were, and both were specifically at the

13  Paso del Norte border crossing.

14       Q.  Okay.  At the Presidio Port of Entry, are

15  officers stationed at a limit line?

16       A.  Yes.  When they do metering, they station them

17  as close to the international boundary line as -- as

18  possible without going over.

19       Q.  Do you have an estimate of the distance between

20  the international boundary line and the limit line at

21  the Presidio Port of Entry?

22       A.  I do not have an estimate.  My understanding is

23  that within the El Paso Field Office, we -- we do it

24  very similarly.  Officers are as close to the

25  international boundary line as possible without going



Page 113

1    over.

2        Q.  At the Presidio Port of Entry, would you say

3    that the distance between the international boundary

4    line and the limit line is closer to 1 foot or 10 feet?

5        A.  █████  sir.

6        Q.  At the Presidio Port of Entry in January 2019,

7    what would an asylum seeker who approached the limit

8    line have been told?

9        A.  They would have been told they're unable --

10                MS. SHINNERS:  Object to the form.

11        A.  They would have been told they're unable to be

12   taken at this time and they'll have to wait.

13       Q.  (BY MR. FENN)  And a similar question as with

14   Tornillo:  The -- are officers who staff the limit line

15   at the port of entry in Presidio given written

16   instructions about what to tell asylum seekers if

17   Presidio is engaged in metering?

18       A.  No, not that I -- not that I know of.

19       Q.  Are they verbally instructed in musters?

20       A.  Yes, they have been instructed so they know

21   what to do.

22       Q.  Okay.  Let's turn to the Columbus Port of

23   Entry.  From 2016 to the present, have asylum seekers

24   been metered at Columbus?

25       A.  Yes.



Page 114

1    Q.  And do you recall when the practice of metering

2    began at Columbus?

3    A.  Yes.  My understanding is it's the spring of

4    2019.

5    Q.  So asylum seekers prior to 2019 -- prior to

6    spring of 2019, asylum seekers were never metered at the

7    Columbus Port of Entry?

8    A.  That's my understanding.

9    Q.  Has the practice of metering been in place

10   consistently since the spring of 2019 at the Columbus

11   Port of Entry?

12   A.  No.  My understanding, at Columbus, it's not

13   very consistent.  They've used it, but it's not

14   consistent.

15   Q.  And how do they determine at the Columbus Port

16   of Entry when they're going to meter or not?

17   A.  Operational capacity, how many they could

18   process at the time.

19   Q.  Do -- does CBP staff at the Columbus Port of

20   Entry take into account detention capacity whether

21   to -- whether to meter or not?

22   A.  They do.  They take into account both.  But

23   since their capacity is -- is -- is kind of low, you

24   know, their -- their physical capacity, my understanding

25   is -- is, like, ███ so operational capacity would be



Page 115

1    lower than that just because they're a small port, small

2    staffing.  So they would take into consideration both,

3    yes, that's correct.

4        Q.  When asylum seekers who approach the limit line

5    at the Columbus Port of Entry are metered, are they told

6    that they must wait elsewhere?

7        A.  They're told they must --

8            MS. SHINNERS:  Object to the form.

9        A.  They're told they must wait.  And the purpose

10   of them being told to wait is not for officers to

11   designate specifically where and how to wait.  So if

12   they choose to wait in line literally at the

13   international boundary, they can.  If they choose to

14   wait somewhere else, they can.  It's not for us to

15   designate that.  So the officers are instructed not to

16   tell them specifically where they have to wait.

17       Q.  (BY MR. FENN)  Are they allowed to wait on U.S.

18   soil?

19       A.  No.

20       Q.  So would you agree with me that they have no

21   other choice but to wait in Mexico?

22       A.  I agree with that.

23       Q.  And is that the same with the other ports of

24   entry in the El Paso Field Office aside from Columbus?

25       A.  Yes, sir.



Page 116

1      Q.  Are you familiar with the physical layout of

2   the Columbus Port of Entry?

3      A.  I am, although it's changed recently.  So I'm

4   less familiar than I was, but, yes, I am.

5      Q.  If you could, could you describe the pedestrian

6   entrance at the Columbus Port of Entry?

7      A.  Yes.  The pedestrian -- they have limited

8   pedestrian crossings with the exception of school

9   children.  They have a lot of school children in the

10  morning.  So in the mornings, they may use more than one

11  pedestrian lane, but generally they use one pedestrian

12  lane.  Their building is now further back from the --

13  the international boundary than it used to be, so

14  it -- it's a little bit more of a distance than it was

15  in the past.

16     Q.  Where do migrants first encounter a CBP officer

17  when they are metered at the Columbus Port of Entry?

18     A.  If -- if metering is being conducted, it'll be

19  done as close to the international boundary as possible

20  without going over.

21     Q.  And are CBP officers stationed at a limit line

22  at the Columbus Port of Entry?

23     A.  Well, they'll be stationed at the international

24  boundary, so they'll be as close as possible as they can

25  be.



Page 117

1        Q.   So are they standing on the international

2   boundary?

3        A.   They'll be standing right behind it, just like

4   the other ports of entry that we discussed.

5        Q.   If you had to estimate a distance between the

6   limit line and the international boundary at Columbus,

7   how much space would you say there is between those two?

8        A.   Given your previous example of closer to 1 foot

9   or closer to 10 feet, I would say closer to ███████.

10       Q.   Closer to ███████ or closer to ███████?

11       A.   I would say closer to ███████.

12       Q.   Okay.  Has this changed at all since 2016?

13       A.   How -- no, I -- I guess not.

14       Q.   If Columbus -- if the Port of Columbus is

15   engaged in metering and an asylum seeker approaches the

16   limit line, what is the asylum seeker told?

17            MS. SHINNERS:  Object to the form.

18       A.   They won't be able to take them at this time;

19   they'll have to wait until they can.

20       Q.   (BY MR. FENN)  And similar question as with the

21   other ports of entry:  What an officer who is stationed

22   at the limit line at Columbus is supposed to tell an

23   asylum seeker if the port is engaged in metering, is

24   that contained in any written instructions?

25       A.   No, not that I know of.



Page 118

1      Q.  Would it be the subject of musters?

2      A.  Yes, and the officers would be told how to

3  conduct themselves.

4      Q.  Okay.  How about the Port of Santa Teresa, from

5  2016 to the present?  Have asylum seekers been metered

6  at Santa Teresa?

7      A.  Yes, sir.

8      Q.  And when did the practice of metering begin at

9  Santa Teresa?

10      A.  My understanding is it was similar to the Port

11  of El Paso.  The spring or summer of 2018.

12      Q.  You said the spring or summer of 2018, correct?

13      A.  Yes, sir.

14      Q.  And has the practice of metering been

15  consistently implemented since that time at Santa

16  Teresa?

17      A.  No.  It's -- I think it's both.  There have

18  been times where it's been consistent and times where

19  it's just when necessary, so...

20      Q.  Have asylum seekers been told to wait in Mexico

21  when they've been metered at the Port of Santa Teresa?

22      A.  They will be told they're unable to be taken in

23  at that time and they would need to wait.  And of

24  course --

25      Q.  And --



Page 119

1      A.  -- they're in Mexico when they're told that,

2  so, yes.

3      Q.  I'm sorry.  I didn't mean to interrupt you.

4          So is your testimony similar to Columbus

5  and Tornillo in that asylum seekers, when they're

6  metered, are not allowed to wait on U.S. soil?

7      A.  That is correct, sir.

8      Q.  So effectively, they must wait in Mexico?

9      A.  Yes, that will be the end result.

10     Q.  Okay.  Are you familiar with the physical

11  layout of Santa Teresa?

12     A.  Yes, sir.

13     Q.  Could you describe that to me?

14     A.  Yes, sir.  The building is pretty close to

15  international border.  There -- there's not much

16  distance between the lanes and the international

17  boundary.  And Santa Teresa is small as well, so they'll

18  alternate between one pedestrian lane or maybe two,

19  depending on the travel times, that type of thing.

20     Q.  And at Santa Teresa, are there any physical

21  structures in between the international boundary line

22  and the port of entry?

23     A.  Just the port-hardening measures that were in

24  place at one time.  As for additional structures, no, I

25  don't think so.  I don't -- I don't know.  That's a long



Page 120

1  span of time, so...

2      Q.  Are officers stationed at a limit line at the

3  Santa Teresa Port of Entry?

4      A.  If there is metering conducted, they will stand

5  at the international boundary, yes, sir.

6      Q.  And at the Santa Teresa Port of Entry, where is

7  the limit line in relation to the international

8  boundary?

9      A.  They will stand as close to the international

10  boundary as they can without going over.

11      Q.  If the Santa Teresa Port of Entry is engaged in

12  metering and an asylum seeker approaches, what does the

13  CBP officer tell the asylum seeker?

14      A.  They'll be told that they're unable to process

15  at that time or take anyone in at that time, and they

16  would have to wait.

17      Q.  I'm not sure if you want to take a break.  This

18  might be a good stopping point.  Otherwise, we can keep

19  going.

20      A.  I --

21          MS. SHINNERS:  Sorry, Mr. Cleaves.

22  I -- let's go off the record for a second.

23          THE VIDEOGRAPHER:  The time is 12:11 p.m.

24  We're going off the record.

25          (Break was taken.)



Page 121

1              THE VIDEOGRAPHER:  The time is 1:01 p.m.

2    We're back on the record.

3         Q.  (BY MR. FENN)  Welcome back, Mr. Cleaves.  I'd

4    like to ask you some questions about how metering at

5    ports of entry in the El Paso Field Office has changed

6    over time or hasn't changed over time.

7              You testified earlier that you were

8    familiar with the metering guide issued in April of 2018

9    by Todd Owen; is that correct?

10        A.  Yes, sir.

11             MR. FENN:  Kevin, can we put up Exhibit 3,

12   please?

13        Q.  (BY MR. FENN)  Mr. Cleaves, have you seen this

14   document before?

15        A.  Yes.

16        Q.  Does this appear to be a copy of the

17   April 27th, 2018, metering guide that was issued by Todd

18   Owen?

19        A.  Yes.

20        Q.  Did you receive this document when it was

21   distributed on April 27th, 2018?  And by "you," I mean

22   you personally.

23        A.  I don't know if I received it when it was

24   issued in April 2018 or not, but I have seen it.  So

25   somewhere down the line, I've seen it.



Page 122

1          Q.  So at some point after it was issued on

2     April 27, 2018, you saw this document.  Was that prior

3     to your preparation for your deposition?

4          A.  Oh, yes.

5          Q.  Okay.  Do you recall how you learned of this

6     document?

7          A.  No, I don't recall exactly how.

8          Q.  This metering guidance memorandum is currently

9     being implemented at Paso del Norte Port of Entry,

10    correct?

11         A.  Metering was being used at the Paso del Norte

12    border crossing, yes.  And -- and, of course, this

13    guidance helped direct the conduct of metering.  It's

14    a -- it's our guidance.

15         Q.  Right.  Yeah.  And I -- I'm not asking if

16    metering is being implemented currently at Paso del

17    Norte.  I'm asking whether this guidance is currently

18    being implemented.

19              So is -- is Mr. Owen's guidance currently

20    being implemented at the border crossing at Paso del

21    Norte?

22         A.  When metering is used, yes, this guidance will

23    be used.

24         Q.  And is the metering guidance currently being

25    implemented at the Bridge of the Americas border



Page 123

1    crossing?

2         A.   Yes.  When metering is in place, yes, the

3    guidance will be used.

4         Q.   How about Ysleta?

5         A.   Yes, sir.

6         Q.   Is this guidance being implemented currently at

7    the Columbus Port of Entry?

8         A.   When metering is used, the guidance will be

9    used, yes, sir.

10        Q.   And is this guidance currently being

11   implemented at the Santa Teresa Port of Entry?

12        A.   Same answer:  When metering is used, the

13   guidance will be used, yes, sir.

14        Q.   Same answer for Tornillo?

15        A.   Yes, sir.

16        Q.   And how about Presidio?

17        A.   Yes, sir.

18        Q.   If you look at the bottom of the first page of

19   the memorandum, there's a distribution section, correct?

20        A.   Yes, sir.

21        Q.   And it appears that this memorandum was sent to

22   each director of field operations for the four OFO field

23   offices on the U.S.-Mexico border; is that correct?

24        A.   Yes.

25        Q.   This memorandum did not contain any exceptions



Page 124

1    for any port of entry on the U.S.-Mexico border,

2    correct?

3              MS. SHINNERS:  Objection, vague.

4         A.  I don't see anything in the document that

5    indicates what port of entry specifically it will be

6    used at, if that's what you mean.

7         Q.  (BY MR. FENN)  Right.  So you don't see

8    anything in the memorandum that says:  This guidance

9    applies to these ports of entry on the U.S.-Mexico

10   border but not these other ports of entry on the

11   U.S.-Mexico border?

12        A.  Right.  I think the memo is designed for:  If

13   you're using metering, this is the guidance to be used.

14        Q.  And there are no field offices on the

15   U.S.-Mexico border that are excepted from the memo,

16   correct?

17        A.  The field offices for the southwest border are

18   listed on the memo.

19        Q.  Okay.  Isn't it true that CBP leadership

20   believed that the only port of entry where asylum

21   seekers were a real challenge as of April 2018 was San

22   Ysidro?

23              MS. SHINNERS:  Object to the scope.

24        A.  To my know- -- to my knowledge, that would be

25   not true.


MAGNA
LEGAL SERVICES

Page 125

1    Q.   (BY MR. FENN)  So you would disagree that in

2    April 2018, CBP leadership believed that the only port

3    of entry with an asylum seeker challenge was San Ysidro?

4    A.   Yes, based on my exper- --

5              MS. SHINNERS:  Object to the scope and

6    form.

7              Okay.  Go ahead.

8    A.   Based on my experience, I would disagree with

9    that.  Because of my knowledge of the Port of El Paso,

10   we were having challenges ourselves at that time;

11   therefore, San Ysidro only would not be accurate in my

12   view.

13   Q.   (BY MR. FENN)  Okay.  But I guess my question

14   is really about what CBP leadership believed.

15             So at that time, in April 2018, did CBP

16   leadership believe that asylum seekers were a challenge

17   for the Port of El Paso?

18   A.   I believe so, sir.

19             MS. SHINNERS:  Object to the scope and

20   foundation.

21             Go ahead.  You believe so?  Sorry.

22   A.   Yeah, I believe so.

23   Q.   (BY MR. FENN)  Okay.  Let's --

24             MR. FENN:  Kevin, if you could pull up

25   Exhibit 165.



Page 126

1          Q.  (BY MR. FENN)  I'm showing you what we will

2     mark as Exhibit 165 to your deposition.  It is a

3     two-page e-mail that bears the Bates Nos.

4     AOL-DEF-00047772 through 73.

5               This is a June 16th to 17th, 2018, e-mail

6     exchange between Kevin McAleenan, Todd Owen, Randy Howe,

7     and others, correct?

8          A.  Yes.

9          Q.  At the time of this e-mail, Kevin McAleenan was

10     the commissioner of CBP, correct?

11          A.  I believe so, yes.

12          Q.  At the time of this e-mail, Mr. McAleenan was

13     senior-most leader at CBP, correct?

14          A.  Yes, sir.

15          Q.  And at the time of this e-mail, Todd Owen was

16     the executive assistant commissioner of CBP, correct?

17          A.  Yes, sir.

18          Q.  At the --

19          A.  For Office of Field Operations, yes, sir.

20          Q.  I'm sorry.  I -- I didn't hear what you said.

21          A.  For Office of Field Operations, yes, sir.

22          Q.  Okay.  So is it fair to say that at the time of

23     this e-mail, Mr. Owen was senior-most career official at

24     OFO?

25          A.  Yes, sir.



Page 127

1      Q.  And at the time of this e-mail, Randy Howe was

2   the executive director for operations at OFO, correct?

3      A.  Yes, sir.

4      Q.  Mr. Howe recently became the director of field

5   operations for the Laredo Field Office, correct?

6      A.  Yes.

7      Q.  That was a demotion, correct?

8      A.  No.  I think they're -- both are senior

9   executive service-level positions, so I think it's kind

10  of a lateral.  However --

11     Q.  Okay.

12     A.  -- the -- the -- it is true that the executive

13  director of operations is in the chain of command above

14  the -- the DFOs, but as for rank, I think it's a

15  lateral.  They're all SES level.

16     Q.  So would the director of field operations for

17  the Laredo Field Office report to the executive director

18  for operations at OFO?

19     A.  Yes, that would be accurate.

20     Q.  Okay.  Do you know why Mr. Howe left OFO

21  headquarters and moved to the Laredo Field Office?

22              MS. SHINNERS:  Object to the --

23     A.  No, I do not.

24              MS. SHINNERS:  -- scope, foundation.

25              Go ahead.



MAGNA ▶
LEGAL SERVICES

Page 128

1        A.  No, I do not.

2        Q.  (BY MR. FENN)  Okay.  This e-mail chain starts

3    with an e-mail that Ryan Koseor sent on June 16th, 2018,

4    at 7:17 p.m., correct?

5              MR. FENN:  And, Kevin, I think we need to

6    move to the next page.  No.  I'm wrong.  Okay.  Yeah.

7        A.  You're asking about date and time.  So it says

8    Saturday, June 16th, 7:17 p.m., yes, sir.

9        Q.  (BY MR. FENN)  Okay.  And Mr. Koseor's e-mail

10   contains a queue management update for June 16th, 2018,

11   correct?

12       A.  Yes.

13       Q.  Mr. Howe forwarded Mr. Koseor's e-mail to

14   Mr. Owen; is that correct?

15              MR. FENN:  Kevin, if we could move up the

16   chain.  Sorry.

17       A.  Yes.  It says it's from Ex D Howe -- former

18   Ex D Howe to Mr. Owen.

19       Q.  (BY MR. FENN)  And Mr. Howe wrote to Mr. Owen:

20   "Below is the current status on queue management and

21   migrant capacity along the SWB."

22              Did I read that correctly?

23       A.  Yes, sir.

24       Q.  SWB is southwestern border; is that correct?

25       A.  Yes.



Page 129

1    Q.  Mr. Howe did not say that the report sent by

2    Mr. Koseor contained inaccurate migrant capacity

3    information, correct?

4    A.  No.

5    Q.  He did not write -- Mr. Howe did not write the

6    capacity information should not be relied upon, correct?

7            MS. SHINNERS:  Object to the scope.

8            Continue.

9    Q.  (BY MR. FENN)  Mr. Howe did not advise Mr. Owen

10   that the migrant capacity did not reflect the

11   operational capacity of the ports of entry, correct?

12   A.  Correct.

13           MS. SHINNERS:  Object to the scope.

14   A.  I don't think that would be necessary, but it

15   doesn't expressly state that, correct.

16   Q.  (BY MR. FENN)  Mr. Owen then forwarded

17   this -- this e-mail containing the June 16th, 2018,

18   queue management report to commissioner Kevin McAleenan,

19   correct?

20           MR. FENN:  And, Kevin, if we can --

21           MS. SHINNERS:  Object to the scope.

22           MR. FENN:  Kevin, if we could look at the

23   next e-mail in the chain.

24   A.  Correct.

25   Q.  (BY MR. FENN)  Mr. Owen wrote:  "Commissioner,



Page 130

1    current status along the SWB."

2              Did I read that correctly?

3    A.  Yes.

4    Q.  Mr. Owen did not tell Mr. McAleenan that the

5    queue management report contained inaccurate capacity

6    information, correct?

7              MS. SHINNERS:  Object to the scope.

8    A.  Correct.

9    Q.  (BY MR. FENN)  Mr. Owen did nothing to warn

10   Mr. McAleenan that he should not rely upon the queue

11   management report, correct?

12             MS. SHINNERS:  Object to the scope, vague.

13   Are you talking about the contents of this e-mail?

14             MR. FENN:  Correct.

15   Q.  (BY MR. FENN)  You can answer.

16   A.  Correct.  There's nothing in the e-mail that

17   states something's inaccurate.

18   Q.  In fact, Mr. Owen told commissioner McAleenan

19   that the queue management report in this e-mail showed

20   the current status along the U.S.-Mexico border,

21   correct?

22   A.  Correct.

23   Q.  Mr. McAleenan responded to Mr. Owen at

24   8:44 p.m. on June 16th, 2018, correct?

25   A.  Correct.



Page 131

1    Q.  Mr. McAleenan wrote:  "Really just a San Ysidro

2    challenge."

3           Did I read that correctly?

4    A.  Yes.

5    Q.  Do you have any understanding as to why the CBP

6    issued a border-wide metering policy in April of 2018

7    when asylum seekers were really just a San Ysidro

8    challenge?

9           MS. SHINNERS:  Object, assumes facts,

10   mischaracterizes document.

11           You can answer.

12   A.  Because it wasn't true.  I think the way you're

13   characterizing it is out of context.  So San Ysidro was,

14   by far, the biggest challenge, and they encountered this

15   challenge first.  But at this time of 2018, El Paso was

16   certainly having their challenges.  Now, from a higher

17   leadership point of view, they may not view our

18   challenges as particularly a -- a big challenge for

19   them, but at -- at the field level, El Paso was

20   experiencing challenges with migrant surges in June of

21   2018.

22   Q.  (BY MR. FENN)  Mr. McAleenan did not write in

23   his e-mail on June 16, 2018, at 8:44 p.m. that San

24   Ysidro was the biggest challenge, did he?

25   A.  He did not.



Page 132

1        Q.  He wrote "really just a San Ysidro challenge,"

2   correct?

3        A.  He wrote that, yes, sir.

4        Q.  Are you aware that CBP headquarters had, prior

5   to April 2018, previously provided guidance to ports of

6   entry to engage in metering?

7        A.  No.  Well, in 2016, we engaged in metering at

8   the Port of El Paso.

9        Q.  And in 2016, when you engaged in metering, did

10  you receive any guidance from CBP headquarters on how

11  that metering should be executed?

12       A.  Yes, but it was a -- there was a learning curve

13  in 2016, because it was new, on the mechanics of how to

14  do it, but, yes.

15       Q.  Okay.

16            MR. FENN:  Kevin, if we could put up

17  Exhibit 166, please.

18       Q.  (BY MR. FENN)  I'm showing you what we will

19  mark as Exhibit 166 to your deposition.  This is a

20  November 18th, 2016, e-mail from Joe Agosttini to Carlos

21  Gonzalez and William Brooks, copying Michael Humphries,

22  with the subject line "Consolidated Weekly highlights,"

23  forwarding an e-mail from CBP attaché at the U.S.

24  Embassy in Mexico City.

25            Do you see that?



Page 133

1        A.  Yes, sir.

2        Q.  Do you personally know Mr. Agosttini, Gonzalez,

3   Brooks, or Humphries?

4        A.  I do not.

5        Q.  So you do not interact with any of those four

6   individuals regularly?

7        A.  No.

8        Q.  The second sentence of the second paragraph --

9   I'm sorry.

10            MR. FENN:  Maybe, Kevin, if we could zoom

11   in on the -- the second e-mail there from Carlos

12   Gonzalez, Friday, November 18th.  One above that.  Yeah.

13        Q.  (BY MR. FENN)  If you could look at the second

14   paragraph there, starting with "INM is back to the

15   drawing board."  Do you see that paragraph?

16        A.  Yes.

17        Q.  And the second sentence there says:  "As you

18   may already know, we (CBP) announced to GoM two days ago

19   that our ports will be pushing migrants without entry

20   documents back to Mexico to await an appointment to be

21   processed at the POEs.  These self-metered measures

22   began in El Paso already."

23            Did I read that correctly?

24        A.  Yes.

25        Q.  So is it fair to say that El Paso had begun



Page 134

1    metering even before November 18th, 2016?

2         A.  Yes, they did.

3         Q.  Do you know if every port of entry in the

4    El Paso Field Office was metering in November 2016?

5         A.  No.  My understanding, it was the Port of

6    El Paso.

7         Q.  Only the Port of El Paso?

8         A.  That's my understanding.

9              MR. FENN:  Kevin, if we could put up

10   Exhibit 167, please.

11        Q.  (BY MR. FENN)  I'm showing you what's been

12   marked as Exhibit 167 or -- I'm sorry -- will be marked

13   as Exhibit 167 and is Bates-stamped AOL-DEF-00272935.

14   This is a November 11th, 2016, e-mail from Kevin

15   McAleenan to Todd Owen and John Wagner with subject

16   line:  "RE:  Metering in Texas."

17              Do you see that?

18        A.  Yes, sir.

19        Q.  And if I can direct your attention to the

20   first-in-time e-mail down at the bottom there,

21   Mr. McAleenan writes to Owen and Wagner:

22              "EAC/DDAC, Just wanted to touch base

23   directly because I'm not sure it was conveyed with full

24   clarity from CAT.  C1 and I briefed S1 that we wanted to

25   increase efforts to meter arrivals of non-UAC, non-



MAGNA
LEGAL SERVICES

Page 135

1    Mexican CF cases mid-bridge.  If INAMI is not willing to

2    help, we will push up to the line and hold them back

3    there.  This will be mostly CENTAM families.  Please

4    advise if you have concerns and let me know how

5    implementation goes."

6                    Did I read that correctly?

7    A.  Yes.

8    Q.  What do EAC and DEAC stand for?

9    A.  EAC is the executive assistant commissioner.

10   DEAC is the deputy, deputy assistant -- deputy executive

11   assistant commissioner.

12   Q.  And what about CAT?

13   A.  Crisis Action Team.

14   Q.  Okay.  How about C1 and S1?

15   A.  C1 is the abbreviation for commissioner.  S1 is

16   for the Secretary of Homeland Security.

17   Q.  Okay.  And when you say "commissioner," you

18   mean the commissioner of CBP?

19   A.  Yes, sir.

20   Q.  And in November of 2016, who would the

21   commissioner of CBP have been?

22                    MS. SHINNERS:  Object to the scope.

23                    But go ahead.

24   A.  I believe it was Mr. McAleenan, but I might

25   be -- I don't know when he took over.



Page 136

1        Q.   (BY MR. FENN)   And in November of 2016, who

2    would S1 have been, the secretary of DHS?

3                 MS. SHINNERS:   Object to the scope.

4                 You can answer.

5        A.   I think it would have been Ms. Nielsen, but I'm

6    not sure.

7        Q.   (BY MR. FENN)   Do you know why CBP wanted to

8    increase efforts to meter at this time?

9        A.   Yes, I do.   From the Port of El Paso

10   perspective, we had a severe overcrowding issue,

11   extremely severe.   And we had tried other methods, like

12   all kinds of methods to deal with it, you know, take

13   them all in and place them in other locations, and it

14   started to -- actually it didn't start to, it flat out

15   degraded our ability to do other mission sets.   It got

16   to the point where it became an emergency, and so other

17   methods were being discussed on how to address this

18   situation.

19       Q.   And Mr. McAleenan notes that the metering would

20   occur midbridge and that CBP officers would push up to

21   the line and hold them back there; is that correct?

22       A.   It says that.

23       Q.   In the ports of entry in the El Paso Field

24   Office, were there officers stationed at the limit line

25   in November of 2016?



Page 137

1      A.  There were, yes.

2      Q.  And what did Mr. McAleenan mean by "hold them

3  back there"?

4          MS. SHINNERS:  Objection, scope,

5  foundation.

6      A.  My understanding is that that's just informal

7  wording of if you can't process them now, then don't let

8  them in, and they'll have to wait.  So I guess that

9  would be his wording for waiting, waiting in line.

10     Q.  (BY MR. FENN)  And so what -- what would that

11  have looked like in practice at, for instance, the Port

12  of El Paso in November 2016?

13     A.  It would have been very similar, if not the

14  same, to what we talked about in 2018 for the ports of

15  entry in your questions on the interrogatories, with the

16  exception of the first week.  There were -- we didn't do

17  it right in the first week, so we had officers stationed

18  correctly sometimes and officers not stationed correctly

19  at other times, so we had some corrections to make in

20  the first week of this implementation.

21     Q.  When you say "not stationed correctly," what do

22  you mean?

23     A.  I mean sometimes the officers weren't stationed

24  clo- -- as close to the international boundary as they

25  were supposed to, and there were shifts, especially on



Page 138

1    the midnight shift, where they pulled the officers down

2    to the end of the pedestrian catwalks, meaning they were

3    not at the international boundary.

4        Q.  And when you say the "end of the pedestrian

5    catwalks," do you mean on the U.S. side?

6        A.  On the U.S. side, yes, sir.

7        Q.  What does CENTAM stand for?

8        A.  Central American.

9        Q.  Were you personally -- and I'm asking you this

10    question in your personal capacity.  Were you personally

11    responsible for the implementation or execution of this

12    guidance?

13        A.  No, sir.

14        Q.  Was there ever any written guidance issued

15    outlining this metering effort in November 2016, either

16    from OFO or the director of the El Paso Field Office?

17        A.  I don't think so.

18        Q.  How then was the metering guidance conveyed to

19    CBP officers at ports of entry within the El Paso Field

20    Office?

21        A.  Well, it was definitely conveyed verbally, so

22    where to be, how to do it, and the reasoning behind it.

23    In the first week, it wasn't done correctly all the

24    time, and so we had to do some corrections.

25        Q.  And who -- who would have been responsible for



Page 139

1    conveying this information within the El Paso Field

2    Office?

3        A.  It would have been field office leadership

4    within the El Paso Field Office.

5        Q.  And how about within individual ports of entry?

6        A.  Within the individual ports of entry, it would

7    be the port directors and port leadership.

8        Q.  So would this guidance be conveyed at musters?

9        A.  Yes, it could have been, yes.

10       Q.  Okay.  Moving to the next-in-time e-mail, which

11   is from Mr. Owen to Mr. McAleenan and Mr. Wagner at

12   2:55 p.m.  Mr. Owen responds:  "Deputy, we are on board

13   with the metering.  Wanted to express this verbally with

14   the SWB DFOs as opposed to a written record.  I thought

15   we had advised them via telephone last night to start,

16   and that this would be among the various custody issues

17   to discuss in more depth next week.  We will call the 4

18   DFOs right now."

19            The DFOs are the directors of field

20   operations on the southwestern border between the U.S.

21   and Mexico, correct?

22       A.  Yes.

23       Q.  At this time, in November 2016, would the

24   director of the El Paso Field Office have been Beverly

25   Good?



Page 140

1       A.   No.

2       Q.   Who was, at the time, the director for the

3  El Paso Field Office?

4       A.   I think it was Hector Mancha was the DFO for

5  the El Paso Field Office.

6       Q.   Why do you think Mr. McAleenan would have

7  preferred to express this guidance verbally as opposed

8  to a written record?

9            MS. SHINNERS:  Objection, scope,

10  foundation.

11       A.   I do not know.

12       Q.   (BY MR. FENN)  Why, generally, would a person

13  not want to put something in writing or leave a written

14  record?

15            MS. SHINNERS:  Same objections -- or --

16  yeah.

17       A.   I don't know.

18       Q.   (BY MR. FENN)  So according to Mr. Owen's

19  e-mail, the DFO for El Paso would have participated on a

20  phone call regarding the implementation of this metering

21  guidance in November 2016, correct?

22       A.   Yes.  The e-mail says that the EAC thought

23  there was a phone call the night before.

24       Q.   Do you know -- and -- and I'm asking now in

25  your capacity as a CBP representative.  Do you know


MAGNA
LEGAL SERVICES

Page 141

1    whether that phone call ever occurred?

2         A.  I don't know if that phone call occurred, but I

3    know, based on the Port of El Paso implementing metering

4    the day of November 11th and then the day after,

5    November 12th, that some form of communication did

6    occur, had to have occurred.

7         Q.  Okay.

8              MR. FENN:  Kevin, if we could put up 168,

9    please.

10        Q.  (BY MR. FENN)  We're showing you what will be

11   marked as Exhibit 168, and it is Bates-stamped

12   AOL-DEF-00272936.  This is a November 11th, 2016, e-mail

13   from Kevin McAleenan to Todd Owen and John Wagner, with

14   subject line "Forward Metering FMUAs at the Texas CBP

15   POEs."

16              Do you see that?

17        A.  Yes.

18        Q.  I'd like to look at the bottom e-mail first

19   from November 10th, 2016, from Gloria Chavez to Beverly

20   Good, copying Enrique Tamayo and Patrick Flanagan.

21              Gloria Chavez appears to be on the Crisis

22   Action Team at the time, correct?

23        A.  Yes, I do think that was correct.

24        Q.  Yeah.  I think if you look at her e-mail

25   signature at the bottom of that e-mail, it indicates



Page 142

1    that she was a part of the Crisis Action Team, right?

2        A.  Yes, it does, yes.

3        Q.  What was the Crisis Action Team?

4        A.  Well, there's -- they'll stand up a crisis

5    action team for any crisis event that's occurring.  For

6    this, they would have been for migrant related.

7        Q.  And is that different from the MCAT?

8            MS. SHINNERS:  Object to the scope.

9        Q.  (BY MR. FENN)  Sorry.  Let me rephrase.

10           The Crisis Action Team that's referenced in

11   Ms. Chavez's e-mail signature in this e-mail, is that

12   different from the MCAT as it exists today?

13       A.  My understanding is there's --

14           MS. SHINNERS:  Object to the scope.

15       A.  My understanding is there's no significant

16   difference.

17       Q.  (BY MR. FENN)  Okay.  The first paragraph of

18   Ms. Chavez's e-mail states:  "Beverly, one other topic

19   that C2 discussed at the NAC meeting today was the

20   ability to meter the flow of FMUAs at the POE bridges

21   (at the middle of the bridge) at some of our Texas POEs

22   to prevent the overflow at the actual POEs.  For

23   example, placing a couple of CBPOs at the international

24   boundary line (middle of the bridge) to manage the flow

25   of arriving FMAUs at the POE.  The proposal is focused



Page 143

1    towards the family units from Central America; the

2    exception being Mexican FMUAs claiming credible fear of

3    course.  All other legitimate pedestrian traffic would

4    be okay to pass through and not be held up."

5              Did I read that correctly?

6        A.  Yes.

7        Q.  Do you know how CBPOs were expected to manage

8    the flow at the international boundary line?

9              MS. SHINNERS:  Objection, vague.  Where?

10       Q.  (BY MR. FENN)  I'm referring to the line in

11   Ms. Chavez's e-mail that's --

12             MS. SHINNERS:  Sorry.  My objection is

13   vague as to geographic scope.  Apologies.

14       Q.  (BY MR. FENN)  Let me rephrase.

15             In November 2016 at the El Paso Port of

16   Entry, do you know how CBPOs were expected to manage the

17   flow at the international boundary line?

18       A.  If your question is related to when metering

19   was implemented -- is that correct?

20       Q.  I'm referring to the phrase "manage the flow"

21   in Ms. Chavez's e-mail.

22       A.  Right.  And I take that to mean when metering

23   is implemented, managing the flow of metering.  If

24   that's your question, then, yes, the officers were

25   instructed on how to do that.


MAGNA
LEGAL SERVICES

Page 144

1      Q.  And do you know how they were instructed on how

2  to do that?

3      A.  Yes.

4          MS. SHINNERS:  Objection, vague.

5          Go ahead.

6          THE WITNESS:  Okay.

7      A.  Yes.  So metering, it is to prevent

8  overcrowding at the port of entry.  So if we're not able

9  to take people in at that time, then they will tell

10  people "We're not able to take you in," and they'll have

11  to wait.  And it's not a primary inspection or a

12  secondary inspection station, so they won't be doing

13  inspections at the metering limit line.

14      Q.  (BY MR. FENN)  So a CBP officer who was

15  stationed at the international boundary line at this

16  time in El Paso would have told an asylum seeker that

17  we're not able to take you in?

18      A.  Yes.  If that was the case, yes, which at that

19  time was often, yes.

20      Q.  Would the -- the CBP officer have provided a

21  reason for why the port was not able to take the asylum

22  seeker in?

23      A.  Yes, they could -- they could tell them, you

24  know, "We're at capacity.  We're unable to process you

25  at this time."  And -- and then, "You'll have to wait



Page 145

1    until we're able to -- to take you."

2         Q.  Were CBP officers instructed to provide asylum

3    seekers a reason for why they couldn't take asylum

4    seekers in during this time?

5         A.  I don't know if they were provided specifically

6    reasons.  They were not provided any -- they weren't

7    prohibited from answering that question on the reason

8    why, so...

9         Q.  But they weren't necessarily instructed that

10   they should provide a reason?

11        A.  I think that's fair, fair to say.  Although, I

12   think at the Port of El Paso, we normally did,

13   especially in the beginning.

14        Q.  And is that because it was a -- it was part of

15   guidance at El Paso, or it -- was it a more informal

16   practice?

17        A.  I think it was because it was new.  So

18   obviously, people coming to the bridge encountering

19   something new, you know, an explanation of -- of what

20   we're doing is -- is helpful.

21        Q.  Okay.  Looking back at Ms. Chavez's e-mail, she

22   states that this guidance was:  "Focused towards the

23   family units from Central America."

24              Is that correct?

25        A.  It says that, yes.



Page 146

1      Q.   So a family unit from Central America

2  approaching a POE in Texas in late November 2016 would

3  have been treated differently by CBP than another type

4  of pedestrian approaching that POE, correct?

5      A.   Yes.  At the -- from the Port of El Paso, we

6  were experiencing a very large surge of migrants, and

7  most of them were Central American families.  So it

8  appears like the metering was focused toward that surge.

9      Q.   And so those Central American families

10  approaching a POE would have been told something

11  different by a CBP officer stationed at the limit line

12  during this time, correct, than -- I'm sorry.  Let me

13  rephrase.

14          A Central American family approaching a POE

15  in El Paso at this time would have been told something

16  different by the officer stationed at the limit line

17  than some other type of pedestrian who was approaching

18  the limit line?

19      A.   Yes.  Undocumented migrants, if we were

20  metering, would have been told something different than

21  pedestrians with travel documents that could proceed to

22  primary inspection.

23      Q.   Would Mexican family units have been told the

24  same thing by a CBP officer stationed at the limit line

25  at this time in El Paso?



Page 147

1      A.  If they're claiming fear of Mexico, then, no.

2  I mean -- your question's pretty vague on whether --

3  whether or not they would have been told something

4  different, so I'll answer it this way.  If a migrant --

5  undocumented migrant was claiming fear of Mexico, they

6  would not have been told to wait.

7      Q.  And how would a -- how would a CBP officer

8  stationed at the limit line during this time have

9  determined whether a family unit or another pedestrian

10  was coming from Mexico or from Central America?

11      A.  Well, they're all coming -- they're all coming

12  from Mexico.

13      Q.  Yeah.  I guess I'm asking about their point of

14  origin.  How would a CBP officer stationed at the limit

15  line during this time have determined that?

16      A.  Well, sometimes these people will tell you, but

17  different cultures and different nationalities dress

18  different.  So it can be -- you can decipher that as

19  well.  Obviously, that's not 100 percent, but there are

20  significant difference in many cases.

21      Q.  So it would have been a visual inspection?

22      A.  Yes, sir.

23      Q.  Ms. Chavez then says in her e-mail:  "All other

24  legitimate pedestrian traffic would be okay to pass

25  through and not be held up."



Page 148

1              What do you understand the word

2    "legitimate" to mean in the course of normal

3    conversation?

4         A.  Well --

5              MS. SHINNERS:  Object to the scope.

6              Go ahead.

7         A.  In the course of normal conversation, legal.

8    In the course of this memo that you're asking me about

9    here, I would expect that to mean somebody with a -- a

10   document so they can proceed to primary inspection.  At

11   primary, they would determine whether or not they

12   would -- admissibility, viability, or whether or not the

13   document was genuine, purpose of travel, that type of

14   thing.

15        Q.  (BY MR. FENN)  So according to Ms. Chavez's

16   e-mail, CBP did not consider family units from Central

17   America to be legitimate pedestrian traffic at this

18   time; is that correct?

19             MS. SHINNERS:  Objection, scope,

20   mischaracterizes document, foundation.

21        A.  My understanding is -- is they were trying to

22   differentiate between undocumented migrants and those

23   who do have a travel document that may be admissible.

24        Q.  (BY MR. FENN)  Okay.  But Ms. Chavez doesn't

25   say anything about travel documents in her e-mail,



Page 149

1   correct?

2       A.  Correct.  That is my understanding, though.

3   The reason being is undocumented travelers are obviously

4   inadmissible.

5       Q.  I'd like to turn to the -- actually, strike

6   that.

7              MR. FENN:  Kevin, can we put up

8   Exhibit 169, please.

9       Q.  (BY MR. FENN)  Mr. --

10             MS. SHINNERS:  Can you hold on one second?

11  I apologize.  I -- I'm having trouble getting back to my

12  e-mail.  Thank you.  All right.  Thank you.  Go ahead.

13      Q.  (BY MR. FENN)  Mr. Cleaves, I'm showing you

14  what's been marked as -- I'm sorry -- what will be

15  marked as Exhibit 169.  This is a document titled:

16  "Defendants' Objections and Responses to Plaintiffs'

17  Fifth Set of Interrogatories to All Defendants."

18             Do you see that?

19      A.  Yes.

20      Q.  Have you seen this document before?

21      A.  I think so.

22      Q.  And when you say you think so, is that similar

23  to with the fourth set of response -- I'm sorry -- the

24  objections and responses to the fourth set of

25  interrogatories; you're not sure -- you've seen



Page 150

1    responses and objections, but you're not sure whether it

2    was this set or a different set?

3        A.   Right, yes, sir.

4        Q.   Another yes-or-no question:  Were you consulted

5    with respect to the facts described in this document?

6        A.   No.

7             MS. SHINNERS:  You can take your time to

8    look at the document too.

9        Q.   (BY MR. FENN)  Yeah.  If you want to scroll

10   through the document, you're welcome to do that.

11       A.   Okay.  The scroll's not working, but -- oh,

12   there it goes.

13       Q.   Yeah.  I think you have to ask Kevin to scroll,

14   unfortunately.

15       A.   Oh, I apologize.  Okay.

16       Q.   It's a little bit clunky.

17       A.   So my understanding is these documents have an

18   El Paso section.

19       Q.   That's right.  And -- and I'm happy to direct

20   you to the El Paso section momentarily.  So if it's

21   easier, I can ask you when we get to that section

22   whether you were consulted with respect to the facts

23   there.

24       A.   Okay.

25       Q.   If I can direct your attention to the top of



Page 151

1    page 8 of the document, there's a heading there that

2    says "Interrogatory No. 21."  Do you see that?

3        A.  Yes.

4        Q.  And Interrogatory No. 21 reads:  "For each POE,

5    describe with specificity how you applied the metering

6    and/or queue management policy to noncitizens that

7    attempted to present themselves for inspection and

8    processing at the POE prior to the creation of the limit

9    line position, including without limitation:  (a)

10   whether arriving noncitizens were permitted to step onto

11   U.S. soil before they were metered and the number of

12   times that this occurred, (b) whether arriving

13   noncitizens were escorted from U.S. soil back to Mexican

14   soil and the number of times that this occur, (c)

15   whether arriving noncitizens were permitted to stay in

16   the space between the limit line and the POE building

17   and the number of times that this occurred, and (d) when

18   you began metering/queue management at the POE."

19           Did I read this correctly?

20       A.  Yes.

21       Q.  Okay.

22           MR. FENN:  And now if we can turn to

23   page 14, which contains the response for El Paso.

24       Q.  (BY MR. FENN)  Do you see the -- the heading

25   there, "El Paso," at the top of the page?



Page 152

 1        A.  I do.

 2        Q.  Okay.  And the response states:  "The El Paso

 3   POE began conducting metering in April 2018 at the limit

 4   line position shortly after the issuance of the

 5   April 2018 metering guidance.  It had previously

 6   conducted metering between November and December 2016.

 7   Accordingly, there was no time during which the metering

 8   and/or queue management policy was applied prior to the

 9   creation of the limit line position."

10             Did I read that correctly?

11        A.  Yes.

12        Q.  I'm hoping you can help me with this response.

13             The response states that for the El Paso

14   Port of Entry, the limit line position was established

15   shortly after the issuance of the April 2018 metering

16   guidance, right?

17        A.  No.  My understanding is the Port of El Paso

18   implemented it in late May of 2018.  That was the first

19   time.  May 20th, if I -- I'm estimating.

20        Q.  But that would be if -- if the Port of El Paso

21   implemented the limit line position in May of 2018, that

22   would be shortly after the metering guidance was issued

23   in April, correct?

24        A.  Yeah.  I guess from your point of view,

25   it -- it's not a year after, but it's not the day after



Page 153

1    either.  So, yes, I'm --

2         Q.  Fair enough.

3         A.  About a --

4         Q.  Fair enough.

5         A.  -- month -- about a month later.  How --

6    however short you want that to be, yeah.

7         Q.  Okay.  But you and I just discussed that

8    metering had occurred at Texas ports of entry in

9    November 2016, correct?

10        A.  Yes.

11        Q.  And the next sentence of the response

12   acknowledges the occurrence of metering at the El Paso

13   Port of Entry between November and December 2016,

14   correct?

15        A.  Right.  It says before November 2016, there was

16   no metering, I guess.

17        Q.  So --

18             MS. SHINNERS:  Um -- go ahead.

19        Q.  (BY MR. FENN)  So then, isn't it correct that

20   there was a metering or queue management policy that was

21   applied prior to the creation of the limit line position

22   in 2018?

23             MS. SHINNERS:  Objection, doesn't take into

24   account the objections asserted in the definitions of

25   metering and/or queue management policy in the document.



Page 154

1      Q.  (BY MR. FENN)  You can answer.

2      A.  Sure.  My understanding, there was no

3  difference between 2018 and 2016.  It's just that 2016,

4  it was new, so it took a while -- there was a learning

5  curve to kind of get it right, but there was -- there

6  was no difference.  The -- the purpose of it would be to

7  do it at the international boundary.  In 2018, we -- we

8  did a better job of it from the beginning.  That would

9  be the difference.

10     Q.  Okay.  Are you aware personally or on behalf of

11  CBP of any metering that occurred at any ports of entry

12  within the El Paso Field Office between December 2016

13  and April 2018?

14     A.  I am aware that no metering was done between

15  that times.

16     Q.  So you're not aware of any asylum seekers that

17  were metered at the port of entry within the El Paso

18  Field Office between December 2016 and April 2018?

19     A.  Yes, I think that's correct.

20     Q.  Are you aware of any asylum seekers that were

21  turned back from a port of entry in -- within the

22  El Paso Field Office between December 2016 and

23  April 2018?

24          MS. SHINNERS:  Objection, vague.

25     A.  No, I'm not aware of anybody who was turned



Page 155

1    back, no.  And I'm not aware of any metering being

2    conducted at that time.

3         Q.  (BY MR. FENN)  Okay.  Are you -- are you aware

4    that there are reports of asylum seekers being turned

5    back during this time across the southwestern border,

6    including at the El Paso Port of Entry?

7              MS. SHINNERS:  Objection, vague.

8         A.  No.

9              MR. FENN:  Kevin, if we could put up

10   Exhibit 170, please.

11        Q.  (BY MR. FENN)  Mr. Cleaves, this is a

12   document --

13             MS. SHINNERS:  One second.  I -- I haven't

14   received the -- sorry.  I haven't received the document.

15   If you could wait one moment.

16             MR. FENN:  Sure.

17             MS. SHINNERS:  Thank you.

18             MS. SLOCUM:  Hey.  I'm sorry.  This is

19   Louisa from CBP.  I don't have a chat function anymore.

20   Can I get it back, please?

21             MAGNA TECH:  It should be there now.

22             MS. SLOCUM:  Thank you.

23             MR. FENN:  Katie, will you let us know when

24   you receive the document?

25             MS. SHINNERS:  I will.  I still haven't



Page 156

1    received it.

2              Okay.  Received.

3         Q.  (BY MR. FENN)  Okay.  Mr. Cleaves, you're being

4    shown what will be marked as Exhibit 170.  This is a

5    copy of a report published by the organization Human

6    Rights First entitled "Crossing the Line:  U.S. Border

7    Agents Illegally Reject Asylum Seekers."  And the report

8    is from May 2017.

9              Do you see that?

10        A.  Yes.

11        Q.  Have you ever seen this document before?

12        A.  I don't think so, but it's possible.

13        Q.  Have you generally seen reports from the

14   organization Human Rights First before?

15        A.  No, not that I recall.

16        Q.  This is a long report, but you're welcome to

17   take your time to flip through it, if you want.

18   Otherwise, I'm happy to direct you to the particular

19   places that I'd like to focus on.

20        A.  Okay.  That will be fine, yes, sir.

21        Q.  Okay.

22              MR. FENN:  Kevin, if we could flip to page

23   No. 13 of the report.  And -- yep, that was -- that's

24   the one.

25        Q.  (BY MR. FENN)  And, Mr. Cleaves, if you could



Page 157

1  look at the right-hand column, the first orange bullet

2  there.  And that portion reads, after the bolded text:

3  "In earlier February '17, Martin, a prosecuted Mexican

4  journalist, arrived with his attorney at the El Paso

5  Port of Entry.  Martin had covered police violence in

6  Guerrero, Mexico, and had been attacked by police

7  officers and received multiple death threats.  The

8  international organization, Reporters Without Borders,

9  had documented the persecution of Martin and many others

10  in Mexico, which is one of the most dangerous countries

11  for journalists.  At the U.S. port of entry, a CBP agent

12  told the attorney that Mexicans could not get asylum in

13  the United States.  After a protracted negotiation, the

14  lawyer eventually convinced CBP to appropriate --

15  appropriately process his client as an asylum seeker."

16          Do you have any personal knowledge of this

17  particular event?

18      A.  No.

19          MS. SHINNERS:  And, yeah, I'm going to

20  object to -- object to the scope.  You haven't -- but

21  continue.

22          MR. FENN:  Yeah.  I -- and -- and

23  I'm -- I'm asking Mr. Cleaves in his personal capacity.

24      Q.  (BY MR. FENN)  Do you have any reason to

25  believe that this account is not accurate?



Page 158

1        A.  No, I don't have any reason to believe that

2    it's not accurate.

3        Q.  And so would you agree that, in some instances,

4    turnbacks did, in fact, occur at the Port of El Paso

5    between December 2016 and April 2018?

6        A.  No, I don't agree with that.  I do agree with

7    our officers have made mistakes.  We've done it wrong.

8    This is obviously incorrect and inappropriate, and we

9    have had that type of thing occur.  So...

10       Q.  And -- and you testified earlier that even when

11   metering was being implemented officially in

12   November 2016, Mexicans who expressed credible fear were

13   not supposed to be metered at that time; is that right?

14       A.  That's correct.

15       Q.  Would you agree that if the CB -- CBP agent in

16   question in this account did, in fact, tell Martin that

17   Mexicans could not get asylum in the United States, that

18   CBP officer was lying?

19              MS. SHINNERS:  Objection, scope.

20              Go ahead.

21       A.  No, I don't know.  It could be, but it is

22   definitely wrong and inappropriate.

23       Q.  (BY MR. FENN)  Okay.

24       A.  Whether or not he actually thought that or not,

25   it's still completely wrong, but...



Page 159

1      Q.  I'd like to go back to the April 2018 metering

2  guidance issued by Mr. Owen that we were looking at

3  earlier.

4              MR. FENN:  Kevin, if you could please put

5  up Exhibit 165.

6      Q.  (BY MR. FENN)  You may recall from our

7  discussion of this document earlier that Mr. McAleenan,

8  on June 16, 2018, just two months after the metering

9  guidance was issued by Mr. Owen, stated that asylum

10  seekers were really just a San Ysidro problem, correct?

11              MS. SHINNERS:  Objection, mischaracterizes

12  document.

13      A.  I recall the e-mail that you showed me, yes.

14      Q.  (BY MR. FENN)  Were there -- were the ports of

15  entry in the El Paso Field Office engaged in metering

16  asylum seekers as of April 2018, immediately after the

17  April 2018 metering guidance was issued?

18      A.  My understanding is no.  My understanding is we

19  started at the Port of El Paso in late May.

20      Q.  Okay.  So as of June 2018, when this e-mail

21  correspondence on your screen took place, ports of entry

22  in the El Paso Field Office would have been engaged in

23  metering?

24      A.  The Port of El Paso was engaged in metering in

25  June of 2018, yes, sir.



Page 160

1      Q.   Okay.  At ports of entry in the El Paso Field

2   Office, how are CBP officers who are stationed at the

3   limit line kept apprised of port capacity?

4      A.   Generally speaking, that would be outside their

5   span of control, so that would be port leadership and

6   port management control.  So they will meter according

7   to the supervisors and the second line chiefs and the

8   watch commanders on duty.  They will apprise them, I

9   guess.

10     Q.   So the -- the -- if -- if I can just rephrase

11  to make sure I understand what you're saying.

12          The watch commanders and supervisors and

13  others at the port of entry will inform or apprise the

14  officers stationed at the limit line what the port

15  capacity is?

16     A.   Yeah, not directly.  I guess it would be more

17  appropriate to say that they will let them know when

18  we're able to take people in and when we're not.

19     Q.   And how often does that occur?

20     A.   Every day.

21     Q.   Once a day or at multiple times throughout the

22  day?

23     A.   Multiple times throughout the day.  There's

24  actually two times specifically throughout the day that

25  Mexican immigration prefers to be notified, so multiple



Page 161

1   times throughout the day.

2       Q.  And when the supervisor or watch commander or

3   others at the port of entry are informing CBP officers

4   who are stationed at the limit line what the capacity

5   is, do they do that verbally or via radio, or how is

6   that information conveyed?

7       A.  Again, they don't get into specifics of

8   capacity, but their communications with officers at the

9   international boundary is primarily through radio.

10      Q.  Okay.  So you said they don't get into

11  specifics.  Is it possible that the -- that a CBP

12  officer who is stationed at the limit line would have no

13  idea what the current capacity of the port is at any

14  given point in time?

15      A.  Yeah, that's possible.  They wouldn't have the

16  operational knowledge of -- of what's going on with the

17  entire port that would determine whether or not we could

18  take anybody in or not.  Their interest would be "do I

19  take someone in or not?"

20      Q.  So how does a CBP officer who's stationed at

21  the limit line know what to tell an asylum seeker who

22  approaches the limit line when metering is occurring?

23      A.  If they've been informed that we're not able to

24  take people at that time, then they will inform the

25  people approaching undocumented migrants that we will



Page 162

1    not be able to take people at that time.

2         Q.  What is CBP's opinion of nonprofit

3    organizations that attempt to help migrants seek asylum?

4              MS. SHINNERS:  Objection, scope.

5         A.  I don't think CBP, as an agency, has one

6    opinion of any organization.

7         Q.  (BY MR. FENN)  Is an asylum seeker who

8    approaches the limit line at a port of entry in the

9    El Paso Field Office more likely to gain entry if they

10   are accompanied by an advocate or a lawyer, in your

11   experience?

12        A.  No.  However, that has occurred.  So we

13   occasionally do get them accompanied by various

14   advocates.

15        Q.  And from your personal experience, why do you

16   think asylum seekers feel that they need to be

17   accompanied by an advocate or a lawyer when they present

18   themselves at a POE?

19             MS. SHINNERS:  Objection, foundation, that

20   calls for speculation, scope.

21        A.  From my personal perspective, I don't think

22   they do that.  I actually think it's the other way

23   around.  I -- I think the advocates go out recruiting

24   people to bring with them.  Judging from the -- the

25   migrants that come in, they -- they make comments of,



Page 163

1    you know, "that person there," and -- in other words, it

2    doesn't seem like they even know them.

3        Q.  (BY MR. FENN)  So you don't think that asylum

4    seekers seek out help from advocates or lawyers before

5    presenting at a port of entry?

6        A.  I think --

7            MS. SHINNERS:  Objection, scope, calls for

8    speculation.

9            You can answer.

10       A.  I think it's possible they do seek help, but in

11   your example of those being brought up to a port of

12   entry by advocates, in my personal experience, it

13   appears like the advocates are seeking people to -- to

14   bring them in.

15       Q.  (BY MR. FENN)  Okay.

16           MR. FENN:  Let's take a look at

17   Exhibit 171, please.

18       Q.  (BY MR. FENN)  Mr. Cleaves, I'm showing you

19   what's been marked -- what will be marked as

20   Exhibit 171.  This is a June 3rd, 2018, e-mail from

21   Randy Howe to Hector Mancha, with the subject line "RE:

22   Bridge even."  I'm not sure, that might be a typo in the

23   subject line there.

24           But do you see that?

25       A.  Yes.



Page 164

1      Q.  I'd like to look at the earliest e-mail on the

2  third page of the document, please.  This is an e-mail

3  from Robert Moore to Roger Maier.

4            Do you personally know who Robert Moore is?

5      A.  I know that he's a reporter, but I don't

6  personally know him.

7      Q.  Do you know who Mr. Moore works for?

8      A.  I think it's something called Texas Monthly,

9  but I'm not sure.

10     Q.  Okay.  And do you personally know Roger Maier?

11     A.  I do, yes, sir.

12     Q.  And what is his position within CBP?

13     A.  He works for the Office of Public Affairs.

14     Q.  Okay.  Mr. Moore's e-mail reads:  "I

15  accompanied Ruben Garcia from Annunciation House today

16  to talk to a group of Guatemalans who said they were

17  denied the opportunity to come into the United States to

18  make an asylum claim.  After being with them, Ruben took

19  a badly sunburned mother and her baby, as well as a

20  16-year-old unaccompanied girl.  Our group was stopped

21  at the top of the bridge, just inside U.S. territory,

22  for CBP agents who asked the Guatemalans for ID.  The

23  agents initially said they would not allow the three

24  Guatemalans to move forward."

25            Did I read that correctly?



Page 165

1          A.  You read that correctly.

2          Q.  Are you familiar -- excuse me.

3               Are you familiar with the organization

4    Annunciation House?

5          A.  I am.

6          Q.  And are you personally familiar with Ruben

7    Garcia?

8          A.  I am.

9          Q.  What is CBP's position regarding asylum seekers

10   who are on U.S. soil when they make their asylum claim?

11         A.  We process them.

12         Q.  Always?

13         A.  We should be processing them, yes.

14         Q.  The e-mail goes on:  "While we were waiting,

15   another agent armed with a semiautomatic or automatic

16   rifle arrives.  At one point, he discharged his Taser

17   toward the ground.  It was not a threatening move, but

18   it was audible and visible."

19               Are all CBP officers who are stationed at

20   the limit line armed?

21         A.  ███████████████████████████████████████████

22   █████████

23         Q.  And I assume CBP officers undergo weapons

24   training?

25         A.  They do.



Page 166

1    Q.  Does that training include any portion on power

2   dynamics for the perception of armed officers?

3              MS. SHINNERS:  Object to the scope.

4    A.  In general, yes.  Officer --

5              MS. SHINNERS:  You can go ahead.

6    A.  -- officer presence or perception, yes, there

7   is training on that.

8    Q.  (BY MR. FENN)  Does the weapons training

9   include use of a Taser?

10             MS. SHINNERS:  Scope objection.

11    A.  Yes.  Those who have a Taser are trained in the

12   use of a Taser.

13    Q.  (BY MR. FENN)  The e-mail continues:  "The

14   supervisor, Agent Gomez, arrives after a few minutes.

15   He told Ruben the facilities were at capacity, a claim

16   Ruben challenged.  Agent Gomez also initially said that

17   Guatemalans couldn't move forward.  Ruben and his

18   assistant insisted that since they were on U.S. soil,

19   the law required that they be processed.  Agent Gomez

20   eventually agreed to allow them to come forward to be

21   processed."

22             Did I read that correctly?

23    A.  Yes.

24    Q.  And my question is:  Are CBP officers who are

25   stationed at the limit line and the supervisors at ports



Page 167

1    of entry in the El Paso Field Office trained on the law

2    regarding asylum seekers stepping foot onto U.S. soil?

3         A.   Yes.  Yes, they know if they're on U.S. soil,

4    they should be processed.

5         Q.   And the e-mail continues, from Mr. Moore:

6    "While I was there, I saw agents standing at the

7    boundary blocking Guatemalans from coming in or trying

8    to urge Guatemalans back to the Mexican side.  At one

9    point, one of the agents crossed into Mexican territory

10   to keep a migrant from coming onto U.S. soil."

11             If it's true that the Guatemalans in

12   question in this account were on U.S. soil, should they

13   have been allowed to enter the port of entry?

14        A.   If it's true, yes.

15        Q.   And are CBP officers trained to station

16   themselves in Mexican territory?

17        A.   They're trained not to.  My understanding is

18   that did not occur.

19        Q.   When you say "that did not occur," do you mean

20   generally or in this particular instance?

21        A.   In this particular instance.

22        Q.   So do you have familiarity with this particular

23   event?

24        A.   On a personal, no, but as a representative,

25   yes.  I also know that the officer who discharged the


MAGNA▶
LEGAL SERVICES

Page 168

1    Taser, he was doing a spark test at the beginning of his

2    shift, which is part of the training.  However, all

3    officers were reminded you don't do that in public.  So

4    that was inappropriate for him to do at that time.

5        Q.  So the -- so CBP officers are trained not to

6    perform their spark tests in public?

7        A.  Yes.  Well, they were definitely told after

8    this that's the case, but my understanding is, yes, that

9    there's no reason for a spark test to be done in public.

10       Q.  Okay.  Let's go -- strike that.

11           You mentioned that Roger Moore is, you

12   think, a reporter for Texas Monthly, correct?

13       A.  Yes.

14       Q.  And in your personal experience, is it common

15   for reporters or other media members to accompany asylum

16   seekers to ports of entry in the El Paso Field Office?

17       A.  I think at this time, when it was starting

18   back, it was somewhat common.

19       Q.  Do you personally read Texas Monthly?

20       A.  No.

21       Q.  Did you read the article that Mr. Moore wrote

22   regarding this incident?

23       A.  No.

24           MR. FENN:  Let's go two e-mails up to the

25   bottom of the first page, please.



Page 169

1      Q.  (BY MR. FENN)  And if I could direct your

2   attention to Mr. Moore's e-mail, the thir- -- yeah, the

3   third sentence there, starting "Ruben Garcia

4   challenged."  Do you see that sentence?

5      A.  Yes.

6      Q.  Okay.  It reads:  "Ruben Garcia challenged the

7   accuracy of the capacity claims.  Can you tell me the

8   capacity for holding people at the bridges, particularly

9   PDN, where we were today?  Can you provide some

10  statistics for the past week or so on the number of

11  people detained at the ports?"

12             Did I read that correctly?

13     A.  Yes.

14     Q.  Do you know whether Mr. Maier ever responded to

15  this portion of Mr. Moore's enquiry about capacity

16  numbers?

17     A.  I imagine it might be on the top of this

18  message string, whatever his response was, I guess.

19     Q.  Well, we can take a minute if you want to look

20  at the rest of the e-mail chain.

21     A.  Okay.

22             MR. FENN:  Kevin, if you could scroll up so

23  that we can see the rest of it, that would be helpful.

24     Q.  (BY MR. FENN)  And, then, Mr. Cleaves, let me

25  know when you've had a chance to read the rest of the



Page 170

1    chain.

2        A.  Okay.  It looks like he responded on June 2nd,

3    Roger Maier back to Robert Moore.

4        Q.  Right.  But in any of Mr. Maier's responses,

5    did you see anything about capacity numbers at the port

6    of entry that day?

7        A.  Yeah.  He says it would vary based on multiple

8    factors.

9        Q.  Okay.  And if you were asked for capacity

10   numbers for Paso del Norte or for the El Paso Port of

11   Entry by somebody at OFO for a given day, you would be

12   able to get those numbers, correct?

13       A.  I can give them physical capacity, detention

14   capacity numbers, but operational capacity, probably

15   not.  At best, we'd have to make an estimate of what was

16   occurring at that time, and the farther back you go, the

17   more difficult that would be to estimate.

18       Q.  Okay.  And, in fact --

19       A.  Farther back in time I mean.

20       Q.  I'm sorry.  I didn't mean to interrupt you.

21       A.  No.

22       Q.  In fact, we did look at an example where the

23   El Paso Field Office provided capacity numbers for each

24   port of entry within the El Paso Field Office to OFO,

25   correct?



Page 171

1     A.  You provided past e-mails that listed the

2  physical detention capacity of multiple ports of entry,

3  of which El Paso was one of them.  Are you referring to

4  those e-mails?

5     Q.  Yes, yes, correct.

6     A.  Yes, I remember those.

7     Q.  Okay.

8          MR. FENN:  Kevin, if we could please pull

9  up Exhibit 172.

10     Q.  (BY MR. FENN)  Mr. Cleaves, I'm showing you

11  what will be marked as Exhibit 172.  This is a document

12  Bates-numbered AOL-DEF-37758.  It is an e-mail dated

13  June 15th, 2018, from Ryan Koseor to the El Paso Ops

14  Center copying Randy Howe, Hector Mancha, you, and

15  others.  Do you see that?

16     A.  Yes.

17     Q.  I'd like to move one e-mail down in the chain

18  to Daniel Thomson's 6:35 p.m. e-mail.  Do you see that?

19     A.  Yes.

20     Q.  Okay.  Mr. Thomson is, in this e-mail,

21  providing capacity numbers for the POEs in the El Paso

22  Field Office, correct?

23     A.  Yes.

24     Q.  And Mr. Thomson states that the Port of El Paso

25  is on at 50.4 percent capacity, correct?



Page 172

1        A.  Yes.

2        Q.  But Mr. Thomson also states that PDN and Ysleta

3   are "holding the line," correct?

4        A.  Yes.

5        Q.  And does that mean that they, at this time,

6   were metering?

7        A.  Yes.

8        Q.  And staying within that same e-mail but moving

9   down to Mr. Thomson's description for the Port of

10   Tornillo, the description for the Port of Tornillo

11   states that it is:  "Processing and housing 0 detainees

12   with capacity of █ "

13             Correct?

14        A.  Yes.

15        Q.  Do you see where it says "Current State -

16   Challenges" right underneath Tornillo Port of Entry?

17        A.  Yes, sir.

18        Q.  And under that, the first bullet reads:

19   "National media (CNN) attention outside the port and

20   media request to enter the port due to the HHS UAC

21   facility.  Media is attempting to capture photos of the

22   housing and children."

23             Did I read that correctly?

24        A.  Yes.

25        Q.  In your experience, why would this be



Page 173

1    considered a challenge?

2        A.  Well, they decided to -- and I think it was

3    GSA.  I'm not sure who made the decision, but the

4    Tornillo Port of Entry has a large amount of land, and

5    their cargo facility, it is not used due to -- they were

6    built for cargo, and the Mexican side was supposed to

7    build their infrastructure and facilities to match it,

8    but they haven't done it yet.

9            So there's a lot of open space that -- a

10   lot of that space was given away to another agency, in

11   this case, Health and Human Services.  However, those

12   facilities use the same exit gates and entrance gates,

13   so it presents a challenge to the port of entry because

14   these people are protesting one facility, but it -- it

15   impedes on the port of entry's ability to -- to operate

16   sometimes.

17       Q.  Do you recall at this time what CBP's position

18   would have been with respect to CNN taking photos of the

19   HHS UAC facility?

20       A.  No.  I mean, it was -- it was Health and Human

21   Services' facility, so I think our view was it's --

22   Health and Human Services would have to deal with

23   whether or not that was appropriate or not.

24       Q.  Okay.  And then, the second bullet point there

25   under "Current State - Challenges" says:  "Congressman



Page 174

1    Beto O'Rourke planning march to Tornillo Port of Entry

2    on June 17th, 2018."

3                Did I read that correctly?

4    A.  Yes.

5    Q.  Do you recall if the march described in that

6    bullet point actually occurred?

7                MS. SHINNERS:  Object to the scope.

8    A.  Yes, I think so.  There were -- there were

9    several protests and marches, so I think this was one of

10   them.  The -- these were protests against the Health and

11   Human Services facility, but since it's on the same land

12   as the Tornillo Port of Entry, you know, it -- it

13   involved us, only because we're nearby, we're next door,

14   so...

15   Q.  (BY MR. FENN)  Is it common for media or

16   politicians to visit ports of entry in the El Paso Field

17   Office?

18   A.  It's common -- somewhat common for the Port of

19   El Paso.  It's extremely uncommon for the Port of

20   Tornillo.

21   Q.  Uh-huh.  And is that because Tornillo is a

22   smaller port of entry than El Paso?

23   A.  I think so.

24               MS. SHINNERS:  Object to the scope.

25   Q.  (BY MR. FENN)  Congressman O'Rourke was a



Page 175

1    member of the U.S. House of Representatives and

2    represented El Paso, correct?

3        A.  Yes, sir.

4        Q.  Did Congressman O'Rourke often visit ports of

5    entry in the El Paso Field Office?

6            MS. SHINNERS:  Object to the scope.

7        A.  I know he often visited the Port of El Paso.

8    How often he visited the other ports of entry, I don't

9    know if you would describe it as frequent or not, but...

10       Q.  (BY MR. FENN)  And did you ever personally

11   interact with Congressman O'Rourke?

12           MS. SHINNERS:  Same objection to scope.

13       A.  At least on two occasions, yes.

14       Q.  (BY MR. FENN)  And can you describe the nature

15   of those interactions?

16       A.  Sure.  One of those --

17           MS. SHINNERS:  Same objection.

18       A.  One of those was a leadership meeting at the

19   El Paso Field Office that he attended and spoke to us

20   on, and one was when there was a Tornillo holding

21   facility in 2016 at the Tornillo -- on the land of

22   Tornillo Port of Entry, and he visited that site.

23       Q.  (BY MR. FENN)  Okay.

24           MR. FENN:  Kevin, could we pull up

25   Exhibit 173, please?



Page 176

1            MS. SHINNERS:  I just -- I don't have that

2    exhibit yet.  I'll let you know when we get it.

3            MR. FENN:  Okay.

4            MS. SHINNERS:  Received.  Received.

5            MR. FENN:  Okay.  Thank you.

6    Q.  (BY MR. FENN)  Mr. Cleaves, I am showing you

7    what's -- what will be marked as Exhibit 173.  This is

8    Congressman Beto O'Rourke's Twitter page, and it

9    contains a video clip that was posted on December 14th,

10   2018.  Do you see that?

11   A.  Yes.

12   Q.  And in December 2018, was the El Paso Port of

13   Entry engaged in metering?

14   A.  Yes.

15   Q.  Okay.

16           MR. FENN:  Kevin, could we -- actually,

17   strike that.

18   Q.  (BY MR. FENN)  The description that accompanies

19   the video on Mr. O'Rourke's Twitter page says that

20   Congressman O'Rourke visited Juárez.  Do you see that?

21   A.  Yes, sir.

22   Q.  And Juárez is on the Mexican side of the border

23   adjacent to El Paso; is that correct?

24   A.  Yes, sir, a large city adjacent to El Paso on

25   the Mexican side.


MAGNA
LEGAL SERVICES

Page 177

1      Q.  Okay.

2             MR. FENN:  Kevin, could we play the video?

3             (Video playing.)

4             (Video stopped.)

5      Q.  (BY MR. FENN)  Mr. Cleaves, do you agree with

6  Congressman O'Rourke's comparison of the asylum process

7  before metering was implemented in El Paso as compared

8  to after metering was implemented in El Paso?

9             MS. SHINNERS:  Objection, to memory test of

10  the video.

11             But go ahead.

12      A.  The only thing I disagree with his

13  characterization is the word "rejected."  They haven't

14  been rejected.  They're just waiting in line to then go

15  into the same process that he described as before

16  metering.

17      Q.  (BY MR. FENN)  And in the video, the asylum

18  seekers had wait-list numbers written on their arms.

19  Did you see that?

20      A.  I did.

21      Q.  Has it ever been a CBP practice at ports of

22  entry in the El Paso Field Office to write wait-list

23  numbers on asylum seekers?

24      A.  No.  Mexican Immigration reported that the

25  migrants themselves actually started that practice.



Page 178

1      Q.  Do you have any reason to believe that that

2  type of action was ever performed by a CBP officer

3  metering an asylum seeker in the El Paso Field Office?

4      A.  No, sir.

5          MS. SHINNERS:  Object to the form.

6          Sorry, Mr. Cleaves.  Go ahead.

7      A.  No.

8      Q.  (BY MR. FENN)  Okay.  And has it ever been a

9  CBP practice at ports of entry in the El Paso Field

10  Office to hand out tickets with wait-list numbers to

11  asylum seekers?

12      A.  I don't think we ever handed out tickets, but

13  in the first week of 2016 when we first implemented it,

14  they were giving appointments.  They were taking names

15  down, and then we had to correct that.  So that was part

16  of the -- that was part of the operational steps we took

17  in -- in -- when it was first implemented in 2016, it

18  was not correct.

19      Q.  And when asylum seekers were given appointments

20  in 2016, was that a verbal appointment or a verbal

21  notification of when their appointment was?

22      A.  My understanding, it -- it was, yes, sir.

23      Q.  At that time in 2016 when metering was

24  occurring at El Paso, were asylum seekers who were

25  turned back given any -- any documentation or anything



Page 179

 1   on paper?

 2                MS. SHINNERS:  Object to the form.

 3        A.  No.  My understanding is they were not issued

 4   anything.

 5        Q.  (BY MR. FENN)  Okay.  Are you aware that

 6   Congresswoman Alexandria Ocasio-Cortez and other members

 7   of Congress visited border patrol and CBP detention

 8   facilities in El Paso in July of 2019?

 9                MS. SHINNERS:  Object to the scope.

10        A.  Yes.

11        Q.  (BY MR. FENN)  I'm sorry, Mr. Cleaves.  Was

12   that a "yes"?

13        A.  Yes.

14        Q.  Did you personally interact with any of the

15   members of Congress when they visited?

16                MS. SHINNERS:  Same objection to scope.

17        A.  Yes.

18        Q.  (BY MR. FENN)  Which -- which congressmen or

19   women did you interact with during their visit?

20                MS. SHINNERS:  Same objection.

21        A.  I don't remember --

22                THE WITNESS:  I'm sorry.

23                MS. SHINNERS:  Go ahead.

24        A.  I don't remember because they were in a group.

25   So the -- the one I remember answering questions from



Page 180

1    was Ms. Escobar, and that's because she's our local

2    representative, so I know her.  And then, the others,

3    you know, I had -- we had questions from multiple, so

4    I -- I don't know which ones.  I don't remember which

5    ones asked questions and which ones we were answering,

6    and it was quite brief actually.

7         Q.  (BY MR. FENN)  Okay.  And I know you testified

8    earlier that you do not have a Facebook account and --

9    and never have.  Are you aware of the Facebook group

10   called "I'm 10-15"?

11             MS. SHINNERS:  Object to the scope.

12        A.  I am not aware of that Facebook group, but I am

13   aware of the circumstances on how that Facebook group

14   came to -- to be known, I guess, in general.

15        Q.  (BY MR. FENN)  And, if you could, tell us how

16   did that Facebook group come to be known?

17        A.  My understanding is --

18             MS. SHINNERS:  Object to the scope.

19             THE WITNESS:  Oh, I'm sorry.

20        A.  My --

21             MS. SHINNERS:  You can continue.

22             THE WITNESS:  Okay.

23        A.  My understanding is that there were some

24   extremely inappropriate posts on that site related to

25   migrants, and that's how I became aware of it.



Page 181

1      Q.   (BY MR. FENN)  Had you ever seen any of those

2  allegedly inappropriate posts from that Facebook group?

3                MS. SHINNERS:  Object to the scope.

4      A.   In my --

5      Q.   (BY MR. FENN)  Sorry.  I didn't hear your

6  response, Mr. Cleaves.

7      A.   No problem.  No, I don't think I've seen any of

8  the posts.  I think I've seen a photograph that was

9  supposed to be a part of a post because I think it was

10  widely distributed in the media or something like that.

11     Q.   And was -- was the photograph you're referring

12  to a photograph of a father and daughter who died

13  attempting to cross through the Rio Grande?

14     A.   Yes, sir.

15                MS. SHINNERS:  Object to the scope.

16     Q.   (BY MR. FENN)  Are you aware that -- strike

17  that.

18                Do you know whether CBP ever issued any

19  sort of statement condemning the allegations surrounding

20  the Facebook group "I'm 10-15"?

21                MS. SHINNERS:  Object to the scope.

22     A.   I don't know if the agency did or not, but

23  I -- I -- I want to say I think they did, but I don't

24  recall if something specific was issued like that or

25  not.



Page 182

1      Q.   (BY MR. FENN)   Okay.   So it's fair to say that

2   you wouldn't have been personally involved in issuing

3   such a statement if one was issued?

4      A.   No, and I would be the wrong component.   My

5   understanding was that was a border patrol site or -- or

6   border patrol agent's site, so OFO didn't have much

7   knowledge or involvement in any of that other than us

8   finding out about it or hearing about it.

9              MR. FENN:   This might be a good time to

10   take a break if you want.   We've been going for about an

11   hour and a half.

12             MS. SHINNERS:   Okay.   Do you know how much

13   you have -- you guys have left?

14             MR. FENN:   I think we're -- we're getting

15   closer, but I would estimate maybe an hour.

16             MS. SHINNERS:   Okay.   Yeah, we can go off

17   the record.

18             MR. FENN:   Okay.

19             THE VIDEOGRAPHER:   The time is 2:31 p.m.

20   We're going off the record.

21                (Break was taken.)

22             THE VIDEOGRAPHER:   The time is 2:49 p.m.

23   We're back on the record.

24      Q.   (BY MR. FENN)   Welcome back, Mr. Cleaves.

25             MR. FENN:   Kevin, if you could please put



Page 183

1    up Exhibit 86.

2              Katy, have you received this exhibit?

3              MS. SHINNERS:  Yes.  Thank you.

4      Q.   (BY MR. FENN)  Okay.  Mr. Cleaves, I'm showing

5    you what's been previously marked as -- I'm sorry --

6    what will be previously marked as exhibit -- let me try

7    that again.  I promise I'll stop doing that.

8              I am showing you what will be marked as

9    Exhibit 86.  This is a June 5th, 2018, memorandum from

10   Homeland Security Secretary Kirstjen Nielsen, with the

11   subject line "Prioritization-Based Queue Management."

12             Do you see that?

13     A.   Yes.

14             MR. FENN:  And if we could flip to the

15   second page of the memo.

16     Q.   (BY MR. FENN)  About halfway down, there is a

17   highlighted section, and that section reads:  "CBP

18   personnel and resources that would otherwise be deployed

19   to process inadmissible arriving aliens can focus on the

20   detention and apprehension of narcotics and currency

21   smugglers."

22             Did I read that correctly?

23     A.   Yes.

24     Q.   Does this sentence still reflect the policy of

25   CBP?



Page 184

1        A.  It --

2                MS. SHINNERS:  Objection.

3                THE WITNESS:  I'm sorry.

4                MS. SHINNERS:  But you can answer,

5    Mr. Cleaves.

6                THE WITNESS:  Yes, ma'am.

7        A.  Yes.  In 2016, at the Port of El Paso, the

8    overcrowding reached emergent levels, so we pulled from

9    other mission sets.  We pulled a lot from other mission

10   sets, and it degraded our ability to perform those

11   mission sets to some degree.  And it was the focus in

12   2018, as the surge began again, to -- to not do that.

13       Q.  (BY MR. FENN)  So in 2016, you were able to

14   shift resources in order to handle what -- what might

15   have been a surge in migrants seeking asylum; is that

16   right?

17       A.  Yeah.  In 2016, we shifted resources to try and

18   handle that emergent surge that we were experiencing,

19   but it didn't work.  It wasn't sustainable, and it was

20   degrading our -- our other mission sets.  Some of the

21   mission sets were degraded significantly.  So it was

22   becoming a problem.

23               So as -- as 2018, at least for the Port of

24   El Paso's perspective, when the surge started hitting

25   again and -- and -- and started to become very similar,



Page 185

1    it was a concern.  And -- and it was expressed to us to

2    not degrade the other mission sets to the point that you

3    did before.  So continue processing, but there will have

4    to be some waiting in line so that way we don't degrade

5    the other mission sets.

6        Q.  And you said that --

7            MS. SHINNERS:  I'm sorry to interrupt.  I

8    have lost -- we can go off the record if you'd like, but

9    I've lost my -- Kevin, I've lost my ability to chat.

10           MR. FENN:  Yeah, let's go.

11           MAGNA TECH:  One second.

12           THE VIDEOGRAPHER:  The time is 2:52 p.m.

13   We're going off the record.

14               (Off the record.)

15           THE VIDEOGRAPHER:  The time is 2:53 p.m.

16   We're back on the record.

17       Q.  (BY MR. FENN)  Okay.  Mr. Cleaves, you -- you

18   mentioned that the shifting of resources in 2016 was not

19   effective, correct?

20       A.  Correct.

21       Q.  But you also said before that the Port of

22   El Paso did not engage in metering between December 2016

23   and, we'll call it, May of 2018, correct?

24       A.  Correct.

25       Q.  Okay.



Page 186

 1                     MR. FENN:  If we could look back at the

 2     document on the next page.

 3          Q.  (BY MR. FENN)  And I'm looking at the second

 4     full paragraph, the second-to-the-last line there.

 5     Secretary Neilsen directs CBP to "initiate a 30-day

 6     pilot program to prioritize staffing and operations" at

 7     all ports of entry on the U.S.-Mexico border, correct?

 8          A.  Yes.

 9                     MR. FENN:  And if we could zoom in on

10     the -- the numbered portion below.

11          Q.  (BY MR. FENN)  That prioritized order is,

12     first, national security efforts; second,

13     counter-narcotics operations; third, economic security;

14     and fourth, trade and travel facilitation, correct?

15          A.  Yes.

16          Q.  And inspecting and processing asylum seekers

17     does not fall within those four priorities, correct?

18          A.  It's not listed within those four, correct.

19          Q.  And because of this prioritization, fewer

20     asylum seekers get processed than if CBP treated all of

21     its statutory mandates with equal priority, correct?

22          A.  Incorrect.

23                     MS. SHINNERS:  Objection.

24          A.  I need to learn to pause.

25                     Incorrect.  At least for the Port of



Page 187

1  El Paso, fiscal year 2019 was the only year the Port of

2  El Paso consistently did metering for the entire year,

3  and we processed more inadmissibles that year than any

4  other year without metering.  We processed 12 percent

5  more inadmissibles in 2019 than 2018.  2018, we only did

6  metering for about half the year, and we processed

7  10 percent more inadmissibles than 2016, and in 2016 we

8  only did 3 weeks.

9           MR. FENN:  I -- I'm sorry.  I'm -- I'm

10  hearing, I think, somebody else's voice or a clip or

11  something in the background.  If -- if -- wherever

12  that's coming from, if they could please mute it, that

13  would be helpful.

14       Q.  (BY MR. FENN)  Okay.  The queue management in

15  the title of Ms. Nielsen's memo, queue management refers

16  to metering, correct?

17       A.  Yes.

18       Q.  And so this entire memo is really about how to

19  implement metering in a way that ensures it is the

20  lowest of CBP's priorities, correct?

21       A.  No.

22           MS. SHINNERS:  Objection, argumentative.

23       A.  No.

24       Q.  (BY MR. FENN)  Would you agree -- I think you

25  did agree that processing and inspecting asylum seekers



Page 188

1    does not appear on this list of four priorities that we

2    have in front of us, correct?

3         A.   Correct.

4         Q.   And those four priorities are supposed to be

5    prioritized ahead of processing and inspecting asylum

6    seekers, correct?

7         A.   Yes, that's the emphasis of this memo, I

8    believe.  However, in many ways, that's always been our

9    priority, especially national security and narcotics,

10   which includes outbound and -- and trade, cargo.  That's

11   part of our mission statement.  So it's not too much of

12   a departure from what we've always been doing in

13   cer- -- in certain ways.

14        Q.   Did CBP know that adopting priority-based queue

15   management would impact the number of asylum seekers

16   that could be processed and increase the number that

17   could be turned away?

18        A.   I don't know if they knew if that would be the

19   case.  I know for the Port of El Paso, it -- it did

20   create a wait time, people waiting in line.  However,

21   for us, in 2019, we're actually able to process more

22   with metering, and I think it's because metering allowed

23   us to prevent emergencies.  They -- they allowed us to

24   prevent the crisis management that -- that occurred in

25   2016 and -- and other times.



Page 189

1              And so you can be pretty efficient and

2     effective, even though -- so the -- in other words,

3     keeping a consistent flow.  And it was successful in

4     processing more people than in the other years.  And

5     then, of course, at the end of 2019, we reached the end

6     of the line.  So Mexican Immigration in late

7     January 2020 started reporting that there were no people

8     in line.  And then, throughout February, intermittently

9     there would be some there in low numbers and some --

10    and -- and at times, there were none.

11         Q.  Okay.  But you don't know one way or another

12    whether CBP knew prior to adopting this priority-based

13    queue management system whether it had the potential to

14    lead to an increased number of asylum seekers who were

15    turned away?

16         A.  No, I do not know that.

17              MR. FENN:  Kevin, let's put up, please,

18    Exhibit 174.

19         Q.  (BY MR. FENN)  Mr. Cleaves, I'm showing you

20    what will be marked as Exhibit 174, and it's

21    Bates-labeled AOL-DEF-00095574.  It is a May 24th, 2018,

22    e-mail from Ray Provencio to Randy Howe and copying

23    Hector Mancha, with subject line:  "RE:  Info needed by

24    1600."

25              Do you see that?



Page 190

1    A.  Yes.

2    Q.  At this time, Hector Mancha was the director of

3  field operations for the El Paso Field Office, correct?

4    A.  Yes.

5    Q.  And at this time, Ray Provencio was an

6  assistant director of field operations for the El Paso

7  Field Office, correct?

8    A.  Yes.

9    Q.  I'd like to draw your attention to the initial

10  e-mail in the chain from Todd Owen to Randy Howe and

11  others, which starts at the bottom of page ending in

12  Bates 575.

13         MR. FENN:  So I think it should be the next

14  page, Kevin.  At the very bottom there and then

15  continuing on to the next page, yeah.

16    Q.  (BY MR. FENN)  The bullet point in Mr. Owen's

17  e-mail states in part:  "S1's office is asking if we

18  fully implement the priority-based queue management

19  option, wants a rough estimate of the number of folks

20  that would likely be turned away per day."

21         Did I read that correctly?

22    A.  Yes.

23    Q.  And I think you testified earlier that S1 is

24  the secretary --

25         MS. SHINNERS:  So I apologize for the



Page 191

1    interruption.  It -- I -- may I consult with CBP counsel

2    about this e-mail?  It looks like this is the -- this

3    relates to predecisional deliberations.

4              MR. FENN:  You can -- sure, you can confer.

5              MS. SHINNERS:  Okay.  Can we go off the

6    record?

7              THE VIDEOGRAPHER:  The time is 3:02 p.m.

8    We're going off the record.

9                   (Off the record.)

10             THE VIDEOGRAPHER:  The time is 3:14 p.m.

11   We're back on the record.

12             MR. FENN:  Katy, do you want to state your

13   intentions regarding the document that I've shown

14   Mr. Cleaves?

15             MS. SHINNERS:  Sure.  We -- just before the

16   break, Plaintiffs' counsel introduced Exhibit 174, which

17   is AOL -- beginning Bates Nos. AOL-DEF-00095574.  And

18   I've informed Plaintiff that Defendants intend to call

19   back this document on the basis of deliberative process

20   privilege or at least the substantive contents of the

21   e-mail, and we'll follow up with a formal clawback

22   letter with privilege log.

23             MR. FENN:  And during the break, I informed

24   defense counsel that we disagree with the assertion of

25   the deliberative process privilege over the document in



Page 192

 1    question for several reasons, including that Defendants

 2    haven't taken the necessary steps to assert the

 3    privilege, including providing a declaration.  In

 4    addition, Defendants know deliberative process, the

 5    qualified privilege, and we think that in this case, the

 6    qualified privilege would be fairly easily overcome.

 7                That being said, we agreed that we don't

 8    want to have a privilege dispute on the record regarding

 9    this document, and it's not a good use of everyone's

10    time for me to ask questions about it.  So while the

11    privilege dispute -- while there is a privilege dispute

12    pending before Judge Bashant, we will agree to forego

13    questioning on this document, reserving our rights to

14    ask Mr. Cleaves questions about this document should

15    Judge Bashant rule in our favor on this or similar

16    documents.

17                MS. SHINNERS:  Yeah.  And just for the

18    record -- yeah.  Okay.  Yeah, that's fine.

19                MR. FENN:  Okay.

20                MS. SHINNERS:  Continue.

21        Q.  (BY MR. FENN)  Mr. Cleaves, thanks for your

22    patience.  I appreciate you bearing with us.

23        A.  Sure.

24        Q.  Have you heard the term "throughput" with

25    respect to processing asylum seekers at ports of entry



Page 193

1    on U.S.-Mexico border?

2        A.   No.   I know of the term "throughput" that's

3    usually for legitimate travel, pedestrians, vehicles,

4    cargo.   I don't think I've ever heard it applied to

5    admissibility processing.

6        Q.   Okay.   Would you agree that increasing

7    the -- the number of arriving noncitizens that are

8    detained in OFO and ICRO facilities would decrease the

9    number of people that a port of entry is able to

10   process?

11       A.   Yes.   The number of people that a port of entry

12   is detaining at a time or the number of people that ICRO

13   can accept is an operational capacity concern.   It will

14   affect the number of people that we can continue to

15   accept.

16       Q.   And would you agree that decreasing the

17   capacity of a port of entry to detain asylum seekers

18   could also decrease the number of people that that port

19   of entry is able to process?

20       A.   Yes.   If -- if there are operational capacity

21   concerns that make it where we are unable to accept

22   people, that will naturally mean that we can't accept

23   people at that time, I guess.

24       Q.   Is tracking the processing rate of ports of

25   entry on the U.S.-Mexico border operationally important



Page 194

1    for CBP?

2         A.  I think it would be.  It would be very

3    difficult to track because it would change from day to

4    day.  The operational concerns from a day to day, shift

5    to shift would affect, on average, how many you could

6    do.  So you'd probably end up with estimates of what you

7    could do routinely, what you could do with overtime if

8    you had the overtime, what you could do if you

9    implemented temporary emergent measures, knowing that

10   temporary emergent measures can't be held for long

11   periods of time, that type of thing.

12        Q.  Does --

13        A.  Just as important, but I would think it would

14   be very difficult to quantify and estimate.  So

15   estimates, I think, would be -- if I had to do it, it

16   would be about as good as you can get.

17        Q.  And I take it from your answer, which was

18   somewhat hypothetical, that CBP doesn't actually

19   quantify or track the rate of processing through ports

20   of entry on a U.S.-Mexico border?

21        A.  Well, we can track it historically.  So, I

22   mean, we can know -- I know how much -- how many we

23   processed yesterday.  I won't know how much we'll be

24   able to process today, if that makes any sense, for

25   tracking.



Page 195

1      Q.  Okay.  Isn't it true that a noncitizen seeking

2   asylum in the United States could be paroled into the

3   country?

4      A.  From the fie- -- from the field, no.  So asylum

5   requires mandatory detention.  We would have to

6   coordinate with ICRO for detention placement first.

7   Now, if ICRO is unable to provide placement or there are

8   other exigent circumstances and they're unable to detain

9   them, then we can consider other avenues.

10             And one of those might be, in rare

11  circumstances, a parole, but we cannot go from A to Z

12  without going through the, you know, B, C, and D first.

13  So, in other words, because of mandatory detention, we'd

14  have to -- we're very dependant upon ICRO making

15  decisions on who can be placed and where and how and how

16  fast.

17     Q.  And has that been CBP's policy in the time that

18  you've been employed by CBP?

19     A.  Yes.

20     Q.  You mentioned certain circumstances under which

21  an asylum seeker could be paroled into the United

22  States, but limited circumstances.  Could you explain

23  what those circumstances might be?

24     A.  Yeah, sure.

25             MS. SHINNERS:  Object to the scope.



Page 196

 1              Go ahead.

 2         A.   Yeah, sure.  So ICE will make the decision of

 3    whether or not they can place them, and it's -- it's not

 4    always straightforward, and it's really dependant upon

 5    the makeup of the detainee, whether they're a single

 6    adult, unaccompanied alien child, family unit, the

 7    makeup of the family unit.  Sometimes it gets down to

 8    sexual orientation, transgender, that type of thing,

 9    and -- and the space that they have.  It also can go

10    down to we know that ICRO cannot accommodate severe

11    medical conditions as well.

12              So -- so those are some of the exigent

13    circumstances that we have to wait for ICE to make a

14    decision on.  And based on their decision, then, you

15    know, we -- we have to react to that.  So even if they

16    accept someone, and especially in the case of family

17    units, we may have to reprocess them, which is another

18    operational capacity concern.  It happens often, so

19    instead of processing somebody once, you have to process

20    them twice, which creates kind of a cascade effect of

21    people waiting longer.  So those are some of the -- the

22    operational challenges we have with waiting for ICRO to

23    find placement for -- for asylum seekers.

24         Q.   Isn't it true that a noncitizen seeking asylum

25    in the United States can be processed in regular removal



Page 197

1    proceedings and be given a notice to appear or NTA?

2        A.  They can be processed for 235 proceedings,

3    expedited removal, and they can be provided -- they can

4    be processed for 240 proceedings and NTA.  That was part

5    of the exigent circumstance issue when the surges hit,

6    and it became emergent.  ICRO was unable to handle the

7    amount that was coming in, and they were directing CBP.

8    And in -- in my capacity at Port of El Paso, I know they

9    were directing the Port of El Paso to reprocess people

10   that were already processed for 235 proceedings and

11   reprocess them for 240 proceedings.  So that has

12   occurred, so, yes.

13       Q.  And what is your understanding of what the term

14   "regular removal proceedings" means?

15       A.  I actually don't have any idea what you mean by

16   regular removal proceeding.  So perhaps you can clarify,

17   and then I can --

18       Q.  I will -- I'll -- I'll move on.

19       A.  My answer to that one would be:  We've been

20   talking the entire time about undocumented migrants.

21   Legally, they're immigrants, and they're inadmissible,

22   (7)(A)(i).  So 212(7)(A)(i) (sic), immigrants without

23   documents.  And those are subject to 235 proceedings,

24   expedited removal.  My view of regular removal

25   proceedings would be 235 proceedings based for -- based



Page 198

1    on immigrants who are inadmissible per (7)(A)(i).

2        Q.  Okay.  What about the term "expedited removal"?

3    What does that term mean to you?

4        A.  Those are 235 proceedings for those

5    inadmissible for 212(a)(7)(A) and (B) and (6)(E).

6        Q.  Okay.  And who makes the determination

7    regarding whether an asylum seeker should be placed into

8    expedited removal proceedings?

9        A.  The admissibility --

10               MS. SHINNERS:  Object to the scope.

11               Go ahead.  Go ahead, Mr. Cleaves.

12       A.  The admissibility processing personnel.  Those

13   cases are processed by officers and reviewed by first-

14   and second-line supervisors.

15       Q.  (BY MR. FENN)  So prior to the CDC order

16   barring asylum seekers, under what circumstances would

17   an asylum seeker be placed into expedited removal

18   proceedings?

19       A.  Just for clarification, I -- I don't believe

20   the CDC public health order is specific to asylum

21   seekers.  I think it's specific to foreign citizens in

22   general, foreign travel.  However, expedited removal

23   would normally be done for anyone inadmissible for

24   (7)(A), 212, (7)(B), and (6)(E).

25       Q.  The CDC order, though, does have the effect of



Page 199

1    barring asylum seekers; isn't that right?

2                   MS. SHINNERS:  Object to --

3         A.  The CDC order --

4                   MS. SHINNERS:  -- the scope.

5         A.  The CDC order has the effect of barring -- and

6    not barring -- severely limiting -- I would say limiting

7    significantly foreign travel overall, all categories,

8    so...

9                   MR. FENN:  Okay.  I am going to turn the

10   questioning over to my colleague, Sydney Fields, for a

11   few questions on Topic 15.  We are getting closer to

12   being finished with our questions.

13                          EXAMINATION

14   BY MS. FIELDS:

15        Q.  Hi, Mr. Cleaves.  Good afternoon.  My name is

16   Sydney Fields; I also represent Plaintiffs in this case.

17                   You previously testified that you

18   understood that you are the designated CBP

19   representative to discuss Topic 15 at the Port of

20   El Paso and El Paso ports of entry; is that correct?

21        A.  Yes, ma'am.

22        Q.  All right.  So I will be asking you questions

23   about CBP's communications with the Mexican government

24   concerning metering, queue management, and turnbacks, as

25   covered by Topic 15.  Understood?



Page 200

1       A.  Yes, ma'am.  Yes, ma'am.

2       Q.  All right.  So the same rules that Mr. Fenn

3    outlined at the start of the deposition will also apply

4    to my questions.  Okay?

5       A.  (No verbal response.)

6       Q.  All right.  So, first, I'd like to show you

7    what will be marked as Exhibit 175, which has the Bates

8    No. AOL-DEF-00799450 through 451.

9            MAGNA TECH:  Sydney, give me one minute.

10   I'm just sending these over to Katy and Ari.

11           MS. FIELDS:  No problem.

12           MS. SHINNERS:  I'll let you know when I've

13   received it.

14           MS. FIELDS:  Thank you.

15           MS. SHINNERS:  Sorry, y'all.  I still

16   haven't received it.

17           MR. FENN:  So is this --

18           MS. SHINNERS:  There it is.

19           MR. FENN:  Okay.

20           MS. SHINNERS:  All right.

21           MS. FIELDS:  Great.

22           MS. SHINNERS:  Thank you.  We're ready.

23           MS. FIELDS:  No problem.

24       Q.  (BY MS. FIELDS)  So what will be marked as

25   Exhibit 175 is a November 17th, 2016, e-mail exchange



Page 201

1    from Fernando Thome, copying you, among others, with the

2    subject:  "RE:  ***RFI*** please provide response by COB

3    today."

4                Do you see that?

5    A.  Yes, ma'am.

6    Q.  All right.

7                MS. FIELDS:  And, Kevin, if we could go to

8    the first-in-time e-mail, so on the last page of the

9    document.  Great.  And if you could just -- yeah --

10   scroll up from there initially, and then I'll --

11   Q.  (BY MS. FIELDS)  What was Mr. Thome's position

12   at CBP at this time?

13   A.  Border security coordinator.

14               MS. FIELDS:  And if we could go up one more

15   e-mail.  Thank you.

16   Q.  (BY MS. FIELDS)  It shows that you forwarded

17   the first-in-time e-mail to Mr. Thome; is that correct?

18   A.  Yes, ma'am.

19   Q.  Do you have any reason to question the accuracy

20   of the answers Mr. Thome provides at the top of the

21   e-mail chain to these questions?

22   A.  Let me take a look at them, and then I'll --

23   Q.  Sure.

24   A.  -- be happy to answer them.

25               MS. SHINNERS:  Could Kevin perhaps



Page 202

1    highlight the -- the top e-mail?

2               MS. FIELDS:  Yes, that would be great,

3    Kevin, if you wouldn't mind.

4         A.  I believe your question was on accuracy.  I

5    have no reason to believe it's not accurate.  Is that

6    correct, what your question was?

7         Q.  (BY MS. FIELDS)  Yes.  Thank you.  That was my

8    question.

9         A.  Yes, ma'am.

10        Q.  What was the reason that you forwarded this

11   e-mail to Mr. Thome to answer the questions that were

12   presented below?

13        A.  He's the border security coordinator, so it

14   would either be him or the assistant director who would

15   answer this type of inquiry.

16        Q.  Okay.  If I could direct you to the top of the

17   e-mail that we have open, the first question reads:  "Is

18   the POE/crossing metering OTMs?"

19               Do you see that?

20        A.  Yes, ma'am.

21        Q.  Okay.  What does OTM stand for?

22        A.  Other than Mexican.

23        Q.  Okay.  In response to that part of the

24   question, Mr. Thome wrote:  "Port of El Paso:  Yes."

25               Did I read that correctly?



Page 203

 1          A.  Yes, ma'am.

 2          Q.  And in response to Question 2, which reads "Who

 3   is doing the metering? (CBP or Mexico)," Mr. Thome

 4   wrote:  "CBP OFO officers are performing the metering."

 5               Did I read that correctly?

 6          A.  Yes, ma'am.

 7          Q.  And finally, in response to Question 5, which

 8   reads, "If the metering is done in Mexico, how is the

 9   POE communicating the number of OTMs to be metered to

10   the POE?" Mr. Thome responded:  "Not applicable -

11   metering conducting -- metering conducted by CBP OFO."

12               Did I read that correctly?

13          A.  Yes, ma'am.

14          Q.  At the time of this e-mail, which was in

15   November of 2016, did CBP communicate with Mexican

16   Immigration officials regarding the number of

17   non-Mexican asylum seekers to be metered at the Port of

18   El Paso?

19          A.  No, not on a regular basis.  I think, at best,

20   there were some meetings, and I mean by one or two

21   meetings where it was discussed in general.  But from

22   your question of -- or their question in No. 5, no,

23   there was no -- that type of communication was not

24   occurring, no.

25          Q.  And when you said there were a few meetings,



Page 204

1     did you mean meetings within CBP?

2          A.   No.   We had -- there was -- there are regular

3     meetings with multiple agencies, binational meetings,

4     and I think in one of those meetings in -- in

5     October 2016, the migrant surge had been brought up

6     and -- and how Mexico was dealing with it, that type of

7     thing.   And then we had an ad hoc meeting with them and

8     the Mexican consulate, "them" being Mexican

9     immigration and the Mexican consulate, to discuss kind

10    of like a research, what they were seeing, what they

11    were willing to do, what they were capable of doing,

12    that type of thing.

13         Q.   Okay.   And since the metering policy in 2018

14    that you discussed with Mr. Fenn, had -- has CBP

15    communicated with Mexican immigration regarding

16    metering?

17         A.   I'm sorry.   Can you repeat the first part of

18    that question?   Since what date?

19         Q.   Since the April 2018 metering guidance that you

20    discussed earlier with Mr. Fenn, have you -- has CBP

21    discussed metering with Mexican Immigration?

22         A.   Yes.   In the summer or fall of 2018, the watch

23    commanders for passenger operations at the Port of

24    El Paso communicate with Grupo Beta, which is a -- a

25    department within Mexican Immigration, and they were



Page 205

1    doing that on -- pretty regularly on a daily basis.

2    Communication was quite simple.  We would let them know

3    when we had the ability to take people in and a -- and a

4    number, and Mexican Immigration would -- would respond.

5         Q.  And how would you communicate with Grupo Beta

6    about your capacity?

7         A.  Phone calls and text message.

8         Q.  Were the texts sent via the -- like, regular

9    text or via something like WhatsApp?

10        A.  Regular text.

11        Q.  Okay.  And would -- this might be a question

12   directed at Ms. Shinners.  Were those records produced?

13        A.  I'm sorry?

14             MS. SHINNERS:  No, they have not been.

15             MS. FIELDS:  Okay.  Thank you.

16        Q.  (BY MS. FIELDS)  Okay.  You testified earlier

17   that Paso del Norte, Bridge of the Americas, and Ysleta

18   were part of the El Paso Port of Entry, correct?

19        A.  Yes, Paso del Norte, Bridge of the Americas,

20   and Ysleta, yes, ma'am.

21        Q.  Okay.  And Mr. Fenn asked you whether any

22   asylum seekers could cross onto U.S. soil, and you said

23   that it would not be possible without going around the

24   officer stationed at the border?

25        A.  That's correct.



Page 206

1       Q.  Okay.  If I can direct you to Question 6, which

2   reads:  "Has the port of entry/crossing turned away any

3   aliens due to capacity issues once the aliens were on

4   U.S. soil?"

5               The response Mr. Thome provided is:  "All

6   metering is conducted at the top of the bridge or the

7   base of the bridge on the U.S. side, therefore all

8   aliens are being turned away and given appointments

9   while on U.S. side of the bridge."

10              Did I read that correctly?

11      A.  Yes, ma'am.

12              MS. FIELDS:  Kevin, if you could bring up

13  Exhibit 176, which has the Bates No. AOL-DEF-00808783

14  through 785.

15      Q.  (BY MS. FIELDS)  I will represent to you,

16  Mr. Cleaves, that this exhibit is an August 21st, 2019,

17  e-mail exchange from Francisco Maldonado to you, among

18  others, with the subject "OFO Port of El Paso/Mexican

19  Immigration meeting."

20              The first-in-time e-mail --

21              MS. FIELDS:  Which will be on the last

22  page, Kevin, if you don't mind.  Thank you.

23      Q.  (BY MS. FIELDS)  -- was sent by Juan Carrillo

24  or Carrillo, the supervisory CBP officer at the time of

25  this e-mail; is that correct?



Page 207

1          A.   He is a supervisor with CBP, yes.

2          Q.   Do you have any reason to doubt the accuracy of

3     the information that is sent by Mr. Carrillo in this

4     e-mail?

5          A.   Let me take a look.  I don't have any reason to

6     doubt the accuracy of it.  I just don't know what it is.

7          Q.   You can take a minute to read it if you need

8     to.

9          A.   All right.  So in the last document, which was

10    in November 2016, as previously stated, we didn't

11    implement the metering correctly.  So there were people

12    stepping onto the U.S. soil until we got it corrected

13    after that week.  And then, this document seems to be

14    about the shelters.

15         Q.   So if -- if I'm reading it correctly, it -- it

16    seems that Mr. Carrillo is providing information about a

17    meeting with INAMI in this e-mail?  Is that correct

18    based on your reading of the e-mail?

19         A.   Yes.

20         Q.   Okay.  What does INAMI stand for?

21         A.   Mexican Immigration.  It's their acronym.

22         Q.   Okay.  And I take it that you were not present

23    at this meeting in August of 2019?

24              MS. SHINNERS:  Objection, mischaracterizes

25    document.  Am I looking -- yeah.  Objection,



Page 208

 1    mischaracterizes document.

 2         Q.  (BY MS. FIELDS)  Mr. Cleaves, were you at

 3    this --

 4              THE REPORTER:  I'm sorry.  Was there an

 5    answer?

 6              MS. FIELDS:  I'm sorry.

 7              THE REPORTER:  I'm sorry.  Was there an

 8    answer before the objection?

 9              THE WITNESS:  No, I didn't answer.

10         A.  I can answer now if you guys need me to.

11         Q.  (BY MS. FIELDS)  I'll re-ask.

12              Were you present at this meeting with INAMI

13    in August of 2019?

14         A.  I do not know.

15              MS. SHINNERS:  Same objection.  Same

16    objection.  I'm not sure where you're getting the date

17    from, Ms. Fields.

18              MS. FIELDS:  Oh, I'm sorry.

19              Kevin, could you please include the top of

20    the e-mail, the top of that e-mail being sent?

21         Q.  (BY MS. FIELDS)  Oh, apologies.  November 2018.

22         A.  I don't know, ma'am, if I was present or not.

23         Q.  Okay.  If I could direct you to the first

24    bullet point in that e-mail, which reads:  "Mexican

25    Immigration, in conjunction with Red Cross, is



Page 209

1    attempting to move all the immigrants staged on the

2    bridges to shelters in Ciudad Juárez.  Mexican Red Cross

3    would put together a list and would coordinate with OFO

4    the processing of these immigrants."

5              Is that correct?

6       A.  Where does it say that?

7       Q.  In the first bullet point under "The following

8    were topics of discussion."

9       A.  Yes, ma'am.

10             MS. SHINNERS:  Mr. Cleaves, is the font a

11   little too small?

12             THE WITNESS:  I'm able to make it out.

13      A.  I just wasn't sure which bullet point.  I

14   apologize.

15      Q.  (BY MS. FIELDS)  That might be a little easier

16   to read.

17      A.  Thank you, ma'am.

18             THE WITNESS:  Thank you, sir.

19      A.  Yes, it says that.

20      Q.  (BY MS. FIELDS)  And then, in the next bullet

21   point, it says:  "OFO Mexican Red Cross and INAMI would

22   share a POCs.  Via these POCs, OFO INAMI, and Red

23   Cross -- Mexican Red Cross would communicate how many

24   OFO is able to process at any given time and at what

25   Port of Entry."



Page 210

1              Is that correct?

2        A.  Yes, it says that.

3        Q.  And what would you understand POC to mean?

4        A.  Point of contact.

5        Q.  Thank you.  And finally, in the next subbullet,

6   it states:  "I.e., once OFO has space available to

7   process 20 individuals at PDN, BOTA, YSL, OFO would

8   notify Mexican Red Cross.  In turn, Red Cross would

9   transport the next 20 individuals on the list to that

10  location for processing by OFO."

11              Is that correct?

12       A.  That's correct.  To my knowledge, that never

13  occurred, though.

14       Q.  Thank you.  You read my mind.

15              Do you know why this process was not

16  implemented?

17       A.  Well, the process was implemented, but it was

18  with Mexican Immigration, so it just didn't occur with

19  Mexican Red Cross.  I don't know the reason why other

20  than it's quite common and easy for us to coordinate

21  with federal agencies of Mexico, so it -- it was quite

22  easy to -- to do that with Mexican Immigration.  But

23  other than logistics and -- I guess I don't have a very

24  good reason.  So I guess in this meeting it apparently

25  was discussed that Mexican Red Cross may be a part of



Page 211

1    the -- this communication, but that never occurred.  It

2    turns out it was with Mexican Immigration.

3        Q.  Okay.  Thank you.  And we'll go back to that in

4    just a few minutes.

5            Finally, in this e-mail, I'd like to direct

6    you to the second-to-last bullet point.  Let me make

7    sure that's on the page.  So it's the second-to-last

8    bullet point that's in the blowup Kevin provided.  And

9    in the second sentence, it -- it reads:  "They would

10   also attempt to educate the immigrant on the requirement

11   and what is needed to be processed for asylum in an

12   attempt to discourage them to continue to United

13   States."

14           Do you understand that "they" at the

15   beginning of that sentence would refer to INAMI?

16       A.  Yes, I -- that seems to be correct.

17       Q.  Why would INAMI deter asylum seekers from

18   coming to the United States?

19       A.  I don't know if they would be engaged in

20   deterrence.  I know the meetings I've had with them,

21   they have their own processes on how to -- to handle

22   immigrants.  They give them temporary work visas

23   and -- and -- for certain citizenships.  In other words,

24   they have their own laws and policies like us that are

25   able to get -- credible fear of asylum.  And other



Page 212

1    citizenships that are more difficult.  Other than the

2    fact that they're trying to handle the surge like we

3    are, I don't have a specific answer for that.

4        Q.  Understood.  Has CBP ever discussed with INAMI

5    how to defer asylum seekers from coming to U.S. ports of

6    entry?

7        A.  No.

8        Q.  Okay.

9            MS. FIELDS:  And, Kevin, if we could go to

10   the top of the e-mail chain.  Thank you.

11       Q.  (BY MS. FIELDS)  So in this e-mail, Francisco

12   Maldonado states:  "They would coordinate with OFO to

13   facilitate the processing of migrants, like in San

14   Diego."

15           Is that correct?

16       A.  Yes, it says that.

17       Q.  Were you aware that there was a similar system

18   to the one described in this e-mail in San Diego at this

19   time?

20           MS. SHINNERS:  Object to the scope.

21       A.  We were aware San Diego had a system.  We

22   weren't exactly aware of the specifics of it.  We even

23   asked Mexican Immigration if they were aware of how

24   Tijuana Mexican Immigration, of the mechanics of it.  So

25   we're -- we're aware some system of communication



Page 213

1    occurred; we weren't really aware of the mechanics of

2    it.

3        Q.   (BY MS. FIELDS)   Okay.   And was your awareness

4    based on the fact that similar guidance was shared with

5    the port of entries on the U.S.-Mexico border?

6        A.   No.   I -- I think at that time it was almost

7    word of mouth.   And -- and there were probably some

8    assumptions made on our part and -- and probably some

9    incorrectly.   Since we didn't know what the mechanics

10   were, we may have made some assumptions of how it

11   worked.   So I do know that in our meetings with Mexican

12   Immigration back in 2016, we were asking them what they

13   knew, so...

14       Q.   And making assumptions about what other ports

15   were doing, was that because the Port of El Paso was

16   seeking to implement similar metering policies?

17       A.   We knew metering was going to be something we

18   may have to do, and we knew San Diego was communicating.

19   What we didn't know is -- is the mechanics of it.   My

20   understanding is that the communication we have now,

21   which is directly with Mexican Immigration, it's -- it's

22   kind of similar to San Ysidro.

23             My understanding now is that the mechanics

24   involved in Tijuana is Mexican Immigration is much more

25   integrated in communicating with nongovernment



Page 214

1    organizations and Red Cross and everything in Tijuana

2    than they were here in Juárez, especially in the

3    beginning.  So I think that was the -- the major

4    difference.

5         Q.  Okay.  Thank you.

6              MS. FIELDS:  And, Kevin, if you could

7    please pull up Exhibit 177.  Thank you.

8         Q.  (BY MS. FIELDS)  So what will be labeled as

9    Exhibit 177 is a September 13, 2019, e-mail chain from

10   Roger Maier to you, among others, with the subject:

11   "Questions about Mexican citizens waiting to apply for

12   asylum in Juárez."

13             And you testified earlier that you -- or

14   sorry -- that Roger Maier works in public affairs for

15   CBP; is that correct?

16        A.  Yes, ma'am.  Yes, ma'am.

17        Q.  Do you have any reason to doubt the

18   authenticity of the information he provides in this

19   e-mail?

20             MS. FIELDS:  And you might need to scroll

21   down to see where he provides responses.

22        A.  I guess in general I wouldn't have any reason

23   to doubt it.  I can't read -- I can't read it, to be

24   quite honest.

25             THE WITNESS:  Thank you.  Sorry.  Thank



Page 215

1    you.

2              MS. FIELDS:  Thank you, Kevin.

3        A.  No, I don't have any reason to doubt the

4    information that he provided.

5        Q.  (BY MS. FIELDS)  All right.  Thank you.

6              MS. FIELDS:  And, Kevin, if we could go to

7    the first-in-time e-mail, which will be at the bottom of

8    the e-mail chain.  Perfect.  Thank you.  If you could

9    just highlight that.

10       Q.  (BY MS. FIELDS)  This e-mail is from Julian

11   Aguilar of the Texas Tribune and was sent to Roger

12   Maier.  Mr. Aguilar wrote:  "I've been told CBP

13   communicates with Grupo Beta about non-Mexican asylum

14   seekers."

15              Is that correct?

16       A.  Yes, yes.

17       Q.  And you already testified that Grupo Beta is

18   the Mexican Immigration group with which CBP

19   communicates regarding metering?

20       A.  Yes, ma'am.

21       Q.  And what is Grupo Beta's relationship to INAMI?

22       A.  They're the humanitarian wing of Mexican

23   Immigration.

24       Q.  Okay.  So it's under the purview of INAMI or is

25   an arm of INAMI?



Page 216

1          A.  Yes, ma'am.

2          Q.  And you testified that CBP communicates with

3     Grupo Beta via phone calls and text messages; is that

4     correct?

5          A.  Yes, yes.

6          Q.  How frequently does CBP communicate with Grupo

7     Beta about metering?

8          A.  Today we don't.  It's because we're under the

9     public health order, and no metering is being conducted.

10    When it was being conducted, it was on a daily basis.

11         Q.  Was it more than once a day?

12         A.  Yes, frequently more than once a day.

13         Q.  Okay.  Does Grupo Beta maintain a list of

14    individual asylum seekers at the Port of El Paso?

15         A.  My understanding --

16              MS. SHINNERS:  Objection, scope.

17              Go ahead.

18         A.  My understanding is they do not.

19         Q.  (BY MS. FIELDS)  Okay.  And when CBP

20    communicates with Grupo Beta, does it provide the number

21    of individuals it has capacity to process?

22         A.  Yes, we do.

23         Q.  And then Grupo Beta selects individuals to be

24    processed that day; is that correct?

25         A.  I don't know how they gain the people.  I know



Page 217

1    that there is some coordination.  I know that there is a

2    list, from what Mexican Immigration says.  I think

3    there's a state agency involved with it or that became

4    involved with it over time, that the migrants are

5    heavily involved with maintaining that as well.

6              So I don't know how Mexican Immigration

7    brings the people or selects the people or even if they

8    do select the people, but I do know they're the ones who

9    bring them, that transports them to the Paso del Norte

10   border crossing.

11       Q.  Okay.  So your understanding is that someone in

12   Mexican Immigration, in conjunction with migrants,

13   maintains the wait list?

14       A.  No.  My understanding is that Mexican

15   Immigration is not involved with the list.

16       Q.  And it's only the state agencies in Mexico?

17       A.  My understanding is the state agency has some

18   sort of involvement with that, yes.

19       Q.  Okay.  So when you communicate with grupo (sic)

20   INAMI, they would then have to communicate with the

21   state agency to relay the information --

22              MS. SHINNERS:  Objection --

23       Q.  (BY MS. FIELDS)  -- CBP has provided about --

24              MS. SHINNERS:  Objection -- objection,

25   calls for speculation.



Page 218

1          A.   I don't know who they have to communicate with.

2          Q.   (BY MS. FIELDS)   Okay.

3               MS. FIELDS:   Kevin, if you could pull up

4     Exhibit 178, which has the Bates No. AOL-DEF-00811791

5     through 792.   Thank you.

6          Q.   (BY MS. FIELDS)   So what will be marked as

7     Exhibit 178 is a March 11th, 2019, e-mail chain from

8     Timothy Tyler to Luis Mejia, copying others, with the

9     subject:   "Question on secondary intake - ELP."

10              You see that?

11         A.   Yes.   Thank you.

12              MS. FIELDS:   And if we could go to the

13    second e-mail in the chain, which is sent by Victor

14    Reyes.   Perfect.   Thank you.

15         Q.   (BY MS. FIELDS)   And Officer Reyes says, under

16    Port of El Paso:   "We currently coordinate two intakes

17    per day with INAMI.   The intake occurs at approximately

18    1000 hours and 1700 hours M-F at PDN.   Each group

19    consists of 10 to 30 subjects, depending on overall

20    capacity."

21              Did I read that correctly?

22         A.   Yes.   That's not correct, but that is correct

23    on the e-mail.

24         Q.   What about this is incorrect?

25         A.   It's not Monday through Friday; it's seven days



Page 219

1    a week, or it was.

2        Q.  Okay.  Okay.  Thank you.  Do you know who at

3    CBP coordinates with INAMI for these intakes?

4        A.  Yeah.  The communication, it's the watch

5    commanders for passenger operations.

6        Q.  And do you know who the watch commanders

7    communicate with at INAMI?

8        A.  They do -- most of the communication is

9    actually a one-on-one communication between one of

10   the -- our watch commanders, former watch commanders,

11   and the director of Grupo Beta.  So it -- it's

12   usually -- most of the communication was between that

13   one watch commander and the director.

14            Some of the other watch commanders have

15   communicated as well when they're on duty and -- and he

16   wasn't.  And then, the only other person in Grupo Beta

17   is when the director either -- he would lose his phone

18   sometimes.  He didn't have his phone or for some other

19   reason, we would talk to his deputy.

20       Q.  Okay.  Does CBP communicate with anybody else

21   in Mexican Immigration other than the director of Grupo

22   Beta?

23            MS. SHINNERS:  Objection, scope, overbroad.

24       A.  Only the director and his deputy sometimes.

25       Q.  (BY MS. FIELDS)  Okay.  Thank you.  When the



Page 220

1    intakes occur, does CBP contact INAMI only when they

2    have capacity?

3        A.  No.  Generally, we were contacting them each

4    day regardless.  And they have the ability to contact

5    us, should we -- you know, if there were times where we

6    hadn't contacted them yet, they may contact us and ask

7    us.

8        Q.  So even if CBP did not have capacity to process

9    individuals, they -- you -- CBP would still contact

10   INAMI daily?

11       A.  Yes, I think we were to let them know that,

12   yes.  Yes.

13       Q.  Okay.  And after you contact INAMI, what

14   happens on the CBP end?  And for clarity, what

15   I'm -- what I'm asking is:  Do you wait for individuals

16   to show up that INAMI has somehow located on the Mexican

17   side?

18       A.  No.  Mexican Immigration will -- will escort

19   the people up to the international boundary at the Paso

20   del Norte border crossing, and at that time, officers

21   will radio down that they're -- that they're there so

22   that way we can receive them.

23       Q.  ████    ████████████████████████████████

24   ████████████████████████████████

25       A.  ████████████████████████████████████████████



Page 221

```
1
2
3
4
5
6
7
```

8      Q.  Okay.  Are you aware of how Mexican Immigration

9  or the federal police determines which migrants they

10  will be bringing from the -- from the wait list?

11      A.  No.

12      Q.  Okay.  Does the process that we just described

13  regarding CBP's communications with Mexican Immigration

14  apply to other ports in the El Paso Field Office?

15          MS. SHINNERS:  Object to the scope.

16      A.  I don't think it does.  I think Mexican

17  Immigration's communication with us regarding space and

18  our processing capability and the shelters from which

19  they bring people I think is with the Port of El Paso.

20      Q.  (BY MS. FIELDS)  Okay.  When --

21      A.  I think a lot of that is determined -- and

22  specifically the Paso del Norte border crossing, and I

23  think it's mainly because of the location, Paso del

24  Norte being downtown El Paso and the main pedestrian

25  bridge.



Page 222

1    Q.  Would it apply --

2    A.  It's also --

3    Q.  I'm sorry.

4    A.  -- where Mexican Immigration has offices.  They

5    don't have offices at -- at every port of entry.

6    Q.  Okay.  Would that apply also to the Bridge of

7    the Americas and Ysleta -- or is that Ysleta? -- or just

8    to Paso del Norte?

9    A.  It's all one port of entry back then, so the

10   communications with the Port of El Paso, meaning all of

11   the locations within the Port of El Paso and Mexican

12   Immigration.

13   Q.  Okay.  When you are -- when CBP at the Port of

14   El Paso is at capacity, is that based on the queue

15   waiting at the port?

16   A.  It's based on multiple factors.  So it'll be

17   based on:  Facility capacity and operational capacity of

18   how many people we have detained, how many are in

19   processing; how many ICRO can move or will be moving;

20   how many we have to reprocess again depending on ICRO's

21   decisions; depending on operational factors of the other

22   mission sets, are they overloaded at the time; are there

23   other violations being caught that have to be processed

24   first; number of transports; number of medical.

25              It's -- it -- so it -- it encompasses all



Page 223

1  of the port operations.  It can't impact -- in other

2  words, other mission sets can impact migrant processing;

3  migrant processing workload can impact other mission

4  sets.  So we have to take that into consideration.

5       Q.  Are migrants who wait in a queue at the Port of

6  El Paso processed more quickly than those who would come

7  from the state agencies' list?

8       A.  No, no difference.

9       Q.  Okay.

10       A.  The only difference, ma'am -- actually, the

11  answer to your question is no difference.  The -- the

12  one group that is prioritized is unaccompanied alien

13  children.  They -- they will be moved to the front of

14  the line and processed first, regardless.

15       Q.  Okay.  So based on the timing of this e-mail,

16  at least as recently as March 2019, CBP has been

17  communicating with INAMI to coordinate metering; is that

18  correct?

19       A.  Yes, ma'am.

20       Q.  Would you say that there is a date prior to

21  March 2019 when CBP started coordinating with Mexican

22  Immigration?

23       A.  Yes.

24       Q.  What would that be?

25       A.  I think it might be the summer or fall of 2018,


MAGNA
LEGAL SERVICES

Page 224

1    maybe the fall of 2018.

2        Q.  Okay.

3            MS. FIELDS:  Kevin, if you could bring up

4    Exhibit 179.

5        Q.  (BY MS. FIELDS)  And what -- what will be

6    marked as Exhibit 179 has the Bates No. AOL-DEF-00838795

7    through 798.  And this is a March 30th, 2019, e-mail

8    chain from Ray Provencio to Hector Mancha, with the

9    subject:  "GoM assistance with EWI control."

10            MS. FIELDS:  And, Kevin, if we could go to

11   first-in-time e-mail, which will be on the last page of

12   the document.  Thank you.

13       Q.  (BY MS. FIELDS)  So this is an e-mail that you

14   sent to Juan Carrillo and Arnoldo Gomez.  You wrote:

15

16

17

18

19

20

21            Is that correct?

22       A.  Yes, yes.

23       Q.  And GoM stands for Government of Mexico,

24   correct?

25       A.  Yes.



Page 225

1        Q.   And MX stands for Mexico?

2        A.   Yes, ma'am.

3        Q.   Okay.  And what is EWI?

4        A.   Entry without inspection.

5        Q.   And what -- who did that refer to or what does

6    that refer to?

7        A.   It refers to subjects illegally entering the

8    United States, not stopping for inspection.

9        Q.   Okay.  And can you describe what INAMI's

10   shelter system is?

11       A.   Yeah.  They don't have a shelter system, so I

12   guess that's an improper way of referring to it in my

13   e-mail.  Ciudad Juárez has a shelter system, and INAMI

14   coordinates and communicates with them.  However,

15   Mexican Immigration, one of their largest concerns is

16   maintaining order within the shelter system, so...

17       Q.   Okay.  Further down that e-mail, you also

18   wrote:  "Arnie, When possible, can you notify Grupo

19   Beta, Coordinator Meza, and Delegado Local Pico

20   Escobar?"

21             Is that correct?

22       A.   Yes.

23       Q.   Do you know what Coordinator Meza's full name

24   is?

25       A.   Juan Carlos.


MAGNA
LEGAL SERVICES

Page 226

1        Q.   Thank you.  And what are his responsibilities

2   as coordinator of Grupo Beta as relates to the metering

3   process?

4        A.   He's the director of Grupo Beta that watch

5   commander Gomez communicates with.

6        Q.   Okay.  And what is the "Delegado Local"?

7        A.   So the Mexican Immigration delegado is the head

8   of Mexican Immigration here in Juárez.  Mr. Pico Escobar

9   is no longer here; he's been replaced.

10       Q.   And is the delegado part of INAMI as well,

11   similar to Grupo Beta?

12       A.   Yes, but delegado would be the head of Mexican

13   Immigration here locally.  Grupo Beta is just another

14   arm under Mexican Immigration.

15       Q.   Okay.  And do you know who replaced Pico

16   Escobar?

17       A.   Yes, Delegado Alcala.

18       Q.   Can you spell that, please?

19       A.   Yes, ma'am.  A-L-C-A-L-A.

20       Q.   Thank you.  And how does CBP typically

21   communicate with delegado?

22       A.   Phone call and meetings, face-to-face meetings.

23       Q.   How frequently does CBP have face-to-face

24   meetings with delegado?

25       A.   I would say a couple times a year.



Page 227

1      Q.  Okay.  And how frequently do you communicate by

2  phone with delegado?

3      A.  Maybe a little bit more frequently than that,

4  but not often.

5      Q.  Okay.  And finally, at the bottom of the

6  e-mail, you wrote:  "Juan, can you notify subinspector

7  Bolado?"

8          Do you know what Inspector Bolado's full

9  name is?

10     A.  Omar.

11     Q.  And what entity is he affiliated with?

12     A.  Mexican Federal Police.

13     Q.  And what are his responsibilities in the

14  Mexican Federal Police with regards to metering?

15     A.  No responsibilities with metering whatsoever.

16     Q.  Okay.  What was the purpose for which you

17  corresponded with him?

18     A.  So the correspondence with him would be the

19  same in general with Grupo Beta and delegado is Mexican

20  Immigrations.  ████████████████████████████████████

21  ████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25              ████████████████████████████████████████


MAGNA
LEGAL SERVICES

Page 228



18        Q.   Okay.  And just to clarify, when you say

19    "federal laws," you were referring to Mexican federal

20    laws?

21        A.   Yes, ma'am.  Of course, yes.

22        Q.   Okay.  How would CBP typically communicate with

23    the Mexican Federal Police?

24        A.   Phone call.

25        Q.   And about how often would you have phone calls



Page 229

1    with Mexican Federal Police?

2         A.

3

4

5

6         Q.   Okay.

7         A.   I don't know how often they communicate.

8              MS. FIELDS:   Kevin, if we could move up to

9    the e-mail from Juan Carrillo on March 29th.   Perfect.

10   Thank you.

11        Q.   (BY MS. FIELDS)   So in the second sentence of

12   the e-mail, Mr. Carrillo wrote -- refers to a BVPP

13   meeting.   What does BVPP stand for?

14        A.   Border violence -- there's two meetings that

15   they generally have with -- binational meetings with

16   multiple state agencies.   They're -- they're both called

17   border violence protocol meetings, BVP.   One of them has

18   an extra P to designate one of the meetings is

19   high-level leadership, and one of them is our work

20   groups.   I don't know what the extra P stands for.

21   I'm -- I'm sure I've been told, but I don't remember.

22        Q.   Okay.   When did the BVP or BVPP meetings begin?

23        A.   I don't know when, but the -- the border

24   violence problems that Juárez had that were very

25   significant was in 2010 and 2011.   So my understanding



Page 230

1    is they probably started around that time or shortly

2    thereafter.

3        Q.  How frequent were these meetings?

4        A.  They are held at least quarterly and I think

5    sometimes monthly.

6        Q.  Is there a reason that it would be quarterly

7    versus monthly?

8        A.  Yes.  I think it's because the -- the quarterly

9    ones may involve the leadership, and the monthly ones

10   may involve the lower levels.

11       Q.  Okay.  Did -- did you personally ever attend

12   the BVP or the BVPP meetings?

13       A.  Yes, I've attended a few of those.

14       Q.  And who else from CBP attends those meetings?

15       A.  From time to time, the DFO will attend; the

16   assistant director, ADFO, will attend; sometimes the

17   border security coordinator; sometimes there may be port

18   leadership to attend on behalf of field office

19   leadership; and usually the ILU, International Liaison

20   Unit, will attend, in other words, Mr. Carrillo.

21       Q.  And from the non-U.S. side, from the Mexican

22   side, who would have attended those meetings?

23       A.  Oh, there's multiple agencies.  Mexican

24   Immigration may be one of them.  I don't know if they

25   attend all of them or not, but there's quite a few.  I



Page 231

 1   don't know --

 2        Q.  Okay.

 3        A.  -- them all, not off -- not off the top of my

 4   head.

 5        Q.  What is the general purpose of the BVP

 6   meetings?

 7        A.  Well, the general purpose is for -- to continue

 8   binational communication of what's affecting the agency

 9   and the countries in this area at the time, both for

10   situational awareness so we know where each other are --

11   the challenges we're facing and what we're doing about

12   it, and sometimes there may be opportunities for

13   collaboration.

14        Q.  So from around 2010 or 2011 through present,

15   CBP has been engaging in the BVP meetings with Mexican

16   government officials; is that correct?

17        A.  Yes, ma'am.

18        Q.  Okay.  Did anyone from the Port of El Paso

19   Field Office regularly participate in other meetings

20   with their Mexican counterparts?

21        A.  The Port of El Paso has binational meetings

22   with Mexican customs.  They're usually held monthly.

23   Sometimes Mexican Immigration attends those.

24        Q.  And are those meetings held in person?

25        A.  They are.



Page 232

1      Q.   Where do those meetings occur?

2      A.   At the Port of El Paso.

3      Q.   On the U.S. side of the border?

4      A.   Yes, ma'am.

5      Q.   Okay.  And you said those are monthly?

6      A.   Yes, ma'am.

7      Q.   Okay.

8           MS. FIELDS:  Then, Kevin, if we can move up

9   to the second page of the document.  Thank you.  To the

10   March 30th e-mail from Juan Carrillo to Ray Provencio.

11   I'm looking for the e-mail that begins with "The

12   Comisario wants to meet."  I don't know.  Perhaps I have

13   the wrong page number.  Maybe up a little further.  Oh,

14   there you go.  Thank you.

15      Q.   (BY MS. FIELDS)  So in this e-mail, Officer

16   Carrillo wrote:  "The Comisario wants to meet however he

17   does not have a Visa.  Would you want to meet at the

18   port or maybe we can give him a one day parole to go

19   meet with you at the field Office."

20           Is that correct?

21      A.   It says that, yes.

22      Q.   Okay.

23           MS. FIELDS:  And then, Kevin, if we could

24   just go up one e-mail to Mr. Provencio's response.

25   Thank you.



Page 233

1          Q.  (BY MS. FIELDS)  And he responds:  "Let's

2    shoot" -- excuse me -- "let's shoot for the Port then."

3               Is that correct?

4          A.  Yes, ma'am.

5          Q.  And I believe you said before, but who does

6    "Comisario" refer to?

7          A.  I actually don't know, but my understanding is

8    that this is a meeting with Mexican Federal Police.  If

9    that's it, then it's probably Mr. Bolado.

10         Q.  Okay.  And was Mr. Bolado the comisario at the

11   time of this e-mail in 2019?

12         A.  I don't know if that's his official title.  I

13   think his official title is subinspector.

14         Q.  Okay.  And would this type of meet --

15         A.  I don't know --

16         Q.  Oh, go ahead.

17         A.  Actually, the subinspector, Bolado, may have

18   been involved.  I know -- I don't know if it was for

19   this meeting, but there have been times where he

20   arranged the meeting for his higher up, which may have

21   been the comisario.  Maybe that's what this is.

22         Q.  Okay.  How frequently would CBP officials meet

23   with Mexican Federal Police in person?

24               MS. SHINNERS:  Object to the scope.

25         A.  As frequently as the border violence protocol



Page 234

1    meetings are held.  They usually attend those.

2          Q.  (BY MS. FIELDS)  Okay.

3              MS. FIELDS:  And then, finally, if we could

4    go to the first e-mail in the chain at the very top of

5    the first page.  Thank you.

6          Q.  (BY MS. FIELDS)  In this e-mail, also Provencio

7    wrote: ███████████████████████████████

8    ████████████████████████████████████████

9    ████████████████████████████████████████

10             Correct?

11         A.  Yes.

12         Q.  ███████████████████████████████

13    ███████████████████████████████████

14         A.  ████████████████████████████

15    ████████████████████████████████████████

16    ████████████████████████████████████████

17    ████████████████████████████████████████

18    ████████████████████████████████████████

19    ████████████████████████████████████████

20         Q.  Okay.  And for about how long would you say

21    this was in place, that they were -- that Me- - ██████

22    ████████████████████████████████████████

23    ████████████████████████████████████████

24         A.  I don't remember exactly, but I'm thinking

25    ████████████████



Page 235

1    Q.  Okay.  And during that time, would the officers

2    that were stationed there coordinate with CBP officers?

3    A.  ████████████████████████████████████

4    Q.  ████████████████████████████████████

5    A.  ████████████████████████████████████

6    Q.  Okay.  So, Mr. Cleaves, we've been going now

7    again for a little over an hour and 20 minutes.  If you

8    would like to take a short break or we can keep going.

9              MS. SHINNERS:  Is the -- I don't know that

10   you have much time left on the record.  How much time do

11   you guys have?  I think it's probably about 30.

12             MS. FIELDS:  Short.  So we only have

13   probably less than 30 minutes of actual questions.  But

14   according to our timer, it's been about 5 hours and

15   40 minutes.

16             MS. SHINNERS:  That doesn't seem correct.

17   It should be about at least 6 hours.  We've been going

18   since 11:00.  It's -- Eastern Time, it's 6:23.  I think

19   we've taken about an hour and 30 minutes' worth of

20   breaks.

21             MS. FIELDS:  Okay.

22             MR. NAZAROV:  Yeah, right.  You're right.

23             MS. SHINNERS:  So, I mean, Mr. Cleaves, do

24   you want to keep going?

25             THE WITNESS:  I'm -- I'm fine with whatever



Page 236

1   you want to do, Ms. Shinners.

2           MS. SHINNERS:  I think it might make sense

3   just to keep going.

4           MS. FIELDS:  Okay.

5           MS. SHINNERS:  If -- and -- and we can take

6   a break after Plaintiffs' counsel continue questioning

7   to see whether defense counsel has any questioning.

8           MS. FIELDS:  Okay.  Thank you.

9           In that case, Kevin, if you could pull up

10  Exhibit 180.

11      Q.  (BY MS. FIELDS)  And to this point, we've been

12  largely discussing non-Mexican asylum seekers.  Now I'd

13  like to focus a bit on Mexican asylum seekers.

14          So what will be marked as Exhibit 180 bears

15  the Bates No. AOL-DEF-00851607 through 608.  And this is

16  an August 26th, 2019, e-mail chain from Ray Provencio to

17  you, among others, with the subject:  "MPP/metering

18  (Dallas Morning News)."

19          Is that correct?

20      A.  I'm trying to read the title.

21          MS. FIELDS:  Kevin, if you wouldn't mind

22  blowing up the top.  Thank you.

23          THE WITNESS:  Sorry, guys.  Thank you very

24  much.

25      A.  Yes.



Page 237

1    Q.  (BY MS. FIELDS)  Great.

2         MS. FIELDS:  And, Kevin, if we could

3    actually go to the last page of the document, to the

4    very first e-mail that was sent.

5    Q.  (BY MS. FIELDS)  And this is an e-mail from

6    Alfredo Corchado at the Dallas Morning News, which he

7    sent to Roger Maier.  And in it, he wrote:  "Understand

8    that a rising number of migrants (ILLEGAL ALIENS)

9    waiting on the mexican side are Mexican, even though

10   based on my understanding that they are not supposed to

11   be on such a list."

12        Is that correct?

13   A.  That's what it says, yes, ma'am.

14   Q.  Okay.

15        MS. FIELDS:  And then, Kevin, if we can go

16   to the second e-mail on the first page of the document.

17   Yes.  Thank you.

18   Q.  (BY MS. FIELDS)  So this appears to be an

19   e-mail that was forwarded from Mr. Maier with additional

20   questions from Mr. Corchado, and it reads in part:  "Are

21   Mexicans subjected to metering system?"

22        And then goes on to add:  "Are you saying

23   that Mexican officials determine list and if they are on

24   list Mexico is to blame?"

25        Is that correct?


MAGNA
LEGAL SERVICES

Page 238

 1        A.  Yes, it says that.

 2        Q.  Okay.  Are Mexican asylum seekers supposed to

 3   be maintained on any list?

 4        A.  I have --

 5             MS. SHINNERS:  Objection, foundation.

 6             Go ahead.

 7        A.  I have no idea what is supposed to be on

 8   Mexican lists.

 9        Q.  (BY MS. FIELDS)  Are Mexican asylum seekers who

10   have credible fear claims suppo- -- subject to metering

11   policy?

12        A.  No.

13        Q.  Okay.  Are you aware of any separate list

14   maintained by Mexican state agencies for Mexican

15   migrants?

16        A.  No.

17        Q.  Okay.

18             MS. FIELDS:  Kevin, if you could pull up

19   Exhibit 177.  Thanks.

20        Q.  (BY MS. FIELDS)  All right.  So we've already

21   looked at Exhibit 177.

22             MS. FIELDS:  And if we could, again, focus

23   on the first e-mail in the chain, so it'll be the last

24   page of the document.  Sorry.

25        Q.  (BY MS. FIELDS)  So Mr. Aguilar wrote:



MAGNA
LEGAL SERVICES

Page 239

1    "Chihuahua officials say they aren't part of the

2    metering process and instead are waiting to seek asylum

3    on their own."

4                And then, in the last sentence of this

5    e-mail, he asks:  "How does CBP determine when the

6    Mexicans are allowed to apply?"

7                Is that correct?

8         A.  Yes, yes, it says that.

9         Q.  Okay.  And you just testified that Mexican

10   migrants who have credible fear are not subject to the

11   metering process; that's correct?

12        A.  Correct.

13        Q.  Are other Mexican migrants subject to metering

14   process?

15        A.  I'm sorry?

16        Q.  Are other Mexican migrants subject to metering?

17        A.  Subjects claiming fear of Mexico will be

18   brought in to be processed.

19        Q.  And if they're not claiming fear of Mexico,

20   then they may not be brought in?

21        A.  That's correct.  If we're unable to bring in

22   undocumented migrants, then that will occur.  They will

23   have to wait.

24        Q.  Okay.  Does CBP also communicate with Grupo

25   Beta regarding Mexican asylum seekers?



Page 240

1       A.   No, we don't communicate with Grupo Beta about

2  any particular citizenship whatsoever.

3       Q.   Okay.  So if it were true that Mexican migrants

4  were maintained on the same state agency list as

5  non-Mexican asylum seekers, then the same process would

6  apply as we just discussed applying to non-Mexican

7  migrants?

8            MS. SHINNERS:  Objection, vague.

9       A.   Subjects claiming fear of Mexico would be

10  brought in to be processed.

11      Q.   (BY MS. FIELDS)  And Mexican migrants who are

12  not claiming fear would be -- who are required to wait,

13  it would be -- they would be put on the same state

14  agency list that is maintained in Mexico as

15  non-asylum -- or non-Mexican asylum seekers?

16           MS. SHINNERS:  Objection, foundation.

17      A.   I have no idea how Mexico maintains their list

18  whatsoever.

19      Q.   (BY MS. FIELDS)  Okay.  When INAMI escorts

20  asylum seekers to the border after CBP communicates with

21  them, are they a mix of Mexican and non-Mexican asylum

22  seekers?

23      A.   At the time they're --

24           MS. SHINNERS:  Object to the form.

25           Go ahead.



Page 241

1     A.  At the time they're being escorted, we don't

2  know their citizenships.  We would have to determine

3  that ourselves through secondary inspection once we've

4  receive them.

5     Q.  (BY MS. FIELDS)  Okay.

6          MS. FIELDS:  All right.  And, Kevin, if you

7  could finally bring up Exhibit 181.  We are getting

8  close to the end now.

9     Q.  (BY MS. FIELDS)  So what will be marked as

10  Exhibit 181 bears the Bates No. AOL-DEF-00 -- or --

11  yeah -- 0084250 through 506.  And this is a

12  September 29, 2019, e-mail chain from you to Roger

13  Maier, copying others, with the subject:  "Los Angeles

14  Times Mexican asylum seeker question for story running

15  Tuesday."

16          Is that correct?

17     A.  Yes, ma'am, it says that.

18     Q.  Okay.

19          MS. FIELDS:  And, Kevin, if we could go to

20  the first e-mail, so at the bottom of the document,

21  dated September 28th.  Great.

22     Q.  (BY MS. FIELDS)  And this is an e-mail from

23  Molly Hennessy-Fiske of the Los Angeles Times, and she

24  wrote:  "I'm writing about thousands of Mexican asylum

25  seekers in El Paso and Tijuana being forced to join and



Page 242

1    maintain waiting lists (the Mexican government does not

2    maintain the lists - migrants do)."

3                Is that correct?

4        A.  Yes, ma'am.  Yes, ma'am.

5        Q.  Okay.  Are you, in your personal capacity,

6    aware of Mexican asylum seekers maintaining a wait list?

7        A.  No, no.

8        Q.  Okay.  And when Mr. Fenn showed you the video

9    in Exhibit 173, you noted that Mexicans started

10   the -- the practice of writing numbers on their arms.

11   Do you understand this to be a form of a wait list?

12       A.  Yes.  But a clarification:  I don't believe

13   Mexican Immigration indicated it was Mexicans that

14   started writing the numbers.  It was the migrants

15   themselves.  And back then, most of the migrants were

16   actually from other countries, so...

17       Q.  Okay.  So there -- to your knowledge, there is

18   no distinction between Mexican and non-Mexican asylum

19   seekers with regard to the migrant-run list?

20       A.  I -- I don't --

21                MS. SHINNERS:  Objection, vague.

22       A.  I don't know the mechanics behind the -- the

23   list in Mexico.

24       Q.  (BY MS. FIELDS)  Okay.  So CBP does not rely on

25   any list maintained by asylum seekers to determine who



Page 243

1  to process?

2       A.  Correct.

3       Q.  Okay.  Does CBP ever communicate with Mexican

4  asylum seekers directly, other than when they're being

5  processed?

6       A.  No, ma'am.

7       Q.  Okay.  And then, in the e-mail,

8  Ms. Hennessy-Fiske goes on to say:  "Is it at all ports

9  or just El Paso and Tijuana?"

10           Is that correct?

11      A.  Yes, ma'am, it says that.

12      Q.  Okay.  And you previously testified that

13  Mexican immigrants are subject to metering if they're

14  not claiming credible fear; is that correct?

15           MS. SHINNERS:  Object to the form.

16      A.  Undocumented migrants would be subject to

17  metering if we're not able to take them in and process

18  them.  Those that claim a fear of Mexico will be brought

19  in and processed.

20      Q.  (BY MS. FIELDS)  Okay.  So if CBP is unable to

21  process migrants, including Mexican migrants, they would

22  be subject to metering?

23      A.  Undocumented migrants would be subject to

24  metering if we're unable to process them at this time.

25  And if they claim fear of Mexico, those will be brought



Page 244

1    in.

2       Q.  So Mexican migrants could be subject to

3    metering if they are not claiming fear of Mexico; is

4    that correct?

5       A.  At the time of metering, no inspection has been

6    done, we would not know their citizenship.  So, correct,

7    that could happen.

8       Q.  Okay.  Are you aware of metering of Mexican

9    migrants occurring at ports other than the Port of

10   El Paso?

11           MS. SHINNERS:  Object to the scope.

12      A.  I'm not aware of metering of any specific

13   citizenship at any port of entry.

14      Q.  (BY MS. FIELDS)  Okay.  Are you aware of

15   metering of Mexican immigrants at San Ysidro?

16           MS. SHINNERS:  Object to the scope.

17      A.  Same answer:  I'm not aware of any metering of

18   any specific citizenship at any port of entry, to

19   include San Ysidro.

20      Q.  (BY MS. FIELDS)  Okay.  Thank you very much,

21   Mr. Cleaves.

22           MS. FIELDS:  Ms. Shinners, if you wouldn't

23   mind, we can go off the record for a couple of minutes

24   to just regroup on our end and your end to see if

25   there's anything else you want to bring up.



Page 245

1              MS. SHINNERS:  Sure.  That's fine.

2              MS. FIELDS:  Okay.  Great.

3              MR. FENN:  Maybe let's take 15 minutes.

4              THE VIDEOGRAPHER:  The time is 4:36 p.m.

5    We're going off the record.

6                  (Break was taken.)

7              THE VIDEOGRAPHER:  The time is 6 --

8    4:58 p.m.  We're back on the record.

9        Q.  (BY MS. FIELDS)  Mr. Cleaves, I just have one

10   issue I wanted to follow up on before handing it over to

11   Defendants' counsel.

12              I asked you earlier about the communication

13   process between CBP and INAMI at the Port of El Paso.

14   Are you aware of communications between CBP and Mexican

15   Immigration at any of the other ports that are

16   encompassed in the El Paso Field Office?

17              MS. SHINNERS:  Object to the scope.

18              Go ahead, Mr. Cleaves.

19       A.  I think they have port meetings with their

20   counterparts, Mexican customs, as well.  I don't know if

21   Mexican Immigration attends their port meetings.  I know

22   that Mexican Immigration is not present at all ports.

23   Is that the type of communication you were referring to,

24   ma'am?

25       Q.  (BY MS. FIELDS)  Yes.  And are you aware of any


MAGNA
LEGAL SERVICES

Page 246

1    phone or texting communications at any of those ports

2    between CBP and Mexican Immigration?

3                    MS. SHINNERS:  Object to the scope.

4        A.  Okay.  No, ma'am.  No.

5                    BY MS. FIELDS:  Okay.  That's everything

6    from Plaintiffs' counsel.

7                         EXAMINATION

8    BY MS. SHINNERS:

9        Q.  Okay.  I just have a -- a couple questions that

10   I'd like that you, Mr. Cleaves.

11       A.  Yes, ma'am.

12       Q.  All right.  Mr. Cleaves, in November 2016 when

13   the Port of El Paso began metering, did the Port of

14   El Paso receive any guidance from OFO to implement

15   metering differently with respect to undocumented family

16   units versus other types of undocumented aliens?

17       A.  No, ma'am.  The Port of El Paso was

18   experiencing a surge in family units from Central

19   America, primarily family units, so all discussions

20   regarding the surge tended to use the word "family unit"

21   because that's what we were experiencing.  But, no,

22   there was no guidance differentiating processing between

23   the different types of migrants.

24       Q.  Thank you.  And earlier in the deposition,

25   Plaintiffs' counsel, Mr. Fenn, asked you about whether



Page 247

1   it was possible for an undocumented alien subject to

2   metering to step foot onto U.S. soil when CBP officers

3   are at the limit line position at the various pedestrian

4   crossings at the Port of El Paso.  Do you recall that

5   questioning?

6        A.  Yes, ma'am.

7        Q.  And if I recall, your testimony was that you

8   said that it was not possible.  Did I correctly recount

9   your testimony?

10       A.  Yes.

11       Q.  Can you explain what you meant when you said it

12  was not possible?

13       A.  Yes.  As a general rule, it wouldn't be

14  possible, people just walking up and engaging with the

15  officers in metering.  They'll stop them before that

16  occurs.  However, if they go around or force their --

17  their way through, then they can get onto U.S. soil, and

18  that does happen.

19       Q.  And if that happens, what -- what does CBP do

20  with respect to the undocumented alien who steps foot on

21  U.S. soil?

22       A.  We process them.

23            MR. FENN:  Objection, vague.

24       A.  We process them.

25            MS. SHINNERS:  Okay.  Those are all the



Page 248

1   questions that I had at this time.  And does Plaintiffs'

2   counsel have any further questioning?

3             MR. FENN:  We don't have any further

4   questioning.  We are going to hold Mr. Cleaves'

5   deposition open for three reasons.  First is, as

6   Mr. Cleaves said earlier in the deposition, he's

7   prepared only to testify as a representative of the Port

8   of El Paso and not the El Paso Field Office, which is an

9   ongoing dispute.  Second, I believe we're expecting a

10  production of text messages.  And, third, because of the

11  dispute which we put on the record regarding the clawed

12  back document.  But no further questions.

13            MS. SHINNERS:  Okay.  And Defendants do

14  disagree with respect to the scope of Mr. Cleaves'

15  testimony.  There are issues related to text messages we

16  can discuss off the -- offline too.  I don't believe

17  that any of the text messages belong to any currently

18  designated custodians.  And of course we've already gone

19  over the dis- -- the privilege dispute.

20            I also wanted to state on the record that

21  the transcript would be deemed confidential for 30 days

22  under the affiliated protective order and also that the

23  witness would like to read and sign.

24            MR. FENN:  Okay.

25            THE REPORTER:  Mr. Fenn, would you like me



Page 249

1    to produce the transcript?

2                    (Discussion off the record.)

3                    MR. FENN:  Oh, yes, we would like that.

4    Thank you.

5                    MS. SHINNERS:  Okay.

6                    THE REPORTER:  And, Ms. Shinners, would you

7    like a copy?

8                    MS. SHINNERS:  Yes, we will be ordering the

9    transcripts.  Is there an order form?

10                   THE REPORTER:  I can get your order on the

11   record.  Did you want just electronic or electronic and

12   paper form?

13                   MS. SHINNERS:  Electronic.

14                   MR. FENN:  We're fine with electronic as

15   well.

16                   THE REPORTER:  Okay.  Thank you.

17                   THE VIDEOGRAPHER:  Okay.  The time is

18   5:04 p.m.  This concludes the deposition of Samuel

19   Cleaves.  We're off the record.

20                   (Deposition concluded at 5:04 p.m.)

21

22

23

24

25



Page 250

                          CHANGES AND SIGNATURE

1

2

3     PAGE LINE          CHANGE                REASON

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____



Page 251

1          I, SAMUEL CLEAVES, have read the foregoing
2     deposition and hereby affix my signature that same is
3     true and correct, except as noted above.

4

5

6

7          _____
      SAMUEL CLEAVES

8

9

10

11    THE STATE OF TEXAS      )
12    COUNTY OF HARRIS        )

13

14         Before me, _____, on this day
      personally appeared SAMUEL CLEAVES, known to me (or
15    proved to me under oath or through _____)
      (description of identity card or other document) to be
16    the person whose name is subscribed to the foregoing
      instrument and acknowledged to me that they executed the
17    same for the purposes and consideration therein
      expressed.
18         Given under my hand and seal of office this _____
      day of _____.

19

20

21

22         _____
      NOTARY PUBLIC IN AND FOR
23    THE STATE OF _____
24

25



Page 252

```
 1                UNITED STATES DISTRICT COURT
 2               SOUTHERN DISTRICT OF CALIFORNIA
 3
                                ) IN THE DISTRICT COURT
 4    AL OTRO LADO, INC., ET     )
      AL.,                       )
 5       PLAINTIFFS,             ) CASE NO.
                                 ) 17-cv-02366-BAS-KSC
 6    VS.                        )
                                 )
 7                               )
      KEVIN K. MCALEENAN, ET     )
 8    AL.,                       )
         DEFENDANTS.             )
 9
10               REPORTER'S CERTIFICATION
                DEPOSITION OF SAMUEL CLEAVES
11                    MAY 20, 2020
12
13        I, Delia Ordonez, Certified Shorthand Reporter in
14    and for the State of Texas, hereby certify to the
15    following:
16        That the witness, SAMUEL CLEAVES, was duly sworn by
17    the officer and that the transcript of the oral
18    deposition is a true record of the testimony given by
19    the witness;
20        That the deposition transcript was submitted on
21    _____ to the witness or to the attorney
22    for the witness for examination, signature and return to
23    me by _____;
24        That the amount of time used by each party at the
25    deposition is as follows:
```



Page  253

 1        Matthew E. Fenn.....05:19
          Sydney Fields..... 01:09
 2        Katherine J. Shinners.....00:02
          Ari Nazarov .....00:00

 3

 4        That pursuant to information given to the
 5   deposition officer at the time said testimony was taken,
 6   the following includes counsel for all parties of
 7   record:
 8        Matthew E. Fenn, Attorney for Plaintiff
          Sydney Fields, Attorney for Plaintiff
 9        Katherine J. Shinners, Attorney for Defendant
          Ari Nazarov, Attorney for Defendant

10

11        That $_____ is the deposition officer's
12   charges to the Plaintiff for preparing the original
13   deposition transcript and any copies of exhibits;
14        I further certify that I am neither counsel for,
15   related to, nor employed by any of the parties or
16   attorneys in the action in which this proceeding was
17   taken, and further that I am not financially or
18   otherwise interested in the outcome of the action.
19        Certified to by me this ____ of May, 2020
20
21   _____
          DELIA ORDONEZ Texas CSR 7040
22        Expiration Date:  12/31/20
          Firm Registration No. 633
23        Magna Legal Services
          1635 Market Street, 8th Floor
24        Philadelphia, PA 19103
          (866)624-6221
25        www.MagnaLS.com



## A

**abbreviation** 135:15
**ability** 19:17 111:16 136:15 142:20 173:15 184:10 185:9 205:3 220:4
**able** 24:3 85:18 89:5 102:19 117:18 144:8 144:10,17,21 145:1 160:18 161:23 162:1 170:12 184:13 188:21 193:9 193:19 194:24 209:12,24 211:25 243:17
**above-styled** 1:19
**accent** 17:9
**accept** 44:13 55:23 193:13 193:15,21,22 196:16
**accidently** 98:13
**accommodate** 196:10
**accompanied** 162:10,13,17 164:15
**accompanies** 176:18
**accompany** 168:15
**account** 14:2,4 56:9,11,24 57:1 58:10 114:20 114:22 153:24 157:25 158:16 167:12 180:8
**accounted** 55:22
**accuracy** 84:21 169:7 201:19

202:4 207:2,6
**accurate** 92:16 92:19 97:20 99:10 101:14 125:11 127:19 157:25 158:2 202:5
**accurately** 7:16
**acknowledged** 251:16
**acknowledges** 153:12
**acronym** 207:21
**action** 7:12 69:17 77:12 79:10 135:13 141:22 142:1,3,5,10 178:2 253:16 253:18
**actions** 89:25
**actively** 13:2
**actual** 50:22 53:6 73:14,15 112:1 142:22 235:13
**ad** 204:7
**add** 103:23 237:22
**added** 99:21 103:20
**addition** 192:4
**additional** 89:25 110:21 119:24 237:19
**address** 136:17
**adequate** 73:8
**ADFO** 230:16
**adjacent** 94:19 101:6 176:23 176:24
**admissibility** 30:6,8 56:17 65:23 148:12 193:5 198:9,12
**admissible** 148:23
**admission** 21:17

**admissions** 21:16
**adopting** 188:14 189:12
**adoption** 16:18
**adult** 89:6,9 196:6
**adults** 72:4
**adverse** 80:8
**advise** 129:9 135:4
**advised** 139:15
**Advisory** 30:6
**advocate** 162:10 162:17
**advocates** 162:14 162:23 163:4 163:12,13
**affairs** 164:13 214:14
**affect** 56:16 80:9 99:22 193:14 194:5 228:3
**affidavit** 12:8
**affiliated** 227:11 248:22
**affix** 251:2
**afternoon** 199:15
**age** 89:17
**agencies** 11:7 39:21 204:3 210:21 217:16 223:7 229:16 230:23 238:14
**agency** 6:22 11:6 14:21 17:6 162:5 173:10 181:22 217:3 217:17,21 231:8 240:4,14
**agent** 157:11 158:15 165:15 166:14,16,19
**agents** 156:7 164:22,23 167:6,9
**agent's** 182:6

**ago** 12:15,15,16 42:22,24 43:1 133:18
**Agosttini** 132:20 133:2
**agree** 8:5 9:17 67:7 85:16,17 115:20,22 158:3,6,6,15 177:5 187:24 187:25 192:12 193:6,16 234:12
**agreed** 100:10 102:25 166:20 192:7 234:22
**Aguilar** 215:11 215:12 238:25
**ahead** 20:3 32:25 33:4 44:1 54:1 57:15 65:4,6 70:15,15 71:3 76:14 78:21 79:8 86:10 89:1 93:21 105:12 105:20 125:7 125:21 127:25 135:23 144:5 148:6 149:12 153:18 158:20 166:5 177:11 178:6 179:23 188:5 196:1 198:11,11 216:17 233:16 238:6 240:25 245:18
**airport** 38:11 72:13,14,14,23
**al** 1:4,4,8 6:3,3,4 24:25 252:4,4,8
**Albuquerque** 38:5
**Alcala** 226:17
**Alex** 22:21 23:9
**Alexandria** 179:6

**Alfredo** 237:6
**alien** 89:19,22 196:6 223:12 247:1,20
**aliens** 83:10 183:19 206:3,3 206:8 237:8 246:16
**allegations** 181:19
**allegedly** 181:2
**allow** 103:4 164:23 166:20
**allowed** 10:7 115:17 119:6 167:13 188:22 188:23 239:6
**alternate** 119:18
**aluminum** 101:3 103:19
**Amended** 4:14 90:8
**Amer** 98:9
**America** 143:1 145:23 146:1 147:10 148:17 246:19
**American** 138:8 146:7,9,14
**Americas** 37:25 38:10 49:15,19 71:21 96:1,2,6 96:9,21 97:2,9 97:20 98:9,18 98:22,25 99:12 100:4 122:25 205:17,19 222:7
**amount** 20:19 58:18 73:15 94:2 173:4 197:7 252:24
**amounted** 82:8
**amounts** 110:24
**and/or** 16:16 82:12 151:6


MAGNA
LEGAL SERVICES

152:8 153:25
**Angeles** 241:13
241:23
**announced**
133:18
**Annunciation**
164:15 165:4
**answer** 7:15 8:1
8:7,12,13,18
19:14 22:4 37:2
44:9,22,23
45:17 48:1,9
49:25 52:6 53:3
53:4 63:19 67:1
69:15 84:22
90:17 123:12
123:14 130:15
131:11 136:4
147:4 154:1
163:9 184:4
194:17 197:19
201:24 202:11
202:15 208:5,8
208:9,10 212:3
223:11 244:17
**answering** 7:24
145:7 179:25
180:5
**answers** 201:20
**Antelope** 37:20
43:24 44:3
**anybody** 78:13
154:25 161:18
219:20
**anymore** 42:21
42:23 155:19
**AOL** 191:17
**AOL-DEF-00**
241:10
**AOL-DEF-000...**
4:11 81:13
**AOL-DEF-000...**
4:25
**AOL-DEF-000...**
4:24
**AOL-DEF-000...**

4:7
**AOL-DEF-000...**
4:16 126:4
**AOL-DEF-000...**
4:8
**AOL-DEF-000...**
5:6 189:21
191:17
**AOL-DEF-002...**
4:18 134:13
**AOL-DEF-002...**
4:19 141:12
**AOL-DEF-002...**
4:10 68:25
**AOL-DEF-002...**
4:9 32:17
**AOL-DEF-007...**
5:7 200:8
**AOL-DEF-008...**
5:8 206:13
**AOL-DEF-008...**
5:10 218:4
**AOL-DEF-008...**
5:11 224:6
**AOL-DEF-008...**
5:13
**AOL-DEF-008...**
5:9
**AOL-DEF-008...**
5:12 236:15
**AOL-DEF-012...**
4:17
**AOL-DEF-377...**
171:12
**apologies** 143:13
208:21
**apologize** 89:2,3
149:11 150:15
190:25 209:14
**apparently**
210:24
**appear** 121:16
188:1 197:1
**appearances**
6:13
**appeared** 251:14

**appears** 123:21
141:21 146:8
163:13 237:18
**applicable**
203:10
**applied** 151:5
152:8 153:21
193:4
**applies** 124:9
**apply** 37:20
44:12 200:3
214:11 221:14
222:1,6 239:6
240:6
**applying** 240:6
**appointment**
133:20 178:20
178:21
**appointments**
178:14,19
206:8
**appreciate** 7:7
20:2 192:22
**apprehension**
183:20
**apprise** 160:8,13
**apprised** 160:3
**approach** 96:20
115:4
**approached**
107:14,23
109:1 113:7
**approaches**
87:19 88:16,20
107:3 117:15
120:12 161:22
162:8
**approaching**
88:7 112:4
146:2,4,10,14
146:17 161:25
**appropriate**
58:11 157:14
160:17 173:23
**appropriately**
45:12 157:15

**approximately**
24:16 92:1,8,10
93:14 94:9,16
97:15 99:5
100:22 101:1
102:9 218:17
**April** 51:20,22
88:10 121:8,17
121:21,24
122:2 124:21
125:2,15 131:6
132:5 152:3,5
152:15,23
154:13,18,23
158:5 159:1,16
159:17 204:19
**arbitration** 12:1
**area** 13:1 37:17
41:23 231:9
**areas** 47:13
56:23 58:14
72:11 74:10
**argumentive**
187:22
**Ari** 2:10 6:20
26:10 200:10
253:2,9
**Ari.Nazarov@...**
2:13
**arm** 215:25
226:14
**armed** 31:2
165:15,20,21
166:2
**arms** 177:18
242:10
**Arnie** 225:18
**Arnoldo** 22:11
224:14
**arranged** 233:20
**arrangement**
221:5
**arrangements**
221:5,6
**arrested** 13:13
**arrivals** 134:25

**arrived** 157:4
**arrives** 165:16
166:14
**arriving** 142:25
151:10,12,15
183:19 193:7
**article** 168:21
**articles** 26:1
**aside** 11:23 77:20
110:16 115:24
**asked** 76:24
88:14 164:22
170:9 180:5
205:21 212:23
245:12 246:25
**asking** 9:17
52:19,19 62:12
67:11,12
102:18 122:15
122:17 128:7
138:9 140:24
147:13 148:8
157:23 190:17
199:22 213:12
220:15
**asks** 239:5
**assembling** 33:12
**assert** 192:2
**asserted** 153:24
**assertion** 65:9
191:24
**assigned** 30:9
32:5 45:12 86:1
91:11
**assist** 224:19
234:14
**assistance** 224:9
**assistant** 11:4
22:12,18,21,24
24:15,19 29:3
31:23 33:23
34:19,23 35:5,9
35:13 36:15,15
39:5 40:2,2,11
40:21,22 41:7,9
41:15,18 44:17



48:17 78:10
126:16 135:9
135:10,11
166:18 190:6
202:14 230:16
**assume** 8:7 9:15
42:3 50:3 88:24
165:23
**assumed** 35:8
36:2 42:5
**assumes** 84:21
131:9
**assumptions**
213:8,10,14
**asylum** 44:7,19
48:19,22 57:2
86:6 87:5,19
88:20 93:15
94:24 95:6 96:6
96:20 98:17
102:10 104:9
104:22 105:7
107:3,4,14,23
108:8,15,21,25
113:7,16,23
114:5,6 115:4
117:15,16,23
118:5,20 119:5
120:12,13
124:20 125:3
125:16 131:7
144:16,21
145:2,3 154:16
154:20 155:4
156:7 157:12
157:15 158:17
159:9,16
161:21 162:3,7
162:16 163:3
164:18 165:9
165:10 167:2
168:15 177:6
177:17,23
178:3,11,19,24
184:15 186:16
186:20 187:25

188:5,15
189:14 192:25
193:17 195:2,4
195:21 196:23
196:24 198:7
198:16,17,20
199:1 203:17
205:22 211:11
211:17,25
212:5 214:12
215:13 216:14
236:12,13
238:2,9 239:2
239:25 240:5
240:15,20,21
241:14,24
242:6,18,25
243:4
**attaché** 132:23
**attacked** 157:6
**attempt** 162:3
211:10,12
**attempted** 151:7
**attempting**
102:21 172:21
181:13 209:1
**attend** 230:11,15
230:16,18,20
230:25 234:1
**attended** 175:19
230:13,22
**attends** 230:14
231:23 245:21
**attention** 33:14
69:5 134:19
150:25 169:2
172:19 190:9
**attorney** 8:10
157:4,12
252:21 253:8,8
253:9,9
**attorneys** 10:8
24:18 26:4,5,15
26:22,25
253:16
**audible** 7:17

165:18
**audience** 78:23
79:4
**audio** 7:21
**August** 206:16
207:23 208:13
236:16
**authenticity**
214:18
**automated** 47:4
**automatic** 165:15
**automatically**
46:17,23
**available** 111:3
210:6
**Aveitia** 35:4
**Aveitia's** 36:3
**avenues** 195:9
**average** 194:5
**await** 133:20
**aware** 22:14
45:18 59:3,7
60:12 132:4
154:10,14,16
154:20,25
155:1,3 179:5
180:9,12,13,25
181:16 212:17
212:21,22,23
212:25 213:1
221:8 238:13
242:6 244:8,12
244:14,17
245:14,25
**awareness** 213:3
231:10
**Ayuda** 17:4
**A-L-C-A-L-A**
226:19
**a.m** 1:20 6:7
15:24 16:2,6,8
68:16,19

—————————
**B**
—————————
**b** 91:9 151:12
195:12 198:5

198:24
**baby** 164:19
**bachelor** 27:18
27:19
**back** 16:3,11
43:3 57:1,11
68:20 75:14
76:21 79:23
86:20 93:3,10
93:11 95:24
102:3 116:12
121:2,3 133:14
133:20 135:2
136:21 137:3
145:21 149:11
151:13 154:21
155:1,5,20
159:1 167:8
168:18 170:3
170:16,19
178:25 182:23
182:24 185:16
186:1 191:11
191:19 211:3
213:12 222:9
242:15 245:8
248:12
**background**
187:11
**bad** 57:12
**badly** 164:19
**barricades**
103:21 110:7
111:13
**barrier** 92:3,7,11
93:25 94:10
95:17 100:22
100:24 101:1,4
110:16
**barriers** 94:3
95:23 97:13
111:2
**barring** 198:16
199:1,5,6
**Barry** 35:10,13
41:7

**base** 134:22
206:7 234:17
**based** 73:22
125:4,8 141:3
170:7 196:14
197:25,25
207:18 213:4
222:14,16,17
223:15 237:10
**Bashant** 192:12
192:15
**basically** 28:13
**basis** 54:8 61:8
191:19 203:19
205:1 216:10
**Bates** 126:3
190:12 191:17
200:7 206:13
218:4 224:6
236:15 241:10
**Bates-labeled**
32:17 68:25
81:12 189:21
**Bates-numbered**
171:12
**Bates-stamped**
134:13 141:11
**bearing** 192:22
**bears** 126:3
236:14 241:10
**Bebon** 41:8,14,17
42:3
**becoming** 184:22
**began** 28:6,16
86:16,18 96:8
104:15 108:12
114:2 133:22
151:18 152:3
184:12 246:13
**beginning** 52:10
53:10,22 58:13
145:13 154:8
168:1 191:17
211:15 214:3
**begins** 6:2 232:11
**begun** 133:25



behalf 15:15 63:4
154:10 230:18
believe 51:11
78:18,22 79:12
125:16,18,21
125:22 126:11
135:24 157:25
158:1 178:1
188:8 198:19
202:4,5 233:5
242:12 248:9
248:16
believed 124:20
125:2,14
belong 248:17
Bel-Air 28:5
Ben 2:11
beneficial 62:8
best 7:25 18:20
19:17 69:18
170:15 203:19
Beta 17:5 204:24
205:5 215:13
215:17 216:3,7
216:13,20,23
219:11,16,22
225:19 226:2,4
226:11,13
227:19 239:25
240:1
Beta's 215:21
Beto 5:5 174:1
176:8
better 154:8
Beverly 32:2
38:23 139:24
141:19 142:18
beyond 78:23
79:2,3
big 131:18
biggest 131:14,24
Bill 30:19
binational 204:3
229:15 231:8
231:21
bit 51:24 59:13

65:18 85:21
101:25 102:5
116:14 150:16
227:3 236:13
blame 237:24
blocking 167:7
blowing 236:22
blowup 211:8
board 133:15
139:12
body 12:5
Bolado 227:7
228:9 229:5
233:9,10,17
Bolado's 227:8
bolded 157:2
booth 101:4,6
103:20
Boquillas 44:3
border 6:23 9:4
11:2 14:13 31:6
34:11 35:19
37:15,16,17,19
37:21 40:14,17
44:3 49:3,6,7
49:13,19 66:4
69:13 86:14,16
87:15,20 88:3
88:19 92:18
93:14,17 95:11
96:18 97:1
100:5,7 101:20
105:8 109:2
111:7 112:13
119:15 122:12
122:20,25
123:23 124:1
124:10,11,15
124:17 128:24
130:20 139:20
155:5 156:6
176:22 179:7
182:5,6 186:7
193:1,25
194:20 201:13
202:13 205:24

213:5 217:10
220:20 221:22
228:12 229:14
229:17,23
230:17 232:3
233:25 240:20
Borders 157:8
border-wide
131:6
BOTA 210:7
bottom 69:6
90:21 100:16
123:18 134:20
141:18,25
168:25 190:11
190:14 215:7
227:5 241:20
boundary 77:3,6
91:8,14 92:5,6
93:15 94:6,19
94:23 95:19
97:14,16 98:1,4
98:12,15,21
99:1,6,17,24
100:23,24
101:17,21
102:9,21
103:25 104:3,6
105:24 106:8
106:13,16,24
107:9,11 108:6
109:12 110:2
110:22 111:7
112:5,17,20,25
113:3 115:13
116:13,19,24
117:2,6 119:17
119:21 120:5,8
120:10 137:24
138:3 142:24
143:8,17
144:15 154:7
161:9 167:7
220:19 234:9
234:13,17
Box 2:11

break 8:16,17,18
68:10,18
120:17,25
182:10,21
191:16,23
235:8 236:6
245:6
breakdown
221:3
breaking 68:9
breaks 10:10,14
25:16 235:20
bridge 37:25
38:10 49:15,19
71:21 91:24
96:1,2,6,8,21
97:2,8,20 98:9
98:9,18,22,25
99:12 100:4
103:4 112:7,9
122:25 142:21
142:24 145:18
163:22 164:21
205:17,19
206:6,7,9
221:25 222:6
bridges 100:2
142:20 169:8
209:2 228:16
234:18
brief 180:6
briefed 134:24
briefly 36:13
41:23
bring 162:24
163:14 206:12
217:9 221:19
224:3 239:21
241:7 244:25
bringing 221:10
brings 217:7
broad 103:13
broken 19:11
40:24 228:13
Brooks 132:21
133:3

brought 163:11
204:5 239:18
239:20 240:10
243:18,25
Brown 2:5 6:8,14
6:17
budget 65:19
budget's 40:24
budget-wise
40:23
build 173:7
building 116:12
119:14 151:16
built 53:19 56:19
111:10 173:6
bullet 157:1
172:18 173:24
174:6 190:16
208:24 209:7
209:13,20
211:6,8
burden 63:9
butchering 35:4
BVP 229:17,22
230:12 231:5
231:15
BVPP 229:12,13
229:22 230:12

## C

c 2:1 91:10
151:14 195:12
calculated 71:24
72:1 73:25
calculating 61:5
74:6
California 1:2
6:5 252:2
call 36:12 57:1
139:17 140:20
140:23 141:1,2
185:23 191:18
226:22 228:24
called 28:5 30:7
164:8 180:10
229:16



calls 15:7 162:20
  163:7 205:7
  216:3 217:25
  228:25
canopies 95:21
canopy 97:11
  99:16,19
  100:20
capability 65:16
  72:15 221:18
capable 72:3
  204:11
capacities 66:20
capacity 9:11
  45:14,18,22
  46:14,16 47:24
  48:7,15 49:21
  50:1,5,15,22,23
  51:2,6,8,13,13
  51:14,25 52:11
  52:16,22,24
  53:5,6,7,19,23
  54:14,24 55:3
  55:20,20 56:1,1
  56:2,2,7,7,8,25
  57:7,22,23 58:4
  58:5,12,13,14
  58:15,23 59:11
  59:16,17,23
  60:1,4,7,12,15
  60:20,23 61:5,9
  61:13,19,20
  64:5,8,15,21,22
  64:23,23 65:1,9
  65:11,21 66:1,7
  66:11,21,24
  67:5,6,8,9,15
  67:22 68:4
  69:12 70:5,7,9
  70:11,13,18,20
  70:22,23 71:13
  71:17,21 73:21
  75:1,11,18,22
  76:1,11 77:2
  80:2,19,24,24
  81:4,6 82:9,21

82:23 83:1,14
  83:17 84:6,13
  85:5,5,5,6
  114:17,20,23
  114:24,25
  128:21 129:2,6
  129:10,11
  130:5 138:10
  140:25 144:24
  157:23 160:3
  160:15 161:4,8
  161:13 166:15
  169:7,8,15
  170:5,9,13,14
  170:14,23
  171:2,21,25
  172:12 193:13
  193:17,20
  196:18 197:8
  205:6 206:3
  216:21 218:20
  220:2,8 222:14
  222:17,17
  228:3 242:5
capture 68:4
  172:21
captures 67:25
  68:5
card 251:15
career 28:14
  126:23
cargo 41:22
  173:5,6 188:10
  193:4
Carlos 132:20
  133:11 225:25
Carrillo 206:23
  206:24 207:3
  207:16 224:14
  229:4,9,12
  230:20 232:10
  232:16
cascade 196:20
cascaded 46:17
  47:3
case 1:5 11:11,16

12:7 17:15 18:1
  18:13 25:3,5
  26:5 38:17 58:2
  111:17 144:18
  168:8 173:11
  188:19 192:5
  196:16 199:16
  236:9 252:5
cases 13:2,4
  65:12,13 135:1
  147:20 198:13
Cassler 2:14
CAT 134:24
  135:12
catch 72:22
categories 19:11
  199:7
catwalk 99:18
  103:23
catwalks 138:2,5
caught 222:23
cause 1:20
CB 158:15
CBP 2:20 9:4,10
  9:16 11:5,8
  13:20 15:2,15
  20:10 21:25
  22:7,7,10 28:7
  28:16,24 29:6
  30:21 31:23
  44:19 46:24
  50:18,23 66:10
  66:18 77:17
  88:5,17,21
  89:12 93:17
  95:7 98:14,18
  101:5 102:11
  106:13 114:19
  116:16,21
  120:13 124:19
  125:2,14,15
  126:10,13,16
  131:5 132:4,10
  132:23 133:18
  135:18,21
  136:7,20

138:19 140:25
  141:14 144:14
  144:20 145:2
  146:3,11,24
  147:7,14
  148:16 154:11
  155:19 157:11
  157:14 158:15
  158:18 160:2
  161:3,11,20
  162:5 164:12
  164:22 165:19
  165:23 166:24
  167:15 168:5
  177:21 178:2,9
  179:7 181:18
  183:17,25
  186:5,20
  188:14 189:12
  191:1 194:1,18
  195:18 197:7
  199:18 201:12
  203:3,4,11,15
  204:1,14,20
  206:24 207:1
  212:4 214:15
  215:12,18
  216:2,6,19
  217:23 219:3
  219:20 220:1,8
  220:9,14,23
  222:13 223:16
  223:21 226:20
  226:23 228:22
  230:14 231:15
  233:22 235:2
  239:5,24
  240:20 242:24
  243:3,20
  245:13,14
  246:2 247:2,19
CBPOs 142:23
  143:7,16
CBP's 28:7 162:2
  165:9 173:17
  187:20 195:17

199:23 221:13
CDC 198:15,20
  198:25 199:3,5
cell 72:4 73:10
  75:8
cells 53:13,13
  56:5,6 72:2,5
  72:11,13,17,23
  73:1,3,5,22
  74:17 75:2,5,7
CENTAM 135:3
  138:7
center 2:15 46:20
  77:12,15,18
  171:14
central 16:6
  52:15 138:8
  143:1 145:23
  146:1,7,9,14
  147:10 148:16
  246:18
cer 188:13
certain 58:18
  59:17 71:5
  111:4 188:13
  195:20 211:23
certainly 131:16
Certificate 3:10
certification
  63:10 252:10
Certified 252:13
  253:19
certify 252:14
  253:14
CF 135:1
chain 127:13
  128:2,16
  129:23 169:20
  170:1 171:17
  190:10 201:21
  212:10 214:9
  215:8 218:7,13
  224:8 234:4
  236:16 238:23
  241:12
chain-link 97:10



97:10 100:19
100:20 110:17
**challenge** 124:21
125:3,16 131:2
131:8,14,15,18
131:24 132:1
173:1,13
**challenged**
166:16 169:4,6
**challenges** 82:13
125:10 131:16
131:18,20
172:16 173:25
196:22 231:11
**challenging** 7:8
**chance** 95:5
169:25
**change** 52:22
55:8 61:8 66:7
92:23,25 93:2
95:24 194:3
250:3
**changed** 31:11
31:12 52:2,3,10
52:12 53:23
95:12,20 99:13
103:8,12,17
116:3 117:12
121:5,6
**changes** 3:9
30:25 99:22
100:7 104:1
250:1
**changing** 54:2,21
**characterization**
177:13
**characterizing**
131:13
**charge** 47:13
48:11 77:7,19
**charged** 13:11
**charges** 253:12
**chart** 69:20,21,23
70:4,11 71:14
73:21 75:14
76:9 77:1 79:23

81:3,5 82:11,25
83:2
**chat** 155:19
185:9
**Chavez** 141:19
141:21 147:23
148:24
**Chavez's** 142:11
142:18 143:11
143:21 145:21
148:15
**check** 89:13,15
**chief** 14:21 18:2
18:2,10,10
**chiefs** 45:10
160:7
**Chihuahua**
228:11 239:1
**child** 89:19,22
90:2 196:6
**children** 116:9,9
172:22 223:13
**choice** 115:21
**choose** 115:12,13
**Christopher**
34:20
**chronological**
19:16
**circulated** 38:9
**circumstance**
197:5
**circumstances**
7:8 180:13
195:8,11,20,22
195:23 196:13
198:16
**citizens** 198:21
214:11
**citizenship** 240:2
244:6,13,18
**citizenships**
211:23 212:1
241:2
**city** 132:24
176:24
**Ciudad** 87:10,16

209:2 224:18
225:13 228:11
**Civil** 14:12
**claim** 164:18
165:10 166:15
243:18,25
**claiming** 143:2
147:1,5 239:17
239:19 240:9
240:12 243:14
244:3
**claims** 44:7 169:7
238:10
**clarification**
95:15 198:19
242:12
**clarified** 36:18
87:8
**clarify** 16:4
197:16 228:18
**clarity** 62:23
134:24 220:14
**Class** 43:20,23
44:4,10,13
**classes** 44:14
**clawback** 191:21
**clawed** 248:11
**clear** 62:1,6,16
63:22
**Cleaves** 1:14,17
3:2,5 4:2 5:2
6:3 7:2,6 10:19
14:9 15:11 16:7
16:9,13 20:4
32:15 33:8 37:5
38:23 40:10
62:23 63:18
64:2 68:14,23
70:15 71:3
76:14 79:20
81:11 84:22
86:10 88:25
90:11 105:22
120:21 121:3
121:13 149:13
155:11 156:3

156:25 157:23
163:18 169:24
171:10 176:6
177:5 178:6
179:11 181:6
182:24 183:4
184:5 185:17
189:19 191:14
192:14,21
198:11 199:15
206:16 208:2
209:10 235:6
235:23 244:21
245:9,18
246:10,12
248:4,6,14
249:19 251:1,7
251:14 252:10
252:16
**client** 157:15
**clip** 176:9 187:10
**clo** 137:24
**close** 54:19 97:25
98:11 99:1,20
100:6 101:21
102:20 103:5
106:7,16
110:23 111:13
112:17,24
116:19,24
119:14 120:9
137:24 241:8
**closed** 111:16
**closer** 97:24
99:20 113:4
117:8,9,9,10,10
117:11 182:15
199:11
**closes** 72:16
**clunky** 150:16
**CNN** 172:19
173:18
**COB** 201:2
**collaboration**
231:13
**colleague** 7:14

199:10
**collect** 45:22,25
**collection** 39:19
**Columbus** 23:2
24:11 37:22,24
42:20,22,23
49:14,17 76:4
83:12,13,17
113:22,24
114:2,7,10,12
114:15,19
115:5,24 116:2
116:6,17,22
117:6,14,14,22
119:4 123:7
**column** 70:3 76:8
76:10 77:5,9,19
77:25 78:7,13
78:17 82:11,17
83:4,7 84:16
157:1
**columns** 83:2
**COMAR** 17:5
**combination**
61:12
**come** 57:11 103:4
162:25 164:17
166:20 180:16
223:6
**comes** 55:23
109:14
**coming** 54:16,17
88:14 92:20
93:4,8 112:7
145:18 147:10
147:11,11
167:7,10
187:12 197:7
211:18 212:5
**comisario** 232:12
232:16 233:6
233:10,21
234:7
**Comisión** 17:4
**command** 127:13
**commander**



22:11 28:24
29:6,7,11,12,19
29:20,21 30:10
30:11,14,20
31:4,18,19 47:9
47:15,16,17
161:2 219:13
226:5
**commanders**
32:5,8 45:9
46:18 47:12,12
47:19,20 48:2
78:11 160:8,12
204:23 219:5,6
219:10,10,14
**comments**
162:25
**commissioner**
126:10,16
129:18,25
130:18 135:9
135:11,15,17
135:18,21
**common** 168:14
168:18 174:15
174:18,18
210:20
**commonly** 49:8
57:14
**communicate**
10:8 203:15
204:24 205:5
209:23 216:6
217:19,20
218:1 219:7,20
226:21 227:1
228:22 229:7
239:24 240:1
243:3
**communicated**
204:15 219:15
**communicates**
215:13,19
216:2,20
225:14 226:5
240:20

**communicating**
10:13 203:9
213:18,25
223:17
**communication**
37:3 141:5
203:23 205:2
211:1 212:25
213:20 219:4,8
219:9,12
221:17 229:2,5
231:8 245:12
245:23
**communications**
17:3 161:8
199:23 221:13
222:10 245:14
246:1
**compared** 29:20
40:22 177:7
**comparison**
177:6
**compile** 45:22
**compiling** 69:11
**completely** 72:17
158:25
**complex** 56:8
57:8 65:18
67:22
**component** 182:4
**comprised** 11:8
**con** 85:15
**concern** 185:1
193:13 196:18
**concerned** 62:14
**concerning** 17:6
19:7 199:24
**concerns** 135:4
193:21 194:4
225:15 227:20
**concluded**
249:20
**concludes** 249:18
**conclusion** 15:8
**concrete** 111:1
**condemning**

181:19
**conditions** 102:1
196:11
**conduct** 13:19
86:2 108:5
118:3 122:13
**conducted** 23:23
86:14 105:3
116:18 120:4
152:6 155:2
203:11 206:6
216:9,10
**conducting** 152:3
203:11
**cones** 92:4,7,11
93:25 94:5,10
94:16,20 95:18
95:22 110:17
**confer** 191:4
**conference** 26:7
**confidential** 1:12
248:21
**confirm** 22:15
**confirmed** 17:19
**Congress** 179:7
179:15
**Congressman**
173:25 174:25
175:4,11 176:8
176:20 177:6
**congressmen**
179:18
**Congresswoman**
179:6
**conjunction**
208:25 217:12
**connects** 97:11
100:20
**consequences**
10:2
**consider** 52:24
54:25 55:5
61:15 148:16
195:9
**consideration**
24:6 53:6 56:22

59:5 60:2 64:19
64:20 67:5,8
89:20 115:2
223:4 251:17
**considerations**
50:21 58:22,24
59:2,10,22
72:20 82:24
**considered** 31:17
38:18 58:6 96:2
100:11,12
173:1
**considering**
61:16 76:17
**consistent** 86:19
114:13,14
118:18 189:3
**consistently**
108:16 114:10
118:15 187:2
**consists** 218:19
**Consolidated**
132:22
**constitute** 34:8
**consulate** 204:8,9
**consult** 191:1
**consultants** 25:8
**consulted** 90:18
150:4,22
**contact** 210:4
220:1,4,6,9,13
**contacted** 220:6
**contacting** 220:3
**contain** 123:25
**contained** 90:19
117:24 129:2
130:5
**containing**
129:17
**contains** 37:14
128:10 151:23
176:9
**contents** 130:13
191:20
**context** 102:18
131:13

**continue** 88:24
89:1 129:8
157:21 180:21
185:3 192:20
193:14 211:12
231:7 236:6
**continued** 53:16
**continues** 166:13
167:5
**continuing**
190:15
**contraband**
39:18
**contracts** 56:20
73:18
**contrast** 30:2
**control** 160:5,6
224:9 234:15
234:15,23
**controlling**
224:19
**conversation**
7:14 23:20
85:12,14 148:3
148:7
**conversations**
26:4 27:7,8
**convert** 73:3
**conveyed** 134:23
138:18,21
139:8 161:6
**conveying** 139:1
**convicted** 13:8
**convinced** 157:14
**coordinate** 195:6
209:3 210:20
212:12 218:16
223:17 235:2
**coordinates**
219:3 225:14
**coordinating**
223:21
**coordination**
39:20 217:1
**coordinator** 31:6
201:13 202:13



226:2 230:17
**copies** 253:13
**copy** 11:15,19,21
121:16 156:5
249:7
**copying** 69:7
132:21 141:20
171:14 189:22
201:1 218:8
241:13
**Corchado** 237:6
237:20
**correct** 22:1
23:14,15 28:8
29:8 33:13,17
34:21 38:10
40:11 41:5 42:2
45:6 46:25
48:25 49:4 53:1
53:5 55:1,2
58:12 67:9,16
70:24 71:14,18
73:23 74:21
75:16,24 76:5
77:4,15,16
79:25 81:4,5,24
82:6,9,18 83:16
83:18 84:14,18
85:6,9 89:24
90:16 93:18
94:1,15,17 96:3
96:15,16 98:6
99:24 100:13
101:16 102:6,7
103:2 104:4
106:20 111:18
111:19 115:3
118:12 119:7
121:9 122:10
123:19,23
124:2,16 126:7
126:10,13,16
127:2,5,7 128:4
128:11,14,24
129:3,6,11,12
129:15,19,24

130:6,8,11,14
130:16,21,22
130:24,25
132:2 136:21
139:21 140:21
141:22,23
143:19 145:24
146:4,12
148:18 149:1,2
152:23 153:9
153:14,19
154:19 158:14
159:10 168:12
170:12,25
171:5,22,25
172:3,13 175:2
176:23 178:15
178:18 185:19
185:20,23,24
186:7,14,17,18
186:21 187:16
187:20 188:2,3
188:6 190:3,7
199:20 201:17
202:6 205:18
205:25 206:25
207:17 209:5
210:1,11,12
211:16 212:15
214:15 215:15
216:4,24
218:22,22
223:18 224:21
224:24 225:21
231:16 232:20
233:3 234:10
235:16 236:19
237:12,25
239:7,11,12,21
241:16 242:3
243:2,10,14
244:4,6 251:3
**corrected** 207:12
**corrections**
137:19 138:24
**correctly** 16:20

17:8 22:17 45:2
45:8 46:22
70:25 72:20
82:14 91:15
92:14 97:17
101:7 106:20
128:22 130:2
131:3 133:23
135:6 137:18
137:18,21
138:23 143:5
151:19 152:10
164:25 165:1
166:22 169:12
172:23 174:3
183:22 190:21
202:25 203:5
203:12 206:10
207:11,15
218:21 247:8
**corresponded**
227:17
**correspondence**
159:21 227:18
**counsel** 6:12,22
10:14 14:21,21
14:22,23 18:2,2
18:10,10 20:4,8
20:20 21:6
32:24,24 36:13
37:4 191:1,16
191:24 236:6,7
245:11 246:6
246:25 248:2
253:6,14
**counsel's** 37:6
**count** 46:1,2,9,12
49:5 52:10
**counted** 53:12
**counterparts**
231:20 245:20
**counter-narcot...**
186:13
**counting** 58:14
**countries** 54:17
157:10 231:9

242:16
**country** 195:3
**COUNTY**
251:12
**couple** 18:14
19:5 40:1
142:23 226:25
244:23 246:9
**course** 10:9
118:24 122:12
143:3 148:2,7,8
189:5 228:21
248:18
**court** 1:1,3 6:5
6:10,25 7:16
11:9 16:5 25:3
63:15 252:1,3
**courtroom** 9:24
**covered** 99:15
157:5 199:25
**Cranford** 2:24
6:10
**create** 66:19
188:20
**creates** 57:14
196:20
**creating** 55:17
98:12
**creation** 151:8
152:9 153:21
**credible** 143:2
158:12 211:25
238:10 239:10
243:14
**crime** 13:8,11
**criminal** 10:1
11:12,13,23
43:5
**crisis** 69:16 77:11
79:10 135:13
141:21 142:1,3
142:4,5,10
188:24
**cross** 87:15
102:19 181:13
205:22 208:25

209:2,21,23,23
210:8,8,19,25
214:1
**crossed** 167:9
**crossing** 37:19,21
40:14,18 44:3
86:14,16 87:6
87:20 88:3,19
92:18 93:14,17
95:11 96:15,18
97:2 101:24
105:8 109:2
112:13 122:12
122:20 123:1
156:6 217:10
220:20 221:22
**crossings** 37:15
37:16,17 38:12
49:6,7,19
101:20 116:8
247:4
**CSR** 1:21 253:21
**culmination**
66:13
**cultures** 147:17
**currency** 183:20
**current** 31:23
32:3 42:7
128:20 130:1
130:20 161:13
172:15 173:25
224:16
**currently** 32:1,9
47:7,10 49:7,20
80:13,16 122:8
122:16,17,19
122:24 123:6
123:10 218:16
248:17
**curve** 132:12
154:5
**custodians**
248:18
**custody** 59:25
82:6 83:12
139:16



**customs** 6:23 9:3
11:1 14:12
28:21,22
231:22 245:20
**cut** 101:9
**cuts** 75:10
**C-L-E-A** 10:19
**C1** 134:24 135:14
135:15
**C2** 142:19

**D**

**d** 91:12 128:17
128:18 151:17
195:12
**daily** 39:9,10
61:8 205:1
216:10 220:10
**Dallas** 236:18
237:6
**dangerous**
157:10
**Daniel** 171:18
**data** 45:22,25
46:14,16,22
47:8,24 48:6
54:23 55:3 67:9
67:15,19 69:11
84:8
**date** 38:8 71:5
80:21 83:16
84:13 128:7
204:18 208:16
223:20 253:22
**dated** 81:23
171:12 241:21
**dates** 85:4 96:13
96:14
**daughter** 181:12
**day** 46:4 64:11
66:7,8,12 71:11
76:12 80:10
81:4 82:22
84:17 141:4,4
152:25 160:20
160:21,22,23

160:24 161:1
170:6,11
190:20 194:3,4
194:4,4 216:11
216:12,24
218:17 220:4
232:18 251:14
251:18
**days** 85:9 133:18
218:25 248:21
**de** 17:3,4
**DEAC** 135:8,10
**deal** 136:12
173:22
**dealing** 30:3
39:16 59:6
76:20 204:6
**death** 157:7
**December** 11:8
28:7,9,10 84:9
86:18 152:6
153:13 154:12
154:18,22
158:5 176:9,12
185:22
**decided** 55:8
173:2
**decipher** 147:18
**decision** 67:22
173:3 196:2,14
196:14
**decisions** 67:6
79:16 195:15
222:21
**decision-making**
66:24 78:14
**declaration** 12:9
12:10,11 192:3
**decrease** 193:8
193:18
**decreasing**
193:16
**deemed** 248:21
**default** 78:3
**Defendant** 253:9
253:9

**defendants** 1:8
2:8 4:13,15,20
4:22 6:19,21
25:9 84:8 90:9
149:16,17
191:18 192:1,4
245:11 248:13
252:8
**defending** 19:25
**defense** 32:24
191:24 236:7
**defer** 212:5
**define** 50:22
51:14 85:24
**defined** 44:11,11
51:6,9
**definitely** 76:23
85:13 138:21
158:22 168:7
**definition** 50:5,7
50:8,14,22,23
51:2,25 52:21
52:24 53:23
54:2 60:3,15,17
60:20,23 61:3
97:22,22 99:8
**definitions**
153:24
**degrade** 185:2,4
**degraded** 136:15
184:10,21
**degrading**
184:20
**degree** 43:18
184:11
**del** 37:24 38:9
40:13,17 41:4
48:23 49:15,18
71:21 86:5,7,13
86:16 87:5,20
88:19 91:21,24
92:17 93:13
95:11 96:15
98:25 100:3
101:23 112:13
122:9,11,16,20

170:10 205:17
205:19 217:9
220:20 221:22
221:23 222:8
227:23
**delegado** 225:19
226:6,7,10,12
226:17,21,24
227:2,19
**Delia** 1:21 6:10
252:13 253:21
**deliberations**
191:3
**deliberative**
191:19,25
192:4
**demotion** 127:7
**denied** 164:17
**dep** 25:15
**department** 2:10
6:19,21 8:25
43:5 204:25
**departure** 188:12
**dependant**
195:14 196:4
**depending** 49:10
65:18 101:25
102:2 109:23
119:19 218:19
222:20,21
**deployed** 183:18
**deposition** 1:13
1:17 3:1 4:1 5:1
6:2,7 8:24 9:6
9:13 10:9 11:16
11:17,19 14:12
16:6 20:12,18
20:20 22:15
23:13 25:6,9,12
25:15 26:6 27:4
27:10 31:1
34:14 36:11,22
37:3 39:24
43:14 62:10
63:18 74:23
83:24 122:3

126:2 132:19
200:3 246:24
248:5,6 249:18
249:20 251:2
252:10,18,20
252:25 253:5
253:11,13
**depositions** 11:23
**depth** 59:8
139:17
**deputy** 135:10,10
135:10 139:12
219:19,24
**describe** 30:1
33:25 35:16
39:7 55:21 91:5
92:22 105:16
109:9 116:5
119:13 151:5
175:9,14 225:9
**described** 94:12
150:5 174:5
177:15 212:18
221:12
**describing** 68:5
**description** 4:4
5:4 47:5 91:21
92:16,17 93:23
97:19 101:9,13
104:14 172:9
172:10 176:18
251:15
**designate** 115:11
115:15 229:18
**designated** 15:14
199:18 248:18
**designed** 52:14
52:17 56:3
60:11 73:6
74:17 124:12
**despite** 8:13
**details** 77:1
**detain** 72:16
193:17 195:8
**detained**
54:25 55:5



169:11 193:8
222:18
**detainee** 59:17
196:5
**detainees** 71:1,13
71:18 75:15
76:3,11 77:2
82:6 83:12,18
172:11
**detaining** 57:24
193:12
**detention** 51:13
52:15 53:13
55:20 56:1,2,7
56:18 57:3,23
58:5,13 60:4,7
60:11,12,13,15
60:20,23 61:13
64:9,22 67:5
70:9,13,18,20
70:23 72:3,6,18
73:4,6,7,11,14
73:23 75:3,25
80:24 114:20
170:13 171:2
179:7 183:20
195:5,6,13
**deter** 211:17
**determination**
77:25 198:6
**determine** 89:5,9
89:17,21 98:10
114:15 148:11
161:17 237:23
239:5 241:2
242:25
**determined**
74:11 75:2
147:9,15
221:21
**determines** 221:9
**determining**
67:23 74:10
**deterrence**
211:20
**development**

16:17
**DFO** 34:5 140:4
140:19 230:15
**DFOs** 127:14
139:14,18,19
**DHS** 8:25 136:2
**died** 181:12
**Diego** 212:14,18
212:21 213:18
**differ** 62:4
**difference** 29:14
37:16 40:23
55:25 58:21
67:7,10 99:14
142:16 147:20
154:3,6,9 214:4
223:8,10,11
**different** 21:20
29:18 31:21
35:18 39:14
45:20 53:16
56:10 57:13
63:7 66:15
95:21 110:18
142:7,12
146:11,16,20
147:4,17,17,18
150:2 246:23
**differentiate**
148:22
**differentiating**
246:22
**differently** 146:3
246:15
**difficult** 67:15
170:17 194:3
194:14 212:1
**digital** 25:19
**dining** 56:20
73:18
**direct** 31:10
32:19 33:14
43:10 48:19
69:5 91:17
122:13 134:19
150:19,25

156:18 169:1
202:16 206:1
208:23 211:5
**directed** 48:23
88:2 97:1 105:7
109:2 205:12
**directing** 197:7,9
**directly** 31:9
32:3 92:12
94:21 134:23
160:16 213:21
224:19 243:4
**director** 11:4
22:21,24 29:4
30:16,17 31:24
31:25 33:15,19
33:23 34:5 35:5
35:9,14 38:24
39:5 40:3,11,21
41:9,15,18
44:17 48:17
78:10 123:22
127:2,4,13,16
127:17 138:16
139:24 140:2
190:2,6 202:14
219:11,13,17
219:21,24
226:4 230:16
**directors** 22:13
22:18 24:15,16
34:20,24 36:15
36:16 40:2,4,22
41:7 78:10
139:7,19
**directs** 186:5
**dis** 248:19
**disagree** 125:1,8
177:12 191:24
248:14
**discharged**
165:16 167:25
**disciplined** 13:19
**discontent** 12:21
**discourage**
211:12

**discovery** 62:4
**discuss** 20:7,9
41:23 85:22
139:17 199:19
204:9 248:16
**discussed** 18:9
23:17 27:5,10
108:21 117:4
136:17 142:19
153:7 203:21
204:14,20,21
210:25 212:4
240:6
**discussing** 52:2
236:12
**discussion** 18:4
24:14 59:13,15
159:7 209:8
249:2
**discussions** 24:9
24:19,22 55:10
55:12 246:19
**dispute** 63:13
192:8,11,11
248:9,11,19
**disruptive** 62:17
**distance** 91:7,12
104:2,5 105:25
109:11,13,15
112:19 113:3
116:14 117:5
119:16
**distinction**
242:18
**distinguish** 55:19
55:21
**distinguished**
58:4,7
**distinguishing**
57:22 58:2
**distributed**
121:21 181:10
**distribution**
123:19
**District** 1:1,2,3
6:5,5 252:1,2,3

**document** 14:11
14:16,23 15:10
16:14 21:20
32:16,19 33:9
33:12,15 34:18
51:9 60:24 61:2
68:24 76:7
81:14,17 84:5
89:16 90:10,19
91:18 97:6
98:16 100:16
121:14,20
122:2,6 124:4
131:10 148:10
148:13,20,23
149:15,20
150:5,8,10
151:1 153:25
155:12,14,24
156:11 159:7
159:12 164:2
171:11 186:2
191:13,19,25
192:9,13,14
201:9 207:9,13
207:25 208:1
224:12 232:9
237:3,16
238:24 241:20
248:12 251:15
**documentation**
178:25
**documented**
157:9
**documents** 18:15
18:18,21,22
19:1,4,8,10
20:5,7,9 24:24
25:2,12,15,20
84:21 89:13,15
89:17 133:20
146:21 148:25
150:17 192:16
197:23
**doing** 12:21
25:17 45:5



MAGNA
LEGAL SERVICES

77:22 85:24
106:15 144:12
145:20 168:1
183:7 188:12
203:3 204:11
205:1 213:15
231:11
**DOJ** 14:21 18:2
**door** 174:13
**doubt** 207:2,6
214:17,23
215:3
**downtown**
221:24
**drafting** 33:12
**draw** 190:9
**drawing** 133:15
**dress** 147:17
**drops** 64:24
**duck** 93:8
**due** 172:20 173:5
206:3
**duly** 1:19 7:3
252:16
**duty** 160:8
219:15
**dynamics** 166:2
**D.C** 2:6,12,16

— E —

**E** 2:1,1 3:4,5,6
4:4 5:4 198:5
198:24 253:1,8
**EAC** 135:8,9
140:22
**EAC's** 88:9
**EAC/DDAC**
134:22
**earlier** 21:24
28:6 41:8 42:15
58:8 67:14
96:14 100:10
102:4 121:7
157:3 158:10
159:3,7 180:8
190:23 204:20

205:16 214:13
227:24 245:12
246:24 248:6
**earliest** 164:1
**early** 71:8
**easier** 32:20
150:21 209:15
**easily** 192:6
**East** 27:21
**Eastern** 235:18
**east-west** 92:6
**easy** 210:20,22
**eat** 65:25
**economic** 186:13
**Ed** 32:11
**educate** 211:10
**education** 27:16
27:17
**EEO** 12:10,18
**EEOC** 12:17
**effect** 40:20
196:20 198:25
199:5
**effective** 185:19
189:2
**effectively** 119:8
**efficient** 189:1
**effort** 138:15
**efforts** 134:25
136:8 186:12
**either** 78:10
86:25 109:16
109:19 138:15
153:1 202:14
219:17
**EI** 17:20,22,22,24
22:13 24:1,8
29:4,7,12,13,19
29:20,22 30:11
30:12,15,21
31:2,4,19,19
33:20 34:24
35:5 36:16
37:10 38:4,6,8
38:11,11,13,24
40:4,24 41:3,9

42:16,17,19
43:8,9,17,19,22
44:17 45:14,23
46:5,6,10,19,20
46:25 47:17,17
47:19,21 48:3,6
48:13,16,18
49:3,8,14,18,20
50:4,12,15,18
50:24 52:6,9
53:10 54:10,11
54:24 55:4,19
56:9 57:19,20
57:21 58:3,6,9
61:16,21 62:3
62:13,14,20,24
62:25 63:1,4,5
63:12,16,20,24
63:25 64:4,16
65:8 66:4,7,11
66:19,20 67:2
67:16 68:2
70:25 71:8,13
71:17 72:5
73:22 74:2 77:9
77:13,15,18,21
77:23 78:5,13
78:23 79:3,25
80:11 82:5,9,16
82:21 84:1,8,13
85:4,23 87:6,9
87:15 91:19,22
96:2,10 100:11
100:11 107:10
110:8,16,19
111:12,20,23
112:11,23
115:24 118:11
121:5 125:9,17
131:15,19
132:8 133:22
133:25 134:4,6
134:7 136:9,23
137:12 138:16
138:19 139:1,4
139:24 140:3,5

140:19 141:3
143:15 144:16
145:12,15
146:5,15,25
150:18,20
151:23,25
152:2,13,17,20
153:12 154:12
154:17,22
155:6 157:4
158:4 159:15
159:19,22,24
160:1 162:9
167:1 168:16
170:10,23,24
171:3,13,21,24
174:16,19,22
175:2,5,7,19
176:12,23,24
177:7,8,22
178:3,9,24
179:8 184:7,24
185:22 187:1,2
188:19 190:3,6
197:8,9 199:20
199:20 202:24
203:18 204:24
205:18 206:18
213:15 216:14
218:16 221:14
221:19,24
222:10,11,14
223:6 224:17
231:18,21
232:2 234:13
234:23 241:25
243:9 244:10
245:13,16
246:13,14,17
247:4 248:8,8
**electronic** 249:11
249:11,13,14
**ELP** 218:9
**else's** 187:10
**Elsie** 26:10
**Embassy** 132:24

**emergencies**
188:23
**emergency**
136:16
**emergent** 66:3
184:8,18 194:9
194:10 197:6
**emphasis** 188:7
**employed** 10:23
10:25 195:18
253:15
**employees** 21:25
22:7,10 30:21
77:17
**employment**
27:25
**encompass** 39:11
71:20
**encompassed**
38:9 245:16
**encompasses**
222:25
**encounter** 93:17
94:25 116:16
**encountered**
131:14
**encountering**
95:7 98:18
102:11 145:18
**ended** 86:18
234:19
**enforce** 228:10
**enforcement**
30:8 39:20
**engage** 132:6
185:22
**engaged** 112:6
113:17 117:15
117:23 120:11
132:7,9 159:15
159:22,24
176:13 211:19
**engaging** 231:15
247:14
**enquiry** 169:15
**Enrique** 141:20



ensures 187:19
enter 167:13
  172:20
entering 225:7
entire 41:3 95:23
  106:25 161:17
  187:2,18
  197:20
entitled 15:12
  63:17 84:1
  156:6
entity 227:11
entrance 103:23
  105:17 109:10
  116:6 173:12
entries 44:13
  84:25 213:5
  228:2 234:15
entry 9:7 16:16
  23:21 24:11
  29:16 34:12
  37:11,14,16,18
  38:1,3,5,14,18
  42:16,18 43:4,8
  43:17,19,20,23
  44:4,5,6,10,14
  45:14,19,23
  46:6,10 47:20
  48:3,6,18,19
  49:2,6,9,13,22
  50:2,6 52:1,5
  54:18,19 59:6,9
  60:13 61:5,10
  61:21 62:25
  63:16,19 65:8
  67:2 68:2,3
  69:12 70:22,25
  71:17 75:16,22
  75:23 77:3,20
  77:23 78:4
  80:11,17 82:5
  82:22 83:12,17
  84:1,10 85:23
  87:6,15 91:4
  96:3 100:11,13
  101:18 103:17

104:10,22
105:6,8,14,17
105:25 106:9
106:14 107:4
108:8,9,12,16
108:20 109:3,7
109:10,12
110:3,15,22
111:4,9,23
112:14,21
113:2,6,15,23
114:7,11,16,20
115:5,24 116:2
116:6,17,22
117:4,21
119:22 120:3,6
120:11 121:5
122:9 123:7,11
124:1,5,9,10,20
125:3 129:11
132:6 133:19
134:3 136:23
137:15 138:19
139:5,6 143:16
144:8 152:14
153:8,13
154:11,17,21
155:6 157:5,11
159:15,21
160:1,13 161:3
162:8,9 163:5
163:12 167:1
167:13 168:16
170:6,11,24
171:2 172:16
173:4,13 174:1
174:12,16,22
175:5,8,22
176:13 177:22
178:9 186:7
192:25 193:9
193:11,17,19
193:25 194:20
199:20 205:18
209:25 212:6
222:5,9 225:4

244:13,18
entry's 83:14
  173:15
entry/crossing
  206:2
equal 186:21
equated 75:18
equates 83:13
Escobar 180:1
  225:20 226:8
  226:16
escort 220:18
escorted 151:13
  241:1
escorts 240:19
especially 57:9
  110:9 137:25
  145:13 188:9
  196:16 214:2
established
  152:14
estimate 36:7
  72:9 112:19,22
  117:5 170:15
  170:17 182:15
  190:19 194:14
estimated 72:3
estimates 194:6
  194:15
estimating
  152:19
et 1:4,7 6:3,4
  252:4,7
Evan 2:19 6:24
  26:11 36:12
event 34:2,3,8
  35:21 142:5
  157:17 167:23
events 30:3 41:21
  66:3,5 67:19
eventually
  157:14 166:20
everybody 62:8
everyone's 192:9
Evidence 83:25
EWI 224:9 225:3

234:14,23
EWIs 224:16
Ex 128:17,18
exactly 48:13
  52:18 67:23
  122:7 212:22
  234:24
examination 3:6
  3:7,8 7:4 15:12
  199:13 246:7
  252:22
example 34:7,12
  37:18 39:13,13
  57:9 59:16
  72:13 76:18
  117:8 142:23
  163:11 170:22
  228:14
examples 39:22
exceed 64:23
excepted 124:15
exception 116:8
  137:16 143:2
exceptions
  123:25
exchange 126:6
  200:25 206:17
excuse 165:2
  233:2
executed 45:8
  132:11 251:16
execution 138:11
executive 126:16
  127:2,9,12,17
  135:9,10
exercise 45:4
exhibit 4:5,6,7,8
  4:9,10,11,12,13
  4:16,17,18,19
  4:20,23,24,25
  5:5,6,7,8,9,10
  5:11,12,13 14:8
  14:10 16:12
  32:14,16,25
  33:1,2 68:22,24
  81:10,12 83:21

83:24,25 85:1
90:4,7 121:11
125:25 126:2
132:17,19
134:10,12,13
141:11 149:8
149:15 155:10
156:4 159:5
163:17,20
171:9,11
175:25 176:2,7
183:1,2,6,9
189:18,20
191:16 200:7
200:25 206:13
206:16 214:7,9
218:4,7 224:4,6
236:10,14
238:19,21
241:7,10 242:9
exhibits 4:1 5:1
  253:13
exigent 195:8
  196:12 197:5
exists 142:12
exit 173:12
  ███ 99:20,21
expect 148:9
expected 143:7
  143:16
expecting 248:9
expedited 197:3
  197:24 198:2,8
  198:17,22
exper 125:4
experience 27:16
  42:17 43:13,15
  74:13,16 125:8
  162:11,15
  163:12 168:14
  172:25
experiences 66:5
experiencing
  131:20 146:6
  184:18 246:18
  246:21



expert 25:5
**Expiration**
253:22
**explain** 29:14,24
37:15 40:17
72:1 80:15
82:20 83:9
106:1 195:22
247:11
**explanation**
145:19
**express** 139:13
140:7
**expressed** 158:12
185:1 251:17
**expressly** 129:15
██████ 2:1
**extent** 62:3
**extra** 229:18,20
**extremely** 104:13
136:11 174:19
180:24
**e-mail** 18:5 47:6
47:8 48:6,12
69:1,5,20 126:3
126:5,9,12,15
126:23 127:1
128:2,3,9,13
129:17,23
130:13,16,19
131:23 132:20
132:23 133:11
134:14,20
139:10 140:19
140:22 141:12
141:18,24,25
142:11,11,18
143:11,21
145:21 147:23
148:16,25
149:12 159:13
159:20 163:20
164:1,2,14
165:14 166:13
167:5 169:2,20
171:12,17,18

171:20 172:8
189:22 190:10
190:17 191:2
191:21 200:25
201:8,15,17,21
202:1,11,17
203:14 206:17
206:20,25
207:4,17,18
208:20,20,24
211:5 212:10
212:11,18
214:9,19 215:7
215:8,10 218:7
218:13,23
223:15 224:7
224:11,13
225:13,17
227:6 229:9,12
232:10,11,15
232:24 233:11
234:4,6 236:16
237:4,5,16,19
238:23 239:5
241:12,20,22
243:7
**e-mailed** 47:6
**e-mailing** 10:13
**e-mails** 168:24
171:1,4
**E-S** 10:20

**F**

**Facebook** 13:23
14:2,4 180:8,9
180:12,13,16
181:2,20
**facets** 67:24
**face-to-face**
226:22,23
**facilitate** 212:13
**facilitation**
186:14
**facilities** 52:14
56:19 57:17,18
60:10 73:14

166:15 173:7
173:12 179:8
193:8
**facility** 53:7 56:3
56:3,18 60:13
72:22 172:21
173:5,14,19,21
174:11 175:21
222:17
**facility-wise**
70:23
**facing** 92:6
100:25 231:11
**fact** 130:18 158:4
158:16 170:18
170:22 212:2
213:4
**factors** 66:14
170:8 222:16
222:21
**facts** 90:18 131:9
150:5,22
**fair** 15:17 126:22
133:25 145:11
145:11 153:2,4
182:1
**fairly** 192:6
**fall** 29:16 37:17
186:17 204:22
223:25 224:1
**falls** 37:19
**fam** 109:5
**familiar** 21:23
43:7,16 69:20
105:13 109:6
116:1,4 119:10
121:8 165:2,3,6
**familiarity** 43:10
43:12 167:22
**families** 135:3
146:7,9
**family** 57:9,10
143:1 145:23
146:1,14,23
147:9 148:16
196:6,7,16

246:15,18,19
246:20
**far** 76:8 82:12
106:12 131:14
**farther** 170:16
170:19
**fashioned** 111:1
**fast** 195:16
**father** 181:12
**favor** 192:15
**fear** 143:2 147:1
147:5 158:12
211:25 238:10
239:10,17,19
240:9,12
243:14,18,25
244:3
**February** 17:16
18:8 86:20,25
87:2 110:19
157:3 189:8
**Fed** 234:8
**federal** 14:11
83:25 210:21
221:1,9 224:16
227:12,14
228:9,11,13,16
228:19,19,23
229:1 233:8,23
234:12,22
235:3
**feel** 162:16
████████
████████
████████
████████
████████
████████
**felt** 24:1
**fence** 97:10,11
100:19,20
110:17
**Fenn** 2:4 3:6 6:14
6:14 7:5,11
14:7,9 15:9,11
15:21 16:4,9,11

16:13,25 17:2
20:4 22:4 26:12
32:13,15 33:3,5
33:8 34:17,19
35:1,3 37:5,8
37:10 38:21,23
40:8,10 44:4,15
44:24 45:17
47:24 48:4,14
49:2 50:4 52:8
53:21 54:9,23
58:3 59:10
60:14 61:4,18
62:7,22 63:13
64:1,2 68:1,8
68:13,21,23
69:19 70:19
71:12 76:25
79:2,11,20 81:2
81:9,11 82:2,4
83:21,23 84:24
85:2 86:15
87:13 88:2 89:7
90:4,6,21,25
93:23 95:5 97:5
97:7 100:15,17
101:10,13
104:15 105:6
105:13 106:6
107:21 108:25
113:13 115:17
117:20 121:3
121:11,13
124:7 125:1,13
125:23,24
126:1 128:2,5,9
128:15,19
129:9,16,20,22
129:25 130:9
130:14,15
131:22 132:16
132:18 133:10
133:13 134:9
134:11 136:1,7
137:10 140:12
140:18 141:8


MAGNA
LEGAL SERVICES

141:10 142:9
142:17 143:10
143:14 144:14
148:15,24
149:7,9,13
150:9 151:22
151:24 153:19
154:1 155:3,9
155:11,16,23
156:3,22,25
157:22,24
158:23 159:4,6
159:14 162:7
163:3,15,16,18
166:8,13
168:24 169:1
169:22,24
171:8,10
174:15,25
175:10,14,23
175:24 176:3,5
176:6,16,18
177:2,5,17
178:8 179:5,11
179:18 180:7
180:15 181:1,5
181:16 182:1,9
182:14,18,24
182:25 183:4
183:14,16
184:13 185:10
185:17 186:1,3
186:9,11 187:9
187:14,24
189:17,19
190:13,16
191:4,12,23
192:19,21
198:15 199:9
200:2,17,19
204:14,20
205:21 242:8
245:3 246:25
247:23 248:3
248:24,25
249:3,14 253:1

253:8
**Fernando** 31:8
201:1
**fewer** 186:19
**fie** 195:4
**field** 11:1 17:23
22:13 29:7,13
29:17,19,22
30:3,4,12 31:5
31:19 33:16,19
33:20 34:24
35:6 36:16
37:11 38:4,6
40:4 41:9 42:16
42:19 43:8,17
43:20,22 45:14
45:23 46:7,8,10
46:20 47:2,17
47:21 48:3,6,18
49:3,14 50:4,16
50:19,24 54:11
55:19 61:21
62:3,13,14,24
63:1,4,5,16,20
63:24,25 67:2
68:2 76:21
77:13,15,18,23
78:13,23 79:3
79:16 80:12
85:23 110:16
110:20 111:10
111:21,23
112:23 115:24
121:5 123:22
123:22 124:14
124:17 126:19
126:21 127:4,5
127:16,17,21
131:19 134:4
136:23 138:16
138:19 139:1,3
139:4,19,24
140:3,5 154:12
154:18,22
159:15,22
160:1 162:9

167:1 168:16
170:23,24
171:22 174:16
175:5,19
177:22 178:3,9
190:3,3,6,7
195:4 221:14
224:15 230:18
231:19 232:19
245:16 248:8
**Fields** 2:4 3:7
6:16,16 7:15
199:10,14,16
200:11,14,21
200:23,24
201:7,11,14,16
202:2,7 205:15
205:16 206:12
206:15,21,23
208:2,6,11,17
208:18,21
209:15,20
212:9,11 213:3
214:6,8,20
215:2,5,6,10
216:19 217:23
218:2,3,6,12,15
219:25 221:20
224:3,5,10,13
229:8,11 232:8
232:15,23
233:1 234:2,3,6
235:12,21
236:4,8,11,21
237:1,2,5,15,18
238:9,18,20,22
238:25 240:11
240:19 241:5,6
241:9,19,22
242:24 243:20
244:14,20,22
245:2,9,25
246:5 253:1,8
**Fifth** 4:21 149:17
**figure** 31:1 74:18
**filed** 25:2

**filing** 12:18,19
**filled** 41:12 42:6
42:13
**finally** 203:7
210:5 211:5
227:5 234:3
241:7
**financially**
253:17
**find** 17:14 24:3
90:2 196:23
**finding** 182:8
**fine** 68:15 156:20
192:18 235:25
245:1 249:14
**finish** 7:24,25
**finished** 199:12
**Firm** 253:22
**first** 4:23 7:3
10:20 14:24
18:2,8 23:8
27:24 40:10
42:21,24 43:2
61:19 69:6 86:5
90:23 97:7
116:16 123:18
131:15 137:16
137:17,20
138:23 141:18
142:17 152:18
156:6,14 157:1
168:25 172:18
178:13,13,17
186:12 195:6
195:12 198:13
200:6 202:17
204:17 208:23
209:7 222:24
223:14 228:14
228:17 234:4,5
237:4,16
238:23 241:20
248:5
**first-chair** 19:25
**first-in-time**
134:20 201:8

201:17 206:20
215:7 224:11
**fiscal** 187:1
**fit** 75:8 102:15,17
103:1
**five** 12:15,16
49:5,7
**fixed** 54:4
**Flanagan** 141:20
**flat** 136:14
**flip** 15:9 32:18
35:1 37:8 38:21
40:8 156:17,22
183:14
**Floor** 253:23
**Flores** 59:25
**flow** 142:20,24
143:8,17,20,23
189:3
**FMAUs** 142:25
**FMUAs** 141:14
142:20 143:2
**focus** 156:19
183:19 184:11
236:13 238:22
**focused** 142:25
145:22 146:8
**folks** 190:19
**follow** 37:6
191:21 245:10
**following** 209:7
252:15 253:6
**follows** 7:3
252:25
**font** 209:10
**food** 56:19 73:18

**force** 247:16
**forced** 241:25



**forego** 192:12
**foregoing** 251:1
251:16
**foreign** 38:12
198:21,22
199:7
**forklifts** 111:3
**form** 44:21 49:1
86:8 87:7,22
88:23 93:20
95:3 104:11,25
105:10 107:17
108:24 113:10
115:8 117:17
125:6 141:5
178:5 179:2
240:24 242:11
243:15 249:9
249:12
**formal** 53:11
59:15,20 60:16
60:21 191:21
**format** 7:21 70:2
81:18
**former** 22:11,21
24:15 40:2
128:17 219:10
**formula** 61:4,7
**Fort** 37:18
**forth** 76:21 95:25
**forward** 69:2
141:14 164:24
166:17,20
**forwarded**
128:13 129:16
201:16 202:10
237:19
**forwarding**
132:23
**found** 57:11
**foundation** 78:20
125:20 127:24
137:5 140:10
148:20 162:19
238:5 240:16
**four** 26:16

109:19 123:22
133:5 186:17
186:18 188:1,4
**fourth** 4:14 70:3
90:8 149:23,24
186:14
**Francisco** 206:17
212:11
**Franklin** 2:11
**FRE** 4:12
**frequency** 23:22
**frequent** 175:9
230:3
**frequently** 46:2
64:24 216:6,12
226:23 227:1,3
233:22,25
**Friday** 133:12
218:25
**front** 77:1 188:2
223:13
**full** 44:6 97:8
134:23 186:4
225:23 227:8
**fully** 190:18
**function** 155:19
**functions** 73:17
**further** 93:11
101:25 102:6
116:12 225:17
232:13 248:2,3
248:12 253:14
253:17

_____
**G**
**G** 3:5 4:4 5:4
**gain** 162:9
216:25
**Garcia** 164:15
165:7 169:3,6
**gate** 97:25,25
98:3 100:1,5
103:23 111:8
**gates** 99:15 100:2
111:10,11
173:12,12

**gears** 85:21
**general** 8:19 31:1
78:18,22 80:8,9
87:6,9 95:20
101:19 102:14
166:4 180:14
198:22 203:21
214:22 227:19
231:5,7 247:13
**generally** 12:20
12:23,25 21:11
23:16 34:2
35:20 36:24
61:15 62:12
65:5 66:22
79:15 93:4
116:11 140:12
156:13 160:4
167:20 220:3
221:6 229:3,15
**gentle** 224:18
**genuine** 148:13
**geographic** 40:25
143:13
**getting** 149:11
182:14 199:11
208:16 241:7
**girl** 164:20
**give** 7:17 34:7
39:13 54:20
64:7 170:13
200:9 211:22
221:2,3 232:18
**given** 7:20 66:12
76:12 87:23
103:5 105:2
113:15 117:8
161:14 170:11
173:10 178:19
178:25 197:1
206:8 209:24
251:18 252:18
253:4
**giving** 54:3
178:14
**Gloria** 141:19,21

**go** 7:13 8:18
15:19 20:3
32:25 33:4 44:1
46:19 54:1
57:14 58:23
59:18 61:7 65:6
66:23 70:15,15
71:3 73:17
76:14 78:21
79:8 82:2 86:10
89:1 93:21
102:21 105:12
105:20 120:22
125:7,21
127:25 135:23
144:5 148:6
149:12 153:18
158:20 159:1
162:23 166:5
168:10,24
170:16 177:11
177:14 178:6
179:23 182:16
185:8,10 191:5
195:11 196:1,9
198:11,11
201:7,14 211:3
212:9 215:6
216:17 218:12
224:10 232:14
232:18,24
233:16 234:4
237:3,15 238:6
240:25 241:19
244:23 245:18
247:16
**goes** 59:8 64:24
71:10 79:1
135:5 150:12
165:14 237:22
243:8
**going** 8:24 9:13
15:24 26:3 37:1
53:8 62:24
63:15 65:15,22
65:23,23,25

67:23 68:8,17
76:18,19,21,22
95:4 99:2
101:22 102:13
103:4 106:1,17
112:18,25
114:16 116:20
120:10,19,24
157:19 161:16
182:10,20
185:13 191:8
195:12 199:9
205:23 213:17
235:6,8,17,24
236:3 245:5
248:4
**GoM** 133:18
224:9,18,23
**Gomez** 22:12
166:14,16,19
224:14 226:5
**Gonzalez** 132:21
133:2,12
**good** 7:6 24:1
32:2 36:7 38:24
39:4,8,15,23
57:11 68:10
120:18 139:25
141:20 182:9
192:9 194:16
199:15 210:24
**governing** 50:15
**government** 17:5
199:23 224:23
231:16 242:1
**governmental**
12:4
**graduate** 27:22
**graduated** 27:25
**Grande** 181:13
**great** 200:21
201:9 202:2
237:1 241:21
245:2
**Grill** 28:5
**ground** 7:13 92:2



165:17
**group** 164:16,20
179:24 180:9
180:12,13,16
181:2,20
215:18 218:18
223:12
**groups** 61:23
64:7 229:20
**grupo** 204:24
205:5 215:13
215:17,21
216:3,6,13,20
216:23 217:19
219:11,16,21
225:18 226:2,4
226:11,13
227:19 239:24
240:1
**Grupos** 17:5
**GSA** 53:11 58:17
58:18 173:3
**guard** 56:21
**Guatemalans**
164:16,22,24
166:17 167:7,8
167:11
**Guerrero** 157:6
**guess** 11:8 18:18
18:20 19:17
30:1 31:15 47:5
49:10,11 50:21
59:24 64:11
74:15 81:22
94:20 95:14
99:25 117:13
125:13 137:8
147:13 152:24
153:16 160:9
160:16 169:18
180:14 193:23
210:23,24
214:22 225:12
**guidance** 4:5
44:19 50:18,20
59:12,14,18,25

60:16 122:8,13
122:14,17,19
122:22,24
123:3,6,8,10,13
124:8,13 132:5
132:10 138:12
138:14,18
139:8 140:7,21
145:15,22
152:5,16,22
159:2,9,17
204:19 213:4
246:14,22
**guide** 121:8,17
**guys** 182:13
208:10 235:11
236:23

———————
**H**
**half** 68:9 75:12
75:12 92:8,9
101:1,2 182:11
187:6
**halfway** 183:16
**halls** 56:20
**Hancock** 37:18
**hand** 178:10
251:18
**handed** 178:12
**handing** 245:10
**handle** 44:5,11
59:19 85:18
184:14,18
197:6 211:21
212:2
**hang** 93:24
**happen** 244:7
247:18
**happening** 54:6
85:17 234:19
**happens** 57:13
196:18 220:14
247:19
**happy** 150:19
156:18 201:24
**Hardney** 106:23

**HARRIS** 251:12
**Hawkins** 22:20
22:23 23:11,17
24:4 27:9
**head** 7:17 226:7
226:12 231:4
**heading** 70:4
90:25 91:23
151:1,24
**headquarters**
18:11 51:12,16
76:22 127:21
132:4,10
**health** 17:17
107:8 173:11
173:20,22
174:10 198:20
216:9
**hear** 10:15 79:21
110:12 126:20
181:5
**heard** 7:12 49:21
49:24 50:2
192:24 193:4
**hearing** 182:8
187:10
**heavily** 217:5
**heavy** 109:16,23
**Hector** 30:18
33:16 140:4
163:21 171:14
189:23 190:2
224:8
**held** 6:7 65:14
70:25 76:4 82:5
143:4 147:25
194:10 230:4
231:22,24
234:1
**help** 135:2
152:12 162:3
163:4,10
234:23
**helped** 122:13
**helpful** 44:15
145:20 169:23

187:13
**Hennessy-Fiske**
241:23 243:8
**Hey** 155:18
**HHS** 172:20
173:19
**Hi** 199:15
**high** 61:19
**higher** 71:6,7
131:16 233:20
**highest** 27:17
**highlight** 202:1
215:9
**highlighted**
183:17
**highlights** 132:22
229:22
**high-level** 229:19
**hint** 224:18
**hired** 25:8
**historically**
194:21
**hit** 197:5
**hitting** 184:24
**Hmm** 27:23
**hoc** 204:7
**hold** 15:23 52:16
52:20 54:7
55:16,24 63:17
72:25 135:2
136:21 137:2
149:10 248:4
**holding** 46:1,3,13
56:4 58:10
72:15 73:2
80:13,16 169:8
172:3 175:20
**holds** 56:6
█████ 99:15
**Homeland** 8:25
135:16 183:10
**honest** 35:24
214:24
**hoping** 152:12
**hot** 102:5
**hotels** 221:5,7
**hour** 26:18 68:9

75:8 182:11,15
235:7,19
**hours** 19:6 26:18
58:17 71:9
218:18,18
235:14,17
**House** 164:15
165:4 175:1
**housing** 172:11
172:22
**Howe** 20:16 69:1
69:7 126:6
127:1,4,20
128:13,17,18
128:19 129:1,5
129:9 163:21
171:14 189:22
190:10
**Human** 4:23
156:5,14
173:11,20,22
174:11
**humanitarian**
215:22
**Humphries** 62:9
132:21 133:3
**hundred** 18:22
106:2
**hypothetical**
98:20 194:18
**Hypothetically**
102:17

———————
**I**
**ICE** 57:1,3 196:2
196:13
**ICRO** 57:2,11
73:13 193:8,12
195:6,7,14
196:10,22
197:6 222:19
**ICRO's** 59:16
222:20
**ID** 164:22
**idea** 24:1 161:13
197:15 238:7



240:17
identity 251:15
ILLEGAL 237:8
illegally 156:7
  225:7
ILU 229:3
  230:19
imagine 169:17
immediately
  34:6 92:4 94:6
  101:4 159:16
immigrant
  211:10
immigrants
  197:21,22
  198:1 209:1,4
  211:22 243:13
  244:15
immigration
  2:11 28:18,19
  30:8 31:15,15
  39:18 86:22
  87:11,17
  160:25 177:24
  189:6 203:16
  204:9,15,21,25
  205:4 206:19
  207:21 208:25
  210:18,22
  211:2 212:23
  212:24 213:12
  213:21,24
  215:18,23
  217:2,6,12,15
  219:21 220:18
  220:25 221:8
  221:13 222:4
  222:12 223:22
  225:15 226:7,8
  226:13,14
  228:5 230:24
  231:23 242:13
  245:15,21,22
  246:2
Immigrations
  227:20

Immigration's
  221:17
impact 4:12 76:9
  76:10,17,22
  77:8,20 78:1,8
  79:24 80:3,8,12
  84:1,6,16,17,18
  85:8,9,16,16,19
  188:15 223:1,2
  223:3
impacts 224:19
impede 99:21
impedes 173:15
impetus 61:14
implement
  110:20 187:19
  190:18 207:11
  213:16 246:14
implementation
  16:19 135:5
  137:20 138:11
  140:20
implemented
  85:22 110:15
  118:15 122:9
  122:16,18,20
  122:25 123:6
  123:11 143:19
  143:23 152:18
  152:21 158:11
  177:7,8 178:13
  178:17 194:9
  210:16,17
implementing
  44:18,25 141:3
important 7:22
  193:25 194:13
  228:6
importantly
  58:16 75:7
impossible 58:20
  66:14 102:23
improper 225:12
inaccurate 52:10
  99:7 129:2
  130:5,17

inadmissible
  149:4 183:19
  197:21 198:1,5
  198:23
inadmissibles
  187:3,5,7
INAMI 135:1
  207:17,20
  208:12 209:21
  209:22 211:15
  211:17 212:4
  215:21,24,25
  217:20 218:17
  219:3,7 220:1
  220:10,13,16
  223:17 224:15
  225:13 226:10
  240:19 245:13
INAMI's 224:20
  225:9
inappropriate
  158:8,22 168:4
  180:24 181:2
inbound 38:15
inception 11:6
  28:7
incident 168:22
include 25:19
  26:7 53:20
  76:23 85:19
  95:17 166:1,9
  208:19 244:19
included 72:7
  75:5,6,7
includes 188:10
  253:6
including 16:17
  44:6 53:12
  56:17 91:6
  151:9 155:6
  192:1,3 228:12
  243:21
incorrect 158:8
  186:22,25
  218:24
incorrectly 213:9

increase 134:25
  136:8 188:16
increased 189:14
increasing 193:6
incursion 98:13
independent
  25:22
INDEX 3:1
indicated 96:14
  96:14 98:16
  242:13
indicates 82:4
  83:11 124:5
  141:25
individual 73:16
  139:5,6 216:14
individuals 34:23
  133:6 210:7,9
  216:21,23
  220:9,15
influence 78:7
Info 189:23
inform 160:13
  161:24
informal 59:15
  137:6 145:15
information
  22:16 24:3,5
  46:17 54:13
  63:7 77:10
  78:12,16,24,25
  79:13,13,15
  82:16 83:2
  129:3,6 130:6
  139:1 161:6
  207:3,16
  214:18 215:4
  217:21 253:4
informed 161:23
  191:18,23
  220:23 224:16
informing 161:3
infrastructure
  95:14 100:8
  173:7
infrequently 36:1

initial 190:9
initially 164:23
  166:16 201:10
initiate 186:5
INM 17:4 133:14
input 77:25
inputting 77:8,19
inquiry 202:15
inside 164:21
insisted 166:18
inspecting
  186:16 187:25
  188:5
inspection 89:10
  89:23 144:11
  144:12 146:22
  147:21 148:10
  151:7 225:4,8
  228:2 234:15
  241:3 244:5
inspections
  144:13
inspector 28:18
  28:19,22 227:8
install 100:2
installed 100:5
instance 1:18
  26:1 42:19
  48:24 137:11
  167:20,21
instances 112:10
  158:3
Instituto 17:3
instruct 37:2
instructed 8:12
  89:13 113:19
  113:20 115:15
  143:25 144:1
  145:2,9
instructing 103:3
instruction 37:6
instructions 88:5
  88:11 103:5
  113:16 117:24
instrument
  251:16



**intake** 218:9,17
224:17
**intakes** 218:16
219:3 220:1
**integrated**
213:25
**intelligence**
39:19
**intend** 37:6
191:18
**intent** 112:6,8,9
**intentions** 191:13
**interact** 33:22
35:12,19,24
36:1 39:4 41:17
133:5 175:11
179:14,19
**interactions** 34:1
35:17 39:8
41:20 175:15
**intercepting**
65:24
**interest** 161:18
**interested** 253:18
**interfere** 111:6
**intermittently**
189:8
**international**
92:5,6 93:15
94:6,19,23
95:19 97:13,16
98:1,4,12,15,21
99:6,17,24
100:5,6,23,24
101:17,21
102:9,20
103:24 104:3,6
105:24 106:8
106:12,16,24
107:8,11 108:5
109:12 110:2
110:22 111:7
112:17,20,25
113:3 115:13
116:13,19,23
117:1,6 119:15

119:16,21
120:5,7,9
137:24 138:3
142:23 143:8
143:17 144:15
154:7 157:8
161:9 220:19
229:3 230:19
234:9,17
**interrogatories**
4:15,21 21:1,8
21:21 90:9,14
137:15 149:17
149:25
**interrogatory**
21:4,9,13 91:1
91:3 151:2,4
**interrupt** 57:16
70:16 119:3
170:20 185:7
**interruption**
191:1
**introduced**
191:16
**involve** 64:9
230:9,10
**involved** 12:1
13:2 55:12
69:16 73:12
74:6 174:13
182:2 213:24
217:3,4,5,15
233:18
**involvement**
12:25 182:7
217:18
**in-person** 18:7
**issuance** 152:4
152:15
**issue** 57:7,24
68:3 136:10
197:5 245:10
**issued** 51:19
121:8,17,24
122:1 131:6
138:14 152:22

159:2,9,17
179:3 181:18
181:24 182:3
**issues** 56:15,15
82:12 139:16
206:3 228:15
248:15
**issuing** 182:2
**it'll** 116:18
222:16 238:23
**I.e** 210:6

_____
**J**
_____

**J** 2:9 3:8 253:2,9
**January** 8:21
86:19 87:12,13
104:17,20
107:13,24
112:3,4 113:6
189:7
**Jersey** 92:3,7,11
93:24 94:3,9
95:17 100:22
100:24 101:1,4
110:16 111:2
**job** 11:3 12:21
28:17,20 29:18
45:12 154:8
**Joe** 32:11 132:20
**John** 22:20 32:11
134:15 141:13
**join** 241:25
**journalist** 157:4
**journalists**
157:11
**Juan** 206:23
224:14 225:25
227:6 229:9
232:10
**Judge** 192:12,15
**Judging** 162:24
**Julian** 215:10
**July** 55:4 84:25
84:25 85:3,3
112:2,9 179:8
227:23,24

228:15
**June** 68:25 69:10
71:1,16 75:15
75:21 76:3 77:9
79:23 80:3,10
84:9,11 126:5
128:3,8,10
129:17 130:24
131:20,23
159:8,20,25
163:20 170:2
171:13 174:2
183:9
**Justice** 2:10 6:19
6:21
**Juárez** 87:10,16
176:20,22
209:2 214:2,12
224:18 225:13
226:8 228:12
229:24

_____
**K**
_____

**K** 1:7 2:5 6:4
252:7
**Katherine** 2:9
3:8 6:18 253:2
253:9
**Katherine.j.shi...**
2:13
**Katie** 155:23
**Katy** 183:2
191:12 200:10
**keep** 64:22
120:18 167:10
235:8,24 236:3
**keeping** 189:3
**kept** 160:3
**Kevin** 1:7 2:24
6:4,9 14:7 15:9
16:11,25 32:13
35:1 38:21
68:21 81:9 82:2
90:24 101:11
121:11 125:24
126:6,9 128:5

128:15 129:18
129:20,22
132:16 133:10
134:9,14 141:8
141:13 149:7
150:13 155:9
156:22 159:4
169:22 171:8
175:24 176:16
177:2 182:25
185:9 189:17
190:14 201:7
201:25 202:3
206:12,22
208:19 211:8
212:9 214:6
215:2,6 218:3
224:3,10 229:8
232:8,23 236:9
236:21 237:2
237:15 238:18
241:6,19 252:7
**key** 37:13
**kind** 68:9 71:9
107:1 111:7
114:23 127:9
154:5 196:20
204:9 213:22
**kinds** 136:12
**Kirstjen** 183:10
**knew** 112:8
188:18 189:12
213:13,17,18
**know** 8:17 12:14
13:3 21:7,7,19
25:1,4 30:25
33:1 34:5 41:23
42:6,12,14,22
45:19 46:8 48:5
48:12 50:1,14
51:4,5,8 54:13
54:13 56:13
58:7,24 59:5,14
60:3,5,6,14,19
61:2 64:18 67:3
67:10 68:3 69:9



69:10,23,25
70:2,11,19
71:24 73:1,5,8
73:12,18,25
75:8 77:7,24
78:12,16 79:3
79:14,18,22
80:15 86:15
89:20 94:2
95:22 97:24
103:21,21
105:25 106:10
106:12,22
107:2,10,13
108:1,2,11
109:15 110:5,6
110:9 113:18
113:20 114:24
117:25 119:25
121:23 124:24
127:20 133:2
133:18 134:3
135:4,25 136:7
136:12 140:11
140:17,24,25
141:2,3 143:7
143:16 144:1
144:24 145:5
145:19 155:23
158:21 160:17
161:21 163:1,2
164:4,5,6,7,10
167:3,25
169:14,25
174:12 175:7,9
176:2 180:2,3,4
180:7 181:18
181:22 182:12
188:14,18,19
189:11,16
192:4 193:2
194:22,22,23
195:12 196:10
196:15 197:8
200:12 205:2
207:6 208:14

208:22 210:15
210:19 211:19
211:20 213:9
213:11,19
216:25,25
217:1,6,8 218:1
219:2,6 220:5
220:11 225:23
226:15 227:8
227:23,24
228:7 229:2,7
229:20,23
230:24 231:1
231:10 232:12
233:7,12,15,18
233:18 234:16
235:9 241:2
242:22 244:6
245:20,21
**knowing** 194:9
**knowledge** 9:14
23:22,25 24:2
43:11 69:18
124:24 125:9
157:16 161:16
182:7 210:12
242:17
**known** 180:14,16
251:14
**Koseor** 69:6,8
128:3 129:2
171:13
**Koseor's** 128:9
128:13
**K-rails** 111:2

_____
**L**
**labeled** 76:9
214:8
**Lado** 1:4 6:3
24:25 252:4
**lag** 7:21
**land** 173:4
174:11 175:21
228:12
**lane** 91:25 92:2,8

92:9,17,25
95:11 97:9,11
97:12,19 99:12
100:18,21,21
101:3 103:7,16
103:17 106:5
116:11,12
119:18
**lanes** 91:25 95:17
97:10 100:8,19
109:17,20
119:16
**Laredo** 127:5,17
127:21
**large** 54:15 61:23
64:7 66:4
109:18 110:24
111:17 146:6
173:4 176:24
228:16
**largely** 236:12
**larger** 56:22
**largest** 225:15
**lasted** 24:16
**late** 71:7 87:12
87:13 146:2
152:18 159:19
189:6
**lateral** 127:10,15
**law** 2:15 50:10
166:19 167:1
**laws** 50:13
211:24 228:10
228:11,12,19
228:20
**lawsuit** 13:17
27:13
**lawyer** 157:14
162:10,17
**lawyers** 27:3,8
163:4
**lay** 58:19
**laying** 75:10
**layout** 43:16
92:24 93:2
95:13 105:14

109:6 116:1
119:11
**lead** 189:14
**leader** 126:13
**leadership** 47:1
74:2 78:9
124:19 125:2
125:14,16
131:17 139:3,7
160:5 175:18
229:19 230:9
230:18,19
**learn** 186:24
**learned** 74:15
75:12 122:5
**learning** 132:12
154:4
**leave** 140:13
**led** 111:11
**left** 70:4 86:25
127:20 182:13
235:10
**legacy** 11:7
**legal** 1:24 2:23
6:11 15:7 21:20
148:7 253:23
**Legally** 197:21
**LegalVision** 1:23
**legitimate** 143:3
147:24 148:2
148:17 193:3
**length** 106:25
**Leos** 22:22 23:6
23:12,18 24:10
27:9
**letter** 191:22
**let's** 15:17,17
61:18,18 81:8
86:5 96:1 100:9
104:8 108:7
113:22 120:22
125:23 163:16
168:10,24
185:10 189:17
233:1,2 245:3
**level** 27:17

127:15 131:19
234:8
**levels** 184:8
230:10
**Liaison** 30:8
229:3 230:19
**limit** 85:25 87:20
88:6,7,16,20
89:12,23 91:5,7
91:10,11,13
92:10,12 93:13
93:18,25 94:8
94:12,23 95:1,7
95:18 96:20
97:14,14,22,23
98:9,15,19 99:4
99:8,23 101:5
101:17,21
102:8,12 104:3
106:19 107:3,6
107:14,22,24
109:1 110:2
112:15,20
113:4,7,14
115:4 116:21
117:6,16,22
120:2,7 136:24
144:13 146:11
146:16,18,24
147:8,14 151:8
151:16 152:3,9
152:14,21
153:21 160:3
160:14 161:4
161:12,21,22
162:8 165:20
166:25 247:3
**limitation** 91:7
151:9
**limited** 16:17
23:22 24:10
116:7 195:22
**limiting** 199:6,6
**line** 42:21,25
43:2 45:10 69:2
76:16 77:3,6



80:13,16 83:5
85:25 86:23
87:4,20 88:6,7
88:16,20 89:13
89:23 91:5,7,8
91:10,12,13,14
92:5,6,10,12
93:13,15,18,25
94:6,8,12,23,24
95:1,8,18,19
96:20 97:14,14
97:15,16,22,23
98:9,15,15,19
99:5,6,8,23
100:23,25
101:2,5,17
102:8,10,12
104:3 106:8,19
107:3,6,11,14
107:22,24
109:1 110:2,2
110:22 112:5
112:15,17,20
112:20,25
113:4,4,8,14
115:4,12
116:21 117:6
117:16,22
119:21 120:2,7
121:25 132:22
134:16 135:2
136:21,24
137:9 141:14
142:24 143:8
143:10,17
144:13,15
146:11,16,18
146:24 147:8
147:15 151:9
151:16 152:4,9
152:14,21
153:21 156:6
160:3,7,14
161:4,12,21,22
162:8 163:21
163:23 165:20

166:25 172:3
177:14 183:11
185:4 186:4
188:20 189:6,8
189:23 223:14
247:3 250:3
**LinkedIn** 13:23
13:24,25
**list** 59:21 188:1
209:3 210:9
216:13 217:2
217:13,15
221:10 223:7
237:11,23,24
238:3,13 240:4
240:14,17
242:6,11,19,23
242:25
**listed** 38:24
40:11 41:7 42:1
42:15 79:24
80:12 84:14
85:4,9 124:18
171:1 186:18
**lists** 34:19 35:3
37:24 84:16
238:8 242:1,2
**literally** 115:12
**litigation** 2:11
24:25
**little** 57:8 63:3
65:18 85:21
93:5 101:25
102:5 116:14
150:16 209:11
209:15 227:3
232:13 235:7
**live** 53:14
**LLP** 6:8
**local** 18:10 180:1
225:19 226:6
**locally** 226:13
**located** 40:19
220:16
**location** 40:25
86:1 87:23

96:23 105:2
210:10 221:23
**locations** 23:23
56:11 100:3
111:4,5 136:13
222:11
**log** 191:22
**logistics** 210:23
**long** 11:5 19:3
23:20 26:17
32:19 42:22,24
106:2,22
119:25 156:16
194:10 234:20
**longer** 72:25 73:2
196:21 226:9
**long-term** 54:8
55:16 72:18
**look** 37:13 49:11
51:24 69:19
70:3 82:11,25
84:10,24 90:21
94:4 97:5,7
100:15 123:18
129:22 133:13
141:18,24
150:8 157:1
163:16 164:1
169:19 170:22
186:1 201:22
207:5
**looked** 54:23
55:3 137:11
238:21
**looking** 75:14
76:25 79:23
85:2 90:17
145:21 159:2
186:3 207:25
232:11
**looks** 75:14 89:18
170:2 191:2
**Lopez** 22:20 23:1
23:11,17 24:10
27:9
**Los** 241:13,23

**lose** 219:17
**lost** 185:8,9,9
**lot** 55:10 92:20
92:25 116:9
173:9,10 184:9
221:21
**Louisa** 2:20 6:23
26:10 155:19
**low** 71:9 80:20
114:23 189:9
**lower** 115:1
230:10
**lowest** 187:20
**Luis** 218:8
**lying** 10:2 158:18
**L-E-O-S** 23:8

---

## M

**M** 3:4
**machine** 1:22
**Magna** 1:23,24
2:23 6:11
155:21 185:11
200:9 253:23
**Maier** 164:3,10
169:14 170:3
214:10,14
215:12 237:7
237:19 241:13
**Maier's** 170:4
**main** 221:24
**maintain** 103:2
216:13 227:25
242:1,2
**maintained**
238:3,14 240:4
240:14 242:25
**maintaining**
217:5 225:16
227:21 242:6
**maintains** 217:13
240:17
**major** 214:3
**makeup** 196:5,7
**making** 45:5 67:6
195:14 213:14

221:4,6
**Maldonado**
206:17 212:12
**manage** 142:24
143:7,16,20
**management**
16:16 17:6
23:23 29:22,25
30:6 39:17 69:2
69:24 76:2
81:20,23 82:17
82:20 84:7 86:2
128:10,20
129:18 130:5
130:11,19
151:6,18 152:8
153:20,25
160:6 183:11
187:14,15
188:15,24
189:13 190:18
199:24
**manager** 30:3,5
**managing** 42:17
143:23
**Mancha** 30:19
33:16,19,22
34:1,10,13
140:4 163:21
171:14 189:23
190:2 224:8
**mandated** 73:15
**mandates** 186:21
**mandatory** 57:3
195:5,13
**manner** 85:22
**manual** 38:8
**map** 37:10,14,24
49:9
**march** 11:7
38:17 100:12
174:1,5 218:7
223:16,21
224:7 229:9
232:10
**marches** 174:9


MAGNA
LEGAL SERVICES

**mark** 71:10
126:2 132:19
**marked** 14:10
32:16 68:24
81:12 83:24
90:7 134:12,12
141:11 149:14
149:15 156:4
163:19,19
171:11 176:7
183:5,6,8
189:20 200:7
224:6 236:14
241:9
**markers** 106:7
**Market** 253:23
**Martin** 157:3,5,9
158:16
**Maryann** 22:20
**match** 173:7
**math** 71:16 75:20
83:16
**Matt** 7:11 15:19
**matter** 6:3 11:23
17:20 63:9
102:14 228:5
**matters** 228:6
**Matthew** 2:4 3:6
6:14 253:1,8
**Mayer** 2:5 6:8,14
6:16
**ma'am** 44:2
105:23 184:6
199:21 200:1,1
201:5,18 202:9
202:20 203:1,6
203:13 205:20
206:11 208:22
209:9,17
214:16,16
215:20 216:1
223:10,19
225:2 226:19
228:21 231:17
232:4,6 233:4

235:5 237:13
241:17 242:4,4
243:6,11
245:24 246:4
246:11,17
247:6
**McAleenan** 1:7
6:4 126:6,9,12
129:18 130:4
130:10,18,23
131:1,22
134:15,21
135:24 136:19
137:2 139:11
140:6 141:13
159:7 252:7
**MCAT** 77:11
79:9,13,14
142:7,12
**McCulloch** 2:19
6:24 26:11
36:13
**mean** 21:19
29:24 34:3,7
44:5 45:19
46:21 47:4
57:16 58:7 63:3
64:18 71:13
80:2,5,6,7,17
81:21 85:11,25
93:10 95:13,15
99:16 103:13
104:19 108:4
119:3 121:21
124:6 135:18
137:2,22,23
138:5 143:22
147:2 148:2,9
167:19 170:19
170:20 172:5
173:20 193:22
194:22 197:15
198:3 203:20
204:1 210:3
235:23
**meaning** 138:2

222:10 228:3
**means** 10:12 15:4
40:18 52:16
63:23 64:25
71:16 80:16
94:13 197:14
**meant** 53:11
247:11
**measures** 55:22
110:5,5,12,14
110:15,18,21
111:16 119:23
133:21 194:9
194:10
**mechanics** 67:3
132:13 212:24
213:1,9,19,23
242:22
**media** 6:2 168:15
172:19,20,21
174:15 181:10
**medical** 56:20
73:17 196:11
222:24
**meet** 26:9,14
232:12,16,17
232:19 233:14
233:22
**meeting** 18:7,9
26:6,24 142:19
175:18 204:7
206:19 207:17
207:23 208:12
210:24 229:13
233:8,19,20
234:7
**meetings** 26:17
26:22 27:2,3
203:20,21,25
204:1,3,3,4
211:20 213:11
226:22,22,24
229:14,15,17
229:18,22
230:3,12,14,22
231:6,15,19,21

231:24 232:1
234:1 245:19
245:21
**Mejia** 218:8
**member** 13:22
175:1
**members** 168:15
179:6,15
**memo** 51:11,15
51:18,21,22,24
88:9 124:12,15
124:18 148:8
183:15 187:15
187:18 188:7
**memorandum**
50:24 60:18
122:8 123:19
123:21,25
124:8 183:9
**memorialized**
50:8 58:24 59:2
59:12,14 60:4,7
60:15,21,24
**memory** 177:9
**mentioned** 17:16
27:8 41:8 43:12
51:11 53:21
57:17,23 58:22
59:11,22 61:7
74:20,22 88:9
100:1,9 110:7
110:11 111:15
168:11 185:18
195:20
**mentions** 51:13
**message** 169:18
205:7
**messages** 216:3
248:10,15,17
**met** 26:5
**meter** 80:21 81:1
114:16,21
134:25 136:8
142:20 160:6
**metered** 86:7
96:6 104:9

108:9,15
113:24 114:6
115:5 116:17
118:5,21 119:6
151:11 154:17
158:13 203:9
203:17
**metering** 4:5
16:15 17:6
21:11 23:23
24:6,11 44:19
51:12,22 61:10
61:12,14,22
64:6,17 80:18
85:22 86:14,15
86:21,21 96:8
104:13,20
105:3 107:7,18
108:11 112:16
113:17 114:1,9
116:18 117:15
117:23 118:8
118:14 120:4
120:12 121:4,8
121:17 122:8
122:11,13,16
122:22,24
123:2,8,12
124:13 131:6
132:6,7,9,11
134:1,4,16
136:19 138:15
138:18 139:13
140:20 141:3
141:14 143:18
143:22,23
144:7,13 146:8
146:20 151:5
152:3,5,6,7,15
152:22 153:8
153:12,16,20
153:25 154:11
154:14 155:1
158:11 159:1,8
159:15,17,23
159:24 161:22



172:6 176:13
177:7,8,16
178:3,23
185:22 187:2,4
187:6,16,19
188:22,22
199:24 202:18
203:3,4,8,11,11
204:13,16,19
204:21 206:6
207:11 213:16
213:17 215:19
216:7,9 223:17
226:2 227:14
227:15 228:10
237:21 238:10
239:2,11,13,16
243:13,17,22
243:24 244:3,5
244:8,12,15,17
246:13,15
247:2,15
**metering/queue**
151:18
**methods** 136:11
136:12,17
**mexican** 17:5
86:22 87:10,17
135:1 143:2
146:23 151:13
157:3 160:25
167:8,9,16
173:6 176:22
176:25 177:24
189:6 199:23
202:22 203:15
204:8,8,9,15,21
204:25 205:4
207:21 208:24
209:2,21,23
210:8,18,19,22
210:25 211:2
212:23,24
213:11,21,24
214:11 215:18
215:22 217:2,6

217:12,14
219:21 220:16
220:18,25
221:1,8,13,16
222:4,11
223:21 225:15
226:7,8,12,14
227:12,14,19
228:5,9,13,16
228:19,23
229:1 230:21
230:23 231:15
231:20,22,23
233:8,23
234:12,18,21
235:3 236:13
237:9,9,23
238:2,8,9,14,14
239:9,13,16,25
240:3,11,21
241:14,24
242:1,6,13,18
243:3,13,21
244:2,8,15
245:14,20,21
245:22 246:2
**Mexicana** 17:4
**Mexicans** 157:12
158:12,17
237:21 239:6
242:9,13
**Mexico** 49:3,13
83:5 87:21 91:9
91:14 96:21
104:23 108:22
112:6 115:21
118:20 119:1,8
123:23 124:1,9
124:11,15
130:20 132:24
133:20 139:21
147:1,5,10,12
157:6,10 186:7
193:1,25
194:20 203:3,8
204:6 210:21

213:5 217:16
224:23 225:1
237:24 239:17
239:19 240:9
240:14,17
242:23 243:18
243:25 244:3
**Meza** 225:19
**Meza's** 225:23
**Mfenn@mayer...**
2:7
**Michael** 132:21
**midbridge**
136:20
**midday** 71:9
**middle** 142:21,24
**midnight** 93:5
138:1
**mid-bridge** 135:1
**Migración** 17:3
**migrant** 53:16,19
69:16 77:11
79:9 80:9 88:7
88:22 89:21
128:21 129:2
129:10 131:20
142:6 147:4,5
167:10 204:5
223:2,3
**migrants** 65:25
72:14 87:9,14
89:13 116:16
133:19 146:6
146:19 148:22
161:25 162:3
162:25 177:25
180:25 184:15
197:20 212:13
217:4,12
220:24 221:9
223:5 237:8
238:15 239:10
239:13,16,22
240:3,7,11
242:2,14,15
243:16,21,21

243:23 244:2,9
246:23
**migrant-run**
242:19
**mile** 106:1
109:14
**Miller** 35:10,13
35:25 36:2,10
36:21 41:7,8
42:4
**Miller's** 41:12
42:1,3,10,12
**mind** 109:14
202:3 206:22
210:14 236:21
244:23
**mine** 43:4
**minimal** 85:9,11
85:15,16,19
95:24
**minor** 88:22 89:6
89:14
**minute** 169:19
200:9 207:7
**minutes** 23:20
24:16 166:14
211:4 235:7,13
235:15,19
244:23 245:3
**Miranda** 32:11
**mischaracterizes**
131:10 148:20
159:11 207:24
208:1
**missed** 23:5
**mission** 136:15
184:9,9,11,20
184:21 185:2,5
188:11 222:22
223:2,3
**missions** 35:22
**misspoke** 28:10
**misstates** 22:2
67:17
**mistake** 74:12
90:24

**mistakes** 158:7
**mix** 240:21
**Molaski** 30:19
**Molly** 241:23
**moment** 155:15
**momentarily**
150:20
**Monday** 218:25
**month** 153:5,5
234:25
**monthly** 164:8
168:12,19
230:5,7,9
231:22 232:5
**months** 159:8
**Moore** 164:3,4,7
167:5 168:11
168:21 170:3
**Moore's** 164:14
169:2,15
**morning** 7:6 71:7
71:8 116:10
236:18 237:6
**mornings** 116:10
**mother** 164:19
**Mountain** 1:21
16:3,7
**mouth** 213:7
**move** 56:23
65:15 101:10
128:6,15
164:24 165:17
166:17 171:17
197:18 209:1
222:19 229:8
232:8
**moved** 65:4,15
65:16 111:3
127:21 223:13
**moving** 139:10
172:8 222:19
**MPP/metering**
236:17
**multipage** 83:25
**multiple** 32:7
43:4 66:13



67:24 74:4,5
157:7 160:21
160:23,25
170:7 171:2
180:3 204:3
222:16 229:16
230:23
**musters** 51:5,6
88:12 108:3
113:19 118:1
139:8
**mute** 187:12
**MX** 224:15 225:1
**M-F** 218:18

**N**

**N** 2:1 3:4,4
**NAC** 142:19
**Nacional** 17:3
**name** 7:11 10:17
10:19,20,21
23:5,7,8,8
35:10 40:13,18
42:1 69:24
199:15 225:23
227:9 251:16
**names** 21:7,7
32:10 178:14
**Narcotic** 11:14
**narcotics** 39:17
183:20 188:9
**national** 172:19
186:12 188:9
**nationalities**
147:17
**natural** 68:9
**naturally** 193:22
**nature** 11:11
33:25 35:16
39:7 41:20
175:14
**Nazarov** 2:10
6:20,20 15:19
15:22 26:10
235:22 253:2,9
**near** 34:11 100:4

103:24 234:9
234:13
**nearby** 174:13
**necessarily** 58:11
108:22 145:9
**necessary** 45:3
110:23 118:19
129:14 192:2
**need** 8:13,17 34:5
34:9 80:21 81:1
99:19 107:20
108:4 111:13
118:23 128:5
162:16 186:24
207:7 208:10
214:20
**needed** 24:6
189:23 211:11
**negative** 78:3
79:25 80:6,7
**negotiation**
157:13
**Neilsen** 186:5
**neither** 253:14
**Network** 30:7
**networking**
13:22
**never** 11:21
52:14,17,17
56:3 73:1
104:14 114:6
180:9 210:12
211:1
**new** 132:13
145:17,19
154:4
**news** 26:1 27:12
57:11,12
236:18 237:6
**next-in-time**
139:10
**Nielsen** 136:5
183:10
**Nielsen's** 187:15
**night** 71:7 139:15
140:23

**non** 134:25
**nonattorneys**
26:21
**noncitizen** 195:1
196:24
**noncitizens** 151:6
151:10,13,15
193:7
**nongovernment**
213:25
**nonprofit** 162:2
**non-asylum**
240:15
**non-Mexican**
203:17 215:13
236:12 240:5,6
240:15,21
242:18
**non-UAC** 134:25
**non-U.S** 230:21
**normal** 7:9 85:19
148:2,7
**normally** 64:8
76:20 145:12
198:23
**Norman** 41:8
**Norte** 37:25 38:9
40:13,17 41:4
48:23 49:15,19
71:21 86:5,7,13
86:16 87:5,20
88:19 91:21,24
92:17 93:14
95:11 96:15
99:1 100:3
101:23 112:13
122:9,11,17,21
170:10 205:17
205:19 217:9
220:20 221:22
221:24 222:8
227:23
**northwest-sout...**
100:25
**Nos** 126:3 191:17
**NOTARY**

251:22
**note** 76:10
105:18
**noted** 242:9
251:3
**notes** 19:7 20:23
21:12 24:21
136:19
**notice** 4:6 14:11
197:1
**notification**
178:21
**notified** 17:21
160:25
**notify** 210:8
225:18 227:6
**notwithstanding**
17:8
**November** 81:24
82:5 86:17
96:11 132:20
133:12 134:1,4
134:14 135:20
136:1,25
137:12 138:15
139:23 140:21
141:4,5,12,19
143:15 146:2
152:6 153:9,13
153:15 158:12
200:25 203:15
207:10 208:21
246:12
**NTA** 197:1,4
**number** 46:12
53:14 54:3,5,7
54:15,15 55:15
64:13,14,21
65:12,13,14,15
65:17 71:20,24
72:2,4,7 73:20
73:22 74:1,7,13
74:20,23,24,25
75:1,4 76:11
77:1,2,5 91:11
111:17 151:11

151:14,17
169:10 188:15
188:16 189:14
190:19 193:7,9
193:11,12,14
193:18 203:9
203:16 205:4
216:20 220:23
222:24,24
224:17 228:3
232:13 237:8
**numbered** 1:20
90:23,23
186:10
**numbers** 56:23
58:12 61:20
66:22 75:7,21
80:2,20 87:1
169:16 170:5
170:10,12,14
170:23 171:21
177:18,23
178:10 189:9
221:2,3,4,4
228:16 242:10
242:14
**N.W** 2:5,15

**O**

**O** 3:4
**oath** 9:19,22,23
10:2 12:8
251:15
**object** 8:11 43:25
44:8,21 47:23
47:25 48:8 49:1
53:25 54:12
59:4 60:9 61:11
61:24,24,25
69:14 70:14
71:2 76:13
80:22 86:8
87:22 88:23
93:20 95:3
104:11,25
105:10 107:17



108:24 113:10
115:8 117:17
124:23 125:5
125:19 127:22
129:7,13,21
130:7,12 131:9
135:22 136:3
142:8,14 148:5
157:20,20
166:3 174:7,24
175:6 178:5
179:2,9 180:11
180:18 181:3
181:15,21
195:25 198:10
199:2 212:20
221:15 233:24
240:24 243:15
244:11,16
245:17 246:3
**objected** 62:4
63:7
**objection** 8:14
15:7 19:13,20
22:2 37:1 45:16
49:23 52:4 53:2
53:25 57:25
61:1 62:6,9,15
62:18 63:17,23
67:17 78:19
79:7,19 84:20
87:7 105:19
124:3 137:4
140:9 143:9,12
144:4 148:19
153:23 154:24
155:7 158:19
159:11 162:4
162:19 163:7
166:10 175:12
175:17 177:9
179:16,20
184:2 186:23
187:22 207:24
207:25 208:8
208:15,16

216:16 217:22
217:24,24
219:23 238:5
240:8,16
242:21 247:23
**objections** 4:20
20:1 140:15
149:16,24
150:1 153:24
**objects** 92:5
**obtain** 27:19
**obtained** 27:17
**obvious** 55:15
**obviously** 73:18
145:18 147:19
149:3 158:8
**Ocasio-Cortez**
179:6
**occasionally**
69:11 162:13
**occasions** 111:25
175:13
**occupancy** 53:11
58:16,17 75:4
**occur** 18:4 41:21
136:20 141:6
151:14 158:4,9
160:19 167:18
167:19 210:18
220:1 232:1
239:22
**occurred** 34:4
111:20,22
112:1,2 141:1,2
141:6 151:12
151:17 153:8
154:11 162:12
174:6 188:24
197:12 210:13
211:1 213:1
**occurrence**
153:12
**occurring** 66:3
67:20 142:5
161:22 170:16
178:24 203:24

228:1 244:9
**occurs** 218:17
247:16
**October** 204:5
**offenses** 13:7,10
**office** 2:11 11:1
17:23 22:14
29:7,13,17,19
29:22 30:4,12
31:5,11,14,19
33:20 34:24
35:6 36:16
37:11 38:4,6
40:4,19 41:9
42:16,19 43:8
43:17,20,22
45:15,23 46:7,9
46:10,21 47:2
47:18,21 48:3,6
48:18 49:3,14
50:4,16,19,24
54:11 55:19
61:21 62:3,13
62:14,24 63:1,4
63:5,16,20,24
63:25 67:2 68:2
76:21 77:13,15
77:18,23 78:13
78:23 79:3,16
80:12 85:23
110:16,20
111:10,21,23
112:23 115:24
121:5 126:19
126:21 127:5
127:17,21
134:4 136:24
138:16,20
139:2,3,4,24
140:3,5 154:12
154:18,22
159:15,22
160:2 162:9
164:13 167:1
168:16 170:23
170:24 171:22

174:17 175:5
175:19 177:22
178:3,10 190:3
190:7,17
221:14 224:15
230:18 231:19
232:19 245:16
248:8 251:18
**officer** 12:20
47:13 48:10
88:5,17,21
89:22 93:17
94:25 95:7
98:14,18
102:11 103:3
106:19 107:21
116:16 117:21
120:13 144:14
144:20 146:11
146:16,24
147:7,14
158:18 161:12
161:20 166:4,6
167:25 178:2
205:24 206:24
218:15 232:15
252:17 253:5
**officers** 31:2 66:2
86:1 88:13
89:12 91:11,13
92:12 93:3
94:13,15 97:23
98:2,8,20,24
99:9 101:5,20
101:24 102:20
103:2 104:6
106:13 107:5,8
108:4 112:15
112:24 113:14
115:10,15
116:21 118:2
120:2 136:20
136:24 137:17
137:18,23
138:1,19
143:24 145:2

157:7 158:7
160:2,14 161:3
161:8 165:19
165:23 166:2
166:24 167:15
168:3,5 198:13
203:4 220:20
234:13,22
235:1,2 247:2
247:15
**officer's** 253:11
**offices** 123:23
124:14,17
222:4,5
**official** 50:20
51:9 60:24 61:2
126:23 233:12
233:13
**officially** 42:11
158:11
**officials** 203:16
231:16 233:22
237:23 239:1
**offline** 248:16
**OFO** 79:11,13,15
123:22 126:24
127:2,18,20
138:16 170:11
170:24 182:6
193:8 203:4,11
206:18 209:3
209:21,22,24
210:6,7,10
212:12 246:14
**oh** 19:15 26:2
70:17 101:9
109:22 122:4
150:11,15
180:19 208:18
208:21 230:23
232:13 233:16
249:3
**okay** 10:17 14:6
19:23 24:24
25:21 27:15
29:6 31:4,17



32:12,22 33:3
34:16 36:9 37:5
37:20 38:7,20
40:7 42:9,15
44:15 47:7
49:12,21 51:24
61:4 63:13,21
68:1,7,13 69:19
70:3 71:12,20
73:20 75:14
76:2,7,25 77:17
79:14,23 80:10
80:19 81:2,8,23
82:1 83:20
84:24 85:21
86:4,11 90:3
94:22 95:10
96:1 97:4 98:23
99:11,22 100:9
101:13 102:8
104:8 108:7
109:22 112:14
113:22 117:12
118:4 119:10
122:5 124:19
125:7,13,23
126:22 127:11
127:20 128:2,6
128:9 132:15
135:14,17
139:10 141:7
142:17 143:4
144:6 145:21
147:24 148:24
150:11,15,24
151:21 152:2
153:7 154:10
155:3 156:2,3
156:20,21
158:23 159:20
160:1 161:10
163:15 164:10
164:14 168:10
169:6,21 170:2
170:9,18 171:7
171:20 173:24

175:23 176:3,5
176:15 177:1
178:8 179:5
180:7,22 182:1
182:12,16,18
183:4 185:17
185:25 187:14
189:11 191:5
192:18,19
193:6 195:1
198:2,6 199:9
200:4,19
202:16,21,23
204:13 205:11
205:15,16,21
206:1 207:20
207:22 208:23
211:3 212:8
213:3 214:5
215:24 216:13
216:19 217:11
217:19 218:2
219:2,2,20,25
220:13,23
221:8,12,20
222:6,13 223:9
223:15 224:2
225:3,9,17
226:6,15 227:1
227:5,16
228:18,22
229:6,22
230:11 231:2
231:18 232:5,7
232:22 233:10
233:14,22
234:2,20 235:1
235:6,21 236:4
236:8 237:14
238:2,13,17
239:9,24 240:3
240:19 241:5
241:18 242:5,8
242:17,24
243:3,7,12,20
244:8,14,20

245:2 246:4,5,9
247:25 248:13
248:24 249:5
249:16,17
**Omar** 227:10
**once** 52:12 53:15
57:10 75:10
112:2,2 160:21
196:19 206:3
210:6 216:11
216:12 241:3
**ones** 180:4,5,5
217:8 228:14
228:17 230:9,9
**one-on-one** 219:9
**one-way** 7:14
**ongoing** 56:12
63:14 248:9
**open** 63:18 92:13
173:9 202:17
248:5
**operate** 56:13
106:4 109:17
173:15
**operating** 51:1,2
59:20,21 60:21
107:9
**operation** 4:12
41:24 42:23
56:16 59:9
77:12,14,18
86:3
**operational** 24:6
50:20 51:14
53:7 55:20,25
56:8,22,25 57:7
57:22 58:4,23
59:5,11,15,23
60:1 61:5,9,13
61:19,20 64:5,8
64:15,21,25
65:9,11,21 66:1
66:6,11,20,21
66:24 67:6,8,9
67:15,22 68:4
70:7 78:14

80:24 81:3,6
82:23 83:1
114:17,25
129:11 161:16
170:14 178:16
193:13,20
194:4 196:18
196:22 222:17
222:21
**operationally**
193:25
**operations** 11:1
32:6 33:16,20
39:9,10,14,16
39:19,20 41:1,3
42:18 43:5,7
44:6 46:20 47:2
47:11 56:12,13
56:16 76:9,17
77:8,20 78:1,8
79:16,17,24
80:4,8,12 84:2
84:6,16,17 85:8
85:19 86:2
123:22 126:19
126:21 127:2,5
127:13,16,18
139:20 186:6
186:13 190:3,6
204:23 219:5
223:1
**opinion** 162:2,6
**opportunities**
231:12
**opportunity**
164:17
**opposed** 139:14
140:7
**Ops** 171:13
**option** 190:19
**oral** 1:13,17 3:1
4:1 5:1 252:17
**orally** 10:14
**orange** 92:3,4
95:22,22
100:22 103:21

110:7,17 157:1
**order** 17:18
19:16 23:13
61:10,21 64:5
89:21 107:8
184:14 186:11
198:15,20,25
199:3,5 216:9
225:16 227:21
227:25 248:22
249:9,10
**ordering** 249:8
**ordinary** 85:12
85:14
**Ordonez** 1:21
6:10 252:13
253:21
**organization**
156:5,14 157:8
162:6 165:3
**organizations**
162:3 214:1
**orientation** 92:7
100:25 196:8
**oriented** 29:23
29:25 30:5
**origin** 147:14
**original** 253:12
**OTM** 202:21
**OTMs** 202:18
203:9
**Otro** 1:4 6:3
24:25 252:4
**outbound** 38:15
188:10
**outcome** 253:18
**outlined** 200:3
**outlining** 138:15
**outside** 12:7
23:25 27:3,7
42:16 43:8
78:25 160:4
172:19
**overall** 65:14,14
199:7 218:19
**overbroad** 61:1



219:23
**overcome** 192:6
**overcrowding**
55:18 136:10
144:8 184:8
**overexaggerati...**
66:16
**overflow** 142:22
**overloaded**
222:22
**overnight** 52:15
52:16,20,25
53:18,20 54:8
54:25 55:6,16
56:4,6,18 57:24
58:15 72:3,6
73:4,6,7,11,23
75:3,10
**oversight** 31:16
**overtime** 194:7,8
**overwhelmed**
110:24
**overwhelms**
228:2
**Owen** 51:22 69:1
121:9,18 126:6
126:15,23
128:14,18,19
129:9,16,25
130:4,9,18,23
134:15,21
139:11,12
141:13 159:2,9
190:10
**Owens** 20:16
**Owen's** 122:19
140:18 190:16
**O'Rourke** 5:5
174:1,25 175:4
175:11 176:20
**O'Rourke's**
176:8,19 177:6

**P**

**P** 2:1,1 3:5 4:4
5:4 229:18,20

**PA** 253:24
**page** 15:9 16:14
17:1 33:14,15
34:18,19 35:2,3
37:8 38:21 40:8
40:11 41:6,25
69:6 82:3 85:1
90:22,22,23
91:17 97:6
100:16 101:11
123:18 128:6
151:1,23,25
156:22 164:2
168:25 176:8
176:19 183:15
186:2 190:11
190:14,15
201:8 206:22
211:7 224:11
232:9,13 234:5
237:3,16
238:24 250:3
**pages** 18:20,23
32:20
**paper** 179:1
249:12
**paragraph** 91:22
97:8 99:4
100:16,17
133:8,14,15
142:17 186:4
**parallel** 92:5
100:24
**parameters**
52:11,13 73:13
**parentheses**
40:14
**parole** 195:11
232:18
**paroled** 195:2,21
**part** 29:9 45:21
55:14 72:12
74:8 96:2
100:11 142:1
145:14 168:2
178:15,16

181:9 188:11
190:17 197:4
202:23 204:17
205:18 210:25
213:8 226:10
237:20 239:1
**participate** 26:24
231:19
**participated** 27:1
140:19
**particular** 62:2
83:11 90:15
93:16 156:18
157:17 167:20
167:21,22
240:2
**particularly**
102:5 131:18
169:8
**parties** 6:12
253:6,15
**party** 13:17
252:24
**Paso** 17:20,22,22
17:24 22:13
24:1,8 29:4,7
29:12,13,19,20
29:22 30:11,12
30:15,21 31:2,4
31:19,19 33:20
34:24 35:5
36:16 37:10,24
38:4,6,8,9,11
38:11,13,24
40:4,13,17,24
41:3,4,9 42:16
42:17,19 43:8,9
43:17,19,22
44:17 45:14,23
46:5,6,10,19,20
46:25 47:17,17
47:19,21 48:3,6
48:13,16,18,23
49:3,8,14,15,18
49:18,20 50:4
50:12,15,18,24

52:6,9 53:10
54:10,11,24
55:4,19 56:9
57:19,20,21
58:3,6,9 61:16
61:21 62:3,13
62:14,20,24,25
63:1,4,5,12,16
63:20,24,25
64:4,16 65:8
66:4,7,11,19,20
67:2,16 68:2
70:25 71:8,13
71:17,21 72:5
73:22 74:2 77:9
77:13,15,18,21
77:23 78:5,13
78:23 79:3,25
80:11 82:5,16
82:21 84:1,8,13
85:4,23 86:5,7
86:13,16 87:5,6
87:9,15,20
88:19 91:19,21
91:22,24 92:17
93:13 95:11
96:2,10,15
98:25 100:3,11
101:23 107:10
110:8,16,19
111:12,20,23
112:11,13,23
115:24 118:11
121:5 122:9,11
122:16,20
125:9,17
131:15,19
132:8 133:22
133:25 134:4,6
134:7 136:9,23
137:12 138:16
138:19 139:1,4
139:24 140:3,5
140:19 141:3
143:15 144:16
145:12,15

146:5,15,25
150:18,20
151:23,25
152:2,13,17,20
153:12 154:12
154:17,22
155:6 157:4
158:4 159:15
159:19,22,24
160:1 162:9
167:1 168:16
170:10,10,23
170:24 171:3
171:13,21,24
174:16,19,22
175:2,5,7,19
176:12,23,24
177:7,8,22
178:3,9,24
179:8 184:7
185:22 187:1,2
188:19 190:3,6
197:8,9 199:20
199:20 202:24
203:18 204:24
205:17,18,19
213:15 216:14
217:9 218:16
220:19 221:14
221:19,22,23
221:24 222:8
222:10,11,14
223:6 224:17
227:23 231:18
231:21 232:2
234:13,23
241:25 243:9
244:10 245:13
245:16 246:13
246:14,17
247:4 248:8,8
**Paso's** 82:9
184:24
**Paso/Mexican**
206:18
**pass** 143:4



147:24
**passenger** 32:5
  39:16 40:14
  41:1,2 43:4
  47:11 204:23
  219:5
**patience** 16:10
  192:22
**Patricia** 35:3
**Patrick** 141:20
**patrol** 179:7
  182:5,6
**pause** 186:24
**PD** 100:3
**PDF** 37:9 38:22
  40:9
**PDN** 169:9 172:2
  210:7 218:18
**pede** 100:7
**pedestrian** 38:14
  38:15,16 88:16
  91:25 92:2,8,9
  92:13,17,20,25
  93:1 95:10,16
  97:9,11,12,19
  99:12 100:8,18
  100:21,21
  101:2,2 102:2,3
  103:7,13,16,17
  103:19 105:16
  106:3,5 109:9
  109:16,17,20
  109:23 111:11
  116:5,7,8,11,11
  119:18 138:2,4
  143:3 146:4,17
  147:9,24
  148:17 221:24
  247:3
**pedestrians**
  39:17 93:4,8
  103:24 111:17
  146:21 193:3
**pending** 8:18
  192:12
**people** 31:12

45:11 46:1,2,9
46:12 52:19,20
52:25 54:7,16
54:17,25 55:5
55:16,23 56:20
56:23 57:24
58:10,18,20
65:14 67:20
74:4,5 75:10
87:12 88:14
89:4 102:19
103:3 110:24
110:25 112:4
144:9,10
145:18 147:16
160:18 161:24
161:25 162:1
162:24 163:13
169:8,11
173:14 188:20
189:4,7 193:9
193:11,12,14
193:18,22,23
196:21 197:9
205:3 207:11
216:25 217:7,7
217:8 220:19
221:6,19
222:18 228:4
247:14
**percent** 70:4
  71:13 75:18
  76:11 77:2 82:8
  82:22 83:13
  84:14 85:4,5,5
  85:6 147:19
  171:25 187:4,7
**percentage** 64:13
  64:15,19
**perception** 166:2
  166:6
**perfect** 68:11
  215:8 218:14
  229:9
**perform** 168:6
  184:10

**performed** 178:2
**performing**
  203:4
**performs** 89:23
**period** 8:20
  96:22 106:22
**periodically**
  86:21 220:25
**periods** 72:25
  194:11
**permanent** 91:9
**permitted** 151:10
  151:15
**persecution**
  157:9
**person** 18:5,8,9
  23:5 31:12,12
  32:7 74:3
  140:12 163:1
  219:16 231:24
  233:23 251:16
**personal** 9:10
  42:17 138:10
  157:16,23
  162:15,21
  163:12 167:24
  168:14 242:5
**personally** 55:13
  121:22 133:2
  138:9,10
  154:10 164:4,6
  164:10 165:6
  168:19 175:10
  179:14 182:2
  230:11 251:14
**personnel** 183:18
  198:12
**perspective** 63:5
  136:10 162:21
  184:24
**Philadelphia**
  253:24
**phone** 6:24 18:10
  23:19 26:7
  36:12 140:20
  140:23 141:1,2

205:7 216:3
219:17,18
226:22 227:2
228:24,25
229:5 246:1
**photograph**
  181:8,11,12
**photos** 172:21
  173:18
**phrase** 83:1
  143:20
**physical** 43:16
  53:6 56:2,7
  58:14 70:13,18
  70:20,23 75:25
  80:23 92:24
  93:2 95:10,13
  95:16 97:12
  99:11 103:7,9
  103:16 104:2
  105:14 106:6,7
  106:18,21,24
  109:6 110:1
  114:24 116:1
  119:10,20
  170:13 171:2
**physically** 40:19
  102:23
**Pico** 225:19
  226:8,15
**pilot** 186:6
  ████ 165:21
**place** 27:24 72:24
  108:22 111:8
  114:9 119:24
  123:2 136:13
  159:21 196:3
  234:21
**placed** 57:4 92:4
  94:5 97:13
  110:22 195:15
  198:7,17
**placement** 57:12
  195:6,7 196:23
**places** 53:12
  156:19

**placing** 142:23
**Plaintiff** 1:18
  191:18 253:8,8
  253:12
**plaintiffs** 1:5 2:3
  4:14,21 6:15,17
  7:12 14:11 90:8
  149:16 191:16
  199:16 236:6
  246:6,25 248:1
  252:5
**planning** 174:1
**plastic** 92:3
  100:22
**platform** 13:23
  13:25
**play** 177:2
**playing** 177:3
**please** 6:12 7:1
  7:23 8:4,17
  9:17 10:17 14:8
  17:1 32:14
  34:18 35:2 37:8
  38:22 40:9
  81:10 83:22
  84:10 89:1 90:5
  90:22 100:15
  121:12 132:17
  134:10 135:3
  141:9 149:8
  155:10,20
  159:4 163:17
  164:2 168:25
  171:8 175:25
  182:25 187:12
  189:17 201:2
  208:19 214:7
  226:18
**POC** 210:3
**POCs** 209:22,22
**POE** 9:7 91:5
  100:18 142:20
  142:25 146:2,4
  146:10,14
  151:4,8,16,18
  152:3 162:18



MAGNA
LEGAL SERVICES

203:9,10
**POEs** 43:22
133:21 141:15
142:21,22
171:21
**POE/crossing**
202:18
**point** 28:24 52:15
68:10 71:5
80:25 120:18
122:1 131:17
136:16 147:13
152:24 161:14
165:16 167:9
173:24 174:6
185:2 190:16
208:24 209:7
209:13,21
210:4 211:6,8
236:11
**police** 157:5,6
221:1,9 224:16
227:12,14
228:9,13,17,23
229:1 233:8,23
234:8,12,22
235:3
**policies** 211:24
213:16
**policy** 30:3 35:21
44:18,25 45:2,6
45:8 59:25 61:2
131:6 151:6
152:8 153:20
153:25 183:24
195:17 204:13
238:11
**politicians**
174:16
**poor** 47:5
**port** 4:12 9:6
11:4 17:19,22
17:24 22:12,18
22:21,23,24
24:1,7,15,15
29:4,4,11,20

30:2,4,10,14,16
30:17,21 31:2
31:18,24,25
33:23 34:5,11
35:14 36:15
37:17,19,21
38:5,8,14,18,24
39:5,9 40:2,2,3
40:11,21,22,24
41:1,3,7,15,18
42:16 43:3,9
44:4,5,6,10,13
44:17 45:18
46:5,24 47:1,16
47:19 48:13,16
48:17,22 49:8
49:17,20 50:12
52:6,9 53:9,10
54:9,18,24 55:4
56:9 57:19,20
57:21 58:3,6,9
58:14 59:9
60:13 61:5,9,16
61:20 62:16,20
63:1,12 64:4,5
64:16 65:3,8,22
66:3,7,10,19,20
67:16,23 70:22
70:25 71:8,12
71:17 72:5
73:21 74:2,2
75:16,22,23
76:9,12,12,17
77:3,8,9,20,21
78:1,3,5,8,9,10
78:10 79:16,24
80:3,9,12 82:5
82:8,16,21
83:12,13,17
84:1,1,6,8,13
84:16,17 85:4,8
85:18,20 86:2
87:6,9,15 91:4
96:3,10 100:11
100:12 101:18
103:17 104:10

104:22 105:6,7
105:14,17,19
105:25 106:8
106:14,22
107:4,10,10,15
107:22 108:7,9
108:12,16,20
109:3,3,7,10,12
110:3,8,23
111:12,18
112:10,14,21
113:2,6,15,22
114:7,11,15,19
115:1,5 116:2,6
116:17,22
117:14,23
118:4,10,21
119:22 120:3,6
120:11 122:9
123:7,11 124:1
124:5,20 125:2
125:9,17 132:8
134:3,5,7 136:9
137:11 139:7,7
141:3 143:15
144:8,21
145:12 146:5
152:14,17,20
153:13 154:17
154:21 155:6
157:5,11 158:4
159:19,24
160:3,5,6,13,14
161:3,13,17
162:8 163:5,11
167:13 170:5
170:10,24
171:24 172:9
172:10,16,19
172:20 173:4
173:13,15
174:1,12,18,19
174:22 175:7
175:22 176:12
184:7,23
185:21 186:25

187:1 188:19
193:9,11,17,18
197:8,9 199:19
202:24 203:17
204:23 205:18
206:2,18
209:25 213:5
213:15 216:14
218:16 221:19
222:5,9,10,11
222:13,15
223:1,5 224:17
230:17 231:18
231:21 232:2
232:18 233:2
234:13,22
244:9,13,18
245:13,19,21
246:13,13,17
247:4 248:7
**portion** 76:15
91:18 92:13
157:2 166:1
169:15 186:10
**portions** 84:7
**ports** 16:16 22:13
23:21 24:11
29:16 37:11,14
37:16 38:1,3
40:3,4 42:15,18
43:8,17,19,20
43:23 44:14
45:14,22 46:6,8
46:10 47:20
48:2,5,18,19
49:2,5,8,13,22
50:2,6 52:1,5
54:10,17 59:6
62:3,5,13,20,25
63:7,8,16,19,25
67:1 68:2,3
69:12 77:20,23
80:11,17 85:23
108:20 110:15
110:21 111:4,9
111:22 115:23

117:4,21 121:5
124:9,10
129:11 132:5
133:19 136:23
137:14 138:19
139:5,6 153:8
154:11 159:14
159:21 160:1
166:25 168:16
169:11 171:2
174:16 175:4,8
177:21 178:9
186:7 192:25
193:24 194:19
199:20 212:5
213:14 221:14
243:8 244:9
245:15,22
246:1
**port-hardening**
110:4,12,14,18
110:21 111:16
119:23
**port-specific**
63:6,8,24
**position** 29:21
39:2 42:6,12
91:5,8,10,12,13
92:10 93:13,18
94:9 97:14,15
98:16,19,24
99:5 101:6
102:8 151:9
152:4,9,14,21
153:21 164:12
165:9 173:17
201:11 247:3
**positioning** 99:23
**positions** 127:9
**possible** 73:3
91:6 93:15
94:24 98:12,16
101:22 102:10
102:15,25
103:6 112:18
112:25 116:19



116:24 156:12
161:11,15
163:10 205:23
225:18 247:1,8
247:12,14
**post** 181:9
**posted** 176:9
**posts** 180:24
181:2,8
**potential** 189:13
**Poverty** 2:15
**power** 166:1
**practice** 16:15,18
62:2 108:11
114:1,9 118:8
118:14 137:11
145:16 177:21
177:25 178:9
242:10
**practices** 61:25
62:19 63:4,6,8
63:12,24
**preclass** 63:9
**predecisional**
191:3
**preferred** 140:7
**prefers** 160:25
**preparation**
11:16 25:3 26:6
34:13 36:10,21
37:3 39:23
43:13 122:3
**prepare** 18:15,19
20:13 21:1,16
21:25 22:8
23:13 25:23
27:4 40:5
**prepared** 16:22
17:11 63:11,18
69:17 248:7
**preparing** 18:12
25:6,9 63:10
253:12
**presence** 103:3
166:6 234:8
**present** 2:18 6:12

6:23 8:21 11:3
24:18 26:21
86:6 96:5,22
104:9 108:8
109:1 113:23
118:5 151:7
162:17 207:22
208:12,22
231:14 245:22
**presented** 202:12
**presenting** 163:5
**presently** 10:23
**presents** 173:13
**Presidio** 23:6
24:12 38:1
42:19 49:16,18
76:4 108:7,9,12
108:16,19
109:2,7,10
110:3 112:14
112:21 113:2,6
113:15,17
123:16
**pretty** 86:19
103:13 119:14
147:2 189:1
205:1
**prevent** 142:22
144:7 188:23
188:24
**previewed** 18:19
**previous** 42:10
117:8
**previously** 14:10
49:10 52:24
70:1 132:5
152:5 183:5,6
199:17 207:10
243:12
**primarily** 161:9
246:19
**primary** 89:16
144:11 146:22
148:10,11
227:20
**prior** 28:12 30:11

36:5 114:5,5
122:2 132:4
151:8 152:8
153:21 189:12
198:15 223:20
**priorities** 186:17
187:20 188:1,4
**prioritization**
186:19
**Prioritization-...**
183:11
**prioritize** 186:6
**prioritized**
186:11 188:5
223:12
**priority** 186:21
188:9
**priority-based**
188:14 189:12
190:18
**privately** 10:8
**privilege** 191:20
191:22,25
192:3,5,6,8,11
192:11 248:19
**pro** 29:25
**probably** 7:20
18:3 19:5 23:20
35:4 60:10
74:12 76:15
78:3 95:20
170:14 194:6
213:7,8 230:1
233:9 235:11
235:13
**problem** 55:18
62:11,12 64:7
65:7 70:17
159:10 181:7
184:22 200:11
200:23
**problems** 229:24
**procedure** 14:12
45:2,6 51:1,3
60:21
**procedures** 30:3

35:22 59:20,21
**proceed** 89:16
146:21 148:10
**proceeding** 11:12
11:13 12:2
57:13 197:16
253:16
**proceedings**
12:10 197:1,2,4
197:10,11,14
197:23,25,25
198:4,8,18
**process** 53:8
55:24 57:1,5,6
57:7,10 65:17
65:17,19 72:25
114:18 120:14
137:7 144:24
157:15 165:11
177:6,15
183:19 188:21
191:19,25
192:4 193:10
193:19 194:24
196:19 209:24
210:7,15,17
216:21 220:8
221:12 226:3
239:2,11,14
240:5 243:1,17
243:21,24
245:13 247:22
247:24
**processed** 65:4
86:24,24
133:21 166:19
166:21 167:4
186:20 187:3,4
187:6 188:16
194:23 196:25
197:2,4,10
198:13 211:11
216:24 220:24
222:23 223:6
223:14 239:18
240:10 243:5

243:19
**processes** 56:11
211:21
**processing** 39:19
44:7 48:20,24
51:13 53:16,19
56:17 65:24
66:23 67:21
72:15 75:9 80:9
87:10,25 151:8
165:13 172:11
185:3 186:16
187:25 188:5
189:4 192:25
193:5,24
194:19 196:19
198:12 209:4
210:10 212:13
221:18 222:19
223:2,3 246:22
**produce** 249:1
**produced** 1:18
24:25 84:7
205:12
**production**
248:10
**program** 29:22
29:25 30:5,6
186:6
**programs** 30:9,9
31:15
**progress** 82:17
82:21
**prohibited** 145:7
**project** 65:15,17
**promise** 183:7
**promotion** 31:17
**pronunciation**
35:4
**proportionality**
63:9
**proposal** 142:25
**prosecuted** 157:3
**prosecution** 43:6
**Protection** 6:23
9:4 11:2 14:13



**protective** 248:22
**protest** 112:6
**protesting**
 173:14
**protests** 174:9,10
**protocol** 229:17
 233:25
**protracted**
 157:13
**proved** 251:15
**Provencio** 34:20
 35:12,19 36:9
 36:19,25
 189:22 190:5
 224:8 232:10
 234:6 236:16
**Provencio's**
 232:24
**provide** 8:13
 101:4 145:2,10
 169:9 195:7
 201:2 216:20
 221:1
**provided** 12:7
 20:5 21:6 25:11
 47:1 132:5
 144:20 145:5,6
 170:23 171:1
 197:3 206:5
 211:8 215:4
 217:23
**provides** 201:20
 214:18,21
 220:25
**providing** 63:7
 78:25 171:21
 192:3 207:16
**public** 17:17
 107:8 164:13
 168:3,6,9
 198:20 214:14
 216:9 251:22
**published** 156:5
**pull** 14:7 16:11
 32:13 83:21
 90:4 125:24

171:8 175:24
 214:7 218:3
 236:9 238:18
**pulled** 138:1
 184:8,9
**pulling** 86:20
**purpose** 62:6
 63:22 78:16
 115:9 148:13
 154:6 227:16
 231:5,7
**purposes** 99:19
 103:22 251:17
**pursuant** 253:4
**purview** 215:24
**push** 135:2
 136:20
**pushing** 133:19
**put** 19:17 58:18
 58:20 68:21
 79:12 81:9 93:6
 95:6 99:14
 121:11 132:16
 134:9 140:13
 141:8 149:7
 155:9 159:4
 182:25 189:17
 209:3 234:12
 234:22 240:13
 248:11
**puts** 79:13
**putting** 111:11
**p.m** 1:21 120:23
 121:1 128:4,8
 130:24 131:23
 139:12 171:18
 182:19,22
 185:12,15
 191:7,10 245:4
 245:8 249:18
 249:20
**P.O** 2:11

_____
**Q**

**qualified** 192:5,6
**quantifies** 81:3,6

**quantify** 194:14
 194:19
**quarter** 106:1
 109:14
**quarterly** 230:4
 230:6,8
**question** 7:24 8:1
 8:4,7,11 45:20
 52:6,18 62:12
 64:3 67:21 68:1
 90:18 113:13
 117:20 125:13
 138:10 143:18
 143:24 145:7
 150:4 158:16
 166:24 167:12
 192:1 201:19
 202:4,6,8,17,24
 203:2,7,22,22
 204:18 205:11
 206:1 218:9
 223:11 228:8
 241:14
**questioning** 16:5
 192:13 199:10
 236:6,7 247:5
 248:2,4
**questions** 7:15
 8:13,18,20
 27:15 62:18,25
 63:15,19 121:4
 137:15 179:25
 180:3,5 192:10
 192:14 199:11
 199:12,22
 200:4 201:21
 202:11 214:11
 235:13 237:20
 246:9 248:1,12
**question's** 147:2
**queue** 16:15 17:6
 65:3 69:2,24
 76:2 77:3,5
 81:20,23 82:17
 82:20 84:7 86:2
 128:10,20

129:18 130:5
 130:10,19
 151:6 152:8
 153:20,25
 183:11 187:14
 187:15 188:14
 189:13 190:18
 199:24 222:14
 223:5
**quick** 19:19
**quickly** 54:6
 99:20 223:6
**quite** 35:24 57:14
 59:13,16 66:4,5
 105:24 109:13
 180:6 205:2
 210:20,21
 214:24 230:25

_____
**R**

**R** 2:1
**radio** 89:20
 161:5,9 220:21
**railing** 92:1
**railroad** 38:12
**Randy** 69:1,7
 126:6 127:1
 163:21 171:14
 189:22 190:10
**range** 44:6
**rank** 127:14
**rare** 195:10
**rarely** 36:1
 104:14 107:18
**rate** 53:11 58:16
 58:17 75:4
 193:24 194:19
 224:16 228:2
**Ray** 34:20 189:22
 190:5 224:8
 232:10 236:16
**reached** 86:22
 87:3,11 184:8
 189:5
**react** 196:15
**read** 16:20 17:8

20:19 26:1
 27:12 76:10
 82:14 91:15
 92:14 95:12
 97:17 99:4,13
 101:7 128:22
 130:2 131:3
 133:23 135:6
 143:5 151:19
 152:10 164:25
 165:1 166:22
 168:19,21
 169:12,25
 172:23 174:3
 183:22 190:21
 202:25 203:5
 203:12 206:10
 207:7 209:16
 210:14 214:23
 214:23 218:21
 236:20 248:23
 251:1
**reading** 70:24
 207:15,18
**reads** 16:15 17:2
 91:3,23 97:8
 100:17 151:4
 157:2 164:14
 169:6 172:18
 183:17 202:17
 203:2,8 206:2
 208:24 211:9
 237:20
**ready** 200:22
**real** 19:19 124:21
**realized** 52:12
 53:15 54:6
**really** 53:24 58:7
 65:1 93:2
 125:14 131:1,7
 132:1 159:10
 187:18 196:4
 213:1
**reason** 10:4
 58:11 61:17
 64:21 65:5



109:13 111:9
111:11 144:21
145:3,7,10
149:3 157:24
158:1 168:9
178:1 201:19
202:5,10 207:2
207:5 210:19
210:24 214:17
214:22 215:3
219:19 230:6
250:3
**reasoning** 111:14
138:22
**reasons** 16:18
145:6 192:1
248:5
**Rebecca** 2:14
**recall** 21:4,9
27:24 28:24
29:1 36:2 50:1
51:18 53:22
55:8 96:8
104:15 114:1
122:5,7 156:15
159:6,13
173:17 174:5
181:24 247:4,7
**receive** 48:14
121:20 132:10
155:24 220:22
241:4 246:14
**received** 32:24
33:2 121:23
155:14,14
156:1,2 157:7
176:4,4 183:2
200:13,16
**recommending**
55:14
**record** 6:2 7:16
10:18 15:20,25
16:1,3 32:23,24
62:2 67:15,19
68:17,20
120:22,24

121:2 139:14
140:8,14
182:17,20,23
185:8,13,14,16
191:6,8,9,11
192:8,18
235:10 244:23
245:5,8 248:11
248:20 249:2
249:11,19
252:18 253:7
**recorded** 46:23
**recording** 67:9
**records** 205:12
**recount** 247:8
**recruiting** 162:23
**Red** 208:25 209:2
209:21,22,23
210:8,8,19,25
214:1
**refer** 8:24 9:3,6
9:13 25:12,14
38:7 81:20
211:15 225:5,6
233:6
**referenced**
142:10
**referred** 49:8
**referring** 9:16
47:15 51:21
57:19 75:1 87:4
143:10,20
171:3 181:11
225:12 228:19
245:23
**refers** 70:12
187:15 225:7
229:12
**reflect** 129:10
183:24
**Refugiados** 17:4
**regard** 242:19
**regarding** 12:19
20:23 21:12
26:5 27:12
44:19 90:18

140:20 165:9
167:2 168:22
191:13 192:8
198:7 203:16
204:15 215:19
221:13,17
239:25 246:20
248:11
**regardless** 220:4
223:14
**regards** 227:14
**Registration**
253:22
**regroup** 244:24
**regular** 66:19
196:25 197:14
197:16,24
203:19 204:2
205:8,10
**regularly** 133:6
205:1 231:19
**regulation** 50:15
59:3,7,8 60:6,8
**Reject** 156:7
**rejected** 177:13
177:14
**relate** 8:20 62:19
**related** 35:23
37:2 60:10,12
142:6 143:18
180:24 248:15
253:15
**relates** 191:3
226:2
**relation** 63:12,25
120:7
**relationship**
95:18 104:2
215:21
**relay** 217:21
**relevant** 32:20
**relied** 129:6
**rely** 130:10
242:24
**remember** 13:2
20:15 23:16

54:2,3,21,22
58:1 171:6
179:21,24,25
180:4 229:21
234:24
**remembering**
22:16
**reminded** 168:3
**remotely** 6:8
**removal** 196:25
197:3,14,16,24
197:24 198:2,8
198:17,22
**renamed** 30:7
**repeat** 204:17
**rephrase** 64:2
142:9 143:14
146:13 160:10
**replaced** 226:9
226:15
**report** 4:23 30:15
31:5,10,24
35:22 46:14,16
46:18,19 47:24
54:14 58:11
66:22 67:4,25
69:24 70:24
76:3,6 77:11
78:18,22,25
79:4 81:21,23
82:3,4,10 83:11
83:17 84:7
85:13 127:17
129:1,18 130:5
130:11,19
156:5,7,16,23
**reported** 1:22
31:6,9 73:21
75:2 76:19 78:4
86:22 87:18
177:24
**reporter** 6:10,25
7:16 16:5 19:19
19:22 20:2
164:5 168:12
208:4,7 248:25

249:6,10,16
252:13
**reporters** 157:8
168:15
**Reporter's** 3:10
252:10
**reporting** 30:22
32:8 34:2,3
35:21 55:9 78:6
87:11 189:7
**reports** 25:5 32:3
48:14 66:19
68:3 69:17 70:1
70:21 76:20
79:15,22 81:16
155:4 156:13
**represent** 6:13
6:15 7:11 75:20
84:5 199:16
206:15
**representative**
9:10 15:2,5
17:19,22 62:23
140:25 167:24
180:2 199:19
248:7
**Representatives**
175:1
**represented**
175:2
**reprocess** 57:12
196:17 197:9
197:11 222:20
**request** 6:8 21:17
172:20
**requesting**
224:15
**requests** 21:15
**required** 166:19
240:12
**requirement**
211:10
**requires** 195:5
**research** 25:22
204:10
**resembled** 81:16



reserving 192:13
resolved 63:14
resources 54:19
  54:20 183:18
  184:14,17
  185:18
respect 49:22
  50:6 52:1 59:11
  59:22 99:23
  150:5,22
  173:18 192:25
  246:15 247:20
  248:14
respectively 85:6
respond 205:4
  228:14,17
responded
  130:23 169:14
  170:2 203:10
responds 139:12
  233:1
response 57:18
  77:8,19 78:7
  79:21 90:15
  96:17 108:19
  149:23 151:23
  152:2,12,13
  153:11 169:18
  181:6 200:5
  201:2 202:23
  203:2,7 206:5
  232:24
responses 4:14
  4:21 7:17 21:4
  21:10,13,15
  90:8,14 149:16
  149:24 150:1
  170:4 214:21
responsibilities
  29:18 40:21,25
  41:2 42:4,5,8
  42:10 226:1
  227:13,15
responsibility
  44:18,24 45:1,4
  45:13,21 47:7

47:21 48:5
responsible
  69:11 74:4 78:6
  138:11,25
rest 29:10 169:20
  169:23,25
restaurant 28:3,4
restaurants
  28:14
restraints 65:19
result 43:13
  119:9
resume 16:5
return 252:22
review 11:15
  18:15 20:12
  21:1,15 24:24
  25:5
reviewed 19:10
  21:5,22 25:2
  198:13
reviewing 18:25
  19:3 20:18
revised 54:8
Reyes 26:10
  218:14,15
re-ask 208:11
RFI 201:2
rifle 165:16
right 8:11 31:3
  37:13 38:1
  41:10 52:13
  76:8 82:12
  83:14 90:23
  94:8 105:21
  106:24 110:12
  117:3 122:15
  124:7,12
  137:17 139:18
  142:1 143:22
  149:12 150:3
  150:19 152:16
  153:15 154:5
  158:13 170:4
  172:16 184:16
  199:1,22 200:2

200:6,20 201:6
  207:9 215:5
  235:22,22
  238:20 241:6
  246:12
rights 4:23 156:6
  156:14 192:13
right-hand 157:1
Rio 181:13
riot 227:22
  228:15
rising 237:8
Robert 164:3,4
  170:3
Robles 32:11
Roger 164:3,10
  168:11 170:3
  214:10,14
  215:11 237:7
  241:12
role 31:21,23
  32:4 33:12,22
  35:8,13 36:3
  39:4 41:12,14
  41:18 47:10
  74:9
roles 29:15 42:4
  43:4
room 58:17,19,20
  75:11
rough 72:9
  190:19
rounding 71:19
routinely 194:7
Ruben 164:15,18
  165:6 166:15
  166:16,17
  169:3,6
rule 8:19 14:11
  15:2,4 17:14,25
  18:13,16 20:13
  83:25 192:15
  247:13
rules 7:13 200:2
running 110:24
  241:14

rush 112:9
rushing 111:17
  112:1,5
Ryan 69:6,8
  128:3 171:13

—————————
S
—————————

S 2:1
safely 53:20 64:8
  74:18
safety 93:6 99:18
Saindon 34:20
  35:13,22 36:10
  36:21
Sam 6:3 10:22
Samuel 1:14,17
  3:2,5 4:2 5:2
  7:2 10:19,20
  249:18 251:1,7
  251:14 252:10
  252:16
San 124:21 125:3
  125:11 131:1,7
  131:13,23
  132:1 159:10
  212:13,18,21
  213:18,22
  244:15,19
Santa 22:25
  37:24 49:14,17
  75:16,23,25
  118:4,6,9,15,21
  119:11,17,20
  120:3,6,11
  123:11
Saturday 128:8
saw 14:24 51:15
  122:2 167:6
saying 63:22
  160:11 237:22
says 33:15 40:13
  58:18 75:17
  76:6 77:19 78:7
  81:25 82:7,10
  82:12 83:4
  84:19 85:7,10

91:1,18 94:5,7
  94:8 124:8
  128:7,17
  133:17 136:22
  140:22 145:25
  147:23 151:2
  153:15 170:7
  172:15 173:25
  176:19 209:19
  209:21 210:2
  212:16 217:2
  218:15 232:21
  237:13 238:1
  239:8 241:17
  243:11
schedule 45:11
school 116:8,9
science 27:18,20
scope 23:25
  43:25 44:8
  47:25 48:8
  49:23 52:4
  54:12 59:4 60:9
  61:11,25 62:6
  63:23 69:14
  70:14 71:2
  76:13 78:19
  79:19 80:22
  104:12 105:1
  105:11,19
  124:23 125:5
  125:19 127:24
  129:7,13,21
  130:7,12
  135:22 136:3
  137:4 140:9
  142:8,14
  143:13 148:5
  148:19 157:20
  158:19 162:4
  162:20 163:7
  166:3,10 174:7
  174:24 175:6
  175:12 179:9
  179:16 180:11
  180:18 181:3



181:15,21
195:25 198:10
199:4 212:20
216:16 219:23
221:15 233:24
244:11,16
245:17 246:3
248:14
**screen** 16:12
68:22 88:21
89:4 159:21
**screening** 89:17
**scroll** 150:9,13
169:22 201:10
214:20
**scroll's** 150:11
**seal** 30:7 251:18
**seating** 101:5
**second** 15:20
45:10 91:22
120:22 133:8,8
133:11,13,17
149:10 155:13
160:7 173:24
183:15 185:11
186:3,12 211:9
218:13 229:11
232:9 237:16
248:9
**secondary**
144:12 218:9
241:3
**second-line**
198:14
**second-to-last**
211:6,7
**second-to-the-l...**
186:4
**secretary** 135:16
136:2 183:10
186:5 190:24
**section** 15:12
123:19 150:18
150:20,21
183:17,17
**secure** 234:8

**security** 8:25
31:6 35:19
73:18 135:16
183:10 186:12
186:13 188:9
201:13 202:13
230:17
**see** 14:14 15:11
15:16 19:22
22:16 32:17
38:25 40:15
41:25 49:9 69:3
70:5 80:13
82:25 83:7 84:3
84:4 87:19
89:15 91:1,19
94:11 101:8
124:4,7 132:25
133:15 134:17
141:16 149:18
151:2,24 156:9
163:24 169:4
169:23 170:5
171:15,18
172:15 176:10
176:20 177:19
183:12 189:25
201:4 202:19
214:21 218:10
236:7 244:24
**seeing** 16:14
204:10
**seek** 162:3 163:4
163:10 239:2
**seeker** 48:22
87:19 88:20
94:24 95:6
98:17 102:10
107:3,5,14,23
108:21 113:7
117:15,16,23
120:12,13
125:3 144:16
144:22 157:15
161:21 162:7
178:3 195:21

198:7,17
241:14
**seekers** 44:19
48:19 57:2 86:6
87:5 93:16 96:6
96:20 104:9,23
105:7 108:8,15
108:25 113:16
113:23 114:5,6
115:4 118:5,20
119:5 124:21
125:16 131:7
145:3,4 154:16
154:20 155:4
156:7 159:10
159:16 162:16
163:4 165:9
167:2 168:16
177:18,23
178:11,19,24
186:16,20
187:25 188:6
188:15 189:14
192:25 193:17
196:23 198:16
198:21 199:1
203:17 205:22
211:17 212:5
215:14 216:14
236:12,13
238:2,9 239:25
240:5,15,20,22
241:25 242:6
242:19,25
243:4
**seeking** 163:13
184:15 195:1
196:24 213:16
**seen** 7:20 14:16
14:18 33:8
50:24 51:10,11
59:12 60:25
70:1,21 81:14
81:16,18 90:10
90:14 121:13
121:24,25

149:20,25
156:11,13
181:1,7,8
**segregated** 91:25
97:9 100:19
**seizures** 11:14
39:17,18
**select** 20:20
217:8
**selects** 216:23
217:7
**self-inflicted**
55:17
**self-metered**
133:21
**semiautomatic**
165:15
**sending** 200:10
**senior** 127:8
**senior-most**
126:13,23
**sense** 62:21
194:24 236:2
**sent** 123:21 128:3
129:1 205:8
206:23 207:3
208:20 215:11
218:13 224:14
237:4,7
**sentence** 99:3
133:8,17
153:11 169:3,4
183:24 211:9
211:15 229:11
239:4
**separate** 18:22
21:21 238:13
**September** 214:9
227:25 241:12
241:21
**serve** 47:13
**Service** 28:21
**services** 1:24
6:11 56:24
173:11,21,22
174:11 253:23

**service-level**
127:9
**SES** 127:15
**set** 4:14,21 50:22
90:8 102:10
149:17,23,24
150:2,2
**sets** 136:15 184:9
184:10,11,20
184:21 185:2,5
222:22 223:2,4
**setup** 95:10,16
99:11 103:7,9
103:16

**severe** 136:10,11
196:10
**severely** 199:6
**sexual** 196:8
**Sfields@mayer...**
2:7
**shade** 93:5 95:21
101:5 102:6
**shakes** 7:18
**share** 209:22
**shared** 213:4
**shelter** 224:20
225:10,11,13
225:16 227:22
**shelters** 207:14
209:2 221:4,7
221:18 224:18
228:4
**shift** 46:19 47:14
85:21 93:6
138:1 168:2
184:14 194:4,5
**shifted** 184:17
**shifting** 185:18
**shifts** 46:11
137:25
**Shinners** 2:9 3:8
6:18,18,22 8:10
15:7 19:13,20
19:21,24 22:2



26:10 32:23
33:4,6 37:1
43:25 44:8,21
45:16 47:23,25
48:8 49:1,23,25
52:4 53:2,25
54:12 57:25
59:4 60:9 61:1
61:11,24 62:11
63:2,21 67:17
68:11,14 69:14
70:14 71:2
76:13 78:19
79:7,19 80:22
84:20 86:8,10
87:7,22 88:23
88:25 93:20
95:3 104:11,25
105:10,18,22
107:17 108:24
113:10 115:8
117:17 120:21
124:3,23 125:5
125:19 127:22
127:24 129:7
129:13,21
130:7,12 131:9
135:22 136:3
137:4 140:9,15
142:8,14 143:9
143:12 144:4
148:5,19
149:10 150:7
153:18,23
154:24 155:7
155:13,17,25
157:19 158:19
159:11 162:4
162:19 163:7
166:3,5,10
174:7,24 175:6
175:12,17
176:1,4 177:9
178:5 179:2,9
179:16,20,23
180:11,18,21

181:3,15,21
182:12,16
183:3 184:2,4
185:7 186:23
187:22 190:25
191:5,15
192:17,20
195:25 198:10
199:2,4 200:12
200:15,18,20
200:22 201:25
205:12,14
207:24 208:15
209:10 212:20
216:16 217:22
217:24 219:23
221:15 233:24
235:9,16,23
236:1,2,5 238:5
240:8,16,24
242:21 243:15
244:11,16,22
245:1,17 246:3
246:8 247:25
248:13 249:5,6
249:8,13 253:2
253:9
**shoot** 233:2,2
**shooting** 34:11
**short** 68:10 153:6
235:8,12
**shorthand** 1:22
252:13
**shortly** 152:4,15
152:22 230:1
**show** 200:6
220:16
**showed** 14:20,23
48:22 49:9
130:19 159:13
242:8
**showing** 14:9
32:15 66:19
68:23 81:11
83:23 90:6
126:1 132:18

134:11 141:10
149:13 163:18
171:10 176:6
183:4,8 189:19
**shown** 156:4
191:13
**shows** 201:16
**sic** 45:11 197:22
217:19
**side** 37:13 76:9
83:5 111:5
138:5,6 167:8
173:6 176:22
176:25 206:7,9
220:17 230:21
230:22 232:3
234:18 237:9
███████ 165:21
**sides** 99:15
**sign** 248:23
**signature** 3:9
141:25 142:11
250:1 251:2
252:22
**significant** 34:4,8
60:1 66:5 80:8
99:14 142:15
147:20 229:25
**significantly**
75:11 184:21
199:7
**similar** 21:21
98:25 101:23
113:13 117:20
118:10 119:4
137:13 149:22
184:25 192:15
212:17 213:4
213:16,22
226:11
**similarly** 112:24
**simple** 205:2
**simply** 13:1
**single** 196:5
**sir** 7:10 12:12
17:10 20:6 23:8

24:20 28:11
31:22 35:7 36:4
36:23 37:7
40:16 51:23
71:23 74:24
75:17,19 80:14
90:16 91:2,16
91:20 92:15
99:25 100:14
101:12 104:7
104:21 105:15
108:10,18
109:4,8,25
110:13,19
111:24 113:5
115:25 118:7
118:13 119:7
119:12,14
120:5 121:10
123:5,9,13,15
123:17,20
125:18 126:14
126:17,19,21
126:25 127:3
128:8,23 132:3
133:1 134:18
135:19 138:6
138:13 147:22
150:3 156:20
159:25 164:11
172:17 175:3
176:21,24
178:4,22
181:14 209:18
**site** 175:22
180:24 182:5,6
**situation** 136:18
**situational**
231:10
**six** 49:6,12,13,14
49:22 50:6 52:1
**size** 56:5
**sleep** 58:19 72:4
**slight** 7:21
**Slocum** 2:20 6:24
26:11 155:18

155:22
**slower** 57:6
**slows** 59:17
**small** 43:3 54:18
85:13,16 87:1
101:3 115:1,1
119:17 209:11
**smaller** 174:22
**smugglers**
183:21
**social** 13:22
**soil** 93:16 98:17
102:11 115:18
119:6 151:11
151:13,14
165:10 166:18
167:2,3,10,12
205:22 206:4
207:12 247:2
247:17,21
**Solange** 2:22 6:9
**somebody** 66:18
148:9 170:11
187:10 196:19
**somebody's**
102:15 103:1
**someone's** 89:17
90:1
**something's**
130:17
**somewhat** 168:18
174:18 194:18
**sorry** 19:15,19
20:3 22:6 28:10
35:11 36:15
57:14,16 65:6
70:15 75:23
77:11,14 79:9
79:20 90:22
91:4 92:23
101:9 103:15
109:5,19
111:21 119:3
120:21 125:21
126:20 128:16
133:9 134:12



MAGNA
LEGAL SERVICES

142:9 143:12
146:12 149:14
149:23 155:14
155:18 170:20
178:6 179:11
179:22 180:19
181:5 183:5
184:3 185:7
187:9 200:15
204:17 205:13
208:4,6,7,18
214:14,25
222:3 236:23
238:24 239:15
**sort** 51:9 181:19
217:18
**sound** 75:24
92:16 97:20
101:14
**Sounds** 21:21
**southern** 1:2
2:15 6:5 66:4
252:2
**southwest** 124:17
**southwestern**
69:13 128:24
139:20 155:5
**space** 73:12,13
73:15 94:22
95:7 101:16
102:16,18
103:1 117:7
151:16 173:9
173:10 196:9
210:6 221:17
**spaces** 58:9 75:6
**span** 92:8 110:10
120:1 160:5
**Spanish** 17:9
**spans** 101:1
**spark** 168:1,6,9
**speak** 21:25 22:7
22:10 25:8 34:9
34:13 36:9,16
36:20,24 39:15
39:23 40:3 52:5

71:10
**speaking** 20:1
23:12 63:3
160:4
**special** 39:19
**specific** 61:25
62:2,5,19,19
63:12 66:21,25
78:4,6 87:23
108:22 181:24
198:20,21
212:3 244:12
244:18
**specifically** 38:7
67:3 74:3 79:4
81:3 87:4 110:6
110:8 112:12
115:11,16
124:5 145:5
160:24 221:22
228:8
**specificity** 91:6
151:5
**specifics** 105:19
161:7,11
212:22
**speculation**
162:20 163:8
217:25
**spell** 10:17 23:7
226:18
**spent** 19:3 20:17
175:19
**spoke** 22:11,12
22:19,20 40:1
175:19
**spread** 56:10
**spring** 24:8
108:14 114:3,6
114:10 118:11
118:12
**staff** 35:24 91:11
113:14 114:19
**staffing** 72:12,21
91:13 92:12
106:19 107:5
115:2 186:6

**stage** 54:15
**staged** 111:4,5
209:1
**stand** 86:1 91:13
92:12 97:24
98:10,11,21
99:9 106:16,19
120:4,9 135:8
138:7 142:4
202:21 207:20
229:13
**standard** 51:1,2
59:20,21 60:21
**standards** 64:9
**standing** 62:8,18
94:14,15,18
97:23 98:14
105:19 117:1,3
167:6
**stands** 224:23
225:1 229:20
**Stanton** 37:25
38:9,14
**start** 16:5 75:10
136:14 139:15
200:3
**started** 24:7
29:11 54:4,5
86:20 110:20
136:14 159:19
177:25 184:24
184:25 189:7
223:21 230:1
242:9,14
**starting** 133:14
168:17 169:3
**starts** 91:22
128:2 190:11
**state** 1:22 6:13
8:19 10:17
27:21 70:21
89:1 129:15
172:15 173:25
191:12 217:3
217:16,17,21
223:7 228:11

229:16 238:14
240:4,13
248:20 251:11
251:23 252:14
**stated** 16:5 159:9
207:10
**statement** 181:19
182:3 188:11
**states** 1:1 6:4
82:17 93:23
130:17 142:18
145:22 152:2
152:13 157:13
158:17 164:17
171:24 172:2
172:11 190:17
195:2,22
196:25 210:6
211:13,18
212:12 225:8
252:1
**static** 234:8
**station** 2:11
112:16 144:12
167:15
**stationed** 88:6,17
88:21 89:12,23
95:1 98:3,8
101:24 102:20
106:13 107:22
112:15 116:21
116:23 117:21
120:2 136:24
137:17,18,21
137:23 144:15
146:11,16,24
147:8,14 160:2
160:14 161:4
161:12,20
165:19 166:25
205:24 235:2
**statistics** 169:10
**status** 128:20
130:1,20
**statute** 50:9,10
58:24 59:7,8

60:4
**statutory** 186:21
**stay** 53:17 151:15
**staying** 172:8
**steel** 92:1
**step** 93:3,10,10
93:16 94:24
98:17 102:3
151:10 247:2
**stepping** 167:2
207:12
**steps** 45:7 178:16
192:2 247:20
**stop** 54:7 183:7
247:15
**stopped** 86:21
164:20 177:4
**stopping** 120:18
225:8
**stops** 59:18
**stories** 27:12
**story** 241:14
**straightforward**
196:4
**Street** 2:5,15
253:23
**strike** 35:11
46:13 52:22
67:12 88:18
92:23 104:18
111:21 149:5
168:10 176:17
181:16
**string** 169:18
**structure** 106:18
**structures** 91:9
106:7,21,24
107:1 110:1
119:21,24
**stuff** 25:24
**subbullet** 210:5
**subinspector**
227:6 233:13
233:17
**subject** 69:1
88:12 108:3



118:1 132:22
134:15 141:14
163:21,23
183:11 189:23
197:23 201:2
206:18 214:10
218:9 224:9
236:17 238:10
239:10,13,16
241:13 243:13
243:16,22,23
244:2 247:1
**subjected** 237:21
**subjects** 218:19
225:7 239:17
240:9
**submitted** 252:20
**subscribed**
251:16
**substance** 26:3
**substantive**
191:20
**successful** 189:3
**successfully**
56:14
**sued** 13:15
**sufficiently** 80:20
**suitable** 72:6
73:4,10,23 75:3
**Suite** 2:15
**summarizes** 84:6
**summary** 4:12
83:25 84:21
**summer** 24:8
118:11,12
204:22 223:25
**sunburned**
164:19
**sunny** 102:5
**supervisor** 42:21
42:25 43:2 65:8
161:2 166:14
207:1 229:4
**supervisors**
45:10 160:7,12
166:25 198:14

**supervisory**
206:24
**Supplemental**
4:13 90:7
**supplies** 35:23
**suppo** 238:10
**support** 73:17
**supposed** 88:6
98:10,11
107:23 117:22
137:25 158:13
173:6 181:9
188:4 237:10
238:2,7
**sure** 9:16 15:21
35:18 39:16
45:1,5,7,9 52:8
62:1,5 71:4
72:2 86:12
90:15 95:23
103:20 120:17
134:23 136:6
149:25 150:1
154:2 155:16
160:11 163:22
164:9 173:3
175:16 191:4
191:15 192:23
195:24 196:2
201:23 208:16
209:13 211:7
229:21 245:1
**surge** 54:5 146:6
146:8 184:12
184:15,18,24
204:5 212:2
246:18,20
**surges** 53:16
131:20 197:5
**surprised** 112:7
**surrounding**
181:19
**suspect** 90:1
**suspended** 17:17
**sustainable**
184:19

**swapped** 103:20
**SWB** 69:2 128:21
128:24 130:1
139:14
**swear** 7:1
**sworn** 1:19 7:3
252:16
**swung** 111:8
**Sydney** 2:4 3:7
6:16 199:10,16
200:9 253:1,8
**symbols** 37:14,15
**system** 47:4
189:13 212:17
212:21,25
224:20 225:10
225:11,13,16
227:22 237:21
**Systems** 30:7
**S-A-M-U-E-L**
10:20
**S1** 134:24 135:14
135:15 136:2
190:23
**S1's** 190:17

___

**T**

**T** 3:4
**tactical** 41:22,25
42:7
**take** 8:16 9:23
15:17 19:7
20:23 21:12
24:21 32:18
33:11 42:9 45:7
51:24 53:5
56:13 57:6
64:19 65:1,13
65:23 67:5
68:10 73:9 80:7
80:17,23 87:24
88:15 89:19
96:25 97:21
107:20 114:20
114:22 115:2
117:18 120:15

120:17 136:12
143:22 144:9
144:10,17,21
145:1,3 150:7
153:23 156:17
160:18 161:18
161:19,24
162:1 163:16
169:19 182:10
194:17 201:22
205:3 207:5,7
207:22 223:4
228:4 235:8
236:5 243:17
245:3
**taken** 1:19 9:19
9:23 42:7 64:20
68:18 105:4
113:12 118:22
120:25 182:21
192:2 235:19
245:6 253:5,17
**takes** 56:9,11,25
57:5 66:2
**talk** 7:23 61:18
63:11 86:5 96:1
100:9 104:8
164:16 219:19
**talked** 11:24
137:14
**talking** 47:16
62:16 63:23
76:16 130:13
197:20
**Tamayo** 141:20
**target** 78:22 79:4
**Taser** 165:16
166:9,11,12
168:1
**tasks** 30:9
**team** 69:17 77:12
79:10 135:13
141:22 142:1,3
142:5,10
**tear** 103:22
**tech** 6:9 155:21

185:11 200:9
**technically** 94:20
**TECHNICIAN**
2:23
**telephone** 18:4,6
18:8 26:12
139:15
**tell** 8:4 9:20
23:11 57:4 65:7
73:15 88:6
107:23 113:16
115:16 117:22
120:13 130:4
144:9,23
147:16 158:16
161:21 169:7
180:15
**telling** 25:16
**temporarily**
72:24 234:14
**temporary** 73:2
75:9 91:10
194:9,10
211:22
**ten** 12:15 56:10
97:15 99:5
**tend** 64:22
**tended** 246:20
**Tennessee** 27:21
**tenure** 48:17
**Teresa** 22:25
37:24 49:15,17
75:16,23 118:4
118:6,9,16,21
119:11,17,20
120:3,6,11
123:11
**Teresa's** 75:25
**term** 49:21,24
50:5,15 51:5,8
51:25 60:7
85:25,25
110:11 192:24
193:2 197:13
198:2,3
**terms** 63:6,10



**terrible** 17:9
**territory** 93:11
  101:25 102:6
  164:21 167:9
  167:16
**test** 168:1,9 177:9
**testified** 7:3 11:9
  11:22 12:4 28:6
  67:14 121:7
  158:10 180:7
  190:23 199:17
  205:16 214:13
  215:17 216:2
  239:9 243:12
**testify** 7:7 10:4
  13:4 15:15
  16:22 17:11
  18:12,16,19
  20:13 21:2,16
  21:25 22:8
  25:23 63:11
  248:7
**testifying** 9:9,24
  15:1
**testimony** 7:17
  12:8,23 22:3
  52:23 66:6
  67:18 98:2
  119:4 247:7,9
  248:15 252:18
  253:5
**tests** 168:6
**Texas** 1:22
  134:16 141:14
  142:21 146:2
  153:8 164:8
  168:12,19
  215:11 251:11
  252:14 253:21
**text** 157:2 205:7
  205:9,10 216:3
  248:10,15,17
**texting** 10:13
  246:1
**texts** 205:8
**Thank** 7:6 20:2

23:10 33:5
35:11 36:20
38:7 44:15
149:12,12
155:17,22
176:5 183:3
200:14,22
201:15 202:7
205:15 206:22
209:17,18
210:5,14 211:3
212:10 214:5,7
214:25,25
215:2,5,8 218:5
218:11,14
219:2,25
224:12 226:1
226:20 229:10
232:9,14,25
234:5 236:8,22
236:23 237:17
244:20 246:24
249:4,16
**thanks** 16:9
192:21 238:19
**theirs** 54:21
**thing** 35:23 66:23
72:17 119:19
146:24 148:14
158:9 177:12
194:11 196:8
204:7,12
**things** 22:16 61:6
65:22 76:18
103:21 110:6,9
**think** 14:19
17:16 18:21
21:24 27:1,23
28:3,5 29:1
36:7 39:21 43:1
44:10,11 51:17
53:12 58:8
59:24 62:7,22
63:3 67:24
69:16 71:19
74:20,22 76:15

78:15 81:7 89:8
90:12,13 95:20
100:10 101:8
102:4 103:6
105:2 109:12
110:11 118:17
119:25 124:12
127:8,9,14
128:5 129:14
131:12 136:5
138:17 140:4,6
141:23,24
145:11,12,17
149:21,22
150:13 154:19
156:12 162:5
162:16,21,22
162:23 163:3,6
163:10 164:8
168:12,17
173:2,21 174:8
174:9,23
178:12 181:7,8
181:9,23
182:14 187:10
187:24 188:22
190:13,23
192:5 193:4
194:2,13,15
198:21 203:19
204:4 213:6
214:3 217:2
220:11 221:16
221:16,19,21
221:23 223:25
227:23 230:4,8
233:13 234:17
234:18 235:11
235:18 236:2
245:19
**thinking** 234:24
**thir** 169:2
**third** 35:8 164:2
169:3 186:13
248:10
**Thome** 31:8

201:1,17,20
202:11,24
203:3,10 206:5
**Thome's** 201:11
**Thomson** 171:20
171:24 172:2
**Thomson's**
171:18 172:9
**thought** 53:10
100:1 139:14
140:22 158:24
**thousands**
241:24
**threatening**
165:17
**threats** 157:7
**three** 23:20 24:16
32:9 36:14 46:4
46:11 72:13
83:12 86:17
92:1,3 96:11
100:3 164:23
248:5
**throughput**
192:24 193:2
**tickets** 178:10,12
**Tijuana** 212:24
213:24 214:1
241:25 243:9
**time** 1:21 6:7 7:7
7:21 8:10,10,20
14:24 15:18,24
16:2,3,6,6,7,7
20:17,19 24:7
29:9,10 30:11
30:17,25 31:1,7
31:11,13 32:18
33:7,24,24
35:15,15 41:21
41:21 42:7,22
52:3 53:8,22
54:16 57:5
59:25 64:10
65:2 66:2 68:10
68:16,19 71:5
72:12 73:1

74:11,14,16
75:13 76:23
80:18 85:18
86:6 87:25
90:24 95:21,23
95:24 96:5,22
105:4 106:22
106:23,25,25
107:20 108:17
110:5,10 112:8
113:12 114:18
117:18 118:15
118:23 119:24
120:1,15,15,23
121:1,6,6
125:10,15
126:9,12,15,22
127:1 128:7
131:15 136:8
138:24 139:23
140:2 141:22
144:9,16,19,25
145:4 146:12
146:15,25
147:8,15
148:18 150:7
152:7,19 155:2
155:5 156:17
158:13 161:14
161:24 162:1
168:4,17
170:16,19
172:5 173:17
178:23 182:9
182:19,22
185:12,15
188:20 190:2,5
191:7,10
192:10 193:12
193:23 194:11
195:17 197:20
201:12 203:14
206:24 209:24
212:19 213:6
217:4 220:20
222:22 230:1



MAGNA
LEGAL SERVICES

230:15,15
231:9 233:11
235:1,10,10,18
240:23 241:1
243:24 244:5
245:4,7 248:1
249:17 252:24
253:5
**timer** 235:14
**times** 19:5 26:14
46:4 92:19 93:7
101:24 118:18
118:18 119:19
137:19 151:12
151:14,17
154:15 160:21
160:23,24
161:1 188:25
189:10 220:5
226:25 228:1
233:19 241:14
241:23
**timing** 223:15
**Timothy** 218:8
**title** 11:3 28:17
28:20,25 33:15
84:4 187:15
233:12,13
236:20
**titled** 14:11 90:7
149:15
**Tobias** 32:11
**today** 6:6 7:7
9:11,20,23 10:5
15:2 16:23
17:12 21:2,16
21:25 22:8 25:6
25:9,12,15,23
36:11 39:24
40:5 43:14
107:4,7,12
142:12,19
164:15 169:9
194:24 201:3
216:8
**today's** 27:4

**Todd** 51:22 69:1
121:9,17 126:6
126:15 134:15
141:13 190:10
**told** 11:8 17:25
24:5 25:24
73:13 87:21,24
88:13 89:18
96:21,23,24
104:23 105:4
107:5,15,19
108:5,6,21
113:8,9,11
115:5,7,9,10
117:16 118:2
118:20,22
119:1 120:14
130:18 144:16
146:10,15,20
146:23 147:3,6
157:12 166:15
168:7 215:12
227:21 229:21
**top** 97:5 100:2
111:2 150:25
151:25 164:21
169:17 201:20
202:1,16 206:6
208:19,20
212:10 228:15
231:3 234:4
236:22
**topic** 15:16 16:15
16:22 17:2,11
23:19 142:18
199:11,19,25
**topics** 15:12,15
21:9,11 23:16
209:8
**Tor** 104:18
**Tornillo** 23:4
24:11 37:19
38:1 42:20
48:23 49:16,18
54:14 75:22
76:4 104:8,10

104:13,16,20
104:22 105:6
105:14,17
106:8,14 107:4
107:10,15,18
107:22 113:14
119:5 123:14
172:10,10,16
173:4 174:1,12
174:20,21
175:20,21,22
**Tornillo's** 54:14
**Torres** 22:21
23:3,12,17
24:10 27:9
**total** 26:19 71:17
75:22
**touch** 134:22
**touched** 21:10
**track** 45:13,19
66:11,14 194:3
194:19,21
**tracking** 193:24
194:25
**trade** 35:25
38:12 41:22
186:14 188:10
**traffic** 13:7,10
39:16 92:4,7,11
92:20 93:1,25
94:5,10,16,20
95:18 99:21
102:2,3 106:3
109:16,24
111:6 143:3
147:24 148:17
**trained** 166:11
167:1,15,17
168:5
**training** 43:5
165:24 166:1,7
166:8 168:2
**Tran** 2:22 6:9
**transcript** 11:15
11:20 248:21
249:1 252:17

252:20 253:13
**transcripts** 20:12
20:15,18,21,24
249:9
**transferred**
28:21
**transgender**
196:8
**transitioned**
31:18 42:4
**transmission**
7:22
**transmitted**
46:24
**transport** 56:20
72:14,24 73:19
210:9
**transportation**
72:21
**transports** 66:1
71:8 217:9
222:24
**travel** 119:19
146:21 148:13
148:23,25
186:14 193:3
198:22 199:7
**traveler** 44:12
**travelers** 44:14
149:3
**treated** 146:3
186:20
**trial** 6:9
**Tribune** 215:11
**tricky** 63:3
**tried** 136:11
**trouble** 149:11
**true** 124:19,25
127:12 131:12
167:11,14
195:1 196:24
240:3 251:3
252:18
**truth** 9:20
**truthfully** 10:5
13:5

**try** 64:22 183:6
184:17
**trying** 50:21,21
55:17 148:21
167:7 212:2
234:15 236:20
**Tuesday** 241:15
**turn** 16:25 34:17
57:2,3 76:7
108:7 113:22
149:5 151:22
199:9 210:8
**turnbacks** 16:16
17:7 158:4
199:24
**turned** 154:21,25
155:4 178:25
188:17 189:15
190:20 206:2,8
**turns** 211:2
**twice** 112:2
196:20
**Twitter** 5:5 176:8
176:19
**two** 23:20 24:16
26:18 29:15
34:23 38:12
39:14 41:6
58:17 66:2 75:8
92:10 94:9
117:7 119:18
133:18 159:8
160:24 168:24
175:13 203:20
218:16 229:14
**two-page** 126:3
**Tyler** 218:8
**type** 21:20 35:23
44:12 56:19
59:17 66:23
69:21,23 70:11
72:16 73:1
77:10,11 110:9
119:19 146:3
146:17 148:13
158:9 178:2



194:11 196:8
202:15 203:23
204:6,12
233:14 245:23
**types** 39:14,18
53:17 65:24
95:21 110:18
246:16,23
**typically** 53:17
57:6 106:4,13
226:20 228:22
**typo** 163:22

___

**U**

**UAC** 172:20
173:19
**UDAs** 83:5,9
**Uh-huh** 68:14
174:21
**uh-huhs** 7:18
**Um** 153:18
**unable** 87:24
88:15 96:25
107:19 113:9
113:11 118:22
120:14 144:24
193:21 195:7,8
197:6 239:21
243:20,24
**unaccompanied**
89:19,22 90:1
164:20 196:6
223:12
**uncommon**
174:19
**undergo** 165:23
**underlined** 91:18
**underneath**
172:16
**understand** 7:18
8:2,4,8,14,22
9:1,4,7,9,19,22
10:1,7,12 15:1
15:4,14 25:14
25:20 28:23
45:10 46:22

52:23 81:21
86:3 148:1
160:11 210:3
211:14 237:7
242:11
**understanding**
9:14 44:13 67:4
78:2 104:21
106:15 108:13
108:18 112:22
114:3,8,12,24
118:10 131:5
134:5,8 137:6
142:13,15
148:21 149:2
150:17 152:17
154:2 159:18
159:18 167:17
168:8 178:22
179:3 180:17
180:23 182:5
197:13 213:20
213:23 216:15
216:18 217:11
217:14,17
229:25 233:7
237:10
**understood** 8:3,8
25:21 48:4 64:1
72:19 199:18
199:25 212:4
**undocumented**
83:10 146:19
147:5 148:22
149:3 161:25
197:20 239:22
243:16,23
246:15,16
247:1,20
**unemployed**
28:13
**unfortunately**
150:14
**unique** 56:10
**unit** 43:6 146:1
147:9 196:6,7

229:3 230:20
246:20
**United** 1:1 6:4
157:13 158:17
164:17 195:2
195:21 196:25
211:12,18
225:8 252:1
**units** 57:9 143:1
145:23 146:23
148:16 196:17
246:16,18,19
**University** 27:21
**unobstructed**
92:9 101:3
**unsworn** 12:10
12:11
**unusable** 72:18
**unusual** 76:19
**update** 69:2
128:10
**urge** 167:8
**usable** 73:8 74:15
75:6
**use** 24:5 50:20
52:13 61:12
72:23 78:24
79:22 85:25
104:14 106:4
111:12 116:10
116:11 166:9
166:12 173:12
192:9 246:20
**uses** 79:15
**usual** 7:22
**usually** 52:19
56:19 64:10
76:22 77:10
193:3 219:12
228:14,17
230:19 231:22
234:1
**U.S** 2:10 6:18,21
6:23 8:25 9:3
11:1 14:12
28:21 49:3,13

91:8,14 93:11
93:16 98:17
101:25 102:6
102:11,19
115:17 119:6
123:23 124:1,9
124:11,15
130:20 132:23
138:5,6 139:20
151:11,13
156:6 157:11
164:21 165:10
166:18 167:2,3
167:10,12
175:1 186:7
193:1,25
194:20 205:22
206:4,7,9
207:12 212:5
213:5 232:3
247:2,17,21

___

**V**

**V** 10:19
**vague** 19:13
45:16 53:2,3,25
57:25 61:1
124:3 130:12
143:9,13 144:4
147:2 154:24
155:7 240:8
242:21 247:23
**various** 69:12
139:16 162:13
247:3
**vary** 170:7
**vehicle** 91:25
93:6,8 97:10
100:19
**vehicles** 39:17
193:3
**verbal** 178:20,20
200:5
**verbally** 113:19
138:21 139:13
140:7 161:5

**verified** 65:10
**versus** 6:4 65:14
230:7 246:16
**viability** 148:12
**Victor** 10:20
218:13
**video** 5:5 26:7
176:9,19 177:2
177:3,4,10,17
242:8
**videoconference**
26:25 27:1
**Videographer**
2:21 6:1,9,25
15:23 16:2
68:16,19
120:23 121:1
182:19,22
185:12,15
191:7,10 245:4
245:7 249:17
**VIDEOTAPED**
1:13,17 3:1 4:1
5:1
**view** 125:12
131:17,17
152:24 173:21
197:24
**violations** 53:17
53:18 222:23
**violator** 72:23
**violators** 65:25
**violence** 34:11
157:5 228:13
229:14,17,24
233:25
**Visa** 232:17
**visas** 211:22
**visible** 89:10
165:18
**visit** 174:16
175:4 179:19
**visited** 175:7,8,22
176:20 179:7
179:15
**visual** 89:11,23



147:21
**voice** 187:10
**VS** 1:6 252:6

**W**

**Wagner** 134:15
134:21 139:11
141:13
**wait** 7:24,25
87:21,25 88:1
96:21,23,24
104:23 105:3,5
107:20 108:21
113:12 115:6,9
115:10,11,12
115:14,16,17
115:21 117:19
118:20,23
119:6,8 120:16
137:8 144:11
144:25 147:6
155:15 188:20
196:13 217:13
220:15 221:10
223:5 239:23
240:12 242:6
242:11
**waiting** 65:4 83:5
86:23 87:1,5,10
87:12,14 137:9
137:9 165:14
177:14 185:4
188:20 196:21
196:22 214:11
220:24 222:15
237:9 239:2
242:1
**wait-list** 177:18
177:22 178:10
**walking** 89:5
247:14
**want** 32:25 37:18
52:7 62:1,5,17
90:2 120:17
140:13 150:9
153:6 156:17

169:19 181:23
182:10 191:12
192:8 232:17
235:24 236:1
244:25 249:11
**wanted** 23:24
33:1 86:12
134:22,24
136:7 139:13
245:10 248:20
**wants** 190:19
232:12,16
**warn** 130:9
**Washington** 2:6
2:12,16
**wasn't** 54:16
74:15 131:12
138:23 184:19
209:13 219:16
**watch** 22:11
28:23 29:6,7,11
29:12,19,20,21
30:10,11,14,20
31:4,18,19 32:5
32:8 45:9 46:18
47:9,11,12,15
47:16,17,19,20
48:2 78:11
160:8,12 161:2
204:22 219:4,6
219:10,10,13
219:14 226:4
**water** 71:9
**way** 19:18 30:1
45:11,20 48:13
72:16 89:4,8
99:16,16
131:12 147:4
162:22 185:4
187:19 189:11
220:22 225:12
247:17
**ways** 188:8,13
**weapons** 165:23
166:8
**wear** 103:22

**weather** 93:7
102:1
**weathering**
103:22
**web** 7:21
**Webex** 1:23 18:6
26:13
**websites** 25:19
**Wednesday** 6:6
**week** 137:16,17
137:20 138:23
139:17 169:10
178:13 207:13
219:1
**Weekly** 132:22
**weeks** 14:19
17:18 18:14
19:2 86:18
96:11 187:8
**welcome** 32:18
121:3 150:10
156:16 182:24
**Wells** 37:21
43:24 44:3
**went** 19:5 227:24
**weren't** 53:13
74:17 75:6
137:23 145:6,9
212:22 213:1
**we'll** 45:9 51:24
185:23 191:21
194:23 211:3
**we're** 15:24 16:3
45:5,5 46:1
47:15 53:18
56:17 60:13
61:16 62:16
68:9,17 73:6
85:2 87:24
88:15 90:6
96:24 107:7
120:24 121:2
141:10 144:8
144:10,17,24
144:24 145:1
145:20 160:18

160:18 161:23
174:13,13
182:14,14,20
182:23 185:13
185:16 188:21
191:8,11
195:14 200:22
212:25,25
216:8 231:11
231:11 239:21
243:17,24
245:5,8 248:9
249:14,19
**we've** 33:1 63:7
68:8 95:21
103:20 108:20
158:7 182:10
188:12 197:19
228:15 235:6
235:17,19
236:11 238:20
241:3 248:18
**WhatsApp** 205:9
**whatsoever** 59:6
59:7 227:15
240:2,18
**widely** 181:10
**width** 92:8 101:1
**William** 132:21
**willing** 135:1
204:11
**wing** 215:22
**wire** 111:2
**wish** 8:16
**witness** 1:18 7:1
17:15 18:1,13
18:16 20:13
37:2 44:2 63:10
68:15 70:17
71:4 86:9,11
88:24 89:3
105:21,23
144:6 179:22
180:19,22
184:3,6 208:9
209:12,18

214:25 235:25
236:23 248:23
252:16,19,21
252:22
**women** 179:19
**word** 85:11 148:1
177:13 213:7
246:20
**wording** 137:7,9
**words** 30:5 72:17
87:9 163:1
189:2 195:13
211:23 223:2
230:20
**work** 23:21 27:16
28:12 43:13,15
74:19 76:16
184:19 211:22
229:19
**worked** 11:5 13:1
28:3,13 213:11
**working** 28:7,16
77:17 150:11
**workload** 56:15
223:3
**works** 164:7,13
214:14
**worth** 18:20
235:19
**wouldn't** 78:24
99:22 111:6,12
161:15 182:2
202:3 214:22
236:21 244:22
247:13
**write** 129:5,5
131:22 177:22
**writes** 134:21
**writing** 66:16
140:13 241:24
242:10,14
**written** 12:8,23
60:18 88:7
107:25 113:15
117:24 138:14
139:14 140:8



MAGNA
LEGAL SERVICES

140:13 177:18
**wrong** 52:11 54:3
128:6 158:7,22
158:25 182:4
232:13
**wrote** 66:15
128:19 129:25
131:1 132:1,3
168:21 202:24
203:4 215:12
224:14 225:18
227:6 229:12
232:16 234:7
237:7 238:25
241:24
**www.MagnaL....**
253:25
**www.MagnaL....**
1:25

**X**

**X** 3:4

**Y**

**yards** 106:2
**yeah** 12:18 18:24
30:1 36:18
59:13 62:17
65:5 66:14
68:12 78:2
86:11 89:11
94:20 122:15
125:22 128:6
133:12 140:16
141:24 147:13
150:9,13
152:24 153:6
157:19,22
160:16 161:15
169:2 170:7
182:16 184:17
185:10 190:15
192:17,18,18
195:24 196:2
201:9 207:25
219:4 225:11

235:22 241:11
**year** 27:22 28:15
28:24 29:1,3
36:5,7,8 152:25
187:1,1,2,3,4,6
226:25
**years** 12:15,15,16
43:1 189:4
227:21
**yep** 156:23
**yesterday** 194:23
**yes-or-no** 90:17
150:4
**Ysidro** 124:22
125:3,11 131:1
131:7,13,24
132:1 159:10
213:22 244:15
244:19
**YSL** 210:7
**Ysleta** 37:25
38:10,18 49:15
49:18 71:22
96:18 98:25
100:5,9,10,18
101:18 102:10
103:8,9,17
123:4 172:2
205:17,20
222:7,7
**y'all** 200:15

**Z**

**Z** 195:11
**Zeke** 22:20
**Zone** 38:12
**zoom** 133:10
186:9

**0**

**0** 172:11
**00:00** 253:2
**00:02** 253:2
**0084250** 241:11
**01:09** 253:1
**05:19** 253:1

**1**

**1** 6:2 92:3 100:22
100:23 101:3
101:16 102:9
102:15,17
103:1 113:4,5
117:8,9,10,11
**1st** 8:21 38:17
112:2 227:23
**1:01** 121:1
**10** 97:15,25 98:1
98:14,21 99:5
113:4 117:9
187:7 218:19
**10th** 141:19
**10-15** 180:10
181:20
**10:11** 15:24
**10:33** 68:16
**10:54** 68:19
**100** 18:20,23
147:19
**1000** 218:18
**1006** 4:12 83:25
■ 72:11
**11th** 134:14
141:4,12 218:7
**11:00** 235:18
**110** 85:4,5
**1101** 2:15
■ 71:19,24 72:7
73:20
■ 71:18
**12** 75:23 76:1
83:18 114:25
187:4
**12th** 141:5
**12/31/20** 253:22
**12:11** 120:23
**121** 4:5
**125** 4:16
**13** 156:23 214:9
**132** 4:17
**134** 4:18
**14** 4:6 43:1 91:17

100:16 151:23
**14th** 176:9
**141** 4:19
**149** 4:20
**15** 15:15 17:2
43:1,1 97:6
199:11,19,25
245:3
**15th** 171:13
**155** 4:23
**159** 4:8 33:2
**16** 131:23 159:8
71:16 75:15,21
76:3 79:23 80:3
80:10 84:9
126:5 128:3,8
128:10 129:17
130:24
**16-year-old**
164:20
**160** 4:9 32:14,16
32:25 33:2
**1600** 189:24
**161** 4:10 68:22,24
**162** 4:11 81:10,12
**163** 4:12,24 83:21
83:24
**1635** 253:23
**164** 4:13 90:4,7
**165** 4:16 125:25
126:2 159:5
**166** 4:17 132:17
132:19
**167** 4:18 134:10
134:12,13
**168** 4:19 141:8,11
**169** 4:20 149:8,15
**17** 157:3
**17th** 2:15 84:25
85:3 126:5
174:2 200:25
**17-cv-02366-B....**
1:5 252:5
**170** 4:23 155:10
156:4

**1700** 218:18
**171** 4:24,25
163:17,20
**172** 4:25 171:9,11
**173** 5:5 175:25
176:7 242:9
**174** 5:6 189:18,20
191:16
**175** 5:5,7 200:7
200:25
**176** 5:8 206:13
**177** 5:9 214:7,9
238:19,21
**178** 5:10 218:4,7
**179** 5:11 224:4,6
**18** 91:1
**18th** 132:20
133:12 134:1
**180** 5:12 236:10
236:14
**181** 5:13 241:7,10
**183** 4:7
**189** 5:6
**19th** 84:11
**19103** 253:24
**199** 3:7
**1994** 27:23
**1996** 11:8 28:9,10
28:16
**1999** 2:5

**2**

**2** 15:15,16 16:15
33:14 92:10
93:14,24 94:9
94:16,18,22,25
203:2
**2nd** 170:2
■ 95:6
**2:31** 182:19
**2:49** 182:22
**2:52** 185:12
**2:53** 185:15
**2:55** 139:12
**20** 1:15,20 3:2
4:2 5:2 87:1



210:7,9 235:7
252:11
**20th** 6:6 84:25
85:3 152:19
**200** 5:7
**20006** 2:6
**2003** 11:6,7
**20036** 2:16
**20044** 2:12
**2009** 29:2
**2010** 29:2 229:25
231:14
**2011** 229:25
231:14
**2016** 8:21 28:7
54:4,24 57:23
86:6,13,17,18
95:12 96:5,11
96:22 99:13
103:8,18 104:8
108:8,25 110:4
113:23 117:12
118:5 132:7,9
132:13,20
134:1,4,14
135:20 136:1
136:25 137:12
138:15 139:23
140:21 141:12
141:19 143:15
146:2 152:6
153:9,13,15
154:3,3,12,18
154:22 158:5
158:12 175:21
178:13,17,20
178:23 184:7
184:13,17
185:18,22
187:7,7 188:25
200:25 203:15
204:5 207:10
213:12 246:12
**2017** 29:5 156:8
**2018** 4:12 24:8
51:20,22 54:5

55:4,4 69:1,10
71:1,17 75:15
75:21 76:3 77:9
79:24 80:3,11
81:24 82:5 84:9
84:9,11,25 85:1
85:3,3 86:19
88:10 96:12
118:11,12
121:8,17,21,24
122:2 124:21
125:2,15 126:5
128:3,10
129:17 130:24
131:6,15,21,23
132:5 137:14
152:3,5,15,18
152:21 153:22
154:3,7,13,18
154:23 158:5
159:1,8,16,17
159:20,25
163:20 171:13
174:2 176:10
176:12 183:9
184:12,23
185:23 187:5,5
189:21 204:13
204:19,22
208:21 223:25
224:1
**2019** 104:17,20
107:13,24
108:14 110:19
112:2 113:6
114:4,5,6,10
179:8 187:1,5
188:21 189:5
206:16 207:23
208:13 214:9
218:7 223:16
223:21 224:7
227:24 233:11
236:16 241:12
**202.263.3221** 2:6
**202.355.4471**

2:16
**202.598.8259**
2:12
**2020** 1:15,20 3:2
4:2 5:2 6:6
17:16 38:17
86:19,20 87:2
87:12,13
100:12 112:3,4
189:7 252:11
253:19
**206** 5:8
**21** 151:2,4
**21st** 206:16
**212** 198:24
**212(a)(7)(A)**
198:5
**212(7)(A)(i)**
197:22
**214** 5:9
**218** 5:10
**224** 5:11
74:13,21,23
74:25
**235** 197:2,10,23
197:25 198:4
**236** 5:12
**24th** 189:21
**240** 197:4,11
**241** 5:13
**246** 3:8
**25** 83:13
**25th** 112:3
**250** 3:9
**252** 3:10
**26th** 236:16
**27** 122:2
**27th** 121:17,21
**28th** 241:21
**29** 241:12
**29th** 229:9

―――――――
**3**
―――――――
**3** 4:5 90:23 92:1
92:3 121:11
187:8

**3rd** 163:20
**3:02** 191:7
**3:14** 191:10

**30th** 224:7
232:10
**30(b)(6)** 4:6
14:12 15:2,5
17:15,25 18:13
18:16 20:13
62:23
**30-day** 186:5
**31st** 84:9
**32** 4:9
**33** 4:8

―――――――
**4**
―――――――
**4** 90:22,22 139:17
**4:36** 245:4
**4:58** 245:8
**40** 235:15
**451** 200:8
**47** 38:21

―――――――
**5**
―――――――
**5** 37:8 117:10
203:7,22
235:14
**5th** 81:24 82:5
183:9
**5:04** 1:20 249:18
249:20
**50** 71:13
**50.4** 171:25
**506** 241:11
**575** 190:12
71:1,6,13
75:18

―――――――
**6**
―――――――
**6** 198:5,24 206:1
235:17 245:7
**6:23** 235:18

**6:35** 171:18
**608** 236:15
**633** 253:22
**68** 4:10
**69** 82:8,22

―――――――
**7**
―――――――
**7** 3:6 15:10 16:14
197:22 198:1
198:24,24
**7:17** 128:4,8
**700** 31:2
**7040** 253:21
**705** 2:15
**73** 126:4
**785** 206:14

**792** 218:5
**798** 224:7

―――――――
**8**
―――――――
**8** 151:1
**8th** 253:23
**8:44** 130:24
131:23
**8:59** 1:20 16:8
**81** 4:11
**83** 4:12
85:5 172:12
**86** 4:7 183:1,9
**866)624-6221**
253:24
**866.624.6221**
1:24
**868** 2:11

―――――――
**9**
―――――――
**9** 17:1
**9:17** 16:2
**9:59** 6:7 16:6
**90** 4:13
**95** 84:14
**97** 85:6

