MAYER BROWN LLP
  Matthew H. Marmolejo (CA Bar No. 242964)
  *mmarmolejo@mayerbrown.com*
350 S. Grand Avenue
25th Floor
Los Angeles, CA 90071-1503
  Ori Lev (DC Bar No. 452565)
  (*pro hac vice*)
  *olev@mayerbrown.com*
  Stephen M. Medlock (VA Bar No. 78819)
  (*pro hac vice*)
  *smedlock@mayerbrown.com*
1999 K Street, N.W.
Washington, D.C. 20006
Telephone:  +1.202.263.3000
Facsimile:   +1.202.263.3300

SOUTHERN POVERTY LAW CENTER
  Melissa Crow (DC Bar No. 453487)
  (*pro hac vice*)
  *melissa.crow@splcenter.org*
1101 17th Street, N.W., Suite 705
Washington, D.C. 20036
Telephone: +1.202.355.4471
Facsimile: +1.404.221.5857

*Additional counsel listed on next page*
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Al Otro Lado, Inc., *et al.*,<br><br>             Plaintiffs,<br><br>     v.<br><br>Chad F. Wolf,[1] *et al.*,<br><br>             Defendants. | Case No.:  17-cv-02366-BAS-KSC<br><br>**EXHIBIT 118 IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>**FILED UNDER SEAL** |

---

[1] Acting Secretary Wolf is automatically substituted for former Acting Secretary McAleenan pursuant to Fed. R. Civ. P. 25(d).

CENTER FOR CONSTITUTIONAL RIGHTS
   Baher Azmy (NY Bar No. 2860740) (*pro hac vice*)
   *bazmy@ccrjustice.org*
   Ghita Schwarz (NY Bar No. 3030087) (*pro hac vice*)
   *gschwarz@ccrjustice.org*
   Angelo Guisado (NY Bar No. 5182688) (*pro hac vice*)
   *aguisado@ccrjustice.org*
666 Broadway, 7th Floor
New York, NY 10012
Telephone: +1.212.614.6464
Facsimile: +1.212.614.6499

SOUTHERN POVERTY LAW CENTER
   Sarah Rich (GA Bar No. 281985) (*pro hac vice*)
   *sarah.rich@splcenter.org*
   Rebecca Cassler (MN Bar No. 0398309) (*pro hac vice*)
   *rebecca.cassler@splcenter.org*
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Telephone: +1.404.521.6700
Facsimile: +1.404.221.5857

AMERICAN IMMIGRATION COUNCIL
   Karolina Walters (DC Bar No. 1049113) (*pro hac vice*)
   *kwalters@immcouncil.org*
1331 G St. NW, Suite 200
Washington, D.C. 20005
Telephone: +1.202.507.7523
Facsimile: +1.202.742.5619

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

_____
                              )
AL OTRO LADO, INC., et al.,   )
                              )
        Plaintiffs,           )    Civil Action
                              )
vs.                           )    No. 17-cv-02366
                              )        (BAS)(KSC)
KEVIN K. MCALEENAN, et al.,   )
                              )
        Defendants.           )
_____)


DEPOSITION OF JOSEPH JACKSON EATON IV

As 30(b)(6) Designee of

U.S. DEPARTMENT OF HOMELAND SECURITY

(Via videoconference)

August 13, 2020


Reported by:  John L. Harmonson, RPR

Job No. 613725



Page 2

1

2

3

4

5                                   August 13, 2020

6                                   1:33 p.m.

7

8

9        Deposition of JOSEPH JACKSON EATON IV, taken

10   via videoconference with all parties appearing

11   remotely, pursuant to the Federal Rules of Civil

12   Procedure, subject to such stipulations as may be

13   recited herein or attached hereto, before John L.

14   Harmonson, a Registered Professional Reporter and

15   Notary Public of the District of Columbia, who

16   officiated in administering the oath to the

17   witness.

18

19

20

21

22



Page 3

```
 1              A P P E A R A N C E S
 2
 3    On behalf of the Plaintiffs:
 4         MAYER BROWN
           1999 K Street, NW
 5         Washington, DC  20006
           202.263.3221
 6         (Via videoconference)
           BY:  STEPHEN M. MEDLOCK, ESQ.
 7              smedlock@mayerbrown.com
 8
 9    On behalf of the Defendants:
10         U.S. DEPARTMENT OF JUSTICE
           Office of Immigration Litigation
11         Ben Franklin Station, P.O. Box 868
           Washington, DC  20044
12         202.598.8259
           (Via videoconference)
13         BY:  ARI NAZAROV, ESQ.
                ari.nazarov@usdoj.gov
14
15         U.S. DEPARTMENT OF HOMELAND SECURITY
           Office of the Inspector General
16         395 E Street, SW
           Washington, DC  20024
17         (Via videoconference)
           BY:  DAVID YOUNG, ESQ.
18              JILLIAN CLOUSE, ESQ.
                david.young@oig.dhs.gov
19              jillian.clouse@oig.dhs.gov
20
21
22
```



```
                                                        Page 4
 1                    APPEARANCES (Cont.'d)

 2

 3        U.S. DEPARTMENT OF HOMELAND SECURITY

          Office of the Inspector General

 4        245 Murray Lane

          Washington, DC  20528

 5        (Via videoconference)

          BY:   JOANNE HOWARD, ESQ.

 6              joanne.howard@oig.dhs.gov

 7

 8

 9    ALSO PRESENT (via videoconference):

10        MICHELLE SLACK, ESQ., USDOJ

11        JOSH PINKUS, Legal Video Specialist

12

13

14

15

16

17

18

19

20

21

22
```



Page 5

```
 1                   EXAMINATION INDEX

 2   WITNESS                                      PAGE

 3   JOSEPH JACKSON EATON IV

 4     Examination by Mr. Medlock                   8

 5     Examination by Mr. Nazarov                  94

 6                      * * *

 7

 8                    EXHIBIT INDEX

 9   EXHIBIT NO.                                  PAGE

10   Exhibit 344   Tecate report                  28

11   Exhibit 345   Letter from J. Cuffari to      30

12                 members of Congress

13   Exhibit 346   Letter from H. Kerner to       38

14                 Secretary Nielsen; AOL-DEF-

15                 00205421 - 205422

16   Exhibit 347   Memorandum; AOL-DEF-00210444 -  42

17                 210448

18   Exhibit 348   Note by CBPO ██████████;        48

19                 AOL-DEF-00216886

20

21

22
```



1                   EXHIBIT INDEX (Cont.'d)

2    EXHIBIT NO.                                      PAGE

3    Exhibit 349    Initial Observations             76

4                   Regarding Family Separation

5                   Issues Under the Zero Tolerance

6                   Policy

7    Exhibit 350    Memorandum; AOL-DEF-00095566 -   78

8                   95568

9    Exhibit 351    Email; AOL-DEF-00216910          81

10   Exhibit 352    Project 18-122 Information        85

11                  Request; AOL-DEF-00208172 -

12                  208173

13   Exhibit 353    Exit Interview; AOL-DEF-          87

14                  00210313 - 210316

15                          * * *

16

17              PREVIOUSLY MARKED EXHIBITS

18   EXHIBIT NO.                                      PAGE

19   Exhibit 340  . . . . . . . . . . . . . . . .    15

20   Exhibit 341  . . . . . . . . . . . . . . . .    25

21

22



Page 7

```
 1   ------------------------------------------------
 2               P R O C E E D I N G S
 3                    1:33 p.m.
 4   ------------------------------------------------
 5            THE VIDEOGRAPHER:  We are now on the
 6        record.  This begins videotape number 1 in
 7        the deposition of Jackson Eaton, in the
 8        matter of Al Otro Lado v. McAleenan.
 9            Today is August 13, 2020.  The time is
10        1:33 p.m.  This deposition is being taken
11        remotely via Magna LegalVision at the
12        request of Mayer Brown, LLP.
13            The videographer is Josh Pinkus of
14        Magna Legal Services, and the court reporter
15        is John Harmonson of Magna Legal Services.
16            Will counsel and all parties present
17        state their appearances and whom they
18        represent.
19            MR. MEDLOCK:  Good afternoon.  This is
20        Stephen Medlock from Mayer Brown, LLP.  I
21        represent Al Otro Lado and the class.
22            MR. NAZAROV:  This is Ari Nazarov from
```



Page 8

1          the United States Department of Justice,

2          Civil Division, Office of Immigration

3          Litigation, and I represent the defendants.

4               I'm joined by DHS counsel who will

5          introduce themselves.

6               MR. YOUNG:  This is David Young with

7          DHS Office of the Inspector General, Office

8          of Counsel.

9               MS. CLOUSE:  I'm Jillian Clouse with

10         DHS OIG, agency counsel as well.

11              THE VIDEOGRAPHER:  Will the court

12         reporter please swear in the witness.

13                         * * *

14  Whereupon

15              JOSEPH JACKSON EATON IV,

16  after having been first duly sworn or affirmed,

17  was examined and did testify under oath as

18  follows:

19                     EXAMINATION

20  BY MR. MEDLOCK:

21      Q.    Good afternoon, sir.  Please state and

22  spell your full name for the record.



Page 9

```
 1        A.    Joseph Jackson Eaton IV.  J-o-s-e-p-h,

 2   J-a-c-k-s-o-n, E-a-t-o-n, and the Roman numeral

 3   IV.

 4        Q.    Do you go by the name Jackson, sir?

 5        A.    Yes.  Feel free to call me Jackson.

 6        Q.    I'll stick with sir if it's all right

 7   with you.

 8              Are you presently employed?

 9        A.    Yes.

10        Q.    Who are you employed by?

11        A.    The Office of Inspector General,

12   Department of Homeland Security.

13        Q.    What's your present job title at the

14   Office of Inspector General?

15        A.    Deputy assistant inspector general for

16   the Office of Special Reviews and Evaluations.

17        Q.    If I refer to the Office of Inspector

18   General today by the acronym OIG, will you

19   understand that, sir?

20        A.    Yes.

21        Q.    If I refer to the U.S. Department of

22   Homeland Security as DHS, will you understand
```



Page 10

1    that?

2              MR. MEDLOCK:  I think we lost the

3         audio.  Let's go off the record for a

4         second.

5              THE VIDEOGRAPHER:  The time is 1:36.

6         We're off the record.

7              (Technical difficulties resolved off

8         the record.)

9              THE VIDEOGRAPHER:  The time is 1:39.

10        We are back on the record.

11   BY MR. MEDLOCK:

12        Q.   Welcome back, Mr. Eaton.  I think

13   before you dropped out, my question was:  If I

14   refer to the U.S. Department of Homeland Security

15   by the acronym DHS, will you understand that

16   today?

17        A.   Yes.

18        Q.   And what's name of the office that you

19   said you lead within OIG?

20        A.   I'm the deputy of the Office of

21   Special Reviews and Evaluations, which we

22   typically refer to as SRE.



Page 11

1      Q.     Thank you.

2             And what is the mission of SRE?

3      A.     We produce reports for the Office of

4      Inspector General.  Those reports are typically

5      inspections, evaluations or special reviews.

6      Q.     And these would be the public-facing

7      reports that are available on OIG's website; is

8      that right?

9      A.     That's correct.

10     Q.     How long have you worked in your

11     present role, sir?

12     A.     I came on board in June of last year.

13     Q.     And before that, where did you work?

14     A.     Before that, I was employed by the

15     Senate Committee on Homeland Security and

16     Governmental Affairs.

17     Q.     Were you majority staff or minority

18     staff?

19     A.     I was a minority staff member.

20     Q.     Have you ever testified in court

21     before, sir?

22     A.     No.



Page 12

1          Q.    Have you ever testified at a

2    deposition before?

3          A.    No.

4          Q.    All right.  So since it sounds like

5    it's your first time, I'll go over a few ground

6    rules that maybe your counsel went over with you

7    beforehand, but it's good to be on the same page.

8                A deposition is essentially a

9    question-and-answer session in which I ask

10   questions and you answer them.  It's important

11   over videoconferencing that you give audible

12   responses.  Our court reporter, John, is very

13   good but he can't take down shakes of the head,

14   and phrases like "uh-huh" and "huh-uh" can sound

15   very similar.

16               Do you understand that, sir?

17         A.    Yes.

18         Q.    And most important today is if at any

19   point you don't understand any of my questions or

20   a phrase used in my question, just say so and

21   I'll attempt to improve my question.  Okay?

22         A.    Okay.



Page 13

1      Q.    From time to time, your counsel may

2    object to my questions.  Unless your counsel

3    instructs you not to answer my question, the

4    objection is something the judge overseeing this

5    case will rule on at a later date.  So I'll ask

6    you to answer my question even though there is an

7    objection pending.

8           Do you understand that?

9      A.    Yes.

10     Q.    Okay.  I mentioned before, we're

11   taking this deposition via Webex.  All

12   videoconferencing software has a similar

13   limitation in that it can really only process one

14   person's audio at a time.  So I'll try to pause

15   to make sure you're done with your answer before

16   I ask another question.  If you can pause to make

17   sure I'm done with my question before you start

18   answering.  Okay?

19     A.    Sure.

20     Q.    And as happened earlier, if there are

21   any technological issues that you're having where

22   you can't hear audio or you lose video, just let



Page 14

1   us know and we'll try and remedy it as soon as

2   possible.  Okay?

3        A.    Will do.

4        Q.    Okay.  So today, unless I state

5   otherwise, my questions are going to relate to

6   the time period from January 1, 2016, through the

7   present.

8              Do you understand that?

9        A.    Yes.

10       Q.    And we went over a few acronyms

11   earlier.  But today I may also refer to U.S.

12   Customs and Border Protection as CBP.  If I use

13   that acronym, will you understand it, sir?

14       A.    Yes.

15       Q.    And I'm also probably going to refer

16   to the Office of Field Operations within CBP as

17   OFO.  If I use that acronym, will you understand

18   it?

19       A.    Yes.

20       Q.    Do you understand that you've taken an

21   oath to tell the truth today and it's the same

22   oath that you would take as if you testified in


MAGNA
LEGAL SERVICES

Page 15

1    court?

2        A.    Yes.

3        Q.    Is there any reason you can think of

4    why you wouldn't be able to give me full and

5    complete answers to my questions today?

6        A.    I can't think of a reason.

7        Q.    All right.

8              MR. MEDLOCK:  Could we please put up

9        Tab 1, please, Josh.

10             (Exhibit 340, previously marked for

11             identification, is attached hereto.)

12   BY MR. MEDLOCK:

13       Q.    Sir, I've put in front of you what was

14   previously marked in another deposition as

15   Exhibit 340.  It's a multipage document that on

16   the front cover says "Plaintiffs' Notice of

17   Federal Rules of Civil Procedure 30(b)(6)

18   Deposition of U.S. Department of Homeland

19   Security."

20             My question, sir, is have you ever

21   seen a copy of this document before?

22       A.    I think so.



Page 16

```
 1        Q.    When was the first time that you saw a

 2   copy of this document?

 3        A.    It was, I think, back in June whenever

 4   the OIG, Office of Counsel, informed me that I

 5   might be a deposition witness.

 6        Q.    Who in the Office of Counsel informed

 7   you that you might be a deposition witness?

 8        A.    I think that was Jillian Clouse.

 9             MR. MEDLOCK:  Josh, can we please move

10        to page 8 of Exhibit 340.

11   BY MR. MEDLOCK:

12        Q.    I'll represent to you there's a number

13   of numbered topics that are listed here in this

14   deposition notice.  I want to focus with you for

15   a second on Topic 10.  If you need to take a

16   moment to review it, but my question for you is,

17   is this one of the topics that you're here to

18   testify about today?

19        A.    Yes.

20             MR. MEDLOCK:  And if we could move to

21        page 11, please.  Sorry, page 12.

22
```



Page 17

1    BY MR. MEDLOCK:

2         Q.    I want to focus with you on Topic 27

3    at the top of page 12 of Exhibit 340.  Is

4    Topic 27 one of the topics that you are here to

5    testify about today, sir?

6         A.    I'm waiting to see page 12.

7         Q.    I'm sorry.  We are on page 12.  My

8    apologies.  Do you see Topic 27 at approximately

9    the middle of the page?

10        A.    Sorry.  It was still on page 8.

11               Page 12 loaded.  And yes, I'm here to

12   testify on it.

13               MR. MEDLOCK:  Josh, could you scroll

14          down on the page?  Oh, I'm sorry, keep

15          moving to the next page.  I apologize.

16               I had it right.  Go back to the

17   page -- at the very bottom of page 12.

18   BY MR. MEDLOCK:

19        Q.    At the very bottom of page 12, sir, do

20   you see the beginning of Topic 34 that refers to

21   communications between CBP Officer ██████████

22   and DHS OIG?



Page 18

1       A.     Yes.

2       Q.     Is that one of the topics that you're

3    here to testify about today?

4       A.     Yes.

5       Q.     Do you know of any other topics that

6    you've been designated to testify about today?

7       A.     No.

8       Q.     Without going into the substance of

9    any conversations that you've had with attorneys,

10   can you describe for me what you did to prepare

11   to testify at today's deposition?

12      A.     I had discussions with the attorneys

13   of the Office of Counsel as well as with

14   attorneys from the Department of Justice, and I

15   also had discussions with members of the project

16   teams for those two topics that you pointed out

17   with the Office of Counsel.

18             I also reviewed documents that the

19   Office of Counsel provided me.

20      Q.     You said you had discussions with

21   project teams regarding a couple of the topics.

22   Who on the project teams did you speak with?



Page 19

1          A.     I spoke or emailed with Jon Goodrich

2     and with Matt Neuburger regarding the Tecate

3     report.  I believe that's numbered OIG 1965.

4          Q.     Uh-huh.

5          A.     And I had -- I think it was email

6     discussions on the project team with Elizabeth

7     Kingma for Project 18-122.

8          Q.     Project 18-122 is the investigation

9     into the processing of asylum-seekers at ports of

10    entry on the U.S.-Mexico border?

11         A.     That's correct.  I think it was

12    Topic 27.

13         Q.     Correct.

14                So when you say you spoke or emailed

15    with Jon Goodrich, Matt Neuburger and Elizabeth

16    Kingma, did you actually speak with any of those

17    individuals over the phone?

18         A.     With Matt and with Jonathan, I spoke

19    with them via Microsoft Teams.

20         Q.     Okay.  With Ms. Kingma, how did you

21    communicate with her?

22         A.     I think that was via email.



Page 20

1      Q.    You said you reviewed documents to

2    prepare to testify.  Were all the documents that

3    you reviewed selected for you either by OIG

4    counsel or DOJ?

5      A.    Yes, I think so.

6      Q.    How many documents did you review?

7      A.    I think it was probably about ten

8    different documents.

9      Q.    How many?

10     A.    I said I think it was about ten.

11    Maybe a little more than that but...

12     Q.    Okay.  How long did you spend

13    reviewing those documents?

14     A.    It seems like I probably spent 10 to

15    15 hours either reviewing those documents or

16    having preparation sessions with counsel.

17     Q.    Would your communications with

18    Mr. Goodrich, Mr. Neuburger and Ms. Kingma fall

19    into that 10 to 15 hours that you were just

20    discussing?

21     A.    Yes, I think so.

22     Q.    So in total, did you spend 10 to 15



Page 21

1    hours preparing for today's deposition?

2        A.    That sounds about right.

3        Q.    Other than reviewing documents, having

4    conversations with the project teams, and your

5    preparation sessions with OIG counsel and the

6    Department of Justice, did you do anything else

7    to prepare for today's deposition?

