# EXHIBIT 1

BRIAN M. BOYNTON
Acting Assistant Attorney General
WILLIAM C. PEACHEY
Director
KATHERINE J. SHINNERS (DC 978141)
Senior Litigation Counsel
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 598-8259 | Fax: (202) 305-7000
katherine.j.shinners@usdoj.gov
ALEXANDER J. HALASKA (IL 6327002)
Trial Attorney

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA
### (San Diego)

| | |
|---|---|
| AL OTRO LADO, Inc., *et al.*, | Case No. 3:17-cv-02366-BAS-KSC |
| *Plaintiffs*, | Hon. Cynthia A. Bashant |
| v. | **DEFENDANTS' RESPONSIVE MEMORANDUM REGARDING SUMMARY JUDGMENT REMEDY & PLAINTIFFS' REQUEST FOR COMPLIANCE MONITORING** |
| ALEJANDRO MAYORKAS, Secretary of Homeland Security, *et al.*, in their official capacities, | |
| *Defendants*. | |

# **TABLE OF CONTENTS**

I.    **Plaintiffs' Proposed Order Does Not Provide an Effective or Comprehensive Carve-Out for the Exercise of Independent Legal Authority.** ......... 1

II.    **The Court Should Not Enter the Newly-Requested, Vague, and Unsupported Relief Set Forth in Paragraph 3.** ....................................................... 3

III.    **Paragraph 3's Title 42 Carve-Out Threatens to Operate as a De Facto Injunction Preventing Enforcement of the CDC Order.** ........................... 7

IV.    **If the Court Enters an Injunction, It Is Not Necessary or Appropriate To Appoint a Special Master To Monitor Compliance.** ................................ 12

V.    **The Court Should Reject Burdensome Reporting, Inspection, and Discovery Requirements.** ................................................................................. 16

VI.    **The Court Should Allow Flexibility In Publishing Notice to Class Members.** ...................................................................................................... 19

i

1
2

# TABLE OF AUTHORITIES

## FEDERAL CASES

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Barahona-Gomez v. Reno*,
    167 F.3d 1228–37 (9th Cir. 1999) ............................................................. 19

*Civil Rights Educ. & Enf't Ctr. v. RLJ Lodging Tr.*,
    2016 WL 314400 (N.D. Cal. Jan. 25, 2016) ......................................... 6

*Fed. Trade Comm'n v. Publishers Bus. Servs., Inc., No. 2:08-cv-00620*,
    2009 WL 10692838 (D. Nev. Oct. 30, 2009) ..................................... 10

*Firebaugh Canal v. United States*,
    203 F.3d 568 (9th Cir. 2000) ................................................................ 13

*Fraihat v. U.S. Immigr. & Customs Enf't, No. 20-55634*,
    2021 WL 4890884 (9th Cir. Oct. 20, 2021) ....................................... 13

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70*
*of Alameda Cty.*,
    415 U.S. 423 (1974) .......................................................................... 3-4

*Huisha-Huisha v. Mayorkas*,
    2021 WL 420688 (D.D.C. Sept. 16, 2021) ........................................... 9

*Maryland v. King*,
    567 U.S. 1301 (2012) ........................................................................... 11

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139–57 (2010) ......................................................................... 6

*Norton v. S. Utah Wilderness Alliance*,
    542 U.S. 55 (2004) ........................................................................ 13, 14

*Oppenheimer Fund, Inc.*,
    437 U.S. ................................................................................................. 19

*Otarola v. INS*,
    270 F.3d 1272 (9th Cir. 2001) ............................................................ 4-5

*P.J.E.S. v. Wolf*,
    502 F. Supp. 3d 492 (D.D.C. 2020) ...................................................... 9

*Ribadab Properties Corp. v. Eaton, No. 05-cv-2338*,

2006 WL 1734368 (D. Ariz. June 16, 2006) .................................................. 12

*Rowland v. U.S. Dist. Ct. for N. Dist. of California,*
  849 F.2d 380 (9th Cir. 1988) .............................................................. 2-3

*Sale v. Haitian Centers Council,*
  509 U.S. 155 & n.27 (1993) ............................................................... 1-2

*South Bay United Pentecostal Church v. Newsom,*
  140 S. Ct. 1613 (2020) ....................................................................... 11

*United States v. Apple Inc.,*
  992 F. Supp. 2d 263 (S.D.N.Y. 2014) ............................................ 12, 14-15

## FEDERAL STATUTES

5 U.S.C. § 706(1) ............................................................................ 5, 13

5 U.S.C. § 706(2) ................................................................................. 5

42 U.S.C. § 265 ................................................................................. 3, 7

## FEDERAL RULES AND REGULATIONS

84 Fed. Reg. 33,829 (July 16, 2019) ................................................... 5, 6

85 Fed. Reg. 16,559 (Mar. 24, 2020) ..................................................... 8

85 Fed. Reg. 17,060 (Mar. 26, 2020) ..................................................... 8

85 Fed. Reg. 56,424 (Sept. 11, 2020) ..................................................... 8

85 Fed. Reg. 65,806 (Oct. 16, 2020) ..................................................... 8

85 Fed. Reg. 82,260 (Dec. 17, 2020) ..................................................... 5

86 Fed. Reg. 38,717 (July 22, 2021) ..................................................... 8

86 Fed. Reg. 42,828 (Aug. 5, 2021) ..................................................... 7, 9

Fed. R. Civ. P. 23(b)(2) .................................................................... 5, 6

Fed. R. Civ. P. 23(d)(1)(B) ................................................................. 19

Fed. R. Civ. P. 53 .............................................................................. 12

Fed. R. Civ. P. 65(d)(1) ....................................................................... 3

1  Defendants submit this responsive brief to address certain of the new requests
2  for relief made by Plaintiffs in their Brief Concerning Declaratory and Injunctive
3  Relief (ECF No. 768) (Pls.' Remedy Br.) and corresponding proposed order (Pls.'
4  Proposed Order, attached as Exhibit 1). These specific requests, and the particular
5  arguments in support thereof, were not presented in Plaintiffs' Complaint or in sum-
6  mary judgment briefing, and thus Defendants have not yet had the opportunity to
7  respond to them. Defendants respectfully request that the Court reject or modify
8  Plaintiffs' requests as set forth below.

