# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AL OTRO LADO, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ALEJANDRO MAYORKAS, *et al.*,[1]<br><br>Defendants. | Case No. 17-cv-02366-BAS-KSC<br><br>**ORDER:**<br><br>**(1) GRANTING PLAINTIFFS' MOTION TO SEAL (ECF No. 718); AND**<br><br>**(2) DENYING PLAINTIFFS' MOTION TO FACILITATE CLASS NOTICE (ECF No. 720)** |

Before this Court is Plaintiffs' motion pursuant to Federal Rule of Civil Procedure ("Rule") 23(d)(1)(B) to facilitate notice to class members ("Motion to Facilitate") (Mot., ECF No. 720; Mem., ECF No. 720-1) and Plaintiffs' contemporaneously filed motion to seal information contained in that submission ("Motion to Seal") (ECF No. 718). Defendants oppose the Motion to Facilitate (Opp'n, ECF No. 723) but support the Motion

---

[1] Because all Defendants are sued in their official capacities, the successors for these public offices are automatically substituted as Defendants per Fed. R. Civ. P. 25(d).

- 1 -

to Seal (ECF No. 722). Plaintiffs reply in support of their Motion to Facilitate. (Reply, ECF No. 724.) The Court finds the Motions suitable for determination on the papers submitted and without oral argument. Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1). For the reasons set forth below, the Court **GRANTS** the Motion to Seal and **DENIES** the Motion to Facilitate.

## I.  BACKGROUND

### A.  Pertinent Procedural History

Plaintiffs brought this suit in 2017 to challenge as unlawful Defendants' practice of systemically denying asylum seekers access to the U.S. asylum process at land ports of entry ("POEs") along the U.S.-Mexico border. At the heart of this lawsuit is Defendants' "Turnback Policy"—a practice informally implemented in 2016, 2017, and 2018 by United States Custom and Border Protection ("CBP") officials, and which in 2018 was formalized by the United States Department of Homeland Security ("DHS") pursuant to a memorandum to the CBP Commissioner entitled "Prioritization-Based Queue Management" ("PBQM Memo"). *See Al Otro Lado, Inc. v. Mayorkas*, No. 17-cv-2366-BAS-KSC, 2021 WL 3931890, at *2–4 (S.D. Cal. Sept. 2, 2021) ("Summary Judgment Order"). While the Turnback Policy's precise implementation differed over the years, it generally "included a 'metering' or 'waitlist' system," under which CBP officers instructed asylum seekers arriving at or near land POEs along the U.S.-Mexico border "to wait on the bridge, in the pre-inspection area, or at a shelter," or simply that CBP could not process anymore asylum seekers because the POE was "'full or 'at capacity.'" *Al Otro Lado, Inc. v. Wolf*, 952 F.3d 999, 1003 (9th Cir. 2020). The PBQM Memo justified these practices on the ground that U.S.-asylum processing at land POEs along the U.S.-Mexico border drew CBP resources away from "its primary mission: to protect the American public from dangerous people and materials while enhancing our economic competitiveness through facilitating legitimate trade and travel." Summary Judgment Order at *3–4. The PBQM Memo, thus, called for the reprioritization of CBP objectives at POEs, and utilized the Turnback Policy as a mean to that end. *Id.*

On August 6, 2020, this Court granted Plaintiffs' request to certify a class of asylum seekers impacted by the Turnback Policy ("*AOL* Class"). *Al Otro Lado, Inc. v. Wolf*, 336 F.R.D. 494 (S.D. Cal. 2020). The *AOL* Class consists of

> All noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A [POE] on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of [CBP] officials on or after January 1, 2016.

*Id.* at 500, 507.[2]

On September 2, 2021, this Court granted in part and denied in part competing motions for summary judgment (ECF Nos. 535, 563). *See* Summary Judgment Order. In so holding, this Court found, *inter alia*, that: (1) by implementing the Turnback Policy, Defendants had violated their statutory duties under 8 U.S.C. §§ 1158(a)(1) and 1125 "to inspect and refer asylum seekers both on U.S. soil and outside the international boundary line who are arriving at POEs"; and (2) that by failing to perform their statutory duties, Defendants had also deprived Plaintiffs—and, thus, the *AOL* Class—of their Fifth Amendment due-process rights. Summary Judgment Order at *20.[3]

### B. Migrant Waitlist

As this Court has repeatedly noted in its authored decisions, including in its recent Summary Judgment Order, Defendants' implementation of the Turnback Policy led many asylum seekers to remain in Mexican border communities adjacent to or near POEs as they waited for an opportunity to return for inspection and referral by CBP Officers. *See*, *e.g.*, Summary Judgment Order at *17 ("The failure to inspect and refer as asylum seekers first arrived also create[d] additional burdens by requiring that asylum seekers stay in Mexico and make return trips to POEs to access the process."). In response to the growing backlog

---

[2] The Court also certified a sub-class. *Al Otro Lado, Inc.*, 336 F.R.D. at 507.

