# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

AL OTRO LADO, INC.; ABIGAIL DOE, BEATRICE DOE, CAROLINA DOE, DINORA DOE, INGRID DOE, URSULA DOE, JOSE DOE, ROBERTO DOE, MARIA DOE, JUAN DOE, VICTORIA DOE, BIANCA DOE, EMILIANA DOE, AND CESAR DOE, individually and on behalf of all others similarly situated,

                                                 Plaintiffs,

        v.

ALEJANDRO MAYORKAS, Secretary, U.S. Department of Homeland Security, in his official capacity; CHRIS MAGNUS, Commissioner, U.S. Customs and Border Protection, in his official capacity; PTEER FLORES, Executive Assistant Commissioner, Office of Field Operations, U.S. Customs and Border Protection, in his official capacity,

                                                 Defendants.[1]

Case No. 17-cv-02366-BAS-KSC

**ORDER:**

**(1)  GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTIONS SEEKING CLARIFICATION OR MODIFICATION OF THE PRELIMINARY INJUNCTION AND CLARIFICATION ORDER (ECF Nos. 644, 736);**

**(2)  CONVERTING PRELIMINARY INJUNCTION INTO A PERMANENT INJUNCTION; AND**

**(3)  DENYING PLAINTIFFS' REQUEST FOR OVERSIGHT (ECF No. 736)**

---

[1] Because all Defendants are sued in their official capacities, the successors for these public offices are automatically substituted as Defendants per Federal Rule of Civil Procedure 25(d).

- 1 -

In an Opinion dated November 19, 2019, this Court enjoined Defendants from applying 8 C.F.R. § 208.13(c)(4), known more commonly as the "Asylum Ban," to the immigration proceedings of members of a provisionally certified class comprised of "all non-Mexican asylum seekers who were unable to make a direct asylum claim at a [United States] [port of entry] before July 16, 2019 because of the [United States] Government's metering policy" ("P.I. Class"). (Prelim. Inj. at 36, ECF No. 330.) On October 30, 2020, this Court issued a Clarification Order elucidating what is required to remain in compliance with the Preliminary Injunction. (Clarification Order, ECF No. 605.) The Clarification Order established that the Preliminary Injunction applies both to Defendants *and* the Executive Office of Immigration Review ("EOIR," together with Defendants, the "Government"). (*Id.* at 24–25.) It also explained that the Preliminary Injunction requires the Government to: (1) "make all reasonable efforts to identify" members of the P.I. Class; (2) provide notice to P.I. Class members in Department of Homeland Security ("DHS") custody or "in administrative proceedings" of their potential "membership and the existence and import of the Preliminary Injunction"; and (3) "take immediate affirmative steps to reopen or reconsider" prior asylum determinations of P.I. Class members that were predicated upon the Asylum Ban. (*Id.*)

Since October 30, 2020, the Government has developed procedures at various stages of the immigration process with the aim of effectuating the directives of the Clarification Order. The Government has begun to implement many of these procedures and represents that it soon plans to implement those that have yet to be administered. (*See generally* First Decl. of Katherine J. Shinners ("First Shinners Decl.") ¶ 8, ECF No. 758-1.)

Nevertheless, in two separate motions before this Court, Plaintiffs challenge various aspects of the Government's procedures as falling short of the Clarification Order's requirements for P.I. Class-member identification, notice, and immigration case re-opening and re-consideration. (*See* Pls.' Mot. to Enforce Prelim. Inj. & Clarification Order ("Enforcement Mot."), ECF No. 644; Mem. in Supp. of Enforcement Mot. ("Enforcement Mem."), ECF No. 646; Pls.' Mot. to Oversee Prelim. Inj. & Clarification Order ("Oversight

Mot."), ECF No. 736; Mem. in Supp. of Oversight Mot. ("Oversight Mem."), ECF No. 736-1; *see also* Pls.' Statement ¶¶ 1–16, Joint Status Report at 1–2, ECF No. 803.) Plaintiffs seek "enforcement" of the Preliminary Injunction and Clarification Order in the form of an order (1) finding the challenged aspects of the Government's procedures noncompliant and (2) adopting Plaintiffs' interpretation of the Clarification Order's directives. (Enforcement Mot.; Oversight Mot.)

Additionally, Plaintiffs seek to convert into a permanent injunction the Preliminary Injunction, inclusive of the Clarification order and any other clarification and/or modification relief this Court issues here, as well as an order appointing Magistrate Judge Karen S. Crawford special master pursuant to Federal Rule of Civil Procedure ("Rule") 53 to oversee and monitor the Government's compliance therewith.[2] (Proposed Order ¶¶ 4, 8, ECF No. 773-4.)

For the reasons explained below, the Court construes Plaintiffs' pending motions as ones to clarify and/or modify the Clarification Order and Preliminary Injunction, which this Court **GRANTS IN PART** and **DENIES IN PART**, as set forth in Section III.A. (*See* ECF Nos. 644; 736.) Furthermore, the Court **GRANTS** Plaintiffs' request for to convert the Preliminary Injunction into a permanent injunction but **DENIES** Plaintiffs' request for appointment of a special master.

## I.   BACKGROUND

The Court presumes the parties' familiarity with the factual and procedural history of this case. That history is incorporated by reference hereto and repeated only to the extent necessary to frame the issues placed before the Court by Plaintiffs' Enforcement and Oversight Motions. (*See* Prelim. Inj. at 1–7; Clarification Order at 1–7.)

//

---

[2] Plaintiffs also request other permanent injunctions to vindicate the statutory and constitutional violations found in this Court's September 2, 2021 opinion granting in part and denying in part the parties' cross-motions for summary judgment ("MSJ Opinion") (ECF No. 742). (*See* Proposed Order ¶¶ 2–3.) Those requests are addressed in the Remedies Opinion, filed contemporaneously with this Opinion. (Remedies Opinion, ECF No. 817.)

### A.   Procedural History

Plaintiffs commenced this action in 2017, alleging, *inter alia*, that Defendants' "Turnback Policy" violates Section 706 of the Administrative Procedures Act ("APA") and, thus, deprives the *AOL* Class of their Fifth Amendment due process right to access the U.S. asylum process.[3,4]   (Second Am. Compl. ("SAC") ¶ 3; *see id.* ¶¶ 256–59, 283–92.) Plaintiffs allege that the "Turnback Policy" was a formal policy "to restrict access to the asylum process" at Class A Ports of Entry ("POEs"), pursuant to which low-level CBP officials were ordered to "directly or constructively turn back asylum seekers at the [U.S.-Mexico] border." (*Id.* ¶ 3.)   The Turnback Policy included a "metering" or "waitlist" system, which involved instructing asylum seekers "to wait on the bridge, in the pre-inspection area, or a shelter," or simply telling asylum seekers that "they [could not] be processed because the [POE] [was] 'full' or 'at capacity[.]'" (*Id.*)   Accordingly, asylum seekers who arrived at Class A POEs often were unable to pursue asylum at the time they presented themselves, and instead had to wait indeterminate lengths of time for Defendants to reopen POEs for asylum processing.   (*See id.* ¶¶ 1–3.)

On July 16, 2019, while this action was pending, the DHS promulgated the Asylum Ban.  *See* 84 Fed. Reg. 33,829 (July 16, 2019), *codified at* 8 C.F.R. § 208.13(c)(4).   Among other things, the Asylum Ban rendered ineligible for asylum noncitizens who entered, attempted to enter, or arrived at the U.S.-Mexico border after transiting through at least one

---

[3] The plaintiff class (defined above as, "*AOL* Class") consists of "all noncitizens who seek or will seek to access the U.S. asylum process by presenting themselves at a Class A Port of Entry on the U.S.-Mexico border, and were or will be denied access to the U.S. asylum process by or at the instruction of [Customs and Border Protection ("CBP")] officials on or after January 1, 2016." (Class Certification Order at 18, ECF No. 513).   The Court also certified a subclass consisting of "all noncitizens who were or will be denied access to the U.S. asylum process at a Class A POE on the U.S.-Mexico border as a result of Defendants' metering policy on or after January 1, 2016." (*Id.*)

[4] This Court has since granted summary judgment in favor of Plaintiffs on these claims.  (Summary Judgment Order, ECF No. 742.)   As previously mentioned, *supra* note 2, this Court's Remedies Opinion, which issues relief tailored to address these violations, is filed concurrently herewith at ECF No. 816.

country other than their country of origin without applying for humanitarian protection in that country ("Transit Rule").[5]  *Id.*

On September 26, 2019, Plaintiffs moved to preliminarily enjoin application of the Asylum Ban to P.I. Class members, arguing that the "[Transit Rule] would not have affected [P.I. Class members' eligibility for asylum] but for Defendants' illegal use of metering, which forced [P.I. Class members] to stay in Mexico longer than they otherwise would have," *i.e.*, until July 16, 2019 or later.  (Pls.' Mot. for Prelim Inj. at 7–8, ECF No. 294-1.)  This Court granted Plaintiffs' application on November 19, 2019 in its Preliminary Injunction, which states:

> Defendants are hereby **ENJOINED** from applying the Asylum Ban to members of the [P.I. Class] and **ORDERED** to return to the pre-Asylum Ban practices for processing the asylum applications of members of the [P.I. Class].

(Prelim. Inj. at 36.)[6]

In July of 2020, citing what they believed to be deficiencies in Defendants' compliance procedures, Plaintiffs sought clarification of the Preliminary Injunction.  (Pls.' Mot. for Clarification, ECF No. 494.)  On October 30, 2020, this Court granted Plaintiffs' application and clarified the Preliminary Injunction as follows:

> (1)    EOIR is bound by the terms of the [P]reliminary [I]njunction [("Paragraph 1")];

> (2)    DHS and EOIR must take immediate affirmative steps to reopen and reconsider past determinations that potential [P.I.] [C]lass members

---

[5] By its express terms, the Asylum Ban applied only to the immigration proceedings of individuals who entered, attempted to enter, or arrived at the U.S.-Mexico border on or after July 16, 2019.  8 C.F.R. § 208.13(c)(4).  It did not apply retroactively.  *Id.*

[6] Defendants appealed the Preliminary Injunction and sought an emergency stay.  On December 20, 2019, the Ninth Circuit administratively stayed the Preliminary Injunction pending resolution on the merits of Defendants' stay application.  (ECF No. 369.)  Following oral argument, the Ninth Circuit lifted the stay on March 5, 2020.  *Al Otro Lado v. Wolf*, 952 F.3d 999, 1013 (9th Cir. 2020).  The Ninth Circuit held oral argument on the underlying appeal on July 20, 2020; that appeal still is pending.  *See Al Otro Lado et al. v. Chad Wolf, et al.*, No. 19-56417 (9th Cir. Dec. 5, 2019), Dkt. Nos. 97, 105.

were ineligible for asylum based on the Asylum Ban, for all potential class members in expedited or regular removal proceedings. Such steps include identifying affected class members and either directing immigration judges or the [Board of Immigration Appeals ("BIA")] to reopen or reconsider their cases or directing DHS attorneys representing the government in such proceedings to affirmatively seek, and not oppose, such reopening or reconsideration [("Paragraph 2")];

(3) Defendants must inform identified [P.I. Class] members in administrative proceedings before [United States Citizenship and Immigration Services ("USCIS")] or EOIR, or in DHS custody, of their potential [P.I.] [C]lass membership and the existence and import of the [P]reliminary [I]njunction [("Paragraph 3")]; and

(4) Defendants must make all reasonable efforts to identify [P.I. Class] members, including but not limited to reviewing their records for notations regarding class membership made pursuant to the guidance issued on November 25, 2019, and December 2, 2019, to [U.S. Customs and Border Protection] CBP and [CBP's Office of Field Operations ("OFO")], respectively, and sharing information regarding [P.I. Class] members' identities with Plaintiffs [("Paragraph 4")].

(Clarification Order at 24–25.)[7]

Crucially, in *Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020) ("*C.A.I.R.*"), the Asylum Ban was deemed legally invalid and, thus, vacated, on June 30, 2020. *See id.*, 471 F. Supp. 3d at 25, *appeal dismissed as moot I.A. v. Garland*, No. 20-5271, 2022 WL 696459, at *1 (D.C. Cir. Feb. 24, 2022). The Government avers that after June 30, 2020, "the Asylum Ban should not have been applied to anyone." (First Shinners Decl. ¶ 8.)

//

//

---

[7] As with the Preliminary Injunction, the Government sought a stay of the Clarification Order, which the Ninth Circuit granted in part but lifted shortly thereafter. *See Al Otro Lado et al. v. Chad Wolf, et al.*, No. 20-56287 (9th Cir. Dec. 4, 2020), Dkt. Nos. 15, 30. The Government's underlying appeal of the Clarification Order remains pending alongside their appeal of the Preliminary Injunction. *Id.*, Dkt. 62. Those appeals were consolidated on May 26, 2022. *See Id.*, Dkt. 72.