8        A.    I made my own notes on some of the

9    documents, but I don't know whether that was

10   encompassed in your question.

11       Q.    When you make notes on documents, do

12   you highlight them?  Underline them?  Do you make

13   marginal notes about the documents?  What's your

14   process?

15       A.    Sorry.  I don't mean to say I was

16   making notes actually on the documents.  It was

17   more I was making my own summaries of what the

18   documents were.

19       Q.    Oh, okay.  So in a separate Word

20   processing file or pen and paper, you were making

21   separate notes about what you were seeing in the

22   documents; is that right?



Page 22

1        A.    Yes, pen and paper.

2        Q.    That's the way I do it too.

3              Is there anything else you can think

4     of that you did to prepare for today's

5     deposition?

6        A.    Not offhand.

7        Q.    Okay.  I would like to focus with you

8     first on the Office of Inspector General's

9     investigation into the Tecate port of entry.  I

10    take it from your earlier answers that you're

11    familiar with that investigation.  Is that right?

12       A.    Yes.  I typically refer to that report

13    as the Tecate report, if that makes things

14    easier.

15       Q.    Thank you.  That does make things

16    easier.

17             In preparation for today's deposition,

18    did you actually review the Tecate report?

19       A.    I did.

20       Q.    Based on your preparation for today's

21    deposition, is it your understanding that it's

22    improper for a CBP officer to turn an



Page 23

1    asylum-seeker back from U.S. soil to Mexican

2    territory without inspecting or processing them?

3            MR. NAZAROV:  Objection; form.

4            You can answer.

5            THE WITNESS:  So when you say turning

6        back an asylum-seeker, do you mean an

7        asylum-seeker that has crossed the border

8        and has made it to the port of entry for

9        processing and then been returned?

10   BY MR. MEDLOCK:

11       Q.    Right, that's what I mean.  Someone

12   who is on U.S. soil and gets returned to Mexico

13   without being processed.

14       A.    Yes.  I understand, based on that

15   report, that is improper.

16       Q.    Based on your preparation for today's

17   deposition and your review of the Tecate report,

18   is it your understanding that it's improper for

19   CBP officers to lie to asylum-seekers in order to

20   get them to return to Mexican territory from the

21   U.S.?

22           MR. NAZAROV:  Objection; form.



Page 24

1            You can answer.

2            THE WITNESS:  I don't know.  I can't

3       remember that particular aspect as it was

4       described in the report.

5  BY MR. MEDLOCK:

6       Q.    Have you ever actually been to the

7  Tecate port of entry?

8       A.    No, I have not.

9       Q.    Have you been to any ports of entry on

10  the U.S.-Mexico border?

11      A.    Yes.

12      Q.    Which ones?

13      A.    I believe it was the McAllen and

14  around the Rio Grande Valley.  Also, the San

15  Ysidro port of entry.  But those visits were all

16  conducted in my previous job, not at DHS OIG.

17      Q.    I see.  During those visits -- let's

18  just take the San Ysidro port of entry, for

19  example.  During your visit to the San Ysidro

20  port of entry, were you able to observe both

21  pedestrian operations and vehicular operations at

22  the port of entry?



Page 25

1          A.    Yes.

2          Q.    So for vehicular operations, is it the

3     case that cars are processed in the order in

4     which they arrive at the port of entry?

5          A.    I mean, I think generally yes.  I

6     can't remember, but there might have been some

7     kind of fast-track lane for cars that had a

8     special trusted traveler type of identification.

9          Q.    And even in that lane, the trusted

10    traveler lane let's call it, cars are processed

11    in the order in which they come up to the port of

12    entry; is that right?

13         A.    Yeah, that was my recollection.

14         Q.    Okay.

15              MR. MEDLOCK:  Let's pull up Tab 2,

16         please, Josh.

17              (Exhibit 341, previously marked for

18         identification, is attached hereto.)

19    BY MR. MEDLOCK:

20         Q.    All right, sir.  I've put in front of

21    you a multipage document.  It's pulled off of the

22    OIG website.  It is a cover letter to the Office



Page 26

1    of Special Counsel with the Tecate report

2    attached.  You can take a moment to review it.

3    It sounds like you've already seen it, though.

4           My first question for you is have you

5    seen this cover letter to the Office of Special

6    Counsel before?

7           MR. NAZAROV:  Before you answer, I

8           just want -- Mr. Eaton, Josh is going to go

9           to the bottom of the document and go up.  I

10          want you to see the entire document and just

11          take a moment to read it.

12          MR. MEDLOCK:  Josh, I think he means

13          to the last page and then move forward.

14          MR. NAZAROV:  Yeah, Steve is right.

15          How many pages are there?

16          MR. MEDLOCK:  There's a considerable

17          number.  There's the entire length of the

18          report and the cover letter.

19          MR. NAZAROV:  Okay.  Well, let's go

20          just to the cover letter -- thank you for

21          your patience with me -- which I think is

22          only about two pages.  Is that right?



Page 27

```
 1              MR. MEDLOCK:  It should be two pages,
 2        that's right.
 3              MR. NAZAROV:  Why don't we start at
 4        the bottom there.  I just want Mr. Eaton to
 5        take another quick look at it.  Go up.  He
 6        can let us know when he's ready to answer
 7        questions.  I just want him to familiarize
 8        himself with it again even though he's seen
 9        it.
10  BY MR. MEDLOCK:
11        Q.   Mr. Eaton, when you're done reviewing
12  the document, let me know verbally on the record,
13  then we'll move on with the questioning.
14        A.    I see the bottom of the cover letter.
15              MR. NAZAROV:  Ask Josh to go up.  He's
16        our tech, and he'll just -- yeah, there we
17        go.
18              THE VIDEOGRAPHER:  I'll scroll up a
19        little bit.
20              THE WITNESS:  Josh, do you want to
21        scroll all the way up to the top of the
22        first page?
```



Page 28

1           Okay.

2    BY MR. MEDLOCK:

3        Q.    All right, sir.  Have you seen this

4    cover letter from Randolph "Tex" Alles to Henry

5    J. Kerner at the Office of Special Counsel?

6        A.    Yes.  I think I've seen it when I

7    pulled up the report, the Tecate report, from the

8    website.

9        Q.    Okay.  And did OIG play any role in

10   drafting this cover letter from Mr. Alles?

11       A.    No, I don't think so.

12       Q.    Does this cover letter reflect the

13   views of OIG?

14       A.    I mean, I think it summarized our

15   report.  But they didn't ask us for our input or

16   anything like that, or our views about it.

17       Q.    Okay.  So you never saw a copy -- let

18   me back up.  I asked a bad question.

19           No one at OIG that you're aware of saw

20   a copy of this cover letter before it was sent to

21   the U.S. Office of Special Counsel; is that

22   right?



Page 29

1        A.    Correct.

2        Q.    Sir, I would like to turn, if I could,

3   to page 6 of the PDF which is Exhibit 344.

4              (Exhibit 344 marked for identification

5         and attached hereto.)

6   BY MR. MEDLOCK:

7        Q.    And this is the beginning of the body

8   of the OIG report; is that correct?

9        A.    Yes.

10       Q.    And this takes the form of a

11  memorandum for Randolph "Tex" Alles, the deputy

12  undersecretary for Management at DHS, from

13  Jennifer Costello who lists her position as

14  acting inspector general.  Do you see that?

15       A.    Yes, I do.

16       Q.    Does it affect the findings of this

17  report in any way that Ms. Costello signed this

18  Memorandum of Understanding as acting inspector

19  general?

20       A.    What do you mean, does it affect the

21  findings?

22       Q.    Well, let me go to the next exhibit.



Page 30

1    Maybe that will make it a bit clearer.

2            MR. MEDLOCK:  Josh, can you please

3        bring up Tab 3A and Tab 3B at the same time,

4        if it's possible.

5            (Exhibit 345 marked for identification

6        and attached hereto.)

7    BY MR. MEDLOCK:

8    Q.   We'll mark this Exhibit 345 to your

9    deposition.  It's a copy of a June 11, 2020,

10   letter from Joseph V. Cuffari, the inspector

11   general at the OIG at DHS.

12           Have you seen a copy of this letter

13   before, sir?

14   A.   Yes.

15   Q.   Okay.  And this is a letter informing

16   the chairs and ranking members of DHS's oversight

17   committees in Congress that Jennifer Costello is

18   no longer employed with the DHS Office of

19   Inspector General.  Correct?

20           MR. NAZAROV:  Could we have

21       Mr. Eaton -- I'm sorry to interrupt --

22       review this, take a quick look at it?



Page 31

1          Mr. Eaton, do you want to take a quick

2     look at it before you answer the question?

3          THE WITNESS:  Let me just take a quick

4     look at one or two sentences in here.

5          MR. NAZAROV:  I'm sorry to interrupt,

6     Steve.  I put myself on mute by accident.  I

7     was going to speak earlier.

8          MR. MEDLOCK:  No worries.

9          THE WITNESS:  Okay.

10  BY MR. MEDLOCK:

11     Q.    So you've reviewed the document, sir?

12     A.    Yes.

13     Q.    This letter informs the congressional

14  oversight committee chairperson and ranking

15  members that Jennifer Costello is no longer

16  employed by the DHS Office of Inspector General;

17  is that right?

18     A.    Yes.

19     Q.    And this letter makes the accusation

20  that Ms. Costello falsely held herself out as the

21  acting inspector general from June 11, 2019,

22  until July 25, 2019.  Is that correct?



Page 32

1      A.    Yes, it does assert that.

2      Q.    Without going into the merits of that

3   allegation, does the fact that Ms. Costello is no

4   longer employed at the OIG and is accused of

5   having falsely held herself out as the acting

6   inspector general of OIG have any effect on the

7   findings in the Tecate report?

8           MR. NAZAROV:  Objection; form.

9           THE WITNESS:  I don't -- no, I would

10          not be -- I'm not the authority on what

11          effect falsely holding one's self out as

12          inspector general would have on a report.

13             As far as simply no longer being

14          employed, that has no effect on our findings

15          or reports.  Typically when an IG retires

16          and a new one replaces them, our reports

17          from the previous IG are still valid and are

18          still published on our website.

19          MR. MEDLOCK:  Okay.  Let's go back to

20          Tab 2, please, Josh, which is Exhibit 344.

21             I'll note for the record, if I didn't,

22          the letter that we showed you, sir, will be



Page 33

1          Exhibit 345.

2                    Josh, if you could flip through to the

3          fifth page of the PDF.

4     BY MR. MEDLOCK:

5          Q.    Sir, on this page of the Tecate report

6     there is a summary of the three findings of the

7     report.  Do you see that, sir?

8          A.    Yes.

9                    MR. NAZAROV:  Mr. Eaton, do you want

10         to just take a minute with this document and

11         read it over so you remember it?

12                   THE WITNESS:  Yes.  Josh, when you

13         first pull it up, I can see the entire page

14         and I can read that fine.  You don't need to

15         zoom in.

16    BY MR. MEDLOCK:

17         Q.    Sir, my question is on the right side

18    of the document.  There is a section called "What

19    We Found."  Does that section summarize the three

20    findings in the Tecate report?

21         A.    Can Josh scroll down so I can see the

22    end of the document?  Thank you.



Page 34

1          Yes, it does.

2     Q.    Have any of those findings or

3  conclusions changed as a result of Ms. Costello

4  no longer being employed by OIG or as a result of

5  Ms. Costello being accused of falsely holding

6  herself out as the acting inspector general?

7     A.    No.

8          MR. NAZAROV:  Objection.

9  BY MR. MEDLOCK:

10    Q.    Was your answer no, sir?  I couldn't

11  hear it.

12    A.    Correct, my answer was no.

13    Q.    All right, thank you.

14          I would like to focus with you on the

15  first finding on this page.  It reads, quote:

16  "First, we found that contrary to federal law and

17  U.S. Customs and Border Protection (CBP) policy,

18  CBP officials at the Tecate, California, port of

19  entry returned some asylum applicants from inside

20  the United States back to Mexico and instructed

21  those individuals to go to other ports of entry

22  to make their asylum claims."



Page 35

1            Did I read that correctly, sir?

2      A.    Yes.

3      Q.    Do you know whether that practice is

4  still occurring at Tecate, at the Tecate port of

5  entry today?

6            MR. NAZAROV:  Objection; form.

7            THE WITNESS:  I don't know.

8  BY MR. MEDLOCK:

9      Q.    Has the Office of Inspector General

10  done anything to follow up to determine whether

11  that practice is continuing?

12     A.    As you noted at the outset, we have a

13  separate report, Project 18-122.  That report

14  looks at a similar issue.  That reports field

15  work complete.  So we no longer have any ongoing

16  work specific to that particular issue.

17     Q.    Based on the investigation in OIG

18  Report 1965, or the field work that's been

19  conducted in OIG Matter 18-122, is OIG aware of

20  other instances in which noncitizens who were

21  standing on U.S. soil were returned to Mexico

22  without being processed or inspected?



Page 36

1           MR. NAZAROV:  Objection; form.

2           THE WITNESS:  Can you repeat the

3      beginning part of that question again?  I

4      couldn't tell whether you were asking

5      whether we had identified other instances

6      outside of Tecate aside from those two

7      reports or within these two reports.

8  BY MR. MEDLOCK:

9      Q.    So we know about the incident at --

10  the incidents at Tecate.

11          Outside of the port of entry at

12  Tecate, is OIG aware of other ports of entry

13  where noncitizens standing on U.S. soil were

14  returned to Mexico without being inspected or

15  processed?

16          MR. NAZAROV:  Objection; form.

17          THE WITNESS:  That answer would go to

18      findings in an unpublished report.

19  BY MR. MEDLOCK:

20      Q.    Okay.  So there may be findings about

21  that in the unpublished report for OIG Matter

22  18-122; is that right?



Page 37

1          A.    There may be.

2          Q.    Okay.  And we'll get to Matter 18-122.

3                Outside of any findings in an

4    unpublished report, is OIG aware of instances at

5    ports of entry other than the Tecate, California,

6    port of entry in which asylum-seekers standing on

7    U.S. soil were turned back to Mexico without

8    being inspected or processed?

9                MR. NAZAROV:  Objection; form.

10               THE WITNESS:  No, I don't think so.

11   BY MR. MEDLOCK:

12         Q.    So the only instances you would be

13   aware of are instances that are recounted in the

14   published Tecate report and in -- that could

15   possibly be mentioned in the unpublished report

16   related to OIG Matter 18-122; is that right?

17               MR. NAZAROV:  Objection; form.

18               THE WITNESS:  Right.

19   BY MR. MEDLOCK:

20         Q.    You can answer, sir.

21         A.    Oh, that's correct.  Sorry.

22         Q.    That's all right.



Page 38

```
 1              So I want to bring your attention to

 2    another document which we'll bring up as Tab 4,

 3    please.

 4              (Exhibit 346 marked for identification

 5         and attached hereto.)

 6    BY MR. MEDLOCK:

 7         Q.    So this is a multipage letter that

 8    begins with the Bates number AOL-DEF-00205420 and

 9    will be marked as Exhibit 345 [sic] to your

10    deposition.  I believe it is a two- or three-page

11    letter.

12              If you want to take a moment to review

13    it, you can do that and Josh can scroll either

14    from the front of the letter to the back or back

15    to front, whatever you prefer.  Just let me know

16    audibly on the record when you're done reviewing

17    the document.

18              THE WITNESS:  Josh, if you could just

19         scroll to the bottom.

20              THE REPORTER:  Excuse me one moment.

21         I think we've already got an Exhibit 345.

22              MR. MEDLOCK:  You're correct.  This
```



Page 39

1          will be 346.  Thank you for the correction.

2               THE WITNESS:  I've reviewed it.

3     BY MR. MEDLOCK:

4          Q.    Have you seen a copy of this letter

5     from the U.S. Office of Special Counsel to then

6     DHS Secretary Kirstjen Nielsen?

7          A.    Yes.

8          Q.    And this letter is a referral of a

9     whistleblower complaint for further investigation

10    by DHS; is that correct?

11         A.    Yes.

12         Q.    I want to focus with you on the second

13    page of Exhibit 346, which has an ending Bates

14    number at the bottom ending in 421.  And I'm

15    focused on the first paragraph at the top of the

16    second page that begins with "According to DHS

17    regulations."

18               Do you see that paragraph, sir?

19         A.    Not yet.  Yes.

20         Q.    The sentence that begins that

21    paragraph reads, quote:  "According to DHS

22    regulations, all arriving aliens who approach a



Page 40

1   port of entry are subjected to either expedited

2   removal or detention pending an asylum review."

3           Did I read that correctly, sir?

4   A.    Yes.

5   Q.    Is that your understanding of DHS

6   regulations based on what you know of OIG's

7   investigations?

8   A.    Yes, I think so.

9   Q.    What is your understanding of the word

10  "approach" based on OIG's investigations into the

11  processing of asylum-seekers?

12          MR. NAZAROV:  Objection; form.

13          You can answer.

14          THE WITNESS:  My understanding of it

15      is -- well, I guess I'm thinking in my mind

16      that it could either be approaching the

17      boundary at the port of entry with Mexico or

18      it could be approaching the port of entry

19      facility, which is typically located close

20      to but within -- well, within the boundary.

21  BY MR. MEDLOCK:

22  Q.    Okay.  So the word "approach" could



Page 41

1    mean a person who is on Mexican soil but is

2    walking towards the pedestrian boundary with the

3    United States; is that right?

4        A.    Just as an offhand reading, yes.

5        Q.    Okay.  Let's move down to the next

6    paragraph that begins with "Pursuant to my

7    authority."

8              Do you see that paragraph?

9        A.    Yes.

10       Q.    That paragraph begins, quote:

11   "Pursuant to my authority under 5 USC

12   Section 1213(c), I have concluded that there is a

13   substantial likelihood that the information

14   provided to OSC discloses violation of law, rule

15   or regulation."

16             Did I read that correctly?

17       A.    Yes.

18       Q.    Based on your understanding of OIG's

19   Tecate report and investigation, do you have any

20   reason to doubt the accuracy of this statement in

21   OSC's letter to Secretary Nielsen?

22             MR. NAZAROV:  Objection; form.



Page 42

```
 1                You can answer.

 2                THE WITNESS:  No.  Based on the

 3         report, that seems like an accurate

 4         statement for Mr. Kerner to have made at the

 5         time.

 6                MR. MEDLOCK:  All right, Josh.  Can

 7         you please bring up Tab 5.

 8                (Exhibit 347 marked for identification

 9         and attached hereto.)

10  BY MR. MEDLOCK:

11         Q.   Sir, I've put in front of you what we

12  will mark as Exhibit 347 to your deposition.  It

13  is a five-page set of interview notes taken by

14  Jon Goodrich, investigative counsel, related to

15  the Tecate investigation.  It begins with the

16  beginning Bates number AOL-DEF-00210444.

17                Please take a moment to review the

18  interview notes and let me know when you're done

19  reviewing them.

20                THE WITNESS:  Go to page 2, please.

21                MR. NAZAROV:  Mr. Eaton, do you want

22         Josh to blow it up a little more and zoom
```



Page 43

1     in?

2              THE WITNESS:  No.  I'm okay with that

3        size, but if you could go to page -- there

4        you go.  Thank you.

5              Okay, page 3.

6              Page 4.

7              Page 5.

8              And back to page 1.  That's

9        sufficient.