9  **I.  Plaintiffs' Proposed Order Does Not Provide an Effective or Com-
10     prehensive Carve-Out for the Exercise of Independent Legal Au-
       thority.**

11  Plaintiffs argue that the Court should declare unlawful and enjoin the "turning
12  back" of noncitizens from ports of entry without inspection and "asylum pro-
13  cessing," "absent any independent, express, and lawful statutory authority to do so
14  outside of title 8 of the U.S. Code." Pls.' Proposed Order ¶¶ 1-2; Pls.' Remedy Br.
15  at 10. Although Defendants have largely addressed their position on declaratory and
16  injunctive relief in their prior briefing, Defendants have not had the opportunity to
17  respond to Plaintiffs' contentions regarding how the government may exercise "in-
18  dependent, express, and lawful statutory authority." Defendants agree that such a
19  carve-out is both necessary and contemplated by the Court's Summary Judgment
20  Order. Defs.' Remedy Br. (ECF No. 770) at 1, 2; Order on Summary Judgment (ECF
21  No. 742) (MSJ Order) at 22, 33-34. Plaintiffs are incorrect, however, to assert that
22  such authority must exist *outside* of Title 8 of the U.S. Code. Independent, express
23  statutory authority that may be invoked to supersede duties to inspect or process for
24  asylum could very well arise from existing or future provisions codified in Title 8
25  that were not at issue in this litigation. *See Sale v. Haitian Centers Council*, 509 U.S.
26  155, 160-64, 172 & n.27 (1993) (describing 1981 and 1992 Executive Orders that
27  allowed interdiction at sea and repatriation of certain migrants, based on authority
28  in 8 U.S.C. § 1182(f) that allows the President to suspend the entry of "any class of

DEFS.' RESPONSE BRIEF
RE: REMEDY
Case No. 3:17-cv-02366-BAS-KSC

aliens" or to "impose on the entry of aliens any restrictions he may deem to be appropriate."). The Court cannot properly preemptively limit Defendants' exercise of superseding authority to that which exists outside of Title 8 when this case is focused on metering authority and none of those express Title 8 authorities were addressed in this litigation. The Court should thus decline to adopt the language "outside of title 8 of the U.S. Code" in fashioning its carve-out to allow for the exercise of independent statutory authority.

Further, although Plaintiffs acknowledge the need to carve out actions taken pursuant to an independent legal authority, at the same time they seek to deprive the carve-out of force by asking the Court to require Defendants to pre-justify any action taken under that independent authority that may result in the withholding of inspection or processing. They argue that Defendants must: "have the burden of demonstrating" to a Special Master or monitor the existence of independent legal authority, *see* Pls.' Remedy Br. at 10; Pls.' Proposed Order ¶ 8(d)(xvi); provide written, advance notice to Plaintiffs of any governmental plans to implement a "policy, guidance, memorandum, directive, or muster, whether written or unwritten" pursuant to such independent legal authority, *id.* ¶ 8(h); Pls.' Remedy Br. at 18-19; and make a numerical report to Plaintiffs of all individuals who were in the process of arriving at a port of entry (POE) but were not inspected and processed as a result of the exercise that independent authority, Pls.' Proposed Order ¶ 8(d)(xvi). Leaving aside that compliance monitoring is not justified in this case (*see infra* Parts IV-V), these measures have an apparent effect of requiring Defendants to obtain advance approval of their discretionary implementation of any particular statutory authority. This is improper, because that hypothetical future exercise of authority has not been addressed in this litigation and has not been held unlawful by this Court. *See, e.g., Rowland v. U.S. Dist. Ct. for N. Dist. of California*, 849 F.2d 380, 382 (9th Cir. 1988) (holding that district court lacked jurisdiction to authorize monitor to conduct inspection of conditions of confinement at new prison not covered by its holdings and

injunction). Accordingly, the Court should reject these provisions in Paragraph 8 of Plaintiffs' proposed order.[1]

## II.  The Court Should Not Enter the Newly-Requested, Vague, and Unsupported Relief Set Forth in Paragraph 3.

Plaintiffs also ask the Court to order the government—including non-party agencies United States Citizenship and Immigration Services, U.S. Immigration and Customs Enforcement, and the Department of Justice's Executive Office for Immigration Review—to "inspect and provide asylum processing" to class members who were subject to metering/queue management[2] under the "rules and regulations that would have applied to them at the time of their initial arrival." Pls.' Proposed Order ¶ 3; *see also* Pls.' Remedy Br. at 9-10 (arguing that the Court "should order Defendants to process class members under the rules and regulations that existed as of [the date they first attempted to arrive at a POE]"), 10-11 (arguing that "changes to rules or regulations affecting access to the asylum process effective between the time a person was initially turned back and the time she ultimately entered the United States be inapplicable to that person's case"). This request is improper for several reasons.