[3] The Court has yet to reach a conclusion as to the appropriate remedy. *See* Summary Judgment Order at *45. The parties have submitted supplemental briefing on that issue in accordance with the Summary Judgment Order. (ECF Nos. 768, 770, 773, 774.)

of asylum seekers, Mexican federal and municipal officials and shelter workers in eleven Mexican border cities began collecting the names, nationalities, and contact information of migrants awaiting processing, and compiled that information into "waitlists."[4] (Sarvey Decl. ¶¶ 4–5, 7, Ex. 1 to Medlock Decl., ECF No. 720-3.) These waitlists were used, *inter alia*, "to prevent confusion and conflict about the order in which asylum seekers were being processed at [POEs]"; "to allow asylum seekers to wait in shelters while maintaining their places in line"; "to minimize security and health risks [to] asylum seekers waiting outside [POEs], given the insecurity and extreme temperatures in Mexican border cities"; and "to halt the congregation of asylum seekers outside [POEs], which blocked pedestrian traffic and led local residents to complain." (*Id.* ¶ 7; *see also* Draganac Decl. ¶ 4, Ex. 1 to Halaska Decl., ECF No. 723-2.)

Approximately 18,700 individuals remained on those waitlists as of May of 2021. (Arvey Decl. ¶¶ 8, 12.) "The length of time asylum seekers at the top of the lists have been waiting rang[e] from 16 to 20 months, depending on the city." (*Id.*)

### C. CDC's Title 42 Order

In March of 2020, as the COVID-19 pandemic began to reach a critical point in the United States, the Government effectively suspended the U.S. asylum process at land POEs along the U.S.-Mexico border. (*Id.* ¶¶ 11–12 (attesting that since March of 2020, the Government essentially has "suspend[ed] the processing [of] asylum seekers"); *see also A Guide to Title 42: Expulsions at the Border*, Fact Sheet, Am. Immigration Council (Mar. 29, 2021) (describing impact of Government's COVID-19 immigration-related measures), Ex. 3 to Medlock Decl., ECF No. 720-5; Human Rights First, *Failure to Protect: Biden Administration Continues Illegal Trump Policy to Block and Expel Asylum Seekers to Danger* (Apr. 2021), Ex. 4 to Medlock Decl., ECF No. 720-6.)

---

[4] According to Plaintiffs, waitlists operated in the Mexican border cities of Agua Prieta, Ciudad Acuña, Ciduad Juárez, Matamoros, Mexicali, Nogales, Nuevo Laredo, Piedras Negras, Reynoso, San Luis Rio Colorado, Tijuana. (Arvey Decl. ¶ 9, Ex. 1 to Medlock Decl., ECF No. 720-3.)

Specifically, on March 26, 2020, the Director of the United States Department of Health and Human Services Centers for Disease Control and Prevention ("CDC") issued an order "suspending the introduction of persons into the United States . . . traveling from Canada or Mexico (regardless of their country or origin) who would otherwise be introduced into a congregate setting in a land [POE] or Border Patrol station at or near the United States borders with Canada and Mexico[,]" pursuant to 42 U.S.C. §§ 265 and 268 ("Title 42 Order").[5] 85 Fed. Reg. 17,060 (Mar. 26, 2020). The Title 42 Order provides, in pertinent part:

> [m]any of those person [who migrate across the United States land borders with Mexico and Canada] (typically aliens who lack valid travel documents and are therefore inadmissible) are held in common areas of the facilities, in close proximity to one another, for hours or days, as they undergo migration processing. The common areas of such facilities were not designed for, and are not equipped to, quarantine, isolate, or enable social distancing by persons who are or may be infected with COVID-19. The introduction into congregate settings in land POEs and Border Patrol stations of persons from Canada or Mexico increases the already serious danger to the public health to the point of requiring temporary suspension of the introduction of such persons to the United States.