17cv2366

**B.     The Government's Preliminary Injunction
and Clarification Order Compliance Procedures**

The Government has developed and implemented, or soon plans to implement, procedures at various stages of immigration proceedings to (1) identify potential P.I. Class members; (2) provide notice to those individuals; and (3) screen potential P.I. Class members to determine (a) whether they, in fact, meet the criteria for P.I. Class membership and, if so, (b) whether their cases are eligible for reopening and reconsideration.

**1.     Identifying Potential P.I. Class Members**

On November 20, 2020, the Government queried CBP's electronic system of records to identify "all non-Mexican aliens encountered along the southwest border by both [U.S. Border Patrol ("USB")] and OFO, with an encounter date of July 16, 2019 through June 30, 2020, who were processed for expedited removal, expedited removal/credible fear, or a notice to appear[.]"  (Decl. of Jay Visconti ("Second Visconti Decl.") ¶ 5 (attesting CBP STAT Division "queried available data from the relevant systems of record for all records based on the requested criteria"), ECF No. 695-2.)  The Government then narrowed this list to individuals who:  "(1) as of February 1, 2021, the electronic records of EOIR indicated that the individual filed for [a]sylum, [w]ithholding, or the [c]onvention against [t]orture before EOIR on or after July 16, 2019, and that a decision had been entered on that application; (2) were noted as being originally processed by CBP for [expedited removal/credible fear]; or (3) as of January 11, 2021, USCIS ha[d] an electronic record of the individual in the Asylum Division's case management system (other than records reflecting a Migrant Protection Protocols case or a Reasonable Fear case)."  (*See* First Shinners Decl. ¶ 24; *see* Decl. of Katherine J. Shinners ("Second Shinners Decl.") ¶¶ 3–4, Ex. 1 to Unopposed Mot. to Correct, ECF No. 784-2.)[8]

---

[8] The Court **GRANTS** Defendants' Unopposed Motion to Correct, which identifies, and seeks to amend and correct, a misstatement in Defendants' Oversight Opposition respecting the parameters of its query for potential P.I. Class members.  (ECF No. 784.)

The Government compiled names of individuals who met each of the above-mentioned criteria into a "Master List."  (First Shinners Decl. ¶ 24.)  The individuals whose names appear on the Master List are deemed "potential" P.I. Class members by the Government; USCIS and/or EOIR assesses those individuals for P.I. Class-membership and entitlement to relief under the Preliminary Injunction pursuant to the procedures set forth below, *infra* Sec. I.B.2.  (Decl. of Andrew J. Davidson ("Davidson Decl.") ¶¶ 4–5 (USCIS), ECF No. 758-2; First Decl. of Jill W. Anderson ("First Anderson Decl.") ¶ 4, ECF No. 695-6 (EOIR).)  The Master List is also used to facilitate notice to potential P.I. Class members.  (First Shinners Decl. ¶ 24; Davidson Decl. ¶¶ 4–5; First Anderson Decl. ¶ 4.)

### 2.    P.I. Class Membership Determinations and Affirmative Steps to Reopen and Reconsider Eligible Cases

#### a.    ICE

On November 6, 2020, Immigration and Customs Enforcement ("ICE") directed its Enforcement and Removal Operations ("ERO") division to "suspend all removals . . . pending further screening by USCIS" of individuals appearing on a list consisting of non-Mexican noncitizens in DHS custody who had a final order of removal issued between July 16, 2019 and June 30, 2020.  (Decl. of Robert Guadian ("Gaudian Decl.") ¶ 5, ECF No. 695-5; Guidance Regarding *Al Otro Lado v. McLeenan*, 423 F. Supp. 3d 848 (Nov. 19, 2019) ("ICE P.I. Notice"), Ex. 1 to Guadian Decl., ECF No. 695-5.)[9]  On November 13, 2020, ICE distributed to ERO additional guidance, entitled "Review of Cases for Potential Membership in the Provisionally Certified Class" ("ICE Interim P.I. Guidance").  (*See* ICE Interim P.I. Guidance, Ex. 2 to Guadian Decl.)  The ICE Interim P.I. Guidance essentially forbids ERO from removing noncitizens in DHS custody who possibly could qualify as P.I. Class members, while "enabl[ing] removal operations to proceed" with respect to noncitizens in DHS custody who, based on agreed-upon, objective criteria, could not

---

[9] All exhibits to the Guadian Declaration are annexed at ECF No. 695-5.

possibly qualify for P.I. Class membership.  (*Id.* at 2–3 (listing 10 agreed-upon P.I. Class exclusionary criteria, which, if just one is found present in a given case, authorizes ERO to proceed with removal); Guadian Decl. ¶¶ 5–6; Decl. of Elizabeth Mura ("Mura Decl.") ¶¶ 3, 5, ECF No. 695-3.)

On January 15, 2021, ICE issued updated guidance instructing ERO to "[c]ontinue to screen cases at imminent risk of removal using the [ICE Interim P.I. Guidance]" and to refer immediately to USCIS for "further class membership screening" those individuals who "d[o] not meet any of the exclusion[ary] criteria."  (Further Guidance on *Al Otro Lado* Compliance ("ICE Referral Guidance"), Ex. 3 to Guadian Decl.)  The ICE Referral Guidance, which remains in effect, requires ERO to, *inter alia*, serve upon individuals whom it refers to USCIS for P.I. Class membership screening "a copy of the Notice of Potential Class Membership in Cases Subject to Removal," notify USCIS of the referral, and provide USCIS with documentation in ICE's possession that could bear upon P.I. Class membership.  (ICE Referral Guidance at 2.)  Additionally, as of April of 2022, DHS has posted notice concerning the Preliminary Injunction and its import in all ICE detention facilities.  (Joint Status Report at 5.)

### b.   USCIS

#### i.   Procedures for Potential P.I. Class Members with Final but Unexecuted Orders of Removal

The USCIS has delineated a framework (1) to make P.I. Class-membership determinations for individuals with final but unexecuted orders of removal and (2) to assess what form of reopening and/or reconsideration relief is warranted for those individuals who qualify for P.I. Class status ("USCIS Guidance").  (Mura Decl. ¶¶ 3, 4, 7; *see* ECF No. 695-3; Email of Andrew Davidson re: "*Al Otro Lado* Preliminary Injunction Guidance" ("Davidson Email"), Ex. 1 to Mura Decl.; USCIS *AOL* Preliminary-Injunction Class

Membership Screening Guidance ("Non-detained P.I. Class Screening Procedures"), Ex. 2 to Mura Decl., ECF No. 758-2).)[10]

P.I. Class-Membership Determinations: USCIS asylum officers undertake P.I. Class-membership determination interviews for two sets of potential P.I. Class members: (1) those in ICE custody who were referred to USCIS by ICE pursuant to the ICE Referral Guidance; and (2) those named in the Master List who (a) are not in ICE custody; (b) were issued final orders of removal, (c) have not yet been removed; and (d) were last located inside the United States according to ICE data. (Mura Decl. ¶¶ 3, 5–6.)

Prior to a P.I. Class-membership interview, asylum officers must review DHS records for any evidence that might bear upon an interviewee's P.I. Class membership, *i.e.*, evidence that the interviewee was metered prior to the relevant pre-Asylum Ban period. (*See* Non-detained P.I. Class Screening Procedures at 2.) Specifically, asylum officers must "[n]ote whether the [interviewee's] name seems to appear on one of the . . . waitlists [in the Government's possession] . . . that may indicate [the interviewee's] presence in a Mexican border town[.]"[11] (*Id.* at 2–3.) Asylum officers also review, *inter alia*, any Form I-213s, I-867A/Bs, and I-877s in an interviewee's case file. (*Id.* at 4.) Finally, asylum officers examine an interviewee's case file to assess whether he or she "was previously

---

[10] All exhibits to the Mura Declaration are annexed to ECF No. 758-2. Although the Government proffers only the document for Non-detained P.I. Class Screening Procedures, it attests that USCIS implements substantially identical procedures for potential P.I. Class members in DHS custody. (Mura Decl. ¶ 7.)

[11] As explained in this Court's March 8, 2022 Order, "[i]n response to the growing backlog of asylum seekers [in Mexican border cities], Mexican federal and municipal officials and shelter workers . . . Mexican border cities began collecting the names, nationalities, and contact information of migrants awaiting processing, and compiled that information into 'waitlists.'" (Class Facilitation Order at 4, ECF No. 800.) Although the Government did not create or administer these waitlists, it is undisputed that the Government relied upon them to call asylum seekers waiting in Mexican border towns to Class A POEs for asylum inspection and referral. *See Al Otro Lado*, 952 F.3d at 1008. According to Plaintiffs, waitlists operated in at least the Mexican border cities and towns of Agua Prieta, Ciudad Acuña, Ciduad Juárez, Matamoros, Mexicali, Nogales, Nuevo Laredo, Piedras Negras, Reynoso, San Luis Rio Colorado, Tijuana. (Class Facilitation Order at 4 n.4.) However, the Government possesses only a fraction of the waitlists that were in operation during the Asylum Ban period. These were provided to the Government either by Plaintiffs' counsel or Mexico's federal immigration agency ("INAMI"). (Non-detained P.I. Class Screening Procedures at 1 n.2 and 3 n.6.)

asked class membership screening questions" in connection with the Government's prior P.I. Class-membership screening process, which was instituted immediately after the Preliminary Injunction.  If so, asylum officers must note "whether the responses contained evidence of [P.I.] [C]lass membership or evidence that would tend to negate [P.I.] [C]lass membership."  (*Id.* at 4; *see also* First Shinners Decl. ¶ 13 (describing briefly USCIS's pre-Clarification Order screening procedures).)

At the P.I. Class-membership interview, asylum officers ask interviewees a set of scripted questions "to determine whether the individual sought to enter the United States at a [Class A POE] to seek asylum before July 16, 2019" but was prevented from doing so because of the Government's Turnback Policy.  (USCIS *AOL* Preliminary-Injunction Class Member Screening Interview Questions ("Amended Screening Questions"), Ex. 4 to Mura Decl.; Non-detained P.I. Class Screening Procedures at 4.)  The USCIS Guidance explicitly instructs asylum officers to ask these Amended Screening Questions even if the interviewee was previously interviewed in connection with USCIS's prior screening procedures.  Furthermore, it forbids asylum officers from using the scripted interview questions ("Initial Screening Questions") that were deployed in USCIS's prior screening procedures.  (*See* Initial Screening Questions, Ex. 1 to Enforcement Mot., ECF No. 644-3 (setting forth P.I. Class screening questions developed by USCIS immediately following Preliminary Injunction); *see also* Non-detained P.I. Class Screening Procedures at 4; *see also* Davidson Email at 2 ("As of today, asylum officers must *no longer use* the USCIS *AOL* metering questions distributed by Deputy Chief Ashley Caudill-Mirillo on November 24, 2019 [Initial Screening Questions].") (emphasis in original).)  At the conclusion of the interview, asylum officers must solicit from interviewees any additional evidence of P.I. Class membership they wish to submit.  (Amended Screening Questions ¶ 10.)

After the P.I. Class-membership interview, "the asylum officer must determine if the [interviewee] has established he or she is more likely than not [a P.I. Class] member."  (Non-detained P.I. Class Screening Procedures at 5; Mura Decl. ¶ 16.)  "Documentary evidence of [P.I.] [C]lass membership is not required to meet this standard."  (Non-detained

P.I. Class Screening Procedures at 5.)   However, documentary evidence of P.I. Class membership—"including but not limited to, documentation of a stay in a shelter or hotel in a Mexican border town/city during the relevant pre-[Asylum Ban] time period[,] documentation regarding the placement of a name on a waitlist during the relevant pre-[Asylum Ban] time period[,] and declarations, affidavits, or the individual's own statements regarding whether they may have been subject to metering during the relevant pre-[Asylum Ban] time period"—"will *generally be sufficient* to establish" P.I. Class membership.  (*Id.* (emphasis added).)

The USCIS Guidance permits asylum officers to consider "contradictory evidence" in an interviewee's DHS records or testimony, including testimony elicited in response to the Initial Screening Questions.  (*Id.*)  Indeed, while the USCIS Guidance instructs asylum officers "not [to] rel[y] on the results of prior [P.I] class membership screenings to exclude individuals from consideration for [P.I.] [C]ass membership," it also states asylum officers may consider "an individual's prior statements in prior screening interviews" in deciding whether an interviewee establishes P.I. Class membership.  (First Shinners Decl. ¶ 13; *see* Non-detained P.I. Class Screening Procedures at 6.)