10   BY MR. MEDLOCK:

11       Q.   All right, sir.  Are you done

12   reviewing the document?

13       A.   Yes.

14       Q.   Okay.  My first question for you, this

15   is a Memorandum of Interview.  What is a

16   Memorandum of Interview at OIG?

17       A.   This is a formal memorialization of an

18   interview conducted in the course of a review.

19       Q.   Is drafting a Memorandum of Interview

20   a regular process that investigative counsel go

21   through when working on an inquiry?

22       A.   Yes.



Page 44

1       Q.    And is keeping and maintaining

2   memoranda of interviews something that DHS OIG

3   does?

4       A.    Yes.

5       Q.    Do you have any reason to believe that

6   this Memorandum of Interview that you've just

7   reviewed shown in Exhibit 347 is inaccurate in

8   any way?

9       A.    No.

10      Q.    Okay.  On the first page, there is

11  a -- the CBP officer, ████████, is defined

12  as CBPO 1.  Do you see that, sir?

13      A.    Yes.

14            MR. MEDLOCK:  Josh, if you could move

15        to the second page, please.

16  BY MR. MEDLOCK:

17      Q.    All right, sir.  So on the second

18  page -- this is the page ending in Bates number

19  445 of Exhibit 347.  Do you see maybe about

20  two-thirds of the way down the page there is a

21  section header that reads "Officers' Concerns

22  About the Limit Line"?


MAGNA ▶
LEGAL SERVICES

Page 45

1          A.     Yes.

2          Q.     What's your understanding of what the

3     term "limit line" means?

4          A.     My understanding of the limit line is

5     that it is a checkpoint set up at the physical

6     boundary between Mexico and the United States at

7     which travelers attempting to enter the United

8     States, and specifically to enter that port of

9     entry, are essentially checked before proceeding.

10              So in the context of this particular

11     report and this interview, the limit line would

12     be set up to identify whether a traveler

13     entering -- attempting to enter the United States

14     was an asylum-seeker.

15          Q.     Is the limit line position

16     specifically for pedestrian operations at a port?

17          A.     That's always been my understanding.

18          Q.     Okay.  So in this section underneath

19     "Officers' Concerns About the Limit Line," the

20     beginning of it reads, quote:  "CBPO 1 said that

21     officers' main concern with the limit line was

22     that they were told to redirect asylum-seekers,



1    but the law seems to say that individuals have

2    the right to claim asylum."

3              Did I read that correctly?

4    A.    Yes.

5    Q.    And it's your understanding from

6    reviewing materials related to the Tecate

7    investigation and report that asylum-seekers

8    standing on U.S. soil have a right to claim

9    asylum in the United States and have that claim

10   processed; is that right?

11             MR. NAZAROV:  Objection; form.

12             You can answer.

13             THE WITNESS:  That's right.  My only

14        potential caveat was that -- and I think

15        this was mentioned in the Tecate report --

16        is that the limit line is designed to be set

17        up on the physical border exactly where the

18        boundary is between Mexico and the United

19        States.

20             However, there appear to be some

21        instances where the limit line may have

22        been -- and I don't know what the right term



Page 47

```
 1          is, whether it's one or two feet, several

 2          feet -- but was slightly inside the U.S.

 3          border.  And we did not specifically touch

 4          the question of whether an asylum-seeker who

 5          was stopped at a limit line that was several

 6          feet within the boundary was effectively on

 7          U.S. soil for that purpose.

 8   BY MR. MEDLOCK:

 9          Q.   Okay.  But you're aware that there are

10   some ports of entry where the limit line position

11   that the CBP officers stand at is several feet

12   into U.S. territory; right?

13              MR. NAZAROV:  Objection; form.

14              You can answer.

15              THE WITNESS:  Yes, I believe that's

16          stated in the report.

17   BY MR. MEDLOCK:

18          Q.   And OFO -- not OFO.  OIG is not taking

19   a position on whether an asylum-seeker standing

20   several feet on the U.S. side of the border

21   interacting with a CBP officer at that limit line

22   position is in the United States.
```



Page 48

1            MR. NAZAROV:  Objection; form.

2    BY MR. MEDLOCK:

3        Q.    Did I read that correctly?

4        A.    We consider that question as part of

5    the broader question of whether the limit line

6    itself was legal, and we decided that was a

7    question that we were not going to address in the

8    report.  That was a question that was before the

9    courts.

10       Q.    So OIG has not taken a position one

11   way or the other on the legality of the limit

12   line position; is that correct?

13       A.    That's correct.

14       Q.    And OIG has not taken a position one

15   way or the other on the legality of metering; is

16   that right?

17       A.    That's correct.

18            MR. MEDLOCK:  Josh, could we pull up

19       Tab 6, please.

20            (Exhibit 348 marked for identification

21       and attached hereto.)

22   BY MR. MEDLOCK:



Page 49

 1     Q.   Tab 6 is a one-paragraph note that is

 2  signed by CBPO ███████████.  It bears the Bates

 3  number AOL-DEF-00216886.

 4         Please take a moment to review it.

 5  I'll note for the record it will be marked as

 6  Exhibit 348.  Please take a moment to review the

 7  note and let me know when you're done reviewing

 8  it, sir.

 9     A.   I've reviewed it.

10     Q.   Okay.  Do you know whether this note

11  was provided to OIG?

12     A.   Yes, I think it was.  Because I

13  believe I reviewed this note as part of my

14  preparation.

15     Q.   Would it have been provided to

16  Mr. Goodrich or Mr. Neuburg?

17     A.   Neuburger, yes.

18     Q.   Neuburger, I apologize.

19         I would like to -- actually, let me

20  back up.

21         Is receiving written notes like this

22  one part of the job of an OIG investigator?



Page 50

```
 1        A.    Yes.

 2        Q.    And is keeping and maintaining notes

 3   like this in the files of OIG part of what OIG

 4   does?

 5        A.    Yes.

 6        Q.    Do you have any reason to believe that

 7   this note from ██████████ is inaccurate in any

 8   way?

 9        A.    No.

10        Q.    Okay.  I want to focus on the

11   beginning of the letter -- or the note, I guess I

12   should say.

13        ██████████ writes, quote:  "On

14   Wednesday, February 13, 2019, at approximately

15   1230 hours, I was assigned to the limit line at

16   the Tecate POE.  All officers have been

17   instructed to turn away or redirect those seeking

18   asylum to other ports."

19              Did I read that correctly?

20        A.    Yes, that's correct.

21        Q.    Does this note provide substantiation

22   for the complaint made by the whistleblower that
```



Page 51

1   officers at the Tecate port of entry were turning

2   away asylum-seekers?

3              MR. NAZAROV:  Objection; form.

4              THE WITNESS:  It substantiated that

5         there was a limit line.  It did not

6         substantiate that asylum-seekers who passed

7         the limit line and made it to the port of

8         entry were returned to Mexico.

9   BY MR. MEDLOCK:

10      Q.    How does ██████████ saying that

11  asylum-seekers were turned away or redirected not

12  provide substantiation for the allegation that

13  asylum-seekers were being turned back from the

14  limit line position to Mexico?

15             MR. NAZAROV:  Objection; form.

16             You can answer.

17             THE WITNESS:  Sorry if I was being

18        confusing.  It does provide substantiation

19        that asylum-seekers were being turned back

20        from the limit line.  It does not provide

21        substantiation that asylum-seekers were

22        being turned back from the port of entry



Page 52

1          facility within the limit line.

2     BY MR. MEDLOCK:

3          Q.    I see.  Thank you for that

4     clarification.

5               MR. MEDLOCK:  You can take that note

6          down, Josh.

7               I would like to move on to the ongoing

8          investigation that we sort of referenced a

9          few times today.

10    BY MR. MEDLOCK:

11         Q.    Are you familiar with the OIG

12    investigation that's known as CBP's processing of

13    asylum-seekers at ports of entry that has the OIG

14    Matter Number 18-122?

15         A.    I'll answer the question, but I was

16    going to ask if we were switching topics if we

17    can take a short break afterwards.

18               But yes, I'm familiar with that.

19         Q.    Go ahead and answer and then we'll

20    take a break.

21               Are you familiar with it?

22         A.    Yes.



Page 53

1              MR. MEDLOCK:  Okay.  Let's take a

2        break now.

3              THE VIDEOGRAPHER:  The time is 2:39.

4        We are off the record.

5              (Recess taken.)

6              THE VIDEOGRAPHER:  The time is 2:53.

7        We are back on the record.

8    BY MR. MEDLOCK:

9        Q.    All right.  Mr. Eaton, before we took

10   a break, we had just started discussing OIG

11   Investigation 18-122.  I would like to start by

12   asking you, when did that investigation begin?

13       A.    So it's best to describe that as kind

14   of a continuum.  And maybe I can walk you through

15   various points.

16       Q.    Please do.

17       A.    So in June of 2018, SRE was working on

18   a project that resulted in the report issued in

19   September 2018.  The name of it was something

20   like "Initial Observations on Family Separations

21   Under the Zero Tolerance Policy."

22              And in conducting field work for that



Page 54

1    project, the project team identified issues with

2    asylum-seekers being turned away at ports of

3    entry and with asylum-seeking families being

4    separated, and the lack of documentation of that.

5              In August of 2018, the inspector

6    general at the time, John Kelly, decided that we

7    should look at that specifically.  And he

8    indicated that there should be an immediate

9    unannounced inspection of ports looking at that

10   practice.

11             So an inspections and evaluations team

12   conducted an inspection of the San Diego ports of

13   entry at that time.  And when they returned in

14   September -- when they had -- when they had gone

15   in August, my understanding is that it was seen

16   as, for lack of a better word, sort of Phase 2 of

17   the family separation report.

18             And when they came back, there was a

19   discussion, I believe.  There were other program

20   offices involved; so for instance, the Office of

21   Audits; perhaps INV, the Office of

22   Investigations.  I believe Ms. Costello was



Page 55

1    involved.

2              And the outcome of that meeting, as I

3    understand, was that the issue of turning away

4    asylum-seekers and the separation of

5    asylum-seeking families should be a specific

6    project.

7              And then in October of 2018, OIG

8    issued an engagement letter to DHS, which is sort

9    of our official notification that a specific

10   inspection or evaluation or review is beginning.

11             So that's sort of how I would answer

12   how it began.

13   Q.    Thank you.  That was very

14   comprehensive.

15             Who at OIG has been assigned to work

16   on that investigation?

17   A.    So that investigation is led by Chief

18   Inspector Tatyana Martell.  It's staffed by Lead

19   Inspector Liz Kingma.  Additional team members

20   included Inspector Adam Brown, Inspector Stephen

21   Farrell, Inspector Paul Lewandowski.  I believe

22   Inspector Jason Wahl also worked on it.



Page 56

1           There has also been support from

2     Inspector Donna Ruth and Inspector Michael

3     Brooks.  And the team also relied on work

4     conducted by the Tecate report team which

5     included Matt Neuburger, Jon Goodrich, Steven

6     Staats, and Greg Flato.

7           Q.    What's the current status of

8     Investigation Number 18-122?

9           A.    Obviously, it is unpublished.  It's in

10    what we would call the report review stage.

11          Q.    Can you explain to me what the report

12    review stage is?

13          A.    So generally speaking, the report

14    review stage is what occurs after a report has

15    been approved by the assistant inspector general

16    or SRE or Office of Audits.

17               Once it has cleared that program

18    office, it needs to be cleared through several

19    other program offices as well as the department,

20    and then it is cleared again.

21               So I can speak generally about that

22    process.



Page 57

1     Q.    What does clearing the unpublished

2   report through the department mean?

3     A.    So after a draft report has cleared

4   through the program offices and has been -- the

5   draft has been approved by the inspector general,

6   the report is submitted to the department or to

7   the component for a response.

8             And that response can include

9   technical comments; for instance, if we got the

10  name of an office wrong, got the number or

11  something wrong.  And it also includes their

12  management response, which is both a sort of

13  high-level response to the overall report as well

14  as their specific responses, their concurrences

15  or nonconcurrences with any particular

16  recommendations.

17            I suppose it would be wrong to

18  describe that submission and response from the

19  department as clearing it.  It's not as though we

20  decide to publish or not publish a report if the

21  department approves it, but it is a necessary

22  step as part of eventually publishing the report.



Page 58

1        Q.    How long does this report review phase

2    typically last for a report that ultimately gets

3    published?

4        A.    It varies a lot.  It varies a lot.

5        Q.    How long has -- oh, sorry.  Go ahead.

6    I didn't mean to interrupt you.

7        A.    It can depend on a lot of factors.  It

8    really depends on the report.

9        Q.    How long has the report for Matter

10   Number 18-122 been in the review phase?

11       A.    It's been in that phase since

12   September of 2018 -- no, I'm sorry, September of

13   2019.

14       Q.    Okay.  I want to make sure I

15   understand this correctly.  The report has been

16   complete since September 2019 and it's been in

17   the report review phase since then?

18       A.    So generally, yes.  Of course, during

19   the report review phase, if program offices are

20   reviewing the report and identify a particular

21   issue that needs to be adjusted, that adjustment

22   is being made.  So, of course, the report isn't



Page 59

1    complete until a final draft of the report is

2    signed off by the IG.

3        Q.    I understand.

4             Where in the report review process is

5    the report -- the unpublished report for Matter

6    18-122?  Are you waiting for a management

7    response?  Or is there something else that you're

8    waiting on at this point?

9        A.    The report is currently with the front

10   office.  And I expect once it is -- once that

11   version of the report is approved, it will go to

12   the department for a response.

13       Q.    When you say front office, do you mean

14   the front office of OIG, or the front office of a

15   component agency, or front office of DHS?

16       A.    When I say front office, I mean the

17   front office of OIG.

18       Q.    And when you say front office of OIG,

19   are you referring specifically to the inspector

20   general, or to somebody else in the front office

21   who it is with?

22             MR. NAZAROV:  Objection; form.



Page 60

1          THE WITNESS:  It includes the

2          inspector general.  That also includes his

3          acting chief of staff and a -- I don't know

4          her exact title.  I think it's special

5          advisor or counsel to the chief of staff.

6          There are additional personnel in the

7          chief of staff, but those are the three that

8          are involved in reviewing reports.

9   BY MR. MEDLOCK:

10    Q.    So is it the case that there's been an

11   unpublished report that has been reviewed in the

12   review phase since September of last year?

13          MR. NAZAROV:  Objection; form.

14          You can answer.

15          THE WITNESS:  Yes, that's correct.

16   BY MR. MEDLOCK:

17    Q.    And how long has the report been with

18   the front office?

19    A.    So in the report review process,

20   reports go through the front office on multiple

21   occasions.  So it is with the front office

22   already.  It's now back at the front office.  My



Page 61

1   understanding is it was sent to the front office

2   again yesterday.

3       Q.    What role does the front office play

4   in finalizing an unpublished report?

5       A.    The front office reviews the report

6   and ensures that it is meeting its standards for

7   quality, meaning the IG's standards for how he

8   wants that report to be published.

9       Q.    When you say standards for quality,

10  are those standards that are written down, or is

11  that sort of the IG's sort of subjective

12  standards about what makes a good report?

13      A.    I think it's both.  Those standards

14  are written down, but those standards aren't too

15  detailed.  And so a lot of it depends on what the

16  IG and the front office think is a quality

17  report.

18      Q.    You mentioned that the unpublished

19  report for Matter 18-122 was sent back to the

20  front office yesterday.  Who sent the report back

21  to the front office?

22      A.    I think it might be helpful to



Page 62

1    describe the general process.

2        Q.    Sure.  Start there, and then we can go

3    to the specifics, I guess.

4        A.    Okay.  So generally speaking, after a

5    draft report has been approved by the assistant

6    inspector general, the report goes through

7    something within the program office called

8    independent reference -- independent review and

9    referencing, or IRR.  It's an occasion for

10   someone who is not on the original project team

11   to independently fact-check the report.

12            When that process is complete, the

13   report is typically sent to the Integrity and

14   Quality Oversight, or IQO, program office for a

15   contract editor to review the report.

16            When the contract editor completes

17   that, the report is then sent to the Office of

18   Counsel for legal sufficiency review.

19            When the Office of Counsel completes

20   that review, the report is sent back to the IQO

21   office and undergoes what's called a report

22   quality assurance or RQA review.



Page 63

 1               At that point the report -- a draft of

 2     the report is sent to the department or the

 3     component for comment.

 4               Then the report returns to OIG and it

 5     goes to the -- back to the program office and the

 6     project team.  The project team reviews the

 7     department's response, makes any appropriate

 8     changes based on the technical comments,

 9     incorporates the management response, and also

10     provides OIG's analysis in response to that

11     response in the report.  Essentially the OIG gets

12     the last word in these reports.

13               When the team has finished that, then

14     it's reviewed by the assistant inspector general.

15     And when the AIG approves, it repeats that

16     earlier process going to the contract editor, the

17     Office of Counsel, RQA, and the front office.

18               Sometimes those transmittals during

19     the clearance process are from the offices

20     directly to one another, and sometimes they go

21     back to the project team who is essentially

22     playing air traffic controller and sending it on



Page 64

1    to the next stop.

2         Q.    Okay.  In the case of -- actually, let

3    me back up.

4              Is that the entire process that you've

5    described prior to publication?

6         A.    That is typically the process, yes.

7         Q.    Okay.  And is that the process that's

8    being followed with respect to OIG Matter Number

9    18-122?

10        A.    There were two different parts that

11   are deviating from that.  So one, I believe in

12   the beginning of the process, because the

13   report -- well, let me back up.

14             I would say under AIG Diana Shaw, if

15   there were reports that were particularly

16   sensitive or that the issues touched on other

17   issues that other program offices had dealt with,

18   she would ask the other assistant inspector

19   generals such as AIG for audits, some of the

20   deputy AIGs in that office, to review the report.

21   So that went through that sort of additional

22   level of review and comment in this case.



Page 65

1                The review of the report, this report,

2    since we received the response back from the

3    department, has resulted in change to the report

4    that requires it to be sent back to the

5    department for another round of response and

6    comment.

7        Q.    So there was a substantive change made

8    to the report in response to the comments that

9    came from CBP; is that right?

10       A.    There was a change made to the report

11   subsequent to receiving a response.

12       Q.    Was that change a substantive change

13   or merely a technical change?

14             MR. NAZAROV:  Objection; form.

15             THE WITNESS:  That was a substantive

16       change.

17   BY MR. MEDLOCK:

18       Q.    So where does the report sit in that

19   process that you've currently described?  You

20   said it's at the front office.  But as you

21   described, the front office is involved in

22   several points of that chain of responsibility.



Page 66

1        A.    So the report is with the front

2   office, and if the front office approves this

3   version of the report -- this is the version that

4   now includes the change that was previously

5   discussed.  Once the front office approves that

6   version, it will return to the department for a

7   second round of comment and response, and we will

8   receive that report back -- that response back

9   and it will again go through the program office,

10  contract editor, Office of Counsel, RQA and front

11  office review.  Which at that point, after

12  completing that, will result in a published

13  report.

14        Q.    Okay.  How much revision of the

15  unpublished report was required by this

16  substantive change that was made with respect

17  to -- after getting comments from CBP?

18              MR. NAZAROV:  I'm going to object to

19         that and instruct at this point the witness

20         not to answer because it goes to the

21         deliberative process.

22  BY MR. MEDLOCK:



Page 67

1        Q.    How much time was spent revising the

2    report after receiving the comments from CBP?