First, Plaintiffs' requested provision is too vague to satisfy Rule 65's requirement that an injunction "state its terms specifically" and "describe in reasonable detail . . . the act or acts … required." Fed. R. Civ. P. 65(d)(1). "[T]hose against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits." *Granny Goose Foods, Inc. v. Bhd. of Teamsters &*

---

[1] As set forth below (*see infra* Part III), Plaintiffs' purported carve-out also does not adequately protect the government's ability to enforce current public health orders issued under 42 U.S.C. § 265, when read in conjunction with Paragraph 3 of Plaintiffs' Proposed Order.

[2] Plaintiffs proposed provision refers broadly to "Defendants' illegal conduct," Pls.' Proposed Order ¶ 3; the only conduct that was the subject of the Court's decision was CBP's metering/queue management practices.

DEFS.' RESPONSE BRIEF
RE: REMEDY
Case No. 3:17-cv-02366-BAS-KSC

*Auto Truck Drivers Loc. No. 70 of Alameda Cty.*, 415 U.S. 423, 444 (1974). Paragraph 3 does not provide such notice. Other than the CDC Orders,[3] Plaintiffs do not specify what "rules and regulations" they believe relate to "inspect[ion]" and "asylum processing" and are thus encompassed in their request. *See* Pls.' Proposed Order ¶ 3. In fact, Plaintiffs even argue in their brief that "the list of those regulations" should remain open-ended, because the determination of what belongs on that list is "best left to the advocates and Immigration Judges [IJs] involved in an asylum seeker's case." Pls.' Remedy Br. at 12 n.8. Plaintiffs' nebulous suggestion would unfairly put the impacted agencies in the position of trying to ascertain what the Court's order may require in each individual case, which is a recipe for further litigation. Plaintiffs do not even describe in either their proposed order or their brief what *category* of rules or regulations to which they are referring, or what changes to the law or regulations may be relevant to class members. A variety of rules and regulations could potentially be applicable under Plaintiffs' overbroad formulation: regulations governing expedited removal processing, rules or practices governing inspection, regulations regarding ancillary benefits such as employment authorization, or substantive asylum rules applied by IJs and asylum officers. It is thus unclear what the various agencies would be required to do under Plaintiffs' requested provision.

Second, to the extent Plaintiffs are asking that IJs and asylum officers apply substantive asylum rules that were in effect at the time of a noncitizen's arrival (as "arrival" is defined by this Court)—regardless of when the asylum decision is rendered—this would contravene the long-settled presumption that agencies should apply the law in effect at the time of the decision (*not* the date of inspection). *Otarola v. INS*, 270 F.3d 1272, 1275 (9th Cir. 2001) (stating the general rule that the agency is to apply the law in effect at the time of the decision, and citing *Urbina-Mauricio*

---

[3] Defendants address Paragraph 3's provisions respecting the CDC Orders more fully in Part III, *infra*.

DEFS.' RESPONSE BRIEF
RE: REMEDY
Case No. 3:17-cv-02366-BAS-KSC

1  *v. INS*, 989 F.2d 1085, 1088 n.4 (9th Cir. 1993), and *Ortiz v. INS*, 179 F.3d 1148,

2  1156 (9th Cir. 1999)). Accordingly, under Plaintiffs' proposed relief, for a hypothet-

3  ical individual who was subject to metering in May 2018, subsequently entered and

4  was inspected in June 2018, and had an asylum hearing in December 2019, the IJ

5  would apply asylum law as it existed in May 2018. Yet for someone who was not

6  subject to metering but entered in May 2018 and had an asylum hearing in December

7  2019, the IJ would generally apply the law as it existed in December 2019.

8      Third, this type of relief does not correspond to Plaintiffs' claims or match the

9  violation found by this Court. APA relief is limited to an order "compel[ling]" man-

10  datory agency action or "set[ting] aside" unlawful agency action. 5 U.S.C. § 706(1),

11  (2). The Court's summary-judgment decision addresses whether to compel CBP to

12  "inspect" Class Members under Section 1225, and only holds that CBP's practices

13  that result in deferring such inspection to a subsequent "arrival" are an unlawful

14  withholding of agency action. That decision does not address the substantive law

15  governing any of the Class Members' claims to relief, and does not entitle Class

16  Members to be processed under any particular substantive laws, rules, regulations,

17  or practices.[4]

18      Fourth, Plaintiffs have not made the showing required to enter the particular

19  injunctive relief requested in Paragraph 3 as to the Rule 23(b)(2) Class. In a Rule

20  23(b)(2) class action, injunctive relief must be "appropriate respecting the class as a

21  whole." Fed. R. Civ. P. 23(b)(2). Typically, in a Rule 23(b)(2) class action:

22

23  [4] The Court noted that "[substantive asylum] regulations promulgated after class

24  members were turned back have not applied to them," MSJ Order at 29 n.14, refer-

25  ring to its preliminary-injunctions concerning the third-country transit rule, Asylum
   Eligibility and Procedural Modifications, set forth in 84 Fed. Reg. 33,829 (July 16,

26  2019) (interim final rule) and 85 Fed. Reg. 82,260 (Dec. 17, 2020) (final rule). But—

27  because Plaintiffs did not raise such claims—the Court necessarily did not analyze
   whether particular substantive rights other than a right to inspection and referral are

28  conferred at the time of a noncitizens' first "arrival."

DEFS.' RESPONSE BRIEF
RE: REMEDY
Case No. 3:17-cv-02366-BAS-KSC

> any relief obtained on behalf of the class . . . does not require distribution to the class. . . . [I]t is usually unnecessary to define with precision the persons entitled to enforce compliance. *Newberg on Class Actions* § 3.7 (5th ed.) (citation omitted). Identification of individual class members is not required; to the contrary, the fact that class members are difficult or impossible to identify individually supports class certification under Rule 23(b)(2).