*Id.* at 17,061 (alterations added). Pursuant to the Title 42 Order, the CDC requested that the suspension delineated therein be implemented by DHS. *Id.* at 17,067.

---

[5] 42 U.S.C. § 265 provides, in pertinent part

Whenever the Surgeon General determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by introduction of persons or property from such country a suspension of the right to introduce such persons and property is required in the interest of the public health, the Surgeon General, in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons . . . from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

42 U.S.C. § 265. 42 U.S.C. § 268 requires "customs officers . . . to aid in the enforcement of quarantine rules and regulations."

On September 11, 2020, the CDC made clear in a slightly revised Title 42 Order that it views the suspension as applying to the U.S. asylum process. *See* 85 Fed. Reg. 56,450 (responding to a "Public Comment" that the CDC's measure "violates the United States' obligations under," *inter alia*, "the asylum and withholding provisions at 8 U.S.C. [§§] 1158," that "[i]n section 362 of the PHS Act, Congress authorized the suspension of the introduction of persons into the United States when a suspension of the right to introduce is required in the interest of U.S. public health. Congress did not exempt from the scope of section 362 any category of persons or any rights of introduction under specific laws"). The CDC slightly amended and extended the Title 42 Order on October 16, 2020 and, again, on August 5, 2021. *See* 85 Fed. Reg. 65,806 (Oct. 16, 2020); 86 Fed. Reg. 42,829 (Aug. 5, 2021) ("Following an assessment of the current status of the COVID-19 public health emergency and the situation in congregate settings where noncitizens seeking to enter the United States are processed and held, [the] CDC has determined that an Order remains appropriate at this time for all other covered noncitizens as described therein."). The Title 42 Order remains in effect today. *See Huisha-Huisha v. Mayorkas*, No. 21-5200, 2022 WL 628061, at *1 (D.C. Cir. Mar. 4, 2022); *Texas v. Biden*, No. 4:21-cv-0579-P, 2022 WL 658579, at *1 (N.D. Tex. Mar. 4, 2022).

Critically, the legality of the Title 42 Order is not, nor has it ever been, before this Court. Neither this Court nor Plaintiffs have construed the Turnback Policy at issue in the instant case so broadly as to encompass any action taken by the Executive branch affecting asylum seekers' ability to access the U.S. asylum process. (*See* Pls.' Supplemental Br. 2, ECF No. 768 ("While Plaintiffs doubt the validity of the recent regulations promulgated under 42 U.S.C. § 265, *Plaintiffs are not challenging them in this case*.") (emphasis added).) Rather, the Turnback Policy is the discrete practice employed by CBP to turnback asylum seekers through a system of "metering" and "waitlists" and on the ground that processing asylum seekers drew CBP resources away from other endeavors. As Plaintiffs point out in their Memorandum, the constitutionality of the Title 42 Order is before another court in a different venue. *See Huisha-Huisha v. Mayorkas*, No. 21-cv-0100 (D.D.C.).

### C. Humanitarian Exception to the Title 42 Order

In May of 2021, the DHS established a limited "humanitarian exception" to the Title 42 Order, under which "vulnerable individuals and family members" otherwise "covered" by the Title 42 Order can "enter the United States," despite that Order's suspension of the asylum process. (Ojeda Decl. ¶ 3, Ex. 5 to Medlock Decl., ECF No. 720-7; *see also* U.S. Dep't of Homeland Security, *DHS Improves Process for Humanitarian Exceptions to Title 42* (May 12, 2021), Ex. 6 to Medlock Decl., ECF No. 720-8.)[6] According to Plaintiffs, a consortium of humanitarian groups largely has been responsible for the administration of this humanitarian exemption to the Title 42 Order. (Ojeda Decl. ¶ 3; *see* Elliot Spagat & Julie Watson, *Biden Taps Groups to Help Ick Asylum-Seekers to Come to U.S.*, Associated Press (June 4, 2021), Ex. 7 to Medlock Decl., ECF No. 720-9.) In essence, the consortium partners identify potentially eligible candidates and vet them pursuant to DHS-devised standards for entry into the United States. (Ojeda Decl. ¶ 3.)