The USCIS Guidance deems "generally sufficient" for establishing P.I. Class membership the presence of a potential P.I. Class member's name on a metering waitlist pre-dating the Asylum Ban.  (Non-detained P.I. Class Screening Procedures at 4–5.)  However, the USCIS Guidance explicitly confers asylum officers discretion to "giv[e] greater weight" to an individual's own statements—including those elicited at a prior P.I. Class-membership screening—that are "clearly and unequivocally contradict[ory]" of P.I. Class membership status.  (*Id.* at 5; *see also id.* at 3 n.6 ("These [metering waitlists] may not be reliable, accurate, or comprehensive lists of those who were waiting to enter the United States through a [POE] at any given time.").)

The USCIS Guidance further prescribes that "[t]he absence of an individual's name on a waitlist should not be used to conclude that the individual is not a [P.I.] [C]lass member where there is other credible evidence of [P.I.] class membership, including but

17cv2366

not limited to the individual's own testimony." (*Id.* at 6.)  The USCIS Guidance explains that such flexibility is necessary in part because the Government only has incomplete waitlists from four Mexican border cities and towns and none of the waitlists from the other seven Mexican border cities and towns in which such a system was known to operate.  (*Id.* at 5–6.)

If, after an interview, an asylum officer concludes an interviewee fails to satisfy the standard for P.I. Class membership, a negative P.I. Class-membership determination will issue.  (Non-detained P.I. Class Screening Procedures at 6–7.)  However, if the asylum officer finds the interviewee establishes that he or she is more likely than not a P.I. Class member, the asylum officer must proceed to the second strand of the USCIS Guidance's framework:  identifying the appropriate form of relief to administer.  (*Id.* at 7.)

<u>Reopening and Reconsideration Relief</u>:  The USCIS Guidance instructs asylum officers to ascertain whether the Asylum Ban was applied to deny asylum in the cases of identified P.I. Class members and, if so, at which stage in immigration proceedings.  (Mura Decl. ¶¶ 16–17.)  In the case of a P.I. Class member to whom USCIS previously applied the Asylum Ban during his or her credible fear interview, the USCIS Guidance mandates that the case be reopened, the prior negative fear determination be vacated, and the responsible asylum officer reconduct the new credible fear interview and make a new credible fear determination without applying the Transit Rule.  (*See id.* ¶ 17.)  In the case of a P.I. Class member to whom an EOIR immigration judge ("IJ") previously applied the Asylum Ban during review of the USCIS's negative fear determination, the USCIS Guidance confers jurisdiction to EOIR for the purpose of fashioning reopening or reconsideration relief.  The asylum officers merely must re-issue the negative fear determination paperwork, re-refer for review the negative fear determination to the IJ, and notify the EOIR of USCIS's determination and referral.  (*Id.* ¶ 17; Non-detained P.I. Class Screening Procedures at 8–9.)  The propriety of reopening and/or reconsideration relief in this second category of cases is governed by the EOIR's procedures delineated below, *see infra* Sec. 1.B.2.c.

### ii.   Procedures for Potential P.I. Class Members Removed from the United States

As of September 2021, USCIS had developed, but not yet implemented, procedures to identify and screen potential P.I. Class members who have been removed pursuant to an expedited removal order and, thus, presumably are no longer located in the United States. (*See* Davidson Decl. ¶ 18.)[12]  This process begins with USCIS querying the Master List to isolate individuals "who received a negative [credible fear] determination where the Asylum Ban was applied and [who] were removed pursuant to an expedited removal order." (*Id.* ¶ 18; *see id.* ¶ 24 ("To identify [removed potential P.I. Class members], USCIS will rely on the same data available in the [M]aster [L]ist[.]").)  Class counsel—not the Government—has agreed to provide notice to these potential P.I. Class members, who then must self-identify by sending directly to USCIS applications for P.I. Class membership in accordance with such notice.  Upon receipt of a potential P.I. Class member's submission is received, a USCIS asylum officer will review the individual's DHS case file and solicit the individual to submit additional evidence.  (*Id.* ¶¶ 20–21, 25–26.)  USCIS will deploy substantially the same process for evaluating evidence to determine P.I. Class membership as set forth above, *see supra* Sec. I.2.b.i, except that potential P.I. Class members who have been removed will not receive an in-person screening interview.  (*Id.* ¶ 26.)

Individuals deemed P.I. Class members will "be provided instructions on further processing, including how to request to return to the [United States] to participate in their immigration case." (Davidson Decl. ¶ 27.)  Specifically, P.I. Class members must submit to DHS a Form I-131, Application for Travel Document; if the application is approved, DHS will send the P.I. Class member a travel letter allowing him or her to board an aircraft and travel to a POE.  (First Shinners Decl. ¶ 35 (citing 8 C.F.R. § 212.5(f)).)  Upon a removed P.I. Class member's arrival at a POE, CBP will inspect and determine how to process the individual depending upon the specific circumstances of his or her case.  (*Id.*)

---

[12] The Government did not state in its section of the Joint Status Report whether USCIS had begun to institute its contemplated procedures for this subset of potential P.I. Class members. (*See* ECF No. 803.)

### c.   EOIR

On October 30, 2020, EOIR's Office of General Counsel ("EOIR-OGC") issued legal guidance to its adjudicators—IJs and the BIA—regarding how to effectuate the directives of the Clarification Order ("EOIR Guidance").  (First Anderson Decl. ¶ 7.)[13] The EOIR Guidance instructs its adjudicators to undertake a *sua sponte* review of the records of proceeding ("ROP") in the cases of individuals identified from the Master List and referred to EOIR by USCIS pursuant to the above-referenced procedures ("ROP Review").  (*Id.* ¶ 4.)  EOIR has also established a collateral process through which potential P.I. Class members themselves can affirmatively move to reopen their cases, notwithstanding the results of the ROP Review.  (Decl. of Jill W. Anderson ("Second Anderson Decl.") ¶ 7, Ex. B to First Shinners Decl., ECF No. 758-3.)

### i.   ROP Review

The ROP Review entails (1) identifying eligible potential P.I. Class members and (2) reviewing the contents of the ROPs in those cases to (a) determine whether those potential P.I. Class members are, in fact, P.I. Class members, and (b) fashion the appropriate reopening and reconsideration relief to P.I. Class members.[14]  (*See* Second Anderson Decl. ¶ 5.)  The potential P.I. Class members subject to the ROP Review includes those individuals identified from the Master List who are in Section 240 removal proceedings, whose application for asylum was denied, and who were encountered by CBP between July 16, 2019 and June 30, 2020.  (*Id.* ¶ 4.)  The ROP Review also encompasses

---

[13] The EOIR Guidance does not refer to a specific document proffered by the Government but rather to a policy about which the Government has attested the details and accuracy.  The EOIR-OGS contends the policy documents are protected by attorney-client privilege and, thus, the Government has chosen not to proffer those papers to this Court.  (First Anderson Decl. ¶ 7.)

[14] The task of conducting an ROP Review is the responsibility of the last entity to issue a decision in a given case, *i.e.*, the IJ or BIA.  (*See* First Anderson Decl. ¶ 15.)  "For example, when an [IJ] issues a decision in an individual's removal proceeding and neither the individual nor DHS appeals the decision to the BIA, the IJ is the last entity to issue a decision and jurisdiction over a motion to reopen would lie with the IJ."  (*Id.*)  "If an IJ's decision is appealed to the BIA, and the BIA is the last entity to issue a decision in the case, the BIA would have jurisdiction to reopen proceedings," with some limited exceptions.  (*Id.*)

P.I. Class members referred to EOIR by USCIS under the process delineated above, *supra* Sec. I.B.2.b.i.  (First Anderson Decl. ¶¶ 9–19; Mura Decl. ¶ 7.)  However, in this second set of cases, adjudicators leave undisturbed USCIS's P.I. Class-membership determination and address only the question of whether reconsideration relief is warranted.  (Mura Decl. ¶ 7.)

To identify P.I. Class members, adjudicators examine the ROP of a potential P.I. Class member's case to determine whether he or she:  (1) is a non-citizen or national of Mexico; (2) most recently entered the United States on or after July 16, 2019; (3) was subject to metering at the southwest border before July 16, 2019; and (4) continues to seek access to the U.S. asylum process.  (First Anderson Decl. ¶ 11.)  During this process, EOIR adjudicators examine only the ROP.  They do not search DHS records to locate additional evidence of metering that was not made part of the ROP.  (First Shinners Decl. ¶ 38; Second Anderson Decl. ¶ 8.)

The EOIR Guidance requires its adjudicators to examine the final order of removal in the cases of individuals deemed P.I. Class members pursuant to the above-referenced procedure to ascertain whether that determination "was based on the Asylum Ban." (Second Anderson Decl. ¶ 5.)  Where the Asylum Ban is listed as a ground for denial, adjudicators must reopen the case and issue a "new decision on the merits."  (First Anderson Decl. ¶ 14.)  The Government attests that it is standard practice for adjudicators to deny applications for asylum "on a number of grounds in the alternative should one of the grounds fail to survive further review."  (*Id.* ¶ 13.)  Thus, it is not uncommon for P.I. Class members' final orders of removal to identify the Asylum Ban, along with other legal bases, as grounds for denying asylum.  (*Id.*)  The EOIR Guidance requires case reopening even where there are alternative grounds for denying asylum listed in the final order of removal.  However, it also confers to adjudicators discretion to issue in reopened cases a new merits decision denying a P.I. Class member's asylum application predicated upon alternative, non-Asylum Ban grounds for denying asylum, if any, identified in the prior order of removal.  (*Id.* ¶¶ 13–14 (explaining "[w]here asylum was denied based on the

- 16 -

17cv2366

Asylum Ban, but the adjudicator alternatively determined that the respondent had not satisfied his or her burden of proving eligibility for asylum on the merits," on reconsideration "the adjudicator [has discretion to] issue an order reopening the proceedings and setting forth the [negative] merits determination in the same order").)

The EOIR-OGC reviews each new decision resulting from ROP Review. (Second Anderson Decl. ¶ 6 ("EOIR-OGC reviews the results of the adjudicator-level review for each filing, including review of the adjudicator's notes and findings, and the individual file if necessary.").) If a deficiency is identified, the case is returned to the pertinent IJ or the BIA for remediation. (*Id.*)

As of September of 2021, the EOIR has completed ROP Review for 1,631 of the 2,117 identified cases. (Second Anderson Decl. ¶ 4.) EOIR adjudicators deemed 1,169 of those cases ineligible for reopening and 462 eligible.[15] Of the 462 cases reopened, in 271 adjudicators found that the Asylum Ban had been applied to deny asylum. (*Id.* ¶ 8.) An additional 46 cases subject to the ROP Review were determined to have "insufficient evidence" to make a P.I. Class-membership determination. (Second Anderson Decl. ¶¶ 4, 8.) The Government is "determining how to best accomplish any further review" respecting these 46 cases. (Shinners Decl. ¶ 38; *see also* Second Anderson Decl. ¶ 8 ("EOIR continues to explore whether and what further review procedures may be necessary for these 46 cases.").)

### ii. Motions to Reopen

In addition to the ROP Review, EOIR established a process for individuals in Section 240 removal proceedings whose applications for asylum were denied to "file an affirmative motion to reopen." (Second Anderson Decl. ¶ 7.) An individual deemed ineligible for relief pursuant to the EOIR's ROP Review is *not* precluded from filing such a motion. (*Id.* ¶ 9.) The EOIR will reopen a case pursuant to the above-described motion practice when

---

[15] The Government cautions the EOIR did not issue positive P.I. Class-membership determinations in all 462 re-opened cases. (Second Anderson Decl. ¶ 8 n.1.) Rather, some of those cases purportedly were reopened based upon adjudicators' "*sua sponte* authority" to do so "for other reasons." (*Id.*)

17cv2366

a movant establishes P.I. Class membership and the movant's ROP indicates the Asylum Ban was applied in his or her immigration case.  (*Id*. ¶ 7.)  If the movant fails to provide sufficient evidence of P.I. Class membership, the EOIR Guidance instructs adjudicators "to solicit additional information pursuant to an order or by conducting a hearing on the motion."  (*Id.*)

The EOIR has in recent months developed a template motion, which it has posted to its website "with instructions and a link to [Plaintiffs' counsel's] website to obtain additional information."  (Joint Status Report at 3 (stating EOIR developed the template motion together with Plaintiffs' counsel).)  "The template motion and instructions . . . provide potential [P.I. Class] members with additional information about their existing right to file motions to reopen[,] to submit additional evidence of class membership[,] and [to] seek reopening or reconsideration."  (*Id.* at 4.)