3              MR. NAZAROV:  I'm going to object to

4         form.  But the witness can answer.

5              THE WITNESS:  I believe we received

6         the report back from the department in June.

7         I believe.  And so the report has been

8         undergoing that report review process since

9         then.  The revision -- it's hard to say sort

10        of how long the report was being revised.

11        The revision occurred in -- I want to say in

12        July.

13   BY MR. MEDLOCK:

14        Q.    Okay.  You mentioned that the Office

15   of Inspector General conducted unannounced site

16   visits at ports of entry as a part of

17   investigating Matter Number 18-122.  Did the

18   Office of Inspector General use other

19   investigative techniques such as requesting

20   documents or conducting interviews to investigate

21   Matter 18-122?

22        A.    Yes, we did use documents and



Page 68

1    interviews.

2        Q.    Do you recall who was interviewed in

3    CBP's Office of Field Operations for purposes of

4    investigating Matter 18-122?

5        A.    I know generally.  I don't know

6    exhaustively.

7        Q.    Okay.  Tell me what you know

8    generally.

9        A.    So I understand that we interviewed

10   approximately I think it's 49 CBP officials.

11   Some of those officials were in headquarters.

12   Some of those officials were at the head of the

13   respective field offices.

14            Generally speaking, my understanding

15   is that when we were conducting an inspection as

16   part of this review at a given port of entry, we

17   would talk to officers staffing the limit line.

18   We would talk to officers staffing the pedestrian

19   primary facility.  We would talk to officers

20   responsible for staffing the holding cells and

21   ministering to detainees.  And we would talk to

22   officers responsible for transporting detainees


MAGNA
LEGAL SERVICES

Page 69

1    from one facility to another.

2        Q.    Do you know whether Todd Owen was

3    interviewed as a part of investigating Matter

4    18-122?

5        A.    I believe we interviewed the OFO

6    executive assistant commissioner.  I don't know

7    if Todd Owen held that position at the time.

8        Q.    He would have.

9              How about Randy Howe, who would have

10   been executive director of operations at OFO?

11   Was he interviewed?

12       A.    We did interview the director of

13   operations.

14       Q.    Was Todd Hoffman, the director of

15   Admissibility and Passenger Programs at OFO,

16   interviewed?

17       A.    I don't think so.

18       Q.    Was Luis Mejia, M-e-j-i-a, one of

19   Mr. Hoffman's direct reports, interviewed?

20       A.    Do you know whether this person was in

21   headquarters or was part of a regional --

22       Q.    He was in headquarters.  He was part



Page 70

1    of Admissibility and Passenger Programs.

2        A.    I don't think so.

3        Q.    Do you know whether Jay Ryan Hutton,

4    H-u-t-t-o-n -- he is a direct report of

5    Mr. Hoffman's in Admissibility and Passenger

6    Programs in headquarters -- whether he was

7    interviewed?

8        A.    I don't think so.  I'm hesitating

9    somewhat because I'm recalling from a list, and I

10   know when I asked for the list, I asked for who

11   we interviewed and did it include people from

12   headquarters.  And I'm not sure whether the fact

13   that names weren't on the list is indicative that

14   they weren't actually interviewed.  You might

15   have just given a couple of examples of who we

16   hadn't.

17       Q.    Sure, no problem.

18             Do you know whether officials from

19   each of the four field offices in OFO on the

20   U.S.-Mexico border were interviewed?

21       A.    By the four field offices, do you mean

22   within San Diego, or do you mean --



Page 71

1        Q.    I'm talking about San Diego, Tucson,

2   Laredo and El Paso.

3        A.    Yes, I believe there were officers

4   interviewed at each one.

5        Q.    Do you know whether Johnny Armijo,

6   A-r-m-i-j-o, who is employed in the San Diego

7   field office, whether he was interviewed?

8        A.    I don't know.

9        Q.    As a part of the investigation into

10  Matter Number 18-122, did OIG review reports that

11  were compiled by the Migration Crisis Action

12  Team, or MCAT team, regarding the capacity of

13  ports of entry on the U.S.-Mexico border?

14            MR. NAZAROV:  Objection; form.

15            You can answer.

16            THE WITNESS:  I don't know whether

17        those particular documents were reviewed.  I

18        do know we reviewed documents about

19        capacity.

20  BY MR. MEDLOCK:

21        Q.    As part of the investigation, did OIG

22  set out to locate a formal definition of the term



MAGNA
LEGAL SERVICES

Page 72

1    "operational capacity" as it's used at CBP?

2              MR. NAZAROV:  Objection; form.

3              THE WITNESS:  Our review set out to

4         determine whether ports of entry were

5         turning away asylum-seekers and whether

6         ports of entry were separating

7         asylum-seeking families, and whether they

8         were documenting that.  That's what we set

9         out to do.

10   BY MR. MEDLOCK:

11        Q.    As a general matter, is it true that

12   when an asylum-seeker is turned away from the

13   limit line position at a port of entry they

14   aren't provided with any documentation such as a

15   ticket or a time to return?

16             MR. NAZAROV:  Objection; form.

17             THE WITNESS:  I mean, I would prefer

18        not to talk about what our findings were

19        with 18-122, but I know that our Tecate

20        report found that there was a lack of

21        documentation for turned away

22        asylum-seekers.


MAGNA
LEGAL SERVICES

Page 73

1   BY MR. MEDLOCK:

2        Q.    As a part of the investigation into

3   Matter 18-122, did OIG directly collect the

4   emails of certain OFO officials?

5        A.    Yes.

6        Q.    Do you know whose emails were directly

7   collected?

8        A.    I believe it was around 50 people.

9        Q.    Would that include officials at

10  headquarters?

11       A.    Yes, I think so.

12       Q.    As a part of the investigation, did

13  OIG collect the emails of Kevin McAleenan?

14       A.    I don't know.  I would have to take a

15  guess, and I would rather not guess.

16       Q.    Okay.  Do you know whether Kevin

17  McAleenan was interviewed for part of the OIG

18  investigation into Matter Number 18-122?

19       A.    I don't believe he was.

20       Q.    As a part of the investigation into

21  Matter 18-122, did OIG investigate the purpose of

22  the April 27, 2018, metering guidance that was



Page 74

1    issued by Todd Owen?

2              MR. NAZAROV:  Objection; form.

3              THE WITNESS:  Again, I would prefer to

4         discuss what we -- what our objective was,

5         what we set out to investigate, rather than

6         talk about things that we -- in any

7         investigation, you may set out to

8         investigate one thing and, depending on what

9         you find, you may decide to investigate

10        other things.

11             So I would prefer not to talk about

12        what other things we decided to investigate

13        aside from the original set of three things

14        of whether asylum-seekers were being turned

15        away at ports of entry, whether

16        asylum-seeking families were separated, and

17        whether those separations were documented.

18   BY MR. MEDLOCK:

19        Q.    When you say that one of the

20   objectives was to determine whether

21   asylum-seekers were being turned away at ports of

22   entry, how do you define the phrase "turned away



Page 75

1    at ports of entry"?

2         A.     I don't -- so I should say that I

3    don't know whether it was specifically defined

4    for the purpose of the project, but I believe

5    they were both looking at the practice of turning

6    away at the limit line and returning -- or

7    turning away asylum-seekers that had crossed the

8    limit line and made it to the pedestrian

9    facility.

10        Q.     When you say you were looking at

11   asylum-seekers who were turned away at ports of

12   entry, were you looking at just whether that

13   occurred or whether that was legal, or both?

14             MR. NAZAROV:  Objection; form.  Calls

15        for a legal conclusion.

16             You can answer.

17             THE WITNESS:  We were not -- we were

18        not planning to look and did not look at

19        whether particular practices were legal if

20        they were under litigation.

21   BY MR. MEDLOCK:

22        Q.     Is that a policy of OIG, to not weigh



Page 76

1    in on the legality of an issue if it's subject to

2    litigation?

3        A.    Generally speaking, yes.  I'm not

4    aware of an exception to that.

5              MR. NAZAROV:  I withdraw my objection.

6              MR. MEDLOCK:  Josh, pull up Tab 7,

7         please.

8              MR. NAZAROV:  What did you say?

9              MR. MEDLOCK:  I was asking Josh to

10        bring up Tab 7.

11             MR. NAZAROV:  Mr. Eaton, do you need a

12        break?

13             THE WITNESS:  I can keep going a bit

14        longer.

15             MR. MEDLOCK:  I'm going to wrap up

16        pretty soon here.

17             (Exhibit 349 marked for identification

18        and attached hereto.)

19    BY MR. MEDLOCK:

20        Q.    I've put in front of you what we will

21    mark Exhibit 349 to your deposition.  It is a

22    September 27, 2018, report titled "Special



Page 77

1    Review, Initial Observations Regarding Family

2    Separation Issues Under the Zero Tolerance

3    Policy."

4              Do you see that, sir?

5         A.    Yes.

6         Q.    Is this the report that you sort of

7    described as being part of the genesis of the

8    current 18-122 investigation?

9         A.    Yes.

10        Q.    And part of the reason why the current

11   investigation began was that in the process of

12   investigating zero tolerance, the inspector

13   general made some observations about metering at

14   ports of entry in this report; is that right?

15             MR. NAZAROV:  Objection; form.

16             THE WITNESS:  Yes.  The Office of

17        Inspector General made observations that

18        asylum-seeking families were being separated

19        at ports of entry and that asylum-seekers

20        were being turned away.

21             MR. MEDLOCK:  All right.  Josh, can

22        you please bring up Tab 8.



Page 78

```
 1              (Exhibit 350 marked for identification

 2         and attached hereto.)

 3    BY MR. MEDLOCK:

 4         Q.    So this is a one-page memorandum -- or

 5    sorry.  It's a three-page memorandum that is

 6    dated October 29, 2018, and has the initial Bates

 7    number AOL-DEF-00095566, and we'll mark it as

 8    Exhibit 350 to your deposition.

 9              Take a moment to review it and let me

10    know when you're done reviewing it, sir.

11         A.    I've reviewed it.

12              MR. NAZAROV:  Hold on.  It's three

13         pages, Mr. Eaton.  Have you reviewed all

14         three pages?

15              THE WITNESS:  Thank you.

16              MR. NAZAROV:  I don't know what page

17         you want to start on.  Do you want to start

18         on 3 and go up or start --

19              THE WITNESS:  I would like -- okay,

20         next page.

21              I take it that's the last page.

22    BY MR. MEDLOCK:
```



Page 79

1          Q.    It is, sir.

2          A.    Okay.  Go back to the first page.

3          Q.    So you've reviewed it now, sir?

4          A.    Yes.

5          Q.    Okay.  And is this the memorandum that

6    you were speaking about earlier in which John V.

7    Kelly informed DHS that the investigation into

8    the processing of asylum-seekers at ports of

9    entry would be continuing?

10         A.    Yes.  I have not seen this memo

11   before, but this is what I was describing.  This

12   is what we would call an engagement memo.  And he

13   says that we are continuing the earlier review,

14   but I also see that towards the bottom of the

15   page in italics it says "Project Number 18-122,"

16   which is an indication that a new project number

17   has been assigned that resulted in the case --

18   the project we've been talking about.

19         Q.    And I notice that it's OIG Project

20   Number 18-122-ISP-CBP.  What does ISP stand for

21   there?

22         A.    That should be short for inspection.



Page 80

1    Q.   Thank you for confirming.

2       And as you mentioned, if you look at

3 the first page, Tatyana Martell is listed as a

4 contact.  That is indicative of the fact that she

5 was one of the senior officials in charge of the

6 investigation; is that right?

7    A.   Yeah.  She was the sole chief

8 inspector for the project.

9    Q.   And then if you look at the second and

10 third page that follow this memorandum, there is

11 an initial request for documents and information;

12 is that correct?

13    A.   Yes.

14    Q.   Do you know whether OIG sent

15 additional requests for documents to CBP in

16 connection with Investigation 18-122?

17    A.   Can you go to page 3?

18       Yes, we did send an additional request

19 for documents.

20    Q.   Okay.

21       MR. MEDLOCK:  Josh, can we please

22    bring up Tab 11, please.



Page 81

1              (Exhibit 351 marked for identification

2        and attached hereto.)

3    BY MR. MEDLOCK:

4        Q.    This is going to be a real test of

5    your eyesight here, Mr. Eaton.  But this is a

6    one-page email.  It has the Bates number

7    AOL-DEF-00216910.  It will be marked as

8    Exhibit 351 to your deposition.

9              Please take a moment to review it.

10   Obviously, we can expand it and make it as big as

11   you need to review it.  And let me know when

12   you're done reviewing this document.

13             THE WITNESS:  Josh, can you scroll

14        down a little bit?

15             And this is the only page?

16   BY MR. MEDLOCK:

17        Q.    That's correct, sir.

18        A.    Okay.

19        Q.    So does this -- this is an email from

20   Elaine Dismuke to Steven Staats and Stephen

21   Farrell -- I'm sorry, this is an email from Jon

22   Goodrich to Elaine Dismuke with copies to Steven



Page 82

1    Staats and Stephen Farrell that was sent on

2    November 9, 2018.

3              Do you see that, sir?

4        A.    Yes.

5        Q.    And the subject line of this email is

6    "OIG email request."  Correct?

7        A.    Yes.

8        Q.    And this appears to be a request to

9    pull emails from particular custodians and to

10   apply search terms to them.  Is that correct?

11       A.    Yes.

12       Q.    And you mentioned that up to 50

13   custodians' emails were searched in connection

14   with Project Number 18-122.  So I take it this is

15   just a subset of the individuals whose emails

16   needed to be searched.  Is that right?

17       A.    Yes.  I understood it to be 50, so I

18   imagine there were other custodians that we asked

19   for, yes.

20       Q.    Okay.  Who was responsible for sifting

21   through the emails of all of those custodians?  I

22   imagine it was a Herculean task.



Page 83

1          A.    I'm sure it was a big task.  It would

2    have been the same staff who were on the project

3    team that I listed before.

4          Q.    If that project team found

5    particularly useful documents, would those

6    documents have been placed into some sort of

7    investigative file related to Matter Number

8    18-122?

9          A.    Yes.

10              MR. NAZAROV:  Objection; form.

11              You can answer.

12              THE WITNESS:  Yes.

13   BY MR. MEDLOCK:

14         Q.    And is it a process of OIG

15   investigators to mark up or annotate documents

16   that they think are useful in their

17   investigation?

18              MR. NAZAROV:  Objection; form.

19              You can answer.

20              THE WITNESS:  I don't know to what

21         extent our staff mark up or annotate

22         documents.  I imagine they do.  I also



Page 84

1        imagine they maintain an original that's not

2        marked up.

3   BY MR. MEDLOCK:

4        Q.    Sure.  Understood.

5             MR. MEDLOCK:  Josh, could we pull up

6        Tab 12, please.

7             MR. NAZAROV:  Would this be a good

8        time to take a break?  Mr. Eaton, do you

9        need a break?

10            THE WITNESS:  Either right now, or if

11       this is a related line of questioning and we

12       want to finish that.  But sometime in the

13       next five or ten minutes would be good.

14            MR. NAZAROV:  Does that work for you,

15       Steve?

16            MR. MEDLOCK:  Yeah.  One second.  I

17       think I can be done with my questioning in

18       the next ten minutes if you guys will

19       indulge me.

20            MR. NAZAROV:  Does that work for you,

21       Mr. Eaton?

22            THE WITNESS:  That's fine with me.



Page 85

1              (Exhibit 352 marked for identification

2        and attached hereto.)

3    BY MR. MEDLOCK:

4        Q.    I've put in front of you what we will

5    mark as Exhibit 351 [sic] to your deposition, a

6    two-page document that has the leading Bates

7    number AOL-DEF-00208172.  And it has a title at

8    the top "DHS Project 18-122 - CBP's processing of

9    asylum-seekers at ports of entry, information

10   requests, February 22, 2019."

11              Let me know when you're done reviewing

12   the document, sir, and I'll have a few questions

13   for you about it.

14       A.    Is there more than this page?

15       Q.    It's two pages.

16              THE WITNESS:  Go to the next page.

17       And back to the first.

18   BY MR. MEDLOCK:

19       Q.    Does this refresh your recollection,

20   sir, that there was a second request for

21   information that was sent out in February 2019 in

22   relation to Investigation 18-122?



Page 86

1      A.    I was not aware of how many particular

2  information requests were made, but I see that

3  clearly there was one made in February.

4      Q.    Okay.  Who would have been responsible

5  for drafting these information requests?

6      A.    The project team.  I imagine Liz

7  Kingma, as the lead inspector, would probably be

8  the one the most responsible for approving this.

9  Tatyana Martell might have given it a quick

10  once-over.

11      Q.    Okay.  And these information requests

12  would have been kept and maintained in the files

13  of OIG related to Project Number 18-122; is that

14  right?

15      A.    Yes, I think so.  You know, the one

16  caveat I'm making is that for a request that --

17  and I'm not familiar with the particulars here so

18  I don't know if this applies to them.  But for a

19  request that might be exceedingly voluminous,

20  like perhaps one of the email pulls might result

21  in hundreds of thousands of emails, we might

22  maintain that data separately outside of the case



Page 87

1    file.  If there were significant documents, or

2    any documents that we relied on for a report, we

3    would maintain those in the case file.

4              But documents that might have come in

5    as part of the request but that were not used in

6    developing findings, we wouldn't need to include

7    those in the case files.

8        Q.    Okay.  Let's go to the last exhibit

9    today, which is Tab 13, please.

10             (Exhibit 353 marked for identification

11        and attached hereto.)

12   BY MR. MEDLOCK:

13       Q.    All right, sir.  I've put in front of

14   you what we will mark as Exhibit 352 [sic] to

15   your deposition.  It's a four-page --

16             THE REPORTER:  Excuse me, Steve.  We

17        have accidently gotten two 351s.  So the

18        last exhibit should be 352 and this should

19        be 353.

20             MR. MEDLOCK:  Thank you.  I appreciate

21        that, John.

22   BY MR. MEDLOCK:



Page 88

1      Q.    We'll put in front of you what will

2   apparently be Exhibit 353 to your deposition.

3   It's a four-page set of interview notes that has

4   the leading Bates number AOL-DEF-00210313.

5          Take a moment to review it and let me

6   know when you're done reviewing it, sir.

7          MR. NAZAROV:  It's four pages, just

8      FYI.  So take your time.

9          THE WITNESS:  Okay, next page.

10         Okay, next page.

11         Okay, next page.

12         I don't know if there is another page

13      after this.

14   BY MR. MEDLOCK:

15      Q.    That's the last page, sir.

16      A.    Okay, we can go back to the beginning.

17      Q.    So this appears to be an exit

18   interview of an official whose name has been

19   blanked out that was drafted by Steve Farrell on

20   September 10, 2018.  Do you see that, sir?

21      A.    Yes.

22      Q.    And this interview took place at the



Page 89

1    Otay Mesa port of entry on August 29, 2018, at

2    2:30 p.m.

3              Do you see that, sir?

4        A.    Yes.

5        Q.    And is this a typical format in which

6    OIG would write up an interview that they've

7    conducted in the course of an investigation?

8        A.    This appears to be a specific type of

9    interview.  This is an exit interview.  So I

10   think a typical interview as one would usually

11   think of it in terms of an information-gathering

12   process would be in a slightly different form;

13   for instance, when we talked about ████████████

14   and we saw that format.