*The Civil Rights Educ. & Enf't Ctr. v. RLJ Lodging Tr.*, 2016 WL 314400, at *5 (N.D. Cal. Jan. 25, 2016). Yet the particular relief Plaintiffs seek in Paragraph 3 does not fit this mold and is not appropriate respecting the class as a whole. Application of Paragraph 3 would require an individualized remedy determination for every Class Member because a regulation's applicability does not necessarily hinge on the date of entry or inspection. Plaintiffs implicitly concede that whether and how this relief would be applicable may depend on the particular class members' circumstances, the language of the rule at issue, whether the change in law was beneficial to the class member, or other factors that cannot be determined on a classwide basis. *See* Pls.' Remedy Br. at 12 n.8. This relief is thus not permissible classwide relief under Rule 23(b)(2).

Fifth, Plaintiffs have not met their burden to demonstrate entitlement to this type of equitable relief. They have generally not pointed to, or submitted evidence of, an irreparable injury that has been or will be suffered by any members of the class as a result of changes in asylum law that occurred between November 2016 and the present, or that the balance of the hardships favor entry of this injunctive relief.[5] *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (a plaintiff seeking a permanent injunction must demonstrate irreparable injury and that the balance of the hardships warrant a remedy in equity).

---

[5] The only exception is the narrow showing Plaintiffs made regarding the application of the third-country transit rule, Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019) (interim final rule), which was the subject of this Court's preliminary injunction. *See* ECF No. 330 (PI Order); ECF No. 294 (Pls.' Mot. for Prelim. Inj.).

DEFS.' RESPONSE BRIEF
RE: REMEDY
Case No. 3:17-cv-02366-BAS-KSC

For these reasons, the Court should decline to issue the relief proposed in Paragraph 3.

### III. Paragraph 3's Title 42 Carve-Out Threatens to Operate as a De Facto Injunction Preventing Enforcement of the CDC Orders.

Plaintiffs also request in Paragraph 3 of their Proposed Order that the Court require that Defendants inspect[] and provide[] asylum processing" to "individuals who would not have been subject to" the CDC Orders first issued in March 2020[6] but for metering/queue management, explaining that this means that "if any asylum seeker was turned back before the U.S. government issued orders restricting the processing of asylum seekers under Title 42, then those orders should not apply to that individual." Pls.' Remedy Br. at 11. This request is less vague, but otherwise suffers from the same infirmities discussed in Part II above. The Court should deny this request for the additional, independent reasons that the terms of the CDC Orders do not provide for any exception for Class Members who initially "arrived" (under the Court's formulation) before their issuance, and because the relief requested would likely inflict significant harm on the public interest by effectively depriving the government of the ability to enforce the current CDC Order, a vital public health measure designed to protect against the uncontrolled spread of COVID-19.

To provide additional background: In March 2020, in light of the unprecedented COVID-19 pandemic, the Department of Health and Human Services (HHS) and its Centers for Disease Control and Prevention (CDC) issued an interim final rule under Section 265 of Title 42 to provide a procedure for the CDC Director to

---

[6] As used herein, the term "CDC Order," singular, refers to the CDC Order issued in August 2021 by the U.S. Centers for Disease Control and Prevention under the authority in 42 U.S.C. § 265, titled Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42,828 (Aug. 5, 2021). The term "CDC Orders," plural, refers to the current CDC Order as well as its predecessors as described herein.

DEFS.' RESPONSE BRIEF
RE: REMEDY
Case No. 3:17-cv-02366-BAS-KSC

temporarily suspend the introduction of certain persons into the United States. 85 Fed. Reg. 16,559 (Mar. 24, 2020). The rule's preamble explained that international travel increases the risk of communicable disease transmission into and through the United States, particularly "when travelers are in congregate settings." *Id.* at 16,560. In March 2020, the CDC Director issued an Order pursuant to the March 2020 rule that temporarily suspended the introduction of certain noncitizens traveling from Canada and Mexico into the United States. 85 Fed. Reg. 17,060 (Mar. 26, 2020). The Order applied to "covered aliens," defined as persons "traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting" at or near the border, "typically aliens who lack valid travel documents." *Id.* at 17,061. The CDC Order explained that, under typical procedures, covered noncitizens may spend hours or days in congregate settings while undergoing immigration processing, and that POEs and U.S. Border Patrol stations are "not designed for, and are not equipped to, quarantine, isolate, or enable social distancing by persons who are or may be infected with COVID-19." *Id.* at 17,061, 17,066. The Order also explained that holding covered noncitizens in congregate settings risks the spread of COVID-19 to CBP personnel and further transmission of COVID-19 to the U.S. population, with a concomitant increased strain on the U.S. healthcare system and supply chain. *Id.* at 17,061. In September 2020, HHS and CDC published a final rule. 85 Fed. Reg. 56,424 (Sept. 11, 2020) (codified at 42 C.F.R. § 71.40). The CDC Director then issued a new Order suspending the introduction of covered noncitizens into the United States, for reasons that substantially tracked the March 2020 Order. 85 Fed. Reg. 65,806, 65,807-08 (Oct. 16, 2020).[7] In August 2021, CDC

---

[7] On July 22, 2021, CDC announced that it was excepting unaccompanied noncitizen children from the Order, because there is infrastructure in place to manage the public health risks posed by introduction of these children, who are typically placed into HHS Office of Refugee Resettlement (ORR) custody, and in light of the humanitarian concerns posed by expelling unaccompanied noncitizen children. *See* 86 Fed. Reg. 38,717 (July 22, 2021).