### E. Motion to Facilitate

According to Plaintiffs, the humanitarian exemption to the Title 42 Order has been implemented without transparency and public messaging. (*Id.*) Thus, they attest that the vast majority of asylum seekers waiting in Mexico or elsewhere to be processed at land POEs—including members of the *AOL* Class—are completely unaware they may be eligible for entry into the United States despite the Title 42 Order. (*Id.*) Accordingly, Plaintiffs benevolently intend to provide "notice" to *AOL* Class members about the humanitarian exemption to the Title 42 Order. (Mot.)

Plaintiffs filed their Motion to Facilitate *not* so that this Court would order Defendants to provide humanitarian exception notice to the *AOL* Class, but rather in order to compel Defendants' assistance with class-identification so that Plaintiffs, themselves, can provide such notice. (Mem. 2–3.) Plaintiffs aver that in order to effectuate the humanitarian exception notice, they need the "invaluable contact information for likely

---

[6] The Ojeda Declaration is among the submissions Plaintiffs filed under seal. The unsealed and unredacted version of Plaintiffs' submission, including the Ojeda Declaration, is located at ECF No. 719.

class members" contained in the above-mentioned waitlists, which are in the hands of Mexican government officials and non-government organization workers. Plaintiffs claim that Defendants are far better suited than they are to obtain those waitlists. Thus, by their Motion to Facilitate, Plaintiffs ask that the Court exercise its discretion under Rule 23(d)(1)(B) and order Defendants "to make all reasonable efforts to obtain the waitlists from their Mexican contacts, including, at a minimum, requesting those lists, and produce all waitlists they receive to Plaintiffs." (*See* Mem. 9.)

## II. ANALYSIS

### A. Motion to Seal

Plaintiffs move to seal the declarations of Joanna Williams and Ursela Ojeda, as well as redacted references in their Memorandum thereto. Plaintiffs aver that material contains the names of the consortium partners and information about the nature of each partner's role in implementing the humanitarian exception; disclosure, they attest, would pose danger to the consortium partners and their employees' privacy and security. Because this Court has previously determined compelling reasons justify the nondisclosure of similar identifying information on substantially identical grounds (*see* ECF No. 510, 605, 760), the Court finds sealing warranted. Accordingly, the Motion to seal is **GRANTED**.[7]

### B. Motion to Facilitate

Rule 23(d)(1)(B) allows a court to direct that notice be given in a class action, either upon a motion by a party or on its own initiative, "to protect class members and fairly conduct the action." Fed. R. Civ. P. 23(d)(1)(B). "As examples of the purposes that notice under [Rule 23(d)(1)(B)] might serve," the Rule specifies that the court may direct notice of: (i) "any step in the action'" (ii) "the proposed extent of the judgment"; (iii) "the members' opportunity to signify whether they consider the representation fair and adequate to intervene and present claims and defenses or otherwise come into the action," Fed. R.

---

[7] The Court **TERMINATES AS MOOT** the Motion to Seal to the extent it requests the nondisclosure of the same materials and information that were subject to prior motions to seal the Court granted while the present Motions were pending. (*See* ECF No. 743, 760.)

Civ. P. 23(d)(1)(B)(i)–(iii); Wright & Miller, 7B Fed. Prac. & Proc. Civ. § 1787 (3d ed. 2021). However, this list is non-exhaustive. *See* Rule 23(d)(2) Advisory Committee's Note (1966).

"The sufficiency of [Rule 23(d)(1)(B) notice] is . . . measured against the broader standards of due process to which the class action procedure is of course subject[.]" *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1126–27 (9th Cir. 1977) (citing 3B Moore's Federal Prac. P 23.01, at 23–36 (2d ed. 1977)). "Whether due process commands that nonparty class members be given notice of a particular turn of an action after they have received actual notice of the action itself is dependent upon whether such notice is required *for the fair representation of their interests*." *Id.* (citing *Hansberry v. Lee*, 311 U.S. 32 (1940)) (emphasis added). "In this respect the trial court has an obligation to those not before it to ensure that they are apprised of proceedings that may finally affect them; and pursuant to this responsibility the court is vested with broad administrative as well as adjudicative power." *Id.* (citing *Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 832 (3d Cir. 1973).