## C.  Plaintiffs' Pending Motions

In both their Enforcement and Oversight Motions, Plaintiffs identify numerous aspects of the Government's Preliminary Injunction-compliance procedures that purportedly fall short of the Clarification Order's directives for screening P.I. Class members, providing notice to P.I. Class members, and providing P.I. Class members with the reopening and reconsideration relief.  (Enforcement Mem. 13–25; Oversight Mem. at 13–25; Pls.' Statement ¶¶ 1–16.)  Plaintiffs seek to "enforce" the Clarification Order's directives against the Government by requesting that the Court resolve the disputes Plaintiffs have identified and once again clarify or modify the Preliminary Injunction and, moreover, the Clarification Order.

The Government opposes.  It contends its procedures are compliant with both the Preliminary Injunction and Clarification Order. (Opp'n to Enforcement Mot. ("Enforcement Opp'n"), ECF No. 657; Opp'n to Oversight Mot. ("Oversight Opp'n"), ECF No. 758.)  Plaintiffs reply.  (Reply in supp. of Enforcement Mot. ("Enforcement Reply"), ECF No. 665; Reply in supp. of Oversight Mot. ("Oversight Reply"), ECF No. 759.)

Additionally, Plaintiffs seek:  (1) to convert to a permanent injunction the Preliminary Injunction, inclusive of the Clarification Order and any further relief issued here; and (2) to appoint Magistrate Judge Karen S. Crawford special master for the purpose of overseeing the Government's compliance with a permanent injunction.  (*See generally* Oversight Mem; Proposed Order ¶¶ 4, 8.)  The Government opposes both requests.  (*See* Defs.' § 1252(f)(1) Br., ECF No. 813; Oversight Reply.)  Relying upon a newly issued United States Supreme Court decision, the Government contends this Court lacked jurisdiction to issue either the Preliminary Injunction or Clarification Order under 8 U.S.C. § 1252(f)(1) and, thus, lacks jurisdiction to now enter a permanent injunction.  (*See* Defs.' § 1252(f)(1) Br. at 1 (citing *Garland v. Aleman Gonzalez*, 142 U.S. 2057 (2022)).)  The Government further argues that even if injunctive relief is not barred, the Court need not institute procedures for monitoring the Government's compliance, considering it "ha[s] continued to adhere to and progressively implement the terms of the [Preliminary Injunction] and the [Clarification Order]."  (Oversight Opp'n at 17.)

## II.   LEGAL STANDARDS

### A.   Rule 65

"It is undoubtedly proper for a district court to issue an order clarifying the scope of an injunction in order to facilitate compliance with the order and to prevent 'unwitting contempt.'"  *Paramount Pictures Corp. v. Carol Publ'g Grp.*, 25 F. Supp. 2d 372, 374 (S.D.N.Y. 1998) (citing *Regal Knitwear Co. v. Nat'l Labor Relations Bd.*, 324 U.S. 9, 15 (1945)); *Sunburst Prod., Inc. v. Derrick Law Co.*, 922 F.2d 845 (9th Cir. 1991) (Memorandum Disposition) ("The modification or clarification of an injunction lies within the 'sound discretion of the district court[.]'") (citing same).  Rule 65 requires that injunctions be specific "so that those who must obey them will know what the court intends to require and what it intends to forbid."  *Int'l Longshoremen Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1968).  "By clarifying the scope of a previously issued preliminary injunction, a court 'add[s] certainty to an implicated party's effort to comply with the order and provide[s] fair warning as to what future conduct may be found

contemptuous.'"  *Robinson v. Delicious Vinyl Records Inc.*, No. CV 13-411-CAS (PLAx), 2013 WL 12119735, at *1 (C.D. Cal. Sept. 24, 2013) (alterations in original) (quoting *N.A. Sales Co. v. Chapman Indus. Corp.*, 736 F.2d 854, 858 (2d Cir. 1984)).

### B.  Permanent Injunctive Relief

In the Ninth Circuit, a plaintiff who seeks a permanent injunction must satisfy a four-factor test.  *See Kurin, Inc. v. Magnolia med. Techs., Inc.*, No. 3:18-CV-1060-L-LL, 2020 WL 4049977, at *9 (S.D. Cal. July 20, 2020) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  A plaintiff must establish:

> (1) That it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction [(collectively, "*eBay* factors")].

*eBay Inc.*, 547 U.S. at 391.  Where the Government is the party opposing issuance of injunctive relief, the above-mentioned third and fourth factors—balancing of hardships and public interest—merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  This merger requires the Court to examine whether the "public consequences" that would result from the permanent injunction sought favor or disfavor its issuance.  *See Fraihat v. U.S. Immigration & Customs Enf't*, 445 F. Supp. 3d 709, 749 (C.D. Cal. 2020).

Typically, courts hold an evidentiary hearing before converting a previously-ordered preliminary injunction into a permanent one.  *See Charlton v. Estate of Charlton*, 841 F.2d 988, 989 (9th Cir. 1989).  However, no evidentiary hearing is necessary "when the facts are not in dispute."  *Id.*; *see United Food & Commercial Workers Local 99 v. Bennett*, 934 F. Supp. 2d 1167 (D. Ariz. Mar. 29, 2013) (holding that where plaintiffs had satisfied the *eBay* factors in their prior order "and nothing in the record indicates that the circumstances have changed," no evidentiary hearing is necessary).

//
//

## C.    Rule 53

"The appointment of a Special Master, with appropriately defined powers, is within both the inherent equitable powers of the court and the provisions of [Rule 53]." *Madrid v. Gomez*, 899 F. Supp. 1146, 1282 (N.D. Cal. 1995).  Rule 53 provides, in pertinent part, "[u]nless a statute provides otherwise, a court may appoint a master only to . . . hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by . . . some exceptional condition."  Fed. R. Civ. P. 53(a)(1)(B)(i).  Under this provision, a special master may "be appointed because of the complexity of litigation and problems associated with compliance with [a] district court order." *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 775 (9th Cir. 1990) (citing *Hoptowit v. Ray*, 682 F.2d 1237, 1263 (9th Cir. 1982)). Circumstances that particularly warrant a special master's oversight of injunctive relief include those in which "a party has proved resistant or intransigent to complying with the remedial purpose of the injunction in question." *United States v. Apple*, 992 F. Sup. 2d 263, 280 (S.D.N.Y. 2014) (citing *United States v. Yonkers Bd. of Educ.*, 29 F.3d 40, 44 (2d Cir. 1994) (per curiam)).

## III.    ANALYSIS

### A.    Motions to Clarify or Modify

Before the Court are eleven distinct disputes concerning the Government's Preliminary Injunction and Clarification Order implementation measures:  four disputes relate to the Government's purported failure to identify P.I. Class members pursuant to Paragraphs 2 and 4 of the Clarification Order; two relate to the Government's purported failure to provide notice to individuals identified in Paragraph 3 of the Clarification Order; and five relate to the Government's purported failure to issue reopening and/or reconsideration relief in accordance with Paragraph 4 of the Clarification Order and the Preliminary Injunction.  (Pls.' Statement ¶¶ 2–11, 13–16.)[16]

---

[16] The Court notes that while Plaintiffs identified 16 disputes in their Joint Status Report, there truly exist only 11.   The disputes identified at Paragraphs 3 and 4 and Paragraphs 6 and 7 essentially overlap.  (Pls.' Statement ¶¶ 3–4, 6–7.)  Paragraph 15 identifies a dispute that was never raised in either

While Plaintiffs style their request to have the Court weigh in on these disputes as a motion to "enforce," what Plaintiffs truly seek is further clarification, or modification, of the Preliminary Injunction and, moreover, the Clarification Order.  In so construing Plaintiffs' request, the Court finds significant both that (1) Plaintiffs do not seek the imposition of measures to compel the Government to comply with the Clarification Order, *e.g.*, sanctions or civil contempt, and (2) Plaintiffs' Enforcement and Oversight Motions principally ask the Court to define the requirements of the directives of Paragraphs 2, 3, and 4 of the Clarification Order more precisely.  *See*, *e.g.*, *Shilitani v. United States*, 384 U.S. 364, 370 (1966) (observing motions to enforce generally seek sanctions or civil contempt to compel the nonmovant's compliance with a prior order).

Thus, the Court construes Plaintiffs' requests in their Enforcement and Oversight Motions to "enforce" the Preliminary Injunction and Clarification Order as requests to clarify and/or modify and grants in part and denies in part those requests for the reasons set forth below.

### 1.    Paragraph 4:  Defendants' P.I. Class-Membership Identification Procedures

As set forth above, Paragraph 4 of the Clarification Order provides:

> Defendants must make all reasonable efforts to identify [P.I. Class] members, including but not limited to reviewing their records for notations regarding class membership made pursuant to the guidance issued on November 25, 2019, and December 2, 2019, to CBP and OFO, respectively, and sharing information regarding [P.I. Class] members' identities with Plaintiffs.

(Clarification Order at 25.)

Plaintiffs allege the Government has failed to "make all reasonable efforts to identify P.I. Class members."  <u>First</u>, Plaintiffs contend that the Master List is underinclusive

---

of Plaintiffs' Motions. (*Id.* ¶ 15.)  The dispute listed in Paragraph 1—that the Government must "provide a timeline for fully complying with the [Preliminary Injunction] and Clarification Order—effectively seeks oversight and does not identify any actual dispute concerning the manner in which the Government has carried out its compliance procedures. (*Id.* ¶ 1.)  And there is no enumerated Paragraph 13.

17cv2366

because the Government did not review USB Form I-213 annotations as an independent source to identify potential P.I. Class members, despite the explicit instruction to do so in Paragraph 4. (*See* Oversight Mem. at 24–25; Pls.' Statement ¶ 16.) <u>Second</u>, Plaintiffs assert the USCIS Guidance is noncompliant because it (A) does not contemplate the Government obtaining outstanding metering waitlists from its Mexican counterparts; (B) does not attribute sufficient evidentiary weight to metering waitlist; and (C) permits asylum officers to consider potential P.I. Class members' answers to the Initial Screening Questions in making P.I. Class-membership determinations. (Enforcement Mem. at 13–17; Pls.' Statement ¶¶ 3–6.)[17]

### a.    USB Form I-213 Review

"The Form I-213 is essentially a recorded recollection of [an agent's] conversation with [an] alien[.]" *Bustos-Torres v. Immigration & Naturalization Servs.*, 898 F.2d 1053, 1056 (5th Cir. 1990). Both OFO *and* USB agents routinely complete Form I-213 after a first encounter with an undocumented noncitizen. *See Espinoza v. Immigration & Naturalization Servs.*, 45 F.3d 308, 309 (9th Cir. 1995). Following the Preliminary Injunction, USB and OFO agents were instructed on November 25, 2019 and December 2, 2019, respectively, to annotate Form I-213s with "Potential AOL Class Member" if they encountered an individual who affirmatively stated they were metered, provided information from which an agent could infer the individual had been subjected to metering, or affirmatively claimed to be an *AOL* Class member. (First Decl. of Jay Visconti ("First Visconti Decl.") ¶¶ 1, 4, 6.) These policies have remained in effect ever since. (Clarification Order at 24.)

---

[17] Plaintiffs further aver that the ROP Review procedure is noncompliant with Paragraph 4 because it excludes from review P.I. Class members who received a final order of removal after June 30, 2020 and does not involve a separate examination of DHS records. (Enforcement Mem. at 18; Oversight Mem. at 17; Pls.' Statement ¶¶ 11, 14.) However, the text of Paragraph 4 clearly applies to *Defendants* only, not the EOIR. The Clarification Order sets forth the requirements applicable to EOIR's P.I. Class-identification procedures under Paragraph 2. *See infra* Sec. III.A.3.

The Clarification Order directed Defendants to "make all reasonable efforts to identify" P.I. Class members, "including but not limited to reviewing their records for notations regarding class membership" in the Form I-213s.  (Clarification Order at 23–25.) Defendants digitized and made text searchable OFO Form I-213s, rendering these forms queryable data.  Therefore, OFO Form I-213 annotations were among the information the Government reviewed in identifying potential P.I. Class members to place on the Master List.  The Government attests it identified 10 potential P.I. Class members from its review of OFO Form I-213 annotations.  In contrast, the USB Form I-213s are in paper form only and, therefore, must be manually reviewed.  The Government acknowledges that it did not systematically search for and review notations made on USB Form I-213s as an independent source of data for identifying potential P.I. Class members in the first instance, but contend that its implementation measures nonetheless comply with Paragraph 4 because the USCIS Guidance requires asylum officers to review both OFO and USB Form I-213s, if any, found in a potential P.I. Class member's case file when making a P.I. Class-membership determination.  (Shinners Decl. ¶¶ 26, 37.)