15             This appears to be on the occasion of

16   an exit interview, which is sometimes done at the

17   conclusion of an inspection, at which time the

18   inspectors have a discussion with officials at

19   the facility to talk about -- to talk about the

20   inspection that they were conducting.

21       Q.    I see.

22             So when you say exit interview, it's



Page 90

1    not like somebody was leaving a job.  It's that

2    the inspection is done and the OIG officials are

3    leaving the facility.  Is that right?

4        A.    That's right.  It's interesting

5    because sometimes -- I haven't seen many exit

6    interview write-ups.  But my understanding is

7    that oftentimes there is -- they can be more of a

8    formality where it's mostly OIG explaining

9    certain findings.  As we see written here, it

10   looks like this also was OIG gathering additional

11   information during the interview.

12       Q.    Okay.  And there is a section at the

13   bottom of the first page of the exhibit with the

14   Bates number ending in 313 that's entitled

15   "Conclusions."

16            Are these the findings that would have

17   been discussed with the official before OIG left

18   the facility?

19       A.    I don't -- I don't know that these

20   would necessarily have been discussed with the

21   facility.  You know, if I read the whole --

22   everything, I might be able to get more context.



Page 91

1    I can't tell whether these are conclusions about

2    the particular inspection that the team is

3    memorializing for their own benefit or whether

4    these particular conclusions were shared with the

5    facility.

6         Q.    Understood.

7              So the first conclusion starts, quote:

8    "CBP HQ provided policy guidance on the

9    implementation of limit line metering to control

10   the flow of asylum-seekers at ports based on the

11   port's capacity to process the number of

12   asylum-seekers they were receiving.  The" -- and

13   then it's blanked out -- "were reluctant to

14   provide the memo, and did not provide many

15   details on how they implemented the policy at

16   Otay Mesa."

17             Did I read that correctly?

18        A.    Yes.

19        Q.    Okay.  Is it typical for officials to

20   be reluctant in providing information to OIG in

21   connection with an investigation?

22        A.    Unfortunately, it's not uncommon when



Page 92

1    we conduct investigations that officials are

2    reluctant to provide information.

3         Q.    Okay.

4         A.    That is something our teams have to

5    deal with.

6         Q.    Okay.  Let's move to the next page,

7    still on the "Conclusion" section at the top.

8              Conclusion 2 begins, quote:  "Officers

9    at the limit line told OIG inspectors that they

10   tell travelers the port is at capacity and they

11   should go to San Ysidro."

12             Did I read that correctly?

13        A.    Yes.

14        Q.    I assume when they say "they should go

15   to San Ysidro," they mean the travelers, not the

16   OIG inspectors.  Is that how you read it?

17        A.    Yes.

18        Q.    The next conclusion begins quote:

19   "When limit line officers tell travelers they can

20   go to San Ysidro or wait at the limit line, there

21   is no check to verify capacity within the

22   facility, and travelers wait until they are no


MAGNA
LEGAL SERVICES

Page 93

1    longer there."

2              Did I read that correctly?

3        A.    Yes.

4        Q.    So these conclusions indicate that

5    officers at Otay Mesa were telling travelers that

6    the facility was at capacity but weren't actually

7    checking on the capacity of the facility;

8    correct?

9              MR. NAZAROV:  Objection; form.

10             You can answer.

11             THE WITNESS:  That's how I read it,

12       yes.

13             MR. MEDLOCK:  Okay.  Thank you, sir.

14       I have no further questions.

15             MR. NAZAROV:  Can we take ten minutes?

16       Can we be back at 4:10?

17             MR. MEDLOCK:  That's fine.

18             MR. NAZAROV:  Thank you.

19             THE VIDEOGRAPHER:  The time is 3:56.

20       We're off the record.

21             (Recess taken.)

22             THE VIDEOGRAPHER:  The time is 4:09.



Page 94

1          We're back on the record.

2                    EXAMINATION

3    BY MR. NAZAROV:

4          Q.    Mr. Eaton, I just have a couple of

5    questions.

6                    You realize you're still under oath?

7          A.    Yes.

8          Q.    Okay.  Project 18-122 is a project

9    conducted by the Special Reviews and Evaluation

10   unit; correct?

11         A.    Yes.

12         Q.    It is not conducted by the Office of

13   Investigations; correct?

14         A.    Correct.

15         Q.    Can you explain the difference between

16   the Office of Special Reviews and Evaluations and

17   the work done by the Office of Investigations?

18         A.    The Office of Investigations tends to

19   investigate potential violations of criminal law

20   or official misconduct.

21                   Special Reviews and Evaluations, we

22   obviously conduct inspections, evaluations, and



Page 95

1   reviews.  Occasionally, some of those projects

2   may veer into misconduct, but that's kind of

3   where the line shifts.

4              MR. NAZAROV:  I pass the witness.

5              MR. MEDLOCK:  You held it to three or

6       four.

7              I have no further questions.

8              MR. NAZAROV:  We would like to review

9       and sign.

10             MR. MEDLOCK:  Thank you for your time,

11      Mr. Eaton.

12             MR. NAZAROV:  Thank you, Mr. Eaton.

13             THE WITNESS:  No problem.  Thank you,

14      everyone.

15             THE VIDEOGRAPHER:  We are off the

16      record.  The time is 4:11, and that

17      concludes today's deposition.

18             (Deposition adjourned at 4:11 p.m.)

19

20

21

22



Page 96

1          ACKNOWLEDGMENT OF DEPONENT

2

3       I, JOSEPH JACKSON EATON IV, have read or

4    have had the foregoing testimony read to me and

5    hereby certify that it is a true and correct

6    transcription of my testimony with the exception

7    of any attached corrections or changes.

8

9

10   _____

11   JOSEPH JACKSON EATON IV

12   [ ] No corrections

13   [ ] Correction sheet(s) enclosed

14

15       SUBSCRIBED AND SWORN TO BEFORE ME, the

16   undersigned authority, by the witness, JOSEPH

17   JACKSON EATON IV, on this the _____ day of

18   _____, _____.

19

20

21

22



Page 97

1                    C E R T I F I C A T E

2    DISTRICT OF COLUMBIA

3              I, JOHN L. HARMONSON, a Notary Public

4    within and for the District of Columbia, do

5    hereby certify that JOSEPH JACKSON EATON IV, the

6    witness whose deposition is hereinbefore set

7    forth, was duly sworn or affirmed by me and that

8    such deposition is a true record of the testimony

9    given by such witness.

10             That before completion of the

11   proceedings, review and signature of the

12   transcript was reserved.

13             I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage; and that I am in no way interested in

16   the outcome of this matter.

17             IN WITNESS WHEREOF, I have hereunto set

18   my hand this 13th day of August, 2020.

19

20             _____

21             JOHN L. HARMONSON, RPR

               My commission expires: 11/14/20

22



Page 98

1                          ERRATA SHEET

2       CASE:      Al Otro Lado v. McAleenan

        DATE:      August 13, 2020

3       WITNESS:  JOSEPH JACKSON EATON IV

4       Reason Codes:

5               1.  To clarify the record.

                2.  To conform to the facts.

6               3.  To correct transcription errors.

7       Pg. Ln.  Now Reads          Should Read         Reason

8       ___ ___  _____  _____  _____

9       ___ ___  _____  _____  _____

10      ___ ___  _____  _____  _____

11      ___ ___  _____  _____  _____

12      ___ ___  _____  _____  _____

13      ___ ___  _____  _____  _____

14      ___ ___  _____  _____  _____

15      ___ ___  _____  _____  _____

16      ___ ___  _____  _____  _____

17

18                                _____

                                  Signature of Deponent

19

20      SUBSCRIBED AND SWORN BEFORE ME

21      THIS ___ DAY OF _____, _____

22      _____



## A

**able** 15:4 24:20 90:22
**accident** 31:6
**accidently** 87:17
**accuracy** 41:20
**accurate** 42:3
**accusation** 31:19
**accused** 32:4 34:5
**ACKNOWLE...** 96:1
**acronym** 9:18 10:15 14:13,17
**acronyms** 14:10
**acting** 29:14,18 31:21 32:5 34:6 60:3
**action** 1:6 71:11 97:14
**Adam** 55:20
**additional** 55:19 60:6 64:21 80:15,18 90:10
**address** 48:7
**adjourned** 95:18
**adjusted** 58:21
**adjustment** 58:21
**administering** 2:16
**Admissibility** 69:15 70:1,5
**advisor** 60:5
**Affairs** 11:16
**affect** 29:16,20
**affirmed** 8:16 97:7
**afternoon** 7:19 8:21
**agency** 8:10 59:15
**ahead** 52:19 58:5
**AIG** 63:15 64:14 64:19

**AIGs** 64:20
**air** 63:22
**al** 1:5,5,8 7:8,21 98:2
**aliens** 39:22
**allegation** 32:3 51:12
**Alles** 28:4,10 29:11
**analysis** 63:10
**annotate** 83:15 83:21
**answer** 12:10 13:3,6,15 23:4 24:1 26:7 27:6 31:2 34:10,12 36:17 37:20 40:13 42:1 46:12 47:14 51:16 52:15,19 55:11 60:14 66:20 67:4 71:15 75:16 83:11,19 93:10
**answering** 13:18
**answers** 15:5 22:10
**AOL-DEF** 5:14 6:13
**AOL-DEF-000...** 6:7 78:7
**AOL-DEF-002...** 38:8
**AOL-DEF-002...** 6:11 85:7
**AOL-DEF-002...** 88:4
**AOL-DEF-002...** 5:16 42:16
**AOL-DEF-002...** 5:19 49:3
**AOL-DEF-002...** 6:9 81:7
**apologies** 17:8
**apologize** 17:15 49:18

**apparently** 88:2
**appear** 46:20
**appearances** 4:1 7:17
**appearing** 2:10
**appears** 82:8 88:17 89:8,15
**applicants** 34:19
**applies** 86:18
**apply** 82:10
**appreciate** 87:20
**approach** 39:22 40:10,22
**approaching** 40:16,18
**appropriate** 63:7
**approved** 56:15 57:5 59:11 62:5
**approves** 57:21 63:15 66:2,5
**approving** 86:8
**approximately** 17:8 50:14 68:10
**April** 73:22
**Ari** 3:13 7:22
**ari.nazarov@u...** 3:13
**Armijo** 71:5
**arrive** 25:4
**arriving** 39:22
**aside** 36:6 74:13
**asked** 28:18 70:10,10 82:18
**asking** 36:4 53:12 76:9
**aspect** 24:3
**assert** 32:1
**assigned** 50:15 55:15 79:17
**assistant** 9:15 56:15 62:5 63:14 64:18 69:6
**assume** 92:14
**assurance** 62:22

**asylum** 34:19,22 40:2 46:2,9 50:18
**asylum-seeker** 23:1,6,7 45:14 47:4,19 72:12
**asylum-seekers** 19:9 23:19 37:6 40:11 45:22 46:7 51:2,6,11 51:13,19,21 52:13 54:2 55:4 72:5,22 74:14 74:21 75:7,11 77:19 79:8 85:9 91:10,12
**asylum-seeking** 54:3 55:5 72:7 74:16 77:18
**attached** 2:13 15:11 25:18 26:2 29:5 30:6 38:5 42:9 48:21 76:18 78:2 81:2 85:2 87:11 96:7
**attempt** 12:21
**attempting** 45:7 45:13
**attention** 38:1
**attorneys** 18:9,12 18:14
**audible** 12:11
**audibly** 38:16
**audio** 10:3 13:14 13:22
**audits** 54:21 56:16 64:19
**August** 1:16 2:5 7:9 54:5,15 89:1 97:18 98:2
**authority** 32:10 41:7,11 96:16
**available** 11:7
**aware** 28:19 35:19 36:12 37:4,13 47:9

76:4 86:1
**A-r-m-i-j-o** 71:6

## B

**back** 10:10,12 16:3 17:16 23:1 23:6 28:18 32:19 34:20 37:7 38:14,14 43:8 49:20 51:13,19,22 53:7 54:18 60:22 61:19,20 62:20 63:5,21 64:3,13 65:2,4 66:8,8 67:6 79:2 85:17 88:16 93:16 94:1
**bad** 28:18
**BAS** 1:7
**based** 22:20 23:14,16 35:17 40:6,10 41:18 42:2 63:8 91:10
**Bates** 38:8 39:13 42:16 44:18 49:2 78:6 81:6 85:6 88:4 90:14
**bears** 49:2
**began** 55:12 77:11
**beginning** 17:20 29:7 36:3 42:16 45:20 50:11 55:10 64:12 88:16
**begins** 7:6 38:8 39:16,20 41:6 41:10 42:15 92:8,18
**behalf** 3:3,9
**believe** 19:3 24:13 38:10 44:5 47:15 49:13 50:6



54:19,22 55:21
64:11 67:5,7
69:5 71:3 73:8
73:19 75:4
**Ben** 3:11
**benefit** 91:3
**best** 53:13
**better** 54:16
**big** 81:10 83:1
**bit** 27:19 30:1
76:13 81:14
**blanked** 88:19
91:13
**blood** 97:14
**blow** 42:22
**board** 11:12
**body** 29:7
**border** 14:12
19:10 23:7
24:10 34:17
46:17 47:3,20
70:20 71:13
**bottom** 17:17,19
26:9 27:4,14
38:19 39:14
79:14 90:13
**boundary** 40:17
40:20 41:2 45:6
46:18 47:6
**Box** 3:11
**break** 52:17,20
53:2,10 76:12
84:8,9
**bring** 30:3 38:1,2
42:7 76:10
77:22 80:22
**broader** 48:5
**Brooks** 56:3
**Brown** 3:4 7:12
7:20 55:20

_____
**C**

**C** 3:1 7:2 97:1,1
**California** 1:2
34:18 37:5
**call** 9:5 25:10

56:10 79:12
**called** 33:18 62:7
62:21
**Calls** 75:14
**capacity** 71:12
71:19 72:1
91:11 92:10,21
93:6,7
**cars** 25:3,7,10
**case** 13:5 25:3
60:10 64:2,22
79:17 86:22
87:3,7 98:2
**caveat** 46:14
86:16
**CBP** 14:12,16
17:21 22:22
23:19 34:17,18
44:11 47:11,21
65:9 66:17 67:2
68:10 72:1
80:15 91:8
**CBPO** 5:18
44:12 45:20
49:2
**CBP's** 52:12 68:3
85:8
**cells** 68:20
**certain** 73:4 90:9
**certify** 96:5 97:5
97:13
**chain** 65:22
**chairperson**
31:14
**chairs** 30:16
**change** 65:3,7,10
65:12,12,13,16
66:4,16
**changed** 34:3
**changes** 63:8
96:7
**charge** 80:5
**check** 92:21
**checked** 45:9
**checking** 93:7
**checkpoint** 45:5

**chief** 55:17 60:3
60:5,7 80:7
**Civil** 1:6 2:11 8:2
15:17
**claim** 46:2,8,9
**claims** 34:22
**clarification** 52:4
**clarify** 98:5
**class** 7:21
**clearance** 63:19
**cleared** 56:17,18
56:20 57:3
**clearer** 30:1
**clearing** 57:1,19
**clearly** 86:3
**close** 40:19
**Clouse** 3:18 8:9,9
16:8
**Codes** 98:4
**collect** 73:3,13
**collected** 73:7
**Columbia** 2:15
97:2,4
**come** 25:11 87:4
**comment** 63:3
64:22 65:6 66:7
**comments** 57:9
63:8 65:8 66:17
67:2
**commission**
97:21
**commissioner**
69:6
**committee** 11:15
31:14
**committees**
30:17
**communicate**
19:21
**communications**
17:21 20:17
**compiled** 71:11
**complaint** 39:9
50:22
**complete** 15:5
35:15 58:16

59:1 62:12
**completes** 62:16
62:19
**completing** 66:12
**completion** 97:10
**component** 57:7
59:15 63:3
**comprehensive**
55:14
**concern** 45:21
**Concerns** 44:21
45:19
**concluded** 41:12
**concludes** 95:17
**conclusion** 75:15
89:17 91:7 92:7
92:8,18
**conclusions** 34:3
90:15 91:1,4
93:4
**concurrences**
57:14
**conduct** 92:1
94:22
**conducted** 24:16
35:19 43:18
54:12 56:4
67:15 89:7 94:9
94:12
**conducting** 53:22
67:20 68:15
89:20
**confirming** 80:1
**conform** 98:5
**confusing** 51:18
**Congress** 5:12
30:17
**congressional**
31:13
**connection** 80:16
82:13 91:21
**consider** 48:4
**considerable**
26:16
**Cont** 4:1 6:1
**contact** 80:4

**context** 45:10
90:22
**continuing** 35:11
79:9,13
**continuum** 53:14
**contract** 62:15
62:16 63:16
66:10
**contrary** 34:16
**control** 91:9
**controller** 63:22
**conversations**
18:9 21:4
**copies** 81:22
**copy** 15:21 16:2
28:17,20 30:9
30:12 39:4
**correct** 11:9
19:11,13 29:1,8
30:19 31:22
34:12 37:21
38:22 39:10
48:12,13,17
50:20 60:15
80:12 81:17
82:6,10 93:8
94:10,13,14
96:5 98:6
**correction** 39:1
96:13
**corrections** 96:7
96:12
**correctly** 35:1
40:3 41:16 46:3
48:3 50:19
58:15 91:17
92:12 93:2
**Costello** 29:13,17
30:17 31:15,20
32:3 34:3,5
54:22
**counsel** 7:16 8:4
8:8,10 12:6
13:1,2 16:4,6
18:13,17,19
20:4,16 21:5



26:1,6 28:5,21
39:5 42:14
43:20 60:5
62:18,19 63:17
66:10
**couple** 18:21
70:15 94:4
**course** 43:18
58:18,22 89:7
**court** 1:1 7:14
8:11 11:20
12:12 15:1
**courts** 48:9
**cover** 15:16
25:22 26:5,18
26:20 27:14
28:4,10,12,20
**criminal** 94:19
**Crisis** 71:11
**crossed** 23:7 75:7
**Cuffari** 5:11
30:10
**current** 56:7 77:8
77:10
**currently** 59:9
65:19
**custodians** 82:9
82:13,18,21
**Customs** 14:12
34:17

————————
**D**
**d** 4:1 6:1 7:2
**data** 86:22
**date** 13:5 98:2
**dated** 78:6
**David** 3:17 8:6
**david.young@...**
3:18
**day** 96:17 97:18
98:21
**DC** 3:5,11,16 4:4
**deal** 92:5
**dealt** 64:17
**decide** 57:20 74:9
**decided** 48:6

54:6 74:12
**defendants** 1:9
3:9 8:3
**define** 74:22
**defined** 44:11
75:3
**definition** 71:22
**deliberative**
66:21
**department** 1:14
3:10,15 4:3 8:1
9:12,21 10:14
15:18 18:14
21:6 56:19 57:2
57:6,19,21
59:12 63:2 65:3
65:5 66:6 67:6
**department's**
63:7
**depend** 58:7
**depending** 74:8
**depends** 58:8
61:15
**Deponent** 96:1
98:18
**deposition** 1:12
2:9 7:7,10 12:2
12:8 13:11
15:14,18 16:5,7
16:14 18:11
21:1,7 22:5,17
22:21 23:17
30:9 38:10
42:12 76:21
78:8 81:8 85:5
87:15 88:2
95:17,18 97:6,8
**deputy** 9:15
10:20 29:11
64:20
**describe** 18:10
53:13 57:18
62:1
**described** 24:4
64:5 65:19,21
77:7