DEFS.' RESPONSE BRIEF
RE: REMEDY
Case No. 3:17-cv-02366-BAS-KSC

issued a new Order—the current CDC Order—which replaced and superseded the previous Orders. 86 Fed. Reg. 42,828 (Aug. 5, 2021) (attached hereto as Exhibit 2). The CDC Order explains that, "[u]pon reassessment of the current situation with respect to the pandemic and the situation at the U.S. borders, CDC finds that an Order" temporarily suspending the right to introduce certain noncitizens traveling from Canada and Mexico, regardless of their country of origin, into the United States "remains necessary" for single adults and family units, subject to recurring 60-day reviews. *Id.* at 42,829–30. CDC made this determination after an updated public health assessment that evaluated numerous considerations, including the particular risks of COVID-19 transmission in congregate settings at DHS facilities, *id.* at 42,833, the limited ability to maintain physical distancing and cohorting given capacity constraints, *id.* at 42,835, the significant increase in CBP encounters that has caused DHS facilities to exceed capacity, *id.*, the emergence of the highly transmissible Delta variant, *id.* at 42,832–33, and the increase in community transmission and hospitalizations along the U.S.-Mexico border, *id.* at 42,830–31, 42,834–35.

Plaintiffs acknowledge that they have not challenged the CDC Orders in this litigation. Pls.' Remedy Br. at 2, 11. Yet Plaintiffs go on to ask for relief that would nonetheless significantly interfere with the government's ability to enforce the CDC Order.[8] If the Court were to issue relief that required the government to except from the CDC Order all individuals who were "turned back" at a POE before the CDC first exercised its authority in March 2020 to prevent the introduction of covered

---

[8] As previously noted by both parties, issues concerning enforcement of the CDC Order have been, and are being, litigated in other courts. The D.C. Circuit granted stays pending appeal of district-court orders that preliminarily enjoined application of the CDC Order to expel family units and unaccompanied minors. *See Huisha-Huisha v. Mayorkas*, 2021 WL 420688, at *11 (D.D.C. Sept. 16, 2021), *order stayed by Huisha-Huisha v. Mayorkas*, No. 21-5200, Order (D.C. Cir. Sept. 30, 2021); *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 510 (D.D.C. 2020), *order stayed by P.J.E.S. v. Pekoske*, No. 20-5357, Order (D.C. Cir. Jan. 29, 2021).

DEFS.' RESPONSE BRIEF
RE: REMEDY
Case No. 3:17-cv-02366-BAS-KSC

noncitizens to mitigate the spread of COVID-19, this could effectively prevent CBP from assisting in the enforcing of the CDC Order at the borderline. Because of the nature of metering, CBP necessarily does not have records of individuals who approached the borderline before March 2020, *see* ECF No 308-5 (Howe Declaration) ¶¶ 4-5, nor does it have comprehensive records of individuals who may never have approached the borderline but put their names on waitlists maintained by a separate entity, *see* ECF No. 657-2 (Draganac Decl.) ¶¶ 5, 7. Therefore, CBP officers assisting in the enforcement of the CDC Order at the borderline will not be able to accurately assess and determine whether a covered noncitizen who is seeking to enter the United States at a POE first approached a POE before March 2020. *Cf.* ECF No. 308-5 (Howe Declaration) ¶ 4 (explaining limitations on ascertaining facts about individuals who approach the limit line). Accordingly, under Plaintiffs' requested Paragraph 3, CBP would possibly need to allow *any* noncitizen who claims to have been subject to metering before March 2020 to enter the POE and be processed under Title 8 to avoid the appearance of non-compliance with a court order or the threat of contempt. Thus, absent a concrete, definitive list of such class members (supported by evidence), combined with a provision that allows CBP or DHS to pre-screen such individuals to evaluate whether they should be excepted from the CDC Order before they approach a POE, this provision would prevent effective enforcement of the CDC Order at the border.[9] And no such comprehensive and definitive list exists,

---

[9] Plaintiffs submit a declaration stating that Plaintiff Al Otro Lado "conducted an online survey of over 17,000 asylum seekers stuck in Mexico near the U.S. border," and assert that over 12,500 of those surveyed individuals "arrived at the U[.]S[.]-Mexico border before March 2020, when the Title 42 restrictions were implemented." Pls. Remedy Br., Medlock Decl. Ex. 1 (Pinheiro Decl.) ¶ 17. It is unclear what this number precisely represents, as Plaintiffs do not submit the actual results of the survey, describe the questions asked, explain when the survey was taken, or adequately define the population surveyed. For example, they do not explain whether this 12,500 figure includes individuals who have already been inspected in

10

even if Plaintiffs were able to obtain all waitlists. *See, e.g.*, ECF No. 657, at 13-17 (describing waitlists and highlighting deficiencies).

The resulting restraint on enforcement of the CDC Order would cause serious injury to the government and public interest. "'Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). That is especially true where the injunction would tend to interfere with the decisions of public officials entrusted with "the safety and the health of the people" in "areas fraught with medical and scientific uncertainties." *See South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613-14 (2020) (Roberts, C.J., concurring). The CDC Order itself illustrates the substantial harm to the government, the public, and to Class Members and other migrants themselves, should the government be effectively prohibited from enforcing the Order. Minimizing the protections of the Order "would increase the number of noncitizens processed under Title 8, resulting in severe overcrowding and a high risk of COVID-19 transmission among those held in the facilities and the CBP workforce, ultimately burdening the local healthcare system." CDC Order, 86 Fed. Reg. at 42,837. This is so even though there have been improvements in COVID-19-related healthcare re-

the United States under Title 8 and returned to Mexico under the Migrant Protection Protocols (MPP). *See, e.g.*, https://www.dhs.gov/archive/migrant-protection-protocols-trump-administration (describing MPP). Nor have Plaintiffs provided any information that could show that these hearsay survey responses are somehow admissible under an exception to the hearsay rule. *See Fed. Trade Comm'n v. Publishers Bus. Servs., Inc.*, No. 2:08-cv-00620, 2009 WL 10692838, at *5 (D. Nev. Oct. 30, 2009) (discussing requirements for admission of survey results under residual hearsay exception, Fed. R. Evid. 807). Accordingly, the Court may not consider this survey as evidence that 12,500 individuals arrived at the U.S.-Mexico border and were unable to enter the POEs to be inspected before the March 2020 CDC Order took effect.