It is well-settled that ancillary to a court's authority to order notice under Rule 23(d)(1)(B) is its authority "in appropriate circumstances to require a defendant's cooperation in identifying the class members to whom notice must be sent." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 355–56 (1978) ("[Class] identification simply is another task that must be performed in order to send notice[.]"); *In re Victor Techs. Sec. Litig.*, 792 F.2d 862, 865 (9th Cir. 1986) (holding power to compel class-action defendants to compile and produce list of class members arises from Rule 23, not the discovery provisions of Rule 26(b)).

Plaintiffs aver that their humanitarian exception notice fits within the types of notice courts have discretion to order under Rule 23(d)(1)(B) and, thus, this Court can—and should—issue an order compelling class-identification discovery from Defendants to aid Plaintiffs in effectuating such notice. (Mem. 7–9.) Specifically, Plaintiffs claim that the humanitarian exception notice falls within this Court's assertedly unlimited discretion to

- 9 -

17cv2366

issue orders under Rule 23(d)(1)(B) to "protect class members." Defendants disagree. They claim that this Court is without textual basis under Rule 23(d)(1)(B) to order either party to issue the humanitarian exception notice. Defendants further argue that Rule 23(d)(1)(B)'s conferral of discretion to district courts to grant notice to "protect class members" does not include the power to fashion orders that "advance the asserted substantive rights of class members," which is exactly what the humanitarian exception notice does. Accordingly, Defendants argue that because Rule 23(d)(1)(B) does not confer this Court with authority to order either party to issue the humanitarian exception notice, any attendant discovery order in connection with that notice, too, would be unauthorized. (Opp'n 9–11.)

Plaintiffs' argument is premised upon the insinuation that there is no limitation to the notice a district court may authorize pursuant to Rule 23(d)(1)(B) to "protect class members."[8] That assertion is incongruent with Ninth Circuit law. As the Ninth Circuit has instructed, the question whether notice under Rule 23(d)(1)(B) is warranted depends on whether such notice would advance class members' due-process rights to fair representation in the class action. *See In re Gypsum Antitrust Cases*, 565 F.2d at 1126–27. Plaintiffs' submission fails to indicate how the humanitarian exception notice bears upon *AOL* Class members' ability to participate in or be kept apprised of the instant action, or

---

[8] Notably, Plaintiffs rely heavily upon an excerpt from Wright & Miller, 7B Fed. Prac. & Proc. § 1786 ("Wright & Miller") for the proposition that Rule 23(d)(1)(B) authorizes courts to direct class notice to protect the rights of class members "whenever there is a question of the need to do so." (Opp'n 7.) However, this excerption omits key, contextual language. The full quotation upon which Plaintiffs rely provides:

> As is discussed under subdivision (d)(2), the court should utilize its authority freely to protect the rights of the absentee members whenever there is any question of the need to do so *in order that a judgment in Rule 23(b)(1) or a Rule 23(b)(2) action may be binding on all class members.*

Wright & Miller, 7B Fed. Prac. & Proc. § 1786 (emphasizing portions omitted from Memorandum). Because Plaintiffs do not aver the humanitarian exception notice is required "in order that a judgment in Rule 23(b)(1) or a Rule 23(b)(2) action may be binding on all class members," its reliance upon Wright & Miller is misplaced.

otherwise advances members' due-process rights to "fair representation" in the instant class action. Indeed, it appears to this Court that the notice Plaintiffs intend to provide is aimed only at advancing *AOL* Class members' end-goal to obtain lawful entry to the United States. But Rule 23(d)(1)(B) authorizes "notice to protect class members' rights to participate in the litigation[;] it does not authorize substantive orders protecting the very rights class members seek to vindicate." *Cobell v. Kempthorne*, 455 F.3d 317, 324–325 (D.C. Cir. 2006).