It is self-evident that Form I-213s are particularly useful in identifying *potential* P.I. Class members.  The objective, defining trait of all P.I. Class members is that they were metered at a Class A POE along the U.S.-Mexico border, during the relevant pre-Asylum Ban period, and the Form I-213 annotations explicitly indicate whether a noncitizen claims to have been, or has evidence that he or she was, metered upon arriving at a Class A POE. (*See* Clarification Order.)  Therefore, it is inexplicable why the Government would screen only OFO Form I-213s for the purpose of identifying potential P.I. Class members, and not USB Form I-213s.  The Government does not offer any qualitative distinction between the two Form I-213s that might justify the Government's decision to use OFO Form I-213s, but not USB Form I-213s, in compiling its Master List.  Nor is one apparent to this Court.

Rather, the Government's argument that a fulsome review of USB Form I-213s is unnecessary rests exclusively on burdensomeness grounds.  (Oversight Opp'n 22–23.)  But as this Court has repeatedly opined, the Government's burdensomeness arguments

respecting class-identification garner little sympathy. (Clarification Order at 23 n.6 ("[T]he [P.I. Class] is based on a metering system established by Defendants . . . . It therefore does not follow that determining who was subject to metering for the purposes of complying with the Preliminary Injunction now presents an insurmountable task.").) That is particularly the case where, as here, it appears that a review of USB Form I-213s is likely to unearth additional potential P.I. Class Members. (*See* First Shinners Decl. ¶ 37 (attesting that review of OFO Form I-213s identified 10 potential P.I. Class members).) Furthermore, the Government's assertion of undue burden rings hollow because there exists a simple alternative to conducting a purportedly burdensome manual review of paper documents: digitizing and rendering text-searchable the USB Form I-213s just as it did the OFO Form I-213s.

Accordingly, the Court **CLARIFIES** that Paragraph 4 of the Clarification Order directs the Government to review *all* Form I-213s—including those completed by USB agents—for annotations of *AOL* Class membership in identifying potential P.I. Class members for inclusion to the Master List.

### b.   USCIS Guidance

### i.   Metering Waitlists

Plaintiffs allege that Paragraph 4's directive that the Government make "all reasonable efforts to identify" includes attempting to obtain metering waitlists from the Mexican federal or municipal government officials or charity staff members responsible for managing those waitlists.[18] They also allege that "reasonable efforts to identify" P.I. Class members requires that asylum officers treat as "presumptive" evidence of P.I. Class membership the presence of a potential P.I. Class member's name on a metering waitlist. Plaintiffs claim that because the Government refuses to attempt to obtain outstanding metering waitlists and because the USCIS Guidance treats waitlist evidence as merely

---

[18] The Government has partial copies of the waitlists from Tijuana, Ciudad Juarez, Mexicali, and Ojinaga. (Non-detained P.I. Class Screening Procedures at 3.) It does not have any metering waitlists from the other Mexican border cities and towns in which those lists were maintained. (*Id.*)

"probative," the Government's Clarification Order implementation measures violate Paragraph 4.  (Pls.' Statement ¶¶ 2–4.)

Attempting to Obtain Metering Waitlists:  As this Court has stated repeatedly, it is well-established Defendants relied upon waitlists managed by Mexican government and charity officials in border towns and cities to facilitate metering.  (See, e.g., Clarification Order at 23 n.6.)  The Government has obtained from class counsel and INAMI incomplete versions of waitlists from four Mexican border towns/cities in which such lists were maintained.  However, the Government refuses to attempt to obtain outstanding metering waitlists used at numerous other Mexican border cities and towns, despite Plaintiffs' repeated pleas that it do so.[19]   Plaintiffs attest that they have been unsuccessful in their endeavors to obtain outstanding waitlists, and that the Government is in a much better position to access these documents.  (See, e.g., Decl. of Ori Lev ("Lev Decl.") ¶ 24(c), ECF No. 644.)   The Government contends that this premise ignores complex and nuanced diplomatic considerations and the fallout that could result from requesting INAMI to produce copies of the metering waitlists.  (See, e.g., Decl. of Joseph Draganac ("Draganac Decl.") ¶ 12 ("[W]ere CBP to make a request to the Mexican government for the waitlists for use in this litigation, it could cause harm to CBP's relationship with Mexico, especially on the local level . . . .  I am concerned that a request for the waitlists could be perceived by individuals in the Mexican government as CBP attempting to monitor or regulate Mexico's internal processes for addressing immigration."), ECF No. 657-2.)

---

[19] Furthermore, Plaintiffs have repeatedly sought court orders directing the Government to obtain outstanding metering waitlists.  For example, Plaintiffs sought discovery from Defendants of some metering waitlists not in the Government's control, essentially implying the Government has an obligation to retrieve those waitlists from its Mexican counterparts pursuant to Rule 34 discovery procedures.  (ECF No. 760.)  Magistrate Judge Crawford found that request overbroad; she instructed Plaintiffs to serve Defendants "with a more narrowly tailored document request . . . that only requires [Defendants] to produce copies of any waitlists in their physical possession that they have used or intend to use to determine whether any individual is a class member."  (ECF No. 795 at 7.)  Moreover, Plaintiffs Motion for Class Facilitation asked this Court to order Defendants to take all reasonable steps to obtain all outstanding metering waitlists from Mexican federal, state, and municipal officials.  (ECF No. 720.)  However, the Court denied this request on the ground that it lacked authority to issue such an order pursuant to Rule 23.  (ECF No. 800.)

Plaintiffs argue that "tak[ing] all reasonable steps to identify [P.I. Class] members" includes attempting to procure from Mexican officials copies of all the relevant metering waitlists that the Government does not possess. (Enforcement Mem. at 13–14; Pls.' Statement ¶ 2.) The Government contends that Plaintiffs' argument is without textual basis in the Clarification Order, which requires only that the Government "must review [its] *own* records to aid in the identification of class members." (Clarification Order at 23 (emphasis added); *see* Enforcement Opp'n at 14–15.) The Court agrees with the Government. The Clarification Order directed the Government in unambiguous terms to review its *own* records. (*See* Clarification Order at 25.) It did not require the Government to obtain and review waitlists in the sole possession, custody, or control of Mexican authorities.

To the extent Plaintiffs request that the Court modify its Preliminary Injunction and Clarification Order to direct the Government to attempt to obtain from Mexican government and charity officials all outstanding waitlists, the Court declines to do so. Courts have jurisdiction to modify the terms of an injunction consistent with its original purposes in order to "preserve the status quo." *Nat'l Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001) (holding district court may take action pursuant to Rule 62 so long as that action does not "materially alter the status of the case on appeal"); *see also Tribe v. U.S. Bureau of Reclamation*, 319 F. Supp. 3d 1168, 1171 (N.D. Cal. Apr. 30, 2018).

Here, Plaintiffs have not shown modification of the Clarification Order is warranted. Individuals whose names are listed on metering waitlists the Government does not possess are not comparably disadvantaged when it comes to qualifying for "potential" P.I. Class membership. The Master List is purposefully overinclusive and, thus, additional waitlists are unlikely to serve a unique or necessary purpose for identifying potential P.I. Class members. Indeed, the Government currently identifies individuals for its Master List without examining the metering lists in its possession, a practice to which Plaintiffs do not object. Thus, this Court is not persuaded that USCIS's procedures for identifying potential P.I. Class members are impermissibly narrow absent the outstanding metering waitlists.

17cv2366

1   Nor does the USCIS Guidance put at a comparable disadvantage individuals whose
2   names are listed on metering waitlists the Government does not possess.   The USCIS
3   Guidance explicitly provides "the absence of an individual's name on a waitlist should not
4   be used to conclude that the individual is not a [P.I.] [C]lass member." (Non-detained P.I.
5   Class Screening Procedures at 5–6.)   Under the USCIS Guidance, there are many other
6   forms of evidence in DHS records or that the potential P.I. Class member can proffer him-
7   or herself that are "generally sufficient" to establish P.I. Class membership.   (*Id.* at 4–5.)
8   For example, although asylum officers will be unable to examine metering waitlists from
9   the Mexican border town of San Luis Rio Colorado—waitlists which the Government does
10   not possess—such potential P.I. Class members may rely upon other, easily-attainable
11   alternative forms of evidence to establish P.I. Class membership.   This evidence includes:
12   (1) Form I-213s, I-867A/Bs, and I-877s in their DHS case files; (2) documentary evidence
13   indicating presence along the U.S.-Mexico border during the pre-Asylum Ban period,
14   including but not limited to documentation of a stay at a shelter or hotel; and (3) testimony
15   of metering during the pre-Asylum Ban period, all of which are "generally . . . sufficient
16   to establish" P.I. Class membership.   (*Id.* at 5.)   Thus, Plaintiffs have failed to show that
17   unless the Government obtains the outstanding metering waitlists, implementation of the
18   USCIS Guidance will lead to exclusionary P.I. Class membership determinations.   Without
19   such a showing, it cannot be said Plaintiffs' proposed modification is necessary to preserve
20   the status quo of the Preliminary Injunction or Clarification Order.   *See*, *e.g.*, *Sierra Club*
21   *v. U.S. Army Corps of Eng'rs*, 732 F.2d 253, 257 (2d Cir. 1984) ("[W]hen reviewing an
22   order modifying a preliminary injunction we look to see whether or not the status quo is
23   maintained by the modification[.]") (emphasis omitted)).

24   <u>Waitlists as "Presumptive" Evidence</u>:   Plaintiffs complain that the USCIS Guidance
25   violates Paragraph 4 because it treats evidence of an interviewee's name on a waitlist as
26   merely "probative" of P.I. Class membership, rather than "presumptive."   (Enforcement
27   Mem. at 13–14; Pls.' Statement ¶¶ 3–4.)   The Government contends that the Clarification
28   Order does not prescribe evidentiary rules or presumptions; rather, it requires the

- 28 -

17cv2366

Government to undertake "reasonable efforts" to identify P.I. Class members, which, the Government avers, the USCIS Guidance does. (Enforcement Opp'n at 16–17.)

Under the USCIS Guidance, the presence of a potential P.I. Class member's name on a metering waitlist is generally sufficient to establish P.I. Class membership. (Non-detained P.I. Class Screening Procedures at 4–5.) "However, if an individual's name is on one of these waitlists, but the individual's own statements . . . clearly and unequivocally contradict that information . . . the individual's own statements may be given greater weight than the existence of a name on the waitlist." (*Id.*)

As an initial matter, it is unclear to the Court how, in Plaintiffs' view, the USCIS Guidance treats metering waitlists as "probative" as opposed to "presumptive." Indeed, Plaintiffs repeatedly use the term "presumptive" to describe the evidentiary weight they believe should attach to the waitlists, but never in their papers do Plaintiffs explain what the USCIS Guidance must do to treat waitlists as "presumptive" rather than "probative." Is the presumption they imagine should attach to metering waitlists rebuttable, or is it irrefutable? Plaintiffs do not say. Nor do Plaintiffs explain how the USCIS Guidance, particularly its requirement that evidence a potential P.I. Class member was not metered must be "clear and unequivocal" to outweigh other documentary evidence demonstrating metering, is incompatible with treating metering waitlists "presumptive" of P.I. Class membership. The answers to these questions ultimately matter not because this Court is solely concerned with the question whether USCIS's P.I. Class-identification procedures are "reasonable" ones. (*See* Clarification Order at 25.) The Court is satisfied that, indeed, they are.

On the one hand, the USCIS Guidance acknowledges that the presence of an individual's name on a metering waitlist during the pre-Asylum Ban period strongly indicates that person was metered at a Mexican border city or town and, thus, is likely a P.I. Class member. Indeed, the USCIS Guidance instructs asylum officers to treat that evidence as sufficient for establishing P.I. Class membership in ordinary cases. (Non-detained P.I. Class Screening Procedures at 5 ("[D]ocumentation regarding the placement

of a name on a waitlist during the relevant pre-July 16, 2019 time period . . . will generally be sufficient to establish that an individual is more likely than not a class member.").)  In fact, where waitlist evidence exists in a case, it may only be rebutted by "clear and unequivocal" evidence to the contrary.  (*Id.*)  However, the USCIS Guidance also provides the Government with the necessary flexibility to account for unusual instances in which a potential P.I. Class member stated in no uncertain terms that he or she was not actually subjected to metering during relevant the pre-Asylum Ban period.  (*Id.*)  This scenario is far from inconceivable, as Plaintiffs themselves have attested that there have been "numerous reports" of list managers adding individuals' names to waitlists remotely, before they reached a Class A POE.  (*See* Decl. of Nicole Ramos ("Ramos Decl.") ¶ 10, ECF No. 390-48.)