**describing** 79:11
**designated** 18:6
**designed** 46:16
**Designee** 1:13
**detailed** 61:15
**details** 91:15
**detainees** 68:21
68:22
**detention** 40:2
**determine** 35:10
72:4 74:20
**developing** 87:6
**deviating** 64:11
**DHS** 8:4,7,10
9:22 10:15
17:22 24:16
29:12 30:11,18
31:16 39:6,10
39:16,21 40:5
44:2 55:8 59:15
79:7 85:8
**DHS's** 30:16
**Diana** 64:14
**Diego** 54:12
70:22 71:1,6
**difference** 94:15
**different** 20:8
64:10 89:12
**difficulties** 10:7
**direct** 69:19 70:4
**directly** 63:20
73:3,6
**director** 69:10,12
69:14
**discloses** 41:14
**discuss** 74:4
**discussed** 66:5
90:17,20
**discussing** 20:20
53:10
**discussion** 54:19
89:18
**discussions** 18:12
18:15,20 19:6
**Dismuke** 81:20
81:22

**District** 1:1,2
2:15 97:2,4
**Division** 8:2
**document** 15:15
15:21 16:2
25:21 26:9,10
27:12 31:11
33:10,18,22
38:2,17 43:12
81:12 85:6,12
**documentation**
54:4 72:14,21
**documented**
74:17
**documenting**
72:8
**documents** 18:18
20:1,2,6,8,13
20:15 21:3,9,11
21:13,16,18,22
67:20,22 71:17
71:18 80:11,15
80:19 83:5,6,15
83:22 87:1,2,4
**DOJ** 20:4
**Donna** 56:2
**doubt** 41:20
**draft** 57:3,5 59:1
62:5 63:1
**drafted** 88:19
**drafting** 28:10
43:19 86:5
**dropped** 10:13
**duly** 8:16 97:7

————————
**E**
**E** 3:1,1,16 7:2,2
97:1,1
**earlier** 13:20
14:11 22:10
31:7 63:16 79:6
79:13
**easier** 22:14,16
**Eaton** 1:12 2:9
5:3 7:7 8:15 9:1
10:12 26:8 27:4

27:11 30:21
31:1 33:9 42:21
53:9 76:11
78:13 81:5 84:8
84:21 94:4
95:11,12 96:3
96:11,17 97:5
98:3
**editor** 62:15,16
63:16 66:10
**effect** 32:6,11,14
**effectively** 47:6
**either** 20:3,15
38:13 40:1,16
84:10
**El** 71:2
**Elaine** 81:20,22
**Elizabeth** 19:6
19:15
**email** 6:9 19:5,22
81:6,19,21 82:5
82:6 86:20
**emailed** 19:1,14
**emails** 73:4,6,13
82:9,13,15,21
86:21
**employed** 9:8,10
11:14 30:18
31:16 32:4,14
34:4 71:6
**enclosed** 96:13
**encompassed**
21:10
**engagement** 55:8
79:12
**ensures** 61:6
**enter** 45:7,8,13
**entering** 45:13
**entire** 26:10,17
33:13 64:4
**entitled** 90:14
**entry** 19:10 22:9
23:8 24:7,9,15
24:18,20,22
25:4,12 34:19
34:21 35:5



36:11,12 37:5,6
40:1,17,18 45:9
47:10 51:1,8,22
52:13 54:3,13
67:16 68:16
71:13 72:4,6,13
74:15,22 75:1
75:12 77:14,19
79:9 85:9 89:1
**ERRATA** 98:1
**errors** 98:6
**ESQ** 3:6,13,17,18
4:5,10
**essentially** 12:8
45:9 63:11,21
**et** 1:5,8
**evaluation** 55:10
94:9
**evaluations** 9:16
10:21 11:5
54:11 94:16,21
94:22
**eventually** 57:22
**exact** 60:4
**exactly** 46:17
**Examination** 5:1
5:4,5 8:19 94:2
**examined** 8:17
**example** 24:19
**examples** 70:15
**exceedingly**
86:19
**exception** 76:4
96:6
**Excuse** 38:20
87:16
**executive** 69:6,10
**exhaustively** 68:6
**exhibit** 5:8,9,10
5:11,13,16,18
6:1,2,3,7,9,10
6:13,18,19,20
15:10,15 16:10
17:3 25:17 29:3
29:4,22 30:5,8
32:20 33:1 38:4

**38**:9,21 39:13
42:8,12 44:7,19
48:20 49:6
76:17,21 78:1,8
81:1,8 85:1,5
87:8,10,14,18
88:2 90:13
**EXHIBITS** 6:17
**exit** 6:13 88:17
89:9,16,22 90:5
**expand** 81:10
**expect** 59:17
**expedited** 40:1
**expires** 97:21
**explain** 56:11
94:15
**explaining** 90:8
**extent** 83:21
**eyesight** 81:5
**E-a-t-o-n** 9:2

---
**F**

**F** 97:1
**facility** 40:19
52:1 68:19 69:1
75:9 89:19 90:3
90:18,21 91:5
92:22 93:6,7
**fact** 32:3 70:12
80:4
**factors** 58:7
**facts** 98:5
**fact-check** 62:11
**fall** 20:18
**falsely** 31:20 32:5
32:11 34:5
**familiar** 22:11
52:11,18,21
86:17
**familiarize** 27:7
**families** 54:3
55:5 72:7 74:16
77:18
**family** 6:4 53:20
54:17 77:1
**far** 32:13

**Farrell** 55:21
81:21 82:1
88:19
**fast-track** 25:7
**February** 50:14
85:10,21 86:3
**federal** 2:11
15:17 34:16
**Feel** 9:5
**feet** 47:1,2,6,11
47:20
**field** 14:16 35:14
35:18 53:22
68:3,13 70:19
70:21 71:7
**fifth** 33:3
**file** 21:20 83:7
87:1,3
**files** 50:3 86:12
87:7
**final** 59:1
**finalizing** 61:4
**find** 74:9
**finding** 34:15
**findings** 29:16,21
32:7,14 33:6,20
34:2 36:18,20
37:3 72:18 87:6
90:9,16
**fine** 33:14 84:22
93:17
**finish** 84:12
**finished** 63:13
**first** 8:16 12:5
16:1 22:8 26:4
27:22 33:13
34:15,16 39:15
43:14 44:10
79:2 80:3 85:17
90:13 91:7
**five** 84:13
**five-page** 42:13
**Flato** 56:6
**flip** 33:2
**flow** 91:10
**focus** 16:14 17:2

**22**:7 34:14
39:12 50:10
**focused** 39:15
**follow** 35:10
80:10
**followed** 64:8
**follows** 8:18
**foregoing** 96:4
**form** 23:3,22
29:10 32:8 35:6
36:1,16 37:9,17
40:12 41:22
46:11 47:13
48:1 51:3,15
59:22 60:13
65:14 67:4
71:14 72:2,16
74:2 75:14
77:15 83:10,18
89:12 93:9
**formal** 43:17
71:22
**formality** 90:8
**format** 89:5,14
**forth** 97:7
**forward** 26:13
**found** 33:19
34:16 72:20
83:4
**four** 70:19,21
88:7 95:6
**four-page** 87:15
88:3
**Franklin** 3:11
**free** 9:5
**front** 15:13,16
25:20 38:14,15
42:11 59:9,13
59:14,14,15,16
59:17,18,20
60:18,20,21,22
61:1,3,5,16,20
61:21 63:17
65:20,21 66:1,2
66:5,10 76:20
85:4 87:13 88:1

**full** 8:22 15:4
**further** 39:9
93:14 95:7
97:13
**FYI** 88:8

---
**G**

**G** 7:2
**gathering** 90:10
**general** 3:15 4:3
8:7 9:11,14,15
9:18 11:4 29:14
29:19 30:11,19
31:16,21 32:6
32:12 34:6 35:9
54:6 56:15 57:5
59:20 60:2 62:1
62:6 63:14
67:15,18 72:11
77:13,17
**generally** 25:5
56:13,21 58:18
62:4 68:5,8,14
76:3
**generals** 64:19
**General's** 22:8
**genesis** 77:7
**getting** 66:17
**give** 12:11 15:4
70:15 86:9 97:9
**given** 68:16
70:15 86:9 97:9
**go** 9:4 10:3 12:5
17:16 26:8,9,19
27:5,15,17
29:22 32:19
34:21 36:17
42:20 43:3,4,20
52:19 58:5
59:11 60:20
62:2 63:20 66:9
78:18 79:2
80:17 85:16
87:8 88:16
92:11,14,20
**goes** 62:6 63:5
66:20



**going** 14:5,15
  18:8 26:8 31:7
  32:2 48:7 52:16
  63:16 66:18
  67:3 76:13,15
  81:4
**good** 7:19 8:21
  12:7,13 61:12
  84:7,13
**Goodrich** 19:1
  19:15 20:18
  42:14 49:16
  56:5 81:22
**gotten** 87:17
**Governmental**
  11:16
**Grande** 24:14
**Greg** 56:6
**ground** 12:5
**guess** 40:15
  50:11 62:3
  73:15,15
**guidance** 73:22
  91:8
**guys** 84:18

——————
**H**
**H** 5:13
**hand** 97:18
**happened** 13:20
**hard** 67:9
**Harmonson** 1:21
  2:14 7:15 97:3
  97:21
**head** 12:13 68:12
**header** 44:21
**headquarters**
  68:11 69:21,22
  70:6,12 73:10
**hear** 13:22 34:11
**held** 31:20 32:5
  69:7 95:5
**helpful** 61:22
**Henry** 28:4
**Herculean** 82:22
**hereinbefore**

97:6
**hereto** 2:13 15:11
  25:18 29:5 30:6
  38:5 42:9 48:21
  76:18 78:2 81:2
  85:2 87:11
**hereunto** 97:17
**hesitating** 70:8
**he'll** 27:16
**highlight** 21:12
**high-level** 57:13
**Hoffman** 69:14
**Hoffman's** 69:19
  70:5
**Hold** 78:12
**holding** 32:11
  34:5 68:20
**Homeland** 1:14
  3:15 4:3 9:12
  9:22 10:14
  11:15 15:18
**hours** 20:15,19
  21:1 50:15
**HOWARD** 4:5
**Howe** 69:9
**HQ** 91:8
**huh-uh** 12:14
**hundreds** 86:21
**Hutton** 70:3
**H-u-t-t-o-n** 70:4

——————
**I**
**identification**
  15:11 25:8,18
  29:4 30:5 38:4
  42:8 48:20
  76:17 78:1 81:1
  85:1 87:10
**identified** 36:5
  54:1
**identify** 45:12
  58:20
**IG** 32:15,17 59:2
  61:16
**IG's** 61:7,11
**imagine** 82:18,22

83:22 84:1 86:6
**immediate** 54:8
**Immigration**
  3:10 8:2
**implementation**
  91:9
**implemented**
  91:15
**important** 12:10
  12:18
**improper** 22:22
  23:15,18
**improve** 12:21
**inaccurate** 44:7
  50:7
**incident** 36:9
**incidents** 36:10
**include** 57:8
  70:11 73:9 87:6
**included** 55:20
  56:5
**includes** 57:11
  60:1,2 66:4
**incorporates**
  63:9
**independent** 62:8
  62:8
**independently**
  62:11
**INDEX** 5:1,8 6:1
**indicate** 93:4
**indicated** 54:8
**indication** 79:16
**indicative** 70:13
  80:4
**individuals** 19:17
  34:21 46:1
  82:15
**indulge** 84:19
**information** 6:10
  41:13 80:11
  85:9,21 86:2,5
  86:11 90:11
  91:20 92:2
**information-ga...**
  89:11

**informed** 16:4,6
  79:7
**informing** 30:15
**informs** 31:13
**initial** 6:3 53:20
  77:1 78:6 80:11
**input** 28:15
**inquiry** 43:21
**inside** 34:19 47:2
**inspected** 35:22
  36:14 37:8
**inspecting** 23:2
**inspection** 54:9
  54:12 55:10
  68:15 79:22
  89:17,20 90:2
  91:2
**inspections** 11:5
  54:11 94:22
**inspector** 3:15
  4:3 8:7 9:11,14
  9:15,17 11:4
  22:8 29:14,18
  30:10,19 31:16
  31:21 32:6,12
  34:6 35:9 54:5
  55:18,19,20,20
  55:21,22 56:2,2
  56:15 57:5
  59:19 60:2 62:6
  63:14 64:18
  67:15,18 77:12
  77:17 80:8 86:7
**inspectors** 89:18
  92:9,16
**instance** 54:20
  57:9 89:13
**instances** 35:20
  36:5 37:4,12,13
  46:21
**instruct** 66:19
**instructed** 34:20
  50:17
**instructs** 13:3
**Integrity** 62:13
**interacting** 47:21

**interested** 97:15
**interesting** 90:4
**interrupt** 30:21
  31:5 58:6
**interview** 6:13
  42:13,18 43:15
  43:16,18,19
  44:6 45:11
  69:12 88:3,18
  88:22 89:6,9,9
  89:10,16,22
  90:6,11
**interviewed** 68:2
  68:9 69:3,5,11
  69:16,19 70:7
  70:11,14,20
  71:4,7 73:17
**interviews** 44:2
  67:20 68:1
**introduce** 8:5
**INV** 54:21
**investigate** 67:20
  73:21 74:5,8,9
  74:12 94:19
**investigating**
  67:17 68:4 69:3
  77:12
**investigation**
  19:8 22:9,11
  35:17 39:9
  41:19 42:15
  46:7 52:8,12
  53:11,12 55:16
  55:17 56:8 71:9
  71:21 73:2,12
  73:18,20 74:7
  77:8,11 79:7
  80:6,16 83:17
  85:22 89:7
  91:21
**investigations**
  40:7,10 54:22
  92:1 94:13,17
  94:18
**investigative**
  42:14 43:20



67:19 83:7
**investigator**
49:22
**investigators**
83:15
**involved** 54:20
55:1 60:8 65:21
**IQO** 62:14,20
**IRR** 62:9
**ISP** 79:20
**issue** 35:14,16
55:3 58:21 76:1
**issued** 53:18 55:8
74:1
**issues** 6:5 13:21
54:1 64:16,17
77:2
**italics** 79:15
**IV** 1:12 2:9 5:3
8:15 9:1,3 96:3
96:11,17 97:5
98:3

**J**

**J** 5:11 28:5
**Jackson** 1:12 2:9
5:3 7:7 8:15 9:1
9:4,5 96:3,11
96:17 97:5 98:3
**January** 14:6
**Jason** 55:22
**Jay** 70:3
**Jennifer** 29:13
30:17 31:15
**Jillian** 3:18 8:9
16:8
jillian.clouse@...
3:19
**JOANNE** 4:5
joanne.howard...
4:6
**job** 1:22 9:13
24:16 49:22
90:1
**John** 1:21 2:13
7:15 12:12 54:6

79:6 87:21 97:3
97:21
**Johnny** 71:5
**joined** 8:4
**Jon** 19:1,15
42:14 56:5
81:21
**Jonathan** 19:18
**Joseph** 1:12 2:9
5:3 8:15 9:1
30:10 96:3,11
96:16 97:5 98:3
**Josh** 4:11 7:13
15:9 16:9 17:13
25:16 26:8,12
27:15,20 30:2
32:20 33:2,12
33:21 38:13,18
42:6,22 44:14
48:18 52:6 76:6
76:9 77:21
80:21 81:13
84:5
**judge** 13:4
**July** 31:22 67:12
**June** 11:12 16:3
30:9 31:21
53:17 67:6
**Justice** 3:10 8:1
18:14 21:6
**J-a-c-k-s-o-n** 9:2
**J-o-s-e-p-h** 9:1

**K**

**K** 1:8 3:4
**keep** 17:14 76:13
**keeping** 44:1
50:2
**Kelly** 54:6 79:7
**kept** 86:12
**Kerner** 5:13 28:5
42:4
**Kevin** 1:8 73:13
73:16
**kind** 25:7 53:13
95:2

**Kingma** 19:7,16
19:20 20:18
55:19 86:7
**Kirstjen** 39:6
**know** 14:1 18:5
21:9 24:2 27:6
27:12 35:3,7
36:9 38:15 40:6
42:18 46:22
49:7,10 60:3
68:5,5,7 69:2,6
69:20 70:3,10
70:18 71:5,8,16
71:18 72:19
73:6,14,16 75:3
78:10,16 80:14
81:11 83:20
85:11 86:15,18
88:6,12 90:19
90:21
**known** 52:12
**KSC** 1:7

**L**

**L** 1:21 2:13 5:18
97:3,21
**lack** 54:4,16
72:20
**Lado** 1:5 7:8,21
98:2
**lane** 4:4 25:7,9
25:10
**Laredo** 71:2
**law** 34:16 41:14
46:1 94:19
**lead** 10:19 55:18
86:7
**leading** 85:6 88:4
**leaving** 90:1,3
**led** 55:17
**left** 90:17
**legal** 4:11 7:14,15
48:6 62:18
75:13,15,19
**legality** 48:11,15
76:1

**LegalVision** 7:11
**length** 26:17

**letter** 5:11,13
25:22 26:5,18
26:20 27:14
28:4,10,12,20
30:10,12,15
31:13,19 32:22
38:7,11,14 39:4
39:8 41:21
50:11 55:8
**let's** 10:3 24:17
25:10,15 26:19
32:19 41:5 53:1
87:8 92:6
**level** 64:22
**Lewandowski**
55:21
**lie** 23:19
**likelihood** 41:13
**limit** 44:22 45:3
45:4,11,15,19
45:21 46:16,21
47:5,10,21 48:5
48:11 50:15
51:5,7,14,20
52:1 68:17
72:13 75:6,8
91:9 92:9,19,20
**limitation** 13:13
**line** 44:22 45:3,4
45:11,15,19,21
46:16,21 47:5
47:10,21 48:5
48:12 50:15
51:5,7,14,20
52:1 68:17
72:13 75:6,8
82:5 84:11 91:9
92:9,19,20 95:3
**list** 70:9,10,13
**listed** 16:13 80:3
83:3

**lists** 29:13
**litigation** 3:10
8:3 75:20 76:2
**little** 20:11 27:19
42:22 81:14
**Liz** 55:19 86:6
**LLP** 7:12,20
**Ln** 98:7
**loaded** 17:11
**locate** 71:22
**located** 40:19
**long** 11:10 20:12
58:1,5,9 60:17
67:10
**longer** 30:18
31:15 32:4,13
34:4 35:15
76:14 93:1
**look** 27:5 30:22
31:2,4 54:7
75:18,18 80:2,9
**looking** 54:9 75:5
75:10,12
**looks** 35:14 90:10
**lose** 13:22
**lost** 10:2
**lot** 58:4,4,7 61:15
**Luis** 69:18