11

sources, as there continue to exist emerging variants and the potential for future vaccine-resistant variants. *Id.*

In sum, the Court should decline to enter the relief requested by Plaintiffs in Paragraph 3, which would grant blanket exceptions from the CDC Order in a case in which the CDC is not a party and in a manner that is not administratively feasible and would minimize or eliminate the government's ability to enforce the CDC Order at POEs. At a minimum, if the Court is considering granting this relief, the Court should permit full briefing on this question.

### IV. If the Court Enters an Injunction, It Is Not Necessary or Appropriate To Appoint a Special Master To Monitor Compliance.

Plaintiffs ask that the Court appoint a Special Master to oversee compliance with its order on relief for at least five years. *See* Pls.' Proposed Order ¶ 8. Plaintiffs have not shown that such compliance monitoring is appropriate or warranted here.

The facts in this case do not justify appointment of a Special Master under Rule 53. Appointment of a master remains "the exception and not the rule." *Ribadab Properties Corp. v. Eaton*, No. 05-cv-2338, 2006 WL 1734368, at *1 (D. Ariz. June 16, 2006) (quoting Fed. R. Civ. P. 53, Advisory Committee Notes (2003 Amendments)). The appointment of a post-judgment master—and compliance monitoring generally—is only necessary when "a complex decree requires complex policing, particularly when a party has proved resistant or intransigent," Fed. R. Civ. P. 53, Advisory Committee Notes (2003 Amendments); *see also United States v. Apple Inc.*, 992 F. Supp. 2d 263, 280 (S.D.N.Y. 2014) (stating that monitoring may be appropriate where a party has proved "resistant or intransigent to complying with the remedial purpose of the injunction in question") (emphasis added). Here, there should be no complex decree of the type that would require complex policing, nor has the government demonstrated resistance or intransigence with respect to any of the Court's orders, let alone any future orders it will issue.

This case is not like those Plaintiffs cite, in which complex consent decrees

DEFS.' RESPONSE BRIEF
RE: REMEDY
Case No. 3:17-cv-02366-BAS-KSC

have justified the appointment of a Special Master. Those cases involve decrees concerning prison reform, remedies to longstanding discriminatory practices, or other orders with multiple affirmative requirements. As Defendants have already argued, if this Court orders an injunction, that injunction must be limited to remedy the precise violation found. And under the provision of the APA the Court relied upon in granting summary judgment, 5 U.S.C. § 706(1), the remedial injunction may only require an order that the agency perform the task required by statute; the court may not mandate precisely *how* the agency shall perform or accomplish that task. *See* Defs.' Remedy Br. at 11-12; *see also Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64, 67 (2004); *Firebaugh Canal v. United States*, 203 F.3d 568, 578 (9th Cir. 2000) ("Although the district court can compel the Department [] to provide drainage service as mandated by the San Luis Act, the district court cannot eliminate agency discretion as to how it satisfies the drainage requirement."). The fact that the Court found a due process violation from deprivation of the statutory duties at issue does not change this analysis, because Class Members' due process rights to certain procedures extend only as far as what is specifically required by the statute. *See* Defs.' Remedy Br. at 13. A court should not grant relief that "place[s] presumptively Executive responsibilities in judicial hands" where not clearly warranted by the law in question. *See Fraihat v. U.S. Immigr. & Customs Enf't*, No. 20-55634, 2021 WL 4890884, at *32 (9th Cir. Oct. 20, 2021).

In sum, a complex order setting forth detailed directives as to how to accomplish inspection of Class Members as they first arrive would not be an appropriate remedy for the violation the Court found. Indeed, the core injunctive relief that Plaintiffs request at Paragraph 2 of their Proposed Order, while vague and overbroad in certain respects, does not set forth any such detailed directives. Their Proposed Order contains some detailed directives, but those directives all fall outside the scope of what would be a proper remedy here. For example, as explained further in Part V, *infra*, Plaintiffs' proposed reporting and notification requirements at Paragraphs 6

13

and 8 are both improper and irrelevant to the violation found, and their proposed requirements at Paragraphs 3 and 4 to apply particular rules or exemptions to particular class members are likewise not a proper remedy here (*see supra* Parts II, III; Defs.' Remedy Br. at 17-18).

Plaintiffs similarly argue that appointment of a Special Master is appropriate because an injunction will necessitate "widespread reform" and "organizational change," Pls.' Remedy Br. at 14, 15 (although they fail to explain precisely what "complex structural changes" they believe are needed, *see id.* at 13, let alone what role a Special Master would play in oversight of those issues). Such an injunction of queue management would be extremely burdensome for CBP and DHS and disruptive to the overall operations of POEs, the enforcement of immigration laws, and border security. *See* Defs.' Remedy Br. at 14-16. Yet even these significant burdens—and potential organizational change that may result—would not warrant the appointment of a Special Master. As shown just above, court oversight over structural changes would be antithetical to the nature of the remedy for § 706(1) violations. Neither this Court nor a Special Master is authorized to decide for Defendants *how* to accomplish a statutory mandate. The APA does not contemplate "pervasive oversight by federal courts" over the manner of compliance with a statutory directive. *S. Utah Wilderness Alliance*, 542 U.S. at 67. Accordingly, Plaintiffs' argument that an injunction will require wholesale supervision of DHS and CBP's operations at each POE is incorrect.