The Court notes that Plaintiffs do not point to any case in which a court has deployed Rule 23(d)(1)(B) in a manner remotely similar to the humanitarian exception notice Plaintiffs seek to provide here. Indeed, this Court is well-aware that Rule 23's advisory committee notes provide that the instances in which it may order notice pursuant to that Rule are not restricted to the specific occasions set forth in sub-provisions (i) through (iii). Wright & Miller, Fed. Prac. & Proc. § 1793 ("[Rule 23(d)(1)(B)] is designed as a general statement of equitable powers that federal courts had even prior to the addition of the subdivision as part of the 1966 amendment of Rule 23.") Rule 23(d)(1)(B) is frequently used to send notice to class members for the purpose of, *inter alia*, "poll[ing] members on a proposed modification of a consent decree"; "notify[ing] class members of the deadline to file statements of intention to present claims"; "notify[ing] interested governmental agencies of class information"; and notifying class members of an injunction. *See* Herbert B. Newberg, *Orders in the Conduct of Class Actions: A Consideration of Subdivision (d)*, 10 B.C.L. Rev. 577, 595 (1969); *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1236 (9th Cir. 1999). However, the humanitarian exception notice does not fall within or adjacent to any of the types of notice recounted above. Rather, humanitarian exception notice Plaintiffs intend to provide *AOL* Class members amounts to the communication of substantive legal advice about matters unrelated to the instant proceeding. Nowhere does Rule 23's advisory committee notes suggest that Rule 23(d)(1)(B) requires or permits such notice.

To the extent Plaintiffs argue that notice is warranted because the Title 42 Order is just "the latest iteration of the Government's Turnback Policy" and, thus, would inform

*AOL* Class members of a "step in the action" (Reply 4), the Court is not persuaded. This argument is predicated upon a mischaracterization of Defendants' Turnback Policy. This Court does not, nor has it ever, construed the Turnback Policy so broadly as to encompass *any* Government action restricting the *AOL Class* members' rights to enter the United States. Indeed, the operative Complaint alleges that the Turnback Policy is a policy adopted by CBP under which "lower-level [CBP] officials directly or constructively turn back asylum seekers . . . based on purported—but ultimately untrue—assertions that there is a lack of 'capacity' [at the POE] to process [asylum seekers]." (Second Am. Compl. ¶ 3, ECF No. 189.) The Title 42 Order is an entirely different legal barrier to the U.S. asylum process—implemented by the CDC, not the CBP, and predicated upon the CDC's purported statutory authority under 42 U.S.C. §§ 265 and 268 to suspend the U.S. asylum in order to prevent the spread of a communicable disease, not upon the need to preserve CBP's resources. In fact, Plaintiffs themselves admit in other filings that the Title 42 Order entirely different issue from the Turnback Policy in this action. (*See* Pls. Supplemental Br. 10 ("While Plaintiffs doubt that the government's recent regulations promulgated under the guide of Title 42 have a sufficient legal basis, the legality of the government's orders purporting to restrict the inspection and processing of asylum seekers under Title 42 are being litigated in other courts . . . The Court need not wade into that debate to resolve this case, and Plaintiffs are not asking this Court to do so."); *id.* at 2 (Plaintiffs are not challenging [the Title 42 Order] in this case.").) Thus, the humanitarian exception notice does not seek to apprise the *AOL* Class members of any occurrence in *this action* at all.

Finally, the Court observes that Plaintiffs heavily cite a list of cases standing for the proposition that Rule 23(d)(1)(B) authorizes courts to compel discovery from class-action defendants to aid with the class identification required for notice to go out. (Reply 2–3 & n.2). However, as the parties agree, and the Supreme Court has made clear, a court's authority to issue an order compelling discovery of class-identifying materials is contingent upon its authority to issue the notice for which such discovery is sought. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 356 (1978). In each of the cases to which Plaintiffs

cite, Rule 23 discovery was premised upon there being a valid basis for class notice—either under Rule 23(c) or the statute under which the cause of action arose. *See Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 168–70 (1989) (involving Rule 23(c)(2) notice); *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig.*, No. 09-md-2023 (BMC), 2012 WL 4747441, at *2–3 (E.D.N.Y. Oct. 4, 2012) (Rule 23(e) notice); *Curtis v. Scholarship Storage Inc.*, No. 2:14-cv-303-NT, 2015 WL 1241365, at *5 (D. Me. 2015) (Rule 23(c)(2) notice). Because this Court lacks authority under Rule 23(d)(1)(B) to require the humanitarian exception notice, so, too, does it lack authority to issue any discovery orders to effectuate such notice.

Accordingly, the Motion to Facilitate is **DENIED**.

### III. CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiffs' Motion to Seal and **DENIES** Plaintiffs' Motion to Facilitate. (ECF Nos. 718, 720.) The Court further **ORDERS** the Clerk of Court to accept and file under seal the proposed seal lodged documents. (ECF No. 719.)

**IT IS SO ORDERED.**

**DATED: March 8, 2022**

Hon. Cynthia Bashant
United States District Judge