Accordingly, the Court **DENIES** the Motions to the extent they seek an order clarifying or modifying Paragraph 4 to (1) require the Government to attempt to obtain from its Mexican official counterparts the outstanding metering waitlists and (2) impose evidentiary rules overriding the USCIS Guidance's procedures for weighing evidence of a potential P.I. Class member's name on a metering waitlist.

### c.   Prior P.I. Class Membership Screening

Following the Preliminary Injunction, but before the Clarification Order, USCIS screened for P.I. Class membership a group of individuals whose names appear on the Master List.  (First Shinners Decl. ¶ 13; *see* Non-detained P.I. Class Screening Procedures at 6.)  That process involved a prior set of interviews, at which asylum officers asked the Initial Screening Questions and after which asylum officers made P.I. Class-membership determinations.  (*See* First Shinners Decl. ¶ 13.)  USCIS amended its procedures for P.I. Class-membership screening following the Clarification Order, vacated all prior P.I. Class-membership determinations, and directed asylum officers to re-interview potential P.I. Class members subjected to the prior screening process using the Amended Screening Questions.  (*See id.*; *see also* Non-detained P.I. Class Screening Procedures at 4, 6.)  But while the USCIS Guidance invalidates the *results* of the prior P.I. Class-membership

screening process, it does not restrict asylum officers from considering testimony elicited from that prior screening process in making new P.I. Class-membership determinations. (Non-detained P.I. Class Screening Procedures at 6.)   Plaintiffs claim that Paragraph 4 forbids consideration of interviewees' answers to the Initial Screening Questions.   (*See* Enforcement Mem. at 16; Pls.' Statement ¶ 5.)

The Initial Screening Questions, Plaintiffs aver, are plagued by a "myriad" of problems. (Enforcement Mem. at 15–16 & n.6; *compare* Initial Screening Questions *with* Amended Screening Questions.)   Plaintiffs list the following flaws:

- Question 2 asks interviewees whether they "[sought] to enter the United States" before the date of their entry?  (Initial Screening Question ¶ 2.)  Plaintiffs aver that "sought to enter" could easily have been misconstrued to mean "attempts to enter without inspection between [POEs] or the physical act of approaching the limit line (as opposed to putting one's name on [a] waitlist]."  (Enforcement Mem. at 16);

- Question 3 asks interviewees "[d]id you ever put your name on any sort of list in Mexico that you believed would get you a place in line to get into the United States?" (Initial Screening Question ¶ 3.)  Plaintiffs aver that this question easily could have been construed both narrowly and literally as asking whether the interviewee ever personally "physically wr[o]te" his or her name on a waitlist, as opposed to whether the list manager wrote his or her name on the list, as is usual practice.  (Enforcement Mem. At 15 n.6); and

- Finally, Question 3(a) asks interviewees whether they "put [their] name on [a waitlist] after [July 16, 2016]?  (Initial Screening Question ¶ 3(a).)  Plaintiffs correctly point out that there is a typographical error in Question 3(a): "2016" should have been "2019."  (Enforcement Mem. at 15 n.6.)

(Enforcement Mem. at 15–16 & n.6.)  Plaintiffs aver that reliance upon answers to those questions would "threaten improper exclusion" of P.I. Class members.  (Enforcement Reply at 7.)

Plaintiffs' argument, however, overlooks that USCIS has rephrased and revised the P.I. Class-membership screening questions to address fully Plaintiffs' list of concerns.  (*See* Amended Screening Questions ¶ 4 (asking "did you ever try to approach a [POE] to enter

the United States" instead of "did you seek entry"), ¶ 5 (asking "did you ever add your name to any sort of list in Mexico that you believed would get you a place in line to cross through a [POE]" and if so "did you add your name to the waitlist by writing it yourself" or "did someone else write your name on the list" instead of "did you ever put your name on any sort of list in Mexico"), ¶ 5(d) (asking whether metering occurred prior to "July 16, 2019" as opposed to "July 16, 2016").)  Also, every potential P.I. Class member who was asked the Initial Screening Questions in connection with USCIS's prior screening process must be granted a new interview where he or she will be asked the Amended Screening Questions.  (Davidson Email at 2; Non-detained P.I. Class Screening Procedures at 4.)  Thus, it appears the USCIS Guidance is designed to rectify instances in which the Initial Screening Questions may have led to imprecise, inaccurate, or unreliable testimony.

Plaintiffs further argue that this Court should disallow consideration of prior statements because it has previously found the Initial Screening Questions ambiguous. (Enforcement Mem. at 16 (citing Order Granting Emergency Prelim. Inj. ("Emergency Order") at 5, ECF No. 607).)  This is not true.  Plaintiffs cite to an Emergency Order of this Court, which found that an asylum officer had erred when he asked an interviewee an unauthorized and ambiguous question.  (*Id.* ("Although the asylum officer asked whether she was told to put her name on a list to get to a POE, Applicant did not answer the question and asked if it could be repeated. Critically, the asylum officer did not repeat this exact question, but instead asked if Applicant had put her name on a list to enter a POE *besides San Ysidro*, to which Applicant said she had not.") (emphasis in original).)  Contrary to Plaintiffs' assertion, this Court has never found any one of the Initial Screening Questions to be ambiguous or otherwise improper.

Accordingly, the Court **DENIES** the Motions to the extent they seek clarification or modification of Paragraph 4 to forbid asylum officers from consulting for the purpose of making P.I. Class-membership determinations an interviewee's testimony elicited in response to the Initial Screening Questions.

//

### 2. Paragraph 3: P.I. Class Notice

As set forth above, Paragraph 3 of the Clarification Order provides:

Defendants must inform identified [P.I] [C]lass members in administrative proceedings before USCIS or EOIR, or in DHS custody, of their potential [P.I.] [C]lass membership and the existence and import of the preliminary injunction.

(Clarification Order at 25.)  Plaintiffs allege the Government refuses to provide notice to certain groups of P.I. Class members identified in Paragraph 3.  (Pls.' Statement ¶ 11.)

First, Plaintiffs aver it is the Government's position that it need not provide notice to persons in DHS custody at ICE detention centers.  (Oversight Mem. at 22; Pls.' Statement ¶ 11.)  However, the Government represented in the Joint Status Report that DHS posted notice in all ICE detention facilities in October of 2021 containing language that was the result of a collaborative process between DHS and class counsel.  (Joint Status Report at 5.)  Plaintiffs do not contest the accuracy of this attestation or assert that this method of notice is flawed. Accordingly, this dispute appears to be moot, and the Court is unpersuaded that the Government has failed to provide notice to P.I. Class members in DHS custody.

Second, Plaintiffs claim the Government believes it need not provide notice to individuals who, on or after the date of the Clarification Order, "had pending motions to reopen before EOIR or pending petitions for review of final removal orders in the federal courts of appeal." (Oversight Mem. at 22.)  Plaintiffs allege that, unless the EOIR finds in its ROP Review that such an individual is, in fact, a P.I. Class member, a noncitizen with a pending motion to reopen will not receive notice to which they are purportedly entitled pursuant to Paragraph 3.  (Id. (noting the EOIR only notifies individuals with cases subject to ROP Review if there is a positive P.I. Class-membership identification).)  The Government contends it has mooted this dispute by posting to the EOIR website a "template motion" and, more importantly, "instructions and a link to [class counsel's] website to obtain additional information" concerning potential P.I. Class members'

"existing right to file motions to reopen[,] to resubmit additional evidence of class membership[,] and [to] seek reopening or reconsideration." (Joint Status Report at 4.) The Government effectively asserts that, together with the *sua sponte* review for potential P.I. Class members undertaken by USCIS and EOIR, these notice procedures provide adequate and reasonable procedural safeguards to individuals who had pending motions to reopen or appeals when the Court issued its Clarification Order and may qualify for P.I. Class-membership status.

The parties' arguments are slightly off target in that they miss a different, but related, issue with Paragraph 3's language. That directive instructs the Government to notify individuals it already has "identified" as P.I. Class members that they *may potentially be* P.I. Class members. On its face, this directive is backwards: as a matter of procedure, it places the cart before the horse. What this Court meant by Paragraph 3 is to direct the Government to notify individuals in administrative proceedings before USCIS or EOIR, or in DHS custody of the existence of the Preliminary Injunction and their potential *rights to reopening and/or reconsideration relief thereunder* (not potential P.I. Class membership). Because this strand of Plaintiffs' Paragraph 3 challenge seeks to require the Government to provide notice to a potentially broad swath of individuals whom the Government has not even identified as potential P.I. Class members pursuant to its Master List query and ROP Review processes, Plaintiffs' interpretation goes beyond both the letter and spirit of the Court's intended directives concerning P.I. Class notice.

Accordingly, the Court **MODIFIES** Paragraph 3 of the Clarification Order as follows:

> Defendants must inform identified Preliminary Injunction class members in administrative proceedings before USCIS or EOIR, or in DHS Custody, of their class membership, as well as the existence and import of the Preliminary Injunction (ECF No. 330), Clarification Order (ECF No. 605), and this Order (ECF No. 808).

Furthermore, the Court **DENIES** the Motions to the extent they seek clarification or modification of Paragraph 3 to require the Government to provide notice to all individuals

- 34 -

17cv2366

with pending motions to reopen before EOIR or pending petitions for review of final removal orders in the federal courts of appeal.  The Clarification Order requires that notice be given to "identified" P.I. Class members.  It does not direct that notice be given to individuals who have not even been identified as *potential* P.I. Class members.

### 3.   Paragraph 2:  EOIR's P.I. Class Membership Identification Procedures and the Implementation of Reopening and Reconsideration Relief

As set forth above, Paragraph 2 of the Clarification Order provides:

DHS and EOIR must take immediate affirmative steps to reopen and reconsider past determinations that potential [P.I.] [C]lass members were ineligible for asylum based on the Asylum Ban, for all potential class members in expedited or regular removal proceedings.  Such steps include identifying affected class members and either directing immigration judges or the BIA to reopen or reconsider their cases or directing DHS attorneys representing the government in such proceedings to affirmatively seek, and not oppose, such reopening or reconsideration.

(Clarification Order at 25.)  Plaintiffs allege the Government has failed to comply with Paragraph 2 in several respects.

First, Plaintiffs claim that the EOIR Guidance violates the P.I. Class membership-identification procedures applicable to the EOIR under Paragraph 2 because the ROP Review (A) excludes P.I. Class members who received a final order of removal after June 30, 2020 and (B) does not include an independent review of DHS records that might bear upon P.I. Class-membership, which have not been made part of the EOIR case file. (Pls.' Statement ¶¶ 8, 14.)  Second, Plaintiffs claim the Government has failed to "take immediate affirmative steps to reopen and reconsider" the immigration cases of P.I. Class members. (Pls.' Statement ¶¶ 6–7, 9–10, 13.)

//
//
//
//

17cv2366

### a.   EOIR P.I. Class Identification Procedures

### i.   June 30, 2020 Cutoff

The EOIR Guidance instructs its adjudicators to undertake the ROP Review in cases where an IJ or the BIA issued a final order of removal identifying the Asylum Ban as a ground for denying asylum, between July 16, 2019, the date on which the Asylum Ban was effectuated, and June 30, 2020, the date on which the Asylum Ban was vacated by the *C.A.I.R.* Court.  (First Anderson Decl. ¶ 4.)  Plaintiffs contend that one would reasonably expect some delay between the *C.A.I.R.* decision and the IJs "recogniz[ing] the import of [the *C.A.I.R.* decision], especially in light of the government's appeal of that decision." (Enforcement Mem. at 25 (citing ECF No. 605-6).)  Plaintiffs therefore argue that the temporal scope of the ROP Review is likely to exclude P.I. Class members who received final orders of removal *after* June 30, 2020, in violation of Paragraph 4's directive that the EOIR "identif[y] potential [P.I. Class] members."  (Enforcement Mem. at 25.)

Plaintiffs aver that the Government could put to rest concerns about misapplication of the Asylum Ban after June 30, 2020 if it showed that EOIR provided notice to its adjudicators of the *C.A.I.R.* decision and its import immediately following issuance of the decision.  (Enforcement Mem. at 25.)  But the Government has not done so, despite the ease with which it could have.[20]  Instead, it conclusively attests that on July 1, 2020, the Asylum Ban "*should* not have applied to anyone."  (First Shinners Decl. ¶¶ 8, 27 (emphasis added).)  This is cold comfort, particularly given that the record reflects instances of delays between pivotal judicial decisions of this Court, on the one hand, and notice to the pertinent agency of the policy changes that necessarily flowed therefrom, on the other.  For example, it took ICE approximately one week following the Clarification Order to notify ERO of that Order's import and to instruct ERO personnel not to remove potential P.I. Class members in ICE custody pending USCIS screening.  (*See* ICE P.I. Notice (issued

---

[20] The Government attests that EOIR-OGC has deemed the EOIR Guidance attorney-client privileged, and, thus, has chosen not to proffer any documentation concerning that Guidance.  (*See* First Anderson Decl. ¶ 7.)