**M**

**M** 3:6
**Magna** 7:11,14
7:15
**main** 45:21
**maintain** 84:1
86:22 87:3
**maintained**
86:12
**maintaining** 44:1
50:2
**majority** 11:17
**making** 21:16,17
21:20 86:16
**management**
29:12 57:12
59:6 63:9



marginal 21:13
mark 30:8 42:12
  76:21 78:7
  83:15,21 85:5
  87:14
marked 6:17
  15:10,14 25:17
  29:4 30:5 38:4
  38:9 42:8 48:20
  49:5 76:17 78:1
  81:1,7 84:2
  85:1 87:10
marriage 97:15
Martell 55:18
  80:3 86:9
materials 46:6
Matt 19:2,15,18
  56:5
matter 7:8 35:19
  36:21 37:2,16
  52:14 58:9 59:5
  61:19 64:8
  67:17,21 68:4
  69:3 71:10
  72:11 73:3,18
  73:21 83:7
  97:16
Mayer 3:4 7:12
  7:20
McAleenan 1:8
  7:8 73:13,17
  98:2
McAllen 24:13
MCAT 71:12
mean 21:15 23:6
  23:11 25:5
  28:14 29:20
  41:1 57:2 58:6
  59:13,16 70:21
  70:22 72:17
  92:15
meaning 61:7
means 26:12 45:3
Medlock 3:6 5:4
  7:19,20 8:20
  10:2,11 15:8,12

16:9,11,20 17:1
  17:13,18 23:10
  24:5 25:15,19
  26:12,16 27:1
  27:10 28:2 29:6
  30:2,7 31:8,10
  32:19 33:4,16
  34:9 35:8 36:8
  36:19 37:11,19
  38:6,22 39:3
  40:21 42:6,10
  43:10 44:14,16
  47:8,17 48:2,18
  48:22 51:9 52:2
  52:5,10 53:1,8
  60:9,16 65:17
  66:22 67:13
  71:20 72:10
  73:1 74:18
  75:21 76:6,9,15
  76:19 77:21
  78:3,22 80:21
  81:3,16 83:13
  84:3,5,16 85:3
  85:18 87:12,20
  87:22 88:14
  93:13,17 95:5
  95:10
meeting 55:2
  61:6
Mejia 69:18
member 11:19
members 5:12
  18:15 30:16
  31:15 55:19
memo 79:10,12
  91:14
memoranda 44:2
memorandum
  5:16 6:7 29:11
  29:18 43:15,16
  43:19 44:6 78:4
  78:5 79:5 80:10
memorialization
  43:17
memorializing

91:3
mentioned 13:10
  37:15 46:15
  61:18 67:14
  80:2 82:12
merely 65:13
merits 32:2
Mesa 89:1 91:16
  93:5
metering 48:15
  73:22 77:13
  91:9
Mexican 23:1,20
  41:1
Mexico 19:10
  23:12 24:10
  34:20 35:21
  36:14 37:7
  40:17 45:6
  46:18 51:8,14
  70:20 71:13
Michael 56:2
MICHELLE
  4:10
Microsoft 19:19
middle 17:9
Migration 71:11
mind 40:15
ministering
  68:21
minority 11:17
  11:19
minute 33:10
minutes 84:13,18
  93:15
misconduct
  94:20 95:2
mission 11:2
moment 16:16
  26:2,11 38:12
  38:20 42:17
  49:4,6 78:9
  81:9 88:5
move 16:9,20
  26:13 27:13
  41:5 44:14 52:7

92:6
moving 17:15
multipage 15:15
  25:21 38:7
multiple 60:20
Murray 4:4
mute 31:6
M-e-j-i-a 69:18

## N

N 3:1 7:2
name 8:22 9:4
  10:18 53:19
  57:10 88:18
names 70:13
Nazarov 3:13 5:5
  7:22,22 23:3,22
  26:7,14,19 27:3
  27:15 30:20
  31:5 32:8 33:9
  34:8 35:6 36:1
  36:16 37:9,17
  40:12 41:22
  42:21 46:11
  47:13 48:1 51:3
  51:15 59:22
  60:13 65:14
  66:18 67:3
  71:14 72:2,16
  74:2 75:14 76:5
  76:8,11 77:15
  78:12,16 83:10
  83:18 84:7,14
  84:20 88:7 93:9
  93:15,18 94:3
  95:4,8,12
necessarily 90:20
necessary 57:21
need 16:15 33:14
  76:11 81:11
  84:9 87:6
needed 82:16
needs 56:18
  58:21
Neuburg 49:16
Neuburger 19:2

19:15 20:18
  49:17,18 56:5
never 28:17
new 32:16 79:16
  41:21
noncitizens 35:20
  36:13
nonconcurrenc...
  57:15
Notary 2:15 97:3
note 5:18 32:21
  49:1,5,7,10,13
  50:7,11,21 52:5
noted 35:12
notes 21:8,11,13
  21:16,21 42:13
  42:18 49:21
  50:2 88:3
notice 15:16
  16:14 79:19
notification 55:9
November 82:2
number 7:6
  16:12 26:17
  38:8 39:14
  42:16 44:18
  49:3 52:14 56:8
  57:10 58:10
  64:8 67:17
  71:10 73:18
  78:7 79:15,16
  79:20 81:6
  82:14 83:7 85:7
  86:13 88:4
  90:14 91:11
numbered 16:13
  19:3
numeral 9:2
NW 3:4

## O

O 7:2
oath 2:16 8:17
  14:21,22 94:6
object 13:2 66:18



67:3
**objection** 13:4,7
  23:3,22 32:8
  34:8 35:6 36:1
  36:16 37:9,17
  40:12 41:22
  46:11 47:13
  48:1 51:3,15
  59:22 60:13
  65:14 71:14
  72:2,16 74:2
  75:14 76:5
  77:15 83:10,18
  93:9
**objective** 74:4
**objectives** 74:20
**observations** 6:3
  53:20 77:1,13
  77:17
**observe** 24:20
**obviously** 56:9
  81:10 94:22
**occasion** 62:9
  89:15
**Occasionally**
  95:1
**occasions** 60:21
**occurred** 67:11
  75:13
**occurring** 35:4
**occurs** 56:14
**October** 55:7
  78:6
**offhand** 22:6
  41:4
**office** 3:10,15 4:3
  8:2,7,7 9:11,14
  9:16,17 10:18
  10:20 11:3
  14:16 16:4,6
  18:13,17,19
  22:8 25:22 26:5
  28:5,21 30:18
  31:16 35:9 39:5
  54:20,21 56:16
  56:18 57:10

59:10,13,14,14
  59:15,16,17,18
  59:20 60:18,20
  60:21,22 61:1,3
  61:5,16,20,21
  62:7,14,17,19
  62:21 63:5,17
  63:17 64:20
  65:20,21 66:2,2
  66:5,9,10,11
  67:14,18 68:3
  71:7 77:16
  94:12,16,17,18
**officer** 17:21
  22:22 44:11
  47:21
**officers** 23:19
  44:21 45:19,21
  47:11 50:16
  51:1 68:17,18
  68:19,22 71:3
  92:8,19 93:5
**offices** 54:20
  56:19 57:4
  58:19 63:19
  64:17 68:13
  70:19,21
**official** 55:9
  88:18 90:17
  94:20
**officials** 34:18
  68:10,11,12
  70:18 73:4,9
  80:5 89:18 90:2
  91:19 92:1
**officiated** 2:16
**OFO** 14:17 47:18
  47:18 69:5,10
  69:15 70:19
  73:4
**oftentimes** 90:7
**oh** 17:14 21:19
  37:21 58:5
**OIG** 8:10 9:18
  10:19 16:4
  17:22 19:3 20:3

21:5 24:16
  25:22 28:9,13
  28:19 29:8
  30:11 32:4,6
  34:4 35:17,19
  35:19 36:12,21
  37:4,16 43:16
  44:2 47:18
  48:10,14 49:11
  49:22 50:3,3
  52:11,13 53:10
  55:7,15 59:14
  59:17,18 63:4
  63:11 64:8
  71:10,21 73:3
  73:13,17,21
  75:22 79:19
  80:14 82:6
  83:14 86:13
  89:6 90:2,8,10
  90:17 91:20
  92:9,16
**OIG's** 11:7 40:6
  40:10 41:18
  63:10
**okay** 12:21,22
  13:10,18 14:2,4
  19:20 20:12
  21:19 22:7
  25:14 26:19
  28:1,9,17 30:15
  31:9 32:19
  36:20 37:2
  40:22 41:5 43:2
  43:5,14 44:10
  45:18 47:9
  49:10 50:10
  53:1 58:14 62:4
  64:2,7 66:14
  67:14 68:7
  73:16 78:19
  79:2,5 80:20
  81:18 82:20
  86:4,11 87:8
  88:9,10,11,16
  90:12 91:19

92:3,6 93:13
  94:8
**once** 56:17 59:10
  59:10 66:5
**once-over** 86:10
**ones** 24:12
**one's** 32:11
**one-page** 78:4
  81:6
**one-paragraph**
  49:1
**ongoing** 35:15
  52:7
**operational** 72:1
**operations** 14:16
  24:21,21 25:2
  45:16 68:3
  69:10,13
**order** 23:19 25:3
  25:11
**original** 62:10
  74:13 84:1
**OSC** 41:14
**OSC's** 41:21
**Otay** 89:1 91:16
  93:5
**Otro** 1:5 7:8,21
  98:2
**outcome** 55:2
  97:16
**outset** 35:12
**outside** 36:6,11
  37:3 86:22
**overall** 57:13
**overseeing** 13:4
**oversight** 30:16
  31:14 62:14
**Owen** 69:2,7 74:1

---
**P**
---
**P** 3:1,1 7:2
**page** 5:2,9 6:2,18
  12:7 16:10,21
  16:21 17:3,6,7
  17:9,10,11,14
  17:15,17,17,19

26:13 27:22
  29:3 33:3,5,13
  34:15 39:13,16
  42:20 43:3,5,6
  43:7,8 44:10,15
  44:18,18,20
  78:16,20,21
  79:2,15 80:3,10
  80:17 81:15
  85:14,16 88:9
  88:10,11,12,15
  90:13 92:6
**pages** 26:15,22
  27:1 78:13,14
  85:15 88:7
**paper** 21:20 22:1
**paragraph** 39:15
  39:18,21 41:6,8
  41:10
**part** 36:3 48:4
  49:13,22 50:3
  57:22 67:16
  68:16 69:3,21
  69:22 71:9,21
  73:2,12,17,20
  77:7,10 87:5
**particular** 24:3
  35:16 45:10
  57:15 58:20
  71:17 75:19
  82:9 86:1 91:2
  91:4
**particularly**
  64:15 83:5
**particulars** 86:17
**parties** 2:10 7:16
  97:14
**parts** 64:10
**Paso** 71:2
**pass** 95:4
**passed** 51:6
**Passenger** 69:15
  70:1,5
**patience** 26:21
**Paul** 55:21
**pause** 13:14,16



**PDF** 29:3 33:3
**pedestrian** 24:21
 41:2 45:16
 68:18 75:8
**pen** 21:20 22:1
**pending** 13:7
 40:2
**people** 70:11
 73:8
**period** 14:6
**person** 41:1
 69:20
**personnel** 60:6
**person's** 13:14
**Pg** 98:7
**phase** 54:16 58:1
 58:10,11,17,19
 60:12
**phone** 19:17
**phrase** 12:20
 74:22
**phrases** 12:14
**physical** 45:5
 46:17
**Pinkus** 4:11 7:13
**place** 88:22
**placed** 83:6
**Plaintiffs** 1:6 3:3
 15:16
**planning** 75:18
**play** 28:9 61:3
**playing** 63:22
**please** 8:12,21
 15:8,9 16:9,21
 25:16 30:2
 32:20 38:3 42:7
 42:17,20 44:15
 48:19 49:4,6
 53:16 76:7
 77:22 80:21,22
 81:9 84:6 87:9
**POE** 50:16
**point** 12:19 59:8
 63:1 66:11,19
**pointed** 18:16
**points** 53:15

65:22
**policy** 6:6 34:17
 53:21 75:22
 77:3 91:8,15
**port** 22:9 23:8
 24:7,15,18,20
 24:22 25:4,11
 34:18 35:4
 36:11 37:6 40:1
 40:17,18 45:8
 45:16 51:1,7,22
 68:16 72:13
 89:1 92:10
**ports** 19:9 24:9
 34:21 36:12
 37:5 47:10
 50:18 52:13
 54:2,9,12 67:16
 71:13 72:4,6
 74:15,21 75:1
 75:11 77:14,19
 79:8 85:9 91:10
**port's** 91:11
**position** 29:13
 45:15 47:10,19
 47:22 48:10,12
 48:14 51:14
 69:7 72:13
**possible** 14:2
 30:4
**possibly** 37:15
**potential** 46:14
 94:19
**practice** 35:3,11
 54:10 75:5
**practices** 75:19
**prefer** 38:15
 72:17 74:3,11
**preparation**
 20:16 21:5
 22:17,20 23:16
 49:14
**prepare** 18:10
 20:2 21:7 22:4
**preparing** 21:1
**present** 4:9 7:16

9:13 11:11 14:7
**presently** 9:8
**pretty** 76:16
**previous** 24:16
 32:17
**previously** 6:17
 15:10,14 25:17
 66:4
**primary** 68:19
**prior** 64:5
**probably** 14:15
 20:7,14 86:7
**problem** 70:17
 95:13
**Procedure** 2:12
 15:17
**proceeding** 45:9
**proceedings**
 97:11
**process** 13:13
 21:14 43:20
 56:22 59:4
 60:19 62:1,12
 63:16,19 64:4,6
 64:7,12 65:19
 66:21 67:8
 77:11 83:14
 89:12 91:11
**processed** 23:13
 25:3,10 35:22
 36:15 37:8
 46:10
**processing** 19:9
 21:20 23:2,9
 40:11 52:12
 79:8 85:8
**produce** 11:3
**Professional** 2:14
**program** 54:19
 56:17,19 57:4
 58:19 62:7,14
 63:5 64:17 66:9
**Programs** 69:15
 70:1,6
**project** 6:10
 18:15,21,22

19:6,7,8 21:4
 35:13 53:18
 54:1,1 55:6
 62:10 63:6,6,21
 75:4 79:15,16
 79:18,19 80:8
 82:14 83:2,4
 85:8 86:6,13
 94:8,8
**projects** 95:1
**Protection** 14:12
 34:17
**provide** 50:21
 51:12,18,20
 91:14,14 92:2
**provided** 18:19
 41:14 49:11,15
 72:14 91:8
**provides** 63:10
**providing** 91:20
**Public** 2:15 97:3
**publication** 64:5
**public-facing**
 11:6
**publish** 57:20,20
**published** 32:18
 37:14 58:3 61:8
 66:12
**publishing** 57:22
**pull** 25:15 33:13
 48:18 76:6 82:9
 84:5
**pulled** 25:21 28:7
**pulls** 86:20
**purpose** 47:7
 73:21 75:4
**purposes** 68:3
**pursuant** 2:11
 41:6,11
**put** 15:8,13 25:20
 31:6 42:11
 76:20 85:4
 87:13 88:1
**p.m** 2:6 7:3,10
 89:2 95:18
**P.O** 3:11

**Q**

**quality** 61:7,9,16
 62:14,22
**question** 10:13
 12:20,21 13:3,6
 13:16,17 15:20
 16:16 21:10
 26:4 28:18 31:2
 33:17 36:3
 43:14 47:4 48:4
 48:5,7,8 52:15
**questioning**
 27:13 84:11,17
**questions** 12:10
 12:19 13:2 14:5
 15:5 27:7 85:12
 93:14 94:5 95:7
**question-and-a-**
 12:9
**quick** 27:5 30:22
 31:1,3 86:9
**quote** 34:15
 39:21 41:10
 45:20 50:13
 91:7 92:8,18

**R**

**R** 3:1 7:2 97:1
**Randolph** 28:4
 29:11
**Randy** 69:9
**ranking** 30:16
 31:14
**read** 26:11 33:11
 33:14 35:1 40:3
 41:16 46:3 48:3
 50:19 90:21
 91:17 92:12,16
 93:2,11 96:3,4
 98:7
**reading** 41:4
**reads** 34:15
 39:21 44:21
 45:20 98:7
**ready** 27:6
**real** 81:4



**realize** 94:6
**really** 13:13 58:8
**reason** 15:3,6
  41:20 44:5 50:6
  77:10 98:4,7
**recall** 68:2
**recalling** 70:9
**receive** 66:8
**received** 65:2
  67:5
**receiving** 49:21
  65:11 67:2
  91:12
**Recess** 53:5
  93:21
**recited** 2:13
**recollection**
  25:13 85:19
**recommendati...**
  57:16
**record** 7:6 8:22
  10:3,6,8,10
  27:12 32:21
  38:16 49:5 53:4
  53:7 93:20 94:1
  95:16 97:8 98:5
**recounted** 37:13
**redirect** 45:22
  50:17
**redirected** 51:11
**refer** 9:17,21
  10:14,22 14:11
  14:15 22:12
**reference** 62:8
**referenced** 52:8
**referencing** 62:9
**referral** 39:8
**referring** 59:19
**refers** 17:20
**reflect** 28:12
**refresh** 85:19
**regarding** 6:4
  18:21 19:2
  71:12 77:1
**regional** 69:21
**Registered** 2:14

**regular** 43:20
**regulation** 41:15
**regulations** 39:17
  39:22 40:6
**relate** 14:5
**related** 37:16
  42:14 46:6 83:7
  84:11 86:13
  97:13
**relation** 85:22
**relied** 56:3 87:2
**reluctant** 91:13
  91:20 92:2
**remedy** 14:1
**remember** 24:3
  25:6 33:11
**remotely** 2:11
  7:11
**removal** 40:2
**repeat** 36:2
**repeats** 63:15
**replaces** 32:16
**report** 5:10 19:3
  22:12,13,18
  23:15,17 24:4
  26:1,18 28:7,7
  28:15 29:8,17
  32:7,12 33:5,7
  33:20 35:13,13
  35:18 36:18,21
  37:4,14,15
  41:19 42:3
  45:11 46:7,15
  47:16 48:8
  53:18 54:17
  56:4,10,11,13
  56:14 57:2,3,6
  57:13,20,22
  58:1,2,8,9,15
  58:17,19,20,22
  59:1,4,5,5,9,11
  60:11,17,19
  61:4,5,8,12,17
  61:19,20 62:5,6
  62:11,13,15,17
  62:20,21 63:1,2

  63:4,11 64:13
  64:20 65:1,1,3
  65:8,10,18 66:1
  66:3,8,13,15
  67:2,6,7,8,10
  70:4 72:20
  76:22 77:6,14
  87:2
**Reported** 1:21
**reporter** 2:14
  7:14 8:12 12:12
  38:20 87:16
**reports** 11:3,4,7
  32:15,16 35:14
  36:7,7 60:8,20
  63:12 64:15
  69:19 71:10
**represent** 7:18
  7:21 8:3 16:12
**request** 6:11 7:12
  80:11,18 82:6,8
  85:20 86:16,19
  87:5
**requesting** 67:19
**requests** 80:15
  85:10 86:2,5,11
**required** 66:15
**requires** 65:4
**reserved** 97:12
**resolved** 10:7
**respect** 64:8
  66:16
**respective** 68:13
**response** 57:7,8
  57:12,13,18
  59:7,12 63:7,9
  63:10,11 65:2,5
  65:8,11 66:7,8
**responses** 12:12
  57:14
**responsibility**
  65:22
**responsible**
  68:20,22 82:20
  86:4,8
**result** 34:3,4