Plaintiffs also claim that a Special Master is required because they "have had considerable difficulty monitoring and enforcing compliance with this Court's preliminary injunction regarding the [third-country transit rule]." Pls.' Remedy Br. at 12. Yet this does not evidence resistance or intransigence on the government's part, and certainly not with respect to the injunction in question, which has not issued. *See Apple Inc.*, 992 F. Supp. 2d at 280 (stating that monitoring may be appropriate where a party has proved "resistant or intransigent to complying with the remedial purpose

DEFS.' RESPONSE BRIEF
RE: REMEDY
Case No. 3:17-cv-02366-BAS-KSC

1  of the *injunction in question*") (emphasis added).

2        Although Plaintiffs have indeed filed numerous motions concerning the pre-

3  liminary injunction of the third-country transit rule, those motions have primarily

4  involved good-faith disagreements over the precise requirements of two prelimi-

5  nary-injunction orders. As Defendants' opposition briefing to those motions demon-

6  strate, the government has cooperated and compromised with Plaintiffs in many re-

7  spects, and has made conscientious, concerted, and substantial efforts to comply with

8  the Court's orders and to effect the remedial purpose of the injunctions. *See, e.g.*,

9  ECF No. 657, 695, 758. Moreover, the original preliminary-injunction order and the

10 October 30 Order are different in character from any injunction that the Court may

11 order here. Both of these preliminary-injunction orders required the government to

12 identify, at various stages of their immigration proceedings, particular individuals

13 who were subject to metering before a particular date. This type of complex identi-

14 fication task should not be required to remedy the violation found by this Court on

15 summary judgment. *See also supra* Parts II-III; Defs.' Remedy Br. at 17-18. And the

16 October 30 Order's requirements for retrospective identification and reopening ef-

17 forts for certain members of the preliminary-injunction class have required the de-

18 velopment of complex review, interview, and notification procedures, and other an-

19 cillary procedures for processing applications for return to the United States for some

20 of the class members whose cases are reopened or reconsidered. *See, e.g.*, ECF No.

21 657, 695-2 to 695-6, 758. Thus, any experience with implementation of the prelim-

22 inary-injunction orders is largely irrelevant to whether a Special Master should be

23 appointed to oversee any forthcoming injunction, as those orders provide relief that

24 is distinct from the type of relief that the Court may order as final injunctive relief.

25       Plaintiffs may argue that this experience with the preliminary injunction is

26 relevant because they have requested conversion of that preliminary-injunction relief

27 to a permanent injunction, *see* Pls.' Proposed Order ¶ 4, and because of the com-

28 plexity of identifying class members for entitlement to the application of particular

rules or regulations under Paragraph 3 of their Proposed Order. But these types of relief are not a proper remedy for the violation found by the Court. *See supra* Parts II-III; Defs.' Remedy Br. at 17-18. At most, however, that argument would potentially support monitoring only of the administration of the relief requested in Paragraphs 3 and 4 of Plaintiffs' Proposed Order, which request the application of particular rules or regulations to particular class members based on the date of their initial "arrival," as defined by the Court. It would not support the type of compliance monitoring and reporting that Plaintiffs request, which is focused almost entirely on the capacity and operations of POEs, rather than the application of particular rules to particular class members. *See generally* Pls.' Proposed Order ¶ 8.[10] For these reasons, the appointment of a Special Master—or any monitor—is not warranted, nor are any of the specific monitoring measures discussed more fully in Part V, *infra*.

## V.   The Court Should Reject Burdensome Reporting, Inspection, and Discovery Requirements.

As part of their request for monitoring, Plaintiffs request a number of highly-specific and burdensome quarterly reporting and inspection measures, as well as discovery, Pls.' Proposed Order ¶¶ 6, 8(d), (e), (f), (g), all of which are unwarranted

---

[10] Finally, Plaintiffs' claim the government has somehow *already* evidenced "recalcitrance" with respect to this Court's forthcoming order is unsupported. *See* Pls.' Remedy Br. at 6. They cite only to the fact that government counsel correctly expressed that it was not appropriate to discuss compliance measures before this Court issued an order addressing Plaintiffs' requests for relief, and to a declaration asserting that officers at the San Ysidro Port of Entry responded to a large gathering/demonstration at the border on September 3, 2021, with the posting of officers at vehicle lanes and suspension of pedestrian processing. *Id.* at 4-5; Medlock Decl. ¶¶ 7-9 & Ex. 1 (Pinheiro Decl.) ¶ 8. Notably, Plaintiffs make no direct accusations of noncompliance or defiance of a court order. And they cannot argue that this Court's reasoning precludes CBP from stationing officers at the limit line to assess whether travelers approaching the POE possess appropriate travel documentation, because the CDC Orders independently suspend the introduction of covered noncitizens. The Court should decline Plaintiffs' invitation to find "recalcitrance" based on their unsupported suggestions.

1   and disproportionate to the needs of this case, because the proper remedy for the

2   violation found does not contemplate such oversight and monitoring.