November 6, 2020).)  While anecdotal, this data point supports the premise that complex agency guidance takes time to issue and, thus, there may have been a delay between the *C.A.I.R.* decision and uniform non-application of the Asylum Ban by EOIR adjudicators.

The Government contends that the benefit of expanding the ROP Review does not justify the burden considering instances of Asylum Ban misapplication are likely "rare." (Enforcement Opp'n at 24 n. 9.)  But Plaintiffs do not seek an open-ended expansion of the ROP Review; their position contemplates that a cutoff is consistent with Paragraph 2, although they do not explicitly identify a cutoff for the ROP Review they view as reasonable.  (Enforcement Mem. at 25.)  Plaintiffs certainly have not made a showing that a lengthy expansion of the ROP Review's temporal scope is necessary.  Indeed, Plaintiffs do not appear to have identified a single instance in a post-June 30, 2020 EOIR proceeding where the Asylum Ban was relied upon by an IJ or the BIA to issue a declination.  Indeed, each of the exemplar cases cited by Plaintiffs either pre-date the *C.A.I.R.* decision or do not involve application of the Transit Rule at all.  (*Id.* (citing Immigration Case #1, Lev Decl., Ex. 3 (issued on June 30, 2020); Immigration Case #2, Lev Decl., Ex. 4 (Asylum Ban not applied)).)

The Court finds that an expansion of the ROP Review period by one month adequately accounts for the potential lack of uniformity among EOIR adjudicators in applying the Transit Rule immediately following the *C.A.I.R.* decision, while limiting the burden of an expanded ROP Review of cases, the majority of which it appears will rarely be eligible for relief under the Preliminary Injunction.  *See Syst. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 648 (1961) (describing district court's discretion to modify its injunctive relief as "wide").

Accordingly, the Court **CLARIFIES** that Paragraph 2's language requiring EOIR to take affirmative steps "to reopen and reconsider past determinations that potential [P.I.] [C]lass members were ineligible for asylum based on the Asylum Ban" requires EOIR to extend the temporal scope of its ROP Review to include final orders of removal issued up until July 31, 2020.

- 37 -

## ii.    Review of DHS Records

The EOIR's ROP Review requires adjudicators to examine only the ROPs in potential P.I. Class members' immigration proceedings.  (First Shinners Decl. ¶ 38; First Anderson Decl. ¶ 8.)  EOIR adjudicators do not separately examine DHS records for evidence bearing upon P.I. Class membership.  (First Shinners Decl. ¶ 38.)  Plaintiffs allege that this approach is noncompliant with the EOIR's P.I. Class-identification requirements under Paragraph 2 because it will inevitably lead to the exclusion of P.I. Class members whose DHS records reflect evidence of metering but whose ROPs do not.  (Oversight Mem. at 17.)

To quell Plaintiffs' concerns, the Government insinuates it is amenable to reviewing the DHS records in the 46 cases where EOIR adjudicators declared there was "insufficient evidence" to make a P.I. Class-member determination.  (Shinners Decl. ¶ 38; Anderson Decl. ¶ 8.)  The Government's modest concession does not suffice to bring the EOIR Guidance into compliance with the directive under Paragraph 2 that EOIR "identify affected" P.I. Class members.  Under the EOIR Guidance for the ROP Review, an adjudicator would review DHS data indicative of metering—*e.g.*, waitlists, Form I-213s, Form I-867A/Bs, Form I-87s, or any other processing document of DHS's that might contain affirmative indications of class membership—only if the asylum seeker filed that information in his or her immigration case.  (*See* Non-detained P.I. Class Screening Procedures at 3–4 (describing the DHS data USCIS asylum officers review in making P.I. Class-membership determinations).)  But as Plaintiffs point out, "[t]here would have been little reason for metering information to be filed with EOIR when the Asylum Ban was in full effect because at that time," evidence that an asylum seeker was metered at the U.S.-Mexico border "was not relevant to access to the asylum process or eligibility for relief." (Oversight Mem. at 18.)  Thus, it appears that under the EOIR Guidance, adjudicators conducting ROP Reviews are making P.I. Class determinations without regard to evidence in the Government's possession that is most probative of P.I. Class membership.

- 38 -

17cv2366

This strand of the EOIR Guidance cannot reasonably be said to accord with the letter or spirit of Paragraph 2.  It is not sufficient for the EOIR merely to examine DHS records in the 46 cases where it could not determine P.I. Class membership.  The Government has not—nor can it—assure this Court that, in each of those 410 cases where a negative P.I. Class-membership determination was issued, adjudicators did not overlook evidence in DHS's possession that might contradict that determination.  Thus, the EOIR Guidance taints the validity of these at least 410 negative P.I. Class-membership determinations yielded by the ROP Review.  (*See* Second Anderson Decl. ¶ 8.)

Accordingly, the Court **CLARIFIES** that the EOIR's obligation under Paragraph 2 to "identify affected [P.I.] [C]lass members" precludes the EOIR from issuing a negative P.I. Class-membership determination without first considering any evidence of metering during the relevant pre-Asylum Ban period in DHS's records.

### 3. Reopening and Reconsideration Relief

#### a. USCIS

##### i. Self-Identification of Removed Potential P.I. Class Members

The USCIS Guidance developed to apply to potential P.I. Class members removed from the United States operates in the following manner.  First, USCIS queries the Master List and identifies individuals who (1) received a negative credible fear determination where the Asylum Ban was applied and (2) ICE data reflects the individual was removed pursuant to an expedited removal order and is no longer located in the United States. (Davidson Decl. ¶¶ 18, 24.)  The Government will next provide this information to class counsel, who is responsible for providing notice.  Removed potential P.I. Class members then must self-identify to the Government in accordance delineated in the class notice to begin the P.I. Class-membership identification process.  (*Id.* ¶¶ 20–21, 23.)

Plaintiffs allege the Government abdicates its "affirmative duty" under Paragraph 2 to provide reopening and reconsideration relief to all P.I. Class members because the USCIS Guidance places the burden on removed potential P.I. Class members to invoke

their prospective rights under the Preliminary Injunction.  (Oversight Mem. at 16; Pls.' Statement ¶ 13.)  But Paragraph 2 encumbers Defendants with an "*affirmative* duty" to provide reopening and reconsideration relief only to the eligible cases of P.I. Class members "in expedited or regular removal proceedings."  (Clarification Order at 25.) Because they have been removed, the distinct subset of potential P.I. Class members at issue here cannot be said to be "in expedited or regular removal proceedings" and, thus, the Government's affirmative duty does not extend to them.  Thus, procedures such as the USCIS Guidance's reliance upon self-identification, which aid the Government in dealing with the complex cases of potential P.I. Class members who have been removed and whose locations are unknown, are entirely consistent with both the letter and spirit of Paragraph 2.

Accordingly, the Court **DENIES** the Motions to the extent they seek to clarify or modify Paragraph 2 to invalidate the self-identification process delineated in the USCIS Guidance applicable to potential P.I. Class members who have been removed.

### ii.    Solicitation and Receipt of Metering Evidence

Plaintiffs further complain that the USCIS Guidance respecting removed potential P.I. Class members violates Paragraph 2 because it does not provide to that specific subset of individuals an equivalent process under which the USCIS solicits or receives evidence of P.I. Class membership.  This argument mischaracterizes the Government's planned procedures.  The Government attests that the USCIS will solicit and provide a process for potential P.I. Class members who self-identify to submit evidence of metering during the relevant Asylum Ban period. (Davidson Decl. ¶¶ 10, 20–21, 25–26.)  Therefore, this Court is unpersuaded by Plaintiffs' assertion the Government's putative procedures do not contemplate soliciting and considering evidence of metering for potential P.I. Class members removed from the United States.

//

//

//

### iii.    Return to the United States
### of Removed P.I. Class Members

Finally, Plaintiffs argue that USCIS's failure to delineate any process for returning to the United States removed individuals who, after self-identifying, establish they qualify for P.I. Class membership violates Paragraph 2.  (Pls.' Statement ¶ 9 ("Defendants have not adopted procedures for [P.I.] [C]lass members located outside the United States to return to the United States.").)  But this is inaccurate.  As explained above, *supra* Sec. I.B.2.b.ii, the USCIS intends to instruct removed individuals who make the requisite showing of P.I. Class membership to submit to DHS a Form I-131, Application for Travel Document; if the application is approved, the individual will receive from DHS a travel letter allowing him or her to board an aircraft and travel to a POE.  (First Shinners Decl. ¶ 35 (citing 8 C.F.R. § 212.5(f)).)  Once at a POE, CBP will inspect the individual and will ultimately determine how to proceed, which may depend on the circumstances of the case. (*Id.*)  Plaintiffs do not challenge these procedures.  Again, Plaintiffs fail to establish that the Government's putative procedures do not contemplate a process for returning removed P.I. Class members to the United States for asylum processing.

*            *            *            *

Having concluded that Plaintiffs challenges to the contemplated USCIS procedures concerning potential P.I. Class members who have been removed are either moot or do not warrant judicial intervention, the Court notes that the Government still has not informed this Court whether implementation of the procedures delineated in *supra* Sec. I.B.2.b has begun or, if not, when the Government plans to begin the process of identifying and providing reopening and/or reconsideration relief to removed P.I. Class members.  Thus, the Court **ORDERS** the Government to provide an update concerning the status of these procedures **by no later than August 22, 2022**.

//

//

//

17cv2366

### b.    EOIR

Where an ROP Review of a case results in a positive P.I. Class-membership determination, the adjudicator must reopen the case if the prior order of removal identified the Asylum Ban as a basis for denying asylum.  (Second Anderson Decl. ¶ 9.)  In each of those cases, adjudicators must issue a new asylum decision on the merits.  (*Id.*)  However, under the EOIR Guidance, an adjudicator may review the prior order of removal to see what, if any, alternative bases for denying asylum besides the Asylum Ban were also applied.  (Anderson Decl. ¶ 12.)  If the adjudicator identifies such an alternative basis, it may issue a new decision denying asylum predicated upon that alternative ground set forth in the prior order of removal.  (*Id.*)

Plaintiffs claim that, in this respect, the EOIR Guidance is noncompliant with the directive in Paragraph 4 to "reconsider" eligible cases.  (Pls.' Statement ¶¶ 6–7; Enforcement Mem. at 23–24.)  In their view, EOIR's adjudicators should be strictly forbidden from relying upon prior final orders of removal in which the Asylum Ban was identified as one of several grounds for denial, because all such orders are inevitably "tainted."  (Enforcement Mem. at 23–24.)

Plaintiffs do not cite to a textual basis in the Clarification Order for this premise.  Rather, they argue that the Preliminary Injunction's mandate that the Government "return to pre-Asylum Ban practices" requires the Government, in all eligible cases, to invalidate alternative, independent grounds for declination in a final order of removal and to require further factfinding.  (Enforcement Mem. at 23–24 (citing Preliminary Injunction at 36).)  But the Preliminary Injunction did not enjoin, disturb the application of, or even touch upon other rules or regulations constituting a basis for denying asylum.  Indeed, Plaintiffs do not identify any other rule or regulation besides the Asylum Ban as having a nexus to the Turnback Policy Plaintiffs principally challenged by this action.  (Mot. for Prelim. Inj. at 1 ("[T]he very reason the [P.I. Class] members face application of the categorical prohibition in the Asylum Ban is the unlawful metering policy which forced them to wait in Mexico.  These class members would have had their asylum claims heard under pre-

existing law but for the illegal metering policy that is challenged in this case.").)  Thus, Plaintiffs' interpretation of Paragraph 2 is untenable, for it would lead to an untenably overbroad and, therefore, abusive Preliminary Injunction.  *See*, *e.g.*, *Milliken v. Bradley*, 433 U.S. 267, 281–82 (1974) ("The well-settled principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the [alleged wrongful conduct] itself."); *see also Church of Holy Light of Queen v. Holder*, 443 F. App'x 302 (9th Cir. 2011) (finding preliminary injunction "overly broad because it . . . enjoins government regulations that were explicitly never challenged or litigated" (citing, *inter alia*, *Stormans*, 586 F.3d at 1141)); *Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1480 (9th Cir. 1994) (similar).

Accordingly, the Court **DENIES** the Motions to the extent they seek to clarify or modify Paragraph 2 to prohibit EOIR adjudicators from predicating a new merits decision in a reopened case upon an alternative, legally valid ground for denying asylum that was set forth in the P.I. Class member's prior final order of removal.