  66:12 86:20
**resulted** 53:18
  65:3 79:17
**retires** 32:15
**return** 23:20
  66:6 72:15
**returned** 23:9,12
  34:19 35:21
  36:14 51:8
  54:13
**returning** 75:6
**returns** 63:4
**review** 16:16
  20:6 22:18
  23:17 26:2
  30:22 38:12
  40:2 42:17
  43:18 49:4,6
  55:10 56:10,12
  56:14 58:1,10
  58:17,19 59:4
  60:12,19 62:8
  62:15,18,20,22
  64:20,22 65:1
  66:11 67:8
  68:16 71:10
  72:3 77:1 78:9
  79:13 81:9,11
  88:5 95:8 97:11
**reviewed** 18:18
  20:1,3 31:11
  39:2 44:7 49:9
  49:13 60:11
  63:14 71:17,18
  78:11,13 79:3
**reviewing** 20:13
  20:15 21:3
  27:11 38:16
  42:19 43:12
  46:6 49:7 58:20
  60:8 78:10
  81:12 85:11
  88:6
**reviews** 9:16
  10:21 11:5 61:5
  63:6 94:9,16,21

  95:1
**revised** 67:10
**revising** 67:1
**revision** 66:14
  67:9,11
**right** 9:6 11:8
  12:4 15:7 17:16
  21:2,22 22:11
  23:11 25:12,20
  26:14,22 27:2
  28:3,22 31:17
  33:17 34:13
  36:22 37:16,18
  37:22 41:3 42:6
  43:11 44:17
  46:2,8,10,13,22
  47:12 48:16
  53:9 65:9 77:14
  77:21 80:6
  82:16 84:10
  86:14 87:13
  90:3,4
**Rio** 24:14
**role** 11:11 28:9
  61:3
**Roman** 9:2
**round** 65:5 66:7
**RPR** 1:21 97:21
**RQA** 62:22 63:17
  66:10
**rule** 13:5 41:14
**rules** 2:11 12:6
  15:17
**Ruth** 56:2
**Ryan** 70:3

---

**S**

**S** 3:1 7:2
**San** 24:14,18,19
  54:12 70:22
  71:1,6 92:11,15
  92:20
**saw** 16:1 28:17
  28:19 89:14
**saying** 51:10
**says** 15:16 79:13



79:15
scroll 17:13
  27:18,21 33:21
  38:13,19 81:13
search 82:10
searched 82:13
  82:16
second 10:4
  16:15 39:12,16
  44:15,17 66:7
  80:9 84:16
  85:20
Secretary 5:14
  39:6 41:21
section 33:18,19
  41:12 44:21
  45:18 90:12
  92:7
Security 1:14
  3:15 4:3 9:12
  9:22 10:14
  11:15 15:19
see 17:6,8,20
  24:17 26:10
  27:14 29:14
  33:7,13,21
  39:18 41:8
  44:12,19 52:3
  77:4 79:14 82:3
  86:2 88:20 89:3
  89:21 90:9
seeing 21:21
seeking 50:17
seen 15:21 26:3,5
  27:8 28:3,6
  30:12 39:4
  54:15 79:10
  90:5
selected 20:3
self 32:11
Senate 11:15
send 80:18
sending 63:22
senior 80:5
sensitive 64:16
sent 28:20 61:1

61:19,20 62:13
  62:17,20 63:2
  65:4 80:14 82:1
  85:21
sentence 39:20
sentences 31:4
separate 21:19
  21:21 35:13
separated 54:4
  74:16 77:18
separately 86:22
separating 72:6
separation 6:4
  54:17 55:4 77:2
separations
  53:20 74:17
September 53:19
  54:14 58:12,12
  58:16 60:12
  76:22 88:20
Services 7:14,15
session 12:9
sessions 20:16
  21:5
set 42:13 45:5,12
  46:16 71:22
  72:3,8 74:5,7
  74:13 88:3 97:6
  97:17
shakes 12:13
shared 91:4
Shaw 64:14
SHEET 98:1
sheet(s) 96:13
shifts 95:3
short 52:17 79:22
showed 32:22
shown 44:7
sic 38:9 85:5
  87:14
side 33:17 47:20
sifting 82:20
sign 95:9
signature 97:11
  98:18
signed 29:17 49:2

59:2
significant 87:1



similar 12:15
  13:12 35:14
simply 32:13
sir 8:21 9:4,6,19
  11:11,21 12:16
  14:13 15:13,20
  17:5,19 25:20
  28:3 29:2 30:13
  31:11 32:22
  33:5,7,17 34:10
  35:1 37:20
  39:18 40:3
  42:11 43:11
  44:12,17 49:8
  77:4 78:10 79:1
  79:3 81:17 82:3
  85:12,20 87:13
  88:6,15,20 89:3
  93:13
sit 65:18
site 67:15
size 43:3
SLACK 4:10
slightly 47:2
  89:12
smedlock@ma...
  3:7
software 13:12
soil 23:1,12 35:21
  36:13 37:7 41:1
  46:8 47:7
sole 80:7
somebody 59:20
  90:1
somewhat 70:9
soon 14:1 76:16
sorry 16:21 17:7
  17:10,14 21:15
  30:21 31:5
  37:21 51:17

58:5,12 78:5
  81:21
sort 52:8 54:16
  55:8,11 57:12
  61:11,11 64:21
  67:9 77:6 83:6
sound 12:14
sounds 12:4 21:2
  26:3
SOUTHERN 1:2
speak 18:22
  19:16 31:7
  56:21
speaking 56:13
  62:4 68:14 76:3
  79:6
special 9:16
  10:21 11:5 25:8
  26:1,5 28:5,21
  39:5 60:4 76:22
  94:9,16,21
Specialist 4:11
specific 35:16
  55:5,9 57:14
  89:8
specifically 45:8
  45:16 47:3 54:7
  59:19 75:3
specifics 62:3
spell 8:22
spend 20:12,22
spent 20:14 67:1
spoke 19:1,14,18
SRE 10:22 11:2
  53:17 56:16
Staats 56:6 81:20
  82:1
staff 11:17,18,19
  60:3,5,7 83:2
staffed 55:18
staffing 68:17,18
  68:20
stage 56:10,12,14
stand 47:11
  79:20

standards 61:6,7
  61:9,10,12,13
  61:14
standing 35:21
  36:13 37:6 46:8
  47:19
start 13:17 27:3
  53:11 62:2
  78:17,17,18
started 53:10
starts 91:7
state 7:17 8:21
  14:4
stated 47:16
statement 41:20
  42:4
States 1:1 8:1
  34:20 41:3 45:6
  45:8,13 46:9,19
  47:22
Station 3:11
status 56:7
step 57:22
Stephen 3:6 7:20
  55:20 81:20
  82:1
Steve 26:14 31:6
  84:15 87:16
  88:19
Steven 56:5
  81:20,22
stick 9:6
stipulations 2:12
stop 64:1
stopped 47:5
Street 3:4,16
subject 2:12 76:1
  82:5
subjected 40:1
subjective 61:11
submission 57:18
submitted 57:6
SUBSCRIBED
  96:15 98:20
subsequent 65:11
subset 82:15



substance 18:8
substantial 41:13
substantiate 51:6
substantiated
  51:4
substantiation
  50:21 51:12,18
  51:21
substantive 65:7
  65:12,15 66:16
sufficiency 62:18
sufficient 43:9
summaries 21:17
summarize 33:19
summarized
  28:14
summary 33:6
support 56:1
suppose 57:17
sure 13:15,17,19
  58:14 62:2
  70:12,17 83:1
  84:4
SW 3:16
swear 8:12
switching 52:16
sworn 8:16 96:15
  97:7 98:20

T

T 97:1,1
Tab 15:9 25:15
  30:3,3 32:20
  38:2 42:7 48:19
  49:1 76:6,10
  77:22 80:22
  84:6 87:9
take 12:13 14:22
  16:15 22:10
  24:18 26:2,11
  27:5 30:22 31:1
  31:3 33:10
  38:12 42:17
  49:4,6 52:5,17
  52:20 53:1
  73:14 78:9,21

81:9 82:14 84:8
  88:5,8 93:15
taken 2:9 7:10
  14:20 42:13
  48:10,14 53:5
  93:21
takes 29:10
talk 68:17,18,19
  68:21 72:18
  74:6,11 89:19
  89:19
talked 89:13
talking 71:1
  79:18
task 82:22 83:1
Tatyana 55:18
  80:3 86:9
team 19:6 54:1
  54:11 55:19
  56:3,4 62:10
  63:6,6,13,21
  71:12,12 83:3,4
  86:6 91:2
teams 18:16,21
  18:22 19:19
  21:4 92:4
Tecate 5:10 19:2
  22:9,13,18
  23:17 24:7 26:1
  28:7 32:7 33:5
  33:20 34:18
  35:4,4 36:6,10
  36:12 37:5,14
  41:19 42:15
  46:6,15 50:16
  51:1 56:4 72:19
tech 27:16
technical 10:7
  57:9 63:8 65:13
techniques 67:19
technological
  13:21
tell 14:21 36:4
  68:7 91:1 92:10
  92:19
telling 93:5

ten 20:7,10 84:13
  84:18 93:15
tends 94:18
term 45:3 46:22
  71:22
terms 82:10
  89:11
territory 23:2,20
  47:12
test 81:4
testified 11:20
  12:1 14:22
testify 8:17 16:18
  17:5,12 18:3,6
  18:11 20:2
testimony 96:4,6
  97:8
Tex 28:4 29:11
thank 11:1 22:15
  26:20 33:22
  34:13 39:1 43:4
  52:3 55:13
  78:15 80:1
  87:20 93:13,18
  95:10,12,13
thing 74:8
things 22:13,15
  74:6,10,12,13
think 10:2,12
  15:3,6,22 16:3
  16:8 19:5,11,22
  20:5,7,10,21
  22:3 25:5 26:12
  26:21 28:6,11
  28:14 37:10
  38:21 40:8
  46:14 49:12
  60:4 61:13,16
  61:22 68:10
  69:17 70:2,8
  73:11 83:16
  84:17 86:15
  89:10,11
thinking 40:15
third 80:10
thousands 86:21

three 33:6,19
  60:7 74:13
  78:12,14 95:5
three-page 38:10
  78:5
ticket 72:15
time 7:9 10:5,9
  12:5 13:1,1,14
  14:6 16:1 30:3
  42:5 53:3,6
  54:6,13 67:1
  69:7 72:15 84:8
  88:8 89:17
  93:19,22 95:10
  95:16
times 52:9
title 9:13 60:4
  85:7
titled 76:22
today 7:9 9:18
  10:16 12:18
  14:4,11,21 15:5
  16:18 17:5 18:3
  18:6 35:5 52:9
  87:9
today's 18:11
  21:1,7 22:4,17
  22:20 23:16
  95:17
Todd 69:2,7,14
  74:1
told 45:22 92:9
tolerance 6:5
  53:21 77:2,12
top 17:3 27:21
  39:15 85:8 92:7
Topic 16:15 17:2
  17:4,8,20 19:12
topics 16:13,17
  17:4 18:2,5,16
  18:21 52:16
total 20:22
touch 47:3
touched 64:16
traffic 63:22
transcript 97:12

transcription
  96:6 98:6
transmittals
  63:18
transporting
  68:22
traveler 25:8,10
  45:12
travelers 45:7
  92:10,15,19,22
  93:5
true 72:11 96:5
  97:8
trusted 25:8,9
truth 14:21
try 13:14 14:1
Tucson 71:1
turn 22:22 29:2
  50:17
turned 37:7
  51:11,13,19,22
  54:2 72:12,21
  74:14,21,22
  75:11 77:20
turning 23:5 51:1
  55:3 72:5 75:5
  75:7
two 18:16 26:22
  27:1 31:4 36:6
  36:7 38:10 47:1
  64:10 85:15
  87:17
two-page 85:6
two-thirds 44:20
type 25:8 89:8
typical 89:5,10
  91:19
typically 10:22
  11:4 22:12
  32:15 40:19
  58:2 62:13 64:6

U

uh-huh 12:14
  19:4
ultimately 58:2



**unannounced**
54:9 67:15
**uncommon** 91:22
**undergoes** 62:21
**undergoing** 67:8
**Underline** 21:12
**underneath**
45:18
**undersecretary**
29:12
**undersigned**
96:16
**understand** 9:19
9:22 10:15
12:16,19 13:8
14:8,13,17,20
23:14 55:3
58:15 59:3 68:9
**understanding**
22:21 23:18
29:18 40:5,9,14
41:18 45:2,4,17
46:5 54:15 61:1
68:14 90:6
**understood**
82:17 84:4 91:6
**Unfortunately**
91:22
**unit** 94:10
**United** 1:1 8:1
34:20 41:3 45:6
45:7,13 46:9,18
47:22
**unpublished**
36:18,21 37:4
37:15 56:9 57:1
59:5 60:11 61:4
61:18 66:15
**USC** 41:11
**USDOJ** 4:10
**use** 14:12,17
67:18,22
**useful** 83:5,16
**usually** 89:10
**U.S** 1:14 3:10,15
4:3 9:21 10:14

14:11 15:18
19:10 23:1,12
23:21 24:10
28:21 34:17
35:21 36:13
37:7 39:5 46:8
47:2,7,12,20
70:20 71:13

---
**V**

**v** 7:8 30:10 79:6
98:2
**valid** 32:17
**Valley** 24:14
**varies** 58:4,4
**various** 53:15
**veer** 95:2
**vehicular** 24:21
25:2
**verbally** 27:12
**verify** 92:21
**version** 59:11
66:3,3,6
**video** 4:11 13:22
**videoconference**
1:15 2:10 3:6
3:12,17 4:5,9
**videoconferenc...**
12:11 13:12
**videographer** 7:5
7:13 8:11 10:5
10:9 27:18 53:3
53:6 93:19,22
95:15
**videotape** 7:6
**views** 28:13,16
**violation** 41:14
**violations** 94:19
**visit** 24:19
**visits** 24:15,17
67:16
**voluminous**
86:19
**vs** 1:7

---
**W**

**Wahl** 55:22
**wait** 92:20,22
**waiting** 17:6 59:6
59:8
**walk** 53:14
**walking** 41:2
**want** 16:14 17:2
26:8,10 27:4,7
27:20 31:1 33:9
38:1,12 39:12
42:21 50:10
58:14 67:11
78:17,17 84:12
**wants** 61:8
**Washington** 3:5
3:11,16 4:4
**way** 22:2 27:21
29:17 44:8,20
48:11,15 50:8
97:15
**Webex** 13:11
**website** 11:7
25:22 28:8
32:18
**Wednesday**
50:14
**weigh** 75:22
**Welcome** 10:12
**went** 12:6 14:10
64:21
**weren't** 70:13,14
93:6
**we'll** 14:1 27:13
30:8 37:2 38:2
52:19 78:7 88:1
**we're** 10:6 13:10
93:20 94:1
**we've** 38:21
79:18
**WHEREOF**
97:17
**whistleblower**
39:9 50:22
**withdraw** 76:5
**witness** 2:17 5:2
8:12 16:5,7

23:5 24:2 27:20
31:3,9 32:9
33:12 35:7 36:2
36:17 37:10,18
38:18 39:2
40:14 42:2,20
43:2 46:13
47:15 51:4,17
60:1,15 65:15
66:19 67:4,5
71:16 72:3,17
74:3 75:17
76:13 77:16
78:15,19 81:13
83:12,20 84:10
84:22 85:16
88:9 93:11 95:4
95:13 96:16
97:6,9,17 98:3
**word** 21:19 40:9
40:22 54:16
63:12
**work** 11:13 35:15
35:16,18 53:22
55:15 56:3
84:14,20 94:17
**worked** 11:10
55:22
**working** 43:21
53:17
**worries** 31:8
**wouldn't** 15:4
87:6
**wrap** 76:15
**write** 89:6
**writes** 50:13
**write-ups** 90:6
**written** 49:21
61:10,14 90:9
**wrong** 57:10,11
57:17

---
**Y**

**yeah** 25:13 26:14
27:16 80:7
84:16

**year** 11:12 60:12
**yesterday** 61:2
61:20
**Young** 3:17 8:6,6
**Ysidro** 24:15,18
24:19 92:11,15
92:20

---
**Z**

**zero** 6:5 53:21
77:2,12
**zoom** 33:15
42:22

---
**0**

**00205421** 5:15
**00210313** 6:14

---
**1**

**1** 7:6 14:6 15:9
43:8 44:12
45:20 98:5
**1:33** 2:6 7:3,10
**1:36** 10:5
**1:39** 10:9
**10** 16:15 20:14,19
20:22 88:20
**11** 16:21 30:9
31:21 80:22
**11/14/20** 97:21
**12** 16:21 17:3,6,7
17:11,17,19
84:6
**1213(c)** 41:12
**1230** 50:15
**13** 1:16 2:5 7:9
50:14 87:9 98:2
**13th** 97:18
**15** 6:19 20:15,19
20:22
**17-cv-02366** 1:7
**18-122** 6:10 19:7
19:8 35:13,19
36:22 37:2,16
52:14 53:11
56:8 58:10 59:6



61:19 64:9
67:17,21 68:4
69:4 71:10
72:19 73:3,18
73:21 77:8
79:15 80:16
82:14 83:8 85:8
85:22 86:13
94:8
**18-122-ISP-CBP**
79:20
**1965** 19:3 35:18
**1999** 3:4

**2**

**2** 25:15 32:20
42:20 54:16
92:8 98:5
**2:30** 89:2
**2:39** 53:3
**2:53** 53:6
**20006** 3:5
**20024** 3:16
**20044** 3:11
**2016** 14:6
**2018** 53:17,19
54:5 55:7 58:12
73:22 76:22
78:6 82:2 88:20
89:1
**2019** 31:21,22
50:14 58:13,16
85:10,21
**202.263.3221** 3:5
**202.598.8259**
3:12
**2020** 1:16 2:5 7:9
30:9 97:18 98:2
**20528** 4:4
**205422** 5:15
**208173** 6:12
**210316** 6:14
**210448** 5:17
**22** 85:10
**245** 4:4
**25** 6:20 31:22

**27** 17:2,4,8 19:12
73:22 76:22
**28** 5:10
**29** 78:6 89:1

**3**

**3** 43:5 78:18
80:17 98:6
**3A** 30:3
**3B** 30:3
**3:56** 93:19
**30** 5:11
**30(b)(6)** 1:13
15:17
**313** 90:14
**34** 17:20
**340** 6:19 15:10,15
16:10 17:3
**341** 6:20 25:17
**344** 5:10 29:3,4
32:20
**345** 5:11 30:5,8
33:1 38:9,21
**346** 5:13 38:4
39:1,13
**347** 5:16 42:8,12
44:7,19
**348** 5:18 48:20
49:6
**349** 6:3 76:17,21
**350** 6:7 78:1,8
**351** 6:9 81:1,8
85:5
**351s** 87:17
**352** 6:10 85:1
87:14,18
**353** 6:13 87:10,19
88:2
**38** 5:13
**395** 3:16

**4**

**4** 38:2 43:6
**4:09** 93:22
**4:10** 93:16
**4:11** 95:16,18

**42** 5:16
**421** 39:14
**445** 44:19
**48** 5:18
**49** 68:10

**5**

**5** 41:11 42:7 43:7
**50** 73:8 82:12,17

**6**

**6** 29:3 48:19 49:1
**613725** 1:22

**7**

**7** 76:6,10
**76** 6:3
**78** 6:7

**8**

**8** 5:4 16:10 17:10
77:22
**81** 6:9
**85** 6:10
**868** 3:11
**87** 6:13

**9**

**9** 82:2
**94** 5:5
**95568** 6:8