3       None of Plaintiffs' proposed reporting requirements would help measure

4   *whether* Defendants are complying with Plaintiffs' proposed injunctive relief or with

5   any injunctive relief that may be proper to remedy the violation found by the Court

6   in this case. In its MSJ Order, the Court "conclude[d] that turning back asylum seek-

7   ers at POEs without inspecting and referring them upon their arrival" constitutes

8   unlawful withholding of agency action. MSJ Order 33–34. The Court defined "the

9   'turnbacks' at issue" as the specific practice of "placing CBP personnel at the inter-

10  national line" and "affirmatively turning asylum seekers away from the border when

11  Mexican immigration officials did not control the flow." MSJ Order 17. It concluded

12  that Defendants fail to discharge their statutory obligations when they engage in this

13  conduct instead of inspecting and processing asylum seekers "on their first arrival to

14  the port." *Id.* at 26 n.12. That is, the Court reasoned that interrupting the process of

15  arrival and "requiring [Class Members] to make their way back to the POE at least

16  a second time to access asylum," MSJ Order 31, constitutes an unlawful withholding

17  of mandatory agency action.

18      Plaintiffs' proposed reporting does not appear calculated to ascertain whether

19  individuals who arrive at a POE have been inspected instead of being turned back in

20  this manner. Instead, they seek to obtain oversight over minute aspects of operations

21  at approximately two dozen POEs across the Southwest border by asking the Court

22  to require extremely detailed reports on how Defendants are utilizing physical hold-

23  ing capacity and processing capacity at each POE throughout the day, how each POE

24  is staffed, the hours of each POE, the daily wait times at each POE before inspection,

25  planned or actual construction or lane closures, changes to classification of POEs,

26  and a variety of other details. *See* Pls.' Proposed Order ¶ 8(d). Yet this Court's ruling

27  expressly does not touch on CBP's use of its physical space or temporary spaces, its

28

pace of inspecting and processing applicants for admission, or its decisions to re-classify POEs or engage in construction projects at POEs. Indeed, the Court concluded that Defendants' operational and physical capacity concerns were irrelevant to its holding,[11] and it did not address Plaintiffs' late-raised "unreasonable delay" claims. *See* MSJ Order at 26 n.12, 28 n.13, 34. Plaintiffs also ask for other irrelevant information, such as the impact of "security exercises or show of force operations," which was never addressed in the lawsuit. Plaintiffs' proposed reporting requirements are thus improper, and the Court should decline to enter the relief requested in Paragraph 8.[12]

Plaintiffs' requests to permit unannounced inspections by the Special Master and at least eight inspections a year upon demand by Plaintiffs' Counsel (or unidentified designees) to "all areas of the Port of Entry identified by Plaintiffs' counsel"—including "offsite detention facilities"—are similarly overly burdensome. *See* Pls.' Proposed Order ¶ 8(e), (f). Even if some monitoring were appropriate here (which it is not), it is unclear how such broad access would help monitor compliance with the injunction Plaintiffs request. Further, there are many areas of the POEs to which Plaintiffs' counsel seek access that are not relevant to any issues in this case, and to

---

[11] Plaintiffs argue that regular and on-demand reporting on highly specific capacity information for every single POE across the Southwest border is justified because, they claim, "discovery demonstrated that Defendants used POE capacity as a pretext to turn back asylum seekers at the southern border," and that, "[g]iven this history, Defendants should regularly, and on demand, report relevant capacity data to Plaintiffs and the special master." Pls.' Remedy Br. at 17. But the Court did not evaluate the government's capacity constraints, and it did not find that they were pretextual. It instead held they were irrelevant to its holding. *See* MSJ Order at 34.

[12] Certain of these proposed requirements also appear to ask for information about non-final plans, such as "plans to close" POEs, or "planned, contemplated" construction projects. Pls.' Proposed Order ¶ 8(xviii), (xxii). Such information is generally protected by the deliberative process privilege.

which access should not be permitted.

Accordingly, the Court should also reject the proposals set forth in Paragraph 8(a), (c)-(h).[13]

## VI.    The Court Should Allow Flexibility In Publishing Notice to Class Members.

Plaintiffs proposed that the Court require Defendants to "post written notices and/or videos on their public websites and in areas of Class A Ports of Entry that are likely to be viewed by" noncitizens in the process of arriving in the United States at Class A Ports of Entry."  Pls.' Proposed Order ¶ 8(b).

Such notice is likely not required here to protect class members, *see* Rule 23(d)(1)(B), because they should not need to identify any right to relief. Further, Plaintiffs do not present evidence to overcome the "general rule" that "the representative plaintiff should perform" the "particular tasks necessary to send the class notice." *Oppenheimer Fund, Inc.*, 437 U.S. at 356; *see also Barahona-Gomez v. Reno*, 167 F.3d 1228, 1236–37 (9th Cir. 1999) (extending this rule to a Rule 23(b)(2) class action). Defendants do not object in principle, however, to publishing some form of notice, but they request that the Court permit the government more flexibility in how and when to accomplish notice publication,[14] and the languages into which such notice will be translated.

\* \* \*

The Court should reject Plaintiffs' new requests for relief for the reasons stated above.

---

[13] If the Court were to order reporting, inspections, and discovery, the parties must agree to an appropriate confidentiality protective order to safeguard confidential and sensitive information to allow Defendants to produce the information sought.

[14] The timing of publication must be flexible given the current impact of the CDC Order on Title 8 obligations and the resulting potential for confusion to noncitizens who present themselves at POEs.

19

DATED: October 22, 2021                Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Acting Assistant Attorney General

                                       WILLIAM C. PEACHEY
                                       Director

                                       */s/ Katherine J. Shinners*
                                       KATHERINE J. SHINNERS
                                       Senior Litigation Counsel
                                       United States Department of Justice
                                       Civil Division
                                       Office of Immigration Litigation
                                       District Court Section
                                       P.O. Box 868, Ben Franklin Station
                                       Washington, D.C. 20044
                                       Tel: (202) 598-2859 | Fax: (202) 305-7000
                                       katherine.j.shinners@usdoj.gov

                                       ALEXANDER J. HALASKA
                                       Trial Attorney

                                       *Counsel for Defendants*