### B.  Permanent Injunction

Plaintiffs seek entry of an order converting the Preliminary Injunction—inclusive of the Clarification Order and the orders in the instant Opinion at *supra* Sec. III.A—into a permanent one.  Ordinarily, a court must conduct an evidentiary hearing to convert preliminary injunctive relief into permanent relief.  *See Bennett*, 934 F. Supp. 2d at 1188. But this Court already concluded in its Preliminary Injunction that the factors enumerated in *eBay Inc.* tip sharply in favor of enjoining application of the Asylum Ban to the P.I. Class.  (Prelim. Inj. at 35 ("The Court concludes Plaintiffs have clearly shown . . . irreparable harm[] and that the balance of equities and the public interest fall in their favor.").)  Since this Court issued its preliminary injunction, nothing in the record indicates that circumstances have changed such that this Court's analysis of the *eBay* factors today would yield a different result.  Moreover, since this Court issued its preliminary injunction, it has since found on summary judgment that Defendants' Turnback Policy is both statutorily and constitutionally unlawful and, thus, no facts are in dispute as to whether the

P.I. Class was subjected to the Asylum Ban by virtue of an infringement of their legal rights. *See Bennett*, 934 F. Supp. 2d at 1188.   Because the Government admittedly has yet to finish complying with that Order, it is clear conversion of the Preliminary Injunction into a permanent injunction is warranted.

The Government does not ask for an evidentiary hearing.  Nor does it contest that the factors enumerated in *eBay Inc.* tip in Plaintiffs' favor.  Rather, the Government asserts this Court never had jurisdiction to issue the Preliminary Injunction or Clarification Order in the first place and, therefore, it does not have jurisdiction to make those orders permanent.  (Defs.' § 1252(f)(1) Br.)  This is the same stale argument that the Government raised in opposition to Plaintiffs' initial request for the Preliminary Injunction and their subsequent request for clarification:  that the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") at 8 U.S.C. § 1252(f)(1) strips this Court of jurisdiction to "enjoin or restrain the operation of" specifically enumerated immigration enforcement laws, which govern removal proceedings, and that the Preliminary Injunction falls within this jurisdictional bar because it applies to a class of individuals "who are or will be placed into expedited removal or Section 1229a removal proceedings."[21]  This Court has twice rejected this same argument.  (*See* Prelim. Inj. at 15; Clarification order at 19–21.)  It has held repeatedly that § 1252(f) is not implicated because the Preliminary Injunction enjoins the Government from taking actions "not authorized by the Asylum Ban or, in fact, by any implementing regulation or statute."  (Prelim. In. at 15.)

---

[21] § 1252(f)(1) provides:

Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, [which includes 8 U.S.C. § 1225,] as amended by the Illegal Immigration Reform and Immigration Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1).

Despite this Court's repeated rejection of its § 1252(f)(1) argument, the Government, citing the recent United States Supreme Court decision, *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057 (2022) ("*Aleman Gonzalez*"), asserts a different outcome is warranted in this instance.[22]   The Government argues that *Aleman Gonzalez* repudiates the Ninth Circuit precedent upon which this Court purportedly relied in the Preliminary Injunction and Clarification Order, *Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (2003) ("*Rodriguez*") and *Ali v. Ashcroft*, 346 F.3d 873, 896 (2003) ("*Ali*").   *Ali* and *Rodriguez* hold § 1252(f)(1) is inapplicable "[w]here . . . a petitioner seeks to enjoin conduct that allegedly is not even authorized by [§§ 1221–32]" because in such instances "the court is not enjoining the *operation* of [the covered Immigration and Nationality Act ("INA") provisions]." *Ali*, 346 F.3d at 896.   *Aleman Gonzalez*, however, suggests that lower courts lack jurisdiction even to enjoin or restrain immigration enforcement agencies' unauthorized implementation of the covered INA provisions.  *Aleman Gonzalez*, 142 S. Ct. at 2065 (holding an injunction that "requires officials to take actions that (in the Government's view) are not required by [8 U.S.C. §§ 1221–32]" or "to refrain from actions that (again in the Government's view are allowed by [§§ 1221–32] . . . interfere[s] with the Government's efforts to *operate* [§§ 1221–32]" and, thus, is barred by § 1252(f)(1)).

While this Court agrees with the Government's assertion *Ali* and *Rodriguez* are irreconcilable with *Aleman Gonzalez*, it disagrees that the latter seals the fate of the Preliminary Injunction and Clarification Order In its Preliminary Injunction and Clarification Order.  Rather the injunctive relief issued in this case fits squarely within a different line of Ninth Circuit precedent, which *Aleman Gonzalez* explicitly did not displace:  *Catholic Social Services. v. Immigration & Naturalization Services.*, 232 F.3d 1139 (9th Cir. 2000) ("*Catholic Social Services*"), *Gonzales v. Department of Homeland Security*, 508 F.3d 1227 (9th Cir. 2007) ("*Gonzales*"), and *Gonzalez v. U.S. Immigration*

---

[22] For an in-depth analysis on *Aleman Gonzalez* and the implication it appears to have on permanent injunctions in the context of immigration enforcement, *see* this Court's Remedies Opinion at ECF No. 817.

& *Customs Enforcement*, 975 F.3d 788 (9th Cir. 2020) ("*Gonzalez*"), which this Court cited as a ground for finding § 1252(f)(1) inapplicable in its Clarification Order (Clarification Order at 20).  Taken together, these cases stand for the premise that lower courts may "enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision." *Aleman Gonzalez*, 142 S. Ct. at 2067 n.4 (citing *Gonzales*, 508 F.3d at 1227 and describing the principle holding in that case as "nonresponsive" to the questions at issue in *Aleman Gonzalez*) (emphasis in original).

The Preliminary Injunction enjoins application of the Asylum Ban to the P.I. Class members on the basis that the regulation, by its express terms, does not apply to them because they are "non-Mexican foreign nationals . . . who attempted to enter or arrived at the southern border *before* July 16, 2019."  (Prelim. Inj. at 31.)  The Government does not explain how enjoining or restraining the Government from taking actions not even authorized by the Asylum Ban, let alone any implementing regulation or statute, interferes with the operation of 8 U.S.C. §§ 1221 through 1332.[23]

Here, the Preliminary Injunction "directly implicates" 8 U.S.C. § 1158(b)(2)(C), the statute under which it was issued, not one of § 1252(f)(1)'s covered provisions.  *Gonzales*, 508 at 1233 (holding an injunction that "directly implicates" a provision that is not covered by § 1252(f)(1) is authorized, notwithstanding that injunction's "collateral consequence[s]" on the operation of a covered provision); *see C.A.I.R.*, 471 F. Supp.3d at 59–60 (citing 84 Fed. Reg. at 33,835 (July 16, 2019)).  And while the Preliminary Injunction no doubt effects the removal proceedings of potential and actual P.I. Class members, those consequences definitionally are collateral, and, thus, insufficient under *Catholic Social Services, Gonzales*, and *Gonzalez* to bring the injunctive relief issued here within the panoply of § 1252(f)(1).  *See Gonzales*, 508 F.3d at 1233.  It does not interfere with the "independent judgment and discretion" afforded to immigration judges in deciding the

---

[23] As the *C.A.I.R.* Court found, to the extent the Asylum Ban directly implicates a provision of the INA, it is 8 U.S.C. § 1158(b)(2)(C), to which § 1252(f)(1) is inapplicable.  *C.A.I.R.*, 471 F.3d at 59–60.

individual cases before them.  8 C.F.R. § 1003.10(b).  Immigration judges are still tasked with addressing whether the individual asylum seekers have sufficiently demonstrated class membership and are thus subject to the Preliminary Injunction's mandate, and, moreover, these judges maintain the authority to make other findings on the merits that warrant removal.   Any effect the Preliminary Injunction has on the decisions of adjudicators with whom authority is vested to preside over removal proceedings is "one step removed" from enjoining application of the Asylum Ban to P.I. Class members. *Gonzales*, 508 F.3d at 1233.

Because neither the Preliminary Injunction, Clarification Order, nor the orders in this Opinion enjoin or restrain the INA's operation, the Court **GRANTS** Plaintiffs' request to convert the Preliminary Injunction into a Permanent Injunction.

## C.   Oversight

Plaintiffs seek appointment of Magistrate Judge Karen S. Crawford as Special Master to oversee the Government's compliance with the Preliminary Injunction. Furthermore, they request that this Court issue "instructions that [Judge Crawford] hold regular status conferences with the parties regarding [Preliminary Injunction] compliance issues, seek to mediate areas of disagreement, and either decide, or make recommendations to this Court regarding, disputes that the parties cannot resolve through mediation." (Oversight Mem. at 1–2; Proposed Order ¶ 8; *see also id.* ¶ 6.)  Plaintiffs principally argue that the Government's "continued intransigence" warrants the appointment they request. (*Id.*)

But the record does not support Plaintiffs' bold claim.  Rather, as set forth in detail above, *supra* Sec. I.B, the Government has developed and implemented (or nearly implemented) procedures to comply with the Preliminary Injunction and Clarification Order at each stage of immigration proceedings.  For example, ICE has procedures in place to ensure no potential P.I. Class member in its custody removed; USCIS has implemented procedures to screen for P.I. Class membership for potential P.I. Class members within the United States; and the EOIR is nearly three-quarters of the way complete with their ROP

17cv2366

Review of nearly 2,000 immigration cases.   While the instant case is no doubt a complicated one, Plaintiffs make no showing of the Government's resistance or obduracy in complying with the Preliminary Injunction.   *See Apple*, 992 F. Sup. 2d at 280 ("[M]onitors have been found to be appropriate where consensual methods of implementation of remedial orders are 'unreliable' or where a party has proved resistant or intransigent to complying with the remedial purpose of the injunction in question."). Moreover, Plaintiffs have not identified a single instance in which a noncitizen, despite qualifying for P.I. Class-membership, was removed due to application of the Asylum Ban.

Accordingly, the Court **DENIES** Plaintiffs' request for oversight of the now-Permanent Injunction.

## IV.   CONCLUSION

Plaintiffs' Enforcement Motion and Oversight Motion are **GRANTED IN PART** and **DENIED IN PART**.  For the reasons stated above:

(1)   The Court **CLARIFIES** that Paragraph 4 of the Clarification Order directs the Government to review *all* Form I-213s—including those of USB agents—for annotations of *AOL* Class membership in identifying potential P.I. Class members to add to the Master List.

(2)   The Court **MODIFIES** Paragraph 3 of the Clarification Order to read as follows:

> Defendants must inform identified Preliminary Injunction class members in administrative proceedings before USCIS or EOIR, or in DHS Custody, of their class membership, as well as the existence and import of the Preliminary Injunction (ECF No. 330), Clarification Order (ECF No. 605), and this Order (ECF No. 808).

(3)   The Court **CLARIFIES** that Paragraph 2's language requiring EOIR to take affirmative steps "to reopen and reconsider past determinations that potential [P.I.] [C]lass members were ineligible for asylum based on the Asylum Ban" requires EOIR to extend the temporal scope of its ROP Review to include final orders of removal issued up until July 31, 2020.

17cv2366

(4)    The Court **CLARIFIES** that the EOIR's obligation under Paragraph 2 to "identify affected [P.I.] [C]lass members" precludes the EOIR from issuing a negative P.I. Class-membership determination without first considering any evidence of metering during the relevant pre-Asylum Ban period in DHS's records.

(5)    The Court **GRANTS** Plaintiffs' request to convert to a **PERMANENT INJUNCTION** the Preliminary Injunction (ECF No. 330), as clarified in the Clarification Order (ECF No. 605) and above, *supra* Sec. III.A.

(6)    The Court **DENIES** Plaintiffs' request to appoint a special master pursuant to Federal Rule of Civil Procedure 53 to oversee Defendants' compliance with this Permeant Injunction

*    *    *    *

The Court also **GRANTS** Defendants' Unopposed Motion to Correct. (ECF No. 784.)  Further, the Court **ORDERS** the Government to provide an update concerning the implementation status of USCIS's procedures for P.I. Class-membership identification and the provision of reopening and reconsideration relief to potential P.I. Class members who were removed from the United States **by no later than August 22, 2022.**  Finally, the Court **ORDERS** that, in the event any party hereafter seeks clarification, modification, or enforcement of the Permanent Injunction, the parties **ALL MUST CERTIFY** in a court filing that despite having undertaken all reasonable efforts to resolve their disputes they believe they have reached an impasse that necessitates court intervention.

**IT IS SO ORDERED.**

**DATED: August 5, 2022**

Hon. Cynthia Bashant
United States District Judge

- 49 -

17cv2366